# EXHIBIT 13

**SEALED BY ORDER OF COURT**

ORIGINAL
FILED

AUG 2 4 1999

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEWLETT-PACKARD COMPANY, ) | Civ. No. 99-20207 SW |
| Plaintiff, ) | ORDER GRANTING PLAINTIFF'S |
| v. ) | MOTION FOR SUMMARY |
| ) | ADJUDICATION |
| CIGNA PROPERTY AND CASUALTY ) | |
| INSURANCE COMPANY, ) | |
| Defendant. ) | |

Plaintiff Hewlett-Packard Corporation ("HP") brings this action against its insurer, Cigna Property Casualty Insurance Company ("Cigna"), to determine Cigna's duty to defend and indemnify it in an underlying action. Before the Court is HP's motion for summary adjudication that Cigna owes HP a defense. Having considered the papers submitted and the arguments of counsel at the May 12, 1999 hearing, and for the reasons set forth below, the Court GRANTS the motion.

### BACKGROUND

A.    The Cigna Policy

Cigna issued its "Comprehensive General and Automobile Liability Policy: Foreign" to HP as named insured, policy number CXC 024869 (the "Policy" or "Cigna Policy"), effective October 31,

STATE LEGAL®

EXHIBIT

13

1992 to October 31, 1993. This Policy was renewed without material change for the policy periods October 31, 1993 to October 31, 1994, and October 31, 1994 to October 31, 1995.

As stated in the Policy's title, it is a "foreign" policy providing coverage for claims for damages resulting from extraterritorial activities:

> Policy Territory
> Shall be worldwide for claim or suit resulting from an occurrence outside the United States of America, its territories or possessions, Canada, Cuba and North Korea.[1]

Endsley Decl. Exh. A at 6.

The Policy provides coverage for damages which HP must pay for "Personal Injury Liability," "Property Damage Liability," "Advertiser's Liability," and "Employer's Liability." Id. at 1. The present action concerns only the coverage for "Advertiser's Liability," which is defined to include damages resulting from, among other things, "unfair competition." Specifically, the Policy provides:

> Advertiser's Liability
> To pay on behalf of [HP] all sums which [HP] shall become legally obligated to pay as damages occurring in the course of [HP's] advertising activities, arising out of libel, slander, defamation of character, violation of right of privacy, unfair competition or infringement of copyright, title or slogan, or to indemnify [HP],

---

[1] Under the Policy, an "occurrence" means

an accident or event including continuous or repeated exposure to conditions, which results in bodily injury or property damage . . . .

Endsley Decl. Exh. A at 5.

2

therefore, in jurisdictions where legally prohibited from paying on his behalf.

Id. The Policy also covers defense of lawsuits against HP seeking damages on account of Advertiser's Liability:

Defense and Settlement

The company shall have the right and duty, except in such jurisdiction where legally prohibited, to defend any suit against [HP] seeking damages on account of . . . Advertiser's Liability . . . even if any of the allegations of the suit are groundless, false or fraudulent and may make such investigations, negotiation and settlement of any claim or suit as it deems expedient . . . .

Id.

B. The Underlying Action

In July 1993, Nu-kote International, Inc. ("Nu-kote"), a U.S.-based company specializing in printing supplies, began marketing inkjet refill products intended to be used with and to compete with HP inkjet cartridges. Nu-kote's products, which apparently were sold throughout the United States, enabled inkjet printer customers to refill HP inkjet cartridges with new ink following exhaustion of the original supply.

In September 1994, HP commenced a civil action against Nu-kote alleging, inter alia, that Nu-kote's inkjet refill products infringed various HP patents, and that Nu-kote's products infringed HP's trademarks and trade dress, entitled Hewlett-Packard Company v. Nu-kote International, Inc., U.S.D.C., N.D. Cal., Civil Case No. 94-20647 JW (EAI).

In November 1994, Nu-kote filed and served its original answer and counterclaim against HP. Nu-kote's Amended Answer and Counterclaims to Third Amended Complaint was filed May 4, 1998.

3

The Amended Answer and Counterclaims to Fourth Amended Complaint ("Nu-kote Counterclaim" or "Counterclaim") was filed March 18, 1999, alleging, _inter alia_, that HP marketing materials distributed during the effective period of the Cigna Policy contained misrepresentations that caused Nu-kote competitive injury. Allegedly, HP's marketing was designed to instill "fear, uncertainty, and doubt" (or "FUD") about Nu-kote inkjet refill products in the minds of resellers and customers. For example, Nu-kote alleges:

> On information and belief, Hewlett-Packard has published, and continues to publish, statements, through advertising and otherwise, that its ink jet printer cartridges are non-refillable and non-reusable. . . .
> On information and belief, such statements and images have had the effect of making a substantial number of consumers believe Hewlett-Packard's cartridges are not refillable and reusable.

Nu-kote Counterclaim ¶ 165.

> Hewlett-Packard's statements and images have, on information and belief, deceived or confused consumers into believing that products such as Nu-kote's refill kits are ineffective or likely to cause damage to the printer.

_Id._ ¶ 167.

> As a result of Hewlett-Packard's unlawful conduct, Nu-kote has incurred or will incur injury and damages, including without limitation lost sales and otherwise unnecessary expense in entering and competing in the relevant aftermarkets, all in an amount to be determined at trial.

_Id._ ¶ 169.

Causes of action listed in the Nu-kote Counterclaim include among others: Lanham Act false and deceptive advertising (Count and California statutory and common law unfair competition (Coun 10). The Counterclaim alleges that "Hewlett-Packard's conduct

4

constitutes unfair competition . . . under California common law."

Id. ¶ 181.

In its tender to Cigna, HP produced copies of "package inserts" included in HP inkjet cartridge boxes distributed worldwide during Cigna's policy period. The inserts state, in various languages including English, "CAUTION! Damages to the printer or print cartridge resulting from modifying or refilling the print cartridge is not the responsibility of Hewlett-Packard."

An insert also states:

> You're about to give your HP inkjet printer a "tune-up." How? With every new HP 51626A print cartridge, you're installing brand new inkjet nozzles, electrical contacts and flex circuitry that keep performance at its peak. You're also getting HP patented ink that's specifically formulated to work with printer and cartridge components for optimum print quality, water resistance and clog-free operation. So "tune-up" with new HP 51626A print cartridges and enjoy great performance . . . now and down the road.

See Watson Decl. Exh. A-C.

By letter dated June 13, 1998, HP tendered the defense of the Nu-kote Counterclaim to Cigna. Cigna has not yet accepted or denied coverage. HP filed its Complaint for Declaratory Relief in this Court on February 18, 1999.

### LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In light of the facts presented by the nonmoving party, along with any undisputed facts, the Court must decide whether the moving party is entitled to judgment as a matter of law. See T.W. Elec

<u>Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 631 & n.3 (9th Cir. 1987). When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment for the moving party is proper when a rational trier of fact would not be able to find for the nonmoving party on the claims at issue. <u>See</u> <u>id</u>.

## DISCUSSION

### A. Duty to Defend

California law on an insurer's duty to defend its insured is well settled. As explained in a recent opinion:

> A liability insurer owes a broad duty to defend its insured against claims which create a potential for indemnity, and must defend a suit which potentially seeks damages within the policy coverage. The duty to defend is broader than the duty to indemnify, and an insurer may owe a duty to defend its insured in an action in which no damages are ultimately awarded.

<u>Hendrickson v. Zurich American Insurance Company of Illinois</u>, 72 Cal. App. 4th 1084, 1088 (1999). Whether claims create a potential for indemnity is determined by comparing the factual allegations of the complaint in the underlying action, together with extrinsic facts known to the insurer, against the terms of the insurance policy. <u>Montrose Chemical Corp. v. Superior Court</u>, 6 Cal. 4th 287, 295 (1993); <u>Gray v. Zurich Insurance Co.</u>, 65 Cal.2d 263, 275-77 (1966). Factual allegations, not denominated causes of action, are what trigger coverage. <u>CNA Cas. of California v. Seaboard Surety Co.</u>, 176 Cal. App. 3d 598, 607-08

6

(1986); Gray, 65 Cal. 2d at 275. Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. Gray, 65 Cal. 2d at 276.

If interpretation of terms of an insurance policy is required, that interpretation is a question of law. See Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 18 (1995). Courts look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it. Id. The interpretation of a contract must give effect to the "mutual intention" of the parties. Id. Contract provision are to be interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage." Id.

The insured has the burden to show that the underlying claim may fall within policy coverage. Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group, 50 Cal. App. 4th 548, 556 (1996). To negate its duty to defend, the insurer must prove that it cannot. Id. Generally speaking, doubts as to whether the facts give rise to a duty to defend are resolved in favor of the insured. Horace Mann Ins. Co. v. Barbara B., 4 Cal. 4th 1076, 1081 (1993).

B.  Policy Territory

The basic question presented by this motion is whether the Nu-kote Counterclaim reveals a potential, however slight, that Cigna could be liable to indemnify HP for "unfair competition" committed within the Policy Territory. "Where there is no potential for coverage, there is no duty to defend." La Jolla

<u>Beach & Tennis Club, Inc. v. Industrial Indemnity Co.</u>, 9 Cal. 4th

27, 40 (1994).

HP argues that the Nukote Counterclaim alleges activities

that fall within the territorial limitations of the Policy because

HP distributed in foreign markets package inserts intimating that

the HP cartridges are not refillable. The Nu-kote Counterclaim is

silent as the location of the misconduct. It paints HP's

advertising activities with a broad brush. The Counterclaim

states:

> On information and belief, Hewlett-Packard has published
> knowingly false statements and engaged in deceptive
> advertising (including deceptive packaging) and <u>other
> unfair business practices concerning Hewlett-Packard's
> own printer supply products</u> and/or Nu-kote's printer
> supply products for use with Hewlett-Packard equipment.
> This misconduct has included, without limitation, <u>false
> representations about the refillability of Hewlett-
> Packard's cartridges</u> and the quality, compatibility,
> and/or safety of Nu-kote's products. This misconduct
> also includes express and <u>company-approved use of
> marketing misinformation techniques designed to instill
> "fear, uncertainty and doubt" or "FUD" in the minds of
> customers about competitive products.</u>

Nu-kote Counterclaim ¶93 (emphasis added). As discussed above,

however, HP has delivered to Cigna copies of HP inkjet refill

package inserts which were distributed internationally during the

relevant time period. These international package inserts warn

consumers against refilling their cartridges, and therefore could

be construed as "making false representations about the

refillability of Hewlett-Packard's cartridges" as set forth in the

Counterclaim.[2]

_____

[2] Even if the statements regarding refillability in the
package inserts turn out to be true, the Cigna Policy would still
cover an action based upon them. The Cigna Policy provides for a

8

Cigna contends that any "FUD" allegedly suffered by consumers and distributors in foreign markets is irrelevant because there is no allegation or evidence that Nu-kote sold inkjet refill products outside of the United States during the Policy period. Therefore, argues Cigna, HP could not have suffered any damage to its international sales.

Whether Cigna is correct hinges on the proper interpretation of the scope of the Policy Territory provision of the Policy. The provision is worded broadly, covering claims <u>worldwide</u> "resulting from an occurrence" within the Policy Territory. For most accidents resulting in personal injury, such as vehicle accidents, the site of the "occurrence" will also be the site of the injury.[3] However, in the realm of advertising injury, the locus of the misrepresentation and the site of the resulting injury could easily be disjointed. For example, it is conceivable that a false statement in Maine could diminish a competitor's sales in Florida.

In terms of where the damages resulting from HP's advertising activities may ultimately be felt, the Policy does not establish an impermeable border between the United States and the

---

defense even if "allegations of the suit are groundless, false or fraudulent." Endsley Decl. Exh. A at 1.

[3] In fact, the "Policy Period" clause of the Cigna Policy appears to recognize this principle. It states that "[t]his policy applies only to such occurrences and <u>personal injury</u> which take place during the policy period and <u>within the policy territory</u>." <u>Id.</u> at 11 (emphasis added).

9

international territories. The claim at issue must only "result from an occurrence outside the United States . . . ."[4]

In short, nothing in the Policy restricts covered Advertising Injury claims to those in which all damages must be suffered outside of the United States, its territories or possessions, Canada, Cuba and North Korea. The territorial limitation in the Cigna Policy emphasizes the location of the occurrence, not the location of the resulting damages.

In the present case, HP disseminated allegedly false advertisements about refilling inkjet printer cartridges internationally. Nu-kote alleges that HP's statements concerning refillability of cartridges caused it to suffer damages. Because Nu-kote could possibly claim damages to domestic business based, at least in part, on HP's extraterritorial acts, the Court finds that the Policy Territory requirement is satisfied.

