1    evaluate "real world solutions to defective conditions." The architect also testified, however, that

2    the information derived from the repair work never actually benefited the defense because the

3    case settled before the information was needed for depositions and/or trial. *Id.* Transcontinental

4    called an expert witness who opined the repair costs were not necessary to Barratt's defense and

5    were not reasonable defense costs. *Id.*  The jury found that the expenses incurred in connection

6    with the houses not involved in the Cortina lawsuit were defense costs. *Barratt* at 856.

7        On appeal, the insurer argued that the claimed defense costs were not recoverable as a

8    matter of law, relying upon *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, (1998) 18

9    Cal.4th 857, 883.   The court disagreed, stating that:

10           To the contrary, in reaching its conclusion, *Foster-Gardner* expressly reaffirmed
             *Aerojet-General's* holding that an insurer has a duty to pay defense costs if the costs are
11           incurred between tender and settlement of a lawsuit, and if the defense investigation and
             expenses are reasonable and necessary to mount a defense in a pending lawsuit. (*Foster-
12           Gardner*, supra, 18 Cal.4th at 886.) Under *Aerojet-General*, a liability insurer must bear
             these defense costs even if the insured obtains additional benefits from the expenditures,
13           and even if the same costs could potentially be characterized as an indemnification cost in
             a different context. (*Aerojet-General*, supra, 17 Cal.4th at 65-66.)

14    *Id.* at 859-860.  The *Barratt* court stated that:

15           As applied here, these principles mean that the costs incurred by Barratt are potentially
             recoverable even though they may serve more than one objective. If Barratt's
16           expenditures qualify as defense costs in the Cortina action, they do not lose that status
             merely because the costs are not independently recoverable based on the nonplaintiff
17           property damage claims. Under *Aerojet-General* and *Foster-Gardner*, the critical issue is
             whether the costs were reasonably and necessarily incurred in defense of an existing
18           lawsuit. If the investigation costs satisfy this test, they are recoverable even if the
             payments of these costs benefited a third party who did not file suit against the insured.

19

20

21    *Id.* at 860.

22        Transcontinental alternatively argued that the judgment must be reversed because

23    insufficient evidence supported the jury's conclusions that the repairs to the nonplaintiff homes

24    constituted a necessary and reasonable effort to defend the Cortina lawsuit and that the amount

25    of those costs was necessary and reasonable to achieve that purpose. *Barratt* at 860-861. The

26    Court found that although Barratt's evidence may have supported a general conclusion that it can

27    be a reasonable trial strategy in construction defect litigation to use repair information from other

28    homes in a residential development to bolster defense theories, the general conclusion "does not

      support a reasonable inference that in this case it was reasonable and necessary to engage in this

1   strategy by repairing every claimed defect in every Cortina nonplaintiff home and to spend

2   $580,714.50 in doing so." *Id.* at 861. The court stated that:

3       The testimony of Barratt's attorneys and litigation coordinator (all of whom were
        testifying as percipient witnesses rather than experts) that it was possible that these

4       unspecified repairs to the nonplaintiff homes could be useful to explain the nature of the
        plaintiffs' claimed construction defects and/or to help show the viability of a defense

5       repair strategy was too theoretical to establish that a reasonable insured would have
        incurred all of these expenses in defending against the Cortina lawsuit in this case.

6       In reaching this conclusion, we emphasize two aspects of proof that were missing in this

7       case.
                First, there was no evidence that the problems found and corrective repairs made

8       to the nonplaintiff homes were similar to the problems that were the subject of the claims

9       in the Cortina lawsuit, or that the repairs reflected alternate methods of repair that would
        potentially rebut the Cortina plaintiffs' repair costs at trial. ... Further, there was no

10      evidence connecting the repair work to the plaintiff homeowners' claims.

11      ...
                Second, it is not enough to produce evidence that repairs to nonplaintiff homes

12      would be "helpful" or "useful" in litigation involving other homes in the residential
        development. It may always be said that a defendant would obtain some benefit from

13      additional investigation that has some relationship to the subject of a lawsuit, but this fact
        is not enough to logically support the requisite finding that the investigation was

14      reasonable and necessary for purposes of defending the existing suit. Instead, a developer
        seeking reimbursement for repair costs to homes not the subject of a lawsuit must present

15      evidence that a reasonable insured would have engaged in a similar defense strategy,
        which necessarily involves a consideration of whether the benefits of the strategy are

16      worth the cost. Without this weighing analysis, the fact that it may be helpful or useful to

17      a defense to learn additional information does not - in and of itself - lead to an inference
        that a reasonable insured would have found the costs were reasonable and necessary to

18      defend the lawsuit.

19

20  *Id.* at 861-862 (emphasis added). Citing *Aerojet* at 62, the Court stated;

21      Moreover, the fact that Barratt attorneys and employees may have actually believed this
        was a good defense strategy or that they were subjectively motivated to do the repairs by

22      a desire to obtain more information in the Cortina lawsuit does not support an inference
        that a reasonable insured would also reach this conclusion. What matters here is whether

23      the ... investigation would be conducted against liability by a reasonable insured under
        the same circumstances.

24

25  *Id.* at 862. "While we have concluded that it is conceptually possible to prove that in

26  construction defect litigation a repair of a nonparty home can be a reasonable and necessary

27  expense to support defense theories in *the filed lawsuit*, there must be meaningful proof

28  establishing a connection between the particular repairs and the defense theory." *Id.* at 863
    (emphasis in original).

1    The developer in *Barratt* argued that because it presented evidence that the insurer

2  breached its duty to defend and the parties stipulated as to the amount that was spent on the

3  repairs to the non-plaintiff homes, it had proven the existence and amount of the expenses, and

4  therefore the burden of proof shifted to the insurer to prove that the costs were unreasonable and

5  unnecessary. The court disagreed, stating that:

6          Under *Aerojet-General*, the burden does not shift to the insurer to prove the
       expenses were unreasonable or unnecessary until the insured has met its burden to prove
7       the "existence ... of the ... investigation expenses ...." (*Aerojet-General, supra*, 17 Cal.4th
       at 64.) The fact that the parties stipulated that $580,714.50 was spent on repairs to the
8       non-plaintiff homes does not mean that Barratt satisfied its burden to show the existence
       of investigation expenses. To show that the repairs even constituted a defense
9       investigation expense, Barratt had the initial obligation to establish that a reasonable
       insured would have made the repairs to third party homes in defense of the lawsuit that
10      was in fact brought.

11 *Barratt* at 864.

12              *KLA-Tencor Corp. v. Travelers Indem. Co. of Illinois*

13      *KLA-Tencor Corp. v. The Travellers Indemnity Co.*, 2004 WL 1737297 (N.D.Cal. 2004)

14 involved two underlying patent infringement actions and responsive counterclaims. Plaintiff

15 KLA-Tencor Corporation ("KLA") filed *Therma-Wave I*, alleging infringement of U.S. Patent

16 No. 4,899,055 ("'055 patent") by Defendant Therma-Wave. On October 23, 1998 Therma-Wave

17 answered and counterclaimed against KLA, seeking a declaration that the '055 patent was

18 invalid or had not been infringed, and alleging infringement of Therma-Wave's U.S. Patent No.

19 5,596,406 ("'406 patent"). On July 22, 1999 KLA filed a second complaint against Therma-

20 Wave, ("*Therma-Wave II*"), alleging infringement of two additional KLA patents. Therma-

21 Wave counterclaimed for a declaration of invalidity of one of the patents (the '842 patent);

22 infringement of two additional Therma-Wave patents (the '837 patent" and the '939 patent); a

23 violation of Lanham Act § 43(a)("the disparagement counterclaim"); intentional and negligent

24 interference with prospective economic advantage; intentional interference with contractual

25 relations and unfair competition under Cal. Bus. & Prof. Code § 17200. The *Therma-Wave II*

26 disparagement counterclaim alleged that KLA had engaged in a campaign to disparage Therma-

27 Wave and to damage improperly Therma-Wave's efforts to raise capital and to compete making

28 disparaging and untrue statements to: (1) actual and prospective customers of Therma-Wave and

   market analysts about Therma-Wave's financial condition and future viability; (2) actual and

1    prospective customers of Therma-Wave that Therma-Wave would not be able to sell or ship its
2    Opti-Probe products due to KLA's lawsuit alleging that Therma-Wave infringed the '055 Patent;
3    and (3) market analysts that Therma-Wave had lost large orders. A request to treat *Therma-*
4    *Wave I* and *Therma-Wave II* as related cases was granted, on the cases involved identical
5    technology and largely the same documents and witnesses. The parties later agreed that all
     discovery in *Therma-Wave I* could be used in *Therma-Wave II.*
6           On October 29, 1999, four days after receipt of the *Therma-Wave II* counterclaim, KLA
7    tendered *Therma-Wave I* and *Therma-Wave II* to Travelers. Travelers denied coverage on
8    January 4, 2000 and refused to pay any defense costs. Thereafter, Therma-Wave amended its
9    disparagement counterclaim in *Therma-Wave II,* alleging statements made to actual and
10   prospective customers that Therma-Wave's Opti-Probe products could not ship because they
11   infringed the '055 patent and alleging statements that Therma-Wave had lost large orders when,
12   in fact, Therma-Wave had won the order in question over KLA. Subsequently, KLA's outside
13   counsel conducted an investigation and concluded that certain statements alleged by Therma-
14   Wave, which formed the basis for Therma-Wave's disparagement allegations, had likely been
15   made. In addition, KLA discovered a number of internal documents that contained potentially
16   disparaging statements. Based upon its investigation, KLA asserted that the disparagement
17   counterclaims exposed KLA to significant liability. KLA then moved for consolidation of
18   *Therma-Wave I and II,* arguing, *inter alia,* that if KLA prevailed against Therma-Wave in
19   *Therma-Wave I,* then statements that Therma-Wave was enjoined from shipping its Opti-Probe
20   products would be true, and thus, resolution of the '055 patent may provide KLA with a further
     defense to the disparagement counterclaim in Therma-Wave II.
21          KLA settled the underlying litigation, and commenced an action for indemnity against
22   Travelers. The court subsequently ruled that Travelers had a duty to defend the disparagement
23   allegations made by Therma-Wave in *Therma-Wave II. KLA* at *3.
24          The *KLA* opinion addresses Travelers' motion for partial summary judgment that
25   Travelers had no duty to reimburse KLA for any attorney's fees or expenses incurred by KLA in
26   the defense of *Therma-Wave I.* KLA argued that a critical component its defense to
27   disparagement counterclaims in *Therma-Wave II* was its ability to prevail on its '055 Patent
28   claims in *Therma-Wave I* by proving that the '055 Patent was valid and that it was infringed by
     Therma-Wave. *Id.* In conjunction with this validity and infringement defense, KLA argued that

the five separate categories of fees and costs were intertwined with a successful defense of the disparagement counterclaims: (1) fees and costs relating to KLA's '055 patent infringement claim; (2) fees and costs relating to factual and legal analysis of the products, companies and marketplaces at issue in *Therma-Wave I*; (3) fees and costs relating to *Therma-Wave's* '406 patent infringement claim in *Therma-Wave I*; (4) fees and costs relating to KLA's defenses to all of Therma-Wave's counterclaims in *Therma-Wave II*; and (5) fees and costs relating to settlement activities. The parties disputed the scope of the costs that were reasonable and necessary to defend the disparagement counterclaims. The court first stated that:

> Neither party disputes that bringing a successful claim for infringement of the '055 patent in *Therma-Wave I*, and winning damages pursuant to that claim, was one of KLA's objectives. But as *Barratt* makes clear, these costs are potentially recoverable even if they serve more than one objective. *See Barratt*, 102 Cal.App. 4th at 860. KLA asserts, essentially, that the best defense to the disparagement counterclaims was showing that the '055 patent was valid, and further that Therma-Wave's Opti-Probe products infringed that patent. Considering KLA's potential for liability based on its internal investigation, this was not an unreasonable strategy.

*KLA* at *4. The court stated the general rule that "reasonable and necessary costs of defending a lawsuit are recoverable if the insurer breaches its duty to defend," and summarized the relevant burdens of proof for recovery of such costs when an insurer breaches its duty to defend set forth in *State v. Pac. Indem. Co.*, 63 Cal.App. 4th 1535, 1548 (1998); *Aerojet-General Corp. v. Transp. Indem. Co.*, and *Barratt*. *Id.* at *4. After summarizing the facts and basis for the court's decision in *Barratt*, and concluding the *Aerojet* burden shifting was applicable, the court found that:

> Accordingly, KLA has the burden of proving the existence and amount of the expenses involved in defending the disparagement counterclaims. KLA may meet that burden by demonstrating the hours worked and providing testimony that the work was all related to the defense, but subject to the requirement that such work must be reasonable and necessary to defense of the disparagement counterclaims. *See State*, 63 Cal.App. 4th at 1549; *Barratt*, 102 Cal.App. 4th at 858. Travelers then bears the burden of showing that these costs were unreasonable. *See* State, 63 Cal.App. 4th at 1549. Moreover, to the extent that certain costs related to the disparagement counterclaims cannot be separated from costs unrelated to those claims, Travelers bears the burden of showing which costs are in fact unreasonable or unnecessary. [FN4] *Id.* at 1548.

*Id.* at *6. Footnote 4 states that "KLA must, however, make a good faith effort to separate its costs." *Id.* at *6 n.4. The court, citing to *Barratt*, also found that "KLA must present evidence

1   "that a reasonable insured would have engaged in a similar defense strategy, which necessarily

2   involves a consideration of whether the benefits of the strategy are worth the cost." *Id* at *7.

3          KLA submitted declarations stating that: (1) legal research and analysis, document

4   management, factual investigation, discovery, technical analysis and expert analysis relating to

5   the companies, marketplaces and products at issue in *Therma-Wave I* were intertwined with the

6   *Therma-Wave II* litigation as the parties and technologies overlapped substantially; (2) all post-

7   tender fee and cost entries in *Therma-Wave I* had been reviewed; (3) after segregating fees and

8   costs related to defending Therma-Wave's '406 patent infringement claim (with the exception of

9   damages-related items) in *Therma-Wave I*, prosecution of KLA's '842 patent infringement

10  claims in *Therma-Wave II*, and fees and costs related to obtaining insurance coverage, the

11  individual subtracted these amounts from the total fees and costs in *Therma-Wave I*; and (4)

12  based thereon, KLA concluded that $4,781,428.61 in fees and costs were incurred in KLA's

13  defense of the counterclaims in *Therma-Wave II*. KLA at *7.

14         The court, again citing *Barratt*, stated that to satisfy the "reasonable and necessary" test,

15  KLA's fees and costs must meet three requirements: (1) the challenged costs and fees must relate

16  to an action conducted within the temporal limits of Travelers' duty to defend; (2) the challenged

17  costs and fees must relate to a reasonable and necessary effort to avoid or minimize liability; and

18  (3) the challenged costs and fees must be reasonable and necessary for that purpose. *KLA at *7*.

19  The court concluded that "[w]hile KLA's underlying theory is at least viable, certain categories

20  of fees and costs that KLA asserts are related to successfully bringing its '055 infringement

21  claim are not." *Id*.

