1    or technological efficiency, including efficiency resulting from scientific research; or by

2    obtaining a lawful patent."

3        HP's proof of its lawful patents over which monopoly power was alleged to exist during

4    Phase I was a specific defense to the wrongful acquisition of monopoly power element of Nu-

5    kote's monopolization counterclaim. (RT. 886:4-25, 822:8-823:24, 813:18-815:19; HT. 852:20-

6    855:21.) According to Mr. Sullivan, HP's Phase 1 case included the following defensive patent

7    evidence on this point: the actual patents that were awarded by the U.S. Patent Office (RT.

8    883:20-21); evidence of anticipation, obviousness, best mode and enablement (RT. 886:19-

9    887:3); evidence that there was not any prior art relevant to HP's patents (RT. 883:12-14,

10   883:24-886:3, 886:19-887:3); other evidence establishing HP had valid patents (RT. 882:17-21,

11   929:7-12.). HP's Phase 1 patents pertained to all of Nu-kote's competing inkjet products. (*See*

12   Ex. 1688; RT. 871:11-880:9.) Mr. Sullivan testified that HP's Phase 1 patent case challenged

13   Nu-kote's entire aftermarket product line. (RT. 873:21-25, 877:2-8, 877:19-878:6.) HP also

14   offered proof that it lawfully acquired monopoly power in the inkjet market with evidence

15   presented in Phase 1 that HP acquired a lawful monopoly through the exercise of superior

16   foresight and skill, better products, economic or technological efficiency, including efficiency

17   resulting from scientific research, including that HP was a company of inventors and it was

18   constantly trying to make its products work better for consumers. (See e.g. RT. 814:13-815:3,

19   820:24-821:4, 822:8-823:24, 887:19-24, 852:20-855:21; HT, 1140:14-1141:4, 1139:1-24,

20   721:22-724:2, 464-466, 451:20-452:3, 588:2-14, 466:2-21.). ACE's only witness with antitrust

21   litigation background, Robert Rose (testifying at the 2002 hearing), acknowledged that HP

22   defended the wrongful acquisition element of Nu-kote's monopolization counterclaim by

23   presenting evidence of lawful patents. (HT. 1401-1404.) HP's expert, Mr. Blecher, opined that

24   HP's patent case was an effective defense to the "unlawfully acquired monopoly" element of Nu-

25   kote's antitrust counterclaim. (RT. 735:10-18, 736:17-737:8 and RT. 769:13-24.) He concluded

26   a reasonable insured under the same circumstances would have pursued the same defense

27   strategy and would not, even for a moment, have seriously entertained the thought of dismissing

28   the affirmative claims given their obvious benefit to the defense and the fact that there would

   have been no significant cost savings from dismissing because all of the same evidence would

   then have had to be presented anyway in the antitrust phase of the trial. (RT. 771:5-772:4.)

1    HP further offered testimony, through Mr. Blecher and Mr. Sullivan, to show that during

2    Phase I of the trial, HP offered evidence to defeat the antitrust claims, including evidence that:

3    (1) because virtually Nu-kote's entire refill product line infringed HP's patents, Nu-kote had no

4    lawful market presence and thus could not recover antitrust damages; (2) HP's evidence of

5    trademark infringement also showed that Nu-kote had no lawful market presence; and (3) HP's

6    proof of patent and trademark infringement damages also offset Nu-kote's claimed antitrust

7    damages. Whether or not proof of these issues amounts to a legal defense to the antitrust claims,

8    HP's efforts in this regard were part of its strategy for the defense of the Nu-kote counterclaims.

9    Whether HP's strategy and expenses related thereto would have been conducted against liability

     by a reasonably insured under the same circumstances is discussed below.

10    In sum, even interpreting the conducted against liability standard in the manner argued by

11    ACE, i.e., the activity or expense must disprove an element of the alleged liability, the weight of

12    the evidence presented at the hearing was that proof of HP's affirmative claims in the post-tender

13    period disproved overlapping elements of the Nu-kote counterclaims. Accordingly, HP's proof

14    of its affirmative claims was conducted against liability.

### C.  HP's Strategy

15    HP's primary position during the proceedings before the Special Master was that

16    everything in the Nu-kote case was defensive and that all of its expenses were conducted against

17    liability by a reasonable insured under the same circumstances. HP contends that prosecuting the

18    affirmative case was strategically necessary to defense of the antitrust claims and that

19    strategically defensive trial conduct is "conducted against liability." HP further asserts that ACE

20    did not prove that HP's strategy was not one a "reasonable insured would have conducted against

21    liability under the same circumstances."

22    ACE contends that strategy is not and cannot be the standard required by Judge Ware.

23    ACE asserts if strategic benefit was enough to make a prosecution outlay defensive for purposes

24    of determining what expenses were conducted against liability, the Court could have simply

     affirmed the Special Masters findings on alternative grounds under Fed.R.Civ.P. 53.

25    In the March 31, 2003 report and recommendation, the Special Master summarized the

26    extensive evidence offered by HP during the damages hearing to establish that the post-tender

27    fees and costs incurred by HP in the Nu-kote were related to and therefore necessary to the

28    defense of the Nu-kote counterclaims. *See* March 31, 2003 Report at 27-37. The Special Master

1  found that HP had presented evidence, through the testimony of Messrs. Blecher, Cooper,

2  Sullivan, Marshall, Pecau, Brigham and HP in-house counsel, that "by the time HP tendered the

3  defense of the Nu-kote action to ACE, the litigation was focused around the Nu-kote

4  counterclaim and that HP's pursuit of its affirmative claims was part of an overall strategy of

5  defense against the counterclaim." March 31, 2003 Report at 37. Based thereon, the Special

6  Master concluded that HP had met its burden of establishing that all of the post-tender fees and

7  costs incurred by HP were related to the defense of the Nu-kote counterclaim, and that as a

8  result, all HP's post-tender fees and costs were presumed to be reasonable and necessary defense

9  costs. *Id.*   The Special Master concluded that HP had presented, through its attorneys and Mr.

10 Blecher that all the post-tender fees and costs were necessary to the defense of the counterclaim

11 due to the "strategic interrelationship of the prosecution and the defense." *Id.* at 51. The Special

12 Master further found that ACE had failed to meet its burden of proving by a preponderance of

13 the evidence that any of the post-tender fees and costs were unnecessary to the defense of the

14 counterclaim.

The Court disagreed, stating that:

> The Court finds that a trier of fact could reasonably conclude, by a preponderance of evidence, that a portion of HP's expenses were unnecessary to the defense of the Nu-kote counterclaims. An expense is necessary only if the expense would be conducted against liability by a reasonable insured under the same circumstances. *Aerojet* at 62-63; *see also Barratt* at 848; and *Larkin* at *19. In other words, an expense[] is unnecessary if the expense would not have been conducted against liability by a reasonable insured under the same circumstances.
>
> In this case, a trier of fact could reasonably conclude that ACE presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims. ... Second, ACE presented the testimony of Professor Menell, who essentially opined that there was a clear dividing line between prosecution expenses and defense expenses. Third, Robert Rose also testified that HP's prosecution claims and Nu-kote's counterclaims were separate. Fourth, Craig Aronson also testified that he could separate out expenses related to HP's prosecution claims. Implicit in each of these witnesses' testimony is that certain prosecution related expenses are severable from the defense expenses, and thus clearly unnecessary to the defense. That the three witnesses may not have used the terms necessary, unnecessary, reasonable or unreasonable to label expenses does not mean that their testimony is inadequate to carry ACE's burden of proof.

