**EXHIBIT 3**

# G GAUNTLETT & ASSOCIATES
### A T T O R N E Y S   A T   L A W

David A. Gauntlett
M. Danton Richardson++
Eileen Spadoni
Leo E. Lundberg, Jr.
Stanley H. Shure
Richard Wm. Zevnik
Eric Robert Little
Mark H. Plager*
Richard B. Hopkins
Catherine A. Kruy
Cesar Nava

18400 Von Karman, Suite 300
Irvine, California 92612
Phone: (949) 553-1010
Facsimile: (949) 553-2050

info@gauntlettlaw.com
www.gauntlettlaw.com

++Also Admitted in TX, LA & D.C.
*Also Admitted in CO, D.C., NJ & NY

Our File Number:

10191-003

June 16, 1998

## CONFIDENTIAL INSURED-INSURER COMMUNICATION

The following communication is an insurer-insured communication protected within the meaning of Civil Code § 2860(d), which provides in relevant part: "Any information disclosed by the insured or by the independent counsel is not a waiver of the privilege as to any other party."

## VIA FACSIMILE & U.S. Mail
**(818) 593-4430**

Insurance Company of North America
c/o CIGNA
21860 Burbank Boulevard, Suite 200
Woodland Hills, CA 91367
   Attn: Guy S. Blaire
         Senior Claims Specialist

Re:    **Hewlett Packard Company v. Nu-kote International, Inc.**
       **Counterclaim Nu-kote International, Inc. v. Hewlett Packard Co.**
       **United States District Court Northern District Case No. C-95-2254CW**

Subject: **Request for Settlement Authority**

| Policy Number | Policy Period | Coverage | Limit of Liability |
|---|---|---|---|
| XCPG0962191-A | 09/30/92 - 09/30/93 | Excess | $10,000,000 XS $50,000,000 |

Dear Mr. Blaire:

On February 23, 1998, our office, on behalf of our client, Hewlett Packard ("H-P"), tendered a defense for counterclaims against H-P in an action pending in the Federal District Court for the Northern District of California entitled, <u>Hewlett-Packard Co. v. Nu-kote International, Inc.</u>, U.S.D.C., N.D. Case No. C-95-2254 CW (the "Nu-kote Action").

10191-003/061698/38970.1

HP0000830

EXHIBIT
3



GAUNTLETT &
ASSOCIATES
ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 2

Due to a very recent development in the Nu-kote matter we require an immediate response from Insurance Company of North America ("INA"). Settlement negotiations between H-P and Nu-kote have reached a critical juncture. An opportunity presently exists to settle Nu-kote's counterclaims for an extremely reasonable sum based on H-P's potential damages exposure should the Nu-kote counterclaims proceed through trial to judgment.

Accordingly, H-P requests that INA participate in a telephone conference on Wednesday, June 17, 1998, at 10:30 a.m. PST. The conference phone number is (650) 494-8002 and the Call ID# is 3604.[1] Participating in the telephone conference will be H-P, its coverage counsel and representatives of the insurers in H-P's insurance program with appropriate settlement authority to discuss grants of settlement authority to H-P to resolve the Nu-kote counterclaims. H-P urges INA to immediately take all appropriate steps, including engaging the services of coverage counsel to assist its evaluation of this claim, so that INA is able to participate meaningfully in the meeting with H-P.

The amount of the proposed settlement is $15 million. H-P's attorneys' fees incurred in this litigation to date exceed $23 million. Costs through trial are presently estimated to be $12 million. Defense counsel's best estimate of H-P's likely damages exposure if no settlement occurs approaches $100 million. However, the total damages to which H-P is exposed in the event the present opportunity to settle the Nu-Kote counterclaims is not taken advantage of could approach $300 million before any trebling, exclusive of any award to Nu-kote of its attorneys' fees which we understand to be approximately $20 million. This latter estimate potentially exceeds H-P's total indemnity limits under all applicable policies.

While the amount of the proposed settlement may not involve INA's layer of coverage, H-P is providing INA with the following information regarding the claim and pertinent coverage issues so that INA is fully informed as to the claims asserted against H-P. In the event any of the insurers of layers underlying INA's coverage fail to participate in the proposed settlement, H-P expects INA to fund any such shortfall, subject to its equitable subrogation rights against any such nonparticipating underlying insurer. See Diamond Heights Homeowners Ass'n v. National American Ins. Co., 227 Cal.App.3d 5563, 579 (1991).

Based on recent rulings by Judge Ware, only 5 of the 12 patents asserted by H-P remain part of the action by H-P against Nu-kote. The alleged impropriety of H-P's prosecution of its patent claims against Nu-kote is one of the key elements of Nu-kote's antitrust counterclaim.

---

[1]Simply call (650) 494-8002, select 1 to enter the conference, type in the Call ID# (3604) and state your name.

