# EXHIBIT 18



1  Hon. Peter G. Stone (Ret.)
   JAMS
2  160 W. Santa Clara St.
   Suite 1150
3  San Jose Ca, 95113
4  408-288-2240
   408-295-5267 (fax)
5

6                  **UNITED STATES DISTRICT COURT**

7        **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

8

9  HEWLETT-PACKARD COMPANY,          )  Case No. C-99-20207 JW
                                     )  JAMS Reference No.  1110005854
10          Plaintiff,               )
                                     )
11 v.                                )  REPORT AND RECOMMENDATION
                                     )  AFTER REMAND HEARING
12 ACE PROPERTY & CASUALTY           )
   INSURANCE CO.,                    )
13                                   )
                                     )
14                                   )
            Defendant.               )
15                                   )
                                     )
16                                   )
                                     )
17                                   )
                                     )
18 _____

19      On March 31, 2003, the Special Master issued a Report and Recommendation regarding

20 the computation and determination of the monies due to Plaintiff Hewlett Packard Company

21 ("HP") from Defendant ACE Property and Casualty Insurance Company ("ACE") in connection

22 with the defense of the Nu-kote action, wherein the Special Master recommended that HP be

23 reimbursed over $28 million in fees and costs incurred for its defense of the Nu-kote action.   On

24 November 25, 2003, Judge Ware found that a trier of fact could reasonably conclude, by a

25 preponderance of the evidence, that a portion of HP's expenses were unnecessary to the defense

26 of the Nu-kote counterclaims. On October 15, 2004, in light of the Court's holding on the legal

27 definition of what is necessary to the defense, the case was referred back to the Special Master

28 "to assess what expenses would be conducted against liability by a reasonable insured under the

   same circumstances."

**EXHIBIT**

**18**

A further hearing was held before the Special Master on January 9-13, 2006. On March 27, 2006, ACE submitted an opening post-remand hearing brief. HP's responsive brief, all 206 pages of it, was submitted to the Special Master on May 30, 2006. ACE's reply brief was submitted on June 30, 2006.

This second report of the Special Master is being rendered at the direction of the United States District Court, Northern District of California, San Jose Division, by order of Hon. James Ware. After the conclusion of the remand hearing referred to below, the undersigned reviewed and researched all briefing filed in connection with both the damages hearing and remand hearing, reviewed and studied the transcript of both hearings and the exhibits submitted at the hearing and finally reviewed the entire history of both the underlying litigation and this subject litigation.

As with the initial report, well over 100 hours have been spent since the final submission of the briefs of the parties in order to complete the following report. The undersigned appreciates the parties' patience with respect to the time taken to render the second report. Moreover, the undersigned again feels compelled to again avail himself of the opportunity to point out that the parties were most fortunate to have been so ably and vigorously represented by their respective counsel. Counsel for both HP and ACE acquitted themselves in the highest traditions of our system of justice with vigor, energy, professionalism, expertise and the highest degree of ethical conduct, never wavering in the intensity of their advocacy. They are all to be commended.

After having considered the papers and arguments of counsel, and having submitted the matters, the Special Master reports and recommends as follows:

## BACKGROUND

### I. The Nu-kote Action

#### A. *HP's Ink Jet Technology*

The genesis of this insurance coverage dispute can be traced back to the mid-1980's and HP's development of personal inkjet printers. In 1984, HP developed its first inkjet printer, a revolutionary product that allowed high quality low cost printing. HP invested millions of dollars in research and development to create and perfect the inkjet printer and its component parts. In 1984, HP developed the St. Helen's cartridge, the first of HP's printer cartridges that it continues to develop and perfect. Generally, the printer cartridges contain a reservoir of ink,

which is ejected on to paper through microscopic nozzles, yielding high quality printing. HP designed and intended that its cartridges be discarded after the ink runs dry; they never were intended to be refillable. As inkjet printing became perfected, the cost of printers dropped drastically. The cost of inkjet cartridges, however, remains relatively high, and the sale of cartridges generates a billion dollar income stream. Accordingly, HP was highly motivated to protect its intellectual property rights in its inkjet printer cartridge technology.

### B. The Filing of the Nu-kote Action

In July 1993, Nu-kote, a company primarily specializing in supplies for computer, fax and other printers, began marketing inkjet refill products intended to be used with HP printing equipment and to compete with HP inkjet cartridges. HP viewed Nu-kote as a challenge to HP and its hardware competitors (Canon, Epson) consumables business. *HP v. Nu-kote* Trial Transcript ("TT") 5849-55. Nu-kote marketed its products in packages that prominently displayed the HP logo and used HP's color scheme.

On September 19, 1994, without first sending a cease and desist letter to Nu-kote, HP filed a complaint against Nu-kote entitled *Hewlett-Packard Company v. Nu-kote International, Inc.*, U.S. D.C. N.D. Cal., Civil Case No. 94 20647 JW, alleging patent infringement, federal and state trademark infringement, trade dress infringement, unfair competition, violations of federal and state false advertising laws and other related causes of action. In part, HP asserted that the "green and white" packaging Nu-kote used to sell its inkjet refill products infringed on HP's trademark. HP also believed that Nu-kote falsely advertised its own refill products as being approved by HP, and as being less expensive to use than HP cartridges. The complaint sought injunctive relief and damages. At the time the complaint was filed, HP anticipated that Nu-kote would respond by filing a counterclaim. HP retained Pennie & Edmonds ("P&E") to prosecute its suit against Nu-kote. P&E was a renowned intellectual property firm that HP routinely retained to handle legal issues concerning its intellectual property rights. Jonathan Marshall and William Pecau were the principal P&E attorneys assigned to the action.

In November 1994, Nu-kote answered HP's complaint and filed a counterclaim alleging invalidity and non-infringement of various HP patents and alleging claims of restraint of trade, unfair competition and antitrust activity. The scope of Nu-kote's claims increased significantly when Nu-kote changed counsel and filed amended counterclaims in June 1996. HP retained Gibson Dunn & Crutcher ("GD&C"). Robert Cooper and Peter Sullivan were the principal

1   GD&C attorneys assigned to the action.  GD&C was generally responsible for the defense of the

2   Nu-kote counterclaim, while P&E was generally responsible for preparing HP's affirmative case

3                                      C. *Motion to Bifurcate*

4        In late 1996, HP filed a renewed motion for separate later trials of Nu-kote's antitrust-

5   based claims and damages and for stay of related discovery. In their reply to the motion, HP

6   made an assertion which has been relied upon by ACE and cited by the Special Master and

7   subsequently the Court.  *See* Exs. 2142 and 1593 (multiple copies of the same exhibit); ACE's

8   Damages Hearing Briefing; March 31, 2003 Report and Recommendation and Judge's

9   November 2003 and October 2004 Orders.  In part, HP stated in a heading that "the vast majority

10   of Nu-kote's antitrust allegations are not inextricably related to the patent, trademark and false

11   advertising, unfair competition issues in this case." (Ex. 2142; Damages Hearing Transcript

12   ("HT"), 2349:21-24.)

13        A further review of the 1996 reply brief by the Special Master reveals that the statement

14   in question, like everything else in this case, must be placed in proper context.  In the 1996 brief,

15   HP made the following statements and/or assertions:

16
- "HP's renewed motion for separation and stay was brought at the magistrate's own recommendation regarding case management."
- "Not all of Nu-kote's antitrust allegations are interrelated with the patent trademark and unfair competition issues in this action."
- "Nu-kote's antitrust allegations have no bearing on the patent infringement theories in this case."
- "The vast majority of Nu-kote's antitrust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case."
  - **"While resolution of the patent validity and fraud issues as well as the false advertising claims may obviate trial on certain of Nu-kote's antitrust allegations and counterclaims,** determination as to (i) whether certain prior art renders the patents-in-suit obvious, (ii) whether HP withheld relevant and non-cumulative prior art with the specific intent of defrauding the Patent Office, (iii) whether Nu-kote's product packaging and use of HP's trademarks and the trade name are likely to cause consumers to mistakenly believe that Nu-kote's inkjet products are HP product or are licensed or sponsored by, otherwise affiliated with HP, or (iv) whether Nu-kote's packaging falsely states that its inkjet products are 'equivalent' to specific number of genuine new HP inkjet cartridges are plainly not inextricably related to, and intertwined with the vast majority of facts underlying Nu-kote's antitrust allegations..."
  - "In arguing that virtually every issue and claim in this case is intermingled and interrelated, Nu-kote purposefully confuses and ignores substantive patent, trademark and unfair competition law..."

- o "It simply cannot be disputed that Nu-kote's antitrust claims interject 'a host of entirely new issues' into an already complex trademark and patent infringement case."
- "Separating the patent/unfair competition and antitrust issues will simplify the issues in any subsequent antitrust trial."
  - o "Although the vast majority of Nu-kote's antitrust allegations are not intermingled with, and dependent on, facts underlying the issues of patent infringement, validity, unenforceability on the basis of fraud before the Patent Office, trademark infringement and false advertising/unfair competition, **several of the allegations underlying Nu-kote's antitrust counterclaims _do_ involve issues and proofs that are directly related to underlying, dispositive patent and trademark infringement/unfair competition issues.** (emphasis added)

_Id._ HP then gave four examples of allegations in Nu-kote's antitrust claims that were directly related to dispositive patent and trademark infringement issues, including: (1) the sham litigation allegation (stating that "if HP prevails on its claims of trademark and patent infringement, then a separate trial based on its assertions that HP instituted [sham litigation] ... is necessarily obviated"); (2) fraudulent patent procurement and enforcement of patents known to be invalid or noninfringement; and (3) if Nu-kote succeeds in proving that HP's patents are invalid or infringed, a second trial on HP's assertion of known fraudulently procured, invalid and noninfringed patents would be simplified and streamlined.

Despite HP's arguments, HP's motion for separate later trials was denied. (Remand Hearing Transcript ("RT"), 828:13-19, 850:16-851:3.)

### D. Settlement Efforts and Nu-kote's Bankruptcy Petition

While the case was pending trial, Nu-kote's financial situation deteriorated significantly. HP made substantial efforts to settle the case, offering dismissal of the claims against Nu-kote, millions of dollars in cash, license rights and an arrangement under which HP would make cartridges for Nu-kote below the cost Nu-kote could get them elsewhere. In mid-1998, HP and Nu-kote's CEO negotiated a settlement agreement. However, Ron Katz, Nu-kote's counsel, persuaded the board of directors to reject the proposed settlement based upon his belief that hundreds of millions of dollars could be obtained from HP in the lawsuit. (HT 651:1-19.) The Nu-kote board rejected the settlement and fired the CEO for suggesting it.

