*See* January 23, 2006 Order Denying Plaintiff Hewlett-Packard Company's Motions for Partial Summary Judgment that: (1) Defense of Nu-kote's Declaratory Relief Counterclaim Was "Conducted Against Liability" and (2) Phase One of the Nu-kote Trial Was "Conducted Against Liability" as a Defense to a Potentially Covered Discrimination Claim at 39-42.

### J. *The Remand Hearing*

Pursuant to the District Court's orders, from January 9, 2006 through January 13, 2006, the Special Master heard additional testimony and evidence to assist in the determination of what HP expenses "would be conducted against liability by a reasonable insured under the same circumstances," and thus would be recoverable by HP from ACE. ACE presented additional testimony from its experts, Professor Peter Menell, Raymond J. Ocampo, Jr., and Craig Aronson. ACE asserts that these experts provided specific testimony relevant to the new standard, including whether a reasonable insured would have considered HP's affirmative claims to have been conducted against liability.

First, ACE again retained Professor Peter Menell to determine what was and what was not "conducted against liability." Based upon this review of the underlying record, Professor Menell testified that as of May 7, 1999, Nu-kote's counterclaims had been reduced to the point that HP's affirmative claims of patent and trademark infringement and false advertising were no longer defensive to Nu-kote's remaining counterclaims. Professor Menell testified that the facts supporting or defending the causes of action addressed in Phase I did not overlap with the elements of the antitrust counterclaim that ultimately went to trial in Phase II, and concluded that as of May 7, 1999, none of the expenses that HP incurred in connection with the Phase I trial of HP's affirmative claims were conducted against liability.

Next, ACE presented the testimony of Raymond L. Ocampo, the former Vice President and General Counsel of Oracle Corporation. Mr. Ocampo provided testimony regarding what he believes a reasonable insured would do under the same circumstances.

Finally, ACE again retained Craig Aronson to quantify the amount of prosecution expenses that were not conducted against liability and the amount of prosecution expenses that a reasonable insured would incur and not expect to be reimbursed for by its insurance company. In determining the amount of prosecution expenses that were not conducted against liability, Mr. Aronson relied upon the May 7, 1999 date that Professor Menell identified. Mr. Aronson

calculated the amount of fees and costs that HP incurred solely to prosecute its affirmative claims of patent and trademark infringement and false advertising between May 7, 1999 and the end of the underlying trial. Mr. Aronson testified that the amount of expenses that HP incurred after May 7, 1999 that were not conducted against liability was $6,480,000. Mr. Aronson also calculated the amount of prosecution expenses incurred prior to May 7, 1999 that were attributable solely to the patent and trademark infringement and false advertising claims that HP pursued to trial. This calculation was based on Mr. Ocampo's testimony about what a reasonable insured would expect its insurer to pay. Mr. Aronson testified that these pre-May 7, 1999 expenses that HP incurred that were not "conducted against liability by a reasonable insured under the same circumstances" totaled $6,541,498.

HP again presented Maxwell Blecher, an expert in antitrust and intellectual property trials, who again reviewed the evidence in light of Judge Ware's order for remand and the supporting case law. He testified that based upon Judge Ware's standard, HP's prosecution of its patent, trademark and false advertising claims was entirely defensive to Nu-kote's antitrust claims, that the claims were all part of a single trial, that HP could not have dismissed any part of its affirmative case without risking loss of the antitrust case, that the strategy HP followed was obviously successful and that a failure to prosecute the affirmative claims as part of the defense would have been "malpractice" and "suicidal."

Finally, HP presented further testimony from Peter Sullivan, one of HP's lead antitrust defense counsel in the underlying action, to address how the Nu-kote case was actually tried. He emphasized the interrelationship and necessity of proving the "prosecution" case as a defense to Nu-kote's counterclaims and the effect of phasing the trial. He explained errors in Professor Menell's theory that HP's successful motions for partial summary judgment had eliminated Nu-kote factual allegations or made the prosecution of HP's claims irrelevant to the defense.

## LEGAL STANDARD

### Aerojet-General Corp. v. Transport Indemnity Co.

In *Aerojet-General Corp. v. Transport Indemnity Co.*, 17 Cal.4th 38 (2002), the California Supreme Court, in an action concerning insurance coverage for liability based on hazardous waste disposal, addressed in pertinent part the generally accepted principle that when an insurer breaches a duty to defend, the damages the insured is entitled to recover may include the reasonable costs of defending the underlying action. Aerojet had discharged hazardous

substances, causing property damage to its own and adjacent property. Aerojet was sued by numerous entities, including the State of California and the United States, and thereafter spent approximately $26 million in "site investigation expenses" to investigate the extent of the contamination, the viability of cleanup options and to monitor the spread of waste from the site.

Aerojet's insurer, Transport Indemnity Company ("Transport") filed a complaint for declaratory relief against numerous other insurers and their common insureds, Aerojet and its wholly owned subsidiary, regarding the parties' rights and duties under various comprehensive general liability and other insurance policies. Transport sought declarations including that it was not obligated to provide, and Aerojet was not entitled to receive, either indemnification or defense. Aerojet filed a cross-complaint for declaratory and other relief against Transport, its other insurers as to the actions brought by the United States, the State of California or private parties. In its amended cross-complaint, Aerojet sought, among other things, a declaration that it was entitled to receive, and the insurers were obligated to provide, both indemnification and defense. Aerojet alleged that it had tendered the defense, but that the insurers had either refused or had accepted only under "unreasonable" reservations of rights. *Id.* at 47-48.

The trial court subsequently summarily adjudicated that "'response costs' under CERCLA, and similar costs under the Porter-Cologne Water Quality Control Act, could not constitute indemnification costs, i.e., expenses to resolve liability, that the insurers had to incur in fulfilling their duty to indemnify." *Aerojet* at 48. The Court of Appeal concluded to the contrary. The Court of Appeal, however, "did not consider whether costs of this sort could constitute defense costs, i.e., expenses to avoid or at least minimize liability." *Id.*

The issue tried to the jury in phase III of the trial was whether site investigation expenses could be defense costs. *Aerojet* at 51. Before the presentation of evidence at phase III, the superior court preinstructed the jury that the insured's investigation costs did not include recoverable defense costs "even if [the insured's] lawyers used information developed during the investigation to assist them in negotiating with the governments to limit [the insured's] obligations to clean up and to remediate." *Id.* The jury returned a unanimous verdict determining that Aerojet's site investigation expenses were not defense costs in any part, and the superior court then rendered a final judgment. *Id.* at 52-53. The Court of Appeal affirmed. *Aerojet* at 54.

The Supreme Court granted review, and resolved two issues: (1) whether, under standard comprehensive or commercial general liability insurance policies, site investigation expenses may constitute defense costs that the insurer must incur in fulfilling its duty to defend; and (2) whether, under such policies, defense costs may be allocated to the insured. *Aerojet* at 55-56. The Court first addressed the policies in question. "Standard comprehensive or commercial general liability insurance policies are contracts between an insurer and an insured: In each, the insurer makes promises, and the insured pays premiums, the one in consideration for the other, against the risk of loss." *Id.* at 56. "In pertinent part, standard comprehensive or commercial general liability insurance policies provide that the insurer has a duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as damages for a covered claim."[5] *Id.*

"Standard comprehensive or commercial general liability insurance policies also provide that the insurer has a duty to defend the insured in any action brought against the insured seeking damages for a covered claim." *Aerojet* at 57-58 (citation omitted). "By definition, the duty entails the rendering of a service, viz., the mounting and funding of a defense which is not limited, expressly or otherwise, in order to avoid or at least minimize liability." *Id.* at 58 (internal citations omitted). "As such, it requires the undertaking of reasonable and necessary efforts for that purpose, including investigation." *Id.* (internal citations omitted). "It also requires the incurring of reasonable and necessary costs to that end, including investigative expenses." *Id.* (internal citations omitted). "It runs to claims that are merely potentially covered, in light of facts alleged or otherwise disclosed." *Id.* "It arises as soon as tender is made, before liability is established and apart therefrom." *Id.* "It is discharged when the action is concluded." *Id.* "It may be extinguished earlier, if it is shown that no claim can in fact be covered." *Id.* "If it is so extinguished, however, it is extinguished only prospectively and not retroactively." *Id.* The duty to defend "is triggered if specified harm may possibly have been caused by an included

---

[5] "By definition, [the duty to indemnify] entails the payment of money which is expressly limited in amount, in order to resolve liability." *Aerojet* at 56 (citation omitted). "It is not narrowly confined to money that the insured must give under law as compensation to third parties, but may also include money that the insured must itself expend in equity in order to provide relief of the same sort." *Id.* "It runs to claims that are actually covered, in light of the facts proved." *Id.* "It arises only after liability is established and as a result thereof." *Id.* "It is triggered if specified harm is caused by an included occurrence, so long as at least some such harm results within the policy period." *Id.* "It extends to all specified harm caused by an included occurrence, even if some such harm results beyond the policy period." *Id.* at 56-57.

occurrence, so long as at least some such harm may possibly have resulted within the policy period." *Id.*

The insurer's duty to defend is broader than its duty to indemnify, but it is not unlimited." *Aerojet* at 59. "It extends beyond claims that are actually covered to those that are merely potentially so, but no further." *Id.* "In a 'mixed' action, in which at least one of the claims is at least potentially covered and at least one of the claims is not, ... the insurer has a duty to defend the entire 'mixed' action imposed by law in support of the policy." *Id.* "To defend meaningfully, it must defend immediately." *Id.* at 59-60. "To defend immediately, it must defend entirely." *Id.* at 60. "It is manifest that this analysis applies, as it were, not only between claims but also between parts of a single claim." *Id.*

The court next addressed "whether, under standard comprehensive or commercial general liability insurance policies, site investigation expenses may constitute defense costs that the insurer must incur in fulfilling its duty to defend." *Aerojet* at 60. "In fulfilling its duty [to defend], [the insurer] must undertake reasonable and necessary efforts to avoid or at least minimize liability." *Id.* "To that end, it must incur reasonable and necessary costs." *Id.* "All this it must do from as early as tender of the defense through as late as conclusion of the action." *Id.* "It follows that the insured's site investigation expenses constitute defense costs that the insurer must incur in fulfilling its duty to defend if, and only if, the following requirements are satisfied:

> First, the site investigation must be conducted within the temporal limits of the insurer's duty to defend, i.e., between tender of the defense and conclusion of the action. Second, the site investigation must amount to a reasonable and necessary effort to avoid or at least minimize liability. Third and final, the site investigation expenses must be reasonable and necessary for that purpose.

*Id.* at 60-61. "Thus, if and to the extent that the insured's site investigation ... amounts to a reasonable and necessary effort to avoid or at least minimize liability, the related site investigation expenses may possibly be defense costs that the insurer must incur in fulfilling its duty to defend." *Aerojet* at 61. "If and to the extent that these site investigation expenses are reasonable and necessary for that purpose, they are in fact defense costs that the insurer must incur in fulfilling its duty to defend; but if and to the extent that they are not, they are not." *Id.* "By contrast, if and to the extent that the site investigation .... does not amount to a reasonable and necessary effort to avoid or at least minimize liability, the related site investigation expenses

1   cannot even possibly be defense costs that the insurer must incur in fulfilling its duty to defend."

