1    In sum, ACE has mischaracterized HP's 1996 reply brief, and HP's reliance upon the

2  "inextricably intertwined" statement in 1996 is misplaced.  Further, ACE's argument that HP

3  asserted to Judge Ware in 1999 that HP claims and Nu-kote counterclaims "were completely

4  separate" is not supported by the record.

5    In a somewhat related argument, ACE asserts that "HP always believed its affirmative

6  case and the antitrust counterclaims were separate." (ACE Opening Post-Remand Hearing Brief

7  at 16-18.)  ACE asserts that:  (1) throughout Phase I, HP vigorously maintained that its

8  affirmative case was separate and distinct from Nu-kote's antitrust counterclaims, and objected

9  to Nu-kote's attempts to mix the two during trial (citing *inter alia*, Mr. Cooper's suggestion that

10 the Court should  impanel a second jury to hear and consider Nu-kote's antitrust claims); and (2)

11 that the Court reminded counsel and the jury that he regarded "the two cases as separate."  ACE

12 asserts that "HP's judicial admissions that its affirmative patent claims and Nu-kote's antitrust

13 counterclaims were separate and distinct are dispositive and irreconcilable with HP's present

14 argument that the Special Master should view the underlying case "inextricably intertwined" for

15 purposes of insurance coverage.  ACE further asserts that "consistent with its position that the

16 intellectual property claims and antitrust claims were distinct," HP retained two law firms to

17 represent it in the action - Pennie & Edmonds, a firm noted for its patent expertise, Gibson Dunn

18 & Crutcher because of its antitrust expertise.

19    First, as noted above, HP's 1996 reply brief suggests that contrary to ACE's argument,

20 HP did *not* believe its affirmative case and the antitrust counterclaims were completely separate,

21 and instead argued to the Court that certain aspects of the affirmative claims and counterclaims

22 were "directly related."   Second, with respect to the statements/objections made by counsel for

23 HP during Phase I in response to counsel for Nu-kote's effort to inject antitrust issues during

24 Phase I, the evidence presented during the damages and remand hearings compels the conclusion

25 that HP's actions were consistent with HP's defense and phasing strategy.  The objections were

26 made to keep Nu-kote from asserting its "bad" antitrust evidence while HP presented its

27 affirmative claims to the jury.  (RT. 826-829:17 (Mr. Sullivan).)  Which respect to the jury

28 instructions given by the Court to consider each claim separately, HP offered compelling

   evidence that the instructions do not compel the conclusion that evidence in support of one claim

   cannot defend another claim, including the testimony of Professor Menell, discussed below, that

HP's affirmative claims operated as a defense to portions of the Nu-kote counterclaims for most of the case. (*See* HT. 2181-2182, 2185, 2187-2189, 2215-2216, 2258 (Mr. Blecher); HT. 1141:5-1143:15 (Mr. Cooper); and Special Jury Instruction No. 14, Ex. 1603 at 7:27-8:3 ("A company may not be found to have willfully acquired or maintained monopoly power if it has acquired or maintained that power . . . by obtaining a lawful patent").)

The statement during Phase I by Mr. Cooper, HP's counsel, suggesting that the Court empanel a second jury, does not prove or establish that the affirmative claims and counterclaims were "separate" in the way ACE uses that term. Mr. Cooper was concerned that the jury had been infected by Nu-kote's efforts to argue sham litigation during Phase 1, so he suggested a new antitrust jury because it gave HP the opportunity to reassert its original bifurcation defense strategy. (TT. 3554:2-9; RT. 1022:16-1023:9.) As Mr. Sullivan testified, if HP had prevailed on its affirmative claims in a separate trial before a separate jury, the rulings likely would have severely restricted the scope of the subsequent antitrust trial. (RT. 848-850:9, 1022:16-1023:9.) The statement by Mr. Cooper does not compel the conclusion that the affirmative claims could not be used to defeat the legal liability posed by the counterclaims. Finally, the Special Master is not persuaded by ACE's argument that HP's use of separate law firms shows that the affirmation claims and antitrust claims were "separate."

In sum, ACE's assertion that HP "admitted" that its affirmative claims and Nu-kote's antitrust counterclaim were separate and distinct is not supported by the record.

### B. State Law Claims

ACE contends that HP's Phase I case was not conducted against any liability posed by the severed state-law claims. ACE asserts that Nu-kote's state law claims succeeded or failed on precisely the same predicate acts as those alleged in their federal counterparts. ACE asserts that when Judge Ware eliminated the federal counterclaims by his summary judgment rulings, any corresponding liability posed by the analogous Nu-kote state court claims was eliminated as well. In pertinent part, ACE asserts that "HP conceded in 1999 that the liability posed by the state court counterclaims had been eliminated by Judge Ware's rulings," citing exhibit 1598 (HP's response to Nu-kote's opposition to the Court's stated intent to dismiss the state law claims as cumulative). ACE asserts that exhibit 1598, filed in accordance with Fed.R.Civ.P. 11, is a binding admission by HP that it believed each of the state-law claims had been eliminated and that HP did not face any liability from such claims.

On April 21, 1999, the Court issued an Order Setting Briefing Schedule. The Order provides in pertinent part that:

> It is the Court's intention to dismiss all of the parties' respective state law claims pretrial on the basis that the claims are cumulative of the federal claims and do not provide a basis for any additional damages or equitable relief.

(Ex. 1597.) To the extent that the parties objected to the Court dismissing the claims, the parties were given the opportunity to file briefs in opposition. *Id.*

Nu-kote submitted an opposition on May 3, 1999. (Ex. 1598) Nu-kote asserted that: (1) Nu-kote's state law claims were not cumulative of its federal claims, on the grounds that the state law claims set forth different standards of proof than the related federal claims, and that some claims provided additional damages to the federal claims (including Nu-kote's claim for interference with economic advantage, which provided damages for lost profits and had no federal counterpart); (2) in the event that Nu-kote failed to prove at trial that HP's conduct injured competition, as opposed to a specific competitor, Nu-kote could still prevail on the interference claim based upon the harm suffered by Nu-kote; and (3) if the state law claims were dismissed, they should be dismissed without prejudice.

HP's response is dated May 10, 1999. (Ex. 1598) Therein, HP asserted that: (1) the court had already granted summary judgment against Nu-kote's state law claims of false advertising and defamation-related claims (counterclaims 8-10); (2) if there was anything left of Nu-kote's unfair competition claim (count 10) after the court's partial summary judgment rulings, it could only relate to whether the conduct that formed the basis for Nu-kote's tying and conspiracy claims, despite being lawful, was unfair, but the California Supreme Court had recently confirmed that conduct that does not rise to the level of an antitrust violation is not "unfair" for purposes of the unfair competition law; (3) the court had effectively disposed of Nu-kote's Cartwright Act claim (counterclaim 7) by ruling in connection with Nu-kote's federal tying claims, that no reasonably jury could conclude that "HP did not have legitimate business justifications" for its inkjet cartridge design, or that HP had any agreements with other printer manufacturers to restrain competition; (4) those holdings were fatal to Nu-kote's claims under the Sherman Act and the Cartwright Act; (5) "there is no reason not to dismiss Nu-kote's intentional interference claim because Nu-kote has conceded that … 'there is no admissible evidence of any wrongful conduct or statements by HP that caused the disruption of any

1    economic relationship' between Nu-kote and its resellers;" (6) all of Nu-kote's state law claims

2    should be dismissed with prejudice. *Id.*

3        On May 10, 1999, Judge Ware issued an Amended Final Pretrial Conference Order. (Ex.

4    1601.) The order provides *inter alia* that "[t]he Court orders off-calendar and bifurcates for later

     proceedings all state-law claims and defenses and all equitable defenses to federal claims." *Id.*

5        In light of the May 10, 1999 order, Nu-kote' state law claims were not dismissed from the

6    action. While HP essentially argued that the state law claims had already effectively been

7    dismissed, HP lost the argument. ACE's suggestion that HP's losing argument is somehow an

8    admission that the state law claims had no merit is not supported by the record. The state law

9    claims were not dismissed, remained viable and were left for later consideration. ACE's

10   assertion that HP's opposition argument is a binding admission by HP that it believed each of the

11   state-law claims had been eliminated and that HP did not face any liability from such claims is

12   without merit. Given the fact that the Court did not dismiss the state law claims, any reasonable

13   defendant (in this case an insured defendant) would assume that the claims remained in the case,

14   and had to be defended. The Special Master will address below ACE's assertion that when

     Judge Ware eliminated portions of the federal counterclaims by his partial summary judgment

15   rulings, any corresponding liability posed by the analogous Nu-kote state court claims was

16   eliminated as well.

17                        C. Testimony of Professor Menell

18       ACE offered the testimony of Professor Peter Menell to determine whether HP's

19   expenses were "conducted against liability."[9] ACE asserts that the import of Professor Menell's

20   testimony is that

21       as of May 7, 1999, Nu-kote's counterclaims had been whittled down to the point that
         HP's affirmative claims of patent and trademark infringement and false advertising were
22       no longer defensive to Nu-kote's remaining counterclaims. The facts supporting or
         defending the causes of action addressed in Phase I did not overlap the elements of the
23       antitrust counterclaim that ultimately went to trial in Phase II. Thus, Professor Menell
         concluded that as of May 7, 1999, none of the expenses that HP incurred in connection
24       with the Phase I trial of HP's affirmative claims were conducted against liability

25

26

27   _____

28   [9] Professor Menell, however, did not testify with respect to whether litigation activities would be conducted against
     liability by a reasonable insured under the same circumstances. His analysis was instead limited to overlapping
     elements of the parties' claims, and did not address what a reasonable insured might do under the circumstances.

Professor Menell testified that he reviewed extensive amounts of materials from the Nu-kote action, including the motions for partial summary judgment, the orders on the motions, and the trial transcripts. (RT. 120:3-13.) Professor Menell interpreted Judge Ware's October 2003 and November 2004 orders to mean that as of the date of the filing of the fourth amended answer and counterclaim by Nu-kote, there was some overlap between Nu-kote's counterclaims and HP's affirmative claims, and his review of the records of the Nu-kote action attempted to determine whether there was some point at which the HP's affirmative claims no longer overlapped with the Nu-kote counterclaims, i.e., at what point HP's affirmative claims were no longer conducted against liability. (RT. 121:16-122:6.) Professor Menell understood "conducted against liability" to mean an overlap of elements, something that would "directly disprove [an element] in Nu-kote's case." (RT. 216:24-217:17.) Moreover, Professor Menell considered "conducted against liability" to be an evidence "overlap" that "absolved" HP of liability. (RT. 217:25-218:4.) He therefore looked for aspects of HP's affirmative case that "would be a legal defense" to a counterclaim. (RT. 217:18-24.) In conducting this review, Professor Menell did not consider Nu-kote's counterclaim for declaratory relief, on the grounds that the declaratory relief claim did not subject HP to potential "liability.[10] (RT. 124:9-125:11.)

Professor Menell determined that *as of March 18, 1999, there were common issues of proof, such that HP's affirmative claims would in fact serve as defenses to Nu-kote's counterclaims, i.e., would be conducted against the liability of some of the counterclaims.* (RT. 127:2-11.) Professor Menell testified that HP's trademark infringement, false advertising and patent infringement claims all involved proof of the validity and enforceability of HP's trademarks and patents. (RT. 127:12-17.) Professor Menell testified that Nu-kote's monopolization (2nd), attempted monopolization (3rd), and California state law counterclaim claims (6th-11th) also involved the validity and enforceability of HP's trademarks and patents. (RT. 127:18-24.) Professor Menell testified that these aspects of HP's affirmative claims would serve "in a defensive posture," i.e., proof of trademark infringement, patent infringement and false advertising by HP would also serve as a defense to a specific allegations contained in Nu-kote's monopolization counterclaims and state law counterclaims. (RT. 128.) Professor Menell

---

[10] Professor Menell did testified that proving Nu-kote infringed HP's patents directly refuted Nu-kote's counterclaim seeking a declaration that it did not infringe. (RT. 353:13 – 355:11.)

1    testified that HP's proof of these issues overlapped with the following affirmative allegations by

2    Nu-kote:

3         (1)     HP had published knowingly false accusations that Nu-kote was infringing
                  its trademarks and patents;

4         (2)     HP had procured and sought to enforce invalid and non-infringed patents,
                  which Professor Menell labeled as "sham litigation;"

5         (3)     HP defrauded the Patent and Trademark office in prosecuting the '503
                  patent; and

6         (4)     HP had assembled a thicket of patents.

7    (RT. 129:1-22.)  These specific allegations, found in paragraphs 99, etc of the counterclaim, are

8    incorporated by reference into all of the counterclaims included in Nu-kote's 4th amended

9    counterclaim.

