# EXHIBIT 46

# G GAUNTLETT & ASSOCIATES

## ATTORNEYS AT LAW

David A. Gauntlett
Eileen Spadoni
James A. Lowe*
Richard Wm. Zevnik
Eric J. Schindler**
Eric Robert Little
Dean H. McVay***
Raymond J. Liddy
Andrea C. Okura

18400 Von Karman, Suite 300
Irvine, California 92612
Phone: (949) 553-1010
Facsimile: (949) 553-2050

Email: info@gauntlettlaw.com
Website: www.gauntlettlaw.com

*Admitted in CO
**Also Admitted in LA
***Also Admitted in D.C.

Our File Number:
10191.003

March 17, 2000

Alan E. Greenberg, Esq.
Lewis, D'Amato, Brisbois & Bisgaard
550 West "C" Street, Suite 800
San Diego, CA 92101-3540

Re:  ***Under Seal v. Under Seal*, USDC Northern District, San Jose Division, Case No. C-99-20207 SW**

Underlying Action:  ***Hewlett-Packard Company v. Nu-kote International, Inc.; And Nu-kote Counterclaim*, USDC Northern District, Case No. C-95-2254 CW**

Dear Mr. Greenberg:

Hewlett Packard Company ("HP") writes to meet and confer for the purpose of attempting to resolve the dispute between CIGNA and HP regarding CIGNA's professed belief that discovery as to the existence of potentially applicable "other insurance" is necessary.

## A.    Introduction

For the reasons we outline in some detail in this letter, no such discovery is appropriate or necessary, because the issue of "other insurance" is not relevant to any issue that remains to be litigated between HP and CIGNA in this action within the meaning of Federal Rules of Civil Procedure, rule 26(b)(1), which limits permissible discovery solely to information that is "reasonably calculated to lead to the discovery of admissible evidence."

EXHIBIT

46

**GAUNTLETT &**
**ASSOCIATES**
A T T O R N E Y S   A T   L A W

Alan E. Greenberg, Esq.
March 17, 2000
Page 2

1.    **CIGNA Owes HP A Complete Defense Without Regard To Whether Any Other**
**Insurer Might Also Have Had A Duty To Defend, And Cannot Avoid Or**
**Reduce Its Obligation To Provide A Complete Defense Based On Speculation**
**That Another Insurer May Also Have A Duty To Defend**

The District Court has found that CIGNA has a duty to defend HP with respect to the action
on the *Nu-kote* counterclaim. The duty to defend as among multiple insurers must be assessed
independently, since each insurer's duty to defend is independent of whatever duty another insurer
might have. *Wausau Underwriters Ins. Co. v. Unigard Security Ins. Co.*, 68 Cal. App. 4th 1030, 1033
(1998). When the duty to defend arises, the insurer owing such a duty must defend the action in its
entirety and immediately. *Buss v. Superior Court*, 16 Cal. 4th 35, 49 (1997); *Haskel, Inc. v. Superior
Court*, 33 Cal. App. 4th 963, 976 note 9 (1995) ["For purposes of the issues presented to us, we will
treat Hartford's acceptance of a 13 percent share of the defense burden as the equivalent of a defense
denial. Such a unilateral limitation of its responsibility is not justified. If it owes any defense
burden, it must be fully borne (*Horace Mann Insurance Co. v. Barbara B., supra.*, 4 Cal. 4th [1076]
at p. 1084) with allocation of that burden among other responsible parties to be determined later."]

Consequently, assuming, for the sake of argument, that any of HP's other policies may
obligate its insurer to defend, that fact would have no bearing on the determination of CIGNA's duty
to defend, nor of the extent of CIGNA's duty to defend. If, as has been conclusively ruled in this
case, CIGNA has a duty to defend, CIGNA must fully reimburse HP for all of its defense costs.
Upon payment to HP, CIGNA would then accede to standing to pursue equitable contribution from
other of HP's insurers that CIGNA believes may also have had a duty to defend. *See Fireman's
Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1289 (1998) [discussing elements of an
equitable contribution claim between insurers]; and *Golden Eagle Ins. Co. v. Foremost Ins. Co.*, 20
Cal. App. 4th 1372, 1390 (1993) [holding that standing to bring an equitable contribution claim arises
only upon payment of the insured's loss by the insurer seeking contribution.] *See also* Civil Code
§ 1432 ["Except as provided in Section 877 of the Code of Civil Procedure, a party to a joint, or joint
and several obligation, who satisfies more than his share of the claim against all, may require a
proportionate contribution from the parties joined with him."].

Since CIGNA has not paid HP's defense costs, CIGNA has no contribution rights, and
therefore has no basis on which to seek discovery of HP's other insurance.

10191-003-3/16/2000-106773.2

**GAUNTLETT &
ASSOCIATES**
ᴬTTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 3

2.    **CIGNA Is Not Entitled To Equitable Contribution From HP Because HP Is Self-Insured, And CIGNA Therefore Is Not Entitled To Discovery Of HP's Fronting Policies**

Equitable contribution is available only between primary insurers. *Fireman's Fund v. Maryland Cas., supra,* 65 Cal. App. 4th at p. 1300. CIGNA therefore cannot recover equitable contribution from any insurer whose coverage is excess to CIGNA's. Consequently, CIGNA is not entitled to discovery of any of HP's excess policies. Nor may an insurer recover equitable contribution from a self-insured entity. *See Aerojet General Corp. v. Transport Indemnity Co.,* 17 Cal. 4th 38, 72 (1997); *County of San Bernardino v. Pacific Indemnity Co.,* 56 Cal.App.4th 666 (1997). HP was self-insured on the domestic side of its liability insurance program at the primary and first excess levels during all policy periods commencing prior to and incuding with the 1992-1993 policy period when Nu-kote first began competing with HP in the inkjet refill market. Since CIGNA cannot recover equitable contribution from HP, CIGNA is not entitled to discovery of the fronting policies by which HP established its self-insured retentions during the arguably pertinent policy periods.

