# EXHIBIT 68

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                    SAN JOSE DIVISION

 4
    HEWLETT-PACKARD CO.,      ]    C-94-20647-JW
 5
             PLAINTIFF,       ]    SAN JOSE, CALIFORNIA
 6
             V               ]    MAY 17, 1999
 7
    NU-KOTE INTERNATIONAL,    ]    VOLUME 1
 8
             DEFENDANT.       ]    PAGES 1-210
 9
    _ _ _ _ _ _ _ _ _ _ _ _ _]
10
                 TRANSCRIPT OF PROCEEDINGS
11           BEFORE THE HONORABLE JAMES WARE
             UNITED STATES DISTRICT JUDGE
12
    A P P E A R A N C E S:
13
    FOR THE PLAINTIFF:        GIBSON, DUNN & CRUTCHER
14                            BY:  ROBERT E. COOPER
                                   PETER SULLIVAN
15                            333 SOUTH GRAND AVENUE
                              LOS ANGELES, CALIFORNIA
16                            90071

17                            PENNIE & EDMONDS
                              BY: STEVEN I. WALLACH
18                                WILLIAM G. PECAU
                                  TOM CANOVA
19                                JAMES MARKEY
                              1155 AVENUE OF THE
20                            AMERICAS
                              NEW YORK, NEW YORK
21                            10024

22
             (APPEARANCES CONTINUED ON THE NEXT PAGE)
23

24  OFFICIAL COURT REPORTER:  IRENE L. RODRIGUEZ, CSR
                              CERTIFICATE NUMBER 8074
25                            PETER TORREANO, CSR
                              CERTIFICATE NUMBER 7623
```

1



EXHIBIT

68

ALL-STATE LEGAL®

```
 1
 2    A P P E A R A N C E S: (CONT'D)
 3    FOR THE DEFENDANT:        COUDERT BROTHERS
                                BY:  RONALD S. KATZ
 4                                   MARK WILDASIN
                                     BRUCE MCCUBBREY
 5                                   ROBERT A. CHRISTOPHER
                                SUITE 1250
 6                              10 ALMADEN BOULEVARD
                                SAN JOSE, CALIFORNIA 95113
 7
 8
 9    ALSO PRESENT:             HEWLETT-PACKARD
                                BY:  BRUCE COWGER
10                                   BOB WEIS
                                1000 NE CIRCLE BOULEVARD
11                              CORVALLIS, OREGON 97330
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

2

1    SAN JOSE, CALIFORNIA            MAY 17, 1999

2                    P R O C E E D I N G S

3           (WHEREUPON, COURT CONVENED AND THE

4    FOLLOWING PROCEEDINGS WERE HELD:)

5           THE CLERK:  MATTER OF CIVIL 94-20647,

6    HEWLETT-PACKARD COMPANY VERSUS NU-KOTE

7    INTERNATIONAL.  JURY SELECTION.

8           COUNSEL, STATE YOUR APPEARANCE FOR THE

9    RECORD, PLEASE.

10          MR. COOPER:  FOR HEWLETT-PACKARD BOB

11   COOPER; BOB WEIS, WHO IS THE VICE PRESIDENT OF THE

12   DESKJET PRINTER GROUP OF HEWLETT-PACKARD; BILL

13   PECAU; PETER SULLIVAN, AND THEN ASSISTING ME TODAY

14   IS BARBARA SWAIN.

15          THE COURT:  GOOD MORNING.

16          MR. COOPER:  GOOD MORNING.

17          MR. KATZ:  GOOD MORNING.  RON KATZ FOR

18   NU-KOTE.  WITH ME ARE MARK WILDASIN, ROBERT

19   CHRISTOPHER, BRUCE MCCUBBREY AND DENNIS SOBCZAK.

20          THE COURT:  GOOD MORNING.

21          MR. KATZ:  GOOD MORNING.

22          THE COURT:  GOOD MORNING, LADIES AND

23   GENTLEMEN.

24          NOT TOO FRIENDLY OUT THERE, ARE YOU?

25          WELL, I REALLY WANT TO THANK YOU FOR YOUR

                                                    3

FOR THAT PURPOSE, THAT WOULD BE HELPFUL.

MR. SULLIVAN: YOUR HONOR, THERE IS ONE
OTHER ISSUE AND THAT IS H-P WROTE TO NU-KOTE'S
LAWYERS LAST WEEK, LATE LAST WEEK AND SUGGESTED
THAT ONE OF THE CLAIMS BE DROPPED AND H-P WOULD BE
WILLING TO DROP THE CLAIM ON THE CONDITION THAT A
CLAIM DROPPED IN THE INTELLECTUAL PROPERTY CASE
DOESN'T COME BACK TO HAUNT US IN THE ANTITRUST
CASE, AND NU-KOTE REJECTED THAT OFFER. SO THAT'S
SOMETHING THAT WE WOULD LIKE TO TALK TO YOU ABOUT
THIS AFTERNOON.

MR. WILDASIN: YOUR HONOR, JUST SO WE'RE
ALL SURE WHAT WE'RE GOING TO BE TALKING ABOUT THIS
AFTERNOON, THERE ARE THE TWO MOTIONS THAT
MS. DANIELVARDA BROUGHT TO OUR ATTENTION AT THE
FIRST BREAK THAT YOUR HONOR WANTS ARGUMENT ON. THE
PARTIES HAVE ALSO EXCHANGED DEMONSTRATIVES AND
DOCUMENTS, AND WE HAVE SOME OBJECTIONS, AND THEY
HAVE NOT BEEN RESOLVED THIS WEEKEND. AND WE WOULD
LIKE TO ADDRESS THOSE TO THE COURT THIS AFTERNOON.

THE COURT: I'LL MAKE MYSELF AVAILABLE TO
YOU FOR THAT. IF IT'S A DEMONSTRATIVE, I'M VERY
LIBERAL IN ALLOWING THOSE TO BE USED, BUT IF THERE
ARE THINGS THAT YOU CAN'T RESOLVE, YOU'LL BE
PREPARED TO TELL ME BE THEM WHEN WE MEET THIS

85

AFTERNOON.

I DON'T WANT TO TURN THE AFTERNOON SESSION INTO A LONG, DRAWN-OUT SESSION, QUITE FRANKLY, BECAUSE I'M STILL NEEDING SOME TIME, SINCE SO FAR AS I COULD SEE I DIDN'T GET ANY JOINT INSTRUCTIONS FROM ANYBODY.  EVERYTHING WAS ALL DIFFERENT, AND SO I'M STILL WORKING HARD ON OPENING INSTRUCTIONS TO TRY AND SAY TO THE JURY FROM YOUR VARIOUS DRAFTS SOME OF THE DESCRIPTIONS OF WHAT THEY WILL BE DEALING WITH.

IN THAT REGARD, LET ME TELL YOU NOW BEFORE WE -- BEFORE WE BREAK FOR LUNCH MY INTENT. SINCE THIS, SINCE THIS CASE HAS SOME VERY COMPLEX JURY INSTRUCTIONS, I'VE DECIDED THAT RATHER THAN WAITING UNTIL THE END OF THE CASE TO INSTRUCT THE JURY ON THE LAW, THAT I WOULD TRY TO INSTRUCT ON SOME ISSUES AT THE BEGINNING OF THE CASE AND EVEN THEN WHEN I WAS LOOKING AT THE BEGINNING INSTRUCTIONS THEY BECAME SO LONG GIVEN THE NUMBER OF ISSUES IN THE CASE THAT I DECIDED TO BREAK UP THE INSTRUCTIONS SO THAT THEY FOLLOWED AS CLOSE AS I COULD TO THE WAY THE CASE IS GOING TO BE PRESENTED.

MY INTENT THEN WOULD BE TO GIVE INSTRUCTIONS ON THE TRADEMARK AND PATENT AND FALSE

86

1  ADVERTISING CLAIMS AND IN THAT REGARD NOT TO GIVE

2  ALL OF THE INSTRUCTIONS ON THOSE BUT TO GIVE THOSE

3  THAT ARE -- THAT HAVE TO DO WITH DEFINITIONS OF

4  TERMS AND TO ALLOW THE BURDEN OF PROOF AND THEN TO

5  WAIT UNTIL THE CLOSE OF THE CASE TO SAY MORE

6  ABOUT -- ABOUT THOSE ISSUES TO THE EXTENT THAT I

7  NEED TO AND ALSO TO WAIT UNTIL THE END OF THE CASE

8  TO GIVE DETAILED INSTRUCTIONS ON DAMAGES AS TO ANY

9  ASPECT OF THE CASE.  SO I INTEND NOT TO ADDRESS

.0  DAMAGES IN THE OPENING INSTRUCTIONS.

.1          AND THEN AS THE CASE PROCEEDS WHERE I

.2  FIND IT APPROPRIATE TO GIVE AN INSTRUCTION -- TO

.3  GIVE SUPPLEMENTAL INSTRUCTIONS.  MY HOPE IS THAT BY

.4  THE END OF THE CASE THAT I WOULD HAVE COVERED MANY

.5  OF THE AREAS.  I WILL GIVE THE JURY THE

.6  INSTRUCTIONS IN WRITING AND SO AT THE END OF THE

.7  CASE IT WILL BE MY -- MY JOB TO SORT OF REMIND THE

8  JURY OF THE VARIOUS INSTRUCTIONS THAT I'VE GIVEN

9  THEM, TO INSTRUCT ON DAMAGES AND THEN TO ALLOW YOU

0  TO ARGUE THE CASE AND THEN TO GIVE THEM SOME FINAL

1  INSTRUCTIONS ON THEIR JURY DELIBERATIONS.  AND THAT

2  WAY THAT IF DURING THE COURSE OF THE CASE MATTERS

3  CHANGE, I CAN ALWAYS GIVE AN ADDITIONAL OR

4  MODIFICATION TO THE -- TO THE INSTRUCTIONS.

5          SO WE'LL CONTINUE TO WORK WITH THAT.  I

87

1    SO YOUR OBJECTION IS OVERRULED.

2            MR. KATZ:  I UNDERSTAND.  AND ALSO I WILL

3    STATE FOR THE RECORD, YOUR HONOR, THAT WE OBJECTED

4    AT THE VERY FIRST MOMENT.  WE DID NOT WAIT ON THIS

5    ONE.  AND IF THAT'S NOT THE CASE THEN, YOU KNOW, I

6    WOULD INVITE RULING AGAINST US.

7            THE COURT:  ALL RIGHT.  SO, SO --

8            MR. COOPER:   THAT WAS HIS COUPLE OF BEST

9    SHOTS.

10           MR. WILDASIN:  THAT WAS MY BEST SHOT.

11           MR. COOPER: I HAD A NUMBER OF SHOTS THAT

12   I WANTED TO MAKE, TOO, BUT YOU ONLY SAID ONE.

13           THE COURT:  I SAID ONLY ONE.

14           MR. COOPER: THERE ARE A COUPLE OF ISSUES

15   THAT WE NEED TO ADDRESS.

16           THE COURT:  ALL RIGHT.  QUICKLY.

17           MR. COOPER:   ONE THING WE HAD CONCLUDED

18   WE WOULD DO WAS WITH RESPECT TO THE CONCESSION OF

19   THE SHORTNESS OF LIFE -- I DIDN'T MEAN THAT IN THE

20   SENSE THAT THE COURT HAD IMPOSED ANYTHING TO US.

21   WE AGREE TO THE SCHEDULE AND WE THINK IT MAKES

22   SENSE.

23           WE ARE TRYING TO SHORTEN THE CASE.  WE

24   ARE PREPARED TO DROP THE MEET OR EXCEEDS CLAIM IN

25   THE CASE, BUT WE ADVISED NU-KOTE THAT WE COULD DO

                                              194

1   SO, OF COURSE, IF THEY'RE PREPARED TO RAISE THE

2   FACT THAT IF THEY DON'T BRING UP THE FACT THAT WE

3   BROUGHT THE CLAIM AND DROPPED IT.

4         THE COURT:  WHAT IS MEET OR EXCEEDS?

5         MR. COOPER:  THEIR PACKAGING MEETS OR

6   EXCEEDS THE SPECIFICATIONS OF OUR INKS.  WE'RE

7   PREPARED TO DROP THAT CLAIM, BUT NOT IF WE HAVE TO

8   TURN AROUND AND DEFEND AN ANTITRUST CLAIM THAT WE

9   BROUGHT IT AND DROPPED IT AND THEREFORE THAT WAS

10  INAPPROPRIATE.  SO WE ASKED NU-KOTE IF THEY WERE

11  PREPARED TO SUCH AN AGREEMENT.  THEY WERE NOT.  SO

12  THAT NOW BRINGS THE MATTER TO THE COURT.

13        WE THINK THAT WE SHOULD BE ALLOWED TO

14  DROP A CLAIM WITHOUT HAVING TO DEAL WITH THAT SORT

15  OF RESPONSE IN THE ANTITRUST CASE.  IF YOUR HONOR

16  AGREES WE WILL DROP THE CLAIM AND TRY TO SHORTEN

17  THAT PHASE OF THE CASE.  IF NOT, WE WILL PROCEED

18  WITH IT BECAUSE WE ARE PREPARED TO.  WE ARE

19  PREPARED TO PURSUE IT.

20        THE COURT:  I DON'T HAVE THE RIGHT BOOKS

21  OUT HERE TO DEAL WITH THAT ONE.

22        PART OF THE -- PART OF THE -- OF THE

23  TRADEMARK CLAIM?

24        MR. COOPER:  IT'S A FALSE ADVERTISING

25  CLAIM.

195

1          THE COURT:  RIGHT.

2          MR. COOPER:  WE DON'T NEED TO TAKE THE

3   COURT'S TIME UP NOW.  IT'S NOT CRITICAL I COVER IT

4   IN THE OPENING IN ANY EVENT.  WE CAN ADDRESS IT A

5   LITTLE MORE AT YOUR LEISURE, BUT WE WILL HAVE TO

6   ADDRESS IT AT SOME POINT.

7          THE COURT:  IS THAT A SEPARATE CLAIM OR

8   PART OF A CLAIM?

9          MR. COOPER:  A DISTINCT PIECE OF

0   ADVERTISING THAT WE BELIEVE WAS FALSE AND WE

1   HAVE --

2          THE COURT:  BUT IT'S EVIDENCE ON A

3   PARTICULAR -- YOU'RE NOT DROPPING A COUNT AS I'M

4   CALLING IT OPEN.

5          MR. COOPER:  WE'RE NOT DROPPING A FALSE

6   ADVERTISING COUNT.  WE'RE DROPPING ONE OF THE

7   CLAIMS OF FALSE ADVERTISING WITHIN THAT COUNT.

8          THE COURT:  I WAS HAVING TROUBLE WITH THE

9   NUMBERING OF YOUR COUNTS, BUT, AS I HAVE IT, THE

0   CHART THAT I'M LOOKING AT IS -- WELL, I ACTUALLY

1   DON'T SEE THE LANGUAGE YOU'RE REFERRING TO IN MY

2   CHART.  WHICH CLAIM IS IT?

3          MR. PECAU:  YOUR HONOR, I DON'T HAVE IT

4   IN FRONT OF ME, BUT I WOULD GUESS IT'S CLAIM 3.

5   THE LANGUAGE IS THAT H-P CLAIMED THAT NU-KOTE'S

                                    196

1   THIS FALSE ADVERTISING WHEN NU-KOTE CLAIMED THAT

2   THEY MET OR EXCEEDED EITHER THE SPECIFICATIONS OR

3   THE PERFORMANCE OF H-P'S INKS.

4           THE COURT:  NOW, ISN'T THAT PART OF YOUR

5   ANTITRUST CLAIM?

6           MR. KATZ:  WELL, THEY KNEW WHEN THEY MADE

7   THOSE STATEMENTS THAT WE MET OR EXCEEDED.  FIRST OF

8   ALL, WE DESIGNED IT TO EXCEED.  SECONDLY, THEY

9   DID -- AND THEY KNEW BY THEIR OWN TESTING THAT WE

0   DID MEET OR EXCEED.  SO THAT'S WHY THEY WANT TO

1   DROP IT.

2           MR. COOPER:  YOUR HONOR, IT WON'T HELP US

3   TO ARGUE THE FACTS.  THERE IS NO QUESTION THAT IN

4   THE ANTITRUST CASE NU-KOTE CONTENDS THAT -- THAT

5   OUR STATEMENTS TO RETAILERS THAT OUR INKS ARE

6   SUPERIOR, THEY CLAIM THOSE ARE WERE PART OF A

7   CAMPAIGN TO HARM THEM.

8           THE COURT:  RIGHT.

9           MR. COOPER:  AND THAT DOESN'T GO AWAY.

0   I'M NOT SUGGESTING THAT CLAIM GOES AWAY SOMEHOW.

1   WE HAD AN AFFIRMATIVE CLAIM THAT WE MADE FOR FALSE

2   ADVERTISING WITH RESPECT TO THEIR MEETS OR EXCEEDS

3   ADVERTISING.  I'M SIMPLY SAYING THAT WE'RE PREPARED

4   TO SHORTEN THAT PHASE OF THE CASE BY DROPPING THAT

5   CLAIM IN OUR AFFIRMATIVE CASE AS LONG AS WE WILL

197

1    NOT BE MET WITH A CLAIM OR CHARGE THAT WE BROUGHT

2    THAT CLAIM AND THEN DROPPED IT ON THE EVE OF TRIAL

3    AND THAT THAT WAS PART OF AN OVERALL PLAN TO PUT

4    NU-KOTE TO AN UNDUE BURDEN.

5            THEY HAVE COME BACK AND SAID THAT IF WE

6    DROPPED IT THEY WILL ARGUE THAT, THEREFORE, WE WILL

7    NOT DROP IT UNLESS THE COURT IS PREPARED TO RULE

8    THAT THAT IS AN INAPPROPRIATE ARGUMENT TO BE MADE

9    UNDER THE CIRCUMSTANCES.

.0            THE COURT:  LET ME HEAR YOUR RESPONSE.

