Q     BUT YOU SEND IT, SIR, DIDN'T YOU?

A     YES.

Q     YOU SENT THE ATTACHMENT.

        WHO WROTE THE MEMO?  DO YOU KNOW?

A     NO.

Q     AND YOU DON'T RECALL WHY YOU SENT IT?

A     NOT NOW, NO.

Q     AND AS YOU LOOK AT THE MEMO, DOES THAT REFRESH
YOUR RECOLLECTION THAT YOU HAVE SUGGESTED THAT ONE
WAY OF DEALING WITH THE THREAT OF REFILL
COMPETITION IS TO MAKE H-P'S PRINTERS BURN OUT
CARTRIDGES FASTER?

A     NO.

Q     AND DOES IT REFRESH YOUR RECOLLECTION THAT YOU
SUGGESTED THAT FUD SHOULD BE USED?

A     AGAIN, I DIDN'T WRITE THIS MEMO.

Q     I'M JUST ASKING YOU, DOES IT REFRESH YOUR
RECOLLECTION?

A     NO, IT DOESN'T.

Q     AND HAVE YOU EVER SUGGESTED THAT FUD SHOULD BE
USED?

A     ME PERSONALLY?  I'M NOT SURE.

Q     AND DOES THIS REFRESH YOUR RECOLLECTION THAT
YOU SUGGESTED THAT PHYSICAL LOCKOUTS OF CARTRIDGES
FROM PRINTERS WAS A WAY OF RESPONDING TO THE THREAT

3970

U.S. COURT REPORTERS

OF REFILL COMPETITION?

A    NO.

Q    AND HAVE YOU EVER SUGGESTED THAT?

A    IF YOU MEAN BY "LOCKOUTS" KEEPING, MAKING SURE

A CARTRIDGE IS ONLY USED IN THE PRINTER IT IS

DESIGNED FOR, I SUGGESTED THAT, NOT TO PROHIBIT

SOMEBODY FROM REFILLING A CARTRIDGE.

MR. KATZ:  MAY WE APPROACH, YOUR HONOR?

THE COURT:  SURE.

(SIDE-BAR CONFERENCE.)

BY MR. KATZ:

Q    SIR, ISN'T IT A FACT THAT H-P IS AN

INTERNATIONAL ORGANIZATION?

A    YES.

Q    AND WITH RESPECT TO THE PRINTERS AND SUPPLIES,

IT HAS OPERATIONS IN SINGAPORE AND EUROPE AND

BARCELONA; IS THAT RIGHT?

A    PRINTERS IN BARCELONA AND INKJET AND PRINTERS

IN SINGAPORE, YES.

Q    AND IN IRELAND AS WELL?

A    YES, INKJET SUPPLIES IN IRELAND.

Q    AND THE POLICIES FOR H-P ARE MADE AT H-P'S

HEADQUARTERS WORLDWIDE?

A    WELL, THEY'RE MADE ALL OVER THE PLACE.

Q    AND YOU ATTEND MEETINGS ALL OVER THE PLACE IN

3971

ORDER TO MAKE POLICIES FOR H-P WORLDWIDE, DON'T
YOU, SIR?

A    I ATTEND MEETINGS ALL OVER THE PLACE, RIGHT.

Q    AND AT THAT MEETINGS, POLICIES ARE MADE TO
APPLY WORLDWIDE; IS THAT RIGHT?

A    POSSIBLY.

MR. KATZ:  I OFFER IT, YOUR HONOR.

MR. SULLIVAN:  SAME OBJECTION, YOUR
HONOR.

THE COURT:  SUSTAINED.

BY MR. KATZ:

Q    AND SOME OF THESE MEETINGS OCCUR IN GENEVA;
ISN'T THAT RIGHT, SIR?

A    I HAVE BEEN TO A MEETING IN GENEVA, YES.

Q    AND AT THAT MEETING, POLICIES WERE MADE THAT
APPLY WORLDWIDE; ISN'T THAT CORRECT?

A    IT DEPENDS ON WHAT YOU MEAN BY "POLICY."  I
DON'T THINK WE DECIDED ANYTHING THERE.

Q    WELL, THE MEETING HAD A BUSINESS PURPOSE;
RIGHT?

A    IT WAS A REVIEW OF THE MARKETING CENTER.

Q    AND THE BUSINESS PURPOSE APPLIED, HAD
APPLICATION AROUND THE WORLD, NOT JUST IN EUROPE;
ISN'T THAT RIGHT?

A    IT WAS THE EUROPEAN MARKETING CENTER REVIEW

3972

U.S. COURT REPORTERS

1    FOR EUROPE.  THAT'S WHY WE WERE THERE.

2    Q    AND IDEAS DISCUSSED THAT APPLIED ELSEWHERE

3    THAN EUROPE?

4    A    IT COULD BE.

5              MR. KATZ:  I OFFER IT, YOUR HONOR.

6              MR. SULLIVAN:  SAME OBJECTION, YOUR

7    HONOR.

8              THE COURT:  THE DIFFICULTY THAT THE COURT

9    IS HAVING IS THAT I CAN'T TELL FROM WHAT HAS BEEN

10   SAID SO FAR WHETHER OR NOT THIS IS A RELEVANT

11   DOCUMENT, AND I UNDERSTAND YOUR RELUCTANCE IN THE

12   PRESENCE OF THE JURY TO GO INTO GREATER DETAIL

13   GIVEN MY RULINGS.

14             BUT LET ME ASK YOU, MR. SECCOMBE, THIS IS

15   A DOCUMENT THAT YOU ACKNOWLEDGE HAVING SENT.

16             I PRESUME YOU HAVE SEEN IT BEFORE TODAY.

17             THE WITNESS:  I HAVE SEEN IT, YES.

18             THE COURT:  THIS CENTER IN EUROPE THAT

19   YOU HAVE MENTIONED, IS THAT A PLACE WHERE THE FOCUS

20   IS ON EUROPEAN MARKETING OF INKJET SUPPLIES?

21             THE WITNESS:  YES.

22             THE COURT:  DO YOU KNOW ENOUGH ABOUT THE

23   DOCUMENT THAT YOU CAN TELL US WHETHER OR NOT THAT

24   IS A DOCUMENT THAT FOCUSES ONE WAY OR THE OTHER,

25   WHETHER IT'S WORLDWIDE OR EUROPE OR WHAT ITS FOCUS

                                        3973

                 U.S. COURT REPORTERS

IS, OR DO YOU NOT KNOW?

THE WITNESS:  IT WAS A DISCUSSION OF
STUFF THAT WAS PRINCIPALLY AIMED AT EUROPE.  I
MEAN, THE WHOLE -- THE DISCUSSION -- THE REASON FOR
THE MEETING WAS EUROPE.

THE COURT:  PRINCIPALLY AIMED, BUT THERE
WERE OTHER THINGS THAT WERE DISCUSSED WHICH WERE
AIMED ELSEWHERE?

THE WITNESS:  THEY COULD HAVE BEEN.  I
MEAN, THEY WEREN'T NAMED ANYWHERE.  IT WAS JUST A
DISCUSSION.  BUT YOU COULD HAVE USED SOME OF THE
THINGS ELSEWHERE, YES.

THE COURT:  CAN YOU DISTINGUISH IN THE
MEMORANDUM WHAT THINGS WERE WHAT, OR IS THAT
SOMETHING THAT WE WOULD HAVE TO ASK SOMEBODY ELSE
TO DO?

THE WITNESS:  WELL, AGAIN, THIS IS ALL
ADDRESSING EUROPEAN ISSUES, BUT THAT DOESN'T MEAN
SOME OF THE THINGS BEING DONE IN EUROPE COULDN'T BE
DONE IN THE UNITED STATES, IF YOU SEE WHAT I MEAN.

IN OTHER WORDS, PRICING FOR EUROPE COULD
WORK FOR THE UNITED STATES, BUT IT WAS IN EUROPE
THAT WE WERE DISCUSSING PRICING STRATEGIES AND SO
ON.

THE COURT:  AT THIS POINT I'LL SUSTAIN

3974

U.S. COURT REPORTERS

1    THE OBJECTION TO THE DOCUMENT.

2            BUT YOU MAY USE THE DOCUMENT BASED ON THE

3    WITNESS'S STATEMENT.  PERHAPS THERE ARE THINGS IN

4    THE DOCUMENT THAT APPLY TO THE ISSUES THAT THE JURY

5    HAS TO DECIDE, WHETHER CONDUCT THAT TOOK PLACE IN

6    THE UNITED STATES VIOLATED THE ANTITRUST.

7            MR. KATZ:  THANK YOU, YOUR HONOR.

8    Q    DO YOU KNOW WHY YOU WOULD SEND MR. SNYDER A

9    MEMO SUGGESTING THAT THERE WAS A NEED TO FIND A WAY

0    TO STOP OTHERS FROM USING H-P CARTRIDGES

1    A    AGAIN, I DIDN'T WRITE THIS MEMO, AND I DON'T

2    KNOW WHY NOW I SENT THIS DOCUMENT THEN.  I MEAN, I

3    DON'T KNOW WHAT HE ASKED OR WHY I SENT IT.

4    Q    BUT ISN'T IT FAIR TO SAY THAT YOU WOULD NOT

5    HAVE SENT HIM A DOCUMENT WITH WHICH YOU DISAGREED?

6    A    NO.  THERE MAY BE STATEMENTS IN HERE THAT I

7    DISAGREE WITH, SURE.

8    Q    BUT YOU SIMPLY CAN'T REMEMBER WHY YOU SENT

9    THIS MEMO, EVEN THOUGH YOU ACKNOWLEDGE THAT YOU DID

20   SEND IT?

21   A    WELL, I ONLY ACKNOWLEDGE I SENT IT BECAUSE IT

22   HAS MY FAX NUMBER ON IT.  I DON'T REMEMBER.  YOU

23   KNOW, IT HAS MY LETTERHEAD AND FAX NUMBER ON IT.

24   Q    IT HAS YOUR LETTERHEAD AND YOUR FAX NUMBER AND

25   IT WAS PRODUCED FROM H-P OUT OF H-P'S FILES?

                                    3975

                    U.S. COURT REPORTERS

1    A    RIGHT.

2    Q    BUT YOU DON'T HAVE ANY REASON TO DOUBT THAT

3    THIS IS AN AUTHENTIC H-P DOCUMENT, DO YOU, SIR?

4    A    NO.

5    Q    AND IF, IN FACT -- AND IF THE NEED FROM H-P'S

6    POINT OF VIEW TO FIND A WAY TO STOP OTHERS FROM

7    USING H-P CARTRIDGES WAS A WORLDWIDE NEED, IT WAS

8    NOT LIMITED TO EUROPE, WAS IT?

9    A    I DISAGREE WITH THAT.  WE WERE NOT TRYING TO

10   FIND A WAY TO STOP OTHER PEOPLE FROM USING OUR

11   CARTRIDGES.

12   Q    WHY DID YOU SEND MR. SNYDER A MEMO --

13   A    AGAIN, THIS IS NOT MY MEMO.

14   Q    AND WHAT ABOUT THE NEED FOR PHYSICAL LOCKOUTS?

15   THAT WAS A WORLDWIDE NEED, WASN'T IT?

16   A    AS I EXPLAINED BEFORE, IF YOU MEAN BY

17   "LOCKOUTS," WHAT I MEAN BY LOCKOUTS ARE THINGS THAT

18   ARE ON CARTRIDGES TO MAKE SURE THAT THEY GO IN THE

19   PRINTER THEY'RE DESIGNED FOR AS AN EXAMPLE, A PEN

20   THAT IS DESIGNED FOR A PORTABLE PRINTER, YOU MIGHT

21   WANT TO HAVE A LOCKOUT ON THAT PEN SO IT ONLY GOES

22   IN THE PORTABLE PRINTER.

23        THAT IS SOMETHING THAT WE ROUTINELY DO IN

24   OUR CARTRIDGES.  VARIOUS CARTRIDGES GO IN CERTAIN

25   PRINTERS.  THOSE ARE CALLED LOCKOUTS.

3976

U.S. COURT REPORTERS

Q    AND THAT APPLIES WORLDWIDE, DOESN'T IT?

A    THOSE MAY BE USED WORLDWIDE, YES.

Q    AND THAT COULD ALSO APPLY TO REFILLERS; ISN'T
THAT RIGHT?

A    AS I DEFINE LOCKOUT, IT HAS NOTHING TO DO WITH
REFILLER.

Q    OKAY.  AND THE USE OF FUD IS WORLDWIDE, ISN'T
IT, SIR?  THIS WONDERFUL EDUCATIONAL EFFORT THAT
YOU'RE MAKING?

        MR. SULLIVAN:  OBJECTION, ARGUMENTATIVE,
YOUR HONOR.

        THE COURT:  OVERRULED.

        THE WITNESS:  WE WOULD TRY TO EDUCATE OUR
CUSTOMER BASE AS TO THE VALUE OF OUR CARTRIDGES AND
THE DEFICIENCIES OF OTHER CARTRIDGES WORLDWIDE,
YES, WE WOULD.

BY MR. KATZ:

Q    AND FUD WAS A RESPONSE TO THE REFILLER THREAT,
WASN'T IT, SIR?

A    MARKETING, YES.

Q    AND MAKING H-P PRINTERS BURN OUT CARTRIDGES
FASTER, THAT'S SOMETHING THAT APPLIED WORLDWIDE,
TOO, WASN'T IT?

A    ABSOLUTELY NOT.

Q    IT ONLY APPLIED IN EUROPE?

3977

U.S. COURT REPORTERS

1          MR. SULLIVAN:  OBJECTION.  HE'S USING THE

2   DOCUMENT AS IF IT WERE IN EVIDENCE.

3          THE COURT:  OVERRULED.

4          THE WITNESS:  WE DID NOT TRY TO MAKE

5   CARTRIDGES BURN OUT FASTER.

6   BY MR. KATZ:

7   Q    WELL, WHY DID YOU SEND MR. SNYDER A MEMO THAT

8   SUGGESTED THAT?

9          MR. SULLIVAN:  OBJECTION.  HE'S NOW

10  READING FROM THE DOCUMENT AS IF IT WERE IN

11  EVIDENCE.

12         THE COURT:  IT ASSUMES A FACT NOT IN

13  EVIDENCE.  HE ALREADY INDICATED THAT HE DOESN'T

14  RECALL THE CIRCUMSTANCES.

15         MR. KATZ:  WELL, HE SAID HE SENT IT.

16         THE COURT:  YES.  BUT IT'S NOW ASKING

17  DETAILS ABOUT WHAT HIS INTENT WAS IN PARTICULAR

18  POINTS.

19         AND THE OBJECTION IS SUSTAINED.

20  BY MR. KATZ:

1   Q    ARE YOU TAKING ANY MEDICATION WHICH WOULD

2   AFFECT YOUR MEMORY, SIR?

3   A    NO.

4   Q    DO YOU RECALL A MEETING IN GENEVA?  DID YOU

5   ATTEND A MEETING IN GENEVA?

                                              3978

                   U.S. COURT REPORTERS

A    YES, I DID.

Q    DO YOU RECALL THERE WAS SOMETHING AT THE

MEETING CALLED INKJET REVIEW?

A    YES.

Q    AND WHO GAVE THE REVIEW?

A    WELL, IT WOULD BE THE MANAGEMENT OF THE INKJET

MARKETING OPERATIONS IN EUROPE.

Q    DO YOU RECALL THE NAMES OF THE INDIVIDUALS?

A    I'LL SAY MICHAEL DIEHL WOULD BE THE ONE I

REMEMBER WOULD BE THE MANAGER IN CHARGE.

Q    AND DO YOU RECALL DISCUSSING THE REFILLER

THREAT IN GENEVA?

A    WE MIGHT NOT HAVE USED THOSE TERMS, BUT WE

TALKED ABOUT REFILLING, YES.

Q    AND DID YOU DISCUSS PHYSICAL LOCKOUTS AS A WAY

OF RESPONDING TO THE REFILLER THREAT?

        MR. SULLIVAN:  OBJECTION, YOUR HONOR.  I

THINK THIS IS GOING TO AN IRRELEVANT AREA OUTSIDE

OF THE UNITED STATES.

        THE COURT:  OVERRULED, NOT AS THE

QUESTION IS FRAMED.

        THE WITNESS:  I RECALL TALKING ABOUT

PETJET LOCKOUTS AS I JUST DESCRIBED A FEW MINUTES

AGO

BY MR. KATZ:

3979

<pre>
 1                 UNITED STATES DISTRICT COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4
      HEWLETT-PACKARD CO.,      ]   C-94-20647-JW
 5
              PLAINTIFF,        ]    SAN JOSE, CALIFORNIA
 6
                  V             ]    JUNE 30, 1999
 7
      NU-KOTE INTERNATIONAL,    ]    VOLUME 21
 8
              DEFENDANT.        ]    PAGES 4032-4166
 9
      _ _ _ _ _ _ _ _ _ _ _ ]
10
                   TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE JAMES WARE
                 UNITED STATES DISTRICT JUDGE
12
      A P P E A R A N C E S:
13
      FOR THE PLAINTIFF:        GIBSON, DUNN & CRUTCHER
14                              BY:   ROBERT E. COOPER
                                      PETER SULLIVAN
15                                    RODNEY STONE
                                      CHAD HUMMEL
16                              333 SOUTH GRAND AVENUE
                                LOS ANGELES, CALIFORNIA
17                              90071

18                              PENNIE & EDMONDS
                                BY:   STEVEN I. WALLACH
19                                    WILLIAM G. PECAU
                                      THOMAS CANOVA
20                                    JAMES MARKEY
                                1155 AVENUE OF THE
21                              AMERICAS
                                NEW YORK, NEW YORK
22                              10024

23          (APPEARANCES CONTINUED ON THE NEXT PAGE)

24    OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                               CERTIFICATE NUMBER 8074
25                             LEE-ANNE SHORTRIDGE, CSR
                               CERTIFICATE NUMBER 9595

                                               4032

                   U.S. COURT REPORTERS
</pre>

```
1

2

3      A P P E A R A N C E S:  (CONT'D)

4      FOR THE DEFENDANT:        COUDERT BROTHERS
                                 BY:   RONALD S. KATZ
5                                      MARK WILDASIN
                                       BRUCE MCCUBBREY
6                                      ROBERT A. CHRISTOPHER
                                       ROBERT BECKER
7                                SUITE 1250
                                 10 ALMADEN BOULEVARD
8                                SAN JOSE, CALIFORNIA 95113

9

10
       ALSO PRESENT:             NU-KOTE INTERNATIONAL
11                               BY:   PATRICK E. HOWARD
                                       IAN ELLIOTT
12                               200 BEASLEY DRIVE
                                 FRANKLIN, TENNESSEE 37064
13

14

15

16

17

18

19

20

21

22

23

24

25
                                                   4033

                        U.S. COURT REPORTERS
```

```
1                          INDEX OF PROCEEDINGS

2

3        FOR THE DEFENDANT-COUNTERCLAIMANT:

4
         DANA SECCOMBE:          AS-ON CROSS-EXAMINATION P. 4061
5                                AS-ON DIRECT EXAMINATION P.4122

6        DEPOSITION READ OF ROBERT DONALD HASS, JR. P. 4155

7

8                              IDENT.        EVIDENCE

9        DEFENDANT'S
         7163                                  4060
10       1644                                  4065
         6402                                  4073
11       6410                                  4084
         7152                                  4090
12       1614                                  4093
         4988                                  4099
13       7450                                  4102
         6464                                  4109
14       7165                                  4115
         7257                                  4118
15       7267                                  4120
         3392                                  4156
16

17       PLAINTIFF'S

18       3597-A                                4138

19

20

21

22

23

24

25


                                              4034

                    U.S. COURT REPORTERS
```

**Case Transcript, Vol 21, Pgs 4032-4166        Page 4035**

1    SAN JOSE, CALIFORNIA          JUNE 30, 1999

2                    P R O C E E D I N G S

3            (WHEREUPON, THE PROCEEDINGS WERE HELD

4    WITHOUT THE JURY.)

5            MR. KATZ:  GOOD AFTERNOON, YOUR HONOR.

6            THE COURT:  HELLO.

7            MR. KATZ:  MAY IT PLEASE THE COURT,

8    YESTERDAY I TRIED TO GET IN EXHIBIT 7163.  THAT WAS

9    THE FAX THAT MR. SECCOMBE HAD SENT TO MR. SNYDER

.0    AND THE ATTACHMENT THAT WAS HEADED "GENEVA INKJET

.1    REVIEW" AND I WAS UNABLE TO LAY A SUFFICIENT

.2    FOUNDATION AT THAT TIME.

