# EXHIBIT 72

THOMAS M. CORRELL  [SBN 108773]
JANELLE F. GARCHIE  [SBN 118453]
TROY A. EDWARDS  [SBN 149380]
**CORRELL, GARCHIE & EDWARDS** LLP
550 West C Street, Suite 500
San Diego, CA 92101-3540
Telephone (619) 557-0424
Facsimile  (619) 557-0428

ALAN E. GREENBERG  [SBN90688]
**LEWIS, D'AMATO, BRISBOIS & BISGAARD** LLP
550 West C Street, Suite 800
San Diego, CA  92101-3540
Telephone (619) 233-1006
Facsimile  (619) 233-8627

Attorneys for Defendant,
UNDER SEAL

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| UNDER SEAL,<br><br>      Plaintiff,<br><br>    v.<br><br>UNDER SEAL,<br><br>      Defendant. | Case No. C-99-20207 SW<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR ADJUDICATION THAT: (1) NO ALLOCATION PERMITTED BETWEEN POTENTIALLY COVERED AND UNCOVERED CLAIMS; (2) DUTY TO DEFEND EXISTED THROUGH END OF *NU-KOTE* ACTION; AND (3) CALIFORNIA CIVIL CODE § 2860 IS NOT APPLICABLE** |

**[FILED UNDER SEAL PURSUANT TO COURT ORDER DATED 3/24/99]**

EXHIBIT

72

ALL-STATE LEGAL®

OPPOSITION TO PLAINTIFF'S MOTION FOR ADJUDICATION THAT: (1) NO ALLOCATION PERMITTED BETWEEN
POTENTIALLY COVERED AND UNCOVERED CLAIMS; (2) DUTY TO DEFEND EXISTED THROUGH END OF *NU-KOTE* ACTION;
AND (3) CALIFORNIA CIVIL CODE § 2860 IS NOT APPLICABLE
CASE NO. C-99-20207 SW

1 | THOMAS M. CORRELL [SBN 108773]
JANELLE F. GARCHIE [SBN 118453]
2 | **CORRELL, GARCHIE & EDWARDS LLP**
550 West C Street, Suite 500
3 | San Diego, CA 92101-3540
Telephone (619) 557-0424
4 | Facsimile (619) 557-0428

5 | ALAN E. GREENBERG   [SBN 90688]
**LEWIS, D'AMATO, BRISBOIS & BISGAARD LLP**
6 | 550 West C Street, Suite 800
San Diego, California 92101
7 | Telephone:  (619) 233-1006
Facsimile :  (619) 233-8627
8 |

9 | Attorneys for Defendant,
ACE PROPERTY AND CASUALTY INSURANCE COMPANY
10 |

11 |

12 | **UNITED STATES DISTRICT COURT**

13 | **FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

14 | HEWLETT-PACKARD COMPANY,

| Case No. C-99-20207 SW

15 |                     Plaintiff,

| **ACE PROPERTY AND CASUALTY
INSURANCE COMPANY'S
16 |        v.** | **OPPOSITION TO PLAINTIFF'S
MOTION FOR ADJUDICATION
17 | ACE PROPERTY AND CASUALTY
INSURANCE COMPANY,** | **THAT:  (1) NO ALLOCATION
PERMITTED BETWEEN
18 |                     Defendant.** | **POTENTIALLY COVERED AND
UNCOVERED CLAIMS; (2) DUTY
19 |** | **TO DEFEND EXISTED THROUGH
END OF *NU-KOTE* ACTION; AND
20 |** | **(3) CALIFORNIA CIVIL CODE §
2860 IS NOT APPLICABLE**

21 |

| Judge:  Hon. Spencer Williams
22 |        | Date:   March 26, 2002
Time:   5:00 p.m.
23 |        | Dept.:  J.A.M.S. San Jose, CA

24 |

25 |

26 |        [FILED UNDER SEAL PURSUANT TO MARCH 24, 1999 ORDER]

27 |

28 | :ODMA\PCDOCS\docs\25208\1

# TABLE OF CONTENTS

I.  **INTRODUCTION** ...................................................................................... 1

    A.  Summary of Argument ......................................................................... 1

    B.  Summary of Facts and Procedure......................................................... 2

II.  **STATEMENT OF FACTS** ................................................................... 5

    A.  HP's Tender Of The Nu-Kote Counterclaim ................................... 5

    B.  The HP Complaint Against Nu-Kote, And The Allegations
       Contained In The Nu-Kote Counterclaim ........................................ 6

    C.  The Insurance Policy ............................................................................ 7

    D.  ACE PCIC's Requests For Pertinent Information ........................... 8

    E.  HP's Response To ACE PCIC's Inquiries ....................................... 9

    F.  ACE PCIC's Continued Efforts To Investigate, And HP's Continuing
       Refusal To Provide Information, Led To The Filing Of This
       Declaratory Relief Action.............................................................. 11

    G.  HP's Production Of Limited Information Was Promised Only After
       The Declaratory Relief Action Was Filed, And Still HP Continued
       To Delay The Production............................................................... 12

    H.  ACE PCIC Continued To Plead For Documents  Even After The
       Declaratory Relief Action Was Filed ........................................... 13

    I.  Throughout The Investigation Process, HP Attempted To Mislead
       ACE PCIC And Repeatedly Refused To Provide Information Crucial
       To The Coverage Issues................................................................. 13

    J.  The Court Ruled That ACE PCIC Was Obligated To Defend HP, But
       Left Open The Possibility That The Documents Would Reveal
       Coverage Defenses ....................................................................... 15

    K.  Although Discovery Is Continuing, Certain Documents  Reveal That
       Even In Light of This Court's Duty to Defend Ruling,  Most Of The
       Fees Incurred By HP In The Underlying Action Are Clearly Not
       Reimburseable As Covered Defense Costs ................................... 16

    L.  Under The Facts And Circumstances Of This Matter,  ACE PCIC Is
       Entitled To Allocate Its Obligation To Pay Pursuant to a
       "Preponderance of the Evidence" Standard .................................. 18

III.  **ACE PCIC REQUESTS A RULE 56(f) CONTINUANCE ON THE
GROUND THAT HP'S MOTION IS PREMATURE BECAUSE
FURTHER DISCOVERY IS NECESSARY FOR ACE PCIC TO
OPPOSE THE MOTION**.................................................................. 18

IV.  ACE PCIC IS NOT A BREACHING INSURER AS ACE PCIC WAS NOT GIVEN THE OPPORTUNITY TO EITHER ACCEPT OR DENY THE DEFENSE OF HP IN THE UNDERLYING ACTION ............... 19

A.  ACE PCIC Fully Complied With California's Insurance Regulations And Is Entitled To Analyze Extrinsic Evidence When Making A Coverage Determination ................................................................. 20

B.  Neither The Special Master Nor The Court Can Possibly Have Ruled That ACE PCIC Is A "Breaching Insurer" ..................................... 21

C.  An Insurer Has Not Breached The Duty To Defend By Failing To Render A Coverage Decision During Its Investigation ................................ 22

D.  There Is No Case Law That Would Deem ACE PCIC To Be A "Breaching Insurer" Under These Circumstances ......................................... 23

V.  ACE IS ENTITLED TO ALLOCATE THE FEES BETWEEN COVERED AND UNCOVERED CLAIMS ....................................................... 26

A.  In Cases Very Similar To This Case, Courts Have Allowed Allocation Of Fees According To A "Preponderance Of The Evidence" Burden Of Proof .......................................................................... 26

B.  Even "Breaching" Insurers Are Entitled To Allocate Fees, Although The Burden Of Proof Is The "Undeniable Evidence" Standard ................... 29

C.  Under No Circumstances Is An Insurer Obligated To Pay For The Prosecution Of An Insured's Own Claim ....................................................... 30

D.  Upon The Conclusion Of Discovery, ACE PCIC Will Be Able To Prove Its Entitlement To Allocate ......................................................... 33

E.  The Case Law Cited By HP Does Not Support HP's Argument That ACE PCIC Is Not Entitled To Allocate Between Covered And Uncovered Claims ................................................................................. 34

VI.  ACE IS NOT OBLIGATED TO REIMBURSE HP FOR LEGAL FEES INCURRED TO DEFEND UNCOVERED CLAIMS AT THE TIME OF TRIAL ....................................................................................................... 36

A.  All Of The Claims That The Court Deemed Potentially Covered Were Dismissed Prior To Trial ................................................................ 36

B.  The "FUD" Allegations That Remained Through Trial Pertained To The Antitrust Claims, Which Were Not Covered As A Matter Of Law ............................................................................................................. 37

VII.  ACE IS ONLY OBLIGATED TO PAY REASONABLE RATES TO DEFEND HP AS TO POTENTIALLY COVERED CLAIMS ASSERTED IN THE UNDERLYING ACTION ................................................. 39

A.  Section 2860 Is Relevant Only In That It Supports California's Policy Of Not Awarding An Inequitable Windfall Of Extra-Contractual Damages To An Insured ............................................... 40

ii

B.  Even If ACE PCIC Were A "Breaching" Insurer, Which It Is Not, HP Is Not Entitled To Extra-contractual Damages In The Form Of Hourly Rates In Excess Of ACE PCIC's Panel Rates ................................... 41

VIII.  **CONCLUSION** ...................................................................................................... **43**

::ODMA\PCDOCS\docs\25208\1

1

<u>**TABLE OF AUTHORITIES**</u>

2

<u>Cases</u>

3

*Aerosafe International v. ITT Hartford of the Midwest*
    (1993) 1993 U.S. Dist. LEXIS 10443 ................................................................29

4

*Anderson v. Virginia Surety Co.*
    (1998) 985 F.Supp. 182 .................................................................19, 24, 25

5

6

*Bank of the West v. Superior Court,*
    (1992) 2 Cal. 4th 1254 ................................................................38

7

*Blackburn v. Fidelity and Deposit Company of Maryland*
    (Ala. 1995) 667 So.2d 661 .................................................................24, 25

8

9

*Buss v. Superior Court (Transamerica)*
    (1997) 16 Cal.4th 35 ................................................................25, 30, 35, 41

10

*Crist v. INA*
    (C.D. Utah 1982) 529 F.Supp. 601 ................................................................30

11

12

*Foxfire, Inc. v. New Hampshire Ins. Co.*
    (N.D.Cal. 1994) 1994 U.S. Dist. LEXIS 9249 ................................................................29

13

*Ganz v. Public Service Mutual Ins. Co.*
    (1989) 551 N.Y.S.2d 437 ................................................................25

14

*Haskel v. Superior Court*
    (1995) 33 Cal.App.4th 963 ................................................................23

15

16

*Hogan v. Midland National Ins. Co.*
    (1970) 3 Cal.3d 553 ................................................................35

17

*Holt v. Utica Mutual Ins. Co.*
    (Ariz. 1988) 759 P.2d 623 ................................................................24

18

19

*Horace Mann Ins. Co. v. Barbara B.*
    (1993) 4 Cal.4th 1076 ................................................................30

20

*Horton v. Allstate Ins. Co.*
    (1984) 125 Ill.App.3d 1034 ................................................................23

21

22

*James 3 Corporation v. Truck Insurance Exchange*
    (2001) 91 Cal.App.4th 1093 ................................................................31

23

*Kush & Associates v. American States Ins. Co.*
    (7th Cir. 1990) 927 F.2d 929 ................................................................22

24

25

*Larkin v. ITT Hartford*
    (1999) 1999 U.S. Dist. LEXIS 9960 ................................................................30

26

*Manny v. Estate of Anderson*
    (1977) 117 Ariz. 548 ................................................................22, 23

27

28

*Maxconn Inc. v. Truck Ins. Exchange.*
(1999) 74 Cal.App.4th 1267 .................................................................... 38

*Mez Industries, Inc. v. Pacific National Ins. Co.*
(1999) 76 Cal.App.4th 856 ...................................................................... 38

*Montrose Chemical Corp. v. Superior Court*
(1993) 6 Cal.4th 287 ............................................................................... 23

*Morgan, Lewis & Bockius v. United States District Court*
(D.N.J. 1996) 929 F.Supp. 764 ............................................................... 37

*Ranger Ins. Co. v. Safety-Kleen Corp.*
(N.D. Ill. 1994) 194 U.S. Dist. LEXIS 4007 .......................................... 22

*Scottsdale Ins. Co. v. United States District Court*
(N.D.Cal. 1992) 145 F.R.D. 523 ........................................................ 26, 27

*Select Insurance Company v. Superior Court* (Custer)
(1990) 226 Cal.App.3d 631 ..................................................................... 21

*Sentex Systems, Inc. v. Hartford Accident & Indemnity Co.,*
882 F.Supp. 930, 946 (C.D.Cal. 1995),aff'd 93 F.3d 578 (9th Cir. 1996)........... 41, 42

*Sherwood Brands, Inc. v. Hartford Accident and Indemnity Company*
(1997) 347 Md. 32 ................................................................................... 21

*Shoshone First Bank v. United Bancorporation of Wyoming, Inc.*
(Wy. 2000) 2 P.3d 510, 511 ..................................................................... 32

*State of California v. Pacific Indemnity Co.*
(1998) 63 Cal.App.4th 1535 .................................................................... 36

*Trailer Marine Transport Corp. v. Crowley Maritime Corporation*
(N.D. Cal. 1992) 791 F.Supp. 809 .......................................................... 38

*United Coastal Ins. Company v. Strategic Organizational Systems*
(1992) 1992 U.S. App. LEXIS 11621 ...................................................... 31

*Waller v. Truck Insurance Exchange*
(1995) 11 Cal.4th 1 ................................................................................. 10

**Statutes**

California Civil Code section 2860 ............................................................ 40, 42

**Rules**

Federal Rule of Civil Procedure 56(f) ........................................................ 19

Local Rule 7-9 ........................................................................................ 1, 15

I.    **INTRODUCTION**

This court should not grant Hewlett-Packard Company's ("HP") motion for the following reasons:

> 1. HP cannot and has not asserted a single, supportable legal theory that prohibits ACE Property and Casualty Insurance Company ("ACE PCIC") from presenting evidence at trial to allocate and distinguish between fees and costs that it is obligated to pay and those that it is not.
>
> 2. HP's motion regarding allocation is premature because this Court's conditional interlocutory duty to defend ruling is dependent upon facts and evidence currently being produced by HP to ACE PCIC. If applicable, ACE PCIC is still entitled to file a Motion for Reconsideration pursuant to Local Rule 7-9.
>
> 3. HP's motion regarding allocation is also premature because this court has ruled that ACE PCIC is entitled to file a motion for summary judgment/adjudication if evidence is obtained that supports a finding that ACE PCIC has been prejudiced by HP's failure to cooperate and late notice. The documents that ACE PCIC has requested for nearly four years are now being provided to ACE PCIC. The production is not complete. Based on HP's production so far, it appears that ACE PCIC will need to meet and confer on certain issues. If ACE PCIC succeeds on its claim of prejudice based on lack of cooperation and late notice, ACE PCIC would not owe any fees or costs.
>
> 4. HP has no support for the notion that ACE PCIC is responsible to pay the hourly rates charged by two law firms it has retained in connection with the underlying action. ACE PCIC is not responsible to pay the exorbitant rates of certain of its attorneys.

