# EXHIBIT 76

1  THOMAS M. CORRELL   [SBN 108773]
   JANELLE F. GARCHIE   [SBN 118453]
2  **CORRELL, GARCHIE & EDWARDS LLP**
   550 West C Street, Suite 500
3  San Diego, CA 92101-3540
   Telephone (619) 557-0424
4  Facsimile (619) 557-0428

5  ALAN E. GREENBERG   [SBN 90688]
   ERNEST SLOME       [SBN 122419]
6  **LEWIS BRISBOIS BISGAARD & SMITH LLP**
   550 West C Street, Suite 800
7  San Diego, California  92101
   Telephone: (619) 233-1006
8  Facsimile: (619) 233-8637

9  ROBERT J. ROMERO   [SBN 136539]
   MERLE J. PANICK    [SBN 124731]
10 **HINSHAW & CULBERTSON**
   244 Jackson Street, Suite 300
11 San Francisco, California 94111
   Telephone: (415) 362-6000
12 Facsimile: (415) 834-9070

13

14 Attorneys for Defendant

15            **UNITED STATES DISTRICT COURT**

16  **FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

17

18 UNDER SEAL,                    Case No. C-99-20207 JW

19        Plaintiff,             **DEFENDANT'S MEMORANDUM OF POINTS
                                 AND AUTHORITIES IN SUPPORT OF**
20      v.                       **MOTION FOR SUMMARY ADJUDICATION
                                 OF THE ABSENCE OF A DUTY TO DEFEND**
21 UNDER SEAL,                   **PLAINTIFF
                                 MSJ NO. 6**
22        Defendant.             Judge:   Hon. James Ware
                                 Date:    September 9, 2002
23                               Time:    9:00 a.m.
                                 Dept.:   8-4th Floor
24

25     **FILED UNDER SEAL PURSUANT TO MARCH 24, 1999 ORDER**

26
                        ┌─────────────────────┐
27                      │   **EXHIBIT**       │
                        │                     │
28                      │      76             │
                        └─────────────────────┘

::ODMA\PCDOCS\docs\271142\1    DEFENDANT' MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF MSJ OF THE ABSENCE OF A DUTY TO DEFEND DEFENDANT

                                                            Case No. C-99-20207 JW

1 THOMAS M. CORRELL [SBN 108773]
  JANELLE F. GARCHIE [SBN 118453]
2 **CORRELL, GARCHIE & EDWARDS LLP**
  550 West C Street, Suite 500
3 San Diego, CA 92101-3540
  Telephone (619) 557-0424
4 Facsimile (619) 557-0428

5 ALAN E. GREENBERG [SBN 90688]
  ERNEST SLOME [SBN 122419]
6 **LEWIS BRISBOIS BISGAARD & SMITH LLP**
  550 West C Street, Suite 800
7 San Diego, California 92101
  Telephone: (619) 233-1006
8 Facsimile: (619) 233-8627

9 ROBERT J. ROMERO [SBN 136539]
  MERLE J. PANICK [SBN 124731]
10 **HINSHAW & CULBERTSON**
  244 Jackson Street, Suite 300
11 San Francisco, California 94111
  Telephone: (415) 362-6000
12 Facsimile: (415) 834-9070

13

14 Attorneys for Defendant,
  ACE PROPERTY AND CASUALTY INSURANCE COMPANY

15 **UNITED STATES DISTRICT COURT**

16 **FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

17

|  |  |
|---|---|
| 18 HEWLETT-PACKARD COMPANY, | Case No. C-99-20207 JW |
| 19　　　　　Plaintiff, | **ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF THE ABSENCE OF A DUTY TO DEFEND HEWLETT-PACKARD COMPANY** |
| 20　　　　　v. | |
| 21 ACE PROPERTY AND CASUALTY INSURANCE COMPANY, | |
| 22　　　　　Defendant. | **MSJ NO. 6** |
| 23 | Judge:　　Hon. James Ware |
| 24 | Date:　　September 9, 2002 |
| | Time:　　9:00 a.m. |
| | Dept.:　　8-4th Floor |

25

26 **FILED UNDER SEAL PURSUANT TO MARCH 24, 1999 ORDER**

27

28

:ODMA\PCDOCS\docs\27133\1

# TABLE OF CONTENTS

**Page**

I.   SUMMARY OF ARGUMENT ..................................................................................1

II.  STATEMENT OF FACTS .....................................................................................2

    A.   The ACE PCIC Foreign Liability Insurance Policy .............................................2

    B.   The Newly Discovered Evidence About The Underlying Action......................3

        1.   The Complaint and Counterclaim ............................................................3

        2.   The 1998 Tender..........................................................................4

        3.   The Undisclosed Facts of the Underlying Action ...................................4

III. RULE 56 REQUIRES HP TO PROVIDE EVIDENCE OF DAMAGE WITHIN THE POLICY TERRITORY.................................................................8

IV.  REVERSAL OF THE 1999 SUMMARY ADJUDICATION IS MANDATED BY THE COMPILATION SINCE 1999 OF A COMPLETE AND ACCURATE FACTUAL RECORD. ................................................9

V.   SPECULATION IS NOT A SUBSTITUTE FOR THE REQUIREMENT THAT THE INSURED MUSTER EVIDENCE OF A POTENTIAL FOR COVERAGE. ........................................................................10

VI.  THE LEGAL FOUNDATION FOR THE 1999 RULING HAS BEEN UNDERMINED BY THE CALIFORNIA COURTS. .....................................13

    A.   The Court Applied an Erroneous Construction of "Policy Territory" and "Occurrence." ...................................................................13

    B.   The Court Applied an Erroneous Construction of "Advertising Activities." ..................................................................17

VII. CONCLUSION ...........................................................................20

::ODMA\PCDOCS\docs\271331

ACE PCIC'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MSJ  REGARDING ABSENCE OF DUTY TO DEFEND HP
Case No. C-99-20207 JW

# TABLE OF AUTHORITIES

**Page**

## Cases

*American Cyanamid v. American Home Assurance Company*
(1994) 30 Cal.App.4th 969 ...........................................................................17, 18

*Bank of the West v. Superior Court*
(1992) 2 Cal.4th 1254, 1277, fn 9..............................................................20

*Barragan v. Allstate Ins. Co.*
1998 U.S. Dist. LEXIS 19913 (N.D. Cal.) ................................................14

*Celotex Corp. v. Catrett*
(1986) 477 U.S. 317 ....................................................................................9, 10

*Diesel v. The Travelers Insurance Company*
1997 U.S. Dist. LEXIS 4288 (N.D. Cal.) ..................................................14

*El-Corn Hardware, Inc. v. Fireman's Fund Ins. Co.*
(2001) 92 Cal.App.4th 205, *217* ...............................................................19

*Gray v. Zurich*
(1996) 65 Cal.2d 263 ..................................................................................12

