# EXHIBIT 78

1  Hon. Peter G. Stone (Ret.)
   JAMS
2  160 W. Santa Clara St.
   Suite 1150
3  San Jose, CA 95113
4  408-288-2240
   408-295-5267 (fax)
5

6

7              UNITED STATES DISTRICT COURT

8       NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

9

10

11  HEWLETT-PACKARD COMPANY,        )   Case No. C-99-20207 JW
                                    )   Jams Reference No.  1110005854
12          Plaintiff,              )
                                    )
13  v.                             )
                                    )   REPORT OF SPECIAL MASTER
14  ACE PROPERTY & CASUALTY        )
    INSURANCE CO.,                 )
15                                 )
                                    )
16                                 )
            Defendant.             )
17                                 )
                                    )
18                                 )
19                                 )
20

21

22

23

24

25

26

27

28

EXHIBIT

78

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  BACKGROUND ................................................................. 3

III. DISCUSSION ................................................................. 12

    A.   Fees and Costs Associated with HP's Affirmative Claims ..................13

    B.   Reasonableness.......................................................52

    C.   HP In-house Timekeepers................................................63

    D.   Pre-Judgment Interest .................................................78

    E.   Late Notice..........................................................87

IV.  CONCLUSION.................................................................87

This report of the Special Master is being rendered at the direction of the United States District Court, Northern District of California, San Jose Division, first by order of Hon. Spencer Williams and subsequently by order of Hon. James Ware. After the conclusion of the damages hearing referred to below, the undersigned reviewed and researched all briefing, both pre- and post-hearing, reviewed and studied the entire transcript and each exhibit submitted at the hearing and finally reviewed the entire history of both the underlying litigation and this subject litigation.

Over 100 hours have been spent since the final submission of the briefs of the parties in order to complete the following report. The undersigned feels compelled to avail himself of the opportunity to point out that the parties are most fortunate to have been so ably and vigorously represented by their respective counsel. It was indeed an honor and privilege to work with all counsel. They acquitted themselves in the highest traditions of our system of justice with vigor, energy, professionalism, expertise and the highest degree of ethical conduct, never wavering in the intensity of their advocacy. They are all (and there are many) to be commended.

## I.    INTRODUCTION

This action arises from a comprehensive general liability policy that ACE Property and Casualty Insurance Company ("ACE"), then called Cigna, issued to Hewlett-Packard Inc. ("HP"). The policy, in pertinent part, provided coverage for HP's "Advertising Liability" arising from activities outside the United States from October 1992 to October 1995. In July 1993, Nu-kote International, Inc. ("Nu-kote") began marketing inkjet refill products intended to be used with and to compete with HP inkjet cartridges. In September 1994, HP filed a civil action against Nu-kote, alleging that Nu-kote's products infringed HP's patents, trademarks and trade dress. In November 1994, Nu-kote filed an answer and counterclaim against HP. The

-1-

counterclaim alleged that HP's marketing materials, distributed during the effective period of the policy, contained misrepresentations that caused Nu-kote competitive injury. Four years later, in June 1998, HP tendered the defense of the then third amended counterclaim to ACE. To date, ACE has not accepted or rejected the tender.

HP filed the present action for declaratory relief in February 1999, seeking a declaration as to ACE's obligations under the policy. On August 24, 1999, Judge Williams granted HP's motion for adjudication that ACE owed HP a defense of the underlying action because the Nu-kote counterclaim contained claims potentially covered by the ACE policy. In the summer of 2001, ACE and HP stipulated to an order appointing the undersigned as a Special Master and referring to the Special Master the computation and determination of the monies due to HP from ACE in connection with the defense of the Nu-kote Action. The order provides that the Special Master "shall make a detailed report to the Court, and his report shall specifically make necessary findings of the determination of amounts due to HP including reasonable attorneys' fees and costs."

A damages hearing was held before the Special Master on October 14-18, 2002 and October 28-30, 2002. The parties submitted post-hearing briefs on January 27, 2003. The primary question for the Special Master, and the focus of this report, is whether the approximately $28 million in fees and costs HP incurred in the underlying action - in the post-tender period - were reasonable and necessary to the defense of the Nu-kote counterclaim.

//

//

//

//

## II.   BACKGROUND

### A.   The Nu-kote Action

#### 1. HP's Ink Jet Technology

The genesis of this insurance coverage dispute can be traced back to the mid- 1980's and HP's development of personal inkjet printers. In 1984, HP developed its first inkjet printer, a revolutionary product that allowed high quality low cost printing. HP invested millions of dollars in research and development to create and perfect the inkjet printer and its component parts. In 1984, HP developed the St. Helen's cartridge, the first of HP's printer cartridges that it continues to develop and perfect. The St. Helens cartridge was followed by the Stanley cartridge, and then a series of others. HP designed and intended that its cartridges be discarded after the ink runs dry; they never were intended to be refillable. As inkjet printing has become perfected, the cost of printers has dropped drastically. The cost of inkjet cartridges, however, remains relatively high, and the sale of cartridges generates a billion dollar income stream. Accordingly, HP was highly motivated to protect its intellectual property rights in its inkjet printer cartridge technology.

#### 2. Complaint & Counterclaim

In July 1993, Nu-kote, a company primarily specializing in supplies for computer, fax and other printers, began marketing inkjet refill products intended to be used with HP printing equipment and to compete with HP inkjet cartridges. Nu-kote marketed its products in packages that prominently displayed the HP logo and used HP's color scheme. HP elected to sue Nu-kote without first sending a cease and desist letter. On September 19, 1994, HP filed a complaint against Nu-kote entitled *Hewlett-Packard Company v. Nu-kote International, Inc.*, U.S. D.C. N.D. Cal., Civil Case No. 94 20647 JW, alleging patent infringement, trademark infringement,

1    trade dress infringement, unfair competition and other related causes of action. HP asserted that

2    the "green and white" packaging Nu-kote used to sell its inkjet refill products infringed on HP's

3    trademark. HP also believed that Nu-kote falsely advertised its own refill products as being

4
     approved by HP, and as being less expensive to use than HP cartridges. The complaint sought
5

6    injunctive relief and damages.   At the time the complaint was filed, HP anticipated that Nu-kote

7    would respond by filing a counterclaim.

8         In November 1994, Nu-kote answered HP's complaint and brought a counterclaim

9    alleging invalidity and non-infringement of various HP patents and alleging claims of restraint of

10
     trade, unfair competition and antitrust activity.   The scope of Nu-kote's claims increased
11

12   significantly when Nu-kote filed the Amended Counterclaims in June 1996.   With each

13   amendment, Nu-kote's counterclaim was expanded to allege additional claims for HP to defend.

14   The second amendment, for example, now included new claims of conspiracy and restraint of

15
     trade. Similarly, the third amendment added a new claim of interference with economic
16

17   advantage. The fourth amendment added no new claims, but significantly expanded the factual

18   allegations against HP.

19                                          *3. Counsel*

20        HP retained Pennie & Edmonds ("P&E") to prosecute its suit against Nu-kote. P&E is a

21
     renowned intellectual property firm that HP routinely retained to handle legal issues concerning
22

23   its intellectual property rights. Jonathan Marshall and William Pecau were the principal P&E

24   attorneys assigned to the action. HP also was represented by its in-house counsel. HP

25   subsequently retained Gibson Dunn & Crutcher (GD&C) in 1996 to defend the Nu-kote antitrust

26   counterclaim. Robert Cooper and Peter Sullivan were the principal GD&C attorneys assigned to

27   the action.

28

Nu-kote originally was represented by the Debevoise & Plimpton firm but in 1996 replaced Debevoise & Plimpton by the Coudert Brothers law firm. Ronald Katz was the principal Coudert attorney assigned to the action.

### 4. Pre-Trial Activities

HP required P&E and GD&C to assign substantial numbers of attorneys to the case, including highly experienced senior counsel, as well as numerous associates and paralegals. Senior attorneys billed thousands of hours in the post-tender period. For example, Peter Sullivan, a senior GD&C partner responsible for case supervision and other work, billed more than 3,000 hours. GD&C's pleading index was more than 200 pages long, showing approximately 1,500 pleadings, and it was not complete.

P&E was generally responsible for preparing HP's affirmative case. The intellectual property issues in the case involved highly technical aspects of HP's inkjet technology and required an integration of technical and legal knowledge. GD&C was generally responsible for the defense of the Nu-kote counterclaim. The division of labor is apparent from the trial plans the respective firms prepared. For example, P&E prepared trial plans that identified evidence, proposed testimony and fact witnesses that would be used to prove HP's patent infringement, trademark infringement and false advertising claims. Similarly, GD&C prepared trial plans that tracked the elements and proof that would be needed to establish the defenses to Nu-kote's antitrust counterclaim.

Discovery was taken on an enormous scale. Nu-kote served upon HP multiple sets of interrogatories and requests for admissions, spent 137 days deposing 90 witnesses and filed 23 motions to compel. HP spent 146 days deposing 75 witnesses and filed 16 motions to compel. The discovery motions were complex and required extensive briefing and argument before

-5-

1   adjudication by the Court. "We had so many discovery disputes that Judge Ware . . . told the

2   parties not to file any more without his permission." [Hearing Transcript ("HT") 839:7-10]

3       In addition to the discovery motions discussed above, numerous other pre-trial motions

4   were filed, including motions for preliminary injunction, at least twenty-one motions to dismiss

5   and nearly thirty motions for summary judgment were filed.

6

7       HP also moved to phase the trial such that its affirmative claims were tried before Nu-

8   kote's counterclaim. (Exhibit 2142.) HP argued that "the vast majority of Nu-kote's antitrust

9   allegations are not inextricably related to the patent, trademark and false advertising, unfair

10  competition issues in this case." (Exhibit 2142; HT, 2349:21-24.) The court granted HP's

11  motion to phase the trial, allowing HP's affirmative trademark infringement, false advertising,

12

13  and patent infringement cases to proceed first. At trial, at least twenty-seven motions in limine

14  were filed.

15              *5. Settlement Efforts and Nu-kote's Bankruptcy Petition*

16

17      While the case was pending trial, Nu-kote's financial situation deteriorated significantly.

18  HP made substantial efforts to settle the case, offering dismissal of the claims against Nu-kote,

19  millions of dollars in cash, license rights and an arrangement under which HP would make

20  cartridges for Nu-kote below the cost Nu-kote could get them elsewhere. In mid-1998, HP and

21  Nu-kote's CEO, Shaun Donnelan, negotiated a settlement agreement. However, Ron Katz, Nu-

22  kote's counsel, persuaded the board of directors to reject the proposed settlement based upon his

23  belief that hundreds of millions of dollars could be obtained from HP in the lawsuit. [HT 651:1-

24  19] The Nu-kote board rejected the settlement and fired the CEO for suggesting it.

