that HP had to incur in defense of the Nu-kote counterclaim. (HT 1839:18-21.) He reviewed all litigation activity that occurred in the Nu-kote action, determined to which claim or issue the activity was attributable – affirmative case or counterclaim – and thus calculated which fees and costs were incurred in the defense of the Nu-kote counterclaim. (HT 1853:17-22.) He offered two approaches which could be applied, the incremental approach and the broad distribution approach.

    Under the incremental approach, the insurer pays any bills that would not have been necessary for the prosecution of the insured's claim against another. (HT 1858:24-25-1859:1-3.) Mr. Aronson believes that the incremental approach is the fairest and most reasonable approach to determine the defense fees and costs owed by the insurer, because it takes into consideration the facts of this unique case, the language of the insurance contract and controlling California law. (HT 1857:11-25-1858:1-4.) Essentially, the incremental approach looks to the difference between what the insured would have had to pay to prosecute the lawsuit regardless of the counterclaims and what it in fact had to pay as a consequence of the counterclaim having been filed. The incremental approach is based largely on *Scottsdale Ins. Co. v Homestead Land Development Corporation*, 145 F.R.D. 523, 534-535 (N.D. Cal. 1992). (HT 1856:9-19.) In other words, the incremental approach requires the insurer to pay only for those essentially additional or incremental expenses that were caused by the filing of the counterclaim. (HT 1856:20-22; 1858:5-10.)

    Under the broad distribution approach, if a legal activity benefits both the prosecution of the affirmative case and the defense of the counterclaim, the cost should be split depending on the nature of the task. For example, whether the task was predominately prosecution or defense with only peripheral benefit to the other. (HT, 1859:10-25; 1861:1-11.)

1   Mr. Aronson testified at some length with respect to his analysis of the bills pursuant to
2   these two approaches. He looked at each outside bill and performed some analysis or exercised
3   some judgment with respect to each and every time entry. (HT 1863:16-25.) For example, if a
4   particular time entry was "Gibson, Dunn & Crutcher, 1.0 hours drafted motion for summary
5   adjudication number 4," Mr. Aronson attempted to understand what the entry meant in terms of
6   what legal activity was being done and then looked to the matching raw material from the
7   underlying action, meaning the deposition transcript or the motion or the discovery, to see what
8   cause of action was implicated. (HT 1863:18-25-1864:1-10.) He placed handwritten notes on
9   the actual bills to reflect his "judgment call" concerning the extent to which the insurer should be
10  charged with the legal expense involved:

> So, if the billing entry were, let's say, four hours, and if I thought the billing entry was, say, a patent validity issue, then under the incremental approach, as we've discussed, patent validity is part and parcel of prosecution of the case in chief, there's necessary added activity so it would get zero under incremental. Under broad distribution there's a split, I would give it half, two hours, and I would do that entry by entry, that analysis. We then generated spread sheets that put down the numbers entry by entry of hours that we were allowing and of course, if you have the hours you're allowing and have a billable rate for the attorney or paralegal involved, then you can generate an amount of dollars that you're allowing, both for a particular entry and in toto for the invoice and that's what we did.

(HT 1865:19-25-1866:1-19.)

Under the incremental approach, Mr. Aronson concluded that ACE should not pay for any fees and costs incurred in connection with the affirmative patent claims or the invalidity count in the Nu-kote counterclaim because such expenses were "part and parcel" of HP's prosecution of its patent case-in-chief. (HT, 10/29/20, 1859:25-1860:5.) Under the broad distribution approach, Mr. Aronson generally split the patent validity issue equally between HP and ACE. (HT 1860:6-17.)

1    Under the broad distribution approach, Mr. Aronson explained that even if there is

2    arguably a dual purpose to an activity, there are some activities that seem to be predominantly

3    one or the other and only peripherally of benefit to the second. (HT, 10/29/03, 1860:22-25.) As

4
5    such, Mr. Aronson gave two-thirds of the time billed for working on claim construction issues to

6    the prosecution of the HP's affirmative case-in-chief and one-third to the counterclaim. (HT

7    1861:8-11). Fees and costs incurred in connection with issues such as "thicket of patents,"

8    applicable to both the patent case and the counterclaim, were generally apportioned 50% to the

9    affirmative action and 50% to defense of the Nu-kote counterclaim. (HT 1862:22-1863:13).

10
11    During his full day of testimony, Mr. Aronson explained and applied his approaches to

12    actual work performed in connection with the Nu-kote action. (HT 1868:24-25-1869:1-6.) For

13    example, Mr. Aronson concluded that Robert Hall, an antitrust expert, was necessary for defense

14    of the Nu-kote counterclaim and that his expenses should be paid by the insurer. (HT 1870:8-14;

15    Exhibit 2524.) He concluded that Albert Bruno, a marketing expert served two roles because his

16
17    report addressed issues relating to both antitrust and false advertising claims. Accordingly, Mr.

18    Aronson apportioned fees and costs associated with Mr. Bruno equally between the prosecution

19    and the defense. (HT 1870:21-1871:14; Exhibit 2525.) Expert Glen R. Stevick's report served

20    several purposes and his testimony related both to HP's patent case and the BIFF/TIFF issue

21    asserted in the Nu-kote counterclaim. Under the incremental approach, fees and costs

22
23    attributable to Mr. Stevick are HP's responsibility. Under the broad distribution approach fees

24    and costs attributable to Mr. Stevick are partially the responsibility of HP and partially the

25    responsibility of ACE. (HT 1871:22-1872:11; Exhibit 2526.) In this manner, Mr. Aronson

26    reviewed sixteen motions for summary judgment or partial summary judgment filed by HP and

27

28

1    determined whether they were necessary to the defense of the Nu-kote counterclaim or were for

2    prosecution of HP's affirmative claims. (Exhibit 2836; HT 1886:21-1890:16.)

3         After review of all bills, Mr. Aronson concluded that under the incremental approach, the

4    total P&E fees and costs attributable to the defense of the counterclaim are $1,639,039. (Exhibit

5    3596, Exhibit 4; Exhibit 3596, p.35).    Under the broad distribution approach, this figure is

6    $3,136,210. (Exhibit 3596, Exhibit 4; Exhibit3596, p.35.)  Under the incremental approach, the

7    total GD&C fees and costs attributable to the defense of the counterclaim are $3,457,806.

8    (Exhibit 5 of 3596; Exhibit 3596, p.35.)  Under the broad distribution approach, this figure is

9    $4,366,043. (Exhibit 5 of 3596; Exhibit 3596, p.35.)

10   
11   
12        Mr. Aronson's testimony is insufficient to overcome the presumption that all of HP's

13   post-tender expenditures were necessary to the defense of the Nu-kote counterclaim.  First, the

14   basis for the "incremental approach" is *Scottsdale*.   As previously noted, *Scottsdale* addressed a

15   defending insurer's right to allocate expenses between covered and uncovered claims. ACE is

16   not a defending insurer and may not allocate.  A non-defending insurer must pay all fees and

17   costs that are reasonable and necessary to defense of the action.   Thus the relevant question is

18   whether the fees and costs incurred by HP were necessary to the defense of the Nu-kote

19   counterclaim.  Mr. Aronson's incremental approach does not focus on this question, but instead

20   asks what fees and costs were *added* by the counterclaim, the assumption being that any fees and

21   costs HP would have paid to prosecute its affirmative claims in any event cannot be considered

22   reasonable and necessary to the defense of the counterclaim.  This assumption is contrary to

23   California law as set forth in *State of California* and the other authorities discussed in Section III

24   A 1 above.

25   
26   
27   
28·

The broad distribution approach assumes that if a legal activity benefits the prosecution of the affirmative defense and the defense of the counterclaim, the costs associated with the activity should be split between the prosecution and defense. This approach is contrary to California law, which provides that an insured may recover expenses necessary to the defense even if the associated activity benefits the prosecution of affirmative claims as well. *See State of California,* 63 Cal.App.4th at 1549.

ACE, in the event that the Special Master rejects Mr. Aronson's two approaches, asserts that Mr. Aronson's spreadsheets and the annotated billings attached to his report support two alternative damages scenarios, a "broadest entitlement" approach and a "rough division of labor" approach. The "broadest entitlement" approach is defined by ACE as follows:

> The Special Master might feel that HP is entitled to recover 100% of the fees attributable to any billing entry that did "double duty" and were a benefit to both the prosecution of the affirmative claims and the defense of the counterclaims. These entries are the entries that Mr. Aronson gave any percentage to in his annotations other than 0%. At the same time, whereas Mr. Aronson gave some credit to HP for vague billings in the same proportion that he was allowing a recovery for the non-vague entries, the Special Master might conclude that HP is not entitled to any credit for the vague billings on the ground that HP did not carry its initial burden of establishing that such billings were "reasonable and necessary" to the defense of the counterclaim.

The "broadest entitlement" approach, like Mr. Aronson's proposed approaches, is not consistent with California law. The relevant inquiry is whether particular fees and costs were necessary to the defense of the Nu-kote counterclaim, not whether particular fees and costs benefited the prosecution or the defense. Moreover, as is discussed below, the burden with respect to vague billings lies with ACE, not HP.

ACE's "rough division of labor approach" is defined as follows:

> The record is replete with evidence and testimony that Gibson, Dunn & Crutcher handled the anti-trust issues (defense) and Pennie & Edmonds handled the intellectual property issues (prosecution). The fees and costs attributed to Gibson, Dunn & Crutcher are $12,331,355. Vague billing entries identified by ACE's experts justify a reduction based

1   on Mr. Jardini's testimony closer to the 49% amount.  After applying a 49% reduction,
2   the total amount is: $6,042,364.

3       Again, the question is necessity to the defense of the Nu-kote counterclaim.  ACE has
4   failed to establish that the post-tender fees and costs of P&E were unnecessary to the defense of
5   the Nu-kote counterclaim.  The "rough division of labor" approach, like the "broadest
6   entitlement" approach, is not consistent with California law, and does not provide the Special
7   Master with any legitimate basis for limiting HP's recovery.

8       The primary weakness in ACE's presentation is its refusal to acknowledge that an insurer
9   who fails to defend may be required to pay expenses associated with the insured's prosecution of
10  affirmative claims under certain circumstances, namely if those expenses are reasonable and
11  necessary to the defense of the action brought against the insured.  Virtually all of the evidence
12  presented by ACE is intended to show that certain expenses are associated with HP's affirmative
13  claims rather than with Nu-kote's counterclaim.  This showing begs the question of whether
14  expenses associated with HP's affirmative claims were reasonable and necessary to the defense
15  of the counterclaim.

