# EXHIBIT 80

1   **GAUNTLETT & ASSOCIATES**
    David A. Gauntlett (SBN 96399)
2   James A. Lowe (SBN 214383)
    18400 Von Karman, Suite 300
3   Irvine, California 92612
    Telephone: (949) 553-1010
4   Facsimile: (949) 553-2050

5   Attorneys for Plaintiff
    HEWLETT-PACKARD COMPANY

6

7

8                    UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10

11  HEWLETT-PACKARD COMPANY, a          )  Case No. C-99-20207 JW
    corporation,                        )
12                                      )  Hon. James Ware
              Plaintiff,                )
13                                      )  **HEWLETT-PACKARD COMPANY'S**
        vs.                             )  **OPPOSITION TO ACE PROPERTY &**
14                                      )  **CASUALTY INSURANCE COMPANY'S**
    ACE PROPERTY & CASUALTY             )  **MOTION FOR RECONSIDERATION**
15  INSURANCE COMPANY, a                )
    corporation,                        )  Date:    October 23, 2003
16                                      )  Time:    1:30 P.M.
              Defendant.                )  Place:   Dept. 8, 4th Floor
17                                      )
                                        )
18

19

20

21

22

23

24

25

26

27

28

ORIGINAL FILED

OCT 0 2 2003

Richard W. Wieking
Clerk, U.S. District Court
Northern District of California
San Jose

EXHIBIT
80

10191-003-10/1/2003-139451.9

HP'S OPP. TO ACE'S MOTION FOR
RECONSIDERATION - C-99-20207 JW

# TABLE OF CONTENTS

Page

I.     THERE ARE FIVE INDEPENDENT REASONS TO DENY ACE'S MOTION ............. 1

II.    *HAMEID* IS NOT A CHANGE IN LAW OR A MATERIAL DIFFERENCE IN LAW ........................................................................................................... 2

    A.     ACE Concedes *Hameid* Simply Follows the Law Previously Cited by ACE ......... 2

    B.     *Hameid* Is Consistent With this Court's Orders ........................................... 3

    C.     ACE Has Shown No Intervening Controlling Case Law ................................ 4

III.   HAMEID DID NOT ADDRESS PROMOTIONAL ACTIVITIES ADDRESSED TO SIGNIFICANT MARKET SEGMENTS ............................................................ 5

    A.     *Hameid* Chose Not To Address Promotional Activities Directed At Specific Market Segments ........................................................................ 5

    B.     Promotional Activities Directed at Specific Market Segments Constitutes Advertising and the *Hameid* Court Did Not Disturb This Rule ................... 5

        1.     The *Hameid* Decision Does Not Permit ACE to Conclusively Negate the Potential for Coverage .......................................... 5

        2.     "Advertising" Has More Than One Reasonable Meaning ....................... 6

        3.     ACE's Argument That the Prior Determination of Coverage Is Controlled by This Decision Is Misplaced .......................................... 6

        4.     Judge Williams Found Broad Claims of Advertising Misconduct Triggering Duty of Defense .......................................................... 7

        5.     ACE Admitted "Advertising" Was Alleged By Nu-kote ............................. 7

IV.    NU-KOTE'S BROAD ALLEGATIONS OF WRONGFUL ADVERTISING BY HP WENT WELL BEYOND PACKAGE INSERTS, AND THUS ACE CANNOT CONCLUSIVELY NEGATE THE POTENTIAL FOR COVERAGE ........... 8

    A.     HP's "Package Inserts" Only Illustrate the Broad Injurious Advertisements Alleged by Nu-kote But Represent Only a Portion of the Injury Nu-kote Alleged Was Caused by HP's Advertising Conduct..................... 8

    B.     ACE Had All Necessary Information To Determine Its Duty to Defend And Had Available All Other Material But Chose Not to Review It ................... 8

    C.     Nu-kote's Discovery Shows That It Pursued Broad Allegations of Injurious European and Other Foreign Advertising ................................ 9

    D.     The Trial Transcript Confirms Nu-kote's Continued Broad Claims of Worldwide Advertising Misconduct Implicating Potential for Coverage ........... 14

TABLE OF CONTENTS
(contd.)

Page

V.   ACE'S DUTY TO DEFEND IS INDEPENDENTLY SUPPORTED BY ALLEGATIONS IMPLICATING "PERSONAL INJURY" COVERAGE FOR "DEFAMATION" ................................................................................................... 15

    A.   ACE's Duty to Defend Is Also Triggered by "Personal Injury" Allegations Including an Express Count for "Defamation" .................................. 15

    B.   The Fact Allegations of Injurious False Statements that Damaged Nu-kote's Reputation Trigger a Potential for Coverage Even If No Cause of Action for Defamation Was Expressly Asserted ........................................... 16

    C.   Nu-kote's "Defamation" Allegations Focused on HP's Conduct in the Policy Territory ................................................................................................. 18

        1.   Evidence Used by Nu-kote Against HP (and Available to ACE) in Attempt to Establish Defamation in Policy Territory ........................... 18

        2.   Nu-kote's Alleged "Defamation" in the Policy Territory ....................... 19

        3.   The "FUD" Allegations Which the Court Found Constituted "Unfair Competition" Also Included Distinct Fact Assertions of Defamation .................................................................................................... 20

VI.  ACE OWES A DUTY OF DEFENSE THAT IS INDEPENDENTLY SUPPORTED BY THE ALLEGATIONS OF "ABUSE OF PROCESS" WHICH IMPLICATE COVERAGE FOR "MALICIOUS PROSECUTION" ............................. 20

    A.   The "Personal Injury" Offense of "Malicious Prosecution" Is Covered by ACE ........................................................................................................................ 20

        1.   ACE's Policy Explicitly Identifies "Malicious Prosecution" as a Covered "Personal Injury" Offense ........................................................... 20

        2.   Allegations of "Abuse of Process" Implicate "Malicious Prosecution" Coverage Under California Law ........................................... 20

    B.   There Are Two Essential Elements to State a Claim for "Abuse of Process" ............................................................................................................. 21

    C.   The Nu-kote Counterclaims Alleged Facts Necessary to State a Claim for Abuse of Process Establishing the Potential for Coverage ....................... 22

    D.   Nu-kote Alleged "Abuse of Process" Conduct Within the Coverage Territory, Supporting the Potential for Coverage ......................................... 23

VII. CONCLUSION ............................................................................................................. 25

HP'S OPP. TO ACE'S MOTION FOR
RECONSIDERATION - C-99-20207 JW

TABLE OF AUTHORITIES
(contd.)

Page

**STATE STATUTES**

CAL. CIV. CODE § 44 ............................................................................................ 16

CAL. CIV. CODE § 45 ............................................................................................ 16

CAL. CIV. CODE § 46 ............................................................................................ 16

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*Amerisure Ins. Co. v. Laserage Tech. Corp.*,
    2 F. Supp. 2d 296 (W.D.N.Y. 1998) ............................................................. 17

*Dobrin v. Allstate Ins. Co.*,
    897 F. Supp. 442 (C.D. Cal. 1995) .............................................................. 17

*Elan Pharm. Research Corp. v. Employers Ins. of Wausau*,
    144 F.3d 1372 (11th Cir. (Ga.) 1998) ........................................................... 4

*Ethicon, Inc. v. Aetna Cas. & Sur. Co.*,
    737 F. Supp. 1320 (S.D.N.Y. 1990) ............................................................ 20

*Heck v. Humphrey*,
    512 U.S. 477 (1994) ...................................................................................... 21

*Lunsford v. American Guar. & Liab. Ins. Co.*,
    18 F.3d 653 (9th Cir. (Cal.) 1994) ........................................................ 20, 21

*New Hampshire Ins. Co. v. Foxfire, Inc.*,
    820 F. Supp. 489 (N.D. Cal. 1993) ............................................................... 3

*State Farm Mut. Auto. Ins. Co. v. Martinez-Lozano*,
    916 F. Supp. 996 (E.D. Cal. 1996) ............................................................. 23

*Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*,
    832 F.2d 1037 (7th Cir. (Ill.) 1987) ........................................................... 20

*Travelers Indem. Co. of Ill. v. Insurance Co. of N. Am.*,
    886 F. Supp. 1520 (S.D. Cal. 1995) .............................................................. 2

## STATE CASES

*Atlantic Mut. Ins. Co. v. J. Lamb, Inc.*,
    100 Cal. App. 4th 1017 (2002) .................................................................... 17

*Bank of the West v. Superior Court*,
    2 Cal. 4th 1254 (1992) ............................................................................... 1, 3

*Barnett v. Fireman's Fund Ins. Co.*,
    90 Cal. App. 4th 500 (2001), *rev. den.*, 2001 Cal. App. LEXIS 6049
    (Aug. 29, 2001) ........................................................................................... 16

*Bear Wolf, Inc. v. Hartford Ins. Co.*,
    819 So. 2d 818 (Fla. Dist. Ct. App. (4th Dist.) 2002), *rev. den.*, 839 So. 2d 698 (2003) ......... 4

*CNA Casualty of California v. Seaboard Surety Co.*,
    176 Cal. App. 3d 598 (1986) ......................................................................... 9

TABLE OF AUTHORITIES
(contd.)

| | Page |
|---|---|

*Clark Equipment Co. v. Wheat,*
    92 Cal. App. 3d 503 (1979) ................................................................................. 22

*Devin v. United Services Auto. Ass'n,*
    6 Cal. App. 4th 1149 (1992), *rev. den.*, 1992 Cal. LEXIS 4241
    (Cal. Aug. 20, 1992) ........................................................................................... 9

*Eigner v. Worthington,*
    57 Cal. App. 4th 188 (1997) ............................................................................. 23

*El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.,*
    92 Cal. App. 4th 205 (2001), *rev. den.*, 2001 Cal. LEXIS 8430 (Cal. Nov. 28, 2001) ......... 3, 4

*Fireman's Fund Ins. Co. v. Atlantic Richfield Co.,*
    94 Cal. App. 4th 842 (2001) ............................................................................. 7

*Fireman's Fund Ins. Co. v. Bradley Corp.,*
    660 N.W.2d 666 (Wis. 2003) ............................................................................. 4

