# EXHIBIT 81

1 | MARK WOOD [SBN 41640]
JOHN F. DAUM [SBN 52313]
2 | **O'MELVENY & MYERS LLP**
400 South Hope Street
3 | Los Angeles, California 90071-2899
Telephone: (213) 430-6000
4 | Facsimile: (213) 430-6407

5 | MARTIN S. CHECOV [SBN 96901]
**O'MELVENY & MYERS LLP**
6 | Embarcadero Center West
275 Battery Street
7 | San Francisco, California 94111-3305
Telephone: (415) 984-8700
8 | Facsimile: (415) 984-8701

9 | [AND OTHER COUNSEL AS SET FORTH ON SIGNATURE PAGE]

10 | Attorneys for Defendant,
ACE PROPERTY AND CASUALTY INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

| | |
|---|---|
| HEWLETT-PACKARD COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>ACE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>Defendant. | Case No. C-99-20207 JW<br><br>**ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION**<br><br>Judge: Hon. James Ware<br>Date: October 23, 2003<br>Time: 1:30 p.m. |

**EXHIBIT 81**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................1

II. *HAMEID* REQUIRES THIS COURT TO GRANT RECONSIDERATION AND TO REVERSE ITS FINDING THAT HP'S PACKAGE INSERTS WERE "ADVERTISING" UNDER CALIFORNIA LAW ......................................................2

    A. *Hameid* Amply Justifies The Motion For Reconsideration .........................2

    B. *Hameid* Compels The Conclusion That The Inserts Are Not "Advertising"..............3

III. HP'S OTHER ALLEGED ACTS OF ADVERTISING, DEFAMATION, AND ABUSE OF PROCESS DID NOT TRIGGER A SEPARATE DUTY TO DEFEND................................................................................................................6

    A. Neither Nu-kote's Complaint Nor Any Available Facts Establish "Advertising" In The Policy Territory During The Policy Period....................7

    B. ACE Has No Duty To Defend Under The Policy's "Personal Injury" Coverage For Defamation...........................................................................11

    C. ACE Has No Duty To Defend Under The Policy's Coverage For Malicious Prosecution.................................................................................14

IV. CONCLUSION...................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlantic Mutual Insurance Co. v. Lamb,*
  100 Cal.App.4th 1017 (2002) ................................................................12

*Bank of the West v. Superior Court,*
  2 Cal.4th 1254 (1992) ..............................................................................2

*Barnett v. Fireman's Insurance Co.,*
  90 Cal.App.4th 500 (2001) ....................................................................12

*Diesel v. Travelers Insurance Co.,*
  1997 U.S. Dist. LEXIS 4288 (N.D. Cal.) ................................................7

*Dobrin v. Allstate Insurance Co.,*
  897 F.Supp. 442 (C.D. Cal. 1995) .........................................................12

*El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.,*
  92 Cal.App.4th 205 (2001) ......................................................................5

*Gunderson v. Fire Insurance Exchange,*
  37 Cal.App.4th 1106 (1995) ....................................................................7

*Hameid v. National Fire Ins.,*
  31 Cal.4th 16, 71 P.3d 761 (2003) .................................................. passim

*New Hampshire Ins. Co. v. Foxfire,*
  820 F.Supp. 489 (N.D. Cal. 1993) ...........................................................6

*Polygram Records v. Superior Court,*
  170 Cal.App.3d 543 (1985) ...................................................................12

*Truck Insurance Exchange v. Bennett,*
  53 Cal.App.4th 75 (1997) ......................................................................12

**Treatises**

Croskey & Kaufman, *California Practice Guide: Insurance Litigation*
  § 7:1041 (TRG 2003) ...............................................................................5

ii

ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION/CASE NO. C-99-20207 JW

## I. INTRODUCTION

In opposing the motion of ACE Property and Casualty Insurance Company ("ACE") for reconsideration in light of the California Supreme Court's recent decision in *Hameid v. National Fire Ins.*, 31 Cal.4th 16, 71 P.3d 761 (2003), Hewlett-Packard Company ("HP") largely ignores the *Hameid* opinion. Instead, HP devotes 18 pages of its 25-page brief to new evidence and theories presented for the first time, essentially conceding that the package inserts that initially led this Court to find a duty to defend are not "advertising" under *Hameid*. Though HP does claim briefly that its package inserts remain "advertising" after *Hameid*, it soon turns to its principal arguments – that ACE's asserted duty to defend arises not only from the package inserts on which this Court rested its original decision, but also from other alleged advertising, defamation, and "abuse of process." HP is wrong on all counts. Its arguments rest on flawed legal analysis and blatantly misleading factual assertions. This Court should grant the motion for reconsideration, vacate the finding that ACE owed HP a duty to defend, and dismiss the action.