B.    "Unfair Competition"

The Policy covers defense of suits against HP seeking damages on account of "Advertiser's Liability."[5] Advertiser's Liability,

---

[4] The Policy's definition of "occurrence," which omits any reference to Advertising Injury, offers no guidance. An "occurrence" "means an accident or event including continuous or repeated exposure to conditions, which results in bodily injury or property damage . . . ."  Id. at 5.

[5] Cigna briefly asserts, without argument, that the package inserts produced by HP are not "advertising" as the term is used in the Policy.  Cigna Opp. at 8 n.3.  The Court disagrees. If there is no evidence that parties intended any technical or special meaning for relevant insurance policy provisions, court must examine the words used in their ordinary or popular sense. Lebas Fashion Imports v. ITT Hartford Insurance Group, 50 Cal. App. 4th 548, 559 (1997).  The package inserts are "advertising" as that terms is commonly used.  See Black's Law Dict. 54 (6th ed. 1990)(to advertise is "[t]o advise, announce, apprise,

as defined in the Policy, includes "libel, slander, defamation of character, violation of right of privacy, unfair competition or infringement of copyright, title or slogan."[6] The present dispute centers around whether the Nu-kote Counterclaim alleges "unfair competition" as that term is used in the Policy.

Cigna argues that the HP inkjet package inserts cannot serve as the basis for the common law tort of unfair competition because under California law, that tort is limited to claims for "passing off" and "palming off" of goods. Both parties appear to agree that the HP package inserts do not constitute an attempt to "palm off" HP's goods as Nu-kote's, but HP counters that the package inserts can serve as the basis for a claim for common law unfair competition because that tort is broader than passing or palming off of goods, and includes claims for damages based on a competitor's misleading advertising.

In interpreting terms in an insurance policy, the Court must apply ordinary and usual meanings of those terms and try to effectuate the mutual intent of the parties. The Policy provides no definition of unfair competition. However, the case law teaches us this much: where, as here, an insurer promises to

_____

command, give notice of, inform, make known, publish" or to "call a matter to the public attention by any means whatsoever").

[6] The Policy expressly excludes liability arising out of an "[i]ncorrect description of any article or commodity." The parties have not briefed the Court regarding the effect of this clause. Presumably, Cigna, which bears the burden of demonstrating that a policy exclusion bars coverage, see Garvey v. State Farm Fire and Casualty Co., 48 Cal. 3d 395, 406 (1989), does not consider the exclusion to bar defense of the Nu-kote Counterclaim.

defend a lawsuit for <u>damages</u> arising out of unfair competition, the term "unfair competition," as a matter of proper policy interpretation, is limited to claims for which civil damages are available as a remedy. <u>Bank of the West v. Superior Court</u>, 2 Cal. 4th 1254, 1265-66 (1992). Therefore, statutory provisions such as California Business & Professions Code § 17200, subjecting offenders only to injunctive relief, are not within the ambit of "unfair competition" coverage. <u>Id</u>.

While the <u>Bank of the West</u> decision states in dicta that "[t]he common law tort of unfair competition is generally thought to be synonymous with the act of 'passing off' one's goods as those of another," <u>Bank of the West</u>, 2 Cal. 4th at 1263, the decision did not purport to narrow the tort of "unfair competition" to those narrow circumstances as a matter of law. Rather, the discussion focused on the distinction between the common law tort, which provides remedies for competitive injury, and the statutes, which extends remedies to the public. <u>Id</u>. at 1264 ("The primary purpose of these statutes was to 'extend[] to the entire consuming public the protection once afforded only to business competitors.'" (citation omitted)).

The present motion for summary adjudication, therefore, constrains this Court to determine the meaning a layperson would ordinarily attach to "unfair competition," <u>see</u> <u>Waller</u>, 11 Cal. 4th at 18, provided that the causes of action falling under that umbrella must afford a litigant damages as a remedy, pursuant to <u>Bank of the West</u>.

This Court is persuaded that "unfair competition," as commonly understood, includes claims for damages beyond just passing off or palming off of goods. According to McCarthy, a claim for "unfair competition" is typically thought to include a wide variety of competitive conduct, including false representations and false advertising. J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 1:10 (4th ed. 1998). According to Prosser, unfair competition "is now a generic name for a number of related torts involving improper interference with business prospects." Prosser and Keeton on Torts 1013 (5th ed. 1984). "[U]nfair competition . . . can be found when the defendant engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of customers or other prospects." Id. at 1014. It includes disparagement of a competitor's goods or business methods, threats of groundless suits,[7] and false advertising. Id. at 1014-20. Black's Law Dictionary states that unfair competition generally refers to palming off, but also refers to "deceitful advertising which injures a competitor." Black's Law Dictionary 1528-29 (6th ed. 1990). Indeed, the California Court of Appeal has applied the "unfair competition" label to allegedly tortious conduct outside of passing or palming off, to the unjustified interference with an advantageous business relationship. See Diodes, Inc. v. Franzen,

---

[7] As HP points out, the Nu-kote Counterclaim also alleges that HP has filed groundless litigation for purposes of intimidating and burdening Nu-kote. This would constitute an alternate basis for finding that the Nu-kote Counterclaim includes a claim for "unfair competition."

60 Cal. App. 2d 244, 255 (1968). In addition, other jursidictions have understood the tort to include a variety of competitive injuries. For example, the Minnesota Court of Appeal concluded that "a public misrepresentation about a product's invention is within the ordinary and usual meaning of unfair competition." <u>Polaris Indus., L.P. v. The Continental Ins. Co.</u>, 539 N.W.2d 619, 623 (Minn. Ct. App. 1995).[8]

Accordingly, because "unfair competition" is commonly understood to encompass claims for false advertising and other tortious conduct resulting in competitive injury, the Court believes that "unfair competition" as presented in the Cigna Policy encompasses the claim for unfair competition alleged in the Nu-kote Counterclaim.

C.    **Timeliness of Tender**

Cigna argues that HP breached Policy conditions by failing to tender the underlying action for nearly four years and by failing to provide all available information concerning the claim at the time of tender. Cigna contends that it has no duty to defend HP because HP breached the Policy requirement that HP notify Cigna as soon as practicable of a covered occurrence. The Policy provides:

---

[8] HP cites to the unpublished case of <u>Atlapac Trading Co., Inc. v. American Motorists Ins. Co.</u>, No. CV 97-0781-CBM, 1997 U.S. Dist. LEXIS 21943, *19 (C.D. Cal. Sept. 19, 1997), to support the argument that claims for misleading advertising fall within common law unfair competition. That case is not on point, as it involved the interpretation of a policy covering "misappropriation of advertising ideas or style of doing business."

INSURED'S DUTIES IN THE EVENT OF OCCURRENCE, CLAIM OR SUIT

a)    The Corporate Insurance Division of [HP] upon learning of any occurrence, . . . shall give written notice as soon as practicable to Alexander & Alexander, Inc. . . .

b)    The Corporate Insurance Division of [HP], upon receipt of notice of claim of suit against [HP] shall immediately forward to [Cigna] every demand, notice, or summons or other process so received.

Endsley Decl. Exh. A at 12.

HP concedes that the "occurrence" took place in 1993 and 1994, and that the original Nu-kote Counterclaim was filed in November 1994, but maintains that it did not become aware of the potential coverage by the Cigna Policy until a mid-December 1997 meeting of HP's corporate risk management department.  HP tendered the Nu-kote Counterclaim to Cigna on June 13, 1998.

Late notice does not relieve the insurer of its obligations unless the delay prejudices the insurer.  See Northwestern Title Security Co. v. Flack, 6 Cal. App. 3d 134, 142-43 (1970).  The insurer has the burden to demonstrate prejudice as a result of the delay in receiving notice.  See Campbell v. Allstate Ins. Co., 60 Cal. 2d 303 (1963).  HP contends that there has been no prejudice to Cigna.  Cigna counters that it is unable to assess the prejudice that has occurred because HP has not provided documents filed under seal in the underlying action.

The Court determines that Cigna has not demonstrated that it has suffered prejudice as a consequence of the delayed tender. However, the Court recognizes that once Cigna has access to the documents filed under seal it may be able to demonstrate such prejudice.  HP conceded as much when it agreed during oral

argument that Cigna could reserve its rights as to this issue. Should examination of the sealed documents reveal prejudice caused by HP's delayed tender, Cigna may raise that issue by way of a motion for summary judgment.

D.   "Other Insurance" Clause

Cigna argues that if the Cigna Policy applies to this loss, the "Other Insurance" clause provides that the Cigna Policy is in excess to all other collectible insurance.  The "Other Insurance" clause states:

> If other valid and collectible insurance with any other insurer is available to the insured covering a loss or expense also covered hereunder (except insurance purchased by [HP] to apply specifically in excess hereof) the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. . . .

Endsley Decl. Exh. A at 12.

Cigna argues that this clause raises an issue regarding the impact of other insurance maintained by HP.  HP responds that the clause applies only to primary insurance policies.  The only primary policy issued to HP during the relevant time, besides the international policy issued by CIGNA, is a "fronting" policy covering HP's domestic activities issued by Old Republic Insurance Company ("Old Republic").  Endsley Decl. ¶ 5, Exh. A.  A fronting policy does not indemnify the insured but is issued to satisfy financial responsibility laws of various states by guaranteeing t third persons who are injured that their claims will be paid.

Old Republic also issued an excess "fronting" policy and an umbrella policy providing coverage over the excess "fronting"

16

policy. _Id._ at ¶ 7. Neither of these two policies contain an express duty to defend. _Id._

On this motion for summary judgment, Cigna had the burden to identify the other insurance which would render the Cigna Policy excess and superfluous. Because Cigna has not identified such "other insurance" which would obviate Cigna's duty to defend, this presence of this issue does not preclude summary adjudication of concerning coverage.

## CONCLUSION

HP has demonstrated that the Nu-kote Counterclaim contains claims potentially covered by the Cigna Policy. Cigna has not demonstrated that the Nu-kote Counterclaim cannot fall within the Policy coverage. Accordingly, HP's motion for summary adjudication is GRANTED.

IT IS SO ORDERED.

DATE: ___AUG 2 4 1999___

_Spencer Williams_
SPENCER WILLIAMS
United States District Judge.

SEALED BY ORDER
OF COURT

# EXHIBIT 14

**ORIGINAL**
**FILED**

**JUN 1 9 2000**

NOT FOR PUBLICATION

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HEWLETT PACKARD COMPANY,<br><br>          Plaintiff,<br><br>      v.<br><br>CIGNA PROPERTY AND CASUALTY<br>INSURANCE COMPANY,<br><br>          Defendant. | CIVIL NO. 99-20207 SW<br><br>ORDER DENYING DEFENDANT'S MOTION<br>FOR RECONSIDERATION<br><br>[FILED UNDER SEAL]<br><br>**SEALED BY ORDER**<br>**OF COURT** |

Defendant Cigna Property and Casualty Company ("Cigna")[1] moves for reconsideration of this Court's August 24, 1999 Order granting Plaintiff Hewlett Packard Company's ("HP") motion for partial summary judgment. On October 28, 1999, this Court granted, in part, Cigna's Application for Leave to File a Motion for Reconsideration regarding the August 24, 1999 Order. The August

---

[1]According to the Reply papers, Cigna is now known as Ace Property and Casualty Insurance Company.



EXHIBIT

14

1  24, 1999 Order adjudicated that Cigna had a duty to defend HP

2  against a counterclaim in an underlying action.

3       On April 16, 2000, this Court denied in part Cigna's motion,

4  but gave Cigna the opportunity to provide additional briefing "to

5  explain what sort of evidence could conclusively establish that the

6  Cigna Policy did not apply to Nu-kote's claims at the time of

7  tender." Having considered the briefing supplied by the parties,

8  the Court hereby determines that Cigna's motion for reconsideration

9  is DENIED.