22         With respect to KLA's '055 patent infringement claim, the court found KLA had raised a

23  triable issue of material fact as to whether the costs and fees directly associated with the '055

24  patent infringement claim were reasonably and necessarily incurred to defend Therma-Wave's

25  counterclaims for disparagement in *Therma-Wave II*, and thus prongs (2) and (3) above were

26  satisfied. *KLA* at *7. The court further found that KLA had raised a triable issue of fact as to

27  whether costs and fees incurred post-tender in *Therma-Wave I* relating to KLA's claim for

28  infringement of the '055 patent may also be deemed incurred in defense of Therma-Wave's

    disparagement claims in *Therma-Wave II*. *Id*.

           With respect to legal, factual and technical analysis in *Therma-Wave I*, the court stated

    that "[t]o the extent that the fees and costs incurred in the legal, factual and technical analysis of

1  *Therma-Wave I* were reasonable and necessary for the purpose of minimizing liability, the court

2  questions the disparity between the costs asserted by KLA and those incurred in *Therma-Wave*

3  *II*." *Id.* at *8. KLA presented evidence that at least a portion of the work attributed to *Therma-*

4  *Wave I* was actually done for *Therma-Wave II*, prior to *Therma-Wave II* receiving a separate

5  billing number and that potential exposure for the disparagement counterclaims was $21.5

6  million, and the settlement value of the disparagement counterclaims was between $3 million

7  and $6 million at the time of settlement. The court concluded that KLA had met its initial burden

8  by showing the amount of fees relating to this category and providing declarations that they

9  related to the defense. *Id.* The court found that "Travelers must now bear the burden of showing

10  specific costs were either unreasonable or unnecessary to the defense," and that "[t]o the extent

11  that Travelers can show that certain costs were not related to successfully litigating the '055

12  patent and minimizing KLA's exposure on the disparagement counterclaims, KLA may not

13  recover." *Id.*

   KLA argued that fees and costs incurred in defending against Therma-Wave's claim for

14  damages in *Therma-Wave I* for the alleged infringement of Therma-Wave's '406 patent were

15  recoverable as part of its defense to the disparagement claims. KLA theorized that the damages

16  Therma-Wave sought for infringement of the '406 patent would have been substantially similar

17  to the damages sought for disparagement. *KLA* at *8. The court found that:

18     This theory, based on cursory deposition testimony, is too far afield from Therma-Wave's
       disparagement counterclaims to establish a triable issue of fact. Specifically, no
19     reasonable counsel would conclude that the costs incurred in the defense of the '406
       patent infringement claim would be necessary for the defense of Therma-Wave's
20     disparagement allegations because such a defense could provide information on damages.
       ... Travelers is entitled to partial summary judgment that costs incurred in defense of
21     Therma-Wave's damage claim for infringement of the '406 patent are not recoverable as
       necessarily incurred in KLA's disparagement defense.

22

23  *Id.* at *8.

   KLA also sought reimbursement of fees and costs for its defense of Therma-Wave's '837

24  and '939 patent counterclaims in *Therma-Wave II*. The court stated that KLA "appears to argue

25  that Travelers must first pay all *Therma-Wave II* counterclaim defense costs, then subsequently

26  seek reimbursement for those claims where there is no potential for coverage." *KLA* at *8. The

27  court states that as opposed to the plaintiff's situation in *State*, "here the fees are more easily

28  segregable." *Id.* The court concluded that KLA was entitled to recover only fees related to the

-57-

1  disparagement counterclaims and that Travelers bore the burden of showing which costs were
2  unreasonable. *Id.*
3      Finally, with respect to settlement activities, the *KLA* court concluded that the California
4  Supreme Court in *Aerojet* made clear that while certain activities related to a party's defense may
5  be reasonable and necessary costs to avoid or at least minimize liability, "[s]ettlement costs
6  cannot be defense costs because, instead, they resolve liability." *KLA* at *9 (citing *Aerojet* at 67).
7  The court concluded that KLA was not entitled to recovery from Travelers for settlement
   activities. *Id.*
8
                              **DISCUSSION**
9  **I.    Burden of Proof for Purposes of the Remand Hearing**
10     "When the insurer breaches the duty to defend, the insured must prove by a
11 preponderance of evidence the existence and amount of the expenses, which are then presumed
12 to be reasonable and necessary as defense costs." November 25, 2003 Order at 8; *see also*
13 October 15, 2004 at 1. "The defense costs may include expenses incurred in prosecuting
14 affirmative claims under appropriate circumstances." *Id.* "Once the insured meets its burden, it
15 is the breaching insurer's burden to prove by a preponderance of evidence that the expenses are
16 unreasonable or unnecessary to the defense."
17     In the November 2003 and October 2004 orders, the Court concurred with the Special
18 Master's determination that HP had proven by a preponderance of the evidence the existence and
19 amount of its defense costs, and therefore HP was entitled to a presumption that its defense costs,
20 including the expenses incurred in prosecution of its claims against Nu-kote, were reasonable
21 and necessary as defense costs." October 15, 2004 Order at 2. The Court, however, disagreed
22 with the Special Master's determination that ACE failed to prove, by a preponderance of
   evidence, that HP's expenses were unreasonable or unnecessary to the defense. *Id.*
23     The Court's November 25, 2003 Order at page 9 concluded that "[a]n expense is
24 necessary only if the expense would be conducted against liability by a reasonable insured under
25 the same circumstances," citing *Aerojet* at 62-63; *Barratt* at 848; and *Larkin* at *19. "In other
26 words, an expense[] is unnecessary if the expense would not have been conducted against
   liability by a reasonable insured under the same circumstances." November 25, 2003 Order at 9.
27 The order provides that:
28

                                      -58-

1    In this case, a trier of fact *could* reasonably conclude that ACE presented a
2    preponderance of evidence that some of HP's expenses were unnecessary to the defense
     of Nu-kote's counterclaims. First, there is evidence from HP itself. During the
3    underlying lawsuit between HP and Nu-kote, HP argued before this Court that "the vast
4    majority of Nu-kote's anti-trust allegations are not inextricably related to the patent,
     trademark and false advertising, unfair competition issues in this case." HP prevailed on
5    this argument and this Court allowed HP's affirmative claims to proceed before the anti-
     trust claims.
6    Second, ACE presented the testimony of Professor Menell, who essentially opined that
7    there was a clear dividing line between prosecution expenses and defense expenses.
     Third, Robert Rose also testified that HP's prosecution claims and Nu-kote's
8    counterclaims were separate. Fourth, Craig Aronson also testified that he could separate
     out expenses related to HP's prosecution claims. Implicit in each of these witnesses'
9    testimony is that certain prosecution related expenses are severable from the defense
10   expenses, and thus clearly unnecessary to the defense. That the three witnesses may not
     have used the terms necessary, unnecessary, reasonable or unreasonable to label expenses
11   does not mean that their testimony is inadequate to carry ACE's burden of proof. Their
     testimony provides circumstantial evidence from which a trier of fact *could* reasonably
12   infer, by a preponderance of evidence, that portions of HP's prosecution expenses were
     wholly unnecessary to its defense.
13
14   November 25, 2003 Order at 9-10 (emphasis added). The case was referred back to Special
15   Master to assess what expenses "would be conducted against liability by a reasonable insured
     under the circumstances." October 15, 2004 Order at 3.
16
         As an initial matter, the Special Master must determine who bears the burden of proof for
17   purposes of the remand hearing. The Court concurred with the Special Master's determination
18   that HP had proven by a preponderance of the evidence the existence and amount of its defense
19   costs, and therefore HP was (and is) entitled to a presumption that its defense costs, including the
20   expenses incurred in prosecution of its claims against Nu-kote, were reasonable and necessary as
21   defense costs." Under the applicable standard, the burden then switched to ACE to establish that
22   HP's expenses were unreasonable or unnecessary to the defense. In the November 2003 and
23   October 15, 2004 orders, the Court found that ACE had presented evidence from which a trier of
24   fact could determine that ACE had presented a preponderance of evidence that some of HP's
25   expenses were unnecessary to the defense of Nu-kote's counterclaims. The Court identified
26   four categories of evidence: (1) HP's "not inextricably related" statement; (2) Professor
27   Menell's testimony; (3) Robert Rose's testimony; and (4) Craig Aronson's testimony. The
28   November 25, 2003 order, however, did not state that ACE had met its burden of proving that

1   there actually was some dollar amount of HP defense expenses that was not necessary to the

2   defense.

3          During the remand hearing, ACE clearly made reference to and relies upon HP's "not

4   inextricably related" statement. ACE, however, did not rely upon and made no reference to the

5   testimony at the initial damages hearing of Professor Menell, Mr. Rose or Mr. Aronson. Instead,

6   ACE offered new and different testimony from Professor Menell and Mr. Aronson. Consistent

7   with the relevant law and ACE's decision to offer new and different evidence at the remand

8   hearing, HP is entitled to the presumption that is expenses were reasonably and necessary as

9   defense costs. The burden of proof for purposes of the remand hearing first rests with ACE. The

10  Special Master must determine whether ACE has presented a preponderance of evidence that

11  some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims, or more

12  specifically, whether ACE has presented a preponderance of evidence that some of HP's

13  expenses would not have been conducted against liability by a reasonable insured under the

    circumstances.

**II.     The Appropriate Legal Standard**

14         As noted above, the case was referred back to Special Master to assess what expenses

15  "would be conducted against liability by a reasonable insured under the circumstances." October

16  15, 2004 Order at 3. In doing so, the Court stated that the definition of "necessary" set forth in

17  the November 25, 2003 Order "requires determining not only whether prosecution expenses are

18  "reasonably related" to the defense, but also whether those "reasonably related" expenses are

19  likely to have been incurred by a reasonable insured under the same circumstances." *Id.* The

20  court further cited *Barratt* at 862 for the proposition that the inquiry into what a reasonable

21  insured would do to defend "necessarily involves a consideration of whether the benefits of the

22  strategy are worth the cost." *Id.* at 3-4.

23         ACE contends that the Court's definition has several elements: (1) an expense must be

24  "*conducted against liability*," i.e., the activity for the expense must be incurred for the purpose of

25  disproving the liability (the risk of a monetary award) sought to be imposed against the insured

26  in the underlying lawsuit - it is not enough that the expense relates to a strategic benefit or

27  advantage in the litigation (e.g., it is not enough that an expense was "defensive in nature,"

    "helpful," or "useful" in litigation); (2) the expense must be one that would be conducted against

28  liability by a party acting as a "reasonable insured" – ACE asserts that "the real question is what

-60-

1  financial responsibility should be imposed on an insurance carrier by virtue of an insurance

2  policy, not how litigation might or might not be conducted by a litigant without reference to

3  insurance coverage;"[6] and (3) the expense must be one that would have been conducted against

4  liability by a reasonable insured under all of the circumstances – the expense must reasonable

5  given its magnitude and the potential reduction in the insured's liability that might reasonably be

6  expected to result from it.

   HP contends that ACE's attempted parsing of the Court's statement of the standard has a

7  number of problems.

8     The Special Master carefully has reviewed the Court's November 2003 and October 2004

9  orders, the cases cited therein and the *KLA-Tencor* case, which was decided before the Court

10  issued the October 2004 order. This review compels the conclusion that ACE improperly is

11  attempting to both narrow the relevant standard and at the same add additional conditions to

12  standard that are not supported by the cases or the Court's prior orders.

13     As an initial matter ACE's erroneously asserts that strategy cannot be considered in

14  determining reasonable and necessary defense expenses. In *Aerojet*, established the three criteria

15  to establish which expenses must be reimbursed by an insurer:

16       First, the [expenditures] must be conducted within the temporal limits of the insurer's
        duty to defend, i.e., between tender of the defense and conclusion of the action. Second,
17       the [expenditures] must amount to a reasonable and necessary effort to avoid or at least
        minimize liability. Third and final, the . . . expenses must be reasonable and necessary
18       for that purpose.

19  *Aerojet*, 17 Cal. 4th at 60-61.

20     In *Barratt*, 102 Cal.App.4th at 859-860, the Court confirmed that an insurer has a duty to

21  pay defense costs "if the defense investigation and expenses are reasonable and necessary to

22  mount a defense in a pending lawsuit ... even if the insured obtains additional benefits from the

23  expenditures." The *Barratt* court nonetheless found that although Barratt's evidence may have

24  supported a general conclusion that it can be a reasonable trial strategy in construction defect

25  litigation to use repair information from other homes in a residential development to bolster

26  defense theories, the general conclusion "does not support a reasonable inference that in this case

27  it was reasonable and necessary to engage in this strategy by repairing every claimed defect in

28  _____
   [6] ACE asserts that an insured's contractual duties of good faith and fair dealing owed to its insurer, and the standard
   for imposing liability on the insurer, must take that relationship and those duties into account.

-61-

1  every Cortina nonplaintiff home and to spend $580,714.50 in doing so." *Id.* at 861. The *Barratt*

2  court, after noting that there was no evidence connecting the repair work to the plaintiffs' claims,

3  stated that:

4  > Second, it is not enough to produce evidence that repairs to nonplaintiff homes would be "helpful" or "useful" in litigation involving other homes in the residential

5  > development. It may always be said that a defendant would obtain some benefit from additional investigation that has some relationship to the subject of a lawsuit, but this fact

6  > is not enough to logically support the requisite finding that the investigation was reasonable and necessary for purposes of defending the existing suit. Instead, *a developer*

7  > *seeking reimbursement for repair costs to homes not the subject of a lawsuit must present*

8  > *evidence that a reasonable insured would have engaged in a similar defense strategy,*

9  > *which necessarily involves a consideration of whether the benefits of the strategy are*

10 > *worth the cost.* Without this weighing analysis, the fact that it may be helpful or useful to a defense to learn additional information does not - in and of itself - lead to an inference that a reasonable insured would have found the costs were reasonable and necessary to

11 > defend the lawsuit.

12 *Id.* at 861-862 (emphasis added). "While we have concluded that it is conceptually possible to

13 prove that in construction defect litigation a repair of a nonparty home can be a reasonable and

14 necessary expense to support defense theories in the filed lawsuit, there must be meaningful

15 proof establishing a connection between the particular repairs and the defense theory." *Id.* at

16 863.

17 In *KLA-Tencor Corp.*, 2004 WL 1737297 (N.D.Cal. 2004), the insured, KLA, argued

18 *inter alia* that a critical component its defense to disparagement counterclaims in *Therma-Wave*

19 *II* was its ability to prevail on its '055 Patent claims in *Therma-Wave I* by proving that the '055

20 Patent was valid and that it was infringed by Therma-Wave. *Id.* at 4. The court first stated that:

20 > Neither party disputes that bringing a successful claim for infringement of the '055 patent

21 > in *Therma-Wave I*, and winning damages pursuant to that claim, was one of KLA's objectives. But as *Barratt* makes clear, these costs are potentially recoverable even if they

22 > serve more than one objective. See *Barratt*, 102 Cal.App. 4th at 860. KLA asserts, essentially, that the best defense to the disparagement counterclaims was showing that the

23 > '055 patent was valid, and further that Therma-Wave's Opti-Probe products infringed

24 > that patent. *Considering KLA's potential for liability based on its internal investigation,*

25 > *this was not an unreasonable strategy.*

26 *KLA* at *4 (emphasis added). The court, citing to *Barratt*, also found that "KLA must present

27 evidence "that a reasonable insured would have engaged in a similar defense strategy, which

28 necessarily involves a consideration of whether the benefits of the strategy are worth the cost."