November 25, 2003 Order at 9-10 (emphasis added). The Court's October 15, 2004 order

clarified that the Special Master had applied an improper definition of what is "necessary to the

defense," stating that the Court's definition is narrower than the definition applied by the Special

Master, and required determination "not only whether prosecutions expenses are 'reasonably related' to the defense, but also whether those reasonably related expenses are likely to have been incurred by a reasonable insured under the same circumstances." The Court further noted that "the inquiry into what a reasonable insured would do to defend necessarily involves a consideration of whether the benefits of the strategy are worth the cost" citing *Barratt* at 862. October 15, 2004 Order at 3-4.

The Special Master's interpretation of the November 2003 and October 2004 orders differs from that of ACE.  As an initial matter, the orders do not require the Special Master to conclude that ACE had presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of the Nu-kote counterclaims.  Instead, the orders state that a trier of fact <u>could</u> so find.  In the remand proceedings, ACE has offered new and different evidence (other than its improper reliance on HP's "not inextricably related" statement in 1996).  Given ACE's new and different showing, the Special Master must determine ACE has presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of the Nu-kote counterclaims.

Perhaps more importantly, the Special Master does not view the Court's orders as precluding HP's reliance upon "strategy" or a "strategic benefit." Instead, the strategy must be viewed in the context of the Court's definition of "necessary." The relevant cases and the Court's orders require that:  (1) the strategy amount to a reasonable and necessary effort to avoid or at least minimize liability; (2) the expenses incurred pursuant to the strategy are reasonable and necessary to avoid or minimize liability, which requires a connection between the strategy and the expenses conduct/strategy; (3) the benefits of the strategy are worth the cost of the strategy. The answers to these question will reveal whether a reasonable insured would have engaged in a similar defense strategy, i.e., whether HP's reasonably related prosecution expenses are likely to have been incurred by a reasonable insured under the same circumstances. *See Aerojet* at 6-61; *Barratt* at 861-862; and October 14, 2004 Order at 3-4.

During the remand hearing, HP again offered compelling that HP's prosecution of its affirmative claims was strategically defensive to Nu-kote's antitrust claims.  Mr. Blecher, HP's antitrust expert, testified that:

> "[O]nce [Nu-kote counterclaims filed by Ron Katz] surfaced seriously, the Hewlett-Packard strategy of prosecuting the claims for patent infringement, effectively to eviscerate the antitrust claims, was a reasonable and proved to be a successful strategy."

(RT. 742:22 – 743:1.)  HP offered testimony that to defend against the antitrust counterclaim, HP principally prosecuted its affirmative case. Mr. Blecher testified that HP's attorneys "set up a lack of standing to maintain the antitrust claims and basically put all of the major allegations into play by denial." (RT. 732:12-22.) Mr. Blecher testified that:

> [T]he successful prosecution of the patent claims by HP in this case, because they covered so substantial a part of Nu-kote's product line, . . . would effectively bar Nu-kote's claim for antitrust damages. . . . I believe the law is or will evolve to be that if you're in the market, if your presence in the market is unlawful because you are a thief and you've stolen somebody else's technology, that you would be barred from recovering antitrust damages. And as a practical matter, presentation of that kind of evidence to a jury which concludes that the antitrust claimant . . . exists in the market by reason of stolen property or infringed property, will not get any damages.

(RT. 733:4 - 735:18.) Mr. Blecher testified that the jury verdict on HP's patent claims and the Nu-kote antitrust claims shows that the jury did not believe Nu-kote had a lawful market presence. (RT. 725:20 – 726:11, 727:19-20, 729:8-21, 730:5-22, 731:21-24, 732:12-22, 732:24-733:3; 733:4 – 736:17-25.) Mr. Blecher testified that "if Nu-kote appears to the jury to be a thief, that its products are based on stolen technology, it's highly improbable, not impossible, but highly improbable, that a jury is going to reward a thief with a damage verdict under the antitrust laws." (RT. 782:8-21.)

HP also offered testimony that HP used the phasing order and its position as plaintiff to ensure that its story was presented to the jury first, and allowed the jury to determine that Nu-kote had no lawful market presence – because its promotion of its products violated HP's intellectual property rights – before deliberating on the antitrust counterclaims. (RT. 756:8 – 757:25; 755:6-13.) Mr. Blecher testified that:

> I believe from the totality of the circumstances, . . . that HP regarded itself at a certain point as the defendant, and that everything they did was calculated to defeat the antitrust claim and that their interest in the patent claims, though still extent, was diminished, as an affirmative matter. . . . . The winning of the patent issues, in my view, was defensive, intended to eliminate the antitrust claims.

(RT. 765:2-25.) With respect to the idea of whether HP could have dismissed its patent or trademark claims and still maintain the strategic advantage it needed to win the case, Mr. Blecher stated that:

> I have an opinion that it would be both suicidal and malpractice. . . . [S]uccessful prosecution of the patent claims is what defeated at least the material part of the antitrust

clause, and they would have lost their advantage of going first and tainting Nu-kote, as obviously they could and apparently did.

And in the end, it wouldn't have made much difference, since all the same evidence would have come in, but only as a defense, after Nu-kote was able to blast HP. So there would have been absolutely no sense, in my opinion, to dismissing the patent claims. . . . [F]rom the time of the bankruptcy on, and maybe before that and based on the testimony of their in-house lawyers that I read, I believe [HP's] mentality was they had become the defendant for practical purposes. . . . . [I]f their presence in the market is unlawful, they're not a lawful competitor, they don't have an entitlement to antitrust damages.

(RT. 769:13 – 772:10; 765:2-25.)

Mr. Sullivan also testified as to why HP's evidence and argument in Phase 1 (where HP sought to prove its affirmative patent, trademark and false advertising claims against Nu-kote) was strategically "conducted against liability" vis-à-vis the claims asserted in Nu-kote's counterclaims. HP's sixteenth affirmative defense asserted that HP could not be liable for antitrust violations or unfair competition where the conduct charged against it is lawful because its actions were protected and encouraged by other laws, including the patent laws. (RT. 834:23 – 837:1.) HP's thirty-third affirmative defense asserted that with respect to Nu-kote's interference claims, HP's allegedly anticompetitive conduct vis-à-vis Nu-kote was lawful because HP possessed patents that justified its suit against Nu-kote. (RT. 837:2 - 837:20.)

Mr. Sullivan also testified that HP used Phase 1 to introduce proof that would be defensive of the counterclaims asserted against it:

[W]e basically spread the antitrust case as much as we could into the . . . IP case so we wouldn't be stuck for time when we had to deal with the . . . issues with antitrust.

. . . .

[T]he case was tried from May to July and there might have been two weeks for both sides to put on any additional evidence with regard to antitrust. . . . We were just putting on our additional evidence. Katz put on his additional evidence, we put on our additional defenses and made some additional points. . . .

[W]e were using the testimony of the ink inventors . . . in the trademark patent IP case to show that the HP inks were invented in a way that made them unique and different. . . . So when we came to . . . the antitrust case to talk about FUD, we already had the evidence that it couldn't have been about FUD because the statement was true that we invented the inks, they were our inks and Nu-kote infringed them. So we were telling the public that Nu-kote inks weren't as good, we were using that as support for the truth of the statement that Nu-kote was trying to say was false.

1  (RT. 902:15 – 903:8, 900:18-901:19.)  In response to Nu-kote's claims that HP changed its

2  cartridge design to be anticompetitive, HP used Phase 1 to offer proof to counter these claims.

3  Mr. Sullivan noted that:

> 4  So we had evidence in the first part of the case to show a couple things:  One, that
> these were not easy to invent, that HP did invent them, we had the customers in mind
> 5  when we did invent them, we wanted to get to perfection as best as HP could.  And that
> the changes . . . that we did with regard to the cartridges was motivated by the need of the
> 6  design to make a better product rather than some anticompetitive motive.