10191-003/061698/38970.1



GAUNTLETT &
ASSOCIATES
ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 3

**You will notice that there are several documents referenced as exhibits to this letter. Given the confidential nature of these documents, H-P requests that you sign the "Confidentiality Agreement" attached hereto as Exhibit "A" before we release these documents to you. Upon receiving a signed copy of the Confidentiality Agreement, we will immediately forward these documents to your office.**

## CLAIMS

We summarize Nu-kote's counterclaim to assist your evaluation of H-P's present request for settlement authority. Nu-kote filed its counterclaim on January 19, 1996. The counterclaim includes ten distinct counts. These counts allege, in part, that H-P wrongfully prosecuted patents relating to its ink-jet printers and designed and marketed its ink-jet printers in such a way as to prevent other companies from making ink refillers for them. A reverse chronological summary of the allegedly abusive patents with the date of issuance follows:

| Item | U.S. Patent No. | Title | Date |
|------|----------------|-------|------|
| 1. | 5,116,409 ("'409 Patent") | "Bleed Alleviation in Ink-Jet Inks" | 5/26/92 |
| 2. | 5,108,503 ("'503 Patent") | "Smear Resistant Inks for Ink-Jet Printers" | 4/28/92 |
| 3. | 5,025,271 ("'271 Patent") | "Thin Film Resistor Type Thermal Ink Pen Using a Form Storage Ink Supply" | 6/18/91 |
| 4. | 4,992,802 ("'802 Patent") | "Method and Apparatus for Extending the Environmental Operating Range of an Ink-Jet Print Cartridge" | 2/12/91 |
| 5. | 4,931,811 ("'811 Patent") | "Thermal Ink-Jet Pen Having a Feedtube with Improved Sizing and Operational with a Minimum of Depriming" | 6/5/90 |
| 6. | 4,827,294 ("'294 Patent") | "Thermal Ink-Jet Printhead Assembly Employing Beam Lead Interconnect Circuit" | 5/2/89 |
| 7. | 4,794,410 ("'410 Patent") | "Barrier Structure for Thermal Ink-Jet Printheads" | 12/27/89 |
| 8. | 4,771,295 ("'295 Patent") | "Thermal Ink-Jet Pen Body Construction Having Improved Ink Storage and Feed Capability" | 9/13/88 |



GAUNTLETT &
ASSOCIATES
ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 4

| 9. | 4,680,859 ("'859 Patent") | "Barrier Structure for Thermal Ink-Jet Printheads" | 7/21/87 |
|---|---|---|---|
| 10. | 4,683,481 ("'481 Patent") | "Thermal Ink-Jet Common-slotted Ink Feed Printhead" | 7/28/87 |
| 11. | 4,635,073 ("'073 Patent") | "Replaceable Thermal Ink-Jet Component and Thermosonic Beam Bonding Process for Fabricating Same" | 1/6/87 |
| 12. | 4,509,062 ("'062 Patent") | "Ink Reservoir with Essentially Constant Negative Back Pressure" | 4/2/85 |

Nu-kote makes the following pertinent allegations:

## AFFIRMATIVE DEFENSES--FACTUAL BACKGROUND

. . .

80. *Hewlett-Packard has designed its printers and ink supply cartridges* in such a way and, on information and belief, for the purpose *to prevent or make more difficult or expensive aftermarket competition from others who make and sell resupply cartridges or refills of used cartridges, and for no legitimate business purpose.* This conduct includes, without limitation, that Hewlett-Packard has combined its patented printhead (traditionally an integral part of the printer) with otherwise easily manufacturable plastic containers of ink to make its ink supply cartridges. . . . Since *Hewlett-Packard* does not recycle used cartridges and, on information and belief, *actively asserts in the marketplace that its cartridges are not refillable.* Hewlett-Packard's conduct also has the additional effects of making ink supply cartridges for Hewlett-Packard printers substantially more expensive to consumers while burdening the environment unnecessarily with significant additional waste material.

81. . . . Hewlett-Packard subsequently redesigned certain features of its cartridges so that they would no longer accommodate the same methods of refill for the sole purpose of stopping such refilling.

82. On information and belief, Hewlett-Packard recently has met with leading retailers of ink jet cartridges, including Office Depot, Office Max, and Staples (all office supply "superstores") to discourage them from carrying ink resupply products of independent companies including Nu-kote. . . .

. . .



GAUNTLETT & ASSOCIATES
ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 5

83.     On information and belief, *Hewlett-Packard has published knowingly false statements and engaged in deceptive advertising* and other unfair business practices concerning Nu-kote's printer supply products for use with Hewlett-Packard equipment, *including, without limitation, the false representation that Nu-kote's products are of inferior quality to Hewlett-Packard's own, are incompatable [sic] with Hewlett-Packard equipment and/or are likely to cause damage to Hewlett-Packard equipment. Such false statements have included the assertion that Hewlett-Packard's ink supply cartridges are not refillable.*

84.     Hewlett-Packard has procured and/or sought to enforce utility patents on ink jet inks and ink-jet printing technology knowing that the patents are invalid, unenforceable and/or not infringed by Nu-kote. . . .

85.     On information and belief, Hewlett-Packard has defrauded the United States Patent and Trademark Office in prosecuting at least one patent on ink useful in ink jet printers, . . . Such patents include, without limitation, the '503 patent.

. . .

88.     On information and belief, *Hewlett-Packard has published knowingly false statements in the marketplace accusing Nu-kote of infringing its trademarks and patents.*

89.     *Hewlett-Packard has employed sham litigation to make* (and on information and belief, to encourage others to make) *knowingly false allegations of trademark infringement, patent infringement and related legal claims against Nu-kote*, and has knowingly sought grossly overbroad remedies, in bad faith, thereby unjustifiably imposing substantial economic burdens on Nu-kote.