In November 1998, Nu-kote filed a Chapter 11 bankruptcy petition in the Middle District of Tennessee and immediately sought relief from the automatic stay to continue its case against HP. HP (and Nu-kote's insurers who were funding its litigation against HP) opposed lifting the

1    stay. The bankruptcy judge, however, granted Nu-kote's motion and permitted the case against

2    HP to continue.

### E. HP's Fourth Amended Complaint

3

4    HP filed a fourth amended complaint on September 1, 1998. The complaint included

5    causes of action for trademark infringement, false advertising, dilution and patent infringement.
     (Ex. 4172.) HP alleged that Nu-kote had infringed HP's registered trademarks (HEWLETT

6    PACKARD, DESKJET and DESKWRITER) and HP's common law trademarks ("51626A,"

7    "51629A" and other product designations). HP's false advertising claims under the Lanham Act

8    were based upon: (1) alleged misstatements concerning the quantity of ink in Nu-kote's

9    products; (2) misrepresentations concerning cost savings; (3) sale of Nu-kote's product with a

10   used printhead in packaging suggesting the printhead is brand new, and (4) Nu-kote's product

11   guarantees concerning OEM specifications. HP also alleged Nu-kote's infringement of nine (9)

12   HP patents. (Ex. 4172.)

### F. Nu-kote's Fourth Amended Counterclaim

13

14   On March 18, 1999, Nu-kote filed an amended answer and counterclaim to HP's fourth

15   amended complaint ("the counterclaim"). (Ex. 4173.) The counterclaim alleged that the sole

16   reason HP commenced the lawsuit against Nu-kote was its decisions to reduce or eliminate
     competition in the aftermarkets for HP ink jet resupply cartridges and refill kits. Counterclaim,

17   ¶ 85. Nu-kote alleged that pursuant to HP's decision to reduce or eliminate competition in the

18   aftermarket for HP inkjet resupply cartridges or refills of used cartridges, HP took numerous

19   predatory actions, none of which were supported by a legitimate business justification

20   ("predatory acts"). Counterclaim, ¶ 89. The predatory acts alleged by Nu-kote included:

21           (1) HP designed its printers and ink supply cartridges to prevent or make more
         difficult or expensive aftermarket competition from others who make or sell resupply
22       cartridges or refills (¶90);

23           (2) after companies like Nu-kote designed methods for refilling cartridges, HP
         redesigned certain features of the cartridges so that they would no longer accommodate
24       the same methods for refill in order to stop refilling (¶91);

25           (3) HP met with leading retailers to discourage them from carrying ink resupply
         products of companies like Nu-kote (¶92);
26           (4) HP published knowledge false statements and engaged in deceptive
         advertising concerning HP's own printer supply products, which included (a) false
27       representations about the refillability of HP's cartridges and the quality, compatibility
         and/or safety of Nu-kote's products, and (b) marketing misinformation techniques
28

designed to instill fear, uncertainty and doubt ("FUD") in the minds of customers about competitive products (¶93);

(5) HP had procured and/or sought to enforce 14 utility patents on ink jet inks and ink jet printing technology knowing that the patents were invalid, unenforceable and/or not infringed by Nu-kote (¶94);

(6) HP defrauded the Patent and Trademark office in prosecuting at least one patent on ink useful in ink jet printers, principally by failing to disclose all pertinent prior art (¶95);

(7) HP licensed patents in ink jet printer technology only to OEMs and on restrictive terms in order to allocate horizontally along product lines the aftermarket(s) for ink jet printer resupply cartridges (¶96);

(8) HP had cross-licenses or other agreements with other OEMs which mutually limited the ability of the parties to these agreements to litigate legal challenges and patent infringement claims against each other with respect to ink jet aftermarket supplies such as ink refills and replacement ink cartridges, but which enable or assist each other in asserting infringement claims against independent suppliers of aftermarket products (¶97);

(9) HP had published knowingly false statements in the marketplace accusing Nu-kote of infringing its trademarks and patents (¶98);

(10) HP employed sham litigation to make knowingly false allegations of trademark infringement, patent infringement and related legal claims against Nu-kote, and has knowingly sought grossly overbroad remedies in bad faith, thereby unjustifiably imposing substantial economic burdens on Nu-kote ("sham litigation") (¶99);

(11) HP agreed with other OEMs to restrict manufacture and sale of aftermarket ink jet cartridges to their own equipment, bring burdensome legal actions against Nu-kote with first contacting Nu-kote to resolve the differences, and take other actions designed to exclude competitors and competition in the aftermarkets for ink jet cartridges (¶100);

(12) HP prosecuted, amassed, employed or planned to employ against potential and existing competitors a thicket of patents, including patents which were fraudulently obtained, invalid, redundant and/or ineffective to the preservation of its legitimate intellectual property rights, in order to discourage competition ("thicket of patents") (¶101).

Counterclaim, ¶¶ 86-101 (emphasis added).

Nu-kote's 1st counterclaim, entitled "Declaratory Relief (Seeking Declaration of Noninfringement, Invalidity and Unenforceability - 28 U.S.C. §§ 2201 and 2202)," alleges that:

133. Nu-kote realleges and incorporates by reference paragraphs 71-101

134. HP claims to be the owner or assignee of [14] patents, and has asserted that Nu-kote has infringed or is about to infringe these patents.

135. Nu-kote has not infringed, nor is about to infringe any valid and enforceable claim of the [14] patents.

136. The [14] patents are invalid, void and unenforceable for the reasons set forth above, including specifically the reasons set forth in the Third through Fifth Affirmative Defenses, above.

137.   This is an exceptional case within the provisions of 35 U.S.C. § 285 and Nu-kote is accordingly entitled to an award of reasonable attorneys' fees.

Nu-kote's fifth affirmative defense, referenced in paragraph 136, alleged that HP had misused its utility patents asserted in its claims, including that it had procured and sought to enforce patents knowing that the patents were invalid, unenforceable and/or noninfringed. Counterclaim, ¶ 111. The relief sought in association with the declaratory relief claim was that the Court adjudge and decree that the 14 patents were not infringed by Nu-kote and/or were invalid, void and unenforceable. *Id.* at 138.

The 2nd and 3rd counterclaims, alleging monopolization and attempted monopolization in the aftermarket for inkjet products and services in violation of the Sherman Act § 2, incorporated each of HP's alleged predatory acts. Nu-kote alleged that HP engaged in the predatory acts in order to maintain its monopoly position in (or to monopolize) the relevant aftermarkets without any legitimate business justification for doing so. Nu-kote alleged that as a result of HP's conduct, the competition in the relevant aftermarkets had been suppressed, resulting in damages to Nu-kote including lost sales in the relevant aftermarkets. The 3rd counterclaim, attempted monopolization, incorporated the allegations of the 1st counterclaim for declaratory relief, i.e., the attempted monopolization counterclaim included the allegation that Nu-kote had not infringed any valid and enforceable patents, and that the patents asserted by HP were invalid, void and unenforceable. Counterclaims, ¶ 144.

The 4th counterclaim alleged that HP had violated Clayton Act § 3 and Sherman Act § 1 by unlawfully tying the sale of ink jet supply cartridges and ink resupplies for HP printers exclusively from HP. Nu-kote alleged that HP effectively forced customers to buy ink supply cartridges and ink resupplies for their HP printers exclusively from HP, by (i) employing a design for its ink supply cartridges that for no legitimate business reason incorporates a patented HP printhead, and (ii) attempting, through cartridge design changes, to thwart any effort by its customers to unbundled ink resupplies. Counterclaim, ¶ 153. The 4th counterclaim incorporated the allegations of the 1st counterclaim for declaratory relief.

The 5th counterclaim alleged that HP engaged in a conspiracy with other computer printer manufacturers to restrain trade in the aftermarkets for ink resupplies for ink jet printers, in violation of Sherman Act § 1. The alleged conspiracy consisted of an agreement not to compete with one another in the ink supply aftermarkets for each other' ink jet printers, and to discourage

competition by various methods, including without limitation sham litigation against Nu-kote, false statements regarding Nu-kote's products, and proposing that office supply retailers refuse to sell non-OEM ink resupply products. The 5th counterclaim incorporated all the alleged predatory acts and the allegations of the 1st counterclaim for declaratory relief.

The 6th counterclaim alleged that in violation of the Lanham Act, HP published false, deceptive and misleading statements in connection with goods and services HP distributed in interstate commerce, that its inkjet cartridges are non-refillable and non-reusable. Nu-kote alleged that HP used images of inkjet cartridges that did not accurately portray material characteristics of the HP cartridges. The counterclaim incorporated by reference all of the alleged predatory acts.

The 7th through 11th counterclaims alleged violations of California law. The 7th cause of action for violation of California Business and Professions Code sections 16720 and 16727 (the Cartwright Act) alleged that HP engaged in the alleged predatory acts within the State of California, and that the acts constituted illegal conduct in restraint of trade and illegal tying arrangements. The counterclaim incorporated all of the alleged predatory acts, and Nu-kote's allegations that HP's patents were invalid. The 8th counterclaim, which incorporated all of HP's alleged predatory acts, alleged that HP had engaged in the "aforesaid acts within the State of California, and so they constitute false advertising under California law in violation of California Business and Professions Code §§ 17500 et seq.

The 9th counterclaim alleged that as a result of HP's predatory acts, HP had published within the state of California knowingly false and disparaging statements concerning Nu-kote and its goods and services, including the quality, character, utility and value of Nu-kote's ink resupply products, and that these false and disparaging statements played a material and substantial part in inducing others not to do business with Nu-kote and caused customers to avoid purchasing Nu-kote products. The counterclaim incorporated each of the alleged predatory acts.

The 10th counterclaim incorporated all of the alleged predatory acts and the allegations that HP's patents were invalid, unenforceable or not infringed, and alleged that HP's conduct constituted unfair competition within the meaning of California Business and Professions Code §§17200, et seq. and under California common law.

The 11th and final counterclaim was for intentional interference with Nu-kote's economic advantage (and Nu-kote business and prospective business relationships). The counterclaim incorporated all of the alleged predatory acts and the allegations that HP's patents were invalid. Nu-kote alleged that HP engaged in intentional acts to interfere with Nu-kote's business and its actual and prospective business relations. Counterclaim, ¶ 186. Paragraph 186 of the counterclaim specifically repeated and realleged the alleged predatory acts, including in pertinent part that: (1) HP published knowingly false statements and engaged in false and deceptive advertising (including deceptive packaging) and other unfair business practices concerning HP's own printer supply products and//or Nu-kote's printer supply products for use with HP equipment, including (a) false statements about refillability of HP cartridges, (b) the quality, compatibility and/or safety of Nu-kote's products, (c) marketing misinformation techniques designed to instill FUD in the minds of customers about Nu-kote's products; (2) HP redesigned certain features of its cartridges so that they could no longer accommodate the same methods of refill, for the purpose of impeding the sale by Nu-kote and other companies of HP-compatible refill products; (3) HP changed its product packaging in manner that was deceptive and misleading and prevented consumers of Nu-kote's products from knowing whether they could use Nu-kote refill products to refill their HP-brand ink cartridges; (4) HP designed its printers and ink supply cartridges in such a way to prevent or make more difficult aftermarket competition from others who make and sell resupply cartridges or refills of used cartridges; and (5) HP engaged in conduct designed to interfere with Nu-kote's business, including (a) publishing knowingly false statements in accusing Nu-kote of infringing its trademarks and patents, and (b) procuring or seeking to enforce utility patents on ink jets and ink-jet printing technology knowing that the patents were invalid, unenforceable and/or not infringed by Nu-kote; (c) HP employed sham litigation to make knowingly false allegations of trademark infringement, patent infringement and related legal claims against Nu-kote, and has knowingly sought grossly overbroad remedies in bad faith, thereby unjustifiably imposing substantial economic burdens on Nu-kote; and (d) HP prosecuted, amassed, employed or planned to employ against potential and existing competitors a thicket of patents, including patents which were fraudulently obtained, invalid, redundant and/or ineffective to the preservation of its legitimate intellectual property rights, in order to discourage competition. (emphasis added)

### G. *HP Reply to Nu-kote's 4th Amended Counterclaims*

On April 22, 1999, HP filed a reply to Nu-kote's counterclaims to HP's fourth amended complaint. (Ex. 1225.). In addition to denying all the predatory acts asserted by Nu-kote, HP asserted a large number of affirmative defenses to the Nu-kote counterclaims, including: (11) the action brought by HP against Nu-kote and other actions to protect HP's trademarks, patents and other rights, and HP's assertion of such rights, as well as the other conduct alleged by Nu-kote, were privileged and immune from attack from the Nu-kote counterclaims under the Constitution and the *Noerr-Pennington* doctrine; (12) Nu-kote's conspiracy, state law trade libel and unfair competition claims were barred by reason of Nu-kote's unclean hands or waiver; (14) Nu-kote lacked standing to assert counts 4, 6 and 9 of its counterclaims because the business activity of Nu-kote affected by HP's actions were in violation of federal law and not deserving of legal protection; (16) HP was immune from liability under the antitrust and unfair competition laws because the conduct alleged by Nu-kote was protected and encouraged by other laws, including the patent laws; and (33) regarding Nu-kote's interference claim, HP's conduct was justified or privileged under the circumstances in that HP engaged in lawful competition and communications regarding its products. *Id.*

### H. *The Narrowing of Issues for Trial*

On March 1, 1999, HP filed 16 motions for summary judgment or partial summary judgment of Nu-kote's counterclaims. As a result of the rulings on the motions, the last of which was dated May 7, 1999, the scope of Nu-kote's counterclaims was undoubtedly narrowed.