2   *Id.*

3       "Whether the insured's site investigation expenses are defense costs that the insurer must

4   incur in fulfilling its duty to defend must be determined objectively, and not subjectively from

5   the viewpoint of either the insurer or the insured." *Aerojet* at 62. "Defense costs, i.e., expenses

6   to avoid or at least minimize liability, are not limited by the policy, expressly or otherwise, but

7   impliedly extend to all such expenses as are reasonable and necessary." *Id.* at 62 n.13. "Whether

8   the insured's site investigation amounts to a reasonable and necessary effort to avoid or at least

9   minimize liability must also be assessed under an objective standard...[w]hat matters here is

10  whether the site investigation would be conducted against liability by a reasonable insured under

    the same circumstances." *Id.*  The court stated that:

11
            Were it not, the question would require a discernment of motive. Why is the insured
12          conducting the site investigation at issue? to resist liability? for that reason and some
            other? for a reason altogether different? Motive, however, is hard ... to discern. That is
13          true ... as to an individual: a person's mind and heart typically reveal themselves and
            conceal themselves at one and the same time. It is truer still ... as to a group of
14          individuals: many minds and hearts are then involved, and they cannot simply be added
            up. And, of course, it is truest ... as to a corporation or similar entity - like the typical
15          commercial or governmental insured: the mind and heart of such a one is purely fictive.

16  *Id.* at 62-63 (internal citations and quotations omitted).

17      "Lastly, whether the insured's site investigation expenses are reasonable and necessary to

18  avoid or at least minimize liability must be assessed under an objective standard as well." *Id.* at

19  63. "What matters here is whether the site investigation expenses would be incurred against

20  liability by a reasonable insured under the same circumstances." *Id.*

21      "In the general case, it is the insured that must carry the burden of proof on the existence,

22  amount, and reasonableness and necessity of ... defense costs, and it must do so by the

23  preponderance of the evidence." *Aerojet,* 17 Cal.4th at 64. "By contrast, in the exceptional case,

24  wherein the insurer has breached its duty to defend, it is the insured that must carry the burden of

25  proof on the existence and amount of the ... expenses, which are then presumed to be reasonable

    and necessary as defense costs, and it is the insurer that must carry the burden of proof that they
26
    are in fact unreasonable or unnecessary." *Id.* at 64 (emphasis added). "As is ordinary in civil
27
    actions generally and for contractual claims in particular, the insurer and the insured must each
28
    carry its burden of proof by a preponderance of the evidence." *Id.*

In *Aerojet*, the record established that "Aerojet's site investigation may have been conducted within the temporal limits of each insurer's duty to defend ... that the site investigation, at least in part, may have amounted to a reasonable and necessary effort to avoid or at least minimize liability ... [and] that the site investigation expenses, at least in part, may have been reasonable and necessary for that purpose." *Id.* at 65. Whether and to what extent they actually were such were left to be resolved on retrial." *Id.*

The Court rejected the insurers' arguments against the foregoing conclusion. *Aerojet* at 65. In pertinent part, the insurers asserted that site investigation expenses may be included within "response costs" under CERCLA. The Court found that while that may be true, it did not mean that site investigation expenses cannot be defense costs. *Id.* The Court stated that:

> For instance, the insured's site investigation expenses for identifying the hazardous substance discharged may be "response costs" insofar as they promote removal and remediation, by enabling it to determine how to neutralize the substance in question. They may also be defense costs insofar as they are reasonable and necessary to avoid or at least minimize liability, by making it possible for it to show that it was not in fact the source of the discharge. *Any assumption that site investigation expenses cannot do double duty is unsupported and hence must be rejected. So too any similar assumption about the site investigation itself. If site investigation expenses must be incurred by the insurer in fulfilling its duty to defend the insured, they must be incurred. The insurer gives, and the insured gets, what they bargained for. Even if the insured may happen to derive some added benefit, the insurer does not shoulder any added burden. The insurer may not be heard to complain.*

*Id.* at 65-66 (emphasis added). The insurers also argued that "if site investigation expenses may constitute defenses costs, so may settlement costs" and that such a result was untenable. *Aerojet* at 68. The Court rejected the argument, stating that "[s]ite investigation expenses may be defense costs because they may be reasonable and necessary to avoid or at least minimize liability... [s]ettlement costs cannot be defense costs because, instead, they resolve liability." *Id.*

### *Larkin v. ITT Hartford*

In *Larkin v. ITT Hartford*, 1999 WL 459351 (N.D.Cal. 1999), the plaintiffs ("Larkin") owned certain real property. In 1988, Larkin entered into a lease with George Navone ("Navone") for construction of a commercial complex on the property. Larkin subsequently discovered that the property was contaminated. Larkin expended approximately $200,000 in corrective action costs but contamination remained on the property and as a result, the property could not be developed as originally planned.

Larkin filed a lawsuit against former tenants of the property, alleging that the tenants caused the contamination (the "*Larkin*" action). Larkin sought the costs incurred in removing the pollution. The former tenants cross-claimed, alleging that Larkin had caused the contamination. Navone filed a complaint against Larkin and the former tenants for damages for negligence and other theories (the "*Navone*" action). Larkin tendered the *Navone* action to Hartford and by way of the same letter, requested that Hartford pay for the prosecution of the *Larkin* action on the ground that there is no meaningful distinction between prosecution of the *Larkin* action and defense of the *Navone* complaint. Hartford agreed to defend the *Navone* action on a pro rata basis, but refused to defend the *Larkin* action. Larkin then filed a coverage and bad faith action alleging that Hartford had breached its insurance contract and seeking reimbursement of one hundred percent of the attorneys' fees and costs incurred in defense of the *Navone* action and the prosecution of the *Larkin* action.

With respect to the *Larkin* fees and costs, Larkin argued that the prosecution of the *Larkin* action was defensive because the purpose of the *Larkin* action was to hold the former tenants responsible for the contamination of the property and defense of the Navone action also was based upon proving that the former tenants and not Larkin were responsible for the contamination. The court found that Hartford did not have a duty to fund the prosecution of the *Larkin* action, noting that Larkin had not cited a single case in which an insurer was held to have a duty to fund the prosecution of a separate action for damages in which the insured is a plaintiff. *Id.* at *6. The court found, *inter alia*, that the prosecution of the *Larkin* damages action, which was initiated prior to the *Navone* action, was not reasonable and necessary to Larkin's defense of the Navone action. *Id.* at *7. The court nonetheless stated that:

> The question is whether the action taken, here the prosecution of the *Larkin* action, "would be conducted against liability by a reasonable insured under the same circumstances." *Aerojet*, 17 Cal.4th at 62.

*Id.* The court further noted that:

> The Court recognizes that some of the actions taken by plaintiffs' counsel in *Larkin* may also have been reasonable and necessary to the defense of the *Navone* action, and plaintiffs may not have duplicated such actions in *Navone* precisely because they had already been performed in connection with *Larkin*. In these circumstances, such actions and the expenses associated with them may properly be characterized as Navone defense costs--provided they are performed during the temporal limits of the duty to defend--and the fact that they did "double duty" in both suits does not prevent such characterization.

*See Aerojet*, 17 Cal.4th at 63. The burden of identifying those actions, however, lies with the plaintiffs. *See id.* at 64.

*Id.* The court concluded that Larkin had not demonstrated that the costs and attorneys' fees incurred in the *Larkin* action were reasonable and necessary to the defense of *Navone* and were also not duplicated in the *Navone* action. *Id.*

### *Barratt American, Inc. v. Transcontinental Ins. Co.*

In *Barratt American, Inc. v. Transcontinental Ins. Co.*, 102 Cal.App.4th 848 (2002), Barratt developed a tract of homes known as the Cortina project, consisting of 208 homes based on four floor plans, using numerous subcontractors. With respect to this project, Barratt was covered by its own primary and excess liability insurance policies, and was also a named additional insured on many of the insurance policies issued to its subcontractors. Barratt's roofing subcontractor obtained a policy from Transcontinental that named Barratt as an additional insured with respect to liability arising out of his work. In May 1996, about 70 Cortina homeowners sued Barratt for numerous construction defects in their homes. In June 1996, Barratt's attorneys tendered the claim to its direct carriers and to some of its additional insured carriers, but not to Transcontinental. Several insurers acknowledged their duty to defend, and one insurer (Gerling) agreed to provide a defense. *Id.* at 852-853.

Shortly thereafter, Barratt representatives met with Barratt's attorneys and made a decision that Barratt would contact and voluntarily offer to repair defects in the residences of the homeowners who had not yet joined the lawsuit. Barratt paid for hundreds of these repairs, including such items as locks, showers, windows, carpet, handrails, doors, drainage systems, cabinets, and garage doors. By June 1997, Barratt had incurred $514,685.33 in costs to repair items in the nonplaintiff homes. *Id.* at 853. On June 30, 1997, one year after the initial tender to Gerling, Barratt tendered the defense of the Cortina action to Transcontinental. Transcontinental acknowledged the tender letter, but did not expressly respond to the tender by agreeing it had a duty to defend. *Id.* In June 1998, Transcontinental's claims representative orally acknowledged that Transcontinental may have "some limited" duty to defend. Transcontinental participated in a mediation with Barratt and several other insurers to settle the Cortina action. Transcontinental's claims representative refused to offer any money on the defense obligation, claiming Transcontinental was responsible to pay for the defense only as it related to the roofing claims. *Id.*

In July 1998, Barratt sued Transcontinental for declaratory relief, breach of the duty to defend, and bad faith. At trial, it was undisputed that the insurer owed a duty to defend. *Barratt* at 852. The trial court ruled that the repair costs were recoverable if they constituted investigative expenses that a reasonable insured would have undertaken to minimize or defend against liability in the Cortina action. *Id.* at 854.

To meet this test at trial, Barratt relied primarily on the testimony of two of its attorneys in the underlying construction defect lawsuit who participated in devising Barratt's strategy to voluntarily repair nonplaintiff Cortina homes. The attorneys acknowledged that one purpose of the repair effort was to discourage the nonplaintiff homeowners from joining the Cortina lawsuit and thus to minimize Barratt's total exposure in the action. *Id.* at 854-855. The attorneys said a second purpose of the repair effort was to develop useful information to assist in Barratt's defense of the ongoing Cortina litigation. *Id.* at 855. With respect to this latter purpose, the attorneys testified that by investigating the problems identified at nonplaintiff homes, Barratt could potentially achieve several defense objectives, including: identifying early in the litigation which plaintiff claims were legitimate and which were spurious or exaggerated; devising effective and economical repair solutions for the legitimate claims; and obtaining evidence of the satisfactory performance of alternative repair methods to rebut plaintiffs' later claims. Barratt also relied on the testimony of a project manager, who identified a chart that listed each vendor who participated in the repair work of the nonplaintiff homes, a general description of the work, and the total cost of the work with respect to each category. The project manager testified that all of the vendors listed on the exhibit performed work that was part of the effort to gather information in defense of the lawsuit and that he consulted with Barratt's attorneys during this repair process. *Id.*

Barratt also sought to establish that the repair effort constituted a necessary and reasonable defense cost through the testimony of an architect who was Barratt's lead construction expert in the underlying litigation. *Barratt* at 855-856. Although the architect acknowledged he was not involved in any inspections or repairs of the nonplaintiff homes, he testified that when he became aware of this effort shortly after he was retained in November 1996, he devised a strategy that would "take advantage" of the information gleaned from this process. *Id.* at 856. He testified the repairs would have been "helpful" to Barratt's defense because they could provide "more data and information," a "larger sample size," and a way to

evaluate "real world solutions to defective conditions." The architect also testified, however, that the information derived from the repair work never actually benefited the defense because the case settled before the information was needed for depositions and/or trial. *Id.* Transcontinental called an expert witness who opined the repair costs were not necessary to Barratt's defense and were not reasonable defense costs. *Id.* The jury found that the expenses incurred in connection with the houses not involved in the Cortina lawsuit were defense costs. *Barratt* at 856.

On appeal, the insurer argued that the claimed defense costs were not recoverable as a matter of law, relying upon *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, (1998) 18 Cal.4th 857, 883. The court disagreed, stating that:

> To the contrary, in reaching its conclusion, *Foster-Gardner* expressly reaffirmed *Aerojet-General's* holding that an insurer has a duty to pay defense costs if the costs are incurred between tender and settlement of a lawsuit, and if the defense investigation and expenses are reasonable and necessary to mount a defense in a pending lawsuit. (*Foster-Gardner*, supra, 18 Cal.4th at 886.) Under *Aerojet-General*, a liability insurer must bear these defense costs even if the insured obtains additional benefits from the expenditures, and even if the same costs could potentially be characterized as an indemnification cost in a different context. (*Aerojet-General*, supra, 17 Cal.4th at 65-66.)