10        Professor Menell testified that there were several summary judgment motions that had the

11   effect of reducing and ultimately eliminating the overlap between HP's affirmative claims and

12   Nu-kote's counterclaims.  Professor Menell testified that:  (1) on April 8, 1999, Judge Ware

13   issued an order dismissing the patent thicket counterclaim (MSJ #7), and that the net effect of

14   this ruling was to dissolve away one of the overlapping issues, and thus shrink the amount of

15   overlap; (2) on April 9, 1999, Judge Ware issued an order on MSJ #4, which Professor Menell

16   testified required that Nu-kote narrow down the false accusations that would go to trial, and that

17   the effect of this ruling was to "get rid of the argument that HP falsely accused Nu-kote of

18   infringing its patents and trademarks;" (3) on April 29, 1999, Judge Ware issued an order on

19   MSJ #5 that eliminated all of Nu-kote's "sham litigation" assertions, wherein Judge Ware found

20   that HP was not engaged in objectively baseless litigation against Nu-kote; and (4) on May 7,

21   1999, Judge Ware issued an order dismissing Nu-kote's "inequitable conduct claim."  (RT.
129:23-132:14; *see also* Ex. 4212.)

22        Professor Menell also concluded that as a result of orders by Judge Ware dated April 21,

23   1999 and May 10, 1999 regarding Nu-kote's state law claims, Nu-kote's state law claims "were

24   out of the case" because all the bases (the overlapping predicate acts) for the claims had been

25   eliminated by the prior summary judgment rulings.  (RT. 266-288.)  Professor Menell testified

26   that while the state law claims may not have been entirely out of the case, there was nothing left

27   of that portion of the state law claims that overlapped with HP's affirmative claims.  (RT. 290-

28   299.)

Professor Menell concluded that as of May 7, 1999, as a result of the above rulings on HP's motions for partial summary judgment, the Nu-kote action had been sufficiently narrowed such that HP's Phase I affirmative claims were no longer conducted against liability. (RT. 120:14-21.) Professor Menell testified that as of this date, the "overlap" became separable, and none of the elements of the causes of action in HP's affirmative claims would serve to defend against the liability exposure of the counterclaims. (RT. 132:15-133:3.) Professor Menell testified that based upon his review of the conduct of Phase II, the Phase I activities had not been conducted against liability. (RT. 164.) He testified that because HP had not made reference to their patents and trademarks during Phase II (or the Phase II closing arguments), the trademarks and patents were not being used as defenses. (RT. 164-165.)

Professor Menell also reviewed the decisions made by Judge Ware during the trial with respect to objections and the interrelations of Phase I and Phase II. (RT. 165-166.) Professor Menell testified that the entire conduct of the trial and Judge Ware's efforts were oriented towards maintaining the separateness of HP's affirmative claims and Nu-kote's counterclaims. (RT. 166.) He testified that the examples of this separateness were: (1) the phasing of the trial; (2) HP's objections to Nu-kote's attempting to bring Phase II issues into Phase I, which were sustained by the Judge; (3) witnesses who could speak on both phases had to testify during both phases, i.e., had to be recalled during Phase II; (4) allowing witness introductions and summaries by counsel so as to explain to the jury the relevance of the evidence to the causes of action; and (5) allowing the jury to begin deliberations on Phase I issues at the end of Phase I; (6) the jury instructions and jury verdict forms. *Id.* at 167-176.

Importantly, Professor Menell testified that: (1) *prior to* May 7, 1999, as a result of these overlapping issues, what HP did in the litigation was "conducted against liability" (RT. 214:9-21; 215:19-23); and (2) what HP did in the litigation after Phase 1, i.e., from the beginning of Phase 2 of the trial until the end of the case, was also directly defensive to Nu-kote's counterclaims and was therefore, "conducted against liability." (RT. 215:4-23.)

## B. Does Professor Menell's Analysis Support ACE?

HP contends that Professor Menell's testimony was inadequate and incomplete. HP asserts that Professor Menell's mistakes of fact and of law invalidate his conclusions. HP asserts that: (1) California law directly contradicts ACE's spurious assumption that an expense is conducted against liability only if it completely avoids liability; (2) Professor Menell's

1   misunderstanding of partial summary judgment undermines his main conclusions; (3) Professor

2   Menell mistakenly believed that state law claims had been dismissed, but admitted that HP's

3   claims would defend against them; (4) Professor Menell failed to consider Nu-kote's remaining

4   equitable claims; (5) Professor Menell failed to consider Nu-kote's declaratory judgment claim;

5   (6) Professor Menell did no cost-benefit analysis; (7) Professor Menell did not quantify any

6   deductible litigation expenses; and (8) Professor Menell's "motives" testimony is irrelevant

    under the reasonable insured test.

7       In reply, ACE asserts that: (1) Professor Menell provided a thorough analysis of the Nu-

8   kote litigation in determining what was conducted against liability; (2) Professor Menell

9   considered Nu-kote declaratory relief claim, and concluded that it posed no liability to HP; (3)

10  Professor Menell correctly characterized the state of the litigation, and HP cannot deny that as of

11  May 7, 1999, HP's defense of the Phase II antitrust counterclaim was effectively separated from

12  Phase I in terms of elements of proof of the underlying causes of action; and (4) Nu-kote's state

13  law claims relied upon the very same factual predicates as the federal claims that preceded to

14  trial in Phase II, and HP cannot point to what aspects of the state law claims were even

15  theoretically viable.

16      Professor Menell's testimony during the remand hearing is essential to ACE's effort to

17  show that not all of the expenses incurred by HP in the post-tender period are recoverable.

18  While Professor Menell did not testify with respect to what a reasonable insured would have

19  done under the circumstances, his testimony is the key component of ACE's effort to show that

20  Phase I of the Nu-kote action was not conducted against liability. Unfortunately for ACE, even

21  accepting as true the premise of Professor Menell's testimony regarding the nature of the overlap

22  between Nu-kote's counterclaims and HP's affirmative claims prior to May 7, 1999, Professor

23  Menell's testimony that no there was no overlap between the claims and counterclaims after May

24  7, 1999 is fundamentally flawed.

25      As an initial matter, Nu-kote's state law claims, which incorporated all of the alleged

26  predatory acts, were not dismissed prior to trial. While HP argued that consistent with the

27  Court's statement of intention, Nu-kote's claims were cumulative of its federal claims and should

28  be dismissed, HP lost the argument – the state claims instead were bifurcated. HP's unsuccessful

    argument in 1999 does not render its current position, that the state law claims survived the

1   motions for partial summary judgment, improper. As is made clear by Exhibit 4212 and 4213,

2   Professor Menell clearly believed that proof of HP's affirmative claims overlapped with each of

3   Nu-kote's state law claims.  Given the survival of the state law claims, Professor Menell's

4   theory is dependent upon the orders on the motions for partial summary judgment eliminating all

5   of the allegations in the state law counterclaims that Professor Menell believes overlapped with

6   HP's affirmative claims.

7        While HP clearly believes that the connectedness of HP's prosecution of its affirmative

8   claims and Nu-kote's counterclaims was much broader than the overlap identified by Professor

9   Menell, HP does not quarrel with Professor Menell's more limited conclusion that proof of

10  trademark infringement, patent infringement and false advertising by HP would also serve as a

11  defense to a specific allegations contained in Nu-kote's monopolization (1st, 2nd) and state law

12  (6th-11th) counterclaims.  HP similarly does not quarrel with Professor Menell's assertion that

13  HP's proof of it claims overlapped with the following specific affirmative allegations by Nu-

14  kote:

- HP had published knowingly false accusations that Nu-kote was infringing its trademarks and patents;
- HP had procured and sought to enforce invalid and non-infringed patents, which Professor Menell labeled as "sham litigation;"
- HP defrauded the Patent and Trademark office in prosecuting the '503 patent; and
- HP had assembled a thicket of patents.

18       The key question, however, is whether Professor Menell is correct that these allegations

19  by Nu-kote were "removed" or "eliminated" from the action as of May 7, 1999, and thus no

20  longer provided support for Nu-kote's state law claims.  If any of these allegations remained in

21  the case, the basis for Professor Menell's conclusion that there was no longer any overlap and

22  thus Phase I expenses were not conducted against liability disappears.

23       Federal Rule of Civil Procedure 56(b) provides that a party against whom a counterclaim

24  is asserted "may, at any time, move with or without supporting affidavits for a summary

25  judgment in the party's favor as to all or any part thereof." "A summary judgment, interlocutory

26  in character, may be rendered on the issue of liability alone although there is a genuine issue as

27  to the amount of damages." Fed.R.Civ.P. 56(c).  Fed.R.Civ.P. 56(d) provides that:

   If on motion under this rule judgment is not rendered upon the whole case or for all the
   relief asked and a trial is necessary, the court at the hearing of the motion, by examining
   the pleadings and the evidence before it and by interrogating counsel, shall if practicable

ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

"Partial summary judgment" is a misnomer because no judgment is entered on such a motion. Rather, "a partial summary judgment is merely an order deciding one or more issues in advance of trial." *Minority Police Officers Ass'n v. South Bend*, 721 F.2d 197, 200 (7th Cir. 1983).

Professor Menell testified that the order regarding MSJ #4 effectively eliminated Nu-kote's allegation that HP had published knowingly false accusations that Nu-kote was infringing HP's trademarks and patents. This allegation is one of the numerous alleged predatory acts by HP, and was incorporated into virtually every counterclaim asserted by Nu-kote. A careful review of the MSJ #4 and the order on the motion reveals that Professor Menell simply is incorrect.

In MSJ #4, HP sought partial summary judgment of Nu-kote's allegations of false and misleading statements and improper marketing techniques *made in support of its claims for monopolization and attempted monopolization under Section 2 of the Sherman Act*, including but not limited to the allegations contained in paragraphs 92, 93 and 98 of Nu-kote's third amended counterclaims. The motion was brought on the grounds that: (1) Nu-kote had not adduced competent evidence of any statements by HP which rose to the level of exclusionary conduct under Section 2 of the Sherman Act; and (2) because Nu-kote had not adduced evidence of any injury linked to the statements, Nu-kote did not have standing to bring the Section 2 claim. HP requested that the Court find that Nu-kote's attempt to predicate its Section 2 claims for monopolization and attempted monopolization on allegations of false or misleading statements and improper marketing techniques failed as a matter of law.

Nu-kote's opposition asserted three allegedly false statements, none of which involved an accusation that Nu-kote had infringed HP trademarks and patents. The Court noted in order to prevail on a claim that false and misleading advertising constitutes exclusionary conduct in violation of Section 2, the plaintiff must present cumulative proof that the representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to

buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals. *American Professional Testing Service, Inc. v. Harcourt Brace Jovanovich Legal and Professional Publications, Inc.*, 108 F.3d 1147, 1152 (9th Cir. 1996)." The court found there was no evidence that HP's statements regarding damage to printers were clearly false, and granted partial summary judgment to the extent Nu-kote's § 2 claims were based upon these alleged misstatements. With respect to statements regarding the quality of refill ink and printer repair, the Court found that there was evidence that HP's statements were false, and could be offered in support of Nu-kote's Section 2 claims.

While the ruling limited the basis for Nu-kote's Section 2 claims, Professor Menell is mistaken to the extent he believes that the ruling eliminated the allegation that HP falsely accused Nu-kote of infringing HP's trademarks and patents. The ruling on MSJ #4 impliedly precluded Nu-kote's ability to rely upon its false accusation of infringement allegation in support of its Section 2 claims. The ruling, however, did not eliminate or impact Nu-kote's ability to rely upon the false accusation of infringement allegation in connection with Nu-kote's other counterclaims. While perhaps the ruling reflected a weakness in Nu-kote's case with respect to the false accusation of infringement allegations or that Nu-kote was not pursuing this particular allegation, nothing in the papers filed in connection with the motion or the order suggest or compel such a conclusion. The motion did not seek, and the Court did not order that due to Nu-kote's failure to identify a false accusation of infringement, Nu-kote was prohibited from offering evidence to support the allegation in support of other claims. As argued by HP, the order granted partial summary judgment as to a portion of Nu-kote's Section 2 claims, not summary judgment of the specific factual allegation made by Nu-kote. The allegation remained. Moreover, to be actionable under Section 2, the statements must be clearly false. The false accusation allegation was contained in and remained in Nu-kote's state law claims. Contrary to Professor Menell's assertions, the order did not "require[] that Nu-kote narrow down the false accusations that would go to trial," and that the ruling *did not* "get rid of the argument that HP falsely accused Nu-kote of infringing its patents and trademarks." Moreover, although not addressed by the parties, Nu-kote would have had to establish that only that the accusations were false, not clearly false, in connection with a number of their state law claims, including the unfair competition and trade libel claims.

1         In light of the foregoing, Nu-kote's allegation that HP falsely accused it of infringing

2   HP's trademarks and patents remained in the case as an allegation supporting Nu-kote's

3   remaining counterclaims, including all of the state law claims.  In other words, the overlapping

4   allegation survived the partial summary judgment orders.  Consistent therewith, under Professor

5   Menell's theory, HP's proof of trademark infringement, patent infringement and false advertising

6   claims continued defending against the liability posed by the false accusation of infringement

7   allegation.  In other words, HP's proof of its affirmative claims during Phase I was conducted

8   against the liability posed by the state law claims.  For this reason alone, Professor Menell's

    analysis fails.