3.    **CIGNA Is Not Entitled To Discovery Of Post 1992-1993 Policies**

CIGNA has raised a meritless argument to the effect that it is entitled to discovery of HP's policies in policy periods subsequent to the October 31, 1992 to October 31, 1993 period of coverage of the CIGNA master primary liability policy under which the District Court has ruled that a duty to defend exists, suggesting that HP's alleged misconduct was in the nature of a continuing tort.

CIGNA's argument cannot withstand critical scrutiny. First, HP showed, and the District Court has ruled, that the 1992-1993 CIGNA policy's duty to defend was triggered because Nu-kote first entered into competition with HP in the inkjet refill market during CIGNA's 1992-1993 policy period, and, HP distributed advertising materials in CIGNA's policy territory that contained statements regarding the refillability of its inkjet cartridges during CIGNA's 1992-1993 policy period that Nu-kote alleged were evidence of unfair competition.

Under *Aerojet General v. Transport Indemnity,* 17 Cal. 4th at 74-75, HP was entitled to select any policy period under which its insurer's defense obligation was triggered and to recover the full amount of its defense costs from that insurer alone. The insurer so selected would, upon payment of HP's defense costs, be entitled to seek equitable contribution from other insurers. *Id.* at 75. ["In a word, although the trigger of the duty to defend is limited to the policy period, the extent of the duty to defend is not."] *See also id.* at p. 71 ["As explained above, the duty to defend embraces all

GAUNTLETT &
ASSOCIATES
ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 4

parts of a claim in which some harm may possibly have resulted, whether within the policy period or beyond."] and at pp. 72-73 ["It bears repeating: if specified harm may possibly have been caused by an included occurrence and may possibly have resulted, at least in part, within the policy period, the duty to defend perdures to all points in time at which some harm may possibly have resulted thereafter."]

The clear import of all of the foregoing authorities is that discovery of other HP policies in this action is irrelevant. CIGNA's duty to defend has been established. At such time as CIGNA has discharged the defense obligation by paying HP's defense costs, CIGNA will accede to standing to seek equitable contribution against other of HP's insurers in a separate action to which HP need not and will not be a party. CIGNA will then have available subpoena power under the Code of Civil Procedure or Federal Rules of Civil Procedure to obtain discovery of HP's policies.

In short, regardless of the content of any other HP policy, CIGNA is not entitled to discovery of any such other policies because CIGNA has been found to owe HP a duty to defend. That duty to defend obligates CIGNA to pay all of HP's legal fees and costs incurred in defending the *Nu-kote* counterclaim. CIGNA cannot avoid or reduce this obligation by seeking to establish that other insurers may also have a duty to defend. Rather, CIGNA must reimburse HP for its defense costs and seek equitable contribution from other insurers in a separate action.

B.    **HP Has Demonstrated That None Of Its Locally-Admitted Foreign Primary Policies Applies To The *Nu-kote* counterclaim**

The declarations submitted by HP in opposition to CIGNA's motion for reconsideration demonstrate that CIGNA either directly issued all locally-admitted foreign primary policies, or in a few exceptions, reinsured the limits of same 100 percent. Consequently, CIGNA is not entitled to discovery of HP's locally-admitted foreign primary policies because:

1.    CIGNA is party to each of those policies and therefore it is deemed to have knowledge of the contents of same (*Aetna Cas. & Sur. Co. v. Richmond*, 76 Cal. App. 3d 645, 652 (1977);

2.    The CIGNA international master policy was the sole international liability policy providing "advertiser's liability" coverage;

GAUNTLETT &
ASSOCIATES
TTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 5

3.      Where such locally-admitted foreign primary policies were issued, their coverage was limited to "bodily injury," and "property damage" claims arising from local premises liability, products liability, and/or auto liability exposures; and

4.      Even if any of these policies applied to the *Nu-kote* counterclaim, the result would be that CIGNA, as the insurer or reinsurer of all locally-admitted foreign primary policies and of the master primary policy, would still be obligated thereunder to pay the full amount of HP's defense costs. How CIGNA may account internally for its obligation to reimburse HP for all of its *Nu-kote* defense costs is irrelevant to any issue as between CIGNA and HP. CIGNA therefore is not entitled to discovery of HP's locally-admitted foreign primary policies. Federal Rules of Civil Procedure, rule 26(b)(1).

CIGNA has continued to demand that HP provide it with locally-admitted foreign primary policies despite the fact that CIGNA admits that it has custody of copies of two policies that it has refused to provide to HP. CIGNA has had more than sufficient time to have obtained translations of those that are in foreign languages to confirm the foregoing information. In light of these facts, and in light of the fact that CIGNA bears the burden of production and persuasion as to any policy provision that operates to restrict or preclude coverage,[1] it is HP's position that CIGNA must support its request for further discovery regarding locally-admitted foreign primary policies with a showing, by admissible documentary evidence, that there exists some _factual_ basis for further inquiry, as opposed to CIGNA's mere speculation that there might be another applicable policy. In other words, to be entitled to further discovery as to other foreign primary policies, CIGNA must demonstrate a factual basis why such discovery is reasonably calculated to lead to the discovery of admissible evidence.[2]

At such time as CIGNA makes such a showing, HP will give all due consideration to providing CIGNA with the discovery it seeks.