.1            I HATE TO DO THIS TO YOU, ANNABELLE, BUT

.2    I NEED THE ANTITRUST.

.3            MR. KATZ:  FIRST OF ALL, THANK YOU FOR

.4    THE COURT'S PATIENCE.

.5            UNDER THE RULES AT THIS POINT HAVING

.6    LITIGATED THIS ISSUE FOR ALMOST FOUR YEARS THEY MAY

.7    NOT DISMISS IT WITHOUT PERMISSION OF THE COURT.  WE

.8    ACTUALLY PREFER THAT THEY NOT DISMISS IT BECAUSE WE

.9    THINK IT STRENGTHENS OUR CASE.  IT'S SUCH A WEAK

.0    CLAIM.  IN FACT, YOUR HONOR HAS ALREADY SHOWN HOW

.1    YOU FEEL ABOUT ISSUES LIKE THIS.  I THINK THERE WAS

.2    A SIMILAR ONE ABOUT "DESIGN TO BE REFILLED."

.3            I MEAN, IT'S CLEAR THAT WE FORMULATE THIS

.4    STUFF TO MEET OR EXCEED.  IT'S ALSO CLEAR THAT

.5    THERE IS EVIDENCE THAT IT DOES MEET OR EXCEED BY

                                                    198

1               THE COURT:  THIS?

2               MR. PECAU:  THE TRADEMARK CHART?  YEAH.

3               THE COURT:  THIS.

4               MR. PECAU:  IT DOES BREAK OUT SEPARATELY

5       THE MEET OR EXCEED CLAIM.

6               THE COURT:  SHOW IT TO ME BECAUSE I'M NOT

7       FINDING THE LANGUAGE.

8               MR. PECAU:  HERE IT IS.  CLAIM 4, YOUR

9       HONOR.

10              THE COURT:  ALL RIGHT.  SO CLAIM 4.  ALL

11      RIGHT.  SO YOU WANT TO DISMISS CLAIM 4?

12              MR. COOPER: YOUR HONOR, WE ARE PREPARED

13      TO DISMISS CLAIM 4, BUT ONLY IF --

14              THE COURT:  I UNDERSTAND YOUR CONDITIONS.

15      THAT'S THE ONE.  ALL RIGHT.  SO NOW I'VE GOT TO

16      IDENTIFY.  AND YOUR OBJECTION TO DISMISSING CLAIM 4

17      IS THAT IT WOULD DEPRIVE YOU, IT WOULDN'T DEPRIVE

18      YOU OF THE RIGHT TO BRING THE ANTITRUST CLAIM, BUT

19      THE QUESTION IS THAT IF IT IS DISMISSED, YOU WOULD

20      WANT TO REASSERT YOUR CLAIM FOR SHAM LITIGATION.

21              MR. KATZ:  WELL, IT MAY RELATE TO SHAM

22      LITIGATION, CERTAINLY.  WE DON'T BELIEVE THAT ANY

23      OBJECTIVE PERSON COULD HAVE BROUGHT THIS.

24              THE COURT:  ALL RIGHT.

25              MR. KATZ:  WE BELIEVE THAT IT'S

                                                    200

1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4
    HEWLETT-PACKARD CO.,        ]     C-94-20647-JW
5
                PLAINTIFF,      ]     SAN JOSE, CALIFORNIA
6
                      V         ]     JUNE 28, 1999
7
    NU-KOTE INTERNATIONAL,      ]     VOLUME 19
8
                DEFENDANT.      ]     PAGES 3521-3853
9
    _ _ _ _ _ _ _ _ _ _ _ _ _ ]
10
                      TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE JAMES WARE
                  UNITED STATES DISTRICT JUDGE
12
    A P P E A R A N C E S:
13
    FOR THE PLAINTIFF:          GIBSON, DUNN & CRUTCHER
14                              BY:  ROBERT E. COOPER
                                     PETER SULLIVAN
15                                   RODNEY STONE
                                     CHAD HUMMEL
16                              333 SOUTH GRAND AVENUE
                                LOS ANGELES, CALIFORNIA
17                              90071

18                              PENNIE & EDMONDS
                                BY:  STEVEN I. WALLACH
19                                   WILLIAM G. PECAU
                                     THOMAS CANOVA
20                                   JAMES MARKEY
                                1155 AVENUE OF THE
21                              AMERICAS
                                NEW YORK, NEW YORK
22                              10024

23          (APPEARANCES CONTINUED ON THE NEXT PAGE)

24  OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8074
25                            LEE-ANNE SHORTRIDGE
                              CERTIFICATE NUMBER 9595

                                              3521

                    U.S. COURT REPORTERS

1

2

3    A P P E A R A N C E S: (CONT'D)

4    FOR THE DEFENDANT:        COUDERT BROTHERS
                                BY:   RONALD S. KATZ
5                                     MARK WILDASIN
                                      BRUCE MCCUBBREY
6                                     ROBERT CHRISTOPHER
                                SUITE 1250
7                                10 ALMADEN BOULEVARD
                                SAN JOSE, CALIFORNIA 95113

8

9

0    ALSO PRESENT:             NU-KOTE INTERNATIONAL
                                BY:   PATRICK E. HOWARD
1                                200 BEASLEY DRIVE
                                FRANKLIN, TENNESSEE 37064

2

3

4

5

6

7

8

9

0

1

2

3

4

5

                                              3522

                    U.S. COURT REPORTERS

```
 1                         INDEX OF PROCEEDINGS

 2      REBUTTAL FOR THE PLAINTIFF:

 3

 4      ROSS MILLS            DIRECT EXAMINATION P.3585
                              CROSS-EXAMINATION P.3609
 5                            REDIRECT EXAMINATION P.3619

 6      YASKO KARAKI          DIRECT EXAMINATION P.3631
                              CROSS-EXAMINATION P.3644
 7

 8      FOR THE DEFENDANT-COUNTERCLAIMANT:

 9      DAVID BRIGANTE        DIRECT EXAMINATION P.3651
                              CROSS-EXAMINATION P.3689
10                            REDIRECT EXAMINATION P.3752
                              FURTHER P. 3767
11                            RECROSS-EXAMINATION P.3762

12                            IDENT.          EVIDENCE
        PLAINTIFF'S:
13
        845                                    3595
14
        2605                                   3597
15
        2578-A                                 3636
16
        2578-B                                 3637
17
        2578-C& D                              3640
18
        5458                                   3701
19
        5460                                   3706
20
        5408                                   3730
21

22

23

24

25
```

3523

U.S. COURT REPORTERS

1

2    SAN JOSE, CALIFORNIA              JUNE 28, 1999

3              P R O C E E D I N G S

4         (WHEREUPON, THE PROCEEDINGS WERE HELD

5    WITHOUT THE JURY.)

6         MR. COOPER:  YOUR HONOR, I THINK I ASKED

7    FOR THIS HEARING.  DO YOU WANT ME TO START?

8         THE COURT:  YOU MAY.  I'LL INTERRUPT YOU

9    SOON, THOUGH.

10         MR. COOPER:  LET ME START WITH THE FIRST

11    ISSUE I'D LIKE TO RAISE.

12         WE MADE A MOTION IN LIMINE AT THE OUTSET

13    OF THE CASE FOR AN ORDER PRECLUDING NU-KOTE, ITS

14    ATTORNEYS, AND ITS WITNESSES FROM INTRODUCING ANY

15    EVIDENCE OR MAKING ANY ARGUMENT THAT OTHERWISE

16    UNLAWFUL H-P CONDUCT MAY VIOLATE SECTION 2 OF THE

17    SHERMAN ACT, EVEN IF IT'S ALLEGED TO BE SOME SORT

18    OR PART OF AN ANTICOMPETITIVE SCHEME.

19         IN RESPONSE, NU-KOTE TOLD THE COURT THAT

20    NU-KOTE WILL DUTIFULLY FOLLOW THE COURT'S RULING ON

21    SUMMARY JUDGMENT AND NO MOTION IN LIMINE OR

22    SEPARATE ORDER IS NECESSARY.

23         AS A RESULT OF THAT, YOUR HONOR THEN

24    ENTERED AN ORDER ON OUR MOTION IN LIMINE WHICH

25    SIMPLY SAID THAT IT'S DENIED SOLELY ON THE GROUND

3524

U.S. COURT REPORTERS

BEING CALLED AS A WITNESS ON BEHALF OF THE

DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

EXAMINED AND TESTIFIED AS FOLLOWS:

       THE WITNESS: YES, I DO.

       THE CLERK: BE SEATED, PLEASE. PLEASE

STATE YOUR FULL NAME FOR THE RECORD, PLEASE.

       THE WITNESS: DAVID BRIGANTE.

       DIRECT EXAMINATION

BY MR. KATZ:

Q    GOOD MORNING, MR. BRIGANTE.

A    GOOD MORNING.

Q    COULD YOU PLEASE GIVE US A BRIEF SUMMARY OF

YOUR EDUCATIONAL BACKGROUND, SIR?

A    I WAS BORN AND RAISED IN SOUTHERN CALIFORNIA,

WENT TO SAINT BERNARD'S HIGH SCHOOL IN DEL REY,

JUST LIKE THE DOG, AND GRADUATED FROM LOYOLA

UNIVERSITY IN LOS ANGELES.

Q    AND COULD YOU GIVE US A BRIEF SUMMARY OF YOUR

EMPLOYMENT HISTORY?

A    I WENT TO WORK FOR BURROUGHS CORPORATION IN

1980. BURROUGHS WAS THE PRECURSOR OF NU-KOTE.

       NU-KOTE WAS ONCE UPON A TIME THE OFFICE

SUPPLIES DIVISION OF BURROUGHS. SO I WORKED THERE

FROM ABOUT 1980 TO ABOUT 1997.

Q    AND WHAT WAS THE BUSINESS AT BURROUGHS?

                            3651

       U.S. COURT REPORTERS

1    A    YES.  AS WAS OUR MOTTO JUST IN THE RIBBON

2    BUSINESS, THEY MADE MORE MONEY WHEN THEY SOLD IT

3    AND THE CONSUMER PAID LESS MONEY WHEN THEY BOUGHT

4    IT.

5    Q    SO WAS THE -- WAS THERE A GOOD RESPONSE FROM

6    THE CHANNEL, FROM THE OFFICE DEPOTS OF THE WORLD?

7    A    YES.  AND WITHOUT FAIL, THE DISTRIBUTION PUT

8    IN OUR PRODUCTS.

9    Q    OKAY.  SO WAS THE BUSINESS SUCCESSFUL WHEN YOU

.0    STARTED IT?

.1    A    YES.

.2    Q    OKAY.  AND THEN AT THAT POINT DID YOU DECIDE

.3    THAT YOU HAD TO MAKE AN ACQUISITION?

.4    A    WE ACTUALLY, AS WE PROGRESSED FROM BEING A

.5    RIBBON BUSINESS, WHILE WE HAD THIS GREAT

.6    RELATIONSHIP OF THE DISTRIBUTION AND THEY SAID "YOU

.7    SOLD ME THE RIBBONS, NOW SELL ME MY LASER

.8    CARTRIDGES, MY INKJET AND ALL OF THESE OTHER

.9    THINGS," SO WE HAD TO GO OUT AND ACQUIRE THE

:0    MANUFACTURING CAPABILITY FOR THESE KINDS OF

!1    PRODUCTS.

!2            WE HAD RIBBON FACTORIES, SO WE ACQUIRED

!3    SEVERAL PRODUCTS, A COMPANY THAT MADE LASER TONER,

!4    A COMPANY THAT REMANUFACTURED THE CARTRIDGES, A

!5    COMPANY, PELIKAN, WHICH WAS THE LEADER IN THE

3669

U.S. COURT REPORTERS

1    DIDN'T HAVE CHOICE.

2             YOU'VE SEEN HERE HOW MAD CUSTOMERS WERE

3    WHO HAD A LEAK.  WELL, WHAT IF YOU KNEW THAT H-P

4    SPECIFICALLY AND INTENTIONALLY DESIGNED A CARTRIDGE

5    SO THAT NU-KOTE WOULD HAVE TO MAKE A NEW PRODUCT

6    THAT WOULD CAUSE LEAKS.

7             THAT'S THE SORT OF THING THAT WE'RE

8    TALKING ABOUT.

9             AND ALTHOUGH MR. BRIGANTE HAD AN

0    UNPARALLELED RECORD OF SUCCESS IN HIS FIRST 16

1    YEARS AT NU-KOTE, HE WAS NAMED I THINK THE CEO OF

2    THE YEAR BY AN IMPORTANT PUBLICATION.  HE WAS A

3    VERY COMPETENT EXECUTIVE.

4             AT WERE SOME POINT THESE STRATEGIES

5    STARTED TO DESTROY NU-KOTE AND TO DESTROY

6    COMPETITION AND TO DESTROY CHOICE FOR CONSUMERS

7    LIKE YOU, AND THAT'S WHAT MR. BRIGANTE WILL BE

8    TELLING YOU ABOUT.

9             THE COUNTERCLAIMANT, NU-KOTE, CALLS MR.

0    DAVID BRIGANTE.

1             THE COURT:  GOOD MORNING.  COME ALL OF

2    THE WAY FORWARD AND BE SWORN.

3             THE CLERK:  RAISE YOUR RIGHT HAND,

4    PLEASE.

5                      DAVID BRIGANTE,

3650

U.S. COURT REPORTERS

1  BEING CALLED AS A WITNESS ON BEHALF OF THE

2  DEFENDANT, HAVING BEEN FIRST DULY SWORN, WAS

3  EXAMINED AND TESTIFIED AS FOLLOWS:

4          THE WITNESS:  YES, I DO.

5          THE CLERK:  BE SEATED, PLEASE.  PLEASE

6  STATE YOUR FULL NAME FOR THE RECORD, PLEASE.

7          THE WITNESS:  DAVID BRIGANTE.

8                DIRECT EXAMINATION

9  BY MR. KATZ:

0  Q     GOOD MORNING, MR. BRIGANTE.

1  A     GOOD MORNING.

2  Q     COULD YOU PLEASE GIVE US A BRIEF SUMMARY OF

3  YOUR EDUCATIONAL BACKGROUND, SIR?

4  A     I WAS BORN AND RAISED IN SOUTHERN CALIFORNIA,

5  WENT TO SAINT BERNARD'S HIGH SCHOOL IN DEL REY,

6  JUST LIKE THE DOG, AND GRADUATED FROM LOYOLA

7  UNIVERSITY IN LOS ANGELES.

8  Q     AND COULD YOU GIVE US A BRIEF SUMMARY OF YOUR

9  EMPLOYMENT HISTORY?

0  A     I WENT TO WORK FOR BURROUGHS CORPORATION IN

1  1980.  BURROUGHS WAS THE PRECURSOR OF NU-KOTE.