.3            THEN WE WENT INTO A SIMILAR DOCUMENT

.4    4985, EXCUSE ME, AND BASICALLY LAID A SIMILAR

.5    FOUNDATION, AND YOUR HONOR RULED THAT THAT ONE

.6    COULD COME IN IF WE WOULD REDACT THE THINGS THAT DO

.7    NOT APPLY TO OUTSIDE OF THE UNITED STATES.

.8            THE COURT:  EXCLUSIVELY.

.9            MR. KATZ:  RIGHT.  AND THEREFORE, I WOULD

20    MOVE FOR THE ADMISSION OF 7163 ON THAT SAME BASIS,

21    AND I DO HAVE CITATIONS FROM YESTERDAY WHERE MR.

22    SECCOMBE TESTIFIED THAT THEY TALKED ABOUT THINGS AT

23    THAT MEETING THAT APPLY WORLDWIDE, AND I WOULD ONLY

24    INTEND TO ASK HIM THINGS THAT APPLY WORLDWIDE.

25            MR. SULLIVAN:  WHAT HE WANTS TO DO IS

                                        4035

                U.S. COURT REPORTERS

1    CONFUSE THE JURY.  HE WANTS TO TAKE THIS DOCUMENT

2    THAT I THINK THE UNEQUIVOCAL TESTIMONY IS IT

3    RELATES TO A MEETING HELD IN EUROPE TO TALK ABOUT

4    THE EUROPEAN SALES OFFICE.

5              AND HE WANTS TO SAY THAT, THAT THE WORD

6    "FUD," AND SOME OTHER EXAMPLES THAT HE READ FROM,

7    IT WAS IN THAT DOCUMENT AND THAT SAME ISSUE IS IN

8    THE UNITED STATES, AND THEN BE ABLE TO SHOW TO THE

9    JURY, HERE IS YET ANOTHER EXAMPLE OF HOW MR.

10   SECCOMBE OF HEWLETT-PACKARD USED THE WORD "FUD."

11   AND I THINK THAT'S AN IMPROPER WAY TO DO THAT.

12             HE HAS AND CAN QUESTION MR. SECCOMBE

13   ABOUT THE WAY FUD IS USED IN THE UNITED STATES.

14   MR. SECCOMBE HAS TESTIFIED TO THAT ALREADY.

15             I THINK HE WANTS TO MISUSE THIS DOCUMENT

16   FOR WHICH A PROPER FOUNDATION HAS NOT BEEN LAID IN

17   ORDER TO CONFUSE THE JURY ON THAT TOPIC.

18             WE WENT AROUND AND AROUND ABOUT THAT AND

19   YOUR LAST RULING WAS THAT THERE WAS NO FOUNDATION

20   FOR THIS DOCUMENT.

21             THE FACT THAT HE MIGHT HAVE BEEN ABLE TO

22   LAY A FOUNDATION ON A DIFFERENT DOCUMENT SHOULD NOT

23   EFFECT YOUR RULING ON THIS ONE.

24             MR. KATZ:  MAY I RESPOND, YOUR HONOR?

25             THE -- AS YOUR HONOR NOTED YESTERDAY, H-P

                                              4036

                    U.S. COURT REPORTERS

1    IS AN INTERNATIONAL ORGANIZATION, HAS MEETINGS IN

2    NUMEROUS PLACES TO DISCUSS WORLDWIDE ISSUES.

3         I HAVE FLAGGED IN THE TRANSCRIPT OF

4    YESTERDAY SEVEN PLACES WHERE MR. SECCOMBE TESTIFIED

5    THAT THINGS THAT APPLY WORLDWIDE WERE DISCUSSED IN

6    THAT MEMO, AND I'M GLAD TO GIVE YOUR HONOR THE PAGE

7    CITES IF YOUR HONOR WANTS THEM, OR TO READ THEM OUT

8    IF YOUR HONOR WANTS THEM.

9         BUT I DO BELIEVE THAT LAYS THE EXACT

0    FOUNDATION THAT YOUR HONOR REQUIRED FOR EXHIBIT

1    4985 WHICH YOUR HONOR ADMITTED.

2         MR. SULLIVAN:  AND I CAN READ EXAMPLES OF

3    THE RECORD, FOR EXAMPLE, FROM PAGE 3974 WHERE THE

4    WITNESS IS SAYING, "WELL, AGAIN, THIS IS ALL

5    ADDRESSING EUROPEAN ISSUES."

6         AND THEN HE SAYS IT DOESN'T MEAN THAT

7    THESE WEREN'T DISCUSSED ELSEWHERE.  BUT HE'S NOT

8    TESTIFYING THAT THEY WERE DISCUSSED OR WERE RELATED

9    TO ELSEWHERE WITH REGARD TO THE GENEVA MEETING.

0         HE'S SAYING THAT THESE WERE DISCUSSED IN

:1   THE EUROPEAN CONTEXT AND IT'S THE MISUSE OF THE

:2   DOCUMENT THAT I'M AFRAID THAT MR. KATZ IS GOING TO

:3   PUT IT --

:4        WHAT I'M WORRIED ABOUT, YOUR HONOR, LET

:5   ME RESTART, IS THAT MR. KATZ IS GOING TO CONFUSE

4037

U.S. COURT REPORTERS

1    THE JURY AND START HIS RECOUNT OF MANY, MANY FUD

2    STATEMENTS THAT MR. SECCOMBE SUPPOSEDLY MADE.

3         HE DIDN'T EVEN WRITE THIS DOCUMENT.   HE

4    SENT THE DOCUMENT.

5         SO WE'RE GETTING FURTHER AND FURTHER INTO

6    TERRITORY THAT SHOWS THE UNDERLYING ABILITY TO HAVE

7    THIS DOCUMENT INTO EVIDENCE.

8         THEY CAN CALL DICK SNYDER, WHO WAS THE

9    ONE WHO RECEIVED THAT DOCUMENT, AND ASK HIM WHY HE

0    GOT THAT DOCUMENT AND WHAT HE WAS GOING TO USE THAT

1    DOCUMENT FOR, BUT IT'S NOT THROUGH THIS WITNESS

2    THAT THIS DOCUMENT CAN COME IN.

3         THE COURT:  IT SEEMS TO ME THAT THIS IS A

4    RELEVANCE ISSUE AS OPPOSED TO ANY OTHER, THIS BEING

5    A BUSINESS RECORD WHICH APPARENTLY WAS DESCRIBING

6    CERTAIN STRATEGIES AND PROPOSALS.

7         WE HAVE THE WITNESS'S TESTIMONY THAT,

8    THAT AS AN INTERNATIONAL CORPORATION, THE COMPANY

9    WOULD OCCASIONALLY MEET IN VENUES OUTSIDE OF THE

0    UNITED STATES TO DISCUSS MATTERS THAT PERTAIN TO

1    THE UNITED STATES AS PART OF A WORLDWIDE MARKET.

2         AND TO THAT EXTENT, I'M TRYING TO ALLOW

3    IN ANY DOCUMENT THAT IS INCLUSIVE OF THE UNITED

4    STATES, EVEN THOUGH IT MIGHT BE INCLUSIVE OF PARTS

5    OF EUROPE, BECAUSE THE COUNTERCLAIM HERE RELATES TO

4038

U.S. COURT REPORTERS

1    THAT.

2              I WAS INITIALLY HESITANT WITH THIS

3    DOCUMENT NOT SO MUCH ON THOSE GROUNDS AS THAT I

4    DIDN'T THINK THAT A SUFFICIENT FOUNDATION WAS LAID

5    ABOUT THIS WITNESS'S KNOWLEDGE OF THE DOCUMENT SO

6    THAT HE CAN MAKE THE DIFFERENTIATIONS.

7              BUT AS HE USED THE DOCUMENT, IT SEEMED TO

8    ME IN FAIRNESS HE WAS USING IT TO IDENTIFY ISSUES

9    THAT, IN HIS MEMORY, WERE WORLDWIDE ISSUES, AS

.0    OPPOSED TO IDENTIFYING FROM THAT DOCUMENT WHICH

.1    THINGS WERE WORLDWIDE AND WHICH THINGS WERE NOT.

.2              AND IT IS MY DETERMINATION TO -- IF YOU

13    BASE YOUR REDACTIONS ON THE TRANSCRIPT TO ALLOW YOU

14    TO PUT IT IN EVIDENCE SO THERE IS SOME DOCUMENTARY

15    EVIDENCE OF THE ISSUES BEING DISCUSSED AT A

16    PARTICULAR POINT IN TIME, BUT TO SAY TO THE JURY AS

17    MUCH I HAVE SAID, THAT IS, "YOU'VE GOT TO

18    UNDERSTAND THE LIMITATIONS THAT ACCOMPANY A RECORD

19    OF THIS KIND," AND I THINK THE JURY CAN UNDERSTAND

20    THE LIMITS OF ITS USE.

21              THE WITNESS HAS INDICATED THAT THIS

22    COMPARATIVE ADVERTISING WAS SOMETHING THAT WAS

23    DONE.  AND, INDEED, IN THE OPENING STATEMENT, MR.

24    COOPER INDICATED THAT COMPARATIVE ADVERTISING IS

25    SOMETHING THAT ALL COMPANIES DO, AND THAT'S NOT AN

4039

U.S. COURT REPORTERS

ISSUE THAT DIVIDES US HERE.

I'VE ACTUALLY BEEN GOING THROUGH THE, THE CLAIM CHART THAT WE DID FOR THE ANTITRUST CASE, AND IT'S MY INTENTION TO READ TO THE JURY, OR GIVE THE JURY ACTUALLY IN WRITING, A LIST OF THE CONDUCTS THAT I'VE AGREED TO THAT ARE IN THE CASE SO THAT THEY CAN FOLLOW ALONG, MUCH AS THEY DID IN THE PATENT CASE, WHICH CONDUCT IS NOW BEING DISCUSSED AND HOW THE TESTIMONY RELATES TO THAT PARTICULAR CONDUCT.

THAT, I THINK, WOULD ASSIST IN PLACING THIS AND ANY OTHER RECORD OF THAT KIND INTO PERSPECTIVE.

CERTAINLY IN THE EXAMINATION OF THE WITNESS, ON DIRECT OR CROSS, IF PROPERLY QUESTIONED HE COULD TESTIFY ABOUT THE LIMITS OF APPLICABILITY OF THIS DOCUMENT TO WHAT CONDUCT WAS CONDUCTED IN THE UNITED STATES.

MR. SULLIVAN:  I TAKE IT, YOUR HONOR, THOUGH, THE DOCUMENT WOULD NOT COME IN UNTIL IT'S APPROPRIATELY REDACTED AND THE PARTIES AGREE?

THE COURT:  YES, THAT'S WHAT I UNDERSTOOD.

MR. KATZ:  BUT I CAN READ FROM IT AS I DID YESTERDAY?

4040

U.S. COURT REPORTERS

1    THE COURT:  RIGHT.

2    MR. SULLIVAN:  WHAT IS THE JURY GOING TO

3 HAVE IN THE JURY ROOM, THE FULL DOCUMENT?

4    THE COURT:  THE REDACTED DOCUMENT.

5    MR. SULLIVAN:  OKAY.  SO UNTIL IT GETS

6 REDACTED, IT'S NOT GOING IN.

7    AND ONE OTHER QUESTION IS WITH REGARD TO

8 WHAT YOU PROPOSE.  YOU'RE GOING TO PROVIDE A LIST

9 FOR THE PARTIES TO COMMENT, OR ARE YOU GOING TO USE

10 A LIST?

11    THE COURT:  I'LL LET YOU SEE IT FIRST.

12    MR. SULLIVAN:  OKAY, THANKS.

13    THE COURT:  IT'S GOING TO BE PRECISELY ON

14 THE CHART WHERE I PUT OKAY AND NOTHING MORE.  YOU

15 SHOULD HAVE THE SAME RECORD THAT I DO ON THAT, BUT

16 I WILL GIVE IT TO YOU.

17    MR. SULLIVAN:  THANK YOU.

18    MR. STONE:  YOUR HONOR, I HAD ONE BRIEF

19 MATTER I WANTED TO RAISE WITH THE COURT.

20    I WANTED TO BRING TO THE COURT'S

21 ATTENTION SEVERAL REMARKS THAT MR. KATZ MADE IN HIS

22 OPENING STATEMENT YESTERDAY AND IN HIS EXAMINATION

23 OF MR. SECCOMBE THAT I THINK BEAR DIRECTLY ON THE

24 ISSUES WITH RESPECT TO THE TYING CLAIM THAT WE'VE

25 BEEN DISCUSSING OVER THE PAST COUPLE OF DAYS.

             4041

1              THE COURT WILL RECALL THAT MR.

2    CHRISTOPHER SAID THE TYING PRODUCT WAS THE PRODUCT

3    THAT THE CUSTOMER WANTED AND THAT THEIR POSITION IS

4    THAT THE TYING PRODUCT IN THIS CASE WAS THE

5    PRINTHEAD AND THE TIED PRODUCT WAS THE INK.

6              WE POINTED OUT TO THE COURT THAT WE

7    BELIEVE THAT'S FUNDAMENTALLY IN CONTRADICTION TO

8    THE FACTS THAT NU-KOTE IS GOING TO PROVE, AND I

9    THINK MR. KATZ'S OPENING STATEMENT, WHICH IS THEIR

10   OFFER OF PROOF, DIRECTLY SUPPORTS THAT.  AND I'D

11   LIKE TO -- I'VE HIGHLIGHTED SEVERAL PORTIONS OF THE

12   OPENING TRANSCRIPT.

13             THE COURT:  JUST GIVE ME ONE.

14             MR. STONE:  I'LL READ TO YOU ONE, WHICH

15   IS MR. KATZ STATED, "ALL YOU WANT IS INK, BUT

16             YOU'VE GOT TO BUY ALL OF THESE OTHER

17             THINGS, THE PLASTIC, PRINTHEAD, AND ALL

18             OF THEIR TECHNOLOGY.  YOU DON'T WANT

19             THAT.  THAT'S WHY WE'VE GOT A PROBLEM

20             HERE."

21             AND THERE WERE SEVERAL OTHER REMARKS

22   ALONG THOSE LINES IN THE OPENING STATEMENT WHICH WE

23   THINK SHOW THAT THE FACTS OF THIS CASE DO NOT FIT

24   WITHIN THE ELEMENTS OF TYING, EVEN AS ALLEGED BY

25   MR. CHRISTOPHER THE DAY BEFORE YESTERDAY, IN WHICH

                                        4042

                    U.S. COURT REPORTERS

1    HE SAID "OUR CONTENTION IS THE TYING PRODUCT IS THE

2    PRINTHEAD," WHICH IS THE PRODUCT SUPPOSEDLY

3    CONSUMERS WANT AND THE PRODUCT OVER WHICH THE

4    DEFENDANT, THE SELLER EXERCISES THE MARKET POWER

5    AND USES THAT MARKET POWER TO FORCE PEOPLE TO BUY

6    SOMETHING THEY DON'T WANT.

7                MR. KATZ SAID THAT WHAT PEOPLE DON'T WANT

8    IS THE PRINTHEAD.  WHAT THEY WANT IS INK.

9                AND I THINK, IN LIGHT OF THOSE STATEMENTS

10   AND THAT OFFER OF PROOF BY MR. KATZ, IT WOULD BE

11   APPROPRIATE AT THIS JUNCTURE FOR THE COURT TO RULE

12   AT THIS TIME THAT IT'S NOT GOING TO INSTRUCT THE

13   JURY AS TO THE TYING CLAIM.

14                AND I THINK IT WOULD BE PARTICULARLY

15   APPROPRIATE BEFORE A CLAIMS CHART LISTING THE

16   CLAIMS IN ISSUE SUBMITTED TO THE JURY THAT THE

17   COURT MAKE THAT DETERMINATION.

18                AND I'D LIKE PERMISSION OF THE COURT TO

19   HAND UP NOW THE, IT'S ONE PAGE, YOUR HONOR, THAT

20   HAS HIGHLIGHTING ON IT FROM THE TRANSCRIPT.  I'D

21   LIKE TO HAND THAT UP.

22                AND I CAN PROVIDE MR. CHRISTOPHER WITH A

23   LIST OF THE HIGHLIGHTED PORTIONS SO HE'LL KNOW

24   EXACTLY WHAT I'M HANDING UP TO YOUR HONOR.

25                THE COURT:  I DON'T NEED THE TRANSCRIPT.

                                                    4043

U.S. COURT REPORTERS

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4
   HEWLETT-PACKARD CO.,      ]   C-94-20647-JW
5
            PLAINTIFF,        ]   SAN JOSE, CALIFORNIA
6
                V            ]   JULY 6, 1999
7
   NU-KOTE INTERNATIONAL,    ]   VOLUME 24
8
            DEFENDANT.       ]   PAGES 4580-4804
9
   _ _ _ _ _ _ _ _ _ _ _ _ ]
10
                TRANSCRIPT OF PROCEEDINGS
11         BEFORE THE HONORABLE JAMES WARE
             UNITED STATES DISTRICT JUDGE
12
   A P P E A R A N C E S:
13
   FOR THE PLAINTIFF:        GIBSON, DUNN & CRUTCHER
14                           BY:  ROBERT E. COOPER
                                  PETER SULLIVAN
15                                RODNEY STONE
                                  CHAD HUMMEL
16                           333 SOUTH GRAND AVENUE
                             LOS ANGELES, CALIFORNIA
17                           90071

18                           PENNIE & EDMONDS
                             BY:  STEVEN I. WALLACH
19                                WILLIAM G. PECAU
                                  THOMAS CANOVA
20                                JAMES MARKEY
                             1155 AVENUE OF THE
21                           AMERICAS
                             NEW YORK, NEW YORK
22                           10024

23        (APPEARANCES CONTINUED ON THE NEXT PAGE)

24   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                              CERTIFICATE NUMBER 8074
25                            PETER TORREANO, CSR
                              CERTIFICATE NUMBER 7623

                                         4580

               U.S. COURT REPORTERS

```
 1

 2

 3      A P P E A R A N C E S: (CONT'D)

 4      FOR THE DEFENDANT:        COUDERT BROTHERS
                                  BY:   RONALD S. KATZ
 5                                      MARK WILDASIN
                                        BRUCE MCCUBBREY
 6                                      ROBERT A. CHRISTOPHER
                                        MATT TROUGHTON
 7                                SUITE 1250
                                  10 ALMADEN BOULEVARD
 8                                SAN JOSE, CALIFORNIA 95113

 9

10      ALSO PRESENT:            NU-KOTE INTERNATIONAL
                                 BY:   IAN ELLIOTT
11                               200 BEASLEY DRIVE
                                 FRANKLIN, TENNESSEE 37064
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

4581

U.S. COURT REPORTERS

**Case Transcript, Vol 24, Pgs 4580-4804     Page 4582**