A.    **Summary of Argument**

After sifting through all of the inaccurate factual statements, unsupportable legal theories, misconstrued case law and irrelevant statements and issues, HP's motion does not have any evidentiary foundation or legal substance. HP thwarted every attempt that ACE PCIC made to investigate the claim so that it could render its coverage position. As a reward for its intolerable conduct, HP seeks to impose upon ACE PCIC, an obligation to reimburse it for what could be in excess of $35 million in attorney fees and costs incurred in approximately 18 months through the use of two law firms using 253 attorneys and

:ODMA\PCDOCS\docs\25208\1

1  paralegals. This is not an ordinary case. One of the most critical facts ignored by HP is that

2  HP never provided ACE PCIC with a single billing statement until October 2001 when this

3  court ordered production of the billing statements. There is absolutely no support for the

4  notion that ACE PCIC is in the wrong in this case. Because HP never presented a single

5  billing statement to ACE PCIC for consideration and payment until HP was forced by this

6  Court to do so in October 2001, HP has no credible legal argument that ACE PCIC is in

7  breach of any duty. The only duties that have been breached in the case are the duties owed

8  by HP to ACE PCIC.

9       It is premature for this Court to rule on any issue that is based on the duty to defend or

10 the breach of any duty owed by ACE PCIC to HP. HP mischaracterizes this Court's prior

11 Order dated August 24, 1999 as a final judgment and misleads the Court by relying on

12 F.R.C.P. Rule 60. By its very nature and by the Court's express findings, the August 24,

13 1999 Order is interlocutory and is still subject to a later motion based on late notice. If ACE

14 PCIC uncovers facts or evidence that were in existence at the time of tender and not provided

15 to ACE PCIC, ACE PCIC is entitled to file a motion for reconsideration. ACE PCIC is also

16 entitled to still adjudicate HP's failure to cooperate as a complete defense to coverage

17 pursuant to ACE PCIC's counterclaim. ACE PCIC was prevented from filing any of these

18 motions because HP had not provided documents to ACE PCIC. The documents have begun

19 to be provided to ACE PCIC in January 2002. The production is not complete as of the date

20 of this motion.

21      **B.    Summary of Facts and Procedure**

22      By way of background, this action relates to a lawsuit HP filed in 1994 against Nu-

23 Kote International, Inc. ("Nu-Kote"), arising out of Nu-Kote's manufacturing of an inkjet

24 cartridge refill system that would allow purchasers of HP printers to refill the empty printer

25 cartridges rather than buying new cartridges when the ink was depleted. In response, Nu-

26 Kote filed a counterclaim against HP. The HP/Nu-Kote litigation continued for a period of

27

28

1 | nearly 4 years before HP tendered the defense of the Nu-Kote counterclaim to ACE PCIC,
2 | on June 13, 1998.

3 |      Upon receipt of the tender, ACE PCIC attempted in good faith to investigate the claim
4 | which, on its face, presented enormous coverage challenges. In particular, the lawsuit did
5 | not allege that an "advertiser's liability" offense took place during the 1992-1993 policy
6 | period and in the "policy territory" of the ACE PCIC international policy (which covers only
7 | occurrences taking place outside of the United States, its territories or possessions, Canada,
8 | Cuba and North Korea). Furthermore, as the litigation had been pending for many years
9 | prior to the tender, ACE PCIC needed to, was obligated and entitled to, review a large
10 | quantity of information in order to determine whether any covered claims were alleged in the
11 | Nu-Kote counterclaim.

12 |      It suffices to say that ACE PCIC's investigation was stymied in every possible way by
13 | HP. HP provided ACE PCIC with the wrong version of the counterclaim, HP refused to
14 | allow ACE PCIC access to the underlying case documents, and HP refused to provide any
15 | evidence that a single advertiser's liability offense had occurred during the ACE PCIC policy
16 | period outside of the United States. During its investigation, ACE PCIC learned that HP
17 | executed a confidentiality agreement with Nu-Kote that prohibited the parties from providing
18 | documents to insurers unless they had already agreed to defend. This agreement is contrary
19 | to California law and demonstrates HP's concealment of information from ACE PCIC, HP's
20 | failure to cooperate and HP's breach of its duties owed to ACE PCIC.

21 |      Frustrated by HP's failure to cooperate with the investigation, ACE PCIC's counsel
22 | repeatedly attempted to obtain the information necessary for ACE PCIC to make a coverage
23 | decision. However, after eight months of refusing to provide the requested information, HP
24 | filed this suit against ACE PCIC seeking a ruling that ACE PCIC was obligated to defend
25 | HP against the Nu-Kote counterclaim in the underlying action.

26 |      In response to HP's declaratory relief action, ACE PCIC filed a counterclaim for
27 | declaratory relief regarding the coverage issues and seeking an order from the Court that
28 |

_ODMA\PCDOCS\docs\252081\_

3

1    ACE PCIC must be allowed to complete its investigation before it could be forced to make a

2    coverage decision. Prior to providing any of the requested documents, and within a few

3    weeks of the filing of ACE PCIC's answer and counterclaim, HP filed a motion for summary

4    judgment. The motion was heard on May 12, 1999. On August 24, 1999, the Court held that

5    ACE PCIC was obligated to defend the Nu-Kote counterclaim, but the Court acknowledged

6    that the interlocutory ruling was subject to review once ACE PCIC was allowed to review

7    the documents. The Court has never held that ACE PCIC breached its duty to defend or that

8    ACE PCIC has committed any sort of wrongdoing with respect to the underlying claim. In

9    fact, the court could not make such a ruling while at the same time allowing ACE PCIC to

10   continue to investigate and proceed on the merits of its answer and counterclaim.

11          Without regard for the accurate facts, HP complains that ACE PCIC has yet to pay the

12   submitted defense billings despite the Court's August 24, 1999 duty to defend ruling. What

13   HP fails to mention is that it took HP more than two years to eventually produce the billing

14   statements at issue, and, even then, ACE PCIC was forced to file a motion to compel the

15   production of the billing statements. These multi-million dollar billing statements are

16   currently being reviewed and audited by ACE PCIC. In addition, ACE PCIC has sent

17   various proposed deposition notices to HP and is attempting to work out a schedule of

18   depositions seeking information in connection with the billing statements. However, it is

19   apparent even at this time that the billing statements reveal the work of more than 250

20   attorneys and paralegals, and include massive amounts of work performed by HP to

21   prosecute its own patent infringement claims against Nu-Kote. The billing statements also

22   include work performed to the end of trial, even though it appears that any alleged

23   potentially covered claims against HP were dismissed months before the trial of the

24   underlying action commenced. These are among the types of charges that ACE PCIC is not

25   obligated to pay under any circumstance.

26          HP's instant motion is premised on the argument that ACE PCIC is a "breaching

27   insurer," and therefore is not entitled to allocate the bills. HP is wrong for many reasons:(1)

28

1  there is not a single authority holding that a breaching insurer is not entitled to allocate the

2  amounts it is obligated to pay from those that it is not, (2) the ruling regarding the duty to

3  defend is subject to the review of this court when ACE PCIC concludes its investigation of

4  thousands of documents just produced by HP.  Thousands of documents are yet to be

5  produced, (3) ACE PCIC was never given the opportunity to render a coverage decision

6  prior to being sued and prior to the court's August 24, 1999 ruling, and (4) ACE PCIC was

7  never presented with any billing statements to pay until only recently.

8      ACE PCIC sets forth more fully below its repeated attempts to properly investigate

9  the underlying claim, as well as HP's repeated refusals to provide ACE PCIC with the

10  necessary information.  As the Court will see, ACE PCIC can in no way be considered to be

11  in breach of any duty, and HP should not be rewarded for its obstreperous behavior during

12  the claims investigation process by this Court's application of a "breaching insurer" label.

13  As is demonstrated below, ACE PCIC did everything in its power to make a thorough and

14  complete coverage investigation, as efficiently as possible given the size and duration of the

15  underlying litigation.  Moreover, California law dictates that even "breaching insurers" are

16  entitled to allocate their obligation to pay only those fees and costs that are reasonable and

17  necessary and that are incurred for the defense of covered claims.  ACE PCIC respectfully

18  requests that HP's motion be denied in its entirety and that this Court issue a ruling that ACE

19  PCIC is entitled to present evidence and argument at the trial of this matter regarding which

20  defense fees and costs are not the obligation of ACE PCIC.

21  **II.    STATEMENT OF FACTS**

22      **A.    HP's Tender Of The Nu-Kote Counterclaim**

23      In late summer 1994, HP sued Nu-Kote for various claims arising from Nu-Kote's

24  alleged violations of HP's patents, trademarks and trade dress.  *See,* **Ex. "A"** to Correll Decl.

25  ¶2.  On or about November 22, 1994, Nu-Kote filed a counterclaim against HP.  *See,* **Ex.**

26  **"B"** to Correll Decl. ¶3.  HP tendered the defense of the Nu-Kote counterclaim to ACE

27

28

1   PCIC on June 13, 1998, attaching to the tender a copy of the Second Amended

2   Counterclaim. *See,* **Ex. "C"** to Correll Decl. ¶4.

3       Following the June 13, 1998 tender of the underlying Nu-Kote counterclaim, ACE

4   PCIC retained coverage counsel, although in September 1998, it was determined that the

5   original coverage counsel had a conflict with respect to further handling of the coverage

6   matter. *See,* Correll Decl. ¶5.  HP refused to agree to a conflict waiver (even if this meant

7   that new coverage counsel would need to be employed at the expense of some delay), and

8   Thomas M. Correll was retained by ACE PCIC as coverage counsel. *See,* Correll Decl. ¶5.

9       **B.    The HP Complaint Against Nu-Kote, And The Allegations Contained In
            The Nu-Kote Counterclaim**

10      HP's complaint against Nu-Kote included eight counts.  Specifically HP sued Nu-

11  Kote for infringing one or more registered trademarks; infringing HP's unregistered marks

12  51608A, 51625A, 51626A, 51629A, 51614A and 51649A used for HP's inkjet cartridges;

13  engaging in unfair competition under the Lanham Act by using a word, term, name or

14  symbol or combination thereof which is likely to cause confusion as to the origin of Nu-

15  Kote's goods; making statements that constitute false advertising; and that Nu-Kote

16  infringed four of its patents. *See,* **Ex. "A"** to Correll Decl. ¶2.

17      Nu-Kote filed its answer, affirmative defenses and counterclaim to the second

18  amended HP complaint on January 19, 1996. *See,* **Ex. "D"** to Correll Decl. ¶6.  There was

19  also a third amended version of the counterclaim.  The final and fourth amended

20  counterclaim included eleven counts.

21          ·       Count One is for Declaratory Relief regarding the invalidity of fourteen alleged

22  patents of HP.

23          ·       Count Two is Monopolization -Sherman Act, Section 2.  Nu-Kote alleges that

24  HP possesses a monopoly share of the relevant aftermarket and has the ability to exclude

25  competition and raise prices on its replacement ink cartridges above a competitive level.

26          ·       Count Three is Attempted Monopolization-Sherman Act, Section 2.

27

28

1      ·     Count Four is for Unlawful Tying Arrangement (Clayton Act- Sherman Act).

2 Nu-Kote alleges that HP effectively forces customers to buy ink supply cartridges and ink

3 resupplies for their HP printers exclusively from HP.

4      ·     Count Five is for Conspiracy in Restraint of Trade.  Nu-Kote alleges that HP

5 has conspired with Epson, Canon and others to restrain trade in the aftermarket for ink

6 resupplies for ink jet printers.