*Gunderson v. Fire Insurance Exchange*
(1995) 37 Cal.App.4th 1106 .......................................................................11, 14

*Haskel, Inc. v. Superior Court*
(1995) 33 Cal.App.4th 963, 977-78............................................................2, 10

*Hawksbill Sea Turtle v. Federal Emergency Management Agency*
(3rd Cir. 1997) 126 F.3d 461 ......................................................................6

*Industrial Indem. Co. v. Apple Computer, Inc.*
(1999) 79 Cal.App.4th 817, 839 .................................................................16, 17

*Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group*
(1996) 50 Cal.App 4th 548, 556 .................................................................9

*Liberty Mutual Ins. Co. v. Superior Court (Jensen-Kelly)*
(1997) 58 Cal.App.4th 617 .........................................................................10, 11

*Monumental Life Insurance Company v. United States Fidelity & Guaranty Company*
(Md. App. 1993) 617 A.2d 1163 .................................................................20, 21

*National Union Fire Insurance Company of Pittsburgh, PA v. Siliconix Incorporated*
(N.D. Cal. 1989) 726 F.Supp. 264 .............................................................11, 12, 14, 15

*Olympic Club v. Those Interested Underwriters At Lloyd's London*
(9th Cir. 1993) 991 F.2d 497.......................................................................14

*Panko Architects, Inc. v. St. Paul Fire and Marine Ins. Co.*
    1996 U.S. Dist. LEXIS 4814 (N.D. Cal.) .................................................. 13

*Peerless Lighting Corp. v. American Motorists Insurance Co.*
    (2002) 82 Cal.App.4th 995 ....................................................... 21, 22

*Remmer v. Glens Falls Indem. Co.*
    (1956) 140 Cal.App.2d 84, 88 ........................................................ 17

*Royal Insurance Company of America v. Quinn-L Capital Corporation*
    3 F.3d 877, 881 (5th Cir. 1993) ....................................................... 6

*Solers, Inc. v. Hartford Casualty Insurance Co.*
    (E.D. Va. 2001), 146 F.Supp. 2d 785 .................................................. 21

*Titan Corp. v. Aetna Cas. & Sur. Co.*
    (1994) 22 Cal.App.4th 457, 474 ...................................................... 16

*Zelda v. Northland Insurance Company*
    (1997) 56 Cal.App.4th 1252, 1262-1263 ............................................... 13

*Zurich Insurance Co. v. Amcor Sunclipse North America*
    (7th Cir. 2001), 241 F.3d 605 ....................................................... 21

## Statutes

C.C.P. section 1008 ...................................................................... 10

## Rules

F.R.C.P. 56(e) ............................................................................ 9

1  ACE Property and Casualty Insurance Company ("ACE PCIC") respectfully submits

2  the following Memorandum of Points and Authorities In Support of its Motion For Summary

3  Adjudication of the Absence of a Duty to Defend Hewlett-Packard Company ("HP").

## I.    SUMMARY OF ARGUMENT

5  On August 24, 1999, Judge Williams granted HP's motion for summary adjudication

6  that ACE PCIC had a duty to defend a counterclaim filed by Nu-Kote International ("Nu-

7  Kote") against HP in the mammoth intellectual property lawsuit being prosecuted by HP

8  against Nu-Kote, *Hewlett-Packard Co. v. Nu-Kote International, Inc.*, N.D. Cal. No. C 94-

9  20647 JW (the "Underlying Action."). During the intervening three years, the validity of

10 that interlocutory ruling has been overtaken by subsequent clarifications of controlling issues

11 of California insurance law, and by the disclosure of undisputed facts that had not

12 previously—until the conduct of discovery in this action—seen the light of day.  Under

13 California law, "[w]hile an insured may obtain an early summary adjudication of a defense

14 obligation, the insurer is entitled to seek a contrary ruling at *any time* it acquires the requisite

15 evidence to conclusively eliminate any potential for coverage." *Haskel, Inc. v. Superior*

16 *Court* (1995) 33 Cal.App.4th 963, 977-78.  By this motion, ACE PCIC seeks an adjudication

17 that, based on the facts and law now properly before this Court, it never owed a duty to

18 defend HP against the counterclaim.

19 It is now clear that the record and the law offer no support for Judge Williams' two

20 key findings in 1999—that (1) coverage under the ACE PCIC foreign policy was triggered

21 by the commission of "unfair competition" occurring in the policy territory (outside the

22 United States), and (2) there existed the potential that Nu-Kote's counterclaim sought

23 recover of damage (admittedly to its domestic business) based in part on an extraterritorial

24 act committed by HP.

25 First, there was no basis (other than HP's sheer speculation) for the conclusion that

26 Nu-Kote's counterclaim might be taken to have included allegations of unfair competition

27 outside the United States. The uncontradicted evidence establishes that, at the time of HP's

28

1  tender to ACE PCIC and thereafter, the only conduct for which Nu-Kote asserted

2  counterclaims against HP took place entirely within the United States.  Under the ACE PCIC

3  foreign liability policy covering only unfair competition occurring outside of the United

4  States, the potential for coverage, and hence a duty to defend, could never have arisen.

5          Second, California law decided since 1999 demonstrates that, contrary to HP's

6  arguments (and Judge Williams' ruling), the time of an "occurrence" under such a policy is

7  not when the act of unfair competition takes place, but when the damages flow therefrom.  In

8  an "occurrence" policy, it is the damages, not the causative act, that determine coverage.

9  There is no allegation or evidence from the underlying case to suggest that Nu-Kote

10  sustained an iota damage outside of the United States.

11         Moreover, the August 24, 1999 ruling did not address a separate legal issue:  whether

12  the alleged misconduct (specifically, the inclusion of a package insert in HP's product

13  packaging) constitutes "advertising activities," as that term has been construed by the

14  California courts.  A package insert, containing *directions* for using a product, which is by

15  definition only seen by a customer after the product is purchase and opened, is not an

16  advertisement within the commonly understood definition of that word—a publication paid

17  for by a seller to entice a prospective purchaser to buy a product.  Courts have drawn a clear

18  distinction between product marketing, on the one hand, and advertising activities on the

19  other.  The record before the Court today conclusively defeats the potential that the

20  counterclaims asserted against HP by Nu-Kote constituted covered "advertising activities"

21  within the meaning of the ACE PCIC foreign liability policy.