25

26      In November 1998, Nu-kote filed a Chapter 11 bankruptcy petition in the Middle District

27  of Tennessee and immediately sought relief from the automatic stay to continue its case against

28

HP. In a reversal of the usual position of parties in bankruptcy court, HP (and Nu-kote's insurers who were funding its litigation against HP) opposed lifting the stay. The bankruptcy judge, however, granted Nu-kote's motion and permitted the case against HP to continue.

### 6.  The Trial

HP expended over 3,000 hours in attorney and paralegal time during the eight-week trial. P&E, GD&C and HP's in-house lawyers worked closely to prepare for the trial. The trial staff worked extremely long hours, at times up to 20 hours a day. The joint witness list was 200 pages long, listing hundreds of potential witnesses. HP presented 122 witnesses, Nu-kote 112 witnesses. The Joint Exhibit List was 545 pages long, with 7,593 potential exhibits. Exhibits included massive documents, videotapes, computer animations and demonstratives. Substantial time was spent in dealing with over forty expert reports, expert discovery and preparing for expert testimony at trial. Approximately 19 outside and in house expert witnesses were called by HP at trial.

After prosecution of all the evidence and argument, Judge Ware instructed the jury that the different claims in the case were separate and separable and had to be evaluated individually:

> You may now retire to deliberate on all aspects of the case. I wish to again emphasize that you should decide each claim in this case separately. **The patent, trademark and unfair competition claims are separate and distinct from the antitrust claims.** If you decide that a particular party is entitled to your verdict on any aspect of the patent claims, you should not use that as a basis for deciding for or against that party with respect to the trademark infringement claims or the antitrust claims.

(TT, 7/19/99, Vol. 32, 6363; emphasis added.)

The jury returned a verdict in favor of HP. Following disposition of motions for directed verdict and judgment notwithstanding the verdict, final judgment was entered in favor of HP on February 14, 2000. On February 17, 2000 Nu-kote filed a notice of appeal in the United States Court of Appeals for the Federal Circuit. On April 26, 2000 the appeal was dismissed when the

1   parties reached a settlement. The settlement included a license agreement between HP and Nu-

2   kote.

3                     B.     The Present Action

4                      1. The Policy

5

6       A Comprehensive General and Automobile Liability Policy: Foreign, policy number

7   CXC024869, was issued by ACE to HP effective October 31, 1992 to October 31, 1993. The

8   policy remained in effect without substantial change until October 31, 1995. The policy

9   provided coverage to HP for its "advertising liability" arising from activities outside the United

10   States. More specifically, the policy obligates ACE to pay on behalf of HP all sums which HP

11   shall become legally obligated to pay as damages occurring in the course of HP's advertising

12   

13   activities, arising out libel, slander, defamation, violation of the right of privacy; unfair

14   competition, or infringement of copyright, title or slogan. The ACE policy provides in pertinent

15   part that: "The Company shall have the right and duty, except in such jurisdictions where legally

16   prohibited, to defend any suit against the insured seeking damages…"

17

18                      2. Tender

19       HP tendered the defense of the action to ACE on June 13, 1998, more than three years

20   after being served with the counterclaim. The tender included Nu-kote's second counterclaim

21   (January 19, 1996) and copies of package inserts included in HP inkjet cartridge boxes

22   distributed worldwide during the ACE policy period. The insert stated in a number of languages

23   

24   that "CAUTION! Damages to the printer or print cartridge resulting from modifying or refilling

25   the print cartridge is not the responsibility of Hewlett-Packard."

26       ACE did not render a formal decision on HP's request for a defense, but instead

27   requested more information from HP about the Nu-kote action. ACE's October 9, 1998 letter to

28

HP sought review of interrogatories and responses thereto; motions; deposition transcripts; and documents relating to such issues as the location of HP's conduct and contents of HP's advertising.  On October 27, 1998, HP responded that, due to the terms of the protective order in the underlying action, HP could not give ACE unfettered access to its entire file.  The protective order precluded non-defending insurers from reviewing confidential documents.  HP therefore requested a more narrowly drawn request from ACE.

Between October 1998 and February 1999, the parties exchanged correspondence on the issue of whether HP had provided (or could provide) sufficient documentation to allow ACE to make a coverage determination.  HP did provide some additional documentation to ACE.  ACE, however, continued to request additional documents.  By February 1999, eight months had passed since the tender of the defense to ACE in June 1998, and ACE had neither accepted nor denied the request for a defense.

### 3. The Declaratory Relief Complaint and Relevant Pre-Trial Rulings

HP filed the present action for declaratory relief on February 18, 1999.  The complaint seeks a declaration that:  (1) ACE had a duty to defend HP against Nu-kote's counterclaim; (2) ACE must pay pre-tender and post-tender fees; and (3) ACE must reimburse HP's counsel at the rates charged by that counsel, rather than at the rates normally paid by ACE.  In April 1999, HP filed a motion seeking summary adjudication that ACE owed HP a defense of the underlying action. On August 24, 1999, Judge Williams granted the motion, finding that HP had demonstrated that the Nu-kote counterclaim contained claims potentially covered by the ACE

1   policy.  ACE sought reconsideration of the Court's ruling on the duty to defend.  On June 19,

2   2000, the Court denied the motion for reconsideration.[1]

3           On May 12, 2001, Judge Williams issued an order on a number of summary judgment

4   motions which further clarified ACE's defense obligations.  The first set of motions concerned

5   the precise date HP first tendered the action to ACE.  The Court found that ACE's duty to

6   defend was triggered as of the June 13, 1998 letter.  The second set of motions concerned

7   whether ACE was liable for reimbursement of HP's pre-tender defense costs, from November

8   1994 to June 13, 1998.  The Court found in favor of ACE, ruling that HP is precluded from

9   recovering any defense fees and costs incurred in connection with the Nu-kote action prior to

10  June 15, 1998.

11          After the reference to the Special Master, HP filed a motion seeking summary

12  adjudication that: (1) ACE had no right to allocate defense costs between potentially covered and

13  uncovered Nu-kote claims in the underlying *Nu-kote* action; (2) ACE's duty to defend HP

14  continued through the termination of the *Nu-kote* action; and (3) Civil Code § 2860 is not

15  applicable to the determination of reimbursable defense costs.  On April 1, 2002, the Special

16  Master granted HP's motion.  On October 10, 2002, Judge Ware adopted the Special Master's

17  order "in its entirety and without any modification as an order of the Court."

18                          C.      The Damages Hearing

19          The damages hearing was held before the Special Master over five days in October 2002.

20  HP argued that it is entitled to recover all expenses incurred in litigating the Nu-kote action and

---

[1] Prior to the conclusion of the damages hearing, ACE filed a "new" motion for summary judgment on the "absence of a duty to defend."  Judge Ware denied the motion on March 4, 2003.

-10-

1   that costs incurred in prosecuting its affirmative claims cannot be separated out. HP presented

2   testimony of four of the principal outside attorneys who litigated the Nu-kote action as well as

3   testimony of ten HP in-house attorneys who worked on the case. All of them explained the

4   nature of the case, the nature of the work done, why it was necessary for the defense against Nu-

5   kote's counterclaims, and why the charges were reasonable under the circumstances. HP

6   

7   additionally presented the testimony of the six principal case supervisors from the two outside

8   firms and HP's in-house staff to describe the work, its organization, and the attempts to control

9   expenses with quarterly budgets, billing restrictions, detailed invoices, careful review before and

10  after invoices were submitted, monthly meetings to discuss billing, discounts, credits and

11  adjustments. Max Blecher, an extremely able, experienced and well respected antitrust lawyer,

12  provided his expert opinion that all the charges in the case were reasonable and necessary for the

13  defense of the Nu-kote counterclaim. HP also presented the testimony of the legal accounting

14  specialist who managed the payments and of HP's general counsel. HP additionally provided

15  testimony from three witnesses who explained the creation and use of a database of the Nu-kote

16  outside counsel and cost bills, reconstructed in-house time and principal events in the case. The

17  database allows an examination of the charges by individual, by firm, by date, by task-based

18  

19  billing code, and in any combination. This permits a detailed, computerized evaluation of billing

20  that could not otherwise be done because there are approximately 55,000 individual billing

21  entries in the post-tender period. The database allows an evaluation by report, by spreadsheet, by

22  

23  pivot-table chart, by Gantt chart, on a computer screen, and in printed reports, all of which were

24  admitted into evidence.

25      ACE argued that the Nu-kote action involved a complaint and counterclaim that were

26  separate and distinct, that each required different litigation activities, and that as a consequence

27  

28

1   ACE is not obligated to reimburse HP for all of the fees and costs incurred in the Nu-kote action.

2   ACE offered the testimony of Professor Peter Menell to show that HP's affirmative claims and

3   Nu-kote's counterclaims were separate and separable.  Robert Rose confirmed Professor

4   Menell's views from the practitioner's viewpoint.  Craig Aronson offered two possible methods

5   by which the fees and costs could be divided between the two separate sets of claims that made

6

7   up the Nu-kote action.  ACE also offered Andre Jardini's testimony regarding the overall

8   propriety and reasonableness of the fees and costs sought by HP.  In that regard, Mr. Jardini's

9   testimony did not dispute that the Nu-kote action was a major litigation.  Rather, ACE offered his

10  testimony to establish the "undue excess, inefficiency and overall unreasonableness that cannot

11

12  be divorced from a meaningful and proper recommendation concerning the amount of fees and

13  costs which should be reimbursable."

14          After the conclusion of the damages hearing, both parties submitted a number of

15  requests to "supplement" the record or "lodge" additional deposition testimony and additional

16

17  portions of the underlying trial transcript.  The Special Master, having considered these

18  requests and in certain instances objections thereto, concludes that all the additional evidence and

19  testimony submitted by the parties properly should be made part of the record of the damages

20  hearing.

21

22

23                          III.    DISCUSSION

24          The task assigned to the Special Master is the computation and determination of the

25  amounts due to HP from ACE in connection with the defense of the Nu-kote Action.   Four

26  major issues were raised at the hearing, each of which will be addressed in turn:  (1) whether the

27

28

fees and costs associated with HP's affirmative claim are reasonable and necessary defense

costs; (2) whether certain elements of HP's fees and costs were reasonable; (3) whether HP is

entitled to recover for the fees and costs incurred by HP's in-house counsel; and (4) whether HP

is entitled to prejudgment interest.