16      HP presented the testimony of the attorneys who were actually involved in the underlying
17  litigation and of Max Blecher to address the issues of necessity to the defense.  These witnesses
18  established that all the post-tender fees and costs were necessary to the defense of the
19  counterclaim. HP does not dispute that some of the work done by its counsel also was related to
20  the prosecution of its affirmative claims.  However, HP's witnesses testified as to the strategic
21  interrelationship of the prosecution and the defense.  HP's witnesses also testified that the
22  defense of the counterclaims was the focus of the litigation in the post-tender period and that all
23  efforts were directed at defending those claims.  Accordingly, ACE has failed to meet its burden

of proving by a preponderance of the evidence that any of the post-tender fees and costs were unnecessary to the defense of the counterclaim.

### B.    Reasonableness Of HP's Billing Practices

In addition to attacking the reasonableness and necessity of HP's tendered expenses as expressed above, ACE also attacks the reasonableness of HP's billing practices.

ACE first contends that HP bears the burden of submitting detailed records justifying the hours claimed to have been expended" citing *Chemical Bank v. City of Seattle* (In re Washington Public Power Supply System Securities Litigation), 19 F.3d 1291, 1305 (9th Cir. 1994).    Because ACE wrongfully refused to defend HP, the reasonableness of HP's expenses is presumed once HP has met its burden of proving the existence and amount of the expenses. *See Aerojet,* 17 Cal.4th at 64. The burden is therefore on ACE to prove by a preponderance of evidence that these expenses are unreasonable. *Id.* An insurer who wrongfully refuses to defend an insured must pay attorneys' fees as provided in the policy or as "incurred in good faith and in the exercise of a reasonable discretion." *Zurich Ins. Co. (U.S. Branch) v. Killer Music, Inc.* 998 F.2d 674, 680 (9th. Cir.1993).

At the damages hearing, ACE offered the testimony of Andre Jardini.  Mr. Jardini attended the University of Notre Dame and graduated in 1973 with a B.A. degree. (HT 970:24-25-971:1-8.) He graduated from Hastings College of the Law in 1976 and worked as a law clerk to a United States District Court judge in Los Angeles through 1978. (HT 971:9-18.) Mr. Jardini is a director member of Knapp, Petersen & Clark. (HT 972:1-4.) He is a trial attorney and acts as audit counsel. (HT 972:7-10.) Mr. Jardini is a member of the American Board of Trial Advocates. (Exhibit 4158; HT 972:15-19.)

1   Mr. Jardini has been performing audits of fee billings since the middle 1980's. (HT

2   974:13-23.) Since 1986, Mr. Jardini or his company, KPC Legal Audit Services, Inc., has

3   performed more than 500 fee audits, including audits of GD&C fees. (HT 977:7-12; 977:13-20.)

4   Mr. Jardini has testified in court as an expert in the field of attorney fee billing approximately 10

5   or 12 times. (HT 999:20-23.) He has reviewed attorney fee billings in patent infringement and

6

7   antitrust cases. (HT 1007:11-22.) He estimates that he spent more than 100 hours personally in

8   connection with this case and that his company has spent more than 1500 hours. (HT 1011:17-

9   24.) A portion of Mr. Jardini's report, Exhibit 3597A, was admitted as Mr. Jardini's testimony.

10  (HT 1085:4-21.)

11

12   Mr. Jardini analyzed the bills in this case pursuant to two separate methodologies.   One

13  methodology was "identifying issues of concern." For this approach, his firm created a database

14  of billing information.  [HT 1002:16 20] The database created by Mr. Jardini was not produced

15  in discovery or entered in evidence, even though his testimony relied on it.  Database reports

16  were generated based on issues which Mr. Jardini deemed to merit "closer inspection" "based on

17  all of the information available, not just the bills but other information of whatever type we

18

19  decide, I decide in specific instances . . . ." [HT 1002:21-1003:2]  After deciding if there was a

20  billing issue, Mr. Jardini determined if there was a way to "reasonably" quantify it. [HT 1003:3

21  4] The categories of billing improprieties or excesses identified by Mr. Jardini included the

22

23  following:

24       1.    Transient Billing
          2     Undescribed Paralegal Billing
25       3.    Inadequate Billing Description
          4.    Billing for Overhead Costs
26       5.    Billing for Clerical Activities
          6.    Billing for Inter-Firm Conferencing
27       7.    Multiple Attendance at Trial
          8.    Multiple Attendance at Depositions and Hearings
28

-53-

9.   Error Billing

10.  Billing for Insurance Coverage Advice

11.  Duplication of Effort

12.  Block Billing

13.  Excessive Minimum Billing Increment (i.e., .25 rather than .1)

Based upon these categories, Mr. Jardini concluded that a number of reductions should be made, resulting in a maximum reasonable amount of attorneys' fees in the Nu-kote action of $8,909,649.98. (Exhibit 3597A, 49:26-27; Exhibit 3597B.).

As an alternative methodology, Mr. Jardini reviewed the invoices, listed and cataloged the services performed, reflected on the staffing choices made by counsel and determined a reasonable value for the services performed. In making this analysis, he did not second guess counsel with regard to the strategic choices made in the litigation, including the number and type of motions made or opposed. (Exhibit 3597A, 47:21-25.)

Mr. Jardini testified that the essence of these methodologies was his own personal experience. [HT 1006:8 14] Mr. Jardini said he reviewed various materials and "many of the pleadings," but that his own experience was the primary basis for his opinions. He did not use surveys or any other outside source of information. [HT 1103:15-1104:25] Mr. Jardini conceded that the only standard he used to arrive at his opinion was his own judgment. [HT 1105:1-1107:4] "I looked at everything that was done and evaluated it against my idea of what would have been reasonable." [HT 1123:18-20]

Mr. Jardini identified the major litigation events in the post-tender period and applied reasonable values concerning all the litigation events. In making his analysis he allowed the full value of time billed by the firms in connection with the summary judgment motions and motions in limine. He allowed the full amount of time billed for computerized litigation projects (2,558 hours). Depositions were valued at 30 hours each. Trial days, absent preparation time, were

1   estimated at five timekeepers at 8 hours a day. Each letter brief was valued at 8 hours. Each

2   item of discovery, and the other motions and pleadings were valued at 30 hours each. Document

3   review was allotted at two attorney years, or 3,600 hours. Preparation for trial and research was

4
    allotted 10 attorney months or 1,500 hours. Court appearances and telephonic hearings were
5
6   valued at 6 hours each. The computation of the above-described litigation events in this fashion

7   results in an allotment of 24,247 hours. (Exhibit 3597A, 48:11-21.)

8         Mr. Jardini testified that additional transactional time concerning other, usually lesser
9
    events, was involved in the litigation and that certain inefficiencies were to be expected in
10
11  litigation of this size. He added an additional 24,247 hours to encompass all such issues and any

12  potential disagreements with the valuations he ascribed. The total of 48,494 hours so derived

13  was valued at the actual combined average rate delivered by GD&C and P&E of $179.91 per

14  hour. Therefore, under this analysis, Mr. Jardini would expect that attorneys' fees would be
15
    limited to $8,724,555.54. (Exhibit 3597A, 48:22-27; 49:1-2; HT 1084:7-10.) Accordingly, he
16
17  concluded that the invoicing of nearly $18 million in fees by GD&C and P&E was unreasonable.

18  (Exhibit 3597A, 49:3-6.)

19        In Mr. Jardini's opinion, none of the fees and costs incurred by HP personnel costs

20  should be reimbursed since such fees and costs are undocumented, potentially duplicative and/or
21
    business costs of HP. (Exhibit 3597A, 47:18-19.) After making all the reduction he deemed
22
23  appropriate Mr. Jardini concluded that the total maximum amount of costs which are recoverable

24  is $3,817,078.61. (Exhibit 3597A, HT, 50:18-20; Exhibit 3597B.)

25        In large part, Mr. Jardini's conclusion are based upon nothing more than his own personal
26
    opinion as to how many hours "should" have been expended on particular activities such as the
27

28

1   taking of depositions the preparation of letter briefs and the like.  These hindsight opinions are

2   insufficient to prove that the hours or costs actually expended on such tasks was unreasonable.

3       Mr. Jardini does identify several particular areas of concern in the billing.  Those areas

4   are:  (1) block billing; (2) vague billing descriptions; (3) staff of the case with transient time

5   keepers and summer associates; (4) unreasonable billing increments used by HP's attorneys; (5)

6   overhead activities, including clerical work, in the bills; (6) excessive interoffice

7

8   communications; and (7) duplicative efforts, including multiple attendance by attorneys at

9   conferences, deposition, hearings and trials.

10

11

12                           *Block Billing & Vague Billing Descriptions*

13       Mr. Jardini asserts that HP seeks reimbursement for numerous instances of block billing[5]

14   and for otherwise unreasonably vague billings, including inadequate description of paralegal

15   time.  ACE asserts that these types of billings preclude the Special Master from properly

16   analyzing the reasonableness of the fees incurred by HP and that the Special Master therefore

17

18   should reduce the fees by up to 50%.

19       HP offered the testimony of Sheri Butman to rebut Mr. Jardini's testimony.  Ms Butman

20   is the technology manager for HP's attorneys in the present action, Gauntlett and Associates, and

21   was responsible in part for the creation of HP's database.  Ms. Butman testified at length about

22   the creation of the database at substantial expense over a two-year period.  After the completion

23

24   of Mr. Jardini's testimony, Ms. Butman reviewed his reports.  [HT 2092:18-20]  Ms. Butman

25   compared the materials used by Mr. Jardini, including his Exhibit reports, schedules, and

26

27

28   _____

[5] Block billing has been defined as "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time spent on specific tasks." *Harold Stores, Inc. v Dillard Department Stores, Inc.*, 82 F 3d 1533, 1554 n. 15 (10th Cir. 1996).