*Hameid v. National Fire Ins. of Hartford,*
    31 Cal. 4th 16 (2003) ............................................................................. 1, 2, 3, 5, 6, 10

*Hartford Acc. & Indem. Co. v. Superior Court,*
    23 Cal. App. 4th 1774 (1994) ............................................................................. 2

*Haskel, Inc. v. Superior Court,*
    33 Cal. App. 4th 963 (1995) ............................................................................. 2

*Oren Royal Oaks Venture v. Greenberg,*
    42 Cal. 3d 1157 (1986) ..................................................................................... 21

*Safeco Ins. Co. of America v. Robert S.,*
    26 Cal. 4th 758 (2001) ..................................................................................... 6

*Shade Foods, Inc. v. Innovative Products Sales & Marketing,*
    78 Cal. App. 4th 847 (2000) ............................................................................. 23

*Spellens v. Spellens,*
    49 Cal. 2d 210 (1957) ....................................................................................... 21

*State of California v. Pacific Indemnity Co.,*
    63 Cal. App. 4th 1535 (1998) ........................................................................... 2

## DOCKETED CASES

*Arquilla v. International Ins. Co.,*
    No. C-86-5980 MHP, 1988 U.S. Dist. LEXIS 17576 (N.D. Cal. July 15, 1998) ............... 23

*Carroll v. Nakatani,*
    Nos. 02-15483, 02-15565, 2003 U.S. App. LEXIS 18117 (9th Cir. Sept. 2, 2003) ............. 2

*Crystal Geyser Water Co. v. AMICO,*
    No. C-94-1531 MHP, 1995 U.S. Dist. LEXIS 9210 (N.D. Cal. June 22, 1995) .............. 23

TABLE OF AUTHORITIES
(contd.)

Page

1

STATE STATUTES

2  CAL. CIV. CODE § 44 .................................................................................................. 16

3  CAL. CIV. CODE § 45 .................................................................................................. 16

4  CAL. CIV. CODE § 46 .................................................................................................. 16

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.  THERE ARE FIVE INDEPENDENT REASONS TO DENY ACE'S MOTION

There are five separate reasons to deny ACE's latest motion for reconsideration.

**First**, the *Hameid*[1] decision is **not a change** or material difference **in the law** so as to justify vacating previous orders.  At most, *Hameid* clarified the law by adopting a general definition of "advertising" suggested by the court in *Bank of the West v. Superior Court*, 2 Cal. 4th 1254 (1992), a case followed by this Court in previous orders.  ACE has misinterpreted *Hameid*.  It says nothing new that affects this case; it is only another "letters alone are not advertising" case.

**Second**, the *Hameid* decision **expressly declined to address** the question of "**whether widespread promotional activities directed at specific market segments constitute advertising** under the CGL policy."  Therefore, *Hameid* has no bearing on this case where it is factually undisputed that the only advertising attacked by ACE in its motion (inserts provided in every single package containing an inkjet printer cartridge) constitutes, at the very least, widespread promotional activities directed at specific market segments.

**Third**, Nu-kote made wide-ranging claims asserting liability based on HP's international advertising **in addition to the package inserts** ACE discusses in its motion.  **The accused advertising included substantial European advertising explored by Nu-kote in its discovery, discussed by Nu-kote in the trial and referred to by the Court in its jury instructions.**

**Fourth**, ACE's **duty of defense is independently triggered by** the potential for coverage for the explicit **allegations of world-wide "defamation" implicating "personal injury" coverage** under the policy.  **Such coverage does not rely upon any advertising.**  ACE has not even attempted to conclusively negate the potential for "personal injury" coverage based on the allegations of defamation.

**Fifth**, ACE's **duty of defense is also independently triggered by** the potential for coverage for the implicit **allegations of abuse of process implicating "personal injury" coverage** for "malicious prosecution."  This coverage likewise does not rely upon any advertising.  ACE has not conclusively negated the potential for "personal injury" coverage based on abuse of process.

---

[1] *Hameid v. National Fire Ins. of Hartford*, 31 Cal. 4th 16 (2003).

1    ACE has presented no new evidence to negate its duty to defend even at this late date, has no

2    actual and applicable new law supporting its assertion, and has never tried to conclusively negate the

3    potential for coverage.[2]  ACE's motion is an effort to fashion from the *Hameid* decision a life

4    preserver to buoy up its five-year refusal to defend HP.[3]  But ACE's arguments do not float.

5    **II.    *HAMEID* IS NOT A CHANGE IN LAW OR A MATERIAL DIFFERENCE IN LAW**

6         **A.    ACE Concedes *Hameid* Simply Follows the Law Previously Cited by ACE**

7         A motion for reconsideration should not be granted absent "highly unusual circumstances,"[4]

8    none of which are established by ACE's motion.  **ACE's Motion for Reconsideration presents no**

9    **evidence whatsoever.**  ACE neither cites to any evidence in the record nor presents any new

10   evidence.  ACE does not argue that the Court committed clear error.  Instead ACE only asserts that

11   the recent case of *Hameid*, 31 Cal. 4th 16, somehow changed the legal basis for the finding of a duty

12   to defend that was made by this Court over four years ago.  But ACE does not even argue that it

13   amounts to "an intervening change in the controlling law."  Rather, ACE merely argues that *Hameid*

14   "clarified" the definition of "advertising" thereby "conclusively negating coverage for the

15

16   _____

17   [2] Only new evidence can end the duty to defend, but never retroactively.  *Hartford Acc. & Indem. Co. v. Superior Court*, 23 Cal. App. 4th 1774, 1781 (1994), as cited in *Haskel, Inc. v. Superior Court*, 33 Cal. App. 4th 963, 977 (1995) ("[A] declaratory judgment of no coverage . . . does not *retroactively* relieve the . . . insurer of the duty to defend.  It only relieves the insurer of the obligation to continue

18   to defend after the declaration." (emphasis added)).  This Court ruled that ACE's duty to defend

19   continued until the *Nu-kote* Action concluded.  [**Exhibit "1126"** 4:8-20]  Since the *Nu-kote* Action was resolved in 2000, ACE cannot retroactively eliminate its duty to defend in 2003.  *Travelers*

20   *Indem. Co. of Ill. v. Insurance Co. of N. Am.*, 886 F. Supp. 1520, 1526-27 (S.D. Cal. 1995) (Proof of the absence of potential for coverage "does not, however, retroactively delete the duty to defend as it

21   had existed up to the point of proof. . . .  Because the Finkelstein action is settled and presumably all defense costs which could be incurred have already been incurred, Generali's attempt to prove now

22   that no coverage existed under its policy then, is moot.").

23   [3] Since ACE refused to defend HP, it is not entitled to reimbursement of defense fees.  *State of California v. Pacific Indemnity Co.*, 63 Cal. App. 4th 1535, 1540 (1998) ("Pacific Indemnity is not currently entitled to reimbursement or offset because, to date, it has provided no defense.").  An

24   insurer may only seek reimbursement by proving a claim was not even potentially covered after providing an entire defense.  *Id.* at 1549 ("By repudiating its duty to defend and providing no

25   defense, Pacific Indemnity has nothing from which to seek reimbursement.").

26   [4] *Carroll v. Nakatani*, Nos. 02-15483, 02-15565, 2003 U.S. App. LEXIS 18117, at *22 (9th Cir. Sept. 2, 2003) ("'[A] motion for reconsideration should not be granted, absent highly unusual

27   circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law.' *Kona* [*Enters. v. Estate of*

28   *Bishop*], 229 F.3d 877 at 890 [(9th Cir. 2000)].").

1  Underlying Action."[5]  ACE further asserts that the *Hameid* court "specifically reject[ed] the case law

2  relied upon by this Court in its March 4, 2003 Order ...." *Id.* at 1:28-2:1.  These meritless

3  arguments are, however, at odds with the facts.

4      ACE's motion admits that the Supreme Court based its *Hameid* decision (about the definition

5  of advertising) on "the very case relied upon by ACE" – *Bank of the West v. Superior Court*, 2 Cal.

6  4th 1254 (1992). *Id.* at 4:15-18. ACE concedes that *Hameid* **merely clarifies** previous law.[6] ACE

7  admits that there is no change or material difference in the law that would justify the reconsideration

8  of the repeated orders of this Court finding a duty to defend based on the potential for coverage.

9     **B.**   ***Hameid* Is Consistent With this Court's Orders**

10      The *Hameid* court hardly rejects the definition of "advertising" adopted by this Court in the

11  March 4, 2003 order, as claimed by ACE.  *Id.* at 2:4-5.  ACE's motion fails to acknowledge that

12  *Bank of the West,* followed by *Hameid*, was considered and quoted extensively by Judge Williams in

13  his original duty to defend order of August 24, 1999. **[Exhibit "102"** 1:19-12:20[7]] This Court also

14  cited *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.*, 92 Cal. App. 4th 205 (2001) in its

15  March 4, 2003 Order supporting its finding that "advertising" is generally defined as "dissemination

16  of promotional material to the public." **[Exhibit "1547"** (2003 U.S. Dist. LEXIS 3586) 8:16-17.]

17  Actually, the *Hameid* decision cited *El-Com* with approval as an example of the majority rule.[8]

18      When it found ACE's "advertising" definition argument "lack[ed] merit," this Court relied

19  upon *El-Com*, a case the *Hameid* court explicitly found consistent with its decision.  **[Exhibit**

20  **"1547"** 8:15-20.]  The Court's citation of the *Foxfire* case[9] appears only as illustrative and not

21

---

22  [5]ACE Motion for Reconsideration 6:19-20 ("[T]he Supreme Court of California has now
unequivocally adopted the definition of 'advertising' set forth in *Bank of the West* ....").

23  [6]Motion for Reconsideration 2:6-8 ("[T]he new *Hameid* case . . . clarif[ied] the definition of
'advertising.'").

24  [7]All Exhibits, except as noted, are attached to the contemporaneously filed Declaration of James

25  Lowe in Opposition to Motion for Reconsideration.

25  [8]*Hameid*, 31 Cal. 4th at 27 ("Recent decisions interpreting California law also apply the majority

26  definition of 'advertising.' . . . [S]ee also *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.* (2001)
92 Cal. App. 4th 205, 217 [commonly understood meaning of the term 'advertising' is 'widespread

27  promotional activities'].").