First, HP's defense of the holding that the package inserts are "advertising" misreads *Hameid* and understates its impact. A proper analysis of *Hameid* makes clear that the package inserts – which provided advice about HP's products only to customers who had already purchased those products, and were never published, broadcasted, or otherwise circulated to the public at large – are not "advertising" under the "ordinary and popular meaning" of that term. Second, there is no legal or factual basis for HP's suggestions that other alleged acts of advertising, libel, and malicious prosecution independently created a duty to defend. Though HP misleadingly devotes pages to discussion of a host of alleged advertising acts in the Policy Territory, its own record citations make clear that HP did not circulate any of its proffered documents within the Policy Period. Even if those documents constituted "advertising" under *Hameid* – which they do not – because HP did not circulate them until after the Policy expired, they could not give rise to any duty to defend. Similarly, HP claims that alleged abuse of process also triggered a duty to defend, but does not point to a single allegation that it brought an action against Nu-kote within the Policy Territory. Finally, HP claims that alleged "defamation" gave rise a duty to defend, but ignores the settled distinction between trade libel and disparagement,

1

on the one hand, and ordinary libel and defamation, on the other. Though the Policy covers the latter category and excludes the former, HP identifies no allegations of defamation.

## II. *HAMEID* REQUIRES THIS COURT TO GRANT RECONSIDERATION AND TO REVERSE ITS FINDING THAT HP'S PACKAGE INSERTS WERE "ADVERTISING" UNDER CALIFORNIA LAW

The California Supreme Court's decision in *Hameid* undercuts HP's prior explanation of how its package inserts were "advertising," rejects the cases on which HP and the Court relied, and removes the rationale for this Court's decision adopting HP's theory. Nevertheless, HP argues that *Hameid* does not satisfy the standards for a motion for reconsideration, and then claims that *Hameid* should not alter the conclusion that its package inserts were advertising. These arguments are insubstantial.[1]

### A. *Hameid* Amply Justifies The Motion For Reconsideration

HP begins by arguing that *Hameid* does not justify reconsideration because "*Hameid* is not a change in law or a material difference in law." Plaintiffs' Brief Opposing ACE's Motion For Reconsideration ("Pl. Br.") 2. This argument is meritless. Although *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1276 n.9 (1992), indicated that the CGL definition of "advertising" requires "widespread promotional activities directed to the public at large," and many California courts had followed that approach, no California Supreme Court decision had formally adopted that definition. *See Hameid*, 31 Cal.4th at 23 (noting that the "meaning of 'advertising' in a CGL insurance policy has presented a problem for courts" and that *Bank of the West* "did not decide the meaning of the term because the question was not before us"). Thus, HP was able to dismiss as dictum *Bank of the West*'s definition of advertising. *See* Pls.' Opp. to Defs.' Motion for Summary Judgment on Absence of a Duty to Defend at 14 (Aug. 24, 2002). Similarly, this Court could conclude that "California courts have not adopted a single uniform definition for 'advertising'" and "have differed as to whether the dissemination [of promotional

---

[1] HP also argues that ACE is seeking to terminate its duty to defend "retroactively," and that the law does not permit such an approach. Pl. Br. 2 n.2. This suggestion misses the point of ACE's motion for reconsideration, for ACE is not seeking to terminate a duty that properly arose under the Policy. Rather, ACE contends that the Policy never imposed any duty to defend Nu-kote's claims against HP, for those claims did not arise from any covered activity within the Policy Territory during the Policy Period. The cases cited by HP address circumstances in which new facts emerge to negate an existing duty. As noted above, ACE's argument rests not on new facts, but on the fact that this Court misconstrued the term "advertising" to find a duty that never existed.

2

ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION/CASE NO. C-99-20207 JW

materials] must be to the public at large, or may be to a more select group." 3/4/03 Order at 8. Though in some sense *Hameid* "clarified" what was already the law, it also *changed* the law by providing for the first time a controlling definition of "advertising" from the Supreme Court: "widespread promotional activities usually directed to the public at large."[2] *Hameid*, 31 Cal.4th at 24. There is no basis for HP's claim that this ruling, explicitly rejecting case law on which HP and this Court relied, did not work " a change in law or a material difference in law."

*Hameid* requires reconsideration of this Court's initial ruling for another reason that HP has entirely ignored. In explaining its rationale for adopting the foregoing broad definition of "advertising," the Supreme Court noted that this definition is proper because "it interprets the contractual term under its ordinary and popular meaning," and it thereby "allows uniformity in interpretation under different factual circumstances." *Hameid*, 31 Cal.4th at 29. The Supreme Court also emphasized the importance of avoiding "malleable" definitions of policy provisions and "case-by-case" analyses, and the need to provide "[s]tandardization of policy terms." *Id.*, at 28-29. In short, *Hameid* makes clear that courts determining whether conduct amounts to "advertising" must use the "ordinary and popular meaning" of that term, and provide the "clarity and certainty that is essential to the insurance industry." These directives from the Supreme Court about the proper approach to interpreting insurance policy provisions – particularly the term "advertising" – necessarily effected a "material difference in law," thereby requiring reconsideration.