10

11       IT IS SO ORDERED.

12  DATED: **JUN 1 9 2000** _____

13                          SPENCER WILLIAMS
                            United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT 15

NOT FOR CITATION

**ORIGINAL
FILED**

MAY - 1 2001

RICHARD W. WIEKING
CLERK, U.S. DISTRICT C  ʿʈ
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| HEWLETT PACKARD COMPANY,<br><br>                    Plaintiff,<br><br>          v.<br><br>CIGNA PROPERTY AND CASUALTY<br>INSURANCE COMPANY,<br><br>                    Defendant. | )  CIVIL NO. 99-20207 SW<br>)<br>)  ORDER DENYING DEFENDANT'S<br>)  REQUEST FOR CERTIFICATION OF<br>)  IMMEDIATE APPEAL<br>)<br>)  ORDER DENYING PLAINTIFF'S CROSS-<br>)  MOTION FOR SUMMARY JUDGMENT<br>)  NUMBER 3<br>)<br>)  ORDER DENYING PLAINTIFF'S CROSS-<br>)  MOTION FOR SUMMARY JUDGMENT<br>)  NUMBER 4 |

ORDER GRANTING DEFENDANT'S
MOTION FOR PARTIAL SUMMARY
JUDGMENT NUMBER 5

ORDER RE: SETTLEMENT CONFERENCE

ORDER ON BOTH PARTIES TO SHOW
CAUSE WHY ACTION SHOULD NOT BE
UNSEALED

**[FILED UNDER SEAL]**

Four motions are pending in this insurance coverage dispute

between Plaintiff Hewlett Packard Company ("HP") and Defendant

SEALED BY ORDER
OF COURT



1  Cigna Property and Casualty Company ("Cigna")[1]: (1) Cigna's request
2  for certification of immediate appeal; (2) HP's cross-motion for
3  summary judgment that Cigna owes post-tender attorney fees as of
4  February 23, 1998 (HP's Motion for Partial Summary Judgment Number
5  4); (3) HP's cross-motion for summary judgment that Cigna is liable
6  for reimubursement of pre-tender legal expenses (HP's Cross-Motion
7  for Partial Summary Judgment Number 3); and (4) Cigna's motion for
8  partial summary judgment that it is <u>not</u> liable for reimbursement of
9  pre-tender legal expenses (Cigna's Cross-Motion for Partial Summary
10 Judgment Number 5).  Having considered the briefs filed and the
11 oral arguments of the parties, the Court rules as follows.[2]

I.   BACKGROUND[3]

13 A. The Subject Policy
14    Cigna issued a "Comprehensive General and Automobile Liability
15 Policy: Foreign," Policy No. CXC 024869, to HP effective October
16 31, 1992 to October 31, 1993 ("Cigna Policy" or "Policy").  The
17 Policy was renewed on an annual basis continuously from October 31,
18 1992 through October 31, 1995.
19    Under the Policy's "Defense and Settlement" provision, Cigna
20 has "the right and duty . . . to defend any suit against the
21 insured seeking damages on account of . . . Advertiser's

22 _____

23    [1] Cigna is now known as ACE Property and Casualty Insurance
   Company ("ACE").  The party "Cigna" in this Order refers to ACE.
24
   [2] Argument was heard on October 18, 2000, at which time the Court
25 issued a Tentative Ruling reaching the same results as contained in
   the present Order.
26
   [3] Familiarity with statements of fact contained in previous
27 Orders filed in this matter is presumed.

28

2

1  Liability."[4]  Policy at p. 1.  The provision also states that where

2  an insurer's defense of a lawsuit is "legally prohibited," Cigna

3  "agrees to indemnify the insured for monies expended in the defense

4  of any suit."  Id.

5      The Policy lists several "conditions."  Condition 7 sets forth

6  the "Insured's Duties in the Event of Occurrence, Claim or Suit."

7  Id. at p. 12.  The insured's first duty under Condition 7 is to

8  provide notice of "occurrences" to Cigna's agent.  Id. (Condition

9  7(a)).[5]  The insured's second duty is to "immediately forward" to

10  Cigna "every demand, notice, or summons of other process so

11  received."  Id. (Condition 7(b)).[6]  The insured's third duty is to

12  _____

13  [4]    In an Order dated August 24, 1999, the Court found that Cigna
    owed a duty to defend HP against the Nu-kote Action under the
    "advertiser's liability" provisions of the Cigna Policy.

14

15  [5] Policy Condition 7(a) reads in full:

16  The Corporate Insurance Division of the Named Insured at
    Boston, MA upon learning of any occurrence, including
    personal injury to which this policy applies shall give
17  written notice as soon as practicable to Alexander &
    Alexander, Inc., A Massachusetts Corporation, One
18  Constitution Plaza, Boston, MA 02129 or any of its
    authorized agents.  Such notice shall contain particulars
19  sufficient to identify the insured and also reasonable
    obtainable information respecting the time, place and
20  circumstances of the occurrence, the names and addresses of
    the injured and of available witnesses.

21
    Policy at p. 12.  The term "occurrence" is defined in the Policy as
22  an accident or exposure to conditions resulting in "bodily injury" or
    "property damage."  Id. at p. 5.

23

24  [6] Policy section 7(b) reads in full:

25  The Corporate Insurance Division of the Named Insured at
    Boston, MA upon receipt of notice of claim of suit against
25  the Insured shall immediately forward to the Company every
    demand, notice, or summons of other process so received.

26

27  Policy at p. 12.

28                                3

1  "cooperate" with Cigna in the conduct of suits.  <u>Id</u>. (Condition

2  7(c)).[7]  Condition 7(c) also contains a "no voluntary payments"

3  clause:

4      The insured shall not, <u>except at his own cost</u>,
       voluntarily make any payment, assume any obligation or
5      incur any expense other than for such first aid to others
       as shall be imperative at the time of accident.

6  <u>Id</u>. (emphasis added).  Throughout this Order, this section shall be

7  referred to as the "no-voluntary-payments clause."

8      The Policy's tenth Condition is titled "Unintentional Errors

9  and Omissions."  It reads:

10     Coverage afforded by this policy shall not be invalidated
       or affected by any inadvertent errors, omissions for
11     improper description of premises, elevators or other
       descriptions mentioned in the policy.  It is also agreed
12     that inadvertent errors to comply with policy terms
       and/or conditions will not invalidate or affect coverage.

13

14 <u>Id</u>. at p. 13 (Condition 10).

15 **B.  Nu-kote Files Counterclaim Against HP**

16     In response to a lawsuit that HP filed against competitor Nu-

17 kote International, Inc. ("Nu-kote"), Nu-kote filed a counterclaim

18 against HP on November 11, 1994 ("Nu-kote Action" or "Nu-kote

19 ───────────────

20     [7] Policy section 7(c) reads in full:

21     The insured shall cooperate with the Company and, upon the
       Company's request, assist in making settlements, in the
22     conduct of suits and in enforcing any rights of
       contribution or indemnify against any person or
23     organization who may be liable to the insured because of
       personal injury or property damage with respect to which
24     insurance is afforded under this policy; and the insured,
       upon upon the Company's request shall attend hearings and
25     trials and assist in securing and giving evidence and
       obtaining the attendance of witnesses.  The insured shall
26     not, except at his own cost, voluntarily make any payment,
       assume any obligation or incur any expense other than for
27     such first aid to others as shall be imperative at the time
       of accident.

28                              4

1 Counterclaim") alleging antitrust and other claims.  HP retained
2 counsel in 1994, and from that point to the termination of the Nu-
3 kote Action, incurred significant legal expenses, apparently in the
4 tens of millions of dollars.  What gives rise to the current set of
5 motions for partial summary judgment is the delayed tender by HP to
6 Cigna: the Nu-kote Counterclaim was filed in late 1994, but no
7 tender was made to Cigna until mid-1998.  HP seeks a ruling that
8 Cigna must cover the more than three and a half years of pre-tender
9 legal fees and costs.

10    HP has presented evidence explaining what occurred at HP in
11 the 1994-1998 timeframe leading to the tender of the defense.  It
12 is undisputed that during a mid-November 1997 meeting HP's Legal
13 department and Corporate Risk Management staff first appreciated
14 that the Nu-kote Action, which was primarily an antitrust action,
15 also contained a potentially covered "advertising injury."

16    There is no dispute that during the 1994-1998 period HP had in
17 place various competent mechanisms and systems for involving
18 insurers in lawsuits.  For example, Corporate Risk Management staff
19 made periodic presentations to HP's Regional Counsel to familiarize
20 the attorneys with available liability coverages and the claims
21 that should be reported to Risk Management.  Cedric Hughes, HP's
22 Director of Risk Management, had made presentations explaining HP's
23 liability for "advertising injury" and "personal injury."  HP
24 published and internally distributed a "Domestic Risk Management
25 Manual" and an "International Risk Management Manual" explaining
26 liability coverages available to HP.  HP also had an established
27 procedure whereby any summons and complaint for "known liability

28

5

1  coverages" (generally, automobile claims, premises liability and

2  property damage claims), was automatically sent to Risk Management

3  for notice to the appropriate insurer.

4      After the mid-November 1997 meeting, Burt Endsley, HP's Risk

5  Management officer charged with the task of identifying and

6  locating potentially applicable policies, spent several weeks

7  compiling a database of HP's older policies.  One of the policies

8  he located was Cigna Policy No. CXC 024869.

9  C.  HP Tenders Defense of the Counterclaim

10     On February 23, 1998, HP sent a tender letter referencing

11 three other policies to Insurance Company of North America ("INA"),

12 a subsidiary of Cigna Insurance Company.  The three policies

13 referenced were domestic excess policies with no primary duty to

14 defend.  HP maintains the notice to INA constitutes constructive

15 notice to Cigna.

16     A few months later, by letter dated June 13, 1998, HP wrote to

17 Cigna Property and Casualty Insurance Company requesting a defense

18 of the Nu-kote Action, and referencing the CXC 024869 policy.  The

19 letter also enclosed a copy of Nu-kote's Second Amended

20 Counterclaim, along with material relevant to the alleged

21 advertising injury claim.  W. John Ryan of Cigna's Property &

22 Casualty Department in Ventura, California, spoke with HP's

23 attorney by telephone on June 23, 1998 and explained that he (Ryan)

24 would handle the claim to completion.  Cigna, however, did not

25 render a formal decision on HP's request for a defense, but instead

26 requested more information about the Nu-kote Action.  Cigna

27 contends that it did not receive sufficient information from HP

28                                      6

1  prior to the filing of this action to determine whether the Policy

2  covered the defense.

## II.   LEGAL STANDARD

4       Under Rule 56 of the Federal Rules of Civil Procedure, summary

5  judgment shall be granted if pleadings, depositions, answers to

6  interrogatories, admissions on file, and affidavits "show that

7  there is no genuine issue as to any material fact and that the

8  moving party is entitled to a judgment as a matter of law."  Fed.

9  R. Civ. P. 56(c).  A defendant seeking summary judgment need only

10  show that there is an absence of evidence to support any element of

11  the plaintiff's case.  See Celotex Corp. v. Catrett, 477 U.S. 317,

12  322 (1986).  Courts must grant summary judgment if the nonmoving

13  plaintiff fails to make a showing sufficient to establish the

14  existence of an element which is essential to his case and upon

15  which he will bear the burden of proof at trial.  See id.  If the

16  nonmoving plaintiff fails to make such a showing on any essential

17  element of the case, "there can be 'no genuine issue as to any

18  material fact,' since a complete failure of proof concerning an

19  essential element of the nonmoving party's case necessarily renders

20  all other facts immaterial."  Id. at 323.  In ruling on a motion

21  for summary judgment, the nonmoving party's evidence "is to be

22  believed, and all justifiable inferences are to be drawn in [that

23  party's] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

24  255 (1986).

25       In an insurance coverage dispute such as the one at bar, a

26  court must follow applicable California contract law.  Under state

27  law, if ambiguity or uncertainty exists, an insurance policy is to

28                                    7

1 be construed against the insurer, and in favor of the insured.

2 State Farm Mut. Auto Ins. Co. v. Johnson, 9 Cal. 3d 270, 274

3 (1973). But courts will not indulge a forced construction to

4 fasten a liability on the insurance company which it has not

5 assumed. New York Life Ins. Co. v. Hollender, 38 Cal. 2d 73, 81

6 (1951). Additionally, "[t]he whole of a contract is to be taken

7 together, so as to give effect to every part, if reasonably

8 practicable, each clause helping to interpret the other." Cal.

9 Civ. Code § 1641.

10     The mutual intent of the parties at the time the insurance

11 policy was formed governs its construction. See Cal. Civ. Code §

12 1636. So far as possible, a court should infer that intent solely

13 from the written provisions of the contract. Id. § 1639; Borg v.

14 Transamerica Ins. Co., 47 Cal. App. 4th 448, 456 (1996). "[W]here

15 the express provisions of an insurance contract are unambiguous,

16 the 'clear and explicit' meaning of those provisions, interpreted

17 in their 'ordinary and popular sense,' controls judicial

18 interpretation, unless 'used by the parties in a technical sense,

19 or unless a special meaning is given to them by usage ....'" Borg,

20 47 Cal. App. 4th at 456 (citation omitted).

21                    III.  DISCUSSION

22 A.  Request for Certification of Immediate Appeal

23     Cigna petitions the Court, pursuant to 28 U.S.C. § 1292(b), to

24 certify an interlocutory appeal of the Court's August 24, 1999

25 Order granting HP's motion for partial summary judgment. Cigna did

26 not contest the Court's tentative denial of this request at oral

27 argument. The request for certification of immediate appeal is

28

1  DENIED.

2  **B. HP's Cross-Motion for Partial Summary Judgment Re: Date of Tender (Plaintiff's Cross-Motion for Summary Judgment Number 4)**

3      HP's cross-motion for partial summary judgment number 4 seeks

4  a determination by the Court as to precisely when HP first tendered

5  the Nu-kote action to Cigna. HP argues that the February 23, 1998

6  letter which made reference to three excess policies issued by INA

7  to HP provided all of the claim information required under the

8  notice provision of the Cigna CXC 024869 Policy. Cigna, on the

9  other hand, maintains that the notice occurred with the June 13,

10  1998 letter and that the undisputed evidence shows that the

11  February letter did not amount to "constructive notice" of the

12  claim. The Court agrees with Cigna.