*Id.* at *7. With respect to KLA's '055 patent infringement claim, the court found KLA had

1    raised a triable issue of material fact as to whether the costs and fees directly associated with the

2    '055 patent infringement claim were reasonably and necessarily incurred to defend Therma-

3    Wave's counterclaims for disparagement in *Therma-Wave II*, and that KLA had raised a triable

4    issue of fact as to whether costs and fees incurred post-tender in *Therma-Wave I* relating to

5    KLA's claim for infringement of the '055 patent may also be deemed incurred in defense of

     Therma-Wave's disparagement claims in *Therma-Wave II*. *Id.* at 7.

6          Finally, Judge Ware's October 2004 Order provides that:

7          This court's definition is narrower than the Special Master's definition of what is

8          necessary to the defense because the Court's definition requires determining not only
           whether prosecution expenses are "reasonably related" to the defense, but also whether

9          those "reasonably related" expenses are likely to have been incurred by a reasonable
           insured under the same circumstances. In *Barratt*, the California Court of Appeal

10         clarified that the inquiry into what a reasonable insured would do to defend "necessarily

11         involves a consideration of whether the benefits of *the strategy* are worth the cost."

12   October 14, 2004 Order at 3-4 (emphasis added).

13         None of the relevant cases or prior orders by the Court suggests that in order to be

14   conducted against liability, the expense must be incurred for the purpose of disproving liability.

15   Similarly, ACE's statement that "it is not enough that the expense relates to a strategic benefit or

16   advantage in the litigation" does not accurately reflect the standard.   A strategy may be

17   considered in determining whether expenses were conducted against liability. The question

18   instead is whether there is evidence that a reasonable insured would have engaged in a similar

19   defense strategy, which necessarily involves a consideration of whether the benefits of the

     strategy are worth the cost. *Barratt* at 861-862.

20         Second, ACE offers no legal authority to support its assertion that "Judge Ware's

21   standard recognizes that the real question is what financial responsibility should be imposed on

22   an insurance carrier by virtue of an insurance policy, not how litigation might or might not be

23   conducted by a litigant without reference to insurance coverage." A review of the cases cited

24   and Judge Ware's order does not support this "element." The test instead focuses on the actions

25   of a reasonable insured. The Special Master declines to add ACE's "real question" to the legal

26   test to be applied in the remand hearing. Finally, ACE's assertion that Judge Ware's order

27   includes an element requiring separate consideration of "all the circumstances" is incorrect. The

28   test is whether the expenses "are likely to have been incurred by a reasonable insured under the

     same circumstances."

## III.   Evidence Issues and Evidence Objections

During the remand hearing, ACE submitted a motion in support of admitting into evidence motions and supporting documents for summary judgment motions #1, #2, #3, #4, #5, #6, #7, #9, #13 and #16 filed by HP in the Nu-kote action. ACE asserted that the motions papers would assist the Special Master in making his recommendation and that admission of the papers would create a complete record. In an order dated October 31, 2006, the Special Master agreed, and stated that a review of the motion papers identified by ACE would provide greater clarity with respect to the scope of Judge Ware's orders on the motions for summary judgment. The Special Master took judicial notice of the motion papers (and supporting documents) identified by ACE. The Special Master further indicated that with respect to any possible motion to augment that HP may consider based upon this ruling, the *only* additional documentation that the Special Master would consider would be Nu-kote's oppositions (and supporting documents) to the motions at issue. HP subsequently requested that the Special Master take judicial notice of the oppositions to the motions. No further briefing was required, but to the extent that HP or ACE believed that it may have been prejudiced by these rulings, the Special Master allowed both parties to submit a letter not to exceed 10 pages regarding the contents of the newly submitted papers. Neither party submitted a letter in response to the October 31, 2006 order.

ACE's motion *in limine* to exclude the testimony of Peter Sullivan was denied at the hearing, subject to ACE's continuing motion to strike the testimony. ACE renews its motion to strike the testimony of Mr. Sullivan in its closing brief. ACE's motion to strike the remand testimony of Peter Sullivan is DENIED.

HP's motion *in limine* to exclude ACE's expert testimony on cost benefit analysis was denied.

Prior to the hearing via a motion *in limine* and during the hearing, HP sought to exclude the testimony of ACE expert Craig Aronson. HP argued that Mr. Aronson's testimony should be disallowed because: (1) Mr. Aronson lacked the background and experience required to qualify him as an expert on any of the matters to which he wanted to testify; (2) Mr. Aronson's opinions were derived from invoice entry reviews and allocations that were not based on any proper or recognized methodology; (3) Mr. Aronson had not formulated and would not offer opinions on the remand issues of whether HP's prosecution efforts in the Nu-kote Action were "conducted

against liability" and whether a reasonable insured in HP's position would have done what HP did to defend itself; and (4) some of Mr. Aronson's proposed testimony had not been disclosed in his expert report as Rule 26 required, triggering the automatic mandatory exclusion of that portion of his testimony under Rule 37. The testimony was admitted at the hearing, subject to a continuing motion to strike. HP renewed its objections at the hearing when ACE asked Mr. Aronson to testify about purported billing allocations pertaining to Judge Ware's "conducted against liability" standard on remand. HP sought the exclusion of this testimony on the grounds that Mr. Aronson and ACE had not disclosed any intent to offer it in his expert report or even during two days of his deposition testimony. (RT. 482:9- 486:6.) This testimony was admitted subject to a continuing motion to strike.

In its closing brief, HP renews its motion to strike Mr. Aronson's testimony. The motion to strike Mr. Aronson's testimony is DENIED.

During the remand hearing, HP submitted to a motion to strike portions of the testimony of Mr. Ocampo and Mr. Aronson that was not disclosed in their expert reports, pursuant to Fed.R.Civ.P. 37(c)(1) and Fed.R.Civ.P. 26(a)(B). HP argued that federal law requires the exclusion from evidence of an expert's testimony where the expert did not completely disclose it in his 26 disclosure. The motion to strike portions of Mr. Aronson's testimony is DENIED.

Prior to the hearing and during the hearing, HP sought to exclude the testimony of Raymond Ocampo. The testimony was admitted at the hearing, subject to a continuing motion to strike. In its closing brief, HP renews its motion to strike Mr. Ocampo's testimony. The motion will be discussed below.

IV.    **Reasonable Insured in the Same Circumstances**

ACE contends that "a reasonable insured in the same circumstances would not expect the expenses of prosecuting affirmative patent or trademark infringement claims to be reimbursable." ACE asserts that a reasonable insured would not expect insurance benefits for expenses incurred to prosecute affirmative claims which only strategically benefited its defense to counterclaims.

A. Ocampo Testimony

At the remand hearing, ACE offered the testimony of Raymond Ocampo, who is a former General Counsel of Oracle Corporation. ACE offered Mr. Ocampo for the purpose of addressing what a reasonable insured would expect to be reasonable and necessary litigation activities in

1    defense of the Nu-kote counterclaims. ACE asked Mr. Ocampo to "step into the shoes of HP to

2    see what a reasonable insured would do in those circumstances [of the Nu-kote lawsuit]." (RT.

3    395:12-23.)

4        Prior to going to work for Oracle, Mr. Ocampo's trial experience involved working on

5    the defense of a few antitrust suits while an associate or contract lawyer for various firms. (RT.

     362:25-363:21, 366:14-367:13, 386:3-19.) In addition, he was also adjunct professor at Hastings

6    College of the Law, where he taught trial practice. (RT. 364:20-365:23). Oracle hired Mr.

7    Ocampo in 1986. His antitrust and complex litigation experience was factors in the decision to

8    hire him. (RT. 369:5-18).

9        Mr. Ocampo supervised 100 lawyers while heading Oracle's General Counsel office.

10   (RT. 374:16-20.) Mr. Ocampo was the primary person responsible for overseeing and directing

11   litigation or litigation events at the company, and was the primary person involved in directing

12   litigation. (RT. 377:10-15; 379:10--380:7.) Although Mr. Ocampo testified that he supervised

13   outside counsel in "two or three" cases involving the defense of trademark claims against Oracle

14   (RT. 388:10-24.), he did not testify about the nature or extent of this supervision.

15       Intellectual property issues were involved in all the cases in which Mr. Ocampo was

16   involved at Oracle. (Id.) While Mr. Ocampo was at Oracle, Oracle threatened lawsuits and were

     threatened with lawsuits. While antitrust suits were considered, Mr. Ocampo did not recall if

17   Oracle had filed any such actions while he was at Oracle. (RT. 379:15-380:7.) No antitrust

18   claims were asserted against Oracle while Mr. Ocampo was employed by Oracle, (RT. 382:24-

19   383:5.) As such, Mr. Ocampo never supervised the defense of a antitrust suit while at Oracle.

20   (RT. 384:19-385:1.)

21       When Oracle was sued and the policy covered it, Oracle would consider whether or not

22   insurance would play a role in terms of reimbursing the company for expenses. (RT. 377:23-

23   378:3.) Mr. Ocampo considered the applicability of insurance when faced with intellectual

24   property litigation. (RT. 382:14-19.) Oracle's senior management expected Mr. Ocampo to

     consider the applicability of insurance when faced with litigation. (RT. 382:20-23.) Mr. Ocampo

25   testified that he has been a "consumer of insurance" (RT. 367:25-368:3), and to some

26   involvement in "asbestos litigation" and "legal malpractice insurance." (RT. 367:18-24.) Mr.

27   Ocampo did not profess to be an insurance coverage expert. (RT. 430:17-431:13.) Mr. Ocampo

28   did have occasion to strategize with an insurance carrier or counsel hired by the carrier in

1  intellectual property cases, in order to negotiate what was covered and what was not covered.
2  (RT. 383:18-394:5.)  Oracle would negotiate with the insurance carrier how to proceed so it
3  could use its in-house counsel and get compensated under the policy. *Id.*

4      Mr. Ocampo testified that HP, like other technology companies, protects its intellectual
5  property rights. (RT. 397:10-16.)  He understood, as was commonly known in the industry, that
6  HP's inkjet cartridge market was a "cash cow" for HP. (RT. 396:17-397:9.)  Mr. Ocampo,
7  relying in part on the testimony of Jack Brigham (HP's General Counsel at the time the Nu-kote
8  case was litigated) that HP's affirmative intellectual property claims had independent value
9  separate and apart from the defense of the Nu-kote counterclaims, stated that HP's affirmative
   case had independent value apart from the defensive nature claimed by HP. (RT. 401:10-23.)

10     On the issue of what a reasonable insured in HP's circumstance would do, and expect,
11 Mr. Ocampo testified that it was his opinion that:  (1)  HP would have prosecuted its affirmative
12 intellectual property claims whether or not antitrust counterclaims were filed and independent of
13 whether it would receive any insurance reimbursement; (2) HP had no reasonable expectation of
14 insurance reimbursement when it prosecuted the case; and (3) the continued prosecution of HP's
15 intellectual property claims was not undertaken solely for defensive purposes (or that it was a
16 beneficial strategy). (RT. 409:11-23; 409:24-410:6; 410:17-411:3.)  Mr. Ocampo's opinions are
17 based on the enormous profits – revenue and high margins – generated by HP's inkjet print
   cartridge product lines. (RT. 409:11-23.)

18     According to Mr. Ocampo, a reasonable insured would not expect reimbursement for
19 prosecuting its affirmative claims, even if prosecuting the affirmative claim put the insured in a
20 favorable light with the jury. (RT. 411:4-412:6.) Mr. Ocampo testified that it would have been
21 unreasonable for HP to receive funding for prosecution of its business interests in the intellectual
22 property claims. (RT. 431:12-21.) Mr. Ocampo testified that if some strategic value to the
23 defense of the case is the standard to determine insurance coverage for prosecution expenses,
24 "reasonable" is taken out of the standard and the insured is given a blank check to decide what is
25 covered. (RT. 411:4-19, 453:7-18.) Mr. Ocampo testified that:

26      I think you can fathom an argument for any strategy, whether it's prosecuting an
        affirmative claim or something else, a white hat strategy.  You can  always argue that it's
27      beneficial. And you might, if you were sitting in my position, decide, yeah, I'm going to
        take -- undertake that strategy.  But that doesn't mean a reasonable insured should expect
28      to receive reimbursement for it. And I would not have expected it as a general counsel of
        Oracle.

(RT. 411:20–412:6.)

On cross-examination, HP elicited the following testimony from Mr. Ocampo: (1) Mr. Ocampo admitted that he did not read *Aerojet* or *Barratt,* and the cases played no part in his opinions (RT. 427:1–428:14.); (2) his testimony addressed his view of what a reasonable insured would do under the circumstances of the Nu-kote case (RT. 436:14–17.); (3) he did not quantify legal expenses or do an allocation between necessary and unnecessary expenses; (4) Mr. Ocampo interpreted the Court's remand orders remand to provide that "HP could recover expenses only if a reasonable insured would have prosecuted the affirmative intellectual property claims of HP in defense of the liability of the Nu-kote counterclaims" (RT. 395:7-11.); (5) he admitted that in litigation there are instances "where you could conduct prosecution efforts that would amount to a defense of the counterclaims, in the areas where there is an overlap in the issues (RT. 442:5-7.); (6) he testified that none of HP's strategies for defending itself in the Nu-kote action were unreasonable. (RT. 449:3-451:12.); (7) it was reasonable for HP to try to portray itself "in a favorable light in order to defend against the counterclaims that Nu-kote presented." (RT. 436:18-438:5); (8) HP's "successful prosecution of [its] affirmative claims would have a favorable effect on the defense of the antitrust claims." (RT. 439:1-8.); (9) he "[did] not believe that [HP] did anything from a litigation standpoint that was necessarily unreasonable in prosecuting its claims . . . even from a defense standpoint" (RT. 445:15-20.); (10) he admitted that he had not "come up with a specific conclusion" as to whether any of the litigation strategies used by HP "were either unreasonable or reasonable in the exercise of good judgment" (RT. 450:16-18.); and (11) there was "nothing [he could] testify about as to any particular strategy that was unreasonable under the circumstances of the Nu-kote case in defending it as HP did." (RT. 450:21-453:2).

### B.  *HP's Motion to Exclude Mr. Ocampo's Testimony*

Before the hearing, HP moved *in limine* to exclude Mr. Ocampo's testimony on the grounds that he was not qualified as an expert witness on any subject for which ACE offered him. HP further objected to Mr. Ocampo's testimony at the hearing. (RT. 384:17-390:5.) The Special Master permitted him to testify, subject to HP's continuing motion to strike. (RT. 393:25-394:8.)