7  (RT. 903:9 – 904:4.)

8  Robert Cooper, counsel for HP during the Nu-kote action, explained the primary value of

9  HP's affirmative claims at trial was to portray HP in a favorable light before Nu-kote had the

10  opportunity to present its antitrust case.  Mr. Cooper wanted the jury to focus on HP's

11  infringement claim and decide it first because he was convinced the jury would then give the

12  antitrust claim "the back of the hand."  HP could take advantage of a "halo effect" that the jury

13  would have in mind when Nu-kote started attacking HP.  Mr. Cooper explained that most

14  antitrust lawyers share his belief that prosecuting a patent case first in such a scenario is

15  important because it gives you an opportunity to be the plaintiff and argue the antitrust claims are

16  nothing more than a non-meritorious "knee-jerk" reaction.  HP tested this theory in jury research

17  and found prosecuting the intellectual property case critical to the defense. (HT. 1137:8-

18  1138:25, 1139:1-24, 1142:18-1143:20.)  Mr. Sullivan agreed with the importance of this "attack

19  first" defense mode so HP could tell the jury that Nu-kote's counterclaim was an ill-founded

20  knee-jerk reaction to HP's lawsuit.  (HT. 926:4-7, 909:12-19.)  Jonathan Marshall, one of HP's

21  testified that that "it was critical that before Katz started throwing mud at us, that we establish

22  that we were the innovators and we were the guys wearing the white hat.  We fought very hard to

23  keep that antitrust stuff out to get the first bite at this, and you get one chance to make a first

24  impression[.]"  [(HT. 721:22-723:9.)  William Pecau testified that HP put on its "affirmative"

25  case only so it could tell its story first as the "plaintiff" to gain control of the narrative and

26  defend the antitrust claims, "which everybody knows that's what you want to do." (HT. 473:17-

27  474:4).

28  Outside of the assertion that a strategy is legally insufficient to meet the Court's standard,

ACE did not address HP's testimony with respect to HP's strategy.  As such, ACE did not refute

meaningfully refute HP's evidence that its Phase 1 trial strategy was to present evidence of

1  patent validity together with evidence of patent and trademark infringement as a defense to all

2  Nu-kote counterclaims.

3  Accordingly, based upon the testimony and evidence presented during the damages and

4  remand hearings, HP has established that HP's "white hat" strategy was part of a reasonable and

5  necessary effort to avoid or at least minimize the liability posed by Nu-kote's antitrust claims.

6  The weight of the evidence presented is that consistent with HP's strategy, which was apparent

7  as early as 1996 (see ex. 1593, HP's reply to its motion to bifurcate), HP's proof of its

8  affirmative claims for patent infringement, trademark infringement and false advertising

9  provided HP with a successful defense to Nu-kote's antitrust claims. As previously noted in

10  connection with the discussion of Professor Menell's testimony, HP's affirmative claims

11  overlapped with and were defensive to Nu-kote's counterclaims, and thus were conducted

12  against liability. Likewise, the weight of the testimony during the damages and remand hearing

13  also was that the expenses incurred pursuant to the strategy were reasonable and necessary to

14  avoid or minimize liability the liability posed by the counterclaims. Provided that the benefits of

15  the strategy are worth the cost, which is discussed below, HP's trial strategy was a reasonable

16  and necessary effort to avoid or at least minimize the liability posed by Nu-kote's antitrust

17  claims. The evidence shows that a reasonable insured facing the circumstances that HP did in

18  the Nu-kote litigation would have presented essentially the same defense to the counterclaims.

**V.  Cost-Benefit Analysis**

The Court's October 2004 Order noted that resolution of the question of what expenses

would have been conducted against liability by a reasonable insured under the circumstances

requires a cost-benefit analysis, and noted that the Special Master had not performed a cost-

benefit analysis. Interestingly, ACE did not offer a cost-benefit analysis during the remand

proceedings, and makes minimal if any argument with respect to a cost-benefit analysis. ACE's

briefs suggest that ACE's view with respect to a cost-benefit analysis is that since HP's

affirmative claims were not conducted against liability as of May 7, 1999, there was no benefit to

pursuing those claims as part of a defensive strategy after that date.

HP contends that a reasonable insured under the same circumstances would have

prosecuted HP's affirmative claims against the liability posed by the counterclaims, after

considering all the costs and benefits of that strategy. HP asserts that: (1) at both the 2002 and

2006 hearings many witnesses offered thorough, detailed and credible testimony that

1   unequivocally demonstrates that HP's affirmative claims operated as a defense to Nu-kote's

2   counterclaims, both before and after May 7, 1999; (2) numerous witnesses explained that the

3   counterclaims posed a serious and substantial risk to HP, a billion dollar monetary exposure plus

4   far-reaching injunctive relief that could have crippled HP's most lucrative business unit, the

5   inkjet cartridge division; (3) the cost of "prosecuting" HP's affirmative case would not have been

6   more than the cost to "defend" and was certainly far less than the potential exposure; and (4) the

7   cost of the strategy was dwarfed by the benefits - the affirmative claims successfully eliminated a

    billion dollar exposure and preserved HP's business.

8       "The inquiry into what a reasonable insured would do to defend necessarily involves a

9   consideration of whether the benefits of the strategy are worth the cost." October 15, 2004 Order

10  at 3-4.

11      The testimony presented compels the conclusion that the benefits of HP's strategy/proof

12  of its affirmative claims were worth the cost. Mr. Blecher testified that HP's "successful

13  prosecution of the patent claims is what defeated at least the material part of the antitrust

14  clause[.]" (RT. 769:20-24.) Mr. Blecher explained that: (1) Nu-kote made a serious settlement

15  demand of a billion dollars, which presented a $3 billion trebling exposure, and so HP was at risk

16  of paying a very substantial money judgment; (2) more important, Nu-kote launched a "direct

17  frontal assault on [HP's] method of doing business;" (3) it sought injunctive relief that would

18  have undermined HP's inkjet cartridge business – which was its "cash cow" and most important

19  business unit, generating a multi-billion dollar annual income stream  and over the long term HP

20  could therefore lose substantial revenues to new competitors which could have debilitated its

21  business; and (4) HP was fighting to preserve its very existence and way of life. (RT. 2190:16-

22  2192:7, 2193:3-19, 2238:7-2239:8.) Mr. Blecher concluded that HP's some $28 million in post-

23  tender fees and costs (which included its prosecution efforts), were reasonable and necessary to

24  HP's defense given the debilitating exposure posed by the counterclaims and relatively marginal

25  defense costs expended in comparison. (HT. 2190:16-2191:15.) All of that money had to be

26  spent and all of the litigation tasks had to be performed, according to Mr. Blecher, because the

27  expenditures allowed HP to "survive[] what could have been a devastating blow both in terms of

28  [a] cash judgment and, even more importantly, in terms of enjoining the operation of their

    business in a way which could have crippled it." (HT. 2201:7-14.) "[I]n similar circumstances I

    think a reasonable company faced with a bet-the-company lawsuit, would have done the same

1    thing to protect itself." (HT. 774:25-775:3.) Mr. Blecher concluded HP's fees and costs were

2    reasonable and necessary to the defense, including in terms of the tasks performed, time spent,

3    lawyer hours and modest hourly rates. (HT. 2191:24-2192:3, 2245:19-25, 2249:1-4.) In Mr.

4    Blecher's opinion, a reasonable insured under the same circumstances would have conducted all

5    of the same litigation tasks that HP did (including prosecuting its affirmative claims), against the

     liability posed by Nu-kote's counterclaims. (HT 773:24-775:3.)