90.     . . . Hewlett-Packard does, and has encouraged and/or agreed with other OEMs to: . . . (2) bring burdensome legal actions against Nu-kote . . .

91.     On information and belief, Hewlett-Packard has prosecuted, amassed and employed against potential and existing competitors a thicket of numerous patents, including patents which are fraudulently obtained, invalid, redundant, "paper patents" only, and/or ineffective to the preservation of its legitimate intellectual property rights, all in order to intimidate and burden potential and existing competition in the aftermarkets for ink jet resupply products. *Hewlett-Packard asserts these patents against others, without regard to whether they in fact are being infringed, in order to discourage competition. . . .*

. . .

### THIRD AFFIRMATIVE DEFENSE



## GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 6

97.    Each of the patents has been, and is invalid and void on the grounds that the purported invention attempted to be patented therein fails to meet the conditions of the patent's ability specified in Title 35, United States Code, including in particular, §§ 101, 102, 103 and/or 112 of said Title.

### FOURTH AFFIRMATIVE DEFENSE

. . .

99.    Hewlett Packard has defrauded the United States Patent and Trademark Office in prosecuting the '503 Patent. A patent on a useful and inkjet printers, principally by failing to disclose relevant prior art. . . . Because of Hewlett Packard's material misrepresentations and/or failures to disclose relevant information during the prosecution of the patent, that patent is invalid and/or unenforceable. . . .

### FIFTH AFFIRMATIVE DEFENSE

. . .

101.    Hewlett Packard has misused its utility patents asserted herein including without limitation as follows: that it has procured and sought to enforce patents knowing that the patents are invalid, unenforceable, and/or non- infringed, in an effort to reduce competition and/or destroy a competitor; that it has employed the patents in an unlawful attempt to monopolize or to maintain a monopoly in a relevant market for ink resupplies to its printer equipment; that it has employed the patents in an unlawful tying arrangement; that it has employed the patents in an unlawful conspiracy to restrain trade in the aftermarkets for ink resupplies for inkjet printers. . . .

### NATURE OF THE ACTION

115.    This is an action for . . . false advertising, trade libel, and unfair competition.

. . .

### COUNT SIX—Lanham Act Violation

154.    Nu-kote realleges and incorporates by reference paragraphs 61 through 91 above as though fully set forth herein.

155.    On information and belief, *Hewlett-Packard has published*, and continues to publish, *statements, through advertising and otherwise, that its ink jet printer cartridges are non-refillable and non-reusable.* On information and

10191-003/061698/38970.1

# GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 7

belief, such statements have had the effect of making a substantial number of consumers believe Hewlett-Packard's cartridges are not refillable and reusable.

156.    Such statements are false and deceptive. As Hewlett-Packard is well aware, simple modifications to its cartridges render them refillable and reusable.

157.    Hewlett-Packard's statements have, on information and belief, deceived or confused consumers into believing that products such as Nu-kote's refill kits are ineffective or likely to cause damage to the printer. These false, deceptive and misleading statements and failures to disclose are material, because they have a tendency to cause consumers to avoid Nu-kote products without any valid reason or justification.

158.    Hewlett-Packard has made these false, deceptive and misleading statements in connection with goods and services it distributed in interstate commerce, in violation of 15 U.S.C. § 1125(a).

159.    As a result of Hewlett-Packard's unlawful conduct, Nu-kote has incurred or will incur injury and damages . . .

## COUNT NINE--Trade Libel, Disparagement of Goods, and Defamation under California Law

166.    Nu-kote realleges and incorporates by reference paragraphs 61 through 91, 154 through 159, and 163 through 165 above as though fully set forth herein.

167.    By the conduct alleged above, Hewlett-Packard has published within the State of California knowingly false and disparaging statements concerning Nu-kote and its goods and services, including without limitation statements concerning the quality, character, utility and value of Nu-kote's ink resupply products.

168.    On information and belief, these false and disparaging statements have played a material and substantial part in inducing others not to do business with Nu-kote and have caused customers to avoid purchasing or using Nu-kote products.

169.    As a result of Hewlett-Packard's unlawful conduct, Nu-kote has incurred or will incur injury and damages . . .

## COUNT TEN--California Unfair Competition

10191-003/061698/38970.1

HP0000836



# GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 8

  170. Nu-kote realleges and incorporates by reference paragraphs 61 through 169 above as though fully set forth herein.

  171. Hewlett-Packard's conduct constitutes unfair competition within the meaning of California Business & Professions Code §§ 17200 et seq., *and under California common law.*

  172. As a result of Hewlett-Packard's unlawful conduct, Nu-kote has incurred or will incur injury and damages . . .

**RELIEF REQUESTED**

Nu-kote respectfully requests:

. . .

  (c) That Nu-kote be awarded damages, including as appropriate expenses and/or lost profits, to compensate it for Hewlett-Packard's wrongful conduct.

. . .

  (g) That Nu-kote be awarded pre-judgment interest and post-judgment interest, as appropriate.