#### 1. MSJ #4

In motion for partial summary judgment ("MSJ") #4, HP sought partial summary judgment of Nu-kote's allegations of false and misleading statements and improper marketing techniques made in support of its claims for monopolization and attempted monopolization under Section 2 of the Sherman Act, including but not limited to the allegations contained in paragraphs 92, 93 and 98 of Nu-kote's third amended counterclaims.[1] (Ex. 2849.) The motion

---

[1] Nu-kote alleged in paragraph 92 that HP met with leading retailers to discourage them from carrying ink resupply products of companies like Nu-kote; in paragraph 93 alleged that HP published knowingly false statements and engaged in deceptive advertising concerning HP's own printer supply products, which included (a) false representations about the refillability of HP's cartridges and the quality, compatibility and/or safety of Nu-kote's products, and (b) marketing misinformation techniques designed to instill fear, uncertainty and doubt ("FUD") in the minds of customers about competitive products; and in paragraph 98, Nu-kote alleged that HP had published knowingly false statements in the marketplace accusing Nu-kote of infringing its trademarks and patents.

was brought on the grounds that: (1) Nu-kote had not adduced competent evidence of any statements by HP which rose to the level of exclusionary conduct under Section 2 of the Sherman Act; and (2) because Nu-kote had not adduced evidence of any injury linked to the statements, Nu-kote did not have standing to bring the Section 2 claim.  HP requested that the Court find that: (1) Nu-kote's attempt to predicate its Section 2 claims for monopolization and attempted monopolization on allegations of false or misleading statements and improper marketing techniques fails as a matter of law; and (2) Nu-kote was barred at trial from asserting that HP had made any false statements or misrepresentations of fact about Nu-kote or its products, since no substantial controversy exists regarding that issue.  In opposition to the motion, Nu-kote identified three allegedly false and misleading statements by HP ("all ink refills lacked HP's print quality," "96% of all printer damage due to refills," and that damage to the printer and cartridges were possible only with refills).  (See Ex. 3956 and Nu-kote's opposition to MSJ #4.)

The court set forth the relevant standard for the motion as follows: "[t]o prevail on a claim that false and misleading advertising constitute exclusionary conduct in violation of Section 2, the plaintiff must present cumulative proof that the representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals. *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1996)." (Ex. 3956.)

The court found that there was evidence of dissemination of negative statements about refilling to the public, and the evidence of dissemination and duration was sufficient to withstand summary judgment. *Id.*  The Court found that there was no evidence that HP's statements regarding damage to printers were clearly false, and granted partial summary judgment to the extent Nu-kote's § 2 claims were based upon these alleged misstatements. *Id.*  With respect to statements regarding the quality of refill ink and printer repair, the Court found that there was evidence that HP's statements were false, and could be offered in support of Nu-kote's Section 2 claim. *Id.* The court further found that there was evidence that might prove that the allegedly false and misleading statements caused antitrust injury. *Id.*

### 2. MSJ #13

In MSJ #13, HP sought partial summary judgment of Nu-kote's Lanham Act (6th), state law false advertising (8th), trade libel (9th) and unfair competition (10th) counterclaims. (Ex. 2876.) The motion was directed at Nu-kote's allegations that HP published statements, through false advertising and otherwise, that its inkjet cartridges were non-refillable and non-reusable. *Id.* HP argued that Nu-kote had not identified any specific advertisements or statements that were allegedly false (or intended for public dissemination) and that there was no evidence that anyone was actually deceive or mislead by any of the alleged false advertising. I

In opposition to the motion, Nu-kote indicated that it did not oppose the motion as to the trade libel counterclaim to the extent that the claim was based upon HP's alleged statements that its cartridges were not refillable or reusable. The motion was granted as to the trade libel claim to the extent it was based on HP's alleged statements that its cartridges were not refillable or reusable. (Ex. 3959.)  With respect to the remaining claims, Nu-kote asserted that HP made false representations that its inkjet cartridges were "not refillable."

The court first noted that in order to prevail on a claim for false advertising under Section 43(a) of the Lanham Act, Plaintiff must satisfy the following elements:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; [fnt] and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997) To satisfy the first element of a false advertising claim, the plaintiff must show that the advertisement is literally false, or is true but has a tendency to mislead. *Id.*

(Ex. 3959 at 3.) The Court found that there was no evidence that HP stated that their cartridges were not refillable or that any HP documents or statements of a representative were likely to mislead anyone into believing HP cartridges cannot be refilled, and granted partial summary judgment as this allegation in the counterclaims. (Ex. 3959 at 6.)

### 3. MSJ #5

In MSJ #5, HP sought partial summary judgment of Nu-kote's allegation that Nu-kote's allegation that HP's filing and maintenance of "sham" litigation to protect its intellectual and other property rights constituted predatory and exclusionary conduct actionable under Section 2.

(Exs. 2836, 2852 and 3966.) HP sought partial summary judgment of this claim on the ground that HP's maintenance of its lawsuit against Nu-kote was protected from antitrust scrutiny by the *Noerr-Pennington* doctrine, and that Nu-kote could not create a genuine issue of material fact that the lawsuit against Nu-kote fell within the "sham" exception to the *Noerr-Pennington* doctrine, which requires, as a threshold matter, that the lawsuit be objectively baseless. (Ex. 2852.)   In the motion, HP offered evidence and argument regarding its claims against Nu-kote to establish that a reasonable litigant could conclude that HP's claims were reasonably calculated to elicit a favorable outcome. *Id.*

In opposition to the motion, Nu-kote asserted that: (1) HP knowingly asserted patents against Nu-kote that HP had fraudulently obtained (the '115, '295, '409 and '503 patents); (2) HP brought suit against Nu-kote on patents that HP knew to be invalid (the '503, '811 and nine cartridge-related patents found not to be infringed in the *Repeat-O-Type* litigation filed by HP) and on trademarks (including HP's inkjet cartridge product model numbers) and false advertising claims (including ink quantity and used printed in packaging suggesting that the printhead was new) that were objectively baseless; and (3) HP's lawsuit based on the '503, '294, '115 patents were subject to antitrust scrutiny as a *Walker Process* claim (enforcement of an invalid patent procured by fraud on the Patent Office may form the basis for a violation of Section 2 of the Sherman Act). *Id.*

After summarizing HP's allegations against Nu-kote, the Court stated that under the *Noerr-Pennington* doctrine, those who petition government for redress are generally immune from antitrust liability.  The order further provides that:

> "*Noerr*, however, withheld immunity from "sham" activities because "application of the Sherman Act would be justified" when petitioning activity, "ostensibly directed toward influencing governmental action, is a mere sham to cover ... an attempt to interfere directly with the business relationships of a competitor." Real Estate Investors, Inc. v. Columbia Pictures, 508 U.S. 49, 56, 113 S.Ct. 1920 (1993).  The United States Supreme Court has established a stringent, two-pronged test for determining when the sham litigation exception applies:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception must fail. [fnt] Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit

conceals "an attempt to interfere directly with the business relationships of a competitor," through the "use [of] the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon,"

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61, 113 S.Ct. 1920 (1993).

(Ex. 3966.) The Court found that there was no evidentiary basis upon which a reasonable jury could find that HP's lawsuit against Nu-kote, in whole or in part, was objectively meritless, and granted HP's motion. (Ex. 3966.) The Court further found that Nu-kote had failed to present any evidence that HP instituted the action knowing that the '504, '115, '409 and '295 patents had been procured by fraud. (*Id.*)

### 4. MSJ #7

In MSJ #7, HP addressed Nu-kote's allegation that 7 HP patents disposed of by the Court in a June 1998 ruling were obtained by inequitable conduct. HP sought partial summary judgment of this claim on the ground that there were no facts disclosed that would a claim of inequitable conduct against these patents. With respect to this argument, Nu-kote submitted a statement of non-opposition, and the Court granted partial summary judgment that there was no inequitable conduct in the prosecution of the 7 patents. (Ex. 3952.)

HP also sought partial summary judgment against Nu-kote's thicket of patents unenforceability defense, alleged in paragraph 101 of the counterclaim, which alleged that HP's 416 ink-jet related patents were evidence that the patents-in-suit were unenforceable. The court granted HP's motion for partial summary judgment that there was no inequitable conduct in the prosecution of the seven patents dismissed from the case by virtue of a prior court order. The court further found that Nu-kote was precluded from presenting a thicket of patents argument as part of its unenforceability defense against the nine (9) patents-in-suit or the 407 patents which were not in suit. (Ex. 3952.)

### 5. Orders On Remaining MSJs

With respect to the other motions for partial summary judgment filed by HP prior to trial, the Court issued orders:

- In MSJ #1, HP sought partial summary judgment of Nu-kote's 4th counterclaim (illegal tying arrangement in violation of Section 1 of the Sherman Act) on the grounds that *inter alia* HP's invention of a unitary, drop on demand thermal inkjet printhead was a single product, as such, no illegal tying arrangement could exist. (Ex. 2837.)

- o The motion was granted to the extent that the claim was based upon the initial design for the product, but was denied insofar as it was addressed to redesigning the inkjet cartridge to preclude resupply. (Ex. 3950.) In practical effect, the paragraph 153(I) of the tying claim was stricken, leaving paragraph 153(ii) as the operative tying allegation. *Id.*

- In MSJ #2, HP sought partial summary judgment of Nu-kote's 5th counterclaim for conspiracy. (Ex. 2840.) Nu-kote alleged that HP, Epson and Canon engaged in an unlawful conspiracy to restrain trade in the aftermarkets for ink resupplies for inkjet printers. The conspiracy alleged took three forms: (1) agreement between HP and other OEMs not to compete in each others' ink supply aftermarket; (2) HP's agreement with Epson not to challenge each others' patents covering ink supplies; and (3) agreement with other OEMs to bring contemporaneous and extraordinarily burdensome lawsuits against Nu-kote. (Ex. 3960.) HP argued that Nu-kote had no standing to bring the claim because the alleged conspiracy had not caused Nu-kote any injury, and there was no admissible evidence to support Nu-kote's conspiracy allegations. (Ex. 2840.)
  - o The motion was granted to the extent that Nu-kote's conspiracy claim was based upon an alleged agreement among HP, Epson and Canon to file suits against Nu-kote and to the extent that it was based upon an alleged agreement among OEMs not to compete in each other' ink supply aftermarkets. (Ex. 3960.) The motion subsequently was granted with respect to the alleged cross-licensing conspiracy. (Ex. 3971.)

- In MSJ #3, HP sought partial summary judgment on the ground that there was no genuine issue as a matter of law on Nu-kote's claims that HP's redesigns of its inkjet cartridges violated section 2 of the Sherman Act. (Ex. 2843.) The pertinent allegation was that HP "subsequently redesigned certain features of its cartridges so that they would no longer accommodate the same methods of refill or, on information and belief, otherwise were not as robust as they originally were, for the sole purpose of stopping such refilling." *Id.* HP argued *inter alia* that the claims failed due to Nu-kote's failure to meet its burden of proving that HP's redesigns lacked any legitimate business justification. *Id.*
  - o The motion was granted to the extent that the counterclaims were based upon the modification of the Kukla cartridge or changes to the Stanley cartridge. The motion was denied to the extent that the counterclaims were based upon the redesigning of the 26A/29A cartridges (relocated fill hole) due to triable issues as to each of HP's proffered legitimate business justifications. (Ex. 3951.)