*Id.* at 859-860. The *Barratt* court stated that:

> As applied here, these principles mean that the costs incurred by Barratt are potentially recoverable even though they may serve more than one objective. If Barratt's expenditures qualify as defense costs in the Cortina action, they do not lose that status merely because the costs are not independently recoverable based on the nonplaintiff property damage claims. Under *Aerojet-General* and *Foster-Gardner*, the critical issue is whether the costs were reasonably and necessarily incurred in defense of an existing lawsuit. If the investigation costs satisfy this test, they are recoverable even if the payments of these costs benefited a third party who did not file suit against the insured.

*Id.* at 860.

Transcontinental alternatively argued that the judgment must be reversed because insufficient evidence supported the jury's conclusions that the repairs to the nonplaintiff homes constituted a necessary and reasonable effort to defend the Cortina lawsuit and that the amount of those costs was necessary and reasonable to achieve that purpose. *Barratt* at 860-861. The Court found that although Barratt's evidence may have supported a general conclusion that it can be a reasonable trial strategy in construction defect litigation to use repair information from other homes in a residential development to bolster defense theories, the general conclusion "does not support a reasonable inference that in this case it was reasonable and necessary to engage in this

-51-

strategy by repairing every claimed defect in every Cortina nonplaintiff home and to spend $580,714.50 in doing so." *Id.* at 861. The court stated that:

> The testimony of Barratt's attorneys and litigation coordinator (all of whom were testifying as percipient witnesses rather than experts) that it was possible that these unspecified repairs to the nonplaintiff homes could be useful to explain the nature of the plaintiffs' claimed construction defects and/or to help show the viability of a defense repair strategy was too theoretical to establish that a reasonable insured would have incurred all of these expenses in defending against the Cortina lawsuit in this case. In reaching this conclusion, we emphasize two aspects of proof that were missing in this case.
>
> First, there was no evidence that the problems found and corrective repairs made to the nonplaintiff homes were similar to the problems that were the subject of the claims in the Cortina lawsuit, or that the repairs reflected alternate methods of repair that would potentially rebut the Cortina plaintiffs' repair costs at trial. ... Further, there was no evidence connecting the repair work to the plaintiff homeowners' claims.
>
> ...
>
> Second, it is not enough to produce evidence that repairs to nonplaintiff homes would be "helpful" or "useful" in litigation involving other homes in the residential development. It may always be said that a defendant would obtain some benefit from additional investigation that has some relationship to the subject of a lawsuit, but this fact is not enough to logically support the requisite finding that the investigation was reasonable and necessary for purposes of defending the existing suit. Instead, a developer seeking reimbursement for repair costs to homes not the subject of a lawsuit must present evidence that a reasonable insured would have engaged in a similar defense strategy, which necessarily involves a consideration of whether the benefits of the strategy are worth the cost. Without this weighing analysis, the fact that it may be helpful or useful to a defense to learn additional information does not - in and of itself - lead to an inference that a reasonable insured would have found the costs were reasonable and necessary to defend the lawsuit.

*Id.* at 861-862 (emphasis added). Citing *Aerojet* at 62, the Court stated;

> Moreover, the fact that Barratt attorneys and employees may have actually believed this was a good defense strategy or that they were subjectively motivated to do the repairs by a desire to obtain more information in the Cortina lawsuit does not support an inference that a reasonable insured would also reach this conclusion. What matters here is whether the ... investigation would be conducted against liability by a reasonable insured under the same circumstances.

*Id.* at 862. "While we have concluded that it is conceptually possible to prove that in construction defect litigation a repair of a nonparty home can be a reasonable and necessary expense to support defense theories in *the filed lawsuit*, there must be meaningful proof establishing a connection between the particular repairs and the defense theory." *Id.* at 863 (emphasis in original).

The developer in *Barratt* argued that because it presented evidence that the insurer breached its duty to defend and the parties stipulated as to the amount that was spent on the repairs to the non-plaintiff homes, it had proven the existence and amount of the expenses, and therefore the burden of proof shifted to the insurer to prove that the costs were unreasonable and unnecessary. The court disagreed, stating that:

> Under *Aerojet-General*, the burden does not shift to the insurer to prove the expenses were unreasonable or unnecessary until the insured has met its burden to prove the "existence ... of the ... investigation expenses ...." (*Aerojet-General*, *supra*, 17 Cal.4th at 64.) The fact that the parties stipulated that $580,714.50 was spent on repairs to the non-plaintiff homes does not mean that Barratt satisfied its burden to show the existence of investigation expenses. To show that the repairs even constituted a defense investigation expense, Barratt had the initial obligation to establish that a reasonable insured would have made the repairs to third party homes in defense of the lawsuit that was in fact brought.

*Barratt* at 864.

### *KLA-Tencor Corp. v. Travelers Indem. Co. of Illinois*

*KLA-Tencor Corp. v. The Travellers Indemnity Co.*, 2004 WL 1737297 (N.D.Cal. 2004) involved two underlying patent infringement actions and responsive counterclaims. Plaintiff KLA-Tencor Corporation ("KLA") filed *Therma-Wave I*, alleging infringement of U.S. Patent No. 4,899,055 ("'055 patent") by Defendant Therma-Wave. On October 23, 1998 Therma-Wave answered and counterclaimed against KLA, seeking a declaration that the '055 patent was invalid or had not been infringed, and alleging infringement of Therma-Wave's U.S. Patent No. 5,596,406 ("'406 patent"). On July 22, 1999 KLA filed a second complaint against Therma-Wave, ("*Therma-Wave II*"), alleging infringement of two additional KLA patents. Therma-Wave counterclaimed for a declaration of invalidity of one of the patents (the '842 patent); infringement of two additional Therma-Wave patents (the '837 patent" and the '939 patent); a violation of Lanham Act § 43(a)("the disparagement counterclaim"); intentional and negligent interference with prospective economic advantage; intentional interference with contractual relations and unfair competition under Cal. Bus. & Prof. Code § 17200. The *Therma-Wave II* disparagement counterclaim alleged that KLA had engaged in a campaign to disparage Therma-Wave and to damage improperly Therma-Wave's efforts to raise capital and to compete making disparaging and untrue statements to: (1) actual and prospective customers of Therma-Wave and market analysts about Therma-Wave's financial condition and future viability; (2) actual and

1   prospective customers of Therma-Wave that Therma-Wave would not be able to sell or ship its
2   Opti-Probe products due to KLA's lawsuit alleging that Therma-Wave infringed the '055 Patent;
3   and (3) market analysts that Therma-Wave had lost large orders. A request to treat *Therma-*
4   *Wave I* and *Therma-Wave II* as related cases was granted, on the cases involved identical
5   technology and largely the same documents and witnesses. The parties later agreed that all
    discovery in *Therma-Wave I* could be used in *Therma-Wave II*.
6       On October 29, 1999, four days after receipt of the *Therma-Wave II* counterclaim, KLA
7   tendered *Therma-Wave I* and *Therma-Wave II* to Travelers. Travelers denied coverage on
8   January 4, 2000 and refused to pay any defense costs. Thereafter, Therma-Wave amended its
9   disparagement counterclaim in *Therma-Wave II*, alleging statements made to actual and
10  prospective customers that Therma-Wave's Opti-Probe products could not ship because they
11  infringed the '055 patent and alleging statements that Therma-Wave had lost large orders when,
12  in fact, Therma-Wave had won the order in question over KLA. Subsequently, KLA's outside
13  counsel conducted an investigation and concluded that certain statements alleged by Therma-
14  Wave, which formed the basis for Therma-Wave's disparagement allegations, had likely been
15  made. In addition, KLA discovered a number of internal documents that contained potentially
16  disparaging statements. Based upon its investigation, KLA asserted that the disparagement
17  counterclaims exposed KLA to significant liability. KLA then moved for consolidation of
18  *Therma-Wave I and II*, arguing, *inter alia*, that if KLA prevailed against Therma-Wave in
19  *Therma-Wave I*, then statements that Therma-Wave was enjoined from shipping its Opti-Probe
20  products would be true, and thus, resolution of the '055 patent may provide KLA with a further
    defense to the disparagement counterclaim in Therma-Wave II.
21      KLA settled the underlying litigation, and commenced an action for indemnity against
22  Travelers. The court subsequently ruled that Travelers had a duty to defend the disparagement
23  allegations made by Therma-Wave in *Therma-Wave II*. *KLA* at *3.
24      The *KLA* opinion addresses Travelers' motion for partial summary judgment that
25  Travelers had no duty to reimburse KLA for any attorney's fees or expenses incurred by KLA in
26  the defense of *Therma-Wave I*. KLA argued that a critical component its defense to
27  disparagement counterclaims in *Therma-Wave II* was its ability to prevail on its '055 Patent
28  claims in *Therma-Wave I* by proving that the '055 Patent was valid and that it was infringed by
    Therma-Wave. *Id.* In conjunction with this validity and infringement defense, KLA argued that

-54-

the five separate categories of fees and costs were intertwined with a successful defense of the disparagement counterclaims: (1) fees and costs relating to KLA's '055 patent infringement claim; (2) fees and costs relating to factual and legal analysis of the products, companies and marketplaces at issue in *Therma-Wave I*; (3) fees and costs relating to Therma-Wave's '406 patent infringement claim in *Therma-Wave I*; (4) fees and costs relating to KLA's defenses to all of Therma-Wave's counterclaims in *Therma-Wave II*; and (5) fees and costs relating to settlement activities.   The parties disputed the scope of the costs that were reasonable and necessary to defend the disparagement counterclaims.   The court first stated that:

> Neither party disputes that bringing a successful claim for infringement of the '055 patent in *Therma-Wave I*, and winning damages pursuant to that claim, was one of KLA's objectives. But as *Barratt* makes clear, these costs are potentially recoverable even if they serve more than one objective. *See Barratt*, 102 Cal.App. 4th at 860.  KLA asserts, essentially, that the best defense to the disparagement counterclaims was showing that the '055 patent was valid, and further that Therma-Wave's Opti-Probe products infringed that patent. Considering KLA's potential for liability based on its internal investigation, this was not an unreasonable strategy.

*KLA* at *4.  The court stated the general rule that "reasonable and necessary costs of defending a lawsuit are recoverable if the insurer breaches its duty to defend," and summarized the relevant burdens of proof for recovery of such costs when an insurer breaches its duty to defend set forth in *State v. Pac. Indem. Co.*, 63 Cal.App. 4th 1535, 1548 (1998); *Aerojet-General Corp. v. Transp. Indem. Co.*, and *Barratt. Id.* at *4.  After summarizing the facts and basis for the court's decision in *Barratt*, and concluding the *Aerojet* burden shifting was applicable, the court found that:

> Accordingly, KLA has the burden of proving the existence and amount of the expenses involved in defending the disparagement counterclaims. KLA may meet that burden by demonstrating the hours worked and providing testimony that the work was all related to the defense, but subject to the requirement that such work must be reasonable and necessary to defense of the disparagement counterclaims. *See State*, 63 Cal.App. 4th at 1549; *Barratt*, 102 Cal.App. 4th at 858.  Travelers then bears the burden of showing that these costs were unreasonable. *See State*, 63 Cal.App. 4th at 1549. Moreover, to the extent that certain costs related to the disparagement counterclaims cannot be separated from costs unrelated to those claims, Travelers bears the burden of showing which costs are in fact unreasonable or unnecessary. [FN4] *Id.* at 1548.