9         Professor Menell's overreaching interpretation of the orders on the motions for partial

10  summary judgment infects the remainder of Professor Menell's "overlap eliminated" testimony.

11  Professor Menell's testified that Nu-kote's allegation that HP had procured and sought to enforce

12  invalid and non-infringed patents was eliminated by the order on MSJ #5.  The predatory acts

13  alleged by Nu-kote included that:  (1) HP had procured and/or sought to enforce 14 utility

14  patents on ink jet inks and ink jet printing technology knowing that the patents were invalid,

15  unenforceable and/or not infringed by Nu-kote (paragraph ¶94 of the counterclaim); and (2)  HP

16  employed sham litigation to make knowingly false allegations of trademark infringement, patent

17  infringement and related legal claims against Nu-kote, and had knowingly sought grossly

18  overbroad remedies in bad faith, thereby unjustifiably imposing substantial economic burdens on

19  Nu-kote ("sham litigation") (paragraph 99).   These allegations were incorporated into each of

20  Nu-kote's counterclaims.  Professor Menell appears to have grouped these two allegations

21  together as Nu-kote's "sham litigation" allegation.   As noted above, Professor Menell testified

22  that these allegations overlapped with HP's affirmative claims such that HP's prosecution of its

    claims served as a defense to Nu-kote's sham litigation allegations.

23        In MSJ #5, HP sought partial summary judgment of Nu-kote's allegation that HP's filing

24  and maintenance of "sham" litigation to protect its intellectual and other property rights

25  *constituted predatory and exclusionary conduct actionable under Section 2*.  Again, the motion

26  was directed only at a portion of Nu-kote's Section 2 claims.  In the motion, HP offered evidence

27  and argument regarding its claims against Nu-kote to establish that a reasonable litigant could

28  conclude that HP's claims were reasonably calculated to elicit a favorable outcome.  *Id.*  In

    opposition to the motion, Nu-kote asserted that:  (1) HP knowingly asserted patents  against Nu-

1  kote that HP had fraudulently obtained (the '115, '295, '409 and '503 patents); (2) HP brought

2  suit against Nu-kote on patents that HP knew to be invalid (the '503, '811 and nine cartridge-

3  related patents found not to be infringed in the *Repeat-O-Type* litigation filed by HP) and on

4  trademarks (including HP's inkjet cartridge product model numbers) and false advertising claims

5  (including ink quantity and used printed in packaging suggesting that the printhead was new) that

6  were objectively baseless knew that some or all of the patent; and (3) HP's lawsuit based on the

7  '503, '294, '115 patents were subject to antitrust scrutiny as a *Walker Process* claim

8  (enforcement of an invalid patent procured by fraud on the Patent Office may form the basis for

   a violation of Section 2 of the Sherman Act). *Id*

9       The Court found that there was no evidentiary basis upon which a reasonable jury could

10 find that HP's lawsuit against Nu-kote, in whole or in part, was objectively meritless, and

11 granted HP's motion. (Ex. 3966.)  The Court further found that Nu-kote had failed to present

12 any evidence that HP instituted the action knowing that the '504, '115, '409 and '295 patents had

13 been procured by fraud. (*Id.*)

14       As a result of the ruling, Nu-kote could not rely upon its sham litigation allegation

15 (paragraph 99 of the counterclaim) to support its Section 2 claims.  The ruling did not eliminate

16 Nu-kote's ability to rely upon the sham litigation theory in support of the state law claims,

17 including Nu-kote's Cartwright Act claim.  While the Court may have granted partial summary

18 judgment of the Cartwright Act claim on the same ground, the ruling with respect to the Section

   2 claims did not automatically eliminate the allegation in the Cartwright Act claim.

19       Moreover, the order did not address and therefore did not eliminate the allegation that HP

20 had procured and/or sought to enforce 14 utility patents on ink jet inks and ink jet printing

21 technology knowing that the patents were invalid, unenforceable and/or not infringed by Nu-kote

22 (paragraph ¶94 of the counterclaim).   This allegation was incorporated into Nu-kote's remaining

23 counterclaims.  In fact, this allegation is in reality virtually identical to Nu-kote's declaratory

24 relief claim wherein Nu-kote asserted that Nu-kote had not infringed any valid and enforceable

25 claim of 14 patents and that the 14 patents were invalid, void and unenforceable *inter alia*

26 because HP had misused its utility patents asserted in its claims, including that it had procured

27 and sought to enforce patents knowing that the patents were invalid, unenforceable and/or

28 noninfringed.  Counterclaim ¶¶ 111, 136.  The declaratory relief claim, like paragraph 94, was

   incorporated into the vast majority of Nu-kote's state law claims.

Finally, the parties expend a great deal of time in their briefs addressing whether HP's defense of Nu-kote's declaratory relief claim was conducted against liability. The issue was thoroughly briefed in connection with HP's motion for partial summary judgment of the issue prior to the remand hearing, and the Special Master found that HP's defense of Nu-kote's declaratory relief counterclaim was conducted against liability. *See* January 15, 2006 Order Denying HP's Motions for Partial Summary Judgment.

Professor Menell testified that HP's defense of the declaratory relief counterclaim was not conducted against liability because the declaratory relief claim did not subject HP to potential "liability. ACE asserts that there is no evidence that a reasonable insured would treat a counterclaim threatening no liability against HP (the declaratory relief counterclaim) as transforming HP's affirmative legal campaign into one conducted against liability.

For the reasons noted in the order denying HP's motion for partial summary judgment of this issue, and the reasons articulated in HP's post-remand hearing brief, the Special Master believes that HP's defense of Nu-kote's declaratory relief counterclaim (alleging that the patents in suit were invalid, unenforceable or not infringed), which involved HP's proof of the patents, and proof of validity and/or infringement, and the expenses related thereto were part of a necessary effort to defend Nu-kote's counterclaim and thus HP's defense of the counterclaim (through proof of its patent claims) was conducted against liability. ACE's assertion that HP could have eliminated Nu-kote's declaratory relief counterclaim by dismissing its patent claims (thereby depriving Nu-kote of standing to pursue the declaratory relief claim) merits a brief comment. HP could have done a number of things, including dismiss the patent claims in the face of Nu-kote's counterclaims. Like HP, ACE could have done a number of things, including accepting the tender of the defense of the Nu-kote counterclaim. There was no evidence presented that if HP dismissed its patent claims, Nu-kote would have dismissed its antitrust claims and/or dismissed its other allegations regarding HP's patents. Other than to benefit its insurer who failed to defend, it is unclear why HP would have dismissed its patent claims, which the undisputed evidence reveals were part of HP's defense of the Nu-kote counterclaims, including the antitrust claims during the post-tender period. Moreover, the undisputed evidence presented suggests that if HP would have dismissed its counterclaims, Nu-kote would have renewed its sham litigation allegations.

-94-

However, even if reasonable minds could disagree about whether HP's defense of the declaratory relief claim was part of an effort to avoid or minimize liability, and the Court were inclined to find that the defense of the declaratory relief counterclaim was not conducted against liability, this issue does not impact whether HP's actions were defensive. ACE's theory, offered via Professor Menell, is that HP's proof of its affirmative patent claims (and trademark and false advertising claims) was defensive to four other allegations in the Nu-kote counterclaim, i.e., the four allegations identified by Professor Menell which were present in each and every counterclaim asserted by Nu-kote (sham litigation, thicket of patents, false accusation of infringement, and enforcement of invalid, fraudulent or non-infringed patents). The fact that ACE believes that HP's proof of the validity and infringement of its patents was not defensive of the Nu-kote declaratory counterclaim does not change the fact that ACE's theory of the case is that proof the validity and infringement of the patents was defensive to other portions of the Nu-kote counterclaim prior to phase I of the trial (i.e., prior to May 7, 1999). Given the failure of ACE's argument vis-à-vis the elimination of "overlapping" allegations, even if the Court was to agree with ACE regarding the defense of the declaratory relief claim, the "overlapping" allegations that remained, as identified by ACE and Professor Menell (and which remained in the case during and after the trial) provide a sufficient and compelling basis for the conclusion that HP's proof of its affirmative claims, including the patent, trademark and false advertising claims, was defensive in nature and conducted against liability throughout the post-tender period.

In conclusion, the evidence relied upon by Professor Menell, e.g., the orders on HP's partial summary judgment motions, does not support Professor Menell's conclusion. The Special Master concurs in Professor Menell's testimony to the extent that Professor Menell testified that HP's prosecution of its affirmative claims was defensive to a number of the allegations in Nu-kote's counterclaims, and thus HP's affirmative claims were conducted against liability prior to Phase I of trial and after Phase I. The Special Master, however, disagrees with Professor Menell's conclusion that the Court's pre-trial orders regarding HP's motions for partial summary judgment eliminated the defensive nature of HP's proof its affirmative claims. The orders did not eliminate the Nu-kote allegations that Professor Menell found to overlap with HP's affirmative claims. The overlapping allegations remained in the case, and HP's proof its affirmative claims during Phase I was conducted against the liability posed by, at a minimum, Nu-kote's state law claims. Accordingly, ACE has failed to meet its burden of proof to establish

by a preponderance of the evidence that HP's affirmative claims tried during Phase I were not conducted against liability.   Moreover, for the reasons noted below, the Special Master finds that the weight of the evidence clearly weighs in favor of the conclusion that HP's affirmative claims tried during Phase I were conducted against liability.

## IV.  HP's Effort to Show that Affirmative Claims Conducted Against Liability

HP contends that ACE as well as HP witnesses confirmed that the Nu-kote case was "conducted against liability."  HP asserts that everything in the Nu-kote case was defensive and all expenses were conducted against liability by a reasonable insured under the circumstances. HP asserts that this position was reconfirmed by many sources and on several grounds.

### A.  HP's Evidence to Show that Affirmative Claims were "Conducted Against Liability"

HP first contends that Professor Menell factually proved HP's case by *admitting* that: (1) everything before Phase 1 of the trial and everything after Phase 1 of the trial was "conducted against liability;" (2) Phase 1 necessarily defended against Nu-kote's declaratory relief/patent invalidity counterclaim; (3) HP's evidence of patent infringement during Phase 1 established that Nu-kote had no lawful market presence and thus defended against the antitrust counterclaim; (4) HP's affirmative claims defended Nu-kote's state law counterclaims because the claims and counterclaims had overlapping, common elements such that proof of the one served to defeat the other; (5) all of HP's affirmative claims of patent and trademark infringement and false advertising defended against Nu-kote's state law counterclaims (disparagement, restraint of trade, false advertising, libel, trade libel, unfair competition, and intentional interference with economic advantage); and (6) Professor Menell conceded that HP's Phase 1 evidence of trademark infringement damages was a defense against Nu-kote's antitrust damage claim.

HP further contends that it affirmatively proved that:  (1) all litigation activity was defensive under the circumstances, (2) the antitrust counterclaims were defended by proving valid and infringed patents and trademarks so as to prove Nu-kote had no lawful market presence, (3) HP acquired lawful monopoly power through its patents, trademarks and otherwise, (4) HP's damages for infringement offset any damages Nu-kote could establish, (5) it was necessary to prove valid and infringed patents to defend against the declaratory relief counterclaim, (6) the antitrust issue of "sham litigation" was necessarily defended throughout Phase 1 of the trial by showing a proper assertion of patent and trademark infringement, and (7)

the state law counterclaims were also defended by evidence of patent and trademark validity and infringement and false advertising by Nu-kote.

ACE contends that HP's further arguments that its affirmative patent and trademark infringement claims were conducted against liability are without merit. ACE asserts that: (1) to prove a lawfully acquired monopoly, a party must show that it holds a patent that is still in effect - it need not conduct an affirmative patent enforcement proceeding; (2) HP does not show, nor can it show, how prosecuting its affirmative trademark infringement and false advertising claims helped prove a lawfully acquired monopoly in light of the fact that trademarks do not function as product monopolies; (3) HP's unlawful market presence defense has never been applied with respect to patents, HP's antitrust expert, Max Blecher could not testify to the contrary, and Judge Ware expressly rejected this defense when he instructed the jury that it could award Nu-kote antitrust damages even if it found that Nu-kote infringed one or more of HP's patents (TT. 6170, 6354); (4) proving trademark infringement does not establish an unlawful market presence; (5) HP's argument that its false advertising claim was "conducted against liability" is merely another variation of its "white hat" argument, as the only basis HP can claim is that proving the false advertising claim makes Nu-kote look bad, and Judge Ware has already said being able to wear the "white hat" is not enough; (5) with respect to the declaratory relief claim (a) expenses incurred to prosecute the trademark infringement and false advertising claims were not conducted against liability by virtue a patent declaratory judgment counterclaim, (b), without HP's patent infringement claims or some other threat by HP of patent enforcement, Nu-kote would have lacked standing to pursue its declaratory judgment counterclaim, and (c) HP could have eliminated Nu-kote's declaratory judgment counterclaim by dismissing its patent claims against Nu-kote with prejudice; (7) HP defeated the sham litigation claim during the summary judgment rulings, it was out of the case and no reasonable insured would continue to litigate against a claim it has won - after April 29, 1999 Nu-kote could not seek damages from HP for sham litigation; (8) because HP argued prior to trial all of the state law claims had been dismissed as a result of Judge Ware's summary judgment rulings, no reasonable insured would pursue affirmative patent and trademark infringement claims to defend against counterclaims that it thought were dismissed; (9) as a result of the summary judgment rulings, Nu-kote's state law counterclaims were effectively dismissed; and (10) offsets are not conducted against liability.