---

[1]*See Waller v. Truck Ins. Exchange*, 11 Cal. 4th 1, 16 (1995) [insurer bears the burden of proof on exclusions or other restrictions on coverage"]. *See also Aydin Corp. v. First State Ins. Co.*, 18 Cal. 4th 1183, 1188 (1998).

[2]In light of the fact that CIGNA admits that it has had custody of one or more locally-admitted foreign primary policies since prior to the March 8, 2000 hearing, but has continued to withhold those policies from HP, the only reasonable inference is that CIGNA has thereby learned that none of those policies is applicable here, and therefore those policies only confirm HP's position, and refute CIGNA's. Moreover, it is unique in our experience for an insurer to affirmatively refuse to provide its own insured with a copy of the insured's policy at the insured's request. Is it CIGNA's position that it has no obligation to provide its insured with a copy of the insured's own policy?

**GAUNTLETT &**
**ASSOCIATES**
ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 6

C.   **None of HP's 1992-1993 Domestic Liability Policies Is Relevant Either The**
**Existence Of CIGNA's Duty To Defend Or The Extent Of CIGNA's Duty To**
**Defend**

In connection with its original motion for partial summary judgment, HP previously provided CIGNA with authenticated copies of the 1992-1993 Old Republic $1 million primary fronting policy, the Old Republic $1.5 million first excess fronting policy, and the Old Republic lead umbrella which provides specific excess coverage to the former two policies, and which also provides specific excess coverage to the CIGNA master primary policy that is at issue in this action.

No further discovery as to any of these policies is warranted. When the plain language of these policies is analyzed in light of the facts of this case, and applicable California authority, it is clear as a matter of law that no defense costs coverage exists under the Old Republic primary and first excess fronting policies because these policies establish HP's self-insured retention, and, CIGNA therefore cannot require HP, a self-insured entity, to make equitable contribution to its own defense costs. *Aerojet General*, 17 Cal. 4th at p. 72.

Moreover, no defense costs coverage exists under the Old Republic lead umbrella for the *Nu-kote* counterclaim because all scheduled underlying coverage, which includes CIGNA's policy, has not been and cannot be exhausted. *See Community Redevelopment Agency of the City of Los Angeles v. Aetna Cas. & Sur. Co.*, 50 Cal. App. 4th 329, 338-339 (1996); and *Olympic Ins. Co. v. Employers Surplus Lines Ins. Co.*, 126 Cal. App. 3d 593, 600 (1981) [excess coverage does not apply until all applicable underlying coverage has been exhausted]. Consequently, discovery as to the Old Republic lead umbrella and the policies in excess to same is not permissible, because the information sought is not reasonably calculated to lead to the discovery of admissible evidence.

We summarize why no defense costs coverage exists under the Old Republic lead umbrella [Policy No. MWZU15347] for the *Nu-kote* counterclaim. The primary reasons are:

1.   The structure of HP's insurance program using separate groups of policies to cover:

   a.   HP's domestic liability exposures; and

   b.   HP's international liability exposures; and

2.   The allegations of the *Nu-kote* counterclaim, which sought to recover for both:

**GAUNTLETT & ASSOCIATES**
ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 7

    a.    Alleged domestic anti-competitive injury; and

    b.    Alleged international anti-competitive injury.

**1.   HP's Separate Domestic Coverage Structure**

The first $2.5 million of HP's domestic liability coverage was provided by:

    1.    Old Republic Insurance Company policy no. MWZY10288, a primary fronting[3] policy with limits of liability of $1 million; and

    2.    Old Republic Insurance Company policy no. MWZX26544, an excess fronting policy with limits of liability of $1.5 million excess of HP's Old Republic primary fronting policy.

**2.   HP's Separate International Coverage Structure**

The first $2 million of HP's international liability coverage applicable to the *Nu-kote* counterclaim was provided by:

    1.    CIGNA Property & Casualty Insurance Company policy no. CXCO 24869.[4]

In addition, there was an excess foreign liability policy issued by Colonia Versicherunges, A.G., with limits of liability of $3 million. The perils insured by the Colonia policy do not encompass "advertising liability" coverage. Moreover, the Colonia policy was purchased as specific excess coverage to CIGNA's coverage, and therefore would never apply in the absence of exhaustion

---

[3] The term "fronting" policy refers to a policy where by various means, the insurer has no liability, and the insured is liable for defense and indemnity payments. Fronting policies are used to establish a large deductible or self-insured retention, yet satisfy financial responsibility requirements. *See generally, Aerojet General, supra,* 17 Cal. 4th at pp. 49-50 and p. 49, note 3.

[4] HP's records indicate that CIGNA was HP's primary level CGL insurer for its international exposures under the "control master program" under this same policy number for not less than four consecutive annual policy periods commencing October 31, 1990, and that CIGNA wrote a fifth year of primary coverage under the "controlled master program" for the 1994-1995 policy period. Consequently, notwithstanding the information provided that the coverage of any locally-admitted foreign primary policies as may have been issued subsequent to the 1992-1993 policy period would have been limited to "bodily injury" and/or "property damage" claims, CIGNA would have been the insurer and custodian of any such policies.



GAUNTLETT &
ASSOCIATES
ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 8

of CIGNA's indemnity limits. *Community Redevelopment Agency v. Aetna, supra; Olympic v. Employers, supra.* Consequently the Colonia policy is not even potentially inapplicable to the *Nukote* counterclaim. The Colonia policy therefore is irrelevant, and CIGNA is not entitled to discovery of same.