2          NU-KOTE WAS ONCE UPON A TIME THE OFFICE

3  SUPPLIES DIVISION OF BURROUGHS.  SO I WORKED THERE

4  FROM ABOUT 1980 TO ABOUT 1997.

5  Q     AND WHAT WAS THE BUSINESS AT BURROUGHS?

3651

U.S. COURT REPORTERS

1    A    IT WAS THE OFFICE SUPPLIES DIVISION, SO WHAT

2    IT DID WAS IT MADE THE SUPPLIES THAT WENT IN

3    PRINTERS.

4         BURROUGHS WAS A BIG MULTI-BILLION DOLLAR

5    COMPUTER COMPANY AND HAD BANKING MACHINES THAT USED

6    RIBBONS, AND LIKE A LOT OF BIG COMPUTER COMPANIES,

7    ALL KINDS OF MACHINES AND EQUIPMENT THAT NEEDED

8    SUPPLIES.

9         SO THE DIVISION MADE THEM FOR BURROUGHS

0    AND WE MADE A WHOLE LINE OF PRODUCTS FOR WHATEVER

1    EQUIPMENT WAS OUT THERE.

2         WE MADE RIBBONS FOR I.B.M. SELECTRIC

3    TYPEWRITERS; WE MADE RIBBONS FOR XEROX TYPEWRITERS

4    AND PRINTERS; AND AS EVERYTHING PROGRESSED, THE

5    FIRST THING PEOPLE GOT WERE DOT MATRIX PRINTERS AND

6    WE MADE THOSE UNDER NU-KOTE OUT IN THE MARKETPLACE.

7         AND FOR THIS PART AT BURROUGHS FOR 45

8    YEARS, THIS IS WHAT THE DIVISION DID AND CLEARLY

9    BECAME THE LARGEST AND MOST SUCCESSFUL SELLER UNDER

0    THE NU-KOTE NAME OUT TO THE OFFICE SUPPLIERS AND

1    DEALERS.

2         YOUR CHOICE WAS YOU COULD BUY THE OEM OR

3    THE NU-KOTE BRAND FOR LESS MONEY FROM THE OFFICE

4    SUPPLIER.

5    Q    AND WAS IT NU-KOTE'S STRATEGY TO WIN ON PRICE?

                                        3652

                    U.S. COURT REPORTERS

A     YEAH.   NU-KOTE -- IN EVERY CASE, ABOUT HALF OF

NU-KOTE'S BUSINESS WAS SELLING PRODUCTS TO THE

OEM'S THEMSELVES WHICH THEY WOULD PUT IN THEIR NAME

AND SELL.

          THE OTHER HALF WAS SELLING A LOT OF THOSE

SAME PRODUCTS OUT TO THE DISTRIBUTION AND IN ALL OF

THOSE CASES TWO THINGS HAPPEN:  THE DISTRIBUTION

MADE MORE MONEY SELLING OURS AND THE CONSUMER PAID

LESS MONEY.

          SO THE IDEA WAS THAT WE USED THE QUALITY

ALTERNATIVE, IT WAS THE SAME QUALITY ITEM AND IT

WOULD WORK JUST AS WELL AND COST LESS.

Q     AND DID YOU PROGRESS THROUGH THE RANKS AT

BURROUGHS WHILE YOU WERE THERE?

A     YEAH.  I STARTED AS A SALESMAN IN 1980 AND

BECAME A REGIONAL SALESMAN, A VP OF SALES, THE

VICE-PRESIDENT AND GENERAL MANAGER OF THE BUSINESS,

THE PRESIDENT OF THE BUSINESS, AND THEN THE CEO,

AND THEN THE CHAIRMAN AND CEO OVER 17 YEARS.

Q     AND DID THERE COME A TIME WHEN BURROUGHS

CEASED TO EXIST BY THAT NAME?

A     YEAH.  IN 1986 OR '87, I BELIEVE, BURROUGHS

ACQUIRED ANOTHER COMPUTER COMPANY CALLED SPERRY AND

THEY FORMED UNYSIS, U-N-Y-S-I-S I THINK, AND SO

THEY FORMED SPERRY AND BURROUGHS BECAME UNYSIS.

                                        3653

                U.S. COURT REPORTERS

1           AND OUT OF THAT CAME NU-KOTE AND A

2    MANAGEMENT BUYOUT.  WE BOUGHT NU-KOTE FROM

3    BURROUGHS FROM THE SUPPLIES BUSINESS IN 1987.

4           WE STILL MADE THE SUPPLIES FOR BURROUGHS

5    AND ALL OF THE OTHER OEM'S AND REALLY RAN THE

6    BUSINESS THE SAME WAY.  THE DIFFERENCE WAS THE

7    MANAGEMENT OWNED THE BUSINESS NOW INSTEAD OF

8    BURROUGHS.

9    Q    SO UNISYS AND BURROUGHS COMBINED.  WAS UNISYS

0    A BIG COMPUTER COMPANY AS WELL?

1    A    WELL, SPERRY -- WELL, LET ME THINK.

2    Q    EXCUSE ME, BURROUGHS AND SPERRY.  SORRY.

3    A    I DON'T KNOW THE NUMBERS EXACTLY, BUT

4    BURROUGHS WAS PROBABLY 4 OR 5 BILLION DOLLARS AND

5    SPERRY WAS PROBABLY 3 OR 4 BILLION, ALMOST THE SAME

6    SIZE.

7           AND SO TOGETHER THE BUSINESS THEY FORMED

8    WAS UNISYS, SO TOGETHER IN SALES I THINK THEY

9    FORMED --

0    Q    AND YOU SAY THAT MANAGEMENT BOUGHT NU-KOTE AND

1    BECAME A SEPARATE COMPANY?

2    A    YES.

3    Q    AND WHAT YEAR WAS THAT?

4    A    I BELIEVE THAT TRANSACTION CLOSED IN 1987.  IT

5    MIGHT HAVE CLOSED RIGHT AT THE END OF '86, BUT

                                        3654

                   U.S. COURT REPORTERS

RIGHT IN THERE.

Q    AND WHAT WAS THE BID OF NU-KOTE AT THAT TIME?

A    AGAIN, AS I SAID, NU-KOTE MADE RIBBONS.

RIBBONS WERE PRIMARILY WHAT WE DID.

          WE MADE SUPPLIES FOR PRINTERS AND

TYPEWRITERS AND THE THINGS YOU USED IN YOUR OFFICE

THEN WERE PRINTERS AND TYPEWRITERS.  SO IT WAS

RIBBONS.

          WE MADE CARBON PAPER, TOO, NOT A BIG

SELLER THESE DAYS, BUT ONCE UPON A TIME WE SOLD A

LOT OF CARBON PAPER AND WE SOLD THEM FOR RIBBONS

AND TYPEWRITERS AND BANKING MACHINES AND EVERYTHING

THAT NEEDED THE SUPPLIES.

Q    AND IN 1986 WHEN IT WAS FORMED, DID IT SELL

INKJET CARTRIDGES?

A    NO, I DON'T THINK IT SOLD ANY INKJET

CARTRIDGES AS EARLY AS '86.  SO REALIZE THAT WHAT

NU-KOTE DID REFLECTED WHAT WAS OUT IN THE

MARKETPLACE.

          WHAT YOU WERE USING WERE TYPEWRITERS AND

FIRST DOT MATRIX, M-A-T-R-I-X, PRINTERS AND --

Q    AND IN 1986, HOW LONG HAD WHAT BECAME NU-KOTE

BEEN IN BUSINESS?

A    I THINK ABOUT 45 YEARS AT THAT POINT IT HAD

BEEN OPERATING.

                                        3655

                U.S. COURT REPORTERS

1    Q    AND WAS THERE ANY SIGNIFICANCE IN THE NAME OF

2    NU-KOTE?

3    A    YEAH.  NU-KOTE WAS THE NAME ORIGINALLY ON THE

4    CARBON PAPER.  BURROUGHS AND THIS DIVISION HAD

5    INVENTED THE FIRST -- OR I DON'T KNOW IF THEY

6    INVENTED IT, BUT THEY CAME OUT WITH THE FIRST

7    CARBON PAPER THAT WOULDN'T MAKE A MESS ALL OVER

8    YOUR SHIRT WHEN YOU USED IT AND IT WAS CALLED

9    NU-KOTE CARBON PAPER AND IT LASTED A LONG TIME.

10        AND THIS WAS, OF COURSE, BEFORE THE XEROX

11    COPIER WAS PREVALENT, SO PEOPLE BOUGHT A LOT OF

12    CARBON PAPER THEN.

13        AND THE NAME WAS ON THE CARBON PAPER AND

14    THE NAME WAS ALSO THE BRAND NAME ON ALL OF THE

15    PRODUCTS THAT WE SOLD IN THE AFTERMARKET FOR 45

16    YEARS.

17        WHEN YOU WENT TO THE OFFICE SUPPLIER

18    DEALER, IF YOU WEREN'T GOING TO BUY THE OEM'S, YOU

19    BOUGHT THE NU-KOTE PRODUCT, AND THAT WAS SIMPLY WHY

20    WE USED THE NAME NU-KOTE, BECAUSE THAT WAS SIMPLY

21    THE BRAND WE WERE GOING TO USE.

22    Q    AND DID NU-KOTE OR ITS PREDECESSORS SELL

23    DIRECTLY TO CUSTOMERS?

24    A    NOT TO END USERS, NO.

25    Q    TO END USERS I MEAN?

1    A    ONLY TO OFFICE SUPPLY DEALERS, NEVER TO END

2    USERS.

3    Q    AND WHAT WERE THE BIG CUSTOMERS OF NU-KOTE,

4    SOME OF THE OFFICE SUPPLY DEALERS?

5    A    YEAH.  NU-KOTE FOREVER -- I MEAN, THE REAL

6    STRENGTH OF NU-KOTE HAD ALWAYS BEEN ITS LONG-TERM

7    RELATIONSHIP WITH THE OFFICE SUPPLY DEALERS.

8         ALL OF THE MAJOR OFFICER SUPPLY DEALERS

9    IN THE COUNTRY BOUGHT NU-KOTE.  IN THE MID-'80'S,

0    DISTRIBUTION IS THAT RIGHT TO CHANGE BECAUSE SUPER

1    STORES CAME AROUND, OFFICE DEPOT AND OFFICE MAX AND

2    BIG COMPANIES LIKE CORPORATE EXPRESS STARTED TO

3    GOBBLE UP AT OFFICE SUPPLY DEALERS.

4         SO WE THEN BECAME A VENDOR TO THEM.  ONE

5    OF THE ABSOLUTE STRENGTHS FOR NU-KOTE WAS WE HAD

6    THE RELATIONSHIP WITH THE DISTRIBUTORS, THE OFFICE

7    SUPPLY DEALERS TRUSTED AND KNEW NU-KOTE.

8         WHENEVER A NEW MACHINE WOULD COME ON THE

9    MARKET, WHEN THERE WERE NEW INTRODUCTIONS, THEY

0    ALWAYS ASSUMED NU-KOTE WOULD COME OUT WITH SUPPLIES

1    FOR THOSE AND THEY COULD MAKE MORE MONEY AND THE

2    END USER COULD SAVE MORE MONEY.

3         SO AS THE THING PROGRESSED IN THE OFFICE

4    PLACE AND DOT MATRIX AND INKJET AND LASER CAME

5    ALONG, WE REALLY HAD A TREMENDOUS OPPORTUNITY

3657

U.S. COURT REPORTERS

BECAUSE WE HAD THE RELATIONSHIP WITH ALL OF THESE

CUSTOMERS.

MR. COOPER:  YOUR HONOR, THIS IS A

NARRATIVE.  I DON'T THINK THERE'S A PENDING

QUESTION.

THE WITNESS:  SORRY.

THE COURT:  SUSTAINED.  YOU NEED TO BE

MORE RESPONSIVE TO EVEN YOUR OWN COUNSEL'S COMMENT.

BY MR. KATZ:

Q    YOU MENTIONED THAT NU-KOTE SOLD TO OEM

MANUFACTURERS?

A    YES.

Q    AND DID NU-KOTE HAVE A RELATIONSHIP WITH

HEWLETT-PACKARD?

A    I BELIEVE NU-KOTE HAD A LOT OF OEM

RELATIONSHIPS, AND I KNOW AND I THINK IT'S STILL

EXISTENT THAT THE ORGANIZATION MADE ALL OF THE

RIBBONS FOR HEWLETT-PACKARD, THAT HEWLETT-PACKARD

SOLD FOR ITS, ITS PRINTERS.

Q    AND YOU SAID THAT ONE OF THE STRENGTHS OF

NU-KOTE WAS THAT IT HAD THESE RELATIONSHIPS WITH

THE CHANNELS.  WHY IS THAT A STRENGTH?

A    BECAUSE THERE'S -- THERE'S ALWAYS, ALWAYS --

THERE PROBABLY USED TO BE 100 COMPANIES IN THE U.S.

THAT MADE RIBBONS, JUST LIKE THERE'S PROBABLY 100

3658

U.S. COURT REPORTERS

1    THAT MAKE INKJET SUPPLIES AND SEVERAL HUNDRED THAT

2    MAKE LASER SUPPLIES.

3         THE REAL BARRIER WAS THE RELATIONSHIP OF

4    THAT DISTRIBUTION.  YOU HAVE THE PRODUCTS, COULD

5    YOU GET THE DISTRIBUTION TO CARRY YOUR PRODUCTS IN

6    YOUR BRAND VERSUS EVERYBODY ELSE'S.

7    Q    AND WHO WERE NU-KOTE'S COMPETITORS AT THAT

8    TIME IN THE PREINKJET PERIOD?

9    A    THERE WERE A COUPLE OF COMPANIES.  A COMPANY

10   CALLED GENERAL RIBBON, A COMPANY CALLED EATON ALLEN

11   WAS A FAIRLY LARGE RIBBON MANUFACTURER THAT WAS A

12   COMPETITOR, AND THEN IT REALLY FALLS OFF TO LARGE

13   NUMBERS OF PRETTY SMALL GUYS.

14   Q    AND DID YOU COMPETE WITH THE OEM'S AS WELL?

15   A    YES.  YOU KNOW, TO THOSE DEALERS, SALES TO THE

16   END USERS, YOU COULD EITHER BUY THE OEM'S PRODUCTS

17   OR OURS.

18   Q    SO, FOR EXAMPLE, DID YOU MAKE RIBBONS FOR THE

19   I.B.M. SELECTRIC TYPEWRITER?

20   A    WE MADE RIBBONS FOR 1200 DIFFERENT KINDS OF

21   EQUIPMENT.  WE MADE AND SOLD RIBBONS FOR THE I.B.M.

22   SELECTRIC 2 AND 3 TYPEWRITERS.

23   Q    AND DID YOU -- DID YOU COMPETE WITH I.B.M. IN

24   THE SALE OF THOSE RIBBONS?

25   A    YES, YES WE DID.

                                              3659

                    U.S. COURT REPORTERS

Q    AND DID YOU -- WHAT WOULD HAPPEN WHEN CHANGES

WOULD OCCUR IN THE, IN THE OEM'S PRODUCTS?  DID

NU-KOTE MAKE CHANGES?