```
 1                  INDEX OF PROCEEDINGS

 2      FOR THE DEFENDANT-COUNTERCLAIM:

 3
        DEPOSITION READ OF BEN WOOD    P. 4591
 4
        IAN ELLIOTT
 5      DIRECT EXAMINATION              4599
        CROSS-EXAMINATION               4686
 6
```

```
 7                      IDENT.     EVIDENCE

 8
        DEFENDANT-COUNTERCLAIMAINT'S:
 9
        3172                          4590
10
        6018
11
        T             4672            4672
12
        B             4672            4673
13
        PLAINTIFF-COUNTERDEFENDANT'S:
14
        5406                          4697
15
        5405                          4698
16
        5409                          4704
17
        4220                          4771
18
        4021                          4756
19
        1073                          4762
20
        4221                          4763
21
        4220                          4771
22
        616                           4779
23
        1494                          4785
24
        1069                          4787
25
        522                           4792

                                 4582

            U.S. COURT REPORTERS
```

1    SAN JOSE, CALIFORNIA          JULY 7, 1999

2                    P R O C E E D I N G S

3

4            (WHEREUPON, THE PROCEEDINGS WERE HELD

5    WITHOUT THE JURY.)

6            MR. WILDASIN:  YOUR HONOR, BEFORE WE

7    START, AT THE END OF LAST WEEK YOU ASKED ABOUT THE

8    UNFAIR COMPETITION INSTRUCTION, AND H-P SAID THEY

9    DID NOT HAVE AN INSTRUCTION AND WE WERE GOING TO

10   GET BACK TO YOUR PROPOSED INSTRUCTION NUMBER 13.

11   WE DON'T HAVE ANY PENDING OBJECTION TO IT.  I JUST

12   WANTED TO LET YOU KNOW THAT.

13           IT WAS IN RESPONSE TO THE JURY'S

14   QUESTION.

15           THE COURT:  OH, YES, YES.  OKAY.

16           MR. WILDASIN:  WE DO NOT HAVE ANY

17   OBJECTION TO THAT, YOUR HONOR.  THANK YOU.

18           MR. HUMMEL:  GOOD MORNING.  CHAD HUMMEL

19   ON BEHALF OF H-P.

20           WE WANTED TO NOTIFY THE COURT, AS WE DID

21   NU-KOTE LAST WEEK, THAT WE HAVE AN EXPERT IN THIS

22   CASE, JERRY WIND, WHO IS A MARKETING EXPERT FROM

23   THE WHARTON SCHOOL AT THE UNIVERSITY OF

24   PENNSYLVANIA.

25           THE ONLY DAY HE CAN TESTIFY IS THIS

                                          4583

                U.S. COURT REPORTERS

1    RAN INTO PROBLEMS AND THEY DIDN'T UNDERSTAND HOW

2    THEY RAN INTO PROBLEMS, AND, OF COURSE, THEY DIDN'T

3    KNOW WHAT WAS GOING ON AT H-P.  THAT'S WHY.

4         INSTEAD OF BEING NOT A VERY SUCCESSFUL

5    AND NOT A VERY COMPETENT COMPANY, THE OPPOSITE WAS

6    TRUE.  IT WAS SUCCESSFUL AND VERY COMPETENT, AND IT

7    BECAME A REVOLVING DOOR OF MANAGEMENT, ET CETERA,

8    ONLY AFTER ALL OF THESE PROBLEMS THAT WERE CAUSED

9    BY H-P.

10        NU-KOTE CALLS MR. IAN ELLIOTT.

11        MR. HUMMEL:  YOUR HONOR, MAY I RESPOND

12   FOR A MOMENT?

13        THE COURT:  ONE MOMENT.

14        MR. HUMMEL:  THANK YOU.

15        LADIES AND GENTLEMEN, WE TOLD YOU IN OUR

16   OPENING STATEMENTS THAT MONOPOLIES BY THEMSELVES

17   ARE NOT ILLEGAL.

18        YOU ARE GOING TO HAVE TO FIND WHEN YOU

19   EVALUATE THE CONDUCT THAT IS AT ISSUE IN THE CASE,

20   THE BIFF PROGRAM THAT YOU HEARD ABOUT, THAT IT WAS

21   EXCLUSIONARY AND THAT IT HARMED COMPETITION.

22        MR. ELLIOTT WILL DEMONSTRATE TO YOU, I

23   THINK, THAT THE CONDUCT WAS NOT EXCLUSIONARY.  IN

24   FACT, NU-KOTE WAS NOT EXCLUDED FROM A SINGLE

25   PRODUCT LINE THAT IT OFFERED BECAUSE OF THE BIFF

4598

U.S. COURT REPORTERS

1    CHANGE, AND YOU'RE ALSO GOING TO HEAR THAT FAR FROM

2    COMPETITION BEING HARMED, IT FLOURISHED.  AND WE'LL

3    SHOW YOU SOME OTHER REFILL COMPANIES THAT MADE

4    PRODUCTS THAT JUST WORKED FINE WITH THIS BIFF

5    PROGRAM.

6              MR. ELLIOTT IS GOING TO TELL YOU ABOUT

7    THOSE, I THINK, AND WHAT THEY'RE REALLY COMPLAINING

8    ABOUT, YOU'LL HEAR FROM MR. ELLIOTT, IS THAT THE

9    COMPETITION ATE NU-KOTE'S LUNCH, NOT H-P.

10             THE COURT:  MR. ELLIOTT, YOU'VE ALREADY

11   BEEN SWORN.

12                  IAN ELLIOTT,

13   BEING RECALLED AS A WITNESS ON BEHALF OF THE

14   DEFENDANT, HAVING BEEN PREVIOUSLY SWORN, WAS

15   FURTHER EXAMINED AND TESTIFIED AS FOLLOWS:

16                DIRECT EXAMINATION

17   BY MR. KATZ:

18   Q    GOOD MORNING, MR. ELLIOTT.

19   A    GOOD MORNING.

20   Q    COULD YOU REFRESH OUR RECOLLECTION OF WHAT

21   YOUR TITLE IS AT NU-KOTE AND SORT OF YOUR HISTORY

22   WITH THE COMPANY.

23   A    MY CURRENT TITLE IS SENIOR VICE PRESIDENT.

24   I'M MAINLY RESPONSIBLE FOR NEW BUSINESS DEVELOPMENT

25   AND NEW PRODUCT DEVELOPMENT.  I'VE BEEN WITH THE

U.S. COURT REPORTERS

HAVE AN IMPACT IN PART ON NU-KOTE'S BUSINESS?

A    YES.  YOU MEAN IN RETROSPECT?

Q    YES.

A    YES, I BELIEVE SO.

Q    AND DID IT HAVE AN IMPACT ON THE AMOUNT OF INK

THAT YOU SOLD THAT WAS COMPATIBLE WITH H-P

PRINTERS?

A    YES, I BELIEVE IT DID THAT PART.

         MR. KATZ:  YOUR HONOR, I THINK THIS IS A

GREAT TIME TO BREAK FOR LUNCH.

         THE COURT:  ALL RIGHT.  WE'LL STOP AT

THIS POINT AND COME BACK TO THIS MATTER AT 1:30.

         (WHEREUPON, THE LUNCH RECESS WAS TAKEN.)

         THE COURT:  READY TO PROCEED?

         MR. KATZ:  YES, YOUR HONOR.

         MR. HUMMEL:  YES, YOUR HONOR.

         (WHEREUPON, THE FOLLOWING PROCEEDINGS

WERE HELD IN THE PRESENCE OF THE JURY:)

         THE COURT:  VERY WELL.  YOU MAY PROCEED.

         MR. KATZ:  THANK YOU, YOUR HONOR.

Q    MR. ELLIOTT, BEFORE LUNCH YOU WERE TALKING

ABOUT WHICH PRODUCTS NU-KOTE WERE PHYSICALLY

IMPACTED BY THE BIFF -- TIFF TO BIFF CHANGE AS

OPPOSED TO REPUTATIONALLY IMPACTED.

         WITH RESPECT TO THE FACTORY BOX AT

4670

U.S. COURT REPORTERS

AND THAT HAS A STATEMENT IN IT ON PAGE 2.6 TO THE

EFFECT -- WELL, I'LL JUST READ IT.

IT SAYS:  "SUPPORTING DATA, 24 OUT OF 25

(96 PERCENT) OF THE PRINTERS RETURNED TO

H-P FOR REPAIR DUE TO INK CARTRIDGE LEAKS

ARE THERE BECAUSE OF DAMAGE FROM NON-H-P

REFILL INK PRODUCTS OR NON-H-P REFILLING

PROCESSES.

NOW, IF THAT HAD BEEN THE 100 PERCENT,

WOULD YOU HAVE CHANGED YOUR ANSWER TO THOSE

QUESTIONS?

A     NO, I DON'T BELIEVE SO.

Q     AND LET ME SHOW YOU WHAT IS IN EVIDENCE AS

EXHIBIT 3051.

IT'S AN H-P DOCUMENT, H-P DESKJET AND

SUPPLIES SELLING GUIDE, AND ON THE PAGE WITH THE

BATES NUMBER C018837, IT SAYS:  "REFILLING LEAKS

CAUSE MOST PRINTER DAMAGE.  NEARLY EVERY

PRINTER RETURNED TO H-P BECAUSE OF

LEAKING INK HAS BEEN DAMAGED BY NON-H-P

REFILL INK PRODUCTS OR PROCESSES."

WOULD YOUR ANSWERS BE THE SAME IF THAT

WERE THE STATEMENT RATHER THAN 100 PERCENT?

A     YES, I BELIEVE IT WOULD.

Q     NOW, RIGHT BEFORE LUNCH WE WERE DISCUSSING

4675

U.S. COURT REPORTERS

1    THIS DOCUMENT A DEMONSTRATIVE EXHIBIT IN

2    MR. COOPER'S OPENING AND WE HAD GONE THROUGH THE

3    FIRST SIX BULLET POINTS AND THE LAST ONE IS NU-KOTE

4    SHOT ITSELF IN THE FOOT BECAUSE OF SENIOR

5    MANAGEMENT TURNOVER.

6              DO YOU AGREE WITH THAT?

7    A    WELL, IT'S TRUE THAT CERTAINLY IN GLASS -- A

8    COUPLE OF YEARS THERE'S BEEN SOME SIGNIFICANT

9    TURNOVER IN MANAGEMENT, BUT I THINK THAT'S A RESULT

10   OF WHAT HAS HAPPENED TO NU-KOTE.  IT WASN'T -- WE

11   DIDN'T CREATE THIS SITUATION BY SHOOTING OURSELVES

12   IN THE FOOT BECAUSE OF SENIOR MANAGEMENT, BUT THAT

13   HAPPENED AFTER THE EVENT.

14   Q    LET ME SHOW YOU ANOTHER DEMONSTRATIVE FROM

15   MR. COOPER'S OPENING.  NU-KOTE BUSINESS BLUNDERS.

16             AND THERE'S FIVE OF THEM.  DO YOU BELIEVE

17   THAT NU-KOTE'S FAILURE TO INTEGRATE THE PELIKAN

18   OPERATIONS WAS A BUSINESS BLUNDER.

19             WELL, FIRST OF ALL, DO YOU THINK THAT

20   NU-KOTE FAILED TO INTRODUCE ANY PELIKAN OPERATIONS

21   THAT IT WANTED TO INTEGRATE BASED ON ITS BUSINESS

22   PLAN?

23   A    BASED ON THE PLAN WE HAD, I THINK WE DID A

24   REMARKABLE JOB OF INTEGRATING THE PELIKAN

25   FACILITIES.

4676

U.S. COURT REPORTERS

1    Q    AND WITH RESPECT TO SHIFTING INKJET

2    MANUFACTURING TO MEXICO AND BACK AGAIN, WAS THAT A

3    NU-KOTE BUSINESS BLUNDER?

4    A    WELL, IT'S NOT CORRECT TO SAY THAT WE

5    SHIFTED -- LET ME REPHRASE THAT.

6              CERTAIN PRODUCTS WITHIN THE INKJET

7    PRODUCT LINE WERE, IN FACT, MOVED TO MEXICO.  AND

8    LATER THEY WERE MOVED BACK TO THE UNITED STATES.

9    AND I THINK IN RETROSPECT IT WAS A MISTAKE TO -- TO

10   MOVE THOSE PRODUCTS TO MEXICO.

11   Q    AND DID THAT CAUSE NU-KOTE'S PROBLEMS?

12   A    NO.  I THINK NU-KOTE'S PROBLEMS EXISTED PRIOR

13   TO THAT.

14   Q    OKAY.  WAS THAT PART OF THE REVOLVING DOOR OF

15   MANAGEMENT COMING UP WITH NEW IDEAS?

16   A    WELL, I THINK THE DECISION TO MOVE THE

17   PRODUCTS TO MEXICO WAS MADE AFTER THE SENIOR

18   MANAGEMENT HAD CHANGED.

19              SO IT -- IT MAY HAVE BEEN MADE BY A

20   MANAGER THAT HAD BEEN BROUGHT IN TO TRY TO HELP

21   NU-KOTE WITH SOME OF ITS ISSUES NOT BEING FULLY

22   AWARE OF THE BACKGROUND OF SOME OF THE ISSUES THAT

23   WE PREVIOUSLY FACED.

24   Q    DO YOU THINK THAT NU-KOTE ENGAGED IN INEPT

25   MARKETING?

4677

U.S. COURT REPORTERS

A    NO.

Q    HAD MARKETING ALWAYS BEEN ONE OF NU-KOTE'S
STRENGTHS BEFORE THE 1995 PERIOD?

A    YES, I BELIEVE SO.

Q    WAS NU-KOTE'S ACCESS TO THE DISTRIBUTION
SOMETHING THAT WAS POSITIVE FORCE OF NU-KOTE?

   MR. HUMMEL:  OBJECTION.  LEADING.

   THE COURT:  SUSTAINED.

BY MR. KATZ:

Q    WHAT, IF ANY, EFFECT DID NU-KOTE'S CONNECTION
WITH ITS CHANNEL OVER THE PERIOD OF 50 YEARS OR SO
HAVE ON ITS ABILITY TO GENERATE PROFITS?

A    I THINK NU-KOTE HAD A UNIQUE RELATIONSHIP WITH
THE CHANNEL AND THAT RELATIONSHIP WAS NU-KOTE.
THAT'S HOW NU-KOTE WAS IN BUSINESS.

Q    OKAY.  AND DO YOU BELIEVE THAT THE INVESTMENT
IN THE PIEZO INKJET THAT YOU DESCRIBED, THE MIT
PRODUCT, DO YOU BELIEVE THAT WAS A BLUNDER?

A    NO.  I THINK THAT WAS PART OF A BRILLIANT
STRATEGY.

Q    OKAY.  LET ME SHOW YOU ANOTHER DEMONSTRATIVE
FROM MR. COOPER'S OPENING WHICH SHOWS VARIOUS
CERTAIN PERCENTAGES THERE.  DO YOU BELIEVE THAT
THIS IS AN ACCURATE PORTRAYAL?

A    NO, I BELIEVE THAT IT IS MISLEADING.

            4678

    U.S. COURT REPORTERS

Q    AND WHY IS THAT?

A    WELL, IT SHOWS NU-KOTE'S NORTH AMERICAN SALES

AS PART OF A CHART OF NU-KOTE'S WORLDWIDE SALES.

IF IT WAS TO BE MEANINGFUL, IT WOULD HAVE TO SHOW

NU-KOTE'S WORLDWIDE SALES OF INKJET PRODUCTS OR

CONVERSELY JUST NU-KOTE'S U.S. SALES OF OTHER

PRODUCTS.  YOU'VE CREATED A LARGER PICTURE WITH

WHICH TO COMPARE -- YOU CAN'T COMPARE WORLDWIDE

SALES WITH NORTH AMERICAN SALES.  APPROXIMATELY 50

PERCENT WERE NORTH AMERICA AND 50 PERCENT WERE IN

THE REST OF THE WORLD.  YOU HAVE TO BE APPLES FOR

APPLES.

Q    AND WHAT IS THE SENSE OF WHAT THIS NUMBER

WOULD BE, 2.31 PERCENT, IF THE REST OF THE PIE

CHART WERE U.S. SALES?

A    CAN I JUST LOOK AT THE PERIOD OF TIME THAT IS

PARTIALLY OBSCURED AT THE BOTTOM?

Q    I'M SORRY.

A    IT'S A TWO-YEAR PERIOD.  IT'S STILL A

RELATIVELY SMALL PIECE OF THE PIE, MAYBE 5 OR 6

PERCENT.

Q    AND WHAT WAS NU-KOTE'S BUSINESS PLAN WITH

RESPECT TO WHETHER THAT PIECE OF THE PIE WOULD BE

GROWING OR SHRINKING?

A    THE BUSINESS PLAN WAS FOR IT TO BE GROWING

4679

U.S. COURT REPORTERS

1    SIGNIFICANTLY.

2    Q    I'D LIKE TO SHOW YOU ANOTHER DEMONSTRATIVE

3    FROM MR. COOPER'S OPENING, NU-KOTE'S TOTAL SALES.

4    DO YOU HAVE A BELIEF AS TO WHY THE SALES HAVE GONE

5    DOWN?

6    A    NOW?

7    Q    YES.

8    A    I THINK CLEARLY THERE'S A NUMBER OF FACTORS

9    BUT ONE OF THE -- A SIGNIFICANT FACTORS TO ME ARE

10   THE -- IS THE CONDUCT THAT H-P ENGAGED ITSELF IN.

11   Q    AND WHAT IMPACT DID THAT CONDUCT HAVE?

12   A    IT COST THE REPUTATION AND THE LOSS OF

13   DISTRIBUTION AND IT CONTRIBUTED TO A DECLINE IN

14   SALES.

15   Q    WHAT, IF ANY, EFFECT DID THAT HAVE ON

16   NU-KOTE'S ABILITY TO IMPLEMENT ITS BUSINESS PLAN TO

17   GO FROM THE IMPACT TO THE NONIMPACT?

18   A    I THINK CLEARLY NU-KOTE HAS FAILED TO ACHIEVE

19   ITS OBJECTIVES IN TERMS OF THE BUSINESS PLAN FOR

20   ITS INKJET PRODUCTS.

21   Q    AND WHAT, IF ANY, IMPACT DID H-P'S CONDUCT

22   HAVE ON THAT?

23   A    I THINK NOW AS I SIT HERE TODAY IT CLEARLY HAD

24   A SIGNIFICANT IMPACT ON NU-KOTE'S ABILITY TO

25   ACHIEVE ITS PLAN.

4680

U.S. COURT REPORTERS

```
1                 UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF CALIFORNIA

3                      SAN JOSE DIVISION

4
     HEWLETT-PACKARD CO.,      ]    C-94-20647-JW
5
              PLAINTIFF,       ]    SAN JOSE, CALIFORNIA
6
                  V           ]    JULY 19, 1999
7
     NU-KOTE INTERNATIONAL,    ]    VOLUME 32
8
              DEFENDANT.       ]    PAGES 6159-6368
9
     _ _ _ _ _ _ _ _ _ _ _ _]
10
                   TRANSCRIPT OF PROCEEDINGS
11            BEFORE THE HONORABLE JAMES WARE
                UNITED STATES DISTRICT JUDGE
12
     A P P E A R A N C E S:
13
     FOR THE PLAINTIFF:      GIBSON, DUNN & CRUTCHER
14                           BY:  ROBERT E. COOPER
                                  PETER SULLIVAN
15                                RODNEY STONE
                                  CHAD HUMMEL
16                           333 SOUTH GRAND AVENUE
                             LOS ANGELES, CALIFORNIA
17                           90071

18                           PENNIE & EDMONDS
                             BY:  STEVEN I. WALLACH
19                                WILLIAM G. PECAU
                                  THOMAS CANOVA
20                                JONATHAN MARSHALL
                                  JAMES MARKEY
21                           1155 AVENUE OF THE
                             AMERICAS
22                           NEW YORK, NEW YORK
                             10024
23         (APPEARANCES CONTINUED ON THE NEXT PAGE)