7      ·     Count Six, Lanham Act Violations based on HP's alleged publication of

8 statements through advertising and otherwise, that its ink jet printer cartridges are non-

9 refillable and non-reusable.  This includes allegations regarding HP's packaging and other

10 advertising.

11      ·     Count Seven is for California Restraint of Trade and includes the same

12 allegations as Count Four except limited to trade in California.

13      ·     Count Eight is For False Advertising Under California Law, limited to

14 California.

15      ·     Count Nine is for Trade Libel, Disparagement of Goods, and Defamation

16 under California Law.

17      ·     Count Ten is for California Unfair Competition, limited to California.

18      ·     Count Eleven is for Intentional Interference With Economic Advantage.

19 *See*, **Ex "F"** to Correll Decl. ¶8.

20      **C.**    **The Insurance Policy**

21      ACE PCIC issued to HP a Foreign Comprehensive General and Automobile Liability

22 Policy. The ACE PCIC policy applies only to such occurrences and personal injury which

23 takes place during the policy period and within the policy territory.  The policy territory is

24 worldwide for claim or suit resulting from an occurrence outside the United States of

25 America, its territories or possessions, Canada, Cuba and North Korea.  HP argues that

26 "Coverage C-Advertiser's Liability" applies.  That coverage provides:

27

28

**Coverage C-Advertiser's Liability**

To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages occurring in the course of the Named Insured's advertising activities, arising out of libel, slander, defamation of character, violation of right of privacy, unfair competition. . . *See*, **Ex. "G"** to Correll Decl. ¶9.

**D.    ACE PCIC's Requests For Pertinent Information**

HP accuses ACE PCIC of embarking "on a correspondence campaign." [HP points and authorities, 4:1-2]. In fact, ACE PCIC repeatedly asked for the same material information, and was repeatedly refused access to it over a period of many months.

Specifically, on October 9, 1998, Mr. Correll contacted counsel for HP to request documents necessary to perform a coverage analysis. *See*, **Ex. "H"** to Correll Decl. ¶10. In this letter, Mr. Correll advised HP that the Confidentiality Agreement requested by HP had been executed by CIGNA (ACE PCIC's predecessor company). Mr. Correll further acknowledged that the underlying action had been ongoing for some time (4 years) and requested specific documents: (1) interrogatories propounded to Nu-Kote along with their responses; (2) any motions filed by either Nu-Kote or HP with regard to the Nu-Kote counterclaims; (3) deposition transcripts of percipient witnesses related to the Nu-Kote counterclaims; and (4) any other documents which relate to the Nu-Kote counterclaims. *See*, **Ex. "H"** to Correll Decl. ¶10.

Another important inquiry was made by Mr. Correll in the October 9, 2001 letter which related to the ultimate coverage issue affecting the foreign policy: the "policy territory" issue. The policy territory only covers an occurrence outside the United States of America, its territories or possessions, Canada, Cuba and North Korea. *See*, **Ex. "G"** to Correll Decl. ¶9. The *Nu-Kote* counterclaim stated, at pages 26 and 27, that the relevant market "*consisting of the aftermarket for ink resupply products, including both resupply cartridges and refill kits, available to consumers who own each of various models of Hewlett-Packard ink-jet printers sold and used **in the United States**.*"; See, **Exs. "B", "D", "E", "F"** to Correll Decl. ¶¶ 3, 6, 7 and 8. Moreover, the Nu-Kote counterclaim alleged

1  that it would suffer injury and damages "in entering and competing in" the relevant United

2  States market. *See,* **Ex. "G"** to Correll Decl. ¶9. Importantly, the ACE PCIC policy does

3  not apply to "advertiser's liability" offenses in the United States. *See,* **Ex. "G"** to Correll

4  Decl. ¶9. As the ACE PCIC policy covered claims for advertiser's liability offenses in

5  connection with HP's advertising activities and arising out of unfair competition in the

6  policy territory, the threshold issue was whether Nu-Kote was even competing with HP in

7  foreign territories as required by the "policy territory" provision. On its face, the Nu-Kote

8  counterclaim was clear that HP was allegedly unfairly competing with Nu-Kote *only* in the

9  United States. *See,* **Ex. "B"** to Correll Decl. ¶3.

10      The *Nu-Kote* counterclaim did not include any allegation of advertiser's liability

11  arising out of unfair competition in the policy territory. As such, Mr. Correll made the

12  proper, relevant inquiry for any information that revealed a potential for coverage in the

13  policy territory. It is important to reiterate that, from the date of tender (June 13, 1998) to

14  the date of Mr. Correll's letter (October 9, 1998) only the Second Amended Counterclaim

15  and copies of package inserts had been provided to ACE PCIC. No other documents had

16  been offered or provided.

17      **E.    HP's Response To ACE PCIC's Inquiries**

18      HP responded to Mr. Correll by letter dated October 27, 1998, erroneously accusing

19  ACE PCIC of requesting HP's entire file despite Mr. Correll's very specific and directed

20  requests. *See,* **Ex. "I"** to Correll Decl. ¶11. HP acknowledged that ACE PCIC had signed

21  the requisite confidentiality order which had been demanded and drafted by HP itself, and

22  still HP refused to provide the requested documents now claiming that it was prohibited from

23  doing so due to "restrictions placed on HP by the District Court's protective order." *See,* **Ex.**

24  **"I"** to Correll Decl. ¶11. The protective order was between HP and Nu-Kote. *See,* **Ex. "J"**

25  to Correll Decl. ¶12. HP then unilaterally informed ACE PCIC that HP had provided all of

26  the information it needed to render a coverage decision. *See,* **Ex. "I"** to Correll Decl. ¶ 11.

27

28

1    Taking it a step further, HP informed ACE PCIC that ACE PCIC could only have the

2  documentation if it agreed to defend. *See,* **Ex. "I"** to Correll Decl. ¶ 11).  In other words,

3  only if ACE PCIC waived its legal entitlement to review extrinsic evidence gathered over a

4  four year period to determine if coverage existed, could ACE PCIC be allowed to make a

5  proper coverage decision. HP's self-serving "Catch-22" violated California law as well as

6  the ACE PCIC policy conditions. *See, Waller v. Truck Insurance Exchange* (1995) 11

7  Cal.4th 1.

8    Focusing only on the package inserts, but ignoring the fact that ACE PCIC needed

9  evidence of a potentially covered claim of advertiser's liability arising out of unfair

10 competition in the policy territory, HP refused to provide any other information.  Certainly,

11 if HP had any evidence that Nu-Kote actually did sell re-fill kits worldwide or was making a

12 claim regarding competition worldwide, that information would have been easily and eagerly

13 provided by HP.  In fact, no such evidence existed.  HP knew (but did not pass on to ACE

14 PCIC at the time of tender) that the court in the underlying action had already ruled that the

15 Lanham Act would not be extended to apply extra-territorially because no evidence was

16 presented by Nu-Kote that it competed with HP outside the United States. *See,* **Ex. "K"** to

17 Correll Decl. ¶13.

18    Refusing to acknowledge the specific documents requests made in Mr. Correll's

19 October 9, 1998 letter, HP concluded its October 27, 1998 letter with the invitation that ACE

20 PCIC should let HP know if there were specific documents that ACE PCIC needed. *See,* **Ex.**

21 **"I"** to Correll Decl. ¶11.  HP also refused to allow ACE PCIC any contact with Nu-Kote, its

22 counsel or insurers. *See,* **Ex. "I"** to Correll Decl. ¶ 11). That eliminated ACE PCIC's only

23 remaining avenue to obtain the information it needed to render a coverage decision,

24 particularly as to the "policy territory" issue.

25 ////

26

27 ////

28

1
2

**F.    ACE PCIC's Continued Efforts To Investigate, And HP's Continuing Refusal To Provide Information, Led To The Filing Of This Declaratory Relief Action**

3    On November 16, 1998, Mr. Correll responded to HP's October 27, 1998 letter

4 specifically renewing the request for documents and providing a specific analysis of the Nu-

5 Kote counterclaim as the basis for his document requests. *See,* **Ex. "L"** to Correll Decl. ¶14.

6 In addition, the letter requested a copy of the operative pleading if the Second Amended

7 Counterclaim was not effective.

8    By letter dated December 8, 1998, Mr. Correll advised HP that he had not received a

9 response to his letter dated November 16, 1998. *See,* **Ex. "M"** to Correll Decl. ¶15.

10    On December 23, 1998, HP eventually responded to Mr. Correll's November 16,

11 1998 and December 8, 1998 letters. *See,* **Ex. "N"** to Correll Decl. ¶16.  At this time, HP

12 only enclosed the protective order from the underlying case and copies of package inserts.

13 HP did not answer any of Mr. Correll's questions regarding whether Nu-Kote competed in

14 the policy territory, nor were any of the documents requested on three prior occasions

15 provided to ACE PCIC.

16    On January 13, 1999, Mr. Correll advised HP that ACE PCIC was not interested in

17 private, technical documents regarding patent issues but rather that ACE PCIC needed

18 documents regarding the precise coverage issues arising from Nu-Kote's Second Amended

19 Counterclaim (ACE PCIC still had not been advised that this was no longer the operative

20 pleading). *See,* **Ex. "O"** to Correll Decl. ¶17.  Mr. Correll renewed ACE PCIC's request for

21 the specific information necessary to render a coverage decision.

22    On February 8, 1999, HP responded to Mr. Correll's January 13, 1999 letter and again

23 refused to provide the requested information. *See,* **Ex. "P"** to Correll Decl. ¶18.  HP still did

24 not advise ACE PCIC that the Second Amended Counterclaim had been further amended.

25 Frustratingly, HP repeated that it needed more "narrowly drawn and specific" requests for

26 information, although Mr. Correll's narrowly drawn and specific requests were, by then,

27 outstanding for five months.

28

1    Eleven days later, without ever responding to ACE PCIC's request for documents, HP

2    notified ACE PCIC that it had filed a Complaint for Declaratory Relief. *See,* **Ex. "Q"** to

3    Correll Decl. ¶19. HP's complaint states three causes of action for declaratory relief against

4    ACE PCIC: (1) the complaint seeks a declaration that ACE PCIC has a duty to defend HP

5    against Nu-Kote's counterclaim, (2) the complaint seeks a declaration that ACE PCIC must

6    pay pre- and post-tender fees, and (3) the complaint seeks a declaration that ACE PCIC must

7    reimburse Hewlett Packard's counsel at the rates charged by that counsel, rather than at the

8    rates normally paid by ACE PCIC.

9    **G.    HP's Production Of Limited Information Was Promised Only After The**
**Declaratory Relief Action Was Filed, And Still HP Continued To Delay**
10    **The Production**

11    Despite the repeated requests outlined above, it was not until March 1999 (after the

12    coverage action was filed) that HP agreed to allow ACE PCIC to review limited documents

13    unilaterally chosen by HP. *See,* **Ex. "R"** to Correll Decl. ¶20. However, further delay was

14    caused by HP's insistence that ACE PCIC be prevented from actually reviewing the

15    documents until it could provide a conformed copy of the Protective Order, even though

16    ACE PCIC had signed the second Protective Order drafted by HP. *See,* **Ex. "R"** to Correll

17    Decl. ¶ 20. Although ACE PCIC requested that the production be expedited, HP insisted on

18    its own procedures. *See,* **Ex. "R"** to Correll Decl. ¶ 20.

19    Just seven days after advising ACE PCIC that it was further delaying ACE PCIC's

20    review of documents, HP advised ACE PCIC by letter dated April 6, 1999 that HP had filed

21    a motion for summary judgment regarding the duty to defend. *See,* **Ex. "V"** to Correll Decl.

22    ¶22. For the first time, as an exhibit to HP's motion for summary judgment, HP advised

23    ACE PCIC that there was a Fourth Amended Counterclaim on file, and HP provided a

24    redacted copy of that pleading. *See,* **Ex. "W"** to Correll Decl. ¶23. HP had never before

25    advised ACE PCIC that there was even a Third Amended Counterclaim, much less a Fourth

26    Amended Counterclaim. *See,* **Ex. "W"** to Correll Decl. ¶23.

27

28

1  **H.    ACE PCIC Continued To Plead For Documents  Even After The**
2  **Declaratory Relief Action Was Filed**

3      Between April 6, 2000 and April 12, 2000, ACE PCIC attempted to arrange a time for

4  the review of the documents promised by HP. *See,* Correll Decl. ¶24.  However, by letter

5  dated April 12, 2000, HP renewed its incredible position that ACE PCIC was requesting

6  "all" documents in the underlying action. *See,* **Ex. "X"** to Correll Decl. ¶25.  As is clear

7  from the evidence set forth above, ACE PCIC never made a request for "all" documents.  To

8  the contrary, ACE PCIC had continually advised HP that it neither needed nor wanted the

9  roomfuls of patent/technical documents surely amassed in a 4 ½ year old patent infringement

10  case. *See,* **Ex. "Y"** to Correll Decl. ¶25.