22  **II.    STATEMENT OF FACTS**

23         **A.    The ACE PCIC Foreign Liability Insurance Policy**

24         HP purchased a "Comprehensive General and Automobile Liability Policy:  *Foreign*"

25  from ACE PCIC, effective October 31, 1992 to October 31, 1993 and renewed for the

26  periods of October 31, 1993 to October 31, 1994 and October 31, 1994 to October 31, 1995

27  (emphasis added).  As stated in the Policy's title, the "foreign" policy provided coverage for

28  claims for damages resulting from extraterritorial activities:

1

Policy Territory

2

Shall be worldwide for claim or suit resulting from *an occurrence*

3

*outside the United States of America*, its territories or possessions,
Canada, Cuba and North Korea. [Ex. "A" to Garchie Decl. (emphasis added)]

4

5    In addition to comprehensive general liability insurance coverage for bodily injury and

6    property damage and certain other coverages, all irrelevant here, the Policy extended

7    coverage for "Advertiser's Liability."  The Advertisers Liability coverage grant states:

8

Advertiser's Liability

9

To pay on behalf of [HP] all sums which [HP] shall become

10

legally obligated to pay as damages *occurring in* the course of
[HP's] advertising activities, arising out of libel, slander,
defamation of character, violation of right of privacy, unfair

11

competition or infringement of copyright, title or slogan....
(Ex "A" to Garchie Decl., emphasis added)

12

13    **B.    The Newly Discovered Evidence About The Underlying Action**

14         **1.    The Complaint and Counterclaim**

15         In July 1993, Nu-Kote, a U.S.-based company specializing in printing supplies, began

16    marketing inkjet refill products intended to be used with and to compete with HP inkjet

17    cartridges.  (Ex. "B" to Garchie Decl., p. 3:11-15).  Nu-Kote's products, which were sold

18    throughout the United States, enabled inkjet printer customers to refill HP inkjet cartridges

19    with new ink following exhaustion of the original supply.  (Ex. "B" to Garchie Decl., p.

20    3:15-18), threatening HP profits from the sale of disposable cartridges.

21         In September 1994, HP launched a $50 million litigation offensive against Nu-Kote,

22    filing suit in this court for a determination that Nu-Kote's inkjet refill products infringed

23    HP's patents, trademarks and trade dress.  (Ex. "B" to Garchie Decl., p. 3:19-24).  In

24    November 1994, Nu-Kote filed its counterclaim against HP.  (Ex. "B" to Garchie Decl., p.

25    3:24-26).  Nu-Kote's Amended Answer and Counterclaim to HP's Fourth Amended

26    Complaint was filed on March 18, 1999, alleging that HP distributed marketing materials

27    that caused Nu-Kote competitive injury.  (Ex. "C" to Garchie Decl.)  The causes of action in

28    the Nu-Kote counterclaim raised claims for relief for false and deceptive advertising claims

ODMA\PCDOCS\docs\271331

3

ACE PCIC'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MSJ REGARDING ABSENCE OF DUTY TO DEFEND HP
Case No. C-99-20207 JW

1 under the Lanham Act (Count 6), as well as California statutory and common law unfair

2 competition theories (Count 10). (Ex. "C" to Garchie Decl.). Further, the Nu-Kote

3 counterclaim alleged:

> As a result of Hewlett-Packard's unlawful conduct, Nu-kote has
> incurred or will incur injury and damages, including without
> limitation lost sales and otherwise unnecessary expense in
> entering and competing in the relevant aftermarkets, all in an
> amount to be determined at trial.

7 (Ex. "C" to Garchie Decl., ¶ 169).

8    The Nu-Kote counterclaim specified that the "relevant aftermarket" was one:

> "consisting of the aftermarket for ink resupply products,
> including both resupply cartridges and refill kits, available to
> consumers who own each of various models of Hewlett-Packard
> ink-jet printers sold and used in the United States" (Emphasis
> added.) (Ex. "C to Garchie Decl., p. 26 and 27).

12    On its face, the Nu-Kote counterclaim referred *exclusively* to claims *and* damage

13 occurring entirely within the United States. (Ex. "C" to Garchie Decl., ¶¶ 72, 132, 139, 145,

14 157-163, 168-169, 171-172, 174, 177, 182, 187 and 192).

15             **2.    The 1998 Tender**

16    Not until June 30, 1998, by which time many millions had been spent by H-P in the

17 all-out prosecution of its original claims against Nu-Kote, did H-P see fit to advise ACE

18 PCIC of Nu-Kote's counterclaim against it, and demand a defense.

19    For many months following that tender, HP steadfastly resisted every effort on the

20 part of ACE PCIC to carry out its coverage investigation, retreating behind the veil of

21 secrecy that surrounded the underlying litigation. See, Correll Decl. ¶¶10 through 32. On

22 February 18, 1999, HP filed this declaratory relief action against ACE PCIC. Only in April

23 1999, when HP filed a motion for summary judgment regarding the duty to defend, did it

24 disclose that Nu-Kote had previously filed a Fourth Amended Counterclaim, providing a

25 redacted copy of that pleading in support of its coverage claims.

26             **3.    The Undisclosed Facts of the Underlying Action**

27    In 1999, when it filed this lawsuit, and when it sought adjudication of the duty to

28 defend, H-P was withholding more than merely the handful of phrases that it had redacted

1    from the Nu-Kote counterclaim. Evidence first discovered in January 2002 shows that, from

2    the beginning, HP had facts in its possession that was vital to the coverage investigation of

3    ACE PCIC, and which was directly responsive to the questions posed to it time and time

4    again. Those facts, if known, would have allowed ACE PCIC to defeat HP's duty to defend

5    motion. However, because of HP's stonewalling, neither ACE PCIC nor the Court possessed

6    the pertinent documents when HP's summary adjudication motion was heard and the Court's

7    August 24, 1999 duty to defend ruling.

8         The evidence that has been discovered since the August 24, 1999 ruling

9    unequivocally shows that the Nu-Kote counterclaim was limited to the United States, both

10   with respect to acts of unfair competition, and all damages flowing therefrom.

11        One of the most revealing documents from the Underlying Action was this Court's

12   August 27, 1997 ruling—issued in the Underlying Action almost a year before tender of the

13   Nu-Kote counterclaim—on Nu-Kote's request to expand the jurisdiction of the initial

14   pleadings by the filing of a Motion for Extraterritorial Application of the Lanham Act.

15   There, the Court ruled that the Lanham Act could not be applied extra-territorially because

16   no evidence was presented by Nu-Kote that it competed with HP outside the United States.

17   See, Ex. "D" to Garchie Decl. This ruling was not challenged by Nu-Kote, and became final

18   and law of the case. *Royal Insurance Company of America v. Quinn-L Capital Corporation*,

19   3 F.3d 877, 881 (5th Cir. 1993) [the law of the case doctrine applies to matters of law

20   decided in the context of granting or denying a preliminary injunction]; *Price v. Kramer*,

21   200 F.3d 1237, 1244 (9th Cir. 2000). Nu-Kote never challenged Judge Ware's decision to

22   limit the preliminary injunction to the United States. As of the date of the tender, there was

23   no extra-territorial claims within the scope of Nu-Kote's allegations against HP. *Hawksbill*

24   *Sea Turtle v. Federal Emergency Management Agency* (3rd Cir. 1997) 126 F.3d 461

25   [findings made in preliminary injunctions can have preclusive effect if the findings are

26   sufficiently firm and if the opinion could have been or actually was appealed.]