### A.    Fees and Costs Associated with HP's Affirmative Claims

#### 1. Legal Standard

ACE contends that it is not obligated to pay for HP's prosecution of its affirmative

claims.   ACE offers a number of California, federal and out-of-state cases for the proposition

that a liability insurer is not obligated to pay for attorneys' fees and costs in connection with an

insured's prosecution of a case against a third party.   Based upon this authority, ACE contends

that California law clearly establishes that where, as here, an insured files a lawsuit in order to

protect or establish some right, all of the costs and expenses in connection with the prosecution

of such suit must be borne by the insured, and that to the extent that a cross-complaint or a

counterclaim is filed against the insured, only those expenses that relate solely to the defense of

such cross-complaint or counterclaim are recoverable as defense costs.   ACE also contends that

there is no "reasonably related" test that would allow prosecution costs to be recoverable as

defense costs, and that California law will not allow an insured to recover prosecution costs as

defense costs simply by asserting that the two sets of claims are factually inextricably

intertwined.

HP contends that ACE, as a nondefending insurer, cannot allocate between covered and

noncovered portions of the case. HP contends that ACE is, in essence, attempting to label

certain aspects of the Nu-kote case as "prosecution" or "affirmative" and therefore

-13-

1. "noncovered," and that such a labeling exercise in avoidance of a defense obligation is legally
2. and factually impermissible. HP contends that all of its expenditures were strategically related to
3. and necessary for the defense of the Nu-kote counterclaim. HP contends that as long as an item
4. of service or expense is reasonably related to the defense of a covered claim, it should be
5. apportioned wholly to the covered claim.
6. 
7.        ACE's argument carefully avoids the controlling factor in this case – ACE wrongfully
8. refused to defend HP. A brief review of California insurance law reveals that the relevant
9. inquiry is not whether particular costs are "prosecution" or "defense" costs but instead is whether
10. particular costs are reasonable and necessary to the defense of the action brought against the
11. 
12. insured.
13.        "Standard comprehensive or commercial general liability insurance policies are contracts
14. between an insurer and an insured: In each, the insurer makes promises, and the insured pays
15. premiums, the one in consideration for the other, against the risk of loss." *Aerojet-General*
16. 
17. *Corp. v. Transport Indem. Co.*, 17 Cal.4th 38, 56 (1997). "In pertinent part, standard
18. comprehensive or commercial general liability insurance policies provide that the insurer has a
19. duty to indemnify the insured for those sums that the insured becomes legally obligated to pay as
20. damages for a covered claim" and also provide that "the insurer has a duty to defend the insured
21. in any action brought against the insured seeking damages for a covered claim." *Id.* at 57-58.
22. 
23. "By definition, the duty entails the rendering of a service, viz., the mounting and funding of a
24. defense which is not limited, expressly or otherwise, in order to avoid or at least minimize
25. liability." *Id.* at 58 (internal citations omitted). As such, it requires the undertaking of
26. reasonable and necessary efforts for that purpose, including investigation. *Id.* (internal citations
27. omitted) It also requires the incurring of reasonable and necessary costs to that end, including

investigative expenses. *Id.* (internal citations omitted). It runs to claims that are merely potentially covered, in light of facts alleged or otherwise disclosed. *Id.* It arises as soon as tender is made, before liability is established and apart therefrom. *Id.*

The insurer's duty to defend is broader than its duty to indemnify, but it is not unlimited. *Id.* at 59. It extends beyond claims that are actually covered to those that are merely potentially so, but no further. "In a "mixed" action, in which at least one of the claims is at least potentially covered and at least one of the claims is not, the insurer does not have a duty to defend the action in its entirety arising out of contract but has a duty to defend the entire "mixed" action imposed by law in support of the policy." *Id.*

In a "mixed" action, as to the claims that are at least potentially covered, the insurer may not seek reimbursement for defense costs. *Buss v. Superior Court*, 16 Cal.4th 35, 49 (1997). As to the claims that are not even potentially covered, however, the insurer may indeed seek reimbursement for defense costs. *Id.* In a "mixed" action, the insurer may obtain reimbursement from the insured for defense costs that can be allocated solely to the claims that are not even potentially covered. *Id.* at 52. In order to preserve the implied in law right to seek reimbursement of defense costs for claims not potentially covered by the policy, the insurer must undertake the defense pursuant to a reservation of rights. *Buss* at 61, n. 27; *see also Blue Ridge Ins. Co. v. Jacobsen*, 25 Cal.4th 489, 501 (2001).

As Judge Williams and Judge Ware previously have found, ACE had a duty to defend HP in the Nu-kote action. Upon tender of the defense, ACE did not undertake the defense pursuant to a reservation of rights. For these reasons, the Special Master previously has found that ACE has no right to obtain reimbursement from the insured for defense costs that can be allocated

1  solely to the claims that are not even potentially covered and may not allocate defense costs

2  between potentially covered and uncovered Nu-kote claims in the underlying *Nu-kote* action.

3  ACE now asserts that HP may recover only those expenses that relate solely to the

4  defense of the counterclaim and that all fees and costs that relate to the prosecution of HP's

5  

6  affirmative claims must be borne by HP. This argument is premised upon two major

7  misperceptions: (1) ACE's failure to defend HP in the underlying action is without consequence;

8  and (2) an insurer never is obligated to pay costs associated with the insured's prosecution of an

9  action.

10  When an insurer wrongfully denies an insured a defense, leaving the insured to his own

11  resources to provide a defense, the insurer forfeits the right to control the litigation, including the

12  

13  right to control the defense of the litigation or settlement thereof. *Safeco Ins. Co. v. Superior*

14  *Court*, 71 Cal.App.4th 782, 787 (1999); *Stalberg v. Western Title Ins. Co.*, 230 Cal.App.3d 1223,

15  1233 (1991). "Where an insured mounts a defense at the insured's own expense following the

16  

17  insurer's refusal to defend, the usual contract damages are the costs of the defense." *Amato v.*

18  *Mercury Casualty Co.*, 53 Cal.App.4th 825, 831 (1997); *see also Barratt American, Inc. v.*

19  *Transcontinental Ins. Co.*, 102 Cal.App.4th 848, 857 (2002). By breaching its duty to defend, an

20  insurer becomes liable for attorneys' fees as provided in the policy or as "incurred in good faith,

21  

22  and in the exercise of a reasonable discretion" in defending the action. *Zurich Ins. Co. (U.S.*

23  *Branch) v. Killer Music, Inc.*, 998 F.2d 674, 680 (9th. Cir.1993) (citing California Civil Code §

24  2778.)

25  "In the general case, it is the insured that must carry the burden of proof on the existence,

26  amount, and reasonableness and necessity of ... defense costs, and it must do so by the

27  preponderance of the evidence." *Aerojet*, 17 Cal.4th at 64. "By contrast, in the exceptional case,

28

wherein the insurer has breached its duty to defend, it is the insured that must carry the burden of proof on the existence and amount of the … expenses, *which are then presumed to be reasonable and necessary as defense costs, and it is the insurer that must carry the burden of proof that they are in fact unreasonable or unnecessary.*" *Id.* at 64 (emphasis added). "As is ordinary in civil actions generally and for contractual claims in particular, the insurer and the insured must each carry its burden of proof by a preponderance of the evidence." *Id.*

In California, an insurer that wrongfully refuses to defend a tendered claim may be required to reimburse the insured for prosecution costs if such costs are sufficiently related to defense of the action brought against the insured. In *State v. Pacific Indem. Co.*, 63 Cal.App.4th 1535 (1998), the State of California ("the State") brought a CERCLA action against a number of defendants. The defendants filed counterclaims against the State. The State's insurer, which had refused to defend the State's tender of the counterclaims, argued that it was not responsible for *prosecution costs* incurred by the State as the plaintiff in the action. The Attorney General's "bills" did not separate time spent between prosecuting and defending the action and did not describe the specific work performed by the attorneys. The trial court found that all the fees were based upon the hours reasonably incurred by the State's counsel "in connection with the defense" of the counterclaims and ordered the insurer to compensate the State for all hours spent by the Attorney General's office on the case.

On appeal, the insurer argued that the method used by the attorneys to record their time on the case made it impossible to separate costs incurred in prosecuting the action from those incurred in defending the action. The State agreed that separation was impossible, but argued that the tasks involved in prosecuting the complaint were inextricably linked to those involved in defending the counterclaims. Because separation of prosecution costs and defense costs in the

action was not possible, the court found the burden of proof to be critical. Relying upon *Aerojet*, the court found that the State had the burden of proving the existence of the amount of the expense, and that it met its burden when it proved the hours worked and provided testimony that "the work was all related to the defense." *Id.* at 1549.

In *Barratt American, Inc. v. Transcontinental Ins. Co.*, 102 Cal.App.4th 848, 857 (2002), a case relied upon by ACE, a residential developer sued its insurer, alleging that its insurer failed to provide a defense in an underlying construction defect lawsuit. At trial, it was undisputed that the insurer owed a duty to defend. The primary issue for the jury was whether costs the developer incurred to repair homes owned by individuals who did not join the underlying construction defect lawsuit qualified as recoverable defense costs. The jury found the costs were recoverable defense costs. On appeal, the insurer argued that the claimed defense costs were not recoverable as a matter of law, relying upon *Foster-Gardner, Inc. v. National Union Fire Ins. Co.*, (1998) 18 Cal.4th 857, 883. The court disagreed, stating that:

> To the contrary, in reaching its conclusion, *Foster-Gardner* expressly reaffirmed *Aerojet-General's* holding that an insurer has a duty to pay defense costs if the costs are incurred between tender and settlement of a lawsuit, and if the defense investigation and expenses are reasonable and necessary to mount a defense in a pending lawsuit. (Foster-Gardner, supra, 18 Cal.4th at p. 886.) Under *Aerojet-General*, a liability insurer must bear these defense costs even if the insured obtains additional benefits from the expenditures, and even if the same costs could potentially be characterized as an indemnification cost in a different context. (*Aerojet-General*, supra, 17 Cal.4th at pp. 65-66.)

*Id.* at 859-860. The court nonetheless found that the evidence presented by the developer was insufficient to show that the expenses to repair nonplaintiff homes qualified as recoverable defense expenses in the underlying litigation. *Id.* at 863. The developer argued that because it presented evidence that the insurer breached its duty to defend and the parties stipulated as to the amount that was spent on the repairs to the non-plaintiff homes, it had proven the existence and

-18-

1    amount of the expenses, and therefore the burden of proof shifted to the insurer to prove that the

2    costs were unreasonable and unnecessary. The court disagreed, stating that:

3        Under *Aerojet-General*, the burden does not shift to the insurer to prove the expenses

4        were unreasonable or unnecessary until the insured has met its burden to prove the

        "existence ... of the ... investigation expenses ...." (*Aerojet-General*, supra, 17 Cal.4th at

5        p. 64.) The fact that the parties stipulated that $580,714.50 was spent on repairs to the

        non-plaintiff homes does not mean that Barratt satisfied its burden to show the existence

6        of investigation expenses. To show that the repairs even constituted a defense

7        investigation expense, Barratt had the initial obligation to establish that a reasonable

        insured would have made the repairs to third party homes in defense of the lawsuit that

8        was in fact brought.