PowerPoint presentation, in his testimony. [HT 2093:1-12] This information was reviewed for internal consistency and compared with the information contained in the HP database, Exhibit "1400," which underwent extensive accuracy checks. [HT 2093:15-20] Ms. Butman identified numerous inaccuracies in the testimony of Mr. Jardini. [HT 2097:6 2103:8]

With respect to allegedly vague or erroneous billing, Mr. Jardini testified about P&E attorney James Markey, who billed on a Saturday and a Sunday for attendance at trial. [HT 1058:15-18] Mr. Jardini opined that such an entry was obviously a mistake. [HT 1058:18-19] Ms. Butman testified that Mr. Markey did bill on Saturday, May 16, 1999, and Sunday, May 22, 1999. [HT 2103:12-14] Ms. Butman further testified that 34 other timekeepers also billed on Saturday, May 16, 1999, for a total of 337.65 hours. [HT 2104:7-12] These included Bob Cooper and William Pecau. [HT 2103:20-2104:6] Mr. Pecau and others testified to substantial weekend trial activity in preparation for trial days. [HT 476:15-22].

Ms. Butman found that Mr. Jardini was confused about the correct time period for analysis; he included some pre-tender invoices in his analysis and he stopped before the case was over in 2000. [HT 2094:14 2095:4] She also found that Mr. Jardini appeared confused about the amount sought by HP. [HT 2096:1-11] His charts and schedules revealed that Mr. Jardini relied on non-existent invoices, creating numbers in his database for invoices that do not exist. [HT 2106:5-24] His calculations of the fees failed to include the credits that HP received from GD&C. [HT 2109:17 23 and 2116:9-12] Significantly, Mr. Jardini failed to note the discounts (almost $1 million) provided to HP by both P&E and GD&C, thereby overstating the charges of the firms. [HT 2116:25-2117:13]

Further, despite his assertions to the contrary, Mr. Jardini actually used some information contained in the HP database, Exhibit "1400." [HT 2111:18-25 and 2120:23-2122:17]

1    However, Mr. Jardini's lists of timekeepers missed people, had wrong time totals for them, and

2    mistook which firm they were with. For example, he listed Craig Pace as a GD&C employee

3    with 121.5 hours, when Mr. Pace was actually the HP Litigation Section Manager who claimed

4
5    only 6.9 hours. [HT 2123:20 2126:25]

6         Ms. Butman also demonstrated that several of the figures in Mr. Jardini's schedules did

7    not match the figures reflected in his charts and PowerPoint presentation during his testimony.

8    These included varying figures for pre- and post-tender fees, use of three different irreconcilable

9
10   percentages for alleged "vague" costs, charted percentages for "interoffice communication" and

11   "clerical activities" that are not supported in any of his schedules. [HT 2117:14 2120:22] He

12   used different figures and different percentages in various places where they should have been

13   the same.

14        In *State of California v. Pacific Indem. Co.*, 63 Cal.App.4th 1535 (1998), the State of

15
16   California sought reimbursement for bills that did not describe the specific work performed by

17   the attorneys. The parties agreed that the method used by the attorneys to record their time

18   precluded separation of costs incurred in prosecuting the action from those incurred in defending

19   the action. The court, however, did not preclude the State from receiving reimbursement for the

20   bills based upon block billing or lack of specificity. The court noted that the burden of proof was

21
22   critical and that the insurer had the burden of proving the fees to be unreasonable. *Id.* at 1549.

23   Because the insurer could not do so, the State was entitled to recover all the fees.

24        Here, ACE is in the same position. ACE cannot meet its burden simply by pointing to

25   instances of block billing or vague descriptions. ACE must affirmatively demonstrate the bills to

26   be unreasonable. ACE has failed to meet its burden.

27

28

*Transient Billers and Summer Associates*

GD&C utilized the services of 87 timekeepers including 15 partners, 21 associate attorneys, and 51 paralegals/other billing personnel. P&E utilized the services of 13 partners, 27 associate attorneys and 37 other billing personnel. Mr. Jardini asserts that of the 164 timekeepers described in the bills, 96 had only a transient involvement, meaning that they billed less than 100 hours during the litigation. The "transient billers" included summer associates. Mr. Jardini asserts that a total of 2,151.42 hours was billed by transient billers and that this is evidence of overstaffing. ACE relies upon *In re Jefsaba, Inc.*, 172 B.R. 786, 81 (Bankr. E.D.Pa. 1994) in support of Mr. Jardini's conclusion:

> Each time a firm makes a personnel decision, i.e., changes the professionals working on a particular matter, the estate should not bear the burden of the new addition's learning curve. It is inappropriate for each new addition to the team to bill for time spent reviewing the file or otherwise familiarizing him or herself with the matter.

Ms. Butman testified as to two types of errors concerning "transient billers." First, she asserted that Mr. Jardini erroneously classified people as "transient billers" based only upon their post tender time, such as the example of Mr. Bruce Barker. [HT 2102:2-22] Ms. Butman showed that Mr. Barker actually worked on the Nu-kote action since 1996. [HT 2102:2-22] Mr. Barker billed no time for familiarizing himself with the case. This comparison was taken directly from Mr. Jardini's presentation during his testimony. [HT 2102:2-3] Ms. Butman also asserted that Mr. Jardini made mathematical miscalculations in his charts, reports and testimony. Ms. Stacey Hallman's time exemplified this. Mr. Jardini testified that she was a "transient biller" who billed less than 100 hours in the post tender period. In fact, Ms. Hallman billed over 550 hours post-tender. [HT 2098:2-8] This amount clearly took her out of Mr. Jardini's

1  definition of "transient timekeeper." [HT 2098:23 2099:6] Similar inaccuracies were found with

2  respect to another so-called transient biller, Mr. Siff. [HT 2100:2-12]

3      Based upon Ms. Butman's testimony, it appears that Mr. Jardini's assertions with respect

4  to who was a "transient" biller were not entirely correct. Moreover, Mr. Jardini failed to present

5

6  evidence that each of his purported "transient billers" billed HP for time spent reviewing the file

7  or otherwise familiarizing themselves with the Nu-kote case. Finally, Mr. Jardini failed to

8  present evidence that utilizing personnel who work less than 100 hours on large cases goes

9  against industry practice or is unreasonable per se. Accordingly, ACE has not carried its burden

10  proving that the fees and costs associated with "transient billers" were unreasonable.

11

12                                    *Billing Increments*

13      The billing statements presented by P&E utilize a .25 minimum billing increment rather

14  than a ".1" billing increment. Mr. Jardini asserts that the timekeepers at GD&C while ostensibly

15  utilizing a ".1" billing increment, most frequently bill in large block-billed amounts and in

16  rounded numbers, typically one-hour and half-hour increments. Mr. Jardini asserts that this was

17  unreasonable. ACE relies upon assertion includes a guideline established by the United States

18

19  Bankruptcy Court of the Northern District of California in support of Mr. Jardini's assertion:

20      Professionals are required to keep time records in minimum increments no greater than 6
21      minutes. Professionals who utilize a minimum billing increment greater than .1 hour are
22      subject to a substantial reduction of their requests.

23      The guideline in question applies:

24      ... to professionals seeking compensation under 11 U.S.C. § 330 and, where indicated, to
25      Chapter 7 and Chapter 11 trustees. The guidelines are not intended to cover every
        situation. The court is advised that compliance with these guidelines will satisfy the
26      requirements of the United States Trustee.

27      ACE has failed to establish that P&E was required to comply with the Bankruptcy Court

28  guidelines. ACE likewise has failed to establish or even suggest that a ".25" billing increment

1    violates industry standards.   Accordingly, ACE has failed to carry its burden of proving that the

2    billing increments used by HP's outside counsel were unreasonable.

3                       *Overhead Activities Including Clerical Work*

4    
5            Mr. Jardini testified that 7,801.55 hours of administrative or clerical work was billed and

6    that these hours resulted in $687,559.35 in fees.   He contends that the bills did not provide

7    information as to why these services were provided by an attorney or paralegal as opposed to a

8    clerical worker, and therefore should be reduced.   To support this assertion, ACE relies upon the

9    following passage from *In re Poseidon Pools of America, Inc.*, 180 B.R. 718, 745-746 (1995):

10
11           When seeking compensation for clerical services performed by an attorney or paralegal, a
             party is required to provide sufficient information to enable the court to make a
12           determination as to why such services were performed by an attorney or paralegal as
             opposed to a paralegal or secretary, respectively.
13

14           As an initial matter, this requirement is applicable to professionals seeking compensation

15    under 11 U.S.C. § 330. *Id.*   Moreover, the testimony presented by HP established that the fees

16    and costs associated with this category customarily are paid for by the client and not counsel.

17
18    ACE has not carried its burden of proving that the clerical work billings in question were

19    unreasonable.

20                       *Excessive Interoffice Communications*

21
22           Mr. Jardini identified 5,542.83 hours, equal to nearly three attorney years, totaling

23    $1,414,740.44, invoiced by HP's outside counsel for conferencing within their firm and between

24    firms.   He concedes that a certain level of conferencing is reasonable and in fact beneficial to the

25    effective handling of a lawsuit, but asserts that the conferencing during the Nu-kote litigation

26    was excessive and inadequately documented.   As previously noted, vague descriptions are

27    insufficient to establish the unreasonableness of fees and costs.   Mr. Jardini, while establishing

28

-61-

that a great deal of time was spent conferencing during Nu-kote, has failed to prove that the

conferencing was unreasonable or of limited value to the defense of the counterclaim. HP

presented compelling testimony with respect to time-consuming nature of the litigation and the

efforts by HP's counsel to work together as a team. ACE has not carried its burden of proving

that the amount of conferencing by HP's counsel in the Nu-kote action was unreasonable.

*Duplicative Efforts*
*(Including Multiple Attendance by Attorneys*
*At Conferences, Deposition, Hearings and Trials)*

In reviewing billing statements submitted by both GD&C and P&E, Mr. Jardini found

that meetings with experts, court appearances and trial days generally were attended by at least

three, and up to nineteen, individuals. With the exception of three days in June 1998, when only

two timekeepers billed to attend the trial, daily attendance ranged from six persons to as many as

nineteen separate individuals, with an average daily attendance of 11.6 persons.

While conceding that there are exceptions, Mr. Jardini asserts that the presence of

multiple counsel at a hearing or other event provides no discernable additional benefit. ACE

relies upon *Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983), in which the court addressed the

question of "reasonable" hours for given tasks. The court stated that:

> In determining what is a reasonable time in which to perform a given task or to prosecute
> the litigation as a whole, the court should consider that what is reasonable in a particular
> case can depend upon factors such as the complexity of the case, the number of
> reasonable strategies pursued, and the responses necessitated by the maneuvering of the
> other side.