28  [9]*New Hampshire Ins. Co. v. Foxfire, Inc.*, 820 F. Supp. 489 (N.D. Cal. 1993).  This is another
"letters alone are not advertising" case in which the insured merely sent letters to 22 to 31 customers,

1  necessary to the finding. Indeed, three cases analyzing an insurance policy which defined

2  "advertising" as "the widespread distribution of material promoting [the insured's] goods, products

3  or services," a definition analogous to that adopted in *Hameid*, have found conduct like that engaged

4  in by HP constitutes "advertising."[10] Thus this Court's previous orders are supported by the same

5  law relied upon by the *Hameid* court and based on the same understanding of "advertising."

### C.     ACE Has Shown No Intervening Controlling Case Law

7       Contrary to ACE's implicit argument, it is not necessary that "advertising" be in the form of

8  billboards or prime time television spots. The *El-Com* court, 92 Cal. App. 4th at 218, for example,

9  found that even a singular hardware catalogue, "made available to the public" and containing within

10  its covers a single offending photograph, was "advertising" establishing a potential for "advertising

11  injury" coverage, triggering a duty to defend that lasted from the tender **until the insurer**

12  **"established beyond dispute that the infringing handle had not been advertised at the time of**

13  **tender."** The *Hameid* court approved that application of this advertising definition.

14       Here, the HP package inserts were indisputably "made available to the public" by the tens of

15  millions. The public is far more likely to open a cartridge box and find the allegedly objectionable

16  insert than it is to open a hardware catalogue and see an infringing picture. ACE has not made the

17  slightest effort to establish beyond dispute that the statements which offended Nu-kote had not been

18  advertised. ACE has not, therefore, shown "an intervening change in the controlling law" and has

19  shown no "binding caselaw holding that package inserts can never constitute 'advertising.'"

20  **[Exhibit "1547" 8:22-24]**

21

22  entirely unlike the instant case.

[10]*Fireman's Fund Ins. Co. v. Bradley Corp.*, 660 N.W.2d 666, 679 (Wis. 2003) (Advertising

23  included product brochures featuring the product in question, as was true here of HP's product
interests – promoting its goods and services.); *Bear Wolf, Inc. v. Hartford Ins. Co.*, 819 So. 2d 818

24  (Fla. Dist. Ct. App. (4th Dist.) 2002) (Trade show display of a lighter in a box resembling a cigar
box, which product in its entirety was allegedly covered by copyright claims); *Elan Pharm.*

25  *Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1377 (11th Cir. (Ga.) 1998) ("A plain
and ordinary reading of the definition of advertising activity in Wausau's policies would include an

26  insured's dissemination of information to promote a product or service. . . . Count II of Pfizer's
complaint accuses Elan of using the clinical studies at issue to 'commercialize' Nifelan in the United

27  States. As Wausau admits, the common definition and usage of the term 'commercialize' includes
developing commerce in a particular item. The dissemination of clinical studies to develop a market

28  for one of Elan's products, therefore, appears to fall well within the definition of advertising
provided in the insurance policies and in the case law.").

1    **III.    HAMEID DID NOT ADDRESS PROMOTIONAL ACTIVITIES ADDRESSED TO SIGNIFICANT MARKET SEGMENTS**

2        **A.    *Hameid* Chose Not To Address Promotional Activities Directed At Specific Market Segments**

3

4        *Hameid* does not hold that package inserts directed at all present and the most likely potential

5    buyers of inkjet cartridges can never constitute "advertising." Contrary to ACE's argument, the

6    *Hameid* court **did not consider whether widespread promotional activities directed at specific**

7    **market segments constitute "advertising."**[11]

8        **It is undisputed that HP's package inserts were widely disseminated to specific market**

9    **segments: all actual and the most likely potential customers.** Every purchaser of an Inkjet

10   Printer received the advertising insert because every printer came with an ink cartridge in a box also

11   containing the insert. This alone targeted the critical market segment, everyone who had an actual

12   future need for new cartridges – tens of millions of people worldwide – meeting any requirement for

13   "widespread promotional" activities. Every purchaser of a new cartridge received the advertising

14   insert. Thus, the advertising was targeted to the entire universe of potential buyers of the HP product

15   (and also the same people who might consider buying a Nu-kote refill product as an alternative).

16   This focused advertising, directed to the largest possible audience, was far more effective than

17   random advertisements in some mass media form.

18       **B.    Promotional Activities Directed at Specific Market Segments Constitutes Advertising and the *Hameid* Court Did Not Disturb This Rule**

19

20           **1.    The *Hameid* Decision Does Not Permit ACE to Conclusively Negate the Potential for Coverage**

21       ACE's argument is that somehow the *Hameid* decision means that certain HP inkjet cartridge

22   package inserts it references cannot be "advertising" for purposes of potential coverage and since

23   these items are not "advertising" that there cannot be any "advertising injury." The March 4, 2003

24   order held, however, that ACE cannot conclusively negate the potential for coverage in the absence

25   of binding case law holding that package inserts can **never** constitute "advertising."

26

---

27   [11]*Hameid*, 31 Cal. 4th at 24 n.3 ("**We** have limited our review to the question presented and **do not**
28   **have occasion to decide whether widespread promotional activities directed at specific market segments constitute advertising** under the CGL policy." (emphasis added)).

1   [Exhibit "1547" 8:22-24]  ACE's assertion that *Hameid* constitutes a change or material difference

2   in law is further undermined by ACE's concession (ACE's Motion for Reconsideration 2:22-26) that

3   it had previously argued in its MSJ #6 the very cases cited by the *Hameid* court.  These were all

4   cases similar to *Hameid,* where courts found that sending a few letters did not constitute

5   "advertising."  *Hameid* was found to have engaged only in "solicitation" and not "advertising" by

6   making telephone calls and sending letters only to a handful of potential customers.

7         The Supreme Court referenced the three cases ACE has previously argued in its discussion

8   distinguishing personal or letter solicitation from advertising:

9         Here, KWP alleged Howard and Billington made telephone calls and sent mailers to
          Bellezza customers advising them of their new location and of Hameid's lower
10        prices.   These activities strongly resemble the solicitations of a competitor's
          customers in *Select Design, supra,* 674 A.2d at pages 801-803, the recruiting letters to
11        a competitor's employees in *Monumental Life Ins. Co. v. U.S. Fidelity & Guaranty
          Co., supra,* 617 A.2d at page 1173, and the subcontractor's submission of bids in
12        *Solers, supra,* 146 F. Supp. 2d at page 795 – all of which were held to be
          "solicitation," not "advertising." [*Hameid,* 31 Cal. 4th at 29-30.]
13

14        The *Hameid* court then **factually** determined that a few telephone calls and letters amounted

15   to "solicitation" of a competitor's customers rather than "advertising."  Here, ACE has never

16   provided undisputed evidence that HP's product inserts were "solicitations" as opposed to

17   "widespread promotional activities," including those directed at "specific market segments."

18         2.     **"Advertising" Has More Than  One Reasonable Meaning**

19         Underscoring ACE's misunderstanding of *Hameid* is its failure to appreciate the significance

20   of the Supreme Court concession that there may be more than one reasonable construction of the

21   term "advertising."  In general, "[a] policy provision is ambiguous when it can have two or more

22   reasonable constructions." *Safeco Ins. Co. of America v. Robert S.,* 26 Cal. 4th 758, 763 (2001).

23   The decision in *Hameid* provides one reasonable construction of the term "advertising" as applied to

24   the specific facts in that case. The Court specifically deferred its determination as to whether or not

25   another reasonable construction might include targeted promotional activity to specific market

26   segments, requiring a further explication of the term "advertising." *Hameid,* 31 Cal. 4th at 24 n.3.

27         3.     **ACE's Argument That the Prior Determination of Coverage Is**
                  **Controlled by This Decision Is Misplaced**

28

1      As one recent California Appellate Court found in reviewing ambiguous policy language, an

2  "insurance company's failure to use available language to exclude certain types of liability gives rise

3  to the inference that the parties intended not to so limit coverage." *Fireman's Fund Ins. Co. v.*

4  *Atlantic Richfield Co.*, 94 Cal. App. 4th 842, 852 (2001). Here, ACE's failure to define the term

5  "advertising" to exclude the activities undertaken by HP in promoting its products leads to the

6  inference that ACE and HP did not intend to limit the Advertisers Liability coverage provided in the

7  ACE policy. This Court has so held in numerous orders and should do so again.

8          **4.    Judge Williams Found Broad Claims of Advertising Misconduct Triggering Duty of Defense**

9

10      In his order of August 24, 1999, Judge Williams found that Nu-kote "paints advertising

11  activities with a broad brush" and quoted paragraph 93 of the Counterclaim:

12      Hewlett-Packard has published knowingly false statements and engaged **in deceptive advertising (including deceptive packaging) and** **other** unfair business **practices**

13      concerning Hewlett-Packard's own printer supply products and/or Nu-kote's printer supply products . . . This **misconduct has included**, without limitation, **false**

14      **representations about the refillability** of Hewlett-Packard's cartridges **and . . . also** includes express . . . **use of marketing misinformation techniques** designed **to**

15      **instill "fear, uncertainty and doubt"** or **"FUD" in the minds of customers** about competitive products. **[Exhibit "102" 8:7-16]**

16

17          **5.    ACE Admitted "Advertising" Was Alleged By Nu-kote**

18      Critically, **ACE conceded that Nu-kote alleged HP advertising** in its Opposition to HP's

19  motion for partial summary judgment **in 1999** stating HP was "accused of telling the public not to

20  use Nu-kote's inkjet refills," and ACE conceded **that**

21      **Nu-kote claims that HP has, in its packaging and other advertising, used images of its inkjet cartridges that do not accurately portray material characteristics of**

22      **the cartridges.**[12]

23      ACE has never conclusively shown the absence of that evidence which it admitted existed in

24  1999. ACE does not claim that its original admissions about Nu-kote's claims of harm from "**HP**

25  **... packaging and other advertising**" were mistaken or that it misunderstood the meaning of

26  "advertising" under its own policy in 1999, but that the *Hameid* decision miraculously changed its

27

28  [12]ACE's Opposition to MSJ dated April 20, 1999, 9:20-10:1 (emphasis added).