**B.    *Hameid* Compels The Conclusion That The Inserts Are Not "Advertising"**

As the foregoing analysis suggests, the conclusion that the package inserts constitute advertising cannot be reconciled with *Hameid*. There, the Supreme Court explained that "advertising" must be interpreted "under its ordinary and popular meaning," *id.* at 29, and that it requires "widespread promotional activities usually directed to the public at large." *Id.* at 24. The package inserts cannot fall within this definition, or within *any* definition consistent with the Supreme Court's methodology for interpreting insurance provisions. As explained in ACE's

---

[2] To the extent that *Hameid* is, as HP contends, only a "clarification" of existing law, reconsideration remains entirely proper. If *Hameid* merely stated existing law, then the original ruling finding that the package inserts were not "advertising" was a "clear error" that provides justification for reconsideration.

3

initial brief, HP did not disseminate its package inserts to the "public at large;" indeed, HP did not even make the information contained in the inserts visible to the public. Rather, it circulated the inserts only to people who had already purchased its products. Such limited, individualized solicitations do not include the broad, generalized efforts required by the *Hameid* formulation.

More important, the package inserts bear not even passing resemblance to the "ordinary and popular" understanding of "advertising." As this Court is well aware, the package inserts are in essence a form of instruction manual, providing consumers with information about how to install a printer cartridge, as well as about performance specifications, and the proper use, care, and maintenance of the product that they have just purchased. The inserts are not glossy or otherwise graphically striking; they explain how the ink cartridges work, and provide guidance about their operation. In light of their content, and the fact that they appear not on billboards, catalogues, or magazines, but inside already purchased products, no reasonable consumer or manufacturer could possibly conclude that the package inserts are "advertising," under a common sense, "ordinary and popular" understanding of that term. For this reason, *Hameid* requires this Court to revisit its previous conclusion that the inserts are "advertising."

In the face of *Hameid*'s inescapable logic, HP offers several futile efforts to distinguish the case and to avoid the effect of its basic approach. First, HP notes that *Hameid* reserved decision on the question "whether widespread promotional activities directed at specific market segments constitute advertising under the CGL policy," *id.* at 24 n.3, and argues that the package inserts constitute advertising because they were "widely disseminated" to a "specific market segment." Pl. Br. 5. But the Supreme Court did not hold that a company's widespread dissemination of information leads inevitably to the conclusion that it has engaged in advertising. Indeed, the language quoted by HP shows that it is at best an open question whether information distributed not to the public at large, but only to a market segment, can be advertising. Other aspects of the opinion make clear that the package inserts do not fall within *Hameid*'s common-sense approach to the meaning of advertising.

In the same footnote cited by HP, the Supreme Court quotes the definition of "advertising" promulgated by the Insurance Services Office, which drafts the standard CGL

4

ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION/CASE NO. C-99-20207 JW

1 | insurance policies. Under that definition, "advertising" is "a notice that is broadcast or published
2 | in the general public or specific market segments for the purpose of attracting customers or
3 | supporters." *Hameid*, 31 Cal.4th at 24 n.3. This definition makes clear that the medium and
4 | purpose of a message, more than the scope of its dissemination, are key elements in determining
5 | whether it is "advertising." The Supreme Court later reinforces this point, noting that small
6 | businesses may engage in "advertising" if they "if they place spots on the radio or television, buy
7 | space on billboards or bus benches, or take out advertisements in newspapers directed to the
8 | public at large." *Id*. at 29. Thus, the Supreme Court's caveat concerning market segments
9 | sought merely to emphasize that these types of activities – commonly understood to be
10 | advertisements – remain advertising even if they do not reach the entire public at large.

11 |     HP would read *Hameid* narrowly to eliminate only small-scale solicitations from the
12 | definition of advertising. Though the facts of the case involved a relatively narrow set of
13 | solicitations, the logic of the opinion is not so easily cabined. *Hameid* establishes that courts
14 | must define advertising clearly, in a manner consistent with common sense and common usage,
15 | in order to promote the certainty that the business of insurance requires. An instruction manual
16 | included *inside* a box of an already purchased product, never published or broadcast, simply does
17 | not fall within those parameters. Moreover, a rule allowing such a broad definition of
18 | "advertising" would not provide the certainty and predictability of result that *Hameid* requires.[3]

19 |     Second, HP argues that because this Court's March 4, 2003 Order and *Hameid* both cited
20 | *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.*, 92 Cal.App.4th 205 (2001), this Court's
21 | Order must necessarily be consistent with *Hameid*.[4] This argument is a logical fallacy, resting

---

[3] Recent commentary agrees: "'Advertising injury' requires widespread promotional activity: 'Advertising injury' as used in a pre-1998 CGL policy requires promotion directed to the public at large; e.g., placing spots on radio or television, buying space on billboards or bus benches, or taking out advertisements in newspapers, directed to the public at large. Individual solicitation ('one on one') does not constitute 'advertising activity.'" Croskey & Kaufman, *California Practice Guide: Insurance Litigation* § 7:1041 (TRG 2003), citing *Hameid*, 31 Cal.4th at 22.