13      INA, not Cigna, issued the three excess policies to HP. INA

14  was a subsidiary of the Cigna Insurance Company, as was Defendant

15  here, Cigna Property and Casualty Insurance Company. HP has not

16  presented any substantial evidence upon which a reasonable jury

17  could find that notice to one subsidiary also constituted actual or

18  constructive notice to the other subsidiary.

19      First, the terms of the Policy make no mention that notice to

20  any Cigna entity would suffice.[8] Second, there is no evidence that

21  Cigna suggested to HP that notice to one would amount to notice to

22  all. HP argues that Cigna marketed the "Computer Risk Information

23  Services," ("CRIS") a program of computerized access to non-U.S.

24  claims. However, Cigna is correct that CRIS was not, and was not

25  _____

26      [8] Although the Policy asks for notice to be provided to Cigna's
broker, it is undisputed that direct notice of a claim to the insurer,

27  rather than through a broker, is also appropriate.

28                                  9

1  represented to be, a policy database system which would enable any

2  Cigna company to access all other policies issued by other Cigna

3  subsidiaries.  Third, the evidence is undisputed that an excess

4  liability claims specialist would only normally be concerned with

5  the primary insurance coverages.  Here, the excess policies'

6  underlying insurance was provided by Old Republic Insurance

7  Company, not by a Cigna company.

8      While HP is correct that the Policy does not require HP to

9  identify the precise policy provision under which tender is made,

10  the policy period under which HP seeks a defense, the policy

11  number, or the legal and factual reasons why HP believes it is

12  entitled to a defense, there is no basis for HP's argument that the

13  Policy permitted a tender to an altogether different Cigna

14  subsidiary, particularly where the undisputed facts show that the

15  subsidiary would have no reasons to know of the CXC 024869 Policy.

16      In sum, the undisputed facts indicate that Cigna should not be

17  charged with constructive notice of the February 23, 1998 tender to

18  INA, a separate insurance company from Cigna, even though it was

19  owned by the same corporate parent as Cigna.  Cigna's duty to

20  defend was triggered as of the June 13, 1998 letter.

21  **C.  Cross-Motions for Summary Judgment Re: Cigna's Liability to**
**     Reimburse HP for Pre-Tender Defense Costs**

22      HP moves for an order that Cigna's duty to defend begins, as a

23  matter of law, on the date that Nu-kote first filed its initial

24  Counterclaim against HP in November 1994.  Cigna cross-moves for an

25  order that it is <u>not</u> liable for reimbursement of pre-tender defense

26  costs (that is, defense costs incurred from November 1994 to June

27

28                                   10

1    13, 1998). HP argues that it acted with reasonable diligence in

2    providing tender of the Counterclaim based on the particular

3    circumstances of the Nu-kote Action. HP futher contends that any

4    undue delay in HP's notice to Cigna was the result of HP's

5    "inadvertent error," which is excused by the Cigna Policy.

6    Finally, HP argues that Cigna cannot show "substantial and actual"

7    prejudice as a result of the timing of HP's notice.

8        Cigna counters that the Policy does not provide for

9    reimbursement of pre-tender defense fees, an insurer need not

10    defend until requested, that HP voluntarily incurred massive legal

11    expenses before tendering the defense of the Nu-kote Action to

12    Cigna, that HP reads the "inadvertent error" provision too broadly,

13    and that the issue of prejudice, while possibly relevant to the

14    issue of post-tender defense obligations, is irrelevant to any duty

15    to reimburse HP for pre-tender expenses.

16        1.   No-Voluntary-Payments Clause[9]

17        Cigna stresses that California law is settled and consistently

18    holds that where an insurance contract contains a "no voluntary

19    payments" clause an insurer does not have a duty to defend prior to

20    tender. HP contends that Condition 7(a) is a "discretionary notice

21    _____

22        [9] The Court noted in a prior ruling that the Policy's no-
voluntary-payments clause itself contemplates that "voluntary" efforts
23    are emergency-type efforts described as "first aid to others as shall
be imperative at the time of the accident." While the Nu-kote
24    counterclaims did not involve any "accident," it is reasonable to read
the "voluntary payments" provision as being limited to payments made
25    for immediate needs. The Court repeats that it will not stretch the
term "voluntary," a term that explicitly encompasses provision of
26    emergency first aid, also to embrace four years of legal fees incurred
during a high-profile litigation. See Order Denying Plaintiff's
27    Motion for Partial Summary Judgment at 6:5-14, filed April 6, 2000.

28                                    11

1  provision" that somehow implies that HP can recover voluntarily

2  incurred pre-tender defense fees so long as it offers a reasonable

3  excuse for its delay in making a tender.  Says HP: "Although not

4  absolute, the policy language gives HP a discretionary right which

5  permits some delay in notice based on HP's exercise of 'reasonable

6  judgment' about whether a potential claim is implicated."

7  Plaintiff's Mem. of P's & A's in Support of Cross-Motion for

8  Partial Summary Judgment Number 3 at 10:18-21.  The Court cannot

9  find this meaning contained in the plain language of the notice

10  provision in Condition 7(a), and moreover, HP's interpretation

11  flies in the face of the clear language of the Policy's no-

12  voluntary-payments clause.

13      An insurer's duties with regard to defense of claims depends

14  upon the language in the contract between insurer and insured.  See

15  Northern Ins. Co. of New York v. Allied Mut. Ins., 955 F.2d 1353,

16  1360 (9th Cir. 1992).  "The limitation on reimbursement for

17  voluntarily incurred pre-tender expenses is contractual.  It arises

18  solely from the policy itself rather than any general rule of law."

19  Id.  The Policy explicitly states that HP is to pay at its own cost

20  all "voluntary" payments, except for "such first aid to others as

21  shall be imperative at the time of accident."  Courts have

22  consistently held that where an insurance policy contains a "no

23  voluntary payments" clause such as the one at issue the insurer is

24  not liable for the expenses voluntarily incurred by an insured

25  before tendering defense of a suit to the insurer.  See id.

26  (insurer not liable for voluntarily incurred defense costs); Faust

27  v. The Travelers, 55 F.3d 471, 472 (9th Cir. 1995)(same); Gribaldo

28                              12

1  <u>Jacobs, Jones & Assoc. v. Agrippina Versicherunges</u>, 3 Cal. 3d 434,

2  448-49 (1970)(same); <u>Jamestown Builders v. General Star Indem. Co.</u>,

3  77 Cal. App. 4th 341, 346 (1999)(insurer not liable for voluntarily

4  incurred repair expenses); <u>Truck Insurance Exchange v. Unigard</u>, 79

5  Cal. App. 4th 966, 977 (2000)(coinsurer not liable to pay portion

6  of pre-tender defense fees incurred by plaintiff insurer where

7  plaintiff insurer had not made a tender); <u>Crystal Geyser Water Co.</u>

8  <u>v. American Motorists Ins. Co.</u>, No. C-94-1531 MHP, 1995 WL 396856

9  at *3 (N.D. Cal. June 22, 1995) (insurer not liable to pay pre-

10 tender defense fees for two-year period during which insured failed

11 to perceive the potential for coverage).[10]

12     In <u>Faust</u>, interpreting a no-voluntary-payments provision

13 almost identical to the one in the Cigna Policy, the insured was

14 considered to have "voluntarily" undertaken legal representation

15 without first tendering to its insurance provider where it knew of

16 the applicable insurance policy and had a copy of the policy, but

17 delayed four months before tendering its lawsuit.  55 F.3d at 472.

18 The Court of Appeals for the Ninth Circuit stated:

19         Faust offers no plausible reason for the more than four-
           month-long delay before the tender.  Even assuming Faust
20         had to immediately retain counsel to counter the TRO
           motion, Faust offers no explanation for why it or its
21         counsel could not have prepared and sent a tender letter
           to [the insurer] in the days or weeks following the
22         filing and service of the [third-party] action.

23 <u>Id</u>. at 473.  The court held that the District Court did not err in

24

25     [10] HP's reliance on <u>Hatco Corp. v. W. R. Grace & Co.</u>, 801 F.
    Supp. 1334 (D. N.J. 1992), judgment vacated on other grounds, 59 F.3d
26  400 (3d Cir. 1995), is misplaced.  <u>Hatco</u> concerns the issue of
    indemnification following a delayed tender, not the issue of liability
27  for reimbursement of pre-tender attorney fees.

28                                    13

1  concluding that no genuine dispute of material fact existed as to

2  the voluntariness of the pre-tender costs and that Travelers was

3  thus entitled to judgment as a matter of law.  Id.  It further

4  emphasized that "if hiring and paying an attorney is not 'incurring

5  an expense,' it is hard to imagine what is."  Id. (quoting the

6  defendant).

7      HP argues that owing to the complex nature of the Nu-kote

8  litigation and the multiplicity of policies held by HP it took

9  several years for the Risk Management Department to match a

10  potentially covered "Advertising Injury" claim to the subject Cigna

11  Policy.  An insured's ignorance of its insurance policy rights,

12  however, does not extend the time in which it must tender the

13  defense of a third-party lawsuit to the insurer.  See Jamestown

14  Builders, 77 Cal. App. 4th at 349; Crystal Geyser, 1995 WL 396856

15  at *3.  In other words, an insured's "erroneous legal belief" does

16  not suffice to excuse its obligation to make a tender if there was

17  any potential basis for coverage.  See Jamestown Builders, 77 Cal.

18  App. 4th at 349.  In the present case, HP set forth its reasons for

19  the delayed tender as follows:

20      Quite simply and quite innocently, the Nu-kote Action was
        a case that HP 'felt would not potentially be covered by
21      insurance,' and did not report to Cigna earlier for that
        reason.

22  Plaintiff's Opposition to Defendant's Cross-Motion for Partial

23  Summary Judgment No. 5 at 21: 12-14 (citation omitted).  Under the

24  case law, this failure to perceive the potential for coverage does

25  not render the pre-tender defenses "involuntary" or trigger an

26  insured's duty to reimburse the insured's pre-tender costs.

27

28                              14

HP would have this Court adopt a "reasonableness" standard to determine the permissibility of recouping pre-tender costs.[11]  But the question under California law interpreting no-voluntary-payments provisions is not whether a pre-tender fee was "reasonable," but whether is was "voluntary."  Where an insurance policy contains a no-voluntary-payments clause, Courts have only allowed recovery of pre-tender fees "_involuntarily_" incurred.  Involuntary payments include those made "because of circumstances beyond [the insured's] control."  Jamestown Builders, 77 Cal. App. 4th at 348.  "This situation might occur where the insured is unaware of the identity of the insurer or the contents of the policy."  Id. (citing Shell Oil Co. v. National Union Fire Ins. Co., 44 Cal. App. 4th 1633, 1649 (1996)).[12]  Also, "the insured may be faced with a situation requiring immediate response to protect its legal interests."  Id. (citing Fiorito v. Superior Court, 226 Cal. App. 3d 433 (1990)).  In Fiorito, the appeals court permitted the insureds to try to prove they involuntarily incurred pre-tender defense costs in order timely to respond to lawsuit and avoid default.  226 Cal. App. 3d at 439-440.  A failure to tender is involuntary where the insured was unable to tender.  See Shell Oil,

---

[11] HP has provided ample evidence that it maintained reasonable procedures for the evaluation of insurance coverage.  However, the reaonsonableness inquiry is a red herring.  HP has failed to produce evidence that the failure to tender was "involuntary," rather than the result of an erroneous legal belief.

[12] The unusual circumstances present in Shell Oil are not found in the pending matter.  In Shell Oil, the trial court found that the insured was unaware both of the insurer's identity and the contents of the policy because the policy had been purchased by the insured's subcontractor, and not by the insured itself.  Shell Oil Co. v. National Union Fire Ins. Co., 44 Cal. App. 4th 1633, 1637-38 (1996)

1  44 Cal. App. 4th at 1649.

2      In the present case, HP does not contend that circumstances

3  beyond its control made it unaware of the identity of the insurer

4  or the contents of the Policy, or that the defense of the Nu-kote

5  Action had to begin before HP had adequate time to identify the

6  insurance policy and then tender the defense.[13]  The undisputed

7  evidence show that HP delayed nearly four years before tendering

8  the defense of the Nu-kote Counterclaim because it was not aware of

9  the potential coverage provided by the Cigna Policy.  HP knowingly

10  and voluntarily retained counsel in 1994 without the knowledge and

11  consent of Cigna.  As stated above, an insured's failure to

12  appreciate coverage potential does not render defense expenses

13  "involuntary."  See Jamestown Builders, 77 Cal. App. at 349.