1    HP's closing brief renews its motion to strike Mr. Ocampo's testimony. HP contends that
2    ACE did not qualify Mr. Ocampo as expert witness. HP asserts that: (1) Mr. Ocampo lacked the
3    background, training and experience to qualify as an expert; (2) even if Mr. Ocampo had testified
4    as represented by ACE, his "expert" testimony would be subjective and hypothetical because it
5    could not be based on any training or experience; (3) Mr. Ocampo did not testify that his
6    opinions were derived from an objective methodology; and (4) Mr. Ocampo's opinions are
     derived from subjective "thought experiments" and are not expert opinions.
7        ACE contends that Mr. Ocampo has the necessary experience and background to qualify
8    as an expert witness. ACE asserts that: (1) *Daubert* and *Kuhmo Tire* are not applicable, and that
9    HP's argument ignores Mr. Ocampo's relevant background, experience, and preparation
10   undertaken prior to rendering his opinion testimony; (2) Mr. Ocampo is eminently and, in this
11   case, uniquely qualified to testify on the issue of what a reasonable insured would do under
12   circumstances faced by HP in the Nu-kote action; (3) he is testifying based on his personal
13   knowledge and experience as General Counsel of Oracle Corporation, not based on scientific
14   methodology; (4) Mr. Ocampo is "remarkably" well qualified to provide testimony to assist the
15   trier of fact in understanding the issues to be tried in light of the District Court's remand order;
16   (5) as a result of his experience and background, Mr. Ocampo is the only witness qualified to
17   answer the question of what a reasonable insured would have done under the circumstances HP
18   faced in the Nu-kote action; and (6) Mr. Ocampo provided relevant testimony based on his
     knowledge and experience as in-house counsel of a company similar to HP.
19       Federal Rule of Evidence 702 provides that:
20       If scientific, technical, or other specialized knowledge will assist the trier of fact to
         understand the evidence or to determine a fact in issue, a witness qualified as an expert
21       by knowledge, skill, experience, training, or education, may testify thereto in the form of
         an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the
22       testimony is the product of reliable principles and methods, and (3) the witness has
         applied the principles and methods reliably to the facts of the case.
23
24       In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme
25   Court made clear that district courts must exercise a "gatekeeping" function with respect to
26   scientific expert evidence in order to determine whether such evidence is admissible under Fed.
27   R. Evid. 702. The Court suggested several factors that might be considered in determining
28   whether such evidence is sufficiently reliable to be admitted, including whether or not the

1  scientific technique or knowledge had been tested, whether or not the theory or technique had

2  been subjected to peer review or publication and whether there was a known rate of error. In

3  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court made clear that this

4  "gatekeeper" function extends to all expert evidence, not just scientific expert evidence. The

5  Court noted that the *Daubert* factors would not necessarily apply to all types of expert evidence,

6  and stated that the district court should be flexible in applying an appropriate inquiry into the

   reliability of the proffered expert evidence depending upon the facts of the particular case.

7       While the Special Master was genuinely impressed with Mr. Ocampo as an individual,

8  Mr. Ocampo lacked the knowledge, background and experience necessary to qualify as an expert

9  witness on the issue for which he was offered. HP, the insured in question, initiated the Nu-kote

10  action, asserting patent infringement, trademark infringement and false advertising claims

11  against Nu-kote. In response to the complaint, Nu-kote asserted antitrust and other

12  counterclaims, which it is fair to say were very broad in scope. Mr. Ocampo did not testify with

13  respect to any experience related to seeking insurance coverage under a policy similar to the

14  ACE policy under circumstances similar to the Nu-kote action. Based upon his testimony, Mr.

15  Ocampo had no experience in circumstances similar to those presented in the Nu-kote action,

16  i.e., attempting to obtain insurance coverage in connection with the defense of antitrust claim

17  that also involved competing intellectual property issues. Mr. Ocampo's subjective opinions

18  based on his personal experiences which did not include cases or situations like those faced by

19  HP in the Nu-kote action are not pertinent to the issue at hand. Accordingly, HP's motion to

20  strike Mr. Ocampo's testimony is GRANTED.[7] In the event that the Court disagrees with the

21  Special Master's ruling regarding the admissibility of Mr. Ocampo's testimony, in the next

    section of this report, the Special Master will address the merits of Mr. Ocampo's testimony.

22               C.  Mr. Ocampo's Reasonable Insured Testimony

23       HP contends that Mr. Ocampo's opinion testimony about HP's motives for asserting its

24  intellectual property rights are not relevant to the "conducted against liability" issue. HP asserts

25  that Mr. Ocampo's testimony essentially was that if an insured like HP has mixed motives for a

26  litigation strategy or tactic and one or more of those motives are unrelated to its defense, an

27  insurer like ACE should not have to reimburse the insured for the fees and costs incurred in

28

---

[7] While the Special Master would have denied HP's motion to strike Mr. Ocampo's testimony "that was not fully disclosed in his expert report," in light of the above ruling, the motion is MOOT.

1   pursuing that strategy or tactic.  HP contends that the law is the just the opposite – HP's

2   subjective motives are not relevant to the standard at issue.

3          HP further argues that the *Aerojet/Barrett* criteria also do not require the Special Master

4   to decide whether a reasonable insured would have expected to be reimbursed by its insurer for

5   its affirmative tactics – the cases only require him to decide what a reasonable insured in HP's

6   position would have done to defend itself under the same circumstances and in light of the

7   relative costs and benefits.  HP asserts that any reasonable insured in HP's position and

8   unwilling to abandon a substantial amount of its business to an antitrust plaintiff seeking a large

9   reduction in HP's market share would have defended its interests as HP did.  HP contends that

10  the "reasonable expectations doctrine" has no application to the "conducted against liability"

11  analysis.  HP asserts that the doctrine comes into play only when the language of an insurance

12  policy relevant to a particular question of coverage is ambiguous, and then the court protects the

13  "objectively reasonable expectations" of the insured by interpreting the provision in the sense

14  that the insurer reasonably must have believed the insured understood it at the time the policy

15  was issued.  HP asserts that as there is no ambiguous policy language to construe here, there is

16  no basis for applying the reasonable expectations doctrine in this case, and even if there were

17  some basis for applying it here, the doctrine requires a court to resolve the ambiguity in favor of

18  the insured by extending coverage to the insured.   HP notes that Mr. Ocampo did not testify

19  about the meaning of any provision of ACE's policy.  HP asserts that while ACE apparently

20  wants the Special Master to apply the "reasonable expectations doctrine" to determine whether

21  any HP litigation and trial strategies and tactics were not "conducted against liability" from the

22  standpoint of a reasonable insured under the same circumstances, there is no legal basis for the

23  Special Master to do so.  HP further asserts that Mr. Ocampo finally opined that HP's

24  "conducted against liability" defense was reasonable.

25         ACE contends that Mr. Ocampo's testimony responds to Judge Ware's standard requiring

26  analysis of what a reasonable insured would do under circumstances faced by HP.  ACE asserts

27  that neither *Barratt* nor *Aerojet* preclude evidence regarding the insured's motivation when

28  analyzing whether prosecution expenses were "conducted against liability."  ACE asserts that

    "the purported preclusion of motive or subjective intent in *Aerojet* and *Barratt* does not involve

    prosecution expenses incurred in litigation."  ACE asserts that HP's motivation in initiating the

    action by filing its intellectual property lawsuit is relevant and probative of the applicable

standard. ACE asserts that if HP's sole motivation in prosecuting its action, both before and after the filing of the antitrust counterclaim, was to protect its intellectual property rights, the fact that the prosecution may have had some strategic benefit to the defense of the cross-complaint is of no moment. ACE asserts that "by failing to consider HP's motivation, and blindly accepting its "beneficial strategy" argument, "you take the reasonable out of the standard and you really give the insured a blank check." (RT. 422:4-19). ACE further asserts that HP's motivation is an inherent factor of any cost-benefit analysis required by the "conducted against liability" standard. ACE asserts that in order to determine the benefit provided by litigation activity, HP's motivation must be analyzed. ACE asserts that while HP has downplayed the value of prosecuting the affirmative claims in the Nu-kote litigation, suggesting that the only value of such effort was to defend against the antitrust counterclaim, "if that were the case, then it would be difficult to justify conducting Phase I except if the benefits to such litigation in terms of defense outweighed the costs." ACE asserts that "because HP derived substantial benefits unrelated to the insurance defense by pursuing the Phase I litigation: HP's primary motivation was to protect its intellectual property rights and dissuade competitors."

The case was referred back to Special Master to assess which of HP's expenses "would be conducted against liability by a reasonable insured under the circumstances." A review of the cases and the Court's orders reveals that an answer to this question compels the review of the following issues: (1) whether the conduct/strategy/expenses amount to a reasonable and necessary effort to avoid or at least minimize liability; (2) whether the expenses incurred pursuant to the conduct/strategy are reasonable and necessary to avoid or minimize liability – a connection between the expenses and conduct/strategy; (3) the benefits of the strategy or conduct; and (4) the cost of the strategy or conduct or that purpose. From these facts, the Special Master may determine whether a reasonable insured would have engaged in a similar defense strategy, i.e., whether HP's reasonably related prosecution expenses are likely to have been incurred by a reasonable insured under the same circumstances. See Aerojet at 6-61; Barratt at 861-862; and October 14, 2004 Order at 3-4.

The pertinent portion of Mr. Ocampo's testimony was that: (1) HP would have prosecuted its affirmative intellectual property claims whether or not antitrust counterclaims were filed and independent of any insurance reimbursement; (2) HP had no reasonable expectation of insurance reimbursement when it prosecuted its affirmative intellectual property

-72-

1   claims; and (3) the continued prosecution of HP's intellectual property claims was not

2   undertaken for defensive purposes. (RT. 409:11-23; 409:24-410:6; 410:17-411:3).

3       None of Mr. Ocampo's opinions are relevant to the issue to be resolved by the Special

4   Master. Mr. Ocampo's opinion regarding the importance of HP's affirmative claims to HP

5   irrespective of the Nu-kote counterclaims goes to HP's motive. HP's motivations, however, are

6   not relevant to the test. In *Aerojet*, the Court stated:

7       Whether the insured's site investigation amounts to a reasonable and necessary
        effort to avoid or at least minimize liability must also be assessed under an objective
8       standard…[w]hat matters here is whether the site investigation would be conducted
        against liability by a reasonable insured under the same circumstances.

9       Were it not, the question would require a discernment of motive. Why is the
10      insured conducting the site investigation at issue? to resist liability? for that reason and
        some other? for a reason altogether different? Motive, however, is hard … to discern.
11      That is true … as to an individual: a person's mind and heart typically reveal themselves
        and conceal themselves at one and the same time. It is truer still … as to a group of
12      individuals: many minds and hearts are then involved, and they cannot simply be added
        up. And, of course, it is truest … as to a corporation or similar entity - like the typical
13      commercial or governmental insured: the mind and heart of such a one is purely fictive.

14

15  *Id.* at 62-63 (internal citations and quotations omitted).   Which respect to the dual purposes for

16  expenses, the Court stated that:

17      For instance, the insured's site investigation expenses for identifying the
        hazardous substance discharged may be "response costs" insofar as they promote
18      removal and remediation, by enabling it to determine how to neutralize the substance in
        question. They may also be defense costs insofar as they are reasonable and necessary to
19      avoid or at least minimize liability, by making it possible for it to show that it was not in
        fact the source of the discharge. Any assumption that site investigation expenses cannot
20      do double duty is unsupported and hence must be rejected. So too any similar assumption
        about the site investigation itself. If site investigation expenses must be incurred by the
21      insurer in fulfilling its duty to defend the insured, they must be incurred. The insurer
        gives, and the insured gets, what they bargained for. Even if the insured may happen to
22      derive some added benefit, the insurer does not shoulder any added burden. The insurer
        may not be heard to complain.
23

24  *Id.* at 65-66 (emphasis added). In *Larkin v. ITT Hartford*, 1999 WL 459351 (N.D.Cal. 1999), the
25  court stated that:

26      The Court recognizes that some of the actions taken by plaintiffs' counsel in
27      *Larkin* may also have been reasonable and necessary to the defense of the *Navone* action,
        and plaintiffs may not have duplicated such actions in *Navone* precisely because they had
28      already been performed in connection with *Larkin*. In these circumstances, such actions

-73-

1    and the expenses associated with them may properly be characterized as Navone defense
2    costs--provided they are performed during the temporal limits of the duty to defend--and
     the fact that they did "double duty" in both suits does not prevent such characterization.
3    *See Aerojet*, 17 Cal.4th at 63.

4    *Larkin* at \*7.  In *Barratt,* the court stated that:

5         To the contrary, in reaching its conclusion, *Foster-Gardner* expressly reaffirmed
     *Aerojet-General's* holding that an insurer has a duty to pay defense costs if the costs are
6    incurred between tender and settlement of a lawsuit, and if the defense investigation and
     expenses are reasonable and necessary to mount a defense in a pending lawsuit. (*Foster-*
7    *Gardner*, supra, 18 Cal.4th at 886.) Under *Aerojet-General*, a liability insurer must bear
8    these defense costs even if the insured obtains additional benefits from the expenditures,
     and even if the same costs could potentially be characterized as an indemnification cost in
9    a different context. (*Aerojet-General*, supra, 17 Cal.4th at 65-66.)

10        ...
          As applied here, these principles mean that the costs incurred by Barratt are
11   potentially recoverable even though they may serve more than one objective. If Barratt's
     expenditures qualify as defense costs in the Cortina action, they do not lose that status
12   merely because the costs are not independently recoverable based on the nonplaintiff
13   property damage claims. Under *Aerojet-General* and *Foster-Gardner*, the critical issue is
     whether the costs were reasonably and necessarily incurred in defense of an existing
14   lawsuit. If the investigation costs satisfy this test, they are recoverable even if the
     payments of these costs benefited a third party who did not file suit against the insured.
15
16   *Barratt* at 859-860.   Finally, in *KLA-Tencor*, the court first stated that:

17   Neither party disputes that bringing a successful claim for infringement of the '055 patent
     in *Therma-Wave I*, and winning damages pursuant to that claim, was one of KLA's
18   objectives. But as *Barratt* makes clear, these costs are potentially recoverable even if they
19   serve more than one objective. See *Barratt*, 102 Cal.App. 4th at 860. KLA asserts,
     essentially, that the best defense to the disparagement counterclaims was showing that the
20   '055 patent was valid, and further that Therma-Wave's Opti-Probe products infringed
     that patent. Considering KLA's potential for liability based on its internal investigation,
21   this was not an unreasonable strategy.

22   *KLA* at \*4.

23        In sum, while the Special Master understands ACE's desire to focus upon the
24   value/importance of HP's affirmative claims against Nu-kote to HP's "cash cow," HP's motives
25   are not pertinent to issue to be resolved by the Special Master.  Moreover, and to ACE's
26   detriment, the testimony at both the damages hearing and the remand hearing was that while the
27   affirmative claims had substantial value to HP, by 1998, the affirmative claims were equally if
     not more important to HP as a means to defeat Nu-kote's counterclaims.  By 1998, Nu-kote's
28   financial situation deteriorated significantly.  HP made substantial efforts to settle the case,

                                      -74-

1    offering dismissal of the claims against Nu-kote, millions of dollars in cash, license rights and an

2    arrangement under which HP would make cartridges for Nu-kote below the cost Nu-kote could

3    get them elsewhere.  In mid-1998, HP and Nu-kote's CEO negotiated a settlement agreement.