6         Mr. Cooper testified that it was absolutely critical for HP to defeat Nu-kote's antitrust

7    counterclaims because the exposure was staggering. (HT. 1149:24-1150:4.) Mr. Cooper

8    testified that Nu-kote sought several hundred million dollars in recovery, which gets trebled

9    under the antitrust laws. (HT. 1134:22-1135:5.) Mr. Cooper testified that if Nu-kote prevailed,

10   HP would have been collaterally estopped on antitrust violations associated with the sale of its

11   most lucrative product (inkjet printer cartridges), and any plaintiff could then file a class action

12   on behalf of all the consumers that bought the cartridges over the years. (HT. 1135:6-18.) If HP

13   lost it would have been facing billions of dollars in exposure which could have been trebled, and

14   so the very existence of HP was threatened by Nu-kote's counterclaims. (HT. 1135:14-21.)

15   HP's exposure probably exceeded its net worth. (HT. 1143:24-1144:12.) Losing "could literally

16   [have] ruin[ed] the company." (*Id.*) Mr. Cooper testified that all of HP's expenditures in the Nu-

17   kote suit were necessary because "[t]hat's what you need to do to win" when faced with that kind

18   of antitrust exposure. (HT. 1143:24-1145:2.) Mr. Cooper explained that HP wanted to present

19   its patent case first and to have the jury focus on it because "we were of the belief that once they

20   saw that and decided that case for us, they were going to give the antitrust case the back of the

21   hand." (HT. 1142:18-23.) "We wanted them to view the antitrust case as nothing more than a

22   knee-jerk response that didn't have merit." (HT. 1143:9-11.) Mr. Cooper explained that the jury

23   did focus heavily on the patent case in their deliberations just as HP wanted. (HT. 1143:2-9.)

24   The result was that HP won most of the patent case and more importantly the antitrust case.

25   (HT. 1143:12-15.) Mr. Cooper also testified that it is very common to have huge defense bills

26   when large companies face staggering antitrust exposure like HP did. (HT. 1144:18-23.) In

27   contrast, in the Nu-kote suit (which was tried in 1999), HP spent just $28,434,834.22 in fees and

     costs in the post-tender period, despite the multiple billion dollar exposure HP faced. See March

28   31 Report and Recommendation at 88:1-5, 89:2-4. Mr. Cooper testified that HP was willing to

     abandon its affirmative intellectual property claims and tried to end the entire case with very

1  lucrative settlement offers and in the bankruptcy, but that Nu-kote and its creditors saw the case

2  as a their ticket to a huge recovery and refused. (HT. 1133:19-1137:7; 1135:22-25.)

3       Mr. Sullivan's testified that Nu-kote's pre-trial demand to HP amounted to a billion

4  dollars (HT. 856:5-11.)  "The amount of money at stake in the antitrust case at the time of trial

5  was in the hundreds of millions of dollars" (HT. 907:6-8.)  Mr. Sullivan testified that Nu-kote

6  sought to "fundamentally change the way HP made its printers" and that "HP would have been a

7  very different company than it is today" if it had lost the antitrust case (HT. 907:8-9; RT. 844:16-

18.).  Mr. Sullivan testified that the liability posed by Nu-kote's antitrust counterclaim was

8  extensive because it threatened the very heart of HP's inkjet business, a billion dollar business at

9  the time of the Nu-kote lawsuit and, a business which cost HP about a billion dollars to develop.

10  (RT. 812:3-7, 20-24; HT. 894:20-23.)  Mr. Sullivan testified that the risk of an adverse judgment

11  was real because: (1) there were HP internal documents that "talked in terms of HP . . . having a

12  monopoly position;" (2) there were other internal documents memorializing HP meetings that

13  talked about "HP wanting to get Nu-kote," which were not good documents, caused the defense

14  team real concern and which they had to deal with at trial; (3) Coudert Brothers, and Mr. Katz in

15  particular, was a very formidable opponent who "could take any document and make it look like

16  the world's worst document; and (4) many HP witnesses were not so good and presented

    problems for HP's case.  (HT. 858:19-25, 857:9-25, 858:19.)  In connection with the bankruptcy

17  proceedings Nu-kote had hired two antitrust law firms independent of Coudert Brothers , to

18  evaluate Mr. Katz's opinion that Nu-kote could win its antitrust case against HP; both firms

19  advised the Nu-kote board of directors that its antitrust case was a good, solid claim and that the

20  odds were in its favor to win.  (HT. 859:3-14.)   Mr. Sullivan testified that due to the serious

21  nature of the counterclaims it was critical for HP to win and, as a result, "we used every arrow in

22  HP's quiver to win that case." (HT. 907:6-11.)  He testified that HP had to devote whatever it

23  took to prevail against Nu-kote's billion dollar counterclaims. (RT. 812:20-813:2.)  Mr. Sullivan

24  also testified that winning HP's trademark case was critical to defeating Nu-kote's antitrust case.

25  (HT. 905:19-906:10.)

         Jonathan Marshall testified that Nu-kote sought almost a billion dollars from HP and also

26  to strip it of its intellectual property in an area that represented additional billions and billions of

27  dollars in investments.  (HT. 609:20-610:7, 618:3-7, 11-17, 637:18-24.)  Nu-kote was trying "to

28  collect a billion dollars to save their company." (HT. 723:20-724:2.)  Mr. Marshall testified that

1   HP offered Nu-kote a settlement in the double digit millions but that Nu-kote rejected the offer

2   because it thought it could recover $900 million on its counterclaims. (HT. 617:23-618:7.) Nu-

3   kote saw the counterclaims as "an opportunity to save the company" out of bankruptcy. (HT.

4   616:20-25.) Mr. Marshall also testified that Nu-kote, in somewhat of a reversal of roles, sought

5   and obtained relief from the automatic bankruptcy stay of the Nu-kote litigation, despite that it

6   was the "defendant," so it could pursue recovery from HP on the counterclaims. (HT. 616:5-

7   619:4.) HP, the "plaintiff," opposed the lifting of the stay because of the substantial risk posed

8   by the counterclaims, because it had no hope of recovering anything from Nu-kote given the

9   bankruptcy, and because Nu-kote was no longer a threat in the marketplace so there was no need

10  to pursue the affirmative claims other than as a defense. (*Id.*) HP's litigation objectives changed

11  to defeating Nu-kote's counterclaims because Nu-kote eventually asserted the right to $900

12  million in antitrust damages and also sought by its counterclaims to dedicate all of HP's inkjet

13  cartridge intellectual property and business to the public. (HT. 718:15-719:13.) The latter was a

14  real concern because HP's inkjet business unit generated a multiple billion dollar annual income

15  stream. (HT. 605:17-606:5.) Mr. Marshall testified that all of HP's expenditures in the Nu-kote

16  suit were necessary given the magnitude of the problem and the magnitude of Nu-kote's

17  challenge to a component of HP's business that was critical to HP. (HT. 646:2-11.) Mr.

    Marshall further testified that HP's affirmative case, including its "white hat" evidence presented

    during Phase 1 of the trial, is what defeated Nu-kote's counterclaims. (HT. 721:22-724:2.)

18          Mr. Pecau testified that a victory on HP's intellectual property claims necessarily spelled

19  a victory against Nu-kote's counterclaims, and that Nu-kote was pursuing HP for hundreds of

20  millions of dollars. (HT. 455:9-21, 456:13-19, 458:8-11.) Nu-kote also prayed for an order

21  dedicating all of HP's inkjet ink and cartridge patents to the public or, alternatively, allowing the

22  public royalty-free licenses to manufacture and sell inkjet ink and cartridges utilizing the

23  processes and techniques embodied by HP's patents. (HT. 539:6-19; Exhibit "193," prayer ¶ e.)