  (h) That Nu-kote recover its attorneys' fees, costs and disbursements incurred in this action.

  (i) That Nu-kote be awarded such other and further relief as this Court deems just and proper.

[Emphasis added]

## INA'S PERTINENT POLICY LANGUAGE

**ENDORSEMENT #2**
**[U-917 (8-89)]**

**INSURING AGREEMENT**

The Insuring Agreement as stated in this Policy is deleted in its entirety and replaced with the following:

. . .

GAUNTLETT &
ASSOCIATES
ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 9

## INSURING AGREEMENTS

**Coverage A**:  The Company will indemnify the Insured for Ultimate Net Loss in excess of the total applicable Limits of Liability of Underlying Insurance set forth under Form G or any renewals or replacements thereof with respect to Coverage A, the provisions of all underlying policies are incorporated as a part of this Policy, except for any obligations to investigate and defend and pay for costs and expenses incident to any of the same, the amounts of the Limits of Liability and the "Other Insurance" Provision or except as otherwise excluded herein.  As to Ultimate Net Loss not covered by Underlying Insurance set forth under Form G, or any renewals or replacements thereof, Coverage B applies.

**Coverage B**:  As to Ultimate Net Loss not covered by Underlying Insurance set forth under Form G, or any renewals or replacements thereof, the Company hereby agree, subject to the Limitations, Terms and Conditions hereinafter mentioned, to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability:

A.    Legal Obligation; or

B.    Assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured while acting on behalf of the Named Insured.

For damages and expenses, all as more fully defined by the term Ultimate Net Loss on account of:

1.    Bodily Injury,

2.    Personal Injury,

3.    Property Damage,

4.    Advertising Liability,

5.    Professional Liability,

Caused by or arising out of an occurrence anywhere during the policy period.

The Company's obligation hereunder shall not exceed the limit of liability stated in the Declarations.

[FORM B]

10191-003/061698/38970.1

HP0000838



# GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 10

**ENDORSEMENT #9**
**[U-917 (8-89)]**

### DEFINITIONS

### COVERAGE B

This Policy - Coverage B only is subject to the following definitions:

. . .

**C.    ADVERTISING LIABILITY**

The term "Advertising Liability" means injury arising out of:

1.    *libel, slander or defamation;*

2.    any infringement of copyright or of title or of slogan;

3.    piracy, *unfair competition* or idea misappropriation under an implied contract;

4.    any invasion of right of privacy;

5.    *any act, error or omission in the use of advertising or merchandising ideas committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast and arising out of advertising activities committed by or on behalf of the Named Insured.*

. . .

**O.    OCCURRENCE**

The term "Occurrence" means:

As respects. . . personal injury. . . - an accident or happening or an event or continuous or repeated exposure to conditions which results in . . . personal injury .. during the policy period neither expected or intended from the standpoint of the Insured against whom the resulting claim is presented. All such exposures to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence. . .

. . .

As respects professional liability - an offense or act or error or omission committed by or at the direction of the Insured in the course of the Named Insured's business operations during the policy period.

As respects advertising liability - an offense or act or error or omission. All injury or damages involving the same injurious materials or act, during the policy period, regardless

10191-003/061698/38970.1



## GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 11

of the frequency or repetition thereof, the number or kind of media used and the number of claimants, and all such damages shall be considered as arising out of one occurrence.

P. **PERSONAL INJURY**

The term *"Personal Injury" means offenses, including but not limited to* false arrest, false imprisonment, wrongful eviction, wrongful entry or other invasion of the right of private occupancy, detention, *malicious prosecution, abuse of process,* discrimination, humiliation, *libel, slander or other defamatory material,* invasion of rights of privacy, *disparagement including disparagement of property,* wrongful discharge except that which arises out of any advertising liability as defined in paragraph C.

W. **ULTIMATE NET LOSS**

The term *"Ultimate Net Loss" means the total sum which the Insured,* or any company as his insurer (including any underlying insurances set forth in Schedule A), or both, *pays or is obligated to pay as a consequence of any occurrence, covered hereunder, by reason of* bodily injury, *personal injury,* property damage, *advertising liability* or professional liability claims, either through adjudication or compromise, *and,* regardless of the final outcome of any judgment, adjudication, compromise, or settlement, *shall also include* hospital, medical and funeral charges and *all sums paid or obligated to be paid as* salaries, wages, compensation, fees, charges and *law costs,* premiums on attachment or appeal bonds, interest, *expense for* doctors, *lawyers,* nurses and investigators *and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid or obligated to be paid as a consequence of any occurrence covered hereunder,* excluding only the salaries of the Insured's or of any underlying insurer's permanent employees and defense costs and expenses paid or obligated to be paid by any underlying insurer, which are in addition to and not part of such underlying insurers limits of liability.

[Emphasis added.]