- In MSJ #8, HP sought partial summary judgment on Nu-kote inequitable conduct defense to the '115 patent. HP sought to dismiss seven allegations of inequitable conduct asserted by Nu-kote in an April 1998 supplemental disclosure.
  - o The motion was granted with respect to seven allegations of inequitable conduct asserted by Nu-kote in its April 1998 supplemental disclosures. (Ex. 3953.)

- In MSJ #11, HP sought partial summary judgment on (1) Nu-kote's anticipation invalidity defense to the '115 patent and (2) Nu-kote's on sale invalidity defenses to the '115 and '350 patents, and denying Nu-kote's counter-motion for summary judgment of invalidity of claims 1-3 of the '115 patent.
  - o The court granted HP's motion for partial summary judgment of Nu-kote's anticipation defense to the '115 patent, but allowed Nu-kote to challenge the validity of claims 4-7 of the '115 patents on the grounds that the Saito patent was

anticipatory. The motion for partial summary judgment of Nu-kote's on-sale invalidity defense to the '115 and '350 patent was granted. (Ex. 3970.)

- In MSJ #9, HP sought partial summary judgment that no inequitable conduct occurred during the prosecution of the patent applications that issued as U.S. Patent Nos. 5,116,409 and 5,108,503, respectively. HP argued that Nu-kote inequitable conduct defenses to the patents should be dismissed because Nu-kote failed to timely particularize its defense. (Ex. 2864.)
    o As a sanction for Nu-kote's failure to properly plead its inequitable conduct defenses to the '409 patent, the Court struck Nu-kote's inequitable conduct defense to the '409 patent. (Ex. 3969.) With respect to the '503 patent, the counterclaim likewise was stricken on the ground of untimely disclosure. *Id.* Because the defenses and claims were barred on this basis, the court did reach the other bases for the motion (no evidence of inequitable conduct). (Ex. 3969.)
- In MSJ #12, HP sought partial summary judgment of Nu-kote's invalidity defenses to the '115 patent under 35 U.S.C. §§ 102(f), 112, 115, 116 and 256.
    o The motion was granted. (Ex. 3958.)
- In MSJ #10, HP sought partial summary judgment of (1) Nu-kote's invalidity defenses to the '295 patent under 35 U.S.C. §§ 102(f), 112, 115, 116 and 256 and (2) Nu-kote's inequitable conduct defense to the '295 patent.
    o The motion was granted except as to one the three bases for Nu-kote's inequitable conduct defense (HP's failure to disclose the preferred degree of porosity in the foam. (Ex. 3968.)
- In MSJ #14, HP sought partial summary judgment of Nu-kote counterclaim for damages under the Lanham Act. The claim alleged *inter alia* that HP's depiction of an inkjet cartridge without a fill hole on a package containing an inkjet cartridge which has a top fill hole constitutes false advertising under the Lanham Act. HP argued that Nu-kote could not show injury resulting from this conduct.
    o The court granted the motion with respect to Nu-kote's false advertising claim for damages regarding HP's revised packaging for its 26A and 29A cartridges. (Ex. 3957.)
- In MSJ #15, HP sought partial summary judgment on Nu-kote's affirmative defenses of laches, estoppel, waiver and acquiescence.
    o The motion was granted with respect to Nu-kote's defenses of waiver and acquiescence, but denied with respect to Nu-kote's laches and estoppel defenses. (Ex. 3965.)
- In MSJ #16, HP sought partial summary judgment of Nu-kote's 12th affirmative defense, which asserted that HP's claims (that Nu-kote had used HP's trademarks and made false product statements) based upon California unfair competition laws were preempted in whole or in part by federal patent, trademark and copyright law. (Ex. 2888.)
    o The court found that HP's state law claims were not preempted by the Patent Act, Lanham Act or the Copyright Act, and granted HP partial summary judgment on Nu-kote's 12th affirmative defense of federal preemption. (Ex. 3955.)

### 6. MSJ #6

HP also filed a motion for partial summary judgment of Nu-kote's 11th counterclaim for interference with economic advantage and Nu-kote's related counterclaims under the Cartwright Act and Cal. Business Professions Code § 17200 (7th and 10th counterclaims). (Ex. 2855.) The motion was made on the grounds that: (1) there was no admissible evidence of any wrongful conduct or statements by HP let alone ones that caused the disruption of any economic relationship between Nu-kote and its customers; (2) even if HP engaged in wrongful conduct, Nu-kote's damages claim was no casually linked to HP's alleged disruption; (3) with respect to the Cartwright Act and unfair competition counterclaims, the unilateral conduct was no actionable under the Cartwright Act; (4) for the reasons discussed in connection with HP's motions for partial summary judgment nos. 1-5, Nu-kote's state law antitrust claims also fail; and (5) there is no evidence of unfair conduct under § 17200.

#### a. Interference Claim

With respect to Nu-kote's interference claim, HP motion was based upon the following undisputed facts: (1) as of February 9, 1999, Nu-kote identifies only three entities - Sears, Sam's Club and Office Depot – with which it contends its economic relationships were disrupted and damaged by HP's intentional interference; (2) there was no admissible evidence of any wrongful conduct or statements by HP by that caused the disruption of any economic relationship between Nu-kote and Sam's Club, Nu-kote and Office Depot or Nu-kote and Sears; (3) in calculating purported damages for Nu-kote's interference claim, Nu-kote's damages expert Phillip Rowley stated that he was aware of no admissible evidence that HP actually interfered with any economic relationships between Nu-kote and Sears, Sam's Club or Office Depot; (4) Nu-kote's damage calculation for its intentional interference claim was not based on any Nu-kote business documents discussing projected, potential or lost sales; and (5) the damages that Nu-kote calculates for its intentional interference claim were not casually linked to the alleged disruption created by HP. (Ex. 2856.)

In response to each of these facts, Nu-kote's statement of issues in opposition to the motion states "Undisputed; however …" and proceed to offer facts. Nu-kote offered the following facts: (1) Nu-kote alleged and HP's documents established the existence of anti-refill campaign targeted directly at Nu-kote's reseller customers and designed to created FUD among reseller customers about the use of Nu-kote's refill products and disrupt Nu-kote's ability to sell

its refill products to reseller customers; (2) after HP communicated this message to resellers, Nu-kote's business reputation was severely damaged and it had a much more difficult time selling its refill products; (3) for purposes of specific damages only, Nu-kote had identified lost sales to three customers (Sears, Sam's Club and Office Depot) as the source of its claim; (4) after HP implemented its programs, Nu-kote was forced to deal with FUD issues concerning the warranty and product quality with its Sear's account, and Sears canceled its Nu-kote inkjet lines; (5) Sam's Club stopped selling all Nu-kote products and, agreeing with the OEM, carried only OEM supplies, e.g., those sold by HP; and (6) following a meeting with HP representatives, Office Depot became confused about Nu-kote refill products, and sales to Office Depot subsequently and dramatically declined.

Based upon its undisputed facts, HP asserted that that Nu-kote's interference counterclaim was not supported by admissible evidence. HP asserted that to avoid summary judgment, Nu-kote must establish the existence of genuine issues of material fact with respect to the following elements of its interference claim: (1) an economic relationship between the plaintiff and some third person containing the probability of future economic benefit to the plaintiff; (2) knowledge by the defendant of the existence of the relationship; (3) wrongful intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) damages proximately caused by the acts of the defendant, citing *inter alia Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 393 (1995).

HP first argued that as a matter of fact and law, HP's alleged conduct was not wrongful. HP asserted that the California Supreme Court squarely places the burden on the plaintiff "to plead and prove as part of its case-in-chief that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in conduct that was wrongful by some legal measure other than the fact of interference itself," citing *Della Penna* at 393, and asserting that under *Della Penna,* the plaintiff must plead and prove "the conduct constituting the interference was itself wrongful by some other measure beyond the fact it amounted to interference, citing *LiMandri v. Judkins,* 52 Cal.App.4th 326,342 (1997). HP argued that:

> If it no longer can rely on its dismissed antitrust, patent, trademark, Lanham Act and disparagement claims, Nu-kote cannot satisfy the requirement that it prove wrongful conduct by HP. Nu-kote has alleged no other conduct that could be considered wrongful "by some other measure beyond the fact it amounted to interference." *LiMandri,* 52 Cal.App.4th. at 342 ... Thus, if Nu-kote's federal and state antitrust and other claims set forth above fails as a matter of law as they should, Nu-kote's claim for intentional

interference with prospective economic advantage also fails under *Della Penna* and its progeny.

(Ex. 2856 at 5.)  HP further argued that there was no admissible evidence in the record of any wrongful conduct by HP that caused any interruption or actual disruption in Nu-kote's sales to Sears, Sam's Club or Office Depot.

In opposition, Nu-kote first argued that HP's conduct was wrongful and intentionally designed to disrupt Nu-kote's reseller relationships.  Nu-kote asserted that:

> Through detailed evidence and legal authority supporting its other counterclaims in this case, Nu-kote has presented substantial evidence that HP's conduct was unlawful (and therefore wrongful) on the following grounds: (1) the acts were premised on patents that were invalid, void and unenforceable; (2) the acts were in furtherance of monopolization, attempted monopolization, unlawful tying and a conspiracy to restrain trade in violation of the Sherman Antitrust Act; (3) the acts violated the Lanham Act; (4) the acts violated Section 16720 and 16727 of California's Cartwright Act; (5) the acts included trade libel, disparagement of goods and defamation under California law, and (6) the acts included acts of unfair competition in violation of California Business and Professions Code section 17200 and 17500.  *See* Nu-kote's Oppositions Numbered 1 through 5, and 7 through 16.  Any one of these grounds provides sufficient basis for a finding of "wrongful" conduct necessary to support an interference claim…

Nu-kote's Opposition to MSJ #6 at 9.  Nu-kote further argued that:  (1) independent from the above wrongful conduct, Nu-kote had demonstrated the wrongful element by proof of HP's wrongful motive for establishing an anti-refill campaign, namely a desire to maintain a 90 % monopoly share of the market; and (2) from HP's own evidence, a reasonable jury could conclude that HP intended to disrupt Nu-kote's relationships with its reseller customers.

Nu-kote argued that it had created at least a triable issue of fact that HP's conduct actually disrupted Nu-kote's reseller relationships (i.e., that as a result of HP's anti-refill FUD campaign communicated to Nu-kote's resellers, resellers discontinued Nu-kote's inkjet products or refused to carry them); and that Nu-kote had created a triable issue of fact that it suffered damage as a result of HP's anti-refill campaign.

In reply, HP argued that:  (1) there was no admissible evidence of any wrongful conduct by HP that caused the actual disruption of any of Nu-kote's reseller relationships; and (2) HP reiterated that its alleged conduct was not "wrongful;" and (3) Nu-kote had not demonstrated that HP's conduct was wrongful by some measure beyond the fact of the interference "other than

1  through its dismissed antitrust, patent, trademark, Lanham Act and disparagement claims." (Ex.

2  2987 at 6.)

3                                      b.  State Unfair Competition

4          With respect to Nu-kote's state law antitrust claims, HP argued that it had engaged in no

5  conduct that was actionable as unfair competition under Business and Prof. Code § 17200, which

6  prohibits "any unlawful, unfair or fraudulent business practice."  HP argued that:

7          Since HP has not violated any federal or state antitrust or trademark laws, for the reasons
       set forth above and in the concurrently filed summary judgment briefs, Nu-kote cannot
8      base its Section 17200 claim on the ground that HP's business practices were "unlawful."
       Moreover, for the reasons set forth above and in concurrently filed briefs, HP has not
9      engaged in "deceptive, untrue or misleading advertising."