*Id.* at *6.  Footnote 4 states that "KLA must, however, make a good faith effort to separate its costs." *Id.* at *6 n.4.  The court, citing to *Barratt*, also found that "KLA must present evidence

1   "that a reasonable insured would have engaged in a similar defense strategy, which necessarily

2   involves a consideration of whether the benefits of the strategy are worth the cost." *Id.* at *7.

3          KLA submitted declarations stating that: (1) legal research and analysis, document

4   management, factual investigation, discovery, technical analysis and expert analysis relating to

5   the companies, marketplaces and products at issue in *Therma-Wave I* were intertwined with the

6   *Therma-Wave II* litigation as the parties and technologies overlapped substantially; (2) all post-

7   tender fee and cost entries in *Therma-Wave I* had been reviewed; (3) after segregating fees and

8   costs related to defending Therma-Wave's '406 patent infringement claim (with the exception of

9   damages-related items) in *Therma-Wave I*, prosecution of KLA's '842 patent infringement

10  claims in *Therma-Wave II*, and fees and costs related to obtaining insurance coverage, the

11  individual subtracted these amounts from the total fees and costs in *Therma-Wave I*; and (4)

12  based thereon, KLA concluded that $4,781,428.61 in fees and costs were incurred in KLA's

13  defense of the counterclaims in *Therma-Wave II*. KLA at *7.

14         The court, again citing *Barratt*, stated that to satisfy the "reasonable and necessary" test,

15  KLA's fees and costs must meet three requirements: (1) the challenged costs and fees must relate

16  to an action conducted within the temporal limits of Travelers' duty to defend; (2) the challenged

17  costs and fees must relate to a reasonable and necessary effort to avoid or minimize liability; and

18  (3) the challenged costs and fees must be reasonable and necessary for that purpose. *KLA at *7.*

19  The court concluded that "[w]hile KLA's underlying theory is at least viable, certain categories

20  of fees and costs that KLA asserts are related to successfully bringing its '055 infringement

21  claim are not." *Id.*

22         With respect to KLA's '055 patent infringement claim, the court found KLA had raised a

23  triable issue of material fact as to whether the costs and fees directly associated with the '055

24  patent infringement claim were reasonably and necessarily incurred to defend Therma-Wave's

25  counterclaims for disparagement in *Therma-Wave II*, and thus prongs (2) and (3) above were

26  satisfied. *KLA* at *7. The court further found that KLA had raised a triable issue of fact as to

27  whether costs and fees incurred post-tender in *Therma-Wave I* relating to KLA's claim for

28  infringement of the '055 patent may also be deemed incurred in defense of Therma-Wave's

    disparagement claims in *Therma-Wave II*. *Id.*

           With respect to legal, factual and technical analysis in *Therma-Wave I*, the court stated

    that "[t]o the extent that the fees and costs incurred in the legal, factual and technical analysis of

*Therma-Wave I* were reasonable and necessary for the purpose of minimizing liability, the court questions the disparity between the costs asserted by KLA and those incurred in *Therma-Wave II*." *Id.* at \*8. KLA presented evidence that at least a portion of the work attributed to *Therma-Wave I* was actually done for *Therma-Wave II*, prior to *Therma-Wave II* receiving a separate billing number and that potential exposure for the disparagement counterclaims was $21.5 million, and the settlement value of the disparagement counterclaims was between $3 million and $6 million at the time of settlement. The court concluded that KLA had met its initial burden by showing the amount of fees relating to this category and providing declarations that they related to the defense. *Id.* The court found that "Travelers must now bear the burden of showing specific costs were either unreasonable or unnecessary to the defense," and that "[t]o the extent that Travelers can show that certain costs were not related to successfully litigating the '055 patent and minimizing KLA's exposure on the disparagement counterclaims, KLA may not recover." *Id.*

KLA argued that fees and costs incurred in defending against Therma-Wave's claim for damages in *Therma-Wave I* for the alleged infringement of Therma-Wave's '406 patent were recoverable as part of its defense to the disparagement claims. KLA theorized that the damages Therma-Wave sought for infringement of the '406 patent would have been substantially similar to the damages sought for disparagement. *KLA* at \*8. The court found that:

> This theory, based on cursory deposition testimony, is too far afield from Therma-Wave's disparagement counterclaims to establish a triable issue of fact. Specifically, no reasonable counsel would conclude that the costs incurred in the defense of the '406 patent infringement claim would be necessary for the defense of Therma-Wave's disparagement allegations because such a defense could provide information on damages. ... Travelers is entitled to partial summary judgment that costs incurred in defense of Therma-Wave's damage claim for infringement of the '406 patent are not recoverable as necessarily incurred in KLA's disparagement defense.

*Id.* at \*8.

KLA also sought reimbursement of fees and costs for its defense of Therma-Wave's '837 and '939 patent counterclaims in *Therma-Wave II* . The court stated that KLA "appears to argue that Travelers must first pay all *Therma-Wave II* counterclaim defense costs, then subsequently seek reimbursement for those claims where there is no potential for coverage." *KLA* at \*8. The court states that as opposed to the plaintiff's situation in *State*, "here the fees are more easily segregable." *Id.* The court concluded that KLA was entitled to recover only fees related to the

1  disparagement counterclaims and that Travelers bore the burden of showing which costs were

2  unreasonable. *Id.*

3      Finally, with respect to settlement activities, the *KLA* court concluded that the California

4  Supreme Court in *Aerojet* made clear that while certain activities related to a party's defense may

5  be reasonable and necessary costs to avoid or at least minimize liability, "[s]ettlement costs

6  cannot be defense costs because, instead, they resolve liability." *KLA* at *9 (citing *Aerojet* at 67).

   The court concluded that KLA was not entitled to recovery from Travelers for settlement

7  activities. *Id.*

8                        **DISCUSSION**

9  **I.    Burden of Proof for Purposes of the Remand Hearing**

10     "When the insurer breaches the duty to defend, the insured must prove by a

11 preponderance of evidence the existence and amount of the expenses, which are then presumed

12 to be reasonable and necessary as defense costs." November 25, 2003 Order at 8; *see also*

13 October 15, 2004 at 1. "The defense costs may include expenses incurred in prosecuting

14 affirmative claims under appropriate circumstances." *Id.* "Once the insured meets its burden, it

   is the breaching insurer's burden to prove by a preponderance of evidence that the expenses are

15 unreasonable or unnecessary to the defense."

16     In the November 2003 and October 2004 orders, the Court concurred with the Special

17 Master's determination that HP had proven by a preponderance of the evidence the existence and

18 amount of its defense costs, and therefore HP was entitled to a presumption that its defense costs,

19 including the expenses incurred in prosecution of its claims against Nu-kote, were reasonable

20 and necessary as defense costs." October 15, 2004 Order at 2. The Court, however, disagreed

21 with the Special Master's determination that ACE failed to prove, by a preponderance of

22 evidence, that HP's expenses were unreasonable or unnecessary to the defense. *Id.*

23     The Court's November 25, 2003 Order at page 9 concluded that "[a]n expense is

24 necessary only if the expense would be conducted against liability by a reasonable insured under

   the same circumstances," citing *Aerojet* at 62-63; *Barratt* at 848; and *Larkin* at *19. "In other

25 words, an expense[] is unnecessary if the expense would not have been conducted against

26 liability by a reasonable insured under the same circumstances." November 25, 2003 Order at 9.

27 The order provides that:

28

In this case, a trier of fact *could* reasonably conclude that ACE presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims. First, there is evidence from HP itself. During the underlying lawsuit between HP and Nu-kote, HP argued before this Court that "the vast majority of Nu-kote's anti-trust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case." HP prevailed on this argument and this Court allowed HP's affirmative claims to proceed before the anti-trust claims.

Second, ACE presented the testimony of Professor Menell, who essentially opined that there was a clear dividing line between prosecution expenses and defense expenses. Third, Robert Rose also testified that HP's prosecution claims and Nu-kote's counterclaims were separate. Fourth, Craig Aronson also testified that he could separate out expenses related to HP's prosecution claims. Implicit in each of these witnesses' testimony is that certain prosecution related expenses are severable from the defense expenses, and thus clearly unnecessary to the defense. That the three witnesses may not have used the terms necessary, unnecessary, reasonable or unreasonable to label expenses does not mean that their testimony is inadequate to carry ACE's burden of proof. Their testimony provides circumstantial evidence from which a trier of fact *could* reasonably infer, by a preponderance of evidence, that portions of HP's prosecution expenses were wholly unnecessary to its defense.

November 25, 2003 Order at 9-10 (emphasis added). The case was referred back to Special Master to assess what expenses "would be conducted against liability by a reasonable insured under the circumstances." October 15, 2004 Order at 3.

As an initial matter, the Special Master must determine who bears the burden of proof for purposes of the remand hearing. The Court concurred with the Special Master's determination that HP had proven by a preponderance of the evidence the existence and amount of its defense costs, and therefore HP was (and is) entitled to a presumption that its defense costs, including the expenses incurred in prosecution of its claims against Nu-kote, were reasonable and necessary as defense costs." Under the applicable standard, the burden then switched to ACE to establish that HP's expenses were unreasonable or unnecessary to the defense. In the November 2003 and October 15, 2004 orders, the Court found that ACE had presented evidence from which a trier of fact could determine that ACE had presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims. The Court identified four categories of evidence: (1) HP's "not inextricably related" statement; (2) Professor Menell's testimony; (3) Robert Rose's testimony; and (4) Craig Aronson's testimony. The November 25, 2003 order, however, did not state that ACE had met its burden of proving that

1  there actually was some dollar amount of HP defense expenses that was not necessary to the

2  defense.

3    During the remand hearing, ACE clearly made reference to and relies upon HP's "not

4  inextricably related" statement. ACE, however, did not rely upon and made no reference to the

5  testimony at the initial damages hearing of Professor Menell, Mr. Rose or Mr. Aronson. Instead,

6  ACE offered new and different testimony from Professor Menell and Mr. Aronson. Consistent

7  with the relevant law and ACE's decision to offer new and different evidence at the remand

8  hearing, HP is entitled to the presumption that is expenses were reasonably and necessary as

9  defense costs. The burden of proof for purposes of the remand hearing first rests with ACE. The

10 Special Master must determine whether ACE has presented a preponderance of evidence that

11 some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims, or more

12 specifically, whether ACE has presented a preponderance of evidence that some of HP's

13 expenses would not have been conducted against liability by a reasonable insured under the

14 circumstances.

## II. The Appropriate Legal Standard

15   As noted above, the case was referred back to Special Master to assess what expenses

16 "would be conducted against liability by a reasonable insured under the circumstances." October

17 15, 2004 Order at 3. In doing so, the Court stated that the definition of "necessary" set forth in

18 the November 25, 2003 Order "requires determining not only whether prosecution expenses are

19 "reasonably related" to the defense, but also whether those "reasonably related" expenses are

20 likely to have been incurred by a reasonable insured under the same circumstances." *Id.* The

21 court further cited *Barratt* at 862 for the proposition that the inquiry into what a reasonable

22 insured would do to defend "necessarily involves a consideration of whether the benefits of the

23 strategy are worth the cost." *Id.* at 3-4.

24   ACE contends that the Court's definition has several elements: (1) an expense must be

25 "*conducted against liability*," i.e., the activity for the expense must be incurred for the purpose of

26 disproving the liability (the risk of a monetary award) sought to be imposed against the insured

27 in the underlying lawsuit - it is not enough that the expense relates to a strategic benefit or

28 advantage in the litigation (e.g., it is not enough that an expense was "defensive in nature,"

"helpful," or "useful" in litigation); (2) the expense must be one that would be conducted against

liability by a party acting as a "reasonable insured" – ACE asserts that "the real question is what

financial responsibility should be imposed on an insurance carrier by virtue of an insurance policy, not how litigation might or might not be conducted by a litigant without reference to insurance coverage;"[6] and (3) the expense must be one that would have been conducted against liability by a reasonable insured <u>under all of the circumstances</u> – the expense must reasonable given its magnitude and the potential reduction in the insured's liability that might reasonably be expected to result from it.