1

2     Throughout its briefs, ACE asserts that "HP ignored Judge Ware's directions on remand,"

3  "HP failed to consider Judge Ware's standard," "HP did not undertake the analysis required by

4  Judge Ware's remand, and that "HP refused to apply the new standard."   Anyone attending the

5  hearing or reading HP's 206-page brief must realize that this simply is not true, and that

6  repeating this statement is in fact a deliberate mischaracterization of HP's efforts during the

7  remand hearing.   HP applied the standard. ACE simply does not agree with HP's evidence or

8  argument. HP presented numerous witnesses during the initial damages hearing, and relies upon

9  a great deal of that testimony in the briefing regarding the remand hearing. Like ACE, HP also

10  offered additional testimony at the remand hearing from two witnesses who testified during the

11  damages hearing. Both parties have addressed what they perceive to be the relevant standard.

12     The question for the Special Master is whether the evidence presented, by ACE and/or

13  HP, establishes that any Nu-kote expenses were not conducted against liability by a reasonable

14  insured. Put another way, does the evidence presented by ACE and/or HP compel the conclusion

15  that all post-tender Nu-kote expenses incurred by HP were conducted against liability by a

16  reasonable insured under the circumstances?

17     Irrespective of the evidence offered by HP, Professor Menell's testimony establishes that

18  HP's proof of its affirmative claims served as defenses to (or part of an effort to avoid or

19  minimize) the potential liability posed by the Nu-kote counterclaims.  Professor Menell testified

20  that *prior to* Phase I, as a result of the overlapping issues, HP's pursuit of its affirmative claims

21  was "conducted against liability" (RT. 214:9-21; 215:19-23); and what HP did in the litigation

22  after Phase 1, i.e., from the beginning of Phase 2 of the trial until the end of the case, was also

23  directly defensive to Nu-kote's antitrust counterclaims and therefore was  "conducted against

24  liability." (RT. 215:4-23.)

25     Thus under Professor Menell's theory, the only expenses that could not have been

26  conducted against liability were those expenses incurred by HP during Phase I of the trial.

27  During Phase I of the trial, HP put on its affirmative case, i.e., the proof of trademark

28  infringement, false advertising and patent infringement claims, all of which involved proof of the

  validity and enforceability of HP's trademarks and patents. The allegations in the Nu-kote

  counterclaims that Professor Menell testified "overlapped" with HP's affirmative claims, i.e.,

  Nu-kote's allegations that HP had procured and sought to enforce invalid and non-infringed

patents and that HP had falsely accused Nu-kote of infringing its trademarks and patents remained in the case, were not eliminated by the Court's orders on the motions and remained in the case.

Moreover, exhibits 4212 and 4213, part of Professor Menell's presentation at the remand hearing, make clear that the HP's proof during Phase I was defensive to the Nu-kote state law claims. The state law claims were not dismissed, and the overlapping allegations in the state law claims were not eliminated by the orders of HP's motions for partial summary judgment. Then there is the matter of the declaratory relief counterclaim. During Phase I, HP was offering proof of its patents and trademarks and infringement thereof, and Nu-kote was attempting to show the invalidity or non-infringement of the patents. Professor Menell agreed that HP's proof its patent claims also served as a defense of the Nu-kote declaratory relief counterclaim. The dispute with respect to the declaratory relief claim is whether HP's defense of the counterclaim was conducted against liability. Even if one accepts that the notion that the declaratory relief claim was not claim that HP had to defend against because it did not seek damages from HP (which the Special Master does not accept), the "defense" of the declaratory relief claim was equally applicable to the remaining state law claims (including the unfair competition and interference claims), all of which clearly threatened HP with "liability" related to allegedly improperly enforced invalid and non-infringed HP patents. In sum, overlapping allegations were litigated during Phase I. Because the "overlapping" allegations remained in the case after the Court's orders on the motions for partial summary judgment, HP's proof of its affirmative claims during Phase I was conducted against liability posed by the declaratory relief and state law claims, all of which included the overlapping allegations.

Additionally, HP's proof of its affirmative claims during Phase I, especially the patent infringement claim, defended against Nu-kote's antitrust counterclaims by showing a lawfully acquired monopoly. The jury instruction regarding Nu-kote's antitrust illegal monopolization counterclaim indicated that to prevail on this claim, Nu-kote must have proved *inter alia* that HP willfully acquired or maintained that power through restrictive or exclusionary conduct. The jury instruction stated that "a company may not be found to have willfully acquired or maintained its monopoly power if it has acquired or maintained that power solely through the exercise of superior foresight and skill; or because of natural advantages; or because of economic

1  or technological efficiency, including efficiency resulting from scientific research; or by

2  obtaining a lawful patent."

3       HP's proof of its lawful patents over which monopoly power was alleged to exist during

4  Phase I was a specific defense to the wrongful acquisition of monopoly power element of Nu-

5  kote's monopolization counterclaim.  (RT. 886:4-25, 822:8-823:24, 813:18-815:19; HT. 852:20-

  855:21.) According to Mr. Sullivan, HP's Phase 1 case included the following defensive patent

6  evidence on this point: the actual patents that were awarded by the U.S. Patent Office (RT.

7  883:20-21); evidence of anticipation, obviousness, best mode and enablement (RT. 886:19-

8  887:3); evidence that there was not any prior art relevant to HP's patents (RT. 883:12-14,

9  883:24-886:3, 886:19-887:3); other evidence establishing HP had valid patents (RT. 882:17-21,

10  929:7-12.). HP's Phase 1 patents pertained to all of Nu-kote's competing inkjet products. (*See*

11  Ex. 1688; RT. 871:11-880:9.) Mr. Sullivan testified that HP's Phase 1 patent case challenged

12  Nu-kote's entire aftermarket product line. (RT. 873:21-25, 877:2-8, 877:19-878:6.)  HP also

13  offered proof that it lawfully acquired monopoly power in the inkjet market with evidence

14  presented in Phase 1 that HP acquired a lawful monopoly through the exercise of superior

15  foresight and skill, better products, economic or technological efficiency, including efficiency

16  resulting from scientific research, including that HP was a company of inventors and it was

  constantly trying to make its products work better for consumers. (See e.g. RT. 814:13-815:3,

17  820:24-821:4, 822:8-823:24, 887:19-24, 852:20-855:21; HT, 1140:14-1141:4, 1139:1-24,

18  721:22-724:2, 464-466, 451:20-452:3, 588:2-14, 466:2-21.).  ACE's only witness with antitrust

19  litigation background, Robert Rose (testifying at the 2002 hearing), acknowledged that HP

20  defended the wrongful acquisition element of Nu-kote's monopolization counterclaim by

21  presenting evidence of lawful patents. (HT. 1401-1404.)  HP's expert, Mr. Blecher, opined that

22  HP's patent case was an effective defense to the "unlawfully acquired monopoly" element of Nu-

23  kote's antitrust counterclaim. (RT. 735:10-18, 736:17-737:8 and RT. 769:13-24.)  He concluded

24  a reasonable insured under the same circumstances would have pursued the same defense

  strategy and would not, even for a moment, have seriously entertained the thought of dismissing

25  the affirmative claims given their obvious benefit to the defense and the fact that there would

26  have been no significant cost savings from dismissing because all of the same evidence would

27  then have had to be presented anyway in the antitrust phase of the trial. (RT. 771:5-772:4.)

28

HP further offered testimony, through Mr. Blecher and Mr. Sullivan, to show that during Phase I of the trial, HP offered evidence to defeat the antitrust claims, including evidence that: (1) because virtually Nu-kote's entire refill product line infringed HP's patents, Nu-kote had no lawful market presence and thus could not recover antitrust damages; (2) HP's evidence of trademark infringement also showed that Nu-kote had no lawful market presence; and (3) HP's proof of patent and trademark infringement damages also offset Nu-kote's claimed antitrust damages. Whether or not proof of these issues amounts to a legal defense to the antitrust claims, HP's efforts in this regard were part of its strategy for the defense of the Nu-kote counterclaims. Whether HP's strategy and expenses related thereto would have been conducted against liability by a reasonably insured under the same circumstances is discussed below.

In sum, even interpreting the conducted against liability standard in the manner argued by ACE, i.e., the activity or expense must disprove an element of the alleged liability, the weight of the evidence presented at the hearing was that proof of HP's affirmative claims in the post-tender period disproved overlapping elements of the Nu-kote counterclaims. Accordingly, HP's proof of its affirmative claims was conducted against liability.

### C.  HP's Strategy

HP's primary position during the proceedings before the Special Master was that everything in the Nu-kote case was defensive and that all of its expenses were conducted against liability by a reasonable insured under the same circumstances. HP contends that prosecuting the affirmative case was strategically necessary to defense of the antitrust claims and that strategically defensive trial conduct is "conducted against liability." HP further asserts that ACE did not prove that HP's strategy was not one a "reasonable insured would have conducted against liability under the same circumstances."

ACE contends that strategy is not and cannot be the standard required by Judge Ware. ACE asserts if strategic benefit was enough to make a prosecution outlay defensive for purposes of determining what expenses were conducted against liability, the Court could have simply affirmed the Special Masters findings on alternative grounds under Fed.R.Civ.P. 53.

In the March 31, 2003 report and recommendation, the Special Master summarized the extensive evidence offered by HP during the damages hearing to establish that the post-tender fees and costs incurred by HP in the Nu-kote were related to and therefore necessary to the defense of the Nu-kote counterclaims. *See* March 31, 2003 Report at 27-37. The Special Master

1   found that HP had presented evidence, through the testimony of Messrs. Blecher, Cooper,

2   Sullivan, Marshall, Pecau, Brigham and HP in-house counsel, that "by the time HP tendered the

3   defense of the Nu-kote action to ACE, the litigation was focused around the Nu-kote

4   counterclaim and that HP's pursuit of its affirmative claims was part of an overall strategy of

5   defense against the counterclaim." March 31, 2003 Report at 37.  Based thereon, the Special

6   Master concluded that HP had met its burden of establishing that all of the post-tender fees and

7   costs incurred by HP were related to the defense of the Nu-kote counterclaim, and that as a

8   result, all HP's post-tender fees and costs were presumed to be reasonable and necessary defense

9   costs. *Id.*   The Special Master concluded that HP had presented, through its attorneys and Mr.

10   Blecher that all the post-tender fees and costs were necessary to the defense of the counterclaim

11   due to the "strategic interrelationship of the prosecution and the defense." *Id.* at 51.  The Special

12   Master further found that ACE had failed to meet its burden of proving by a preponderance of

13   the evidence that any of the post-tender fees and costs were unnecessary to the defense of the

14   counterclaim.

The Court disagreed, stating that:

> The Court finds that a trier of fact could reasonably conclude, by a preponderance
> of evidence, that a portion of HP's expenses were unnecessary to the defense of the Nu-
> kote counterclaims.  An expense is necessary only if the expense would be conducted
> against liability by a reasonable insured under the same circumstances. *Aerojet* at 62-63;
> *see also Barratt* at 848; and *Larkin* at *19.  In other words, an expense[] is unnecessary if
> the expense would not have been conducted against liability by a reasonable insured
> under the same circumstances.
>
> In this case, a trier of fact could reasonably conclude that ACE presented a
> preponderance of evidence that some of HP's expenses were unnecessary to the defense
> of Nu-kote's counterclaims. ... Second, ACE presented the testimony of Professor
> Menell, who essentially opined that there was a clear dividing line between prosecution
> expenses and defense expenses.  Third, Robert Rose also testified that HP's prosecution
> claims and Nu-kote's counterclaims were separate.  Fourth, Craig Aronson also testified
> that he could separate out expenses related to HP's prosecution claims.  Implicit in each
> of these witnesses' testimony is that certain prosecution related expenses are severable
> from the defense expenses, and thus clearly unnecessary to the defense.  That the three
> witnesses may not have used the terms necessary, unnecessary, reasonable or
> unreasonable to label expenses does not mean that their testimony is inadequate to carry
> ACE's burden of proof.