### 3.  HP's Combined Domestic/International Excess Coverage Structure

The next layer of coverage applicable over HP's separate domestic and international coverage structures was provided by Old Republic Insurance Company policy no. MXZW15347 ("Old Republic lead umbrella") with limits of liability of $10 million each occurrence. The schedule of underlying insurance of the Old Republic lead umbrella lists the Old Republic primary and first excess fronting policies, the CIGNA master primary policy, and the Colonia foreign excess policy, as scheduled underlying insurance.[5]

Additional excess policies issued by various other and different insurers provided coverage in excess of the Old Republic lead umbrella. Except for the minor variations in high excess layer policies, these excess policies coverage "followed form" to the Old Republic lead umbrella policy provisions. Key among those provisions are those that establish that their coverage applies only upon exhaustion of underlying coverage. Moreover, since these policies all were purchased as specific excess coverage to CIGNA's coverage, they are expressly inapplicable according to Paragraph 1 of CIGNA's "other insurance" clause.

### 4.  How Coverage Under The Old Republic Lead Umbrella Is Triggered

For a claim against HP that was covered solely by its domestic coverage structure and policies, coverage under the Old Republic lead umbrella would be triggered by HP's payment of $2.5 million in defense costs and/or indemnity dollars. This circumstance does not exist here, because Nu-kote alleged that HP committed alleged unfair competition both in the United States and abroad.

For a claim against HP that was covered only by its international coverage structure and policies, coverage under the Old Republic lead umbrella could be triggered under one of two different scenarios, due to the fact that the CIGNA primary international and the Colonia excess international policies did not cover identical risks of loss.

---

[5] The "other insurance" provision of CIGNA's policy also makes clear that the Old Republic lead umbrella does not apply, and here, is irrelevant and nondiscoverable, because the first paragraph of same expressly exempts "insurance purchased by the Named Insured to apply specifically in excess of the coverage of" the CIGNA policy.

**⁊ GAUNTLETT &
Ⅱ ASSOCIATES**
T T O R N E Y S   A T   L A W

Alan E. Greenberg, Esq.
March 17, 2000
Page 9

First, for a claim covered by the CIGNA policy, but not covered by the Colonia policy, coverage under the Old Republic lead umbrella would be triggered by exhaustion of the $2.0 million per-occurrence indemnity limits of liability under the CIGNA policy.

Second, for a claim covered by both the CIGNA and Colonia policies,[6] coverage under the Old Republic Lead umbrella would be triggered upon exhaustion of the $2.0 million limit of the CIGNA policy, and the $3.0 million limit of the Colonia policy.

However, this circumstance does not exist here, for as CIGNA has judicially admitted, the *Nu-kote* counterclaim alleged that HP allegedly competed unfairly with it in the United States.

For a claim against HP that sought to recover damages both for alleged domestic injury and alleged international injury, in order to trigger coverage under the Old Republic lead umbrella, the coverage of both HP's domestic and international coverage structures had to be exhausted, pursuant to the settled California authority that provides that all scheduled underlying coverage must be exhausted before an excess policy's coverage is triggered.

Here, the *Nu-kote* counterclaim presented just such a claim for both domestic and international injury.[7] Consequently, in order to trigger coverage under the Old Republic lead umbrella and with respect to the *Nu-kote* counterclaim, HP would have to establish exhaustion of both its underlying domestic coverage and its underlying international coverage.

**5.      HP Has Not Exhausted Its 1992-1993 Domestic Self-Insured Retention Under The Old Republic Fronting Policies Because There Is No Judgment Or Settlement Whose Payment Could Contribute Such Exhaustion**

The $2.5 million combined limits of the Old Republic primary fronting policy and of the Old Republic first excess fronting policy represent, in effect, a $2.5 million per-occurrence deductible

---

[6]The major overlap in perils covered by the CIGNA and Colonia policies consisted of "bodily injury" and "property damage" coverages. The Colonia policy did not provide the "advertisers liability" coverage for "unfair competition" under which HP is pursuing its defense costs claims against CIGNA.

[7]Although as discussed above, due to the lack of any "advertising liability" coverage under the Colonia international excess policy, it is not applicable.

10191-003-3/16/2000-106773.2

# GAUNTLETT &
## ASSOCIATES
### ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 10

or self-insured retention, which can be satisfied by payment of defense costs, by payment of judgments or settlements, or by combination of defense and indemnity payments.[8]

The provisions of the Old Republic primary fronting policy that establish how HP can exhaust its underlying domestic coverage are as follows:

1. The policy's "Declarations," "Limits of Insurance," "Personal & Advertising Injury Limit."[9]

2. Endorsement no. 12, Form EE, "Ultimate Net Loss Definition."[10]

3. Endorsement no. 12, Revised Form L, ¶¶ 1 and 2.[11]

---

[8]The fact that the Old Republic fronting policies include coverage for defense costs within the definition of "ultimate net loss" does not mean, however, that CIGNA is entitled to contribution to defense costs. As shown above, *Aerojet General v. Transport Indemnity* holds squarely that an insurer cannot recover contribution to defense costs from an entity that has established a self-insured retention through use of "fronting" policies. Accordingly, under the facts of this case, CIGNA is entitled neither to contribution to defense costs by HP, nor to any set-off represented by HP's $2.5 million self-insured retention.

[9]The limit shown in the Declarations is $1,000,000.

[10]This definition states:

"It is agreed that the term 'Ultimate Net Loss'" is added to SECTION V - DEFINITIONS wherever it is used in this policy it means: The total which the Insured, or any company as its insurer pays or is obligated to pay as a consequence of any occurrence, covered hereunder, by reason of "Bodily Injury," "Property Damage," "Personal Injury," "Advertising Injury," "Professional Liability," or "Injury" either through adjudication or compromise, and, regardless of the final outcome of any judgment, adjudication, compromise, or settlement, and shall also include hospital, medical and funeral charges and all sums paid or obligated to be paid as salaries, wages, compensation, fees, charges and law costs, premiums on attachment or appeal bonds, interest, expense for doctors, lawyers, nurses and investigators and other persons and for litigation, settlement, adjustment and investigation of claims and suits which are paid or obligated to be paid, excluding only the salaries of the Insured's or any insurer's permanent employees. [¶] It is further agreed that any other definition of "Ultimate Net Loss" contained within this policy is deleted and replaced with the above definition.