A    YES.  YOU KNOW, WE ALWAYS ENDEAVOR TO HAVE A

PRODUCT THAT WORKED FOR THE END USERS.  IT'S ONE OF

THE REASONS THAT THE DISTRIBUTORS TRUSTED US, I

THINK, THAT AS THEY WOULD RELEASE NEW MACHINES OR

MAKE CHANGES, WE COULD BE RESPONSIVE FAIRLY QUICKLY

AND MAKE SURE WE HAD A PRODUCT OUT THERE THAT MADE

SENSE.

        THERE'S A LONG CYCLE IN THIS FOR THE

DISTRIBUTION.  THEY HAVE CATALOGS THAT COME OUT

MONTHS LATER, SO THEY HAVE TO KIND OF BELIEVE THAT

YOU'RE GOING TO HAVE THOSE PRODUCTS PRETTY WELL IN

ADVANCE.

Q    AND DID NU-KOTE HAVE SOME SUCCESS IN THE, IN

THE PERIOD FROM -- WELL, IN ITS FIRST 45 YEARS OR

SO OF ITS EXISTENCE BEFORE THE INKJET?

A    YEAH.  NU-KOTE WAS TREMENDOUSLY SUCCESSFUL, BY

FAR THE LARGEST OF THE INDEPENDENTS AND VERY

SUCCESSFUL.

Q    OKAY.  AND DID YOU RECEIVE ANY RECOGNITION IN

YOUR ROLE AS CEO OF NU-KOTE?

A    YEAH.  I DID THAT FOR 17 YEARS AND WE HAD SOME

VERY GOOD ONES.  IN 1995 I WAS NAMED CEO OF THE

                                    3660

Transcript Vol 19, Pgs 3521-3853    Page 3661

1    YEAR BY FINANCIAL MAGAZINE, AND EITHER OR FORTUNE

2    OR FORBES, I DON'T REMEMBER WHICH, NAMED US ONE OF

3    THE BEST SMALL COMPANIES IN AMERICA.  WE HAD A LONG

4    RUN OF SUCCESS.

5    Q    AND WHEN DID YOU BECOME CEO, CHIEF EXECUTIVE

6    OFFICER, OF NU-KOTE?

7    A    I BELIEVE IT WAS IN 1982.

8    Q    OKAY.  AND AS CEO OF NU-KOTE, WHAT WERE YOUR

9    RESPONSIBILITIES?

0    A    THE ROLE OF CEO IS TO REALLY, I THINK, TO SET

1    THE STRATEGIC VISION FOR THE COMPANY OF WHERE ARE

2    YOU GOING TO GO?  WHAT ARE YOUR VALUES?  WHERE ARE

3    YOU GOING TO GO AS AN ORGANIZATION?  HERE'S WHERE

4    WE ARE TODAY AND WHERE DO WE WANT TO BE FIVE YEARS

5    FROM NOW?

6         TO SUPPORT THAT VISION AND JUST TO MAKE

7    SURE YOU HAVE THE APPROPRIATE PEOPLE IN PLACE TO

8    EXECUTE IT.

9    Q    AND AS CEO, DID YOU DEAL WITH MANY OF THE

:0    DETAILS OF THE COMPANY?

:1    A    TO BE HONEST, NO.  I MEAN, WHAT I GENERALLY

:2    DID WAS DECIDED THAT I HAD SMART PEOPLE IN THE

:3    RIGHT PLACES WHO KNEW THE DETAILS AND, AND I DEALT

:4    WITH LARGE ISSUES, BUT NOT WITH DETAILS ON VERY

:5    MUCH OF AN EVERYDAY BASIS AT ALL.

3661

U.S. COURT REPORTERS

1    Q    AND DID THERE COME A TIME WHEN NU-KOTE

2    FORMULATED A STRATEGY REGARDING INKJET CARTRIDGES?

3    A    YES.  YOU KNOW --

4    Q    AND SPECIFICALLY H-P INKJET CARTRIDGES?

5    A    YES.  AND REALIZE ALWAYS FOR NU-KOTE, IT

6    WASN'T SO MUCH LIKE NU-KOTE SAT AND DECIDED "HERE'S

7    WHAT WE'RE GOING TO DO."  THE MARKETPLACE DECIDED

8    FOR US.  WE SOLD TYPEWRITER RIBBONS AND THEN THEY

9    DIDN'T HAVE RIBBONS.

10           AND THEN WE SOLD DOT MATRIX AND THEN THEY

11   GOT RID OF THEM.

12           AND THEN WE SOLD INKJET SUPPLIES.

13           SO WHERE WE WERE GOING TO GO WAS FROM A

14   -- THE DISTRIBUTION DECIDED WHERE WE WERE GOING,

15   WHAT THE NEXT PRODUCTS WERE.

16   Q    AND WHEN YOU SAY "THE DISTRIBUTION," YOU MEAN

17   OFFICE MAX AND STAPLES AND THE CATALOGS?

18   A    RIGHT, RIGHT.  THE BIG BUYERS OF THESE

19   PRODUCTS WHO SOLD THEM TO THE END USERS, THEY WERE

20   REACTING TO WHAT THE END USER WAS USING.

21   Q    AND SO DID THERE COME A TIME WHEN NU-KOTE MADE

22   A DECISION TO GO INTO THE BUSINESS OF PRODUCING OR

23   OF SELLING CARTRIDGES AND OTHER PRODUCTS THAT WERE

24   COMPATIBLE WITH H-P PRINTERS?

25   A    YES.

                                              3662

                     U.S. COURT REPORTERS

```
1    Q    OKAY.  AND WHEN DID THAT TIME COME?

2    A    RON, AS I SIT HERE TODAY I CAN'T SAY EXACTLY

3    WHEN WE MADE THE DECISION THAT SAID WE WERE GOING

4    TO SELL INKJET SUPPLIES, YOU KNOW?  I DON'T KNOW IF

5    THAT WAS '91, '92.  I DON'T KNOW EXACTLY WHEN THAT

6    HAPPENED.

7    Q    IT WAS IN THE EARLY '90'S?

8    A    I BELIEVE SO, YES.

9    Q    AND FROM YOUR PERSPECTIVE AS CEO AT THAT TIME,

0    WHAT ROLE, IF ANY, DID HEWLETT-PACKARD PLAY IN THIS

1    MARKETPLACE?

2    A    WELL, CERTAINLY HEWLETT-PACKARD WAS THE

3    LEADING SELLER OF THE EQUIPMENT.  FAR AND AWAY THEY

4    DOMINATED THE MARKET FOR SELLING THE EQUIPMENT.

5         IF YOU WERE GOING TO BE IN THE INKJET

6    SUPPLY MARKET, YOU HAD TO SELL HEWLETT-PACKARD

7    SUPPLIES.  THEY WERE SUCH A BIG PART OF THE MARKET.

8    Q    AND WHAT PART, IF ANY, DID HEWLETT-PACKARD

9    PLAY IN YOUR STRATEGY, IN NU-KOTE'S STRATEGY?

0    A    AGAIN, WHOEVER HAD THE BIG INSTALLED BASE OF

1    EQUIPMENT, THAT'S THE STUFF YOU WOULD HAVE TO COME

2    OUT WITH.  THOSE ARE THE PRODUCTS THAT YOU WOULD

3    HAVE TO SELL.

4    Q    OKAY.  CAN YOU TELL US WHAT IS AN INSTALLED

5    BASE OF EQUIPMENT?  WHAT DO YOU MEAN BY THAT?
```

                                                    3663

1    A    IT'S JUST THE HARDWARE THAT IS OUT THERE, YOU

2    KNOW, HOW MANY HEWLETT-PACKARD INKJET PRINTERS ARE

3    IN PEOPLE'S OFFICES.  THAT'S INSTALLED BASE.

4         IF SOMEBODY HAS GOT A MILLION INSTALLED

5    BASE, THAT'S BIG.  YOU WOULD COME OUT WITH SUPPLIES

6    FOR IT.

7         IF THEY HAD A VERY SMALL INSTALLED BASE,

8    YOU WOULDN'T BOTHER MAKING THE SUPPLIES BECAUSE

9    THERE WASN'T A LOT OF DEMAND FOR IT.

10        AND HEWLETT-PACKARD CERTAINLY HAD THE

11   MAJOR SHARE OF STUFF OUT THERE.

12   Q    DID YOU CONSIDER MANUFACTURING INKJET

13   PRINTERS?

14   A    NO.

15   Q    WHY NOT?

16   A    IT REALLY WASN'T OUR BUSINESS MAKING PRINTERS.

17   OUR BUSINESS WAS MAKING SUPPLIES.  IT'S WHAT WE HAD

18   ALWAYS DONE.  IT'S WHAT WE UNDERSTOOD.  IT'S WHAT

19   OUR RELATIONSHIP WAS WITH THE CUSTOMERS, WITH THE

20   SUPER STORES AND DEALERS, AND IT'S WHAT THEY

21   EXPECTED US TO DO.

22        SELLING THE HARDWARE WAS A WHOLE

23   DIFFERENT THING.  IT WASN'T WHAT WE DID.  WE WERE A

24   SUPPLY COMPANY.

25   Q    AND DID YOU HAVE AN UNDERSTANDING OF WHICH

3664

U.S. COURT REPORTERS

1    PART OF THE BUSINESS WAS MORE PROFITABLE, THE

2    SELLING OF SUPPLIES OR THE SELLING OF PRINTERS?

3    A    WELL, I'LL TELL YOU.  INTERESTINGLY ENOUGH, I

4    THINK SELLING THE TYPEWRITERS AND EVEN DOT MATRIX

5    PRINTERS WAS EVEN MORE PROFITABLE.

6            I GAVE A SPEECH ONE TIME AS A KEYNOTE

7    SPEAKER AT A CONFERENCE ON SUPPLIES AND HARDWARE,

8    WHICH ONE IS THE ACCESSORIES.

9            AND I THINK WHAT CHANGED MY OWN BELIEF IS

0    WHEN INKJET CAME ALONG, ALL OF A SUDDEN SELLING THE

1    HARDWARE WASN'T WHERE THE MONEY WAS.  THE MONEY WAS

2    IN SELLING THE SUPPLIES.

3    Q    AND WHY IS THAT?

4    A    WELL, THE PRICE OF THE HARDWARE.  AND NOW YOU

5    CAN BUY AN INKJET PRINTER FOR $79, BUT THE INK

6    STILL COSTS $26.

7            I MEAN, IF YOU DO THE MATH, PRETTY SOON

8    YOU'RE SPENDING A LOT MORE ON THE SUPPLIES THAN ON

9    THE PRINTER AND I THINK THE PROFIT MARGINS FOR THE

0    OEM'S ARE PRETTY HIGH.

1    Q    AND DID THERE COME A TIME WHEN NU-KOTE ENTERED

2    THE BUSINESS FOR THE SUPPLY OF INK THAT WORKED WITH

3    H-P INKJET PRINTERS?

4    A    YES.

5    Q    AND WAS THAT BUSINESS -- HOW DID THAT BUSINESS

3665

U.S. COURT REPORTERS

1    PROCEED?

2    A    IT BEGAN VERY, VERY WELL.  WE -- WE --

3    ESPECIALLY WHEN WE PUT PELIKAN AND NU-KOTE

4    TOGETHER, PELIKAN HAD BEEN BY FAR THE LEADER IN THE

5    DEVELOPMENT OF INKJET AFTERMARKET PRODUCTS AND, AND

6    THE SALES WERE GOING THROUGH THE ROOF.  IT WAS

7    GOING VERY, VERY WELL FOR US.

8              BECAUSE OF OUR RELATIONSHIP ALL OF THE

9    DISTRIBUTORS PUT IN, IT WAS SELLING VERY WELL.  IT

.0   WAS GOING VERY, VERY WELL IN THE BEGINNING.

.1   Q    LET ME ASK MR. SOBCZAK TO PUT 1883-B ON THE

.2   BOARD.

.3              IT'S ALREADY IN EVIDENCE, YOUR HONOR.

.4              HAVE YOU EVER SEEN THIS ADVERTISEMENT,

.5   SIR?

.6   A    YES, I HAVE.

.7   Q    AND DID THIS ADVERTISEMENT APPROPRIATE NU-KOTE

.8   WITH A BUSINESS OPPORTUNITY WITH RESPECT TO

.9   SUPPLYING INK TO PEOPLE WHO WERE USING H-P INKJET

!0   PRINTERS?

!1   A    SURE.  IT WAS A GREAT OPPORTUNITY FOR US.

!2              HEWLETT-PACKARD WAS SAYING TO PEOPLE,

!3   "GEE, EVERY TIME YOU RUN OUT OF INK, YOU'VE GOT TO

!4   GET A WHOLE NEW ENGINE."

!5              IT WAS A GREAT OPPORTUNITY FOR US TO SAY

                                                3666

1    "YOU RAN OUT OF INK?  WE'LL SELL YOU THE INK.  WHY

2    DO YOU NEED TO BUY THE WHOLE NEW ENGINE?"

3        Q    AND LET ME SHOW YOU ANOTHER EXHIBIT WHICH IS

4    IN EVIDENCE, NUMBER 1008.

5             DO WE HAVE IT ON THAT MACHINE?

6             MR. SOBCZAK:  I DON'T THINK SO.

7             MR. COOPER:  MAY WE KNOW WHAT IT IS?

8             MR. SOBCZAK:  I'M SORRY, WE DO.

9             MR. KATZ:  IT'S IN EVIDENCE.  YOU PUT IT

0    IN EVIDENCE.

1             THE COURT:  IS THERE AN OBJECTION?

2             MR. COOPER:  THERE'S NO OBJECTION,

3    ALTHOUGH I THOUGHT WE WOULD BE GIVEN THESE IN

4    ADVANCE SO WE WOULD HAVE THEM.  WE DON'T HAVE THAT

5    HERE.

6             MR. KATZ:  IT IS IN EVIDENCE.  I'M GLAD

7    TO GIVE HIM MY COPY.

8             THE COURT:  VERY WELL.

9    BY MR. KATZ:

0        Q    THIS IS A LETTER, SIR, THAT IS FROM A CONSUMER

1    NAMED MR. SCOTT T. DOWNING, WHO TESTIFIED IN THIS

2    COURT.

3             HAVE YOU SEEN THIS LETTER RECENTLY, SIR?

4        A    YES.  YOU SHOWED IT TO ME.

5        Q    AND I'D LIKE TO SHOW YOU PARTICULARLY THE

3667

U.S. COURT REPORTERS

```
 1    LANGUAGE AT THE BOTTOM OF THE FIRST PAGE AND THE

 2    BEGINNING OF THE SECOND PAGE.

 3              CAN WE ENLARGE THAT, PLEASE, WHERE --

 4    WHERE MR. DOWNING SAYS "THE CARTRIDGES THEMSELVES

 5    ARE ALSO FINE, JUST EXPENSIVE."

 6              IT'S THE LAST LINE THERE.  CAN YOU MOVE

 7    TO THE NEXT PAGE, PLEASE?  AND ENLARGE THE TOP.

 8              AND IT SAYS, "I GUESS WE ARE JUST STUCK

 9    BUYING THE MORE EXPENSIVE CARTRIDGES."

.0              DID THIS SORT OF SENTIMENT ON THE PART OF

.1    CONSUMERS PRESENT AN OPPORTUNITY FOR NU-KOTE?

.2    A    YEAH.  IT WAS WONDERFUL FOR US BECAUSE PEOPLE

.3    DIDN'T WANT TO SPEND $26 TO REPLACE THE INK.  WE

.4    ALWAYS HAD A BUSINESS WHERE WE SOLD SUPPLIES FOR

.5    LESS THAN THE OEM'S DID, AND WHEN IT WAS A $2.99

.6    RIBBON, WE BUILT A GREAT BUSINESS.  WE HAD A HUGE

.7    SHARE OF THE RIBBON BUSINESS.

.8              NOW THAT IT WAS A $26 VIAL OF INK, WE HAD

.9    A BETTER OPPORTUNITY.  WE HAD A BUSINESS.  WE OWNED

20    THE DISTRIBUTION.  WE HAD A MUCH BETTER PRICE

21    PROPOSITION, AND WE WERE VERY EXCITED ABOUT IT.

22    Q    AND DID NU-KOTE OFFER THE CHANNEL, THE OFFICE

23    DEPOTS AND THE STAPLES, ET CETERA, A CHANCE TO MAKE

24    MORE PROFIT ON NU-KOTE PRODUCTS THAN ON OEM

25    PRODUCTS LIKE H-P?
```