24   OFFICIAL COURT REPORTER: IRENE RODRIGUEZ, CSR, CRR
                             CERTIFICATE NUMBER 8074
25                           PETER TORREANO, CSR
                             CERTIFICATE NUMBER 7623

                                        6159

                   U.S. COURT REPORTERS
```

```
 1

 2       A P P E A R A N C E S :  (CONT'D)

 3    FOR THE DEFENDANT:          COUDERT BROTHERS
                                  BY:  RONALD S. KATZ
 4                                     MARK WILDASIN
                                       BRUCE MCCUBBREY
 5                                     ROBERT A. CHRISTOPHER
                                       ROBERT BECKER
 6                                SUITE 1250
                                  10 ALMADEN BOULEVARD
 7                                SAN JOSE, CALIFORNIA 95113

 8

 9
                                  NU-KOTE INTERNATIONAL
10    ALSO PRESENT:               BY:  PATRICK E. HOWARD
                                       IAN ELLIOTT
11                                200 BEASLEY DRIVE
                                  FRANKLIN, TENNESSEE 37064
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                              6160

                          U.S. COURT REPORTERS

1              INDEX OF PROCEEDINGS

2

      PATENT AND TRADEMARK CLOSINGS:

3

4     PLAINTIFF'S CLOSING P.6183, 6208

5

      DEFENDANT'S CLOSING P.6227

6

7     PLAINTIFF'S REBUTTAL P.6265

8

      ANTITRUST CLOSINGS:

9

10    COUNTERCLAIMANT CLOSING ARGUMENT P.6273

11

      COUNTERDEFENDANT CLOSING ARGUMENT P.6306

12

13    COUNTERCLAIMAINT REBUTTAL ARGUMENT P.6354

14

15

16

17

18

19

20

21

22

23

24

25


                                          6161

              U.S. COURT REPORTERS

```
1     SAN JOSE, CALIFORNIA              JULY 19, 1999

2                    P R O C E E D I N G S

3                                           09:02:05

4          (WHEREUPON, THE FOLLOWING PROCEEDINGS   09:02:05

5     WERE HELD WITHOUT THE JURY:)

6          MR. STONE:  ON FRIDAY, YOUR HONOR, WE HAD   09:34:04

7     SUBMITTED TO THE COURT AN OBJECTION TO THE   09:34:07

8     ANTITRUST DAMAGE INSTRUCTION SETTING FORTH THAT IT   09:34:09

9     DIDN'T CONTAIN AN INSTRUCTION ON ANTITRUST INJURY   09:34:13

10    OR INJURY TO COMPETITION, WHICH WE BELIEVE IS AN   09:34:17

11    ESSENTIAL ELEMENT OF PRIVATE ANTITRUST CLAIM, AND   09:34:21

12    WE SUBMITTED A PROPOSED INSTRUCTION TO BE INCLUDED   09:34:24

13    IN THE DAMAGES INSTRUCTION.   09:34:28

14          I'VE REVIEWED THE COURT'S NEW DRAFT OF   09:34:29

15    SUPPLEMENTAL INSTRUCTION NUMBER 15 AND IT DOES NOT   09:34:32

16    INCLUDE AN ANTITRUST INJURY INSTRUCTION.  SO I WANT   09:34:36

17    TO RENEW OUR OBJECTION TO THE FACT THAT THE DAMAGES   09:34:40

18    INSTRUCTIONS AS THEY ARE CURRENTLY DRAFTED, OR THE   09:34:43

19    INSTRUCTIONS IN THEIR ENTIRETY, DO NOT HAVE AN   09:34:47

20    INSTRUCTION ON ANTITRUST INJURY WHICH IS AN   09:34:49

21    ESSENTIAL ELEMENT OF EVERY ANTITRUST CLAIM.   09:34:53

22          THE COURT:  ARE YOU DISAGREEING WITH WHAT   09:34:56

23    I SAID ON THE LIABILITY PART?   09:34:59

24          MR. STONE:  WELL, WE HAD PREVIOUSLY   09:35:01

25    OBJECTED AND, YES, WE BELIEVE ANTITRUST INJURY   09:35:03
```

6162

U.S. COURT REPORTERS

```
1    AND FALSE ADVERTISING CLAIMS                    10:13:52
2              CLOSING ARGUMENT BY MR. MARSHALL
3              MR. MARSHALL:  THANK YOU, YOUR HONOR.  10:13:54
4              GOOD MORNING, MEMBERS OF THE JURY.     10:14:02
5    YOU'VE BEEN INSTRUCTED THAT IT IS YOUR DUTY TO   10:14:02
6    DECIDE FROM THE EVIDENCE WHAT THE FACTS ARE AND TO 10:14:03
7    DECIDE BASED ON THE EVIDENCE WHAT HAPPENED.      10:14:05
8              YOU'VE ALSO BEEN INSTRUCTED THAT THE   10:14:08
9    EVIDENCE INCLUDES TESTIMONY OF WITNESSES, AND    10:14:10
10   DOCUMENTS AND THINGS RECEIVED IN EVIDENCE.       10:14:13
11   STATEMENTS AND ARGUMENTS OF ATTORNEYS AND QUESTIONS 10:14:17
12   AND OBJECTIONS OF ATTORNEYS ARE NOT EVIDENCE.    10:14:20
13             NOW IS THE TIME IN CLOSING ARGUMENTS FOR 10:14:25
14   THE PARTIES TO SHOW YOU, IF THEY CAN, JUST WHERE IN 10:14:28
15   THE TRIAL RECORD IS THE EVIDENCE THAT SUPPORTS   10:14:31
16   THEIR CLAIMS AND DEFENSES.                       10:14:33
17             IN OTHER WORDS, WE HAVE ALL TALKED THE 10:14:36
18   TALK.  IT IS TIME TO SEE WHO CAN WALK THE WALK.  10:14:39
19   ACTUALLY, IT'S GOING TO BE MORE LIKE A TRIAL     10:14:43
20   BECAUSE WE DON'T HAVE MUCH TIME AND THERE'S A LOT 10:14:46
21   OF GROUND TO COVER.                              10:14:48
22             THIS MORNING I'LL TAKE YOU THROUGH THE 10:14:50
23   FOUR PATENTS THAT NU-KOTE INFRINGES.  OUR TRADEMARK 10:14:52
24   INFRINGEMENT AND FALSE ADVERTISING CLAIMS WILL BE 10:14:57
25   HANDLED BY MR. PECAU.                            10:14:59
```

6183

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | H-P AND THE FACT THAT WE ARE USING | 10:47:05 |
| 2 | RETICULATED -- WE'RE NOT USING | 10:47:06 |
| 3 | RETICULATED POLYURETHANE FOAM, I.E. | 10:47:08 |
| 4 | MELAMINE, IS NOT HELPFUL." | 10:47:15 |
| 5 | AND FINALLY QUITE A WHILE LATER:  "WE ARE | 10:47:16 |
| 6 | CURRENTLY IN THE REALM OF WILLFUL AND | 10:47:20 |
| 7 | WANTON." | 10:47:22 |
| 8 | THE EVIDENCE SHOWS THAT NU-KOTE PAID A | 10:47:22 |
| 9 | MILLION -- OVER A MILLION DOLLARS A YEAR TO THE | 10:47:24 |
| 10 | MCKEE FIRM TO AVOID PATENT INFRINGEMENT.  IT'S IN | 10:47:27 |
| 11 | THE RECORD.  BUT THEY OFFERED NO OPINION ON ANY OF | 10:47:36 |
| 12 | THE FOUR PATENTS TO SHOW THAT THEY HAD SOME | 10:47:37 |
| 13 | REASONABLE, GOOD FAITH BASIS TO BELIEVE OR THAT | 10:47:40 |
| 14 | COUNSEL WOULD SIGN OFF ON ANY REASONABLE, GOOD | 10:47:43 |
| 15 | FAITH BASIS TO BELIEVE THAT THE -- THAT THE -- THAT | 10:47:44 |
| 16 | THEY WERE EITHER NOT INFRINGING OR -- OR THAT THE | 10:47:47 |
| 17 | PATENTS WERE INVALID. | 10:47:50 |
| 18 | THIS IS CLEAR AND CONVINCING EVIDENCE. | 10:47:52 |
| 19 | IT'S UNREBUTTED EVIDENCE, IN FACT, OF WILLFUL | 10:47:54 |
| 20 | INFRINGEMENT. | 10:47:57 |
| 21 | THANK YOU. | 10:48:00 |
| 22 | CLOSING ARGUMENT BY MR. PECAU | |
| 23 | MR. PECAU:  GOOD MORNING, LADIES AND | 10:48:09 |
| 24 | GENTLEMEN. | 10:48:10 |
| 25 | ONE THING THAT IS CLEAR AFTER TWO MONTHS | 10:48:12 |

6208

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | EVERYONE CAN HAVE A SEAT. | 11:24:29 |
| 2 | VERY WELL.  THE COURT WILL CALL ON | 11:24:37 |
| 3 | NU-KOTE WITH RESPECT TO ITS ARGUMENT ON THIS PHASE | 11:24:39 |
| 4 | OF THE CASE. | 11:24:41 |
| 5 | CLOSING ARGUMENT BY MR. KATZ. | 11:24:56 |
| 6 | MR. KATZ:  THANK YOU, YOUR HONOR.  MAY IT | 11:24:57 |
| 7 | PLEASE THE COURT. | 11:24:58 |
| 8 | GOOD AFTERNOON, LADIES AND GENTLEMEN OF | 11:24:59 |
| 9 | THE JURY.  I'D LIKE TO WELCOME MR. MARSHALL BACK TO | 11:25:00 |
| 10 | THE COURTROOM.  I'M GOING TO TELL YOU ABOUT | 11:25:04 |
| 11 | SOMETHING THAT HE COULD NOT TELL YOU ABOUT AND THAT | 11:25:08 |
| 12 | IS WHAT HAPPENED WHILE HE WAS AWAY WHICH HAS A LOT | 11:25:10 |
| 13 | TO DO WITH THE EVIDENCE IN THIS CASE.  I AGREE WITH | 11:25:13 |
| 14 | HIM THAT THAT EVIDENCE IS VERY IMPORTANT AND I WILL | 11:25:17 |
| 15 | BE DISCUSSING IT AND IT ALSO HAS TO DO WITH TWO | 11:25:19 |
| 16 | OTHER THINGS THAT ARE VERY IMPORTANT. | 11:25:23 |
| 17 | THE FIRST AND MOST IMPORTANT IS | 11:25:25 |
| 18 | CREDIBILITY AND THE SECOND IS COMMON SENSE. | 11:25:27 |
| 19 | IT IS NOT A COINCIDENCE THAT THE FIRST | 11:25:31 |
| 20 | THING THAT HAPPENS WHEN A WITNESS COMES HERE IS | 11:25:35 |
| 21 | THEY TAKE AN OATH TO TELL THE TRUTH, THE WHOLE | 11:25:38 |
| 22 | TRUTH, AND NOTHING BUT THE TRUTH.  THAT IS THE | 11:25:41 |
| 23 | SINGLE MOST IMPORTANT THING THAT HAPPENS IN A | 11:25:43 |
| 24 | COURTROOM. | 11:25:46 |
| 25 | AND IF YOU DECIDE NOTHING ELSE, SIMPLY | 11:25:48 |

6227

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | YOU NEED A TWO-MINUTE BREAK?  OKAY. | 12:17:56 |
| 2 | BEFORE WE GO TO REBUTTAL WE'LL JUST TAKE A BREAK IN | 12:17:58 |
| 3 | PLACE AND ALLOW YOU TO REFRESH YOURSELVES IF YOU | 12:18:02 |
| 4 | WANT AND WE'LL COME BACK IN ABOUT TWO MINUTES. | 12:18:04 |
| 5 | (WHEREUPON, A RECESS WAS TAKEN.) | 12:20:52 |
| 6 | THE COURT:  VERY WELL.  CAN WE COME BACK | 12:20:53 |
| 7 | TO ORDER.  WE HAVE ABOUT FIVE MORE MINUTES FOR | 12:20:54 |
| 8 | REBUTTAL AND THEN WE'LL TAKE OUR BREAK. | 12:20:57 |
| 9 | MR. MARSHALL:  ARE WE READY TO GO? | 12:21:06 |
| 10 | THE COURT:  YOU MAY PROCEED | 12:21:09 |
| 11 | REBUTTAL ARGUMENT BY MR. MARSHALL | |
| 12 | MR. MARSHALL:  I'M GOING TO HAVE TO DO MY | 12:21:10 |
| 13 | CHRIS BERMAN IMITATION.  WHERE'S THE BEEF?  THERE | 12:21:12 |
| 14 | ISN'T ANY.  THERE'S A LOT OF ARGUMENT, BUT VERY | 12:21:14 |
| 15 | LITTLE EVIDENCE HERE.  VERY LITTLE CHALLENGE TO OUR | 12:21:16 |
| 16 | PROOFS.  OUR PATENTS ARE VALID AND THEY FAILED TO | 12:21:19 |
| 17 | PROVE OTHERWISE.  THEY DIDN'T CHALLENGE THE | 12:21:21 |
| 18 | VALIDITY OF THE '409 AND YET HERE THEY ARE. | 12:21:23 |
| 19 | DR. MILLS, READ THE RECORD.  DR. MILLS | 12:21:26 |
| 20 | DIDN'T SAY YOU CAN PATENT THE WHEEL.  HE SAID HE | 12:21:29 |
| 21 | COULD GET A PATENT ON A WHEEL DEPENDING ON THE | 12:21:32 |
| 22 | ENVIRONMENT.  THE MACHINES HAVE WHEELS WITH GEARS | 12:21:36 |
| 23 | AND PATENT THE WHEEL, THAT'S RIDICULOUS.  AND DR. | 12:21:38 |
| 24 | MILLS DIDN'T TESTIFY TO IT. | 12:21:42 |
| 25 | CONTEMPORANEOUS NOTES.  HOW ABOUT MR. | 12:21:43 |

6265

U.S. COURT REPORTERS

THE COURT:  IF YOU'VE GOT VERDICT           13:47:28

PROBLEMS, TAKE THEM UP TOGETHER AND GIVE THEM TO    13:47:29

MR. DAVIS.                                  13:47:32

    (WHEREUPON, THE FOLLOWING PROCEEDINGS

WERE HELD IN THE PRESENCE OF THE JURY:)

    THE COURT:  VERY WELL.  THE COURT WILL      13:48:21

CALL ON NU-KOTE FOR ITS CLOSING ARGUMENT WITH       13:48:22

RESPECT TO THE ANTITRUST ISSUES.            13:48:25

    ANTITRUST CLOSING ARGUMENT BY MR. KATZ:

    MR. KATZ:  THANK YOU, YOUR HONOR.           13:48:29

    GOOD AFTERNOON, LADIES AND GENTLEMEN.       13:48:34

MAY IT PLEASE THE COURT.                     13:48:36

    WE ARE ON THE LAST LAP NOW OF WHAT HAS      13:48:47

BECOME A MARATHON.  THE -- I HAVE BEHIND ME WHAT     13:48:52

YOU HAVE HEARD SINCE MAY 18TH, 1999.  IT IS A       13:48:57

HERCULEAN TASK TO GO THROUGH THIS AMOUNT OF          13:49:08

MATERIAL AND WE HAVE TRIED TO SUMMARIZE IT FOR YOU   13:49:10

IN VARIOUS DIFFERENT WAYS.                   13:49:13

    THAT CHART UP THERE WHICH I SHOWED YOU ON    13:49:15

THE VERY FIRST DAY OF TRIAL IS ONE WAY TO DO IT AND  13:49:17

I'LL BE TALKING ABOUT THAT, BUT YOU CAN SEE WHY IT   13:49:24

TAKES SO LONG BECAUSE WE'RE GOING OVER A LONG        13:49:24

PERIOD OF TIME AND A LOT OF THINGS HAVE HAPPENED.    13:49:25

    AND I THINK THAT I WILL BE ABLE TO BOIL      13:49:28

THAT DOWN EVEN FURTHER AND GIVE YOU THE ROAD MAP     13:49:31

6273

U.S. COURT REPORTERS

```
1    DOCUMENTS.  I DON'T HAVE TIME TO GO OVER ALL OF      13:57:48
2    THEM, BUT LET'S TAKE A LOOK AT 6425, PLEASE.  THIS    13:57:51
3    IS A -- A DOCUMENT OF MR. SECCOMBE'S.  AND HE SAYS    13:57:55
4    HERE:  "TODAY, WE MEASURE MARKET SHARE.  GOAL:  90    13:57:59
5    PERCENT INK SHARE."                                   13:58:05
6              YOU CAN LOOK AT ALL OF THE DOCUMENTS IN     13:58:07
7    THIS CASE.  YOU WON'T FIND ONE THAT DOESN'T SAY       13:58:09
8    THAT THIS IS WHAT THE MARKET IS.  THAT'S WHAT H-P     13:58:12
9    THOUGHT.  THAT'S WHAT DR. HALL THOUGHT.  IT'S         13:58:14
10   OBVIOUS.                                              13:58:17
11             LET'S TAKE A LOOK AT 7122.  7122 IS         13:58:18
12   ANOTHER MEASURE OF MARKET POWER.  ONE MEASURE OF      13:58:25
13   MARKET POWER -- FIRST WE HAVE TO SHOW MARKET          13:58:29
14   DEFINITION AND THEN WE HAVE TO MOVE TO MARKET         13:58:31
15   POWER.  ONE MEASURE OF MARKET POWER IS MARKET SHARE   13:58:33
16   AND AS YOU CAN SEE THAT H-P HAS A 90 PERCENT SHARE    13:58:36
17   OR MORE.                                              13:58:39
18             A SECOND MEASURE OF MARKET POWER IS THE     13:58:40
19   ABILITY TO CONTROL PRICES, AND THIS IS SOMETHING      13:58:43
20   THAT H-P CLEARLY HAD.  IF WE LOOK AT THE TIME LINE    13:58:47
21   WE CAN SEE SOMETHING THAT YOU'VE HEARD ABOUT QUITE    13:58:51
22   A LOT IN RECENT TIMES AND THAT IS THE BIFF/TIFF.      13:58:55
23   NOVEMBER '96 H-P INTRODUCES THE BIFF.                 13:59:03
24             AND THEN FOUR MONTHS LATER THIS DOCUMENT    13:59:09
25   HERE, H-P RAISES PRICES ON ALL CARTRIDGES.  IT'S      13:59:12
```