11  **I.    Throughout The Investigation Process, HP Attempted To Mislead ACE**
       **PCIC And Repeatedly Refused To Provide Information Crucial To The**
12     **Coverage Issues**

13      As is now clear from evidence obtained only recently, HP had information that could

14  have been provided to ACE PCIC during its investigation that would have directly affected

15  coverage and/or ACE PCIC's ability to defend the underlying action.  For example, on April

16  21, 1999, HP advised ACE PCIC that two motions for summary judgment were granted in

17  the underlying Nu-Kote action, in favor of HP. *See,* **Ex. "Z"** to Correll Decl. ¶26.  HP did

18  not provide copies of those pleadings and, in fact, ACE PCIC just received the pleadings,

19  through discovery in this case, in January 2002.  ACE PCIC was advised that the pleadings

20  were confidential. *See,* **Ex. "Z"** to Correll Decl. ¶26.  ACE PCIC now knows that at least

21  one of the motions is the very motion that removed the causes of action from the

22  counterclaim that HP relied on to support its coverage position. *See,* **Ex. "AA"** to Correll

23  Decl. ¶27.

24      Also, on August 18, 1999, HP wrote to ACE PCIC and advised that on July 22, 1999

25  the jury in the Hewlett-Packard v. Nu-Kote matter returned a verdict in favor of HP, thereby

26  eliminating indemnity exposure. *See,* **Ex. "CC"** to Correll Decl. ¶28.  In that letter, HP

27  advised that it would forward billing summaries to ACE PCIC. *See,* **Ex. "CC"** to Correll

28

1   Decl. ¶28).  ACE PCIC  did not receive the  billing statements with task descriptions until

2   October 9, 2001, and then, only after  a lengthy motion to compel process.  *See*, **Ex. "CC"**

3   to Correll Decl. ¶28.

4        Finally, on August 30, 1999, HP advised Mr. Correll that HP successfully defended

5   the counterclaims in their entirety.  *See*, **Ex. "DD"** to Correll Decl. ¶29.  HP did not offer the

6   important information that the only counterclaims that had remained at the time of trial were

7   Nu-Kote's anti-trust claims and HP's patent and Lanham Act claims against Nu-Kote and,

8   further, that those claims had been bifurcated.  *See*, **Ex. "DD"** to Correll Decl. ¶29.

9        Rather than accurately represent the facts regarding the issues left for trial or

10  providing the documents that would reveal the facts, HP advised that settlement discussions

11  were proceeding and that settlement was likely within the week.  *See*, **Ex. "DD"** to Correll

12  Decl. ¶ 29).  HP further advised that "the settlement being proposed will include a release by

13  HP of its claims against Nu-Kote for enhanced damages and/or attorneys fees."  HP stated:

14             First, any attorney's fees as to which Hewlett-Packard might
             otherwise have been entitled to recover from Nu-Kote would
15             have been an offset to Hewlett-Packard's **costs incurred in
             prosecuting its claims for affirmative relief, and would not
16             constitute sums which could be credited against Century
             Indemnity Company's [an excess insurer also represented by
17             Mr. Correll in connection with this matter] obligation to
             reimburse Hewlett-Packard for costs incurred in defending
18             Nu-Kote's counterclaim.** [*See*, **Ex. "DD"** to Correll Decl. ¶
             29].
19
        HP's statement is an admission that under no circumstances is a liability insurer, such
20
    as ACE PCIC, responsible for paying HP's fees and costs in prosecuting HP's claims against
21
    Nu-Kote.
22
        ACE PCIC continued its efforts to obtain documents from the underlying action even
23
    after the trial concluded and the matter settled.  By letter dated October 20, 1999 ACE PCIC
24
    requested that HP assist it in lifting the protective order in the underlying case so that ACE
25
    PCIC could access the documents that it had been requesting.  *See*, **Ex. "EE"** to Correll
26
    Decl. ¶30.  HP responded by letter dated October 21, 1999 by advising that it would not
27

28

1  attempt to lift the seal and the ACE PCIC was prohibited from involvement in the settlement

2  process.  *See,* **Ex. "FF"** to Correll Decl. ¶31.

3  ### J.    The Court Ruled That ACE PCIC Was Obligated To Defend HP, But Left Open The Possibility That The Documents Would Reveal Coverage Defenses

4

5  On August 24, 1999, well before ACE PCIC had any of the documentation or factual

6  information related above, the Court granted HP's motion for summary adjudication seeking

7  a declaration that ACE PCIC had a duty to defend HP against the Nu-Kote counterclaim.

8  *See,* **Ex. "GG"** to Correll Decl.  ¶32 for a copy of the Court's Order.  Specifically, the Court

9  noted that Nu-Kote's Fourth Amended Counterclaim against HP alleged causes of action for

10  Lanham Act false and deceptive advertising (Count 6) and California statutory and common

11  law unfair competition (Count 10).  *See,* **Ex. "GG"** to Correll Decl. ¶ 32.  The Court did not

12  hold that any other Count in the counterclaim triggered a defense obligation.  Most

13  importantly, the Court did not issue any ruling that ACE PCIC had breached its contract by

14  failing to defend the counterclaim.  Rather, the opposite is true.  The Court held that ACE

15  PCIC's duty to defend could be revisited once ACE PCIC was allowed access to HP's

16  documents:

17

18  > The Court determines that [ACE PCIC] has not demonstrated
   > that it has suffered prejudice as a consequence of the delayed
   > tender.  However, the Court recognizes that once[ACE] has

19  > access to the documents filed under seal it may be able to
   > demonstrate such prejudice.  HP conceded as much when it

20  > agreed during oral argument that [ACE PCIC] could reserve its
   > rights as to this issue.  Should examination of the sealed

21  > documents reveal prejudice caused by HP's delayed tender,
   > [ACE PCIC] may raise that issue by way of a motion for

22  > summary judgment. [*See,* **Ex. "GG"** to Correll Decl. ¶ 32.]

23

24  HP mischaracterizes the procedural impact of this ruling in its brief when it states that

25  ACE PCIC cannot revisit the order.  First, the ruling can be the subject of a motion for

26  reconsideration based on Local Rule 7-9, if circumstances warrant.  Second, the court denied

27

28

::ODMA\PCDOCS\docs\25208\1                          15

1  ACE PCIC certification of the ruling for appeal and, therefore, the order is interlocutory. As

2  such, HP's reliance on Rule 60 is wrong.

3      **K.**    **Although Discovery Is Continuing, Certain Documents Reveal That Even**
              **In Light of This Court's Duty to Defend Ruling, Most Of The Fees**

4                **Incurred By HP In The Underlying Action Are Clearly Not**
              **Reimburseable As Covered Defense Costs**

5

6        The provisional, interlocutory "duty to defend" ruling was based on the Court's belief

7  that HP may have made false statements in its package inserts that its inkjet cartridges were

8  not designed to be refilled or reused. The Court also relied on an allegation that HP's outer

9  packaging did not accurately portray material characteristics of the cartridges, such that a

10  consumer might not realize that they had purchased a cartridge that could be refilled using

11  Nu-Kote's products.

12        According to documents and pleadings that ACE PCIC now has from the underlying

13  action, it is clear that HP did not introduce into the market the allegedly inaccurate outer

14  packaging until December 1996 – long after the ACE PCIC policy expired. *See*, **Exs. "II"**

15  **and "JJ"** to Correll Decl. ¶ 35-36. As such, there is no potential for a covered claim arising

16  from those allegations. Nor, does ACE PCIC have any obligation to reimburse any fees and

17  costs in connection with that issue. It is also abundantly clear from the review of documents

18  that ACE PCIC has been able to complete from the recently produced documents, that huge

19  amounts of fees and costs were spent on this uncovered claim. Had ACE PCIC been made

20  aware of this fact at the time of tender, and certainly by the time the Court rendered its "duty

21  to defend" decision, and important basis for the Court's ruling could have been eliminated.

22        The other potentially covered issue, found by this Court, related to the package inserts

23  that warned consumers that inkjet cartridges might be damaged if refill was attempted. ACE

24  PCIC is now aware that HP filed a motion for partial summary judgment on March 1, 1999

25  regarding this issue. *See*, **Ex. "BB"** to Correll Decl. ¶27. The court granted HP's request for

26  summary judgment regarding this motion addressing alleged statements that HP's inkjet

27  cartridges were not designed to be refilled or reused. *See*, **Ex. "BB"** to Correll Decl. ¶27.

28

1   ACE PCIC can now confirm that any potentially covered claim was adjudicated prior to trial.

2   The court dismissed the state court claims that included unfair competition, false advertising

3   and trade libel, all based on California law. *See*, **Ex. "BB"** to Correll Decl. ¶27. This ruling

4   eliminated any claims for potentially covered damages even according to this Court's "duty

5   to defend" ruling.

6        Although HP has claimed that certain "fear, uncertainty and doubt" ("FUD")

7   allegations remained through trial, these allegations only related to the remaining antitrust

8   claims, which are not covered claims. In addition, the trial court in the underlying action held

9   that there was no evidence that Nu-Kote competed with HP regarding the ink-jet refill

10  business or was making a claim regarding competition outside of the United States, its

11  territories or possessions, Canada, Cuba and North Korea. *See*, **Exs. "K"** to Correll Decl.

12  ¶13. All claims involving unfair competition were dismissed from the case. Consequently, at

13  the time of trial, there was no possibility that covered claims existed. *See*, **Exs. "BB"**,

14  **"HH", "II"**, to Correll Decl. ¶¶ 27,33,34 respectively.

15       According to the recently produced documents, from June 13, 1998 to April 21, 1999,

16  HP filed sixteen motions for summary judgment. *See*, **Ex. "AA"** to Correll Decl. ¶ 27. Only

17  one of the sixteen motions relates to what the court determined was a potentially covered

18  claim: HP's "Motion For Partial Summary Judgment on Nu-Kote's False Advertising Claim

19  Regarding HP's Statements that Its Inkjet Cartridges Are Not Designed to Be Refilled or

20  Reused. [MSJ #13]." *See*, **Ex. "BB"** to Correll Decl. ¶ 27. Consequently, between the time

21  of tender and the time that all covered claims were dismissed, only one of sixteen motions

22  pertained to allegedly potentially covered claims. Certainly, further discovery will reveal the

23  specific purposes of the tasks performed by HP's 253 attorneys and paralegals, and will

24  reveal which tasks were reasonably and necessarily performed to defend HP against the

25  potentially covered Nu-Kote claims. ACE PCIC has propounded discovery seeking this

26  information. *See*, Correll Decl. ¶ 36.

27

28

1     **L.     Under The Facts And Circumstances Of This Matter,  ACE PCIC Is**
      **Entitled To Allocate Its Obligation To Pay Pursuant to a "Preponderance**
2     **of the Evidence" Standard**

3          Certainly, ACE PCIC has made exhaustive, Herculean efforts to obtain the

4     information that it needed to render its coverage conclusion.  The facts of this case are

5     different from the more typical situation where the tender is early in the litigation and there

6     are no documents developed or available.  Here, there were four years of litigation that had

7     preceded the tender, and all of the information was in the absolute control of the insured.  To

8     date, there is not of evidence that has been provided to ACE PCIC that reveals the potential

9     of an unfair competition in the policy territory arising from HP's advertising.

10    **III.    ACE PCIC REQUESTS A RULE 56(f) CONTINUANCE ON THE GROUND**
      **THAT HP'S MOTION IS PREMATURE BECAUSE FURTHER DISCOVERY**
11    **IS NECESSARY FOR ACE PCIC TO OPPOSE THE MOTION**

12         HP's motion underscores the unfair advantage HP has had in this matter from the very

13    beginning.  Namely, HP has at its disposal all of the documents from the underlying case,

14    whereas ACE PCIC has been refused access to documents and information since the outset

15    of this case.  Throughout the claim tender process, continuing into this litigation and

16    particularly in this very motion, HP has been able to selectively reveal to the Court those

17    documents that, when taken out of context, appear to support HP's arguments.  This is

18    particularly evident in Section IV of HP's brief, wherein HP cites to trial transcripts

19    appearing to show that certain allegations ("FUD" – fear, uncertainty and doubt), remained

20    in dispute in the underlying case even through the time of trial, thereby leading one to the

21    conclusion that covered claims were continually litigated through trial.

22         ACE PCIC is entitled to complete discovery on the issue of what exact allegations and

23    issues remained at the time of trial.  From the documents that ACE PCIC does have,

24    however, it appears that all claims the Court opined were potentially covered were dismissed

25    prior to the trial of the underlying case (see Section VI below).  To the extent that HP intends

26    to dispute this, and obviously it does pursuant to its motion, then further discovery is

27    required on this issue.

28

ODMA\PCDOCS\docs\25208\1

18

1    HP's motion is, in essence, a Rule 56 motion for summary adjudication.  In ruling on

2    a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all

3    justifiable inferences are to be drawn in [that party's] favor." *Anderson v. Liberty Lobby,*

4    *Inc.* (1986) 477 U.S. 242, 255.  To the extent that HP asks this Court to believe that all of its

5    fees incurred in the underlying action were reasonably and necessarily incurred to defend HP

6    against covered claims in the underlying action, ACE PCIC requires a continuance to allow

7    the discovery that has been propounded on this very issue to be completed.   Pursuant to

8    Federal Rule of Civil Procedure 56(f), a court "may refuse the application for judgment or

9    may order a continuance to permit affidavits to be obtained or depositions to be taken or

10   discovery to be had or may make such other order as is just." Fed. R. Civ. P. 56(f).

11   Here, without the documentation that has been promised (yet repeatedly delayed) to

12   ACE PCIC, ACE PCIC is unable to fully prove which fees and costs were unrelated to the

13   defense of HP in the underlying action.  Consequently, to the extent that this Court is unable

14   to accept as true all of ACE PCIC's evidence to date on this point, then ACE PCIC is entitled

15   to a Fed. R. Civ. P. 56(f) continuance of this motion until HP's production of documents is

16   complete, and any follow-up discovery has been concluded. *See*, Correll Decl. ¶36, ¶39 and

17   ¶40.