27        Although the extraterritoriality ruling was provided to ACE PCIC before this Court's

28   August 24, 1999 ruling, ACE PCIC had been denied other key documents pertaining to the

1  Underlying Action, and had no reason to know that Nu-Kote had declined to appeal this

2  issue and had abandoned any extra-territorial claims. Thus, a vital fact was not before this

3  Court when it decided HP's motion for summary adjudication of the duty to defend on

4  August 24, 1999:  that as of the date of tender or thereafter, no evidence was, or would be,

5  proffered by Nu-Kote in the Underlying Action of advertising injuries outside of the United

6  States.

7        Other crucial evidence of the purely domestic scope of Nu-Kote's claims remained in

8  a shroud of secrecy as of the date of this Court's prior adjudication of the duty to defend.

9  The August 10, 1998 Opening Expert Report of Robert E. Hall, an expert retained by Nu-

10  Kote, contained that the geographical area encompassed by Nu-Kote's various claims was

11  limited to the United States. (Ex. "E" to Garchie Decl., p. HP4-11624, ¶68.)  Another Nu-

12  Kote expert, damages expert Philip Y. Rowley, comprehensively analyzed Nu-Kote's

13  damage claim in a September 15, 1998 report.  Mr. Rowley concluded that the relevant

14  market was "the U.S. domestic after market for replacement ink supplies, both cartridges and

15  refill systems, for HP ink-jet printers." (Ex. "F" to Garchie Decl., p. HP4-11566, ¶7.)

16        Similarly, critical motions and discovery responses by Nu-Kote—which had been

17  made available to ACE PCIC in August 1999—serve to categorically delineate the

18  geographical scope of the counterclaim asserted in the Underlying Action.  In Nu-Kote's

19  counterclaim, Nu-Kote claims that the alleged injuries occurred *in the United States*.  (Ex.

20  "C" to Garchie Decl.)  In its opposition papers to summary judgment motions and its

21  discovery responses, Nu-Kote purported to set forth "all" evidence supporting its claims of

22  damages against HP; and at no time did Nu-Kote articulate an allegation, much less hint at a

23  scintilla of evidence, that any advertising injury occurred outside of the United States.

24        Indeed, in the course of the Underlying Action, *both* Nu-Kote and HP objected to

25  discovery seeking "information concerning [their] business and rights outside the United

26  States." (Exs. "G", "H", "I", "J", "K", "L", and "M" to Garchie Decl.)  Both parties objected

27  to any discovery seeking information beyond what was at issue in the case—alleged

28  advertising injuries occurring in the United States.

1    Throughout the underlying action, HP's statements were consistent only with a view

2 of Nu-Kote's claims being confined to the domestic market.  In a motion to compel that HP

3 filed against Nu-Kote on July 6, 1998, HP admitted that Nu-Kote's damages should be

4 calculated from "Nu-Kote's monthly units, sales, margins and costs on a product-by-product

5 basis for all Nu-Kote's HP-related ink-jet products manufactured and/or sold in the United

6 States." (Ex. "N" to Garchie Decl., p. HP4-11059:18-24.)  In Nu-Kote's motion to compel

7 against HP, Nu-Kote sought discovery of "information concerning the number of cartridges

8 HP sold *in the United States* and revenues gained thereby" as what was necessary to evaluate

9 Nu-Kote's damages claims.  (Ex. "O" to Garchie Decl., p. HP-18801:4-6 (emphasis added).)

10    On February 28, 1999, HP filed a motion for partial summary judgment in the

11 Underlying Case regarding Nu-Kote's conspiracy claim in which HP again admitted that the

12 geographical boundary to Nu-Kote's anti-trust claims consisted of the United States.  (Ex.

13 "P" to Garchie Decl., p. HP-20101, fn 3.)  HP also filed motions regarding the "sham

14 litigation" issue and the "bulk ink delivery systems" issue in the Underlying Action in which

15 HP acknowledged and supported Nu-Kote's claims that the relevant after market at issue in

16 the Underlying Action was the after market for ink re-supply products sold to consumers

17 owning various HP printers "sold and used *in the United States*." (Exs. "Q", p. HP4-28140,

18 fn3, and "R", p. HP4-31340:3-7, to Garchie Decl. (emphasis added).)

19    An important document in the Underlying Case—also unavailable to ACE PCIC

20 when HP filed its duty-to-defend motion—was published by Nu-Kote's Digital Imaging

21 Division in February 1994; that document, which fully described the relevant market for Nu-

22 Kote's products, mentioned only the U.S. market.  (Ex. "S", p.HP3-11977, to Garchie Decl.)

23 Nu-Kote observed in that, in contrast to other ink jet cartridge refill companies competing in

24 Europe, Nu-Kote was in competition in the United States.  (Ex. "S", p. HP3-11979, to

25 Garchie Decl.)  Finally, the document described Nu-Kote's "competition" as a company who

26 is a "major supplier into the United States" ink jet after market.  (Ex. "S", p. HP3-11999, to

27 Garchie Decl.)  The document mentions not a single Nu-Kote competitor outside the U.S.

28

ODMA\PCDOCS\docs\271331\1
ACE PCIC'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MSJ  REGARDING ABSENCE OF DUTY TO DEFEND HP
Case No. C-99-20207 JW

1    The evidence of exchanges of documents, motions, expert reports and discovery

2  requests and responses in the Underlying Action is uniform.  It is consistent to a letter with

3  the complete absence from the Nu-Kote counterclaim (amid massive detail alleged regarding

4  HP's conduct and the damages caused thereby) of any suggestion that Nu-Kote's damages

5  arose out of any conduct outside the U.S., or that Nu-Kote suffered damage outside the

6  country.  Any thought that Nu-Kote may have entertained to extend the scope of its litigation

7  outside U.S. borders evaporated when Nu-Kote's motion to impose an injunction against HP

8  extended on a worldwide basis was defeated in 1997 and Nu-Kote abandoned any claim

9  based on extraterritorial conduct or damages suffered abroad.

10  **III.    RULE 56 REQUIRES HP TO PROVIDE EVIDENCE OF DAMAGE WITHIN**

11  **THE POLICY TERRITORY.**

12    Under the Federal Rules, the insured has the burden to show that the underlying claim

13  may fall within policy coverage.  *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins.*

14  *Group* (1996) 50 Cal.App 4th 548, 556.

15    F.R.C.P. 56(e) states:

16    When a motion for summary judgment is made and supported as
      provided in this rule, an adverse party may not rest upon the mere
17    allegations or denials of the adverse party's pleading, but the
      adverse party's response, by affidavits or as otherwise provided
18    in this rule, must set forth specific facts showing that there is a
      genuine issue for trial. If the adverse party does not so respond,
19    summary judgment, if appropriate, shall be entered against the
      adverse party.