9

10    *Id.* at 864.

11       A second case relied upon by ACE, *Larkin v. ITT Hartford*, 1999 WL 459351 (N.D.Cal.

12    1999), supports the conclusion that a non-defending insurer may be obligated to pay prosecution

13    costs incurred by the insured. The plaintiffs ("Larkin") brought an insurance coverage bad faith

14    lawsuit against ITT Hartford ("Hartford"). Larkin owned certain real property. In 1988, Larkin

15    entered into a lease with George Navone for construction of a commercial complex on the

16    property. Larkin subsequently discovered that the property was contaminated. Larkin

17

18    expended approximately $200,000 in corrective action costs but contamination remained on the

19    property and as a result, the contamination, the property could not be developed as originally

20    planned.

21       Larkin filed a lawsuit against former tenants of the property, alleging that the tenants

22    caused the contamination ("the Larkin Action"). Larkin sought the costs incurred in removing

23

24    the pollution. The former tenants cross-claimed, alleging that Larkin had caused the

25    contamination. Navone filed a complaint against plaintiffs and the former tenants for damages

26    for negligence and other theories ("the Navone action").

27

28

Larkin tendered the Navone action to Hartford and by way of the same letter, requested that Hartford pay for the prosecution of the Larkin action on the ground that there is no meaningful distinction between prosecution of the Larkin action and defense of the Navone complaint. Hartford agreed to defend the Navone action on a pro rata basis, but refused to defend the Larkin action. Larkin then filed a coverage and bad faith action alleging that Hartford had breached its insurance contract and seeking reimbursement of one hundred percent of the attorneys' fees and costs incurred in defense of the Navone action and the prosecution of the Larkin action.

With respect to the Larkin fees and costs, Larkin argued that the prosecution of the Larkin action was defensive because the purpose of the Larkin action was to hold the former tenants responsible for the contamination of the property and defense of the Navone action also was based upon proving that the former tenants and not Larkin were responsible for the contamination. The court found that Hartford did not have a duty to fund the prosecution of the Larkin action, noting that Larkin had not cited a single case in which an insurer was held to have a duty to fund the prosecution of a *separate action* for damages in which the insured is a plaintiff. The court found, *inter alia*, that the prosecution of the Larkin damages action which was initiated prior to the Navone action was not reasonable and necessary to Larkin's defense of the Navone action. *Id.* at *7. The court nonetheless stated that:

> The question is whether the action taken, here the prosecution of the Larkin action, "would be conducted against liability by a reasonable insured under the same circumstances." *Aerojet*, 17 Cal.4th at 62.

*Id.* The court further noted that:

> The Court recognizes that some of the actions taken by plaintiffs' counsel in Larkin may also have been reasonable and necessary to the defense of the Navone action, and plaintiffs may not have duplicated such actions in Navone precisely because they had already been performed in connection with Larkin. *In these circumstances, such actions and the expenses associated with them may properly be characterized as Navone defense*

1   costs--provided they are performed during the temporal limits of the duty to defend--and
2   the fact that they did "double duty" in both suits does not prevent such characterization.
    See *Aerojet,* 17 Cal.4th at 63. The burden of identifying those actions, however, lies with
3   the plaintiffs. See *id.* at 64.

4   *Id.* (emphasis added) The court concluded, however, that Larkin had not demonstrated that the

5   costs and attorneys' fees incurred in the Larkin action that were reasonable and necessary to the

6   defense of Navone and were also not duplicated in the Navone action. *Id.*

7       The above authorities make clear that fees and costs associated with the prosecution of

8   affirmative claims may be recovered from a breaching insurer if such fees and costs are

9

10  reasonable and necessary to the defense of the action brought against the insured.  The cases

11  cited by ACE for the proposition that an insurer is not obligated to pay for attorneys' fees and

12  costs in connection with an insured's prosecution of a case against a third party are not

13  applicable, as in those cases[2] the insurer agreed to defend the insured, with or without a
14

15  reservation of rights, or the court found that the insurer did not owe the insured a duty to defend.

16      In *Scottsdale Ins. Co. v. Homestead Land Development Corporation,* 145 F.R.D. 523

17  (N.D. Cal. 1992), the underlying case involved an insured ("Homestead") who sued a contractor

18  for breach of contract, fraud, misrepresentation and negligence.  The contractor filed a cross-
19
    complaint against the insured containing multiple, uncovered causes of action.  The cross-
20
21  complaint later was amended to include a single claim for slander against Homestead.   The

22  insurer, Scottsdale Insurance Co. ("Scottsdale"), under reservation of rights, accepted the defense

23  of the slander claim.   The Special Master was instructed to allocate costs between those

24

25

26  [2] *Silva & Hill Construction Co. v. Employers' Mutual Liability Ins. Co.,* 19 Cal.App.3d 914 (1971); *Barney v*
27  *AETNA Casualty & Surety Co.,* 185 Cal.App.3d 966 (1986); *3250 Wilshire Boulevard Bldg v. Employers Ins of*
    *Wausau,* 39 Cal.App.4th 1277 (1995); *James 3 Corp. v. Truck Ins. Exch.,* 91 Cal.App.4th 1093, 1104 (2001);
28  *Scottsdale Ins Co.,* 145 F.R.D. at 534-535; *Larkin,* supra, 1999 WL 459351 (N.D. Cal. 1999); *Onder v. Allstate Ins.*
    *Co.,* 2002 U.S. Dist. LEXIS 11344 (S.D Cal. 2002), and *Spada v. Unigard Insurance Company,* 2002 U.S. Dist.
    LEXIS 2282 (D.Or. 2002).

-21-

1  reasonably related to defense of the slander claim and those related to uncovered claims. *Id.* at

2  525. He concluded as follows:

3     Homestead initiated the underlying action. Its suit against Jacobson obviously did not
4     even arguably trigger any duty in Scottsdale under the subject policy. Six months later
       Jacobson filed a cross-complaint that did not include a covered cause of action. Then
5     more than two years elapsed without Homestead or its counsel (in house or retained) even
       suggesting that the Scottsdale policy covered any aspect of the litigation. It wasn't until
6     the spring of 1990, almost three years after it had initiated the case, that Homestead
7     began claiming that discovery had exposed a possible defamation cause of action that
       would trigger coverage . . . In a setting like this, we do not see how it could be equitable
8     to make the carrier pay for litigation expenses that Homestead clearly would have
9     incurred, even if Jacobson never had added the covered slander claim, as it litigated the
       dominating uncovered claims.
10         * * *
11    Even taking into account the partial evidentiary overlap between some of Jacobson's
       different causes of action against Homestead, as well as the partial overlap between some
12    of Homestead's offensive claims against Jacobson and some of his claims against
       Homestead, the structure of the case as presented by the pleading suggests that no more
13    than 10% of the lawyering activity on behalf of Homestead could fairly be attributed to
       the defense of the slander cause of action.
14
15  *Id.* at 534-535, 542-543. ACE contends that adoption of *Scottsdale's* "incremental approach" in

16  this matter not only is consistent with California law, but produces the most equitable result.

17  ACE asserts that:

18

19    It simply could not have been within the contemplation of either HP or ACE that ACE
20    would be obliged to fund the prosecution of lawsuits initiated by HP to protect against the
       piracy of its intellectual property. Like the insured in *Scottsdale*, HP initiated the
21    underlying action and, like the insured in Scottsdale, HP waited years before asserting
       that one of the theories asserted in Nu-kote's counterclaim triggered coverage. To the
22    extent that there is any partial overlap between HP's offensive claims and Nu-kote's
23    counterclaims, under *Scottsdale*, it is inequitable to make ACE pay for the litigation
       expenses that HP would have incurred in the protection of its intellectual property rights.
24
25    Unlike the insurer in *Scottsdale*, however, ACE did not defend under a reservation of

26  rights. Moreover, *Scottsdale* was issued prior to *Buss*, under which an insurer in a "mixed

27  action" may obtain reimbursement only for defense costs that can be allocated solely to claims

28  not even potentially covered. *Id.* at 52. The allocation theory in *Scottsdale* is not consistent with

*Buss.* Even assuming that it was, the Special Master has found that ACE is precluded from attempting to allocate between covered and uncovered claims.

Another case relied upon by ACE, *James 3 Corp. v. Truck Ins. Exchange*, 91 Cal.App.4th 1093 (2001), hurts rather than helps ACE's position. James 3 Corporation tendered the defense of a lawsuit to its insurer, Truck Ins. Exchange ("Truck"). Truck accepted the tender subject to a reservation of rights. The insured asserted that a reasonable construction of an insurer's agreement to provide a 'defense' would encompass "an obligation to file counterclaims for the insureds when such are 'factually intertwined with the affirmative defenses being asserted.'" The court disagreed, finding that that there was nothing in the policy that contractually obligated Truck to fund and prosecute an insured's affirmative counterclaims or cross-complaints." *James 3* at 1104. The court distinguished the cases relied upon by the insureds, *Safeguard Scientifics v. Liberty Mut. Ins. Co.*, 766 F.Supp. 324 (E.D.Pa. 1991) and *Aerosafe Intern., Inc. v. Itt Hartford of Midwest*, 1993 WL 299372 (N.D. Cal. July 23, 1993), noting that in both those cases the insurers wrongfully refused to defend their insureds in the underlying action. *Id.* at 1105.

In *Safeguard Scientific*, the court held that the insurer was required to pay the expenses and fees incurred by the insured to bring noncompulsory counterclaims because the pursuit of the counterclaims was inextricably intertwined with the defense of the claims against the insured and was necessary to the defense of the litigation as a strategic matter. *Safeguard Scientifics* at 334. In *Aerosafe*, the insured hired its own counsel after the insurer refused to defend the insured. That counsel prepared but never filed a potential federal antitrust action and a state cross-complaint. The insurer argued that it should not be responsible for fees and costs related to preparing those actions and cross-complaints. The court noted that the insurer asserted but did not provide evidence that these matters were unrelated to the defense. *Id.* at *5. The court found

1    that to the extent that these projects were launched as part of the insured's overall defense

2    strategy in response to the action against it, the insurer's argument was unconvincing:

3        In *Safeguard Scientific, Inc. v. Liberty Mutual Ins. Co.*, 766 F.Supp. 324, 334

4        (E.D.Penn. 1991), applying a "reasonableness" standard apparently less stringent than
         California's undeniable evidence standard, the court held that expenditures for

5        noncompulsory counterclaims brought by a defendant insured had to be paid by an
         insurer under a duty to defend because "the pursuit of the counterclaims was inextricably

6        intertwined with the defense of [the claims against the insured] and was necessary to the

7        defense of the litigation as a strategic matter." The court can discern no meaningful
         reason why this rule should not apply to the state cross-complaint and federal antitrust

8        action prepared, but not filed, by Aerosafe's lawyers.