*Id.* at 554. The court stated that another factor the court should examine in determining the

reasonableness of hours expended is the potential duplication of services:

> For example, [if] three attorneys are present at a hearing when one would suffice,
> compensation should be denied for the excess time. ... The court should assess the
> possibility that reported hours include duplication by reviewing with particular care the
> number of lawyers present at hearings, depositions, and other discovery proceedings, and

-62-

by evaluating the roles played by the lawyers in the litigation generally. The court can look to how many lawyers the other side utilized in similar situations as an indication of the effort required. Because utilizing more than one lawyer may be reasonable in some situations, such as during settlement conferences or during trial, we decline to require an automatic reduction of reported hours to adjust for multiple representation or potential duplication.

*Id.*

ACE has failed to provide the Special Master with evidence that HP's use of more than one attorney at any particular function was in fact unreasonable. Mr. Jardini has ably noted the instances of possible duplication of effort. Nineteen attorneys at trial may be excessive. The burden, however, is on ACE to establish that it was in fact excessive. Mr. Jardini's opinion is insufficient. Accordingly, ACE has failed to carry its burden of proving that HP's use of multiple attorneys at various litigation events was unreasonable.

The problems with Mr. Jardini's testimony suggest at least a carelessness in preparation of reports. Regardless of the reason, the demonstrated mathematical and other reporting errors make Mr. Jardini's schedules and testimony either unreliable, or at a minimum, greatly reduce the weight the can be attributed to Mr. Jardini's testimony. In sum, ACE has not carried its burden of proving that the fees and costs of HP's outside counsel were unreasonable.

### C. HP's In-house Counsel Fees

#### *1. Standard for Recovery of In-house Counsel Fees*

ACE contends that HP is not entitled to an award of attorneys' fees generated by HP's in-house personnel. ACE asserts that HP's in-house fees are not relevant to this damages hearing because HP cannot show under any standard that the in-house lawyers "actively litigated" any aspect of the underlying case. HP contends that it is entitled to recover its in-house attorney time

-63-

at market value so long as the in-house attorney services are not unnecessarily duplicative of outside counsel's legal services.

In *Garfield Bank v. Folb*, 25 Cal.App.4th 1804 (1994), *disapproved on other grounds Trope v. Katz*, 11 Cal.4th 274, 286 (1995), the plaintiff sued for declaratory relief and breach of contract. Defendant prevailed and was granted costs, including attorneys' fees, for services of its in-house counsel, Bradley Folb. On appeal, the court held that the purpose of Civil Code § 1717, analogous cases within California and persuasive authority from other states compelled the conclusion that in-house counsel fees are recoverable in California where counsel is actively engaged in preparation of the case for trial. *Id.* at 1807. The court concluded that:

> Because disallowing fees for in-house counsel would provide a windfall for appellant, we can see no reason to distinguish the lost opportunities from actual expenditures on outside counsel. Since Bradley Folb was actively participating in the underlying litigation, we hold the trial court did not abuse its discretion in awarding attorney fees for Bradley Folb's services as in-house counsel.

*Id.* at 1809-1810.

In *PLCM Group v. Drexler*, 22 Cal.4th 1084 (2000), the plaintiff insurer, which was represented by in-house counsel, prevailed in an action against its insured and was awarded attorney fees pursuant Civil Code § 1717. The Supreme Court affirmed, holding that an entity that is represented by in-house counsel may recover attorneys' fees under Civil Code § 1717. *Id.* at 1088. "Like private counsel, in-house counsel stand in an attorney-client relationship with the corporation and provide comparable legal services." *Id.* The Court stated that:

> A corporation represented by in-house counsel is in an agency relationship, i.e., it has hired an attorney to provide professional legal services on its behalf. Nor is there any impediment to the effective and successful prosecution of meritorious claims because of possible ethical conflict or emotional investment in the outcome. The fact that in-house counsel is employed by the corporation does not alter the fact of representation by an independent third party. Instead, the payment of a salary to in-house attorneys is analogous to hiring a private firm on a retainer.

*Id.* at 1093.

The Court found the reasoning in *Garfield Bank* and a number of federal cases, including Pittsburgh *Plate Glass Co. v Fidelity & Cas. Co. of N.Y.*, 281 F.2d 538, 542 (3d Cir. 1960), to be persuasive. *Id.* at 1094. "There is no reason in law or in equity why the insurer should benefit from [the insured's] choice to proceed with some of the work through its own legal department." *Id.*, quoting *Pittsburgh Plate Glass Co.*.

In-house counsel for PLCM did not keep contemporaneous daily billing records for work on the case. For purposes of the fee request, PLCM prepared a detailed reconstruction of time spent on specific legal tasks performed in the case. *Id.* at 1096 n.4. The superior court had based the award of attorneys' fees to the PLCM on the number of hours expended by counsel multiplied by the prevailing market rate for comparable legal services. The Court found this approach to be the proper standard for calculating the fees. *Id.* The Court also found that there was sufficient evidence to support the amount of the award because, in addition to the detailed documentation submitted by PLCM, the superior court was familiar with the quality of the services performed and the amount of time devoted to the case. *Id.*

In *Mix v. Tumanjan Development Corp.*, 102 Cal.App.4th 1318 (2002), the plaintiff, an attorney, retained a law firm to analyze legal and factual issues, help with trial strategy and assist in all aspects of the litigation including trial preparation. The firm had significant experience in real estate law, the subject matter of the lawsuit. The firm did not formally associate in the litigation as counsel of record except once for the limited purpose of filing a reply brief and presenting oral argument on a summary judgment motion. At trial, the law firm drafted motions in limine, researched legal issues, drafted jury instructions and a special verdict form, helped with trial strategy and conducted the examination of the plaintiff.

On appeal, the court held that "an attorney representing himself or herself, who prevails in an action on a contract with an attorney fee provision, may recover reasonable attorney fees incurred for legal services of other attorneys who assist the pro se attorney in the prosecution or defense of the action, even if the assisting attorneys do not appear as attorneys of record in the action." *Id.* at 1321. The court, citing *Garfield Bank*, stated that "[i]t is not unusual for a litigant to be represented by more than one attorney." For example, a litigant may be represented by both privately retained counsel and in-house counsel." *Id.* at 1324. "In those cases, a litigant entitled to an attorney fee award may recover attorney fees for both private counsel and in-house counsel, provided the legal services are not unnecessarily duplicative." *Id.* (citation omitted). The court found that the firm "actively participated in the proceedings by preparing a reply, arguing a motion for summary judgment, examining the attorney Plaintiff as a witness at the trial, preparing jury instructions, preparing motions in limine, and otherwise assisting in the preparation and presentation of the case." *Id.* at 1325.

Accordingly, under California law HP's in-house counsel fees are recoverable provided that HP's counsel actively participated in preparation of the case for trial and that their fees are not unnecessarily duplicative of those of HP's outside counsel.

In *Burger King Corp. v. Mason*, 710 F.2d 1480 (11th Cir. 1983), the district court denied Burger King's claim for attorneys' fees for the services performed by its in-house lawyers. The court found that there was no precedent in Florida law for an award of attorneys' fees for the services of in-house counsel and that cases from other jurisdictions awarding fees for the services of in-house counsel who actively tried the case were "not factually similar to this case when in-house counsel acted primarily as a liaison between the client and outside counsel who had complete responsibility for the conduct of the case." *Id.* at 1498. On appeal, the court affirmed,

for the same reasons. *Id.* at 1499. In contrast, California law plainly allows for the recovery of in-house counsel fees. To the extent that in-house counsel acts only as a liaison between the client and outside counsel, such conduct would likely would not satisfy California's active participation requirement.

In *Milgard Tempering, Inc. v. Selas Corp. of America*, 761 F.2d 553 (9th Cir. 1985), the issue of attorneys' fees was not properly before the court. The court nonetheless noted that "we would hesitate to adopt a per se rule, as the district court did, and bar attorneys' fees awards for in-house counsel whenever fees are authorized by contract." *Id.* 558. The court noted that on remand, the district court, in order to predict Washington law, should examine the modern trend toward providing reasonable fees based on the market rate when "a party is represented by both private counsel and in-house counsel who actively participate in the preparation of the case." *Id.* (citations omitted). "Of course, if in-house counsel are not actively participating (e.g., acting only as liaison), fees should not be awarded. *See Burger King*, 710 F.2d at 1498-99." *Id. Milgard* is consistent with California law.

In *Norwest Financial, Inc. v. Fernandez*, 121 F.Supp.2d 258, 264 (S.D.N.Y., 2000), the issue was the reasonableness of the prevailing party's (Norwest) fees and costs. The defendants objected to the amount of expenses incurred by Norwest's in-house counsel who traveled to Argentina to help prepare witnesses and attend depositions. The court found that while it may have been helpful that the in-house counsel knew the witnesses and spoke Spanish, his presence was not necessary given that Norwest was represented by very experienced counsel. Therefore none of the in-house attorney's travel expenses were compensable. The *Norwest* opinion appears to adopt a standard that would preclude recovery for in-house counsel where the party also is represented by experienced outside counsel, and therefore is at odds with California law.

-67-

In *F.D.I.C. v. Bender*, 182 F.3d 1 (D.C.Cir. 1999), the materials submitted by the FDIC in support of its request for attorneys' fees included the sum of $10,000 for the estimated time spent on the case by the FDIC's in-house counsel. The appellants opposed the inclusion of this sum on two grounds, both of which the court found to be valid. First, the court found that the time counsel devoted to the case was insufficiently documented. *Id.* at 5. Citing *Milgard* and *Burger King*, the court also noted that "it is not possible to determine the FDIC's submissions how much of the time in-house counsel did devote was in a capacity other than that of a mere liaison between the agency and the Justice Department attorneys who represented it in this case, a function for which the recovery of fees is not permitted." *Id.* In remanding the case, the court noted "[i]f, on remand, the court is to award any amount for the in-house counsel's work, it must determine whether she contributed anything of substantive value to the litigation; and if she did, the court must then determine the approximate amount of time she devoted to that work as well as the hourly rate to be charged for it." *Id.* at 5-6. *FDIC* is not inconsistent with *Garfield Bank*, *PLCM* or *Mix.*

The relevant cases do not support ACE's assertion that in-house counsel fees may be recovered only when such counsel "actively litigate" the action. Under California law, in-house counsel fees are recoverable so long as in-house counsel actively *participates* in the action rather than acting merely as liaison counsel, and as long as the in-house counsel's efforts are not unnecessarily duplicative of those of outside counsel.