HP'S OPP. TO ACE'S MOTION FOR
RECONSIDERATION - C-99-20207 JW

1   understanding. Nu-kote's admittedly broad brush advertising allegations, and not merely the

2   package inserts, all created a potential for coverage. **ACE did not** in 1999 or in any of its many

3   motions for reconsideration over the subsequent years **produce any evidence that conclusively**

4   **proves no potential for coverage**. A legal argument does not substitute for factual proof. ACE

5   cannot therefore use *Hameid* now to prove that there was no potential for coverage.

6   **IV.     NU-KOTE'S BROAD ALLEGATIONS OF WRONGFUL ADVERTISING BY HP**
        **WENT WELL BEYOND PACKAGE INSERTS, AND THUS ACE CANNOT**
7        **CONCLUSIVELY NEGATE THE POTENTIAL FOR COVERAGE**

8        **A.     HP's "Package Inserts" Only Illustrate the Broad Injurious Advertisements**
                **Alleged by Nu-kote But Represent Only a Portion of the Injury Nu-kote Alleged**
9                **Was Caused by HP's Advertising Conduct**

10  Nu-kote alleged in the Counterclaims that HP's wrongful conduct involved deceptive

11  advertising (including deceptive packaging). (Nu-kote's Fourth Amended Counterclaims,

12  **Exhibit "193"** ¶ 93) Nu-kote also alleged HP made false statements in its **packaging and other**

13  **advertising**. [**Exhibit "193"** ¶ 165] While HP provided package inserts to ACE to demonstrate its

14  allegedly wrongful advertising activities, this was not the sole wrongful and injurious advertising

15  alleged by Nu-kote. Nu-kote broadly alleged HP's advertising, including packaging, created liability

16  triggering potential coverage under the "advertising injury" offense of "unfair competition."

17  **ACE has not provided undisputed evidence that the package inserts were not**

18  **widespread advertising to specific market segments**. Additionally, ACE has never provided this

19  Court with any evidence that **only** HP's package inserts comprised the advertising activity alleged to

20  have resulted in injury to Nu-kote. To the contrary, this Court recognized that Nu-kote painted

21  "HP's advertising activities with a broad brush" in its finding ACE owed HP a defense. [**Exhibit**

22  **"102"** 8:7-8 and 4:9-23]

23        **B.     ACE Had All Necessary Information To Determine Its Duty to Defend And Had**
                **Available All Other Material But Chose Not to Review It**
24

25  With its June 13, 1998 tender, HP provided ACE with the Nu-kote counterclaims which, as

26  set forth in the Court's August 24, 1999 Order, triggered ACE's defense obligation. HP gave ACE

27  notice of the *Nu-kote* Action, together with a copy of the counterclaims, on February 23

28  [**Exhibit "237"**], June 13 [**Exhibit "145"**], and June 19, 1998 [**Exhibit "258"**]. HP repeatedly

1    confirmed early delivery of all available documents relevant to coverage[13] and offered to provide

2    ancillary documents at cost.[14]   ACE expressly did not seek access to confidential Nu-kote pleadings

3    and documents.[15]   Thus, ACE had all requested and available documentation by April 13, 1999.

4         The deposition testimony discussed herein was provided to ACE and the additional

5    advertising materials discussed in those depositions were documents contained in the CD-ROM

6    discovery materials repeatedly offered over several years to ACE but declined. California law **does**

7    **not permit measurement of the duty to defend by hindsight**[16] but only **on facts available** at the

8    outset of the litigation.[17]   ACE's duty to defend was shown by facts available to it but ignored.

   C.    **Nu-kote's Discovery Shows That It Pursued Broad Allegations of Injurious European and Other Foreign Advertising**

10        ACE's motion inaccurately suggests, without offering any evidence (let alone undisputed

11   evidence), that the only HP European advertising potentially at issue was the package insert.  The

---

13   [13]*See, e.g.*, October 27, 1998 letter to Thomas Correll detailing pleadings, policy, and advertising materials previously provided and explaining that Nu-kote's confidential documents were subject to a "stringent court-ordered protective order" **[Exhibit "241"]**; February 8, 1999 letter to Correll repeating same information **[Exhibit "243"]**; February 19, 1999 letter to Correll pointing out that the underlying protective order permitted confidential documents only to insurers "which have agreed to provide coverage and a defense" **[Exhibit "244"]**.

16   [14]*See, e.g.*, **March 11, 1999 letter** to Thomas Correll **offering any of 4.7 million pages of discovery documents on CD-ROM or on paper** and 6 thousand pleadings, at reproduction cost **[Exhibit "246"]**; **April 12, 1999 letter** to Correll **offering 150 deposition transcripts** at cost **[Exhibit "247"]**; April 14, 1999 letter to Correll confirming that he had reviewed and copied "all non-confidential motions, pleadings and discovery documents" on April 13, 1999 but that other documents were not wanted by CIGNA **[Exhibit "248"]**; January 10, 2002 letter to Janelle Garchie again reminding of the availability of the CD-ROM materials at cost but confirming an understanding that ACE did not want them **[Exhibit "845"]**; June 5, 2002 letter from Garchie complaining about the cost but still not requesting any part of the CD-ROM documents **[Exhibit "1556"]**; and June 18, 2002 letter to Garchie responding to the cost concerns and summarizing the offers to produce the materials on at least seven separate occasions over the previous three years **[Exhibit "1555"]**.

22   [15]*See, e.g.*, March 5, 1999 letter from Thomas Correll stating that CIGNA's document requests did "not extend to materials which were designated as **confidential** in the underlying case" **[Exhibit "245"]** (emphasis in original)]; April 12, 1999 letter to Correll confirming that no confidential materials were requested **[Exhibit "247"]**; June 2, 1999 letter to Correll again confirming that **no confidential materials were requested** by CIGNA **[Exhibit "250"]**.

25   [16]*Devin v. United Services Auto. Ass'n*, 6 Cal. App. 4th 1149, 1157 (1992), *review denied*, 1992 Cal. LEXIS 4241 (Cal. Aug. 20, 1992).

27   [17]*CNA Casualty of California v. Seaboard Surety Co.*, 176 Cal. App. 3d 598, 605 (1986) ("An insurer's duty to defend must be analyzed and determined on the basis of any potential liability arising from **facts available** to the insurer from the complaint or other sources available to and **at the time of the tender of defense**." (emphasis added)).

1  facts are otherwise.  Deposition and trial testimony clearly demonstrate that HP was extremely

2  concerned with the inroads that refill products were making into the European and Asian markets

3  and HP devoted significant advertising and marketing resources to combat these advances.  This

4  more than satisfies the examples of small business advertising mentioned in *Hameid*, 31 Cal. 4th at

5  29 ("spots on the radio or television . . . space on billboards or bus benches or . . . advertisements in

6  newspapers . . . .").  HP's alleged conduct cannot be characterized as the "solicitation" (of

7  competitors' customers, competitors' employees, and a contract bid) that *Hameid*, 31 Cal. 4th at 29-

8  30, agreed was not "advertising."  Tens of millions of customers opening a box to find an advertising

9  insert is no less "advertising" than a few thousand readers who open a newspaper to find a printed

10  insert.[18]

11  As refill and other alternative source products began to become increasingly available in

12  markets across the world, HP saw its respective market share dip, in some cases quite dramatically.[19]

13  In Germany, for example, HP believed that it had lost as much as 33% of its market share for printer

14  supplies.  *Id.* at 12:13-16.  HP felt that refill products were particularly dangerous to its market

15  position in countries like Germany because European consumers tended to be more environmentally

16  conscious than their American counterparts who were thought to be especially receptive to refill

17  products because such products were perceived to be more friendly to the environment.[20]

18  Statistical data showed that HP's fears were not unfounded.  In fact, although HP was able to

19  maintain acceptable sales levels in the North American and (ultimately) Asian markets, HP's

20  European market share fell so far below quota that it dragged HP's overall worldwide performance

21  in the printer supply market below expectations.  As Mr. Siuta testified in his deposition:

22  > Looking at where we are year to date through September, we're about 93 percent of quota on a worldwide basis, but all the regions are at quota or above with the exception of Europe. **Europe is our largest region and their performance is so poor compared to the others that it brings our total worldwide average quota**

24

25  [18]Nu-kote complained broadly about HP's worldwide "FUD" advertising, which included not only package and insert warnings, but sales brochures, print advertisements (HP spent $30 Million worldwide for printing alone [**Exhibit "1548,"** 4184:5-7]) and television spots, all designed to prompt resellers to sell and end-users to buy original HP cartridges instead of refill products.

27  [19]In South Korea, for example HP's market share dropped at one point to approximately 5%.  *See* Deposition of Raymond Siuta ("Siuta Deposition"), Volume 1, 12:16-16, **Exhibit "1552."**

28  [20]Siuta Deposition, Volume 2, 544:3-4, **Exhibit "1553."**

1    performance down below quota.[21]

2    To combat this market share erosion, HP implemented a comprehensive advertising and

3    marketing campaign.[22] This campaign was designed to reach European resellers and consumers with

4    a dual message about the advantages of using HP printer supplies and the dangers of using non-HP

5    printer supplies. *Id.* The European campaign against refill products and companies included:[23]

6    • An aggressive campaign to inform re-sellers of potential for HP printer damage associated

7    with the use of refillers' ink. [Ligon Deposition, Volume 2, 94:12-17, **Exhibit "1549"**]

8    • Warning end users about the dangers of using refill products and using refill "horror stories"

9    as part of HP's overall consumer education program in Europe. [*Id.* at 99:15-19]

10    • Incorporating into HP advertising newspaper stories about refill problems to support HP's

11    claim that refill products are dangerous to HP printer hardware. [Ligon Deposition, Volume 3,

12    78:16-22, **Exhibit "1550"**] [*See* Todd Declaration ¶ 5, **Exhibit "1554"** (Bates No. C034237 -

13    C034238])]

14    • Stressing the fact that refill products were inferior to HP original products.    [Ligon

15    Deposition, Volume 2, 186:23-25 - 187:1-3, **Exhibit "1549"**]

16    HP utilized a number of methods to communicate its message to both end users and resellers.

17    To reach end users with the anti-refill message, **HP placed a warning on the outside of its printer**

18    **cartridges which sternly warned consumers of the danger of using refill products.** [*Id.* at 97:5-

19    12] HP's consumer education plan also included the **dissemination of an advertising brochure**

20    **which sharply attacked the viability of refill products.** [Ligon Deposition, Volume 2, 182:15-25 -

21    _____

22    [21]Suita Deposition, Volume 1, 14:24-25, 15:1-5, **Exhibit "1552"** (emphasis added).