[4] HP also argues that three out-of-state cases that used a "definition analogous to that adopted in *Hameid*, have found conduct like that engaged in by HP constitutes advertising." Pl. Br. 4 & n.10. But HP's own parenthetical descriptions of those cases make clear that the conduct at issue in those cases was not at all "like that engaged in by HP." The distribution of "product brochures," the use of a "trade show display," and the "use of clinical studies to 'commercialize'" are entirely different from the distribution, inside product packaging, of an instruction manual. All of the conduct described by HP falls comfortably within the everyday understanding of "advertising," while the use and distribution of the package inserts plainly does not.

5

on a misreading of this Court's Order. This Court did not "rely" upon *El-Com*, as HP suggests. *See* Pl. Br. 3. Rather, this Court noted that some California courts, like the court in *El-Com*, had defined "advertising" as requiring dissemination to the public at large, while others, like the court in *New Hampshire Ins. Co. v. Foxfire*, 820 F.Supp. 489 (N.D. Cal. 1993), had held that the dissemination may be to a "more select group." 3/4/03 Order at 8. This Court explicitly refrained from adopting *El-Com*, and held that ACE had a duty to defend because there was no case law repudiating *Foxfire*. As noted in ACE's opening brief, *Hameid* has now explicitly rejected *Foxfire*, removing the basis for this Court's ruling.

Finally, HP argues that the term "advertising" is ambiguous, and that ACE's failure specifically to exclude conduct such as the distribution of package inserts from its Policy definition leads to the inference that the parties did not intend to limit the Policy in this way. Pl. Br. 6-7. But the California Supreme Court specifically rejected a similar argument in *Hameid*, holding that the "commonly understood meaning of the word" was clear enough to guide the parties and to prevent the expansive reading advanced by the insured. 31 Cal.4th at 24 n.4. The same common understanding of advertising defeats HP's argument here.

### III. HP'S OTHER ALLEGED ACTS OF ADVERTISING, DEFAMATION, AND ABUSE OF PROCESS DID NOT TRIGGER A SEPARATE DUTY TO DEFEND

Having failed entirely to show that the proposition that its package inserts are advertising can survive the *Hameid* opinion, HP devotes the bulk of its opposition to the arguments that ACE had a duty to defend because (1) there were other acts of "advertising" within the Policy Territory, (2) allegations of defamation created an independent duty to defend under the Policy's Personal Injury coverage, and (3) allegations of "abuse of process" created an independent duty to defend under the Policy's Malicious Prosecution coverage. These arguments are legally and factually baseless. Although 17 pages of its brief catalogue events and acts purportedly supporting these claims, HP neglects to inform the Court that not a single one of the listed statements and publications occurred within the Policy Period. As this Court is well aware, the Policy that HP tendered to ACE (and on which it filed this lawsuit) applies only to "occurrences"

outside the United States, Canada, and certain other areas, and expired in October 1993.[5] Thus, HP has distorted the facts and the law, for neither Nu-kote's complaint, nor any document provided to ACE or cited by HP, reveal any other act of advertising, defamation, or abuse of process within the Policy Territory during the Policy Period.

### A. Neither Nu-kote's Complaint Nor Any Available Facts Establish "Advertising" In The Policy Territory During The Policy Period

HP begins by suggesting for the first time that Nu-kote's complaint is by itself sufficient to establish advertising within the Policy Territory. Pl. Br. 7-8. This contention is inconsistent with HP's own conduct and with basic principles of insurance law. It is well established that a duty to defend cannot arise from unpleaded claims that may later be asserted, or from speculation about facts that do not appear on the face of a complaint. *See, e.g., Gunderson v. Fire Insurance Exchange*, 37 Cal.App.4th 1106, 1114 (1995) ("An insured may not trigger the duty to defend by speculating about 'extraneous' facts regarding potential liability or ways in which the third party claimant might amend its complaint at some future date"); *Diesel v. Travelers Insurance Co.*, 1997 U.S. Dist. LEXIS 4288 (N.D. Cal.) (where complaint for breach of lease did not mention property damage, court rejected as speculation insured's argument that a letter and an arbitration statement accusing the insured of not properly maintaining the property showed that the claimant was asserting property damage); *see also* ACE's Memorandum of Points and Authorities Supporting MSJ Regarding Absence of Duty to Defend (July 23, 2002), at 10-12.

Nu-kote's complaint is silent on the issue of HP's advertising within the Policy Territory. Although the complaint speaks broadly of false and misleading statements contained in HP's advertising and packaging, it nowhere alleges that HP disseminated such statements within the Policy Territory. Because Nu-kote entered the United States market in 1993 and did not compete elsewhere, there was no reason to assume that its complaint, which was silent as to its geographic scope, encompassed claims concerning advertisements allegedly distributed abroad. Moreover, the complaint alleges only misstatements "in interstate commerce," – *i.e.*, within the United

---

[5] Though the parties renewed the Policy until it expired in October 1995, HP based its tender and this lawsuit only on the original Policy in effect through October 1993.