14      Based on the undisputed facts, the Court agrees with Cigna

15  that there is no triable issue of fact as to whether HP acted

16

17      [13] To support its argument that HP's failure to appreciate the
   potential for coverage was reasonable given the complexities of the
18  underlying lawsuit, HP submitted as supplemental material the case of
   Darby & Darby, P.C. v. VSI International, Inc., 2000 N.Y. LEXIS 2915
19  (2000).  The Court agrees with Cigna's position that the case is
   irrelevant.  Darby & Darby involved a lawyer's standard of care owed
20  to his client, and not to any principles involved in determining a
   sophisticated insured's duties pursuant to the provisions and
21  conditions in its general liability policy.  Moreover, HP overreaches
   by interpreting the Court's April 6, 2000 Order as suggesting that HP
22  would be entitled to recoup its attorney fees so long as HP's actions
   were "reasonable."  At page 8, lines 4-17 of the April 6, 2000 Order,
23  cited by HP in its Reply in Support of its Ex Parte Application for
   Leave to File Supplementary Material, the Court does not set forth a
24  "reasonableness" standard per se, but emphasizes that a determination
   of "voluntariness" of payments of pre-tender fees depends in part on
25  the insured's reasons for the delayed tender.  On page 10, lines 5 to
   14, also cited by HP, the Court addresses a discovery issue, and does
26  not set forth a "reasonableness" rule.
       In addition, Cigna's motions to strike the Declaration of Pierre
27  Dugan is GRANTED.

28                                16

1  intentionally and voluntarily when it incurred the nearly four-

2  years' worth of multi-million dollar legal expense while not

3  recognizing the potential for coverage under the Cigna Policy.[14]

4      2.  **Inadvertent Errors Provision**

5  The Policy's Condition 10 reads:

6      Coverage afforded by this policy shall not be invalidated
       or affected by any inadvertent errors, omissions for
7      improper description of premises, elevators or other
       descriptions mentioned in the policy.  It is also agreed
8      that inadvertent errors to comply with policy terms
       and/or conditions will not invalidate or affect coverage.

9  Policy at p. 13 (emphasis added).  HP argues that the second

10  sentence of the provision affords an "escape hatch" against

11  forfeiture if HP inadvertently fails to conform to the exact

12  requirements and conditions set out in the Policy.  HP further

13  contends that any delay in HP's notice of the Nu-kote Action was

14  the result of inadvertent error within the meaning of this

15  provision, and also that discovery abuse in the underlying

16  litigation should excuse the late tender.

17  Cigna argues that Condition 10 does not excuse the late tender

18  for a variety of reasons: that the provision only addresses the

19  situation where an insured inadvertently by error or omission fails

20  to describe or advise of risk in connection with the issuance of

21

22  ─────────────

23  [14]While not a basis for the present ruling, the Court also notes
    that the the Cigna Policy provides that where an insurer's defense of
    a lawsuit is "legally prohibited," Cigna  "agrees to indemnify the
24  insured for monies expended in the defense of any suit."  Policy at
    p. 1.  Looking at both sides of the coin, this provision seems to
25  imply that Cigna did not agree to indemnify HP for monies expended by
    HP in the defense of a suit in a jurisdiction where such defense was
26  not legally prohibited.  There is no question that California law
    would have allowed Cigna to provide its insured a defense in the Nu-
27  kote matter.

28                              17

1  the policy;[15] that the term "coverage" does not include defense

2  costs outside the limits of liability; that HP did not act or fail

3  to act "inadvertently"; that HP's neglect was not "excusable," to

4  the extent that "inadvertence" means "excusable neglect"; and that

5  a "voluntary" expense cannot by definition be an "inadvertent"

6  error.

7      The provision contemplates that inadvertent errors to comply

8  with <u>policy terms</u> and/or <u>conditions</u> will not invalidate or affect

9  coverage.  HP's argument rests on the premise that the relevant

10 "terms and/or conditions" that it inadvertently failed to comply

11 with are the "notice" and "no-voluntary-payment" conditions of

12 Condition 7.[16]  The Court finds that while HP may have inadvertently

13 failed to recognize the potential for coverage by the Cigna Policy,

14

---

15     [15] In support of its argument, Cigna submitted the declaration of
   Karen Sothern, the lead for the Cigna team in negotiating the terms
16 of the Policy.  She states in regard to Condition 10:

17     My understanding of Cigna's underwriting intent in the
       inclusion of the 'unintentional errors and omissions
18     language' in the Cigna Policy was that the language applied
       to exposure data/underwriting information only.  If, for
19     instance, Cigna was inadvertently not advised by HP of a
       change in revenue, a new location, the formation of a joint
20     venture, etc. (presuming that the exposure not advised was
       within the normal scope of HP's business) Cigna's
21     underwriting intent that coverage under the Cigna Policy
       would not be invalidated purely on the basis of that
22     exposure having been unintentionally omitted.

23 Decl. of Karen Sothern ¶ 5.  HP moves to strike the declaration.  HP's
   motion to strike is GRANTED.  Cigna has not shown that the Inadvertent
24 Errors provision was jointly drafted, thereby triggering an exception
   to the general rule regarding construction of ambiguities in insurance
25 contracts.  Sothern's testimony is therefore irrelevant.

26     [16] <u>See</u>, <u>e.g.</u>, Plaintiff's Oppositon to Defendant's Cross-Motion
   for Partial Summary Judgment at 7:6-8, arguing that HP's "accidental
27 omission" led to its delay in notice to Cigna.

                                    18
28

1   as a matter of law it did not "inadvertently" fail to provide

2   notice or "inadvertently" voluntarily pay its own attorneys to

3   provide a legal defense to the Nu-kote Counterclaim.

4          HP repeatedly argues that the failure to tender the Nu-kote

5   Action in November 1994 resulted from an inadvertent <u>failure to</u>

6   <u>appreciate the potential for coverage</u> under the Cigna Policy, both

7   due to the complexity of the Nu-kote matter and to discovery

8   misconduct by Nu-kote.  An inadvertent failure to appreciate the

9   potential for coverage does not equate to an inadvertent failure to

10  comply with policy conditions relating to notice or voluntary

11  payments.  It is a step removed.  Determining whether to tender the

12  defense of an action to an insurer is not part of "complying with

13  the policy terms and conditions."  It is antecedent act of the

14  insured outside of the need to conform to the "terms and

15  conditions" of the Policy.  Furthermore, inadvertent means

16  "heedless, negligent, inattentive, or unintentional."  Webster's

17  Third New International Dictionary 1140 (1969).  Black's Law

18  Dictionary defines inadvertence as "an accidental oversight" or "a

19  result of carelessness."  Black's Law Dictionary 762 (7th ed.

20  1999).  HP's failure to provide notice or decision to make payments

21  to its defense counsel were not accidental oversights or the result

22  of inattention.  They were the result of a deliberate decision not

23  to tender the defense to Cigna.  In sum, HP's interpretation of the

24  inadvertent errors provision is overbroad.  As stated by Cigna:

25          HP's construction of the applicability of the
            "inadvertent errors" provision would, in effect, render
26          the "no voluntary payments" provision a nullity since it
            is hard to imagine a more striking example of the type of
27          situation that the "no voluntary payments" provision was

28                                    19

1    intended to avoid.

2    Reply to Plaintiff's Opposition to Motion for Summary Judgment

3    Number 5 at 12:2-5.

4        Finally, HP cites to <u>Hartford Accident and Indem. Co. v. Rush-

5    Presbyterian-St. Luke's Med. Ctr.</u>, 231 Ill. App. 3d 143, 146, 595

6    N.E.2d 1311, 1314 (1992), and <u>Paramount Communications, Inc. v.

7    Gibraltar Cas. Co.</u>, 204 A.D.2d 241, 612 N.Y.S.2d 156 (N.Y. App.

8    Div. 1994), for the proposition that discovery abuses in the

9    underlying action should not result in a penalty to the insured

10   whose ability to evaluate coverage is thereby impaired.  The Court

11   does not find these cases germane to the issue at hand because they

12   concern indemnity, and not liability for reimbursement of pre-

13   tender attorney fees.

14       3.  **Prejudice**

15       California courts have determined that because an insured's

16   breach of a "notice" or "cooperation" provision can result in a

17   forfeiture of all policy benefits, both defense and indemnity, an

18   insurer must first be prejudiced by the insured's conduct before

19   forfeiture is allowed.  However, prejudice to the insurer is

20   irrelevant as to whether an insurer has a duty to reimburse

21   expenses incurred without consent.  <u>See</u> <u>Faust</u>, 55 F.3d at 472-73,

22   <u>Jamestown Builders</u>, 77 Cal. App. 4th at 349-50.  In other words,

23   there is no prejudice requirement for the enforcement of a no-

24   voluntary-payments provision.  Prejudice is only relevant in

25   situations where an insurer invokes a notice or cooperation clause

26   to compel the insured to forfeit its right to a defense and

27   indemnity.  <u>See</u> <u>Faust</u>, 55 F. 3d at 472-73; <u>Jamestown Builders</u>, 77

28                              20

1  Cal. App. 4th at 349.  Because Cigna is not arguing that the

2  delayed tender caused a forfeiture of policy rights, the prejudice

3  issue is irrelevant.

4  **D.  Settlement**

5     The Court hereby ORDERS the parties to engage in a settlement

6  conference before a Magistrate Judge or mediator of their choosing

7  no later than June 15, 2001.  The Court will extend this deadline

8  for good cause shown.  The parties shall inform the Court if it can

9  be of assistance in setting up any settlement discussions.

10  **E.  Order to Show Cause Why Action Should Not Be Unsealed**

11     It is the Court's understanding that the parties requested

12  that this action be placed under seal so as to keep any information

13  about the coverage dispute from affecting the underlying

14  litigation, which was proceeding at the time of filing.  Seeing as

15  the underlying lawsuit has long ago terminated, the parties shall

16  SHOW CAUSE why this action should not be unsealed.  Separate

17  statements shall be filed and served no later than June 15, 2001.

18                              **IV.  ORDER**

19     (1)  Defendant's Request for Certification of Immediate Appeal

20  is DENIED.

21     (2)  Plaintiff's Cross-Motion for Summary Judgment Number 3 is

22  DENIED.

23     (3)  Defendant's Cross-Motion for Summary Judgment Number 5 is

24  GRANTED.  It is ORDERED, ADJUDGED, and DECREED that the Cigna

25  Policy does not obligate ACE Property and Casualty Insurance

26  Company (fka Cigna Property and Casualty Insurance Company) to pay,

27  reimburse, indemnify or otherwise compensate Hewlett-Packard for

28                                21

1 │ any legal fees and costs incurred by or on behalf of Hewlett-

2 │ Packard, in connection with the underlying action entitled Hewlett-

3 │ Packard v. Nu-kote, and related counterclaim up to June 15, 1998.

4 │ It is ORDERED that HP is precluded from recovering any defense fees

5 │ and costs it incurred in connection with the Nu-kote Action prior

6 │ to June 15, 1998.

7 │     (4) Plaintiff's Cross-Motion for Summary Judgment Number 4 is

8 │ DENIED.

9 │     (5) The parties are ORDERED to participate in a mandatory

10 │ settlement conference no later than June 15, 2001.  The parties

11 │ shall file a joint status report with the Court no later than 14

12 │ days following the close of settlement discusions.

13 │     (6) The parties shall SHOW CAUSE why this action should not be

14 │ unsealed.  Separate statements shall be filed and served no later

15 │ than May 31, 2001.

16 │     IT IS SO ORDERED.