4    However, Ron Katz, Nu-kote's counsel, persuaded the board of directors to reject the proposed

5    settlement based upon his belief that hundreds of millions of dollars could be obtained from HP

     in the lawsuit. (HT 651:1-19.)  In November 1998, Nu-kote filed a Chapter 11 bankruptcy

6    petition and immediately sought relief from the automatic stay to continue its case against HP.

7    HP (and Nu-kote's insurers who were funding its litigation against HP) opposed lifting the stay.

8    The bankruptcy judge, however, granted Nu-kote's motion and permitted the case against HP to

9    continue.  Thus, by late 1998, HP's hopes for damages award were subsumed to HP's desire to

10   defeat Nu-kote's counterclaims.  With respect to HP's claims for injunctive relief, the testimony

11   at the hearings was that by the time of trial, the vast majority of Nu-kote's infringing products

12   had been replaced.  In short, the record at hearings compels the conclusion that not only is Mr.

13   Ocampo's "motives" testimony irrelevant, it is contrary to the facts.  To the extent that Mr.

14   Ocampo's testimony on this point is entitled to any weight, it was substantially outweighed by

     the testimony from HP's counsel and HP's experts.

15         Mr. Ocampo also testified that HP had no reasonable expectation of insurance

16   reimbursement when it prosecuted its affirmative intellectual property claims.  ACE has

17   completely failed to establish the relevance of HP's reasonable expectations of insurance

18   coverage/reimbursement.  As an initial matter, the fact that HP initiated the lawsuit with

19   affirmative claims is irrelevant.  Nu-kote responded to the lawsuit with counterclaims.  Mr.

20   Ocampo did not testify about the policy provisions, and did not review the relevant cases.  Mr.

21   Ocampo did not testify to whether HP should have expected its insurance company to provide a

22   defense to the counterclaims.  The Court has found on numerous occasions that ACE did have a

23   duty to defend the counterclaim.  The duty necessarily extends to all the counterclaims, and

24   under the relevant law, can extend to prosecution expenses under certain circumstances.  Mr.

     Ocampo's reasonable expectations testimony is irrelevant to the issues to be decided.

25         Mr. Ocampo further testified that the continued prosecution of HP's intellectual property

26   claims was not undertaken for defensive purposes.  (RT. 409:11-23; 409:24-410:6; 410:17-

27   411:3).  Here, assuming that Mr. Ocampo is talking about the prosecution of HP's affirmative

28   claims after tender of the Nu-kote counterclaims to ACE, Mr. Ocampo's testimony is at odds

1  with the testimony of Professor Menell, who opines that the prosecution of HP's affirmative

2  claims was defensive to portions of Nu-kote's counterclaims before and after Phase I of the trial.

3  To the extent that Mr. Ocampo is taking the position that irrespective of the fact that HP's claims

4  were technically defensive to a number of the Nu-kote counterclaims, HP's affirmative claims

5  were not actually pursued for that reason, the testimony at the damages and remand hearings is to

6  the contrary. In brief, the weight of the evidence at the hearing was that in the post-tender

7  period, HP's continued prosecution of HP's intellectual property claims was undertaken for

   defensive purposes.

8       Finally, and as argued by HP, Mr. Ocampo's testimony buttresses HP's position that

9  HP's conduct was not unreasonable. While Mr. Ocampo was offered to show the

10 unreasonableness of HP's conduct/strategy in the Nu-kote case, Mr. Ocampo did not identify any

11 conduct/strategy or expenses that he found to be unreasonable or unnecessary. Mr. Ocampo did

12 not review HP's bills. On cross-examination, Mr. Ocampo admitted that in litigation there are

13 instances "where you could conduct prosecution efforts that would amount to a defense of the

14 counterclaims." (RT. 442:5-7.) He also admitted that HP's dual motives for prosecuting its

15 claims did not mean that HP's "pursuit of intellectual property rights as a defense mechanism in

16 the Nu-kote case" was inappropriate. (RT. 447:18-449:2.) He also admitted that not one of HP's

17 strategies for defending itself in the Nu-kote Action was unreasonable. (RT. 449:3-451:12.)

18 Mr. Ocampo agreed that it was reasonable for HP to try to portray itself "in a favorable light in

19 order to defend against the counterclaims that Nu-kote presented." (RT. 436:18-438:5.) He

20 admitted that HP's "successful prosecution of [its] affirmative claims would have a favorable

21 effect on the defense of the antitrust claims." (RT. 439:1-8.) Mr. Ocampo testified that he "[did]

22 not believe that [HP] did anything from a litigation standpoint that was necessarily unreasonable

   in prosecuting its claims . . . even from a defense standpoint." (RT. 445:15-20.)

23      In sum, Mr. Ocampo's testimony does not support ACE's position that portions of the

24 fees and costs sought by HP were not conducted against liability by a reasonable insured under

25 the circumstances. Even if it did support ACE's position, Mr. Ocampo's testimony is entitled to

26 little or no weight, and was substantially outweighed by the testimony offered by HP at the

27 damages and remand hearings, including the testimony of Mr. Blecher on the issue of what a

   reasonable insured would have do under the circumstances faced by HP.

28 //

//

## V.    ACE's Argument that HP's Affirmative Claims Tried During Phase I of the Trial Were Not "Conducted Against Liability"

ACE next contends that Hewlett-Packard's affirmative claims tried during Phase I of the trial were not conducted against any liability and thus are non-reimbursable to HP.   In reliance upon Professor Menell's testimony, ACE asserts that the underlying Nu-kote case was litigated in such a way that as of May 7, 1999, the affirmative case was not conducted by HP against any liability it faced by virtue of Nu-kote's counterclaims.  This assertion is based upon three arguments:  (1) HP moved successfully for summary judgments which eliminated the majority of Nu-kote's counterclaims, which eliminated any possible overlap between proof of HP's claims and their utility as a defense against Nu-kote's counterclaims; (2) HP argued that Nu-kote's state law claims had no place in the trial and Judge Ware severed them from the trial; and (3) HP contended that the remaining antitrust counterclaims were not "inextricably intertwined" with its case against Nu-kote and convinced Judge Ware to allow HP to try its patent and trademark infringement claims in a separate Phase I trial.

### A.  "Inextricably Intertwined"

ACE asserts that as the Nu-kote case approached trial, HP moved to eliminate Nu-kote's overlapping claims, and to phase the HP claims for an earlier and separate trial.   As is discussed in section C below, ACE believes that the Court had winnowed down Nu-kote's counterclaims down such that HP's affirmative claims were no longer conducted against any liability posed by any of the Nu-kote counterclaims.  ACE then makes the following argument:

> After Judge Ware's rulings completely eliminated any possible overlap between proof of HP's claims and their utility as a defense against the Nu-kote counterclaims, HP went right ahead and asked Judge Ware to set these claims for trial separately and independently from its defense of the Nu-kote counterclaims.
>
> HP requested that it be permitted to try its patent infringement, trademark infringement, false advertising case in a separate, first phase of the trial, and before Nu-kote would be allowed to try any of its case against HP.  HP told Judge Ware that the claims and counterclaims were not "inextricably intertwined," but were indeed completely separate.  Based on HP's request, Judge Ware divided the case into two phases and ordered that HP affirmative claims be tried separately and first in a Phase I trial.
>
> The elimination of the counterclaims by Judge Ware and his separation of the case into separate and independent phases confirmed that the fees and expenses attributable to the Phase I trial were not conducted against any Nu-kote liability, and therefore are not reimbursable.

-77-

(ACE Opening Post-Remand Hearing Brief at 27; *see also* id at 16.)

ACE's argument with respect to the phasing order and statements made by counsel for HP in the Nu-kote action does not accurately reflect what occurred in the Nu-kote trial vis-à-vis HP's efforts to have its affirmative claims heard first by the jury. While the Special Master sincerely doubts the initial report and recommendation by the Special Master confused ACE with respect to the actual events in the Nu-kote action, the initial report and recommendation did include a misstatement of the record. Therein, the Special Master noted that:

> In support of its argument to phase the trial and stay Nu-kote's counterclaim in the underlying matter, HP stated that: "the vast majority of Nu-kote's anti-trust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case." (Exhibit 2142; HT 2349:21-24.). HP prevailed on its phasing motion, and the court allowed HP's affirmative trademark infringement, false advertising, and patent infringement cases to proceed first.

Unfortunately, this statement by the Special Master did not accurately reflect the record. More unfortunately, Judge Ware, in his November 25, 2003 Order, appears to have relied upon this passage of the Special Master's initial report, at least in part, as follows:

> In this case, a trier of fact could reasonably conclude that ACE presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims. First, there is evidence from HP itself. During the underling lawsuit between HP and Nu-kote, HP argued before this Court that "the vast majority of Nu-kote's anti-trust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case." HP prevailed on this argument and this Court allowed HP's affirmative claims to proceed before the anti-trust claims.

November 25, 2003 Order at 9-10.

In reality, HP's "inextricably intertwined" statement was made in 1996, more than two years prior the actual phasing of the trial in 1999. In late 1996, HP filed a renewed motion for separate later trials of Nu-kote's antitrust-based claims and damages and for stay of related discovery. In their reply to the motion, HP stated in a heading that "the vast majority of Nu-kote's antitrust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case." (Ex. 2142; Damages Hearing Transcript ("HT"), 2349:21-24.) Immediately after making this statement, HP asserted that:

> ***While resolution of the patent validity and fraud issues as well as the false advertising claims may obviate trial on certain of Nu-kote's antitrust allegations and counterclaims,*** determination as to (i) whether certain prior art renders the patents-in-suit

-78-

obvious, (ii) whether HP withheld relevant and non-cumulative prior art with the specific
intent of defrauding the Patent Office, (iii) whether Nu-kote's product packaging and use
of HP's trademarks and the trade name are likely to cause consumers to mistakenly
believe that Nu-kote's inkjet products are HP product or are licensed or sponsored by,
otherwise affiliated with HP, or (iv) whether Nu-kote's packaging falsely states that its
inkjet products are 'equivalent' to specific number of genuine new HP inkjet cartridges
are plainly *not* inextricably related to, and intertwined with the vast majority of facts
underlying Nu-kote's antitrust allegations …

(Ex. 2142 at 6-7 (emphasis added).)

The next section of HP's 1996 reply brief is entitled "Separating the Patent/Unfair
Competition and Antitrust Issues In This Case Will Simplify the Issues In Any Subsequent
Antitrust Trial." (*Id.* at 8.) HP then made the following argument, which is highly pertinent to
the present proceeding:

Although the vast majority of Nu-kote's antitrust allegations are not intermingled
with, and dependent on, facts underlying the issues of patent infringement, validity,
unenforceability on the basis of fraud before the Patent Office, trademark infringement
and false advertising/unfair competition, *several of the allegations underlying Nu-kote's
antitrust counterclaims do involve issues and proofs that are directly related to
underlying, dispositive patent and trademark infringement/unfair competition issues.*
For example, Nu-kote alleges that HP intentionally instituted this "*sham
litigation*" in a "surprise attack" effort and as part of a global conspiracy with other
printer manufacturers to coordinate sham legal actions to "unfairly reduce or eliminate
competition in the aftermarkets for Hewlett-Packard ink jet resupply cartridges and refill
kits." (*See* Nu-kote's Amended Answer ¶¶ 68-70, 78-79, 82, 84.) However, if HP
prevails on its claims of trademark and patent infringement, then a separate trial based on
Nu-kote's claims based on its assertions that HP has instituted objectively baseless (i.e.,
sham) lawsuit, whether or not as part of a conspiracy with others, is necessarily obviated.
Thus separation would streamline the case.
Further, if HP prevails at a first trial on the patent validity and infringement
issues, Nu-kote's patent-type antitrust defense of fraudulent procurement and
enforcement of patents known to be invalid or noninfringed is rendered moot and a
second trial on that defense is completely unnecessary …
If, on the other hand, Nu-kote succeeds at a first trial in proving that HP's asserted
patents are invalid or not infringed, a second trial on HP's assertion of known
fraudulently procured, invalid or noninfringed patents would be significantly simplified
and streamlined since patent invalidity and/or noninfringement would be "law of the
case" and Nu-kote need not again prove those same issues at the later trial. . . .
Finally, separation will also obviate consideration of certain of Nu-kote's
predatory conduct allegations in a later antitrust trial. For example, if HP's public
statements concerning Nu-kote's inkjet refill kits or refilling in general are true, then
these false advertising/unfair competition allegations cannot constitute evidence of
anticompetitive or monopolistic behavior. If, however, Nu-kote wins on these claims,
then there would be no need to retry them at a later antitrust trial.

1   (*Id.* at 8-0 (emphasis added) (footnote omitted).)

2       Accordingly, while HP argued that the "vast majority" of Nu-kote's anti-trust allegations

3   were not inextricably related to the patent, trademark and false advertising, unfair competition

4   issues in this case," HP also argued that several of the allegations in Nu-kote's counterclaims

5   *did* involve issues and proofs that were directly related to underlying, dispositive patent and

6   trademark infringement/unfair competition issues.[8] The evidence presented during both the

7   damages hearing and the remand hearing confirms that HP moved to bifurcate the trial between

8   the intellectual property and antitrust issues, not because they were "separate," but rather HP

9   sought two separate trials because that would avoid unnecessary antitrust discovery and simplify

10  the case, allowing the jury to focus on HP's strong points first in an initial trial (innovator and

11  that HP's wore the "white hat") – at a time when Nu-kote could not present its own antitrust case

12  – which would set up the very defenses that would ultimately defeat Nu-kote's counterclaims.

13  (RT. 839-851 (testimony of Peter Sullivan); HT. 721-723 (testimony of Jonathan Marshall); and
    HT. 22114-2230 (testimony of Mr. Blecher).)

14      Despite HP's argument, the 1996 motion to bifurcate was denied.  Contrary to ACE's

15  suggestion, HP did not prevail on its argument that the claims and counterclaims were

16  "separate."  Moreover, there was no evidence presented to the Special Master suggesting that in

17  1999, when HP requested that the Court phase (not bifurcate) the trial, HP repeated any portion

18  of the arguments made in 1996, or that HP repeated only the "not inextricably intertwined"

19  portion of the argument in 1999.  Instead, the evidence presented at the damages hearing and

20  remand hearing reveals that HP asked to "phase" the trials so that it could present its best

21  evidence early in the trial, i.e.,  HP's request to phase the trials, just like its motion to bifurcate,

22  was part of HP's overall strategy to use the affirmative claims as a defense to the counterclaims

23  but was not indicative of a belief that the cases were "separate" in the sense that ACE argues.

24  (RT. 814-816, 829, 850:10-851:3, 909, 926 (Mr. Sullivan); HT. 1689-1690 (Ronald Griffin); and
    HT. 473-474 (Mr. Peeau).)  Notably, ACE did not offer any evidence with respect to the nature

25  of HP's 1999 request that the trial be phased.

26

27

28

---

[8] HP's 1996 argument is remarkably similar to the theory asserted by ACE's expert, discussed below, regarding the defensive nature of HP's affirmative claims.

1    In sum, ACE has mischaracterized HP's 1996 reply brief, and HP's reliance upon the

2  "inextricably intertwined" statement in 1996 is misplaced.  Further, ACE's argument that HP

3  asserted to Judge Ware in 1999 that HP claims and Nu-kote counterclaims "were completely

4  separate" is not supported by the record.