24  HP understandably did not want to "have all of its IP portfolio stripped from it." (HT. 587:20-

25  588:1.) HP's inkjet cartridge business generated at least a billion dollar annual income stream.

26  (HT. 430:8-13.) Aside from revenues, Mr. Pecau testified that HP had spent over $2 billion in

27  plant and $350 million in research and development to start its inkjet printer business. (HT.

28  465:24-466:21.) Mr. Pecau testified that so long as the case was tried in phases, with HP's

    affirmative claims put on first, a victory on the affirmative claims would mean the end for the

counterclaims. (HT. 421:5-14.)  Mr. Pecau explained that HP pursued its intellectual property case as the defense to Nu-kote's antitrust claims. HT. 453:5-9.) By the summer of 1998, the antitrust and related claims became the parties' focus with the affirmative claims remaining important only because of their benefit to the defense. (HT. 453:17-19.) Nu-kote had changed its packaging, which significantly diminished HP's interest in pursuing trademark claims. (HT. 454:3-10.) HP similarly no longer had the need to pursue its false advertising claims because Nu-kote's products were doing so poorly in the marketplace that HP believed Nu-kote was going to self-destruct without any intervention by HP. (HT. 454:11-20.) And, aside from the defense benefit, the patent claims were not a big deal at that point either in terms of money or the marketplace. (HT. 455:9-10.) Mr. Pecau testified that but for having to defend Nu-kote's counterclaims, HP would have dropped the litigation. HT. 455:9-21.) According to Mr. Pecau the defense team never considered even for a moment dismissing HP's affirmative claims when Nu-kote filed for bankruptcy (although there was no longer an opportunity to collect on the claims), because it would have been "absolutely stupid" from a trial tactic standpoint given the benefit to the antitrust defense. (HT 595:25-596:9.)

HP's former general counsel Jack Brigham testified that once Ron Katz became involved in the litigation HP pursued its intellectual property claims as a defense to Nu-kote's counterclaims. Mr. Brigham explained that HP, after evaluating strategy and how to defend itself, determined that substantiating its patent rights would defeat Nu-kote's antitrust counterclaims – that "the best defense would be an offense." (HT. 1778:4-1779:14.) HP knew that by establishing that it was the owner of valid patents and trademarks in the relevant market it would prevail against Nu-kote's antitrust claims. (HT. 1789:9-1790:2, 1809:12-17, 1810:4-9.) Mr. Brigham testified that HP certainly did not prosecute its affirmative claims for the sake of monetary recovery but as a very important "defensive tool." (HT. 1790:5-17.) Nu-kote was in bankruptcy and HP never did recover anything from them. (*Id.*) Monetary recovery "was not part of the equation at all." (HT. 1790:15-16.) HP's strategy, as anticipated, turned out to be successful according to Mr. Brigham. (HT. 1779:15-16, 1790:3-4.) He testified that Nu-kote's counterclaims "presented a substantial risk" to HP, a billion dollar exposure, and that he was very concerned that HP might lose the case. (HT. 1798:4-23.) As a result, Mr. Brigham had to report directly to HP's CFO Bob Wayman and CEO Lou Platt on an ongoing basis, including to justify HP's litigation costs. (HT. 1781:9-12, 1784:4-15.) Like Mr. Brigham, Mr. Wayman and

1   Mr. Platt were both concerned about the substantial risk HP faced if it did not prevail in the

2   lawsuit and with controlling HP's litigation costs. (HT. 1781:18-1782:11.) Mr. Wayman's job

3   included watching over costs, and he had some very heated discussions with Mr. Brigham. (HT

4   1785:1-6.) Mr. Brigham had to convince Mr. Wayman that HP was doing the best it could to

    control costs. (Id.)

5   Finally, Ronald Griffin, an in-house patent lawyer for HP testified that HP's affirmative

6   patent and trademark claims were pivotal to its defense against the antitrust claims. (HT.

7   1646:19-1647:20, 1654:24-1655:4, 1689:5-20, 1690:9-14.) Mr. Griffin testified that Nu-kote's

8   counsel Ron Katz made demands for hundreds of millions of dollars before trial. (HT. 1656:5-

9   14.) Mr. Katz's goal in litigating Nu-kote's antitrust counterclaim was not only incalculable

10  monetary recovery but also to emasculate HP's intellectual property rights so Nu-kote would be

11  in a position to do things in the marketplace that it otherwise would not have been permitted to

12  do. (Id.)

13  With one exception, ACE's reply brief did not address the cost-benefit evidence provided

14  by HP. At page 16 of its reply ACE asserts "HP's assertion that it faced a billion dollar claim is

15  contradicted by its own expert reports in the underlying litigation. ACE, however, did not offer

16  the referenced reports into evidence during the damages or remand hearings. None of ACE's

    witnesses during the remand hearing offered contrary cost-benefit evidence or analysis.

17  Based upon the undisputed testimony, the benefit of HP's strategy/prosecution of its

18  affirmative claims far outweighed the associated cost, which under ACE's theory was $13

19  million, and did not exceed $28 million. While the costs clearly were high, the risk posed to HP

20  by the Nu-kote counterclaims was much, much higher. Consistent with the foregoing, the

21  Special Master finds that HP has established by much more than a preponderance of the evidence

22  that a reasonable insured under the same circumstances would have prosecuted HP's affirmative

23  claims as a defense to Nu-kote's counterclaims just as HP did, after considering all the costs and

24  benefits of that strategy. ACE has not met its burden to prove to the contrary.

    ## V.  Craig Aronson's Quantification of Expenses under the Court's Standard

25  ACE contends that slightly more than $13 million of the expenses that HP incurred in the

26  underlying litigation were not conducted against liability by a reasonable insured under the same

27  circumstances. See Ex. 4216 A. ACE asserts that its expert, Craig Aronson, provided a

28  practical method for identifying which HP prosecution expenses were not conducted against

1  liability.  ACE asserts that Mr. Aronson determined which prosecution expenses were not

2  conducted against liability in accordance With Judge Ware's Orders remanding this proceeding

3  to the Special Master.

4

5                              A.  Mr. Aronson's Testimony

6         ACE requested that Mr. Aronson to review the legal bills and costs that were incurred by

7  the three billing entities, Gibson, Dunn & Crutcher, Pennie & Edmonds and HP in-house counsel

8  from the date of tender of the underlying litigation, June 13th, 1998 to the conclusion of the

9  litigation.  (RT. 467-468.)   Mr. Aronson was requested to evaluate and did evaluate whether

10 and/or to what extent the legal activities as reflected in the bills themselves were conducted by a

11 reasonable insured against liability.  (RT. 468.)  With respect to HP's legal fees, Mr. Aronson

12 reached his conclusions after reviewing each billing entry several times and applying the

13 methodologies discussed above.  In connection with his work following Judge Ware's remand,

14 Mr. Aronson testified that he had reviewed each legal expense at least four times.  (RT. 470:20-

15 23.)  Additionally, Mr. Aronson had reviewed the same legal expenses in connection with the

16 October 2002 hearing.  (RT. 470:24-471:2.)  All told, Mr. Aronson has reviewed each  of the

   billing entries at least seven times.  (RT. 471:3-7.)

17        With respect to HP's legal fees which contained descriptions of the services, Mr.

18 Aronson allocated fees based on the following criteria:  (1) review each billing entry; (2)  for

19 each billing entry, review any work product, such as motions or depositions, described in the

20 billing entry; (3) for each billing entry, take into consideration the role of the billing attorney in

21 the litigation; (4) for each billing entry, determine if the activities described in the billing entry,

22 taking into consideration the work product and the billing attorney, were necessary for the proof

23 of HP's affirmative claims of patent infringement, trademark infringement and false advertising;

24 and (5) for each entry billing activity that was necessary to the proof of HP's affirmative claims

25 of patent infringement, trademark infringement and false advertising, determine if the activities

26 described in the billing entry were also necessary to proving or disproving an element of HP's

   defense against Nu-kote's counterclaims.  (RT 476:19-482:8; Ex. 4216.)