I. <u>**THERE IS A POTENTIAL FOR COVERAGE UNDER INA'S PERSONAL INJURY OFFENSE OF "LIBEL, SLANDER OR OTHER DEFAMATORY MATERIAL" DURING THE 9/30/92-9/30/93 POLICY PERIOD**</u>

    A. <u>Under California Law a Corporation Is a Person Which May Be Defamed by Libel or Slander</u>

A corporation is a person for purposes of a libel or slander claim. <u>Barnes-Hind, Inc. v. Superior Court (Allergan Pharmaceuticals, Inc.)</u>, 181 Cal. App. 3d 377, 226 Cal. Rptr. 354 (1986) (a corporation can be libeled); <u>Trans World Accounts, Inc. v. Associated Press</u>, 425 F.Supp. 814 (N.D.Cal.1977) (protection afforded by California libel law extends to corporations as well as to



GAUNTLETT &
ASSOCIATES
ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 12

individuals; corporation may recover for defamatory statements having a tendency to directly affect property or occasion it pecuniary injury).

Section 44 of the California Civil Code defines defamation as either libel or slander. Libel and Slander are defined as follows:

> Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or *which causes him to be shunned or avoided*, or which *has a tendency to injure him in his occupation*.

Civ. Code § 45 [emphasis added].

> A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code.

Civ. Code § 45a.

> Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:
> 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;
> 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;
> 3. *Tends directly to injure him in respect to his* office, profession, *trade or business*, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or *by imputing something with reference to his* office, profession, *trade, or business that has a natural tendency to lessen its profits*;
> 4. Imputes to him impotence or a want of chastity; or
> 5. *Which, by natural consequence, causes actual damage.*

Civ. Code § 46 [emphasis added].

**B.    Nu-kote Expressly Asserts a Claim for Defamation Against HP**

Count Nine of Nu-kote's Counterclaim specifically includes a claim for defamation under California Law. Nu-kote incorporates in that claim allegations that HP "actively asserts in the marketplace that its cartridges are not refillable"[Nu-kote's Counterclaim, ¶ 80] and "has published

10191-003/061698/38970.1



**GAUNTLETT &**
**ASSOCIATES**
T O R N E Y S   A T   L A W

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 13

knowingly false statements and engaged in deceptive advertising . . . including, without limitation, the false representation that Nu-kote's products are of inferior quality to Hewlett-Packard's own, are incompatible with Hewlett-Packard equipment and/or are likely to cause damage to Hewlett-Packard equipment." [Nu-kote's Counterclaim, ¶ 83.] Nu-kote also alleges HP "has published knowingly false statements in the marketplace accusing Nu-kote of infringing its trademarks and patents." [Nu-kote's Counterclaim, ¶ 88.]

Nu-kote further alleges HP "has prosecuted, amassed and employed against potential and existing competitors a thicket of numerous patents, including patents which are fraudulently obtained, invalid, redundant, 'paper patents' only, and/or ineffective to the preservation of its legitimate intellectual property rights, all in order to intimidate and burden potential and existing competition in the aftermarkets for ink jet resupply products. Hewlett-Packard asserts these patents against others, without regard to whether they in fact are being infringed, in order to discourage competition." [Nu-kote's Counterclaim, ¶ 91.]

Statements that Nu-kote's products cannot perform their intended function (i.e. refill the HP cartridges) or will cause damage to the HP printer would certainly cause at least a few potential purchasers to avoid Nu-kote's refill kits. This would directly injure Nu-kote in its trade or business by imputing something that has a natural tendency to lessen profits (that its products will not work and therefore should not be purchased). Thus, the elements of libel and slander are met by Nu-kote's allegations.

Nu-kote specifically claims damages from defamation under California law based, in part, upon the above-referenced allegations. As alleged by Nu-Kote HP developed and disseminated advertising materials during the 9/30/92-9/30/93 policy period which was allegedly designed to create "fear, uncertainty and doubt" about the ability of Nu-kote's refill products to perform their designated function and the possibility of damage to HP printers covered by use of a Nu-kote refill product. See Exhibits "1" through "4."[2]

---

[2]Many of the documents included with this letter are the subject of a confidentiality agreement entered into by H-P in the Nu-kote Action. Therefore, these documents must be treated as confidential by INA and not released to any unauthorized party without H-P's prior written consent.



## GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 14


II.    **THERE IS A POTENTIAL FOR COVERAGE UNDER INA'S PERSONAL INJURY OFFENSE OF "DISPARAGEMENT INCLUDING DISPARAGEMENT OF PROPERTY" DURING THE 9/30/92-9/30/93 POLICY PERIOD**

Nu-kote specifically asserts claims for trade libel and disparagement of goods in conjunction with its claim for defamation.  An action for trade libel is different from an action for defamation in that an action for defamation "is to protect the personal reputation of the injured party; it arose out of the old actions for libel and slander.  The action for injurious falsehood is to protect economic interests of the injured party against pecuniary loss; it arose as an action on the case for the special damage resulting from the publication." Polygram Records, Inc. v. Superior Court (REGE), 170 Cal.App.3d 543, 549, 216 Cal.Rptr. 252, 255 (1985).  To be actionable, disparagement of quality need not be in writing. Polygram Records, 170 Cal.App.3d at 548.  There is no element of intent to the disparagement. Nichols v. Great American Ins. Cos., 169 Cal.App.3d 766, 773, 215 Cal.Rptr. 416, 420 (1985).  "To constitute trade libel, a statement must be false, but need not be malicious except in the sense that it was not privileged." Leonardini v. Shell Oil Co., 216 Cal.App.3d 547, 572, 264 Cal.Rptr. 883, 899 (1989).