10 Ex. 2855 at 8.  HP further argued that its HP's conduct did not violate the "unfair" prong of §

11 17200.  HP argued that a business act or practice was "unfair" only if "it offends an established

12 public policy or when the practice is immoral, unethical, oppressive, unscrupulous or

13 substantially injurious to consumers," citing *People v. Casa Blanca Convalescent Homes, Inc.*

14 159 Cal.App.3d 509, 530.  HP asserted that a court evaluating a claim of unfairness must weigh

15 the utility of the defendant's conduct against the gravity of the harm to the alleged victim, citing

16 *Motors, Inc. v. Times Mirror Co.*, 102 Cal.App.3d 735, 740.  HP argued that Nu-kote could not

17 show as a matter of law that the harm to Nu-kote outweighed the utility of HP's conduct, stating
   that:

18     HP's cartridge design and changes benefited not only HP (by reducing manufacturing
19     costs, among other things) but the consuming public.  HP had many legitimate business
       reasons for its designs and design changes.  There is no evidence that HP engaged in any
20     disparagement of Nu-kote either.  Nor did HP engage in any conspiracy or sham conduct.

21 (*Id.* at 9 (footnotes omitted).)  The omitted footnotes reference the Court to HP's MSJs Nos. 1, 2,

22 4 and 5.  *Id.*

23         In opposition, Nu-kote argued that it had created a genuine issue of material fact

24 concerning its claim for unlawful competition.  Nu-kote asserted that:

25     As noted, HP presumes that Nu-kote has failed to establish any "unlawful" conduct based
       solely on the strength of its other motions for summary judgment filed in this case.  See
26     HP's Motion at 8-9.  In its oppositions to HP's numerous motions for summary judgment,
       Nu-kote details the evidence in support of its claims that HP's conduct was wrongful
27     under both state and federal law.  See Nu-kote's Oppositions Numbered 1 through 5, and
       7-16.  Any of this conduct would support a finding of "unlawful" acts or practices
28     necessary to support a Section 17200 claim. ...

> Moreover, the independent "unfairness" prong of Section 17200 is "intentionally broad, thus allowing courts maximum discretion to prohibit new schemes to defraud." ... HP's own documents create a question of fact that its conduct was unfair; that is, a question of fact exists whether the harm to Nu-kote and the consumer (elimination refill competition, and creation of fear, uncertainty and doubt) outweighs the utility of the conduct (reduction of marketing costs and "other consumer benefits").

Nu-kote's Opposition to MSJ #6 at 14.

### c. State Antitrust Claims

Finally, HP argued that the basis of Nu-kote's Cartwright Act claim was the allegations of Nu-kote's Sherman Act claim, and thus for the reasons set forth in motions for partial summary judgment nos. 1-5, Nu-kote's Cartwright Act claims must fail as well. HP noted that cases brought under the Cartwright Act must be based on the existence of a trust or combination, and argued that because Nu-kote's claims of monopolization and attempted monopolization were based upon unilateral conduct (not prohibited by the Cartwright Act), the Cartwright Act claims failed for this additional reason. (Ex. 2855.)

In opposition, Nu-kote asserted that it had created a genuine issue of material fact concerning its Cartwright Act claims, citing its oppositions to HP's MSJs nos. 1-5. Nu-kote asserted that for the very reasons its federal antitrust claims should survive, its Cartwright Act claims should survive. *See* Nu-kote's Opposition to MSJ #6.

### d. No Ruling on MSJ # 6

The Court deferred ruling on MSJ #6 until after the trial. (*See* Ex. 1598 at HP4-37894.)

### I. *Cumulative State Law Claims?*

On April 21, 1999, Judge Ware issued an Order Setting Briefing Schedule. The Order provides in pertinent part that:

> It is the Court's intention to dismiss all of the parties' respective state law claims pretrial on the basis that the claims are cumulative of the federal claims and do not provide a basis for any additional damages or equitable relief.

(Ex. 1597.) To the extent that the parties objected to the Court dismissing the claims, the parties were given the opportunity to file briefs in opposition. *Id.*

Nu-kote submitted an opposition on May 3, 1999. (Ex. 1598) Nu-kote asserted that: (1) Nu-kote's state law claims were not cumulative of its federal claims, on the grounds that the state law claims set forth different standards of proof than the related federal claims, and that some claims provided additional damages to the federal claims (including Nu-kote's claim for

interference with economic advantage, which provided damages for lost profits and had no federal counterpart);   (2) in the event that Nu-kote failed to prove at trial that HP's conduct injured competition, as opposed to a specific competitor, Nu-kote could still prevail on the interference claim based upon the harm suffered by Nu-kote; and (3) if the state law claims were dismissed, they should be dismissed without prejudice.

HP's response to the Court's April 21, 1999 order is dated May 10, 1999. (Ex. 1598) Therein, HP asserted that: (1) the court had already granted summary judgment against Nu-kote's state law claims of false advertising and defamation-related claims (counterclaims 8-10); (2) if there was anything left of Nu-kote's unfair competition claim (count 10) after the court's partial summary judgment rulings, it could only relate to whether the conduct that formed the basis for Nu-kote's tying and conspiracy claims, despite being lawful, was unfair, but the California Supreme Court had recently confirmed that conduct that does not rise to the level of an antitrust violation is not "unfair" for purposes of the unfair competition law; (3) the court had effectively disposed of Nu-kote's Cartwright Act claim (counterclaim 7) by ruling in connection with Nu-kote's federal tying claims, that no reasonably jury could conclude that "HP did not have legitimate business justifications" for its inkjet cartridge design, or that HP had any agreements with other printer manufacturers to restrain competition; (4) those holdings were fatal to Nu-kote's claims under the Sherman Act and the Cartwright Act; (5) "there is no reason not to dismiss Nu-kote's intentional interference claim because Nu-kote has conceded that … 'there is no admissible evidence of any wrongful conduct or statements by HP that caused the disruption of any economic relationship' between Nu-kote and its resellers;" (6) all of Nu-kote's state law claims should be dismissed with prejudice. *Id.*

On May 10, 1999, Judge Ware issued an Amended Final Pretrial Conference Order. (Ex. 1601.) The order provides *inter alia* that "[t]he Court orders off-calendar and bifurcates for later proceedings all state-law claims and defenses and all equitable defenses to federal claims." *Id.*

## J.   *The Trial*

In early 1999, HP requested that the Court "phase" the trial so that HP could present its intellectual property claims before Nu-kote put on evidence in support of its antitrust claims. (RT. 850:10-851:3.). No evidence was submitted to support ACE's suggestion that HP made its "not inextricably related" comment in support of its 1999 request for phasing. On May 10, 1999,

1   Judge Ware issued an Amended Final Pretrial Conference Order. (Ex. 1601.) The order states

2   that:

> 3   The trial will be conducted in phases. . . . In Phase 1, Hewlett-Packard will present its
> patent infringement and trademark case and Nu-kote may cross-examine. After it [HP]
> 4   rests its case, Nu-kote [may] present evidence of any defenses and Hewlett-Packard may
> cross-examine. After it [Nu-kote] rests its defensive case, Hewlett-Packard may present
> 5   any rebuttal evidence. In Phase 2, Nu-kote may present its antitrust claim. The same
> procedure will be followed with respect to defenses and rebuttal. Parties will be given an
> 6   opportunity to make interim opening statements at the beginning of each phase. Opening
> statements shall be directed to the issues being heard during each particular phase.
> 7   Parties will be allowed to discuss, however, any theory of relationship between the claims
> or defenses in the respective phases which have not been barred by the Court.
> 8

9   (Ex. 1601.)

10       Phase 1 took place between May 17, 1999 and June 28, 1999. On May 18, 1999, Judge

11   Ware instructed the jury on HP's "affirmative" patent claims during trial, i.e., that HP claimed

12   that Nu-kote infringed HP's `115, `295, `350 and `409 patents. [TT 228:17-229:13]. The jury

13   instruction regarding Nu-kote's antitrust illegal monopolization counterclaim indicated that to

14   prevail on this claim, Nu-kote must have proved each of the following elements by a

15   preponderance of the evidence:

> 16   First, that there is a relevant market [the market for ink replacement supplies available to
> consumers who own HP inkjet printers sold and used in the U.S.] in which HP has
> 17   monopoly power;
> Second, that HP willfully acquired or maintained that power through restrictive or
> 18   exclusionary conduct;
> Third, that HP's activities occurred in or affected interstate commerce; and
> 19   Fourth, that Nu-kote was injured because HP's restrictive or exclusionary conduct.
> 20

21   (Ex. 1603.) With respect to the second element, the jury instruction states that "the next element

22   Nu-kote must prove is that HP either willfully acquire or willfully maintained its monopoly

23   power through restrictive or exclusionary acts or practices rather than by the ordinary means of

24   competition, by offering better products or services, by exercising superior business judgment, or

25   just by chance." *Id.* at 7. The jury instruction states that:

> 26   A company may not be found to have willfully acquired or maintained its monopoly
> power if it has acquired or maintained that power solely through the exercise of superior
> 27   foresight and skill; or because of natural advantages; or because of economic or
> technological efficiency, including efficiency resulting from scientific research; *or by*
> 28   *obtaining a lawful patent.* The acts or practices that result in the acquisition of or
> maintenance of monopoly power must represent something more than the conduct of

business that is part of the normal competitive process or extraordinary commercial
success. They must represent conduct that has made it difficult or impossible for
competitors to engage in fair competition.

*Id.* (emphasis added)  According to the jury instruction, the exclusionary acts that Nu-kote
alleged that HP had engaged in involved an unfair campaign against competing ink resupply
products, including changes to some HP inkjet products (redesign on the 26A and 29A cartridges
to eliminate the top-fill hole, reduced resistor life on the 29A cartridges and redesign of 33A
cartridges) and false, deceptive and misleading marketing statements to sellers and potential
buyers of refill products, in an attempt to persuade people not to sell or use refill products. *Id.* at
9.  With respect to Nu-kote's claims that HP had engaged in exclusionary conduct by
redesigning or changing certain features of its products in a way that unreasonably excluded or
handicapped competition, the jury instruction provides that:

> As a general rule, a company may bring its products to market whenever and however it
> chooses.  To establish an antitrust violation based on design changes, Nu-kote must show
> that a new product introduction or change by HP to an existing product was unreasonable
> because it involved an anticompetitive use of monopoly power, or was a restrictive or
> exclusionary means of attempting to monopolize the relevant market.

*Id.* at 10.

During HP's opening statement on May 18, 1999, counsel identified three points that HP
would prove during Phase 1:

> There are three key points that we will make during our case.  First, Hewlett-
> Packard revolutionized home printing.  Hewlett-Packard invented, perfected and
> marketed thermal inkjet printing.  These are affordable printing systems that brought
> extraordinarily effective print quality and reliability into our homes and into small
> businesses.
> The second point, Nu-kote traded on Hewlett-Packard's good name to mislead
> customers.
> And the third key point, Nu-kote infringed Hewlett-Packard's patented
> inventions, four patents in all.  And as the court instructed you, each one of these patents
> is presumed to be valid.

(TT. 238:8-22.)

During Phase I, HP presented evidence that its patents had been infringed by Nu-kote,
Nu-kote responded with invalidity and non-infringement arguments and HP rebutted Nu-kote's
showing by offering proof of its patents.  (RT. 136.)  For example, on direct examination, HP
introduced its `295 patent claim and then Nu-kote attacked the patent by saying it was invalid.

(RT. 137:21-22, 138:16-17, 25, 139:1-140:7.) Nu-kote presented evidence it was not a new invention and otherwise invalid because HP failed to disclose the best mode. (RT. 139:1-140:7.) So HP countered that evidence with evidence of validity. (*Id.*) During Phase I, HP also prosecuted its trademark infringement and false advertising claims. (RT. 146.) HP presented evidence of its trademarks and that they had been infringed by Nu-kote. (RT. 146-147). Nu-kote also defended against the trademark claims during Phase I. (RT. 147-149.)

During Phase I, in discussing Nu-kote's contention that it should be allowed to mention limited antitrust issues in Phase I because certain issues were related, HP's counsel, Mr. Cooper, argued that:

> I don't know what the relationship is at all. Sham [litigation] is out; therefore, that is not an issue. Now, I don't know how they create a relationship between the fact that we are pursuing certain patent claims against them and the antitrust claims other than through sham litigation.