HP contends that ACE's attempted parsing of the Court's statement of the standard has a number of problems.

The Special Master carefully has reviewed the Court's November 2003 and October 2004 orders, the cases cited therein and the *KLA-Tencor* case, which was decided before the Court issued the October 2004 order. This review compels the conclusion that ACE improperly is attempting to both narrow the relevant standard and at the same add additional conditions to standard that are not supported by the cases or the Court's prior orders.

As an initial matter ACE's erroneously asserts that strategy cannot be considered in determining reasonable and necessary defense expenses. In *Aerojet*, established the three criteria to establish which expenses must be reimbursed by an insurer:

> First, the [expenditures] must be conducted within the temporal limits of the insurer's duty to defend, i.e., between tender of the defense and conclusion of the action. Second, the [expenditures] must amount to a reasonable and necessary effort to avoid or at least minimize liability. Third and final, the . . . expenses must be reasonable and necessary for that purpose.

*Aerojet*, 17 Cal. 4th at 60-61.

In *Barratt*, 102 Cal.App.4th at 859-860, the Court confirmed that an insurer has a duty to pay defense costs "if the defense investigation and expenses are reasonable and necessary to mount a defense in a pending lawsuit ... even if the insured obtains additional benefits from the expenditures." The *Barratt* court nonetheless found that although Barratt's evidence may have supported a general conclusion that it can be a reasonable trial strategy in construction defect litigation to use repair information from other homes in a residential development to bolster defense theories, the general conclusion "does not support a reasonable inference that in this case it was reasonable and necessary to engage in this strategy by repairing every claimed defect in

---

[6] ACE asserts that an insured's contractual duties of good faith and fair dealing owed to its insurer, and the standard for imposing liability on the insurer, must take that relationship and those duties into account.

1  every Cortina nonplaintiff home and to spend $580,714.50 in doing so." *Id.* at 861. The *Barratt*

2  court, after noting that there was no evidence connecting the repair work to the plaintiffs' claims,

3  stated that:

> Second, it is not enough to produce evidence that repairs to nonplaintiff homes
> would be "helpful" or "useful" in litigation involving other homes in the residential
> development. It may always be said that a defendant would obtain some benefit from
> additional investigation that has some relationship to the subject of a lawsuit, but this fact
> is not enough to logically support the requisite finding that the investigation was
> reasonable and necessary for purposes of defending the existing suit. Instead, *a developer*
> *seeking reimbursement for repair costs to homes not the subject of a lawsuit must present*
> *evidence that a reasonable insured would have engaged in a similar defense strategy,*
> *which necessarily involves a consideration of whether the benefits of the strategy are*
> *worth the cost.* Without this weighing analysis, the fact that it may be helpful or useful to
> a defense to learn additional information does not - in and of itself - lead to an inference
> that a reasonable insured would have found the costs were reasonable and necessary to
> defend the lawsuit.

12  *Id.* at 861-862 (emphasis added). "While we have concluded that it is conceptually possible to

13  prove that in construction defect litigation a repair of a nonparty home can be a reasonable and

14  necessary expense to support defense theories in the filed lawsuit, there must be meaningful

15  proof establishing a connection between the particular repairs and the defense theory." *Id.* at

16  863.

17  In *KLA-Tencor Corp.,* 2004 WL 1737297 (N.D.Cal. 2004), the insured, KLA, argued

18  *inter alia* that a critical component its defense to disparagement counterclaims in *Therma-Wave*

19  *II* was its ability to prevail on its '055 Patent claims in *Therma-Wave I* by proving that the '055

20  Patent was valid and that it was infringed by Therma-Wave. *Id.* at 4. The court first stated that:

> Neither party disputes that bringing a successful claim for infringement of the '055 patent
> in *Therma-Wave I,* and winning damages pursuant to that claim, was one of KLA's
> objectives. But as *Barratt* makes clear, these costs are potentially recoverable even if they
> serve more than one objective. *See Barratt,* 102 Cal.App. 4th at 860. KLA asserts,
> essentially, that the best defense to the disparagement counterclaims was showing that the
> '055 patent was valid, and further that Therma-Wave's Opti-Probe products infringed
> that patent. *Considering KLA's potential for liability based on its internal investigation,*
> *this was not an unreasonable strategy.*

26  *KLA* at *4 (emphasis added). The court, citing to *Barratt,* also found that "KLA must present

27  evidence "that a reasonable insured would have engaged in a similar defense strategy, which

28  necessarily involves a consideration of whether the benefits of the strategy are worth the cost."

*Id.* at *7. With respect to KLA's '055 patent infringement claim, the court found KLA had

raised a triable issue of material fact as to whether the costs and fees directly associated with the '055 patent infringement claim were reasonably and necessarily incurred to defend Therma-Wave's counterclaims for disparagement in *Therma-Wave II*, and that KLA had raised a triable issue of fact as to whether costs and fees incurred post-tender in *Therma-Wave I* relating to KLA's claim for infringement of the '055 patent may also be deemed incurred in defense of Therma-Wave's disparagement claims in *Therma-Wave II. Id.* at 7.

Finally, Judge Ware's October 2004 Order provides that:

> This court's definition is narrower than the Special Master's definition of what is necessary to the defense because the Court's definition requires determining not only whether prosecution expenses are "reasonably related" to the defense, but also whether those "reasonably related" expenses are likely to have been incurred by a reasonable insured under the same circumstances. In *Barratt*, the California Court of Appeal clarified that the inquiry into what a reasonable insured would do to defend "necessarily involves a consideration of whether the benefits of *the strategy* are worth the cost."

October 14, 2004 Order at 3-4 (emphasis added).

None of the relevant cases or prior orders by the Court suggests that in order to be conducted against liability, the expense must be incurred for the purpose of disproving liability. Similarly, ACE's statement that "it is not enough that the expense relates to a strategic benefit or advantage in the litigation" does not accurately reflect the standard. A strategy may be considered in determining whether expenses were conducted against liability. The question instead is whether there is evidence that a reasonable insured would have engaged in a similar defense strategy, which necessarily involves a consideration of whether the benefits of the strategy are worth the cost. *Barratt* at 861-862.

Second, ACE offers no legal authority to support its assertion that "Judge Ware's standard recognizes that the real question is what financial responsibility should be imposed on an insurance carrier by virtue of an insurance policy, not how litigation might or might not be conducted by a litigant without reference to insurance coverage." A review of the cases cited and Judge Ware's order does not support this "element." The test instead focuses on the actions of a reasonable insured. The Special Master declines to add ACE's "real question" to the legal test to be applied in the remand hearing. Finally, ACE's assertion that Judge Ware's order includes an element requiring separate consideration of "all the circumstances" is incorrect. The test is whether the expenses "are likely to have been incurred by a reasonable insured under the same circumstances."

## III.    Evidence Issues and Evidence Objections

During the remand hearing, ACE submitted a motion in support of admitting into evidence motions and supporting documents for summary judgment motions #1, #2, #3, #4, #5, #6, #7, #9, #13 and #16 filed by HP in the Nu-kote action.  ACE asserted that the motions papers would assist the Special Master in making his recommendation and that admission of the papers would create a complete record.  In an order dated October 31, 2006, the Special Master agreed, and stated that a review of the motion papers identified by ACE would provide greater clarity with respect to the scope of Judge Ware's orders on the motions for summary judgment.  The Special Master took judicial notice of the motion papers (and supporting documents) identified by ACE.  The Special Master further indicated that with respect to any possible motion to augment that HP may consider based upon this ruling, the *only* additional documentation that the Special Master would consider would be Nu-kote's oppositions (and supporting documents) to the motions at issue.  HP subsequently requested that the Special Master take judicial notice of the oppositions to the motions.  No further briefing was required, but to the extent that HP or ACE believed that it may have been prejudiced by these rulings, the Special Master allowed both parties to submit a letter not to exceed 10 pages regarding the contents of the newly submitted papers.  Neither party submitted a letter in response to the October 31, 2006 order.

ACE's motion *in limine* to exclude the testimony of Peter Sullivan was denied at the hearing, subject to ACE's continuing motion to strike the testimony.  ACE renews its motion to strike the testimony of Mr. Sullivan in its closing brief.  ACE's motion to strike the remand testimony of Peter Sullivan is DENIED.

HP's motion *in limine* to exclude ACE's expert testimony on cost benefit analysis was denied.

Prior to the hearing via a motion *in limine* and during the hearing, HP sought to exclude the testimony of ACE expert Craig Aronson.  HP argued that Mr. Aronson's testimony should be disallowed because: (1) Mr. Aronson lacked the background and experience required to qualify him as an expert on any of the matters to which he wanted to testify; (2) Mr. Aronson's opinions were derived from invoice entry reviews and allocations that were not based on any proper or recognized methodology; (3) Mr. Aronson had not formulated and would not offer opinions on the remand issues of whether HP's prosecution efforts in the Nu-kote Action were "conducted

against liability" and whether a reasonable insured in HP's position would have done what HP did to defend itself; and (4) some of Mr. Aronson's proposed testimony had not been disclosed in his expert report as Rule 26 required, triggering the automatic mandatory exclusion of that portion of his testimony under Rule 37. The testimony was admitted at the hearing, subject to a continuing motion to strike. HP renewed its objections at the hearing when ACE asked Mr. Aronson to testify about purported billing allocations pertaining to Judge Ware's "conducted against liability" standard on remand. HP sought the exclusion of this testimony on the grounds that Mr. Aronson and ACE had not disclosed any intent to offer it in his expert report or even during two days of his deposition testimony. (RT. 482:9- 486:6.) This testimony was admitted subject to a continuing motion to strike.

In its closing brief, HP renews its motion to strike Mr. Aronson's testimony. The motion to strike Mr. Aronson's testimony is DENIED.

During the remand hearing, HP submitted to a motion to strike portions of the testimony of Mr. Ocampo and Mr. Aronson that was not disclosed in their expert reports, pursuant to Fed.R.Civ.P. 37(c)(1) and Fed.R.Civ.P. 26(a)(B). HP argued that federal law requires the exclusion from evidence of an expert's testimony where the expert did not completely disclose it in his 26 disclosure. The motion to strike portions of Mr. Aronson's testimony is DENIED.

Prior to the hearing and during the hearing, HP sought to exclude the testimony of Raymond Ocampo. The testimony was admitted at the hearing, subject to a continuing motion to strike. In its closing brief, HP renews its motion to strike Mr. Ocampo's testimony. The motion will be discussed below.

**IV.  Reasonable Insured in the Same Circumstances**

ACE contends that "a reasonable insured in the same circumstances would not expect the expenses of prosecuting affirmative patent or trademark infringement claims to be reimbursable." ACE asserts that a reasonable insured would not expect insurance benefits for expenses incurred to prosecute affirmative claims which only strategically benefited its defense to counterclaims.

### A. Ocampo Testimony

At the remand hearing, ACE offered the testimony of Raymond Ocampo, who is a former General Counsel of Oracle Corporation. ACE offered Mr. Ocampo for the purpose of addressing what a reasonable insured would expect to be reasonable and necessary litigation activities in

defense of the Nu-kote counterclaims.  ACE asked Mr. Ocampo to "step into the shoes of HP to see what a reasonable insured would do in those circumstances [of the Nu-kote lawsuit]."  (RT. 395:12-23.)

Prior to going to work for Oracle, Mr. Ocampo's trial experience involved working on the defense of a few antitrust suits while an associate or contract lawyer for various firms.  (RT. 362:25-363:21, 366:14-367:13, 386:3-19.)  In addition, he was also adjunct professor at Hastings College of the Law, where he taught trial practice.  (RT. 364:20-365:23).  Oracle hired Mr. Ocampo in 1986.  His antitrust and complex litigation experience was factors in the decision to hire him.  (RT. 369:5-18).