November 25, 2003 Order at 9-10 (emphasis added).   The Court's October 15, 2004 order

clarified that the Special Master had applied an improper definition of what is "necessary to the

defense," stating that the Court's definition is narrower than the definition applied by the Special

Master, and required determination "not only whether prosecutions expenses are 'reasonably related' to the defense, but also whether those reasonably related expenses are likely to have been incurred by a reasonable insured under the same circumstances." The Court further noted that "the inquiry into what a reasonable insured would do to defend necessarily involves a consideration of whether the benefits of the strategy are worth the cost" citing *Barratt* at 862. October 15, 2004 Order at 3-4.

The Special Master's interpretation of the November 2003 and October 2004 orders differs from that of ACE. As an initial matter, the orders do not require the Special Master to conclude that ACE had presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of the Nu-kote counterclaims. Instead, the orders state that a trier of fact <u>could</u> so find. In the remand proceedings, ACE has offered new and different evidence (other than its improper reliance on HP's "not inextricably related" statement in 1996). Given ACE's new and different showing, the Special Master must determine ACE has presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of the Nu-kote counterclaims.

Perhaps more importantly, the Special Master does not view the Court's orders as precluding HP's reliance upon "strategy" or a "strategic benefit." Instead, the strategy must be viewed in the context of the Court's definition of "necessary." The relevant cases and the Court's orders require that: (1) the strategy amount to a reasonable and necessary effort to avoid or at least minimize liability; (2) the expenses incurred pursuant to the strategy are reasonable and necessary to avoid or minimize liability, which requires a connection between the strategy and the expenses conduct/strategy; (3) the benefits of the strategy are worth the cost of the strategy. The answers to these question will reveal whether a reasonable insured would have engaged in a similar defense strategy, i.e., whether HP's reasonably related prosecution expenses are likely to have been incurred by a reasonable insured under the same circumstances. *See Aerojet* at 6-61; *Barratt* at 861-862; and October 14, 2004 Order at 3-4.

During the remand hearing, HP again offered compelling that HP's prosecution of its affirmative claims was strategically defensive to Nu-kote's antitrust claims. Mr. Blecher, HP's antitrust expert, testified that:

> "[O]nce [Nu-kote counterclaims filed by Ron Katz] surfaced seriously, the Hewlett-Packard strategy of prosecuting the claims for patent infringement, effectively to eviscerate the antitrust claims, was a reasonable and proved to be a successful strategy."

(RT. 742:22 – 743:1.)  HP offered testimony that to defend against the antitrust counterclaim, HP principally prosecuted its affirmative case. Mr. Blecher testified that HP's attorneys "set up a lack of standing to maintain the antitrust claims and basically put all of the major allegations into play by denial."  (RT. 732:12-22.)  Mr. Blecher testified that:

> [T]he successful prosecution of the patent claims by HP in this case, because they covered so substantial a part of Nu-kote's product line, . . . would effectively bar Nu-kote's claim for antitrust damages. . . . I believe the law is or will evolve to be that if you're in the market, if your presence in the market is unlawful because you are a thief and you've stolen somebody else's technology, that you would be barred from recovering antitrust damages.  And as a practical matter, presentation of that kind of evidence to a jury which concludes that the antitrust claimant . . . exists in the market by reason of stolen property or infringed property, will not get any damages.

(RT. 733:4 - 735:18.)  Mr. Blecher testified that the jury verdict on HP's patent claims and the Nu-kote antitrust claims shows that the jury did not believe Nu-kote had a lawful market presence. (RT.  725:20 – 726:11, 727:19-20, 729:8-21, 730:5-22, 731:21-24, 732:12-22, 732:24- 733:3; 733:4 – 736:17-25.)  Mr. Blecher testified that "if Nu-kote appears to the jury to be a thief, that its products are based on stolen technology, it's highly improbable, not impossible, but highly improbable, that a jury is going to reward a thief with a damage verdict under the antitrust laws." (RT. 782:8-21.)

HP also offered testimony that HP used the phasing order and its position as plaintiff to ensure that its story was presented to the jury first, and allowed the jury to determine that Nu-kote had no lawful market presence – because its promotion of its products violated HP's intellectual property rights – before deliberating on the antitrust counterclaims. (RT. 756:8 – 757:25; 755:6-13.)  Mr. Blecher testified that:

> I believe from the totality of the circumstances, . . . that HP regarded itself at a certain point as the defendant, and that everything they did was calculated to defeat the antitrust claim and that their interest in the patent claims, though still extent, was diminished, as an affirmative matter.  . . . . The winning of the patent issues, in my view, was defensive, intended to eliminate the antitrust claims.

(RT. 765:2-25.)  With respect to the idea of whether HP could have dismissed its patent or trademark claims and still maintain the strategic advantage it needed to win the case, Mr. Blecher stated that:

> I have an opinion that it would be both suicidal and malpractice. . . . [S]uccessful prosecution of the patent claims is what defeated at least the material part of the antitrust

clause, and they would have lost their advantage of going first and tainting Nu-kote, as obviously they could and apparently did.

And in the end, it wouldn't have made much difference, since all the same evidence would have come in, but only as a defense, after Nu-kote was able to blast HP. So there would have been absolutely no sense, in my opinion, to dismissing the patent claims. . . . [F]rom the time of the bankruptcy on, and maybe before that and based on the testimony of their in-house lawyers that I read, I believe [HP's] mentality was they had become the defendant for practical purposes. . . . . [I]f their presence in the market is unlawful, they're not a lawful competitor, they don't have an entitlement to antitrust damages.

(RT. 769:13 – 772:10; 765:2-25.)

Mr. Sullivan also testified as to why HP's evidence and argument in Phase 1 (where HP sought to prove its affirmative patent, trademark and false advertising claims against Nu-kote) was strategically "conducted against liability" vis-à-vis the claims asserted in Nu-kote's counterclaims. HP's sixteenth affirmative defense asserted that HP could not be liable for antitrust violations or unfair competition where the conduct charged against it is lawful because its actions were protected and encouraged by other laws, including the patent laws. (RT. 834:23 – 837:1.) HP's thirty-third affirmative defense asserted that with respect to Nu-kote's interference claims, HP's allegedly anticompetitive conduct vis-à-vis Nu-kote was lawful because HP possessed patents that justified its suit against Nu-kote. (RT. 837:2 - 837:20.)

Mr. Sullivan also testified that HP used Phase 1 to introduce proof that would be defensive of the counterclaims asserted against it:

[W]e basically spread the antitrust case as much as we could into the . . . IP case so we wouldn't be stuck for time when we had to deal with the . . . issues with antitrust. . . . .

[T]he case was tried from May to July and there might have been two weeks for both sides to put on any additional evidence with regard to antitrust. . . . We were just putting on our additional evidence. Katz put on his additional evidence, we put on our additional defenses and made some additional points. . . .

[W]e were using the testimony of the ink inventors . . . in the trademark patent IP case to show that the HP inks were invented in a way that made them unique and different. . . . So when we came to . . . the antitrust case to talk about FUD, we already had the evidence that it couldn't have been about FUD because the statement was true that we invented the inks, they were our inks and Nu-kote infringed them. So we were telling the public that Nu-kote inks weren't as good, we were using that as support for the truth of the statement that Nu-kote was trying to say was false.

(RT. 902:15 – 903:8, 900:18-901:19.) In response to Nu-kote's claims that HP changed its cartridge design to be anticompetitive, HP used Phase 1 to offer proof to counter these claims. Mr. Sullivan noted that:

> So we had evidence in the first part of the case to show a couple things: One, that these were not easy to invent, that HP did invent them, we had the customers in mind when we did invent them, we wanted to get to perfection as best as HP could. And that the changes . . . that we did with regard to the cartridges was motivated by the need of the design to make a better product rather than some anticompetitive motive.

(RT. 903:9 – 904:4.)

Robert Cooper, counsel for HP during the Nu-kote action, explained the primary value of HP's affirmative claims at trial was to portray HP in a favorable light before Nu-kote had the opportunity to present its antitrust case. Mr. Cooper wanted the jury to focus on HP's infringement claim and decide it first because he was convinced the jury would then give the antitrust claim "the back of the hand." HP could take advantage of a "halo effect" that the jury would have in mind when Nu-kote started attacking HP. Mr. Cooper explained that most antitrust lawyers share his belief that prosecuting a patent case first in such a scenario is important because it gives you an opportunity to be the plaintiff and argue the antitrust claims are nothing more than a non-meritorious "knee-jerk" reaction. HP tested this theory in jury research and found prosecuting the intellectual property case critical to the defense. (HT. 1137:8-1138:25, 1139:1-24, 1142:18-1143:20.) Mr. Sullivan agreed with the importance of this "attack first" defense mode so HP could tell the jury that Nu-kote's counterclaim was an ill-founded knee-jerk reaction to HP's lawsuit. (HT. 926:4-7, 909:12-19.) Jonathan Marshall, one of HP's testified that that "it was critical that before Katz started throwing mud at us, that we establish that we were the innovators and we were the guys wearing the white hat. We fought very hard to keep that antitrust stuff out to get the first bite at this, and you get one chance to make a first impression[.]" [(HT. 721:22-723:9.) William Pecau testified that HP put on its "affirmative" case only so it could tell its story first as the "plaintiff" to gain control of the narrative and defend the antitrust claims, "which everybody knows that's what you want to do." (HT. 473:17-474:4.)

Outside of the assertion that a strategy is legally insufficient to meet the Court's standard, ACE did not address HP's testimony with respect to HP's strategy. As such, ACE did not refute meaningfully refute HP's evidence that its Phase 1 trial strategy was to present evidence of

1  patent validity together with evidence of patent and trademark infringement as a defense to all

2  Nu-kote counterclaims.

3      Accordingly, based upon the testimony and evidence presented during the damages and

4  remand hearings, HP has established that HP's "white hat" strategy was part of a reasonable and

5  necessary effort to avoid or at least minimize the liability posed by Nu-kote's antitrust claims.

6  The weight of the evidence presented is that consistent with HP's strategy, which was apparent

7  as early as 1996 (see ex. 1593, HP's reply to its motion to bifurcate), HP's proof of its

8  affirmative claims for patent infringement, trademark infringement and false advertising

9  provided HP with a successful defense to Nu-kote's antitrust claims. As previously noted in

10  connection with the discussion of Professor Menell's testimony, HP's affirmative claims

11  overlapped with and were defensive to Nu-kote's counterclaims, and thus were conducted

12  against liability. Likewise, the weight of the testimony during the damages and remand hearing

13  also was that the expenses incurred pursuant to the strategy were reasonable and necessary to

14  avoid or minimize liability the liability posed by the counterclaims. Provided that the benefits of

15  the strategy are worth the cost, which is discussed below, HP's trial strategy was a reasonable

16  and necessary effort to avoid or at least minimize the liability posed by Nu-kote's antitrust

17  claims. The evidence shows that a reasonable insured facing the circumstances that HP did in

18  the Nu-kote litigation would have presented essentially the same defense to the counterclaims.

**V.  Cost-Benefit Analysis**

    The Court's October 2004 Order noted that resolution of the question of what expenses

would have been conducted against liability by a reasonable insured under the circumstances

requires a cost-benefit analysis, and noted that the Special Master had not performed a cost-

benefit analysis. Interestingly, ACE did not offer a cost-benefit analysis during the remand

proceedings, and makes minimal if any argument with respect to a cost-benefit analysis. ACE's

briefs suggest that ACE's view with respect to a cost-benefit analysis is that since HP's

affirmative claims were not conducted against liability as of May 7, 1999, there was no benefit to

pursuing those claims as part of a defensive strategy after that date.

    HP contends that a reasonable insured under the same circumstances would have

prosecuted HP's affirmative claims against the liability posed by the counterclaims, after

considering all the costs and benefits of that strategy. HP asserts that: (1) at both the 2002 and

2006 hearings many witnesses offered thorough, detailed and credible testimony that

1  unequivocally demonstrates that HP's affirmative claims operated as a defense to Nu-kote's
2  counterclaims, both before and after May 7, 1999; (2) numerous witnesses explained that the
3  counterclaims posed a serious and substantial risk to HP, a billion dollar monetary exposure plus
4  far-reaching injunctive relief that could have crippled HP's most lucrative business unit, the
5  inkjet cartridge division; (3) the cost of "prosecuting" HP's affirmative case would not have been
6  more than the cost to "defend" and was certainly far less than the potential exposure; and (4) the
7  cost of the strategy was dwarfed by the benefits - the affirmative claims successfully eliminated a
   billion dollar exposure and preserved HP's business.

8       "The inquiry into what a reasonable insured would do to defend necessarily involves a
9  consideration of whether the benefits of the strategy are worth the cost." October 15, 2004 Order
10 at 3-4.