[11]Revised Form L states:

AMENDMENT TO SECTION III - LIMITS OF INSURANCE

**⟍ GAUNTLETT &
∬ ASSOCIATES
TTORNEYS AT LAW**

Alan E. Greenberg, Esq.
March 17, 2000
Page 11

4.    Endorsement no. 13, Form G, "Revised Deductible Endorsement."[12]

5.    Endorsement no. 13, Revised Form I, "Insuring Agreement."[13]

---

It is hereby understood and agreed that with respect to CL 113 (11-88) Commercial General Liability Coverage Form, SECTION III - LIMITS OF INSURANCE is deleted and replaced with the following:
SECTION III - LIMITS OF INSURANCE

1.    The Company shall be liable for the "Ultimate Net Loss" not to exceed the amounts stated in the Limits of Insurance section of the Policy's Declarations. The Company shall not be obligated to indemnify or pay on behalf of the Insured any "Ultimate Net Loss" after such Limits of Insurance have been exhausted. The limits below fix the most we will pay regardless of the number:
   a.    Insureds;
   b.    Claims made or "suits" brought; or
   c.    Persons or organizations making claims or bringing "suits."

2.    "Personal Injury" and "Advertising Injury Limit" in the Declarations is the most we will pay under Coverage B for "Ultimate Net Loss" because of all "Personal Injury" and "Advertising Injury" arising out of one "Occurrence."

[12]Form G states:
It is agreed that the Policy is subject to the following deductible:

$1,000,000 "Ultimate Net Loss" per "Occurrence."

All sums incurred by the Insured or its insurers and included in the definition of "Ultimate Net Loss" shall be subject to this deductible. All such sums shall: (i) reduce or exhaust the Limits of Insurance set forth in the Declarations and (ii) satisfy the deductible set forth in this Endorsement. [¶] All other terms and conditions of this Policy remain unchanged.

[13]Revised Form I states:
INSURING AGREEMENT

It is agreed that as respects Form CL 113 (Ed. 11-88), Commercial General Liability Coverage Form, **COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY** 1. Insuring Agreement **COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY** 1. Insuring Agreement Policy No. MWZY10288, is deleted and replaced by the following:
"The Company will pay on the behalf of the Insured for all sums, as more fully defined by the term, "Ultimate Net Loss" which the Insured shall become legally obligated to pay as damages because of:
A. "Bodily Injury"; or
B. "Property Damage"; or

# GAUNTLETT &
## ASSOCIATES
### ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 12

The provisions of the Old Republic first excess fronting policy that establish how HP can exhaust its underlying domestic coverages are as follows:

1. Policy's Declarations, Item 4, and Form I, referred to therein;[14]

2. Endorsement No. 10, Form I, "UNDERLYING INSURANCE COVERAGE A";[15]

3. Endorsement No. 3, Form B, "INSURING AGREEMENT";[16]

---

C. "Personal Injury"; or
D. "Advertising Injury"

to which this insurance applies, caused by an Occurrence.

[14]Item 4 of the Declarations states:
    4.    UNDERLYING INSURANCE: See Form I.

[15]Form I states:
UNDERLYING INSURANCE COVERAGE A
GENERAL LIABILITY
Company: Old Republic Insurance Company
Policy No.: MWZY10288
Policy Period: 9-30-92 to 9-30-93
Limit: $1,000,000 Per Occurrence

[16]Form B states: INSURING AGREEMENT
The Insuring Agreement as stated in this Policy is deleted in its entirety and replaced with the following:
INSURING AGREEMENTS
Coverage A: The Company will indemnify the Insured for Ultimate Net Loss in excess of the total applicable Limits of Liability of Underlying Insurance set forth under Form G or any renewals or replacements thereof with respect to Coverage A, the provisions of all underlying policies are incorporated as part of this Policy, except for any obligations to investigate and defend and pay for costs and expenses incident to any of the same, the amounts of the Limits of Liability and the "Other Insurance" provision except as otherwise excluded herein. As to Ultimate Net Loss not covered by Underlying Insurance set forth under Form G, or any renewals or replacements thereof, Coverage B applies.

# GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 13

4.      Endorsement No. 4, Form C, "LIMITS OF LIABILITY";[17]

5.      Endorsement No. 5, Form D, "DEDUCTIBLE ENDORSEMENT";[18]

6.      Endorsement No. 8, Form G, "DEFINITIONS COVERAGE A," ¶ 1-2.[19]

---

[17]Form C states:
LIMITS OF LIABILITY
It is agreed that this Policy is subject to the following:
**LIMITS OF LIABILITY**

The Company shall be liable for $1,500,000 Ultimate Net Loss each occurrence, in excess of the greater of:

A.      The amount recoverable under the underlying insurance set forth under Schedule A or any renewals or replacements thereof; or

B.      Self-insured retained limits of $1,000,000 Ultimate Net Loss each occurrence with respect to Ultimate Net Loss not covered by underlying insurance set out in Schedule A; it being understood, however, that other insurance available to the Insured (including insurance for defense costs and expenses incurred on behalf of the insured) shall reduce, or, if it is $1,000,000 per occurrence or more, shall eliminate the insured's obligation with respect to the self-insured retained limit. (This clause takes precedence over Condition K. – Other Insurance.)