                                                    3668

                        U.S. COURT REPORTERS

1    A    YES.  AS WAS OUR MOTTO JUST IN THE RIBBON

2    BUSINESS, THEY MADE MORE MONEY WHEN THEY SOLD IT

3    AND THE CONSUMER PAID LESS MONEY WHEN THEY BOUGHT

4    IT.

5    Q    SO WAS THE -- WAS THERE A GOOD RESPONSE FROM

6    THE CHANNEL, FROM THE OFFICE DEPOTS OF THE WORLD?

7    A    YES.  AND WITHOUT FAIL, THE DISTRIBUTION PUT

8    IN OUR PRODUCTS.

9    Q    OKAY.  SO WAS THE BUSINESS SUCCESSFUL WHEN YOU

0    STARTED IT?

1    A    YES.

2    Q    OKAY.  AND THEN AT THAT POINT DID YOU DECIDE

3    THAT YOU HAD TO MAKE AN ACQUISITION?

4    A    WE ACTUALLY, AS WE PROGRESSED FROM BEING A

5    RIBBON BUSINESS, WHILE WE HAD THIS GREAT

6    RELATIONSHIP OF THE DISTRIBUTION AND THEY SAID "YOU

7    SOLD ME THE RIBBONS, NOW SELL ME MY LASER

8    CARTRIDGES, MY INKJET AND ALL OF THESE OTHER

9    THINGS," SO WE HAD TO GO OUT AND ACQUIRE THE

0    MANUFACTURING CAPABILITY FOR THESE KINDS OF

1    PRODUCTS.

2        WE HAD RIBBON FACTORIES, SO WE ACQUIRED

3    SEVERAL PRODUCTS, A COMPANY THAT MADE LASER TONER,

4    A COMPANY THAT REMANUFACTURED THE CARTRIDGES, A

5    COMPANY, PELIKAN, WHICH WAS THE LEADER IN THE

3669

1     INKJET CARTRIDGES.

2          WE TOOK ON A LOT OF DEBT AND BOUGHT THOSE

3     BUSINESSES SO WE WOULD HAVE THOSE PRODUCTS BECAUSE

4     THE DISTRIBUTION WANTED THEM.

5     Q     AND DID THERE COME A TIME WHEN NU-KOTE WENT

6     PUBLIC?

7     A     YES.  IN OCTOBER OF 1992, I BELIEVE, WE TOOK

8     NU-KOTE PUBLIC.

9     Q     OKAY.  AND WERE SOME OF THOSE ACQUISITIONS

0     ACCOMPLISHED WITH SHARES, EXCHANGE OF SHARES?

1     A     WHEN WE ACQUIRED PELIKAN, WE ACTUALLY ACQUIRED

2     THAT WITH SHARES OF NU-KOTE STOCK.  WE ASSUMED SOME

3     DEBT AND THE PEOPLE WE BOUGHT PELIKAN FROM BECAME

4     THE LARGEST SHAREHOLDER IN THE COMBINED BUSINESSES.

5     Q     AND CAN YOU TELL US WHAT PELIKAN IS?  IS THAT

6     P-E-L-I-K-A-N?

7     A     K-A-N.

8          PELIKAN IS A GERMAN COMPANY THAT'S BEEN

9     AROUND IN GERMANY FOR OVER 100 YEARS.  IT STARTED

0     AS A FINE WRITING COMPANY.  THERE'S VERY FINE

1     PELIKAN PENS ALL OF THE WAY DOWN TO WHEN KIDS IN

2     SCHOOL IN GERMANY WHEN THEY BEGAN TO WRITE IN

3     SCHOOL, IT'S ALWAYS A PELIKAN PEN.  IT'S A GREAT

4     BRAND PEN.

5          AND IT'S JUST LIKE NU-KOTE.  THEY MADE

3670

U.S. COURT REPORTERS

1    ALL OF THE RIBBONS.  AND AS IT PROGRESSED IT MADE

2    INKJET SUPPLIES.

3            AND THEY HAD A WONDERFUL DISTRIBUTION IN

4    EUROPE AND WE DIDN'T, AND THEY WERE OUR BIGGEST

5    AFTERMARKET COMPETITOR IN THE U.S.

6    Q    AND WHAT WAS THE SIGNIFICANCE, IF ANY, IN YOUR

7    MIND, WHEN NU-KOTE ACQUIRED PELIKAN?

8    A    WHEN WE PUT NU-KOTE TOGETHER WITH PELIKAN, IT

9    WAS THE PERFECT DEAL FOR US AND FOR PELIKAN.  IN

10   THE AFTERMARKET -- IN THE AFTERMARKET, THIS

     DISTRIBUTION WAS GOING TO BUY THEIR SUPPLIES

     GENERALLY FROM PELIKAN OR NU-KOTE.  WE WERE THE TWO

     BIG ONES.

            AND IN EUROPE, THEY WERE BY FAR THE BIG

     ONES.

            SO ONCE WE PUT THE TWO TOGETHER, WE HAD

     ALL OF THE PROPER TECHNOLOGIES FOR THE SUPPLIES,

     WONDERFUL RELATION WITH THE DISTRIBUTIONS, WE COULD

     STOP FIGHTING OTHERS AND CONCENTRATE ON GROWING THE

     BUSINESS.

     Q    AND WHAT WAS THE SIGNIFICANCE OF THE PELIKAN

     ACQUISITION IN TERMS OF SIZE, IN TERMS OF YOUR

     GROSS REVENUES?

     A    PELIKAN WAS ABOUT TWICE THE SIZE OF NU-KOTE AT

     THE TIME FOR OVERALL GROSS REVENUES.  THEY WERE

                                    3671

            U.S. COURT REPORTERS

```
 1    VERY BIG IN EUROPE, SMALLER THAN IN THE U.S., BUT

 2    BIGGER IN EUROPE.

 3           THE OVERALL BUSINESS, I BELIEVE THEY WERE

 4    ABOUT 200, 250 MILLION IN REVENUE.

 5    Q   NOW, WHEN NU-KOTE BEGAN SELLING INKJET --

 6    WELL, EVEN BEFORE THAT, WHEN NU-KOTE WAS SELLING

 7    PRODUCTS LIKE RIBBONS, ET CETERA --

 8    A   UH-HUH.

 9    Q   -- WHAT WAS NU-KOTE'S POLICY WITH REGARD TO

10    WHAT QUALITY THE RIBBONS SHOULD HAVE?

11    A   OUR PRODUCTS WERE ALWAYS EQUAL TO OR BETTER

12    THAN THE PERFORMANCE OF THE OEM'S PRODUCT.  WE

13    ALWAYS HAD A THING WHERE WE SAID "IF I'M A

14    SECRETARY IN AN OFFICE AND I'M TYPING WITH AN

15    I.B.M. RIBBON AND IT JAMS OR BREAKS, I THROW IT

16    AWAY AND I PUT ANOTHER ONE IN."

17           "IF I'M TYPING WITH THE NU-KOTE RIBBON

18    AND IT JAMS, I SAY, 'I SHOULDN'T HAVE BOUGHT THIS

19    CHEAP RIBBON.'"

20           SO WE ALWAYS THOUGHT THAT WE WERE HELD TO

21    A TIGHT SCRUTINY BY THE END USER.

22           HALF OF OUR BUSINESS WAS MAKING THINGS

23    FOR THE OEM'S.  WE KNEW HOW TO DO THAT AND WHAT

24    THOSE SPEC LEVELS WERE.

25           SO OUR PLAN WAS ALWAYS AS GOOD AS OR
```

3672

U.S. COURT REPORTERS

1    BETTER THAN THE OEM'S PRODUCT.

2    Q    OKAY.  AND WHEN YOU -- WHEN NU-KOTE STARTED

3    PRODUCING INKJET CARTRIDGES FOR HEWLETT-PACKARD

4    PRINTERS, WHAT WAS YOUR POLICY, IF ANY, WITH

5    RESPECT TO THE QUALITY OF NU-KOTE PRODUCT?

6    A    EXACTLY THE SAME.  AND IF I'M AN END USER AND

7    I USE THE NU-KOTE PRODUCT, I WOULD HAVE TO BE JUST

8    AS SATISFIED AS I AM WHEN I'M USING THE H-P PRODUCT

9    AND IT'S GOT TO COST LESS.

10    Q    AND DO YOU BELIEVE TODAY, OR AS OF THE LAST

11    TIME -- YOU'RE NO LONGER WITH NU-KOTE; IS THAT

12    CORRECT?

13    A    RIGHT, I'M NO LONGER WITH THE COMPANY.

14    Q    AND WITH WHOM ARE YOU AFFILIATED TODAY?

15    A    I HAVE A BUSINESS CALLED ACCESS GLOBAL THAT

16    I'M INVOLVED IN.

17    Q    AND WHEN DID YOU LEAVE NU-KOTE?

18    A    I OFFICIALLY LEFT NU-KOTE, I BELIEVE, IN MARCH

19    OF 1997.

20    Q    OKAY.  AND AS OF THE TIME YOU LEFT NU-KOTE,

21    DID YOU BELIEVE THAT NU-KOTE'S PRODUCTS WERE

22    COMPARABLE TO THE QUALITY OF THE OEM PRODUCTS?

23    A    I BELIEVE THAT ESPECIALLY THE PRODUCTS THAT,

24    THAT NU-KOTE PUT IN THE MARKETPLACE ORIGINALLY WERE

25    ABSOLUTELY COMPARABLE.  I BELIEVE THAT THE INKS IN

3673

U.S. COURT REPORTERS

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3             SAN JOSE DIVISION

4
   HEWLETT-PACKARD CO.,      ]    C-94-20647-JW
5
            PLAINTIFF,        ]    SAN JOSE, CALIFORNIA
6
              V               ]    JUNE 29, 1999
7
   NU-KOTE INTERNATIONAL,     ]    VOLUME 20
8
            DEFENDANT.        ]    PAGES 3854-4031
9
   _ _ _ _ _ _ _ _ _ _ _ _ ]
10
            TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE JAMES WARE
            UNITED STATES DISTRICT JUDGE
12
   A P P E A R A N C E S:
13
   FOR THE PLAINTIFF:        GIBSON, DUNN & CRUTCHER
14                           BY:  ROBERT E. COOPER
                                  PETER SULLIVAN
15                                RODNEY STONE
                                  CHAD HUMMEL
16                           333 SOUTH GRAND AVENUE
                             LOS ANGELES, CALIFORNIA
17                           90071

18                           PENNIE & EDMONDS
                             BY:  STEVEN I. WALLACH
19                                WILLIAM G. PECAU
                                  THOMAS CANOVA
20                                JAMES MARKEY
                             1155 AVENUE OF THE
21                           AMERICAS
                             NEW YORK, NEW YORK
22                           10024

23        (APPEARANCES CONTINUED ON THE NEXT PAGE)

24   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                             CERTIFICATE NUMBER 8074
25                           LEE-ANNE SHORTRIDGE
                             CERTIFICATE NUMBER 9595

                                          3854


            U.S. COURT REPORTERS

```
1

2

3    A P P E A R A N C E S: (CONT'D)

4    FOR THE DEFENDANT:          COUDERT BROTHERS
                                 BY:  RONALD S. KATZ
5                                     MARK WILDASIN
                                      BRUCE MCCUBBREY
6                                     ROBERT A. CHRISTOPHER
                                      ROBERT BECKER
7                                SUITE 1250
                                 10 ALMADEN BOULEVARD
8                                SAN JOSE, CALIFORNIA 95113

9

10                               NU-KOTE INTERNATIONAL
     ALSO PRESENT:               BY:  PATRICK E. HOWARD
11                                    IAN ELLIOTT
                                 200 BEASLEY DRIVE
12                               FRANKLIN, TENNESSEE 37064

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                         3855

                         U.S. COURT REPORTERS

1               INDEX OF PROCEEDINGS

2    DEFENDANT-COUNTERCLAIMANT'S OPENING P. 3858

3    PLAINTIFF-COUNTERDEFENDANT'S OPENING P. 3894

4
     FOR THE DEFENDANT-COUNTERCLAIMANT:
5
     DANA SECCOMBE:    AS ON CROSS-EXAMINATION P. 3955
6

7                    IDENT.      EVIDENCE

8    DEFENDANT'S
9
10   7396                        3956
11   6425                        3992
12   6131                        3999
13   7156                        4007
14   5114                        4016
15   6454                        4016
16
17
18
19
20
21
22
23
24
25

                                      3856

              U.S. COURT REPORTERS