U.S. COURT REPORTERS

1    NOT A COINCIDENCE.  YOU GET RID OF COMPETITION AND    13:59:17

2    YOU RAISE PRICE.    13:59:20

3            HERE WE SEE THAT THE DISCOUNTS THAT THEY    13:59:23

4    GIVE TO THE OFFICE DEPOTS OF THE WORLD, ET CETERA,    13:59:24

5    WENT DOWN FROM 38 PERCENT TO 36 PERCENT WHICH IS    13:59:27

6    THE EQUIVALENT OF A PRICE RISE.  THAT IS EXHIBIT    13:59:30

7    7122.    13:59:33

8            AND THEN ANOTHER MEASURE OF MARKET POWER,    13:59:35

9    ASIDE FROM THE ABILITY TO CONTROL PRICES, IS THE    13:59:40

10   ABILITY TO EXCLUDE COMPETITION.  IF WE TAKE A LOOK    13:59:41

11   AT EXHIBIT 7188, THAT IS MR. CRANGLE'S MEMO, AND    13:59:46

12   YOU CAN SEE IT SAYS DOWN HERE THAT THE MESSAGE    13:59:54

13   AGAINST REFILLING IS WORKING.    13:59:57

14           AND IF WE LOOK AT THE SECOND PAGE, IF WE    13:59:59

15   ENLARGE THE FIRST PART OF IT, THE FIRST THIRD OF    14:00:05

16   THE PAGE YOU CAN SEE THAT HE TALKS ABOUT A YEAR    14:00:10

17   AGO, THEIR OWN MARKET RESEARCH, H-P'S MARKET    14:00:12

18   RESEARCH SAID THAT COMPETITORS WOULD GET 30 TO 40    14:00:15

19   PERCENTAGE POINTS OF SHARE.  BUT THEN BECAUSE    14:00:21

20   THEY'VE BEEN DOING WELL AND THE MESSAGE AGAINST IS    14:00:24

21   REFILLERS WORKING, NOW THEY PROJECT THAT IT'S 20 TO    14:00:27

22   25 POINTS PER SHARE.  SO H-P'S OWN DOCUMENTS SHOW    14:00:30

23   THAT THEY HAVE THE ABILITY TO EXCLUDE COMPETITION.    14:00:35

24           OF COURSE, NU-KOTE IS NOW IN A BANKRUPTCY    14:00:38

25   PROCEEDING.  THAT'S ABOUT AS EXCLUDED AS YOU CAN    14:00:41

6280

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | BE. | 14:00:43 |
| 2 | SO WE'VE GOT MARKET SHARE, WE'VE GOT THE | 14:00:44 |
| 3 | MARKET DEFINITION, WE'VE GOT THE MARKET POWER.  NOW | 14:00:47 |
| 1 | WE HAVE TO LOOK FOR CONDUCT, CONDUCT THAT CREATES | 14:00:52 |
| 5 | ARTIFICIAL BARRIERS TO ENTRY, CONDUCT TO EXTENT OR | 14:00:57 |
| 5 | MAINTAIN THE MONOPOLY.  AND THAT CONDUCT WAS | 14:01:02 |
| 7 | PROBABLY MOST CLEARLY EXPRESSED IN MR. -- MR. | 14:01:07 |
| 8 | PROSSER'S MEMO 6003, EXHIBIT 6003.  AND IF WE LOOK | 14:01:12 |
| 9 | AT PAGE, PAGE 324 OF THAT BASICALLY THIS IS WHAT | 14:01:18 |
| 10 | H-P IS DOING:  "THEY'RE DRAINING THE BACKWATERS WE | 14:01:24 |
| | KEEP CREATING WITH THE HIGH PRICE/HIGH | 14:01:28 |
| | RETURN STRATEGIES IN ORDER TO DESTROY THE | 14:01:30 |
| | ENVIRONMENT THAT ALLOWS MONSTERS LIKE | 14:01:33 |
| | NU-KOTE TO EVOLVE." | 14:01:35 |
| | THAT WAS THEIR OVERALL PLAN, THEIR | 14:01:37 |
| | OVERALL CAMPAIGN AND THERE WERE VARIOUS PARTS OF | 14:01:41 |
| | IT.  ONE PART WAS FUD, FEAR UNCERTAINTY AND DOUBT; | 14:01:45 |
| | AND ONE PART OF IT WAS THE CHANGE TO BIFF; ONE PART | 14:01:49 |
| | OF IT WAS ONE LIFE TO LIVE; AND ONE PART OF IT IS | 14:01:52 |
| | SOMETHING CALLED THE PETJET LOCKOUT WHICH IS | 14:01:55 |
| | EVIDENCE WE GOT IN MAINLY THROUGH DEPOSITION | 14:02:04 |
| | READINGS.  AND I'LL BE ABLE TO TELL YOU WHAT THAT | 14:02:04 |
| | EVIDENCE IS A LITTLE BIT LATER, BUT I'M SURE YOU | 14:02:05 |
| | CAN TELL FROM THE NAME OF IT THAT THE PETJET | 14:02:08 |
| | LOCKOUT, THAT IS THE CREATION OF THESE ARTIFICIAL | 14:02:11 |

6281

U.S. COURT REPORTERS

```
 1     BARRIERS TO ENTRY THAT DR. HALL WAS TALKING ABOUT.    14:02:13
 2            BUT BEFORE WE TALK ABOUT -- ABOUT THAT,         14:02:16
 3     LET'S DO WHAT WE DID FOR THE INTELLECTUAL PROPERTY     14:02:20
 4     CASE.  LET'S TALK ABOUT CREDIBILITY AND COMMON         14:02:23
 5     SENSE BECAUSE THOSE ARE TWO VERY IMPORTANT THINGS      14:02:25
 6     THAT YOU WILL BE DECIDING.                             14:02:28
 7            AND IN TERMS OF CREDIBILITY, THERE WERE         14:02:31
 8     MANY, MANY H-P WITNESSES THAT CAME HERE AND SAID TO    14:02:34
 9     YOU THINGS THAT WERE DIFFERENT FROM WHAT THEY HAD      14:02:38
10     SAID UNDER OATH BEFORE, AND I POINTED THAT OUT, OR     14:02:40
11     SAID THINGS THAT WERE JUST PLAIN ABSURD.  AND THAT     14:02:43
12     THOSE -- WHEN THEY SAID THOSE THINGS, IT JUST -- IT    14:02:47
13     JUST TURNED INTO ONE -- ONE MISTRUTH AFTER ANOTHER,    14:02:50
14     ONE UNTRUTH AFTER ANOTHER.                             14:02:54
15            MR. SECCOMBE WAS A PRIME EXAMPLE OF THAT.       14:02:56
16     IF WE CAN LOOK AT 7396.  7396 COULD NOT BE CLEARER.    14:02:59
17     MR. SECCOMBE SAYS: "OVER THE PAST FEW MONTHS, AS I     14:03:07
18            REALIZED THAT OUR BUSINESS REALLY IS IN         14:03:10
19            SELLING INK."                                   14:03:14
20            IT'S CRYSTAL CLEAR THERE'S NO AMBIGUITY         14:03:14
21     ABOUT IT, BUT HE CAME HERE, HE TOOK AN OATH, HE        14:03:17
22     SWORE TO YOU THAT H-P WAS NOT IN THE INK BUSINESS.     14:03:20
23     THAT IS ABSURD.  IT'S NOT TRUE.  IT LED TO MANY        14:03:24
24     OTHER UNTRUTHS BECAUSE EVERY TIME WE RAN ACROSS        14:03:28
25     THAT WORD HE HAD TO -- TO MAKE UP SOMETHING IN         14:03:32
```

6282

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | ORDER TO GET AROUND HIS STATEMENT. | 14:03:36 |
| 2 | I THINK JUST LAST WEEK YOU SAW MR. SID | 14:03:39 |
| 3 | ELLIOTT. HE CAME HERE. HE TOOK AN OATH TO TELL | 14:03:43 |
| 4 | YOU THE TRUTH, THE WHOLE TRUTH AND NOTHING BUT THE | 14:03:46 |
| 5 | TRUTH AND HE DID NOT DO THAT. | 14:03:48 |
| 6 | HE TOLD YOU THAT H-P BENEFITED 53 TO 86 | 14:03:50 |
| 7 | MILLION DOLLARS FROM THE BIFF PROGRAM, BUT HE LEFT | 14:03:54 |
| 8 | OUT SOMETHING THAT HE PUT IN A CONTEMPORANEOUS | 14:03:57 |
| 9 | DOCUMENT WHICH IS THE TIME VALUE OF MONEY. AND IF | 14:04:00 |
| 10 | WE LOOK AT EXHIBIT 3067, ONE OF HIS DOCUMENTS, AT | 14:04:02 |
| 11 | PAGE 168, YOU CAN SEE THAT WHAT HE SAID AT THE TIME | 14:04:10 |
| 12 | WAS, WELL, IT LOOKS LIKE WE MIGHT LOSE $600,000 OR | 14:04:14 |
| 13 | IF WE'RE LUCKY OVER EIGHT YEARS MAYBE WE'LL MAKE | 14:04:17 |
| 14 | $1.7 MILLION. BUT THAT WAS COUNTING SOME VERY | 14:04:21 |
| 15 | ABSURD ASSUMPTIONS. | 14:04:25 |
| 16 | YOU'LL RECALL THE NEGATIVE WORD OF MOUTH | 14:04:27 |
| 17 | ASSUMPTIONS. IN FACT, THEY'RE ON THE NEXT PAGE | 14:04:30 |
| 18 | THERE, PAGE 169, AND BASICALLY WHAT HE DID WAS THAT | 14:04:32 |
| 19 | HE ASSUMED THAT IF THEY HAD 3,000 CUSTOMERS THAT | 14:04:36 |
| 20 | HAD A PROBLEM WITH NO BASIS IN FACT, THAT THAT | 14:04:38 |
| 21 | COULD TURN INTO 21,750 LOST CUSTOMERS. THERE WAS | 14:04:42 |
| 22 | NO BASIS IN FACT FOR THAT AND THAT WAS THE LARGEST | 14:04:51 |
| 23 | NUMBER IN HIS 53 TO 86 MILLION DOLLARS. SO, IN | 14:04:53 |
| 24 | FACT, BIFF WAS A COMPLETE FINANCIAL DISASTER FOR | 14:04:57 |
| 25 | THEM. | 14:05:00 |

6283

U.S. COURT REPORTERS

1           AND IT BECOMES EASY TO REFILL MORE           14:10:00

2           FREQUENTLY.  WE DO HAVE AN ISSUE, OKAY,      14:10:02

3           AND WE'D LIKE TO AVOID THAT IN SOME WAY,     14:10:04

4           EITHER THROUGH DESIGN OF THE PRODUCT OR      14:10:07

5           PRICING ACTION OR PROGRAM ACTION,            14:10:08

6           WHATEVER."                                   14:10:11

7           SO, IN OTHER WORDS, THINGS LIKE BIFF,        14:10:11

8    THINGS LIKE ONE LIFE TO LIVE.                       14:10:14

9           AND THEN THERE'S A QUESTION FROM THE         14:10:17

10   AUDIENCE.  THIS IS THE PUNCH LINE.  "IF WE WERE     14:10:18

11   ABLE TO COME UP WITH A WAY TO PREVENT THE REFILLING 14:10:21

12   PROCESS FAIRLY EFFECTIVELY, IS THERE ANYTHING       14:10:23

13   PREVENTING US LEGALLY FROM DOING THAT?"             14:10:26

14          THE ANSWER:  "YEAH."                         14:10:29

15          HE KNEW IT.  HE KNEW IT WAS ILLEGAL, BUT     14:10:30

16   THEY WENT AHEAD AND DID IT ANYWAY.                  14:10:35

17          AND THERE ARE MANY, MANY DOCUMENTS THAT      14:10:38

18   SHOWS H-P'S INTENT.  LET ME SHOW YOU ONE MORE,      14:10:40

19   6463.  THIS IS THE DOCUMENT.  IT'S THE REFILL       14:10:44

20   RESPONSE STRATEGY.  AND YOU CAN SEE ACTIVELY        14:10:52

21   DISCOURAGE THE USE OF REFILLERS.                    14:10:57

22          GO TO THE NEXT PAGE, PLEASE.  121 THEY       14:10:59

23   WANT TO MAINTAIN THEIR 90 PERCENT MARKET SHARE.     14:11:07

24   THEY HAVE AN INABILITY TO DO THAT.  CUSTOMERS WANT  14:11:10

25   LOWER PRICES.                                       14:11:13

                                        6288

                    U.S. COURT REPORTERS

1              GO TO 123, PLEASE.                          14:11:14

2              AGAIN, IT SHOWS THE REASONS FOR LOWER       14:11:20

3    REFILLING SUCCESS.  LOWER P.O.P., STRONG RETAIL       14:11:23

4    PRESENCE, BROAD PRODUCT OFFERING, REDUCED PRINTER     14:11:27

5    SUPPLY COSTS AND REDUCED WASTE.                       14:11:30

6              GO TO 125.  OBJECTIVE:  GAIN DIVISION       14:11:33

7    CONSENSUS OF INTERFUNCTIONAL INVESTIGATION AND        14:11:36

8    PROPOSAL MAINTAIN 90 PERCENT MONOCHROME MARKET        14:11:40

9    SHARE.  THEY WANT TO MAINTAIN THEIR MARKET SHARE.     14:11:45

0              AND LET'S GO TO 139.  ONE OF THEM IS        14:11:47

1    CONTINUE TO CREATE FUD WITH NON-H-P SOLUTIONS.        14:11:53

2              MR. COOPER TELLS YOU THEY ARE CONTINUING    14:12:01

3    NOT TO DO THINGS.  WELL, IF THEY'RE CONTINUING TO     14:12:03

4    DO THINGS, THEY MUST HAVE BEEN DOING IT.              14:12:05

5              IT SHOWS YOU THAT THE HIGHER H-P'S MARKET   14:12:08

6    SHARE GOES, THE HIGHER THEIR PROFITABILITY GOES.      14:12:10

7              YOU'LL RECALL REMEMBER THAT DR. PACE        14:12:14

8    SOMEHOW DIDN'T THINK THAT THAT WORKED THAT WAY FOR    14:12:16

9    NU-KOTE.  HE SAID IF NU-KOTE GOT 60 PERCENT MARKET    14:12:18

:0   SHARE, THAT WOULD BE THE WORST THING THAT COULD       14:12:24

:1   HAPPEN TO NU-KOTE.  THEY WOULD LOSE MONEY IN          14:12:27

:2   BUCKETS EVEN THOUGH YOU KNOW FROM COMMON SENSE THAT   14:12:29

:3   IT'S THE EVERY COMPANY'S DESIRE TO GET MORE MARKET    14:12:31

:4   SHARE.                                                14:12:35

:5             FINALLY, AN OVERALL POINT HERE, IF          14:12:37

                                                  6289

                       U.S. COURT REPORTERS

NU-KOTE WAS SO INCOMPETENT AS H-P SAYS, IF THEY          14:12:39

WERE SUCH A BAD COMPANY, WHY DID H-P HAVE TO DO          14:12:43

ANYTHING?  WHY DID H-P WRITE ALL OF THESE                14:12:45

DOCUMENTS?  WHY WERE THEY OBSESSED WITH NU-KOTE?         14:12:49

THEY WERE OBSESSED WITH NU-KOTE?  BECAUSE NU-KOTE        14:12:51

WAS A CATEGORY KILLER AS YOU SAW THIS MORNING.           14:12:54

          LET'S GO INTO THE CONDUCT.  AND THE FIRST      14:13:00

PART IS FUD, AND BY THAT I DON'T MEAN EDUCATION.         14:13:05

THAT WAS ONE THING THAT MR. SECCOMBE TOLD YOU THAT       14:13:05

DEFIES COMMON SENSE.  I DON'T SEE IT BEING CALLED         14:13:09

"FED," FEAR, EDUCATION.  IT'S BEING CALLED FUD,          14:13:13

FEAR, UNCERTAINTY AND DOUBT.  AND I'M GOING TO           14:13:17

CONCENTRATE ON FOUR, FOUR OF THE -- OF THE MAIN FUD      14:13:20

STATEMENTS, ALTHOUGH THERE ARE OTHERS.                   14:13:24

          THE FIRST FUD STATEMENT WAS -- WAS            14:13:27

THAT -- THAT REFILLER'S INKS ARE INFERIOR.  AND         14:13:29

THAT APPEARS -- THAT APPEARS IN EXHIBIT 1642, THE       14:13:33

INK STORY, EXHIBIT 6056, EXHIBIT 3027, AMONG           14:13:36

OTHERS.                                                14:13:43

          BUT WHAT WAS THE TRUTH?  YOU SAW THE          14:13:48

TRUTH THIS MORNING.  H-P HAD TESTS.  THEY HAD           14:13:50

EXHIBIT 1233, THEY HAD 6412, THEY HAD THE NSTL TEST     14:13:52

WHICH SHOWED THAT -- THAT NU-KOTE INKS DID MEET OR       14:13:57

EXCEED H-P INKS.                                        14:14:01

          WE SAW THE PECENCO NOTES, 7236, WHERE SHE     14:14:02

6290

U.S. COURT REPORTERS

SAID "PRINT QUALITY IS GOOD." YOU CAN'T HAVE GOOD          14:14:12

PRINT QUALITY WITH BAD INK OBVIOUSLY. WE SAW THE          14:14:12

CRANGLE MEMO 7188 WHERE HE SAYS THAT THE PRINT          14:14:14

QUALITY IS OKAY.          14:14:17

     SO THAT WAS NOT COMPARATIVE          14:14:21

ADVERTISEMENT. THAT WAS A KNOWINGLY FALSE          14:14:23

STATEMENT.          14:14:25

     SECOND KNOWINGLY FALSE STATEMENT, REFILL          14:14:26

INKS CAUSE MOST OF THE PRINTER PROBLEMS. AND YOU          14:14:29

CAN FIND THAT IN EXHIBIT 1642, THE INK STORY.          14:14:33

EXHIBIT 3051, THE '95 SELLING GUIDE, EXHIBIT 6186,          14:14:37

ANOTHER SELLING GUIDE, EXHIBIT 6056.          14:14:44

     AND WHAT WAS THE TRUTH, THE TRUTH WAS          14:14:49

THAT THEY KNEW THAT LESS THAN 10 PERCENT OF THE          14:14:51

PROBLEMS WERE CAUSED BY REFILL. AND HOW DO WE KNOW          14:14:54

THAT? BECAUSE MR. MARTIN TESTIFIED TO THAT. THEY          14:14:58

TRIED TO DENY IT UP, DOWN AND SIDEWAYS LATER, BUT          14:15:02

THE TESTIMONY IS CLEAR. YOU CAN DECIDE FOR          14:15:06

YOURSELF.          14:15:08

     "QUESTION: ISN'T IT A FACT, SIR, THAT          14:15:10

     H-P KNOWS THAT LESS THAN 10 PERCENT OF          14:15:12

     THE DAMAGES TO PRINTERS COME FROM          14:15:15

     REFILLS?"          14:15:16

     STARTING FROM LINE 6, MR. SOBCZAK.          14:15:18

     "ANSWER: WELL, I'VE SEEN ESTIMATES FROM          14:15:21

6291

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | REPAIR FACILITIES THAT TALK ABOUT THE | 14:15:23 |
| 2 | OVERALL DAMAGE AND I WOULD SAY THAT | 14:15:24 |
| 3 | GENERALLY OF ALL OF THE DAMAGE THAT | 14:15:26 |
| 4 | OCCURS FROM PRINTERS, LESS THAN 10 | 14:15:28 |
| 5 | PERCENT IS FROM REFILLING, I BELIEVE SO, | 14:15:31 |
| 6 | YES." | 14:15:33 |
| 7 | AND IF THAT WEREN'T ENOUGH FOR YOU, SWORN | 14:15:34 |
| 8 | TESTIMONY TO YOU, YOURSELVES, WE SAW IT ON | 14:15:36 |
| 9 | VIDEOTAPE, ON THE SIUTA VIDEOTAPE. THERE'S A VOICE | 14:15:38 |
| 10 | THAT SAYS IT'S LESS THAN 10 PERCENT, AND MR. MARTIN | 14:15:41 |
| 11 | IDENTIFIED THAT AS HIS VOICE. | 14:15:45 |
| 12 | SO ANOTHER FALSE STATEMENT. A KNOWINGLY | 14:15:49 |
| 13 | FALSE STATEMENT. THIRD KNOWINGLY FALSE STATEMENT | 14:15:51 |
| 14 | THAT, THAT REFILLERS DON'T GET REPEAT CUSTOMERS. | 14:15:56 |
| 15 | WE SEE THAT IN EXHIBIT 3051, THE '95 SELLING GUIDE. | 14:16:00 |
| 16 | WE SEE IT IN EXHIBIT 2037, THE U.S. REFILLERS | 14:16:04 |
| 17 | SUMMARY. WHAT'S THE TRUTH? THE TRUTH IS AS YOU | 14:16:08 |
| 18 | HEARD, AS YOU HEARD MS. CLELAND SAY IN HER | 14:16:11 |
| 19 | VIDEOTAPE, EXHIBIT 7462, TWO-THIRDS REPEAT. THAT | 14:16:13 |
| 20 | WAS THE PROBLEM THAT THEY WERE HAVING, THAT PEOPLE | 14:16:19 |
| 21 | LIKED IT. TWO THIRDS REPEAT. | 14:16:21 |
| 22 | ALSO, WHEN MR. MARTIN WAS TESTIFYING, I | 14:16:24 |
| 23 | SHOWED HIM EXHIBIT 3027 WHICH SHOWED THAT 66 | 14:16:26 |
| 24 | PERCENT OF REFILLER CUSTOMERS WERE SATISFIED, THAT | 14:16:30 |
| 25 | SAME TWO-THIRDS NUMBER AND EXHIBIT 7296, AN NDC | 14:16:32 |