18   **IV.    ACE PCIC IS NOT A BREACHING INSURER AS ACE PCIC WAS NOT
         GIVEN THE OPPORTUNITY TO EITHER ACCEPT OR DENY THE**
19       **DEFENSE OF HP IN THE UNDERLYING ACTION**

20   The cornerstone of HP's motion is that ACE PCIC is a "breaching insurer" for having

21   failed to defend HP immediately upon the tender of the *Nu-Kote* counterclaim, despite HP's

22   repeated and consistent refusal to provide ACE PCIC with the information essential to

23   rendering a coverage decision.  Contrary to HP's assertion, neither the Court nor the Special

24   Master has held that ACE PCIC was a "breaching insurer," as neither adjudicator was

25   presented with a request to make such a ruling.  Furthermore, because the Court has

26   recognized that ACE PCIC's coverage defenses have yet to be adjudicated pending further

27   document reviews, such a ruling cannot have been made.

28

1  **A.    ACE PCIC Fully Complied With California's Insurance Regulations And Is Entitled To Analyze Extrinsic Evidence When Making A Coverage Determination**

2

3    HP implies that ACE PCIC did not comply with California Code of Regulations title

4  10, §2695.7 (2001), which states:

5              (b) Upon receiving proof of claim, every insurer…shall
            immediately, but in no event more than forty (40) calendar days
6            later, accept or deny the claim…
            (c)(1) If more time is required than is allotted in subsection
7            2695.7(b)…then, every insurer shall provide the
            claimant…written notice of the need for additional time [and]
8            shall specify any additional information the insurer requires in
            order to make a determination and state any continuing reasons
9            for the insurer's inability to make a determination.
            (d) No insurer shall persist in seeking information not reasonably
10           required for or material to the resolution of a claim dispute.

11    As is detailed above, ACE PCIC repeatedly informed HP of its need for additional

12  information in order to render its coverage decision, yet ACE PCIC's requests was

13  continually refused.  Although HP has finally agreed to provide the documents ACE PCIC

14  requested many years ago, it was HP's refusal to produce the documents when they were

15  requested that delayed the investigation.

16    HP now admits that an insurer is entitled to rely on extrinsic evidence to deny

17  coverage when the facts are undisputed and there is clearly no potential for coverage.  [HP

18  points and authorities, 5:8-12].  However, at the time the coverage determination needed to

19  be made, HP refused to provide ACE PCIC with the very documents that could have refuted

20  coverage as a matter of law.  It was not sufficient for HP to tell ACE PCIC that the

21  documents would not have revealed any coverage defenses; it was ACE PCIC's right to

22  review those documents for itself and make the appropriate determination.  ACE PCIC's

23  inability to perform this investigation was caused solely by HP itself.  Not once has HP

24  offered a suitable explanation as to why it refused to provide ACE PCIC with the requested

25  documents in a timely fashion.  The only reasonable explanation appears to be that HP

26  needed to manufacture coverage by forcing both ACE PCIC and the Court to rely

27  exclusively on only those pleadings and documents HP saw fit to provide.  HP's clever

28

1  manipulation of this situation cannot lead to a finding that ACE PCIC was a "breaching

2  insurer."

3  **B.    Neither The Special Master Nor The Court Can Possibly Have Ruled That ACE PCIC Is A "Breaching Insurer"**

4

5  Where an insurer has coverage defenses that remain to be adjudicated in a coverage

6  lawsuit, such as ACE PCIC's notice/prejudice defense in this case, a court cannot find that

7  the insurer has breached its duty to defend. *Select Insurance Company v. Superior Court*

8  (*Custer*) (1990) 226 Cal.App.3d 631.  In *Select*, the court held that an insurer's duty to

9  defend cannot be adjudicated until the issue of the insurer's prejudice from late notice has

10 first been adjudicated.  There, the insured suffered a judgment prior to its tender to the

11 insurer.  The insurer declined coverage, arguing that the late notice caused the insurer to

12 suffer sever prejudice.  *Select* at 634.  The court held that before the insurer's duty to defend,

13 or breach thereof, could be adjudicated, the notice defense must be adjudicated. *Select* at

14 639.  Because of the factual nature of the late notice defense, the appellate court held that the

15 trial court erred by granting the insured's summary adjudication motion on the duty to

16 defend.  Although the Court in the instant case has adjudicated the duty to defend prior to

17 adjudicating ACE PCIC's late notice defense, the *Select* decision instructs that this can only

18 be a provisional ruling, and cannot be construed as a finding that ACE PCIC has breached

19 the contract.

20 The Maryland Court of Appeals issued a similar decision in *Sherwood Brands, Inc. v.*

21 *Hartford Accident and Indemnity Company* (1997) 347 Md. 32.  In Sherwood, the court held

22 that a duty to defend cannot be breached "until the insurer is notified of the claim and then,

23 without legal justification, declines to undertake the defense." *Sherwood* at 46.  The

24 Sherwood court held that if the insurer succeeds in persuading a court that it was prejudiced

25 by delayed notice of a claim, then there can be no breach of the duty to defend.  *Sherwood* at

26 49.  Consequently, unless and until the court rules on ACE PCIC's defenses regarding late

27 notice and cooperation, there can be no finding that ACE breached its duty to defend.

28

ODMA\PCDOCS\docs\25208\1

21

1    **C.    An Insurer Has Not Breached The Duty To Defend By Failing To Render
2         A Coverage Decision During Its Investigation**

3        It has been held that an insurer such as ACE PCIC cannot be estopped from asserting

4    its coverage defenses when it has neither accepted nor declined coverage.  In *Ranger Ins. Co.*

5    *v. Safety-Kleen Corp.* (N.D. Ill. 1994) 194 U.S. Dist. LEXIS 4007, the court found that the

6    communications between the insurer and the insured were "ambiguous as to whether Ranger

7    or its agent accepted or denied coverage." *Ranger* at 9.  The court consequently held that

8    factual questions precluded a legal ruling that Ranger could not assert its coverage defenses

9    given that there was no conclusive denial.

10       A finding by the district court that an insurer had a duty to defend is not necessarily a

11   ruling that an insurer has breached that duty.  In *Kush & Associates v. American States Ins.*

12   *Co.* (7th Cir. 1990) 927 F.2d 929, *overruled on unrelated grounds*, the circuit court noted

13   that the district court had ruled that American States had a duty to defend, but that American

14   States did not actually breach its duty.   The circuit court found no error with this holding.

15   As the court pointed out:

16           '[W]here potential coverage exists and an insurer unjustifiably
             refuses to defend, the insurer is estopped, because of its breach of
17           contract, from disputing any question of coverage in any later
             action against it on the policy.'  Unfortunately for [the insured],
18           there was no determination of an 'unjustifiable' refusal to defend.
             Also, American States contests the amount of fees and costs
19           claimed by AKA, not 'coverage.'  [*Kush* at 934.]

20       Similarly, in *Manny v. Estate of Anderson* (1977) 117 Ariz. 548, the insurer sent

21   several letters disputing coverage for a potential claim that was reported, but did not state

22   whether or not it would actually defend any filed lawsuit.  When suit was actually filed, the

23   insured did not tender it to the insurer.  The court held that the insurer's letters denying

24   coverage did not amount to either a breach of contract or an anticipatory breach:

25           We hold that there was no breach of the obligation to
             defend because the insurer did not clearly indicate that it was
26           unwilling to defend.  If there was a breach of contract due to
             refusal to defend, it must have been an anticipatory repudiation
27           because the obligation to defend does not arise until the insurer is
             presented with a complaint. [Citations].   ...In order to
28           constitute an anticipatory breach of contract, there must be a

ODMA\PCDOCS\docs\25208\1                                22

definite and unequivocal manifestation of intention on the part of the repudiator that he will not render the promised performance when the time fixed for it in the contract arrives." [Citation]. In the instant case, although the insurer denied coverage, it did not expressly refuse to defend.
[*Manny* at 550.]

Finally, in *Horton v. Allstate Ins. Co.* (1984) 125 Ill.App.3d 1034, the insured submitted sworn statements of proof of loss to Allstate, who rejected them and requested more detailed statements. The insured made no attempt to comply, and instead immediately commenced a coverage action against Allstate claiming that Allstate breached the contract. The insured claimed that Allstate anticipatorily breached the contact, but the court disagreed:

Before renunciation can be treated as an anticipatory breach, there must be a positive and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed in the contract arrives. ...The plaintiff offers nothing to buttress his argument other than his subjective belief that Allstate did not intend to pay his claim. We believe that this subjective belief was insufficient to defeat Allstate's motion for summary judgment.
[*Horton* at 1038].

As these cases illustrate, the fact that ACE PCIC was unable to make a coverage determination before HP sued ACE PCIC does not render ACE PCIC a "breaching insurer." To the contrary, ACE PCIC was investigating the claim in good faith, and without HP's cooperation, when HP sued ACE. Relevant documents were withheld from ACE PCIC so that it could not complete its coverage investigation. ACE PCIC had neither accepted nor declined the defense when HP filed suit, and believed in good faith that a decision on the defense obligation could not be made given the facts it had at that time. Furthermore, ACE PCIC continues to assert the defenses of late notice and cooperation, and until this defense is adjudicated, there can be no finding that ACE PCIC has breached the insurance contract.

**D.    There Is No Case Law That Would Deem ACE PCIC To Be A "Breaching Insurer" Under These Circumstances**

For all of its argument, HP cannot cite any applicable case law that would render ACE PCIC a "breaching insurer" under the facts of this case. HP's citations to *Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287; *Haskel v. Superior Court* (1995) 33

1  Cal.App.4th 963; and *Buss v. Superior Court* (1997) 16 Cal.4th 35, do not address this

2  situation, where an insurer in the midst of its coverage investigation (which was continually

3  thwarted by the insured) neither accepted nor rejected a defense by the time it was sued by

4  the insured.  These cases all address the situation where there were clearly potentially

5  covered claims alleged in the underlying actions, whereby an immediate defense should

6  certainly be provided.  These cases do not even imply that an insurer in ACE PCIC's

7  situation can be held in breach of contract, or that such an insurer is a "non-defending

8  insurer."

9      HP labels ACE PCIC's conduct a "constructive denial of a defense."  [HP points and

10  authorities, 9:3].  As discussed above, the case law on this subject is to the contrary.  HP, in

11  turn, references three wildly distinguishable cases to support its argument: *Holt v. Utica*

12  *Mutual Ins. Co.* (Ariz. 1988) 759 P.2d 623; *Blackburn v. Fidelity and Deposit Company of*

13  *Maryland* (Ala. 1995) 667 So.2d 661 and *Anderson v. Virginia Surety Co.* (D.Me. 1998) 985

14  F.Supp. 182.

15      The Holt case has no application here.  In Holt, the insurer did absolutely nothing in

16  response to its insured's tender: "it did not investigate, negotiate or even contact its insured

17  about the lawsuit."  *Holt* at 628.  The court acknowledged that "[t]he facts before us are

18  unusual" in light of the insurer's utter lack of response to the insured's tender.  Id.  Here,

19  ACE PCIC did not ignore HP's tender, nor did ACE PCIC delay its decision.  ACE PCIC

20  proactively and repeatedly urged HP to provide it with specific information that would allow

21  ACE PCIC to make a coverage decision.  It was HP's absolute and deliberate refusal to

22  cooperate that caused ACE PCIC's inability to either accept or deny coverage.

23      In *Blackburn*, supra, the insurer repeatedly declined to defend the insured for a period

24  of four years.  The insurer did not request further information that might have assisted its

25  coverage determination, nor did the insurer attempt to perform a proper investigation: "there

26  is evidence that [the insurer] decided to deny Blackburn's demand for a defense without

27  certain critical information and that it ignored other information as it became available."

28

24

1    *Blackburn* at 673. The insurer's conduct in Blackburn is exactly the opposite of ACE

2    PCIC's conduct in this case. Here, ACE PCIC was literally pleading for information from

3    HP so that it could perform its investigation and render a coverage decision.

4        HP's citation to *Anderson v. Virginia Surety Co.* (1998) 985 F.Supp. 182 is equally

5    inapplicable. The court there applied Maine law, which does not allow an insurer to consider

6    extrinsic evidence in rendering a coverage decision [" 'in determining the duty to defend,

7    regardless of when that ruling is made, the court's consideration is limited to the underlying

8    complaint and insurance policy.' *Dolley*, 669 A.2d at 1322-23."] *Anderson* at 188. There is

9    no mention in this case of the insurer requesting information to further any investigation, as

10   did ACE PCIC.

11       Finally, citing *Ganz v. Public Service Mutual Ins. Co.* (1989) 551 N.Y.S.2d 437, 438,

12   HP contends that ACE PCIC's general denial filed in response to this coverage action

13   amounts to an "express denial of coverage." [HP's points and authorities, 9:16]. There is

14   nothing in *Ganz* that helps HP in this case. In fact, in *Ganz*, the court expressly held that an

15   "eight-month period [of indecision after a tender] *cannot* be equated as constructive denial *of*

16   [the insured's] claims." *Ganz* at 438, emphasis added. Furthermore, the New York court

17   held that an insurer's answer disputing coverage constituted a declination in the specific

18   factual circumstances of that case, where the time for submitting the proof of claim in a first

19   party case remained open. There is no similarity between those specific facts and ACE

20   PCIC's inability to make a coverage decision in a third party case due to HP's failure to

21   cooperate. Certainly in California, there is no such thing as a "de facto" denial under these

22   circumstances, as claimed by HP.