20

21    When no evidence is presented to defeat a summary judgment motion, the motion

22  must be granted.  *Celotex Corp. v. Catrett* (1986) 477 U.S. 317.  In *Celotex*, the Supreme

23  Court held that the moving party' initial burden may be discharged "by 'showing'—that is,

24  pointing out to the district court—that there is an absence of evidence to support the

25  nonmoving party's case." *Celotex*, 477 U.S. at 325.  Once that burden is discharged, the

26  party opposing the motion is required to "go beyond the pleadings and by [its] own

27  affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'

28

1  designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at

2  324.

3      There were no allegations, much less any evidence, suggesting an advertising activity

4  or that an advertiser's liability offense occurred in the "policy territory" and caused damage

5  in the "policy territory." Under *Celotex*, HP must produce evidence showing that the

6  counterclaim alleged in the Nu-Kote action sought damages for a covered claim in the policy

7  territory. This burden cannot be discharged because no such evidence exists.

8  **IV.   REVERSAL OF THE 1999 SUMMARY ADJUDICATION IS MANDATED BY**

9        **THE COMPILATION SINCE 1999 OF A COMPLETE AND ACCURATE**

10        **FACTUAL RECORD.**

11      The showing made by ACE PCIC—of the complete absence of evidence in the record

12  of a basis for a finding of potential coverage as of HP's tender—is sufficient to require the

13  granting of the motion. In *Liberty Mutual Ins. Co. v. Superior Court (Jensen-Kelly)* (1997)

14  58 Cal.App.4th 617, the court held that a court may reverse a prior "duty to defend" ruling

15  without satisfying the requirements for motions for reconsideration under C.C.P. section

16  1008. *Liberty Mutual* 58 Cal.App.4th at 619. In that case, as here, the court pointed out that

17  an insurer might be forced to oppose an insured's "duty to defend" motion before the insurer

18  has had sufficient opportunity to investigate the coverage issues. *Liberty Mutual* 58

19  Cal.App.4th at 622, citing, *Haskel, Inc. v. Superior Court* (1995) 33 Cal.App.4th 963. That

20  temporary disability cannot handcuff insurers going forward; insurers must be permitted to

21  "thereafter continue to search for and develop evidence that will ultimately enable them to

22  conclusively defeat [the insured's] coverage claim." *Id*. As the Liberty Mutual court noted,

23  an interlocutory adjudication of the duty to defend in favor of the insured is "ephemeral" and

24  can be reversed at any time that the insurer can conclusively eliminate the potential for

25  coverage. *Id*. at 622. Under *Liberty Mutual*, with the Court finally in possession of complete

26  factual record, an adjudication that no duty defend had ever arisen is permissible—and, in

27  this case, required.

28

1    **V.     SPECULATION IS NOT A SUBSTITUTE FOR THE REQUIREMENT THAT**

2    **THE INSURED MUSTER EVIDENCE OF A POTENTIAL FOR COVERAGE.**

3    The 1999 adjudication of the duty to defend also founders on a basic principle of

4    California insurance law:  in the absence of a potential, based on allegations of the complaint

5    or facts outside the complaint, that the claim in question falls within a policy's insuring

6    agreements, mere speculation that such evidence might materialize is insufficient to create a

7    duty to defend.

8    Nu-Kote filed four amended counterclaims in the underlying action, with five separate

9    pleadings amassing almost 1,000 paragraphs of allegations against HP.  They contain not a

10   single allegation of damage to Nu-Kote outside the U.S.  After Nu-Kote abandoned its effort

11   in 1977 to expand the scope of an injunction beyond the United States, there was no nexus to

12   the ACE PCIC policy territory left in the case for Nu-Kote to pursue.  The Court's

13   conclusion that Nu-Kote could have been claiming damage in the United States based on

14   HP's extraterritorial acts was based upon speculation that although no such acts were in fact

15   asserted, the theoretical possibility remained that they might be.

16   It is settled law that a duty to defend cannot be based upon unpleaded claims that may

17   one day be asserted.  *Gunderson v. Fire Insurance Exchange* (1995) 37 Cal.App.4th 1106;

18   *National Union Fire Insurance Company of Pittsburgh, PA v. Siliconix Incorporated* (N.D.

19   Cal. 1989) 726 F.Supp. 264.  In *Gunderson*, the insured argued that its insurer should predict

20   that a "quiet title" lawsuit could evolve into a suit seeking covered property damage,

21   requiring a defense to be provided.  The court rejected the claim that an insurer is required to

22   speculate about unpled claims whose possible available to the plaintiff were drawn from

23   extrinsic evidence:

24           [N]one of the allegations concerning damage to the fence, as
             found in the several letters of Ferrando's attorney and in her
25           responses to discovery requests, were ever incorporated in her
             complaint against appellants.  Ferrando's attorney himself stated
26           in a declaration under penalty of perjury that he prepared both the
             original Ferrando complaint and the first amended complaint;
27           that "[n]either of these pleadings alleges claims involving
             property damage or seeks damages for property damage"; and
28           that "[a]t no time did I seek to amend these pleadings to allege

ODMA\PCDOCS\docs\271133\1                                                10

ACE PCIC'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MSJ  REGARDING ABSENCE OF DUTY TO DEFEND HP
Case No. C-99-20207 JW

such claims or indicate that I intended to do so." It is clear that
any such allegations would have conflicted with Ferrando's
claims of title to the right-of-way based on appellants'
abandonment. In context, Ferrando's own interrogatory
responses, statements in her deposition, and statement of
undisputed fact regarding the removal of the fence were
concerned either with establishing the time period for her claim
of adverse possession through the obstruction of the easement by
the fence itself, or were made in response to appellants' own
attempts to establish that they had not abandoned the easement.
*Gunderson* at 1116, emphasis in original.

The *Gunderson* court followed "the rule that insureds themselves may not manufacture coverage by speculating about unpled third party claims." *Id.* at 1117.

Similarly, in *National Union Fire, supra*, the policyholder *National Union Fire* argued that under *Gray v. Zurich* (1996) 65 Cal.2d 263, National Union was obligated to defend a patent infringement case because the amount of damages sought by the underlying claimant indicated that potentially covered claims could be asserted. The court disagreed, holding that an insurer need not wait indefinitely for covered claims to be asserted, when clearly none have been asserted and none will likely be:

> In contrast to Gray, neither the numerous complaints filed in the
> patent suit nor any of Siliconix's declarations filed in the present
> action indicate that potentially covered claims will be adjudicated
> in the patent suit.... IRC's complaint against Siliconix in the
> patent suit presently asserts a claim for infringement. It is the
> fourth such complaint. In none of the previous complaints which
> IRC has filed has it asserted any other type of claim. As of the
> date of the summary judgment hearing (September 29, 1989), the
> trial of the patent suit was to begin in less than a week. Thus,
> IRC seems unlikely to amend its complaint to include covered
> claims. . . .