9        While the cross-complaint was not actually filed in the underlying action, the
         reasonableness of its preparation as part of an overall litigation strategy is hardly a matter

10       that Hartford can rebut by undeniable evidence. Having refused Aerosafe's tender of
         defense, Hartford "gave up the right to control the litigation." *Stalberg v. Western Title

11       Ins. Co.*, 230 Cal.App.3d 1223, 1233 (1991). It cannot now complain that it will not pay
         for legal work- product that was prepared as part of Aerosafe's defense strategy simply

12       because it was not filed... Again, having breached its duty to defend, Hartford cannot

13       now attempt retroactively to dictate the legal strategies of Aerosafe's lawyers. The court
         will permit Hartford to provide evidence that the cross-complaint and federal antitrust

14       action were unrelated to the defense of the Systron action. However, under California's
         undeniable evidence standard, Hartford will have to show that the subject matter of these

15       projects could not arguably be related to the Systron action.

16

17   *Id.* at *5-6.

18       After summarizing the *Aerosafe* opinion, the *James 3* court stated that: "In the instant

19   case, Truck has not breached its duty to defend and therefore has not given up its right to control

20   the litigation." *Id.* at 1105.

21       ACE's assertion that there is no "reasonably related" test that would allow prosecution

22   costs to be recoverable as defense costs similarly is without merit. Applicable California cases

23   have not explicitly stated a "reasonably related" test with respect to the recovery of prosecution

24   costs as reasonable and necessary defense costs. The cases do, however, suggest that the

25   standard is something very close to "reasonably related." In *State of California*, the court

26   imposed a burden on the insured to show that "the work was all related to the defense." *Id.* at

27   1549. In *Larkin*, the court noted that the question was whether the prosecution of the action

28

-24-

1   "would be conducted against liability by a reasonable insured under the same circumstances,"

2   citing *Aerojet*, 17 Cal.4th at 62. In *Barratt*, the court found that the insured had the obligation to

3   establish that a reasonable insured would have performed the acts or incurred the costs in defense

4   of the lawsuit brought against it. *Barratt* at 464.

5

6          In summary, when the insurer breaches its duty to defend, the insured then must prove by

7   a preponderance of evidence the existence and amount of the expenses, which then are presumed

8   to be reasonable and necessary as defense costs. *Aerojet*, 17 Cal.4th at 64.   Such defense costs

9   may include expenses incurred in prosecuting affirmative claims under appropriate

10  circumstances.  Once the insured meets its burden, it is the breaching insurer's burden to prove

11  by a preponderance of evidence that the expenses are unreasonable or unnecessary to the

12

13  defense. *Id.*

14         HP argues that once an insured meets its initial burden, the insurer may avoid paying

15  "prosecution" expenses only upon presenting "undeniable evidence" that such expenses were not

16  reasonable and necessary to the defense.  ACE argues that it may avoid paying prosecution

17  expenses by showing that such expenses were unreasonable or unnecessary by a preponderance

18

19  of evidence.

20         HP derives the undeniable evidence standard from two California cases, *Hogan v.*

21  *Midland National Ins. Co.*, 3 Cal.3d 553 (1970) and *Horace Mann Ins. Co. v. Barbara B.*, 4

22  Cal.4th 1076, 1081 (1993) and two federal cases, *Foxfire, Inc. v. New Hampshire Ins. Co.*, 1994

23  WL 361815 (N.D.Cal. July 1, 1994) and *Aerosafe Int'l, Inc. v. ITT Hartford*, 1993 WL 299372

24

25  (N.D. Cal. July 23, 1993) (discussed above).

26         In *Hogan*, the California Supreme Court stated that, in cases considering apportionment

27  of attorneys' fees upon the wrongful refusal of an insurer to defend an action against its insured,

28

-25-

1  the decisions generally hold that the insurer is liable for the total amount of the fees despite the

2  fact that some of the damages are outside the coverage of the policy. *Id.* at 564. The court also

3  stated that:

> In its pragmatic aspect, any precise allocation of expenses in this context would be
> extremely difficult and, if ever feasible, could be made only if the insurer produces
> undeniable evidence of the allocability of specific expenses; the insurer having breached
> its contract to defend should be charged with a heavy burden of proof of even partial
> freedom from liability for harm to the insured which ostensibly flowed from the breach
> (See Annot. in 41 A.L.R.2d 434, 438).

*Id.*

In *Horace Mann*, the Supreme Court cited this passage in *Hogan* for the following

proposition: "Once the defense duty attaches, the insurer is obligated to defend against all of the

claims involved in the action, both covered and noncovered, until the insurer produces

undeniable evidence supporting an allocation of a specific portion of the defense costs to a

noncovered claim." *Horace Mann*, 4 Cal.4th at 1081.

In *Foxfire*, the insurer wrongfully refused to defend Foxfire in an underlying action.

After a jury trial finding that the insurer had breached the implied covenant of good faith and fair

dealing, Foxfire moved to recover the attorneys' fees and costs incurred in the underlying action,

including fees spent on an affirmative claim. The insurer argued that Foxfire was not entitled to

fees for its affirmative claims. As in *Aerosafe*, supra, the court relied upon *Hogan* and required

the insurer to provide undeniable evidence undeniable evidence of the allocability of specific

expenses" to noncovered claims. *Foxfire*, 1994 WL 361815, at *2.

It is unclear what application these authorities, addressing allocation of defense costs,

have here, where the issue is not allocation of defense costs between covered and uncovered

claims, but rather whether certain costs can be attributed to the defense of the action at all. To

the extent that HP's "allocation" authorities are relevant, they are outdated. The more recent

case *Buss v. Superior Court*, 16 Cal.4th 35 (1997) discussed above, disapproves the undeniable

evidence language, stating as follows:

> When we consider Hogan's "undeniable evidence" language in its full context, we arrive
> at the following conclusions. First, it is dictum and not holding: [the insurer] was
> responsible for all Diehl's defense costs in the Kaufman action because all the claims as
> alleged were at least potentially covered. Second, it is dictum that purports to impose a
> burden of proof that is apparently otherwise unknown to the law, and that is seemingly
> even heavier than proof beyond a reasonable doubt. [FN17] ... Fourth, it is dictum that,
> in line with its limited scope, is concerned with reduction of defense costs that the insurer
> has not paid, and not with reimbursement for defense costs that it has. Fifth and final, it is
> dictum that is applicable, in accordance with its own terms, "upon the wrongful refusal of
> an insurer to defend an action against its insured" (*Hogan v. Midland
> National Ins. Co.*, supra, 3 Cal.3d at 564), [FN19] and not upon the proper agreement of
> an insurer to do so. [FN20]

*Id.* at 56-57. The *Buss* court noted that *Hogan's* phrase, "undeniable evidence" was not

derived from the cited annotation, which used the phrase, "clear evidence," and that whereas the

former suggests a novel burden of proof, the latter suggests a common one, viz., proof by clear

and convincing evidence. *Id.* at 57 n. 17.

> The court went on to note that:

> Hogan's "undeniable evidence" language is quoted or paraphrased in subsequent
> decisions, but usually, and somewhat curiously, on the question of the insurer's ability to
> extinguish its duty to defend. (See, e.g., Horace Mann Ins. Co. v. Barbara B., supra, 4
> Cal.4th at p. 1081) [stating in dictum that, "[o]nce the defense duty attaches, the insurer is
> obligated to defend against all of the claims involved in the action, both covered and
> noncovered, until the insurer produces undeniable evidence supporting an allocation of a
> specific portion of the defense costs to a noncovered claim"]

*Id.* at 57 n. 20.

> In light of this language in *Buss* and the explicit language in the subsequent decision in

*Aerojet*, the Special Master concludes that the preponderance of the evidence standard and not an

"undeniable evidence" standard applies in this case.

### 2. HP Has Met Its Burden With Respect To All Post-Tender Fees and Costs, Including Those Associated With HP's Affirmative Claims[3]

After the conclusion of the damages hearing, on December 19, 2002, the parties stipulated that "Hewlett-Packard actually paid the costs and outside counsels' fees in the underlying Nu-kote litigation in the amounts alleged by HP at the damages hearing and as shown in summary reports already in evidence."  At the damages hearing, HP presented uncontradicted testimony that the post-tender amount of outside counsel fees paid by HP was $20,282,313.81, and that HP seeks to recover "only" $17,818,167.05.  HP also presented uncontradicted testimony which established that HP incurred post-tender costs in the amount of $9,483,074.67.  HP presented extensive testimony at the hearing with respect to efforts made to keep expenses down and why the fees and costs were so high.  In light of the parties' stipulation as to the fees and costs, the Special Master will not summarize this testimony.  Based upon the evidence presented at the damages hearing and the parties' stipulation, HP has established the existence and amount of fees and costs incurred in the Nu-kote action.

HP also presented extensive evidence at the damages hearing to establish that the fees and costs all were related to and therefore necessary to the defense of the Nu-kote counterclaims. This evidence, in the Special Master's view, is the key evidence in this case and will be summarized in some detail.

HP presented the expert testimony and opinions of Maxwell M. Blecher, one of the most experienced and well-known antitrust attorneys in the country.  Mr. Blecher qualified as an expert in antitrust cases with intellectual property law components, an area in which he has

---

[3] This section deals with the fees associated with HP's outside counsel and all costs incurred by HP in the post-tender period; HP's in-house counsels' fees will be discussed in section III.

considerable experience in that he has written and lectured extensively on the subject, has been named Antitrust Lawyer of the Year by the State Bar of California, has been appointed by President Carter to the National Commission for the Review of Antitrust Laws and Procedures, and has tried more antitrust cases in the past half-century than any lawyer in the history of America. [HT 2161:23-2162:7; 2163:23-2164:15; 2165:14-2166:3; 2156:20-22; 2157:4-10] Mr. Blecher is listed in books identifying the top lawyers in America and the top trial lawyers in America. [HT 2157:18-25] Although Mr. Blecher had sued HP previously and was prosecuting a patent infringement lawsuit against HP at the time he testified, he agreed to review the Nu-kote case and testify as an expert on behalf of HP. [HT 2159:17-2160:10] Because he tended to represent plaintiffs in cases against large corporations, including suits against HP, Mr. Blecher stated that he did not anticipate ever receiving any future legal work from HP and therefore would not be tempted to make his testimony more favorable to HP. [HT 2160:11-15]

Mr. Blecher agreed with ACE's experts that patent and antitrust cases have different proof elements that can be discussed separately. However, he concluded that in the Nu-kote case, they were strategically related:

> [T]hey're two separate concepts in terms of proof and academics – there's an academic textbook distinction, patent claim is this, consists of a valid and infringed patent, and an antitrust case has its own set of components.
>
> So, sure, can you look at them and analyze them separately, but in the context of the litigation between two parties which involve both questions . . . they come together in a way in which they cannot be effectively separated for terms of trial preparation or trial presentation. They inexorably are going to come together.