//

//

//

//

2.   *Proof of Existence and Amount of In-house Counsel Fees*

HP contends that the post-tender fees of its in-house counsel, totaling $1,133,592.50[6], were reasonable and necessary to the defense of the Nu-kote action.   HP bears the burden of proving the existence and amount these fees.   *Aerojet*, 17 Cal.4th at 64.   HP's in-house counsel did not keep contemporaneous time records.   To prove the existence and amount of the in-house fees incurred, HP has attempted to reconstruct the time spent by in-house counsel in the Nu-kote litigation.   These efforts resulted in the introduction at the damages hearing of "HP Invoice Recaps" and other documents which tally the recreated time of each HP in-house biller. [Exhibits 1427, 1428, 1449, 1451, 1463 etc.]   At the damages hearing, HP also provided testimony from the majority of HP's in-house timekeepers for whom HP seeks reimbursement.

a.   Invoice Recaps

HP presented two witnesses with respect to the creation of the invoice recaps. Sheri Butman, Gauntlett & Associates' Technology Manager, testified about the computerized process that began the reconstruction of HP's in-house time.   Gauntlett's attempt to reconstruct the time for HP's in-house counsel began in mid-to-late-2000. (HT 1160:15-22)   All of the available invoices from HP's outside counsel were entered into a relational database[7].   [HT 201:3-17;

---

[6] Exhibits 1409 and 1412A. HP valued the time of its in-house attorneys at different rates, all of which were between $300 and $350 per hour.

[7] One of the more hotly disputed issues heard by the Special Master was with respect to HP's production of the bills   Prior to May 2002, HP provided ACE with so-called database reports rather than copies of the original bills received from outside counsel. HP provided ACE with copies of the original invoices in May 2002.   At the damages hearing, the Special Master ordered HP to produce the originals of the bills. HP produced the original P&E bills, but did not produce the GD&C bills.   After further investigation and after the conclusion of the damages hearing, HP provided supplemental testimony stating that HP at one time had been in possession of the GD&C bills, but that they had been lost or misplaced.

ACE's motion in limine to exclude the database was denied, subject to a continuing motion to strike.   ACE's renewed motion to strike the database is denied.   The database summarized the contents of voluminous writings. Originals and/or copies of the bills were provided to ACE.   During discovery, ACE deposed HP's outside counsel with respect to the bills.   ACE failed to offer any evidence at the hearing that the database was inaccurate with respect to the billing entries for which HP seeks to recover.   After the conclusion of the hearing, the parties stipulated that "Hewlett-Packard actually paid the costs and outside counsels' fees in the underlying Nu-kote

211:7-20] Once all of the available invoices from HP's outside counsel (GD&C and P&E) were entered into the Access database, searches were run within the task descriptions from those invoices for a number of variations of the names of HP's in-house legal personnel to identify descriptions that referenced the in-house personnel. [HT 237:22-240:40] As each entry within outside counsel's task descriptions was located, that entry was isolated and copied into a file relating to each HP employee that performed work on the Nu-kote case. [HT 237:11-240:40] Once the process of searching all of the invoices was completed, the copied entries were ready for legal staff at Gauntlett & Associates ("Gauntlett") to analyze them. [HT 245:18-246:3] Ms. Butman oversaw the process by which the computer database was searched and provided the results to Gauntlett' legal personnel for their review and revision. [HT 245:18-246:3].

HP also presented testimony of Thomas J. Bayard, a Gauntlett law clerk, to establish the manner in which the time of HP legal personnel was reconstructed. [HT 1155-1197] At all times connected with creation of the HP Invoice Recaps, Mr. Bayard was a law clerk at the firm. (HT 1158:15-1159:17.) He has not been admitted to practice law in California. (HT 1159:7-11.) Mr. Bayard was part of a team of at least three Gauntlett employees responsible for assisting in the reconstruction process. (HT 1161:6-20; 1203:20-1204:8.)

Mr. Bayard described the process by which HP reconstructed time. [HT 1161:22 1162:12] Step one involved a keyword-based search of HP's electronic database. Though Mr. Bayard testified that it was his "understanding" that a fairly comprehensive set of queries were run in this computerized process, he had no personal involvement in step one. (HT 1163:13-18; 1200:8-24.)

litigation in the amounts alleged by HP at the damages hearing and as shown in summary reports already in evidence."

1   Step two involved a subjective review and modification of the retained firms' billing

2   entries that had been identified in the step one computer search. (HT 1164:2-15; 1166:17-25.)

3   Each entry was analyzed by Gauntlett' legal personnel and rewritten to change the tense so that

4   each entry was described in terms of the task performed by the HP timekeeper. [HT 1163:21-

5   

6   1164:22] Mr. Bayard testified that every entry for an HP timekeeper was modified in some way.

7   (HT 1202:20-22.) On some occasions, adjustments to the amount of time spent on the tasks

8   described were required to account for inapplicable portions of the time entries prepared by

9   outside timekeepers. [HT 1163:21 1165:15] This reduction included the exercise of independent

10  subjective judgment. (HT 1161:13-20; 1203:20-1204:8.) Mr. Bayard testified that as of the time

11  of his involvement in the reconstruction process, he had not taken a deposition, or drafted an

12  appellate brief, or drafted a summary judgment motion on the subject of trademark or antitrust

13  

14  violations. (HT 1204:9-1205:20.)

15      Mr. Bayard testified that, when estimating time for tasks performed by HP's in- house

16  timekeepers, conservative amounts were selected based on tenth of an hour time increments.

17  

18  [HT 1209:3-4] He also explained that, absent information confirming an HP timekeeper's

19  participation in a given task, time was based upon documents that independently verified that

20  timekeeper's involvement. [HT 1181:6-10] American Bar Association Uniform Task Based

21  Management System Codes ("ABA codes") were supplied for each entry based upon the nature

22  

23  of the task. [HT 1172:1-7]

24      Thereafter, additional entries were reconstructed using additional documentation such as

25  deposition transcripts, discovery documents, pleadings and other documents from the Nu-kote

26  files where it could be determined that HP's internal timekeepers were involved in the particular

27  tasks at issue. [HT 1181:1-10] Finally, the reconstructed time was sent to each HP timekeeper,

28  

-71-

1 who was asked to review it for accuracy and make any necessary changes. [HT 1181:17-

2 1182:14; 1183:23-1184:3]  Most of the timekeepers had few changes. [HT 1185:25-1186:2]

3 For those that did suggest changes, such as Debbie Bell, they were able to reconstruct additional

4

5 entries from documents such as travel expense reports. [HT 1434:16-25]

6    Additionally, HP timekeepers were asked in an August 19, 1999 e-mail from Robert

7 Sutis, an HP Litigation Manager to estimate the time they had spent working on the Nu-kote

8 case. [Exhibit "1504"] H. Brian Davis, an HP patent attorney, responded to the e mail, Exhibit

9 "1504" at HP3 13485, indicating that he conservatively estimated his time on the Nu-kote matter

10

11 to be approximately 200 hours. The amount of time reconstructed for Mr. Davis for the entire

12 case ultimately was determined to be 227.50 hours based on Exhibit "1504" at page HP3 13499.

13 In many instances, the timekeeper's estimate of his or her time was greater than the time that

14 could be reconstructed. [HT 1196:14-22]

15    At the hearing, ACE objected on hearsay grounds to HP's attempt to introduce the HP

16

17 invoice recaps into evidence.  The Special Master allowed the invoice recaps into evidence

18 subject to a continuing motion to strike.  ACE contends that the invoice recaps are inadmissible

19 for three reasons:  (1) they were not properly authenticated at the hearing; (2) even if properly

20 authenticated at the hearing, the HP invoices should be excluded from evidence under the

21

22 principles stated in *Xebec Development Partners, Ltd. v. National Union Fire Ins. Co. of

23 Pittsburgh, PA*, 12 Cal.App.4th 501 (1993)[8]; and (3) the HP invoices are hearsay.

24    "The requirement of authentication or identification as a condition precedent to

25 admissibility is satisfied by evidence sufficient to support a finding that the matter in question is

26 what its proponent claims." Fed. R. Evid. 901(a).  To establish authenticity, the proponent need

27

28

-72-

not rule out all possibilities inconsistent with authenticity, or . . . prove beyond any doubt that the evidence is what it purports to be. *United States v. Holmquist*, 36 F.3d 154, 168 (1st Cir. 1994). "Rather, the standard for authentication, and hence for admissibility, is one of reasonable likelihood." *Id.* Evidence may be authenticated by "describing a process or system used to produce a result and showing that the process or system produces an accurate result." Fed. R. Evid. 901(b)(9). The emphasis of Rule 901 is upon showing that the offered item, e.g., a computer printout, is what it is claimed to be not that its contents are correct. *U.S. v. Downing*, 753 F.2d 1224 , 1240 n. 21 (3rd Cir. 1985). The invoice recaps are the result of a process performed by Gauntlett personnel. There was no dispute at the hearing that the invoice recaps are a computer print-out of re-created billing time for HP's in-house personnel. Whether or not one questions the accuracy or reliability of the invoice recaps, Ms. Butman and Mr. Bayard's testimony was sufficient to authenticate the documents.

At the hearing, the Special Master questioned HP as to whether the invoice recaps were hearsay. HP's response was that the invoice recaps were properly authenticated and were based upon business records, the actual invoices from P&E and GD&C. The invoice recaps are statements offered in evidence to prove the reconstructed time of HP's in-house counsel and are therefore hearsay. The invoice recaps are not HP business records. HP has failed to establish any exception to the hearsay rule. The invoice recaps, standing alone, are inadmissible.

b. In-House Timekeepers' Testimony

Perhaps anticipating that the invoices would be found to be inadmissible, HP contends that the amount of an in-house counsel fee award may be documented in a number of ways,

---

[8] ACE's motion to exclude the invoice recaps was denied. ACE's renewed motion to exclude the invoice recaps based upon the *Xebec* case is denied.

including: (1) contemporaneous time records; (2) reasonable time estimations; (3) attorney testimony/affidavit; and (4) reconstructed billing records based upon contemporaneously kept documents.   At the damages hearing, HP provided the testimony of eleven of HP's in-house timekeepers (attorneys, paralegals and legal staff) for whom HP seeks reimbursement.   The deposition testimony of a twelfth HP in-house biller, Larry Coit, was designated as testimony for the hearing.   Two additional in-house billers for whom HP seeks reimbursement, David Romney and Craig Pace, did not testify at the hearing.