23    [22]As one HP document put it, "In addition to working with the channel to reinforce the above
consumer messages, the threat of refill competition has created the need for **a much stronger**

24    **message targeted to resellers to ensure an understanding of the potential damage that can
occur to consumer printers and the negative impact such damage has on customer satisfaction.**

25    **Therefore, a much stronger warning statement should be communicated to the HP sales force
and the channel.**  (Emphasis added.)  Deposition of Sarah Ligon, Volume 2, 96:1-12 ("Ligon

26    Deposition"), **Exhibit "1549."**

27    [23]HP's particular concern with Nu-kote's European presence is underscored by the cover of one HP
memorandum which had a picture of the European continent underneath the headline "**HP v.**

28    **Pelikan.**" (Pelikan was acquired by Nu-kote.) Deposition of Michael Roberts, 208:10-15, **Exhibit
"1551."**

183:1-4, **Exhibit "1549"**] [*See* Todd Declaration ¶ 5, **Exhibit "1554"** (Bates No. C018844-45)]

As evidenced by Figure 1, HP's European brochure is full of the type of anti-refill statements for which Nu-kote sought to impose liability on HP. These include referring to refill products as a "false economy," predicting clogged nozzles, and creating consumer "fear, uncertainty and doubt" by warning that any damage to printers, clothing or furniture would not be covered by HP's warranty. [*Id.*]



HP reiterated this message in an advertising piece it developed for use at European trade shows. In this particular piece, HP warned consumers about "ragged" inferior inks which tended to "bleed" and which would "crust" and "clog" printer nozzles. [Ligon Deposition, Volume 2,  188:19-25 - 189:1-3, **Exhibit "1549"**] [*See* Todd Declaration ¶ 5, **Exhibit "1554"** (Bates No. C018840-43)]

HP's European advertising campaign against refill products did not stop there. **HP also disseminated a Reselling Guide designed to reach European resellers with HP's refill message.** The purpose was two-fold: First, to educate European resellers[24] with the idea that the sale of refill products was less profitable than the sale of HP printer supplies because customers who purchased such products were less likely to be satisfied with their purchase than those who purchased HP products. [Ligon Deposition, Volume 2, 188:16-25 - 189:1-2, **Exhibit "1549"**] Second, to increase sales of HP's printer supplies by reaching both end users and resellers with HP's message about the dangers of using refill products. The Reselling Guide made several key assertions, including:

---

[24]The European counterparts to major U.S. resellers such as Office Max, Staples, and Office Depot include such companies as Karvof, ISA France and others. Siuta Deposition, Volume 1, 16:16-21 - 17:2:10, **Exhibit "1552."**

1  • Next to a picture of a "sick printer," a statement in bold that **"Most people who try refilling**

2  **go back to genuine HP cartridges."** Ligon Deposition, Volume 2, 184:15-25 - 185:1-5, **Exhibit**

3  **"1549."** (Emphasis in original.) (See Figure 2) [*See* Todd Declaration ¶ 5, **Exhibit "1554"** (Bates

4  No. C018837)]



5  • Next to a picture of a "flexing ink drop," the

6  statement in bold that **"HP products make customers**

7  **happier than any imitations on the market."** **Exhibit**

8  **"1549"** at 187:14-19 (emphasis in original). [*See* Todd

9  Declaration ¶ 5, **Exhibit "1554"** (Bates No. C018838)]

10  • The statement that **"Non-HP inks aren't the**

11  **same. It's not possible. They cannot copy patented**

12  **HP ink formulas. And they cannot offer a genuine**

13  **HP guarantee."** *Id.* at 186:23-25 - 187:1-3 (emphasis

14  added). [*See* Todd Declaration ¶ 5, **Exhibit "1554"**

15  (Bates No. C018837)]

16  • The statement **"Remember that when you sell a 'refill' it may look like you're selling an**

17  **equivalent product. But if it's not original HP, it's not backed by an HP guarantee."** Ligon

18  Deposition, Volume 3:77:3-6, **Exhibit "1550"** (emphasis added). [*See* Todd Declaration ¶ 5,

19  **Exhibit "1554"** (Bates No. C034235)]

20  • The statement that **"Nearly every printer returned to HP because of leaking ink has been**

21  **damaged by non-HP refill ink products or processes."** **Exhibit "1549"** at 186:1-8 (emphasis

22  added). [*See* Todd Declaration ¶ 5, **Exhibit "1554"** (Bates No. C018837)]

23  The Selling Guide was disseminated to European resellers.[25]  Critically, precisely these

24  claims that refill products were inferior to HP products and could be dangerous to HP printers were

25  core of Nu-kote's "unfair competition" allegations.[26]  **These allegations, developed by Nu-kote in**

26  ───────────

[25]HP also took its message directly to European resellers, **attending Supply Advisory Council**

27  **meetings of European resellers.** [Siuta Deposition, Volume 3, 541:11-15 - 542:1-4, **Exhibit "1553"**]

28  [26]*See, e.g.*, Nu-kote Fourth Amended Counterclaims, ¶¶ 161, 165-167, 186(a) - 186(b), 188, **Exhibit**

its depositions of HP personnel, unequivocally establish that **Nu-kote sought to impose liability against HP for its European advertising activities.**  This conduct, separate and distinct from the dissemination of package inserts, readily meets *Hameid*'s definition of "advertising."

     **D.**    **The Trial Transcript Confirms Nu-kote's Continued Broad Claims of Worldwide Advertising Misconduct Implicating Potential for Coverage**

The trial transcript is replete with references to **Nu-kote's broad** and continued **allegations of HP's wrongful advertising** conduct including references to **television advertising** and **$30 Million spent worldwide** on **printing** of advertising materials: (emphasis added throughout).

> The next reference I'd like to bring to the court's attention was in one of the summary arguments made during the trademark infringement case where Mr. Katz said, quote, "So why is it that **HP is making these horrible accusations of Nu-kote? We see it in their own advertising.** Because they want to stop choice. **[Exhibit "1548"** 3526:6-13]

> **Nu-kote showed you a handful of things, some videos, to suggest that we misused FUD in an advertising campaign. [Exhibit "1548"** 3906:19-21]

> And I think it's pretty serious. **It's not negative advertisement on T.V. It's untrue statements** that they know are untrue and they're telling it to our most valued customers who lead to all end users. It's a very serious matter, and **it's not just negative advertising. [Exhibit "1548"** 4149:7-11]

> In general, yes. I believe **worldwide an advertising number** for the printers and the supplies **is about 30 million dollars. [Exhibit "1548"** 4184:5-7]

Even the jury instructions referenced broad allegations of HP's wrongful advertising conduct.

> IN THIS CASE NU-KOTE CLAIMS THAT HEWLETT-PACKARD HAS ENGAGED IN AN UNFAIR CAMPAIGN AGAINST COMPETING INK RESUPPLY PRODUCTS INVOLVING, AMONG OTHER THINGS, **FALSE, DECEPTIVE AND MISLEADING COMMUNICATIONS TO SELLERS AND POTENTIAL BUYERS OF REFILL PRODUCTS.** IN GENERAL, A PRACTICE OF **USING MISLEADING OR DECEPTIVE MARKETING INFORMATION** TO MAINTAIN MONOPOLY POWER IN A MARKET MAY VIOLATE THE ANTITRUST LAWS. **[Exhibit "1548"** 6144:25-6145:9 (emphasis added)]

Nu-kote's counsel's closing argument provides indisputable evidence that the advertising-based "unfair competition" allegations remained a focus of the case.

> [T]hat was their overall plan . . . . One part was **FUD**, fear uncertainty and doubt . . .
> The first FUD statement was – was that – **that refillers' inks are inferior.** . . .
> So that **was not comparative advertisement.**  That was a knowingly false statement.

"193."

[**Exhibit "927,"** 6281:15-17, 6290:7-16, 6291:5-7]

Nu-kote argued that various HP advertising materials were evidence of antitrust conduct:

Let's go into the conduct. And the **first part is FUD** . . . . I'm going to concentrate on [four] of the main FUD statements . . . . The first . . . was . . . **that refillers' inks are inferior.** And that **appears [in] The Ink Story . . . among others.** . . . [**Exhibit "927,"** 6290:7-19]

So that was not comparative advertisement. That was a knowingly false statement. Second, **knowingly false statement, refill inks cause most of the printer problems.** And you can find that in . . . **The Ink Story.** . . . the `95 Selling Guide . . . . [**Exhibit "927,"** 6291:5-12]

**Nu-kote** specifically **pointed to** an international **advertising** piece printed **in Spanish and Portuguese:**

[**D**]ocuments show that this was disseminated. . . . [T]here was . . . testimony . . . that **The Ink Story was actually on counters . . . [Sara Ligon] talked about publishing the Selling Guide in English, Portuguese and Spanish.** I suggest to you that they were not translating it into all of those languages so that it would not be distributed. [**Exhibit "927,"** 6300:19-23]

Allegations of these forms of explicit worldwide advertising easily meet any definition ACE may argue, but ACE has still shown no evidence to conclusively negate the potential for "advertising injury" coverage.

**V.     ACE'S DUTY TO DEFEND IS INDEPENDENTLY SUPPORTED BY ALLEGATIONS IMPLICATING "PERSONAL INJURY" COVERAGE FOR "DEFAMATION"**

**A.     ACE's Duty to Defend Is Also Triggered by "Personal Injury" Allegations Including an Express Count for "Defamation"**

ACE's Policy provides express "personal injury" as well as "advertising injury" coverage for the offenses of "slander," "libel," and "defamation." [**Exhibit "105,"** HP0000671, 673][27] These "personal injury" offenses are implicated by Nu-kote's fact allegations supporting a finding of liability for "defamation" which falls within that express offense. Nu-kote alleged as "Count Nine – Trade Libel, Disparagement of Goods and **Defamation** under California law." [**Exhibit "193"** 29:25-26] In addition to allegations that HP falsely branded Nu-kote as a patent and trademark

---

[27]The Court has, to date, only based the duty to defend determination on "advertising injury" offenses. But ACE's duty to defend is also independently supported by "personal injury" offenses that require no advertising activity at all. Therefore, ACE's argument about "advertising," even if it had merit, cannot conclusively negate the duty to defend the Nu-kote case.