7

1  States – *see* Complaint, ¶ 168, and false advertising and trade libel, disparagement of goods, and
2  defamation "within the State of California," *id.* ¶¶ 174, 177.  Thus, there is no basis for reading
3  Nu-kote's complaint as requesting relief on the basis of advertising in the Policy Territory.
4  Recognizing this fact, and consistent with the rule described above, HP has never previously
5  intimated that Nu-kote's complaint, standing alone, asserted advertising within the Policy
6  Territory sufficient to give rise to a duty to defend.  Rather, HP has relied from the outset on
7  extraneous facts – *i.e.*, the package inserts – to establish a duty that does not arise from the face
8  of the Complaint.  Exhibit 145, at 11 (Bates No. HP0000770).  As HP recognized, without the
9  package inserts to supplement the silence of the Complaint, ACE had no duty to defend.

       Tacitly conceding this point, HP does not rely on the Complaint alone.  Instead, apparently having scoured the underlying trial record, it sets forth an array of new evidence of "other advertising" within the Policy Territory.  *See* Pl. Br. 9-15.  In its tender and in years of litigation, HP has never previously presented any of these materials, which are in fact entirely irrelevant.  Though HP has not alerted the Court to this fact, none of these voluminous materials were distributed before October 1995, when HP's last policy with ACE terminated, let alone before October 1993, the termination point of the Policy underlying this lawsuit.  Though HP misleadingly implies otherwise, those materials have no bearing on this case.  But even if they did, those materials, like the package inserts, are not "advertising" under *Hameid*.

       In its opening statement at the Nu-kote trial, HP represented in this Court that "what we did was actually very limited," that there was "no advertising on T.V., radio, no advertising in newspapers, magazines, no mass media advertising that even mentions refilling, and that "despite a lot of effort and work people put into the various studies and analyses, that we actually have created *only one single brochure that went out to customers at all and the customers it went to were retailers, sophisticated retailers*."   (Nu-kote Trial Transcript, Vol. 20, at 3908-09 (emphasis added) (attached as Exhibit "A" to Declaration of James E. Friedhofer ("Friedhofer Dec.")).  HP clarified that this brochure was "called the Sales Guide." *Id.* at 3909.  Though HP now relies heavily on this "Sales" or "Selling" Guide, this document does not constitute advertising within the Policy Period.  The Guide bears a copyright dated October 1995, *see*

8

Exhibit 1554 (Bates No. C018832), and, according to Sarah Ligon's deposition testimony, was first published in English in 1996 and later translated into other languages. (*See* Ligon Deposition, Volume 1, at 41:3-14 attached as Exhibit "B" to Friedhofer Dec.) As a result, the Guide falls outside the Policy Period. In addition, HP admits that it disseminated this document only to its resellers, *i.e.*, large retailers. As noted above, narrow dissemination of this kind does not satisfy the definition of advertising set forth in *Hameid*. Finally, HP filed this document under seal, marking it as "CONFIDENTIAL FOR ATTORNEY EYES ONLY." In support of its motion to submit this and other documents under seal, HP claims that they are "highly confidential material which could cause irreparable injury and embarrassment to HP." Miscellaneous Administrative Request to File Portions of Hewlett-Packard's Opposition to ACE's Motion for Reconsideration Under Seal, at p. 1:6-11.[6] If HP had circulated the Guide as advertising, it surely could not claim that the materials were "confidential."

Recognizing the difficulties with the Guide, HP also relies on (1) a "European brochure" in English, Pl. Br. 11-12; (2) an "advertising piece" allegedly "developed for use at European trade shows," *id.* 12, and (3) additional excerpts of advertising and internal materials from 1996 and 1997, *id.* 11-13. None of these documents establish that HP engaged in covered advertising within the Policy Territory during the Policy Period.

**"European Brochure."** HP offers no explanation for this exclusively English language document, reprinted in Exhibit 1554 (Bates Nos. C018844-45), and offered for the first time in these proceedings. Because the accompanying citation indicates only that this was part of a "European marketing center project," Exhibit 1549, at 181:20–182:8, and because neither HP nor Nu-kote introduced the document at trial, there is no way to know how or when HP used that document. There is no way to know if it was ever circulated, or if it was merely an internal document. By appearances, the document could well be a draft, or a package insert. And, once

---

[6] The stipulation in underlying Nu-kote litigation permitted the parties to "designate especially sensitive Confidential Information as being produced for 'Attorneys Eyes Only,'" but required them to use that designation "as sparingly as possible." (Exhibit "C" to Friedhofer Dec., 4:28-5:2.) The stipulation defined "Confidential Information" as information that "a party or non-party claims to be its trade secret or confidential research, development or commercial information with the meaning of FRCP 26(c)." (Exhibit "C" to Friedhofer Dec. at 2:6-8.) Thus, any document so designated by definition cannot have been widely disseminated to the public.