17 │ DATED: ___MAY 0 1 2001___            _____

18 │                                      SPENCER WILLIAMS
     │                                      United States District Judge

19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │                              22

# EXHIBIT 16

1   Hon. Peter G. Stone (Ret.)
2   JAMS
    160 W. Santa Clara St.
3   Suite 1050
    San Jose CA, 95113
4   408-288-2240
5   fax 408-295-5267

6

7

8                    UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11  UNDER SEAL                    )   Case No. C-99-20207 SW
                                  )
12        Plaintiff,              )   JAMS Reference No. 1110005854
                                  )
13        vs.                     )   **ORDER ON PLAINTIFF'S MOTION**
                                  )   **FOR ADJUDICATION**
14  UNDER SEAL                    )
                                  )
15        Defendant.              )
                                  )
16                                )
                                  )
17                                )

18

19

20

21

22

23

24

25

26

27

28

29

Order on Motion

EXHIBIT

**16**

Page 1

APi 1· 2002  4·40PM    JAMS SAN JOSE 4002903207    NU 1390  P. 20

1  Hon. Peter G. Stone (Ret.)
2  JAMS
   160 W. Santa Clara St.
3  Suite 1050
   San Jose Ca, 95113
4  408-288-2240
   fax 408-295-5267
5

6

                    UNITED STATES DISTRICT COURT
7
           NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION
8

9

10  HEWLETT PACKARD,              )  Case No. C-99-20207 SW
                                  )  Jams Reference No. 1110005854
11         Plaintiff,             )
                                  )
12  v.                            )  ORDER ON HEWLETT-PACKARD'S
                                  )  MOTION FOR ADJUDICATION THAT (1)
13  CIGNA PROPERTY & CASUALTY     )  NO ALLOCATION IS PERMITTED
    INSURANCE CO.,                )  BETWEEN POTENTIALLY COVERED
14                                )  AND UNCOVERED CLAIMS; (2) ACE'S
                                  )  DUTY TO DEFEND EXISTED THROUGH
15                                )  THE END OF THE NU-KOTE ACTION;
           Defendant.            )  AND (3) CIVIL CODE § 2860 IS NOT
16                                )  APPLICABLE TO THE DETERMINATION
                                  )  OF REIMBURSABLE DEFENSE COSTS
17                                )
                                  )
18                                )
                                  )
19                                )

20        Hewlett-Packard Inc. ("HP") has filed a motion for adjudication of three issues: (1) Cigna

21  Property and Casualty Ins. Co. ("ACE") has no right to allocate defense costs between

22  potentially covered and uncovered Nu-kote claims in the underlying *Nu-kote* action; (2) ACE's

23  duty to defend HP continued through the termination of the *Nu-kote* action; and (3) Civil Code §

24  2860 is not applicable to the determination of reimbursable defense costs.  Ace has filed an

25  opposition to the motion that includes a request for continuance pursuant to Fed. Rule Civ. Pro.

26  56(f).  After having considered the parties' papers and oral arguments, and having submitted the

27  matter, the Special Master orders as follows:

28

                                                                              1

## BACKGROUND

### 1. The Insurance Policy

ACE issued a comprehensive general liability policy to HP effective October 31, 1992. The policy remained in effect without substantial change until October 31, 1995. The policy provided coverage to HP for claims for damages resulting from activities (an occurrence) outside the United States. The policy provides, in pertinent part, coverage for damages which HP must pay for "Advertising Liability." ACE's obligation with regard to "Advertising liability" is to pay on behalf of HP all sums which HP shall become legally obligated to pay as damages occurring in the course of HP's advertising activities, arising out libel, slander, defamation, violation of the right of privacy, unfair competition, or infringement of copyright, title or slogan.

### 2. Allegations in the Underlying Action

In July 1993, Nu-kote International, Inc. ("Nu-kote") began marketing inkjet refill products intended to be used with and to compete with HP inkjet cartridges. In September 1994, HP filed a civil action against Nu-kote, alleging that Nu-kote's product infringed various HP patents, trademarks and trade dress. Nu-kote filed an answer and counterclaim against HP in November 1994. Nu-kote filed amended answers and counterclaims to HP's second amended complaint (on January 19, 1996); third amended complaint (on May 4, 1998); and fourth amended complaint ("the counterclaim"), which was filed March 18, 1999.

The counterclaim alleged that HP marketing materials, distributed during the effective period of the policy, contained misrepresentations that caused Nu-kote competitive injury. Nu-kote alleged that HP's marketing was designed to instill "fear, uncertainty, and doubt" (or "FUD") about Nu-kote's inkjet refill products in the minds of resellers and customers. See ¶'s 165, 167 and 169 of the counterclaim. These allegations are found in the Lanham Act cause of action (6th), and incorporated by reference into Nu-kote's false advertising, trade libel, defamation, and unfair competition claims (8th – 10th). The counterclaim(s) also included claims for violation of the Sherman Act (antitrust violations). The same allegations and causes of action are also found in each of the prior versions of Nu-kote's answers and counterclaims.

### 3.   Tender of Defense

HP tendered the defense of the Nu-kote counterclaim to ACE on June 13, 1998.  The tender included Nu-kote's second counterclaim (January 19, 1996) and copies of package inserts included in HP inkjet cartridge boxes distributed worldwide during the ACE policy period.  The insert stated in a number of languages that "CAUTION! Damages to the printer or print cartridge resulting from modifying or refilling the print cartridge is not the responsibility of Hewlett-Packard."

ACE did not render a formal decision on HP's request for a defense, but instead requested more information from HP about the Nu-kote action.   ACE's October 9, 1998 letter to HP sought review of interrogatories and responses thereto; motions; deposition transcripts; and documents related to the counterclaims and/or whether the claims were covered (location of conduct, HP's advertising related to the counterclaims).   On October 27, 1998, HP responded that due to the terms of the protective order entered into in the underlying action, HP could not give ACE unfettered access to its entire file, and requested a more narrowly drawn request for documents.   The protective order precluded non-defending insurers from reviewing confidential documents.

Thus began a long running dispute over whether or not HP has provided ACE with sufficient documentation to make a coverage determination.   ACE asserted that since its policy covered claims for advertising liability offenses in connection with HP's advertising activities arising out of unfair competition in the policy territory, the threshold issue was whether Nu-kote was even competing with HP in foreign territories.   The counterclaim, in Ace's view, clearly alleged that HP was unfairly competing with Nu-kote in the United States only.

Between October 1998 and February 1999, the parties exchanged correspondence on the issue of whether HP had provided (or could provide) sufficient documentation to allow ACE to make a coverage determination. HP did provide some additional documentation to ACE.   ACE, however, continued to request additional documents.   By February 1999, eight months had

passed since the tender of the defense to ACE in June 1998, and ACE had neither accepted nor denied the request for a defense.

### 4.    Filing of the Instant Action

HP filed this action for declaratory relief on February 18, 1999. The complaint seeks a declaration that: (1) ACE had a duty to defend HP against Nu-kote's counterclaim; (2) ACE must pay pre-tender and post-tender fees; and (3) ACE must reimburse HP's counsel at the rates charged by that counsel, rather than at the rates normally paid by ACE. The debate over whether HP had provided sufficient documentation continued through early April 1999. On April 7, 1999, HP filed a motion for partial summary judgment regarding the duty to defend.

### 5.    Resolution of the Underlying Action

HP filed sixteen separate motions for summary judgment or partial summary judgment in the underlying action. HP's motion for partial summary judgment of counts six, eight, nine and ten of the counterclaim was granted on April 19, 1999. On April 21, 1999, ACE was informed that two motions for summary judgment were granted in HP's favor in the underlying action. The letter stated that unless filed under seal, the orders would soon be provided to ACE. ACE claims to have just received these pleadings in January 2002.

On August 18, 1999, HP wrote to ACE and advised that on July 22, 1999, a jury verdict was entered in favor of HP, thereby eliminating indemnity exposure. It is unclear how many of Nu-kote's counterclaims were presented at trial. It is clear that Nu-kote's antitrust (Sherman Act) claims were presented to the jury. HP points to the trial transcript and jury instructions to show that Nu-kote's antitrust claims relied upon allegations of false advertising at trial, and that Nu-kote made numerous references to HP engaging in behavior designed to cause fear, uncertainty and doubt ("FUD"). The jury found in favor of HP on the antitrust claims.

On August 30, 1999, HP informed ACE that HP had successfully defended the counterclaims in their entirety. The underlying action was conclusively resolved by settlement in December 1999.

### 5.    Prior Rulings concerning the Duty to Defend

In the instant action, HP filed a motion seeking an adjudication that ACE owed HP a defense of the underlying action.  The motion was heard in May 1999.  On August 24, 1999, Judge Williams granted the motion, finding that HP had demonstrated that the Nu-kote counterclaim contained claims potentially covered by the ACE policy.   The motion revolved around whether the Nu-kote counterclaim revealed a potential, "however slight," that ACE could be liable to indemnify HP for unfair competition within the policy territory.

With respect to the "policy territory" issue, HP argued that the Nu-kote counterclaim alleged activities within the territorial limitations of the policy because HP distributed in foreign markets package inserts intimating that the HP cartridges are not refillable.  ACE argued that any "FUD" allegedly suffered by consumers and distributors in foreign markets was irrelevant because there was no allegation or evidence that Nu-kote sold inkjet refill products outside of the United States during the policy period, and therefore, HP could not have suffered any damages to its international sales.

The court disagreed with ACE.   The court noted that the policy covered claims worldwide resulting from an occurrence within the policy territory.   The court at page 10 of its decision concluded that:

> Nothing in the policy restricts covered Advertising Injury claims to those in which all damages must be suffered outside of the United States…The territorial limitation in the… policy emphasizes the location of the occurrence, not the location of the resulting damages.
> In the present case, HP disseminated allegedly false advertisements about refilling inkjet printer cartridges internationally.  Nu-kote alleges that HP's statements concerning refillability of cartridges caused it to suffer damages.  Because Nu-kote could possibly claim damages to domestic business based, at least in part, on HP's extraterritorial acts, the Court finds that the Policy Territory requirement is satisfied.

With respect to unfair competition, the issue was whether the Nu-kote counterclaim alleged "unfair competition" as that term is used in the policy.  The court found that because "unfair competition" is commonly understood to encompass claims for false advertising and

1  other tortious conduct resulting in competitive injury, "unfair competition" as presented in the

2  ACE policy encompassed the claim for unfair competition alleged in the Nu-kote counterclaim.

3

4       ACE also argued that HP had breached the policy conditions by failing to tender the

5  underlying action and by failing to provide all available information concerning the claim at the

6  time of tender, and as a result, Ace had no duty to defend HP.  HP asserted that it did not

7  become aware of the potential coverage by the Ace policy until mid-December 1997, and

8  tendered the claim on June 13, 1998.  The court found that ACE had not demonstrated that it

9  suffered prejudice as a consequence of the delayed tender.  The court, however, recognized that

10 once ACE had access to the documents filed under seal it may be able to demonstrate prejudice,

11 and that "should examination of the sealed documents reveal prejudice caused by HP's delayed

12 tender, [ACE] may raise that issue by way of a motion for summary judgment."

13

14      ACE sought reconsideration of the Court's ruling on the duty to defend.  ACE argued

15 that further discovery may show that Nu-kote was not competing with HP in any foreign

16 jurisdiction and that Nu-kote could not recover damages for "advertising liability" resulting from

17 an occurrence in the policy territory.  In a ruling dated April 6, 2000, the court found that while

18 ACE could not argue that Nu-kote's claims regarding extraterritorial injury lack merit, ACE

19 would be given until April 28, 2000 to set forth what sort of evidence possessed by HP could

20 conclusively establish that the ACE policy did not apply to Nu-kote's counterclaim concerning

21 HP's competitive conduct abroad.  ACE provided additional briefing to the Court.  On June 19,

22 2000, the court denied the motion for reconsideration.

23

24                   5.     *Subsequent Rulings*

25      On May 12, 2001, Judge Williams issued an order on a number of summary judgment

26 motions which further clarified ACE's defense obligations.  The first set of cross-motions

27 concerned the precise date HP first tendered the action to ACE.  The court found that ACE's

28 duty to defend was triggered as of the June 13, 1998 letter.  The second set of cross-motions

concerned whether ACE was liable for reimbursement of HP's pre-tender defense costs, from

November 1994 to June 13, 1998. The court found in favor of ACE, ruling that HP is precluded from recovering any defense fees and costs incurred in connection with the Nu-kote action prior to June 15, 1998.

### *LEGAL STANDARD*

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); Celotex, 477 U.S. at 324. A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Anderson, 477 U.S. 242, 248-49; Barlow v. Ground, 943 F.2d 1132, 1134-36 (9th Cir. 1991).

### *DISCUSSION*

The Special Master in this case has been appointed for the purpose of (1) determination and computation of the damages HP is entitled to recover from ACE as a result of ACE's failure to provide a defense in the underlying action and (2) to hear related discovery motions. The issues raised by HP in this motion necessarily must be determined in order to ascertain the amount of damages to which HP is entitled. The motion, therefore, is properly within the scope of the referral from Judge Williams.

## I.    The Right to Allocate Between Covered and Uncovered Claims

HP contends that because ACE failed to provide a defense, ACE forfeited the right to allocate between covered and uncovered claims. HP relies upon <u>Buss v. Superior Court</u>, 16 Cal.4th 35 (1997) and <u>State of California v. Pacific Indemnity Co.</u>, 63 Cal.App.4th 1535 (1998) for this proposition.

ACE contends that it is entitled to allocate the fees between covered and uncovered claims, and that the cases relied upon by HP do not support a conclusion to the contrary.   ACE's position is premised upon the argument that there is no factual or legal basis for concluding that ACE is not a defending insurer. ACE contends that it was not given the opportunity to either accept or deny the defense of HP in the underlying action.   ACE asserts that it has never declined coverage in this case and therefore is not in breach of contract.