5

6    In a somewhat related argument, ACE asserts that "HP always believed its affirmative

6  case and the antitrust counterclaims were separate." (ACE Opening Post-Remand Hearing Brief

7  at 16-18.) ACE asserts that: (1) throughout Phase I, HP vigorously maintained that its

8  affirmative case was separate and distinct from Nu-kote's antitrust counterclaims, and objected

9  to Nu-kote's attempts to mix the two during trial (citing *inter alia*, Mr. Cooper's suggestion that

10  the Court should impanel a second jury to hear and consider Nu-kote's antitrust claims); and (2)

11  that the Court reminded counsel and the jury that he regarded "the two cases as separate." ACE

12  asserts that "HP's judicial admissions that its affirmative patent claims and Nu-kote's antitrust

13  counterclaims were separate and distinct are dispositive and irreconcilable with HP's present

14  argument that the Special Master should view the underlying case "inextricably intertwined" for

15  purposes of insurance coverage. ACE further asserts that "consistent with its position that the

16  intellectual property claims and antitrust claims were distinct," HP retained two law firms to

17  represent it in the action - Pennie & Edmonds, a firm noted for its patent expertise, Gibson Dunn

18  & Crutcher because of its antitrust expertise.

18    First, as noted above, HP's 1996 reply brief suggests that contrary to ACE's argument,

19  HP did *not* believe its affirmative case and the antitrust counterclaims were completely separate,

20  and instead argued to the Court that certain aspects of the affirmative claims and counterclaims

21  were "directly related." Second, with respect to the statements/objections made by counsel for

22  HP during Phase I in response to counsel for Nu-kote's effort to inject antitrust issues during

23  Phase I, the evidence presented during the damages and remand hearings compels the conclusion

24  that HP's actions were consistent with HP's defense and phasing strategy. The objections were

25  made to keep Nu-kote from asserting its "bad" antitrust evidence while HP presented its

26  affirmative claims to the jury. (RT. 826-829:17 (Mr. Sullivan).) Which respect to the jury

27  instructions given by the Court to consider each claim separately, HP offered compelling

28  evidence that the instructions do not compel the conclusion that evidence in support of one claim

cannot defend another claim, including the testimony of Professor Menell, discussed below, that

1   HP's affirmative claims operated as a defense to portions of the Nu-kote counterclaims for most

2   of the case. (*See* HT. 2181-2182, 2185, 2187-2189, 2215-2216, 2258 (Mr. Blecher); HT.

3   1141:5-1143:15 (Mr. Cooper); and Special Jury Instruction No. 14, Ex. 1603 at 7:27-8:3 ("A

4   company may not be found to have willfully acquired or maintained monopoly power if it has

5   acquired or maintained that power . . . by obtaining a lawful patent").)

6           The statement during Phase I by Mr. Cooper, HP's counsel, suggesting that the Court

7   empanel a second jury, does not prove or establish that the affirmative claims and counterclaims

8   were "separate" in the way ACE uses that term.  Mr. Cooper was concerned that the jury had

9   been infected by Nu-kote's efforts to argue sham litigation during Phase 1, so he suggested a

10  new antitrust jury because it gave HP the opportunity to reassert its original bifurcation defense

11  strategy. (TT. 3554:2-9; RT. 1022:16-1023:9.)  As Mr. Sullivan testified, if HP had prevailed on

12  its affirmative claims in a separate trial before a separate jury, the rulings likely would have

13  severely restricted the scope of the subsequent antitrust trial. (RT. 848-850:9, 1022:16-1023:9.)

14  The statement by Mr. Cooper does not compel the conclusion that the affirmative claims could

15  not be used to defeat the legal liability posed by the counterclaims.  Finally, the Special Master is

16  not persuaded by ACE's argument that HP's use of separate law firms shows that the affirmation

17  claims and antitrust claims were "separate."

18          In sum, ACE's assertion that HP "admitted" that its affirmative claims and Nu-kote's

19  antitrust counterclaim were separate and distinct is not supported by the record.

                                   B.  State Law Claims

20          ACE contends that HP's Phase I case was not conducted against any liability posed by

21  the severed state-law claims.  ACE asserts that Nu-kote's state law claims succeeded or failed on

22  precisely the same predicate acts as those alleged in their federal counterparts.  ACE asserts that

23  when Judge Ware eliminated the federal counterclaims by his summary judgment rulings, any

24  corresponding liability posed by the analogous Nu-kote state court claims was eliminated as

25  well.  In pertinent part, ACE asserts that "HP conceded in 1999 that the liability posed by the

26  state court counterclaims had been eliminated by Judge Ware's rulings," citing exhibit 1598

27  (HP's response to Nu-kote's opposition to the Court's stated intent to dismiss the state law

28  claims as cumulative).  ACE asserts that exhibit 1598, filed in accordance with Fed.R.Civ.P. 11,
    is a binding admission by HP that it believed each of the state-law claims had been eliminated
    and that HP did not face any liability from such claims.

                                          -82-

1    On April 21, 1999, the Court issued an Order Setting Briefing Schedule. The Order

2   provides in pertinent part that:

3          It is the Court's intention to dismiss all of the parties' respective state law claims pretrial
           on the basis that the claims are cumulative of the federal claims and do not provide a
4          basis for any additional damages or equitable relief.

5   (Ex. 1597.) To the extent that the parties objected to the Court dismissing the claims, the parties

6   were given the opportunity to file briefs in opposition. *Id.*

7          Nu-kote submitted an opposition on May 3, 1999. (Ex. 1598) Nu-kote asserted that: (1)

8   Nu-kote's state law claims were not cumulative of its federal claims, on the grounds that the state

9   law claims set forth different standards of proof than the related federal claims, and that some

10   claims provided additional damages to the federal claims (including Nu-kote's claim for

11   interference with economic advantage, which provided damages for lost profits and had no

12   federal counterpart); (2) in the event that Nu-kote failed to prove at trial that HP's conduct

13   injured competition, as opposed to a specific competitor, Nu-kote could still prevail on the

14   interference claim based upon the harm suffered by Nu-kote; and (3) if the state law claims were

     dismissed, they should be dismissed without prejudice.

15          HP's response is dated May 10, 1999. (Ex. 1598) Therein, HP asserted that: (1) the

16   court had already granted summary judgment against Nu-kote's state law claims of false

17   advertising and defamation-related claims (counterclaims 8-10); (2) if there was anything left of

18   Nu-kote's unfair competition claim (count 10) after the court's partial summary judgment

19   rulings, it could only relate to whether the conduct that formed the basis for Nu-kote's tying and

20   conspiracy claims, despite being lawful, was unfair, but the California Supreme Court had

21   recently confirmed that conduct that does not rise to the level of an antitrust violation is not

22   "unfair" for purposes of the unfair competition law; (3) the court had effectively disposed of Nu-

23   kote's Cartwright Act claim (counterclaim 7) by ruling in connection with Nu-kote's federal

24   tying claims, that no reasonably jury could conclude that "HP did not have legitimate business

25   justifications" for its inkjet cartridge design, or that HP had any agreements with other printer

     manufacturers to restrain competition; (4) those holdings were fatal to Nu-kote's claims under

26   the Sherman Act and the Cartwright Act; (5) "there is no reason not to dismiss Nu-kote's

27   intentional interference claim because Nu-kote has conceded that ... 'there is no admissible

28   evidence of any wrongful conduct or statements by HP that caused the disruption of any

-83-

1  economic relationship' between Nu-kote and its resellers;" (6) all of Nu-kote's state law claims

2  should be dismissed with prejudice. *Id.*

3      On May 10, 1999, Judge Ware issued an Amended Final Pretrial Conference Order. (Ex.

4  1601.) The order provides *inter alia* that "[t]he Court orders off-calendar and bifurcates for later

5  proceedings all state-law claims and defenses and all equitable defenses to federal claims." *Id.*

6      In light of the May 10, 1999 order, Nu-kote' state law claims were not dismissed from the

7  action. While HP essentially argued that the state law claims had already effectively been

8  dismissed, HP lost the argument. ACE's suggestion that HP's losing argument is somehow an

9  admission that the state law claims had no merit is not supported by the record. The state law

10 claims were not dismissed, remained viable and were left for later consideration.   ACE's

11 assertion that HP's opposition argument is a binding admission by HP that it believed each of the

12 state-law claims had been eliminated and that HP did not face any liability from such claims is

13 without merit.   Given the fact that the Court did not dismiss the state law claims, any reasonable

14 defendant (in this case an insured defendant) would assume that the claims remained in the case,

15 and had to be defended.   The Special Master will address below ACE's assertion that when

16 Judge Ware eliminated portions of the federal counterclaims by his partial summary judgment

17 rulings, any corresponding liability posed by the analogous Nu-kote state court claims was

18 eliminated as well.

              C. Testimony of Professor Menell

19      ACE offered the testimony of Professor Peter Menell to determine whether HP's

20 expenses were "conducted against liability."[9] ACE asserts that the import of Professor Menell's

21 testimony is that

22      as of May 7, 1999, Nu-kote's counterclaims had been whittled down to the point that
        HP's affirmative claims of patent and trademark infringement and false advertising were
23      no longer defensive to Nu-kote's remaining counterclaims. The facts supporting or
        defending the causes of action addressed in Phase I did not overlap the elements of the
24      antitrust counterclaim that ultimately went to trial in Phase II. Thus, Professor Menell
        concluded that as of May 7, 1999, none of the expenses that HP incurred in connection
25      with the Phase I trial of HP's affirmative claims were conducted against liability

26

27

28 ────────────────
[9] Professor Menell, however, did not testify with respect to whether litigation activities would be conducted against liability by a reasonable insured under the same circumstances. His analysis was instead limited to overlapping elements of the parties' claims, and did not address what a reasonable insured might do under the circumstances.

1    Professor Menell testified that he reviewed extensive amounts of materials from the Nu-

2   kote action, including the motions for partial summary judgment, the orders on the motions, and

3   the trial transcripts. (RT. 120:3-13.) Professor Menell interpreted Judge Ware's October 2003

4   and November 2004 orders to mean that as of the date of the filing of the fourth amended answer

5   and counterclaim by Nu-kote, there was some overlap between Nu-kote's counterclaims and

6   HP's affirmative claims, and his review of the records of the Nu-kote action attempted to

7   determine whether there was some point at which the HP's affirmative claims no longer

8   overlapped with the Nu-kote counterclaims, i.e., at what point HP's affirmative claims were no

9   longer conducted against liability. (RT. 121:16-122:6.) Professor Menell understood

10  "conducted against liability" to mean an overlap of elements, something that would "directly

11  disprove [an element] in Nu-kote's case." (RT. 216:24-217:17.) Moreover, Professor Menell

12  considered "conducted against liability" to be an evidence "overlap" that "absolved" HP of

13  liability. (RT. 217:25-218:4.) He therefore looked for aspects of HP's affirmative case that

14  "would be a legal defense" to a counterclaim. (RT. 217:18-24.) In conducting this review,

15  Professor Menell did not consider Nu-kote's counterclaim for declaratory relief, on the grounds

16  that the declaratory relief claim did not subject HP to potential "liability.[10] (RT. 124:9-125:11.)

17      Professor Menell determined that *as of March 18, 1999, there were common issues of

18  proof, such that HP's affirmative claims would in fact serve as defenses to Nu-kote's

19  counterclaims*, i.e., *would be conducted against the liability of some of the counterclaims*. (RT.

20  127:2-11.) Professor Menell testified that HP's trademark infringement, false advertising and

21  patent infringement claims all involved proof of the validity and enforceability of HP's

22  trademarks and patents. (RT. 127:12-17.) Professor Menell testified that Nu-kote's

23  monopolization (2nd), attempted monopolization (3rd), and California state law counterclaim

24  claims (6th-11th) also involved the validity and enforceability of HP's trademarks and patents.

25  (RT. 127:18-24.) Professor Menell testified that these aspects of HP's affirmative claims would

26  serve "in a defensive posture," i.e., proof of trademark infringement, patent infringement and

27  false advertising by HP would also serve as a defense to a specific allegations contained in Nu-

28  kote's monopolization counterclaims and state law counterclaims. (RT. 128.) Professor Menell

---

[10] Professor Menell did testified that proving Nu-kote infringed HP's patents directly refuted Nu-kote's
counterclaim seeking a declaration that it did not infringe. (RT. 353:13 – 355:11.)

-85-

1   testified that HP's proof of these issues overlapped with the following affirmative allegations by

2   Nu-kote:

3         (1)     HP had published knowingly false accusations that Nu-kote was infringing
                  its trademarks and patents;

4         (2)     HP had procured and sought to enforce invalid and non-infringed patents,
                  which Professor Menell labeled as "sham litigation;"

5         (3)     HP defrauded the Patent and Trademark office in prosecuting the '503
                  patent; and

6         (4)     HP had assembled a thicket of patents.

7   (RT. 129:1-22.)  These specific allegations, found in paragraphs 99, etc of the counterclaim, are

8   incorporated by reference into all of the counterclaims included in Nu-kote's 4th amended

9   counterclaim.

10        Professor Menell testified that there were several summary judgment motions that had the

11  effect of reducing and ultimately eliminating the overlap between HP's affirmative claims and

12  Nu-kote's counterclaims.  Professor Menell testified that:  (1) on April 8, 1999, Judge Ware

13  issued an order dismissing the patent thicket counterclaim (MSJ #7), and that the net effect of

14  this ruling was to dissolve away one of the overlapping issues, and thus shrink the amount of

15  overlap; (2) on April 9, 1999, Judge Ware issued an order on MSJ #4, which Professor Menell

16  testified required that Nu-kote narrow down the false accusations that would go to trial, and that

17  the effect of this ruling was to "get rid of the argument that HP falsely accused Nu-kote of

18  infringing its patents and trademarks;" (3) on April 29, 1999, Judge Ware issued an order on

19  MSJ #5 that eliminated all of Nu-kote's "sham litigation" assertions, wherein Judge Ware found

    that HP was not engaged in objectively baseless litigation against Nu-kote; and (4) on May 7,

20  1999, Judge Ware issued an order dismissing Nu-kote's "inequitable conduct claim."  (RT.

21  129:23-132:14; *see also* Ex. 4212.)

22        Professor Menell also concluded that as a result of orders by Judge Ware dated April 21,

23  1999 and May 10, 1999 regarding Nu-kote's state law claims, Nu-kote's state law claims "were

24  out of the case" because all the bases (the overlapping predicate acts) for the claims had been

25  eliminated by the prior summary judgment rulings. (RT. 266-288.)  Professor Menell testified

26  that while the state law claims may not have been entirely out of the case, there was nothing left

27  of that portion of the state law claims that overlapped with HP's affirmative claims.  (RT. 290-

28  299.)

1    Professor Menell concluded that as of May 7, 1999, as a result of the above rulings on

2  HP's motions for partial summary judgment, the Nu-kote action had been sufficiently narrowed

3  such that HP's Phase I affirmative claims were no longer conducted against liability. (RT.