27        If in reviewing a billing entry Mr. Aronson concluded that the activity described therein

28 was necessary for the proof of HP's affirmative claims but was not necessary to proving or

1    disproving an element of HP's defense against Nu-kote's counterclaims, the activity was

2    allocated to HP's prosecution expenses. (RT. 477:20-478:5; Ex. 4216) Expenses that served

3    dual purposes, or that were necessary solely for proving or disproving an element of HP's

4    defense against Nu-kote counterclaims, were allocated to HP's defense expenses as such

5    expenses were conducted against liability. (*Id.*) Only those activities that were necessary to

6    proving HP's affirmative claims of patent and trademark infringement and false advertising that

7    did not also prove or disprove an element of HP's defense against Nu-kote's counterclaims were

8    considered "prosecution" expenses that were not "conducted against liability by a reasonable

     insured under the same circumstances." (RT. 476:19-482:8, 496:24-497:12.)

9         Mr. Aronson testified that for billing entries/expenses incurred from May 7, 1999 to the

10   end of the underlying Nu-kote litigation, there was essentially a two-part process. Mr. Aronson

11   first asked whether the activity related to the affirmative case and then secondly, he asked

12   whether it also related to the defense by HP against Nu-kote claims. (RT. 499.)

13        With respect to billing entries for the period from the date of tender to May 7, 1999, the

14   only question was whether the activity was related to the affirmative case. (*Id.*) Prosecution

15   related expenses prior to May 7, 1999 that involved the same claims that were prosecuted by HP

     after May 7, 1999 were allocated as prosecution expenses. (RT. 500.) For example, on the

16   patent claims it was only as to the four patents that were still being prosecuted in the post May

17   7th time period. (*Id.*) When asked why he did it that way, Mr. Aronson stated:

18        Basically, two reasons. First of all, I was requested to review the pre May 7th, 1999 bills
19        and I also thought it was of importance to note that Hewlett-Packard was continuing to
          prosecute post May 7th, 1999 certain of these claims even though the sham litigation and
20        the other trade disparagement type allegations were out of the case.

21   (RT. 500:12-18.) With respect to prosecution expenses that HP incurred affirmatively pursuing

22   patents that didn't go to trial, Mr. Aronson allocated those expenses to the defense. (RT. 500.)

23        With respect to vague legal bills totaling slightly more than $2.4 million, Mr. Aronson

24   applied the following: (1) for the Pennie & Edmonds and Gibson Dunn & Crutcher fees, he

25   totaled the amount of non-vague legal bills for each outside law firm that were allocated to

26   "prosecution" and divided that amount by the total amount of non-vague legal bills for each firm,

27   which resulted in a "prosecution" percentage for each law firm; (2) he took that "prosecution"

28   percentage and multiplied it by the total amount of "vague" legal fees for each outside firm,

     which was then added to the non-vague fees already allocated to "prosecution" to determine the

1  total amount of fees allocated to "prosecution" for each firm; (3) for HP's in-house vague fees,

2  Mr. Aronson determined the percentage of combined "prosecution" fees for Pennie & Edmonds

3  and Gibson Dunn & Crutcher against the combined total fees of these two firms, which was then

4  multiplied by HP's vague legal bills. (HT. 1039:4-1040:7; 1048:23-1049:4; see also Exhibit

5  1032.). With respect to the allocation of HP's costs, Mr. Aronson first segregated the costs into

6  three categories - firm overhead, travel/lodging and outside experts/vendors. Firm overheard

7  was allocated to "prosecution" expenses on the same percentage as legal fees for each firm prior

8  to and after May 7, 1999. (RT. 502:19-503:9, 503:22-504:5.) For travel/lodging costs, Mr.

   Aronson assumed all such costs were conducted against liability unless he could determine that

9  the only purpose for the cost was for an activity that was allocated to HP's "prosecution"

10 expenses. (RT. 504:6-505:3.) For outside vendors and expert fees, such costs were allocated

11 based on the work for which the cost was incurred. (RT. 505:16-24.)

12         Applying his methodology to the $28 million in post-tender legal expenses incurred by

13 HP, Mr. Aronson determined that $13,021,498 million (of more than $28 million) of HP's post-

14 tender expenses were not "conducted against liability by a reasonable insured under the same

   circumstances." As Mr. Aronson explained, this $13 million consists of two parts. ACE asserts

15 that consistent with Professor Menell's opinion that after May 7, 1999 HP's affirmative patent

16 and trademark infringement and false advertising claims were not conducted against liability,

17 Mr. Aronson determined that $6.48 million of HP's expenses were not conducted against

18 liability. Second, ACE asserts that consistent with Mr. Ocampo's opinion that a reasonable

19 insured would not expect insurance coverage to pursue its affirmative patent and trademark

20 infringement claims and false advertising claims, Mr. Aronson determined that another $6.54

21 million of HP's expenses were not "conducted against liability by a reasonable insured under the

22 same circumstances."[11] (Exs. 4217A and 4218.)

23

24 [11] After his initial review of each billing entry, and during each subsequent review as necessary, Mr. Aronson made
   notations on a copy of the original billing entries. (RT. 480:21-481:5; Exhibit 4218 (notebooks containing the
25 notations).) These notations reflected his initial thoughts concerning the amount, if any, of each billing entry that
   Mr. Aronson concluded should be allocated to "prosecution" expenses, and thus were expenses that were not
26 conducted against liability by a reasonable insured under the same circumstances. After reviewing the billing entries
   again to confirm or change his prior notations, the final notations were then transferred by a paralegal under Mr.
27 Aronson's supervision to an Excel spreadsheet. (RT. 498:12-499:2.)
           The Excel spreadsheets prepared under Mr. Aronson's supervision contained every billing entry reflected
28 on the bills for which HP is seeking reimbursement along with Mr. Aronson's determination of the amount of each
   billing entry that should be allocated to "prosecution" expenses. (Id.; Exhibit 4217A (files entitled P&E Post May 7,
   1999 Fees, P&E Pre May 7, 1999 Fees, GD&C Post May 7, 1999 Fees; GD&C Pre May 7, 1999 Fees & HP Pre and

1      In pertinent part, HP's cross-examination of Mr. Aronson revealed that: (1) Mr.

2  Aronson's quantified the expenses that Professor Menell testified were not conducted against

3  liability (RT. 542:21-543:1.); (2) Mr. Aronson analyzed and allocated billing entries between

4  prosecution and defense (RT. 559:23-560:8) without regard to Dr. Menell's analysis; (3) Mr.

5  Aronson had "not relied on" Dr. Menell's opinions when allocating billing entries (RT. 582:5-

6  25.); (4) Mr. Aronson allocated all defense expenses pertaining to HP's four patents that had

7  survived summary judgment to non-covered defense expenses, including pre-May 7, 1999

8  expenses (RT. 552:19-553:13.) – even though Professor Menell had testified that all of HP's pre-

9  May 7, 1999 defense expenses were conducted against liability (RT. 214:9-21.); and (5) Mr.

10  Aronson allocated HP's post-May 7, 1999 expenses related proving infringement and validity of

11  its patents to non-covered expenses (RT. 552:7-15; 672:12-20.), although Dr. Menell had

12  testified that HP's litigation activities from the beginning of Phase 2 of the trial until its

13  conclusion were also conducted against liability regardless of whether HP's affirmative claims

14  were implicated. (RT. 215:19-23.).