> The basic difference between the two torts, it has been noted, is that "an action for defamation is designed to protect the *reputation* of the plaintiff, and the judgment vindicates that reputation, whereas the action for disparagement is based on *pecuniary damage* and lies only where such damage has been severed." Leonardini, 216 Cal.App.3d at 573.

The elements of a cause of action for trade libel are: (1) a publication; (2) which induces a third party not to deal with plaintiff; and (3) special damages. Nichols, 169 Cal.App.3d at 773.  Nu-kote alleged:

> 83.    On information and belief, *Hewlett-Packard has published knowingly false statements* and engaged in deceptive advertising and other unfair business practices concerning Nu-kote's printer supply products for use with Hewlett-Packard equipment, *including, without limitation, the false representation that Nu-kote's products are of inferior quality to Hewlett-Packard's own, are incompatible with Hewlett-Packard equipment and/or are likely to cause damage to Hewlett-Packard equipment.* Such false statements have included the assertion that Hewlett-Packard's ink supply cartridges are not refillable. [Emphasis added.]

> 167.    By the conduct alleged above, Hewlett-Packard has published within the State of California knowingly false and disparaging statements concerning Nu-kote and its goods and services, including without limitation statements concerning the quality, character, utility and value of Nu-kote's ink resupply products.



## GAUNTLETT & ASSOCIATES

### TORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 15

168.    On information and belief, *these false and disparaging statements have played a material and substantial part in inducing others not to do business with Nu-kote* and have caused customers to avoid purchasing or using Nu-kote products.

169.    As a result of Hewlett-Packard's unlawful conduct, Nu-kote has incurred or will incur injury and damages . . . [Emphasis added.]

Each of the necessary elements for trade libel/disparagement has been alleged by Nu-kote. Moreover, Nu-kote alleged in Count Five of its Counterclaim that H-P participated in a conspiracy to disparage Nu-kote by "the making of false statements. . . regarding the effects of using Nu-kote's products."[3] Nu-Kote entered the inkjet refill market in July 1993, and alleges that H-P commenced a civil conspiracy to discourage consumers from using Nu-Kote's inkjet refills.[4] Because these acts allegedly took place within the 9/30/92-9/30/93 policy period, INA owes a duty to defend H-P against the Nu-kote claims arising during this period.

III.    **THERE IS A POTENTIAL FOR COVERAGE UNDER INA'S ADVERTISING LIABILITY OFFENSE OF "LIBEL, SLANDER OR DEFAMATION" DURING THE 9/30/92-9/30/93 POLICY PERIOD**

A.    **Advertising Liability Is Analyzed under a Three-part Test**

The salient test for advertising liability was set forth in New Hampshire Ins. Co. v. Foxfire, Inc., 820 F.Supp. 489, 493 (C.D. Cal. 1993), as follows:

Advertising injury requires: (1) An advertising activity by the named insured; (2) allegations that fit into one of the named offenses; and (3) an injury that arises out of an offense committed in the course of the advertising activity.

Each of these elements are met in this matter.

---

[3]The elements of a civil conspiracy, include: (1) formation of the conspiracy through agreement of initial conspirators; (2) tortious acts done in furtherance of the conspiracy; (3) acts of cooperation, aid, encouragement, or ratification of conspirators who participated after formation; and (4) damages resulting from the acts done pursuant to the conspiracy. Orser v. George (1967) 252 Cal. App. 2d 660, 667, 60 Cal. Rptr. 708; Unruh v. Truck Ins. Exchange 7 Cal. 3d 616, 631, 102 Cal. Rptr. 815, 498 P.2d 1063 (1972)

[4]See Exhibits "1" through "4."

10191-003/061698/38970.1

# GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 16

## B.   Each of the Required Elements for Advertising Liability Is Met Here

Element two of the Foxfire test is met because Nu-kote specifically asserts a claim for defamation in Count Nine of its Counterclaim. Each of the required elements of a defamation claim have been alleged by Nu-kote, as referenced above.

Elements one and three of the Foxfire test are met here because the alleged defamatory statements were made in the course of H-P's advertising. Nu-kote claims injury arising out of those statements. Nu-kote alleges H-P "has published knowingly false statements and engaged in deceptive advertising . . . including, without limitation, the false representation that Nu-kote's products are of inferior quality to Hewlett-Packard's own, are incompatible with Hewlett-Packard equipment and/or are likely to cause damage to Hewlett-Packard equipment." [Nu-kote's Counterclaim, ¶ 83.] Nu-kote also alleges H-P "has published knowingly false statements in the marketplace accusing Nu-kote of infringing its trademarks and patents. [Nu-kote's Counterclaim, ¶ 88.]

Nu-kote's express accusation that H-P confused and deceived consumers through advertising establishes the required causal nexus between H-P's advertising and Nu-kote's alleged injury. H-P's advertising activities took place, in part, during the 9/30/92-9/30/93 policy period as evidenced by Exhibits "2" through "4" hereto. Thus, Nu-kote's claim for defamation is potentially covered under the advertising liability provisions of INA's policy.