(TT. 165:20-166:1.) During the Nu-kote trial, Mr. Cooper suggested to Judge Ware that he should impanel a second jury to hear and consider Nu-kote's antitrust claims. (TT. 3846:2-9.) Throughout the trial, Judge Ware reminded counsel and the jury that he regarded "the two cases as separate." (TT. 3541.)

William Pecau, HP's trademark counsel, argued during his closing that stopping Nu-kote from infringing was of primary importance: "Now, let me just end up talking about damages, as you know that HP's primary interest is in stopping Nu-kote from infringing on HP's trademarks." (TT. 6364.) Similarly, in his patent infringement closing, Mr. Marshall differentiated HP's damage from the injunction HP sought. Mr. Marshall argued, "now, equally important and more important, what we want is an injunction here to stop Nu-kote from infringing our patents going forward." (TT. 6203.)

Phase II of the trial involved Nu-kote's Sherman Act Section II claims. (RT. 152-153.) Nu-kote offered evidence with respect to market definition and market power, and in response HP asserted a number of defenses, including that the marketplace for printers had become much more competitive and much broader, and that consumers were more knowledgeable. (RT. 153-154.) HP defended Nu-kote's allegations regarding product redesign by offering evidence that it was an innovator, and had a legitimate business justifications for its conduct. (RT. 156-157.) Phase II also involved Nu-kote's "FUD" allegations. (Id.) HP defended this allegation by attacking the elements of Nu-kote's claim, e.g., that the statements were not false. (RT. 161.)

After both sides rested following Phase II, Judge Ware again reminded the jury that HP's intellectual property claims and Nu-kote's antitrust counterclaims must be decided separately:

> I want to emphasize that these are separate considerations. The fact that you find that you should or should not award damages to HP with respect to the patent claims has no bearing on your decision whether you should or should not award damages to Nu-kote with respect to the antitrust claims.

(TT. 6170.) After prosecution of all the evidence and argument, Judge Ware instructed the jury as follows:

> You may now retire to deliberate on all aspects of the case. I wish to again emphasize that you should decide each claim in this case separately. The patent, trademark and unfair competition claims are separate and distinct from the antitrust claims. If you decide that a particular party is entitled to your verdict on any aspect of the patent claims, you should not use that as a basis for deciding for or against that party with respect to the trademark infringement claims or the antitrust claims.

(TT. 6363.)

The jury returned verdicts in favor of HP. The Verdict on Patent Claims is dated July 22, 1999. (Ex. 1604.) Half of the twelve interrogatories on the Verdict on Patent Claims asked the jury to determine whether Nu-kote had proven whether any of the four HP patents that went to trial were invalid. The jury found that: (1) Nu-kote had proven that one or more claims of the '115, '295, '350 patents were invalid; (2) HP had proven that Nu-kote had infringed one or more claims of the '115, '295, '350 and '409 patents; (3) Nu-kote willfully infringed three of the four patents; and (4) HP's damages resulting from Nu-kote's sale of infringing products totaled $456,937.80. *Id.*

The Verdict on Antitrust Claims was also signed on July 21, 1999. (Ex. 253.) It found that Nu-kote had proven that HP had monopoly power in the relevant market of replacement ink supplies for use with HP inkjet printers, but then found that Nu-kote had not proven that HP willfully acquired or maintained or attempted to acquire monopoly power through restrictive or exclusionary conduct of redesign or with false or misleading marketing statements. *Id.*

The Verdict on Trademark Infringement, Unfair Competition and False Advertising was signed on July 22, 1999. (Ex. 1605.) It found that three (of nine asserted) HP trademarks were valid and willfully infringed, that Nu-kote had engaged in unfair competition, and that Nu-kote had engaged in false advertising in certain marketing statements. *Id.*

Following disposition of motions for directed verdict and judgment notwithstanding the verdict, final judgment was entered in favor of HP on February 14, 2000. On February 17, 2000 Nu-kote filed a notice of appeal in the United States Court of Appeals for the Federal Circuit. On April 26, 2000 the appeal was dismissed when the parties reached a settlement. In conjunction with the settlement, Nu-kote dismissed its state law claims. The settlement included a license agreement between HP and Nu-kote. HP's Vice President in charge of the Inkjet Division stated in a press release following the Nu-kote settlement that:

> I am pleased that following a verdict in HP's favor, legal action between the two companies had ended. We would have preferred to settle our differences without a trial, but it became paramount for us to protect our patent, trademark and our other intellectual property rights in court. . . . We have invested a tremendous amount of time, energy and resources in discovering, developing and bringing to market leading edge products that benefit consumers and businesses, nobody should think that they can treat HP's intellectual property as its own. As we have clearly demonstrated, HP will always defend it to the utmost of our ability.

(HT. 1284:6-1286:8.)

## II. The Present Action

### A. *The Policy*

The present action arises from a "Comprehensive General and Automobile Liability Policy: Foreign," policy number CXC024869, issued by ACE, then called Cigna, to HP. The policy, in pertinent part, provided coverage for HP's "Advertising Liability" arising from activities outside the United States from October 1992 to October 1995. The policy provided coverage to HP for its "advertising liability" arising from activities outside the United States. More specifically, the policy obligated ACE to pay on behalf of HP all sums which HP shall become legally obligated to pay as damages occurring in the course of HP's advertising activities, arising out libel, slander, defamation, violation of the right of privacy, unfair competition, or infringement of copyright, title or slogan. The ACE policy provides in pertinent part that: "The Company shall have the right and duty, except in such jurisdictions where legally prohibited, to defend any suit against the insured seeking damages..."

### B. *Tender of the Nu-kote Action*

On June 13, 1998, HP tendered the defense of the then third amended counterclaim to ACE. The tender included Nu-kote's second counterclaim (January 19, 1996) and copies of package inserts included in HP inkjet cartridge boxes distributed worldwide during the ACE

policy period. The insert stated in a number of languages "CAUTION! Damages to the printer or print cartridge resulting from modifying or refilling the print cartridge is not the responsibility of Hewlett-Packard." By February 1999, eight months had passed since the tender of the defense to ACE in June 1998, and ACE had neither accepted nor denied the request for a defense.

### C. HP's Declaratory Relief Complaint and Relevant Pre-Damages Hearing Rulings

HP filed the present action for declaratory relief on February 18, 1999. In pertinent part, the complaint seeks a declaration that ACE had a duty to defend HP against Nu-kote's counterclaim and that ACE must pay post-tender fees. HP filed a motion for partial summary judgment that ACE owed HP a defense of the underlying action. On August 24, 1999, Judge Williams granted the motion, finding that HP had demonstrated that the Nu-kote counterclaim contained claims potentially covered by the ACE policy.[2] On May 12, 2001, Judge Williams issued an order on a number of summary judgment motions which further clarified ACE's defense obligations. The first set of motions concerned the precise date HP first tendered the action to ACE. The Court found that ACE's duty to defend was triggered as of the June 13, 1998 letter. The second set of motions concerned whether ACE was liable for reimbursement of HP's pre-tender defense costs, from November 1994 to June 13, 1998. The Court found in favor

---

[2]  The motion revolved around whether the Nu-kote counterclaim revealed a potential, "however slight," that ACE could be liable to indemnify HP for unfair competition within the policy territory. With respect to the "policy territory" issue, HP argued that the Nu-kote counterclaim alleged activities within the territorial limitations of the policy because HP distributed in foreign markets package inserts intimating that the HP cartridges are not refillable. ACE argued that any "FUD" allegedly suffered by consumers and distributors in foreign markets was irrelevant because there was no allegation or evidence that Nu-kote sold inkjet refill products outside of the United States during the policy period, and therefore, HP could not have suffered any damages to its international sales.

The court disagreed with ACE, noting that the policy covered claims worldwide resulting from an occurrence within the policy territory. The court at page 10 of its decision concluded that:

> Nothing in the policy restricts covered Advertising Injury claims to those in which all damages must be suffered outside of the United States...The territorial limitation in the... policy emphasizes the location of the occurrence, not the location of the resulting damages.
> In the present case, HP disseminated allegedly false advertisements about refilling inkjet printer cartridges internationally. Nu-kote alleges that HP's statements concerning refillability of cartridges caused it to suffer damages. Because Nu-kote could possibly claim damages to domestic business based, at least in part, on HP's extraterritorial acts, the Court finds that the Policy Territory requirement is satisfied.

With respect to unfair competition, the issue was whether the Nu-kote counterclaim alleged "unfair competition" as that term is used in the policy. The court found that because "unfair competition" is commonly understood to encompass claims for false advertising and other tortious conduct resulting in competitive injury, "unfair competition" as presented in the ACE policy encompassed the claim for unfair competition alleged in the Nu-kote counterclaim. *See* Lowe Decl., Ex. 102.

of ACE, ruling that HP is precluded from recovering any defense fees and costs incurred in connection with the Nu-kote action prior to June 15, 1998.

In the summer of 2001, ACE and HP agreed to the appointment of a Special Master to report to the Court determining the amount of damages to be awarded to HP. After the reference to the Special Master, HP filed a motion seeking summary adjudication that: (1) ACE had no right to allocate defense costs between potentially covered and uncovered Nu-kote claims in the underlying *Nu-kote* action; (2) ACE's duty to defend HP continued through the termination of the *Nu-kote* action; and (3) Civil Code § 2860 is not applicable to the determination of reimbursable defense costs. On April 1, 2002, the Special Master granted HP's motion. On October 10, 2002, Judge Ware adopted the Special Master's order "in its entirety and without any modification as an order of the Court."

### D. *The Damages Hearing*

A damages hearing was held before the Special Master on October 14-18, 2002 and October 28-30, 2002. The primary question for the Special Master was whether the approximately $28 million in fees and costs HP incurred in the underlying action in the post-tender period were reasonable and necessary to the defense of the Nu-kote counterclaim.

HP argued that it was entitled to recover all expenses incurred in litigating the Nu-kote action and that costs incurred in prosecuting its affirmative claims could not be separated out. HP asserted that all of its expenditures were strategically related to and necessary for the defense of the Nu-kote counterclaim. HP presented testimony of four of the principal outside attorneys who litigated the Nu-kote action as well as testimony of ten HP in-house attorneys who worked on the case. All of the witnesses explained the nature of the case, the nature of the work done, why their work was necessary to HP's defense against Nu-kote's counterclaims, and why the fees and costs were reasonable under the circumstances. HP additionally presented the testimony of the six principal case supervisors from the two outside firms and HP's in-house staff to describe the work, its organization, and the attempts to control expenses with quarterly budgets, billing restrictions, detailed invoices, careful review before and after invoices were submitted, monthly meetings to discuss billing, discounts, credits and adjustments. Max Blecher, an antitrust lawyer, provided his expert opinion that all the charges in the case were reasonable and necessary for the defense of the Nu-kote counterclaim.

ACE argued that the Nu-kote action involved a complaint and counterclaim that were separate and distinct, that each required different litigation activities, and that as a consequence ACE was not obligated to reimburse HP for all of the fees and costs incurred in the Nu-kote action. ACE asserted that California law clearly established that where an insured files a lawsuit in order to protect or establish some right, all of the costs and expenses in connection with the prosecution of such suit must be borne by the insured, and that to the extent that a cross-complaint or a counterclaim is filed against the insured, only those expenses that relate solely to the defense of such cross-complaint or counterclaim are recoverable as defense costs. ACE offered the testimony of Professor Peter Menell to show that HP's affirmative claims and Nu-kote's counterclaims were separate and separable. Robert Rose confirmed Professor Menell's views from the practitioner's viewpoint. Craig Aronson offered two possible methods by which the fees and costs could be divided between the two separate sets of claims that made up the Nu-kote action.