Mr. Ocampo supervised 100 lawyers while heading Oracle's General Counsel office.  (RT. 374:16-20.)  Mr. Ocampo was the primary person responsible for overseeing and directing litigation or litigation events at the company, and was the primary person involved in directing litigation.  (RT. 377:10-15; 379:10--380:7.)  Although Mr. Ocampo testified that he supervised outside counsel in "two or three" cases involving the defense of trademark claims against Oracle (RT. 388:10-24.), he did not testify about the nature or extent of this supervision.

Intellectual property issues were involved in all the cases in which Mr. Ocampo was involved at Oracle.  (*Id.*)  While Mr. Ocampo was at Oracle, Oracle threatened lawsuits and were threatened with lawsuits.  While antitrust suits were considered, Mr. Ocampo did not recall if Oracle had filed any such actions while he was at Oracle.  (RT. 379:15-380:7.)  No antitrust claims were asserted against Oracle while Mr. Ocampo was employed by Oracle, (RT. 382:24-383:5.)  As such, Mr. Ocampo never supervised the defense of a antitrust suit while at Oracle.  (RT. 384:19-385:1.)

When Oracle was sued and the policy covered it, Oracle would consider whether or not insurance would play a role in terms of reimbursing the company for expenses.  (RT. 377:23-378:3.)  Mr. Ocampo considered the applicability of insurance when faced with intellectual property litigation.  (RT. 382:14-19.)  Oracle's senior management expected Mr. Ocampo to consider the applicability of insurance when faced with litigation.  (RT. 382:20-23.)  Mr. Ocampo testified that he has been a "consumer of insurance" (RT. 367:25-368:3), and to some involvement in "asbestos litigation" and "legal malpractice insurance."  (RT. 367:18-24.)  Mr. Ocampo did not profess to be an insurance coverage expert.  (RT. 430:17-431:13.)  Mr. Ocampo did have occasion to strategize with an insurance carrier or counsel hired by the carrier in

intellectual property cases, in order to negotiate what was covered and what was not covered. (RT. 383:18-394:5.) Oracle would negotiate with the insurance carrier how to proceed so it could use its in-house counsel and get compensated under the policy. *Id.*

Mr. Ocampo testified that HP, like other technology companies, protects its intellectual property rights. (RT. 397:10-16.) He understood, as was commonly known in the industry, that HP's inkjet cartridge market was a "cash cow" for HP. (RT. 396:17-397:9.) Mr. Ocampo, relying in part on the testimony of Jack Brigham (HP's General Counsel at the time the Nu-kote case was litigated) that HP's affirmative intellectual property claims had independent value separate and apart from the defense of the Nu-kote counterclaims, stated that HP's affirmative case had independent value apart from the defensive nature claimed by HP. (RT. 401:10-23.)

On the issue of what a reasonable insured in HP's circumstance would do, and expect, Mr. Ocampo testified that it was his opinion that: (1) HP would have prosecuted its affirmative intellectual property claims whether or not antitrust counterclaims were filed and independent of whether it would receive any insurance reimbursement; (2) HP had no reasonable expectation of insurance reimbursement when it prosecuted the case; and (3) the continued prosecution of HP's intellectual property claims was not undertaken solely for defensive purposes (or that it was a beneficial strategy). (RT. 409:11-23; 409:24-410:6; 410:17-411:3.) Mr. Ocampo's opinions are based on the enormous profits – revenue and high margins – generated by HP's inkjet print cartridge product lines. (RT. 409:11-23.)

According to Mr. Ocampo, a reasonable insured would not expect reimbursement for prosecuting its affirmative claims, even if prosecuting the affirmative claim put the insured in a favorable light with the jury. (RT. 411:4-412:6.) Mr. Ocampo testified that it would have been unreasonable for HP to receive funding for prosecution of its business interests in the intellectual property claims. (RT. 431:12-21.) Mr. Ocampo testified that if some strategic value to the defense of the case is the standard to determine insurance coverage for prosecution expenses, "reasonable" is taken out of the standard and the insured is given a blank check to decide what is covered. (RT. 411:4-19, 453:7-18.) Mr. Ocampo testified that:

> I think you can fathom an argument for any strategy, whether it's prosecuting an affirmative claim or something else, a white hat strategy. You can always argue that it's beneficial. And you might, if you were sitting in my position, decide, yeah, I'm going to take -- undertake that strategy. But that doesn't mean a reasonable insured should expect to receive reimbursement for it. And I would not have expected it as a general counsel of Oracle.

(RT. 411:20-412:6.)

On cross-examination, HP elicited the following testimony from Mr. Ocampo: (1) Mr. Ocampo admitted that he did not read *Aerojet* or *Barratt*, and the cases played no part in his opinions (RT. 427:1-428:14.); (2) his testimony addressed his view of what a reasonable insured would do under the circumstances of the Nu-kote case (RT. 436:14-17.); (3) he did not quantify legal expenses or do an allocation between necessary and unnecessary expenses; (4) Mr. Ocampo interpreted the Court's remand orders remand to provide that "HP could recover expenses only if a reasonable insured would have prosecuted the affirmative intellectual property claims of HP in defense of the liability of the Nu-kote counterclaims" (RT. 395:7-11.); (5) he admitted that in litigation there are instances "where you could conduct prosecution efforts that would amount to a defense of the counterclaims, in the areas where there is an overlap in the issues (RT. 442:5-7.); (6) he testified that none of HP's strategies for defending itself in the Nu-kote action were unreasonable. (RT. 449:3-451:12.); (7) it was reasonable for HP to try to portray itself "in a favorable light in order to defend against the counterclaims that Nu-kote presented." (RT. 436:18-438:5); (8) HP's "successful prosecution of [its] affirmative claims would have a favorable effect on the defense of the antitrust claims." (RT. 439:1-8.); (9) he "[did] not believe that [HP] did anything from a litigation standpoint that was necessarily unreasonable in prosecuting its claims . . . even from a defense standpoint" (RT. 445:15-20.); (10) he admitted that he had not "come up with a specific conclusion" as to whether any of the litigation strategies used by HP "were either unreasonable or reasonable in the exercise of good judgment" (RT. 450:16-18.); and (11) there was "nothing [he could] testify about as to any particular strategy that was unreasonable under the circumstances of the Nu-kote case in defending it as HP did." (RT. 450:21-453:2).

### B. *HP's Motion to Exclude Mr. Ocampo's Testimony*

Before the hearing, HP moved *in limine* to exclude Mr. Ocampo's testimony on the grounds that he was not qualified as an expert witness on any subject for which ACE offered him. HP further objected to Mr. Ocampo's testimony at the hearing. (RT. 384:17-390:5.) The Special Master permitted him to testify, subject to HP's continuing motion to strike. (RT. 393:25-394:8.)

HP's closing brief renews its motion to strike Mr. Ocampo's testimony. HP contends that ACE did not qualify Mr. Ocampo as expert witness. HP asserts that: (1) Mr. Ocampo lacked the background, training and experience to qualify as an expert; (2) even if Mr. Ocampo had testified as represented by ACE, his "expert" testimony would be subjective and hypothetical because it could not be based on any training or experience; (3) Mr. Ocampo did not testify that his opinions were derived from an objective methodology; and (4) Mr. Ocampo's opinions are derived from subjective "thought experiments" and are not expert opinions.

ACE contends that Mr. Ocampo has the necessary experience and background to qualify as an expert witness. ACE asserts that: (1) *Daubert* and *Kuhmo Tire* are not applicable, and that HP's argument ignores Mr. Ocampo's relevant background, experience, and preparation undertaken prior to rendering his opinion testimony; (2) Mr. Ocampo is eminently and, in this case, uniquely qualified to testify on the issue of what a reasonable insured would do under circumstances faced by HP in the Nu-kote action; (3) he is testifying based on his personal knowledge and experience as General Counsel of Oracle Corporation, not based on scientific methodology; (4) Mr. Ocampo is "remarkably" well qualified to provide testimony to assist the trier of fact in understanding the issues to be tried in light of the District Court's remand order; (5) as a result of his experience and background, Mr. Ocampo is the only witness qualified to answer the question of what a reasonable insured would have done under the circumstances HP faced in the Nu-kote action; and (6) Mr. Ocampo provided relevant testimony based on his knowledge and experience as in-house counsel of a company similar to HP.

Federal Rule of Evidence 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court made clear that district courts must exercise a "gatekeeping" function with respect to scientific expert evidence in order to determine whether such evidence is admissible under Fed. R. Evid. 702. The Court suggested several factors that might be considered in determining whether such evidence is sufficiently reliable to be admitted, including whether or not the

1  scientific technique or knowledge had been tested, whether or not the theory or technique had

2  been subjected to peer review or publication and whether there was a known rate of error. In

3  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court made clear that this

4  "gatekeeper" function extends to all expert evidence, not just scientific expert evidence. The

5  Court noted that the *Daubert* factors would not necessarily apply to all types of expert evidence,

6  and stated that the district court should be flexible in applying an appropriate inquiry into the

7  reliability of the proffered expert evidence depending upon the facts of the particular case.

     While the Special Master was genuinely impressed with Mr. Ocampo as an individual,

8  Mr. Ocampo lacked the knowledge, background and experience necessary to qualify as an expert

9  witness on the issue for which he was offered. HP, the insured in question, initiated the Nu-kote

10 action, asserting patent infringement, trademark infringement and false advertising claims

11 against Nu-kote. In response to the complaint, Nu-kote asserted antitrust and other

12 counterclaims, which it is fair to say were very broad in scope. Mr. Ocampo did not testify with

13 respect to any experience related to seeking insurance coverage under a policy similar to the

14 ACE policy under circumstances similar to the Nu-kote action. Based upon his testimony, Mr.

15 Ocampo had no experience in circumstances similar to those presented in the Nu-kote action,

16 i.e., attempting to obtain insurance coverage in connection with the defense of antitrust claim

17 that also involved competing intellectual property issues. Mr. Ocampo's subjective opinions

18 based on his personal experiences which did not include cases or situations like those faced by

19 HP in the Nu-kote action are not pertinent to the issue at hand. Accordingly, HP's motion to

20 strike Mr. Ocampo's testimony is GRANTED.[7]  In the event that the Court disagrees with the

21 Special Master's ruling regarding the admissibility of Mr. Ocampo's testimony, in the next

22 section of this report, the Special Master will address the merits of Mr. Ocampo's testimony.

### C. Mr. Ocampo's Reasonable Insured Testimony

     HP contends that Mr. Ocampo's opinion testimony about HP's motives for asserting its

intellectual property rights are not relevant to the "conducted against liability" issue. HP asserts

that Mr. Ocampo's testimony essentially was that if an insured like HP has mixed motives for a

litigation strategy or tactic and one or more of those motives are unrelated to its defense, an

insurer like ACE should not have to reimburse the insured for the fees and costs incurred in

---

[7] While the Special Master would have denied HP's motion to strike Mr. Ocampo's testimony "that was not fully disclosed in his expert report," in light of the above ruling, the motion is MOOT.

pursuing that strategy or tactic. HP contends that the law is the just the opposite – HP's subjective motives are not relevant to the standard at issue.