11      The testimony presented compels the conclusion that the benefits of HP's strategy/proof
12 of its affirmative claims were worth the cost. Mr. Blecher testified that HP's "successful
13 prosecution of the patent claims is what defeated at least the material part of the antitrust
14 clause[.]" (RT. 769:20-24.) Mr. Blecher explained that: (1) Nu-kote made a serious settlement
15 demand of a billion dollars, which presented a $3 billion trebling exposure, and so HP was at risk
16 of paying a very substantial money judgment; (2) more important, Nu-kote launched a "direct
17 frontal assault on [HP's] method of doing business;" (3) it sought injunctive relief that would
18 have undermined HP's inkjet cartridge business – which was its "cash cow" and most important
19 business unit, generating a multi-billion dollar annual income stream  and over the long term HP
20 could therefore lose substantial revenues to new competitors which could have debilitated its
21 business; and (4) HP was fighting to preserve its very existence and way of life. (RT. 2190:16-
22 2192:7, 2193:3-19, 2238:7-2239:8.) Mr. Blecher concluded that HP's some $28 million in post-
23 tender fees and costs (which included its prosecution efforts), were reasonable and necessary to
24 HP's defense given the debilitating exposure posed by the counterclaims and relatively marginal
25 defense costs expended in comparison. (HT. 2190:16-2191:15.)  All of that money had to be
26 spent and all of the litigation tasks had to be performed, according to Mr. Blecher, because the
27 expenditures allowed HP to "survive[] what could have been a devastating blow both in terms of
28 [a] cash judgment and, even more importantly, in terms of enjoining the operation of their
   business in a way which could have crippled it." (HT. 2201:7-14.)  "[I]n similar circumstances I
   think a reasonable company faced with a bet-the-company lawsuit, would have done the same

thing to protect itself." (HT. 774:25-775:3.) Mr. Blecher concluded HP's fees and costs were reasonable and necessary to the defense, including in terms of the tasks performed, time spent, lawyer hours and modest hourly rates. (HT. 2191:24-2192:3, 2245:19-25, 2249:1-4.) In Mr. Blecher's opinion, a reasonable insured under the same circumstances would have conducted all of the same litigation tasks that HP did (including prosecuting its affirmative claims), against the liability posed by Nu-kote's counterclaims. (HT 773:24-775:3.)

Mr. Cooper testified that it was absolutely critical for HP to defeat Nu-kote's antitrust counterclaims because the exposure was staggering. (HT. 1149:24-1150:4.) Mr. Cooper testified that Nu-kote sought several hundred million dollars in recovery, which gets trebled under the antitrust laws. (HT. 1134:22-1135:5.) Mr. Cooper testified that if Nu-kote prevailed, HP would have been collaterally estopped on antitrust violations associated with the sale of its most lucrative product (inkjet printer cartridges), and any plaintiff could then file a class action on behalf of all the consumers that bought the cartridges over the years. (HT. 1135:6-18.) If HP lost it would have been facing billions of dollars in exposure which could have been trebled, and so the very existence of HP was threatened by Nu-kote's counterclaims. (HT. 1135:14-21.) HP's exposure probably exceeded its net worth. (HT. 1143:24-1144:12.) Losing "could literally [have] ruin[ed] the company." (Id.) Mr. Cooper testified that all of HP's expenditures in the Nu-kote suit were necessary because "[t]hat's what you need to do to win" when faced with that kind of antitrust exposure. (HT. 1143:24-1145:2.) Mr. Cooper explained that HP wanted to present its patent case first and to have the jury focus on it because "we were of the belief that once they saw that and decided that case for us, they were going to give the antitrust case the back of the hand." (HT. 1142:18-23.) "We wanted them to view the antitrust case as nothing more than a knee-jerk response that didn't have merit." (HT. 1143:9-11.) Mr. Cooper explained that the jury did focus heavily on the patent case in their deliberations just as HP wanted. (HT. 1143:2-9.) The result was that HP won most of the patent case and more importantly the antitrust case. (HT. 1143:12-15.) Mr. Cooper also testified that it is very common to have huge defense bills when large companies face staggering antitrust exposure like HP did. (HT. 1144:18-23.) In contrast, in the Nu-kote suit (which was tried in 1999), HP spent just $28,434,834.22 in fees and costs in the post-tender period, despite the multiple billion dollar exposure HP faced. See March 31 Report and Recommendation at 88:1-5, 89:2-4. Mr. Cooper testified that HP was willing to abandon its affirmative intellectual property claims and tried to end the entire case with very

1    lucrative settlement offers and in the bankruptcy, but that Nu-kote and its creditors saw the case

2    as a their ticket to a huge recovery and refused. (HT. 1133:19-1137:7; 1135:22-25.)

3    　　Mr. Sullivan's testified that Nu-kote's pre-trial demand to HP amounted to a billion

4    dollars (HT. 856:5-11.) "The amount of money at stake in the antitrust case at the time of trial

5    was in the hundreds of millions of dollars" (HT. 907:6-8.) Mr. Sullivan testified that Nu-kote

6    sought to "fundamentally change the way HP made its printers" and that "HP would have been a

7    very different company than it is today" if it had lost the antitrust case (HT. 907:8-9; RT. 844:16-

8    18.). Mr. Sullivan testified that the liability posed by Nu-kote's antitrust counterclaim was

9    extensive because it threatened the very heart of HP's inkjet business, a billion dollar business at

10   the time of the Nu-kote lawsuit and, a business which cost HP about a billion dollars to develop.

11   (RT. 812:3-7, 20-24; HT. 894:20-23.) Mr. Sullivan testified that the risk of an adverse judgment

12   was real because: (1) there were HP internal documents that "talked in terms of HP . . . having a

13   monopoly position;" (2) there were other internal documents memorializing HP meetings that

14   talked about "HP wanting to get Nu-kote," which were not good documents, caused the defense

15   team real concern and which they had to deal with at trial; (3) Coudert Brothers, and Mr. Katz in

16   particular, was a very formidable opponent who "could take any document and make it look like

17   the world's worst document; and (4) many HP witnesses were not so good and presented

18   problems for HP's case. (HT. 858:19-25, 857:9-25, 858:19.)  In connection with the bankruptcy

19   proceedings Nu-kote had hired two antitrust law firms independent of Coudert Brothers , to

20   evaluate Mr. Katz's opinion that Nu-kote could win its antitrust case against HP; both firms

21   advised the Nu-kote board of directors that its antitrust case was a good, solid claim and that the

22   odds were in its favor to win. (HT. 859:3-14.)   Mr. Sullivan testified that due to the serious

23   nature of the counterclaims it was critical for HP to win and, as a result, "we used every arrow in

24   HP's quiver to win that case." (HT. 907:6-11.) He testified that HP had to devote whatever it

25   took to prevail against Nu-kote's billion dollar counterclaims. (RT. 812:20-813:2.) Mr. Sullivan

26   also testified that winning HP's trademark case was critical to defeating Nu-kote's antitrust case.

27   (HT. 905:19-906:10.)

28   　　Jonathan Marshall testified that Nu-kote sought almost a billion dollars from HP and also

     to strip it of its intellectual property in an area that represented additional billions and billions of

     dollars in investments. (HT. 609:20-610:7, 618:3-7, 11-17, 637:18-24.) Nu-kote was trying "to

     collect a billion dollars to save their company." (HT. 723:20-724:2.) Mr. Marshall testified that

HP offered Nu-kote a settlement in the double digit millions but that Nu-kote rejected the offer because it thought it could recover $900 million on its counterclaims. (HT. 617:23-618:7.) Nu-kote saw the counterclaims as "an opportunity to save the company" out of bankruptcy. (HT. 616:20-25.) Mr. Marshall also testified that Nu-kote, in somewhat of a reversal of roles, sought and obtained relief from the automatic bankruptcy stay of the Nu-kote litigation, despite that it was the "defendant," so it could pursue recovery from HP on the counterclaims. (HT. 616:5-619:4.) HP, the "plaintiff," opposed the lifting of the stay because of the substantial risk posed by the counterclaims, because it had no hope of recovering anything from Nu-kote given the bankruptcy, and because Nu-kote was no longer a threat in the marketplace so there was no need to pursue the affirmative claims other than as a defense. (*Id.*) HP's litigation objectives changed to defeating Nu-kote's counterclaims because Nu-kote eventually asserted the right to $900 million in antitrust damages and also sought by its counterclaims to dedicate all of HP's inkjet cartridge intellectual property and business to the public. (HT. 718:15-719:13.) The latter was a real concern because HP's inkjet business unit generated a multiple billion dollar annual income stream. (HT. 605:17-606:5.) Mr. Marshall testified that all of HP's expenditures in the Nu-kote suit were necessary given the magnitude of the problem and the magnitude of Nu-kote's challenge to a component of HP's business that was critical to HP. (HT. 646:2-11.) Mr. Marshall further testified that HP's affirmative case, including its "white hat" evidence presented during Phase 1 of the trial, is what defeated Nu-kote's counterclaims. (HT. 721:22-724:2.)

       Mr. Pecau testified that a victory on HP's intellectual property claims necessarily spelled a victory against Nu-kote's counterclaims, and that Nu-kote was pursuing HP for hundreds of millions of dollars. (HT. 455:9-21, 456:13-19, 458:8-11.) Nu-kote also prayed for an order dedicating all of HP's inkjet ink and cartridge patents to the public or, alternatively, allowing the public royalty-free licenses to manufacture and sell inkjet ink and cartridges utilizing the processes and techniques embodied by HP's patents. (HT. 539:6-19; Exhibit "193," prayer ¶ e.) HP understandably did not want to "have all of its IP portfolio stripped from it." (HT. 587:20-588:1.) HP's inkjet cartridge business generated at least a billion dollar annual income stream. (HT. 430:8-13.) Aside from revenues, Mr. Pecau testified that HP had spent over $2 billion in plant and $350 million in research and development to start its inkjet printer business. (HT. 465:24-466:21.) Mr. Pecau testified that so long as the case was tried in phases, with HP's affirmative claims put on first, a victory on the affirmative claims would mean the end for the

counterclaims. (HT. 421:5-14.)  Mr. Pecau explained that HP pursued its intellectual property case as the defense to Nu-kote's antitrust claims.  HT. 453:5-9.)  By the summer of 1998, the antitrust and related claims became the parties' focus with the affirmative claims remaining important only because of their benefit to the defense. (HT. 453:17-19.)  Nu-kote had changed its packaging, which significantly diminished HP's interest in pursuing trademark claims.  (HT. 454:3-10.)  HP similarly no longer had the need to pursue its false advertising claims because Nu-kote's products were doing so poorly in the marketplace that HP believed Nu-kote was going to self-destruct without any intervention by HP. (HT. 454:11-20.)  And, aside from the defense benefit, the patent claims were not a big deal at that point either in terms of money or the marketplace. (HT. 455:9-10.)  Mr. Pecau testified that but for having to defend Nu-kote's counterclaims, HP would have dropped the litigation.  HT. 455:9-21.)  According to Mr. Pecau the defense team never considered even for a moment dismissing HP's affirmative claims when Nu-kote filed for bankruptcy (although there was no longer an opportunity to collect on the claims), because it would have been "absolutely stupid" from a trial tactic standpoint given the benefit to the antitrust defense.  (HT 595:25-596:9.)

HP's former general counsel Jack Brigham testified that once Ron Katz became involved in the litigation HP pursued its intellectual property claims as a defense to Nu-kote's counterclaims.  Mr. Brigham explained that HP, after evaluating strategy and how to defend itself, determined that substantiating its patent rights would defeat Nu-kote's antitrust counterclaims – that "the best defense would be an offense." (HT. 1778:4-1779:14.)  HP knew that by establishing that it was the owner of valid patents and trademarks in the relevant market it would prevail against Nu-kote's antitrust claims.  (HT. 1789:9-1790:2, 1809:12-17, 1810:4-9.)  Mr. Brigham testified that HP certainly did not prosecute its affirmative claims for the sake of monetary recovery but as a very important "defensive tool." (HT. 1790:5-17.)  Nu-kote was in bankruptcy and HP never did recover anything from them. (*Id.*)  Monetary recovery "was not part of the equation at all." (HT. 1790:15-16.)  HP's strategy, as anticipated, turned out to be successful according to Mr. Brigham. (HT. 1779:15-16, 1790:3-4.)  He testified that Nu-kote's counterclaims "presented a substantial risk" to HP, a billion dollar exposure, and that he was very concerned that HP might lose the case. (HT. 1798:4-23.)  As a result, Mr. Brigham had to report directly to HP's CFO Bob Wayman and CEO Lou Platt on an ongoing basis, including to justify HP's litigation costs. (HT. 1781:9-12, 1784:4-15.)  Like Mr. Brigham, Mr. Wayman and

1   Mr. Platt were both concerned about the substantial risk HP faced if it did not prevail in the

2   lawsuit and with controlling HP's litigation costs. (HT. 1781:18-1782:11.) Mr. Wayman's job

3   included watching over costs, and he had some very heated discussions with Mr. Brigham. (HT

4   1785:1-6.) Mr. Brigham had to convince Mr. Wayman that HP was doing the best it could to

5   control costs. (*Id.*)

6        Finally, Ronald Griffin, an in-house patent lawyer for HP testified that HP's affirmative

7   patent and trademark claims were pivotal to its defense against the antitrust claims. (HT.