[18]Form D states:
In consideration of the premium charged in the issuance of this Policy, it is agreed that the following amount shall be deducted from the amount of any loss, including any expenses and defense costs, as a result of each occurrence reported under this Policy:

$1,500,000 Deductible amount each occurrence

It is further agreed that expenses incurred by the Insurer arising out of a duty to defend regardless of liability shall be subject to the Deductible Endorsement. Payments under the deductible will reduce the applicable Limits of Insurance under this Policy. The deductible may be satisfied by loss or expense payments from any source as defined in this Policy.

[19]Form G states, in pertinent part:

It is agreed that this Policy for Coverage A is subject to the following definitions:

1.      **SELF-INSURED RETAINED LIMIT:**

10191-003-3/16/2000-106773.2

**GAUNTLETT &
ASSOCIATES**
ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 14

6.    **No Defense Costs Coverage Can Exist Under the 1992-1993 Old Republic Lead
Umbrella Because CIGNA's Limits Are Not and Cannot Be Exhausted Under
The Facts Presented**

The coverage of the CIGNA master policy affords unlimited defense costs coverage in
addition to the $ 2 million indemnity limits of liability. Under settled California law, once CIGNA's
defense obligation arose, CIGNA could terminate its duty to defend in only three ways: (1)
termination of the underlying action; (2) exhaustion of its indemnity limits of liability by payment
of judgments or settlements; or (3) entry of a judgment of no coverage in a declaratory relief action.
*Buss v. Superior Court*, 16 Cal.4th at 46.

Here, the underlying action has concluded, but this fact relieves CIGNA only of liability on
a prospective basis from the date of finality of the underlying settlement. It does not relieve CIGNA
of liability for defense costs incurred prior to termination of the underlying action.

CIGNA cannot terminate its duty to defend based on entry of a judgment of no coverage,
because the District Court has ruled adversely to CIGNA on that question, finding that CIGNA owes
HP a duty to defend.

---

The term "Self-Insured Retained Limit" means the amount of Ultimate Net Loss which, in the absence
of underlying insurance set forth under Form G or any renewals or replacements thereof, is retained
by the Insured.

2.    **ULTIMATE NET LOSS:**

The term "Ultimate Net Loss" means the total sum which the Insured, or any Company as his Insurer
(including any underlying insurance set forth on Form G), or both, pays or is obligated to pay as a
consequence of any occurrence, covered hereunder, by reason of "Bodily Injury," "Personal Injury,"
"Property Damage," "Advertising Liability or Professional Liability Claims," either through
adjudication or compromise, and, regardless of the final outcome of any judgment, adjudication,
compromise, or settlement, shall also include hospital, medical and funeral charges and all sums paid
or obligated to be paid as salaries, wages, compensation, fees, charges and law costs, premiums on
attachment or appeal bonds, interest, expense for doctors, lawyers, nurses and investigators or other
persons and for litigation, settlement, adjustment and investigation of claim and suits which are paid
or obligated to be paid as a consequence of any occurrence covered hereunder, excluding only the
salaries of the Insured's, or of any underlying Insurer's permanent employees and defense costs and
expenses paid or obligated to be paid by any underlying Insurer, which are in addition to and not part
of such underlying Insurer's limits of liability.

# GAUNTLETT &
# ASSOCIATES
### ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 15

Finally, since the CIGNA policy's limits of liability can be exhausted only by payment of covered judgments and settlements, and not by payment of defense costs, and, since HP successfully defended the *Nu-kote* counterclaim, with the result that there is no covered judgment or settlement, it is impossible to exhaust the limits of liability of the CIGNA policy under the facts presented.

Since the CIGNA policy's limits cannot be exhausted, and since the *Nu-kote* counterclaim presented claims for both domestic and international injury, defense costs coverage under the Old Republic lead umbrella cannot be triggered, because all applicable scheduled underlying domestic and international coverage has not been and cannot be, exhausted.

**D.    No HP Policies, Domestic Or Foreign, Issued In Policy Years Subsequent To The 1992-1993 Policy Period Are Relevant**

CIGNA is not entitled to discovery of any HP liability policies issued subsequent to the 1992-1993 policy period. CIGNA has asserted a right to discovery of subsequently issued policies based on vague and speculative allusions to continuing loss theories.

CIGNA is not entitled to discovery of subsequently issued policies, regardless of whether HP may have continued in later policy periods to publish alleged disparaging statements about inkjet refill products in general and Nu-kote's in particular for the reasons set forth above.

First, CIGNA cannot avoid or reduce its defense obligations based on the proposition that another insurer may also owe a duty to defend. *Buss; Horace Mann; Wausau Underwriters; Haskel, supra.* Rather, CIGNA must pay HP's defense costs in full and seek equitable contribution from such other insurers in a separate action.

Second, although certain details of the structure of HP's post 1992-1993 liability insurance program differed from the structure in effect in the 1992-1993 policy period described in the preceding section, the fundamental structure remained the same. On the domestic side, HP had a substantial self-insured retention. On the foreign side, HP had primary and excess foreign liability policies. In excess to both the domestic self-insured retention and the foreign liability policies, was a lead umbrella. In excess of the lead umbrella were multiple following-form, ultimate net loss excess indemnity policies.