```
1    SAN JOSE, CALIFORNIA              JUNE 29, 1999
2                 P R O C E E D I N G S
3              (WHEREUPON, THE PROCEEDINGS WERE HELD
4    WITHOUT THE JURY.)
5              THE COURT:  OKAY.  ARE YOU READY TO
6    PROCEED?
7              SUMMON THE JURY.
8              (WHEREUPON, THE FOLLOWING PROCEEDINGS
9    WERE HELD IN THE PRESENCE OF THE JURY:)
10             THE COURT:  GOOD MORNING.
11             JUROR:  GOOD MORNING.
12             THE COURT:  AS I INDICATED TO YOU
13   YESTERDAY, I WAS GOING TO GIVE THE PARTIES
14   PERMISSION TO MAKE SOME OPENING STATEMENTS TO YOU
15   WITH RESPECT TO THIS PHASE OF THE CASE.
16             IT IS MY INTENT TO GIVE YOU SOME
17   INSTRUCTIONS ON THE LAW AS TO WHAT THE PARTIES ARE
18   REQUIRED TO PROVE ON THIS ASPECT OF THE CASE, BUT
19   I'M GOING TO PERMIT THE PARTIES TO MAKE THEIR
20   OPENING STATEMENTS NOW.
21             AS I'VE TOLD YOU BEFORE, STATEMENTS BY
22   THE LAWYERS IS NOT EVIDENCE.  THIS IS AN
23   OPPORTUNITY I GIVE THE PARTIES TO OUTLINE FOR YOU
24   WHAT THEY BELIEVE THE EVIDENCE WILL SHOW.
25             NOW, ALTHOUGH THEY'RE NOT SWITCHING
```

3857

U.S. COURT REPORTERS

1    TABLES NOW, THERE'S A LITTLE BIT OF A CHANGE IN THE

2    DYNAMICS.  IN THIS PART OF THE CASE, NU-KOTE IS THE

3    PARTY BRINGING THE CASE.  THEY'RE THE PLAINTIFF AS

4    IT WERE.  WE CALLED THEM THE COUNTERCLAIMANT

5    BECAUSE THEY'RE FILING THE CLAIM AS A COUNTER TO A

6    LAWSUIT THAT WAS ALREADY ON FILE.

7            AND HEWLETT-PACKARD IS THE

8    COUNTERDEFENDANT.  AND SO NU-KOTE HAS, HAS THE

9    BURDEN OF PROOF AND I, I WILL ALLOW NU-KOTE TO OPEN

10   THE PRESENTATION WITH ITS STATEMENT OF WHAT IT WILL

11   PROVE.

12           MR. KATZ?

13           MR. KATZ:  THANK YOU, YOUR HONOR.  MAY IT

14   PLEASE THE COURT.

15           YOUR HONOR, COULD YOU INQUIRE, SINCE I'VE

16   MOVED THIS HERE, COULD YOU INQUIRE WHETHER THE

17   JURORS CAN SEE THE SCREEN BECAUSE IT MAY BE

18   DIFFERENT SIDELINES.

19           JUROR:  IT'S BLOCKING THE EDGE.  YOU

20   MIGHT WANT TO MOVE IT.  OKAY.

21           OPENING STATEMENT BY MR. KATZ

22           MR. KATZ:  GOOD MORNING, LADIES AND

23   GENTLEMEN.  FIRST, OF COURSE, I WOULD LIKE TO THANK

24   YOU FOR YOUR EXTRAORDINARY SERVICE SO FAR.  JUDGE

25   WARE HAS MENTIONED IT, AND THERE'S NO QUESTION THAT

                                              3858

1    ABOUT -- THIS IS A GENERIC INK, COSTS ABOUT 13

2    CENTS A MILLILITER.  THAT THIS, THIS INK IN HERE

3    COSTS ABOUT 82 CENTS A MILLILITER, AND THAT DOM

4    PERIGNON CHAMPAGNE, EXCUSE ME, DOM PERIGNON IS 13

5    CENTS, THE INK IS 7 CENTS AND THE H-P INK IS 82

6    CENTS, SIX TIMES MORE BECAUSE YOU HAVE TO BUY ALL

7    OF THIS OTHER STUFF.

8                 ALL YOU WANT IS INK, BUT YOU'VE GOT TO

9    BUY ALL OF THESE OTHER THINGS, THE PLASTIC

10   PRINTHEAD AND ALL OF THEIR TECHNOLOGY.  YOU DON'T

11   WANT THAT.  THAT'S WHY WE'VE GOT A PROBLEM HERE.

12                 AND THAT'S WHY H-P -- THE EVIDENCE WILL

13   SHOW THAT H-P REFERS TO THEIR INK AS A SUPER CASH

14   COW.

15                 MAY WE HAVE 6454, PLEASE.

16                 THIS IS A CARTOON FROM AN H-P DOCUMENT

17   THAT WILL COME INTO EVIDENCE, AND AS YOU CAN SEE,

18   IT SAYS "INK'S OUR MIDDLE NAME."  THEY PUT HIP.

19   THE MILK IS THE INK.  SUPER CASH COW.  THAT'S WHAT

20   WE'RE TALKING ABOUT HERE; A SUPER CASH COW.

21                 THERE'S NOTHING WRONG WITH HAVING A SUPER

22   CASH COW IF YOU'RE THE BEST, IF YOU'RE THE

23   SMARTEST, THAT'S THE COMPETITIVE SOCIETY.  THAT'S

24   THE AMERICAN DREAM.

25                 BUT WHAT IS WRONG IS IF YOU GET THIS

                                              3865

                     U.S. COURT REPORTERS

1    SUPER CASH COW AND YOU DO IT BY ILLEGAL MEANS, AND

2    THAT'S WHAT HAS HAPPENED IN THIS CASE.

3         THAT'S WHAT WE'RE GOING TO TELL YOU, THAT

4    THAT COW, THAT'S THE MONOPOLY AND THEY DIDN'T GET

5    THAT BY FAIR MEANS.  THEY GOT THAT BY ILLEGAL MEANS

6    BY MONOPOLIZING.

7         AND MONOPOLIZING MEANS SIMPLY YOU HAVE A

8    MONOPOLY, AND IT'S CLEAR THAT H-P DOES.  THE

9    EVIDENCE WILL SHOW THAT.

10         AND THEN YOU DO THINGS TO MAINTAIN THE

11    MONOPOLY, FOR EXAMPLE, YOU MAKE YOUR CARTRIDGES

12    NONREFILLABLE FOR NO GOOD REASON.

13         SO WHY, WHY DO PEOPLE DO THIS?  WHY DO

14    INTELLIGENT CONSUMERS LIKE YOU AND ME AND THE

15    PEOPLE THAT WE'VE SEEN HERE, WHY DO THEY PUT UP

16    WITH THIS?  WHY DO THEY BUY A NEW ENGINE EVERY TIME

17    THEY HAVE TO FILL UP WITH GAS?  ARE THEY STUPID?

18    NO.  THEY DON'T HAVE A CHOICE.

19         AND HOW DO WE KNOW THAT THEY DON'T HAVE A

20    CHOICE?  WELL, EVEN ONE OF THE CONSUMERS THAT H-P

21    ITSELF BROUGHT HERE WROTE THAT IN A LETTER TO H-P.

22    AND I WOULD LIKE TO SHOW YOU AGAIN THAT LETTER FROM

23    MR. DOWNING, EXHIBIT 1008, AND ASK MR. SOBCZACK TO

24    ENLARGE THE LAST LINE ON THE FIRST PAGE.  AND IT

25    GOES OVER TO THE SECOND PAGE.

3866

U.S. COURT REPORTERS

1          BUT HE SAYS, "THE CARTRIDGES THEMSELVES

2    ARE ALSO FINE, JUST" -- ON THE NEXT PAGE -- "JUST

3    EXPENSIVE" I THINK HE SAYS.  "I GUESS WE ARE JUST

4    STUCK BUYING THE MORE EXPENSIVE CARTRIDGES."

5          WELL, WE'RE NOT STUCK.  WE WOULDN'T BE

6    STUCK IF THERE WAS A LEVEL PLAYING FIELD.  WE

7    WOULDN'T BE STUCK IF H-P WASN'T ENGAGING IN FOUL

8    PLAY HERE.  THAT'S THE PROBLEM.  THAT'S WHY HE'S

9    STUCK.  THAT'S WHY HE'S PAYING $30 FOR LESS THAN $2

.0    OF INK.

.1          AND THE EVIDENCE WILL SHOW -- AND WE'LL

.2    HAVE A VERY DISTINGUISHED ECONOMIST COME HERE, DR.

.3    ROBERT HALL FROM STANFORD UNIVERSITY.  THE EVIDENCE

.4    WILL SHOW SOMETHING QUITE SHOCKING WHEN YOU THINK

.5    ABOUT IT, THAT CONSUMERS ARE OVER PAYING FOR THESE

L6    CARTRIDGES 1 BILLION DOLLARS A YEAR, MORE THAN 1

L7    BILLION DOLLARS PER YEAR.  AND THAT'S SCHOOLS,

L8    HOSPITALS, BUSINESSES, EVERYTHING.

L9          AND WHY?  WHY ARE THEY DOING THAT?

20    BECAUSE H-P HAS STOPPED CHOICE.  THEY HAVE

21    SPECIFICALLY DECIDED, WITHIN H-P, AND I'M GOING TO

22    SHOW YOU TAPES OF THIS, VIDEOTAPES, THEY HAVE

23    DECIDED, "WE CAN'T COMPETE.  WE'RE TOO EXPENSIVE.

24    SO WHAT ARE WE GOING TO DO?"

25          NOW OUR SYSTEM SAYS WHAT YOU SHOULD DO IS

                                        3867

                    U.S. COURT REPORTERS

"TIGHTEN OUR BELT, LOWER OUR COST, LET'S GO OUT
THERE AND BEAT NU-KOTE.  LET'S BE BETTER AND
CHEAPER."

      THAT'S WHAT YOU'RE SUPPOSED TO DO.

      THEY DON'T SAY THAT.  THEY SAY, "WHAT
WE'RE GOING TO DO IS WE'RE GOING TO ENGAGE IN FUD,
FEAR, UNCERTAINTY AND DOUBT.

      AND THE EVIDENCE WILL SHOW -- I'M NOT
MAKING THIS UP.  H-P IS A GREAT COMPANY, I'VE TOLD
YOU THAT BEFORE.

      BUT THAT DOES NOT MEAN THAT THERE ARE NOT
PEOPLE WITHIN H-P WHO DO THINGS THAT ARE NOT RIGHT.

      YOU WILL HEAR THE WORD FUD FROM H-P
EMPLOYEES THIS MORNING ON THE TAPE, AND YOU WILL
SEE DOZENS -- THIS IS NOT A COINCIDENCE -- DOZENS
AND DOZENS OF DOCUMENTS THAT SAY "FUD, FUD, WE'VE
GOT TO DO FUD, WE'VE GOT TO DO FUD."  FEAR,
UNCERTAINTY AND DOUBT.  VERY, VERY UGLY CONCEPT.

      LET'S TAKE A LOOK AT ONE OF THOSE TAPES.
THIS IS A TAPE IN HOUSE AT H-P.  IT WAS MADE IN
1992.  IT WAS ACTUALLY BEFORE NU-KOTE GOT INTO THIS
BUSINESS.

      AND ONE OF THE THINGS THAT YOU SHOULD
UNDERSTAND IS THAT OUR ANTITRUST LAWS ARE SO
IMPORTANT THAT OUR CONGRESS HAS SAID THAT YOU CAN

3868

U.S. COURT REPORTERS

1    SUE AS A PRIVATE ATTORNEY GENERAL.

2            SO NU-KOTE IS SUING AS A PRIVATE ATTORNEY

3    GENERAL, AND NU-KOTE IS SUING ON BEHALF OF

4    EVERYONE, CONSUMERS, OTHER COMPETITORS, AND YOU'LL

5    SEE THAT THEY FOCUS ON OTHER COMPETITORS IN THIS

6    TAPE BECAUSE NU-KOTE WAS NOT COMPETITIVE IN THIS

7    MARKET YET AT THAT TIME.

8            SO THIS IS A PERSON, HER NAME IS

9    KATHERINE CLELAND, AND SHE'S A MARKETING PERSON AT

10   H-P AND SHE'S REPORTING TO OTHER H-P PEOPLE.  SHE'S

11   LECTURING TO OTHER H-P PEOPLE, WHAT THEY'RE GOING

12   TO DO ABOUT THE THREAT.  THEY CALLED IT A THREAT

13   FROM REFILLERS.

14           AND I'M GOING TO HAVE MR. SOBCZACK STOP

15   THE TAPE AT VARIOUS PARTS SO THAT I CAN COMMENT ON

16   IT.

17           WOULD YOU PLEASE PUT THAT ON, MR.

18   SOBCZACK.

19           (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

20   OPEN COURT OFF THE RECORD.)

21           MR. KATZ:  THE IMPORTANT PART OF THIS

22   ASPECT OF THE TAPE IS THAT IT SHOWS THAT THIS

23   POLICY COMES FROM THE HIGHEST LEVELS OF H-P.  SHE

24   REFERS TO DANA, THAT'S MR. DANA SECCOMBE, WHO WILL

25   BE OUR FIRST -- OUR NEXT WITNESS, AND IT ALSO

                                            3869

              U.S. COURT REPORTERS

1    REFERS TO BELLUZZO THAT'S MR. RICK BELLUZZO, WHO

2    WAS THE NUMBER TWO PERSON AT H-P.  HE'S NOW LEFT

3    H-P.

4              SO I THINK MR. COOPER WILL SAY OH THIS

5    WAS JUST BRAINSTORMING AND LOW-LEVEL PEOPLE BLOWING

6    OFF STEAM, ET CETERA, ET CETERA.  THIS COMES FROM

7    THE HIGHEST LEVELS OF H-P.

8              MAY WE CONTINUE, PLEASE?

9              (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

0    OPEN COURT OFF THE RECORD.)

1              MR. KATZ:  THIS IS THE PROBLEM.  THEY

2    CAN'T COMPETE ON PRICE.  THEY WANT YOU TO THINK

3    THAT REFILLERS ARE MORE EXPENSIVE.  YOU'LL REMEMBER

4    DR. SPENCE CAME HERE, DR. MILLS, THE FAMOUS DR.

5    MILLS.  HE TOLD YOU ABOUT HOW REFILLERS WERE MORE

6    EXPENSIVE.

7              THIS IS FALSE.  IT'S FALSE.  THAT'S THEIR

8    PROBLEM.  THEY CAN'T COMPETE ON PRICE.  IT'S A

9    THREAT.  WHAT DO THEY DO?

:0             LET'S SEE.

:1             (WHEREUPON, A VIDEOTAPE WAS PLAYED IN