6292

U.S. COURT REPORTERS

```
 1    REPORT WHICH GAVE THE SAME INFORMATION.              14:16:38

 2              ANOTHER KNOWINGLY FALSE STATEMENT.         14:16:41

 3              FINAL FUD STATEMENT THAT I WILL FOCUS ON   14:16:50

 4    IS THAT REFILLING MAKES A MESS EVERY TIME.  WE SEE   14:16:50

 5    IT IN THE INK STORY, EXHIBIT 1642.  WE SEE IT IN AN  14:16:51

 6    OVERVIEW MONOCHROME '95 DOCUMENT, EXHIBIT 6461.      14:16:55

 7    BUT WHAT WAS THE TRUTH?                              14:17:00

 8              THE TRUTH WAS -- WAS THAT IT DIDN'T MAKE   14:17:02

 9    A MESS.  IN FACT, WE SEE THE PECENCO NOTES, EXHIBIT  14:17:06

10    7236 AGAIN.  THAT THOSE HANDWRITTEN NOTES, AND IF    14:17:11

11    WE CAN ENLARGE THAT PORTION THAT WE ENLARGED         14:17:16

12    BEFORE, IT SAYS "REASON TO PURCHASE REFILLS, NO      14:17:20

13    MESS."  AND THEN WITH RESPECT TO THE EARLIER         14:17:27

14    STATEMENT ABOUT SCREWING UP YOUR PRINTER IT SAYS     14:17:31

15    "DON'T SCREW UP PRINTER."  H-P KNEW THIS, KNOWINGLY  14:17:36

16    FALSE STATEMENTS.                                    14:17:39

17              ALSO ONE OF THE DEPOSITION READINGS WAS    14:17:40

18    FROM A WOMAN NAMED SARA LIGON, L-I-G-O-N, AND SHE    14:17:43

19    SAID SHE HAD NO IDEA WHAT PROBLEMS, IF ANY, NU-KOTE  14:17:47

20    CUSTOMERS HAVE.                                      14:17:50

21              MOVING NOW TO -- TO BIFF BECAUSE WE'RE ON  14:17:52

22    THE -- WE'VE DONE MARKET DEFINITION, MARKET POWER.   14:17:54

23    NOW WE'RE ON CONDUCT.                                14:17:58

24              WE'VE DONE INTENT AND NOW WE'RE ON         14:18:00

25    CONDUCT AND THE FIRST ASPECT OF THE CONDUCT, THE     14:18:02
```

6293

U.S. COURT REPORTERS

1    FIRST ASPECT OF THE CAMPAIGN TO DESTROY THE MONSTER    14:18:05

2    WAS FUD AND NOW WE'RE TALKING ABOUT -- ABOUT BIFF.    14:18:09

3            THERE WAS NO JUSTIFICATION FOR BIFF.  WE    14:18:15

4    HAVE SHOWN BEYOND ANY DOUBT THAT THERE WAS    14:18:18

5    ABSOLUTELY NO JUSTIFICATION FOR BIFF.    14:18:20

6            THE FIRST JUSTIFICATION THEY USED WAS    14:18:23

7    LEAKS.  AND MR. SECCOMBE HAS TESTIFIED THERE WAS    14:18:25

3    LESS THAN ONE IN A MILLION LEAKS.  AND YOU CAN'T    14:18:28

9    MEASURE IT FROM LESS THAN A MILLION.  I'VE READ    14:18:33

3    THIS MANY TIMES, MOST RECENTLY LAST WEEK.  I'M NOT    14:18:37

1    GOING TO READ IT TO YOU AGAIN.    14:18:39

2            MR. COOPER DENIES IT EVERY TIME.  I READ    14:18:41

3    IT QUITE SIMPLY.  I DON'T KNOW HOW HE DOES IT.    14:18:43

4            THE SECOND PROBLEM IS VENT TAPE ON.    14:18:46

5    REMEMBER THEY HAD THE CROSSING TAPES AND, AND WE    14:18:49

6    SHOWED THAT MR. DUNN, BEFORE BIFF, WROTE A MEMO ON    14:18:52

7    APRIL 21ST, 1995.  IT'S EXHIBIT 3135 AND HE SAID    14:18:56

3    WE'RE GOING TO TRY A NEW SOLUTION AND IT'S GOING TO    14:19:01

9    TAKE US ABOUT A YEAR TO FIND OUT BECAUSE OF ALL OF    14:19:03

3    THE INVENTORY OUT THERE.  AND THEN WHEN WE SEE THE    14:19:06

1    NADO REPORTS, THE RETURN REPORTS A YEAR LATER WE    14:19:10

2    SEE THAT THIS PROBLEM HAS DISAPPEARED AND IT    14:19:14

3    DISAPPEARED BEFORE NOVEMBER OF '96 BEFORE BIFF CAME    14:19:17

4    ON THE MARKET AND THE SOLUTION WAS THOUGHT UP    14:19:20

5    BEFORE THE BIFF PROJECT STARTED.  THAT EXCUSE IS A    14:19:22

6294

U.S. COURT REPORTERS

```
 1    MEMOS.                                            14:23:11

 2            WE ALSO KNOW THAT THERE WAS AN OBVIOUS     14:23:12

 3    SOLUTION TO THIS WHAT H-P'S ENGINEERS CALL AN     14:23:15

 4    OBVIOUS SOLUTION.  WE CAN SEE THAT IN EXHIBIT 6423 14:23:18

 5    AND, IN FACT, WE CAN SEE IT IN EXHIBIT 2426 THAT   14:23:21

 6    THEY COULD HAVE CREATED AN INFINITE LIFE TO LIVE IF 14:23:26

 7    THEY WANTED.  IF THEY DIDN'T WANT TO JUST HAVE INK  14:23:30

 8    OUT, BLOW OUT AT INK OUT, SO, FOR EXAMPLE, IN       14:23:32

 9    2426 -- YOU CAN ENLARGE THE TOP ONE, PLEASE.        14:23:36

.0            THERE IS ONE HERE.  IT SAYS IF YOU HAVE     14:23:43

.1    IT AT 1.0, WHICH IS WHAT THEIR ENGINEERS            14:23:46

.2    RECOMMENDED, AND I CAN'T READ THAT IT SAYS NO TTF,  14:23:53

.3    THAT MEANS NO FAILURES, AN INFINITE LIFE TO LIVE,   14:23:56

14    BUT YET YOU SAW THE DOCUMENTS, IT KEPT GETTING DOWN 14:24:00

15    AND DOWN FROM 40 MILLION DROPS TO 30 MILLION TO 17  14:24:03

16    MILLION.                                            14:24:06

17            SO THEY HAD THE CAPABILITY OF DOING THIS,   14:24:07

18    AND THEY CREATED THE ONE LIFE TO LIVE PROJECT TO    14:24:10

19    GET RID OF COMPETITION.                             14:24:13

20            MR. SCHAFER CAME IN HERE LAST WEEK AND HE   14:24:15

21    SAID, OH, THEY FIXED IT TWO YEARS LATER.  AND GUESS 14:24:18

22    WHAT HAPPENED DURING THAT TWO YEARS?  FIRST OF ALL, 14:24:22

23    WE DON'T HAVE ANY DOCUMENTS THAT THEY FIXED IT.  SO 14:24:24

24    THERE'S NO REAL PROOF OF THAT AND MR. SCHAFER WAS   14:24:26

25    NOT THE PERSON WHO HAD KNOWLEDGE OF THAT AND DURING 14:24:28
```

6298

U.S. COURT REPORTERS

1    THAT TWO YEARS, THAT'S WHEN NU-KOTE WENT BANKRUPT.    14:24:30

2         FINAL CONDUCT IS THE SO-CALLED PETJET    14:24:34

3    LOCKOUT AND AGAIN, THESE DOCUMENTS CAME IN DURING    14:24:38

4    THE DEPOSITION READINGS AND I THINK THAT YOU CAN    14:24:42

5    GET A QUICK IDEA OF WHAT THE PROJECT WAS.  IT WAS A    14:24:47

6    PEN THAT THEY HAD THAT THEY REDESIGNED IN ORDER TO    14:24:52

7    KEEP REFILLERS OUT.  AND IF WE CAN LOOK AT    14:24:55

8    EXHIBIT -- AT EXHIBIT 3531, FOR EXAMPLE.    14:24:58

9         DO WE HAVE THAT ONE?    14:25:10

0         THIS IS THE REFILL RESPONSE STRATEGY    14:25:30

1    DOCUMENT.  IT GOES BACK TO 1994, AND IF WE LOOK AT    14:25:37

2    THIS PAGE, PETJET LOCKOUT DECISION FLOW AND    14:25:40

3    BASICALLY THE DECISIONTRY THAT LEADS DOWN TO    14:25:48

4    LOCKOUT PEN AND THE PURPOSE OF THAT IT SAYS HOW    14:25:52

5    EFFECTIVE IS THE LOCKOUT TO PREVENT REFILLING?    14:25:57

6         IT'S QUITE CLEAR WHAT THE PURPOSE OF THIS    14:26:03

7    WAS.  YOU SEE A MEMO FROM MR. SECCOMBE.  THIS IS    14:26:06

8    EXHIBIT 4987, MAY 19TH, 1994.  "I UNDERSTAND THAT    14:26:15

9         WE ARE NOW CONSIDERING RAMPING UP THE    14:26:25

0         PETJET PRODUCTION LINES TO 900,000 A    14:26:28

1         MONTH.  SINCE THE PRIMARY BENEFICIARY OF    14:26:30

2         THIS WILL BE REFILLERS, I QUESTION THE    14:26:36

3         WISDOM OF THIS ACTION."    14:26:36

4         AND THEN, IN FACT, THEY COMPLETELY    14:26:38

5    CHANGED THE PETJET SO THAT IT PREVENTED REFILLING.    14:26:40

MR. COOPER HAS TOLD YOU ON MANY, MANY    14:26:54

OCCASIONS THAT H-P NEVER DID ANYTHING.  THEY JUST    14:26:57

BRAINSTORMED.  THEY JUST TALKED ABOUT THINGS.  I    14:27:00

THINK THAT YOU WILL SEE THAT THE DOCUMENTS TELL A    14:27:03

DIFFERENT STORY AND, OF COURSE, THERE'S NO DISPUTE    14:27:06

THAT THEY DID BIFF; THERE'S NO DISPUTE THAT THEY    14:27:13

DID ONE LIFE TO LIVE; THERE'S NO DISPUTE THAT THEY    14:27:15

DID THE PETJET LOCK-OUT.    14:27:23

WITH RESPECT TO FUD, I'VE ALREADY SHOWN    14:27:23

YOU A DOCUMENT THAT SAYS THAT OUR MESSAGE AGAINST    14:27:23

REFILLERS IS WORKING.  IT SHOWS THAT THE MARKET    14:27:25

SHARE WENT DOWN, AND THERE ARE A NUMBER OF OTHER    14:27:26

DOCUMENTS THAT SHOW THAT THIS WAS DISSEMINATED.    14:27:29

THERE WAS DEPOSITION TESTIMONY THE OTHER DAY TO THE    14:27:32

EFFECT THAT THE INK STORY WAS ACTUALLY ON THE    14:27:35

COUNTERS AT -- AT OFFICE DEPOT AND OTHER PLACES.    14:27:37

I WOULD ASK YOU TO LOOK AT EXHIBIT 6463,    14:27:42

EXHIBIT 6057, EXHIBIT 1614, AND THE SARA LIGON    14:27:45

DEPOSITION.  SHE TALKED ABOUT PUBLISHING THE    14:27:52

SELLING GUIDE IN ENGLISH, PORTUGUESE AND SPANISH.    14:27:55

I SUGGEST TO YOU THAT THEY WERE NOT TRANSLATING IT    14:27:58

INTO ALL OF THOSE LANGUAGES SO THAT IT WOULD NOT BE    14:28:02

DISTRIBUTED.    14:28:05

KATHLEEN CLELAND TALKED ABOUT THIS AS    14:28:06

EARLY AS 1991, ABOUT THE FUD MESSAGE AND MR.    14:28:08

6300

U.S. COURT REPORTERS

CRANGLE AND MR. SECCOMBE ALSO TALKED ABOUT IT.    14:28:12

SO THAT BRINGS US TO THE SUBJECT OF    14:28:15
DAMAGES AND OUR EXPERTS ON THAT -- ON THAT WERE --    14:28:17
WERE DR. HALL AND MR. ROWLEY.    14:28:20

BEFORE WE MOVE TO DAMAGES, I SHOULD TALK    14:28:28
ABOUT ONE OTHER SUBJECT WHICH IS ANTITRUST INJURY.    14:28:31
I'VE ALREADY ALLUDED TO THAT.  IT'S QUITE CLEAR    14:28:33
THAT THIS WAS AIMED NOT ONLY AGAINST NU-KOTE BUT    14:28:36
AGAINST ALL RESELLERS AND THAT'S WHY MR. CRANGLE,    14:28:39
FOR EXAMPLE, IN 7188 SAID OUR MESSAGE IS WORKING    14:28:44
AND THEN THE MARKET SHARE OF THE REFILLERS IS GOING    14:28:49
DOWN.    14:28:51

THERE'S NO QUESTION THAT IT HURT    14:28:55
CONSUMERS, THAT IT LESSENED CHOICE, AND I THINK    14:28:56
PROBABLY THE CLEAREST DOCUMENT OF THAT IS EXHIBIT    14:28:59
6402.  THIS WAS A SURVEY THAT H-P HAD COMMISSIONED    14:29:02
FROM ITS OWN, ONE OF ITS OWN SURVEY FIRMS, TALK TO    14:29:08
CUSTOMERS AND THE CUSTOMERS WERE COMPLAINING ABOUT    14:29:13
A LACK OF CHOICE.    14:29:15

IF WE CAN LOOK AT PAGE 666.  AND IF YOU    14:29:18
CAN ENLARGE THAT.    14:29:24

THIS IS AN H-P SURVEY OF AN H-P CUSTOMER.    14:29:26
"UNDERSTAND, MY CONCLUSION HERE IS THAT    14:29:29
THE H-P BRAND NAME ON SUPPLIES IS NOT    14:29:31
ENOUGH.  CONSUMERS ARE LOYAL TO H-P    14:29:33

6301

U.S. COURT REPORTERS

1    YOU SAW THE SPLATTER TAPE.  YOU SAW THE PROBLEMS.    14:21:51

2              COMPARE THAT WITH THE TAPE THAT ERIN    14:21:55

3    ANDERSON SHOWED YOU, HOW EASY IT WAS TO DO IT    14:21:56

4    BEFORE AND H-P DID THAT WITH NO JUSTIFICATION    14:21:59

5    EXCEPT TO DESTROY COMPETITION.  AND YOU HEARD THEIR    14:22:05

6    OWN EXPERT, DR. WIND, SAY THAT YOU COULDN'T DO A    14:22:08

7    WORSE THING TO A COMPANY THAN TO MAKE THEM HAVE A    14:22:11

8    BAD PRODUCT.    14:22:14

9              WE DID THE BEST WE COULD.  IT WAS A    14:22:15

10    USABLE PRODUCT BUT VERY DIFFICULT TO USE.  YOU SAW    14:22:17

11    THE PROBLEMS.  THEY WERE INTENTIONALLY CAUSED BY    14:22:20

12    H-P.  IT WAS AN ARTIFICIAL BARRIER TO ENTRY AND    14:22:24

13    THAT'S AN ACT OF MONOPOLIZATION.    14:22:27

14              THEN LET'S MOVE TO ONE LIFE TO LIVE.  WE    14:22:29

15    SEE IN MANY OF THESE DOCUMENTS THAT I'VE SHOWN YOU,    14:22:32

16    FOR EXAMPLE, 6408 THAT THIS IS AN IDEA THAT HAD    14:22:35

17    BEEN AROUND FOR A WHILE.    14:22:40

18              CAN WE LOOK AT 6408 AGAIN, PLEASE.    14:22:41

19              AGAIN AN H-P INTERNAL MEMO AND IT SAYS    14:22:44

20    BLOW OUT RESISTOR AT INK OUT.  THAT WAS THE PLAN    14:22:48

21    THAT THEY HAD, IT APPEARS IN ANY NUMBER OF OTHER --    14:22:51

22    OTHER DOCUMENTS, EXHIBIT 7163, EXHIBIT 6328.  AND    14:22:54

23    WE KNOW THAT THESE -- THAT THESE CARTRIDGES WERE    14:23:02

24    GOOD FOR USE 100 TIMES.  WE KNOW THAT BECAUSE MR.    14:23:05

25    PROSSER SAID SO, BECAUSE WE'VE SEEN SOME OTHER    14:23:09

6297

U.S. COURT REPORTERS

```
 1    MEMOS.                                          14:23:11

 2              WE ALSO KNOW THAT THERE WAS AN OBVIOUS  14:23:12

 3    SOLUTION TO THIS WHAT H-P'S ENGINEERS CALL AN     14:23:15

 4    OBVIOUS SOLUTION.  WE CAN SEE THAT IN EXHIBIT 6423 14:23:18

 5    AND, IN FACT, WE CAN SEE IT IN EXHIBIT 2426 THAT   14:23:21

 6    THEY COULD HAVE CREATED AN INFINITE LIFE TO LIVE IF 14:23:26

 7    THEY WANTED.  IF THEY DIDN'T WANT TO JUST HAVE INK  14:23:30

 8    OUT, BLOW OUT AT INK OUT, SO, FOR EXAMPLE, IN       14:23:32

 9    2426 -- YOU CAN ENLARGE THE TOP ONE, PLEASE.       14:23:36

10              THERE IS ONE HERE.  IT SAYS IF YOU HAVE  14:23:43

11    IT AT 1.0, WHICH IS WHAT THEIR ENGINEERS           14:23:46

12    RECOMMENDED, AND I CAN'T READ THAT IT SAYS NO TTF,  14:23:53

13    THAT MEANS NO FAILURES, AN INFINITE LIFE TO LIVE,   14:23:56

14    BUT YET YOU SAW THE DOCUMENTS, IT KEPT GETTING DOWN 14:24:00

15    AND DOWN FROM 40 MILLION DROPS TO 30 MILLION TO 17  14:24:03

16    MILLION.                                           14:24:06

17              SO THEY HAD THE CAPABILITY OF DOING THIS, 14:24:07

18    AND THEY CREATED THE ONE LIFE TO LIVE PROJECT TO    14:24:10

19    GET RID OF COMPETITION.                            14:24:13

20              MR. SCHAFER CAME IN HERE LAST WEEK AND HE 14:24:15

21    SAID, OH, THEY FIXED IT TWO YEARS LATER.  AND GUESS 14:24:18

22    WHAT HAPPENED DURING THAT TWO YEARS?  FIRST OF ALL, 14:24:22

23    WE DON'T HAVE ANY DOCUMENTS THAT THEY FIXED IT.  SO 14:24:24

24    THERE'S NO REAL PROOF OF THAT AND MR. SCHAFER WAS   14:24:26

25    NOT THE PERSON WHO HAD KNOWLEDGE OF THAT AND DURING 14:24:28
```