23       Rather, the California Supreme Court has held that an insurer is entitled to assert its

24   coverage defenses without being held in breach of contract. *Buss v. Superior Court*

25   *(Transamerica)* (1997) 16 Cal.4th 35. In *Buss*, the court opined that it would be unjust to

26   require an insurer to defend a claim without being allowed to preserve its right to challenge

27

28

1   its duty to pay those defense costs and even recover them upon the conclusion of the case.

2   Id.

3          California courts do not label what occurred in this case as a breach of contract.

4   Insureds do not have the right to manipulate the flow of information to prevent a coverage

5   determination, nor do they have the right to file a motion for summary judgment when

6   documents have been withheld and then argue the insurer breached the contract by refusing

7   to blindly make a coverage determination.  To this day, HP has not yet produced all of the

8   documents from the underlying case.  Here, it is HP's conduct that should be called into

9   question, not ACE PCIC's conduct.

10  **V.     ACE IS ENTITLED TO ALLOCATE THE FEES BETWEEN COVERED AND
            UNCOVERED CLAIMS**

11

12         Even if ACE PCIC did breach the duty to defend (a finding that has not been made

13  and cannot be made on the facts of this case), California state and federal case law

14  overwhelmingly allow ACE PCIC to allocate the defense fees submitted by HP.  A

15  "breaching insurer" label may affect ACE PCIC's burden of proof when allocating, but

16  allocation is allowed in either event.

17         **A.     In Cases Very Similar To This Case, Courts Have Allowed Allocation Of
                   Fees According To A "Preponderance Of The Evidence" Burden Of Proof**

18

19         In a case very similar to this one, *Scottsdale Ins. Co. v. United States District Court*

20  (N.D.Cal. 1992) 145 F.R.D. 523, the issue of defense fee reimbursement was referred to a

21  special master.  In the underlying case, the insured had sued a contractor for breach of

22  contract, fraud, misrepresentation and negligence.  The contractor filed a cross-complaint

23  against the insured containing six uncovered causes of action.  The cross-complaint was later

24  amended to include a claim for defamation.  The insurer contended that it was liable to pay

25  only for the defense of the slander claim and not the uncovered causes of action or the cost to

26  prosecute the complaint.  The special master agreed with the insurer and ultimately ruled that

27  the insurer needed to pay only 10% of the submitted fees.

28

1    In *Scottsdale*, the insurer refused to pay for the entire defense of the cross-complaint,

2    and stated it would only pay the fees arising from the defense of the defamation case.

3    Despite this position, the court held that the insurer had not breached the insurance contract.

4    The special master further held that even a "breaching insurer" could allocate the fees,

5    stating that such a finding would only affect which burden would be placed on the insurer for

6    allocation purposes.

7        Ultimately, the Special Master in Scottsdale applied a "but for" standard to determine

8    which fees were incurred to defend the slander claim.  Only those fees incurred solely to

9    defend the slander claim were reimburseable.  The special master felt that this decision was

10   supported by the "equities of the underlying situation here," in that the insured is the one

11   who instituted the underlying suit, just as HP is the party who instituted the underlying suit

12   against Nu-Kote:

13       Homestead initiated the underlying litigation.  Its suit against
     Jacobson obviously did not even arguably trigger any duty in
14       Scottsdale under the subject policy.  Six months later Jacobson
     filed a cross-complaint that did not include a covered cause of
15       action.  Then more than two years elapsed without Homestead or
     its counsel (in house or retained) even suggesting that the
16       Scottsdale policy covered any aspect of the litigation.  It was not
     until the spring of 1990, almost three years after it had initiated
17       the case, that Homestead began claiming that discovery had
     exposed a possible defamation cause of action that would trigger
18       coverage. ... More important...[the evidence leaves] us with no
     doubt that the underlying litigation was thoroughly dominated
19       throughout by the uncovered breach of contract and business tort
     causes of action.  Those causes of action were real and
20       substantial.  They were litigated vigorously both before and after
     the slander claim surfaced, and it is abundantly clear that they
21       would have been so litigated even if Jacobson never had made
     any allegations sounding in defamation. ... In a setting like this,
22       we do not see how it could be equitable to make the carrier pay
     for litigation expenses that Homestead clearly would have
23       incurred, even if Jacobson never had added the covered slander
     claim, as it litigated the dominating uncovered claims.
24       [*Scottsdale* at 534-535].

25       In rendering its decision, the Special Master detailed the type of evidence it

26   considered for the insurer to meet its burden.  These included (1) the structure of the case as

27   a whole, (2) the discovery, motion and settlement records, (3) the time sheets/billing records

28

::ODMA\PCDOCS\docs\25208\1

1 | from defense counsel, and (4) the declarations from counsel. The court was unable to arrive

2 | at an exact calculation for the cost of defending the slander claim, particularly since the

3 | defense counsel did not "attempt[] in their contemporaneous time sheets/billing records to

4 | separate out the charges that were attributable to the slander claim," and so the court arrived

5 | at an overall, 10% recovery for the insured.

6 |      In this case, it is not a difficult task to determine which attorneys fees and costs were

7 | incurred by HP in connection with alleged potentially covered claims as opposed to

8 | uncovered claims. For example, much of the discovery and motion practice during the all of

9 | the years that the action was pending related solely to HP's patent claims. In addition, one of

10 | the firms hired by HP, Pennie & Edmonds, concentrated, it seems, exclusively, on HP's

11 | patent case. As was explained to the Court in the underlying action at a hearing on

12 | November 4, 1996:

13 |         The Court: I'm not quite sure I understand the relationship with
14 |         respect to the four lawyers who have entered appearances for Hewlett-Packard.

15 |         Mr. Canova: Your honor, I'm Tom Canova. Myself and Alan
16 |         Tenenbaum are with Pennie & Edmonds, and our co-counsel is Gibson, Dunn & Crutcher. And Peter Sullivan and Tanya McVeigh are from Gibson, Dunn & Crutcher.

17 |

18 |         Mr. Sullivan: Your honor, Pennie & Edmonds are the patent lawyers; and Gibson Dunn & Crutcher are the Antitrust lawyers.

19 |         The Court: So you've got your teams. [*See*, **Ex. "KK"** to the
20 |         Correll Decl.]

21 |      It appears from the billing statements that presentation of the evidence to support

22 | ACE PCIC's assertion that it is not obligated to pay most, or any, of the Pennie & Edmonds

23 | billings will be straightforward. Furthermore, in this declaratory relief action, the only

24 | claims that this Court held were allegedly potentially covered (pending the outcome of ACE

25 | PCIC's coverage defenses) were the causes of action relating to the packaging and package

26 | inserts, and those claims were dismissed prior to trial. Consequently, all trial expenses are

27 | not covered. The presentation of that evidence will also be straightforward in that the

28 |

1 | calculation can be made from the date of the Court's ruling on those issues.  Fees and costs

2 | incurred after the particular date will not be the obligation of ACE PCIC.

3 | **B.   Even "Breaching" Insurers Are Entitled To Allocate Fees, Although The Burden Of Proof Is The "Undeniable Evidence" Standard**

4 |

5 | The Northern District of California has held in three decisions that even a breaching

6 | insurer may allocate defense fees, but the burden of proof to be applied is the "undeniable

7 | evidence" standard.  In *Aerosafe International v. ITT Hartford of the Midwest* (1993) 1993

8 | U.S. Dist. LEXIS 10443, the insured was sued for multiple causes of action arising from the

9 | misappropriation of trade secrets.  Unlike ACE PCIC, Hartford actually declined to defend

10 | the suit.  In the subsequent coverage action, the court specifically held that Hartford breached

11 | its duty to defend.  Furthermore, although the court held that Hartford could ultimately

12 | attempt to meet its burden of proving allocability, the court held that the burden upon

13 | Hartford would be "undeniable evidence."  *Aerosafe* at 12-13.

14 | The *Aerosafe* court set forth the showing that Hartford would need to make to prevail

15 | on allocation.  As to a separate action and cross-complaint that were prepared by defense

16 | counsel but never filed, the court held that Hartford could allocate pursuant to the

17 | "undeniable evidence" burden.  As to covered versus uncovered claims, the court recognized

18 | that the insured's expenditures in acquiring or attempting to acquire certain patent rights "is

19 | not ordinarily a transaction that is undertaken in defense of the claims asserted in the

20 | underlying action…" [*Aerosafe* at 20.]  Again, the court allowed Hartford to allocate these

21 | particular fees under the "undeniable evidence" standard.

22 | Similarly, in *Foxfire, Inc. v. New Hampshire Ins. Co.* (N.D.Cal. 1994) 1994 U.S. Dist.

23 | LEXIS 9249, the insured was sued and filed a cross-action for wrongful eviction and

24 | wrongful withholding of wages.  The insurer repeatedly denied coverage under the policy

25 | and the underlying action eventually settled.  In the coverage action, a jury found that the

26 | insurer had committed bad faith, and the court was asked to determine the amount of defense

27 |

28 |

1 | fees owed by the insurer.  The court allowed the insurer to allocate pursuant to the

2 | "undeniable evidence" standard.

3 |     A number of other decisions have confirmed that even a breaching insurer is entitled

4 | to allocate defense costs.  In *Crist v. INA* (C.D. Utah 1982) 529 F.Supp. 601, the court held

5 | that an insurer can allocate between covered and uncovered claims if they are of clearly

6 | allocable nature. [*Crist* at 604-605.]   In *Horace Mann Ins. Co. v. Barbara B.* (1993) 4

7 | Cal.4th 1076, the California Supreme Court noted that an insurer seeking to allocate defense

8 | fees must provide "undeniable evidence supporting an allocation of a specific portion of the

9 | defense costs...." [*Horace Mann* at 1082.]  Finally, in *Buss*, the court specifically "saved for

10 | another day" the issue of a breaching insurer's burden of proving allocation, although the

11 | breaching insurer's entitlement  to allocate was presumed.  Certainly, there is no state or

12 | federal case law supporting the notion that ACE cannot  present evidence at trial to allocate

13 | its obligation as to which fees and costs it must pay from those that it is not obligated to pay.

14 | **C.    Under No Circumstances Is An Insurer Obligated To Pay For The Prosecution Of An Insured's Own Claim**

15 |

16 |     The law is clear that under no circumstances, whether breaching or not breaching, is

17 | an insurer obligated to pay for the prosecution of the insured's own claim.  In *Larkin v. ITT*

18 | *Hartford* (1999) 1999 U.S. Dist. LEXIS 9960, the court found that the insurer had breached

19 | its duty to defend because it would only pay 5% of the defense costs due to its allocation

20 | position.  The court held that, despite its breach, the insurer was not obligated to pay for the

21 | prosecution of a separate action for damages brought by the insured.  Although the insured

22 | argued that the separate action was prosecuted to further the defense of the insured, the court

23 | disagreed.  The court further stated that, to the extent it would be difficult to separate tasks

24 | performed to defend the suit and tasks performed to prosecute, the burden lay with the

25 | insured:

26 |

27 |         The Court recognizes that some of the actions taken by plaintiff's counsel in Larkin may also have been reasonable and necessary to the defense of the Navone action, and plaintiffs may not have

28 |         duplicated such actions in Navone precisely because they had

30

already been performed in connection with Larkin. In these circumstances, such actions and the expenses associated with them may properly be characterized as Navone defense-costs provided they are performed during the temporal limits of the duty to defend – and the fact that they did "double duty" in both suits does not prevent such characterization. See *Aerojet*, 17 Cal.4th at 63. The burden of identifying those actions, however, lies with the plaintiffs. See id. at 64. Plaintiffs have not identified for the Court the costs and attorneys' fees they incurred in Larkin that were reasonable and necessary to the defense of Navone and were also not duplicated in Navone. Instead, plaintiffs argue generally that Hartford was required to fund the prosecution of the Larkin action. For the reasons stated above, the Court disagrees. [Larkin at 20-21.]

In an unpublished decision, the Ninth Circuit also held that even a breaching insurer is not obligated to pay the cost to prosecute an action. In *United Coastal Ins. Company v. Strategic Organizational Systems* (1992) 1992 U.S. App. LEXIS 11621, the insurer had agreed to defend, but never actually funded the defense arguing that the insured was obligated to first segregate and allocate its defense costs between covered and uncovered claims. The court held that the insurer was in breach, but still did not have to pay for the costs of prosecuting a cross-appeal.

In *James 3 Corporation v. Truck Insurance Exchange* (2001) 91 Cal.App.4th 1093, the court held that an insurer can refuse to pay prosecution costs from the outset of the litigation. In James 3, Truck was defending the insured who decided that a cross-complaint was necessary to best posture the case. The insured hired independent counsel to prosecute the cross-complaint, and Truck refused to pay the bills of the independent counsel. The insured claimed that the fees incurred to prosecute the cross-complaint were "factually intertwined with the affirmative defenses being asserted." *James 3* at 1104. The court disagreed, noting that "there is nothing in the policy that contractually obligates Truck to fund and prosecute an insured's affirmative relief counterclaims or cross-complaints." *Id.* at 1104.