> The *mere possibility* that IRC might assert claims against
> Siliconix which are covered by Siliconix's insurance policies, at
> least where such a possibility is extremely remote and not
> suggested by either the complaint in the underlying action nor by
> facts known to the insurer and the insured, is not a sufficient
> ground upon which to deny National Union's motion for
> summary judgment. *Siliconix* at 272 (emphasis added).

In *Panko Architects, Inc. v. St. Paul Fire and Marine Ins. Co.* 1996 U.S. Dist. LEXIS 4814 (N.D. Cal.), the insured was sued for various non-covered causes of action arising from the sexual harassment of an employee. There was evidence that the relationship was consensual, and therefore the insured claimed that this extrinsic evidence could lead to a

1   negligent infliction of emotional distress claim that would be covered.  However, the court

2   rejected this argument, holding that it was improper to speculate about an unpled claim:

3      Panko does not produce any evidence that Kuschel either
   contemplated amending or intended to amend her complaint to

4      add a claim for negligence.  Instead, he relies on ambiguities in
   the complaint and Panko's ambiguous relationship with Kuschel

5      to support a claim for negligent infliction of emotional distress.
   Moreover, the settlement of the Kuschel complaint eliminates the

6      possibility that such a claim will in fact be added.  *Panko* at 19-
   20.

7

8   *See Zelda v. Northland Insurance Company* (1997) 56 Cal.App.4th 1252, 1262-1263

9   ["Appellants can escape the scope of the exclusion here only by speculating [as to] conduct,

10   contrary to the complaints' allegations and the statements in the police report.  However,

11   '[a]n insured may not trigger the duty to defend by speculating about extraneous 'facts'

12   regarding potential liability or ways in which the third party claimant might amend its

13   complaint at some future date'], quoting *Gunderson v. Fire Ins. Exchange* (1995) 37

14   Cal.App.4th 1106, 1114 (emphasis in original); *see also Barragan v. Allstate Ins. Co.* 1998

15   U.S. Dist. LEXIS 19913 (N.D. Cal.) [held improper to speculate that a complaint alleging a

16   dispute over an easement could be interpreted as seeking damage to property when the

17   complaint itself did not state a claim for covered damage]; *Olympic Club v. Those Interested*

18   *Underwriters At Lloyd's London* (9th Cir. 1993) 991 F.2d 497 [speculation that a covered

19   claim will be alleged cannot trigger coverage]; *Diesel v. The Travelers Insurance Company*

20   1997 U.S. Dist. LEXIS 4288 (N.D. Cal.), at 7-8 [where the insured's complaint for breach of

21   lease did not mention property damage, court rejected as speculation the insured's argument

22   that a letter and an arbitration statement accusing the insured of not properly maintaining the

23   property proved that the claimant was seeking property damage].

24      There was no support in the record for HP's speculation in 1999 that the package

25   inserts caused harm to Nu-kote in the "policy territory."  When the counterclaim was

26   tendered, there was no room to conclude that Nu-kote claimed damage in the "policy

27   territory" by any advertising offense committed by HP in the "policy territory" during the

28   policy period.  Like the underlying claimant in *Gunderson*, Nu-kote never incorporated into

12

1    its counterclaim any allegations invoking the coverage of the policy at issue. Exactly as in

2    *National Union Fire*, the claimant had filed multiple amended pleadings, never once alleging

3    a covered claim; coverage could not be based on the "mere possibility" that such an

4    allegation might some day materialize.

5         Accordingly, any surmise by the Court that "Nu-Kote could possibly claim damages

6    to domestic business based, at least in part, on HP's extraterritorial acts," (Ex."D", page 10,

7    to Garchie Decl.), rested not on the allegations within the claimant's contemplation but on

8    the mere possibility of what might be pleaded. The cases preclude the imposition of a duty

9    to defend based on the "mere possibility," as the *National Union Fire* court expressed it, that

10   unpled allegations are not strictly foreclosed by the literal terms of the pleadings before the

11   court. Despite this, the 1999 summary adjudication appears to rest squarely on the

12   observation that Nu-Kote's counterclaim painted with a "broad brush." (Ex. "D", page 8, to

13   Garchie Decl.) This strongly suggests that the Court was laboring under the

14   misapprehension created by HP—in direct contravention to the California rule—that all

15   ambiguities in a pleading should be construed in favor of a finding that the pleading allows

16   room for the "mere possibility" that it might some day be amended to support a potentially

17   covered claim. In this respect, the 1999 summary adjudication amounted to no more than

18   impermissible speculation, for which there is no room under California insurance law or the

19   Federal Rules. The 1999 adjudication should not stand.

20   **VI.   THE LEGAL FOUNDATION FOR THE 1999 RULING HAS BEEN**

21   **UNDERMINED BY THE CALIFORNIA COURTS.**

22        **A.   The Court Applied an Erroneous Construction of "Policy Territory" and**

23        **"Occurrence."**

24        California case law decided after this Court's previous ruling supports a finding that

25   the "policy territory" in the ACE PCIC policy was not invoked. There was no covered

26   offense or damage in the "policy territory." There was no damage in the United States

27   caused by an offense in the "policy territory" as this Court's August 24, 1999 order

28   hypothesized. Finally, this motion addresses the issue that the package inserts relied on by

1   this Court as potentially forming the basis of an advertiser's liability claim in the "policy

2   territory" do not constitute advertisements. For all of those reasons, this motion is properly

3   before this Court as a motion for summary judgment.

4          The ACE PCIC policy territory "shall be worldwide for claim or suit resulting from

5   an occurrence outside the United States of America, its territories or possessions, Canada,

6   Cuba and North Korea." Clearly and unambiguously, occurrences taking place within the

7   United States are not covered by the ACE PCIC policy.

8          California law provides that a policy should be interpreted as a whole with each

9   provision giving meaning to the other. See *Titan Corp. v. Aetna Cas. & Sur. Co.* (1994) 22

10  Cal.App.4th 457, 474. Here, the insurance contract plainly states that it is a "FOREIGN

11  POLICY." To further give meaning to that intent, the "policy territory" provision requires

12  "an occurrence outside of the United States of America." There is no basis in this policy for

13  an objectively reasonable expectation of coverage for claims utterly lacking in a foreign

14  nexus.

15         Judge Williams opined that, for coverage to be triggered, only the "offense" giving

16  rise to advertiser's liability needed to take place in the policy territory, and that coverage was

17  triggered even if the resulting damage occurred outside of the policy territory (i.e., in the

18  United States). However, this hair-splitting view has since been rejected in California. The

19  use of the word "occurrence" as it appears in the "policy territory" provision unambiguously

20  requires that not only the covered offense, but more importantly, *the damage as well*, must

21  be shown to have taken place outside the U.S. See *Industrial Indem. Co. v. Apple Computer,*

22  *Inc.* (1999) 79 Cal.App.4th 817, 839.