[HT 2189:2-13] Mr. Blecher explained the strategic value to HP of having the patent issues tried first:

> I think Gibson out lawyered them getting the judge to try the patent case first. I know Katz resisted it ferociously, as well he should have, and anybody likely would have, because he knew of the devastating effect of being found to be an infringer."

-29-

[HT 2187:17-21]  Mr. Blecher testified further that:

> The fact that the judge ordered [the patent and the antitrust issues] tried separately for the convenience of the jury, I assume, does not in any way alter the conclusion that as a legal matter and strategic matter in the context and dynamics of the lawsuit they become a single claim.  You can separate them as much as you want, but, ultimately, when you get down to the drawing of the final judgment, those two issues come together.

[HT 2188:9-16]

At the damages hearing, HP asserted that its affirmative case was practically, essentially and strategically related to and intertwined with the defense case although different causes of action in the cases had different legal elements.  "The patent allegations . . . created an inextricable tie three different ways."  [HT 2224:14-15]  HP "prosecuted their affirmative claims . . . in my firm and convinced view, to defeat the threatened counterclaim under the antitrust laws."  [HT 2235:19-22]  Mr. Blecher testified that:  (1) proof of patent infringement as alleged by HP was a complete defense to this antitrust case because it showed the "absence of lawful market presence" which deprived Nu-kote of any right to damages and therefore prevented Nu-kote from proving its case [HT 2184:23-2185:5, 2258:9-23]; (2) HP's conduct in obtaining, licensing and enforcing its patents, referred to by Nu-kote's counsel as the "thicket of patents" issue, was alleged to be evidence of HP's antitrust conduct, and therefore the patent claims were merged with the antitrust claims [HT 2185:10-25]; and (3) the Nu-kote "fear, uncertainty and doubt" ("FUD") claims, wherein Nu-kote tried to establish that HP had engaged in an advertising campaign to incite FUD to interfere with Nu-kote's inkjet cartridge refill business, were an integral part of the antitrust case, and HP defended these claims by asserting that its so-called wrongful conduct was nothing more than the lawful assertion of its patents and trademarks.  [HT 2186:1-19, 2224:20-2227:20, 2261:8-25]

1   Mr. Blecher explained that, although the Nu-kote case began as a "garden-variety"

2   intellectual property matter brought by HP, it changed significantly when Nu-kote's counsel

3   changed and the scope of the antitrust claims dramatically increased. [HT 2167:12-2168:7] At

4   that point, Nu-kote, for all practical purposes, became the plaintiff. [HT 2168:13-14] Mr.

5   Blecher also explained that HP's affirmative claims essentially merged with the counterclaim

6   once that happened. When he was asked whether antitrust or intellectual property claims were

7   more complex when both were involved, he responded that "they all come together and become

8   one issue." [HT 2180:22-2181:11] Although the separate elements of the claims may be

9   delineated in a theoretical way, in practical terms the issues become "inextricably interrelated

10   and incapable of separation in the context of the case and in the dynamics of how it unfolds."

11   [HT 2181:23-2182:11] Simply put, both parties cannot be right. [HT 2222:9-2223:7] "The

12   patent allegations and the antitrust allegations cannot, as a practical matter, be separated if you

13   want to reach the final conclusion of both claims." [HT 2223:18-21] He further stated that the

14   fact that the claims were tried one before the other does not alter their practical connection in

15   terms of the jury's decision making. [HT 2188:9-16] Mr. Blecher testified that HP could not

16   have won its patent claims and still lost the antitrust case. [HT 2215:19-2216:1]

17   Mr. Blecher concluded that HP was the real defendant in the case after Ron Katz began

18   representing Nu-kote. Demonstrating HP's true status as a defendant, Mr. Blecher pointed out

19   the terms of HP's best settlement offer. HP offered Nu-kote a covenant not to sue for patent

20   infringement – the equivalent of a license – and offered to provide Nu-kote with cartridges to

21   refill, along with up to $40 million. Mr. Blecher described this as a "very attractive" offer made

22   from a defensive standpoint by a party that viewed itself at risk. [HT 2194:12-2195:12]

23   Additionally, the role reversal that occurred in Nu-kote's bankruptcy filing – with Nu-kote

-31-

seeking to lift the stay and HP fighting to retain it – further reinforced Mr. Blecher's conclusions that HP was on the defensive. [HT 2199:20-2201:6]

HP also offered the testimony of its outside counsel in the underlying action to prove the relatedness of prosecution and defense efforts. The testimony of outside counsel established that HP's affirmative case was practically and strategically related to and intertwined with the defense of the Nu-kote counterclaim. HP's witnesses consistently testified that, by the summer of 1998, the sole reason for maintaining HP's affirmative case against Nu-kote was the need to defend against Nu-kote's counterclaims. This reality was best exemplified by HP's willingness, in the Fall of 1998, to essentially abandon its claims when it opposed Nu-kote's efforts to lift the automatic bankruptcy stay resulting from Nu-kote's Chapter 11 filing.

Robert Cooper was the senior partner at GD&C with the primary responsibility for trying the underlying Nu-kote case. [HT 1129:11-13] Mr. Cooper's career as a defense attorney in the antitrust arena spans more than thirty years. He tried his first antitrust case against Max Blecher as an associate at GD&C in 1968. [HT 1126:12-18] Since that time, he has defended some of the largest companies in the world in massive antitrust litigation. [HT 1126:21-1128:18]

Mr. Cooper participated in the Nu-kote litigation fairly early in GD&C's involvement, but his involvement did not become full-time until the case was closer to trial. [HT 1128:23-1129:10] He explained that it is practically impossible to try large antitrust cases such as Nu-kote with the resources of a single firm because such cases are so massive. [HT 1130:10-16] He also reiterated the testimony of numerous other witnesses when he explained that, in the underlying Nu-kote case, the only value to HP's affirmative claims at trial was the ability to portray HP in a favorable light before Nu-kote had the opportunity to put on its antitrust case. [HT 1137:8-1138:25] In fact, HP was able to introduce much of the evidence it wanted to put on

-32-

1  regarding the antitrust case during its affirmative case. [HT 1140:14-1141:4; 1142:18-1143:11]

2  By the time the underlying case went to trial, a defense verdict on the antitrust case was

3  considered a win by HP, as the patent case no longer was of concern. [HT 1143:16-20]

4
5  During the relevant post-tender period, Jonathan A. Marshall was the senior partner at

6  P&E responsible for billing and staffing the Nu-kote case. [HT 608:6-21; 710:24-711:1]  He

7  initially selected Will Pecau to oversee the case. [HT 608:19-20]  The complexity of the case

8  changed, however, when Coudert Brothers entered an appearance for Nu-kote approximately one

9  year into the litigation, and Mr. Marshall eventually suggested that HP bring in another law firm

10  to assist, one with more antitrust background. [HT 609:4-610:16]  As a result, GD&C was

11
12  brought into the case and the two firms worked well together. [HT 610:17-611:6]  Mr. Marshall

13  described the goals of the two firms as having a "single plan that we had to defend Hewlett-

14  Packard." [HT 612:7-11]  Mr. Marshall explained that the intellectual property claims of HP

15  were closely related to the defense of the antitrust case:

16
17  And the antitrust claim became significantly more important than the intellectual
property. As a matter of fact, the intellectual property remained important only because it
18  was – we felt it was critical for us to persuade the jury that we were the guys wearing the
white hats; that we actually had created this business; and that we had competed fairly;
19  and that we didn't lie any to the patent office; and that all our patents were – were valid;
and that we didn't spread this FUD, the fear, uncertainty and doubt, to try to kill Nu-kote
20  in the market, you know, that they killed themselves by being lousy businessmen, we had
nothing to do with it. And that's why the intellectual property remained important. [HT
21  617:1-14]

22
23  Nu-kote refused HP's settlement offer because it sought hundreds of millions in recovery.

24  Accordingly, HP needed to keep its affirmative claims alive to defend against Nu-kote's

25  counterclaims. [HT 616:5-619:4]

26
27  ACE argued that HP pursued its affirmative claims in order to put Nu-kote out of

28  business, and that such motive can be inferred from HP's failure to send Nu-kote a cease-and-

-33-

desist letter before filing suit. Mr. Marshall testified that HP had other reasons for not sending such a letter, specifically, HP had reached the conclusion that such a letter would not accomplish HP's goals but would only create a risk of having to defend itself in a foreign venue that would likely be less favorable than the one selected by HP. [HT 671:10-672:24] Additionally, Mr. Marshall explained the difference between the pro forma antitrust claims filed initially by Nu-kote's first lawyers and the amended counterclaim filed by Coudert Brothers. The former were essentially devoid of sufficient factual allegations, and therefore subject to being stricken. [HT 682:20-683:6] Mr. Marshall concurred with Mr. Pecau on the impact of Coudert Bros. on the litigation, i.e., that the complexity and cost of the litigation increased dramatically. [HT 609:4-610:11]

ACE argues that because the underlying case was "bifurcated," with HP's intellectual property claims being tried first, the separate nature of the defense and prosecution has been established. But Mr. Marshall explained why HP wanted to present its case first, stating that and it had nothing to do with any theoretical distinction between prosecution and defense. According to Mr. Marshall, "[I]t was critical that before Katz started throwing mud at us, that we establish that we were the innovators and we were the guys wearing the white hat." [HT 721:25-722:3] It was a strategic decision to make a first impression that drove HP's desire to have its claims tried first. [HT 722:4-723:3] Long before the trial, HP was well aware that Nu-kote had no money and that any chances for monetary recovery on HP's affirmative claims had vanished. [HT 723:4-9]

Will Pecau, P&E's partner with day-to-day management responsibility for the case, testified that even from the early stages in the case, HP's counsel recognized that so long as the case was tried in phases with HP's affirmative case put on first, a victory on HP's intellectual

1  property claims would spell the end for Nu-kote's counterclaim. [HT 421:5-14] As Mr. Pecau

2  explained, HP's intellectual property case was the defense to Nu-kote's antitrust claims. [HT

3  453:5-9] By the summer of 1998, the antitrust and related claims essentially had become the

4  focus of the case. [HT 453:17-19] Nu-kote had changed its packaging, which significantly

5  diminished HP's interest in pursuing trademark claims. Indeed, if HP had not already been

6

7  involved in the Nu-kote litigation, it would not have brought trademark claims against Nu-kote.