The testimony, generally, established for each individual who testified: (1) the individuals position and experience; (2) the type of work performed on the Nu-kote action; (3) that the individual had reviewed of his or her reconstructed time records; (4) that the reconstructed time was accurate or a reasonable estimate of time spent on the Nu-kote action; and (5) that the reconstructed time actually understated the total amount of time he or she actually spent on the Nu-kote action.   The reconstructed time for each of HP's in-house personnel who testified was admitted into evidence (see e.g., exhibit 1449 and 1453).   ACE stipulated at the damages hearing that it was not challenging the hourly rates for which HP is seeking to recover for its in-house personnel.

"Testimony of an attorney as to the number of hours worked on a particular case is sufficient evidence to support an award of attorney fees, even in the absence of detailed time records." *Martino v. Denevi*, 182 Cal. App. 3d 553, 559 (1986).   HP has provided ample testimony with respect to the hours worked by its in-house timekeepers.   While the invoice recaps themselves are hearsay, the testimony and evidence admitted at the hearing with respect to the reconstructed time records is sufficient to establish the existence and amount of the in-house fees sought by HP.

### 3. HP Has Met Its Burden To Establish that The In-house Fees Were Related to the Defense of the Nu-kote Counterclaim

HP presented extensive testimony to establish that the work performed by HP in-house counsel was in furtherance of the litigation and not merely administrative or supervisory.  Will Pecau, counsel for P&E, testified that the use of HP's legal staff for certain tasks reduced the cost that would have been incurred had the same work been performed by outside counsel. [HT 445:3-447:8] He testified that even if the HP in-house attorneys did not have technical degrees, they had the equivalent when it came to knowledge of HP's relevant technology. [HT 445:8-13] Mr. Pecau also explained that if HP's in-house personnel had not been able to do the work they did, P&E's staff would have had to do it with less efficiency because the latter did not have the intimate knowledge of HP that the in-house personnel had. [HT 445:24-446:4] HP's in-house personnel assisted with experts, assisted in interfacing with in-house engineers and participated in such substantive decisions as which patents to assert. [HT 446:5-447:8] HP's in-house attorneys also were instrumental in matters of strategy. [HT 447:21-24] HP attorneys worked with outside counsel on all aspects of the case "from soup to nuts," often contributing their essential technical and marketing background. [HT 444:21-447:24]

Jonathan Marshall, a senior partner at P&E who was lead counsel at the outset, described the in-house attorneys as "full partners" on the teams who "actively participated in strategic and tactical decisions." [HT 613:10-14] Mr. Marshall explained that the knowledge held by the in-house lawyers of HP's "peculiarities" and their hard work combined to make their services irreplaceable. [HT 614:2-19] He testified that that the HP in-house personnel actively participated in strategic and tactical decisions. [HT 613:10 14]  Testimony was presented that HP's careful and coordinated use of in-house and outside counsel as a "virtual law firm" enabled

it to defend the case in a more economical manner. [HT 835:4-836:25; 851:20-25; 884:6-25; 447:25-449:16; 1 639:4-13; 1661:7-23; and 1524:24-1525:12]

Similar views were expressed by Peter Sullivan, the GD&C partner who, along with Will Pecau, supervised the day-to-day handling of the case. Mr. Sullivan described HP's in-house lawyers as "part of the team," some of whom he worked with closely on a daily basis. [HT 836:4-8] Mr. Sullivan also explained that monitoring the work of outside counsel was the "least" of what HP's in-house counsel did. [HT 836:18-20] Rather, their unique knowledge and skill was an essential part of HP's ultimate success in the case. [HT 836:20-837:12] Mr. Cooper, the lead trial attorney for the Nu-kote case, similarly described certain in-house attorneys as "part of the trial team." [HT 1130:4]

The testimony of the HP timekeepers likewise establishes that they actively participated in the Nu-kote action. Ms. Bell was a paralegal who performed paralegal work in a variety of areas while the underlying case was pending, such as oversight of document production, witness identification and preparation and preparation of trial exhibits such as charts concerning the marketing of HP's inkjet cartridges. [HT 1425:16-1430:10] Ms. Bell also took assignments directly from GD&C and P&E. Mr. Jenski, a senior patent attorney at HP's Corvallis, Oregon facility, was involved in the claims construction process. [HT 1469:12-16] Mary Dawson, a paralegal, was hired by HP to work exclusively on the Nu-kote case because of her expertise in managing large document productions. [HT 1510:13 1511:8] She worked with outside counsel to assist in the Nu-kote document production. [HT 1510:22-25; 1511:9-20]

Roland Griffin was a patent attorney who was in charge of efforts to settle the Nu-kote litigation for HP and oversaw every aspect of the case. Ed Maker was the first HP

1   attorney to assess potential trademark violations by Nu-kote in its packaging. [HT 1566:18-23;

2   1567:11-15] Mr. Maker was the initial case manager with responsibility for familiarizing outside

3   counsel with the relevant technology, reviewing and editing draft documents – which included

4   some independent research – and reviewing outside counsel's overall work. [HT 1568:3-24]

5

6   Rand Newman was an HP attorney whose role in the case included researching Ronald Katz.

7   [HT 1620:9-1621:1]  Bloor Redding, a patent attorney, evaluated patent issues, assisted outside

8   counsel, assisted with strategy and eventually became co-coordinator on the Nu-kote case.

9   Brian Davis, a patent attorney, reviewed patent and related antitrust issues.  Robert Sutis was the

10  HP litigation manager for the post-tender period. Mr. Sutis was a principal attorney on the Nu-

11  kote case and was part of the HP trial team. [HT 2273:15-24; 1130:6-9]  Jack Brigham was

12

13  HP's general counsel from 1976 through the Nu-kote Action.  He testified that none of his

14  reconstructed time related to purely administrative or client functions. [HT 1789:1-6]  With

15  respect to these timekeepers, HP has met its burden of proof.

16

17         The testimony presented by HP with respect to Larry Coit, David Romney and Craig

18  Pace, however, did not provide the Special Master with a sufficiently clear understanding of their

19  roles in the Nu-kote action.   HP therefore has failed to establish both the amount it seeks to

20  recover for these individuals and that the individuals' work was related to the Nu-kote action.

21

22

23             *4. ACE Has Failed To Meet Its Burden*

24         At the damages hearings,  ACE argued that HP's in-house attorneys' contribution to the

25  litigation in the underlying action was consistent with that of "engaged, helpful clients

26  performing duties for their employer, not defense attorneys." ACE points to the fact that no HP

27  in-house lawyer drafted a pleading, defended a witness at deposition or presented a witness at

28

trial on behalf. (See e.g., HT 798:10-25-799:1-21; 802:11-17; 581:11-18; 582:2-19; 700:25-701:1-18; and 943:17-21.) ACE asserts that this evidence confirms that the HP's in-house attorneys never acted as counsel of record, but instead acted in a purely supervisory role which was fundamentally different from the roles of its outside lawyers and not deserving of reimbursement at the hourly billing rates charged by HP's outside counsel.

As previously noted, California law does not require in-house counsel to actively "litigate" the lawsuit. The standard is active participation. ACE misperceives the impact of this standard. The testimony presented by ACE failed to establish that HP's in-house counsel did not actively participate in the defense of the Nu-kote action. Similarly, ACE failed to establish that HP in-house counsel acted only as liaison counsel or that the work of in-house counsel was duplicative of outside counsel's efforts. Instead, the testimony established that HP's in-house personnel actively participated in the Nu-kote action by assisting significantly in the preparation and presentation of the case. Accordingly, ACE has failed to meet its burden of proving by a preponderance of the evidence that the post-tender fees of HP's in-house counsel were unreasonable or unnecessary to the defense of the counterclaim.

### D. Pre-Judgment Interest

HP contends that it is entitled to prejudgment interest. HP asserts that the amount ACE owes HP has been certain or capable of being made certain from the day HP tendered defense of the underlying action to ACE, i.e., the amount owed by ACE equals the same amount contained in each invoice HP had to be pay for its own defense. HP contends that interest for outside counsel fees and costs runs from the date of the invoices, and that interest for in-house counsel fees runs from the date HP provided ACE with the reconstructed invoice recaps on July 27, 2002. HP further contends that prejudgment interest is part of an insurer's contractual

1  obligation to make the insured whole, and that the fact that ACE has disputed liability for the

2  fees and costs does not preclude the award of prejudgment interest.

3      ACE contends that HP is not entitled to prejudgment interest. ACE contends that HP's

4  damages are not certain because the extent of recovery turns on a determination based upon

5  conflicting evidence. ACE contends that the distinction between prosecution and defense costs

6

7  and the reasonableness of the defense costs have been intensely litigated and thus HP's damages

8  were neither certain nor capable of being made certain by calculation. Alternatively, ACE

9  contends that HP is not entitled to prejudgment interest from any date earlier than May 2002, the

10  date HP first produce copies of the actual billing records and invoices.

11

12      In diversity actions, the issue of entitlement to prejudgment interest and the rate thereof is

13  governed by the laws of the state in which the district court sits. *Northrop Corp. v. Triad*

14  *International Marketing SA*, 842 F.2d 1154, 1155 (9th Cir. 1988). Under California law, the

15  right to prejudgment interest is established by Cal. Civ. Code § 3287(a), which provides in

16

17  relevant part as follows:

18      Every person who is entitled to recover damages certain, or capable of being made
        certain by calculation, and the right to recover which is vested in him upon a particular
19      day, is entitled also to recover interest thereon from that day.

20      The primary purpose of prejudgment interest is to provide just compensation to the

21  injured party for the loss of use of money during the prejudgment period, and thus to make that

22  party whole as of the date of the injury. *Lakin v. Watkins Associated Industries*, 6 Cal.4th 644,

23

24  663-664 (1993). "The certainty requirement of CCP § 3287(a) has been reduced to two tests:

25  (1) whether the debtor knows the amount owed or (2) whether the debtor would be able to

26  compute the damages." *Hartford Accident & Indemnity Co. v. Sequoia Ins. Co.*, 211 Cal.App.3d

27

28  1285, 1307 (1989). Under CCP § 3287(a), damages are considered certain or capable of being

1 | made certain "where there is essentially no dispute between the parties concerning the basis of

2 | computation of damages if any are recoverable but where their dispute centers on the issue of

3 | liability giving rise to damage." *Safeway Stores, Inc. v. National Union*, 64 F.3d 1282, 1291 (9th

4 | Cir. 1995) (quoting *Fireman's Fund Ins. Co. v. Allstate Ins. Co.*, 234 Cal App 3d 1154, 1173

5 | 

6 | (1991)).