1  infringer, Nu-kote complained that it and its products were defamed as being dangerous and

2  incompatible. [**Exhibit "193" ¶ 177**] Defamation[28] is expressly asserted and a defense is triggered.

3      There can be no serious argument that these statements by HP throughout the world would

4  expose Nu-kote to "**obloquy**" and would have "**a tendency to injure [Nu-kote] in [its] occupation**"

5  or that tended to "**directly to injure** [Nu-kote] **in** respect to . . . **trade or business, either by**

6  imputing [a] **general disqualification in**" [the printer refill business] **or by imputing something**

7  [e.g., dangerous products] with reference to [its] . . . trade, or business **that has a natural tendency**

8  **to lessen its profits;** . . . **or** which, **by natural consequence, causes actual damage.**" The statutory

9  definition of defamation is potentially satisfied in numerous ways. Therefore, this Court should find

10 a duty to defend was also owed based upon potential coverage for "defamation."

**B.    The Fact Allegations of Injurious False Statements that Damaged Nu-kote's
       Reputation Trigger a Potential for Coverage Even If No Cause of Action for
       Defamation Was Expressly Asserted**

13 *Barnett v. Fireman's Fund Ins. Co.*, 90 Cal. App. 4th 500, 509-11 (2001), *rev. den.*, 2001

14 Cal. App LEXIS 6049 (Aug. 29, 2001) discussed similar policy language, explained that defamation

15 claims based on statements about flawed business methods triggered "personal injury" coverage:

> Appellants argue the underlying action raised a potentially covered claim for
> defamation because the complainants alleged that **appellants told numerous persons
> that MedPartners' methods of doing business were flawed and would result in
> MedPartners' failure, and made other representations that disparaged and
> damaged MedPartners and SCMC.** These allegations, argue appellants, trigger the
> personal injury coverage of the CGL policy. . . . The complaints in the underlying
> action alleged appellants told third persons that MedPartners' methods of doing
> business were flawed and would result in its failure and made other representations
> that disparaged and damaged MedPartners and SCMC. **These allegations trigger at
> least a potential for coverage under the personal injury coverage for defamation
> provided by the CGL policy. [Emphasis added.]**[29]

_____

[28]California defines "defamation" by statute: Cal. Civ. Code § 44 ("**Defamation is effected by
either of the following: (a) Libel. (b) Slander.**") Cal. Civ. Code § 45 then defines "Libel" as "a
**false and unprivileged publication** by writing, printing, picture, effigy, or other fixed
representation to the eye, **which exposes** any person to hatred, contempt, ridicule, or **obloquy,** or
which causes him to be shunned or avoided, **or which has a tendency to injure him in his
occupation.**" Cal. Civ. Code § 46 then defines slander as Slander "**a false and unprivileged
publication,** orally uttered . . . which: . . . 3. **Tends directly to injure** him **in** respect to his . . .
**trade or business,** either **by** imputing to him **general disqualification** in those respects which the .
. . occupation peculiarly requires, **or by imputing something** with reference to his . . . trade, or
business **that has a natural tendency to lessen its profits;** . . . **or** 5. Which, **by natural
consequence, causes actual damage.**"

[29]The *Barnett* court, 90 Cal. App. 4th at 510, expressly rejected the argument that the personal injury

1  In *Dobrin v. Allstate Ins. Co.*, 897 F. Supp. 442, 444 (C.D. Cal. 1995), the insured was sued

2  for allegedly misrepresenting the nature and circumstances surrounding the dissolution of a law

3  partnership in an effort to divert clients. The court rejected Allstate's claim that such allegations do

4  not constitute "personal injury" and agreed with the insured that:

5  > [T]he factual allegations demonstrate that the breach of fiduciary duty claim is
   > **premised on the claim that [the insured] misrepresented the nature of the**
6  > **dissolution** in order to divert clients away from Raitt, thus **causing Raitt damage to**
   > **his business reputation.** Consequently, a potential claim for personal injury as
7  > defined under the policy exists. [Emphasis added.][30]

8  In a recent highly analogous case, *Atlantic Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th

9  1017, 1034-35 (2002), Justice Croskey analyzed similar policy language and found potential

10  coverage:

11  > Lamb was charged by Continental with *intentionally* communicating with
    > Continental's customers and *falsely* stating to them that **Continental was**
12  > **unlawfully selling them products that were subject to Lamb's prior patent claim**
    > . . . . In short, Continental alleged that **Lamb had falsely stated to Continental's**
13  > **customers that Continental's products were burdened with a prior legal right**
    > and their purchase of such products would subject them to litigation.

14
    > Such allegations, in our view, **clearly allege a disparagement of both**
15  > **Continental as well as its products.** . . . The plain language of the Atlantic Mutual
    > policy includes in the definition of 'personal injury' the publication of any oral or
16  > written statement that not only slanders or libels but also one that disparages an
    > organization or its goods, products or services. **This amounts to coverage for**
17  > product disparagement and trade libel as well as **defamation.** [Citation omitted;
    > emphasis added.][31]

18

19  Nu-kote made substantially similar allegations as were made against Barnett, Dobrin, and

20  _____
    coverage of liability policies applied only to acts enumerated by the policy as covered offenses and
21  that the complaints in the underlying action did not allege all of the elements necessary to state a
    cause of action for defamation and therefore it had no duty to defend the underlying action.

22  [30]In *Dobrin*, the pertinent personal injury provision provided coverage for, *inter alia*, "acts
    committed in the course of your business that give rise to a claim for 'libel, slander or the
23  publication of any material damaging to anyone's reputation.'" 897 F. Supp. at 444.

24  [31]In *Amerisure Ins. Co. v. Laserage Tech. Corp.*, 2 F. Supp. 2d 296, 304 (W.D.N.Y. 1998), the court
    reached the conclusion that fact allegations identical to those herein sounded in claims for both
25  defamation and disparagement. Indeed, Justice Croskey so noted in *Lamb*, 100 Cal. App. 4th at
    1035, citing *Laserage* at 304 with approval for its express finding that "[t]his amounts to coverage
26  for product disparagement and trade libel as well as defamation." While Justice Croskey did not
    address potential coverage for "defamation" (*Lamb* at 1035 n.13) on the facts before him, he noted
27  that the court in *Laserage* had done so and that he found its analysis persuasive. *Lamb* at 1035
    (citing *Laserage* at 304) ("where the court construed nearly identical policy language and **reached**
28  **the same conclusion**" (emphasis added)).

1  Lamb. The ACE policy provides "personal injury" coverage for the offense of "defamation." HP

2  provided uncontradicted evidence of an expressly asserted defamation claim and Nu-kote's factual

3  allegations that HP falsely stated that Nu-kote wrongfully sold products which infringed HP's

4  patents and trademarks and falsely warned that using Nu-kote cartridge refill products was

5  dangerous, thereby causing customers to cease doing business with Nu-kote.

6    C.    **Nu-kote's "Defamation" Allegations Focused on HP's Conduct in the Policy Territory**

7    1.    **Evidence Used by Nu-kote Against HP (and Available to ACE) in Attempt to Establish Defamation in Policy Territory**

8

9    Nu-kote discovered a variety of materials showing that HP planned a campaign in the ACE

10  policy year of 1995 (including print advertising and communications to resellers and others) that

11  would strongly discourage the sale and purchase of inkjet cartridge refill products, such as those sold

12  by Nu-kote. **Exhibit "1554"** is a sample of the discovery materials in the Nu-kote case that were

13  Bates numbered and put on CD-ROM for distribution (*see* Todd Declaration) and were offered

14  repeatedly to ACE (*see* Lowe Declaration). **Exhibit "1554"** H192350-51 is a message from Ray

15  Siuta concerning the 1995 European sales plan. It refers to a marketing strategy for "aggressively

16  pursu[ing] violations of HP inkjet patents and trademarks" and an intent to "finalize the Euro

17  communications process using our existing positioning statements (i.e., reliability & quality)."

18    **Exhibit "1554"** C018658-63 is a followup on 1995 inkjet communication messages from

19  HP's IJBU (Ink Jet Business Unit) referring to approval of key messages for FY '95 implementation

20  including in Europe, Asia Pacific, UK, Germany, France, and Latin America, including target

21  audiences of home and business users, intended to minimize market share erosion.

22    The plan included "aggressively communicate potential for HP printer damage associated

23  with refillers' ink (in some countries in Europe, legal requirements may prevent the use of a message

24  this strong." It includes the use of a strong warning statement against using any non-HP ink because

25  of the potential that it can "clog print-cartridge nozzles . . . corrode the print cartridge . . . corrode

26  other critical printer components and potentially cause damage . . . mess from spilled ink." **Exhibit**

27  **"1554"** C018672-73. Then an HP Status Report in January 1995 discusses the planned "Ink Story"

28  that will include a collection of "consumer 'horror stories' of negative experiences with refill inks.

1  These stories to be made available in print, and potentially video."

2  **2.    Nu-kote's Alleged "Defamation" in the Policy Territory**

3  Nu-kote's evidence then showed that HP carried out the anti-refill campaign that it had

4  planned. **Exhibit "1554"** C018832-39 is a portion of the reseller "Selling Guide" which, on its face,

5  shows distribution to Europe, Asia and Latin America. The Guide then warned against refilling

6  because "refilling leaks cause most printer damage" and noted the value of "risk-free, mess-free and

7  hassle-free printing" and "complete reliability."