9

ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION/CASE NO. C-99-20207 JW

again, HP sought "confidential" treatment for this document in this Court. Thus, the European Brochure could not have been advertising under *Hameid*, and its date forecloses any possibility that it could form the basis for a duty to defend under the original Policy.

**"Advertising Piece."** All evidence indicates that HP never used this document externally during the Policy Period; indeed, the designation of confidentiality suggests that it has *never* done so. The document bears a copyright dated October 1995, *see* Exhibit 1554 (Bates No. C018841), the month in which HP's coverage with ACE expired entirely. Though Sarah Ligon testified that HP used the document at a trade show, she did not testify that the trade show took place in or before October 1995; there was no evidence about any trade show before that month.

**Other documents**. Finally, HP relies on a set of promotional materials that include an article dated May 1996, and therefore can only have been created after that time, and an internal HP memorandum dated February 1997. These internal documents, also filed under seal, are not advertising, nor were they created, let alone circulated, during the Policy Period. Finally, HP relies on testimony about internal planning in late 1994 and 1995 for *future* advertising. For example, though HP claims that it "spent $30 Million worldwide for printing alone . . . and television spots," Pl. Br. 10 n.18, the trial testimony cited to support this assertion tells a different story. The witness actually testified (in 1999) that HP spent that amount "over the past few years," illustrating that HP spent the funds after the Policy expired. Though HP alludes to a "comprehensive advertising and marketing campaign," *id.* at 11, it cites only *internal* discussions and documents that preceded this alleged campaign. *Id.* at 11-13.[7]

---

[7] HP relies principally on the Ligon deposition for this proposition. *See* Pl. Br. 11-12. The cited testimony refers only to internal planning and draft versions of documents. It does not establish that any advertising took place in Europe during the Policy period. HP also claims that the deposition testimony of Raymond Siuta shows that it "took its message directly to European resellers." *Id.* at 13 n.25. But the cited testimony discusses a memorandum drafted after the annual meeting of the Supplies Advisory Council ("SAC"); neither the testimony nor the memorandum discuss dissemination of the sales guide or HP's "message" to resellers. Moreover, Siuta later clarifies that the marketing strategy discussed in the memorandum was not discussed at the SAC meeting. (*See* Siuta Deposition at 547:19–548:5, attached as Exhibit "D" to Friedhofer Dec.)

10

ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION/CASE NO. C-99-20207 JW

Although HP appears to have devoted countless hours to searching for advertising materials associated with Europe during the relevant period, its efforts have been fruitless.[8] HP disclosed nothing at the time of tender to suggest that ACE had a duty to defend, and to this day it still has not located any such documents. Because the package inserts cannot properly be viewed as advertising, ACE had no duty to defend under the Policy's advertising injury section.

**B.     ACE Has No Duty To Defend Under The Policy's "Personal Injury" Coverage For Defamation**

HP contends that ACE has an independent duty to defend under the Policy's "personal injury" coverage for "slander," "libel," and "defamation." For at least three reasons, this argument is meritless. First, Nu-kote's claims against HP sounded not in defamation, but in trade libel and disparagement, causes of action that the Policy does not cover. Second, Nu-kote's complaint expressly asserted that HP made false statements in "interstate commerce" and "within the State of California." Against this background, HP's failure to identify any allegedly defamatory statements in the Policy Territory during the Policy period makes clear that there was no duty to defend under the Policy. Third, Nu-kote's entire theory of the case was that HP had made "knowingly false" statements about its products, but the Policy expressly excludes from its "personal injury" coverage for liability for a "publication or utterance" made "with knowledge of the falsity thereof." If Nu-kote had alleged defamatory statements within the Policy Territory during the Policy Period, the knowing falsity exclusion would remove any duty to defend.

1.     As HP itself acknowledged in an earlier submission to this Court, California law distinguishes between defamation, on the one hand, and trade libel and product disparagement, on the other. *See* HP's Opposition to ACE's MSJ No. 6 on Duty to Defend (Aug. 24, 2002), at 23-24. As HP explained, "[t]rade libel is not true libel and is not actionable as defamation" because "[l]ibel and slander are concerned with injury to reputation, including corporate reputation, specifically plaintiff's reputation for honesty, integrity, and competence," while "statements constituting trade libel disparage the quality of plaintiff's goods." *Id.* at 23 (citing

---

[8] HP also cites a number of references in the trial transcripts to its alleged advertising. See Pl. Br. 14-15. All of these citations concern references to activities within the United States, to internal HP meetings and documents, or to materials that HP did not circulate externally until after the Policy expired, if ever.