Upon tender of a defense, the insurer must immediately assume the defense of any potentially covered claims. <u>Buss v. Superior Court</u> (1997) 16 Cal.4th 35, 46-49. In a "mixed" action, in which some of the claims are at least potentially covered and the others are not, the insurer must defend the entire action. <u>Id.</u> at 48-49. However, the insurer may recover from the insured those defense costs which can be allocated solely to claims not even potentially covered by the policy. This is because the insurer has not been paid premiums by the insured for such claims and did not bargain to bear the defense costs for such claims. <u>Id.</u> at 49-53.

In order to preserve the implied in law right to seek reimbursement of defense costs for claims not potentially covered by the policy, the insurer must undertake the defense pursuant to a reservation of rights. <u>Buss</u> at 61, n. 27.   <u>See also</u> <u>Blue Ridge Ins. Co. v. Jacobsen</u>, 25 Cal.4th 489, 501 (2001).

In <u>State of California v. Pacific Indemnity Co.</u> (1998) 63 Cal.App.4th 1535, the State tendered the defense of an underlying action to its insurer.   Pacific Indemnity refused to defend. The State filed an action for declaratory relief and breach of contract.   The trial court found that

8

1  the insurer had a duty to defend. Pacific Indemnity argued, in pertinent part, that there was no

2  potential for coverage as to some of the allegations against the State.  The underlying action was

3  still underway when the appellate decision was issued. The appellate court found that:

> At this point in time, Pacific Indemnity is not entitled to compensation from its
> insured based on a theory that claims are not even potentially covered. *Buss* was
> premised on a " 'defend now seek reimbursement later' " theory. (*Dynamic Concepts, Inc.
> v. Truck Ins. Exchange* (1998) 61 Cal.App.4th 999, 1006.) By repudiating its duty to
> defend and providing no defense, Pacific Indemnity has nothing from which to seek
> reimbursement. *Buss* does not support Pacific Indemnity's theory that the State should
> contribute to attorney's fees. To the contrary, it unequivocally holds that the insurer's duty
> is to defend the action in its entirety. (*Buss*, supra, 16 Cal.4th at 48.)
>
> Nevertheless, the State's position that Pacific Indemnity is foreclosed from ever
> seeking reimbursement for costs of defense goes too far. ....If Pacific Indemnity, after
> providing an entire defense, can prove that a claim was "not even potentially covered
> because it did not even possibly embrace any triggering harm of the specified sort within
> its policy period or periods caused by an included occurrence," it should have that
> opportunity. (*Aerojet-General Corp. v. Transport Indemnity Co.*, (1997) 17 Cal.4th 38,
> 71.) This task "'if ever feasible,' may be 'extremely difficult.' (*Buss*, supra, 16 Cal.4th at
> 57-58, quoting *Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553, 564.)

State of California v. Pacific Indemnity Co. 63 Cal.App.4th 1535, 1549-1550 (1998).

16

17      ACE did not defend the underlying action.  In light of the fact that the underlying action

18  concluded, at the very latest, in December 1999, ACE cannot now provide a defense of the

19  underlying action. ACE is therefore foreclosed from attempting to allocate between covered and

20  uncovered claims.

21

22      ACE relies upon a number of pre-Buss cases involving the right to allocate.  See

23  Scottsdale Ins. Co. v. U.S. District Court, 145 F.R.D. 523 (defense with reservation of rights);

24  Aerosafe International v. ITT Hartford of the Midwest, 1993 U.S. Dist. LEXIS 10443 (1993)

25  (coverage declined); and Foxfire, Inc. v. New Hampshire Ins. Co., 1994 U.S. Dist. LEXIS (N.D.

26  Cal 1994) (coverage denied).   ACE's reliance on these cases is unavailing.  Buss clarified and

27  reformulated an insurer's right of reimbursement.  Where an insurer refuses to defend, Buss

28  precludes the right to allocate.

9

1    ACE's contention that it was not given the opportunity to either accept or deny the

2    defense of HP in the underlying action is without merit.  The existence of an insurer's duty to

3    defend turns upon the facts known by the insurer at the inception of a third party lawsuit or, as in

4    this case, at the time of tender of the defense.  See Montrose Chemical Corp. v. Superior Court 6

5    Cal.4th 287, 295 (1993) and B & E Convalescent Center v. State Comp. Ins. Fund, 8 Cal.App.4th

6    78, 92 (1992).

7    HP tendered the defense of the Nu-kote action to ACE on June 13, 1998.  The tender

8    included Nu-kote's second counterclaim and copies of package inserts included in HP inkjet

9    cartridge boxes distributed worldwide during the ACE policy period.  Faced with the same

10   allegations and package inserts upon which the Court subsequently based its decision regarding

11   the duty to defend, ACE neither accepted nor denied the tender.  Instead, ACE insisted that

12   additional documentation was necessary to make a coverage determination.  Eight months later,

13   ACE still having failed to make a decision, HP filed the instant action.  The Court subsequently

14   found that ACE had a duty to defend HP in the Nu-kote action based upon the allegations and

15   materials in ACE's possession in June 1998.

16   ACE had the opportunity to accept HP's tender with a reservation of rights, or to deny the

17   defense.  ACE instead persisted in seeking what it terms "threshold" information, whether Nu-

18   kote was competing with HP in the policy territory.  Judge Williams's rulings on the duty to

19   defend, however, did not view the fact that Nu-kote was not a worldwide competitor of HP as

20   conclusive as to whether there was a potential for coverage under the policy.  In sum, ACE

21   chose not to accept or deny the defense based upon an incorrect interpretation of the potential for

22   coverage under the policy.

23

24   In a related argument ACE contends that it is not a "breaching insurer," and neither the

25   Court nor the Special Master have so found.  Resolution of the question of whether ACE has a

26   right to allocate between covered and uncovered claims is not dependent upon a finding that

27   ACE "breached" the insurance policy.  The implied in law right to reimbursement is dependent

28

1

1    upon a showing ACE has not and cannot make: that ACE defended the underlying action with a

2    reservation of rights.

3

4        ACE also contends that it is premature for the Special Master to rule on whether ACE

5    breached the duty to defend, in light of a portion of Judge Williams' August 24, 1999 order on

6    the duty to defend.   The order allows ACE, after access to documents filed under seal, to raise

7    the issue of prejudice resulting from HP's delayed tender by way of motion for summary

8    judgment. Prejudicial delay by the insured in tendering the claim may excuse the insurer from

9    liability on the claim (i.e., it may excuse not only the duty to defend but also the duty to

10    indemnify). Select Ins. Co. v. Sup.Ct., 226 Cal.App.3d 631, 639 (1990).

11

12        HP's reply suggests at pages 13-14 that the Court has ruled against ACE on the late

13    notice/prejudice issue.   The record presented to the Special Master does not support the

14    conclusion that the late notice/prejudice issue has been resolved.   The Special Master's ruling on

15    the issues before him therefore is without prejudice to ACE's assertion of the prejudice

16    argument.

17

18        ACE also argues that under no circumstances is an insurer obligated to pay for the

19    prosecution of an insured's own claim.  HP's motion does not raise this issue.

20

21        At the hearing, ACE moved to strike lines 7-10, of page 8 of HP's reply brief.   The

22    portion of the brief in dispute is a purported citation from Concept Enterprises v. Hartford Ins.

23    Co. of the Midwest, No. CV 00-7267 NM (JWJx), 2001 U.S. Dist. LEXIS 6901 (C.D. Cal. May

24    21, 2001).  The motion to strike is GRANTED.  The quoted language is nowhere to be found in

25    the case.

26

27

28

1

## II.    The Duration of the Duty to Defend

HP contends that ACE's defense obligation, as articulated by Judge Williams, endured through the end of the Nu-kote action. HP notes that insurers attempting to terminate a duty to defend bear the heavy burden of demonstrating that the remaining claims cannot be covered. HP contends that the opening and closing arguments, jury instructions and verdict form in the Nu-kote action all establish that ACE's duty to defend continued through the end of the case. HP specifically points to the use/mention of the false advertising and "FUD" allegations. HP contends that the jury verdict form conclusively establishes that Nu-kote's counterclaims always concerned the same false advertising allegations which the court found triggered the potential for coverage.

ACE contends that it is not obligated to reimburse HP for legal fees incurred to defend uncovered claims at the time of trial in the underlying action. ACE asserts that: (1) all of the claims that the court deemed potentially covered were dismissed prior to trial; (2) the "FUD" allegations that remained through trial pertained to HP's antitrust claims, which were not covered by the policy as a matter of law.

The insurer's duty to defend continues until the underlying lawsuit is concluded . . . or until it has been shown that there is no potential for coverage. <u>Montrose Chem. Corp. v. Sup.Ct.</u> 6 Cal.4th 287, 295 (1993). The duty to defend begins when a potential for coverage arises, and the duty continues until the insurer proves otherwise. A declaratory judgment of no coverage, either by summary judgment or after trial, does not retroactively relieve the primary insurer of the duty to defend. It only relieves the insurer of the obligation to continue to defend after the declaration. <u>Hartford Acc. & Indem. Co. v. Sup.Ct.</u> (1994) 23 Cal.App.4th 1774, 1778, 1781.

ACE's duty to defend HP commenced on June 13, 1998. Judge Williams's duty to defend ruling found that the Nu-kote counterclaim contained claims potentially covered by the policy. The ruling focused on the unfair competition allegations as the basis for potential

1   coverage.  The ruling, however, made no mention of the antitrust claims.  There was no finding

2   that the antitrust claim(s) were not potentially covered by the policy.

3        HP obtained summary judgment of a number of Nu-kote's claims in April 1999,

4   including the Lanham Act and unfair competition claims.  It would appear (although it is by no

5   means clear) that at the time of trial in July 1999, Nu-kote' only remaining claim against HP was

6   for violation of the Sherman Act.  The jury instructions and verdict make clear that Nu-kote's

7   antitrust claim(s) relied in part (to show exclusionary conduct) on the false advertising and

8   "FUD" allegations.

9

10        ACE's duty to defend in this case continued until the conclusion of the underlying

11   lawsuit.  The granting of summary judgment in favor of HP and against Nu-kote on the "unfair

12   competition" claims <u>did not</u> establish that there was no longer any potential for coverage under

13   the ACE policy.  Instead, the burden was on ACE to establish that no potentially covered claims

14   remained in the Nu-kote counterclaim.  *If* ACE had accepted the defense of the Nu-kote

15   counterclaim under a reservation of rights, ACE might have been in a position to establish that

16   its duty to defend had been extinguished upon the judgment regarding the unfair competition

17   claims.  ACE, however, did not defend the underlying action, and did not establish that there was

18   no potential for coverage under the policy prior to the conclusion of the underlying action.

19

20   **III.   California Civil Code § 2860**

21

22        HP contends that Civil Code § 2860 benefits only a fully defending insurer, and ACE, as

23   a non-defending insurer, has no right to assert the rate provisions of Civil Code § 2860(c).

24

25        ACE contends that it is obligated to pay only reasonable rates to defend HP as to

26   potentially covered claims asserted in the underlying action.  While conceding that Civil Code §

27   2860 does not technically or factually apply to this action, ACE contends that the provisions and

28   spirit of Civil Code § 2860 are relevant in that it supports California's policy against awarding an

1

inequitable windfall of extra-contractual damages to an insured. Civil Code § 2860 provides in pertinent part that:

> (a) If the provisions of a policy of insurance impose a duty to defend upon an insurer and a conflict of interest arises which creates a duty on the part of the insurer to provide independent counsel to the insured. ...

> (b) For purposes of this section, a conflict of interest does not exist as to allegations or facts in the litigation for which the insurer denies coverage; however, when an insurer reserves its rights on a given issue and the outcome of that coverage issue can be controlled by counsel first retained by the insurer for the defense of the claim, a conflict of interest may exist. ...

> (c) When the insured has selected independent counsel to represent him or her, the insurer may exercise its right to require that the counsel selected by the insured possess certain minimum qualifications..... The insurer's obligation to pay fees to the independent counsel selected by the insured is limited to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended.

As conceded by ACE, Civil Code § 2860 is factually inapplicable to the instant case. ACE would be entitled to rely upon this section to determine "reasonable" attorneys' fees if, and only if, ACE had defended the underlying action with a reservation of rights.

## IV.    Request for Continuance

Pursuant to Federal Rule of Civil Procedure 56(f) a party may request that the hearing on a motion for summary judgment be continued so as to allow that party to conduct further discovery. Fed. R. Civ. P. 56(f). A motion for continuance under Rule 56(f) must be supported by affidavits setting forth the particular facts expected to be discovered and how those facts would preclude summary judgment. Brae Transportation, Inc. v. Coopers & Lybrand, 790 F.2d 1439, 1443 (9th Cir. 1986). These requirements are not satisfied by references to a need for discovery contained in memoranda or declarations. State of California v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998); Brae, 790 F.2d at 1443. The movant additionally must show that he or

1

1   she has been diligent in conducting discovery. Hawaii Carpenters' Trust Funds v. Henry, 906

2   F.2d 1349, 1352 (9th Cir. 1990); Brae, 790 F.2d at 1443. Failure to comply with the

3   requirements of Rule 56(f) is a proper ground for denying the motion for continuance and

4   proceeding with the motion for summary judgment. Campbell, 138 F.3d at 779; Brae, 790 F.2d

5   at 1443.