4  120:14-21.) Professor Menell testified that as of this date, the "overlap" became separable, and

none of the elements of the causes of action in HP's affirmative claims would serve to defend

5  against the liability exposure of the counterclaims. (RT. 132:15-133:3.) Professor Menell

6  testified that based upon his review of the conduct of Phase II, the Phase I activities had not been

7  conducted against liability. (RT. 164.) He testified that because HP had not made reference to

8  their patents and trademarks during Phase II (or the Phase II closing arguments), the trademarks

9  and patents were not being used as defenses. (RT. 164-165.)

10    Professor Menell also reviewed the decisions made by Judge Ware during the trial with

11  respect to objections and the interrelations of Phase I and Phase II. (RT. 165-166.) Professor

12  Menell testified that the entire conduct of the trial and Judge Ware's efforts were oriented

13  towards maintaining the separateness of HP's affirmative claims and Nu-kote's counterclaims.

14  (RT. 166.) He testified that the examples of this separateness were: (1) the phasing of the trial;

(2) HP's objections to Nu-kote's attempting to bring Phase II issues into Phase I, which were

15  sustained by the Judge; (3) witnesses who could speak on both phases had to testify during both

16  phases, i.e., had to be recalled during Phase II; (4) allowing witness introductions and summaries

17  by counsel so as to explain to the jury the relevance of the evidence to the causes of action; and

18  (5) allowing the jury to begin deliberations on Phase I issues at the end of Phase I; (6) the jury

19  instructions and jury verdict forms. *Id.* at 167-176.

20    Importantly, Professor Menell testified that: (1) *prior to* May 7, 1999, as a result of these

21  overlapping issues, what HP did in the litigation was "conducted against liability" (RT. 214:9-

22  21; 215:19-23); and (2) what HP did in the litigation after Phase 1, i.e., from the beginning of

23  Phase 2 of the trial until the end of the case, was also directly defensive to Nu-kote's

24  counterclaims and was therefore, "conducted against liability." (RT. 215:4-23.)

      B.    Does Professor Menell's Analysis Support ACE?

25    HP contends that Professor Menell's testimony was inadequate and incomplete. HP

26  asserts that Professor Menell's mistakes of fact and of law invalidate his conclusions. HP asserts

27  that: (1) California law directly contradicts ACE's spurious assumption that an expense is

28  conducted against liability only if it completely avoids liability; (2) Professor Menell's

-87-

1  misunderstanding of partial summary judgment undermines his main conclusions; (3) Professor
2  Menell mistakenly believed that state law claims had been dismissed, but admitted that HP's
3  claims would defend against them; (4) Professor Menell failed to consider Nu-kote's remaining
4  equitable claims; (5) Professor Menell failed to consider Nu-kote's declaratory judgment claim;
5  (6) Professor Menell did no cost-benefit analysis; (7) Professor Menell did not quantify any
6  deductible litigation expenses; and (8) Professor Menell's "motives" testimony is irrelevant
   under the reasonable insured test.
7      In reply, ACE asserts that: (1) Professor Menell provided a thorough analysis of the Nu-
8  kote litigation in determining what was conducted against liability; (2) Professor Menell
9  considered Nu-kote declaratory relief claim, and concluded that it posed no liability to HP; (3)
10 Professor Menell correctly characterized the state of the litigation, and HP cannot deny that as of
11 May 7, 1999, HP's defense of the Phase II antitrust counterclaim was effectively separated from
12 Phase I in terms of elements of proof of the underlying causes of action; and (4) Nu-kote's state
13 law claims relied upon the very same factual predicates as the federal claims that preceded to
14 trial in Phase II, and HP cannot point to what aspects of the state law claims were even
15 theoretically viable.

16     Professor Menell's testimony during the remand hearing is essential to ACE's effort to
17 show that not all of the expenses incurred by HP in the post-tender period are recoverable.
18 While Professor Menell did not testify with respect to what a reasonable insured would have
19 done under the circumstances, his testimony is the key component of ACE's effort to show that
20 Phase I of the Nu-kote action was not conducted against liability. Unfortunately for ACE, even
21 accepting as true the premise of Professor Menell's testimony regarding the nature of the overlap
22 between Nu-kote's counterclaims and HP's affirmative claims prior to May 7, 1999, Professor
23 Menell's testimony that no there was no overlap between the claims and counterclaims after May
24 7, 1999 is fundamentally flawed.
25     As an initial matter, Nu-kote's state law claims, which incorporated all of the alleged
26 predatory acts, were not dismissed prior to trial. While HP argued that consistent with the
27 Court's statement of intention, Nu-kote's claims were cumulative of its federal claims and should
28 be dismissed, HP lost the argument – the state claims instead were bifurcated. HP's unsuccessful
   argument in 1999 does not render its current position, that the state law claims survived the

motions for partial summary judgment, improper. As is made clear by Exhibit 4212 and 4213, Professor Menell clearly believed that proof of HP's affirmative claims overlapped with each of Nu-kote's state law claims.  Given the survival of the state law claims, Professor Menell's theory is dependent upon the orders on the motions for partial summary judgment eliminating all of the allegations in the state law counterclaims that Professor Menell believes overlapped with HP's affirmative claims.

While HP clearly believes that the connectedness of HP's prosecution of its affirmative claims and Nu-kote's counterclaims was much broader than the overlap identified by Professor Menell, HP does not quarrel with Professor Menell's more limited conclusion that proof of trademark infringement, patent infringement and false advertising by HP would also serve as a defense to a specific allegations contained in Nu-kote's monopolization (1st, 2nd) and state law (6th-11th) counterclaims.  HP similarly does not quarrel with Professor Menell's assertion that HP's proof of it claims overlapped with the following specific affirmative allegations by Nu-kote:

- HP had published knowingly false accusations that Nu-kote was infringing its trademarks and patents;
- HP had procured and sought to enforce invalid and non-infringed patents, which Professor Menell labeled as "sham litigation;"
- HP defrauded the Patent and Trademark office in prosecuting the '503 patent; and
- HP had assembled a thicket of patents.

The key question, however, is whether Professor Menell is correct that these allegations by Nu-kote were "removed" or "eliminated" from the action as of May 7, 1999, and thus no longer provided support for Nu-kote's state law claims.  If any of these allegations remained in the case, the basis for Professor Menell's conclusion that there was no longer any overlap and thus Phase I expenses were not conducted against liability disappears.

Federal Rule of Civil Procedure 56(b) provides that a party against whom a counterclaim is asserted "may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." Fed.R.Civ.P. 56(c). Fed.R.Civ.P. 56(d) provides that:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable

1   ascertain what material facts exist without substantial controversy and what material facts
2   are actually and in good faith controverted. It shall thereupon make an order specifying
    the facts that appear without substantial controversy, including the extent to which the
3   amount of damages or other relief is not in controversy, and directing such further
    proceedings in the action as are just. Upon the trial of the action the facts so specified
4   shall be deemed established, and the trial shall be conducted accordingly.

5       "Partial summary judgment" is a misnomer because no judgment is entered on such a
6   motion. Rather, "a partial summary judgment is merely an order deciding one or more issues in
7   advance of trial." *Minority Police Officers Ass'n v. South Bend,* 721 F.2d 197, 200 (7th Cir.
8   1983).

9       Professor Menell testified that the order regarding MSJ #4 effectively eliminated Nu-
10  kote's allegation that HP had published knowingly false accusations that Nu-kote was infringing
11  HP's trademarks and patents. This allegation is one of the numerous alleged predatory acts by
12  HP, and was incorporated into virtually every counterclaim asserted by Nu-kote. A careful
13  review of the MSJ #4 and the order on the motion reveals that Professor Menell simply is
14  incorrect.

15      In MSJ #4, HP sought partial summary judgment of Nu-kote's allegations of false and
16  misleading statements and improper marketing techniques *made in support of its claims for*
17  *monopolization and attempted monopolization under Section 2 of the Sherman Act,* including but
18  not limited to the allegations contained in paragraphs 92, 93 and 98 of Nu-kote's third amended
19  counterclaims. The motion was brought on the grounds that: (1) Nu-kote had not adduced
20  competent evidence of any statements by HP which rose to the level of exclusionary conduct
21  under Section 2 of the Sherman Act; and (2) because Nu-kote had not adduced evidence of any
22  injury linked to the statements, Nu-kote did not have standing to bring the Section 2 claim. HP
23  requested that the Court find that Nu-kote's attempt to predicate its Section 2 claims for
24  monopolization and attempted monopolization on allegations of false or misleading statements
    and improper marketing techniques failed as a matter of law.

25      Nu-kote's opposition asserted three allegedly false statements, none of which involved an
26  accusation that Nu-kote had infringed HP trademarks and patents. The Court noted in order to
27  prevail on a claim that false and misleading advertising constitutes exclusionary conduct in
    violation of Section 2, the plaintiff must present cumulative proof that the representations were
28  (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to

1   buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not

2   readily susceptible of neutralization or other offset by rivals. *American Professional Testing*

3   *Service, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d

4   1147, 1152 (9th Cir. 1996)." The court found there was no evidence that HP's statements

5   regarding damage to printers were clearly false, and granted partial summary judgment to the

6   extent Nu-kote's § 2 claims were based upon these alleged misstatements. With respect to

7   statements regarding the quality of refill ink and printer repair, the Court found that there was

8   evidence that HP's statements were false, and could be offered in support of Nu-kote's Section 2

    claims.

9        While the ruling limited the basis for Nu-kote's Section 2 claims, Professor Menell is

10  mistaken to the extent he believes that the ruling eliminated the allegation that HP falsely

11  accused Nu-kote of infringing HP's trademarks and patents. The ruling on MSJ #4 impliedly

12  precluded Nu-kote's ability to rely upon its false accusation of infringement allegation in support

13  of its Section 2 claims. The ruling, however, did not eliminate or impact Nu-kote's ability to

14  rely upon the false accusation of infringement allegation in connection with Nu-kote's other

15  counterclaims. While perhaps the ruling reflected a weakness in Nu-kote's case with respect to

16  the false accusation of infringement allegations or that Nu-kote was not pursuing this particular

17  allegation, nothing in the papers filed in connection with the motion or the order suggest or

18  compel such a conclusion. The motion did not seek, and the Court did not order that due to Nu-

19  kote's failure to identify a false accusation of infringement, Nu-kote was prohibited from

20  offering evidence to support the allegation in support of other claims. As argued by HP, the

21  order granted partial summary judgment as to a portion of Nu-kote's Section 2 claims, not

22  summary judgment of the specific factual allegation made by Nu-kote. The allegation remained.

23  Moreover, to be actionable under Section 2, the statements must be clearly false. The false

24  accusation allegation was contained in and remained in Nu-kote's state law claims. Contrary to

25  Professor Menell's assertions, the order did not "require[] that Nu-kote narrow down the false

    accusations that would go to trial," and that the ruling *did not* "get rid of the argument that HP

26  falsely accused Nu-kote of infringing its patents and trademarks." Moreover, although not

27  addressed by the parties, Nu-kote would have had to establish that only that the accusations were

28  false, not clearly false, in connection with a number of their state law claims, including the unfair

    competition and trade libel claims.

1    In light of the foregoing, Nu-kote's allegation that HP falsely accused it of infringing

2    HP's trademarks and patents remained in the case as an allegation supporting Nu-kote's

3    remaining counterclaims, including all of the state law claims. In other words, the overlapping

4    allegation survived the partial summary judgment orders. Consistent therewith, under Professor

5    Menell's theory, HP's proof of trademark infringement, patent infringement and false advertising

6    claims continued defending against the liability posed by the false accusation of infringement

7    allegation. In other words, HP's proof of its affirmative claims during Phase I was conducted

8    against the liability posed by the state law claims. For this reason alone, Professor Menell's

     analysis fails.

9        Professor Menell's overreaching interpretation of the orders on the motions for partial

10   summary judgment infects the remainder of Professor Menell's "overlap eliminated" testimony.

11   Professor Menell's testified that Nu-kote's allegation that HP had procured and sought to enforce

12   invalid and non-infringed patents was eliminated by the order on MSJ #5. The predatory acts

13   alleged by Nu-kote included that: (1) HP had procured and/or sought to enforce 14 utility

14   patents on ink jet inks and ink jet printing technology knowing that the patents were invalid,

15   unenforceable and/or not infringed by Nu-kote (paragraph ¶94 of the counterclaim); and (2) HP

16   employed sham litigation to make knowingly false allegations of trademark infringement, patent

17   infringement and related legal claims against Nu-kote, and had knowingly sought grossly

18   overbroad remedies in bad faith, thereby unjustifiably imposing substantial economic burdens on

19   Nu-kote ("sham litigation") (paragraph 99).  These allegations were incorporated into each of

20   Nu-kote's counterclaims. Professor Menell appears to have grouped these two allegations

21   together as Nu-kote's "sham litigation" allegation.  As noted above, Professor Menell testified

22   that these allegations overlapped with HP's affirmative claims such that HP's prosecution of its

     claims served as a defense to Nu-kote's sham litigation allegations.

23       In MSJ #5, HP sought partial summary judgment of Nu-kote's allegation that HP's filing

24   and maintenance of "sham" litigation to protect its intellectual and other property rights

25   *constituted predatory and exclusionary conduct actionable under Section 2*. Again, the motion

26   was directed only at a portion of Nu-kote's Section 2 claims. In the motion, HP offered evidence

27   and argument regarding its claims against Nu-kote to establish that a reasonable litigant could

     conclude that HP's claims were reasonably calculated to elicit a favorable outcome. *Id.* In

28   opposition to the motion, Nu-kote asserted that: (1) HP knowingly asserted patents  against Nu-

kote that HP had fraudulently obtained (the '115, '295, '409 and '503 patents); (2) HP brought suit against Nu-kote on patents that HP knew to be invalid (the '503, '811 and nine cartridge-related patents found not to be infringed in the *Repeat-O-Type* litigation filed by HP) and on trademarks (including HP's inkjet cartridge product model numbers) and false advertising claims (including ink quantity and used printed in packaging suggesting that the printhead was new) that were objectively baseless knew that some or all of the patent; and (3) HP's lawsuit based on the '503, '294, '115 patents were subject to antitrust scrutiny as a *Walker Process* claim (enforcement of an invalid patent procured by fraud on the Patent Office may form the basis for a violation of Section 2 of the Sherman Act). *Id.*

The Court found that there was no evidentiary basis upon which a reasonable jury could find that HP's lawsuit against Nu-kote, in whole or in part, was objectively meritless, and granted HP's motion. (Ex. 3966.) The Court further found that Nu-kote had failed to present any evidence that HP instituted the action knowing that the '504, '115, '409 and '295 patents had been procured by fraud. *(Id.)*

As a result of the ruling, Nu-kote could not rely upon its sham litigation allegation (paragraph 99 of the counterclaim) to support its Section 2 claims. The ruling did not eliminate Nu-kote's ability to rely upon the sham litigation theory in support of the state law claims, including Nu-kote's Cartwright Act claim. While the Court may have granted partial summary judgment of the Cartwright Act claim on the same ground, the ruling with respect to the Section 2 claims did not automatically eliminate the allegation in the Cartwright Act claim.