      Mr. Aronson admitted that ACE's counsel provided him with written directions in a

15  December 4, 2004 memorandum instructing him to "calculate" "[t]he legal fees and costs

16  attributable to HP's prosecution of its affirmative claims after April 29, 1999 in [the Nu-kote

17  Action]" and "the legal fees and costs attributable to the same affirmative HP claims in the post-

18  tender period (June 1998) through April 29, 1999." (Ex. 1660.) The memorandum contained his

19  only instructions from ACE. (RT. 556:3-15.) The ACE memorandum ACE did not, however,

20  instruct Mr. Aronson to determine or "calculate" which of HP's Nu-kote litigation activities

21  would or would not have been "conducted against liability" by a reasonable insured. In contrast

22  to Professor Menell's testimony, Mr. Aronson decided that HP's affirmative claims that were

23  tried were not "conducted against liability" in the pre-May 7 time period. (RT. 552:7-558:15.)

---

Post May 7, 1999 Fees).) The spreadsheets also showed amounts that should be allocated to settlement activities as well as those entries that were too vague to directly allocate.

    In addition to listing each billing entry and Mr. Aronson's allocations, the Excel spreadsheets contained on Exhibit 4217A also totaled the amounts that Mr. Aronson allocated to "prosecution" expenses. These amounts were first subtotaled by month. Then, the subtotal for each month was added together to arrive at the total amount that was allocated to "prosecution" expenses, and thus were not conducted against liability by a reasonable insured under the same circumstances. When the totals from each of the spreadsheets in Exhibit 4217A are added together, they equal the amounts that Mr. Aronson concluded should be allocated to "prosecution" expenses and that are expenses not conducted against liability by a reasonable insured under the same circumstances.

During his testimony, Mr. Aronson also admitted that: (1) he spent only six seconds to review each billing entry (RT. 529:5-530:24.); (2) his calculations included mathematical errors (*see e.g.*, RT. 589:6-19; Ex. 1707, RT 592:6-593:15, 591:22-592:5, 592:17-593:9; RT. 586:1-15; Ex. 4216, p. 7; RT. 587:16-23; RT. 593:17-595:3; Ex. 1711, RT. 597-602; :21-23.)

Mr. Aronson initially disputed that HP's assertion that his methodology for allocating HP's attorneys' invoice entries between "prosecution" and "non-prosecution" activities for any given invoice were so subjective that it could not be replicated to yield consistent results. (RT. 493:22-495:13.) Cross-examination revealed, however, that Mr. Aronson "allocations" were not entirely re-producible. For reasons not fully explained at the hearing, Mr. Aronson twice subjected the entries on GDC Invoice No. 981101851 (for September, 1998) to review, twice allocated the dollars billed in each such entry to "prosecution" or "non-prosecution," and prepared two spreadsheets summarizing his analysis and allocations – but with substantially different allocations and results on a large proportion of entries for that invoice. (RT. 655:1 - 665:20; Ex 1712.) Specific examples to which Mr. Aronson admitted included a timekeeper entry that Mr. Aronson first allocated only to prosecution and the second time split between "prosecution" and "non-prosecution" (RT. 662:10-663:22), and another entry that he first allocated to "non-prosecution" and the second time split between "prosecution" and "non-prosecution." (RT. 663:23-665:2.) Mr. Aronson, like Professor Menell and Mr. Ocampo, did not perform a cost-benefit analysis for HP's defense expenses. (RT. 675:25-676:13.)

B. Analysis of Mr. Aronson's Conclusions

HP contends that: (1) Mr. Aronson performed no analysis based on the "conducted against liability" standard as required by Judge Ware; (2) Mr. Aronson's testimony ignored and contradicted Professor Menell's analytical approach; (3) Mr. Aronson did not testify about which Nu-kote action defense expenses were or were not "conducted against liability; and his expert report contained no opinions specifying which HP affirmative litigation activities in the Nu-kote action would not have been "conducted against liability" by a reasonable insured; (4) Mr. Aronson's retroactive allocation of HP's affirmative claims is improper under Judge Ware's standard and contradicts Professor Menell's testimony; and (5) Mr. Aronson's opinions are entitled to no weight because they are based on inadequate billing entry reviews and on inaccurate and non-repeatable calculations.

1       ACE contends that: (1) Mr. Aronson determined which prosecution expenses were not

2   conducted against liability in accordance with Judge Ware's orders; (2) it demonstrated that

3   approximately $13 million of HP's expenses were not conducted against liability by a reasonable

4   insured under the circumstances; (3) Mr. Aronson's testimony is relevant; (4) Mr. Aronson and

5   Professor Menell are entirely consistent' and (5) HP's critique of Mr. Aronson's review is

6   without merit.

    In light of the Court's November 2003 and October 2004 orders, the Special Master

7   approached the remand with a belief that a method would be proposed that would allow the

8   Special Master to determine that some portion of HP's post-tender expenses would not have been

9   conducted against liability by a reasonable insured under the same circumstances.  However,

10  with one limited exception, ACE did not rely upon the evidence that the Court found would be

11  sufficient for a trier of fact to determine that ACE had meet its burden to establish that some

12  expenses were unnecessary.

13      After an even more detailed review of the underlying proceedings than occurred in

14  connection with the initial damages hearing, the Special Master is unable to conclude that ACE

15  has presented a preponderance of evidence that any of HP's post-tender expenses would not have

16  been conducted against liability by a reasonable insured.   In the final analysis, this conclusion is

17  based upon the particular facts of the Nu-kote action, including Nu-kote's bankruptcy- related

18  efforts  in 1998, and perhaps more importantly, the interrelationship between the claims alleged

19  by HP in the underlying action, and the expansive scope of the counterclaims alleged by Nu-

20  kote.  Nu-kote's response to HP's lawsuit had the effect of rendering HP's prosecution of its

21  claims defensive, both strategically and with respect to overlapping elements in the parties'

22  claims.  This interrelationship, testified to by ACE's expert, Professor Menell, combined with

23  ACE's failure to undertake the defense of the lawsuit, creates what would appear to be an

24  anomalous situation, i.e., a situation wherein an insured recovers from its insurer all of its costs

25  incurred in connection with the defense *and* prosecution of an action.

    In *Buss v. Superior Ct.*, 16 Cal. 4th 35, 52 (1997), the California Supreme Court

26  addressed the right of a defending insurer to seek reimbursement of costs actually expended to

27  defend "noncovered" claims.  ACE, however, did not defend.  The Court also noted that for an

28  insurer to carry its burden of proof on allocating "it must accomplish a task that, 'if ever

feasible,' may be extremely difficult." *Buss* at 57-58 (citation omitted; emphasis added).

1    As with Professor Menell and Mr. Ocampo, Mr. Aronson's testimony was insufficient for

2  this Special Master to conclude that any portion of HP's post-tender fees and costs would not

3  have been conducted against liability.  As an initial matter, Mr. Aronson's testimony at the

4  hearing revealed his testimony was not entitled to a great amount of weight.  Although it appears

5  that Mr. Aronson spent an extensive amount of time reviewing the Nu-kote action, even he

6  conceded that he spent only about 6 seconds per billing entry.  Much more importantly, HP's

7  evidence that during Mr. Aronson's review of the bills, and as part of his calculations, Mr.

8  Aronson twice looked at an identical Gibson Dunn bill and came up with different allocations of

9  the entries on the bill is extremely problematic. (Ex. 1712.) Mr. Aronson did not offer any

10  explanation with respect to his inconsistent review of an identical bill. The testimony elicited by

11  HP, at least in the Special Master's eyes, reveals the subjective nature and unreliability of Mr.

12  Aronson's testimony.  The Special Master cannot concur in ACE's assertion that the

13  inconsistency in Mr. Aronson's review of the bill in question "is an indicia of reliability."