## IV.   THERE IS A POTENTIAL FOR COVERAGE UNDER INA'S ADVERTISING LIABILITY OFFENSE OF "UNFAIR COMPETITION" DURING THE 9/30/92-9/30/93 POLICY PERIOD

The INA policy does not define the term "unfair competition." Under California law, undefined terms are interpreted as a layperson would understand them. Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group, 50 Cal. App. 4th 548, 59 Cal. Rptr. 2d 36, 42 (1996); Lunsford v. American Guarantee & Liab. Ins. Co., 18 F.3d 653, 655 (9th Cir. 1994). The Random House Unabridged Dictionary, Random House, Inc., New York, N.Y. (2d ed. 1993) defines unfair competition as follows:

> **Unfair competition. 1.** acts done by a seller *to confuse or deceive the public with intent to acquire a larger portion of the market*, as by cutting prices below cost, misleading advertising, selling a spurious product under a false identity, etc. **2.** the use of any such methods. [Emphasis added.]



**GAUNTLETT &
ASSOCIATES**
T O R N E Y S   A T   L A W

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 17

The acts complained of by Nu-kote fit squarely within the above definition of unfair competition. For example, Nu-kote alleges H-P "has published knowingly false statements and engaged in *deceptive advertising* . . . including, without limitation, the *false representation that Nu-kote's products are of inferior quality* to Hewlett-Packard's own, are incompatible with Hewlett-Packard equipment and/or are likely to cause damage to Hewlett-Packard equipment. Such false statements have included the assertion that Hewlett-Packard's ink supply cartridges are not refillable." [Nu-kote's Counterclaim, ¶ 83.] Nu-kote also alleges H-P "has published knowingly *false statements in the marketplace* accusing Nu-kote of infringing its trademarks and patents [Nu-kote's Counterclaim, ¶ 88], and "has prosecuted, amassed and employed against potential and existing competitors a thicket of numerous patents . . . [and] asserts these patents against others, without regard to whether they in fact are being infringed, *in order to discourage competition*." [Nu-kote's Counterclaim, ¶ 91.] [Emphasis added.]

Element two of the <u>Foxfire</u> test is met because Nu-kote specifically asserts a claim for unfair competition in Count Ten of its Counterclaim. Nu-kote alleges that H-P deceived the public with the intent to increase its market share. These allegations fit squarely within the above definition of unfair competition, and therefore fall within INA's personal injury coverage. As shown above, these acts took place, in part, during the 9/30/92-9/30/93 policy period.

Nu-kote's allegations also satisfy elements one and three of the <u>Foxfire</u> test because the alleged deceiving statements were made in the course of H-P's advertising. Nu-kote claims injury arising out of those statements.

V.    <u>**THERE IS A POTENTIAL FOR COVERAGE UNDER INA'S ADVERTISING LIABILITY OFFENSE OF "ANY ACT, ERROR OR OMISSION IN THE USE OF ADVERTISING OR MERCHANDISING IDEAS" ALLEGEDLY COMMITTED DURING THE 9/30/92-9/30/93 POLICY PERIOD**</u>

INA provides express coverage for the "advertising injury" offense of "any act, error or omission in the use of advertising or merchandising ideas committed or alleged to have been committed during the policy period in any advertisement, publicity article, broadcast or telecast and arising out of advertising activities committed by or on behalf of the Named Insured."

The INA policy does not define the operative terms of the above-referenced advertising liability offense. Policy language should be construed as it would be understood by a layman. <u>Weil v. Federal Kemper Life Assur. Co.</u>, 7 Cal.4th 125, 27 Cal.Rptr.2d 316, 338 (1994):



GAUNTLETT &
ASSOCIATES
TORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 18

. . . the fundamental requirement that words in an insurance policy must be given
their "ordinary and popular sense" (Civ.Code, § 1644)--and must therefore be read
as a layperson would read them--applies to all rules of interpretation of such
policies . . .

The "ordinary and popular sense" of a word is gleaned from dictionary definitions. Golden
Sec. Thrift & Loan Ass'n v. First American Title Ins. Co., 53 Cal.App.4th 250, 61 Cal.Rptr.2d 442,
445 (1997) ("We take judicial notice of various dictionary definitions of 'dimensions' (Evid.Code,
§ 451, subd.  (e)), as the best arbiter of the ordinary and popular meaning, i.e., '[t]he true
signification' of the word.") The Random House Unabridged Dictionary, Random House, Inc., New
York, N.Y. (2d ed. 1993) defines  the pertinent terms as follows:

**Act.** *n.*  1. anything done, being done, or to be done; deed; performance: *a heroic
act.* 2. the process of doing: *caught in the act.* . . .

**Advertisement.** *n.* 1. a paid announcement, as of goods for sale, in newspapers or
magazines, on radio or television, etc. 2. a public notice, esp. in print. 3. the action
of making generally known; a calling to the attention of the public: *The news of this
event will receive wide advertisement.*

**Advertising.** 1. the act or practice of calling public attention to one's product,
service, need, etc., esp. by paid announcements in newspapers and magazines, over
radio or television, on billboards, etc. . . .