### E. *March 31, 2003 Report and Recommendation*

On March 31, 2003, the Special Master submitted his report and recommendation ("the report"). As is relevant here, after a review of a number of cases,[3] the Special Master stated that:

> The above authorities make clear that fees and costs associated with the prosecution of affirmative claims may be recovered from a breaching insurer if such fees and costs are reasonable and necessary to the defense of the action brought against the insured. The cases cited by ACE for the proposition that an insurer is not obligated to pay for attorneys' fees and costs in connection with an insured's prosecution of a case against a third party are not applicable, as in those cases the insurer agreed to defend the insured, with or without a reservation of rights, or the court found that the insurer did not owe the insured a duty to defend.

March 31, 2003 Report at 21.

HP argued that as long as an item of service or expense was reasonably related to the defense of a covered claim, it should be apportioned wholly to the covered claim. ACE asserted that there was no "reasonably related" test. The Special Master concluded that:

---

[3] The cases reviewed included *Buss v. Superior Court,* 16 Cal.4th 35, 49 (1997), *Aerojet-General Corp. v. Transport Indem. Co.,* 17 Cal.4th 38, 56 (1997), *State v. Pacific Indem. Co.,* 63 Cal.App.4th 1535 (1998), *Barratt American, Inc. v. Transcontinental Ins. Co.,* 102 Cal.App.4th 848, 857 (2002), *Larkin v. ITT Hartford,* 1999 WL 459351 (N.D.Cal. 1999)

ACE's assertion that there is no "reasonably related" test that would allow prosecution costs to be recoverable as defense costs similarly is without merit. Applicable California cases have not explicitly stated a "reasonably related" test with respect to the recovery of prosecution costs as reasonable and necessary defense costs. The cases do, however, suggest that the standard is something very close to "reasonably related." In *State of California*, the court imposed a burden on the insured to show that "the work was all related to the defense." Id. at 1549. In *Larkin*, the court noted that the question was whether the prosecution of the action "would be conducted against liability by a reasonable insured under the same circumstances," citing *Aerojet*, 17 Cal.4th at 62. In *Barratt*, the court found that the insured had the obligation to establish that a reasonable insured would have performed the acts or incurred the costs in defense of the lawsuit brought against it. *Barratt* at 464.

In summary, when the insurer breaches its duty to defend, the insured then must prove by a preponderance of evidence the existence and amount of the expenses, which then are presumed to be reasonable and necessary as defense costs. *Aerojet*, 17 Cal.4th at 64. Such defense costs may include expenses incurred in prosecuting affirmative claims under appropriate circumstances. Once the insured meets its burden, it is the breaching insurer's burden to prove by a preponderance of evidence that the expenses are unreasonable or unnecessary to the defense. *Id.*

After the conclusion of the damages hearing, on December 19, 2002, the parties stipulated that "Hewlett-Packard actually paid the costs and outside counsels' fees in the underlying Nu-kote litigation in the amounts alleged by HP at the damages hearing and as shown in summary reports already in evidence." The Special Master further found that HP had presented evidence, through Messrs. Blecher, Cooper, Sullivan, Pecau, Brigham[4] and HP in-house counsel, that "by the time HP tendered the defense of the Nu-kote action to ACE, the litigation was focused around the Nu-kote counterclaim and that HP's pursuit of its affirmative claims was part of an overall strategy of defense against the counterclaim." March 31, 2003 Report at 37. The Special Master concluded that HP had met its burden of establishing that all of the post-tender fees and costs incurred by HP were related to the defense of the Nu-kote counterclaim, and that as a result, all HP's post-tender fees and costs were presumed to be reasonable and necessary defense costs. *Id.*

---

[4]  Jack Brigham, HP's then general counsel testified that Mr. Katz' involvement in the case significantly increased HP's efforts to mount a defense to Nu-kote's counterclaim. (HT 1778:4-22.) That development caused HP to pursue its intellectual property claims because HP decided that "the best defense would be an offense" and that HP would be able to successfully defend against Nu-kote's counterclaim if it could substantiate its position with respect to its intellectual property rights. (HT 1778:23-1779:14.) Mr. Brigham also testified that HP's affirmative intellectual property claims had independent value separate and apart from the defensive nature of the claims asserted by HP's counsel. (RT. 400:18-401:9.)

The Special Master next addressed the testimony of ACE's three experts.   Professor Menell testified that:  (1) the fees and costs associated with litigating HP's affirmative claims could be separated systematically to particular causes of action (HT 1249:12-16); (2) the "lion's share" of fees and costs could be allocated to one or another of the causes of action in HP's affirmative case or the Nu-kote counterclaim (HT 1249:17-20); (3) almost every witness in the Nu-kote action related to a particular cause of action, and therefore the cost could be attributed to a specific cause of action (HT 1250:8-20); (4) bifurcation of the Nu-kote action confirmed the inherently distinct and separate nature of the HP affirmative case as opposed to Nu-kote's antitrust counterclaim (HT 1251:12-20); (5) as the Nu-kote action went to trial, there were three main issues presented by HP (trademark infringement, false advertising and patent infringement) and that these distinct claims requiring distinct proof  (HT 1252:11-24 and 1253:1-8); and (6) even though both HP's affirmative action and Nu-kote's counterclaims included claims of false advertising, the underlying predicate facts were completely different, the experts were completely different and the analysis was completely different (HT 1270:1-12).

Professor Menell disagreed with Mr. Blecher's conclusion that an HP victory on the affirmative case would have provided an absolute defense to Nu-kote's antitrust counterclaim, testifying that:

> Well, I thought Mr. Blecher has not adequately acquainted himself with the issues as presented in this case, and he acknowledged that he hadn't reviewed many of the documents. But he was interpreting what was going on in the case as if we win the case – I mean, if we show in the first part of the case – if HP shows in the first part of the case that it prevails on these intellectual property rights, then Nu-kote will be deemed to be basically a trespasser and have no ability to serve this market at all, and that's not really an accurate statement about what was at issue in the case.  In fact, on trademark or false advertising claim, you prevent them from engaging in certain practices in marketing of products, but they just change their labels, and they change their advertising.  I mean, they still have a lawful presence, if that's the only thing you win.  And on the patent issue, you may be able to work around the patents.  And, in fact, companies have successfully worked around other companies' intellectual property rights.  So at the end of the day, you know, Nu-kote can reassess their strategy, and they may be able to reemerge on the fringe of the market.

(HT 1287:1-1288:10.)

The Special Master found that:

> The testimony of Professor Menell establishes, at most, that fees and costs theoretically could be allocated to particular claims.  As is noted in the discussion of prosecution fees above, a non-defending insurer is not entitled to allocate expenses.  ACE's efforts to

ascribe particular fees to particular causes of action in HP's complaint do not address the relevant issue. For example, even assuming that particular fees and costs could be allocated to HP's patent or trademark claims, Professor Menell did not attempt to show that HP's prosecution of the patent or trademark claims was unrelated or unnecessary to HP's defense of the Nu-kote counterclaim.

March 31, 2003 Report at 43.

The testimony of Robert Rose was consistent with the testimony of Professor Menell – he also concluded that it would be theoretically possible to distinguish between prosecution and defense activities and that the lion's share of costs could be allocated to one or another of the causes of action. (HT 1249:18-1250:7.) Mr. Rose based his allocation theory on four grounds. (HT 1250:5-1251:22.) First, he claimed that each witness could be associated with a different cause of action. Second, there were two law firms working on the case. Third, he relied on the "distinctive nature" of some causes of action. Fourth, he claimed the trial was "bifurcated" into two phases.

With respect to Mr. Rose's testimony, the Special Master found that:

Even if there had been no contradictory testimony from Messrs. Blecher, Cooper, Marshall, Sullivan, Pecau, Sutis, MacAllister, Brigham, Griffin, et al., explaining the interrelationship of the defense and "prosecution" in the case, Mr. Rose's arguments do not establish that any expenses were unreasonable or unnecessary to the defense of the counterclaim. It does not follow that because different witnesses testified about discrete points in a lawsuit that the testimony is entirely unrelated to other points in the lawsuit. Having two law firms working on a lawsuit only evidences the size and complexity of the case. Mr. Rose conceded that this type of case quickly becomes complex. (HT 1365:17-24.) That some parts of the case had a distinctive nature does not establish a lack of relationship to other parts of the case. Finally, there was no evidence that the case was bifurcated; there was a single trial with a single jury in which one party went first and the other party went second in presenting its evidence, just as is done in virtually every lawsuit. It is undisputed that HP requested this phasing of the case, but this strategic decision by HP does not demonstrate that the first phase of the case, dealing with HP's affirmative claims, was unrelated or unnecessary to the second phase of the case, dealing with the counterclaim.

March 31, 2003 Report at 43.

ACE's final expert during the damages hearing was Craig Aronson. Based upon his review of the Nu-kote action, Mr. Aronson testified that: (1) there were very clear and distinct claims, both in HP's complaint and in the Nu-kote counterclaim (HT 1839:11-17); (2) HP's affirmative case and Nu-kote's counterclaim presented very distinct sets of issues, elements of

proof, witnesses, litigation techniques and strategies (HT 1840:12-16); (3) one can separate out legal fees and expenses related to prosecution of HP's complaint as opposed to those fees and costs that HP had to incur in defense of the Nu-kote counterclaim (HT 1839:18-21); (4) he reviewed all litigation activity that occurred in the Nu-kote action, determined to which claim or issue the activity was attributable – affirmative case or counterclaim – and thus calculated which fees and costs were incurred in the defense of the Nu-kote counterclaim (HT 1853:17-22); (5) under his "incremental approach," the insurer pays any bills that would not have been necessary for the prosecution of the insured's claim against another (HT 1858:24-25-1859:1-3.); (6) the incremental approach looks to the difference between what the insured would have had to pay to prosecute the lawsuit regardless of the counterclaims and what it in fact had to pay as a consequence of the counterclaim having been filed, and requires the insurer to pay only for those essentially additional or incremental expenses that were caused by the filing of the counterclaim (HT 1856:20-22; 1858:5-10); and (7) under his broad distribution approach, if a legal activity benefits both the prosecution of the affirmative case and the defense of the counterclaim, the cost should be split depending on the nature of the task (HT, 1859:10-25; 1861:1-11).

      Mr. Aronson testified that under the incremental approach, ACE should not pay for any fees and costs incurred in connection with the affirmative patent claims or the invalidity count in the Nu-kote counterclaim because such expenses were "part and parcel" of HP's prosecution of its patent case-in-chief. (HT, 10/29/20, 1859:25-1860:5.) Under the broad distribution approach, Mr. Aronson generally split the patent validity issue equally between HP and ACE. (HT 1860:6-17.) Under the broad distribution approach, Mr. Aronson explained that even if there arguably was a dual purpose to an activity, there are some activities that seem to be predominantly one or the other and only peripherally of benefit to the second. (HT, 10/29/03, 1860:22-25.) As such, Mr. Aronson gave two-thirds of the time billed for working on claim construction issues to the prosecution of the HP's affirmative case-in-chief and one-third to the counterclaim. (HT 1861:8-11). Fees and costs incurred in connection with issues such as "thicket of patents," applicable to both the patent case and the counterclaim, were generally apportioned 50% to the affirmative action and 50% to defense of the Nu-kote counterclaim. (HT 1862:22-1863:13). After review of the bills, Mr. Aronson offered conclusions with respect to the fees costs attributable to the defense of the Nu-kote counterclaim. Exhibit 3596.