HP further argues that the *Aerojet/Barrett* criteria also do not require the Special Master to decide whether a reasonable insured would have expected to be reimbursed by its insurer for its affirmative tactics – the cases only require him to decide what a reasonable insured in HP's position would have done to defend itself under the same circumstances and in light of the relative costs and benefits. HP asserts that any reasonable insured in HP's position and unwilling to abandon a substantial amount of its business to an antitrust plaintiff seeking a large reduction in HP's market share would have defended its interests as HP did. HP contends that the "reasonable expectations doctrine" has no application to the "conducted against liability" analysis. HP asserts that the doctrine comes into play only when the language of an insurance policy relevant to a particular question of coverage is ambiguous, and then the court protects the "objectively reasonable expectations" of the insured by interpreting the provision in the sense that the insurer reasonably must have believed the insured understood it at the time the policy was issued. HP asserts that as there is no ambiguous policy language to construe here, there is no basis for applying the reasonable expectations doctrine in this case, and even if there were some basis for applying it here, the doctrine requires a court to resolve the ambiguity in favor of the insured by extending coverage to the insured. HP notes that Mr. Ocampo did not testify about the meaning of any provision of ACE's policy. HP asserts that while ACE apparently wants the Special Master to apply the "reasonable expectations doctrine" to determine whether any HP litigation and trial strategies and tactics were not "conducted against liability" from the standpoint of a reasonable insured under the same circumstances, there is no legal basis for the Special Master to do so. HP further asserts that Mr. Ocampo finally opined that HP's "conducted against liability" defense was reasonable.

ACE contends that Mr. Ocampo's testimony responds to Judge Ware's standard requiring analysis of what a reasonable insured would do under circumstances faced by HP. ACE asserts that neither *Barratt* nor *Aerojet* preclude evidence regarding the insured's motivation when analyzing whether prosecution expenses were "conducted against liability." ACE asserts that "the purported preclusion of motive or subjective intent in *Aerojet* and *Barratt* does not involve prosecution expenses incurred in litigation." ACE asserts that HP's motivation in initiating the action by filing its intellectual property lawsuit is relevant and probative of the applicable

standard. ACE asserts that if HP's sole motivation in prosecuting its action, both before and after the filing of the antitrust counterclaim, was to protect its intellectual property rights, the fact that the prosecution may have had some strategic benefit to the defense of the cross-complaint is of no moment. ACE asserts that "by failing to consider HP's motivation, and blindly accepting its "beneficial strategy" argument, "you take the reasonable out of the standard and you really give the insured a blank check." (RT. 422:4-19). ACE further asserts that HP's motivation is an inherent factor of any cost-benefit analysis required by the "conducted against liability" standard. ACE asserts that in order to determine the benefit provided by litigation activity, HP's motivation must be analyzed. ACE asserts that while HP has downplayed the value of prosecuting the affirmative claims in the Nu-kote litigation, suggesting that the only value of such effort was to defend against the antitrust counterclaim, "if that were the case, then it would be difficult to justify conducting Phase I except if the benefits to such litigation in terms of defense outweighed the costs." ACE asserts that "because HP derived substantial benefits unrelated to the insurance defense by pursuing the Phase I litigation: HP's primary motivation was to protect its intellectual property rights and dissuade competitors."

The case was referred back to Special Master to assess which of HP's expenses "would be conducted against liability by a reasonable insured under the circumstances." A review of the cases and the Court's orders reveals that an answer to this question compels the review of the following issues: (1) whether the conduct/strategy/expenses amount to a reasonable and necessary effort to avoid or at least minimize liability; (2) whether the expenses incurred pursuant to the conduct/strategy are reasonable and necessary to avoid or minimize liability – a connection between the expenses and conduct/strategy; (3) the benefits of the strategy or conduct; and (4) the cost of the strategy or conduct or that purpose. From these facts, the Special Master may determine whether a reasonable insured would have engaged in a similar defense strategy, i.e., whether HP's reasonably related prosecution expenses are likely to have been incurred by a reasonable insured under the same circumstances. *See Aerojet* at 6-61; *Barratt* at 861-862; and October 14, 2004 Order at 3-4.

The pertinent portion of Mr. Ocampo's testimony was that: (1) HP would have prosecuted its affirmative intellectual property claims whether or not antitrust counterclaims were filed and independent of any insurance reimbursement; (2) HP had no reasonable expectation of insurance reimbursement when it prosecuted its affirmative intellectual property

1   claims; and (3) the continued prosecution of HP's intellectual property claims was not

2   undertaken for defensive purposes. (RT. 409:11-23; 409:24-410:6; 410:17-411:3).

3          None of Mr. Ocampo's opinions are relevant to the issue to be resolved by the Special

4   Master. Mr. Ocampo's opinion regarding the importance of HP's affirmative claims to HP

5   irrespective of the Nu-kote counterclaims goes to HP's motive. HP's motivations, however, are

    not relevant to the test. In *Aerojet*, the Court stated:

6
7          Whether the insured's site investigation amounts to a reasonable and necessary
           effort to avoid or at least minimize liability must also be assessed under an objective
8          standard...[w]hat matters here is whether the site investigation would be conducted
           against liability by a reasonable insured under the same circumstances.
9
10         Were it not, the question would require a discernment of motive. Why is the
           insured conducting the site investigation at issue? to resist liability? for that reason and
11         some other? for a reason altogether different? Motive, however, is hard ... to discern.
           That is true ... as to an individual: a person's mind and heart typically reveal themselves
12         and conceal themselves at one and the same time. It is truer still ... as to a group of
           individuals: many minds and hearts are then involved, and they cannot simply be added
13         up. And, of course, it is truest ... as to a corporation or similar entity. - like the typical
           commercial or governmental insured: the mind and heart of such a one is purely fictive.
14
15  *Id.* at 62-63 (internal citations and quotations omitted).   Which respect to the dual purposes for

16  expenses, the Court stated that:

17         For instance, the insured's site investigation expenses for identifying the
           hazardous substance discharged may be "response costs" insofar as they promote
18         removal and remediation, by enabling it to determine how to neutralize the substance in
           question. They may also be defense costs insofar as they are reasonable and necessary to
19         avoid or at least minimize liability, by making it possible for it to show that it was not in
           fact the source of the discharge. Any assumption that site investigation expenses cannot
20         do double duty is unsupported and hence must be rejected. So too any similar assumption
           about the site investigation itself. If site investigation expenses must be incurred by the
21         insurer in fulfilling its duty to defend the insured, they must be incurred. The insurer
           gives, and the insured gets, what they bargained for. Even if the insured may happen to
22         derive some added benefit, the insurer does not shoulder any added burden. The insurer
           may not be heard to complain.
23
24
25  *Id.* at 65-66 (emphasis added). In *Larkin v. ITT Hartford*, 1999 WL 459351 (N.D.Cal. 1999), the

26  court stated that:

27         The Court recognizes that some of the actions taken by plaintiffs' counsel in
           *Larkin* may also have been reasonable and necessary to the defense of the *Navone* action,
28         and plaintiffs may not have duplicated such actions in *Navone* precisely because they had
           already been performed in connection with *Larkin*. In these circumstances, such actions

and the expenses associated with them may properly be characterized as Navone defense costs--provided they are performed during the temporal limits of the duty to defend--and the fact that they did "double duty" in both suits does not prevent such characterization. *See Aerojet*, 17 Cal.4th at 63.

*Larkin* at *7.  In *Barratt,* the court stated that:

> To the contrary, in reaching its conclusion, *Foster-Gardner* expressly reaffirmed *Aerojet-General's* holding that an insurer has a duty to pay defense costs if the costs are incurred between tender and settlement of a lawsuit, and if the defense investigation and expenses are reasonable and necessary to mount a defense in a pending lawsuit. (*Foster-Gardner*, supra, 18 Cal.4th at 886.) Under *Aerojet-General*, a liability insurer must bear these defense costs even if the insured obtains additional benefits from the expenditures, and even if the same costs could potentially be characterized as an indemnification cost in a different context. (*Aerojet-General*, supra, 17 Cal.4th at 65-66.)
>
> ...
>
> As applied here, these principles mean that the costs incurred by Barratt are potentially recoverable even though they may serve more than one objective. If Barratt's expenditures qualify as defense costs in the Cortina action, they do not lose that status merely because the costs are not independently recoverable based on the nonplaintiff property damage claims. Under *Aerojet-General* and *Foster-Gardner*, the critical issue is whether the costs were reasonably and necessarily incurred in defense of an existing lawsuit. If the investigation costs satisfy this test, they are recoverable even if the payments of these costs benefited a third party who did not file suit against the insured.

*Barratt* at 859-860.  Finally, in *KLA-Tencor*, the court first stated that:

> Neither party disputes that bringing a successful claim for infringement of the '055 patent in *Therma-Wave I*, and winning damages pursuant to that claim, was one of KLA's objectives. But as *Barratt* makes clear, these costs are potentially recoverable even if they serve more than one objective. *See Barratt*, 102 Cal.App. 4th at 860. KLA asserts, essentially, that the best defense to the disparagement counterclaims was showing that the '055 patent was valid, and further that Therma-Wave's Opti-Probe products infringed that patent. Considering KLA's potential for liability based on its internal investigation, this was not an unreasonable strategy.

*KLA* at *4.

In sum, while the Special Master understands ACE's desire to focus upon the value/importance of HP's affirmative claims against Nu-kote to HP's "cash cow," HP's motives are not pertinent to issue to be resolved by the Special Master.  Moreover, and to ACE's detriment, the testimony at both the damages hearing and the remand hearing was that while the affirmative claims had substantial value to HP, by 1998, the affirmative claims were equally if not more important to HP as a means to defeat Nu-kote's counterclaims. By 1998, Nu-kote's financial situation deteriorated significantly. HP made substantial efforts to settle the case,

offering dismissal of the claims against Nu-kote, millions of dollars in cash, license rights and an arrangement under which HP would make cartridges for Nu-kote below the cost Nu-kote could get them elsewhere. In mid-1998, HP and Nu-kote's CEO negotiated a settlement agreement. However, Ron Katz, Nu-kote's counsel, persuaded the board of directors to reject the proposed settlement based upon his belief that hundreds of millions of dollars could be obtained from HP in the lawsuit. (HT 651:1-19.) In November 1998, Nu-kote filed a Chapter 11 bankruptcy petition and immediately sought relief from the automatic stay to continue its case against HP. HP (and Nu-kote's insurers who were funding its litigation against HP) opposed lifting the stay. The bankruptcy judge, however, granted Nu-kote's motion and permitted the case against HP to continue. Thus, by late 1998, HP's hopes for damages award were subsumed to HP's desire to defeat Nu-kote's counterclaims. With respect to HP's claims for injunctive relief, the testimony at the hearings was that by the time of trial, the vast majority of Nu-kote's infringing products had been replaced. In short, the record at hearings compels the conclusion that not only is Mr. Ocampo's "motives" testimony irrelevant, it is contrary to the facts. To the extent that Mr. Ocampo's testimony on this point is entitled to any weight, it was substantially outweighed by the testimony from HP's counsel and HP's experts.

Mr. Ocampo also testified that HP had no reasonable expectation of insurance reimbursement when it prosecuted its affirmative intellectual property claims. ACE has completely failed to establish the relevance of HP's reasonable expectations of insurance coverage/reimbursement. As an initial matter, the fact that HP initiated the lawsuit with affirmative claims is irrelevant. Nu-kote responded to the lawsuit with counterclaims. Mr. Ocampo did not testify about the policy provisions, and did not review the relevant cases. Mr. Ocampo did not testify to whether HP should have expected its insurance company to provide a defense to the counterclaims. The Court has found on numerous occasions that ACE did have a duty to defend the counterclaim. The duty necessarily extends to all the counterclaims, and under the relevant law, can extend to prosecution expenses under certain circumstances. Mr. Ocampo's reasonable expectations testimony is irrelevant to the issues to be decided.

Mr. Ocampo further testified that the continued prosecution of HP's intellectual property claims was not undertaken for defensive purposes. (RT. 409:11-23; 409:24-410:6; 410:17-411:3). Here, assuming that Mr. Ocampo is talking about the prosecution of HP's affirmative claims after tender of the Nu-kote counterclaims to ACE, Mr. Ocampo's testimony is at odds

with the testimony of Professor Menell, who opines that the prosecution of HP's affirmative claims was defensive to portions of Nu-kote's counterclaims before and after Phase I of the trial. To the extent that Mr. Ocampo is taking the position that irrespective of the fact that HP's claims were technically defensive to a number of the Nu-kote counterclaims, HP's affirmative claims were not actually pursued for that reason, the testimony at the damages and remand hearings is to the contrary. In brief, the weight of the evidence at the hearing was that in the post-tender period, HP's continued prosecution of HP's intellectual property claims was undertaken for defensive purposes.