8   1646:19-1647:20, 1654:24-1655:4, 1689:5-20, 1690:9-14.) Mr. Griffin testified that Nu-kote's

9   counsel Ron Katz made demands for hundreds of millions of dollars before trial. (HT. 1656:5-

10  14.) Mr. Katz's goal in litigating Nu-kote's antitrust counterclaim was not only incalculable

11  monetary recovery but also to emasculate HP's intellectual property rights so Nu-kote would be

12  in a position to do things in the marketplace that it otherwise would not have been permitted to

13  do. (*Id.*)

14       With one exception, ACE's reply brief did not address the cost-benefit evidence provided

15  by HP.  At page 16 of its reply ACE asserts "HP's assertion that it faced a billion dollar claim is

16  contradicted by its own expert reports in the underlying litigation. ACE, however, did not offer

17  the referenced reports into evidence during the damages or remand hearings.  None of ACE's

18  witnesses during the remand hearing offered contrary cost-benefit evidence or analysis.

19       Based upon the undisputed testimony, the benefit of HP's strategy/prosecution of its

20  affirmative claims far outweighed the associated cost, which under ACE's theory was $13

21  million, and did not exceed $28 million.  While the costs clearly were high, the risk posed to HP

22  by the Nu-kote counterclaims was much, much higher.   Consistent with the foregoing, the

23  Special Master finds that HP has established by much more than a preponderance of the evidence

24  that a reasonable insured under the same circumstances would have prosecuted HP's affirmative

25  claims as a defense to Nu-kote's counterclaims just as HP did, after considering all the costs and

26  benefits of that strategy.  ACE has not met its burden to prove to the contrary.

**V.  Craig Aronson's Quantification of Expenses under the Court's Standard**

27       ACE contends that slightly more than $13 million of the expenses that HP incurred in the

28  underlying litigation were not conducted against liability by a reasonable insured under the same

circumstances. *See* Ex. 4216 A.  ACE asserts that its expert, Craig Aronson, provided a

practical method for identifying which HP prosecution expenses were not conducted against

liability. ACE asserts that Mr. Aronson determined which prosecution expenses were not conducted against liability in accordance With Judge Ware's Orders remanding this proceeding to the Special Master.

## A. Mr. Aronson's Testimony

ACE requested that Mr. Aronson to review the legal bills and costs that were incurred by the three billing entities, Gibson, Dunn & Crutcher, Pennie & Edmonds and HP in-house counsel from the date of tender of the underlying litigation, June 13th, 1998 to the conclusion of the litigation. (RT. 467-468.) Mr. Aronson was requested to evaluate and did evaluate whether and/or to what extent the legal activities as reflected in the bills themselves were conducted by a reasonable insured against liability. (RT. 468.) With respect to HP's legal fees, Mr. Aronson reached his conclusions after reviewing each billing entry several times and applying the methodologies discussed above. In connection with his work following Judge Ware's remand, Mr. Aronson testified that he had reviewed each legal expense at least four times. (RT. 470:20-23.) Additionally, Mr. Aronson had reviewed the same legal expenses in connection with the October 2002 hearing. (RT. 470:24-471:2.) All told, Mr. Aronson has reviewed each of the billing entries at least seven times. (RT. 471:3-7.)

With respect to HP's legal fees which contained descriptions of the services, Mr. Aronson allocated fees based on the following criteria: (1) review each billing entry; (2) for each billing entry, review any work product, such as motions or depositions, described in the billing entry; (3) for each billing entry, take into consideration the role of the billing attorney in the litigation; (4) for each billing entry, determine if the activities described in the billing entry, taking into consideration the work product and the billing attorney, were necessary for the proof of HP's affirmative claims of patent infringement, trademark infringement and false advertising; and (5) for each entry billing activity that was necessary to the proof of HP's affirmative claims of patent infringement, trademark infringement and false advertising, determine if the activities described in the billing entry were also necessary to proving or disproving an element of HP's defense against Nu-kote's counterclaims. (RT 476:19-482:8; Ex. 4216.)

If in reviewing a billing entry Mr. Aronson concluded that the activity described therein was necessary for the proof of HP's affirmative claims but was not necessary to proving or

1  disproving an element of HP's defense against Nu-kote's counterclaims, the activity was

2  allocated to HP's prosecution expenses. (RT. 477:20-478:5; Ex. 4216)  Expenses that served

3  dual purposes, or that were necessary solely for proving or disproving an element of HP's

4  defense against Nu-kote counterclaims, were allocated to HP's defense expenses as such

5  expenses were conducted against liability. (*Id.*)  Only those activities that were necessary to

6  proving HP's affirmative claims of patent and trademark infringement and false advertising that

7  did not also prove or disprove an element of HP's defense against Nu-kote's counterclaims were

8  considered "prosecution" expenses that were not "conducted against liability by a reasonable

   insured under the same circumstances." (RT. 476:19-482:8, 496:24-497:12.)

9         Mr. Aronson testified that for billing entries/expenses incurred from May 7, 1999 to the

10  end of the underlying Nu-kote litigation,  there was essentially a two-part  process. Mr. Aronson

11  first asked whether the activity related to the affirmative case and  then secondly, he asked

12  whether it also related to the defense by HP against Nu-kote claims. (RT. 499.)

13         With respect to billing entries for the period from the date of tender to May 7, 1999, the

14  only question was whether the activity was related to the affirmative case. (*Id.*)  Prosecution

15  related expenses prior to May 7, 1999 that involved the same claims that were prosecuted by HP

16  after May 7, 1999 were allocated as prosecution expenses. (RT. 500.)  For example, on the

17  patent claims it was only as to the four patents that  were still being prosecuted in the post May

   7th time  period. (*Id.*)  When asked why he did it that way, Mr. Aronson stated:

18         Basically, two reasons. First of all, I was requested to review the pre May 7th, 1999 bills
19         and I  also thought it was of importance to note that Hewlett-Packard was continuing to
           prosecute post May 7th, 1999 certain of these claims even though the sham litigation and
20         the other trade disparagement type allegations were out of the case.

21  (RT. 500:12-18.)  With respect to prosecution expenses that HP incurred affirmatively pursuing

22  patents that didn't go to trial, Mr. Aronson allocated those expenses to the defense. (RT. 500.)

23         With respect to vague legal bills totaling slightly more than $2.4 million, Mr. Aronson

24  applied the following: (1) for the Pennie & Edmonds and Gibson Dunn & Crutcher fees, he

25  totaled the amount of non-vague legal bills for each outside law firm that were allocated to

26  "prosecution" and divided that amount by the total amount of non-vague legal bills for each firm,

27  which resulted in a "prosecution" percentage for each law firm; (2) he took that "prosecution"

28  percentage and multiplied it by the total amount of "vague" legal fees for each outside firm,

   which was then added to the non-vague fees already allocated to "prosecution" to determine the

1    total amount of fees allocated to "prosecution" for each firm; (3) for HP's in-house vague fees,

2    Mr. Aronson determined the percentage of combined "prosecution" fees for Pennie & Edmonds

3    and Gibson Dunn & Crutcher against the combined total fees of these two firms, which was then

4    multiplied by HP's vague legal bills. (HT. 1039:4-1040:7; 1048:23-1049:4; see also Exhibit

5    1032.). With respect to the allocation of HP's costs, Mr. Aronson first segregated the costs into

6    three categories - firm overhead, travel/lodging and outside experts/vendors. Firm overheard

7    was allocated to "prosecution" expenses on the same percentage as legal fees for each firm prior

     to and after May 7, 1999. (RT. 502:19-503:9, 503:22-504:5.) For travel/lodging costs, Mr.

8    Aronson assumed all such costs were conducted against liability unless he could determine that

9    the only purpose for the cost was for an activity that was allocated to HP's "prosecution"

10   expenses. (RT. 504:6-505:3.) For outside vendors and expert fees, such costs were allocated

11   based on the work for which the cost was incurred. (RT. 505:16-24.)

12         Applying his methodology to the $28 million in post-tender legal expenses incurred by

13   HP, Mr. Aronson determined that $13,021,498 million (of more than $28 million) of HP's post-

14   tender expenses were not "conducted against liability by a reasonable insured under the same

15   circumstances." As Mr. Aronson explained, this $13 million consists of two parts. ACE asserts

16   that consistent with Professor Menell's opinion that after May 7, 1999 HP's affirmative patent

17   and trademark infringement and false advertising claims were not conducted against liability,

18   Mr. Aronson determined that $6.48 million of HP's expenses were not conducted against

19   liability. Second, ACE asserts that consistent with Mr. Ocampo's opinion that a reasonable

20   insured would not expect insurance coverage to pursue its affirmative patent and trademark

21   infringement claims and false advertising claims, Mr. Aronson determined that another $6.54

22   million of HP's expenses were not "conducted against liability by a reasonable insured under the

     same circumstances."[11] (Exs. 4217A and 4218.)

_____

[11] After his initial review of each billing entry, and during each subsequent review as necessary, Mr. Aronson made
notations on a copy of the original billing entries. (RT. 480:21-481:5; Exhibit 4218 (notebooks containing the
notations).) These notations reflected his initial thoughts concerning the amount, if any, of each billing entry that
Mr. Aronson concluded should be allocated to "prosecution" expenses, and thus were expenses that were not
conducted against liability by a reasonable insured under the same circumstances. After reviewing the billing entries
again to confirm or change his prior notations, the final notations were then transferred by a paralegal under Mr.
Aronson's supervision to an Excel spreadsheet. (RT. 498:12-499:2.)
        The Excel spreadsheets prepared under Mr. Aronson's supervision contained every billing entry reflected
on the bills for which Mr. Aronson is seeking reimbursement along with Mr. Aronson's determination of the amount of each
billing entry that should be allocated to "prosecution" expenses. (Id.; Exhibit 4217A (files entitled P&E Post May 7,
1999 Fees, P&E Pre May 7, 1999 Fees, GD&C Post May 7, 1999 Fees; GD&C Pre May 7, 1999 Fees & HP Pre and

In pertinent part, HP's cross-examination of Mr. Aronson revealed that: (1) Mr. Aronson's quantified the expenses that Professor Menell testified were not conducted against liability (RT. 542:21-543:1.); (2) Mr. Aronson analyzed and allocated billing entries between prosecution and defense  (RT. 559:23-560:8) without regard to Dr. Menell's analysis; (3) Mr. Aronson had "not relied on" Dr. Menell's opinions when allocating billing entries (RT. 582:5-25.); (4) Mr. Aronson allocated all defense expenses pertaining to HP's four patents that had survived summary judgment to non-covered defense expenses, including pre-May 7, 1999 expenses (RT. 552:19-553:13.) – even though Professor Menell had testified that all of HP's pre-May 7, 1999 defense expenses were conducted against liability (RT. 214:9-21.); and (5) Mr. Aronson allocated HP's post-May 7, 1999 expenses related proving infringement and validity of its patents to non-covered expenses (RT. 552:7-15; 672:12-20.), although Dr. Menell had testified that HP's litigation activities from the beginning of Phase 2 of the trial until its conclusion were also conducted against liability regardless of whether HP's affirmative claims were implicated.  (RT. 215:19-23.).

Mr. Aronson admitted that ACE's counsel provided him with written directions in a December 4, 2004 memorandum instructing him to "calculate" "[t]he legal fees and costs attributable to HP's prosecution of its affirmative claims after April 29, 1999  in [the Nu-kote Action]" and "the legal fees and costs attributable to the same affirmative HP claims in the post-tender period (June 1998) through April 29, 1999." (Ex. 1660.) The memorandum contained his only instructions from ACE. (RT. 556:3-15.) The ACE memorandum ACE did not, however, instruct Mr. Aronson to determine or "calculate" which of HP's Nu-kote litigation activities would or would not have been "conducted against liability" by a reasonable insured.  In contrast to Professor Menell's testimony, Mr. Aronson decided that HP's affirmative claims that were tried were not "conducted against liability" in the pre-May 7 time period. (RT. 552:7-558:15.)

---

Post May 7, 1999 Fees).)  The spreadsheets also showed amounts that should be allocated to settlement activities as well as those entries that were too vague to directly allocate.

In addition to listing each billing entry and Mr. Aronson's allocations, the Excel spreadsheets contained on Exhibit 4217A also totaled the amounts that Mr. Aronson allocated to "prosecution" expenses. These amounts were first subtotaled by month. Then, the subtotal for each month was added together to arrive  at the total amount that was allocated to "prosecution" expenses, and thus were not conducted against liability by a reasonable insured under the same circumstances.  When the totals from each of the spreadsheets in Exhibit 4217A are added together, they equal the amounts that Mr. Aronson concluded should be allocated to "prosecution" expenses and that are expenses not conducted against liability by a reasonable insured under the same circumstances.