GAUNTLETT &
ASSOCIATES
TTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 16

1.    **CIGNA Is Not Entitled To Discovery Of Any Post 1992-1993 Lead Umbrella And/Or Overlying Excess Policies Because All Underlying Coverage Has Not Been Exhausted And Because These Policies Were All Written As Specific Excess Coverage To CIGNA's Layer Of Coverage**

Defense costs coverage under the lead umbrella policies in effect in the 1993-1994, 1994-1995, 1995-1996, and 1996-1997 policy periods cannot be triggered as a matter of law, because all underlying domestic and foreign liability coverage has not been, and cannot be exhausted. *See Community Redevelopment Agency v. Aetna, supra,* 50 Cal. App. 4th at 338-339; and *Olympic v. Employers Surplus,* 126 Cal. App. 3d at 600 ["A secondary policy, by its own terms, does not apply to cover a loss until the underlying primary insurance has been exhausted. This principle holds true even when there is more underlying primary insurance than contemplated by the terms of the secondary policy."][20]

2.    **CIGNA Is Not Entitled To Discovery Of HP's Post 1992-1993 Fronting Policies Under Which HP Established Its Self-Insured Retention**

HP's post 1992-1993 domestic self-insured retentions cannot be exhausted, assuming for the sake of argument that they potentially could have applied to the *Nu-kote* counterclaim. In *Aerojet General v. Transport Indemnity, supra,* the California Supreme Court held that an insurer which owes its insured a duty to defend cannot compel contribution to defense costs from a self-insured entity. 17 Cal. 4th at p. 72. The Supreme Court held:

> Although insurers may be required to make an equitable contribution to defense costs among themselves, that is all; an insured is not required to make a contribution together with insurers. [Citations omitted.] Equitable contribution applies only between insurers [citations omitted], and then and only in the absence of contract. [Citation omitted.] It therefore has no place between insurer and insured, which have contracted the one with the other. Neither does

---

[20]Moreover, these lead umbrellas and overlying excess policies all were written as specific excess coverage to the same layer of coverage as represented by the 1992-1993 CIGNA policy. In addition, CIGNA wrote the same primary layer of foreign liability coverage in the 1993-1994 and 1994-1995 policy periods. Each of these three CIGNA foreign primary policies contained an "other insurance" clause that exempted policies purchased as specific excess coverage to CIGNA's coverage.

GAUNTLETT &
ASSOCIATES
TTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 17

> it have any place between an insurer and an uninsured or "self-
> insured" party. [Citations and footnote omitted.]

This settled legal principle means that under the facts of this case, where CIGNA has been found to owe HP a duty to defend, and where the underlying claim was successfully defended, the only sums at issue are HP's defense costs – there is no underlying judgment or settlement. Since there is no underlying judgment or settlement, HP's post 1992-1993 fronting policies' limits cannot be exhausted by payment of such [nonexistent] judgment or settlement. And, since CIGNA cannot recover equitable contribution to defense costs from HP, a self-insured entity, HP's post 1992-1993 fronting policies cannot be exhausted by payment of defense costs. Consequently, HP's post 1992-1993 fronting policies do not apply to the *Nu-kote* counterclaim. As such, they are irrelevant to any issue in this litigation, and therefore are not discoverable.

3.    **CIGNA Is Not Entitled To Discovery Of HP's Post 1992-1993 Foreign Primary And Excess Policies Because They Do Not Apply**

HP's post 1992-1993 CIGNA foreign liability coverage, even if assumed to be applicable, cannot be exhausted as a matter of law, because these primary policies under CIGNA's "master" primary policies in effect in each post 1992-1993 policy period provided defense costs coverage <u>in addition to</u>, and not within, the limits of liability. Since HP successfully defended the *Nu-kote* counterclaim, there is no judgment or settlement to be paid which could serve to exhaust the foreign liability policies' limits of liability. And, absent exhaustion of all applicable scheduled underlying coverage, defense costs coverage under any of HP's post 1992-1993 lead umbrellas (and overlying excess indemnity policies) cannot be triggered as a matter of law.

Consequently, discovery of HP's post 1992-1993 policies is not permissible, because such discovery would not lead to information that is reasonably calculated to lead to the discovery of admissible evidence. Federal Rules of Civil Procedure, rule 26(b)(1).

E.    **In Considering Its Response To HP's Position That CIGNA Is Not Entitled To Discovery Of Other HP Insurance, CIGNA Should Recall That It Remains Bound By The Covenant Of Good Faith And Fair Dealing**

In the foregoing pages, HP has stated the factual bases for its position that discovery by CIGNA of HP's other insurance policies is neither necessary nor appropriate, and the legal authority supporting its position.

10191-003-3/16/2000-106773.2

**¬ GAUNTLETT &
Ⅱ ASSOCIATES**
T T O R N E Y S   A T   L A W

Alan E. Greenberg, Esq.
March 17, 2000
Page 18

In considering its response to HP's attempt to meet and confer with it with respect to the issue of "other insurance" discovery, CIGNA would be well-advised to keep in mind the fact that, despite the pendency of this action, CIGNA continues to owe HP a duty of good faith and fair dealing with respect to this claim. *White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 886 (1985).

Lewis, D'Amato, Brisbois & Bisgaard is CIGNA's agent by virtue of its representation of CIGNA in this matter, and the conduct of Lewis, D'Amato's attorneys in this matter, and the potential consequences of same, are attributable to CIGNA, as Lewis, D'Amato's principal. *Carroll v. Abbott Laboratories, Inc.*, 32 Cal. 3d 892, 898 (1982).

The implied covenant of good faith and fair dealing requires CIGNA to refrain from any conduct by which it interferes unreasonably with HP's right to receive the benefits and protections of the insurance coverage HP purchased from CIGNA. Evidence that CIGNA has violated provisions of the unfair claims practices act, Insurance Code §790.03(h)[21] is admissible to show a breach of the implied covenant of good faith and fair dealing. *Spray, Gould & Bowers v. Associated Int'l. Ins. Co.*, 71 Cal. App. 4th 1260, 1269-1271 (1999).