:2   OPEN COURT OFF THE RECORD.)

:3             MR. KATZ:  THIS IS A VERY KEY POINT,

:4   BECAUSE WHAT IT SHOWS IS IS THAT WHEN PEOPLE ARE

:5   DISSATISFIED WITH PRICE, THEY'RE LIKE MR. ALLEN WHO

3870

U.S. COURT REPORTERS

1    THEREFORE, SELL H-P."

2           SO THEN LET'S SEE WHY IT IS A MYTH.

3    LET'S FOCUS ON THE BOTTOM OF THE PAGE THERE.  IF

4    YOU CAN ENLARGE THAT PORTION AT THE BOTTOM?

5           IT DOESN'T MATTER, MR. SOBCZACK.  IT

6    SAYS -- THERE WE GO.

7           "RESELLER NEEDS PEOPLE IN THEIR STORE OR

8    READING THEIR CATALOG.  WHEN AN END USER BUYS A

9    REFILL KIT, THAT RESELLER HAS JUST SAID GOOD-BYE

10   FOR 18 MONTHS TO THAT CUSTOMER."

11          SO THIS IS HOW H-P COMPETES.  THEY DON'T

12   COME IN AND SAY "NU-KOTE PRODUCTS ARE LOUSY."  THEY

13   DON'T COME IN AND SAY "NU-KOTE IS DISHONEST."  THEY

14   DON'T COME IN AND SAY "NU-KOTE IS INFRINGING

15   PATENTS OR TRADEMARKS."

16          THEY COME IN AND THEY SAY "THE PROBLEM

17   WITH NU-KOTE IS THAT YOU'RE GOING TO HAVE A HAPPY

18   CUSTOMER BECAUSE THAT CUSTOMER WILL HAVE SAVED

19   MONEY AND WON'T HAVE TO COME BACK TO YOUR STORE FOR

20   18 MONTHS."

21          THAT'S THE PROBLEM WITH NU-KOTE, THAT

22   NU-KOTE WILL HAVE COMPETED.  THAT NU-KOTE WILL HAVE

23   GIVEN A BETTER PRODUCT.  THAT IS CORRECT THAT

24   NU-KOTE WOULD HAVE GIVEN A LOWER PRICE.  EVERYTHING

25   THAT OUR SYSTEM WANTS.

                                          3886

                   U.S. COURT REPORTERS

1          MR. COOPER:  YOUR HONOR, THIS IS PURE

2    ARGUMENT.

3          THE COURT:  WELL, I HEARD THE LAST LINE,

4    SO I ASSUME WE'RE COMING TO THE END.

5          MR. KATZ:  THE END IS NEAR, YES.

6          NU-KOTE IS DOING WHAT IT'S SUPPOSED TO BE

7    DOING.  H-P IS SLIPPING, AND THAT'S THE PROBLEM.

8          WHEN SOMEBODY SAYS, IF THIS IS THE BEST

9    ARGUMENT THAT THEY CAN USE, SORRY, YOU'RE GOING TO

10   PRODUCE HAPPY CUSTOMERS BECAUSE THEY'RE GOING TO BE

11   PAYING WHAT THEY SHOULD BE PAYING FOR INK, RATHER

12   THAN MONOPOLY PRICES, THEN WE'VE COME TO A SAD

13   PASS.

14          AND THAT'S WHERE YOUR ROLE COMES IN.  YOU

15   CAN STOP THIS.  YOU CAN MAKE SURE THAT WE HAVE A

16   COMPETITIVE MARKET.  YOU CAN MAKE SURE THAT THERE

17   IS A LEVEL PLAYING FIELD; THAT NU-KOTE DOES COME

18   OUT OF INTENSIVE CARE, THAT PEOPLE ARE ABLE TO BUY

19   A GOOD PRODUCT FOR A FAIR PRICE.

20          AND YOU CAN SEND A MESSAGE THAT CONDUCT

21   LIKE THIS SIMPLY CANNOT OCCUR IN OUR COMMUNITY.

22          MR. COOPER:  YOUR HONOR, I OBJECT.  THIS

23   IS INAPPROPRIATE.

24          THE COURT:  THE OBJECTION IS SUSTAINED.

25          THE OBJECT YOU HAVE IS TO MAKE FINDINGS

3887

U.S. COURT REPORTERS

WITH THE ISSUES THAT I'LL SUBMIT TO YOU, MEMBERS OF

THE JURY, AND IT'S INAPPROPRIATE TO SUGGEST THAT

YOUR VERDICT SHOULD BE MADE BASED UPON SOMETHING

THAT YOU WOULD WISH THE, THE -- A MESSAGE TO BE

SENT BEYOND SIMPLY YOUR FINDING ACCORDING TO THE

LAW IN THE CASE.

       YOU MAY BRING YOUR OPENING STATEMENT TO A

CONCLUSION.

       MR. KATZ:  IN CONCLUSION, LADIES AND

GENTLEMEN, I'M CONFIDENT THAT WHEN YOU LOOK AT THE

LAW AND THESE FACTS, AND THIS IS JUST A SMALL

PORTION OF IT, I APOLOGIZE IN ADVANCE, YOU'RE GOING

TO BE INUNDATED WITH FUD, YOU'RE GOING TO BE

INUNDATED WITH BIFF, TIFF, BECAUSE WE'RE GOING TO

SHOW TO YOU HOW WIDESPREAD AND HOW BAD THIS

BEHAVIOR WAS.

       WHEN YOU LOOK AT THE FACTS AND YOU LOOK

AT THE LAW, YOU WILL PUT A STOP TO THIS

UNACCEPTABLE BEHAVIOR IN OUR COMMUNITY.

       THANK YOU VERY MUCH.

       MR. COOPER:  CAN WE HAVE A FEW MINUTES TO

SET UP?

       THE COURT:  MEMBERS OF THE JURY, WE'LL

TAKE A BREAK AT THIS POINT AND WE'LL COME BACK AT A

QUARTER 'TIL THE HOUR.

                          3888

           U.S. COURT REPORTERS

1          (WHEREUPON, A RECESS WAS TAKEN.)

2          (WHEREUPON, THE PROCEEDINGS WERE HELD

3    WITHOUT THE JURY.)

4          THE COURT:  YOU HAVE A MATTER YOU WANT TO

5    RAISE?

6          MR. COOPER:  YES, YOUR HONOR.

7          IN MR. KATZ'S OPENING, HE MADE A POINT OF

8    NOT ONLY SENDING THE MESSAGE, BUT HE SPENT SOME

9    TIME EXPLAINING THAT HE WAS BRINGING AN ACTION AS A

0    PRIVATE ATTORNEY GENERAL AND THAT IT LEFT THE

1    DISTINCT IMPRESSION THAT HE WAS ACTING ON THE

2    BEHALF OTHER THAN PEOPLE AT NU-KOTE.  I THINK THAT

3    WAS INAPPROPRIATE.

4          BUT I'M MOST CONCERNED ABOUT THE FACT

5    THAT HE HAS MADE AN ISSUE OF THE OFTEN QUOTED

6    LANGUAGE THAT THE ANTITRUST LAWS WERE DESIGNED TO

7    PERMIT PEOPLE LIKE NU-KOTE TO ACT AS A PRIVATE

8    ATTORNEY GENERAL.

9          I INTEND, THEREFORE, TO TELL THE JURY

0    THAT IT IS TRUE THAT THE ANTITRUST STATUTES ARE

1    DESIGNED TO ENCOURAGE LITIGATION OF THIS SORT, AND

:2   THAT IT'S CALLED A PRIVATE ATTORNEY GENERAL BECAUSE

:3   IT PROVIDES THAT ANY AWARD IS TREBLED.

:4         MR. KATZ:  I'M GOING TO OBJECT TO THAT,

:5   YOUR HONOR.

                                        3889

              U.S. COURT REPORTERS

1          THE COURT:  WHY WOULD YOU WANT TO DO

2     THAT?

3          MR. COOPER:  WHY WOULD I WANT THE JURY TO

4     KNOW IT'S TREBLED?  IT SEEMS TO ME, NUMBER ONE,

5     JURORS, WHEN THEY ARE TOLD TO SEND A MESSAGE AND

6     WHEN THEY ARE TOLD THAT PLAINTIFFS ARE ACTING IN

7     THE CAPACITY OF A PRIVATE ATTORNEY GENERAL WILL

8     SOMETIMES WILL GO BACK AND ENLARGE THE JURY AWARD

9     FOR THAT REASON.  I THINK THEY NEED TO KNOW THAT

0     ANY AWARD THEY HAVE WILL BE TREBLED AND HE OPENED

1     THE DOOR WHEN HE MADE THAT TYPE OF AN INAPPROPRIATE

2     ARGUMENT.

3          MR. KATZ:  I OBJECT.

4          THE COURT:  THE DETERMINATION OF WHETHER

5     OR NOT DAMAGES ARE TO BE TREBLED RESTS WITH THE

6     COURT.

7          MR. COOPER:  WELL, THEY'RE AUTOMATICALLY

8     TREBLED UNDER THE ANTITRUST LAWS.

9          THE COURT:  I UNDERSTAND UNDER CERTAIN

0     CIRCUMSTANCES, AND IF YOU'RE INDICATING THAT YOU

1     WILL DISCUSS WITH THE JURY WHAT THE EVIDENCE --

2     I -- I'M STILL NOT SURE WHY IT WOULD BE IN THE

3     DEFENDANT'S COUNTERCLAIM POSITION TO EMPHASIZE

4     THAT.

5          BUT IF YOU'RE SAYING, BECAUSE MR. KATZ

                                           3890

1    THINK ONE OF THE THINGS YOU HAVE TO KEEP IN MIND IS

2    YOUR COMMON SENSE IS IF NU-KOTE IS AS UNIMPORTANT

3    AND AS INCOMPETENT AS MR. COOPER SAYS THEY ARE,

4    THEN WHY IS H-P SO UPSET WITH THEM?  WHY CAN'T THEY

5    JUST LET THEM FAIL BECAUSE OF THEIR OWN

6    INCOMPETENCY AND BECAUSE OF THEIR OWN DISHONESTY?

7              AND ONE OF THE THINGS THIS NEXT WITNESS

8    WILL SHOW IS THAT H-P WAS OBSESSED WITH THE

9    REFILLERS, AND PARTICULARLY NU-KOTE.  IT WILL SHOW

.0   THAT H-P TOOK AIM AT NU-KOTE, FIRED, AND HIT

.1   NU-KOTE.

.2              THE CROSSCLAIMANT CALLS MR. DANA

.3   SECCOMBE.

.4              THE COURT:  MR. SECCOMBE, YOU'VE ALREADY

.5   BEEN SWORN IN THIS MATTER.  I'LL REMIND YOU OF

.6   THAT.

.7              THE WITNESS:  YES

.8                   DANA SECCOMBE,

19   BEING RECALLED AS A WITNESS ON BEHALF OF THE

20   DEFENDANT, HAVING BEEN PREVIOUSLY DULY SWORN, WAS

21   EXAMINED AND TESTIFIED AS FOLLOWS:

22              MR. KATZ:  YOUR HONOR, I WOULD REQUEST

23   PERMISSION -- I WOULD REQUEST THAT THE COURT

24   DECLARE MR. SECCOMBE A HOSTILE WITNESS.

25              THE COURT:  YES, I'VE ALREADY INDICATED

                                        3954

            U.S. COURT REPORTERS

1    THAT HE'S CONSIDERED AN ADVERSE WITNESS.  I DON'T

2    CONSIDER WITNESSES HOSTILE, HOWEVER, UNLESS THEY DO

3    SOMETHING THAT IS HOSTILE.  HE IS AN ADVERSE

4    WITNESS.

5              AND AS I MIGHT HAVE TOLD YOU BEFORE, WHEN

6    A WITNESS IS RECOGNIZED AS HAVING AN ADVERSE

7    INTEREST TO THE PARTY CALLING THE WITNESS, THAT

8    ENTITLED MR. KATZ TO ASK LEADING QUESTIONS OF THE

9    WITNESS.

10             AND YOU, MR. SECCOMBE, AS QUESTIONS ARE

11   FRAMED CALLING FOR A YES OR NO ANSWER, YOU MAY

12   ANSWER THE QUESTION YES OR NO.  IF YOU DON'T KNOW

13   THE ANSWER, SAY "I DON'T KNOW."  AND IF YOU CAN'T

14   UNDERSTAND IT, INDICATE YOU CAN'T UNDERSTAND IT.

15             YOU MAY PROCEED

16                  AS-ON CROSS-EXAMINATION

17   BY MR. KATZ:

18   Q    GOOD AFTERNOON, MR. SECCOMBE.

19   A    GOOD AFTERNOON.

20   Q    ISN'T IT CORRECT, SIR, THAT H-P IS REALLY IN

21   THE BUSINESS OF SELLING INK?

22   A    NO, I DON'T BELIEVE THAT.

23   Q    OKAY.  LET ME SHOW YOU, SIR, WHAT'S BEEN

24   MARKED AS EXHIBIT 7396.  IS THIS A MEMO THAT YOU

25   SENT IN THE REGULAR COURSE OF YOUR BUSINESS ON OR

                                              3955

                    U.S. COURT REPORTERS

1    AROUND MARCH 26TH, 1996?

2    A    YES.

3              MR. KATZ:  YOUR HONOR, I OFFER EXHIBIT

4    7396.

5              THE COURT:  7396 IS IN EVIDENCE.

6              (WHEREUPON, DEFENDANT'S EXHIBIT NUMBER

7              7396, HAVING BEEN PREVIOUSLY MARKED FOR

8              IDENTIFICATION, WAS ADMITTED INTO

9              EVIDENCE.)

10   BY MR. KATZ:

11   Q    OKAY.  AND MR. SOBCZACK, CAN YOU PUT IT ON THE

12   BOARD.

13             NOW, THIS IS A MEMO THAT YOU SENT TO MR.

14   PRADEEP JOTWANI, AM I PRONOUNCING THAT CORRECTLY?

15   A    PRADEEP, YES, THAT'S CORRECT.

16   Q    AND TO MR. ANTONIO PEREZ?

17   A    YES.

18   Q    AND PERHAPS YOU COULD JUST REFRESH OUR

19   RECOLLECTION AS TO WHAT YOUR TITLE IS, SIR.

20             IS IT CORRECT THAT YOU ARE THE HEAD OF

21   THE INKJET BUSINESS SUPPLIES UNIT?

22   A    CURRENTLY I'M THE GENERAL MANAGER OF THE

23   INKJET SUPPLIES UNIT, YES.

24   Q    AND IS THAT KNOWN AS IJBU?

25   A    THAT'S CORRECT.