1    THAT TWO YEARS, THAT'S WHEN NU-KOTE WENT BANKRUPT.    14:24:30

2            FINAL CONDUCT IS THE SO-CALLED PETJET    14:24:34

3    LOCKOUT AND AGAIN, THESE DOCUMENTS CAME IN DURING    14:24:38

4    THE DEPOSITION READINGS AND I THINK THAT YOU CAN    14:24:42

5    GET A QUICK IDEA OF WHAT THE PROJECT WAS.  IT WAS A    14:24:47

6    PEN THAT THEY HAD THAT THEY REDESIGNED IN ORDER TO    14:24:52

7    KEEP REFILLERS OUT.  AND IF WE CAN LOOK AT    14:24:55

8    EXHIBIT -- AT EXHIBIT 3531, FOR EXAMPLE.    14:24:58

9            DO WE HAVE THAT ONE?    14:25:10

10           THIS IS THE REFILL RESPONSE STRATEGY    14:25:30

11   DOCUMENT.  IT GOES BACK TO 1994, AND IF WE LOOK AT    14:25:37

12   THIS PAGE, PETJET LOCKOUT DECISION FLOW AND    14:25:40

13   BASICALLY THE DECISIONTRY THAT LEADS DOWN TO    14:25:48

14   LOCKOUT PEN AND THE PURPOSE OF THAT IT SAYS HOW    14:25:52

15   EFFECTIVE IS THE LOCKOUT TO PREVENT REFILLING?    14:25:57

16           IT'S QUITE CLEAR WHAT THE PURPOSE OF THIS    14:26:03

17   WAS.  YOU SEE A MEMO FROM MR. SECCOMBE.  THIS IS    14:26:06

18   EXHIBIT 4987, MAY 19TH, 1994.  "I UNDERSTAND THAT    14:26:15

19           WE ARE NOW CONSIDERING RAMPING UP THE    14:26:25

20           PETJET PRODUCTION LINES TO 900,000 A    14:26:28

21           MONTH.  SINCE THE PRIMARY BENEFICIARY OF    14:26:30

22           THIS WILL BE REFILLERS, I QUESTION THE    14:26:36

23           WISDOM OF THIS ACTION."    14:26:36

24           AND THEN, IN FACT, THEY COMPLETELY    14:26:38

25   CHANGED THE PETJET SO THAT IT PREVENTED REFILLING.    14:26:40

6299

U.S. COURT REPORTERS

1          MR. COOPER HAS TOLD YOU ON MANY, MANY          14:26:54

2    OCCASIONS THAT H-P NEVER DID ANYTHING.  THEY JUST    14:26:57

3    BRAINSTORMED.  THEY JUST TALKED ABOUT THINGS.  I     14:27:00

4    THINK THAT YOU WILL SEE THAT THE DOCUMENTS TELL A    14:27:03

5    DIFFERENT STORY AND, OF COURSE, THERE'S NO DISPUTE   14:27:06

6    THAT THEY DID BIFF; THERE'S NO DISPUTE THAT THEY     14:27:13

7    DID ONE LIFE TO LIVE; THERE'S NO DISPUTE THAT THEY   14:27:15

8    DID THE PETJET LOCK-OUT.                             14:27:23

9          WITH RESPECT TO FUD, I'VE ALREADY SHOWN        14:27:23

10   YOU A DOCUMENT THAT SAYS THAT OUR MESSAGE AGAINST    14:27:23

11   REFILLERS IS WORKING.  IT SHOWS THAT THE MARKET      14:27:25

12   SHARE WENT DOWN, AND THERE ARE A NUMBER OF OTHER     14:27:26

13   DOCUMENTS THAT SHOW THAT THIS WAS DISSEMINATED.      14:27:29

14   THERE WAS DEPOSITION TESTIMONY THE OTHER DAY TO THE  14:27:32

15   EFFECT THAT THE INK STORY WAS ACTUALLY ON THE        14:27:35

16   COUNTERS AT -- AT OFFICE DEPOT AND OTHER PLACES.     14:27:37

17         I WOULD ASK YOU TO LOOK AT EXHIBIT 6463,       14:27:42

18   EXHIBIT 6057, EXHIBIT 1614, AND THE SARA LIGON       14:27:45

19   DEPOSITION.  SHE TALKED ABOUT PUBLISHING THE         14:27:52

20   SELLING GUIDE IN ENGLISH, PORTUGUESE AND SPANISH.    14:27:55

21   I SUGGEST TO YOU THAT THEY WERE NOT TRANSLATING IT   14:27:58

22   INTO ALL OF THOSE LANGUAGES SO THAT IT WOULD NOT BE  14:28:02

23   DISTRIBUTED.                                         14:28:05

24         KATHLEEN CLELAND TALKED ABOUT THIS AS          14:28:06

25   EARLY AS 1991, ABOUT THE FUD MESSAGE AND MR.         14:28:08

| | | |
|---|---|---|
| 1 | CRANGLE AND MR. SECCOMBE ALSO TALKED ABOUT IT. | 14:28:12 |
| 2 | SO THAT BRINGS US TO THE SUBJECT OF | 14:28:15 |
| 3 | DAMAGES AND OUR EXPERTS ON THAT -- ON THAT WERE -- | 14:28:17 |
| 4 | WERE DR. HALL AND MR. ROWLEY. | 14:28:20 |
| 5 | BEFORE WE MOVE TO DAMAGES, I SHOULD TALK | 14:28:28 |
| 6 | ABOUT ONE OTHER SUBJECT WHICH IS ANTITRUST INJURY. | 14:28:31 |
| 7 | I'VE ALREADY ALLUDED TO THAT.  IT'S QUITE CLEAR | 14:28:33 |
| 8 | THAT THIS WAS AIMED NOT ONLY AGAINST NU-KOTE BUT | 14:28:36 |
| 9 | AGAINST ALL RESELLERS AND THAT'S WHY MR. CRANGLE, | 14:28:39 |
| 10 | FOR EXAMPLE, IN 7188 SAID OUR MESSAGE IS WORKING | 14:28:44 |
| 11 | AND THEN THE MARKET SHARE OF THE REFILLERS IS GOING | 14:28:49 |
| 12 | DOWN. | 14:28:51 |
| 13 | THERE'S NO QUESTION THAT IT HURT | 14:28:55 |
| 14 | CONSUMERS, THAT IT LESSENED CHOICE, AND I THINK | 14:28:56 |
| 15 | PROBABLY THE CLEAREST DOCUMENT OF THAT IS EXHIBIT | 14:28:59 |
| 16 | 6402.  THIS WAS A SURVEY THAT H-P HAD COMMISSIONED | 14:29:02 |
| 17 | FROM ITS OWN, ONE OF ITS OWN SURVEY FIRMS, TALK TO | 14:29:08 |
| 18 | CUSTOMERS AND THE CUSTOMERS WERE COMPLAINING ABOUT | 14:29:13 |
| 19 | A LACK OF CHOICE. | 14:29:15 |
| 20 | IF WE CAN LOOK AT PAGE 666.  AND IF YOU | 14:29:18 |
| 21 | CAN ENLARGE THAT. | 14:29:24 |
| 22 | THIS IS AN H-P SURVEY OF AN H-P CUSTOMER. | 14:29:26 |
| 23 | "UNDERSTAND, MY CONCLUSION HERE IS THAT | 14:29:29 |
| 24 | THE H-P BRAND NAME ON SUPPLIES IS NOT | 14:29:31 |
| 25 | ENOUGH.  CONSUMERS ARE LOYAL TO H-P | 14:29:33 |

6301

U.S. COURT REPORTERS

```
1         THE COURT:  I THINK THE ATTENTION IS        14:49:19
2    GOING TO WANE.  YOU SHOULD MODULATE YOUR ARGUMENT  14:49:22
3    BASED ON THE AMOUNT OF CAKE.                     14:49:25
4         MR. COOPER:  I COULD SAY THAT MY ARGUMENT   14:49:28
5    IS GOING TO BE A PIECE OF CAKE, BUT THAT WOULDN'T  14:49:30
6    BE FAIR.                                         14:49:33
7         CLOSING ARGUMENT BY MR. COOPER
8         MR. COOPER:  I MADE THE COMMENT THE OTHER   14:49:34
9    DAY THAT YOU ALL ARE ESSENTIALLY A CAPTIVE AUDIENCE  14:49:36
10   AND I APPRECIATE THAT.  I POINTED OUT TO ONE OF OUR  14:49:39
11   PARTNERS THAT IN EFFECT WHAT YOU'VE BEEN GOING   14:49:42
12   THROUGH IS LIKE TRYING TO TAKE A DRINK OF WATER  14:49:45
13   FROM A FIRE HYDRANT.  HE COMMENTED THAT PROBABLY  14:49:47
14   WASN'T THE BEST ANALOGY.  IT MAY HAVE BEEN MORE  14:49:50
15   LIKE A CHINESE WATER TORTURE CHAMBER. WHICHEVER, I  14:49:54
16   DO WANT TO THANK YOU VERY MUCH ON BEHALF OF H-P AND  14:49:59
17   ITS EMPLOYEES FOR -- FOR THE DEDICATION YOU HAVE  14:50:01
18   SHOWN AND FOR THE COMMITMENT YOU HAVE MADE.      14:50:05
19        I NOW HAVE AN HOUR.  SO I'M GOING TO TRY    14:50:09
20   TO PERFORM THE FIRE HYDRANT ROLE AND I'M GOING TO  14:50:11
21   WALK YOU THROUGH EVERYTHING THAT I THINK IS      14:50:15
22   IMPORTANT.                                       14:50:16
23        MY BASIC POINT IS GOING TO BE THERE'S       14:50:17
24   BEEN A TOTAL FAILURE OF PROOF ON EVERY ELEMENT OF  14:50:20
25   THE CASE AND THE REASON WHY THERE'S A TOTAL FAILURE  14:50:24
```

6306

U.S. COURT REPORTERS

```
1    OUR MONOPOLY PRICES AND HOW HE'S OUT HERE ON BEHALF   15:00:20
2    OF ALL OF THE CONSUMERS IN THE WORLD.  H-P LOST       15:00:24
3    MONEY ON ITS INKJET CARTRIDGES ALL THE WAY THROUGH    15:00:29
4    1991.  IT STARTED BACK IN '84 AND THEN AFTER 1991     15:00:34
5    IT MADE ONLY REASONABLE LEVELS OF PROFIT.  THOSE      15:00:39
6    FIGURES ARE IN EVIDENCE.  THE HIGHEST PROFIT THAT     15:00:43
7    H-P MADE SINCE 1991 ON ITS CARTRIDGES WAS 20          15:00:45
8    PERCENT AS A PERCENT OF SALES.  20 PERCENT.  AND IT   15:00:56
9    AVERAGED OVER THAT PERIOD ONCE WE BEGAN MAKING        15:00:56
10   MONEY ONLY 15 PERCENT.                                15:00:56
11          NOW, MR. KATZ SHOWS YOU THIS PICTURE OF        15:00:59
12   THE CASH COW INK.  YES, THERE'S NO QUESTION THAT WE   15:01:02
13   MAKE A PROFIT ON OUR CARTRIDGES.  AND THAT PROFIT     15:01:07
14   GETS TURNED RIGHT BACK INTO EXTENSIVE R & D TO        15:01:13
15   DEVELOP THE NEXT GENERATION PRINTER, THE NEXT         15:01:17
16   CARTRIDGE AND THAT'S WHY WE'RE SHOWING PROFIT         15:01:20
17   LEVELS OF 15 AND 20 PERCENT AND THAT'S THE EXACT      15:01:24
18   SORT OF THING THAT BUSINESSES SHOULD BE DOING TO      15:01:25
19   REMAIN COMPETITIVE IN THE FUTURE ECONOMY.             15:01:28
20          OKAY.  NOW, LET ME MOVE FROM THAT              15:01:33
21   DISCUSSION TO THE ALLEGED EXCLUSIONARY CONDUCT THAT   15:01:35
22   NU-KOTE ACCUSES US OF ENGAGING IN.                    15:01:43
23          THE FIRST POINT I NEED TO MAKE IS             15:01:47
24   REGARDLESS OF WHAT CONCLUSION YOU REACH ABOUT         15:01:49
25   MONOPOLY POWER AND REGARDLESS OF WHAT CONCLUSION      15:01:52
```

6315

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | YOU REACH ABOUT THE RELEVANT MARKET, NU-KOTE THEN | 15:01:54 |
| 2 | HAS TO PROVE NEXT THAT WE ENGAGED IN | 15:01:57 |
| 3 | ANTICOMPETITIVE EXCLUSIONARY CONDUCT TO ACHIEVE OR | 15:01:59 |
| 4 | OBTAIN A MONOPOLY AND HERE THEY FAIL COMPLETELY. | 15:02:02 |
| 5 | MR. KATZ STARTED HIS DISCUSSION ON THIS | 15:02:05 |
| 6 | WHOLE SUBJECT BY POINTING YOU TO STEVEN PROSSER'S | 15:02:07 |
| 7 | MEMO, THE ONE ABOUT DRAINING THE BACKWATERS THAT | 15:02:12 |
| 8 | ALLOW MONSTERS LIKE NU-KOTE TO EVOLVE. I'M SURE | 15:02:16 |
| 9 | YOU REMEMBER THAT. THE LANGUAGE WAS COLORFUL AND I | 15:02:20 |
| 10 | THINK IT'S AN EXAMPLE OF HOW MR. KATZ MISUSES THE | 15:02:23 |
| 11 | EVIDENCE. | 15:02:27 |
| 12 | THAT MEMO IS VERY CLEAR, AS MR. PROSSER | 15:02:27 |
| 13 | TESTIFIED, AND YOU CAN GO READ IT. IT'S EXHIBIT | 15:02:30 |
| 14 | 6003 AND YOU WILL SEE IT'S VERY CLEAR THAT WHAT HE | 15:02:32 |
| 15 | IS TALKING ABOUT IS SHOULD HEWLETT-PACKARD | 15:02:36 |
| 16 | INTRODUCE ITS OWN PENERGIZER, WHICH WAS A REFILL | 15:02:42 |
| 17 | PRODUCT, SHOULD HEWLETT-PACKARD DO THAT. AND THIS | 15:02:42 |
| 18 | IS A VERY LONG MEMO, ALL KINDS OF SCENARIOS HE'S | 15:02:47 |
| 19 | THINKING ABOUT AND ONE SCENARIO HE SUGGESTS IS IF | 15:02:50 |
| 20 | WE WERE TO INTRODUCE THAT PRODUCT AND IF WE WERE TO | 15:02:54 |
| 21 | PRICE IT VERY AGGRESSIVELY, IN OTHER WORDS, | 15:02:56 |
| 22 | INTRODUCE THE PRODUCT AND PRICE AGGRESSIVELY, THEN | 15:02:58 |
| 23 | YOU DRAIN THE BACKWATERS, I.E., WE WOULD BE IN | 15:03:02 |
| 24 | THERE COMPETING HEAD ON WITH NU-KOTE AND WE WOULD | 15:03:05 |
| 25 | BE TAKING AWAY THE ADVANTAGE THEY HAVE OF OFFERING | 15:03:08 |