Even in Wyoming, a jurisdiction that does not follow California's *Buss* decision, and therefore does not allow allocation even as to defending insurers, the Supreme Court held that an insurer can indeed refuse to pay for the costs of prosecuting the insured's own action:

1 | "the allocation and recovery of costs attributable to the prosecution of a counterclaim is

2 | permitted without regard to any tactical or strategic justification for asserting the

3 | counterclaim." *Shoshone First Bank v. United Bancorporation of Wyoming, Inc.* (Wy. 2000)

4 | 2 P.3d 510, 511. Although the insured argued that the facts and circumstances of the

5 | counterclaim were inextricably intertwined with the facts and circumstances that formed the

6 | basis of the action against the insured, the court held that an insurer is not obligated to fund a

7 | counterclaim.

8 | As did the insured in *Shoshone*, supra, HP also has asserted that ACE PCIC cannot

9 | allocate "prosecution vs. defense" fees because those fees are "inextricably intertwined." HP

10 | has already admitted that the prosecution of its action as compared with the fees and costs

11 | incurred in connection with defense of the *Nu*-Kote counterclaim are separate and bear no

12 | relationship to each other. The letter to ACE PCIC's counsel, Mr. Correll, dated August 30,

13 | 1999, is written in the context of telling the insurer to mind its own business where HP is

14 | negotiating away its right to collect attorneys fees as the prevailing party on HP's own

15 | claims. The August 30, 1999 letter says it as clear as can be:

16 |
17 |     First, any attorney's fees as to which Hewlett-Packard might
    otherwise have been entitled to recover from Nu-Kote would

18 |     have been an offset to Hewlett-Packard's costs incurred in
    prosecuting its claims for affirmative relief, and would not

19 |     constitute sums which could be credited against Century
    Indemnity Company's obligation to reimburse Hewlett-Packard

20 |     for costs incurred in defending Nu-Kote's counterclaim. [*See*,
    **Ex. "DD"** to Correll Decl. ¶ 29].

21 | When HP did not want ACE PCIC involved in settlement of the underlying action or

22 | to control HP's decision whether to release its right to recover attorneys fees, HP advised

23 | that the fees and costs for the patent case and defense of the antitrust case had nothing to do

24 | with a liability insurer's obligation to reimburse fees. Now, HP asserts that the opposite is

25 | true in an effort to make ACE PCIC pay these bills. Situational justice is not allowed. HP

26 | cannot have it both ways. As HP itself has admitted, ACE PCIC is under no obligation

27 |
28 |

1   whatsoever to pay for the prosecution of its claims against Nu-Kote or defense of anti-trust

2   claims against HP.

3   **D.    Upon The Conclusion Of Discovery, ACE PCIC Will Be Able To Prove Its Entitlement To Allocate**

4

5       ACE PCIC's entitlement to allocate the fees in this case is not merely theoretical.  To

6   the contrary, ACE PCIC has reviewed thousands of documents from the underlying action

7   and has requested (and is awaiting) thousands upon thousands more.  ACE PCIC will be able

8   to show that the vast, vast majority of the underlying case had nothing to do with the defense

9   of any potentially covered causes of action.  An allocation of the fees and costs that ACE

10  PCIC is not obligated to pay will be based on at least four remaining categories.  This Court

11  has already determined the first allocation category by ruling that ACE PCIC is not obligated

12  to pay for fees and costs incurred prior to the date of tender.  In addition to a finding that it is

13  not obligated to pay for pre-tender fees and costs, ACE PCIC is not obligated to pay for any

14  fees and costs in connection with HP's patent case.  ACE PCIC is never entitled to pay for

15  those fees and costs pursuant to the terms of its policy.  As HP has already admitted, those

16  fees and costs can be segregated from the remaining fees and costs.  ACE PCIC is not

17  obligated to pay for any fees in connection with the trial based on the fact that there were no

18  alleged potentially covered claims at issue at the time of trial.  HP has attempted to disprove

19  that fact.  However, discovery is still continuing and when ACE PCIC has all of the evidence

20  it believes that it can prove that there were no covered claims at issue at the time of trial.

21  ACE PCIC is not entitled to pay for fees and costs in connection with uncovered claims.

22  Finally, after those allocations have been made any of the remaining fees and costs that are

23  unreasonable and unnecessary are not the obligation of ACE PCIC.

24      The District Court found that the duty to defend was triggered *only* by the Sixth

25  (Lanham Act) and the Tenth (Unfair Competition) causes of action in Nu-Kote's

26  counterclaim, because these causes of action alleged potential "advertising injury" in the

27  "policy territory" related to package inserts in HP's products.  From the documents that ACE

28

1  PCIC has been provided, it appears that the issue regarding package inserts and alleged

2  statements made by HP that implied that the inkjet cartridges were not refillable or reusable

3  were both adjudicated in HP's favor by April 13, 1999.  Between the time of tender (June 13,

4  1998) and the adjudication of April 13, 1999, however, HP filed no fewer than sixteen

5  motions for summary judgment/adjudication or partial summary judgment.  Only one of

6  those motions (Motion No. 13) addressed an alleged potentially covered claim, the package

7  insert issue.  *See,* **Ex. "BB"** to Correll Decl. ¶27.  Consequently, most, if not all, of the

8  submitted (post-tender) fees clearly and undeniably represent work performed on uncovered

9  claims.  Further discovery will ultimately prove this without question.

10  Nu-Kote also alleged in the underlying action that HP's packaging was deceptive.

11  The alleged deceptive packaging was admittedly not used by HP until 1996 -- after the ACE

12  policy expired.  As such, ACE has no obligation to reimburse defenses costs relating to any

13  outer packaging issue.   Furthermore, the Court in the underlying action dismissed  Nu-

14  Kote's state court claims, including the Tenth cause of action, on April 21, 1999.  *See,* **Ex.**

15  **"BB"** to Correll Decl. ¶27.  Therefore, all fees incurred after April 21, 1999 were incurred to

16  prosecute or defend uncovered claims.

17  The allocation issues in this case are very real, and although abundant evidence exists

18  even at this time to prove ACE PCIC's right to allocate, further discovery will allow ACE

19  PCIC to  prove which specific fees and costs are not reimburseable by ACE PCIC.

20  **E.     The Case Law Cited By HP Does Not Support HP's Argument That ACE**
   **PCIC Is Not Entitled To Allocate Between Covered And Uncovered**
21  **Claims**

22  HP claims that ACE PCIC has forfeited its right to allocate due to its failure to defend

23  prior to the district court's ruling. HP cites no applicable authority for this draconian

24  position.

25  First, ACE PCIC is not a "non-defending insurer."  ACE PCIC has never declined

26  coverage in this case, and is not in breach of contract.  By the time this Court ruled that ACE

27

28

1   PCIC had a duty to defend, the underlying action was concluded. There is simply no factual

2   or legal basis for concluding that ACE PCIC is not a defending insurer.

3          Second, HP's discussion of the *Buss, supra* decision is outrageously misleading. The

4   *Buss* court never held that only defending insurers can allocate between covered and

5   uncovered claims. There is not one word in the opinion that so holds.   Rather, the *Buss*

6   court stated that the duty to defend cannot exist "in the air, without regard to whether or not

7   the claims are at least potentially covered." *Buss* at 48. The underlying rationale of *Buss* is

8   that an insured cannot receive benefits that the insurer has not contractually agreed to

9   provide. Here, as discussed above, ACE PCIC is not contractually obligated to pay for fees

10  and costs incurred to prosecute HP's claims against Nu-Kote, nor is ACE PCIC contractually

11  obligated to pay for fees and costs related to uncovered claims. Furthermore, the *Buss* court

12  distinguished its prior holding in *Hogan v. Midland National Ins. Co.* (1970) 3 Cal.3d 553 on

13  the ground that, in *Hogan* (where the insurer was in breach), all of the claims were

14  potentially covered and therefore an allocation could not be made without a heavy burden on

15  the insurer. The *Buss* court did not state that the *Hogan* insurer could not allocate because

16  the *Hogan* insurer had not defended; rather, it was only because the claims at issue in that

17  case were all potentially covered that an allocation was not possible:

18              We concluded that Midland did indeed have a duty to defend,
                that its refusal of the defense was therefore wrongful, and hence
19              that it was responsible for all the defense costs. [Citation]. **This
                determination was compelled by the one stated above, viz.,**
20              **that all the claims as alleged were at least potentially covered**.
                *Buss* at 55, emphasis added.
21

22          Certainly, neither *Buss* nor *Hogan* discuss the situation present here:  where an insurer

23  was unable to render a coverage decision and who could not make a coverage decision to

24  defend or decline only because it was sued before it could make a coverage decision. HP has

25  conceded what the District Court itself noted in its ruling:  ACE PCIC never declined

26  coverage. Pursuant to the court's ruling regarding the duty to defend, ACE PCIC is only

27  obligated to reimburse those defense costs reasonably and necessarily incurred to defend the

28

1   covered claims in the Nu-Kote counterclaim.  ACE PCIC is fully entitled to make a *Buss*

2   allocation and nothing in the Buss decision prevents this.

3       HP's reliance on *State of California v. Pacific Indemnity Co.* (1998) 63 Cal.App.4th

4   1535 ("*State of* California") is just as inappropriate and misleading.  In *State of California*,

5   the insurer (Pacific Indemnity) initially declined to defend the tendered suit.  In that case, the

6   court did not hold that a non-defending insurer cannot allocate, and the citations to that case

7   in HP's brief stop just short of the court's ultimate holding in this regard.  In fact, the court

8   held just the opposite of what HP claims:

9         [T]he State's position that Pacific Indemnity is foreclosed from
ever seeking reimbursement for costs of defense goes too

10         far….In this case, Pacific Indemnity seeks to avoid having to pay
for fees which exceed its contractual burden, not to rely on a

11         contract which it breached….If Pacific Indemnity, after
providing an entire defense, can prove that a claim was "not even

12         potentially covered because it did not even possibly embrace any
triggering harm of the specified sort within its policy period or

13         periods caused by an included occurrence," it should have that
opportunity. *State of California* at 1550, emphasis in original.

14

15      In *State of California*, the defense was ongoing even as the coverage action was

16   proceeding.  The court only recognized that, to say Pacific Indemnity was entitled to

17   "reimbursement" was erroneous because Pacific Indemnity had not actually paid any defense

18   costs yet, so the term "reimbursement" did not fit the situation.  But once Pacific Indemnity

19   agreed to assume the defense, and once the bills were being paid, the court held that Pacific

20   Indemnity was fully entitled to make an allocation between covered and uncovered claims

21   upon the conclusion of the underlying action.

22      Here, of course, the underlying action has fully concluded and ACE PCIC is faced

23   with payment of the submitted fees.  ACE PCIC is fully entitled to allocate between covered

24   and uncovered claims, and HP has cited no case to the contrary.

25   **VI.**    **ACE IS NOT OBLIGATED TO REIMBURSE HP FOR LEGAL FEES
INCURRED TO DEFEND UNCOVERED CLAIMS AT THE TIME OF TRIAL**

26

27       **A.**    **All Of The Claims That The Court Deemed Potentially Covered Were
Dismissed Prior To Trial**

28

1      Until January 2002, ACE PCIC has not had access to even a fraction of the underlying

2    case documents that HP has accumulated and analyzed for almost seven years.  Nevertheless,

3    the evidence to date is clear that the claims that the Court held potentially triggered coverage

4    were dismissed prior to the trial of the underlying Nu-Kote counterclaim.  As discussed

5    above, there is no legal basis for allowing HP to collect fees and costs from ACE PCIC that

6    were incurred in prosecuting HP's own claims and defending other claims that were clearly

7    uncovered.

8      HP concedes that once ACE PCIC  proves that no covered claims against HP

9    proceeded to trial in the underlying action, then ACE PCIC is not obligated to reimburse HP

10   for fees incurred at trial.  [HP points and authorities, 14:14-17].

11     Certainly, it has been held that once all covered claims are dismissed, the insurer is

12   not obligated to pay those defense costs incurred thereafter.  *Morgan, Lewis & Bockius v.*

13   *United States District Court* (D.N.J. 1996) 929 F.Supp. 764.  In *Morgan*, the insured sued

14   Cosmetic Gallery for eight causes of action, and Cosmetic Gallery counterclaimed for

15   antitrust, which included claims for unfair competition and infringement of copyright, title or

16   slogan.  The insured argued that the insurer could not satisfy its burden of allocating defense

17   costs "due to the fact that the issues of fact and law concerning Matrix's claims against

18   Cosmetic Gallery are so interrelated and intertwined that there can be no reasonable basis for

19   such a proposed allocation." [*Morgan* at 766.]  The court followed California's *Scottsdale v.*

20   *Homestead, supra,* case and pointed out that by the time of trial, all covered claims for

21   monetary damages had been dismissed.  Consequently, the court held that none of the trial

22   costs could be assessed to the insurer. *Morgan* at 773.

23     **B.**  **The "FUD" Allegations That Remained Through Trial Pertained To The**
     **Antitrust Claims, Which Were Not Covered As A Matter Of Law**

24

25     HP makes a factual argument that indeed some covered claims did persist even

26   through the trial of the underlying action.  HP claims that the survival of certain "FUD"

27   allegations through trial obligated ACE PCIC to defend HP through trial.  However,

28

1    according to the documents just received by ACE PCIC in December 2001, the only "FUD"

2    allegations that remained in the case by the time of trial were related to the federal antitrust

3    claim, as this was the only claim left in the case by that time. This is not a covered claim as

4    a matter of law, nor did this Court find it to be a potentially covered claim, triggering a

5    defense.