23         In *Industrial Indemnity*, which was published after the August 24, 1999 ruling, the

24  contract at issue defined the policy territory as the United States; the alleged advertising

25  injury in question occurred in England. Finding that the insured was unable to set forth any

26  evidence that a covered offense took place and caused damage in the United States, the court

27  held that there was no coverage:

28

---

1

2

3

4

5

6

The trial court ruled that "[u]nder Policy Type II, it is clear there is no coverage, as the insured's covered activity must be an offense occurring in the United States. In the present case, the offense-giving rise to the advertising injury was the use of the Apple name on products sold by Apple Computer in England that, either by virtue of the noncompetition agreement or by the virtue of some other statutory or common law protection, should only have borne the Apple name if sold by Apple Records. The Court concludes such an 'offense' occurred at the time of promotion and sale in England and could not be construed to be any activity occurring in the United States . . . .

7

8

9

10

We believe the trial court correctly construed Industrial's Type II policies . . . Apple Corp's claims for injunctive relief have no bearing on our analysis since Apples' insurance policies covered only claims for damages arising from advertising injury. ***Apple identifies no such damages Apple Corps might have suffered in North America.*** [Italics in original; boldface added.]

11  79 Cal.App.4th at 838-839.

12      The rule, stated in *Industrial Indem.*, that both an unfair competition offense and the

13  damage must occur in the "Policy Territory" echoes a long-standing principle of California

14  insurance law. For instance, in *Remmer v. Glens Falls Indem. Co.* (1956) 140 Cal.App.2d

15  84, 88, the courts recognized the "general rule," that the "time of occurrence . . . is not the

16  time of the wrongful act was committed, but the time when the complaining party was

17  actually damaged." ACE PCIC's policy does not provide that Advertiser's Liability

18  coverage is triggered by the mere presence of an enumerated offense that occurs in the policy

19  territory, *i.e.,* outside the U.S. Rather, the policy provides coverage for "an occurrence"

20  outside the country. As in *Remmer,* there is no occurrence in the territory without damage

21  there, as well.

22      In *American Cyanamid v. American Home Assurance Company* (1994) 30

23  Cal.App.4th 969, the Court concluded that the triggering event for an advertising injury

24  claim was the injury, not the act of unfair competition. The insured had manufactured

25  chemical light products since 1967. In the underlying action, Chemical Device Company

26  ("CDC") had sued the insured on various causes of action including unfair competition.

27  CDC, also a maker of chemical light products, had existed only since 1986. The insured had

28  eight separate primary policies during the period from 1966 to 1986, all of which provided

15

DDMA\PCDOCS\docs\271331
ACE PCIC'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MSJ REGARDING ABSENCE OF DUTY TO DEFEND HP
Case No. C-99-20207 JW

1   coverage for advertising injury, which was defined to include unfair competition. The

2   policies, however, each had different wording. The insurers moved for summary judgment,

3   arguing that the offense of unfair competition could not have been committed before 1986,

4   because CDC did not exist as a competitor of the insured before that time.

5        The *American Cyanamid* court separated the policies into four different categories.

6   The policy in one of those categories used policy language similar to that of ACE PCIC.

7   Like the policy issued by ACE PCIC in this case, the American Cyanamid policy provided

8   coverage for advertising injury "to which this insurance applies arising from an occurrence

9   within the policy territory." The American Cyanamid policy (like the ACE PCIC policy

10  here) contained no definition of the term "occurrence;" nor was there any other temporal

11  limitation on coverage. The American Cyanamid policy (again, like the policy in this

12  matter) required that the occurrence need only take place "within the policy territory." The

13  definition of advertising injury in the American Cyanamid policy was: "injury or damage

14  arising out of one or more of the following offenses . . . unfair competition . . . ." The policy

15  in this matter also provides that coverage is triggered only by "damages occurring in the

16  course of advertising activities arising out of . . . unfair competition."

17       Reviewing the policy in its entirety, the *American Cyanamid* court concluded:

18              Reading the policy as a whole in its ordinary and popular sense,
                we uphold the trial court's interpretation of this language to mean
19              that the triggering event is the injury, not the act. Accordingly,
                as no injury to CDC occurred during the policy period, the trial
20              court correctly found no duty to defend.

21  *Id.* at Page 981.

22       The language of ACE PCIC's policy is to the same effect. It requires "damages

23  occurring in the course of advertising activities arising out of . . . unfair competition" before

24  coverage can be established. The only logical interpretation of this language, when read in

25  the context of the policy as a whole, is that both the unfair competition and the resulting

26  damage arising out of the insured's advertising activities are required to have occurred

27  within the policy territory—that is, in this case, outside the United States. Since the facts

28  cited above demonstrate that Nu-Kote's claims involve damages occurring only in the United

1   States, and are devoid of any allegation of tortious conduct outside the country, ACE PCIC's

2   "policy territory" is never invoked.  As a matter of law, ACE PCIC affords no potential

3   coverage for the Underlying Action.

4       **B.**    **The Court Applied an Erroneous Construction of "Advertising**

5               **Activities."**

6         The factual and legal distinction between advertising activities (as that term is used in

7   an insurance policy), and marketing activities is well established in California case law and

8   cases decided throughout the United States.  The courts have drawn a sharp distinction

9   between the concept of promoting a product (advertising) and soliciting more business

10  (marketing).  Furthermore, courts have recognized that advertising activities are separate

11  from the actual product.  Thus, even friendly and self-promotional instructions and warnings

12  (like the HP insert) are held not to constitute advertisements when they are contained within

13  a product and only available after a product is purchased.

14        The HP package inserts were included in the HP Inkjet cartridge boxes distributed

15  worldwide during ACE PCIC's policy period.  The inserts contained the following warning

16  to the consumer:

17            CAUTION!  Damages to the printer or printer cartridge resulting
          from modifying or refilling the print cartridge is not the

18            responsibility of Hewlett Packard.

19      The insert also advised the buyer:

20            You're about to give your HP Inkjet Printer a "tune-up."  How?
          With every new HP 51626A Print Cartridge, you are installing a

21            brand new Inkjet nozzles, electrical contacts and flex circuitry
          that keep performance at its peak.  You are also getting HP

22            patented ink that's specifically formulated to work with printer
          and cartridge components for optimum print quality, water

23            resistance and clog-free operation.  So "tune-up" with new HP
          51626A Print Cartridges and enjoy great performance . . . now

24            and down the road.

25  (Ex. "T" to Garchie Decl.)