8  [HT 454:3-10] HP similarly no longer had the need to pursue its false advertising claims

9  because Nu-kote's products were doing so poorly in the marketplace that HP believed Nu-kote

10  was going to self-destruct without any intervention by HP. [HT 454:11-20] In short, but for

11  having to defend the antitrust claims, HP would have dropped the litigation. [HT 455:9 21]

12

13          HP's desire to end the Nu-kote litigation was illustrated when Nu-kote sought to lift the

14  bankruptcy stay so that it could proceed with its counterclaim against HP. HP opposed lifting

15  the stay so that it would not have to further defend the case. [HT 457:7 458:7 and Exhibit

16  "1087"] Essentially, as Mr. Pecau explained, Nu-kote was expecting a "windfall" of hundreds of

17

18  millions of dollars from its counterclaim, whereas HP had realized that even if HP prevailed on

19  its case there would be no chance of collecting any money. [HT 459:2-24]

20          ACE argued that because HP utilized trial plans showing separate evidence for its

21  affirmative claims and the counterclaim, the Special Master should disallow recovery for costs

22

23  associated with the evidence supporting HP's affirmative case. But Mr. Pecau explained that the

24  existence of such trial plans had nothing to do with HP's strategy of defending the counterclaim

25  by proving its affirmative case. [HT 465:2-474:4] Thus, after HP put on its "affirmative" case,

26  there was not much left of its "defense" case. [HT 474:20-25] In other words, the defense of

27

28

1   Nu-kote's counterclaim was accomplished during the phase of the trial that was denominated as

2   HP's "affirmative" case.

3        Peter Sullivan testified from the point of view of an antitrust defense trial lawyer that the

4   HP intellectual property claims were inextricably intertwined with the defense against the

5

6   antitrust claims, just as Nu-kote argued to the Bankruptcy Court in its request to lift the

7   automatic stay so that it could continue to pursue HP's money. [HT 849:19-850:11] Mr.

8   Sullivan echoed the testimony of other witnesses regarding the impact of Nu-kote's bankruptcy

9   on HP's interest in pursuing its affirmative claims. Mr. Sullivan testified that HP viewed the

10  bankruptcy as an opportunity to stay the entire case because at that point, "the case presented

11  really only a downside to Hewlett-Packard." [HT 846:16-24] Mr. Sullivan explained in detail

12

13  the significant level of resources Nu-kote put into getting the bankruptcy stay lifted so that it

14  could pursue what it believed was an antitrust counterclaim worth hundreds of millions of

15  dollars. [HT 847:19-848:24]

16       In Mr. Sullivan's words, Nu-kote's counsel was "almost entirely focused on the antitrust

17

18  claim" brought by Nu-kote. [HT 848:6-18] Mr. Sullivan explained that, "Both sides tried the

19  case as an antitrust case with the trademark and patent infringement claims used by both sides,

20  either as a defense or an offense." [HT 895:6-13] In his view, the case had essentially become

21  an antitrust case by the time Mr. Sullivan got involved in it in January 1996. [HT 897:9-22]

22

23       Mr. Sullivan conceded that it would have been theoretically possible for HP to win its

24  trademark claim against Nu-kote but still lose the antitrust case brought against it. [HT 913:16-

25  23] But he stated that in a practical sense, the claims of both parties were intertwined, because

26  HP had to win its affirmative claims as part of defeating the claims brought against it. That was

27

28

1   particularly true with respect to claims of patent misuse and sham litigation. [HT 912:15-913:7]

2   Mr. Sullivan, like Mr. Marshall, testified with respect to HP's "white hat" defense strategy.

3       HP also offered testimony from its in-house counsel for the proposition that HP's

4   affirmative case was practically and strategically related to the defense case. Ron Griffin

5   explained that Mr. Katz' expansion and pursuit of the antitrust claims completely changed HP's

6   direction in the case towards defending against the counterclaim. [HT 1645:11-1646:9] Once

7   that happened, HP's focus shifted to proving its affirmative claims as a means of defending

8   against Nu-kote's counterclaim. [HT 1646:19-1647:7] It was therefore no longer possible to

9   separate HP's affirmative claims from Nu-kote's counterclaim. [HT 1647:8 19]   Jack Brigham,

10  HP's then general counsel testified that Mr. Katz' involvement in the case significantly increased

11  HP's efforts to mount a defense to Nu-kote's counterclaim. [HT 1778:4-22] That development

12  caused HP to pursue its intellectual property claims because HP decided that "the best defense

13  would be an offense" and that HP would be able to successfully defend against Nu-kote's

14  counterclaim if it could substantiate its position with respect to its intellectual property rights.

15  [HT 1778:23-1779:14]. William MacAllister testified that once Nu-kote filed for bankruptcy,

16  HP no longer was concerned about prosecuting its affirmative claims for offensive purposes

17  because Nu-kote's products were no longer a concern in the marketplace. [HT 778:13-24]

18      The testimony referenced above establishes that by the time HP tendered the defense of

19  the Nu-kote action to ACE, the litigation was focused around the Nu-kote counterclaim and that

20  HP's pursuit of its affirmative claims was part of an overall strategy of defense against the

21  counterclaim. The testimony is detailed, thorough and credible. The Special Master therefore

22  concludes that HP has met its burden of establishing that all of the post-tender fees and costs

incurred by HP were related to the defense of the Nu-kote counterclaim. As a result, all HP's

post-tender fees and costs are presumed to be reasonable and necessary defense costs.

### 3. *ACE Has Failed To Met Its Burden*

ACE contends that HP is estopped from asserting that the prosecution of its affirmative

claim was inextricably linked with the defense of Nu-kote's counterclaim. In support of its

argument to phase the trial and stay Nu-kote's counterclaim in the underlying matter, HP stated

that: "the vast majority of Nu-kote's anti-trust allegations are not inextricably related to the

patent, trademark and false advertising, unfair competition issues in this case." (Exhibit 2142;

HT 2349:21-24.). HP prevailed on its phasing motion, and the court allowed HP's affirmative

trademark infringement, false advertising, and patent infringement cases to proceed first.

Judicial estoppel is an equitable doctrine invoked by courts to protect the integrity of the

judicial process and it precludes parties from taking inconsistent positions in judicial

proceedings. *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 n.3 (9th Cir. 1996). The doctrine,

also known as the doctrine of preclusion of inconsistent positions, is intended to protect against

litigants playing fast and loose with the courts, gaining advantage by taking one position, then

seeking to gain a second advantage by taking an incompatible position. *Bradley v. Harcourt,

Brace & Co.*, 104 F.3d 267, 272 (9th Cir. 1996); *Rissetto v. Plumbers & Steamfitters Local 343*,

94 F.3d 597, 600-601 (9th Cir. 1996).

The doctrine of judicial estoppel recently was analyzed by the Supreme Court in *New

Hampshire v. Maine*, 532 U.S. 742 (2001). There, the Court noted that the doctrine "prevents a

party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that

party in a previous proceeding." *Id.* at 752 (citing 18 Moore's Federal Practice § 134.30 (3d. ed.

2000)).  The Court noted that the circumstances under which judicial estoppel appropriately may

be invoked are not reduceable to any general formula, but that, typically, courts use three factors

in determining whether or not to apply the doctrine:

> First, a party's later position must be "clearly inconsistent" with its earlier position.
> Second, courts regularly inquire whether the party has succeeded in persuading the court
> to accept that party's earlier position, so that judicial acceptance of an inconsistent
> position in a later proceeding would create "the perception that either the first or the
> second court was misled."  Absent success in a prior proceeding, a party's later
> inconsistent position introduces no "risk of inconsistent court determinations", and thus
> poses little threat to judicial integrity.  A third consideration is whether the party seeking
> to assert an inconsistent position would derive an unfair advantage or impose an unfair
> detriment on the opposing party if not estopped.

*Id.* at 752-753 (internal citations omitted).

ACE contends that each of these factors is present here.  ACE asserts that:  (1) it is

beyond question that HP's is taking a position in the coverage action that is diametrically

opposed to the position it took in the underlying action, where it asserted that its claims were not

inextricably linked with Nu-kote's counterclaims; (2) HP prevailed in that argument and

succeeded in obtaining phasing and an order that its claims proceed first; and (3) to allow HP to

assert this inconsistent position clearly provides HP with an unfair advantage.  ACE contends

that under these circumstances, HP should be estopped from even making the argument that the

claim and counterclaim were inextricably intertwined.

In order to have the patent claims tried first, HP asserted in the underlying proceedings

that the majority of Nu-kote's antitrust allegations were not inextricably related to the patent,

trademark, false advertising and unfair competition issues in this case.  During the damages

hearing, HP offered testimony that HP's affirmative claims and the Nu-kote antitrust claims were

in fact inextricably interrelated.  [HT 2228: 14-19 and elsewhere].  These positions, on their face,

are inconsistent.  ACE, however, has failed to establish that HP's current assertion of an

1   inextricable link between the claims and counterclaim would unfairly prejudice ACE.

2   Accordingly, the judicial estoppel doctrine does not apply.

3      The Special Master notes that both parties use the phrase "inextricably intertwined" in

4
5   their briefs. The "inextricably intertwined" language is found in *Safeguard Scientific, Inc. v.*

6   *Liberty Mutual Ins. Co.*, 766 F.Supp. 324, 334 (E.D.Penn.1991). This language has not been

7   adopted by any California case. The applicable test, as noted above, is whether the costs were

8   reasonable and necessary to the defense of the action against the insured. ACE has not

9   demonstrated that HP asserted in the underlying action that the claims and counterclaim were

10
11   unrelated, or that prosecution of the affirmative claims was not reasonable and necessary to HP's

12   defense of the counterclaim.