7 |     The test for recovery of prejudgment interest under CCP § 3287(a) is whether "defendant

8 | actually knows the amount owed or from reasonably available information could the defendant

9 | have computed that amount." *Cassinos v. Union Oil Co.*, 14 Cal App 4th 1770, 1789 (1993)

10 | (citing *Chesapeake Industries, Inc. v Togova Enterprises, Inc.*, 149 Cal.App.3d 901, 907

11 | 

12 | (1983)). Where a defendant "could keep complete records of the transaction from which it could

13 | calculate its indebtedness, prejudgment interest may be awarded from the inception of the

14 | occurrence." *Id.* at 1789 (citation omitted). "If damages may be determined by reference to

15 | reasonably ascertainable market values, they are 'capable of being made certain by calculation'

16 | 

17 | within the meaning of § 3287." *Id.* (citation omitted).

18 |     In *Foxfire, Inc. v. New Hampshire Ins. Co.*, 1994 WL 361815 (N.D.Cal., 1994), the

19 | insurer was found to have breached its duty to defend the insured. The insured sought to recover

20 | attorneys' fees and costs incurred in defense of the underlying action as well as prejudgment

21 | interest. The insurer asserted that the fees were unreasonable, that the insurer was not

22 | responsible for the fees the insured incurred in prosecuting affirmative claims and that pre-

23 | 

24 | judgment interest was not available. The court found that the fees and costs were not

25 | unreasonable and that the insurer was obligated to pay for the insured's "affirmative claims."

26 | With respect to prejudgment interest, the court, citing CCP § 3287(a) and *Esgro Cent., Inc. v.*

27 | 

28 | *General Ins. Co.*, 20 Cal.App.3d 1054, 1060 (1971), noted that damages are considered certain

1   or capable of being made certain when "there is essentially no dispute between the parties

2   concerning the basis of computation of damages if any are recoverable but where their dispute

3   centers on the issue of liability giving rise to damage." *Id.* at *5. The court concluded

4

5   prejudgment interest was appropriate:

6       Once the question of whether the insurer breached its duty to defend under the policy is
        resolved in favor of the insured, the only issues with respect to the attorneys' fees are the
7       allocation, if any, and the method by which they are to be calculated. These are questions
        of law. When these issues were resolved the amount of fees was readily ascertainable.
8       *See id.* at 1174; cf. *Esgro Central, Inc. v. General Ins. Co.*, 20 Cal.App.3d 1054, 1063
        (1971) (prejudgment interest not available under § 3287(a) where "not possible to relate
9       the jury award ... to any amount based upon a calculation from data furnished by
10      appellants").

11      The date on which these amounts became vested for the purpose of subdivision (a) is the
        date on which the fees were billed to the client, for if [the insurer] had not breached its
12      duty to defend it would have been billed or incurred fees on that date. [The insurer] was
13      on notice from the date that it denied a defense that Foxfire would incur defense costs.
        Thus, using the billing dates is consistent with the purpose of section 3287 and the
14      insurer's obligations under the policy. *See generally, Executive Aviation, Inc. v. National
        Ins. Underwriters*, 16 Cal.App.3d 799, 808 (1971).

15

16  *Id.*

17      In *CoPart, Inc. v. Travelers Indemn. Co. of Illinois*, 1999 WL 977948 (N.D.Cal. 1999),

18  the insurer was found to have breached a duty to defend the insured. The parties stipulated as to
19
    a damages amount, but disputed the amount of prejudgment interest the insured was entitled to
20
21  recover on its defense costs. The question for the court was at what point defendant actually

22  knew or could have calculated from reasonably available information the expenses incurred by

23  the insured in defending the copyright action. The court rejected the insured's argument that the

24  insurer forfeited its right to know the amount by refusing to defend. Id. at *2 n.1. The date on

25  which the insured informed the insurer of the exact amount claimed was not in dispute. The

26  dispute was whether the insurer could have known that amount at an earlier time. The insured

27

28  noted that had the insurer wished to ascertain the amount claimed, the bills evidencing the

1    expenses were readily available.  The insurer asserted that the insured had delayed almost a year

2    in responding to discovery requests for the amount of defense costs.  The court agreed that the

3    insurer did not have timely access to the actual billing information, but found that:

4
> ... this is essentially beside the point of § 3287. ... damages are capable of being made
5    certain by calculation if they may be determined by reasonably ascertainable market
> values. The court finds that the fair market value of legal services was available to [the
6    insurer] throughout this litigation and thus [the insurer] was capable of calculating its
> exposure to [the insured's] defense costs. That the actual damages incurred would have
7    been subject to proof if challenged by [the insurer] in court (rather than agreed to by
> stipulation) does not make them uncertain for purposes of section 3287(a).
8

9    *Id.* The court further found that the focus of the lawsuit had been coverage, not the extent of the

10   damages, citing *Esgro Central, Inc. v. General Ins. Co.*, 20 Cal App 3d 1054, 1060 (1971). *Id.* at

11

12   *3.  The court concluded that the insured was entitled to prejudgment interest on the expenses it

13   incurred in defending the underlying action and that interest began to accrue on the date the

14   insured incurred its obligations (i.e., the billing dates). *Id.*

15
         In *Ultra Coachbuilders, Inc. v. General Sec. Ins. Co.*, 229 F.Supp.2d 284 (S.D.N.Y.
16

17   2002), the court found that the insurer owed the insured the duty of defending an underlying

18   action.  The insured moved for partial summary judgment against the insurer for attorneys' fees

19   and other costs incurred in defending the action, with pre-judgment interest thereon from the date

20   of each invoice until the date of judgment.  The court, applying California law, concluded in

21   pertinent part that:

22
> The pre-judgment interest will run from the date of each invoice. See *CoPart v. Travelers*
23   *Indemnity Co.*, 1999 WL 977948, at *8 ("Interest began to accrue on the date CoPart
> incurred its obligations (i.e., the billing dates)"); *Overholtzer v. Northern Counties Title*
24   *Ins. Co.*, 116 Cal.App.2d 113, 127 (1953) ("Obviously, the amount [of litigation
> expenses] thereof became fixed, for interest purposes, when liability therefore was
25   incurred by the [plaintiffs] ).
26

27   *Id.* at 288-289.

28

1    HP is entitled to prejudgment interest. The focus of the present action was coverage, not

2    the extent of damages. The amount of damages sought by HP, i.e., the amount of the post-tender

3    invoices from outside counsel, has never been in serious dispute. The issues in this case, as in

4    *Foxfire*, were the reasonableness of the bills and ACE's assertion that it is entitled to allocate.

5    ACE's strenuous efforts to avoid any liability under the policy and to reduce the amount owed to

6    HP do not render HP's damages uncertain. A defendant's denial of liability does not make

7    damages uncertain for purposes of CCC § 3287. *Wisper Corp. v. California Commerce Bank*

8    49 Cal.App.4th 948, 958 (1996). The amounts sought became sufficiently certain on the dates

9    the fees were billed to HP. If ACE had not wrongfully refused to defend HP, ACE would have

10    been billed or incurred fees on these dates. ACE was on notice from the date that it failed to

11    accept or reject the tender of the defense that HP would incur defense costs. With respect to the

12    in-house fees and costs, the amount due under the policy became certain or capable of being

13    made certain on July 27, 2002, the date the reconstructed invoices were provided by HP to ACE.

14    Use of the billing dates is consistent with the purpose of CCP § 3287(a) and ACE's obligations

15    under the policy.

16
17
18

19    The cases relied upon by ACE do not involve the question of whether an insurer who

20    wrongfully refuses to defend is obligated to pay prejudgment interest from the time of tender.

21    ACE relies upon *Esgro Central, Inc. v. General Ins. Co. of Am.*, 20 Cal. App. 3d 1054

22    (1971) for the proposition that where the amount of damages depends upon a judicial

23    determination based upon conflicting evidence, the certainty requirement is absent and

24    prejudgment interest is not allowed. *Esgro* involved the alleged breach of two insurance

25    contracts insuring stores damaged during the 1965 Watts riot in Los Angeles. The court

26    concluded that prejudgment interest was proper on damages awarded under a fire insurance

27
28

policy because the essential dispute was one of coverage--whether the losses were the result of the fire or looting--and not computation of the amount of loss if any loss was in fact, covered. There was little dispute on the value of the property which had been destroyed. *Id.* at 1061. However, the court said the trial court properly denied prejudgment interest on the judgment entered on a policy of business interruption insurance. The sole issue in that cause of action was the extent of the property owners' damage for losses admittedly covered, a judicial determination to be made from conflicting evidence. *Id.* at 1062-1063. The extent of fees incurred by HP in defense of the Nu-kote action is clearly reflected in the bills themselves.

ACE relies upon *Travelers Indem. Co. v. Liberty Mut. Ins. Co.*, 1997 WL 102506 (N.D.Cal. 1997). Travelers insured M.H. Golden ("Golden"), a general contractor involved in a construction defect lawsuit. A subcontractor of Golden, Schlegel, was insured by Liberty. The subcontract required Schlegel to obtain liability insurance under which Golden would be an additional insured. Golden was listed as an additional insured under the Liberty policy. Golden tendered defense of the lawsuit to Travelers and did not tender the lawsuit to Liberty. Travelers sued Liberty for reimbursement of 50% of the fees and costs incurred in defending Golden. The court ultimately found that Liberty was obligated to contribute towards some but not all of the expenses Travelers incurred in the defense of Golden.

Travelers sought pre-judgment interest on its expenses incurred in defending and settling the claims against Golden. The court noted that the amount of Travelers' damages had been intensely litigated, in part because of the significant uncertainty surrounding the reasonableness of Travelers' expenses, and that because "Travelers' damages were neither certain nor capable of being made certain by calculation," Travelers was not entitled to pre-judgment interest. *Id.* at

\*13. *Travelers* involved the equitable apportionment of fees and costs between two insurers. The primary issue was the extent of the damages rather than liability under the policy.