8  **Exhibit "1554"** C034234-42 illustrates a promotional "Opportunity" program directed to

9  European resellers (identified in part with the HP bird logo used only in Europe [Ligon Deposition,

10  Volume 3, 73:4 – 78:15, **Exhibit "1550"**]). It reprints a German magazine article on the complexity

11  and messiness of refilling, warns against "spills, stains and accidents" caused by refilling, warns of

12  cartridge clogging, "inferior chemical composition [that] can corrode electronic parts and clog

13  nozzles," printer damage, and highlights problem calls from customers having problems with refill

14  inks and kits. **Exhibit "1554"** C034329-31 is a 1997 letter to resellers from HP's Peripherals Group

15  Europe referring to continuing the "Opportunity" program from 1995. It noted that the materials

16  were produced in six languages, English, French, Italian, German, Spanish and Dutch.

17  Nu-kote alleged defamation by HP advertising activities in the policy territory, i.e., in the

18  world marketplace in the course of advertising and otherwise. Nu-kote alleged that HP

19  actively asserts in the marketplace that its cartridges are not refillable [¶ 90] [and] has
   **published knowingly false statements** and engaged in deceptive advertising . . .

20  including, without limitation, the false representation about the refillability of
   Hewlett-Packard cartridges and **the quality, compatibility, and/or safety of

21  Nu-kote's products.** [¶ 93] [Nu-kote also alleges HP] has **published knowingly
   false statements in the marketplace accusing Nu-kote of infringing its

22  trademarks and patents.** [¶ 98] [**Exhibit "193"** (emphasis added)]

23  Nu-kote further alleged that HP's false and misleading statements "have played a material

24  and substantial part in inducing others not to do business with Nu-kote and have caused customers to

25  avoid purchasing or using Nu-kote products." [**Exhibit "193"** ¶ 178 and ¶ 186(a)] Statements that

26  Nu-kote infringed HP's trademarks and patents and especially that its products were unsafe would

27  certainly cause some potential purchasers to avoid Nu-kote's refill kits. This would directly injure

28  Nu-kote in its trade or business by imputing something that has a natural tendency to lessen profits

1  (as alleged by Nu-kote).

2         **3.**    **The "FUD" Allegations Which the Court Found Constituted "Unfair Competition" Also Included Distinct Fact Assertions of Defamation**

3

4      These defamation allegations ("misrepresentations . . . designed to instill 'fear, uncertainty,

5  and doubt'") [**Exhibit "102"** 4:6-8] were relied upon by Judge Williams in his original order finding

6  a duty of defense based only on potential coverage for the false and deceptive advertising and

7  common law unfair competition claims.  The same allegations could just as easily have been used to

8  find potential coverage under the "personal injury" offense of "defamation," but the Court did not

9  need to reach that point.  Your honor noted that "Judge Williams did not address any other

10  counterclaims" [**Exhibit "1547"** 2:13-14] but affirmed the original ruling.

11  **VI.**    **ACE OWES A DUTY OF DEFENSE THAT IS INDEPENDENTLY SUPPORTED BY THE ALLEGATIONS OF "ABUSE OF PROCESS" WHICH IMPLICATE**

12         **COVERAGE FOR "MALICIOUS PROSECUTION"**

13      **A.**    **The "Personal Injury" Offense of "Malicious Prosecution" Is Covered by ACE**

14          **1.**    **ACE's Policy Explicitly Identifies "Malicious Prosecution" as a Covered "Personal Injury" Offense**

15

16      ACE's Policy provides express "personal injury" coverage for the offense of "malicious

17  prosecution" because the Insuring Agreement of the ACE policy also defines "**Personal Injury**

18  **Liability**" coverage to include **malicious prosecution.**"  [**Exhibit "105,"** HP0000671, 673]

19          **2.**    **Allegations of "Abuse of Process" Implicate "Malicious Prosecution" Coverage Under California Law**

20

21      When language similar to that in the ACE policy is interpreted from the standpoint of a

22  layperson, it has been held to include both the tort of "malicious prosecution" and the tort of "abuse

23  of process."[32]  In *Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. (Cal.)

24  1994), the Ninth Circuit ruled that coverage for the personal injury offense of "malicious

25  prosecution" included the duty to defend a claim for "abuse of process." The Court explained that

26  the two torts have the common element of the use of the legal process for an improper purpose, and

27

28  [32]*Ethicon, Inc. v. Aetna Cas. & Sur. Co.*, 737 F. Supp. 1320 (S.D.N.Y. 1990); *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1045 (7th Cir. (Ill.) 1987).

that there are many cases in which the two torts overlap and either will lie. The court reasoned:

> People buy insurance to protect themselves from legal costs for defending claims of various kinds. **There is no reason, given the overlap between malicious prosecution and abuse of process** (particularly in the eyes of those untrained in the law), **why persons who purchase insurance covering** the cost of defending against **the one claim would not also expect the contract to cover the** cost of defending against **the other.** The term as used in the policy is ambiguous. Therefore, **we resolve the issue in favor of coverage.** [Emphasis added.]

**B.    There Are Two Essential Elements to State a Claim for "Abuse of Process"**

An "abuse of process" claim consists of two elements:

(1) an ulterior purpose; and

(2) wilful act in the use of the process not proper in the regular conduct of the proceeding.[33]

The tort of "abuse of process" has been described in California as:

> **"Some definite act** or threat not authorized by the process, or **aimed at an objective not legitimate in the use of the process,** is required; and there is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions. The **improper purpose** usually takes the form of coercion to obtain a **collateral advantage, not properly involved in the proceeding itself,** such as the surrender of property or the payment of money, by the use of the process as a threat or a club. There is, in other words, a form of extortion, and it is what is done in the course of negotiation, rather than the issuance or any formal use of the process itself, which constitutes the tort."[34]

A claim for "abuse of process" does not require that the process itself be illegitimate, only that the **purpose for initiating the process was improper.** In other words, the gravamen of the tort is not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated legal process to illegitimate ends.[35] As one California court explained:

> **The gravamen of the misconduct** for which the liability stated in this Section is imposed **is not the wrongful procurement of legal process** or the wrongful initiation of criminal or civil proceedings; **it is the misuse of process,** no matter how properly obtained, for any purpose other than that which it was designed to accomplish. Therefore, **it is immaterial that** the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that **the proceedings terminated in favor of the person instituting or initiating them.** The subsequent misuse of the process, though properly obtained, constitutes the misconduct for which the liability is imposed under

---

[33] *Lunsford,* 18 F.3d at 655; *see also Oren Royal Oaks Venture v. Greenberg,* 42 Cal. 3d 1157, 1162 n.3 (1986).

[34] *Spellens v. Spellens,* 49 Cal. 2d 210, 232-33 (1957) (emphasis added).

[35] *Heck v. Humphrey,* 512 U.S. 477, 486 n.5 (1994).

the rule stated in this Section.[36]

**C.    The Nu-kote Counterclaims Alleged Facts Necessary to State a Claim for Abuse of Process Establishing the Potential for Coverage**

Nu-kote's Fourth Amended Answer and Counterclaims against HP is replete with allegations that HP used litigation as a tool for maintaining an unlawful market domination and for eliminating Nu-kote as a competitor. Nu-kote alleged that HP engaged in "sham litigation" and used, e.g., a "thicket of patents" to improperly maintain its dominant market position:

> 85.    The **sole reason Hewlett-Packard has commenced this lawsuit** at this time is that Hewlett-Packard has decided **to reduce or eliminate legitimate competition in the aftermarkets** for Hewlett-Packard ink jet resupply cartridges and refill kits.
>
> . . . .
>
> 100.    . . . Hewlett-Packard does, and has encouraged and/or agreed with other OEMs to: . . . (2) bring **burdensome legal actions** against Nu-kote . . . .
>
> 101.    . . . **Hewlett-Packard has prosecuted**, amassed and employed against potential and existing competitors a **thicket of** numerous **patents, including patents which are fraudulently obtained**, invalid, redundant, "paper patents" only, and/or ineffective to the preservation of its legitimate intellectual property rights, all **in order to intimidate and burden potential and existing competition in the aftermarkets for ink jet resupply products**. Hewlett-Packard asserts these patents against others, without regard to whether they in fact are being infringed, **in order to discourage competition**. . . .
>
> . . . .
>
> 186.    Hewlett Packard has engaged in intentional acts designed to interfere with the pursuit of Nu-kote's business and its actual and prospective relationships with third parties. Those acts include the following:
>
> . . . .
>
> (vi)    **Hewlett-Packard has employed sham litigation** . . . and has knowingly sought grossly overbroad remedies, **in bad faith**, thereby unjustifiably imposing substantial economic burdens on Nu-kote.
>
> 187.    The interfering acts of Hewlett Packard herein alleged were wrongful for many reasons, including . . . (3) the acts were in furtherance of **Hewlett Packard's attempt to monopolize the relevant aftermarkets**. . . (15) . . . **the acts were taken with improper motives. [Exhibit "193"** (emphasis added)]

Nu-kote alleged strongly that HP intentionally sought to assert intellectual property rights against Nu-kote for the improper purpose of extending an unlawful monopoly and eliminating Nu-kote as a competitor. Moreover, although certain pre-trial rulings limited Nu-kote's ability to prosecute these claims during the trial, the "improper purpose" theme of Nu-kote's case remained a

---

[36]*Clark Equipment Co. v. Wheat*, 92 Cal. App. 3d 503, 525 (1979) (emphasis added; internal quotations omitted).