*Polygram Records v. Superior Court*, 170 Cal.App.3d 543, 549-550 (1985). Moreover, it is well established that policy coverage for defamation does not confer coverage for disparagement as well. Thus, in *Truck Insurance Exchange v. Bennett*, 53 Cal.App.4th 75, 90 (1997), the court held that a personal injury liability clause offering coverage for defamation and "torts involving harm to personal reputation [] does not provide coverage for disparagement or slander of title."

The Policy's "personal injury" clause includes only "libel, slander, defamation, and invasion of the rights of privacy." Exhibit 105, at 3 (Bates No. HP0000673). It makes no mention of disparagement or trade libel. *See id.* All of HP's alleged misstatements concern the quality and effectiveness of Nu-kote's products, rather than Nu-kote's "honesty, integrity or competence." As a result, such statements at most constitute allegations of disparagement or trade libel, torts that the Policy does not cover. Thus, no duty to defend arose from those types of statements. The cases cited by HP do not weaken this conclusion. In *Atlantic Mutual Insurance Co. v. Lamb*, 100 Cal.App.4th 1017, 1032 (2002), the policy provided coverage for "oral or written publication of material that slanders or libels a person or organization *or disparages a person's or organization's goods, products or services*." (Emphasis added). Thus, the policy expressly covered the tort of disparagement, and the court explicitly relied on this "very broad 'personal injury' coverage," *id.* at 1024, without even considering whether the statements at issue amounted to defamation. *See id.* at 1035 n.13. Similarly, though the court did not draw a distinction between defamation and disparagement, the policy in *Barnett v. Fireman's Insurance Co.*, 90 Cal.App.4th 500, 509 (2001), contained the identical, broad language about disparagement. In addition, the allegations in the underlying action included intentional fraud and the statement that the insured placed profit above human life. Accordingly, unlike HP's criticism of Nu-kote's products, the statements in *Barnett* attacked the insured's integrity, and therefore constituted defamation as well as disparagement. Finally, the policy at issue in *Dobrin v. Allstate Insurance Co.*, 897 F.Supp. 442, 444 (C.D. Cal. 1995), covered not only "libel" and "slander," but also "the publication of any material damaging to anyone's reputation." Thus, the broader policy language would have covered disparagement as well as libel and slander. Moreover, the allegations at issue in *Dobrin* could be read to include an attack

12

on the plaintiff's honor and integrity.

2. Even if HP's statements could be construed as defamation rather than disparagement or trade libel, Nu-kote's complaint made clear that HP made such statements only in the United States, and, most specifically, in California. *See* Complaint ¶ 168 (misstatements "in interstate commerce"); ¶ 174 (false advertising "within the State of California;" ¶ 177 (HP "has published within the state of California knowingly false and disparaging statements concerning Nu-kote and its goods and services"). Thus, there is no basis – apart from impermissible speculation, *see supra* at p. 7 – for concluding that there was any potential for liability for defamation within the Policy Territory. With no support whatsoever from Nu-kote's actual claims and allegations, HP once again invokes the same snippets culled from its internal files. See Pl. Br. 18-19. These submissions suffer from the same fatal flaws here as in the context of HP's "advertising" arguments, *see supra* at pp. 2-7. First, evidence of internal planning in 1994 and 1995 to disseminate a message does not suggest that the dissemination actually took place. Second, all of the publications that HP has actually identified have been filed under seal, with prominent notations and protestations about their confidentiality. Such treatment belies the contention that HP ever circulated those documents. Finally, and most important, the dates on the documents, and HP's own testimony about them, indicate that they could not have been distributed in Europe during the Policy Period.

3. Finally, even if Nu-kote had alleged defamatory statements within the Policy Territory and Policy Period – or if HP had provided extrinsic evidence of such statements – the basic theory of Nu-kote's case foreclosed any duty to defend. The Policy makes clear that its "insurance does not apply" to "liability arising out of a publication or utterance described in Group B, 'personal injury' concerning any organization or business enterprise, or its products or services, made by or at the direction of the Named Insured, *with knowledge of the falsity thereof*." Exhibit 105, at 9 (HP 0000677) (emphasis added). Yet Nu-kote's claims of defamation and false advertising all allege precisely such knowing falsity. *See, e.g.*, Complaint ¶ 98 ("knowingly false statements in the marketplace"), ¶ 177 ("knowingly false and disparaging statements concerning Nu-kote and its goods and services"). Indeed, the entire theory of Nu-

13

kote's claim was that HP engaged in a willful and systematic campaign of falsity to drive Nu-kote out of business. Because the Policy explicitly excludes coverage for defamation claims of this kind, ACE would have no duty to defend even if HP could demonstrate knowingly false defamatory statements within the Policy Territory and Policy Period.