6          The declaration in support of ACE's request for a continuance indicates that the

7   outstanding discovery will provide ACE with factual information going directly to allocation

8   issues and will support a motion for summary adjudication on one or more of coverage defenses.

9   The declaration goes on to state that counsel believes this discovery will provide the evidence

10  necessary to defeat HP's motion.

11

12         The request for a continuance is DENIED.   ACE has failed to suggest how the facts to be

13  obtained would result in denial of the motion.   The right to allocate and the application of Civil

14  Code § 2860 are legal issues.   With respect to the termination of the duty to defend, there is no

15  factual dispute that ACE failed to establish an absence of any potential for coverage prior to the

16  conclusion of the underlying action. The adjudications in this motion do not preclude ACE from

17  completing the outstanding discovery and/or asserting coverage defenses set forth in the answer

18  and counterclaim.

19

20  **V.    CONCLUSION**

21

22         The request for a continuance pursuant to Fed. Rule Civ. Proc. 56(f) is DENIED.

23

24         The motion for adjudication that ACE has no right to allocate defense costs between

25  potentially covered and uncovered Nu-kote claims in the underlying *Nu-kote* action is

26  GRANTED. ACE's failure to defend the underlying action with a reservation of rights precludes

27  its assertion of the right to allocate.

28

The motion for adjudication that ACE's duty to defend HP continued through the termination of the *Nu-kote* action is GRANTED.   ACE failed to establish an absence of any potential for coverage under the policy prior to the conclusion of the underlying action.

The motion for adjudication that Civil Code § 2860 is not applicable to the determination of reimbursable defense costs is GRANTED.   This section is not applicable to this case.

Dated: _____4-1-07_____

Hon. Peter G. Stone (Ret.)
Special Master

## PROOF OF SERVICE BY MAIL & FACSIMILE

I, Emma Kottlowski, not a party to the within action, hereby declare that on April 1, 2002 I served the attached **Order** on the parties in the within action by facsimile and depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Jose, California, addressed as follows:

James Lowe Esq.
Gauntlett & Associates
18400 Von Karman Ave.
Suite 300
Irvine, CA 92612
Tel: 949-553-1010
Fax: 949-553-2050

Janelle F. Garchie Esq.
Correll, Garchie & Edwards, LLP
550 W. "C" Street
Suite 500
San Diego, CA 92101
Tel: 619-446-2829
Fax: 619-557-0428

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Jose, CALIFORNIA on April 1, 2002.

_Emma Kottlowski_
Signature

F:\APPS\jam32\TEMPLATE\Arbitration\Prf fax & reg mail.rtf

# EXHIBIT 17

1

2

3

4

5

6

7

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

8

9

10

11

12

13

14

15

16

| UNDER SEAL,  | NO. C 99-20207 JW |
|---|---|
| Plaintiff, | **ORDER ADOPTING APRIL 1, 2002 ORDER BY THE SPECIAL MASTER; SETTING CASE MANAGEMENT CONFERENCE** |
| v. | |
| UNDER SEAL, | |
| Defendant. | **[FILED UNDER SEAL]** |

17    Currently before the Court are (1) Defendant ACE Property and Casualty Insurance

18  Company's ("ACE") Motion to Reject the April 1, 2002 Order by the Special Master and (2)

19  Plaintiff Hewlett-Packard Company's ("HP") Motion to Reject the Portion of the Special Master's

20  April 1, 2002 Order re: Late Notice/Prejudice.  The Court reviews a special master's findings and

21  conclusions de novo.  See Federal Rule of Civil Procedure 53(e)(2).  Having conducted a de novo

22  review, and considered the comments of counsel at the July 29, 2002 hearing, the Court adopts the

23  Order of the Special Master in its entirety and without any modification as an order of the Court.

24  A.  Ace Has No Right to Allocate Defense Costs

25    ACE objects to the Special Master's determination that ACE has no right to allocate defense

26  costs between covered and uncovered Nu-kote claims in the underlying Nu-Kote action.  The Court

27  finds no merit to the objection.

28    HP tendered the defense of the Nu-kote counterclaim to ACE, and ACE neither accepted nor

United State District Court

For the Northern District of California

**EXHIBIT**

**17**

STATE LEGAL

1    denied the request for a defense.  By order dated August 24, 1999, Judge Williams held that as of

2    June 13, 1998, ACE owed HP a defense under the "advertising injury" coverage of its policy.  Judge

3    Williams' decision was based upon Nu-kote's counterclaims for Lanham Act false and deceptive

4    advertising, and California statutory and common law unfair competition.  Judge Williams did not

5    address any other counterclaims.  The underlying action was conclusively resolved by settlement in

6    December 1999, and thus ACE cannot now provide any defense of the underlying action.

7          California law provides that upon tender of a defense, an insurer must assume defense of all

8    claims that are potentially covered.  Buss v. Superior Court 16 Cal.4th 35, 61 (1997).  In a "mixed"

9    action, in which some of the claims are potentially covered and others are not, the insurer must

10   defend the entire action.  Id. at 48-49.  The duty to defend the entire "mixed" action is not a

11   contractual duty, but one imposed by law.  Id. at 48-49.  The insurer, however, also has a right to

12   seek reimbursement of defense costs which can be allocated solely to claims not even potentially

13   covered by the policy.  Id. at 50.  This right to reimbursement is implied in law as quasi-contractual.

14   In Buss, the Supreme Court  relied on benefit-of-the-bargain principles and the doctrine of unjust

15   enrichment to justify the right of reimbursement as to claims that are not even potentially covered.

16   Buss, 16 Cal.4th at 51-52.  The right of reimbursement, however, is not absolute.  An insurer must

17   preserve its right to seek reimbursement of defense costs by undertaking defense of its insured

18   pursuant to a reservation of rights.  In Buss, the Supreme Court stated:

19              We note that the Court of Appeal assumed that, in order to obtain
                reimbursement for defense costs, the insurer must reserve its right
20              thereto.  To the extent that this right is implied in law as quasi-
                contractual, it *must* indeed be reserved.
21

22   Buss v. Superior Court 16 Cal.4th at 61, n. 27.  See also Blue Ridge Ins. Co. v. Jacobsen, 25 Cal.4th

23   489, 502 (2001); State of California v. Pacific Indemnity Company, 63 Cal.App.4th 1535 (1998).

24          In Pacific Indemnity, supra, the State tendered the defense to its insurer, Pacific Indemnity,

25   and Pacific Indemnity refused to defend.  The State filed suit and the trial court held that the insurer

26   had a duty to defend.  On appeal, Pacific Indemnity conceded that it had a duty to defend, but argued

27   that it should not be responsible for past and future defense costs relating to claims not potentially

28                                                 2

United States District Court
For the Northern District of California

1  covered by the policy. The underlying action was still pending when the appellate court held that

2  Pacific Indemnity could seek reimbursement if it first provided a defense, stating:

> At this point in time, Pacific Indemnity is not entitled to compensation from its
> insured based on a theory that claims are not even potentially covered. <u>Buss</u> was
> premised on a "'defend now seek reimbursement later'" theory. (<u>Dynamic Concepts,
> Inc. v. Truck Ins. Exchange</u> (1998) 61 Cal.4th 999, 1006.) By repudiating its duty to
> defend and providing no defense, Pacific has nothing from which to seek
> reimbursement. <u>Buss</u> does not support Pacific Indemnity's theory that the State
> should contribute to attorney's fees. To the contrary, it unequivocally holds that the
> insurer's duty is to defend the action in its entirety. (<u>Buss, supra,</u> 16 Cal.4th at 48.)
>
> Nevertheless, the State's position that Pacific Indemnity is foreclosed from ever
> seeking reimbursement for costs of defense goes too far. . . . If Pacific Indemnity,
> *after providing an entire defense,* can prove that a claim was "not even potentially
> covered because it did not even possibly embrace any triggering harm of the specified
> sort within its policy period or periods caused by an included occurrence," it should
> have that opportunity.

11  <u>Pacific Indemnity,</u> 63 Cal.4th at 1549-50.

12      In this case, ACE did not provide any defense for the underlying action, and therefore failed

13  to preserve its right to seek reimbursement of defense costs for claims not even potentially covered

14  by the policy.

15      ACE argues, however, that in <u>Hogan v. Midland National Ins. Co.,</u> 3 Cal.3d 553 (1970), the

16  Supreme Court held that an insurer who does not defend the insured has the right to allocate between

17  covered and uncovered claims, and that nothing in <u>Buss</u> indicates that the Supreme Court intended to

18  overrule <u>Hogan.</u>  This Court disagrees with ACE's interpretation of <u>Hogan.</u>  In <u>Hogan,</u> the Supreme

19  Court held that the insurer had a duty to defend against all claims, that its refusal of defense was

20  wrongful, and therefore it was responsible for all of the defense costs. <u>Hogan,</u> 3 Cal.3d at 564.

21  Apportionment was simply not the central issue in <u>Hogan,</u> although it was indeed discussed. Any

22  confusion on this point was resolved in the Supreme Court's subsequent decision in the <u>Buss</u> case.

23  In <u>Buss,</u> the Supreme Court clarified that the language regarding apportionment between covered and

24  uncovered claims in <u>Hogan</u> is dictum and not part of the holding. <u>Buss,</u> 16 Cal.4th at 56. Therefore,

25  the Court finds that the <u>Hogan</u> decision is inapplicable to the facts in this case.

26      ACE next argues that it should not be precluded from pursuing its right to allocate defense

27  costs because HP failed to provide adequate information for ACE to make a coverage determination.

28                                        3

United States District Court
For the Northern District of California

1  This issue has already been decided against ACE. Judge Williams has ruled that ACE had a duty to

2  defend HP in the <u>Nu-kote</u> action based upon the allegations and materials in ACE's possession in

3  June of 1998.

4           Finally, ACE contends that any duty to defend terminated once the trial court granted partial

5  summary judgment in favor of HP on the unfair competition claims. In contrast, HP contends that

6  ACE's duty to defend continued through the trial of Nu-kote's antitrust claim because there

7  remained a possibility of indemnity liability.

8           An insurer's duty to defend continues until the underlying lawsuit is concluded or it has been

9  shown that there is no potential for coverage. <u>Montrose Chem. Corp. v. Sup. Ct.</u>, 6 Cal.4th 287, 295

10 (1993). The insurer carries the burden of proof, by a preponderance of the evidence, to establish that

11 there exists no potential for coverage. The Court finds that the partial summary judgment order did

12 not negate the potential for coverage. First, even after the partial summary judgment order, Nu-

13 kote's remaining claims contained numerous broad allegations regarding unfair competition by fa

14 advertising and disparaging advertising. In particular, Nu-kote continued to assert that HP had

15 engaged in a campaign of "fear, uncertainty and doubt." ACE cannot negate the possibility that the

16 remaining false advertising and disparaging advertising allegations could have been reshaped to state

17 a potentially covered claim. Second, ACE cannot now negate the possibility that Nu-kote could have

18 successfully sought reconsideration of the partial summary judgment. Further, the partial summary

19 judgment order could have eventually been appealed if the case had not settled. Therefore, the Court

20 finds that ACE's duty to defend continued until the conclusion of the underlying lawsuit.

21 <u>B. The Late Notice/Prejudice Issue Remains Unresolved</u>

22           The Special Master rejected HP's assertion that the late/notice prejudice issue had been

23 resolved, and stated that his ruling on the issues before him was without prejudice to ACE's

24 assertion of the prejudice argument. HP objects to this portion of the Special Master's Order. HP

25 contends that the late/notice prejudice issue was conclusively decided against ACE by Judge

26 Williams, and therefore ACE is precluded from raising the issue. The Court has reviewed the

27 underlying record, and agrees with the Special Master that the record does not support the conclusion

28

UNITED STATES DISTRICT COURT
For the Northern District of California

4

1   that the late/notice prejudice issue has been resolved.  Therefore, ACE is not barred from raising the

2   issue in the future.

3        For the reasons set forth above, the Court adopts the Special Master's Order on Plaintiff's

4   Motion for Adjudication dated April 1, 2002 as an order of this Court.  The Court sets a case

5   management conference for November 18, 2002 at 10:00 a.m. to discuss the remaining schedule for

6   the case.  The parties shall file an updated case management statement no later than November 8,

7   2002.  In the statement, the parties shall address the remaining schedule of the case as well as

8   whether the case should continue to remain under seal.

9   Dated:  October 10, 2002

10                                     JAMES WARE
                                       United States District Judge

11

12

13   0210642Ci.civ

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                       5

United States District Court
For the Northern District of California