Moreover, the order did not address and therefore did not eliminate the allegation that HP had procured and/or sought to enforce 14 utility patents on ink jet inks and ink jet printing technology knowing that the patents were invalid, unenforceable and/or not infringed by Nu-kote (paragraph ¶94 of the counterclaim). This allegation was incorporated into Nu-kote's remaining counterclaims. In fact, this allegation is in reality virtually identical to Nu-kote's declaratory relief claim wherein Nu-kote asserted that Nu-kote had not infringed any valid and enforceable claim of 14 patents and that the 14 patents were invalid, void and unenforceable *inter alia* because HP had misused its utility patents asserted in its claims, including that it had procured and sought to enforce patents knowing that the patents were invalid, unenforceable and/or noninfringed. Counterclaim ¶¶ 111, 136. The declaratory relief claim, like paragraph 94, was incorporated into the vast majority of Nu-kote's state law claims.

1    Finally, the parties expend a great deal of time in their briefs addressing whether HP's
2  defense of Nu-kote's declaratory relief claim was conducted against liability. The issue was
3  thoroughly briefed in connection with HP's motion for partial summary judgment of the issue
4  prior to the remand hearing, and the Special Master found that HP's defense of Nu-kote's
5  declaratory relief counterclaim was conducted against liability. *See* January 15, 2006 Order
   Denying HP's Motions for Partial Summary Judgment.
6
       Professor Menell testified that HP's defense of the declaratory relief counterclaim was
7  not conducted against liability because the declaratory relief claim did not subject HP to potential
8  "liability. ACE asserts that there is no evidence that a reasonable insured would treat a
9  counterclaim threatening no liability against HP (the declaratory relief counterclaim) as
10  transforming HP's affirmative legal campaign into one conducted against liability.
11       For the reasons noted in the order denying HP's motion for partial summary judgment of
12  this issue, and the reasons articulated in HP's post-remand hearing brief, the Special Master
13  believes that HP's defense of Nu-kote's declaratory relief counterclaim (alleging that the patents
14  in suit were invalid, unenforceable or not infringed), which involved HP's proof of the patents,
15  and proof of validity and/or infringement, and the expenses related thereto were part of a
    necessary effort to defend Nu-kote's counterclaim and thus HP's defense of the counterclaim
16  (through proof of its patent claims) was conducted against liability. ACE's assertion that HP
17  could have eliminated Nu-kote's declaratory relief counterclaim by dismissing its patent claims
18  (thereby depriving Nu-kote of standing to pursue the declaratory relief claim) merits a brief
19  comment. HP could have done a number of things, including dismiss the patent claims in the
20  face of Nu-kote's counterclaims. Like HP, ACE could have done a number of things, including
21  accepting the tender of the defense of the Nu-kote counterclaim. There was no evidence
22  presented that if HP dismissed its patent claims, Nu-kote would have dismissed its antitrust
23  claims and/or dismissed its other allegations regarding HP's patents. Other than to benefit its
24  insurer who failed to defend, it is unclear why HP would have dismissed its patent claims, which
25  the undisputed evidence reveals were part of HP's defense of the Nu-kote counterclaims,
    including the antitrust claims during the post-tender period. Moreover, the undisputed evidence
26  presented suggests that if HP would have dismissed its counterclaims, Nu-kote would have
27  renewed its sham litigation allegations.
28

1   However, even if reasonable minds could disagree about whether HP's defense of the

2   declaratory relief claim was part of an effort to avoid or minimize liability, and the Court were

3   inclined to find that the defense of the declaratory relief counterclaim was not conducted against

4   liability, this issue does not impact whether HP's actions were defensive. ACE's theory, offered

5   via Professor Menell, is that HP's proof of its affirmative patent claims (and trademark and false

6   advertising claims) was defensive to four other allegations in the Nu-kote counterclaim, i.e., the

7   four allegations identified by Professor Menell which were present in each and every

8   counterclaim asserted by Nu-kote (sham litigation, thicket of patents, false accusation of

9   infringement, and enforcement of invalid, fraudulent or non-infringed patents). The fact that

10  ACE believes that HP's proof of the validity and infringement of its patents was not defensive of

11  the Nu-kote declaratory counterclaim does not change the fact that ACE's theory of the case is

12  that proof the validity and infringement of the patents was defensive to other portions of the Nu-

13  kote counterclaim prior to phase I of the trial (i.e., prior to May 7, 1999). Given the failure of

14  ACE's argument vis-à-vis the elimination of "overlapping" allegations, even if the Court was to

15  agree with ACE regarding the defense of the declaratory relief claim, the "overlapping"

16  allegations that remained, as identified by ACE and Professor Menell (and which remained in the

17  case during and after the trial) provide a sufficient and compelling basis for the conclusion that

18  HP's proof of its affirmative claims, including the patent, trademark and false advertising claims,

19  was defensive in nature and conducted against liability throughout the post-tender period.

20     In conclusion, the evidence relied upon by Professor Menell, e.g., the orders on HP's

21  partial summary judgment motions, does not support Professor Menell's conclusion. The

22  Special Master concurs in Professor Menell's testimony to the extent that Professor Menell

23  testified that HP's prosecution of its affirmative claims was defensive to a number of the

24  allegations in Nu-kote's counterclaims, and thus HP's affirmative claims were conducted against

25  liability prior to Phase I of trial and after Phase I. The Special Master, however, disagrees with

26  Professor Menell's conclusion that the Court's pre-trial orders regarding HP's motions for partial

27  summary judgment eliminated the defensive nature of HP's proof its affirmative claims. The

28  orders did not eliminate the Nu-kote allegations that Professor Menell found to overlap with

    HP's affirmative claims. The overlapping allegations remained in the case, and HP's proof its

    affirmative claims during Phase I was conducted against the liability posed by, at a minimum,

    Nu-kote's state law claims. Accordingly, ACE has failed to meet its burden of proof to establish

1   by a preponderance of the evidence that HP's affirmative claims tried during Phase I were not

2   conducted against liability.   Moreover, for the reasons noted below, the Special Master finds that

3   the weight of the evidence clearly weighs in favor of the conclusion that HP's affirmative claims

4   tried during Phase I were conducted against liability.

5

6   **IV. HP's Effort to Show that Affirmative Claims Conducted Against Liability**

7           HP contends that ACE as well as HP witnesses confirmed that the Nu-kote case was

8   "conducted against liability." HP asserts that everything in the Nu-kote case was defensive and

9   all expenses were conducted against liability by a reasonable insured under the circumstances.

10  HP asserts that this position was reconfirmed by many sources and on several grounds.

11          A. HP's Evidence to Show that Affirmative Claims were "Conducted Against Liability"

12          HP first contends that Professor Menell factually proved HP's case by *admitting* that: (1)

13  everything before Phase 1 of the trial and everything after Phase 1 of the trial was "conducted

14  against liability;" (2) Phase 1 necessarily defended against Nu-kote's declaratory relief/patent

15  invalidity counterclaim; (3) HP's evidence of patent infringement during Phase 1 established that

16  Nu-kote had no lawful market presence and thus defended against the antitrust counterclaim; (4)

17  HP's affirmative claims defended Nu-kote's state law counterclaims because the claims and

18  counterclaims had overlapping, common elements such that proof of the one served to defeat the

19  other; (5) all of HP's affirmative claims of patent and trademark infringement and false

20  advertising defended against Nu-kote's state law counterclaims (disparagement, restraint of

21  trade, false advertising, libel, trade libel, unfair competition, and intentional interference with

22  economic advantage); and (6) Professor Menell conceded that HP's Phase 1 evidence of

23  trademark infringement damages was a defense against Nu-kote's antitrust damage claim.

24          HP further contends that it affirmatively proved that:  (1) all litigation activity was

25  defensive under the circumstances, (2) the antitrust counterclaims were defended by proving

26  valid and infringed patents and trademarks so as to prove Nu-kote had no lawful market

27  presence, (3) HP acquired lawful monopoly power through its patents, trademarks and otherwise,

28  (4) HP's damages for infringement offset any damages Nu-kote could establish, (5) it was

    necessary to prove valid and infringed patents to defend against the declaratory relief

    counterclaim, (6) the antitrust issue of "sham litigation" was necessarily defended throughout

    Phase 1 of the trial by showing a proper assertion of patent and trademark infringement, and (7)

1  the state law counterclaims were also defended by evidence of patent and trademark validity and

2  infringement and false advertising by Nu-kote.

3      ACE contends that HP's further arguments that its affirmative patent and trademark

4  infringement claims were conducted against liability are without merit. ACE asserts that: (1) to

5  prove a lawfully acquired monopoly, a party must show that it holds a patent that is still in effect

6  - it need not conduct an affirmative patent enforcement proceeding; (2) HP does not show, nor

7  can it show, how prosecuting its affirmative trademark infringement and false advertising claims

8  helped prove a lawfully acquired monopoly in light of the fact that trademarks do not function as

9  product monopolies; (3) HP's unlawful market presence defense has never been applied with

10  respect to patents, HP's antitrust expert, Max Blecher could not testify to the contrary, and Judge

11  Ware expressly rejected this defense when he instructed the jury that it could award Nu-kote

12  antitrust damages even if it found that Nu-kote infringed one or more of HP's patents (TT. 6170,

13  6354); (4) proving trademark infringement does not establish an unlawful market presence; (5)

14  HP's argument that its false advertising claim was "conducted against liability" is merely another

15  variation of its "white hat" argument, as the only basis HP can claim is that proving the false

16  advertising claim makes Nu-kote look bad, and Judge Ware has already said being able to wear

17  the "white hat" is not enough; (5) with respect to the declaratory relief claim (a) expenses

18  incurred to prosecute the trademark infringement and false advertising claims were not

19  conducted against liability by virtue a patent declaratory judgment counterclaim, (b), without

20  HP's patent infringement claims or some other threat by HP of patent enforcement, Nu-kote

21  would have lacked standing to pursue its declaratory judgment counterclaim, and (c) HP could

22  have eliminated Nu-kote's declaratory judgment counterclaim by dismissing its patent claims

23  against Nu-kote with prejudice; (7) HP defeated the sham litigation claim during the summary

24  judgment rulings, it was out of the case and no reasonable insured would continue to litigate

25  against a claim it has won - after April 29, 1999 Nu-kote could not seek damages from HP for

26  sham litigation; (8) because HP argued prior to trial all of the state law claims had been

27  dismissed as a result of Judge Ware's summary judgment rulings, no reasonable insured would

28  pursue affirmative patent and trademark infringement claims to defend against counterclaims

that it thought were dismissed; (9) as a result of the summary judgment rulings, Nu-kote's state

law counterclaims were effectively dismissed; and (10) offsets are not conducted against

liability.

1

2      Throughout its briefs, ACE asserts that "HP ignored Judge Ware's directions on remand,"

3   "HP failed to consider Judge Ware's standard," "HP did not undertake the analysis required by

4   Judge Ware's remand, and that "HP refused to apply the new standard."   Anyone attending the

5   hearing or reading HP's 206-page brief must realize that this simply is not true, and that

6   repeating this statement is in fact a deliberate mischaracterization of HP's efforts during the

7   remand hearing.  HP applied the standard. ACE simply does not agree with HP's evidence or

8   argument. HP presented numerous witnesses during the initial damages hearing, and relies upon

9   a great deal of that testimony in the briefing regarding the remand hearing. Like ACE, HP also

10  offered additional testimony at the remand hearing from two witnesses who testified during the

    damages hearing.  Both parties have addressed what they perceive to be the relevant standard.

11     The question for the Special Master is whether the evidence presented, by ACE and/or

12  HP, establishes that any Nu-kote expenses were not conducted against liability by a reasonable

13  insured.  Put another way, does the evidence presented by ACE and/or HP compel the conclusion

14  that all post-tender Nu-kote expenses incurred by HP were conducted against liability by a

    reasonable insured under the circumstances?

15     Irrespective of the evidence offered by HP, Professor Menell's testimony establishes that

16  HP's proof of its affirmative claims served as defenses to (or part of an effort to avoid or

17  minimize) the potential liability posed by the Nu-kote counterclaims. Professor Menell testified

18  that *prior to* Phase I, as a result of the overlapping issues, HP's pursuit of its affirmative claims

19  was "conducted against liability" (RT. 214:9-21; 215:19-23); and what HP did in the litigation

20  after Phase 1, i.e., from the beginning of Phase 2 of the trial until the end of the case, was also

21  directly defensive to Nu-kote's antitrust counterclaims and therefore was "conducted against

22  liability." (RT. 215:4-23.)

23     Thus under Professor Menell's theory, the only expenses that could not have been

24  conducted against liability were those expenses incurred by HP during Phase I of the trial.

25  During Phase I of the trial, HP put on its affirmative case, i.e., the proof of trademark

    infringement, false advertising and patent infringement claims, all of which involved proof of the

26  validity and enforceability of HP's trademarks and patents. The allegations in the Nu-kote

27  counterclaims that Professor Menell testified "overlapped" with HP's affirmative claims, i.e.,

28  Nu-kote's allegations that HP had procured and sought to enforce invalid and non-infringed

-98-

1    patents and that HP had falsely accused Nu-kote of infringing its trademarks and patents

2    remained in the case, were not eliminated by the Court's orders on the motions and remained in

3    the case.

4    Moreover, exhibits 4212 and 4213, part of Professor Menell's presentation at the remand

5    hearing, make clear that the HP's proof during Phase I was defensive to the Nu-kote state law

6    claims. The state law claims were not dismissed, and the overlapping allegations in the state law

claims were not eliminated by the orders of HP's motions for partial summary judgment. Then

7    there is the matter of the declaratory relief counterclaim. During Phase I, HP was offering proof

8    of its patents and trademarks and infringement thereof, and Nu-kote was attempting to show the

9    invalidity or non-infringement of the patents. Professor Menell agreed that HP's proof its patent

10   claims also served as a defense of the Nu-kote declaratory relief counterclaim. The dispute with

11   respect to the declaratory relief claim is whether HP's defense of the counterclaim was

12   conducted against liability. Even if one accepts that the notion that the declaratory relief claim

13   was not claim that HP had to defend against because it did not seek damages from HP (which the

14   Special Master does not accept), the "defense" of the declaratory relief claim was equally

15   applicable to the remaining state law claims (including the unfair competition and interference

claims), all of which clearly threatened HP with "liability" related to allegedly improperly

16   enforced invalid and non-infringed HP patents. In sum, overlapping allegations were litigated

17   during Phase I. Because the "overlapping" allegations remained in the case after the Court's

18   orders on the motions for partial summary judgment, HP's proof of its affirmative claims during

19   Phase I was conducted against liability posed by the declaratory relief and state law claims, all of

20   which included the overlapping allegations.

21   Additionally, HP's proof of its affirmative claims during Phase I, especially the patent

22   infringement claim, defended against Nu-kote's antitrust counterclaims by showing a lawfully

23   acquired monopoly. The jury instruction regarding Nu-kote's antitrust illegal monopolization

24   counterclaim indicated that to prevail on this claim, Nu-kote must have proved *inter alia* that HP

willfully acquired or maintained that power through restrictive or exclusionary conduct. The

25   jury instruction stated that "a company may not be found to have willfully acquired or

26   maintained its monopoly power if it has acquired or maintained that power solely through the

27   exercise of superior foresight and skill; or because of natural advantages; or because of economic

28