14      There are significant additional problems with Mr. Aronson's testimony.  Mr. Aronson's

15  approach to HP's billing entries does not appear on its face to be improper. (Ex. 4216A.) Mr.

16  Aronson looked at each of the entries in light of his extensive review and knowledge of the

17  players and events in the underlying action.  Mr. Aronson then determined whether the activities

18  described in an entry were necessary to the proof of HP's affirmative claims of patent

19  infringement, trademark infringement and false advertising.  With respect to any such entries,

20  Mr. Aronson then determined if the activities described in the billing entry were also necessary

21  to proving or disproving an element of HP's defense against Nu-kote's counterclaims.  (RT

22  476:19-482:8; Ex. 4216.) The methodology, as asserted by ACE, sounds logical.

23      The problem Mr. Aronson's review is his view with respect to what was necessary to

24  proving an element of HP's defense to Nu-kote's counterclaims.  With respect to pre-May 7,

25  1999 expenses, Mr. Aronson testified that expenses that involved HP's affirmative claims were

26  allocated as prosecution expenses, i.e., not to be recovered by HP.  Thus, Mr. Aronson's theory

27  of what pre-May 7, 1999 expenses were conducted against liability is directly contrary to

28  Professor Menell's testimony, which was that prior to May 7, 1999, HP's pursuit of its

affirmative claims served as a defense to the Nu-kote counterclaims.  As such, ACE's experts do

not agreed as to what expenses would be conducted against liability prior to May 7, 1999.  This

is a problem for ACE.  ACE attempts to get around this problem by noting that Mr. Aronson's

1   testimony was consistent with that of Mr. Ocampo's no reasonable expectation of coverage

2   testimony. For the reasons previously noted, Mr. Ocampo's testimony is not admissible, and

3   moreover, does not address the relevant standard, and otherwise is contrary to the weight of the

4   evidence. Mr. Aronson's reliance upon this testimony to find pre-May 7, 1999 expenses related

5   to HP's affirmative claims not recoverable renders his testimony with respect to such expenses

6   incorrect. Mr. Aronson's allocation of pre-May 7, 1999 expenses is also contrary to the Special

7   Master's conclusion that HP's pre-May 7, 1999 expenses associated with the prosecution of its

8   affirmative claims were conducted against liability by a reasonable insured under the same

9   circumstances. As such, the Special Master rejects Mr. Aronson's testimony that $6.54 million

10  of HP's pre-May 7, 1999 expenses were not "conducted against liability by a reasonable insured

11  under the same circumstances." Mr. Aronson's testimony does not comport with a correct

    application of the Court's standard for the remand.

12          Similarly, the Special Master rejects Mr. Aronson's testimony with respect to post-May

13  7, 1999 expenses. For this period, Mr. Aronson allocated expenses that were necessary to

14  proving HP's affirmative patent infringement, trademark infringement and false advertising

15  claims to prosecution expenses, i.e., expenses that are not reimbursable to HP. This conclusion,

16  while generally consistent with Professor Menell's theory, is contrary to the Special Master's

17  conclusion that expenses associated with HP's affirmative claims, even after the Court's rulings

18  on HP's motion for partial summary judgment, were in fact conducted against liability. As

19  previously noted, proper application of Professor Menell's theory compels the conclusion that

20  Phase I and Phase II were conducted against "overlapping" claims such that HP's prosecution of

21  the claims was defensive to Nu-kote's counterclaims. Moreover, Mr. Aronson's testimony is

22  contrary to the Special Master's conclusion that HP's affirmative claims were defensive to the

23  declaratory relief and antitrust claims during Phase I of the trial. Mr. Aronson's view of what

24  was conducted against liability also is contrary to the Special Master's conclusions that HP's trial

25  strategy would have conducted against liability by a reasonable insured, and thus all of HP's

26  post-tender expenses were conducted against liability. Finally, it should be noted that Mr.

27  Aronson's testimony with respect to patent expenses during Phase II of the trial was again

28  contrary to Professor Menell's testimony that all Phase II was conducted against liability.

    Accordingly, given the Special Master's disagreement with Mr. Aronson's allocation vis-à-vis

1   what was conducted against liability, the Special Master is unable to give any weight to Mr.

2   Aronson's testimony regarding unnecessary expenses.

3          In conclusion, ACE has failed to meet its burden to establish that any of HP's post-tender

4   expenses would not have been conducted against liability by a reasonable insured under the same

5   circumstances.   Moreover, the preponderance of the evidence provided by both parties is that all

6   of HP's post-tender expenses would have been conducted against liability be a reasonable

7   insured under the circumstances.

8   **VI.    Conclusion**

9          The case was referred back to Special Master to assess what expenses "would be

10  conducted against liability by a reasonable insured under the circumstances." October 15, 2004

11  Order at 3.  Consistent with the Court's orders, the burden of proof was on ACE to establish by a

12  preponderance of the evidence which post-tender HP fees and costs would not have been

13  conducted against liability by a reasonable insured under the same circumstances.  Based on the

14  preponderance of evidence, ACE has failed to meet its burden of proving that any HP expenses

15  would not have been conducted against liability by a reasonable insured under the same

16  circumstances.  In contrast, HP presented additional uncontradicted evidence all its post-tender

17  expenses were conducted against liability, and evidence that the benefit of HP's conduct and

18  expenses far outweighed the associated cost of HP's conduct.  Based thereon, the Special Master

19  finds that all of HP's post-tender costs and expenses would have been conducted against liability

20  by a reasonable insured under the same circumstances.

21         The Special Master therefore finds, reports and recommends that the principal amount of

22  litigation expenses reported on March 31, 2003, $28,418,671.72 should be awarded to HP and

23  against ACE because they are all reasonable and necessary as defense expenses that were

24  conducted against liability and are likely to have been incurred by a reasonable insured under the

25  same circumstances.

26

27  Dated: _12-4-06_

28                                                    _____

                                                     Hon. Peter G. Stone (Ret.)
                                                     Special Master

### *PROOF OF SERVICE BY MAIL*

I, Lisa Powell, not a party to the within action, hereby declare that on

December 4, 2006 I served the attached Report and Recommendation After Remand

Hearing on the parties in the within action by depositing true copies thereof enclosed in

sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San

Jose, California, addressed as follows:

James Lowe Esq.
Gauntlett & Associates
18400 Von Karman Ave.
Suite 300
Irvine, CA 92612

Janelle F. Garchie Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" St.
Suite 800
San Diego, CA 92101

Alan Greenberg Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" Street
Suite 800
San Diego, CA 92101  USA

Ernest Slome Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" Street
Suite 800
San Diego, CA 92101  USA

Robert J. Romero Esq.
Hinshaw & Culbertson
One California St.
Suite 1800
San Francisco, CA 94111-5419  USA

John F. Daum Esq.
O'Melveny & Myers LLP
400 S. Hope St.
15th Fl.
Los Angeles, CA 90071-2899  USA

David A. Gauntlett Esq.
Gauntlett & Associates
18400 Von Karman Ave.
Suite 300
Irvine, CA 92612

Bradley M. Zamczyk Esq.
Hinshaw & Culbertson LLP
244 Jackson St.
3rd Fl.
San Francisco, CA 94111  USA

Steven H. Bergman Esq.
O'Melveny & Myers LLP
400 S. Hope St.
15th Floor
Los Angeles, CA 90071-2899  USA

Martin S. Checov Esq.
O'Melveny & Myers LLP
275 Battery St.
Suite 2500
San Francisco, CA 94111

I declare under penalty of perjury the foregoing to be true and correct.

Executed at San Jose, CALIFORNIA on December 4, 2006.

_____
Signature