**Any.** *adj.* 1. one, a, an, or some; one or more without specification or
identification: *If you have any witnesses, produce them.  Pick out any six you like.*
2. whatever or whichever it may be: *cheap at any price.* 3. in whatever quantity or
number, great or small; some: *Do you have any butter?* 4. every; all: *Any
schoolboy would know that.  Read any books you find on the subject.* 5. (following
a negative) at all: *She can't endure any criticism.* - *pron.* 6. an unspecified person
or persons; anybody; anyone: *He does better than any before him.* 7. a single one
or ones; an unspecified thing or things; a quantity or number: *We don't have any
left.* - *adv.* 8. in whatever degree; to some extent; at all: *Do you feel any better?*
9. any which way; in any manner whatever; indifferently or carelessly: *Doing your
work any which way is just not good enough.*

**Article.** *n.* 1. a written composition in prose, usually nonfiction, on a specific
topic, forming an independent part of a book or other publication, as a newspaper
or magazine. . . .

**Error.** *n.* 1. a deviation from accuracy or correctness; a mistake, as in action or
speech: *His speech contained several factual errors.* . . .



# GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 19

**Idea.** 1. any conception existing in the mind as a result of mental understanding, awareness, or activity. 2. a thought, conception, or notion . . . 5. a plan of action; an intention . . .

**Merchandising.** *n.* the planning and promotion of sales by presenting a product to the right market at the proper time, by carrying out organized, skillful advertising, using attractive displays, etc. . . .

**Omission.** *n.* 1. the act of omitting. 2. the state of being omitted. 3. something left out, not done, or neglected: *an important omission in a report.*

**Publicity.** *n.* 1. extensive mention in the news media or by word of mouth or other means of communication. 2. public notice so gained. 3. the measures, process, or business of securing public notice. 4. information, articles, or advertisements issued to secure public notice or attention. 5. the state of being public, or open to general observation or knowledge.

Under this broad catch-all offense, INA must provide H-P a defense if one or more thing(s) done, not done or done mistakenly in the use of any notion, concept or plan of action to call public attention to H-P's products or promote sales of H-P's products in one or more written or oral public notice during the 9/30/92-9/30/93 policy period allegedly caused injury.

The previously referenced allegations would all fit within this broad offense. These acts allegedly took place in the course of H-P's advertising. Moreover, product packaging serves to distinguish one Company's product from another, and thus constitutes advertising. Cf. Lebas Fashion Imports of USA. Inc. v. ITT Hartford Ins. Group, 50 Cal. App. 4th 548, 59 Cal. Rptr. 2d 36 (1996), *pet. for review den.*, (November 24, 1996), *mod. and aff'd,* (January 22, 1997); Dogloo Inc. v. Northern Ins. Co. of New York, 907 F. Supp. 1383 (C.D. Cal. 1995); L.A. Gear v. Thom McAn Shoe Co., 25 U.S.P.Q. 2d 1913 (Fed. Cir. 1993).

Nu-kote alleges H-P engaged in a scheme to eliminate competition by wrongfully obtaining patents on its ink-jet products. H-P placed patent notices on its product packaging. Thus, H-P allegedly engaged in wrongful acts in its public notice (advertisement) of its patents to consumers and retailers. These acts took place, in part, within the 9/30/92-9/30/93 policy period. Thus, INA must provide a defense to H-P for the Nu-kote Counterclaim.



## GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Guy S. Blaire, Senior Claims Specialist
Insurance Company of North America
June 16, 1998
Page 20

## VI.    CONCLUSION

There are other potentially covered offenses which give rise to INA's duty to defend H-P. *The covered offenses set forth above are only the most obvious claims. By not addressing such other coverage, H-P does not waive its right to claim that a defense is due under the other pertinent policy provisions.* The offense of libel, slander and defamation is present in both the advertising liability and personal injury coverage provisions of the INA policy. Therefore, INA owes a duty to defend H-P against Nu-kote's counterclaim based upon its 9/30/92-9/30/93 policy period whether or not there is an advertising nexus.

The claims for false advertising/unfair competition, patent misuse and disparagement all flow from the release of an inkjet cartridge which was advertised and distributed during the above-referenced policy period. Although no discovery regarding damages has yet occurred and Nu-kote has not yet advised H-P regarding what damages it will seek, the claims asserted by Nu-kote also trigger potential exposure within INA's policy limits in light of the damage theories which arise in connection with the claims asserted. H-P's alleged advertising activity for which damages are sought is continuing in nature. The claims seek recovery of damages for alleged acts that arose within your policy period referenced above.

Should INA desire more detailed information which demonstrates the reasonableness of the proposed settlement, H-P will provide INA with same upon INA's agreement to enter into a confidentiality agreement. We enclose a copy of same for your review.

Thank you for your consideration of the above in making your coverage determination. If you disagree with our analysis of potential coverage, and INA's corresponding duty to defend H-P, we ask that you specifically address each of your concerns in writing to the undersigned. We look forward to receiving a prompt recognition of H-P's rights under the INA policies.

Time is of the essence in this situation. Your immediate execution and return of the confidentiality agreement to the undersigned (via facsimile and U.S. mail) is requested as is your participation in the telephone conference with the undersigned and H-P representatives to discuss settlement authority.

Very truly yours,

Leo E. Lundberg, Jr.

LEL:RWZ:pam
Enclosure (Confidentiality Agreement)

10191-003/061698/38970.1

HP0000849