The Special Master concluded that Mr. Aronson's testimony was insufficient to overcome the presumption that all of HP's post-tender expenditures were necessary to the defense of the Nu-kote counterclaim, on the grounds that: (1) the relevant question was whether the fees and costs incurred by HP were necessary to the defense of the Nu-kote counterclaim, and Mr. Aronson's incremental approach did not focus on this question, but instead asked what fees and costs were added by the counterclaim, the assumption being that any fees and costs HP would have paid to prosecute its affirmative claims in any event cannot be considered reasonable and necessary to the defense of the counterclaim; (3) this assumption was contrary to California law as set forth in *State of California* and the other authorities discussed in the March 31, 2003 Report; (4) Mr. Aronson's broad distribution approach likewise was contrary to California law, which provides that an insured may recover expenses necessary to the defense even if the associated activity benefits the prosecution of affirmative claims as well.   The Special Master concluded that:

> The primary weakness in ACE's presentation is its refusal to acknowledge that an insurer who fails to defend may be required to pay expenses associated with the insured's prosecution of affirmative claims under certain circumstances, namely if those expenses are reasonable and necessary to the defense of the action brought against the insured. Virtually all of the evidence presented by ACE is intended to show that certain expenses are associated with HP's affirmative claims rather than with Nu-kote's counterclaim. This showing begs the question of whether expenses associated with HP's affirmative claims were reasonable and necessary to the defense of the counterclaim.
>
> HP presented the testimony of the attorneys who were actually involved in the underlying litigation and of Max Blecher to address the issues of necessity to the defense. These witnesses established that all the post-tender fees and costs were necessary to the defense of the counterclaim. HP does not dispute that some of the work done by its counsel also was related to the prosecution of its affirmative claims. However, HP's witnesses testified as to the strategic interrelationship of the prosecution and the defense. HP's witnesses also testified that the defense of the counterclaims was the focus of the litigation in the post-tender period and that all efforts were directed at defending those claims. Accordingly, ACE has failed to meet its burden of proving by a preponderance of the evidence that any of the post-tender fees and costs were unnecessary to the defense of the counterclaim.

The Special Master recommended and reported that HP was entitled to reimbursement from ACE for post-tender outside counsel fees in the amount of $17,818,167.05, in-house legal services in the amount of $1,117,430.00 and costs in the amount of $9,483,074.67, for a total principal amount of $28,418,671.72.  March 31, 2003 Report at 89-90.

F.  *Judge Ware's Order Granting ACE's Motion to Reject or Modify
the Special Master's March 31, 2003 Report*

On November 25, 2003, Judge Ware issued an order regarding Hewlett-Packard's motion for order approving the report of the Special Master and ACE's motion for order rejecting or modifying the Special Master's report.  In pertinent part, ACE argued that the Special Master "committed legal error in imposing a legal presumption against ACE that deemed all expenses incurred in the prosecution of HP's claims against Nu-kote to constitute defense expenses."  The November 25, 2003 order, in pertinent part, states that:

- "The Court ... concurs with the Special Master's statement of the applicable law, including the standard of proof, governing the central issue in this case."
- "The multi-million dollar question remains ... whether the evidence supports the Special Master's determination that HP is entitled to reimbursement of all expenses incurred in prosecution of its claims against Nu-kote."
- "With respect to HP's initial burden, the Court finds that HP submitted sufficient evidence from which a trier of fact could conclude, by a preponderance of evidence, the existence and amount of the expenses."
- "Therefore, a trier of fact could properly apply the presumption against ACE.  It is at this point in the analysis that the Court disagrees with the Special Master's analysis."
- "The Court finds that a trier of fact could reasonably conclude, by a preponderance of evidence, that a portion of HP's expenses were unnecessary to the defense of the Nu-kote counterclaims.  An expense is necessary only if the expense would be conducted against liability by a reasonable insured under the same circumstances. *Aerojet* at 62-63; *see also Barratt* at 848; and *Larkin* at *19. In other words, an expense[] is unnecessary if the expense would not have been conducted against liability by a reasonable insured under the same circumstances."
- "In this case, a trier of fact could reasonably conclude that ACE presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims.
- "First, there is evidence from HP itself.  During the underling lawsuit between HP and Nu-kote, HP argued before this Court that "the vast majority of Nu-kote's anti-trust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case."  HP prevailed on this argument and this Court allowed HP's affirmative claims to proceed before the anti-trust claims.
- "Second, ACE presented the testimony of Professor Menell, who essentially opined that there was a clear dividing line between prosecution expenses and defense expenses.  Third, Robert Rose also testified that HP's prosecution claims and Nu-kote's counterclaims were separate.  Fourth, Craig Aronson also testified that he could separate out expenses related to HP's prosecution claims.
- "Implicit in each of these witnesses' testimony is that certain prosecution related

1    expenses are severable from the defense expenses, and thus clearly unnecessary to
2    the defense.  That the three witnesses may not have used the terms necessary,
     unnecessary, reasonable or unreasonable to label expenses does not mean that
3    their testimony is inadequate to carry ACE's burden of proof.  Their testimony
     provides circumstantial evidence from which a trier of fact could reasonably infer,
4    by a preponderance of evidence, that portions of HP's prosecution expenses were
5    wholly unnecessary to its defense.

6    G.  *Order Denying HP's Motion for Reconsideration of Judge Ware's November 25, 2003 Order*

7            On January 14, 2004, HP filed a motion for leave to file a motion for reconsideration.  On

8    October 15, 2004, Judge Ware denied HP's motion for reconsideration.  Judge Ware began his

9    order by clarifying his agreement/disagreement with the Special Master's report, stating that "the

10   Court concurred with the Special Master's determination that HP had provided by a

11   preponderance of the evidence the existence and amount of its defense costs, and therefore HP

12   was entitled to a presumption that its defense costs, including the expenses incurred in

     prosecution of its claims against Nu-kote, were reasonable and necessary as defense costs."

13   October 15, 2004 Order at 2.  The Court, however, disagreed with the Special Master's

14   determination that ACE failed to prove, by a preponderance of evidence, that HP's expenses

15   were unreasonable or unnecessary to the defense.  *Id.*  The Court's disagreement with the Special

16   Master on this last step of the analysis stemmed from a disagreement over the legal definition of

17   what is necessary to the defense.  The order states that whereas the Special Master found that

18   prosecution expenses are "necessary" so long as they "reasonably relate" to the defense, the

19   Court held that an expense is "necessary" only if the expense "would be conducted against

20   liability by a reasonable insured under the same circumstances."  *Id.*  Applying this latter

21   standard, the Court concluded that ACE had presented sufficient evidence such that a reasonable

22   jury could find, by a preponderance of evidence, that some of HP's expenses were unnecessary

     to the defense of Nu-kote's counterclaims.  *Id.*  In denying HP's motion for reconsideration,

23   Judge Ware stated that:

24        •    "Lastly, in light of the Court's holding on the legal definition of what is necessary
               to the defense, the case is referred back to Special Master Stone to assess what
25             expenses "would be conducted against liability by a reasonable insured under the
               circumstances."
26        •    "In doing so, the Court rejects HP's contention that there is no substantive
27             difference between the Special Master's and the Court's formulation of the
               definition for what is considered necessary to the defense."
28

                                              -38-

- "This court's definition is narrower than the Special Master's definition of what is necessary to the defense because the Court's definition requires determining not only whether prosecution expenses are "reasonably related" to the defense, but also whether those "reasonably related" expenses are likely to have been incurred by a reasonably insured under the same circumstances. In *Barratt*, the California Court of Appeal clarified that the inquiry into what a reasonable insured would do to defend "necessarily involves a consideration of whether the benefits of the strategy are worth the cost."

- "The Special Master's Report does not contain a full cost-benefit analysis."

October 14, 2004 Order at 3-4.

### H. *May 2005 Order Re: Proceedings on Remand to Special Master*

In December 2004, the parties briefed their respective views of the manner in which the further proceedings before the Special Master should be conducted. ACE asserted that it was appropriate to allow the parties to offer limited additional expert testimony directly related to the newly applicable legal standard. HP disagreed. After requesting and receiving clarification of the scope of the remand from the Court, the Special Master found that it was appropriate to allow the parties to offer limited additional evidence directed to the standard set forth by the Court. *See* May 10, 2005 Order at 3-4. Discovery was conducted regarding the new testimony to be presented at the remand hearing.

### I. *HP's Motion for Partial Summary Judgment Re: Nu-kote's Declaratory Relief Claim*

On December 8, 2005, HP filed three separate motions for partial summary judgment. The second motion sought "partial summary judgment that defense of Nu-kote's declaratory relief counterclaim was 'conducted against liability.'" HP argued that: (1) HP was required to defend the declaratory relief counterclaim by proving its challenged patents were valid and infringed; (2) Nu-kote's declaratory judgment counterclaim effectively prevented HP from withdrawing its patent infringement claims; (3) HP's affirmative claim strategy was reasonably "conducted against liability" and necessary to the defense; and (4) ACE's position that Nu-kote's first (declaratory relief) counterclaim does not require a defense was based on a flawed understanding of coverage law and the consequences of Nu-kote's declaratory relief counterclaim. ACE argued that: (1) Nu-kote could only pursue its declaratory relief counterclaim because of HP's affirmative patent claims; (2) Nu-kote's declaratory relief counterclaim did not seek to impose liability on HP and did not seek damages from HP, and thus the actions took in litigating against Nu-kote's declaratory relief counterclaim could not be said

1    to constitute actions "conducted against liability;" (3) HP's motion ignored the trademark

2    infringement and false advertising claims that were also tried in Phase I; and (4) HP's argument

3    regarding the duty to defend the suit as a whole was irrelevant to the proceeding. In reply, HP

4    argued that: (1) the timing of Nu-kote's declaratory judgment action, whether after a suit or

5    receipt of a demand letter, was irrelevant in assessing whether its defense would be "conducted

6    against liability;" (2) under settled California law, the duty to defend extends to both covered as

     well as to uncovered claims; the defense obligation therefore attaches to the suit, not the claim

7    within the suit; (3) it was of no moment that Nu-kote's declaratory relief counterclaim did not

8    seek damages from HP as other counterclaims for which a defense was owed did seek damages;

9    and (4) the patent infringement claims in Phase 1 were "conducted against liability."

10           In the order denying the motion, the Special Master found that the timing of HP's

11   affirmative claims and Nu-kote's declaratory relief counterclaim was not pertinent to the issue of

12   whether HP's pursuit of its patent claims was conducted against liability.   With respect to

13   whether HP's defense of Nu-kote's declaratory relief counterclaim was conducted against

14   liability, the Special Master made the following observations.

15           Viewed solely against the backdrop of the phrase "conducted against liability,"
     ACE's argument regarding HP's defense of Nu-kote's declaratory relief counterclaim

16   appears to be logical.  Properly viewed against the backdrop of the entire litigation and
     relevant body of law, however, ACE's argument ultimately is unpersuasive.

17   ... it is clear that the phrase "conducted against liability" must be viewed within the
     context of the broader question of whether an expense or strategy was necessary to the

18   defense of the Nu-kote counterclaims.  Strategically defensive trial conduct would come
     within this phrase.  The fact that Nu-kote's declaratory relief claim did not seek monetary

19   damages does not mean that a defense of the claim was not "conducted against liability,"
     and ACE has not provided any authority to the contrary.

20           Nu-kote's declaratory relief counterclaim sought an order invalidating the patents

21   identified in HP's patent infringement claim and/or an order that the patents identified in
     HP's claim had not been infringed by Nu-kote.  As a result, HP's effort to show that the

22   patents at issue were valid and that Nu-kote had infringed the patents served, at a
     minimum, two distinct purposes: (1) to support HP's affirmative claims for patent

23   infringement by Nu-kote; and (2) to support HP's defense of Nu-kote's counterclaim for
     invalidity of the patents and non-infringement of the patents by HP.  The fact that the

24   effort/strategy did "double duty" does not mean that the effort/strategy and expenses
     associated therewith cannot be characterized as defense costs. See Aerojet at 65-66,

25   Barratt at 860 and Larkin at *7.  HP's effort/strategy to show that the patents at issue

26   were valid and that Nu-kote had infringed the patents, at a minimum, was reasonably and
     necessarily undertaken in defense of Nu-kote's declaratory relief counterclaim.

27   Consistent therewith, HP's effort/strategy to show that the patents at issue were valid and
     that Nu-kote had infringed the patents was "conducted against liability."

28