Finally, and as argued by HP, Mr. Ocampo's testimony buttresses HP's position that HP's conduct was not unreasonable. While Mr. Ocampo was offered to show the unreasonableness of HP's conduct/strategy in the Nu-kote case, Mr. Ocampo did not identify any conduct/strategy or expenses that he found to be unreasonable or unnecessary. Mr. Ocampo did not review HP's bills. On cross-examination, Mr. Ocampo admitted that in litigation there are instances "where you could conduct prosecution efforts that would amount to a defense of the counterclaims." (RT. 442:5-7.) He also admitted that HP's dual motives for prosecuting its claims did not mean that HP's "pursuit of intellectual property rights as a defense mechanism in the Nu-kote case" was inappropriate. (RT. 447:18-449:2.) He also admitted that not one of HP's strategies for defending itself in the Nu-kote Action was unreasonable. (RT. 449:3-451:12.) Mr. Ocampo agreed that it was reasonable for HP to try to portray itself "in a favorable light in order to defend against the counterclaims that Nu-kote presented." (RT. 436:18-438:5.) He admitted that HP's "successful prosecution of [its] affirmative claims would have a favorable effect on the defense of the antitrust claims." (RT. 439:1-8.) Mr. Ocampo testified that he "[did] not believe that [HP] did anything from a litigation standpoint that was necessarily unreasonable in prosecuting its claims . . . even from a defense standpoint." (RT. 445:15-20.)

In sum, Mr. Ocampo's testimony does not support ACE's position that portions of the fees and costs sought by HP were not conducted against liability by a reasonable insured under the circumstances. Even if it did support ACE's position, Mr. Ocampo's testimony is entitled to little or no weight, and was substantially outweighed by the testimony offered by HP at the damages and remand hearings, including the testimony of Mr. Blecher on the issue of what a reasonable insured would have do under the circumstances faced by HP.

//

//

**V.    ACE's Argument that HP's Affirmative Claims Tried During Phase I of the Trial Were Not "Conducted Against Liability"**

ACE next contends that Hewlett-Packard's affirmative claims tried during Phase I of the trial were not conducted against any liability and thus are non-reimbursable to HP.   In reliance upon Professor Menell's testimony, ACE asserts that the underlying Nu-kote case was litigated in such a way that as of May 7, 1999, the affirmative case was not conducted by HP against any liability it faced by virtue of Nu-kote's counterclaims.  This assertion is based upon three arguments:  (1) HP moved successfully for summary judgments which eliminated the majority of Nu-kote's counterclaims, which eliminated any possible overlap between proof of HP's claims and their utility as a defense against Nu-kote's counterclaims; (2) HP argued that Nu-kote's state law claims had no place in the trial and Judge Ware severed them from the trial; and (3) HP contended that the remaining antitrust counterclaims were not "inextricably intertwined" with its case against Nu-kote and convinced Judge Ware to allow HP to try its patent and trademark infringement claims in a separate Phase I trial.

A. "Inextricably Intertwined"

ACE asserts that as the Nu-kote case approached trial, HP moved to eliminate Nu-kote's overlapping claims, and to phase the HP claims for an earlier and separate trial.  As is discussed in section C below, ACE believes that the Court had winnowed down Nu-kote's counterclaims down such that HP's affirmative claims were no longer conducted against any liability posed by any of the Nu-kote counterclaims.  ACE then makes the following argument:

> After Judge Ware's rulings completely eliminated any possible overlap between proof of HP's claims and their utility as a defense against the Nu-kote counterclaims, HP went right ahead and asked Judge Ware to set these claims for trial separately and independently from its defense of the Nu-kote counterclaims.
>
> HP requested that it be permitted to try its patent infringement, trademark infringement, false advertising case in a separate, first phase of the trial, and before Nu-kote would be allowed to try any of its case against HP.  HP told Judge Ware that the claims and counterclaims were not "inextricably intertwined," but were indeed completely separate.  Based on HP's request, Judge Ware divided the case into two phases and ordered that HP affirmative claims be tried separately and first in a Phase I trial.
>
> The elimination of the counterclaims by Judge Ware and his separation of the case into separate and independent phases confirmed that the fees and expenses attributable to the Phase I trial were not conducted against any Nu-kote liability, and therefore are not reimbursable.

-77-

(ACE Opening Post–Remand Hearing Brief at 27; *see also* id at 16.)

ACE's argument with respect to the phasing order and statements made by counsel for HP in the Nu-kote action does not accurately reflect what occurred in the Nu-kote trial vis-à-vis HP's efforts to have its affirmative claims heard first by the jury. While the Special Master sincerely doubts the initial report and recommendation by the Special Master confused ACE with respect to the actual events in the Nu-kote action, the initial report and recommendation did include a misstatement of the record. Therein, the Special Master noted that:

> In support of its argument to phase the trial and stay Nu-kote's counterclaim in the underlying matter, HP stated that: "the vast majority of Nu-kote's anti-trust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case." (Exhibit 2142; HT 2349:21-24.). HP prevailed on its phasing motion, and the court allowed HP's affirmative trademark infringement, false advertising, and patent infringement cases to proceed first.

Unfortunately, this statement by the Special Master did not accurately reflect the record. More unfortunately, Judge Ware, in his November 25, 2003 Order, appears to have relied upon this passage of the Special Master's initial report, at least in part, as follows:

> In this case, a trier of fact could reasonably conclude that ACE presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims. First, there is evidence from HP itself. During the underling lawsuit between HP and Nu-kote, HP argued before this Court that "the vast majority of Nu-kote's anti-trust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case." HP prevailed on this argument and this Court allowed HP's affirmative claims to proceed before the anti-trust claims.

November 25, 2003 Order at 9-10.

In reality, HP's "inextricably intertwined" statement was made in 1996, more than two years prior the actual phasing of the trial in 1999. In late 1996, HP filed a renewed motion for separate later trials of Nu-kote's antitrust-based claims and damages and for stay of related discovery. In their reply to the motion, HP stated in a heading that "the vast majority of Nu-kote's antitrust allegations are not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case." (Ex. 2142; Damages Hearing Transcript ("HT"), 2349:21-24.) Immediately after making this statement, HP asserted that:

> *While resolution of the patent validity and fraud issues as well as the false advertising claims may obviate trial on certain of Nu-kote's antitrust allegations and counterclaims,* determination as to (i) whether certain prior art renders the patents-in-suit

obvious, (ii) whether HP withheld relevant and non-cumulative prior art with the specific intent of defrauding the Patent Office, (iii) whether Nu-kote's product packaging and use of HP's trademarks and the trade name are likely to cause consumers to mistakenly believe that Nu-kote's inkjet products are HP product or are licensed or sponsored by, otherwise affiliated with HP, or (iv) whether Nu-kote's packaging falsely states that its inkjet products are 'equivalent' to specific number of genuine new HP inkjet cartridges are plainly *not* inextricably related to, and intertwined with the vast majority of facts underlying Nu-kote's antitrust allegations …

(Ex. 2142 at 6-7 (emphasis added).)

The next section of HP's 1996 reply brief is entitled "Separating the Patent/Unfair Competition and Antitrust Issues In This Case Will Simplify the Issues In Any Subsequent Antitrust Trial." (*Id.* at 8.) HP then made the following argument, which is highly pertinent to the present proceeding:

Although the vast majority of Nu-kote's antitrust allegations are not intermingled with, and dependent on, facts underlying the issues of patent infringement, validity, unenforceability on the basis of fraud before the Patent Office, trademark infringement and false advertising/unfair competition, *several of the allegations underlying Nu-kote's antitrust counterclaims do involve issues and proofs that are directly related to underlying, dispositive patent and trademark infringement/unfair competition issues.*

For example, Nu-kote alleges that HP intentionally instituted this "*sham litigation*" in a "surprise attack" effort and as part of a global conspiracy with other printer manufacturers to coordinate sham legal actions to "unfairly reduce or eliminate competition in the aftermarkets for Hewlett-Packard ink jet resupply cartridges and refill kits." (*See* Nu-kote's Amended Answer ¶¶ 68-70, 78-79, 82, 84.) However, if HP prevails on its claims of trademark and patent infringement, then a separate trial based on Nu-kote's claims based on its assertions that HP has instituted objectively baseless (i.e., sham) lawsuit, whether or not as part of a conspiracy with others, is necessarily obviated. Thus separation would streamline the case.

Further, if HP prevails at a first trial on the patent validity and infringement issues, Nu-kote's patent-type antitrust defense of fraudulent procurement and enforcement of patents known to be invalid or noninfringed is rendered moot and a second trial on that defense is completely unnecessary …

If, on the other hand, Nu-kote succeeds at a first trial in proving that HP's asserted patents are invalid or not infringed, a second trial on HP's assertion of known fraudulently procured, invalid or noninfringed patents would be significantly simplified and streamlined since patent invalidity and/or noninfringement would be "law of the case" and Nu-kote need not again prove those same issues at the later trial. . . .

Finally, separation will also obviate consideration of certain of Nu-kote's predatory conduct allegations in a later antitrust trial. For example, if HP's public statements concerning Nu-kote's inkjet refill kits or refilling in general are true, then these false advertising/unfair competition allegations cannot constitute evidence of anticompetitive or monopolistic behavior. If, however, Nu-kote wins on these claims, then there would be no need to retry them at a later antitrust trial.

(*Id.* at 8-0 (emphasis added) (footnote omitted).

Accordingly, while HP argued that the "vast majority" of Nu-kote's anti-trust allegations were not inextricably related to the patent, trademark and false advertising, unfair competition issues in this case," HP also argued that several of the allegations in Nu-kote's counterclaims *did* involve issues and proofs that were directly related to underlying, dispositive patent and trademark infringement/unfair competition issues.[8]  The evidence presented during both the damages hearing and the remand hearing confirms that HP moved to bifurcate the trial between the intellectual property and antitrust issues, not because they were "separate," but rather HP sought two separate trials because that would avoid unnecessary antitrust discovery and simplify the case, allowing the jury to focus on HP's strong points first in an initial trial (innovator and that HP's wore the "white hat") – at a time when Nu-kote could not present its own antitrust case – which would set up the very defenses that would ultimately defeat Nu-kote's counterclaims. (RT. 839-851 (testimony of Peter Sullivan); HT. 721-723 (testimony of Jonathan Marshall); and HT. 22114-2230 (testimony of Mr. Blecher).)

Despite HP's argument, the 1996 motion to bifurcate was denied.  Contrary to ACE's suggestion, HP did not prevail on its argument that the claims and counterclaims were "separate."  Moreover, there was no evidence presented to the Special Master suggesting that in 1999, when HP requested that the Court phase (not bifurcate) the trial, HP repeated any portion of the arguments made in 1996, or that HP repeated only the "not inextricably intertwined" portion of the argument in 1999.  Instead, the evidence presented at the damages hearing and remand hearing reveals that HP asked to "phase" the trials so that it could present its best evidence early in the trial, i.e., HP's request to phase the trials, just like its motion to bifurcate, was part of HP's overall strategy to use the affirmative claims as a defense to the counterclaims but was not indicative of a belief that the cases were "separate" in the sense that ACE argues. (RT. 814-816, 829, 850:10-851:3, 909, 926 (Mr. Sullivan); HT. 1689-1690 (Ronald Griffin); and HT. 473-474 (Mr. Pecau).)  Notably, ACE did not offer any evidence with respect to the nature of HP's 1999 request that the trial be phased.

---

[8] HP's 1996 argument is remarkably similar to the theory asserted by ACE's expert, discussed below, regarding the defensive nature of HP's affirmative claims.