1    During his testimony, Mr. Aronson also admitted that: (1) he spent only six seconds to
2    review each billing entry (RT. 529:5-530:24.); (2) his calculations included mathematical errors
3    (*see e.g.*, RT. 589:6-19; Ex. 1707, RT 592:6-593:15, 591:22-592:5, 592:17-593:9; RT. 586:1-15;
4    Ex. 4216, p. 7; RT. 587:16-23; RT. 593:17-595:3; Ex. 1711, RT. 597-602; :21-23.)
5    Mr. Aronson initially disputed that HP's assertion that his methodology for allocating
6    HP's attorneys' invoice entries between "prosecution" and "non-prosecution" activities for any
7    given invoice were so subjective that it could not be replicated to yield consistent results. (RT.
8    493:22-495:13.) Cross-examination revealed, however, that Mr. Aronson "allocations" were not
9    entirely re-producible. For reasons not fully explained at the hearing, Mr. Aronson twice
10   subjected the entries on GDC Invoice No. 981101851 (for September, 1998) to review, twice
11   allocated the dollars billed in each such entry to "prosecution" or "non-prosecution," and
12   prepared two spreadsheets summarizing his analysis and allocations – but with substantially
13   different allocations and results on a large proportion of entries for that invoice. (RT. 655:1 -
14   665:20; Ex 1712.) Specific examples to which Mr. Aronson admitted included a timekeeper
15   entry that Mr. Aronson first allocated only to prosecution and the second time split between
16   "prosecution" and "non-prosecution" (RT. 662:10-663:22), and another entry that he first
17   allocated to "non-prosecution" and the second time split between "prosecution" and "non-
     prosecution." (RT. 663:23-665:2.) Mr. Aronson, like Professor Menell and Mr. Ocampo, did
18   not perform a cost-benefit analysis for HP's defense expenses. (RT. 675:25-676:13.)
19            B. Analysis of Mr. Aronson's Conclusions
20   HP contends that: (1) Mr. Aronson performed no analysis based on the "conducted
21   against liability" standard as required by Judge Ware; (2) Mr. Aronson's testimony ignored and
22   contradicted Professor Menell's analytical approach; (3) Mr. Aronson did not testify about which
23   Nu-kote action defense expenses were or were not "conducted against liability; and his expert
24   report contained no opinions specifying which HP affirmative litigation activities in the Nu-kote
25   action would not have been "conducted against liability" by a reasonable insured; (4) Mr.
26   Aronson's retroactive allocation of HP's affirmative claims is improper under Judge Ware's
27   standard and contradicts Professor Menell's testimony; and (5) Mr. Aronson's opinions are
28   entitled to no weight because they are based on inadequate billing entry reviews and on
     inaccurate and non-repeatable calculations.

ACE contends that: (1) Mr. Aronson determined which prosecution expenses were not conducted against liability in accordance with Judge Ware's orders; (2) it demonstrated that approximately $13 million of HP's expenses were not conducted against liability by a reasonable insured under the circumstances; (3) Mr. Aronson's testimony is relevant; (4) Mr. Aronson and Professor Menell are entirely consistent' and (5) HP's critique of Mr. Aronson's review is without merit.

In light of the Court's November 2003 and October 2004 orders, the Special Master approached the remand with a belief that a method would be proposed that would allow the Special Master to determine that some portion of HP's post-tender expenses would not have been conducted against liability by a reasonable insured under the same circumstances. However, with one limited exception, ACE did not rely upon the evidence that the Court found would be sufficient for a trier of fact to determine that ACE had meet its burden to establish that some expenses were unnecessary.

After an even more detailed review of the underlying proceedings than occurred in connection with the initial damages hearing, the Special Master is unable to conclude that ACE has presented a preponderance of evidence that any of HP's post-tender expenses would not have been conducted against liability by a reasonable insured. In the final analysis, this conclusion is based upon the particular facts of the Nu-kote action, including Nu-kote's bankruptcy- related efforts in 1998, and perhaps more importantly, the interrelationship between the claims alleged by HP in the underlying action, and the expansive scope of the counterclaims alleged by Nu-kote. Nu-kote's response to HP's lawsuit had the effect of rendering HP's prosecution of its claims defensive, both strategically and with respect to overlapping elements in the parties' claims. This interrelationship, testified to by ACE's expert, Professor Menell, combined with ACE's failure to undertake the defense of the lawsuit, creates what would appear to be an anomalous situation, i.e., a situation wherein an insured recovers from its insurer all of its costs incurred in connection with the defense *and* prosecution of an action.

In *Buss v. Superior Ct.*, 16 Cal. 4th 35, 52 (1997), the California Supreme Court addressed the right of a defending insurer to seek reimbursement of costs actually expended to defend "noncovered" claims. ACE, however, did not defend. The Court also noted that for an insurer to carry its burden of proof on allocating "it must accomplish a task that, 'if ever feasible,' may be extremely difficult." *Buss* at 57-58 (citation omitted; emphasis added).

As with Professor Menell and Mr. Ocampo, Mr. Aronson's testimony was insufficient for this Special Master to conclude that any portion of HP's post-tender fees and costs would not have been conducted against liability. As an initial matter, Mr. Aronson's testimony at the hearing revealed his testimony was not entitled to a great amount of weight. Although it appears that Mr. Aronson spent an extensive amount of time reviewing the Nu-kote action, even he conceded that he spent only about 6 seconds per billing entry. Much more importantly, HP's evidence that during Mr. Aronson's review of the bills, and as part of his calculations, Mr. Aronson twice looked at an identical Gibson Dunn bill and came up with different allocations of the entries on the bill is extremely problematic. (Ex. 1712.) Mr. Aronson did not offer any explanation with respect to his inconsistent review of an identical bill. The testimony elicited by HP, at least in the Special Master's eyes, reveals the subjective nature and unreliability of Mr. Aronson's testimony. The Special Master cannot concur in ACE's assertion that the inconsistency in Mr. Aronson's review of the bill in question "is an indicia of reliability."

There are significant additional problems with Mr. Aronson's testimony. Mr. Aronson's approach to HP's billing entries does not appear on its face to be improper. (Ex. 4216A.) Mr. Aronson looked at each of the entries in light of his extensive review and knowledge of the players and events in the underlying action. Mr. Aronson then determined whether the activities described in an entry were necessary to the proof of HP's affirmative claims of patent infringement, trademark infringement and false advertising. With respect to any such entries, Mr. Aronson then determined if the activities described in the billing entry were also necessary to proving or disproving an element of HP's defense against Nu-kote's counterclaims. (RT 476:19-482:8; Ex. 4216.) The methodology, as asserted by ACE, sounds logical.

The problem Mr. Aronson's review is his view with respect to what was necessary to proving an element of HP's defense to Nu-kote's counterclaims. With respect to pre-May 7, 1999 expenses, Mr. Aronson testified that expenses that involved HP's affirmative claims were allocated as prosecution expenses, i.e., not to be recovered by HP. Thus, Mr. Aronson's theory of what pre-May 7, 1999 expenses were conducted against liability is directly contrary to Professor Menell's testimony, which was that prior to May 7, 1999, HP's pursuit of its affirmative claims served as a defense to the Nu-kote counterclaims. As such, ACE's experts do not agreed as to what expenses would be conducted against liability prior to May 7, 1999. This is a problem for ACE. ACE attempts to get around this problem by noting that Mr. Aronson's

testimony was consistent with that of Mr. Ocampo's no reasonable expectation of coverage testimony.  For the reasons previously noted, Mr. Ocampo's testimony is not admissible, and moreover, does not address the relevant standard, and otherwise is contrary to the weight of the evidence.  Mr. Aronson's reliance upon this testimony to find pre-May 7, 1999 expenses related to HP's affirmative claims not recoverable renders his testimony with respect to such expenses incorrect.  Mr. Aronson's allocation of pre-May 7, 1999 expenses is also contrary to the Special Master's conclusion that HP's pre-May 7, 1999 expenses associated with the prosecution of its affirmative claims were conducted against liability by a reasonable insured under the same circumstances.  As such, the Special Master rejects Mr. Aronson's testimony that $6.54 million of HP's pre-May 7, 1999 expenses were not "conducted against liability by a reasonable insured under the same circumstances." Mr. Aronson's testimony does not comport with a correct application of the Court's standard for the remand.

Similarly, the Special Master rejects Mr. Aronson's testimony with respect to post-May 7, 1999 expenses.   For this period, Mr. Aronson allocated expenses that were necessary to proving HP's affirmative patent infringement, trademark infringement and false advertising claims to prosecution expenses, i.e., expenses that are not reimbursable to HP.  This conclusion, while generally consistent with Professor Menell's theory, is contrary to the Special Master's conclusion that expenses associated with HP's affirmative claims, even after the Court's rulings on HP's motion for partial summary judgment, were in fact conducted against liability.  As previously noted, proper application of Professor Menell's theory compels the conclusion that Phase I and Phase II were conducted against "overlapping" claims such that HP's prosecution of the claims was defensive to Nu-kote's counterclaims.  Moreover, Mr. Aronson's testimony is contrary to the Special Master's conclusion that HP's affirmative claims were defensive to the declaratory relief and antitrust claims during Phase I of the trial.  Mr. Aronson's view of what was conducted against liability also is contrary to the Special Master's conclusions that HP's trial strategy would have conducted against liability by a reasonable insured, and thus all of HP's post-tender expenses were conducted against liability.  Finally, it should be noted that Mr. Aronson's testimony with respect to patent expenses during Phase II of the trial was again contrary to Professor Menell's testimony that all Phase II was conducted against liability. Accordingly, given the Special Master's disagreement with Mr. Aronson's allocation vis-à-vis

what was conducted against liability, the Special Master is unable to give any weight to Mr. Aronson's testimony regarding unnecessary expenses.

In conclusion, ACE has failed to meet its burden to establish that any of HP's post-tender expenses would not have been conducted against liability by a reasonable insured under the same circumstances.   Moreover, the preponderance of the evidence provided by both parties is that all of HP's post-tender expenses would have been conducted against liability be a reasonable insured under the circumstances.

## VI.    Conclusion

The case was referred back to Special Master to assess what expenses "would be conducted against liability by a reasonable insured under the circumstances." October 15, 2004 Order at 3.  Consistent with the Court's orders, the burden of proof was on ACE to establish by a preponderance of the evidence which post-tender HP fees and costs would not have been conducted against liability by a reasonable insured under the same circumstances.  Based on the preponderance of evidence, ACE has failed to meet its burden of proving that any HP expenses would not have been conducted against liability by a reasonable insured under the same circumstances.  In contrast, HP presented additional uncontradicted evidence all its post-tender expenses were conducted against liability, and evidence that the benefit of HP's conduct and expenses far outweighed the associated cost of HP's conduct.  Based thereon, the Special Master finds that all of HP's post-tender costs and expenses would have been conducted against liability by a reasonable insured under the same circumstances.

The Special Master therefore finds, reports and recommends that the principal amount of litigation expenses reported on March 31, 2003, $28,418,671.72 should be awarded to HP and against ACE because they are all reasonable and necessary as defense expenses that were conducted against liability and are likely to have been incurred by a reasonable insured under the same circumstances.

Dated:  12-4-06

Hon. Peter G. Stone (Ret.)
Special Master

## PROOF OF SERVICE BY MAIL

I, Lisa Powell, not a party to the within action, hereby declare that on December 4, 2006 I served the attached Report and Recommendation After Remand Hearing on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Jose, California, addressed as follows:

James Lowe Esq.
Gauntlett & Associates
18400 Von Karman Ave.
Suite 300
Irvine, CA 92612

Janelle F. Garchie Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" St.
Suite 800
San Diego, CA 92101

Alan Greenberg Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" Street
Suite 800
San Diego, CA 92101  USA

Ernest Slome Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" Street
Suite 800
San Diego, CA 92101  USA

Robert J. Romero Esq.
Hinshaw & Culbertson
One California St.
Suite 1800
San Francisco, CA 94111-5419  USA

John F. Daum Esq.
O'Melveny & Myers LLP
400 S. Hope St.
15th Fl.
Los Angeles, CA 90071-2899  USA

David A. Gauntlett Esq.
Gauntlett & Associates
18400 Von Karman Ave.
Suite 300
Irvine, CA 92612

Bradley M. Zamczyk Esq.
Hinshaw & Culbertson LLP
244 Jackson St.
3rd Fl.
San Francisco, CA 94111  USA

Steven H. Bergman Esq.
O'Melveny & Myers LLP
400 S. Hope St.
15th Floor
Los Angeles, CA 90071-2899  USA

Martin S. Checov Esq.
O'Melveny & Myers LLP
275 Battery St.
Suite 2500
San Francisco, CA 94111

I declare under penalty of perjury the foregoing to be true and correct.

Executed at San Jose, CALIFORNIA on December 4, 2006.

_____
Signature