Litigation tactics by an insurer can constitute a breach of the implied covenant of good faith and fair dealing. *White v. Western Title*. Consequently, litigation tactics that have as their sole object to delay resolution of the action so as to interfere with the insured's right to recover policy benefits can be offered as evidence of the insurer's breach of the implied covenant of good faith and fair dealing. The weight to be accorded such evidence increases where litigation tactics are unsupported factually and legally, and/or otherwise are frivolous.

---

[21]In pertinent part, an insurer violates the unfair claims practices act, Insurance Code § 790.03(h) by: . . . .

(3) failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies; . . . .

(5) not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; and

(13) failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement.

*Id.* at subdivisions (h)(3), (h)(5), and (h)(3).

10191-003-3/16/2000-106773.2

## GAUNTLETT & ASSOCIATES
### ATTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 19

HP would not refer to the foregoing principles but for the recent emergence of litigation tactics by CIGNA that HP believes constitute evidence of bad faith by CIGNA. These include, but are not limited to:

1.　CIGNA's violation of the scope of the District Court's order granting it leave to file a motion for reconsideration by rearguing numerous issues for which leave to move for reconsideration was expressly denied;

2.　CIGNA's affirmative misrepresentation of fact to the District Court at the March 8, 2000 hearing that HP did not tender the defense of the *Nu-kote* counterclaim until after the conclusion of the action on same;

3.　CIGNA's improper attempt to reargue the meaning of "unfair competition," an issue for which it sought, and as to which the District Court denied leave to move for reconsideration, in its ex parte letter brief and at the March 8, 2000 hearing;

4.　CIGNA's affirmative misrepresentation of the state of California insurance law as to the meaning of "unfair competition" by virtue of its argument based on the *Standard Fire* decision contained in its letter brief; and CIGNA's failure to disclose and discuss controlling contrary authority[22]; and

5.　CIGNA's affirmative misrepresentation to the District Court in its letter brief that CIGNA had only recently discovered the existence of the *Standard Fire* decision, when the true facts were that CIGNA had cited and discussed *Standard Fire* in its original April 1999 opposition to HP's motion for partial summary judgment on the duty to defend issue.

Accordingly, HP suggests that CIGNA devote appropriate consideration to the following issues when responding to this letter:

1.　In light of the square holding of *Aerojet General v. Transport Indemnity* that an insurer which owes its insured a duty to defend may not seek or recover equitable contribution to defense costs from an insured which is self-insured for certain aspects of its coverage, on what factual and/or legal bases does CIGNA contend that HP's

---

[22]*Cf., Lebas Fashion Imports of U.S.A., Inc. v. ITT Hartford Ins. Group,* 50 Cal.App.4th 548 (1996); and *American Cyanamid Co. v. American Home Assur. Co.,* 30 Cal. App. 4th 969 (1994).

**GAUNTLETT &**
**ASSOCIATES**
TTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 20

fronting policies by which HP has established its self-insured retentions are relevant
to any issue remaining in this action within the meaning of Federal Rules of Civil
Procedure, rule 26(b)(1) such that CIGNA should be permitted discovery of same?[23]

2.    In light of the square holdings of *Community Redevelopment v. Aetna* and *Olympic
v. Employers* that coverage under excess policies is not triggered until all scheduled
applicable underlying insurance has been exhausted, on what factual and/or legal
bases does CIGNA contend that HP's lead umbrella policies (and overlying excess
policies) that are specific excess coverage to CIGNA's coverage are relevant to any
issue remaining in this action within the meaning of Federal Rules of Civil
Procedure, rule 26(b)(1) such that CIGNA should be permitted discovery of same?

3.    In light of the square holdings of *Buss, Horace Mann, Wausau Underwriters* and
*Haskel* that an insurer's duty to defend is immediate and extends to the entirety of an
action, that each insurer's duty to defend must be determined independently, and that
an insurer may not limit the scope of its duty to defend based on the existence of
other insurance believed applicable, on what factual and/or legal bases does CIGNA
contend that any other of HP's insurance policies are relevant within the meaning of
Federal Rules of Civil Procedure, rule 26(b)(1) such that CIGNA should be permitted
discovery of same?

HP submits that CIGNA's response should be measured, and supported factually or legally.
HP will give careful consideration to any such factually and legally supported response. If, however,
CIGNA's response is of the same character and quality as CIGNA's more recent conduct of this
litigation, CIGNA should anticipate that HP will avail itself of all appropriate remedies available to
it, including, but not limited to a motion for leave to amend to assert a cause of action against
CIGNA for breach of the implied covenant of good faith and fair dealing, as evidenced in part by the
conduct of this litigation.

---

[23]In regard to this particular principle of California insurance law, HP believes it is appropriate to point out to
CIGNA that it can hardly claim ignorance of the proposition that an insurer that has a duty to defend may not seek or
recover equitable contribution to defense costs from a self-insured entity. In *Aerojet v. Transport*, the California
Supreme Court relied principally on two prior Court of Appeal decisions in reaffirming that rule of law. These two
decisions were *County of San Bernardino v. Pacific Indemnity Co.*, 56 Cal. App. 4th 666, and *Truck Ins. Exchange v.
AMOCO*, 35 Cal. App. 4th 814. In *San Bernardino v. Pacific Indemnity*, the insurer <u>unsuccessfully</u> argued that a self-
insured entity should be required to contribute to defense costs on a pro-rata basis with the insurer. The Court of Appeal
rejected that argument. We note that Pacific Indemnity was represented by Lewis, D'Amato, and in particular, by Mr.
Greenberg.

# GAUNTLETT & ASSOCIATES
TTORNEYS AT LAW

Alan E. Greenberg, Esq.
March 17, 2000
Page 21

We look forward to your reply.

Very truly yours,

David A. Gauntlett

RWZ/kr

10191-003-3/16/2000-106773.2