```
1     Q    AND IT'S HAD OTHER NAMES AT OTHER TIMES, PL1N?

2     A    IT HAD OTHER NAMES.  IT'S PL1N.

3     Q    AND I THINK YOU TESTIFIED EARLIER THAT MR.

4     PEREZ WAS ONE OF YOUR SUPERIORS?

5     A    THAT'S CORRECT.

6     Q    SO AS OF MARCH 1996, DO YOU RECALL WHAT TITLE

7     MR. PEREZ HELD?

8     A    I BELIEVE AT THAT TIME HE WAS VICE-PRESIDENT

9     OF THE INKJET PRODUCTS GROUP.

.0    Q    SO HE'S ONE OF THE HIGHEST RANKING OFFICERS AT

.1    HEWLETT-PACKARD?

.2    A    YES.

.3    Q    AND IS IT CORRECT TO SAY THAT WHEN YOU SEND

.4    HIM, A MEMO YOU'RE PARTICULARLY CAREFUL TO BE

.5    ACCURATE?

.6    A    YES.

.7    Q    OKAY.  AND WHAT TITLE DID MR. JOTWANI HOLD AT

.8    THAT TIME?

.9    A    HE WAS THE GROUP MARKETING MANAGER.

20    Q    GROUP MARKETING MANAGER.  FOR WHICH GROUP?

21    A    INKJET PRODUCTS GROUP.

22    Q    SO HE'S ONE OF YOUR SUPERIORS AS WELL?

23    A    HE'S A PEER.

24    Q    A PEER.  OKAY.

25         AND THEN YOU SENT COPIES TO MR. SANGEET
```

3957

U.S. COURT REPORTERS

1    OR SANGEET?

2    A    SANGEET.

3    Q    CHOWFLA, C-H-O-W-F-L-A.  WHAT POSITION DID MR.

4    CHOWFLA HOLD IN THE ORGANIZATION?

5    A    HE MANAGES THE INKJET MEDIA OPERATION WHICH

6    REPORTED TO ME.

7    Q    SO HE'S A SUBORDINATE OF YOURS?

8    A    THAT'S CORRECT.

9    Q    AND MR. KEN CRANGLE, WHAT POSITION DID HE

10   HOLD?

11   A    HE WAS THE MARKETING MANAGER FOR PL1N.

12   Q    AND IS HE A SUBORDINATE OF YOURS?

13   A    YES, THAT'S RIGHT.

14   Q    AND IT SAYS THE SUBJECT IS DIGITAL IMAGING

15   PUBLICITY; IS THAT CORRECT?

16   A    THAT'S CORRECT.

17   Q    AND THEN IF WE LOOK AT THE FIRST SENTENCE, I'D

18   LIKE TO HAVE ENLARGED, IT SAYS "OVER THE PAST FEW

19   MONTHS, AS I REALIZE THAT OUR BUSINESS IS IN --

20   REALLY IS IN SELLING INK, I'VE WONDERED WHY INKJET

21   PRINTING, PARTICULARLY DIGITAL COLOR PRINTING, HAS

22   NOT RECEIVED MORE WORD OF MOUTH."

23        SO DO YOU MAINTAIN YOUR PREVIOUS ANSWER

24   THAT YOUR BUSINESS IS NOT PRINCIPALLY SELLING INK?

25   A    YES, I DO.

3958

U.S. COURT REPORTERS

1    Q    OKAY.  NOW, IN FACT, H-P SELLS INK IN A

2    PRINTHEAD -- IN A CARTRIDGE; ISN'T THAT RIGHT?

3    A    WE ONLY SELL INK CARTRIDGES.

4         MR. KATZ:  YOUR HONOR?

5         THE WITNESS:  OKAY.  NO.

6    BY MR. KATZ:

7    Q    YOU DON'T SELL INK IN A CARTRIDGE?

8    A    WE SELL INKJET CARTRIDGES.

9    Q    DO YOUR INKJET CARTRIDGES CONTAIN INK?

10   A    YES.

11   Q    AND IS THAT INK SOLD TO THE PUBLIC?

12   A    NO.

13   Q    WELL, CAN I GO TO OFFICE DEPOT AND BUY SOME OF

14   YOUR INK IN A CARTRIDGE?

15   A    YOU CAN BUY A CARTRIDGE.

16   Q    AND DOES IT CONTAIN INK?

17   A    YES.

18   Q    AND DO YOU CHARGE FOR THAT INK?

19   A    WE CHARGE FOR INKJET CARTRIDGES.

20   Q    AND DOES THAT CHARGE INCLUDE A CHARGE FOR INK?

21   A    WE DON'T DESEGREGATE IT.  NO.

22   Q    SO YOU'RE GIVING AWAY THE INK FOR FREE?

23   A    NO.  WE'RE SELLING IT AS A BUNDLE.

24   Q    BUT YOU ARE SELLING INK; ISN'T THAT RIGHT?

25   A    NO.

3959

U.S. COURT REPORTERS

1    Q    SO IF I RUN OUT OF INK IN MY CARTRIDGE, AND I

2    WANT TO GO AND BUY SOME INK, I SHOULDN'T BUY AN H-P

3    CARTRIDGE; IS THAT RIGHT?

4              MR. SULLIVAN:  OBJECTION, ARGUMENTATIVE,

5    YOUR HONOR.

6              THE COURT:  SUSTAINED.

7    BY MR. KATZ:

8    Q    NOW, THE INK IN THAT CARTRIDGE COSTS YOU ONLY

9    ABOUT A DOLLAR OR TWO; ISN'T THAT RIGHT?

10   A    IT'S IN THAT RANGE, YES.

11   Q    AND THE CARTRIDGES HAVE A LIST PRICE OF WHAT,

12   ABOUT $33?

13   A    IT DEPENDS, BUT YES.

14   Q    NOW, IS THE CARTRIDGE ONE PRODUCT OR TWO

15   PRODUCTS?

16   A    ONE PRODUCT.

17   Q    IT'S ONE PRODUCT.  AND IS INK A SEPARATE

18   PRODUCT FROM A CARTRIDGE?

19   A    NO.  WE DON'T SELL INK.

20   Q    WELL, IN FACT, YOU DO SELL INK, DON'T YOU,

21   SIR?

22             MR. SULLIVAN:  OBJECTION, ARGUMENTATIVE,

23   YOUR HONOR.

24             THE COURT:  OVERRULED.

25             THE WITNESS:  THE VAST MAJORITY OF OUR

                                              3960

                   U.S. COURT REPORTERS

1    BUSINESS DOES NOT SELL INK.

2              MR. KATZ:  YOUR HONOR.

3              THE COURT:  THE QUESTION PUT TO YOU IS

4    WHETHER, IN FACT, YOU DO SELL INK.  NOW, YOU'VE

5    ALREADY EXPLAINED AS TO THE CARTRIDGES, IT'S A

6    BUNDLED PRODUCT.

7              I TAKE THIS QUESTION TO BE THERE ARE

8    CIRCUMSTANCES UNDER WHICH INK IS SOLD.

9              MR. KATZ:  YES, YOU'RE RIGHT, YOUR HONOR.

.0             THE WITNESS:  YES.

.1   BY MR. KATZ:

.2   Q    AND YOU'VE SOLD INK -- THE JURY HAS SEEN MR.

.3   RON JONES.  YOU SOLD TO MR. RON JONES, DIDN'T YOU,

.4   TO COLOSSAL GRAPHICS?

.5   A    IN SPECIAL CIRCUMSTANCES, YES.

.6   Q    AND YOU SELL INK TO A COMPANY CALLED LASER

.7   MASTER, DON'T YOU?

.8   A    AGAIN, IN SPECIAL CIRCUMSTANCES.

.9   Q    AND YOU SELL INK TO A COMPANY CALLED VIP

0    DESIGN, DON'T YOU?

1    A    YES.

2    Q    AND YOU SELL INK TO A COMPANY CALLED GRAPHIC

3    UTILITIES, DON'T YOU, SIR?

4    A    NOT THAT I'M OF AWARE OF, NO.

5    Q    WELL, ISN'T IT THE CASE THAT SOME OF THE

3961

U.S. COURT REPORTERS

1    CUSTOMERS OF H-P, LIKE CHURCH OF SCIENTOLOGY, FOR

2    EXAMPLE, HAVE A NEED FOR SPECIAL COLORS WHICH H-P

3    DOESN'T WANT TO MAKE?

4    A    I'M NOT AWARE.  I DON'T KNOW.

5    Q    AND ISN'T IT A FACT THAT FOR THOSE CUSTOMERS

6    H-P SELLS INK TO GRAPHIC UTILITIES AND THAT INK IS

7    MADE UP IN SPECIAL COLORS?

8    A    AGAIN, I'M NOT AWARE OF THAT.

9    Q    OKAY.  SO WHEN YOU SELL INK TO MR., TO MR.

10   JONES AND COLOSSAL GRAPHICS, YOU'RE NOT SELLING A

11   PRINTHEAD WITH THAT; RIGHT?

12   A    I'M NOT AWARE OF THE, OF THE DETAILS OF THE

13   DEAL WITH MR. JONES, EXACTLY.

14   Q    WELL, ARE YOU AWARE -- ISN'T IT A FACT THAT

15   YOU DON'T SELL MR. JONES PRINTHEADS?

16   A    I DON'T KNOW.

17   Q    BUT YOU DO KNOW THAT YOU SELL HIM INK SEPARATE

18   FROM PRINTHEADS; RIGHT?

19   A    I BELIEVE SO, YES.

20   Q    ALL RIGHT.  AND SO, THEREFORE, THAT INK IS A

21   SEPARATE PRODUCT FROM A PRINTHEAD; ISN'T IT?

22   A    I WOULDN'T CALL IT A PRODUCT IN THE SENSE THAT

23   IT'S ON OUR PRICE LIST.  IT'S A SPECIAL DEAL.

24   Q    YOU DON'T THINK INK IS A PRODUCT?

25   A    AGAIN, NO, NOT IN THE SENSE WE NORMALLY USE

3962

U.S. COURT REPORTERS

THE WORD.

Q    AT H-P?

A    RIGHT.

Q    BUT IS IT A PRODUCT IN THE SENSE THAT THE REST
OF THE WORLD USES THAT WORD?

        MR. SULLIVAN:  OBJECTION, IT CALLS FOR
SPECULATION.

        THE COURT:  SUSTAINED.

BY MR. KATZ:

Q    NOW, IS IT TRUE, SIR, THAT IN APRIL OF 1994,
YOU SUGGESTED A NUMBER OF WAYS TO STOP THE THREAT
OF REFILL COMPETITION?

A    I'M NOT SURE.  I'M NOT SURE WHAT YOU'RE
REFERRING TO.

Q    YOU DON'T RECALL SUGGESTING THAT IN ORDER TO
STOP REFILL COMPETITION, H-P SHOULD FIND A WAY TO
STOP OTHERS FROM USING H-P'S CARTRIDGES?

A    I DON'T RECALL IT, NO.

Q    AND DO YOU RECALL SUGGESTING AS A WAY TO STOP
REFILL COMPETITION, TO MAKE H-P'S PRINTERS BURN OUT
CARTRIDGES FASTER?

A    NO, I DON'T RECALL THAT.

Q    AND DO YOU RECALL, AS A WAY OF STOPPING REFILL
COMPETITION, TO USE WHAT'S CALLED FUD?

A    I DON'T BELIEVE I USED THAT TERM.  OTHERS MAY

                                    3963

            U.S. COURT REPORTERS

HAVE.

Q    OKAY.  AND CAN YOU TELL US WHAT FUD MEANS?

A    IT MEANS COMPARATIVE ADVERTISING.  IT MEANS
COMPARING THE VALUE OF OUR PRODUCTS, THE GOOD
POINTS OF OUR PRODUCTS WITH THE BAD POINTS OF OTHER
PEOPLE'S PRODUCTS.

Q    WHAT DOES THE ACRONYM STAND FOR, SIR?

A    IT STANDS FOR FEAR, UNCERTAINTY AND DOUBT.

Q    AND DOES THAT ACRONYM SAY ANYTHING ANYWHERE
ABOUT EDUCATION?

A    IT SAYS FEAR, UNCERTAINTY AND DOUBT.

Q    AND COULD YOU JUST TELL ME WHICH PART OF THE
ACRONYM IS THE EDUCATION PART?

A    IT'S A COMMON UNDERSTANDING THAT THAT'S WHAT
IT MEANS.

Q    COMMON UNDERSTANDING.

         I'M GOING TO MOVE TO STRIKE THAT AS
SPECULATIVE, YOUR HONOR.

         THE COURT:  IT'S DENIED.

BY MR. KATZ:

Q    SO IF IT'S ABOUT EDUCATION, SHOULDN'T IT BE
FED RATHER THAN FUD, FEAR, EDUCATION AND DOUBT?

A    I DIDN'T INVENT THE TERM.

Q    BUT YOU USE IT; RIGHT?

A    AGAIN, I DON'T NORMALLY USE THE TERM, BUT IT

3964

U.S. COURT REPORTERS

1    IS OCCASIONALLY USED.

2    Q    AND DO YOU RECALL SUGGESTING THAT A WAY OF

3    STOPPING REFILL COMPETITION WOULD BE PHYSICAL BLACK

4    OUTS OF CARTRIDGES TO PRINTERS?

5    A    NO, I WOULDN'T -- I DON'T BELIEVE -- I WOULD

6    NOT HAVE PROPOSED THAT.

7    Q    WELL, LET ME SHOW YOU, SIR, EXHIBIT 7163.  IS

8    THIS --

9              MR. SULLIVAN:  YOUR HONOR, I HAVE AN

10   OBJECTION ABOUT THIS EXHIBIT.

11             THE COURT:  WHAT NUMBER IS IT?

12             MR. SULLIVAN:  IT'S 7163.

13             THE COURT:  DO YOU HAVE AN OBJECTION TO

14   HIM LOOKING AT IT?

15             MR. SULLIVAN:  NOT TO HIM LOOKING AT IT

16   BUT ASKING ABOUT IT.

17             MR. KATZ:  THE THOUGHT THAT ALL

18   OBJECTIONS ARE SUPPOSED TO BE DONE BEFOREHAND.

19             MR. SULLIVAN:  WE DID MAKE THE OBJECTION

20   BEFOREHAND.

21             MR. KATZ:  WELL, THEN I THOUGHT YOUR

22   HONOR WAS SUPPOSED TO RESOLVE THEM BEFOREHAND.

23             THE COURT:  SOMETIMES I DO THAT AND

24   SOMETIMES I DON'T.

25             SO FAR IT HASN'T BEEN OFFERED, SO WHY

                                        3965

               U.S. COURT REPORTERS

1    DON'T YOU WAIT UNTIL IT'S OFFERED?  IT CAN BE USED

2    BY THE WITNESS PERHAPS AS A PURPOSE TO REFRESH HIS

3    RECOLLECTION OF HIS TESTIMONY.

4              MR. SULLIVAN:  SURE.

5    BY MR. KATZ:

6    Q    IS THIS A MEMO THAT YOU SENT IN THE REGULAR

7    COURSE OF YOUR BUSINESS ON OR AROUND APRIL 5TH,

8    1994?

9              MR. SULLIVAN:  OBJECTION, IT

10   MISCHARACTERIZES THE DOCUMENT.

11             THE COURT:  OVERRULED.  HE CAN ANSWER

12   WHETHER IT WAS A MEMO SENT.

13             THE WITNESS:  NO, IT'S NOT A MEMO.

14   BY MR. KATZ:

15   Q    WELL, IS IT A DOCUMENT THAT YOU SENT TO MR.

16   DICK SNYDER ON OR AROUND APRIL 5TH, 1994?

17   A    I SEND THIS TO DICK SNYDER, YES.

18   Q    OKAY.

19             MR. KATZ:  I OFFER IT, YOUR HONOR.

20             MR. SULLIVAN:  AND WE OBJECT, YOUR HONOR.

21             THE COURT:  MAY I SEE IT?

22             MR. SULLIVAN:  SURE.

23             (SIDE-BAR CONFERENCE.)

24   BY MR. KATZ:

25   Q    WHO IS, OR WHO WAS -- WHAT WAS THE TITLE OF

U.S. COURT REPORTERS

MR. DICK SNYDER -- AM I PRONOUNCING IT CORRECTLY?

A    YES.

Q    -- IN APRIL OF 1994?

A    I BELIEVE HE WAS THE GENERAL MANAGER OF THE
VANCOUVER PRINTER DIVISION.  I TAKE IT BACK.  HE
WAS THE GENERAL MANAGER OF THE DESKJET PRINTER
GROUP.

Q    AND THE DESKJET PRINTER GROUP -- WHERE WAS HE
LOCATED?

A    VANCOUVER, WASHINGTON.

Q    OKAY.  AND DID HIS RESPONSIBILITIES INCLUDE
THE UNITED STATES OF AMERICA?

A    WORLDWIDE, YES.

Q    OKAY.  AND --

        MR. KATZ:  I OFFER IT, YOUR HONOR.

        MR. SULLIVAN:  SAME OBJECTION, YOUR
HONOR.

        THE COURT:  THE OBJECTION THAT YOU'RE
MAKING IS FOR LACK OF FOUNDATION, THAT IT PERTAINS
TO MATTERS IRRELEVANT TO THIS PROCEEDING, AND I'LL
SUSTAIN IT AT THIS POINT.

        THERE HASN'T BEEN A FOUNDATION SIMPLY BY
IDENTIFYING THE AUTHOR AND RECIPIENT THAT IT
PERTAINS TO THE ISSUES IN THIS CASE.

BY MR. KATZ:

                                              3967

            U.S. COURT REPORTERS

1    Q    WELL, YOUR RESPONSIBILITIES HAVE TO DO WITH

2    THE UNITED STATES; RIGHT?

3    A    WORLDWIDE.

4    Q    INCLUDING THE UNITED STATES?

5    A    YES.

6    Q    AND YOU SENT THIS -- WHY DID YOU SEND THIS FAX

7    TO MR. SNYDER?

8    A    I DON'T REMEMBER AT THIS TIME.

9    Q    WELL, IS IT FAIR TO SAY THAT YOU DON'T SEND

0    FAXES WITHOUT HAVING SOME BUSINESS PURPOSE?

1    A    RIGHT.

2    Q    AND YOU THOUGHT IT WAS IMPORTANT ENOUGH THAT

3    MR. SNYDER RECEIVE THIS INFORMATION THAT YOU TOOK

4    TIME OUT OF YOUR BUSY DAY TO SEND IT TO HIM; IS

5    THAT RIGHT?

6    A    I SENT IT TO HIM.

7    Q    AND ISN'T IT A FACT -- I ASKED YOU A FEW

8    MOMENTS AGO WHETHER YOU HAD EVER MADE THE

9    SUGGESTION TO SOMEONE ABOUT STOPPING THE THREAT OF

0    REFILL COMPETITION BY FINDING A WAY TO STOP OTHERS

1    FROM USING H-P'S CARTRIDGES.

2            DOES THIS DOCUMENT REFRESH YOU THAT YOU

3    DID MAKE SUCH A SUGGESTION?

4    A    NO.

5            MR. KATZ:  I OFFER IT, YOUR HONOR.

                                              3968

                    U.S. COURT REPORTERS

MR. SULLIVAN:  SAME OBJECTION, YOUR

HONOR.

THE COURT:  SUSTAINED.

BY MR. KATZ:

Q    WHEN CARTRIDGES -- IF CARTRIDGES ARE CHANGED,

FOR EXAMPLE, BIFF/TIFF, YOU'VE HEARD ABOUT THE

BIFF/TIFF CHANGE; RIGHT?

A    YES.

Q    AND IF CARTRIDGES ARE CHANGED, THEY'RE CHANGED

WORLDWIDE; IS THAT RIGHT?

A    IT DEPENDS.

Q    THE BIFF/TIFF CHANGE WAS WORLDWIDE; RIGHT?

A    EVENTUALLY, YES.

Q    AND YOU DIDN'T STATE ANYWHERE IN THIS MEMO

THAT YOU WERE NOT INTENDING THE ATTACHMENT TO APPLY

TO THE UNITED STATES, WERE YOU, SIR?

A    COULD YOU REPEAT THE QUESTION?

Q    YOU DID NOT STATE ANYWHERE IN THIS MEMO THAT

YOU SENT THAT IT DID NOT APPLY IN THE UNITED STATES

OF AMERICA?

A    NO.

Q    AND YOU DIDN'T INTEND THAT IT ONLY APPLIED

OUTSIDE OF THE UNITED STATES OF AMERICA, DID YOU,

SIR?

A    I DIDN'T WRITE THIS MEMO.

3969

U.S. COURT REPORTERS