6316

U.S. COURT REPORTERS

REFILL PRODUCTS AND THAT -- AND THAT IS SOMETHING        15:03:09

THAT WE NEVER DID AND IT JUST HAS NO RELEVANCE IN       15:03:12

THIS LAWSUIT.                                            15:03:15

       MR. KATZ HOPES THAT THE COLORFUL LANGUAGE   15:03:18

WILL SOMEHOW CAUSE YOU TO THINK ILL OF                  15:03:20

HEWLETT-PACKARD AND, IN FACT, WHAT HE'S REALLY          15:03:23

COMPLAINING ABOUT IS SOMETHING THAT IF WE HAD DONE      15:03:27

IT, IT WOULD HAVE MADE LIFE MUCH MORE DIFFICULT FOR     15:03:29

NU-KOTE AND IT WOULD HAVE BEEN PERFECTLY LEGAL.         15:03:35

AND THEN HE SAYS THAT WE DIDN'T DO IT.                  15:03:37

       LET'S START WITH THE ALLEGATION THAT WE     15:03:40

ENGAGED IN THIS MASSIVE FUD CAMPAIGN AS NU-KOTE         15:03:42

LIKES TO CALL IT.                                       15:03:46

       YOU'LL SEE IN AN INSTRUCTION AND YOU'VE     15:03:48

ALREADY HAD IT READ AND YOU HAVE IT IN YOUR BINDER,     15:03:50

WHAT THE LAWS ARE UNDER THE ANTITRUST LAWS.             15:03:54

DISPARAGING STATEMENTS ABOUT RIVALS IN THE             15:03:56

MARKETPLACE ARE PRESUMED NOT TO BE ANTICOMPETITIVE.     15:03:58

AND THAT'S VERY, VERY IMPORTANT.                        15:04:01

       THE INSTRUCTION GOES ON TO SAY THAT IN      15:04:03

ORDER TO OVERCOME THAT PRESUMPTION, NU-KOTE MUST        15:04:06

PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT A         15:04:09

STATEMENT MADE BY HEWLETT-PACKARD WAS, AND THERE'S      15:04:10

A SERIES OF HURDLES, CLEARLY FALSE, AND THE POINTS      15:04:12

H-P MADE ABOUT THE RISKS TO REFILLING ARE NOT          15:04:16

6317

U.S. COURT REPORTERS

CLEARLY FALSE, THEY'RE FAIR AND SUPPORTED, CLEARLY    15:04:19

MATERIAL, CLEARLY LIKELY TO INDUCE REASONABLE    15:04:22

RELIANCE BY BUYERS, MADE TO BUYERS WITHOUT    15:04:26

KNOWLEDGE OF THE SUBJECT MATTER.  LOOK AT THAT ONE    15:04:29

FOR A MOMENT.    15:04:30

     THE STATEMENTS WE ARE ALLEGED TO HAVE    15:04:32

MADE WERE MADE TO THESE SUPERSTORES, THE RETAILERS    15:04:34

WHO HAVE ALL KINDS OF KNOWLEDGE ABOUT THE PRODUCTS    15:04:38

THAT THEY SELL.    15:04:40

     CONTINUED FOR PROLONGED PERIODS OF TIME,    15:04:41

AND NOT READILY SUSCEPTIBLE OF NEUTRALIZATION AND    15:04:44

OTHER OFFSET BY RIVALS.  IN OTHER WORDS, THE RIVALS    15:04:50

CAN'T RESPOND BACK IN KIND.  THAT'S A VERY TOUGH    15:04:53

LEGAL TEST AND THERE'S A GOOD REASON WHY COURTS    15:04:57

IMPOSE THAT.  BECAUSE AGGRESSIVE ADVERTISING IS    15:04:59

PROCOMPETITIVE AND THE LAW IS RELUCTANT TO PUT    15:05:03

BUSINESSES AT RISK TO ANTITRUST LAWSUITS BECAUSE    15:05:06

THEY ENGAGE IN HARD-HITTING ADVERTISING.  AND    15:05:10

THAT'S THE WAY THE LAW SHOULD BE UNLESS WE WANT TO    15:05:12

DIMINISH COMPETITION IN OUR SOCIETY.  NU-KOTE CAN'T    15:05:16

BEGIN TO OVERCOME THAT PRESUMPTION.    15:05:28

     LET ME START WITH SOME SIMPLE FACTS.    15:05:30

REFILLING WAS NOT MENTIONED IN MASS MEDIA.  THE TV    15:05:35

AND RADIO AND NEWSPAPERS ADS WAS NEVER MENTIONED.    15:05:39

     YOU'LL FIND NO FALSE STATEMENTS IN THE    15:05:44

6318

U.S. COURT REPORTERS

H-P PRODUCT INSERTS OR PRINTER MANUAL.  NOW, THIS          15:05:45

IS THE DIRECT AVENUE TO THE CUSTOMER WHEN THEY BUY         15:05:48

A CARTRIDGE.  WHEN THEY GET A PRINTER THEY OPEN IT         15:05:57

UP AND THEY'VE GOT AN INSERT IN THERE TALKING ABOUT        15:05:57

THE CARTRIDGE.  THEY'VE GOT A MANUAL AND THERE ARE         15:05:57

NO UNFAIR FALSE STATEMENTS TO BE FOUND THERE.              15:05:59

     IF WE WERE BENT ON DESTROYING REFILLING,            15:06:02

THAT'S WHERE WE WOULD HAVE ATTACKED.                       15:06:05

     YOU'LL FIND NO FALSE STATEMENTS IN H-P              15:06:07

RESPONSES TO INQUIRIES TO CUSTOMERS ABOUT                  15:06:11

REFILLING.                                                 15:06:13

     CAN WE BRING UP 602.                                15:06:14

     THIS IS ONE OF THE FORM LETTERS THAT H-P            15:06:23

USES TO RESPOND TO ASK CUSTOMERS ABOUT REFILLING.          15:06:26

IT'S A FAIR STATEMENT.  IT'S EXHIBIT 3451.  YOU'LL         15:06:29

FIND THAT IN EVIDENCE.                                     15:06:33

     I DON'T WANT TO SPEND A LOT OF TIME ON              15:06:33

IT, BUT LET ME JUST POINT OUT THAT THE POINTS WE           15:06:35

MAKE.  THIS IS WHAT, BY THE WAY, WE CALL FUD.  "THE        15:06:38

INK IN THE BLACK CARTRIDGE HAS BEEN                        15:06:43

CAREFULLY FORMULATED BY HEWLETT-PACKARD                    15:06:45

TO ENSURE SUPERIOR PRINT QUALITY AND                       15:06:47

COMPATIBILITY WITH.  HEWLETT-PACKARD                       15:06:50

CAUTIONS AGAINST AND IS NOT RESPONSIBLE                    15:06:52

FOR DAMAGE CAUSED TO THE PRINTER BY                        15:06:55

6319

U.S. COURT REPORTERS

REFILLING."                                          15:06:57

FAIR, REASONABLE STATEMENTS.                         15:06:58

WE GO ON TO SAY:  "WE DON'T SUPPORT                  15:07:00

REFILLING.  HOWEVER, IF FREE MARKET                  15:07:02

PEOPLE HAVE THE CHOICE WHETHER OR NOT TO             15:07:06

REFILL INK CARTRIDGES, THAT'S OUR                    15:07:08

STANDARD RESPONSE TO CUSTOMERS ABOUT                 15:07:10

REFILLING."                                          15:07:12

    IF THAT IS ILLEGAL, THEN I DON'T KNOW HOW        15:07:16

ONE GOES ABOUT COMPETING IN THE MARKETPLACE AND      15:07:19

INSTILLING THE VIRTUES OF YOUR PRODUCT AND POINTING  15:07:22

OUT THE DISADVANTAGES OF OTHERS.                     15:07:26

    THE NEXT POINT, AND THIS IS REALLY               15:07:28

IMPORTANT, NU-KOTE DID NOT PRODUCE ONE SINGLE        15:07:32

RETAILER OR ONE SINGLE CUSTOMER TO TESTIFY THAT      15:07:35

THEY HEARD ANYTHING DISPARAGING OR FALSE FROM H-P.   15:07:42

NOT A SINGLE RETAILER OR A SINGLE CUSTOMER.          15:07:45

    NOW, I WOULD SUGGEST THAT THE REASON FOR         15:07:49

THAT IS BECAUSE THEY DIDN'T HEAR ANY SUCH THING.     15:07:50

    THE NEXT POINT.  IF THERE WAS A MASSIVE          15:07:55

DISPARAGING CAMPAIGN OF FALSE STATEMENTS, NU-KOTE    15:07:58

WOULD HAVE BEEN THE FIRST TO HAVE KNOWN ABOUT IT.    15:08:02

SURELY THEY WOULD HAVE HEARD ABOUT IT.               15:08:05

    IAN ELLIOTT TESTIFIED HERE.  HE WAS ASKED        15:08:08

A NUMBER OF QUESTIONS, ONE, I PUT UP WE HAVE A       15:08:11

6320

U.S. COURT REPORTERS

```
1      BOARD UP HERE.                                   15:08:14

2              "AND, IN FACT, DID NU-KOTE KNOW THAT SUCH   15:08:15

3              STATEMENTS WERE BEING MADE?               15:08:17

4              "ANSWER:  NO."                            15:08:19

5              NOW, MR. ELLIOTT IS THE SAME MAN WHO      15:08:20

6      TESTIFIED THAT NU-KOTE HAD THIS UNIQUE RELATIONSHIP 15:08:22

7      WITH THE CHANNEL, WITH THE RETAILERS, THE SAME MAN  15:08:25

8      WHO WAS MOST FAMILIAR WITH NU-KOTE'S INKJET         15:08:27

9      BUSINESS.                                        15:08:32

10             HE CAME IN HERE INTO COURT AND SAID THAT  15:08:34

11     HE DIDN'T KNOW WITH THIS UNTIL HE CAME INTO COURT.  15:08:37

12     THINK ABOUT THAT FOR A MOMENT.  IF THERE WAS ANY    15:08:38

13     SORT OF AN EXTENSIVE MASSIVE CAMPAIGN OF            15:08:41

14     MISINFORMATION OF FALSE STATEMENTS, HOW COULD       15:08:46

15     NU-KOTE NOT KNOW?  THEY'VE GOT SALESPEOPLE OUT      15:08:49

16     THERE.  THEY HAVE RETAILERS.  THEY HAVE CLOSE       15:08:52

17     RELATIONSHIPS WITH THEM.  THEY WOULD BE HEARING     15:08:56

18     BACK ABOUT THIS.  AND YET THEY SAY WE DIDN'T KNOW   15:08:58

19     ANYTHING ABOUT IT.                               15:09:00

20             WHAT THAT TELLS YOU IS THAT THIS WHOLE    15:09:01

21     CASE IS BASED ON PAPER AND IDEAS THAT WERE          15:09:03

22     GENERATED BY OUR PEOPLE AND NOT -- AND IN INTERNAL  15:09:05

23     DOCUMENTS AND NEVER IMPLEMENTED AND NOT WHAT WE, IN 15:09:09

24     FACT, DO.                                        15:09:12

25             BILL BATES, NU-KOTE'S VICE PRESIDENT OF   15:09:14
```

6321

U.S. COURT REPORTERS

1    DEVELOPMENT, BUSINESS DEVELOPMENT, ALSO TESTIFIED    15:09:17

2    HE HAD NO KNOWLEDGE OF ANYTHING H-P SAID OR HAD    15:09:19

3    DONE IN THE MARKET PLACE THAT THIS BLOCKED NU-KOTE.    15:09:21

4    THE SAME THING.  IN OTHER WORDS, THIS WAS NOT ANY    15:09:26

5    SORT OF A PERVASIVE DISINFORMATION CAMPAIGN OF    15:09:30

6    FALSE DISPARAGING STATEMENTS.  IT WAS NOTHING MORE    15:09:35

7    THAN TELLING SOME RETAILERS THE FACTS ABOUT    15:09:39

8    REFILLING.    15:09:41

9            THE NEXT POINT IS THERE'S NO EVIDENCE OF    15:09:43

0    A SINGLE LOST SALE BECAUSE OF ALLEGED    15:09:46

1    DISPARAGEMENT.  NU-KOTE DIDN'T BRING ONE CUSTOMER    15:09:49

2    IN HERE TO SAY THAT THEY MADE A DECISION NOT TO BUY    15:09:53

3    A NU-KOTE PRODUCT OR A REFILL PRODUCT FOR THAT    15:09:55

4    MATTER BECAUSE OF DISPARAGEMENT.    15:09:58

5            AND THEN THE LAST POINT, AND THIS IS VERY    15:10:03

6    TELLING, TOO.  RETAILERS CONTINUE TO SELL A    15:10:05

7    SELECTION OF REFILL PRODUCTS.  THEY'RE SELLING    15:10:09

8    THOSE PRODUCTS AS WE SPEAK.  SHELVES ARE FULL OF    15:10:11

9    REFILL PRODUCTS.  THERE'S EXTENSIVE TESTIMONY FROM    15:10:13

0    DR. HALL AND DR. ORDOVER ABOUT THE BIG DISPLAYS AT    15:10:16

1    ALL OF THE MAJOR SUPERSTORES.  SO WHERE ARE WE?    15:10:23

2            WHERE ARE WE?  WE HAVE SOME 70 REFILLERS    15:10:24

3    OUT THERE.  SURE, MANY ARE SMALL COMPANIES, WHICH    15:10:28

4    SHOWS THAT THERE'S NO BARRIER TO ENTRY IN THIS    15:10:30

5    BUSINESS.  AND WE HAVE A NUMBER OF LARGE COMPANIES.    15:10:32

6322

U.S. COURT REPORTERS

1    YOU SEE SOME OF THEIR PRODUCTS RIGHT HERE.  DATA          15:10:34

2    PRODUCTS, WHICH IS OWNED BY HITACHI, NCR A                15:10:37

3    SUBSTANTIAL COMPANY, THE OLD NATIONAL CASH                15:10:48

4    REGISTER, GRAPHICS UTILITY, PRINT-RITE, JETFILL.          15:10:48

5    THESE ARE MAJOR COMPANIES AND PEOPLE WHO HAVE             15:10:49

6    DISTRIBUTION IN THE RETAIL CHANNEL.                       15:10:51

7              COMPARATIVE ADVERTISING COMPARES THE            15:11:00

8    ADVANTAGES OF OUR PRODUCTS TO THE RISK OF REFILL          15:11:02

9    PRODUCTS.  IT'S PROPER AND COMPETITIVE AND THERE'S        15:11:05

     NOTHING WRONG WITH IT AND THERE'S NOT A SINGLE H-P        15:11:08

     DOCUMENT THAT -- YOU CAN GO THROUGH THEM ALL.  AND       15:11:10

     THERE'S NOT A SINGLE H-P DOCUMENT THAT SUGGESTS          15:11:13

     THAT FUD IS ANYTHING OTHER THAN POINTING OUT THE         15:11:15

     RISKS OF REFILLERS.                                      15:11:18

               THERE'S A NUMBER OF DOCUMENTS WHERE THE        15:11:21

     WORD "FUD" IS USED AND IF YOU LOOK ON THE NEXT PAGE      15:11:26

     YOU'LL SEE AN EXPLANATION OF WHAT THIS CAMPAIGN IS       15:11:26

     SUPPOSED TO BE AND IT'S ALWAYS IN THE CONTEXT OF         15:11:28

     POINTING OUT ADVANTAGES AND POINTING OUT THE RISKS       15:11:32

     OF REFILLING.  SO LET'S RECOGNIZE IT FOR WHAT IT         15:11:35

     IS, WHICH IS OUR EFFORT TO ENGAGE IN COMPARATIVE         15:11:37

     MARKETING.                                               15:11:42

               THERE ARE TWO DOCUMENTS YOU SHOULD READ,       15:11:45

     AND I HOPE YOU READ THEM FROM COVER TO COVER AND         15:11:47

     IT'S A SELLING GUIDE IN THE INK STORY.  THE SELLING      15:11:50

                                 6323

                        U.S. COURT REPORTERS

1    GUIDE IS THE ONLY DOCUMENT THAT GOT INTO THE HANDS    15:11:54

2    OF ANY RETAILERS.  THE EVIDENCE IS THAT A COUPLE OF    15:11:56

3    RETAILERS MAY HAVE HAD IT.  IT WAS BASICALLY    15:12:00

4    PREPARED FOR OUR OWN SALESPEOPLE SO THEY WOULD KNOW    15:12:02

5    THE POINTS TO MAKE IN TALKING WITH RETAILERS.    15:12:05

6         THE SELLING GUIDE WAS A RESPONSE TO    15:12:09

7    CLAIMS MADE BY REFILLERS OF THE QUALITY OF THEIR    15:12:12

8    PRODUCTS AND IT DOESN'T MENTION NU-KOTE OR ANY    15:12:15

9    OTHER REFILLER BY NAME.  IT'S ABOUT, I FORGET, TEN    15:12:17

0    OR SO PAGES.  IT'S EXHIBIT 3051.    15:12:20

1         AND WHEN YOU GO THROUGH IT, YOU'LL SEE    15:12:25

2    ONE PAGE, ONE PAGE THAT DEALS WITH REFILLING.  AND    15:12:26

3    IT HAS FOUR OR SO STATEMENTS ON IT, AND THOSE ARE    15:12:30

4    THE ONES THAT MR. KATZ ENUMERATED.  AND WE'LL TRY    15:12:34

5    TO ADDRESS THEM VERY BRIEFLY.    15:12:36

6         MOST PEOPLE WHO TRY REFILLING GO BACK TO    15:12:40

7    GENUINE H-P CARTRIDGES.    15:12:42

8         ABSOLUTELY RIGHT.  AND IF YOU LOOK AT    15:12:44

9    EXHIBIT 5476 YOU'LL SEE A DRAFT OF THAT DOCUMENT    15:12:46

0    WHERE -- WHERE THERE IS A REVIEWER'S NOTE IN THAT    15:12:49

:1    DOCUMENT THAT SAYS MOST IS 60 PERCENT AND HE    15:12:53

:2    EXPLAINS AND REVIEWERS NOTE THAT THAT COMES FROM A    15:12:57

:3    GRIGGS ANDERSON RESEARCH STUDY DONE IN APRIL 1995.    15:13:01

:4         NOW, WHAT DOES MR. KATZ TELL YOU?  HE    15:13:05

:5    SAYS THAT'S A LIE BECAUSE IN 1991 WE HAD A STUDY    15:13:07

6324

U.S. COURT REPORTERS

| | | |
|---|---|---|
| 1 | THAT SHOWED 64 PERCENT REPEATED WITH RESPECT TO | 15:13:11 |
| 2 | REFILLING.  AND HE'S RIGHT.  THERE IS A 1991 STUDY | 15:13:14 |
| 3 | THAT SHOWS THAT AND THE 1991 STUDY INVOLVED THE OLD | 15:13:19 |
| 4 | STANLEY CARTRIDGE.  THE OLD STANLEY CARTRIDGE | 15:13:23 |
| 5 | DELIVERED HALF THE AMOUNT OF INK AS A NEW TRIAD | 15:13:26 |
| 6 | CARTRIDGE.  THE NEW TRIAD CARTRIDGE WAS A MUCH | 15:13:30 |
| 7 | BETTER VALUE.  IT COST MUCH LESS TO PRINT PER PAGE, | 15:13:33 |
| 8 | AND ONCE IT WAS INTRODUCED REFILLING BECAME LESS | 15:13:35 |
| 9 | ATTRACTIVE AND THAT OLD 1991 STUDY IS OF NO VALUE | 15:13:39 |
| 10 | WITH RESPECT TO THE STATEMENTS THAT WE MADE IN THE | 15:13:43 |
| 11 | INK SELLING, IN THE SELLING GUIDE WHICH WAS A 1995 | 15:13:45 |
| 12 | DOCUMENT. | 15:13:49 |
| 13 | REFILLING LEAKS CAUSED PRINTER DAMAGE. | 15:13:51 |
| 14 | IT'S RIGHT.  THERE'S NO QUESTION TO GET TANGLED UP | 15:13:55 |
| 15 | IN THE TERMINOLOGY HERE.  THERE ARE A LOT OF | 15:14:00 |
| 16 | PRINTERS THAT ARE SENT BACK IN FOR SERVICING.  AND | 15:14:02 |
| 17 | IF YOU LOOK AT ALL OF THE PRINTERS THAT ARE SENT | 15:14:05 |
| 18 | BACK FOR SERVICING BECAUSE THEY HAVE A BAD PART, | 15:14:07 |
| 19 | BECAUSE THEY NEED TO BE CLEANED, REFILLING LEAKS | 15:14:09 |
| 20 | CAUSE ABOUT SOMETHING LESS THAN 10 PERCENT OF THAT | 15:14:12 |
| 21 | SERVICING EFFORT. | 15:14:15 |
| 22 | BUT IF YOU LOOK AT ALL OF THE PRINTERS | 15:14:17 |
| 23 | THAT ARE DAMAGED, ACTUALLY DAMAGED, REFILLING IS -- | 15:14:19 |
| 24 | IS THE BIGGEST PIECE OF THAT BY FAR.  AND THAT'S | 15:14:23 |
| 25 | THE POINT THAT WE WERE MAKING. | 15:14:26 |

6325

U.S. COURT REPORTERS

```
 1              THE COURT:  VERY WELL.  THE COURT WILL        16:07:23

 2      CALL ON COUNSEL FOR NU-KOTE FOR REBUTTAL.            16:07:25

 3          REBUTTAL ANTITRUST CLOSING ARGUMENT BY MR. KATZ:

 4              MR. KATZ:  THANK YOU, YOUR HONOR.            16:07:32

 5              GOOD AFTERNOON, LADIES AND GENTLEMEN OF      16:07:33

 6      THE JURY.                                           16:07:35

 7              MY DAD USED TO SAY IN SOMEWHAT LESS          16:07:35

 8      POLITE TERMS THAT IF YOU SEE A LOT OF COW MANURE,    16:07:38

 9      THAT MEANS THAT THERE'S A COW AROUND SOMEWHERE.      16:07:42

10              AND I THINK WE SEE A LOT OF COW MANURE       16:07:46

11      AROUND RIGHT NOW.  BECAUSE WHAT DID MR. COOPER JUST  16:07:53

12      TELL YOU AMONG OTHER THINGS?  HE SAID H-P IS NOT A   16:07:56

13      CASH COW.  MAYBE HE MEANT THAT THEY'RE NOT A CASH    16:08:00

14      COW, THEY'RE REALLY A SUPER CASH COW.  MAYBE.  I     16:08:04

15      DON'T KNOW EXACTLY WHAT HE MEANT.  BUT DOES HE       16:08:08

16      THINK THAT I DREW THIS?  I DIDN'T DRAW THIS.         16:08:10

17              SOMEBODY AT H-P DREW THIS AND THEY DREW      16:08:13

18      IT FOR A REASON.  BECAUSE H-P MAKES BUCKETS OF       16:08:16

19      MONEY BY DOING THIS.  H-P SELLS INK FOR SIX TIMES    16:08:20

20      MORE THAN THE COST OF THE FINEST CHAMPAGNE AND YOU   16:08:27

21      HAVE THE CHOICE.  DO YOU WANT PEOPLE TO CONTINUE     16:08:32

22      PAYING, OVERPAYING THOSE PRICES SO H-P CAN HAVE A    16:08:34

23      SUPER CASH COW, OR DO WE WANT TO START CLEANING THE  16:08:39

24      COW MANURE OUT OF THE BARN?                          16:08:42

25              BECAUSE THIS ISN'T THE ONLY THING THAT HE    16:08:45
```

6354

U.S. COURT REPORTERS

<u>CERTIFICATE OF REPORTER</u>

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE, INCLUSIVE, CONSTITUTED A TRUE, FULL AND CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED TRANSCRIPTION TO THE BEST OF MY ABILITY.

IRENE L. RODRIGUEZ, C.S.R.
CERTIFICATE NUMBER CSR 8074

IRENE L. RODRIGUEZ, C.S.R. , R.P.R.