6         This Court held that ACE PCIC's duty to defend was triggered under the advertiser's

7    liability coverage in the policy, which contains multiple enumerated offenses, but which does

8    not include coverage for antitrust claims. The California Supreme Court has held that, to

9    trigger coverage, a claim must allege the insured committed one of the specifically

10   enumerated advertising injury offenses in the policy, and the offense must have been

11   committed in the course of the insured's advertising activities. *Bank of the West v. Superior*

12   *Court*, (1992) 2 Cal. 4th 1254, 1262-1273. Numerous California courts have construed the

13   advertising injury coverage narrowly, and, for example, have held that patent infringement

14   claims are not covered under the enumerated "infringement of copyright, title or slogan"

15   offense. *Mez Industries, Inc. v. Pacific National Ins. Co.* (1999) 76 Cal.App.4th 856;

16   *Maxconn Inc. v. Truck Ins. Exchange*. (1999) 74 Cal.App.4th 1267. The ACE PCIC

17   advertiser's liability coverage does not list "antitrust" as an enumerated offense that could

18   trigger coverage, and consequently the antitrust claims from the underlying action, which are

19   the sole claims that survived through the trial, could not have been covered.

20        In addition to the fact that antitrust is not an enumerated offense under the policy, the

21   Northern District of California has held that antitrust claims are not covered as a matter of

22   law because they are intentional in nature. *Trailer Marine Transport Corp. v. Crowley*

23   *Maritime Corporation* (N.D. Cal. 1992) 791 F.Supp. 809. In Trailer Marine, the court held

24   that antitrust conduct is willful as a matter of law, and therefore coverage for such conduct is

25   prohibited by California Civil Code §1668 and California Insurance Code §533. *Id.*

26        HP admits that the basis for the Court's "duty to defend" ruling was the "unfair

27   competition" claims raised in Nu-Kote's counterclaim, not the federal antitrust claims. [HP

28

1  points and authorities, 14:18-22.] Yet, HP quotes from trial transcripts that discuss "FUD"

2  allegations that could only have pertained to the federal antitrust claims, because the

3  potentially covered unfair competition claims and state law claims were dismissed prior to

4  trial and were not adjudicated at trial. Consequently, at the time of trial, there was no

5  potential that damages could be awarded against HP as the result of a covered claim, and

6  ACE PCIC had no duty to reimburse HP for the cost of that defense. ACE PCIC is entitled

7  to allocate the defense fees as between those fees incurred prior to the dismissal of the

8  alleged potentially covered claims, and those incurred thereafter.

9          Finally, it appears from the documents recently received by ACE PCIC that the court

10 in the underlying action ruled that there was no evidence of damage to Nu-Kote outside of

11 the United States. Moreover, Nu-Kote's own pleadings reveal that Nu-Kote was not making

12 any unfair competition or trade libel claims involving the "policy territory" specified in the

13 ACE PCIC policy. The Court's April 1999 ruling in the underlying case eliminated any

14 potential that covered damages could be awarded to Nu-Kote on its counterclaim against HP,

15 as the ACE PCIC policy territory excluded the United States. Consequently, once discovery

16 on this issue is completed and ACE PCIC can prove that these rulings were issued prior to

17 trial, all defense fees costs incurred thereafter would necessarily have been incurred to

18 defend against uncovered claims.

19 **VII.    ACE IS ONLY OBLIGATED TO PAY REASONABLE RATES TO DEFEND
           HP AS TO POTENTIALLY COVERED CLAIMS ASSERTED IN THE**
20 **        UNDERLYING ACTION**

21         ACE PCIC and HP do agree on one thing:  HP's counsel was not Cumis counsel.

22 ACE PCIC does believe, however, that the provisions and spirit of Civil Code §2860 are

23 relevant to the determination as to what rate should be applied here. ACE PCIC is fully

24 entitled to apply its own panel counsel rates to the HP legal bills for the simple reason that

25 the rates ACE PCIC pays to its panel counsel are reasonable and would have been the rates

26 applied if HP had not obstructed ACE PCIC's investigation.

27

28

**A.    Section 2860 Is Relevant Only In That It Supports California's Policy Of Not Awarding An Inequitable Windfall Of Extra-Contractual Damages To An Insured**

Much of HP's argument centers on the lack of factual application of Civil Code section 2860. While this case is not about a conflict that arose between ACE PCIC, HP and its counsel, the spirit of Civil Code section 2860 definitely applies to this matter. Civil Code 2860 provides a benchmark for determining a reasonable rate for counsel even when that counsel is retained by an insured and is not "panel" counsel. Because Civil Code section 2860 does not technically apply to this matter, HP draws the conclusion that ACE PCIC cannot obtain "certain benefits" that it claims are bestowed only upon defending insurers. HP's logic and conclusion is flawed. This is not a matter of ACE PCIC being bestowed a benefit as a result of the application of the statute, it is about the fact that the statute prohibits unreasonable fees and uses the insurer's counsel's rates as the measure of what is reasonable. Civil Code section 2860 simply acknowledges the principle that an insured, under a contract of insurance, only gets what the insured originally bargained for:

> (c) . . . The insurer's obligation to pay fees to the independent counsel selected by the insurer is limited to the rates which are actually paid by the insurer to the attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended.

Regardless of circumstances, an insured has no contractual expectation of receiving benefits in a greater amount than for the amount that the contract provides. This provision of section 2860 is in no way a "reward" for an insurer. ACE PCIC concedes that an insured who has been denied defense counsel does not have to use the insurers' panel counsel if it plans to seek the legal costs incurred as damages for a breach of the duty to defend. Here, ACE PCIC did not deny a defense to HP. Furthermore, even as to insurers who have declined to defend their insureds, the arguments and authority cited by HP speak of the exercise of reasonable discretion in defending the action. Here, when HP hired legal defense counsel billing substantially higher rates than that of lawyers ACE PCIC customarily employs for the same type of work, it did not act reasonably. In that regard, section 2860

1   does have relevance.  A reasonable insured would have followed the guidelines set out in

2   section 2860 if it expected full reimbursement of those costs as contract damages.  HP

3   clearly did not, and made no attempt to.

4       **B.    Even If ACE PCIC Were A "Breaching" Insurer, Which It Is Not, HP Is**
            **Not Entitled To Extra-contractual Damages In The Form Of Hourly Rates**
5           **In Excess Of ACE PCIC's Panel Rates**

6           Even if HP were able to prove that ACE PCIC breached the insurance contract, which

7   is not a cause of action before the Court and is certainly not the case, HP has set forth no

8   claim entitling it to extra-contractual damages.  Even if HP did set forth such a claim,

9   California courts do not award extra-contractual damages for a breach of an insurance

10  contract.  Furthermore, our courts have a policy against rewriting insurance contracts, in the

11  manner suggested by HP, to provide additional insurance benefits not bargained for.

12          HP first asks the Court to assume that ACE PCIC breached its insurance contract, and

13  second asks the Court to adopt a damages assessment that effectively rewrites the insurance

14  policy to give HP a greater benefit than it paid for.  HP wants choice of defense counsel, at

15  hourly rates far higher than that of panel counsel normally provided for ACE PCIC's other

16  insureds under similar policies.

17          California courts eschew such ex post facto rewriting of insurance contracts.  By way

18  of analogy, ACE PCIC notes that the California Supreme Court in *Buss*, supra at p. 50, held

19  that an insurer may seek reimbursement for defense costs paid out for claims not even

20  potentially covered.  The rationale for this holding was that the insurer had not been paid

21  premiums by the insured for such a benefit.  Similarly, ACE PCIC contends that an insured

22  may not recover as damages for a breach legal defense costs that were incurred at rates never

23  contemplated by the parties at the time of contracting.  HP simply cannot recover, under a

24  contractual legal theory, financial amounts higher than ACE PCIC would have incurred had

25  it had the opportunity to timely evaluate the claim.

26          Ironically, one of the cases cited as support by HP actually supports ACE PCIC's

27  position.  In *Sentex Systems, Inc. v. Hartford Accident & Indemnity Co.*, 882 F.Supp. 930,

28

::ODMA\PCDOCS\docs\25208\1

41

1   946 (C.D.Cal. 1995), aff'd 93 F.3d 578 (9th Cir. 1996), the court stated the general rule that

2   if an insurer breaches its contractual duty to defend, it is "liable for attorneys' fees as

3   provided in the policy . . ." [emphasis added].  Nowhere does that case imply that even a

4   breaching insurer should by liable for attorneys' fees at higher hourly rates than those billed

5   by lawyers customarily provided to insureds as a policy benefit.

6          HP analyzes this issue differently, preferring not to focus on contractual remedies.

7   HP argues that "California Civil Code section 2860 cannot benefit ACE."  This is a straw

8   man argument, as ACE PCIC does not contend that Civil Code section 2860 factually applies

9   to this case.  ACE PCIC seeks limitations on the hourly rates incurred by HP's lawyers

10  according to the guidelines set forth by Civil Code section 2860 and pursuant to the

11  reasonable expectations of the parties to the insurance contract.  Simply put, HP wants the

12  court to punish ACE PCIC by awarding more benefits than agreed to by the parties under

13  their insurance contract.  Such punitive assessments are not a remedy for breach of contract,

14  even if a breach did occur.  Such an assessment would be a tort remedy, something not at

15  issue in this case.

16         The cases cited by HP in support of its argument do little more than highlight the

17  arguments irrelevancy.  The first two cases cited in footnote 88 refer to the insurer's sacrifice

18  of the right to "control the litigation."  At stake here is not any such right to control; at issue

19  is payment for litigation that has already been completed.  The third case cited by HP

20  (*Sentex*, supra) is mischaracterized as supposedly holding that a breaching insurer is not

21  entitled to a reduction of post-tender fees based upon section Civil Code section 2860.  Even

22  a casual look through that case demonstrates that the court did not mention Civil Code

23  section 2860, much less analyze its affect on  excessive hourly rates.  Indeed, *Sentex* talks

24  about only whether or not payment should be made for pursuing litigation strategies that the

25  insurer might challenge in hindsight as being unnecessary.

26         As a matter of law and equity, an insured does not act reasonably by hiring high-

27  priced lawyers and not telling the insurer about it until after the legal work has been

28

1  completed.  HP is not entitled to such a windfall when contract benefits, in the form of the

2  fees to be paid, are determined.  As such, ACE PCIC is fully entitled to challenge the rates

3  charged by HP's counsel in defending the underlying action.

4  **VIII.  <u>CONCLUSION</u>**

5  As discussed above, ACE PCIC cannot be penalized for failing to immediately defend

6  a case during the coverage investigation stage, where the insured continually and

7  unreasonably refused to provide ACE PCIC with specific, requested information.  HP's

8  billing statements are subject to review, audit and challenge, if necessary.  ACE PCIC

9  respectfully requests that HP's motion, therefore, be denied and that this Court find that ACE

10  PCIC is entitled to fully challenge the HP billing statements under a "preponderance of

11  evidence" standard.

12

13  Dated: March 4, 2002                   CORRELL, GARCHIE & EDWARDS  LLP

14

15                                         By: _____

16                                            JANELLE F. GARCHIE
                                             Attorneys for Defendant, ACE
17                                           PROPERTY AND CASUALTY
                                             INSURANCE COMPANY

18

19

20

21

22

23

24

25

26

27

28

RE:            [Filed under seal pursuant to Court Order dated 2/18/99]
               *Hewlett Packard Co. v. CIGNA Property & Casualty Ins. Co., et al.*

VENUE:         U.S.D.C., Northern District of California, San Jose Office

CASE NO.:      C-99-20207 SW

## PROOF OF SERVICE

I am employed in the County of San Diego, State of California. I am over the age of eighteen (18) years and not a party to the within action; my business address is: 550 West C Street, Ste. 500, San Diego, CA 92101. On March 4, 2002, the following documents described as:

**OPPOSITION TO PLAINTIFF'S MOTION FOR ADJUDICATION THAT:  (1) NO ALLOCATION PERMITTED BETWEEN POTENTIALLY COVERED AND UNCOVERED CLAIMS; (2) DUTY TO DEFEND EXISTED THROUGH END OF *NU-KOTE* ACTION; AND (3) CALIFORNIA CIVIL CODE § 2860 IS NOT APPLICABLE DECLARATION IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS, SET NO. 4**

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

David A. Gauntlett                          Attorneys for Plaintiff
James A. Lowe                               HEWLETT-PACKARD COMPANY
**GAUNTLETT & ASSOCIATES**
18400 Von Karman, Suite 300
Irvine, CA 92612

Peter G. Stone, Retired                     Special Master
JAMS/Endispute
160 West Santa Clara Street
Suite 1050
San Jose, CA  95113

☐  **(BY MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence by mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage fully prepaid at San Diego, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐  **(BY FACSIMILE)** I caused such document to be delivered by facsimile transmission to the offices of the addressee.

☐  **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand to the offices of the addressee.

☒  **(BY OVERNITE EXPRESS)** I caused such envelope to be delivered by OverNite Express to the offices of the addressee.

☐  **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒  **(FEDERAL)** I declare that I am employed in the offices of a member of this Court at whose direction the service was made.

Executed on March 4, 2002, at San Diego, California.

JOHANNA PALKOWITZ

::ODMA\PCDOCS\docs\23647\1