26        In California, the courts have defined "advertising" to mean the widespread

27  dissemination of promotional material to the general public.  *See, e.g., El-Corn Hardware,*

28  *Inc. v. Fireman's Fund Ins. Co.* (2001) 92 Cal.App.4th 205, *217* ["The generally accepted

1   definition of 'advertise' as used in CGL policies is the act of calling public attention to one's

2   product through widespread promotional activities."] In *Monumental Life Insurance*

3   *Company v. United States Fidelity & Guaranty Company* (Md. App. 1993) 617 A.2d 1163,

4   the court held the term "advertising" as used in a liability policy "encompasses only the

5   'public' sense of the word." *Id.* at 1173. There, the insured was charged with, *inter alia,*

6   making defamatory statements to the plaintiff's current customers. The court held these one-

7   on-one sales presentations, despite their volume, (the insured re-wrote around 10,000 of the

8   underlying plaintiff's life insurance policies) were not "public," and therefore not

9   "advertising." With respect to the HP package inserts, although they did receive widespread

10  distribution, the *Monumental Life* decision establishes that each insert "is neither public nor

11  advertising." *Monumental Life, supra,* at 1173 [internal quotation marks omitted].

12      In order to qualify as "advertising activity," the "advertisement" *must* be widely

13  disseminated to the general public. The Merriam-Webster dictionary defines "public" as

14  "exposed to *general* view. . . accessible to or shared by *all* members of the community."

15  [Emphasis added.] The California Supreme Court has noted that "[m]ost of the published

16  opinions hold that 'advertising' means widespread promotional activities directed to the

17  public at large." *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1277, fn 9.

18      Unlike the picture of the cartridge on the box, the package insert at issue is by

19  definition located *inside* the box, hidden from view. A member of the general public is

20  unable to see the message and, therefore, unable to be persuaded by it, until *after purchase*.

21  In other words, the message is *not* directed at the general public, as required.

22      At most, package inserts constitute one-on-one sales solicitations directed to the

23  purchaser of the replacement cartridge. Several courts, including the court in *Peerless*

24  *Lighting Corp. v. American Motorists Insurance Co.* (2002) 82 Cal.App.4th 995, have held

25  that one-on-one solicitations do not constitute "advertising." Other jurisdictions reach the

26  same result. In *Solers, Inc. v. Hartford Casualty Insurance Co.* (E.D. Va. 2001), 146

27  F.Supp. 2d 785, the court held that certain proposals that were promotional, did not

28  constitute "advertising activity." The proposals were submitted as bids to two potential

ODMA\PCDOCS\docs\271331

18

ACE PCIC'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MSJ REGARDING ABSENCE OF DUTY TO DEFEND HP
Case No. C-99-20207 JW

1   clients of the insured. Relying on *Monumental, supra,* the court found that even though the

2   proposals were promotional, they were not advertising because:

> [t]he proposals are more appropriately characterized as
> 'solicitations,' rather than advertisements. [¶] Advertising and
> solicitation are mutually exclusive . . . advertising and
> solicitation differ because advertising must be of a public nature .
> . . [the insured] publishes its proposals to a single customer at
> one time; therefore, the submission of proposals constitute
> solicitation. *Id.* at 795.

7   California law relating to one-on-one marketing efforts was also analyzed in *Zurich*

8   *Insurance Co. v. Amcor Sunclipse North America* (7th Cir. 2001), 241 F.3d 605. There, the

9   insured was sued for breach of contract and trade secret misappropriation. The insured

10  sought coverage of the lawsuit as an "advertising injury." The court declined to find

11  coverage for the lawsuit. In doing so, the court wrote, "Recent years have witnessed a surge

12  of claims that one or another breach of contract or business tort that to a normal reader has

13  nothing to do with advertising nonetheless should be classified as 'advertising injury' under

14  policies similar to [the insurer's]." *Id.* at 607. The insured attempted to argue that California

15  law provides that one-on-one solicitations can constitute "advertising activity." The court

16  disagreed. The court recognized that, while California law has not dispositively addressed

17  the issue of one-on-one solicitation, there are no cases that provide support for an argument

18  suggesting one-on-one solicitations are "advertising activities." *Id.* at 608. The court relied

19  in part on *Peerless Lighting Corp. v. American Motorists Insurance Co.* (2000) 82

20  Cal.App.4th 995, noting that the *Peerless Lighting* decision does not "suggest that California

21  will sail a lonely course, tacking away from the position of other states of a meaning of

22  'advertising.'" *Id.* The court held, that under California law, a single one-on-one solicitation

23  cannot constitute "advertising activity."

24  The 1999 summary adjudication of the duty to defend erroneously deemed the

25  package inserts on which HP's coverage claims are premised—none of which amounted to

26  more than one-on-one solicitations, and none of which distributed to the "public" or anyone,

27  for that matter, other than an after-the-fact consumer—to constitute "advertising." In

28  holding package inserts to constitute "advertising activities," the 1999 adjudication is

1  inconsistent with California law interpreting language identical to that of the ACE PCIC

2  policy, and should be vacated.

3  **VII.    CONCLUSION**

4       For all of the foregoing reasons, ACE PCIC respectfully requests that this Court rule

5  that its policy imposed no obligation to defend the Underlying Action.

6  Dated:     July 23, 2002                      **CORRELL, GARCHIE & EDWARDS LLP**

7

8                                               By: _____

9                                               JANELLE F. GARCHIE
                                                Attorneys for Defendant, ACE
                                                PROPERTY AND CASUALTY
10                                              INSURANCE COMPANY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ODMA\PCDOCS\docs\271331\1
ACE PCIC'S MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING MSJ REGARDING ABSENCE OF DUTY TO DEFEND HP
Case No. C-99-20207 JW

| | |
|---|---|
| 1 | RE:         [Filed under seal pursuant to Court Order dated 3/24/99] <br> *Hewlett Packard Co. v. CIGNA Property & Casualty Ins. Co., et al.* |
| 2 | VENUE:    U.S.D.C., Northern District of California, San Jose Division |
| 3 | CASE NO.:   C-99-20207 JW |

### PROOF OF SERVICE

I am employed in the County of San Diego, State of California. I am over the age of eighteen (18) years and not a party to the within action; my business address is: 550 West C Street, Ste. 500, San Diego, CA 92101. On July 29, 2002, the following documents described as:

**ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY ADJUDICATION OF THE ABSENCE OF A DUTY TO DEFEND HEWLETT-PACKARD COMPANY (MSJ NO. 6)**

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

David A. Gauntlett                          Attorneys for Plaintiff
James A. Lowe                                HEWLETT-PACKARD COMPANY
GAUNTLETT & ASSOCIATES          Phone: (949) 553-1010
18400 Von Karman, Suite 300        Fax:   (949) 553-2050
Irvine, CA 92612

☐   **(BY MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence by mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage fully prepaid at San Diego, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐   **(BY FACSIMILE)** I caused such document to be delivered by facsimile transmission to the offices of the addressee.

☒   **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand to the offices of the addressee.

☐   **(BY OVERNITE EXPRESS)** I caused such envelope to be delivered by OverNite Express to the offices of the addressee.

☐   **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒   **(FEDERAL)** I declare that I am employed in the offices of a member of this Court at whose direction the service was made.

Executed on July 29, 2002, at San Diego, California.

Lesli Miller