13      At the damages hearing, ACE presented three experts[4] to establish that the Nu-kote action

14   involved a complaint and counterclaim that were separate and distinct, that each required

15
16   different litigation activities, and that as a result "no one in good conscience could conclude that

17   ACE was obligated to reimburse HP for all of the fees and costs incurred in the Nu-kote action."

18      ACE's first witness was Professor Peter Menell.  Mr. Menell received his bachelor's

19   degree from the Massachusetts Institute of Technology, a master's degree and a Ph.D. in

20
21   economics from Stanford University and a law degree from Harvard Law School. (HT 1230:18-

22   25.) He has been law professor at the University of California Berkeley, Boalt Hall School of

23

24

---

25   [4]  HP filed a motion in limine to exclude the expert testimony of Craig Aronson and Andre Jardini, asserting that
     their testimony was inadmissible expert testimony under Fed. R. Evid. 702 and 104(a)  The motion was denied
26   subject to a continuing motion to strike. HP renewed the objections during the damages hearing. The Special
     Master has reviewed HP's *Daubert/Kumho Tire* objections and is satisfied that the testimony of Mr. Aronson and
27   Mr. Jardini meets the standards for admissibility of expert testimony.
        HP also asserts that the Special Master should accord no weight to the testimony of Mr. Aronson and Mr. Jardini
28   due to the lack of credibility of their processes. For the reasons noted in the body of this order, the Special Master,
     after consideration of the expert testimony, finds that ACE's evidentiary showing is insufficient to establish that
     HP's fees and costs were unreasonable and unnecessary.

1  Law for twelve years. (HT 1230:23-25-1231:1-2.) Professor Menell is an internationally

2  renowned expert on law and technology, with a focus on intellectual property. (HT 1231:8-11.)

3  He has coauthored two books. One book, published in 1997, is titled "Intellectual Property in

4
5  the New Technological Age." (HT 1231:14-20.) The book addresses intellectual property law,

6  trade secret, patent, copyright, trademark, and state intellectual property law. (HT 1231:23-25-

7  1232:1.) Professor Menell also published a book entitled "Software and Internet Law" relating

8  to the internet and digital technology. (HT 1232:23-25-1233:1-8.) Professor Menell is

9
10  Executive Director for the Berkeley Center for Law and Technology. (HT 1233:10-11.) For the

11  last five years, Professor Menell has organized and lectured at intellectual property educational

12  programs for federal district court and appellate judges as well as members of the United States

13  Supreme Court. (HT 1234:23-25-1238:1-25; See also, Exhibit 3600A.)

14         Professor Menell was retained, in effect, to ascertain whether HP's affirmative case and

15  the Nu-kote counterclaim were "inextricably intertwined." Professor Menell reviewed the HP

16
17  complaint and amended complaint, the Nu-kote answer and counterclaims through the fourth

18  amended complaint. He also read numerous expert reports from the Nu-kote action and all

19  volumes of the trial transcripts from the Nu-kote action. In addition, he reviewed certain

20  depositions from the present action. (HT 1245:22-12481-4; see also, Exhibit 3600B.) He

21  concluded that the fees and costs associated with litigating HP's affirmative claims could be

22
23  separated systematically to particular causes of action. (HT 1249:12-16.) Moreover, he

24  concluded that the "lion's share" of fees and costs could be allocated to one or another of the

25  causes of action in HP's affirmative case or the Nu-kote counterclaim. (HT 1249:17-20.)

26         Professor Menell concluded that almost every witness in the Nu-kote action related to a

27  particular cause of action. He determined that experts dealt with very specific issues; therefore,

28

1   the cost could be attributed to a specific cause of action. (HT 1250:8-20.) For example, there

2   were experts who dealt with a survey that was done to assess consumer confusion with regard to

3   the trademark cause of action. (HT 1250:11-15.) He also emphasized the fact that work in the

4   Nu-kote action was divided between P&E, an intellectual property firm, and GD&C, an antitrust

5

6   firm. (HT 1250:21-1251:6.) He noted the distinctive nature of some of the proceedings – for

7   example, a Markman hearing is done only for patent cases and would not be conducted for an

8   antitrust case. (HT 1251:7-11.) Professor Menell believed that bifurcation of the Nu-kote action

9   confirmed the inherently distinct and separate nature of the HP affirmative case as opposed to

10

11  Nu-kote's antitrust counterclaim. (HT 1251:12-20.)

12          Professor Menell noted that as the Nu-kote action went to trial, there were three main

13  issues presented by HP: trademark infringement, false advertising and patent infringement. (HT

14  1252:11-24.) These were distinct claims requiring distinct proof. (HT 1253:1-8.) Professor

15  Menell did not conclude that HP's affirmative claims "morphed" into Nu-kote's antitrust claims.

16

17  (HT 1269:16-25-1270:1-2.) Even though both HP's affirmative action and Nu-kote's

18  counterclaims included claims of false adverting, the underlying predicate facts were completely

19  different, the experts were completely different and the analysis was completely different. (HT

20  1270:1-12.)

21          Professor Menell disagreed with Mr. Blecher's conclusion that an HP victory on the

22  affirmative case would have provided an absolute defense to Nu-kote's antitrust counterclaim.

23

24  Professor Menell testified that:

25          Well, I thought Mr. Blecher has not adequately acquainted himself with the issues as
            presented in this case, and he acknowledged that he hadn't reviewed many of the
26          documents. But he was interpreting what was going on in the case as if we win the case –
            I mean, if we show in the first part of the case – if HP shows in the first part of the case
27          that it prevails on these intellectual property rights, then Nu-kote will be deemed to be
28          basically a trespasser and have no ability to serve this market at all, and that's not really

                                                -42-

an accurate statement about what was at issue in the case. In fact, on trademark or false advertising claim, you prevent them from engaging in certain practices in marketing of products, but they just change their labels, and they change their advertising. I mean, they still have a lawful presence, if that's the only thing you win. And on the patent issue, you may be able to work around the patents. And, in fact, companies have successfully worked around other companies' intellectual property rights. So at the end of the day, you know, Nu-kote can reassess their strategy, and they may be able to reemerge on the fringe of the market.

(HT 1287:1-1288:10.)

Professor Menell testified that he would expect one of his students to be capable of performing the actual segregation between prosecution and defense. (HT 1289:6-25; 1290:15-23.)

ACE also offered Robert Rose to address the separability of the Nu-kote action. Mr. Rose graduated from the University of Arizona with a degree in physics and astronomy. He obtained his law degree from the University of Arizona in 1975. (HT 1354:24.) His antitrust experience includes five years at the Department of Justice Antitrust Division and five years with 20th Century Fox handling antitrust issues. (HT 1355:6-1357:12.) Mr. Rose concluded that HP's affirmative claims were separate from the counterclaim and were treated separately by HP's lawyers. (HT 1366:15-21.)

The testimony of Professor Menell establishes, at most, that fees and costs theoretically could be allocated to particular claims. As is noted in the discussion of prosecution fees above, a non-defending insurer is not entitled to allocate expenses. ACE's efforts to ascribe particular fees to particular causes of action in HP's complaint do not address the relevant issue. For example, even assuming that particular fees and costs could be allocated to HP's patent or trademark claims, Professor Menell did not attempt to show that HP's prosecution of the patent or trademark claims was unrelated or unnecessary to HP's defense of the Nu-kote counterclaim.

1    The testimony of Robert Rose was consistent with the testimony of Professor Menell – he

2    also concluded that it would be theoretically possible to distinguish between prosecution and

3    defense activities and that the lion's share of costs could be allocated to one or another of the

4    causes of action. [HT 1249:18-1250:7]. Mr. Rose based his allocation theory on four grounds.

5    [HT 1250:5-1251:22] First, he claimed that each witness could be associated with a different

6    

7    cause of action. Second, there were two law firms working on the case. Third, he relied on the

8    "distinctive nature" of some causes of action. Fourth, he claimed the trial was "bifurcated" into

9    two phases.

10   Even if there had been no contradictory testimony from Messrs. Blecher, Cooper,

11   Marshall, Sullivan, Pecau, Sutis, MacAllister, Brigham, Griffin, et al., explaining the

12   

13   interrelationship of the defense and "prosecution" in the case, Mr. Rose's arguments do not

14   establish that any expenses were unreasonable or unnecessary to the defense of the counterclaim.

15   It does not follow that because different witnesses testified about discrete points in a lawsuit that

16   

17   the testimony is entirely unrelated to other points in the lawsuit. Having two law firms working

18   on a lawsuit only evidences the size and complexity of the case. Mr. Rose conceded that this

19   type of case quickly becomes complex. [HT 1365:17-24] That some parts of the case had a

20   distinctive nature does not establish a lack of relationship to other parts of the case. Finally,

21   there was no evidence that the case was bifurcated; there was a single trial with a single jury in

22   

23   which one party went first and the other party went second in presenting its evidence, just as is

24   done in virtually every lawsuit. It is undisputed that HP requested this phasing of the case, but

25   this strategic decision by HP does not demonstrate that the first phase of the case, dealing with

26   HP's affirmative claims, was unrelated or unnecessary to the second phase of the case, dealing

27   with the counterclaim.

28   

-44-

ACE's final expert was Craig Aronson. Mr. Aronson is a 1977 Summa Cum Laude Phi Beta Kappa graduate of Dartmouth College and a 1980 graduate of the University of Chicago Law School. (HT 1826:24-25.) He is a partner at Berger, Kahn, Chapman and Moss. (HT 1827:1-20.) He is in charge of the intellectual property practice and is also a partner in the insurance coverage unit. (HT 1827:20-25.) Over the past 20 years, he has litigated hundreds of lawsuits against businesses, many of which involved intellectual property issues, trademark, patent, copyright infringement, fraud, breach of contract and trade secret issues. The nature of his counseling with regard to the above-described matters is to advise insurers as to their exposure, liability, damage issues, and/or the possibility of filing counterclaims. In addition, insurance companies typically want evaluations of the cases, including costs, litigation strategy and desired outcomes. (HT 1828:1-25.)

Mr. Aronson spent nearly 800 hours reviewing and understanding the Nu-kote action. (HT 1829:1-16.) He reviewed pleadings, summary judgment motions, all of the expert reports, the entire underlying trial transcripts and numerous deposition transcripts, including the depositions of HP employees such as Mr. MacAllister and Mr. Sutis and outside counsel. He also reviewed all the post-tender bills that HP produced to ACE in connection with the Nu-kote action. (HT 1838:23-1839:1-25.) Based on his review, Mr. Aronson opined that the Nu-kote action was not a "seamless web." Rather, there were very clear and distinct claims, both in HP's complaint and in the Nu-kote counterclaim. (HT 1839:11-17.) More specifically, he explained (in accord with the views of Professor Menell) that HP's affirmative case and Nu-kote's counterclaim presented very distinct sets of issues, elements of proof, witnesses, litigation techniques and strategies. (HT 1840:12-16.) Mr. Aronson opined that one can separate out legal fees and expenses related to prosecution of HP's complaint as opposed to those fees and costs