ACE also relies upon *Safeway Stores, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 64 F.3d 1282 (9th Cir. 1995). In *Safeway Stores*, the insurer conceded that the insured provided documents to support its claims under the policy and did not contest the accuracy of those documents. The insurer did argue that the insured's damages were uncertain because the extent of allocation remained to be decided by the court. The court rejected the argument, stating that the fact that the amount that the insurer was required to pay might be reduced as the result of allocation did not in itself make the amount of damages uncertain. *Id.* at 1291. The court found that the amount of damages was known and the fact that the insurer disputed the issue of coverage did not affect the certainty of the insured's damages. *Id.* at 1292. The court found that the allocation imposed by the district court reflected its judgment that certain items were not covered by the policy, not the uncertainty of the damages claims themselves. *Id.* As noted above, HP's failure to provide the billing invoices to ACE upon receipt does not preclude HP from recovering prejudgment interest. The question is whether the amount sought reasonably could be ascertained by ACE. The Special Master finds that the amount of fees and costs reasonably could be ascertained by ACE at the time of tender and as the underlying litigation progressed.

Finally, ACE relies upon *Ferrellgas, Inc. v. American Premier Underwriters, Inc.*, 79 F.Supp.2d 1160 (C.D.Cal. 1999). In *Ferrellgas*, the issue was the amount of prejudgment interest owed by the insurer to the insured. Pursuant to the terms of the policy, the insured notified the insurer's adjuster of an accident. The injured party subsequently filed a lawsuit against the insured. Two years later, the insurer sent a letter to its broker stating that based upon

the documentation regarding the claim against the insured, it was closing its file. A $2 million judgment was entered against the insured. Three years later, the insured notified the insurance adjuster that the injured party had requested payment of the judgment, costs and accrued interest. The insured paid over $3 million to satisfy the judgment. Two months later, the insured notified the insurer of lawsuit and judgment, and that the insured had incurred a specific amount of defense costs in the action. The insurer subsequently reimbursed the insured for the defense costs. The court found that (1) the insurer's liability for interest on defense costs was severable from its liability for interest on judgment; (2) the insurer's agent's knowledge of the amount of the judgment was imputed to the insurer for purposes of setting the interest accrual date; and (3) interest on defense costs accrued from the date of the insured's demand. *Id.* at 1165, 1167-1168. The *Ferrellgas* court stated:

> The insurance policies do not specify the date when plaintiffs' claim for defense costs became payable. It is unclear when plaintiffs actually paid all or portions of their defense costs. The parties agree that Ferrellgas did not advise Hartford of the amount claimed as defense costs until September 24, 1994, at least a year after Hartford learned of the amount paid to satisfy the judgment. Plaintiffs do not contend that Hartford reasonably could have computed or ascertained their defense costs from information available to it before September 24, 1994.

*Id.* at 1165.

The *Ferrellgas* opinion does not discuss whether the insured tendered the defense of the underlying lawsuit to the insurer or whether the insurer failed to defend the insured. For these reasons alone, the case is distinguishable. HP tendered the action to ACE in June 1998. ACE could have ascertained the amount of defense costs as they accrued following the date of the tender.

Accordingly, HP is entitled to prejudgment interest from the date HP received each invoice from outside counsel. With respect to the in-house fees and costs, HP is entitled to prejudgment interest from the date the reconstructed invoices were provided by HP to ACE.

-86-

### E.   Late Notice Defense

HP contends that ACE waived its late notice defense by failing to introduce any evidence of prejudice at the damages hearing.   Prejudicial delay by the insured in tendering the claim may excuse the insurer from liability on the claim; that is, it may excuse not only the duty to defend but also the duty to indemnify. *Select Ins. Co. v. Sup.Ct.*, 226 Cal.App.3d 631, 639 (1990).   The Special Master previously has found that the late notice issue remained to be resolved.   Judge Ware's October 10, 2002 order confirmed that ACE is not barred from raising the late notice issue in the future.   The late notice defense is relevant to the issue of the duty to defend and not the computation of damages.   ACE's failure to offer evidence with respect to the defense at the damages hearing does not amount to a waiver of the late notice defense.

## IV.   CONCLUSION

HP tendered the defense of the Nu-kote counterclaim to ACE in June 1998.   To date, ACE has failed to accept or reject HP's tender of the defense.   The Court, on numerous occasions, has found that ACE had a duty to defend HP in the Nu-kote action. The Special Master was appointed to make a recommendation with respect to the determination and computation of the damages HP is entitled to recover from ACE as a result of ACE's failure to provide a defense in the underlying action.

The single most important factor in making this determination is ACE's failure to defend. When an insurer wrongfully refuses to defend an insured, the insured must carry the burden of proof on the existence and amount of the expenses, which then are presumed to be reasonable and necessary as defense costs. The insurer then must carry the burden of proof that the expenses are in fact unreasonable or unnecessary. *Aerojet*, 17 Cal.4th at 64.

1   HP has presented extensive and compelling evidence with respect to post-tender costs

2   and attorneys' fees paid to outside counsel P&E and GD&C. Specifically, HP has established

3   that in the post-tender period, HP paid outside counsel fees in the amount of in the amount of

4   $17,818,167.05 and incurred out-of-pocket costs in the amount of $9,483,074.67. HP also has

5   
6   established the reasonableness of the fees and costs and that the fees and costs were related to the

7   defense of the Nu-kote counterclaim.

8   ACE has failed to establish by a preponderance of the evidence that any of the fees and

9   costs were in fact unreasonable or unnecessary. The focus of ACE's effort was to establish that

10  certain of the fees and costs are allocable to the prosecution of HP's affirmative claims.

11  However, as is discussed above, ACE's showing did not address the pertinent question: whether

12  
13  the fees and costs were reasonably necessary to the defense of the Nu-kote action. The

14  testimony of Professor Menell, Robert Rose and Craig Aronson was insufficient to establish that

15  the so-called prosecution costs were unnecessary to the defense of the Nu-kote action.

16  
17  Similarly, the testimony of Mr. Jardini was insufficient to establish that portions of the fees and

18  costs incurred by HP were unreasonable.

19  With respect to the fees of HP's in-house counsel, the test is whether HP's counsel

20  actively participated in the Nu-kote litigation and whether HP's in-house counsel duplicated

21  
22  efforts of HP's outside counsel. The testimony established that HP's in-house timekeepers

23  actively participated in the defense of the Nu-kote counterclaim and that the timekeepers' work

24  was related to the defense of the Nu-kote counterclaim. HP presented extensive testimony in

25  connection with the existence and amount of the in-house fees incurred in defense of the Nu-kote

26  
27  counterclaim. ACE stipulated at the damages hearing that it was not challenging the hourly rates

28  HP assigned its in-house personnel. As for all but three of its in-house timekeepers, HP

-88-

1   established the hours worked and that the work was related to the defense of the Nu-kote

2   counterclaim.   At the damages hearing, HP sought reimbursement of the reasonable value of in-

3   house legal services in the amount of $1,133,592.50.   The Special Master, after eliminating the

4
    requested reimbursement for the services of Mr. Coit, Mr. Romney and Mr. Pace (totaling
5
    $16,162.50), finds that HP is entitled to reimbursement of the reasonable value of in-house legal
6
7   services in the amount of $1,117,430.00.   ACE failed to present evidence to support a finding

8   that the fees of HP's in-house counsel were in fact unreasonable or unnecessary.

9
           Finally, the Referee finds that HP is entitled to prejudgment interest.   The focus of the
.0
.1  present action was coverage, not the extent of damages.   The damages associated with HP's

.2  outside counsel (fees and costs) became sufficiently certain on the dates the fees were billed to

.3  HP.   With respect to the in-house fees and costs, the amount due under the policy became

14  certain or capable of being made certain on July 27, 2002, the date the reconstructed invoices

15  were provided by HP to ACE.   HP is entitled to prejudgment interest at a rate of 10% per

16
    annum.   CCP § 3289(b).   HP shall provide an amended request for prejudgment interest,
17
18  consistent with the above findings, in any proposed order consistent with the terms of this report.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28  //

1    In sum, based upon the legal standards in California and based upon the evidence

2  presented, the Special Master recommends and reports that HP is entitled to reimbursement from

3  ACE for outside counsel fees in the amount of $17,818,167.05, in-house legal services in the

4  amount of $1,117,430.00 and costs in the amount of $9,483,074.67, for a total principal amount

5  of $28,418,671.72. HP is entitled to prejudgment interest consistent with the terms of this

6

7  report.[9]

8

9

10

11   Dated: 3-31-03                              _Peter G. Stone_
                                                 Hon. Peter G. Stone (Ret.)
12                                               Special Master

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  [9] As is noted above, ACE has not waived its late notice defense. The merits of the late notice issue were not litigated before the Special Master. Accordingly, this report and recommendation is subject to any ruling this Court may make with respect to the late notice defense or any other defenses not previously foreclosed by prior rulings.

## *PROOF OF SERVICE BY FACSIMILE*

I, Colleen Cafferkey, not a party to the within action, hereby declare that on April 15, 2003 I served the attached Letter to Judge James Ware, Order on Submitted Matters and Report of Special Master on the parties in the within action by faxing true copies thereof, at San Jose, California, addressed as follows:

James Lowe Esq.
Gauntlett & Associates
18400 Von Karman Ave.
Suite 300
Irvine, CA 92612
Tel: 949-553-1010
Fax: 949-553-2050

Janelle F. Garchie Esq.
Correll, Garchie & Edwards, LLP
550 W. "C" Street
Suite 500
San Diego, CA 92101
Tel: 619-446-2829
Fax: 619-557-0428

Alan Greenberg Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" Street
Suite 800
San Diego, CA 92101  USA
Tel: (619) 233-1006
Fax: (619) 233-8627

Ernest Slome Esq.
Lewis, Brisbois, Bisgaard & Smith LLP
550 W. "C" Street
Suite 800
San Diego, CA 92101  USA
Tel: (619) 233-1006
Fax: (619) 233-8627

Bradley M. Zamczyk Esq.
Hinshaw & Culbertson
244 Jackson Street
3rd Floor
San Francisco, CA 94111  USA
Tel: 415- 393-0137
Fax: (415) 834-9070

Robert J. Romero Esq.
Hinshaw & Culbertson
244 Jackson Street
3rd Floor
San Francisco, CA 94111  USA
Tel: (415) 362-6000
Fax: (415) 834-9070

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Jose, CALIFORNIA on April 15, 2003.

_Colleen Cafferkey_
Signature