1  constant during the trial as evidenced by an objection lodged by Robert Cooper.[37]

2  In his August 24, 1999 Order, **Judge Williams noted** that **Nu-kote's allegations** that "HP

3  has filed **groundless litigation** for purposes of intimidating and burdening Nu-kote ... **would**

4  **constitute an alternate basis** for finding" a duty of defense. **[Exhibit "102"** 13:25-26 (emphasis

5  added)]  No determination was then necessary.  Nevertheless, the fact assertions upon which this

6  finding was made were available to ACE and may properly form a basis for this Court's present

7  ruling.[38]

8    **D.    Nu-kote Alleged "Abuse of Process" Conduct Within the Coverage Territory,**
       **Supporting the Potential for Coverage**
9

10  **Nu-kote alleged HP** and other OEMs **acted** together **in all relevant aftermarkets** to

11  eliminate competition[39] using cooperation agreements and sham litigation.  Although the

12  Counterclaims referred to lawsuits in California, there are additional allegations of "abuse of

13

---

14  [37]"My purpose, the first motion I want to make is to renew that motion in limine and ask the court
    for an appropriate instruction, and let me give you the reasons why. From the outset Mr. Katz has
15  made the argument. Subtly he tries to make it, but he makes it very clearly, and **he's left the jury**
    **with the clear implication that the bringing of the trademark and patent infringement lawsuit**
16  **was part of a plan or scheme to injure Nu-kote and drive it out of business.**" **[Exhibit "1548"**
    3525:6-16 (emphasis added)]

17  [38]**Under California law, an insurer is obligated to fully investigate the tender of a claim by its**
    **insured.** *Shade Foods, Inc. v. Innovative Products Sales & Marketing*, 78 Cal. App. 4th 847, 880
18  (2000) (Insurer may commit bad faith when it "fails to consider, or seek to discover, evidence
    relevant to the issues of liability and damages."); *Crystal Geyser Water Co. v. AMICO*, No. C-94-
19  1531 MHP, 1995 U.S. Dist. LEXIS 9210, at *16 (N.D. Cal. June 22, 1995) ("[B]efore an insurer
    may reject a tender of defense, 'it must investigate and evaluate the facts expressed or implied in the
20  third party complaint as well as those it learns from its insured and any other sources.'").  **An**
    **insurer's failure to adequately investigate a potentially covered claim leaves the insurer liable**
21  **for the complete amount of the insured's defense costs.** *Eigner v. Worthington*, 57 Cal. App. 4th
    188, 195 (1997) ("'The risk that an insurer takes when it denies coverage without investigation is
22  that the insured may later be able to prove that a reasonable investigation would have uncovered
    evidence to establish . . . a potential for coverage.'"); *Arquilla v. International Ins. Co.*, No. C-86-
23  5980 MHP, 1988 U.S. Dist. LEXIS 17576, at *25 (N.D. Cal. July 15, 1998) ("The evidence will not
    be limited to what was actually known by [the insurer] because such an evidentiary limitation would
24  undermine the insurer's obligation to investigate all claims.").  **Thus, an insurer is charged with**
    **knowledge of any information that it would have uncovered through a reasonable investigation**
25  **(i.e., what information was available).** *State Farm Mut. Auto. Ins. Co. v. Martinez-Lozano*, 916 F.
    Supp. 996, 1005 (E.D. Cal. 1996) ("'The insurer's duty to defend is determined on the basis of any
26  potential liability arising from the facts available to it at the time of the tender of the defense.'");
    *Eigner*, 57 Cal. App. 4th at 195.

27  [39]"Relevant aftermarkets" includes at least Mexico and Europe, as can be seen in ¶¶ 86, 87, 97, 98,
28  and 145 of the Counterclaim **[Exhibit "193"]**, both within the "policy territory."

1  process" elsewhere in the world, implicating "malicious prosecution" coverage. These include

2  allegations of actual or threatened actions in Europe and elsewhere within the policy territory. For

3  example, Nu-kote alleged that HP and its co-conspirators made wrongful claims of infringement,

4  some of which can reasonably be understood to have taken place within the coverage territory,

5  including Europe, in order to dominate the relevant aftermarkets.

6        Nu-kote alleged that HP and others coordinated their actions to support their improper

7  infringement claims, threats and legal actions throughout the "aftermarket" with the wrongful

8  purpose of economically harming Nu-kote and other refillers. Nu-kote's Counterclaims include

9  allegations of improper international competition by HP in the printer cartridge aftermarket. For

10  example, in Paragraph 97 of the Counterclaims, Nu-kote alleged HP acted "against independent

11  suppliers of after market products" in the European Patent Office and alleged European actions

12  involving Epson, "a puppet British company," Canon and HP.

13        The rambling paragraph asserting wrongful conduct in Europe is immediately followed by an

14  allegation that HP "has published knowingly false statements in the marketplace accusing Nu-kote

15  of infringing its trademarks and patents." (Counterclaim ¶ 98 [**Exhibit "193"**]) These allegations

16  intertwine litigation misconduct with alleged false statements against Nu-kote in Europe evidencing

17  the potential for coverage both for "malicious prosecution" and "defamation" within the policy

18  territory:

19        97.  . . . **Hewlett-Packard has** cross-licenses and/or other cooperation agreements
20  or understandings (jointly **"agreements"**) with other OEMs which mutually limit the
      ability of the parties to these agreements to litigate legal challenges and patent
21  infringement claims against each other with respect to ink jet aftermarket supplies
      such as ink refills and replacement ink cartridges, but **which enable or assist each**
22  **other in asserting infringement claims against independent suppliers of**
      **aftermarket products.** For example, in April, 1994, **the European Patent Office**
23  **("EPO") issued a ruling allowing Hewlett-Packard's `295 patent** in the face of
      fellow OEM Epson's opposition to the effect that its own patent on a dot matrix
24  printer cartridge encompasses Hewlett-Packard's patent on an ink jet printer
      cartridge. The EPO explicitly rejected Epson's argument. **Hewlett-Packard and**
25  **Epson reached an agreement regarding the `295 patent which, either explicitly**
      **or implicitly, encouraged or assisted Epson in maintaining its own sham patent**
26  **infringement claims against Nu-kote for the purposes of eliminating Nu-kote as a**
      **competitor.** . . .

      . . . .

27        99.  **Hewlett-Packard has employed sham litigation to make** (and on
      information and belief, to encourage others to make) **knowingly false allegations**
28  **of trademark infringement, patent infringement and related legal claims against**

**Nu-kote,** and has knowingly sought grossly overbroad remedies, in bad faith, thereby unjustifiably imposing substantial economic burdens on Nu-kote.

. . . .

161.   . . . [T]he aforesaid combination and conspiracy consists at least in part of a continuing agreement, understanding **and concert of action among Hewlett-Packard, Canon and Epson** not to compete with one another **in the ink supply aftermarkets** for each others' ink jet printers, **and to discourage competition in the ink supply aftermarkets by various methods including,** without limitation, **the institution** without warning **and maintenance of** this **coordinated sham litigation against Nu-kote,** and the making of false statements to the public regarding the effects of using Nu-kote's products.

Based upon Nu-kote's allegations, ACE had sufficient information to establish the potential for coverage for the "personal injury" offense of "malicious prosecution" as that offense is implicated by claims of "abuse of process." These broad allegations also provided ACE with information that the claim for "abuse of process" involved allegedly wrongful activities in the coverage territory, i.e., in the "relevant aftermarkets" throughout the world. There is no reason to read the allegations as only applying to the U.S. and Canada. Thus, the potential for coverage was independently established and ACE owed a duty to defend the Counterclaims based on the separate and distinct coverage for "malicious prosecution," as expressly provided in the ACE policy.

## VII.   CONCLUSION

For the foregoing five reasons, the Court should deny ACE's motion for reconsideration.

Dated: October 1, 2003                              **GAUNTLETT & ASSOCIATES**

By:   _____
      David A. Gauntlett
      James A. Lowe

Attorneys for Plaintiff
HEWLETT-PACKARD COMPANY

1  RE:        *Hewlett-Packard Co. v. ACE Property and Casualty Ins. Co.*
   VENUE:     U.S.D.C., Northern District, San Jose Division
2  CASE NO.:  C-99-20207 JW

3

#### PROOF OF SERVICE

4

5       I am employed in the County of Orange, State of California. I am over the age of eighteen (18)
   years and not a party to the within action; my business address is: Gauntlett & Associates, 18400 Von
6  Karman, Suite 300, Irvine, California 92612.

7       On October 1, 2003, I served the foregoing document described as: **HEWLETT-PACKARD
   COMPANY'S OPPOSITION TO ACE PROPERTY & CASUALTY INSURANCE COMPANY'S**
8  **MOTION FOR RECONSIDERATION** on the interested parties in this action by placing a true copy
   thereof enclosed in a sealed envelope addressed as follows:

9

10                      **SEE ATTACHED SERVICE LIST**

11

12  [ ]    **(BY MAIL)**  I am "readily familiar" with the firm's practice of collection and processing
          correspondence for mailing. Under that practice it would be deposited with U.S. Postal Service
13        on that same day with postage thereon fully prepaid at Irvine, California in the ordinary course of
          business. I am aware that on motion of the party served, service is presumed invalid if postal
14        cancellation date or postage meter date is more than one day after date of deposit for mailing in
          affidavit.

15

16  [ ]    **(BY FACSIMILE)**  The document was transmitted by facsimile transmission to the above fax
          numbers with the transmission reported as complete and without error.

17

18  [X]    **(BY UPS NEXT DAY AIR)**  I caused such package to be deposited with the UPS Drop Box or
          UPS Air Service Center located at one of the following locations: 18400 Von Karman, Irvine,
19        California 92612 or 2222 Michelson Drive, #240, Irvine, California 92612.

20
    [X]    **(FEDERAL)**  I declare that I am employed in the office of a member of the bar of this court at
21        whose direction the service was made.

22

       Executed on October 1, 2003, at Irvine, California.

23

24  Peggy Murray
25  (Print Name)                              (Signature)

26

27

28

## SERVICE LIST

Alan E. Greenberg, Esq.
LEWIS BRISBOIS BISGAARD & SMITH LLP
550 West "C" Street, Suite 800
San Diego, CA  92101-3540
Telephone: (619) 233-1006
Facsimile:  (619) 233-8627


Janelle F. Garchie, Esq.
CORRELL, GARCHIE & EDWARDS LLP
550 West "C" Street, Suite 500
San Diego, CA  92101-3540
Telephone: (619) 557-0424
Facsimile:  (619) 557-0428


Robert J. Romero, Esq.
HINSHAW & CULBERTSON
244 Jackson Street, Suite 300
San Francisco, CA 94111
Telephone: (415) 362-6000
Facsimile:  (415) 834-9070


Mark Wood, Esq.
John F. Daum, Esq.
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, CA 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407


Martin S. Checov, Esq.
O'MELVENY & MYERS LLP
Embarcadero Center West
275 Battery Street
San Francisco, CA 94111-3305
Telephone: (415) 984-8700
Facsimile: (415) 984-8701


Attorneys for Defendant ACE PROPERTY
AND CASUALTY INSURANCE COMPANY