### C. ACE Has No Duty To Defend Under The Policy's Coverage For Malicious Prosecution

HP's invocation of the Policy's "malicious prosecution" coverage is also meritless, for there is no suggestion in Nu-kote's complaint or any other document that HP ever brought or even threatened any legal action against Nu-kote in the Policy Territory. Seeking to avoid this fundamental flaw in its argument, HP engages in a tortured reading of Nu-kote's complaint, with particular focus on an allegation concerning a patent HP obtained from the European Patent Office in 1994. *See* Pl. Br. 24; Complaint ¶ 97. By emphasizing the allegation that HP "assisted Epson in maintaining its own sham patent infringement claims against Nu-kote" while omitting the accompanying point that Epson filed its suit in California, *see* Complaint ¶ 97, HP seeks to obscure the undisputed fact that neither HP nor its alleged co-conspirators ever filed an action against Nu-kote in Europe or elsewhere in the Policy Territory. The absence of any such lawsuit is entirely understandable, as Nu-kote did no business outside the United States, and accordingly was not amenable to suit elsewhere. In short, HP never sued or threatened to sue Nu-kote in the Policy Territory, and its prosecution of a patent application in Europe can scarcely constitute "abuse of process" or "malicious prosecution" with respect to Nu-kote. The malicious prosecution allegations referred only to actions in the United States, and provide no grounds for a duty to defend.[9]

---

[9] In his August 24, 1999 Order, Judge Williams noted that the allegation of "groundless litigation" by HP "would constitute an alternate basis for finding the Nu-kote Counterclaim includes a claim for 'unfair competition.'" 8/24/99 Order at 13 n.7. Judge Williams made this offhand remark in a footnote, in a section of the opinion addressing the distinct question whether the term "unfair competition" extends beyond the tort of "passing off." This observation was not essential to his ruling, and did not address the basic problem that any such "groundless litigation" occurred within the United States, outside the Policy Territory.

14

ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION/CASE NO. C-99-20207 JW

## IV. CONCLUSION

For the reasons stated above, this Court should grant ACE's Motion for Reconsideration and Reverse its Order Denying ACE's Motion for Summary Adjudication of the Absence of a Duty to Defend Plaintiff.

Dated:   October 8, 2003

JOHN F. DAUM   [SBN 52313]
**O'MELVENY & MYERS LLP**
400 South Hope Street
Los Angeles, California 90071-2899
Telephone: (213) 430-6000
Facsimile: (213) 430-6407

JANELLE F. GARCHIE [SBN 118453]
**CORRELL, GARCHIE & EDWARDS LLP**
550 West C Street, Suite 500
San Diego, California 92101-3540
Telephone: (619) 557-0424
Facsimile: (619) 557-0428

ALAN E. GREENBERG [SBN 90688]
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
550 West C Street, Suite 800
San Diego, California 92101
Telephone: (619) 233-1006
Facsimile : (619) 233-8627

ROBERT J. ROMERO [SBN 136539]
**HINSHAW & CULBERTSON**
244 Jackson Street, Suite 300
San Francisco, California 94111
Telephone: (415) 362-6000
Facsimile: (415) 834-9070

Attorneys for Defendant, **ACE PROPERTY AND CASUALTY INSURANCE COMPANY**

By:  *[signature]  John F. Daum*
       JOHN F. DAUM

15

ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION/CASE NO. C-99-20207 JW

| | |
|---|---|
| RE: | [Filed under seal pursuant to Court Order dated 3/24/99]<br>*Hewlett Packard Co. v. CIGNA Property & Casualty Ins. Co., et al.* |
| VENUE: | U.S.D.C., Northern District of California, San Jose Division |
| CASE NO.: | C-99-20207 JW |

## PROOF OF SERVICE

I am employed in the County of San Diego, State of California. I am over the age of eighteen (18) years and not a party to the within action; my business address is: 550 West C Street, Ste. 500, San Diego, CA 92101. On October 8, 2003, the following documents described as:

**ACE PROPERTY AND CASUALTY INSURANCE COMPANY'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RECONSIDERATION BASED UPON THE *HAMEID* DECISION**

on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

David A. Gauntlett  
James A. Lowe  
GAUNTLETT & ASSOCIATES  
18400 Von Karman, Suite 300  
Irvine, CA 92612  
Telephone: (949) 553-1010  
Fax: (949) 553-2050

Attorneys for Plaintiff  
HEWLETT-PACKARD COMPANY

☐ **(BY MAIL)** I am "readily familiar" with the firm's practice of collection and processing correspondence by mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage fully prepaid at San Diego, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ **(BY FACSIMILE)** I caused such document to be delivered by facsimile transmission to the offices of the addressee.

☐ **(BY PERSONAL DELIVERY)** I caused such envelope to be delivered by hand to the offices of the addressee.

☒ **(BY OVERNITE EXPRESS)** I caused such envelope to be delivered by OverNite Express to the offices of the addressee.

☐ **(STATE)** I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ **(FEDERAL)** I declare that I am employed in the offices of a member of this Court at whose direction the service was made.

Executed on October 8, 2003, at San Diego, California.

Lesli D. Miller

::ODMA\PCDOCS\docs\23647\1A