**Exhibit B**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| NU-KOTE HOLDING, INC., | ) | Case No. 398-10600 |
| NU-KOTE IMPERIAL, LTD., | ) | Substantively Consolidated |
| NU-KOTE INTERNATIONAL, INC., | ) | |
| NU-KOTE IMAGING INTERNATIONAL, INC., | ) | Chapter 11 |
| INTERNATIONAL COMMUNICATION | ) | Judge Lundin |
| MATERIALS, INC. | ) | |
| FUTURE GRAPHICS, INC., | ) | |
| NU-KOTE LATIN AMERICA, INC., | ) | |
| | ) | |
| Debtors. | ) | |

RECEIVED FOR ENTRY

DEC 3 1999

_Shua Harded_

3:30 p.m.

## ORDER APPROVING SETTLEMENT AGREEMENT
## BETWEEN NU-KOTE AND HEWLETT-PACKARD

This matter is before the Court on the Motion of Nu-kote International, Inc. (the "Debtor" or "Nu-kote"), and Hewlett-Packard ("HP") for approval, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, of that certain Settlement Agreement between those parties. The Court scheduled a hearing on the Motion on December 2, 1999, at which time the parties stipulated to the following which stipulations are incorporated herein:

Without limiting the foregoing, the parties stipulate as follows:

    A.    The parties are engaged in a civil action captioned Hewlett-Packard Company v. Nu-kote International, Inc., Case No. C-94-20647JW (the "Current Litigation") in the United States District Court for the Northern District of California, San Jose Division (the "Federal District Court").

    B.    Upon the Debtor's motion, after a hearing, this Court lifted the automatic stay of 11 U.S.C. § 362 to permit the Current Litigation to proceed in the Federal District Court.


EXHIBIT
254
ALL-STATE LEGAL®

C.    A jury trial was conducted in the Current Litigation, and the jury returned a verdict which, among other things, found in favor of HP on the Debtor's antitrust claims and further found in favor of HP on certain of HP's patent infringement and false advertising claims. A judgment has not yet been entered in the Current Litigation pending proceedings relating to various forms of relief that were not specifically addressed by the jury.

D.    Unless the Current Litigation is compromised and settled, the parties anticipate that the judgment to be entered by the Federal District Court likely will be appealed, and final resolution of the Current Litigation will be protracted.

E.    In order to facilitate the efforts of the Debtor and other parties in interest to administer this bankruptcy case and to move towards a plan of reorganization, it is in the best interests of the bankruptcy estate to compromise and settle the Current Litigation on reasonable terms.

F.    The parties have negotiated a Settlement Agreement (the "Settlement Agreement") which, upon approval of this Court and implementation of its terms, will resolve the Current Litigation and resolve all disputes between the Debtor and HP. Many of the terms of the Settlement Agreement are highly confidential and proprietary, and the entire Settlement Agreement has been filed with the Court under seal. Pursuant to the terms of the Settlement Agreement, a redacted version of the Settlement Agreement has been publicly filed with the Court and has been sent to creditors and parties in interest. The redacted version redacts the highly confidential and proprietary information. The redacted portions of the Settlement Agreement have been disclosed only to attorneys of record for the secured creditors in this case, attorneys of record for the Committees appointed in this case, the attorneys and certain representatives for the insurance carriers who have an interest in the Settlement Agreement, attorneys for Unisys and the United States Trustee. The redacted portions of the Settlement Agreement shall remain confidential and under seal and may not

be disclosed to any other persons except as explicitly provided for in the Settlement Agreement and this Order. The Court has reviewed the entire unredacted Settlement Agreement filed under seal and the redacted version that has been publicly filed with the Court, and the Court finds that the redacted version discloses all of the material financial and other terms of the Settlement Agreement necessary to enable creditors and parties in interest to make an informed judgment as to whether the Settlement Agreement is in the best interests of the estate or whether they may have any valid objections to approval of the Settlement Agreement.

G.    All objections have been resolved and are withdrawn.

H.    Unless otherwise defined herein, all capitalized terms in this Order shall have the same meanings as defined in the Settlement Agreement.

Accordingly, the Court finds as follows:

A.    Proper notice of the parties' motion for approval of the Settlement Agreement was given to creditors and parties in interest in this case.

B.    The Court finds that the Settlement Agreement was negotiated and executed at arms length and in good faith by each of the parties.

C.    Based upon the Court's review of the Settlement Agreement, the stipulation of the parties, and the entire record in this bankruptcy case, the Court finds that the Settlement Agreement is reasonable and is in the best interests of the bankruptcy estate and therefore should be approved.

D.    This Court has jurisdiction over this matter, and this matter is a core proceeding, pursuant to 28 U.S.C. §§ 1334 and 157(b)(2).

E.    All objections are withdrawn, resolved by written agreements with the insurers and Unisys or resolved by agreements contained in this Order.

Accordingly, it is ORDERED, ADJUDGED and DECREED as follows:

3

1.    The Settlement Agreement between the Debtor and HP is hereby approved, and the parties are directed to perform in accordance with its terms.

2.    Immediately upon entry of this Order, the Debtor and HP and their respective attorneys shall submit to the Federal District Court the Stipulation and Order Modifying Protective Orders in the form of Exhibit D to the Settlement Agreement, and the Debtor and HP and their respective attorneys shall exercise best efforts to cause the prompt entry of such Stipulation and Order.

3.    Immediately upon entry of this Order, Nu-kote and all Nu-kote Persons are hereby required and enjoined to search for (as defined in Exhibit K attached to the Settlement Agreement) and turn over to Garfinkle, McLemore & Walker, PLLC or such other party as is acceptable to HP and Nu-kote (the "Custodian") any and all of the following (hereinafter referred to as "Confidential Information"), whether in written, hard copy, mechanical, electronic, magnetic, or photographic form: all Discovery Materials, including but not limited to HP Discovery Materials and Nu-kote Discovery Materials, Deposition Materials, and Privileged Materials (Nu-kote alone shall not be required to search for or turn over Privileged Materials) that are in the possession, custody or control of Nu-kote or any Nu-kote Persons or that Nu-kote or any Nu-kote Persons know to be in the possession, custody or control of any Litigation Vendors; and immediately turn over to the Custodian any of the items listed in Paragraph 2.6(b)(1) of the Settlement Agreement which become known or are discovered subsequently to the Effective Date of the Settlement Agreement.

4.    All such Confidential Information shall be held in escrow under seal by the Custodian in a storage facility mutually acceptable to HP, Nu-kote, and the Custodian. The storage expense for the Confidential Information will be an administrative expense of the Bankruptcy Case and will be paid by Nu-kote or any other representative of the estates upon issuance of invoices by the

Custodian without further Bankruptcy Court approval or authorization. Upon confirmation of any

plan of reorganization in the Bankruptcy Case, the storage expense will be paid by the reorganized

debtor, or by such other person designated in the plan who is mutually acceptable to Nu-kote, HP

and the Custodian. The Confidential Information will be held under seal by the Custodian according

to the provisions of Paragraph 2.6 of the Settlement Agreement during the hereinafter defined

Retention Period. The "Retention Period" shall be the period of time from the Effective Date of the

Settlement Agreement until the later of: (1) the first anniversary of the Effective Date of the

Settlement Agreement; or (2) the date on which all appeals have been exhausted on Nu-kote's

pending lawsuit with Seiko Epson (Seiko Epson et al v. Nu-kote International, Inc. et al; case no.

CV-95-2734 TJH (JGx), U.S. District Court, Central District of California, Western Division) and

Nu-kote's pending lawsuit with Canon (Canon Computer Systems Inc. et al v. Nu-kote International,

Inc.; case no. CV-95-288 AHS (EEx), U.S. District Court, Central District of California, Southern

Division); or (3) the date on which all claims of Seiko Epson and Canon in the Bankruptcy Case are

finally resolved; provided however, that in no event will the Retention Period exceed three (3) years

from the Effective Date of the Settlement Agreement. At the end of the Retention Period, the

Custodian shall destroy all of the Confidential Information in its possession and so certify to the

parties.

       5.      Confidential Information shall not be delivered or disclosed by the Custodian to any

person or entity without either the prior written consent of Nu-kote and HP or express permission

granted by an Order of this Court in the Bankruptcy Case.  Any Order of this Court granting

permission for delivery or disclosure of any Confidential Information in the custody, possession or

control of the Custodian shall be entered:  (i) only after HP has had a full and fair opportunity to

review any Confidential Information, other than Privileged Materials, subject to such disclosure; (ii)

only after notice to HP with an opportunity to be heard; (iii) only upon good cause shown; (iv) only

pursuant to appropriate provisions regarding the continued confidentiality and protection of the

Confidential Information; and (v) only to the extent that it is essential to enable Nu-kote to litigate

the other two pending cases with Canon and Seiko Epson (referred to as the OEM litigation), or

claims in the Bankruptcy Case related thereto, or other claims or disputes which are a part of the

Bankruptcy Case, and for no other use or purpose whatsoever. ~~The party seeking disclosure has the~~

~~burden of proof to demonstrate by clear and convincing evidence that disclosure is appropriate.~~

6.    Promptly upon resolution of the OEM litigation or at the expiration of the Retention

Period, all Confidential Information delivered pursuant to the consent of Nu-kote and HP or pursuant

to an Order of this Court pursuant to the terms hereof shall be returned to the Custodian.

7.    All Confidential Information shall remain within the exclusive jurisdiction of this

Court and shall not be used in connection with any litigation, proceeding or matter other than the

OEM litigation, claims in the Bankruptcy Case related thereto, or other claims or disputes which are

a part of the Bankruptcy Case in this Court.

8.    Notwithstanding the Protective Orders (which are hereby modified) or the foregoing,

HP is permitted to retain and use as it sees fit any HP Discovery Materials, Privileged Materials,

Nu-kote Discovery Materials and Deposition Materials, including, but not limited to, copies,

excerpts, summaries, quotations, compilations, databases of or containing such, which HP, in its sole

discretion, determines will assist HP with respect to any other cause of action, claim, obligation,

liability, damages, litigation, proceeding or matter.

9.    No Confidential Information will be used or revealed by either party, its

representatives, agents, attorneys, Professional Persons (including all Nu-kote Persons) to anyone

other than as may be required by law or as may be expressly permitted in the Settlement Agreement;

214421 - 3                                            6

provided, however, that Nu-kote and its attorneys shall oppose any such disclosure or use of its Privileged Material in any action, matter, claim or proceeding in which HP is a party on the basis that such is protected from disclosure under applicable attorney-client and work product privileges. In addition, before disclosing any Confidential Information, the disclosing party shall first notify the other party and give such other party sufficient opportunity to object to or limit the nature or scope of the disclosure, or to obtain a protective order, or otherwise take such appropriate action as may be required to protect its interests.

10.    Except as otherwise provided in Paragraph 2.6 of the Settlement Agreement, all Confidential Information is hereby deemed to be the sole and exclusive property of Hewlett-Packard Company and Nu-kote International, Inc., as the case may be; and their respective attorneys, experts, Professional Persons, officers, directors, employees and agents in possession of Confidential Information as well as all Nu-kote Persons will be bound by the decisions of the owner with respect to use of such Confidential Information.

11.    Nu-kote shall immediately direct, in writing, with a duplicate copy furnished to HP, all Nu-kote Persons to comply with the provisions of this Order and Paragraph 2.6 of the Settlement Agreement.

12.    Within twenty-five (25) days after entry of this Order, Nu-kote (on behalf of itself and its officers and directors) and all other Nu-kote Persons are each required and enjoined to provide HP with a Certificate of Compliance, as set forth in Exhibit K attached to the Settlement Agreement, that each such person or entity has fully complied with all of the provisions contained in Paragraphs 2.6(b) and 2.6(g) of the Settlement Agreement.

13.    Pursuant to Paragraphs 2.1(a), 2.3(c), 2.4(a), and 2.4(b) of the Settlement Agreement, HP is hereby allowed liquidated, undisputed, non-contingent, unsecured, pre-petition claims in the

Bankruptcy Case in the following amounts: $1,500,000.00 for awardable costs incurred by HP in the Current Litigation, plus $456,937.80 for damages suffered by HP on HP's patent infringement claims, plus $434,120.00 and $1,138,394.00 for damages suffered by HP on HP's trademark/unfair competition claims and false advertising claims, plus $2,000,000.00 for HP's awardable attorney's fees in the Current Litigation, for a sum total of $5,529,451.80.

14.    Attached as Exhibit N to the Settlement Agreement is a redacted version of the Settlement Agreement, which redacts those portions of the Settlement Agreement that the parties consider to be confidential. The redacted portions of the Settlement Agreement shall remain under seal and shall be disclosed only to the attorneys of record for the Committees appointed in this case, the attorneys of record for the secured creditors in this case, the attorneys for any insurance carriers who have an interest in this Settlement Agreement, and the Custodian; provided any attorney who receives the sealed redacted portions of the Settlement Agreement must first sign a confidentiality agreement under which the attorney agrees not to disclose the sealed redacted portions of the Settlement Agreement to their clients or to any other person. Only the redacted version of the Settlement Agreement, attached as Exhibit N to the Settlement Agreement, shall be shown to other creditors or parties in interest in the Bankruptcy Case. In addition to the persons identified above in this paragraph, the only other persons who shall have access to the sealed redacted portions of the Settlement Agreement shall be prospective purchasers of the assets of Nu-kote or investors in Nu-kote who (i) are approved by HP, in writing, to receive such information, (ii) have signed a bona fide agreement to purchase the assets of Nu-kote or make an investment in Nu-kote subject only to Bankruptcy Court approval and customary conditions to closing the transaction, and (iii) have signed a confidentiality agreement acceptable to HP, which shall be enforceable by the injunctive powers of this Court, to keep all of the information disclosed to the prospective purchasers or investors

234425-1                                       8

strictly confidential. Approval by HP of disclosure to any prospective purchaser or investor of any

of the redacted portions of the Settlement Agreement shall not constitute consent or approval by HP

of an assignment or sale or other transfer to any such prospective purchaser or investor, or a change

in control of Nu-kote, permitting the continuation of the Patent Covenants or the exercise of other

rights conferred on Nu-kote by the Settlement Agreement. ~~This Court shall have the exclusive~~

~~jurisdiction over the confidentiality of the Settlement Agreement and any issues that might arise~~

~~concerning the confidentiality of the Settlement Agreement.~~

15.    This Court shall be the exclusive venue *and this* ~~for any court proceeding to interpret or~~

~~enforce any of the provisions of this Settlement Agreement.~~ This Court shall have the exclusive

jurisdiction to resolve any disputes that may arise under this Settlement Agreement and to enforce

any of the provisions of this Settlement Agreement with respect to the parties hereto ~~and with respect~~ *including issues*

*confidentiality of the Settlement Agreement.* ~~to all other Nu-kote Persons.~~ Both Nu-kote and HP are beneficiaries of this Settlement Agreement.

Accordingly, Nu-kote and HP each shall have standing on its own behalf to commence and prosecute

in this Court any action (including contested matters and adversary proceedings as may be

appropriate) to enforce any of the provisions of the Settlement Agreement or this Order or to realize

any of the benefits of the Settlement Agreement or this Order. ~~This Court shall have jurisdiction~~

~~under 11 U.S.C. § 105, upon any action commenced by either Nu-kote or HP, to issue any order,~~

~~process, injunction or judgment that is necessary or appropriate to carry out the provisions of the~~

~~Settlement Agreement or this Order.~~

16.    Any plan of reorganization filed by Nu-kote in these cases shall be entirely consistent

with the terms of the Settlement Agreement and this Order.

17.    The Settlement Agreement and its Exhibits and any provisions of the Settlement Agreement incorporated in this Order including ¶¶ 4, 5, 6 and 10 of this Order are hereby modified to the extent necessary to provide as follows:

(a)    Coudert Brothers will be required to and enjoined to search for and turn over Confidential Information to the Custodian as provided in § 2.6 of the Settlement Agreement with the sole exception that Coudert Brothers may retain (i) copies of its time records, (ii) copies of documents of public record and (iii) copies of Confidential Information, if any, produced by Shann Donnellan and Glass & Associates in connection with their 2004 examination until the conclusion of such examination at which time the documents in (iii) will also be turned over to the Custodian as provided herein.

(b)    Coudert Brothers has the right to request access to the Confidential Information held by the Custodian for purposes of the 2004 examination of Shaun Donnellan and Glass & Associates, any fee applications or fee hearings, and any claims involving Coudert Brothers arising out of its representation of Nu-kote in the Current Litigation and the Court may release such documents to Coudert Brothers provided Coudert Brothers otherwise complies with the requirements of Section 2.6(c)(1) of the Settlement Agreement and any other applicable provisions of the Settlement Agreement; provided, however, that such Confidential Information shall be returned to the Custodian immediately upon the conclusion of such matters.

(c)    The Retention Period of the escrow as provided in Section 2.6(b) of the Settlement Agreement will not expire until Coudert Brothers has either received from the Debtors and their estates a release of any claims arising out of its representation of Nu-kote in the Current Litigation or any such claims have been finally resolved.

214433 - 3

(d)   The Debtors' Response to Responses and Objections of Wausau, Chubb, Unisys, U.S. Trustee and Coudert Brothers to Motion to Approve the Compromise and Settlement Agreement with Hewlett-Packard Company is hereby stricken and expunged from the record of this case. HP, Nu-kote and Coudert Brothers are required and enjoined not to use such pleading in any way in any proceeding or matter.

(e)   Nu-kote agrees to reimburse Coudert Brothers for its costs and fees incurred in connection with the turnover of documents to the escrow in accordance with this Order.

(f)   The press release attached as Exhibit "O" to the Settlement Agreement will be modified before it is released to delete the word "unfounded" from the last sentence of the fourth paragraph.

(g)   Neither HP nor Coudert Brothers will make any official or authorized public statements nor will their management or attorneys make any public statement regarding the Current Litigation other than in legal proceedings and upon request will promptly disavow any unauthorized statements that are made outside of a legal proceeding.

(h)   The release given by HP in Section 3.1(b) will include any claims HP may have against Coudert Brothers arising out of the Current Litigation provided that Coudert Brothers' representation that Coudert Brothers has not violated any of the protective orders in the Current Litigation is truthful save and except the one inadvertent violation that was previously disclosed to HP in writing by Victoria Brieant regarding showing confidential documents to Nu-kote's insurance carrier.

18.   This Order shall be binding on the Debtor and all Nu-kote Persons, and all of their respective successors and assigns including any chapter 11 or chapter 7 bankruptcy trustee that might be appointed in the Bankruptcy Case.

234431-3

IT IS SO ORDERED this the 3d day of December, 1999.

_Keith M. Lundin_

KEITH M. LUNDIN
UNITED STATES BANKRUPTCY JUDGE

Agreed to and approved for entry by:

_Frank J. Wright_
Frank J. Wright
William T. Burke, Jr.
Hance | Scarborough | Wright
2900 Renaissance Tower
1201 Elm Street
Dallas, TX 75270

Craig V. Gabbert, Jr.
HARWELL HOWARD HYNE
GABBERT & MANNER, P.C.
1800 First American Center
315 Deaderick Street
Nashville, Tennessee 37238

Attorneys for Debtor

_Robert C. Goodrich_    _by_ _____  ) _by him_
Robert C. Goodrich, Jr.
FARRIS, WARFIELD & KANADAY, PLC
Suite 1800, SunTrust Center
424 Church Street
Nashville, Tennessee 37219
Phone: (615) 782-2237
Fax: (615) 782-2371

Attorney for Hewlett-Packard

Ronald Katz
Coudert Brothers
4 Embarcadero Center, Suite 3300
San Francisco, CA 94111
Phone: (415) 986-1300
Fax: (415) 986-0320

12

124683 - 3

**Exhibit C**

Check Your Billing History     Change Client Code

# Case Summary
## U.S. Court of Appeals for the Federal Circuit

Click Here for **Case Details** or **Listing of Briefs**
Click Here To **Search Again**

| | | |
|---|---|---|
| Short Case Title (Name) : | HEWLETT-PACKARD V NU-KOTE INTNL | Docket Number : 2000-119! |
| Lower Court/ Agency : | DCT    Division :ND/CA | Stand Alone Case |
| Lower Court# : | 94-CV-20647 | |
| Notice of Appeal Received: | 2/1/2000 | |
| Notice of Appeal Docketed : | 2/8/2000 | |
| Certified List Filed: | 2/8/2000 | |
| Notice of Appeal Filed : | 1/14/2000 | |
| Fee Paid : | PD       Fee Amount : $105.00 | Receipt No : 508864 |

## ATTORNEYS BY PARTY AS LISTED FOR THIS CASE

HEWLETT-PACKARD COMPANY
Plaintiff-Appellee

PRINCIPAL ATTORNEY
MARSHALL, JONATHAN A.
Firm : Weil, Gotshal & Manges LLP
767 Fifth Avenue, 32nd Floor, New York, NY 10153-0119
(212)310-8000 - Tel ; ext.6407
(212)310-8007 - Fax
EOA Filed :2/25/2000

HEWLETT-PACKARD COMPANY
Plaintiff-Appellee

OF COUNSEL ATTORNEY
PECAU, WILLIAM G.
Firm : Steptoe & Johnson, LLP
1330 Connecticut Avenue, N.W., , Washington, DC 20036-1795
(212)790-9090 - Tel ; ext.
(212)496-4444 - Fax
EOA Filed :2/25/2000

HEWLETT-PACKARD COMPANY
Plaintiff-Appellee

OF COUNSEL ATTORNEY
WALLACH, STEVEN IAN
Firm : Pennie & Edmonds
1155 Avenue of the Americas, , New York, NY 10036-2711
(212)790-9090 - Tel ; ext.
(212)869-8864 - Fax
EOA Filed :2/25/2000

HEWLETT-PACKARD COMPANY
Plaintiff-Appellee

OF COUNSEL ATTORNEY
DAIGNAULT, RONALD M.
Firm : Jenner & Block LLP
919 Third Avenue, 37th Floor, New York, NY 10022
(212)891-1600 - Tel ; ext.

(212)891-1699 - Fax
EOA Filed :2/25/2000

NU-KOTE INTERNATIONAL, INC.
Defendant

PRINCIPAL ATTORNEY
KATZ, RONALD
Firm : Coudert Brothers
Four Embarcadero Center, Suite 3300, San Francisco, CA 94111
( ) - Tel ; ext.
( ) - Fax
Note: *This attorney did not make an appearance for this case.*

XEROX CORPORATION
Movant-Appellant

PRINCIPAL ATTORNEY
LUECK, MARTIN R.
Firm : Robins, Kaplan, Miller & Ciresi
2800 LaSalle Plaza, 800 LaSalle Avenue, Minneapolis, MN 55402-2015
(612)349-8587 - Tel ; ext.
(612)339-4181 - Fax
EOA Filed :2/24/2000

---

## ADDITIONAL PARTY INFORMATION

| PARTY | ADDITIONAL INFO |
|---|---|
| HEWLETT-PACKARD COMPANY | Plaintiff-Appellee |
| NU-KOTE INTERNATIONAL, INC. | Defendant |
| XEROX CORPORATION | Movant-Appellant |

**2000-1195**

- - -

---

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/14/2007 13:41:33 | | |
| PACER Login: | hc0185 | Client Code: | 0813640hatton |
| Description: | dkt summary | Search Criteria: | 2000-1195 |
| Billable Pages: | 2 | Cost: | 0.16 |

Check Your Billing History    Change Client Code

# Case Details
## U.S. Court of Appeals for the Federal Circuit
### HEWLETT-PACKARD V NU-KOTE INTNL
### 2000-1195

Click Here for **Listing of Briefs**
Click Here To **Search Again**

The following documents, **filed after 8/13/07**, are available for download:
official caption, entry of appearance, certificate of interest.
No other case documents are available electronically.

| Date | History |
|------|---------|
| --- | . |
| / / | Appellant Principal Brief Filing Date |
| / / | Appellee or Cross Appellant Principal Brief Filing Date |
| / / | Appellant Reply Brief Filing Date |
| / / | Cross Appellant Reply Brief Filing Date |
| / / | Appendicies Filing Date |
| 4/5/2000 | Disposition: Dismissed ; by Clerk |
| 4/5/2000 | Mandated on |
| >> | *Please Note: The briefs above are only the most current.* << |

| | |
|------|---------|
| --- | >> **Please Note: Motions & Actions Filed are listed first. Entries are listed last.**<< |
| 4/4/2000 | **MOTION:** Entry 3 :by Joint - STIPULATION TO DISMISS APPEAL PURSUANT TO RULE 42(B). **SERVICE :** by Mail on 3/22/2000 |
| 4/5/2000 | **ACTION:** Entry 4 :GRANTED. ISSUED AS A MANDATE AT FILING. |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/14/2007 13:41:46 | | | |
| **PACER Login:** | hc0185 | **Client Code:** | 0813640hatton |
| **Description:** | dkt detail | **Search Criteria:** | 2000-1195 |
| **Billable Pages:** | 1 | **Cost:** | 0.08 |

**Exhibit D**



FILED

SEP 2 11 05 AM '97

RICH... CLERK FILING
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

NOT FOR PUBLICATION

484

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| HEWLETT-PACKARD COMPANY, | NO. C-94-20647- JW/EAI |
| Plaintiff, | ORDER RE EXTRATERRITORIAL APPLICATION OF THE LANHAM ACT[1] |
| v. | |
| NU-KOTE INTERNATIONAL, INC., | |
| Defendants. | |

AND RELATED COUNTERCLAIMS

By order dated July 11, 1997 ("Order"), the Court granted in part and denied in part Nu-kote International, Inc.'s ("Nu-kote") Motion for Preliminary Injunction. The Court concluded that Nu-kote had established a combination of likelihood of success on the merits of its Lanham Act claim and the possibility of irreparable harm which warranted injunctive relief. The Court enjoined Hewlett-Packard Company's ("HP") sales of TIFF cartridges in BIFF packaging in the United States and its territories.

---

[1] This disposition is not appropriate for publication and may not be cited.

1    Later, during a hearing on July 23, 1997, the Court invited the parties to file

2 supplemental briefs addressing whether the Court can apply the Lanham Act's

3 injunctive relief provisions extraterritorially, i.e., to prohibit HP from selling its TIFF

4 product in BIFF packaging outside the United States.

5    The Court has now received and considered the parties' supplemental briefing.

6 Based upon the supplemental briefs, the pleadings and evidentiary record, the Court

7 finds that Nu-kote has failed to satisfy the requirements set forth in Steele v. Bulova

8 Watch Co., 344 U.S. 280 (1952), to justify the extraterritorial application of the

9 Lanham Act in this case.  First, Nu-kote has failed to demonstrate that the exportation

10 and sale by HP of TIFF cartridges in the revised packaging will have an effect on

11 United States commerce.  Second, Nu-kote has failed to identify any other countries in

12 which it allegedly sells refill products for the 26A and 29A print cartridges and

13 therefore has not demonstrated that it is suffering irreparable harm outside the United

14 States. Third, the Court is unable to determine, based upon the record presently before

15 it, whether the extraterritorial application of the Lanham Act will conflict with foreign

16 law.  Accordingly, the Court DENIES Nu-kote's request for an extension of the

17 preliminary injunction to encompass sales of products outside the United States.

18

19 DATED: August 27, 1997

20

21                                          James Ware

22                                 JAMES WARE
                                 United States District Judge

23

24

25

26

27

28                                          2

This is to certify that copies of this order have been mailed to:

Paul Valentine
400 Capitol Mall, 9th Floor
Sacramento, CA 95814

Mark R. Scadina
PENNIE & EDMONDS
2730 San Hill Road
Menlo Park, CA 94025

William G. Pecau
PENNIE & EDMONDS
1155 Avenue of the Americas
New York, New York 10036-2711

Peter Sullivan
GIBSON, DUNN & CRUTCHER
333 South Grand Avenue
Los Angeles, CA 90071-3197

Edward Maker II
HEWLETT-PACKARD COMPANY
3000 Hanover Street, MS 20B0
Palo Alto, CA 94303

Robert Christopher
COUDERT BROTHERS
Ten Almaden Boulevard, Suite 120
San Jose, CA 95113

Ron S. Katz
COUDERT BROTHERS
4 Embarcadero Center
Suite 3300
San Francisco, CA 94111

dated: _____

CLERK OF COURT

By: _____
Ronald L. Davis
Deputy Clerk

3

**Exhibit E**

# FILED

JAN - 9 2002

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
San Jose

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HEWLETT-PACKARD COMPANY, | CIVIL NO. 99-20207 SW |
| Plaintiff, | |
| v. | ORDER REGARDING SCOPE OF SPECIAL MASTER'S ADJUDICATION OF ISSUES RELATING TO DAMAGES; |
| CIGNA PROPERTY AND CASUALTY INSURANCE COMPANY, | NOTIFICATION CONCERNING COURT SEALING OF DOCUMENTS IN THIS CASE |
| Defendant. | |
| | [FILED UNDER SEAL] |

A. ISSUES REGARDING THE MOTION SET BEFORE THE SPECIAL MASTER

The Court has read and considered the correspondence received from both parties concerning the proper scope of Special Master Peter Stone's adjudication of issues relating to damages. A motion by Hewlett-Packard Co. ("HP") relating to the calculation of damages arising from this Court's June 19, 2001 order finding that HP was entitled to a defense from ACE Property and Casualty Insurance Co. ("ACE"), is scheduled to be heard by Special Master Stone on January 31, 2002 ("Motion for Adjudication"). The Court agrees with ACE that the Motion for Adjudication involves the determination of "legal" issues -- involving the duration of ACE's duty to defend, allocation of defense costs among covered and non-covered claims, and the applicability of Cal. Civil Code § 2860 -- that go beyond the raw calculation of hours and rates. The Court

1  also agrees that these issues which could potentially be resolved
2  by way of Federal Rule of Civil Procedure 56 motions for summary
3  judgment. However, because the questions posed by HP are
4  inextricably intertwined with the calculation of damages, the Court
5  believes it is prudent to allow the Special Master to consider the
6  Motion for Adjudication prior to rendering his ultimate
7  recommendation regarding the amount of damages.  In light of the
8  dispute over how California law should be applied in this case, in
9  his final recommendation Special Master Stone may wish to provide
10 various damage "scenarios" resulting from various possible legal
11 conclusions regarding allocation of damages and duration of the
12 duty to defend.  For example, if ACE is liable for the costs of the
13 defense of non-covered claims, the damages would be X, but if ACE
14 is liable only for the costs of the covered claims, the damages
15 would be Y.  Or if ACE's liability only extends for one month, the
16 damages would be W, but if it extends through the conclusion of the
17 case, it would be Z.  Of course, the Special Master would
18 articulate his own legal conclusion, while addressing the
19 possibility of other results.[1]

20        In the interest of resolving this long standing dispute, and
21 in the interest of judicial economy, I am not eager to hear motions
22 that will interrupt and prolong the Special Master's deliberations.
23 The legal issues which are the subject of HP's Motion for
24 Adjudication may be reviewed by the Court after it receives the
25 report of Special Master Stone later this year.

26 ─────────────
27        [1] Whether or not to use this approach lies in the discretion of
   Special Master Stone.

28                               2

1    On a different matter. ACE, which is pursuing discovery of HP

2    documents regarding allocation of costs, also requests a

3    continuance of the motion set before the Special Master.  ACE's

4    position may have some merit, but the Court believes that the

5    timing of the motion and the briefing therefor is a matter best

6    left to Special Master Stone.

7    **B.   NOTIFICATION REGARDING SEALING OF THIS CASE**

8        Because I will be retiring next month, and because it seems

9    inevitable that this case will be transferred to another judge, I

10   have decided not to lift the sealing order in this case at this

11   time.  When the case is transferred, the newly assigned judge may

12   wish to review whether there remains good cause for the documents

13   in this matter to remain under seal.  However, for now, the case

14   will remain sealed.

15       The Plaintiff shall provide a copy of this Order to Special

16   Master Stone no later than noon on January 10, 2002.

17       IT IS SO ORDERED.

18   DATED: January 9, 2002

19                                     SPENCER WILLIAMS
                                       United States District Judge

20

21

22

23

24

25

26

27

28                                 3

**Exhibit F**

1    GAUNTLETT & ASSOCIATES
     David A. Gauntlett (SBN 96399)
2    James A. Lowe (SBN 214383)
     18400 Von Karman, Suite 300
3    Irvine, California 92612
     Telephone: (949) 553-1010
4    Facsimile: (949) 553-2050

5    Attorneys for Plaintiff
     HEWLETT-PACKARD COMPANY

6

7

8                    UNITED STATES DISTRICT COURT

9          NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

10                   C02-01847

11   HEWLETT-PACKARD COMPANY, a          )   Case No.:
     Delaware corporation,               )
12                                       )   COMPLAINT FOR:
                     Plaintiff,          )
13                                       )   1)   Breach of Contract; and,
              vs.                        )
14                                       )   2)   Breach of the Implied Covenant of
     CIGNA PROPERTY & CASUALTY           )        Good Faith and Fair Dealing
15   INSURANCE COMPANY, a Connecticut    )
     corporation; and ACE PROPERTY &     )
16   CASUALTY INSURANCE COMPANY, a       )
     Pennsylvania corporation,           )
17                                       )
                     Defendants.         )
18   _____)

19

20

21

22

23

24

25

26

27

28



ORIGINAL
FILED

APR 17 '02

RICHARD        ING
U.S. DIS
NO. DIST. O       S.J.

EXHIBIT
1715
ALL-STATE LEGAL®

Case 5:07-cv-04676-JW    Document 19-8    Filed 12/17/2007    Page 28 of 53
Case 5:99-cv-20207-JW    Document 472    Filed 08/10/2007    Page 30 of 52
Case 5:02-cv-01847-JW    Document 1    Filed 04/17/2002    Page 2 of 15

Plaintiff, Hewlett-Packard Company ("HP") for its Complaint alleges as follows:

**The Parties**

1.      HP is a Delaware corporation with its principal place of business in Palo Alto, California.  HP is in the business of developing, manufacturing, marketing, distributing, and selling high technology electronic devices, including ink jet printers, ink jet facsimile machines, ink jet cartridges and related components, for which it holds numerous patents, trademarks, and other legally protectable interests within the meaning of federal and state laws.  At all times relevant to this complaint, HP has advertised and sold its inkjet products worldwide.

2.      Defendant CIGNA Property and Casualty Insurance Company ("CIGNA PCIC") is a corporation duly organized and existing under the laws of the state of Connecticut, with its principal place of business in Philadelphia, Pennsylvania.  HP is informed and believes, and on the basis of that information and belief, alleges that at certain times relevant to this complaint, CIGNA Property and Casualty Insurance Company was an admitted property-casualty insurer under the laws of the State of California, and was transacting the business of insurance within California.

3.      Defendant ACE Property and Casualty Insurance Company ("ACE PCIC") is a corporation duly organized and existing under the laws of the State of Pennsylvania, with its principal place of business in Philadelphia, Pennsylvania.  HP is informed and believes, and on the basis of that information and belief, alleges that at certain times relevant to this complaint, ACE was an admitted property-casualty insurer under the laws of the State of California, and was transacting the business of insurance within California.

4.      HP is informed and believes, and on the basis of that information and belief alleges, that in or about 1999, CIGNA PCIC changed its corporate name to ACE Property and Casualty Insurance Company, and that ACE PCIC retained all the assets and liabilities of CIGNA PCIC, including liabilities under the insurance policies at issue in this case.  HP is informed and believes, and on the basis of that information and belief alleges, that ACE PCIC is now responsible for all rights, duties and obligations previously belonging to CIGNA PCIC, including those which are the subject of this breach of insurance contract and bad faith action.  Throughout this complaint, CIGNA Property and Casualty Insurance Company and ACE Property and Casualty Insurance Company are referred to collectively as

1 | "CIGNA," because almost all of the relevant documents, such as insurance policies and historical

2 | correspondence, refer to "CIGNA."

3 | **Jurisdiction and Venue**

4 |      5.    Jurisdiction and venue are proper in this Court in that:

5 |      a.    A substantial part of the events or omissions giving rise to the causes of action

6 | asserted herein occurred within the State of California and within the Northern District of California.

7 |      b.    Counterclaims were brought by Nu-kote against HP in an action styled as

8 | *Hewlett-Packard Co. v. Nu-kote Int'l, Inc.*, counterclaim *Nu-kote Int'l, Inc. v. Hewlett-Packard*

9 | *Company*, United States District Court, Northern District, Case No. C-95-2254 CW (the "*Nu-kote*

10 | Action"), filed in the United States District Court for the Northern District of California.

11 |      c.    The Nu-kote Counterclaims sought relief for unfair competition and other claims

12 | under California law giving rise to claims for damages within the State of California.

13 |      d.    CIGNA was, at all material times, qualified and authorized to transact its

14 | business, and does transact business within the State of California, whether under the corporate name of

15 | CIGNA Property and Casualty Insurance Company or ACE Property and Casualty Insurance Company.

16 |      e.    The insurance policy at issue in this case was sold to HP in the Northern District

17 | of California.

18 |      f.    Jurisdiction is appropriate under 28 U.S.C. § 1332 because there is complete

19 | diversity between the parties. Plaintiff HP is a Delaware corporation, whereas defendants CIGNA

20 | Property and Casualty Insurance Company and ACE Property and Casualty Insurance Company are

21 | Connecticut and Pennsylvania corporations, respectively.

22 |      g.    Additionally, when HP brought a declaratory relief action against CIGNA in

23 | California Superior Court arising out of the same *Nu-kote* Action that gives rise to this case, CIGNA

24 | removed that action to this Court, alleging diversity of citizenship of the parties and proper venue.

25 | **The CIGNA Controlled Master Insurance Program**

26 |      6.    In 1992, HP sought to obtain international liability insurance coverage for its domestic

27 | and foreign operations.

28 |      7.    In approximately October of 1992, HP purchased its foreign liability insurance coverage

Case 5:07-cv-04676-JW    Document 19-8    Filed 12/17/2007    Page 30 of 53
Case 5:99-cv-20207-JW    Document 472    Filed 08/10/2007    Page 32 of 52

Case 5:02-cv-01847-JW    Document 1    Filed 04/17/2002    Page 4 of 15

1  with CIGNA through a broker in CIGNA's "Controlled Master Program." Under the "CIGNA

2  Controlled Master Program," CIGNA issued a primary liability policy which served as a form of

3  "master policy." That Master Policy issued to HP was CIGNA Property and Casualty Insurance

4  Company Policy No. CXCO24869, entitled "Comprehensive General and Automobile Liability Policy:

5  Foreign," effective October 31, 1992 to October 31, 1993 (the "CIGNA Master Policy").

6      8.    CIGNA renewed coverage under the CIGNA Master Policy annually through

7  October 31, 1995 without change in material terms

8      9.    The CIGNA Master Policy contains the following pertinent language:

9                    **INSURING AGREEMENT**
                          . . . .
10  Coverage C – Advertiser's Liability
    To pay on behalf of the Insured all sums which the Insured shall be come
11  legally obligated to pay as damages occurring in the course of the Named
    Insured's advertising activities, arising out of libel, slander, defamation of
12  character, violation of right of privacy, **unfair competition** or
    infringement of copyright, title or slogan or to indemnify the Insured,
13  therefore, in jurisdictions where legally prohibited from paying on his
    behalf. (Emphasis added.)
14                          . . . .
                    **DEFENSE AND SETTLEMENT**
15  The company shall have the right and duty, except in such jurisdiction
    where legally prohibited, to defend any suit against the insured seeking
16  damages on account of . . . Advertiser's liability . . . even if any of the
    allegations of the suit are groundless, false or fraudulent and may make
17  such investigations, negotiation and settlement of any claim or suit as it
    deems expedient, . . . .
18                          . . . .
                        **CONDITIONS**
19                          . . .
20      6.    **POLICY TERRITORY**
            **Shall be worldwide for claim or suit resulting from an**
            **occurrence outside the United States of America**, its territories
21          or possessions, Canada, Cuba and North Korea. (Emphasis
            added.)
22

23                    **Factual Background To Underlying Case**

24      10.    HP has developed a reputation for designing and selling inkjet printers, inkjet facsimile

25  machines, inkjet cartridges, and other inkjet products that produce high quality text and images. This

26  reputation is of great financial value to HP and features prominently in HP's advertising of its inkjet

27  products.

28      11.    HP disseminated such advertising materials regarding its inkjet products worldwide

Case 5:07-cv-04676-JW    Document 19-8    Filed 12/17/2007    Page 31 of 53
Case 5:99-cv-20207-JW    Document 472    Filed 08/10/2007    Page 33 of 52
Case 5:02-cv-01847-JW    Document 1    Filed 04/17/2002    Page 5 of 15

during the period of CIGNA's Master Policy, which were printed in numerous languages other than English. These advertising materials consisted, in part, of publications distributed to HP resellers telling them how to respond to customer inquiries regarding refilling of HP inkjet cartridges, and to encourage customers to use only genuine HP inkjet cartridges to obtain high-quality text and avoid potential damage to their HP equipment.

12.    During all times relevant to this complaint, HP published advertising, marketing and promotional materials to its sellers and customers of its inkjet products in which HP expressed its view that its inkjet cartridges should not be refilled, and identified potential consequences of refilling its inkjet cartridges, including diminished quality of printed output, risks of damage to HP inkjet printers or other devices stemming from refilling of its inkjet cartridges, and inapplicability of warranty coverage for such resultant damage. At all times relevant to this complaint, HP distributed these advertising, marketing and promotional materials worldwide, which were printed in numerous languages in addition to English.

**Litigation Develops with a Competitor that Included
Counterclaims Alleging Unfair Competition and Other Acts
Within the Scope of CIGNA's Master Policy**

13.    In July 1993, Nu-kote International, Inc. ("Nu-kote") first began sales of inkjet refill products intended to be used to refill and thereby to compete with HP inkjet cartridges. Nu-kote marketed its inkjet refill products by asserting that their use would extend the life of HP's inkjet cartridges, which was directly contrary to HP's advertisements for its inkjet cartridges stressing the limited life of its products as being essential to assure optimal performance and quality of printed output.

14.    In or about September 1994, HP commenced a civil action against Nu-kote in the U.S. District Court for Northern California, entitled *Hewlett-Packard Co. v. Nu-kote Int'l, Inc.*, Case No. C-95-2254 CW. HP alleged numerous claims against Nu-kote including patent, trademark and trade dress infringement arising from Nu-kote's marketing and sale of its inkjet refill products.

**Nu-kote Files Counterclaim Against HP**

15.    On or about November 22, 1994, Nu-kote filed and served its initial answer and counterclaim against HP in *HP v. Nu-kote*. After Nu-kote filed counterclaims against HP the lawsuit

Case 5:07-cv-04676-JW    Document 19-8    Filed 12/17/2007    Page 32 of 53
Case 5:99-cv-20207-JW    Document 472    Filed 08/10/2007    Page 34 of 52

Case 5:02-cv-01847-JW    Document 1    Filed 04/17/2002    Page 6 of 15

1   was styled as *Hewlett-Packard Co. v. Nu-kote Int'l, Inc.*, counterclaim *Nu-kote Int'l, Inc. v. Hewlett-*

2   *Packard Co.*, United States District Court, Northern District, Case No. C-95-2254 CW. ("*Nu-kote*

3   Action").

4        16.    Nu-kote's fourth amended counterclaim pleads facts comprising the following

5   "advertiser's liability" claims covered under CIGNA's Master Policy:

6              a.    Lanham Act false and deceptive advertising;

7              b.    California restraint of trade (violation of Cartwright Act);

8              c.    false advertising under California law;

9              d.    trade libel and disparagement of goods under California law;

10             e.    California unfair competition;

11             f.    patent misuse; and

12             g.    intentional interference with economic advantage.

13       17.    Central to Nu-kote's allegations against HP is that HP allegedly engaged in a campaign

14   of "fear, uncertainty, and doubt" ("FUD") designed to encourage HP resellers to steer customers away

15   from inkjet refill products, and to dissuade customers from purchasing and using inkjet refill products.

16       18.    HP vigorously contested the factual allegations of the Nu-kote Counterclaim and

17   contended that those allegations were groundless and false. Those facts, however, if true, would have

18   triggered indemnity coverage under CIGNA's policy and the allegations, even though not true,

19   triggered a duty by CIGNA to defend HP in the underlying Nu-kote matter because CIGNA expressly

20   agreed in the Master Policy to defend "any suit" against HP which contained potentially covered

21   claims. The CIGNA Master Policy expressly promised to defend HP even though the allegations and

22   "suits" against HP may be "groundless, false and fraudulent."

23       19.    Following a jury trial, a verdict was entered on July 22, 1999 in favor of HP and against

24   Nu-kote as to all the Nu-kote counterclaims.

25       20.    On December 3, 1999, the *Nu-kote* Action was finally resolved through a complete,

26   confidential settlement favorable to HP. Nu-kote dismissed its appeal of the verdict in favor of HP and

27   received no payment for its counterclaim.

28       21.    Because the CIGNA Master Policy expressly covers claims or suits for damages

10191-003-4/08/2002-128398.3                6                COMPLAINT FOR BREACH OF CONTRACT
                                                             AND BREACH OF IMPLIED COVENANT

Case 5:07-cv-04676-JW    Document 19-8    Filed 12/17/2007    Page 33 of 53
Case 5:99-cv-20207-JW    Document 472    Filed 08/10/2007    Page 35 of 52

Case 5:02-cv-01847-JW    Document 1    Filed 04/17/2002    Page 7 of 15

1    occurring in the course of HP's advertising activities and "arising out of . . . unfair competition" during

2    the policy period and within the policy territory, CIGNA owed HP a duty of defense with respect to the

3    Nu-kote counterclaim.  Because CIGNA owed HP a defense to the Nu-kote counterclaim, it was

4    obligated to provide HP with a defense to the entirety of that counterclaim under applicable California

5    law, and could not seek to limit that defense obligation in any way until after the Nu-kote counterclaim

6    concluded and then only if it had actually defended.

7                **HP's Tender and CIGNA's Unreasonable Refusal to Defend**

8    **HP's Tender of Defense**

9         22.     By letters dated February 23, 1998 and June 13, 1998, HP tendered the defense of the

10    Nu-kote counterclaim to CIGNA.

11         23.     Rather than provide a defense to HP as to Nu-kote's counterclaim, even under a

12    reservation of rights, CIGNA unreasonably delayed for years, claiming that it was still "investigating."

13    **CIGNA Violated Insurance Regulations Requiring**
      **Prompt Communication and Determination of Claims**

14

15         24.     California Code Regs. title 10, § 2695.7 (2001), applicable to CIGNA, requires that

16    insurers make a prompt determination of every claim, including a prompt decision on a request for

17    defense of a lawsuit. The regulations set the following requirements:

18              (b)      Upon receiving proof of claim, **every insurer . . . shall**
             immediately, but **in no event more than forty (40) calendar days later,**

19              **accept or deny the claim . . . .**

20              (c)(1)   **If more time is required** than is allotted in subsection
             2695.7(b) . . . then, **every insurer shall provide the claimant . . .**

21              **written notice of the need for additional time** [and] shall **specify any**
             **additional information the insurer requires** in order to make a

22              determination and state any continuing reasons for the insurer's inability
             to make a determination.

23                                * * *
             (d)     **No insurer shall persist in seeking information not**

24              **reasonably required** for or material to the resolution of a claim dispute.
             [Emphasis added.]

25

26         25.     CIGNA failed to comply with the insurance regulation in that it failed to accept or deny

27    HP's claim within forty calendar days, it failed to provide written notice of additional time required, it

28

Case 5:07-cv-04676-JW　　Document 19-8　　Filed 12/17/2007　　Page 34 of 53
Case 5:99-cv-20207-JW　　Document 472　　Filed 08/10/2007　　Page 36 of 52

Case 5:02-cv-01847-JW　　Document 1　　Filed 04/17/2002　　Page 8 of 15

1  failed to specify additional information required for a determination of the claim, and it persisted in

2  seeking information not reasonably required for or material to the resolution of the dispute.

3  　　　　26.　　California Code Regs. Title 10, § 2695.5 (2001), applicable to CIGNA, requires that

4  insurers acknowledge receipt of notice of a claim, provide a claimant with any necessary forms, and

5  begin investigation of a claim, all within fifteen days of receiving notice:

6  　　　　　　　　　　(b)　　Upon receiving any communication from a claimant,
　　　　　　　　　　　　　regarding a claim, that reasonably suggests that a response

7  　　　　　　　　　　　　is expected, every licensee shall immediately, **but in no
　　　　　　　　　　　　event more than fifteen (15) calendar days after receipt**

8  　　　　　　　　　　　　**of that communication,** furnish the claimant with a
　　　　　　　　　　　　complete response based on the facts as then known by the

9  　　　　　　　　　　　　licensee. . . .

10  　　　　　　　　　　(e)　　Upon receiving notice of claim, every insurer . . . shall
　　　　　　　　　　　　　immediately, **but in no event more than fifteen (15)**

11  　　　　　　　　　　　　**calendar days later,** do the following unless the notice of
　　　　　　　　　　　　claim received is a notice of legal action:

12  　　　　　　　　　　　　(1)　　acknowledge receipt of such notice to the claimant

13  　　　　　　　　　　　　　　　unless payment is made within that period of
　　　　　　　　　　　　　　time. . . .

14  　　　　　　　　　　　　(2)　　provide to the claimant necessary forms, instructions,
　　　　　　　　　　　　　　　and reasonable assistance, including but not limited

15  　　　　　　　　　　　　　　to, specifying the information the claimant must
　　　　　　　　　　　　　　provide for proof of claim;

16  　　　　　　　　　　　　(3)　　begin any necessary investigation of the claim.

17  　　　　　　　　[Emphasis added.]

18  　　　　27.　　CIGNA failed to comply with the insurance regulation in that it failed to provide HP

19  with a complete response to HP's notice of claim within fifteen days, failed to acknowledge receipt of

20  HP's notice of claim within fifteen days, failed to provide HP with forms or reasonable assistance

21  within fifteen days, and failed to begin investigation of HP's claim within fifteen days, even though

22  CIGNA purportedly believed that an investigation was necessary.

23  　　　　　　　　**HP Successfully Sues CIGNA for Declaratory Relief
　　　　　　　　on the Duty to Defend, but CIGNA Still Pays Nothing**

24

25  **HP Files Suit For Declaratory Relief**

26  　　　　28.　　By February 1999, it was clear that CIGNA had no intention of announcing its coverage

27  decision without substantial delay.　A full year had passed since HP first tendered the Nu-kote

28  counterclaim to CIGNA, but CIGNA refused to defend and insisted that it was still "investigating."　By

Case 5:07-cv-04676-JW   Document 19-8   Filed 12/17/2007   Page 35 of 53
Case 5:99-cv-20207-JW   Document 472   Filed 08/10/2007   Page 37 of 52
Case 5:02-cv-01847-JW   Document 1   Filed 04/17/2002   Page 9 of 15

1   this point, defense costs and attorneys' fees incurred by HP in the *Nu-kote* Action amounted to many

2   millions of dollars.

3         29.    On February 18, 1999 HP sought judicial intervention to remedy CIGNA's refusal to

4   acknowledge its duty to defend by filing a complaint in Santa Clara County, California Superior Court

5   requesting a declaration that CIGNA had a duty to defend HP against Nu-kote's counterclaim and a

6   duty to reimburse HP for the defense costs it actually incurred.  The case brought by HP against

7   CIGNA seeking declaratory relief is referred to as "the Coverage Action" throughout this complaint.

8         30.    On March 11, 1999, CIGNA removed the Coverage Action from state court to the

9   United States District Court for the Northern District of California.  The Coverage Action, which is still

10   pending, is captioned "*Under Seal v. Under Seal*," Case No. C-99-20207 JW.  The case was assigned to

11   the Honorable Spencer Williams and after his retirement was reassigned to the Honorable James Ware.

12         31.    CIGNA had received sufficient documentation to determine coverage by June 13, 1998

13   including copies of the counterclaim and implicated advertising materials.  CIGNA received access to

14   and obtained copies of all other available documentation it desired by April 13, 1999.  CIGNA

15   repeatedly confirmed that it did not want or need any confidential material from the *Nu-kote* Action.

16   Nevertheless, CIGNA refused to defend HP and claimed years afterward that it was still

17   "investigating."

18   **Partial Summary Judgment Entered Finding**
      **CIGNA Had A Duty To Defend**

19

20         32.    On August 24, 1999, Judge Spencer Williams entered an "Order Granting Plaintiff's

21   Motion for Summary Adjudication."  Judge Williams found that CIGNA had a duty to defend the Nu-

22   kote counterclaims.  Judge Williams' order expressly held that coverage under the "policy territory"

23   provision of CIGNA's Master Policy had been satisfied by Nu-kote's allegations: "Because Nu-kote

24   could possibly claim damages to domestic business based, at least in part, on HP's extraterritorial acts,

25   the Court finds that the Policy Territory requirement is satisfied."

26         33.    Judge Williams' August 24, 1999 Order held that "HP has demonstrated that the Nu-

27   kote Counterclaim contains claims potentially covered by the CIGNA Policy.  CIGNA has not

28

Case 5:07-cv-04676-JW     Document 19-8     Filed 12/17/2007     Page 36 of 53
Case 5:99-cv-20207-JW     Document 472     Filed 08/10/2007     Page 38 of 52
Case 5:02-cv-01847-JW     Document 1     Filed 04/17/2002     Page 10 of 15

1   demonstrated that the Nu-kote Counterclaim cannot fall within the Policy coverage. Accordingly, HP's

2   motion for summary adjudication is GRANTED."

3       34.    Despite Judge Williams' determination that CIGNA had a duty to defend HP in the *Nu-*

4   *kote* Action, CIGNA still refused to defend HP or reimburse it for any defense costs incurred in the *Nu-*

5   *kote* Action. More than thirty-two months after the order finding a duty to defend, CIGNA completely

6   refused to defend and it has paid nothing towards HP's defense.

**CIGNA's Conduct in the Coverage Action Reveals its
Strategy of Bad-Faith Delay and Obfuscation**

7

8

9       35.    CIGNA's conduct throughout the pendency of the Coverage Action has delayed a

10  judicial resolution as to the amount of defense costs CIGNA owes HP for the *Nu-kote* Action.

11      36.    Throughout the still-pending Coverage Action, CIGNA has made unreasonable

12  arguments and misrepresentations to the court regarding such matters as: (1) the potential existence of

13  other applicable insurance when CIGNA knew that there was none; (2) CIGNA's ability to assert

14  certain defenses such as HP's alleged violation of the cooperation clause as complete bars to coverage

15  even though such defenses were no longer available after the court held that CIGNA had a duty to

16  defend HP; (3) that HP purportedly withheld information required by CIGNA to make a coverage

17  determination; (4) that HP failed to provide sufficient information to allow CIGNA to determine fees

18  and costs expended to defend against Nu-kote's counterclaims; (5) that all potentially covered claims

19  against HP were resolved in HP's favor before trial of Nu-kote's counterclaims; (6) that CIGNA is a

20  "defending insurer" in relation to HP 's claims concerning the *Nu-kote* Action; and (7) that CIGNA still

21  has the ability to argue that coverage is barred entirely under a late notice defense. CIGNA has and

22  continues to take other unreasonable positions and make other misrepresentations in the Coverage

23  Action, and this list is not exclusive.

**CIGNA's Strategy of Delay Is Further Revealed
by its Refusal to Review Documents from Nu-kote
That it Previously Insisted Were Necessary to
Make its Coverage Determination**

24

25

26

27      37.    CIGNA's early responses to HP's requests for a defense in the *Nu-kote* Action

28  consistently demanded that HP provide CIGNA with virtually every pleading and every document

1   produced in discovery in *Nu-kote*. CIGNA insisted that it required this information before it could

2   make any determination as to coverage.

3       38.     Approximately 4.7 million pages of discovery documents were produced in the *Nu-kote*

4   Action. HP took steps to obtain judicial modification of the protective order in the *Nu-kote* Action so

5   that it could provide certain confidential documents to CIGNA even before the case was tried. Once

6   the case was settled, HP was in a position to offer CIGNA access to all of the documents produced in

7   *Nu-kote*, and did so in writing at least as early as March 11, 1999. In that letter, HP offered to make

8   available to the approximately 4.7 million pages of documents.

9       39.     HP has repeated its offer to make the documents produced in *Nu-kote* available to

10  CIGNA in writing at least twice following HP's March 11, 1999 offer.

11      40.     CIGNA has never accepted HP's offer to make the documents produced in *Nu-kote*

12  available to CIGNA. CIGNA conceded that it did not want to spend the money necessary to obtain

13  copies of the documents.

14      41.     HP confirmed in writing on at least two instances that CIGNA had declined its offer to

15  provide the documents produced in *Nu-kote*. HP's first letter confirming CIGNA's rejection of HP's

16  offer was sent to CIGNA on April 14, 1999. Another confirming CIGNA's rejection of HP's offer was

17  sent to CIGNA on April 30, 1999.

18                                  **FIRST CLAIM**

19                               **(Breach of Contract)**

20      42.     HP incorporates the foregoing paragraphs as though fully set forth here.

21      43.     CIGNA had an obligation, under the insurance policy, to defend HP against Nu-kote's

22  counterclaims.

23      44.     At the time of its initial tender in February 1999, HP provided CIGNA with sufficient

24  information and documentary evidence to establish a potential for coverage of Nu-kote's counterclaim

25  under the CIGNA Master Policy, which triggered CIGNA's duty to defend.

26      45.     CIGNA breached its duty to defend by refusing to accept HP's defense, and instead

27  demanding access to confidential documents that HP could not provide without violating a protective

28  order entered by the court in the *Nu-kote* Action.

Case 5:07-cv-04676-JW     Document 19-8     Filed 12/17/2007     Page 38 of 53
Case 5:99-cv-20207-JW     Document 472     Filed 08/10/2007     Page 40 of 52
Case 5:02-cv-01847-JW     Document 1     Filed 04/17/2002     Page 12 of 15

46.     CIGNA's breach of contract continued even after the United States District Court repeatedly ruled that CIGNA had a duty to defend HP against Nu-kote's counterclaims.  CIGNA continued to deny that it had a duty to defend, and has completely refused to reimburse HP for any defense costs incurred in the *Nu-kote* Action.

47.     CIGNA's breach of contract has and continues to cause economic damage to HP, in an amount to be established at trial.

**SECOND CLAIM**

**(Breach of the Covenant of Good Faith and Fair Dealing)**

48.     HP incorporates the foregoing paragraphs as though fully set forth here.

49.     A duty of good faith and fair dealing is implied by law in every insurance policy issued in California.  This duty requires CIGNA to act fairly and in good faith in discharging its contractual obligations to HP, prohibits CIGNA from doing or failing to do anything which will impair HP's right to receive benefits owed under the policy, and requires CIGNA to consider HP's interests equally with its own. The good faith performance of CIGNA's obligations under the CIGNA Master Policy calls for faithfulness to the agreed common purpose under the policies, consistent with HP's reasonably justified expectations.  Among the duties imposed by the covenant of good faith and fair dealing is the duty to defend immediately and fully, not to misrepresent any facts or law related to coverage issues, and – when a conflict of interest arises – to appoint independent counsel and pay reasonable rates actually paid by the insurer to competent counsel with substantial intellectual property defense experience litigating similar matters in Southern California.

50.     CIGNA put its own financial interests above HP's rights under the CIGNA Master Policy and unreasonably frustrated HP's rights and reasonable expectations to receive benefits under the CIGNA Master Policy.

51.     CIGNA's unreasonable and improper conduct includes, but is not limited to its:

        a.     Failure and refusal to timely or reasonably respond to HP's tender of defense;

        b.     Failure and refusal to defend HP against Nu-kote's counterclaim or reimburse HP for such defense costs, notwithstanding the CIGNA Master Policy's express coverage for "unfair competition," the fact that Nu-kote's counterclaim

specifically alleged claims for "unfair competition," and the fact that CIGNA's obligation to defend such claims under the "advertiser's liability" coverage of the CIGNA Master Policy is well-established under California law;

c.  Failure and refusal to defend HP against Nu-kote's counterclaim or reimburse HP for such defense costs, notwithstanding the fact that HP has expressly advised CIGNA of the factual allegations by Nu-kote and law that establish CIGNA defense obligation;

d.  Failure and refusal to participate in settlement negotiations during the pendency of the *Nu-kote* Action even though HP had provided it with sufficient information to determine that a potential for coverage existed under the Master Policy;

e.  Forcing HP to retain defense counsel at HP's own expense, notwithstanding CIGNA's contractual obligation to fund HP's entire defense against Nu-kote's counterclaim;

f.  Failure and refusal to defend HP against Nu-kote's counterclaim or reimburse HP for such defense costs even though the United States District Court for the Northern District of California repeatedly ruled that CIGNA had a duty to defend HP in the *Nu-kote* Action;

g.  Delaying its coverage determination in violation of its obligations under the Master Policy and those imposed by California Code of Regulations, Title 10 § 2695.7, which required CIGNA to accept or deny HP's claim regarding the *Nu-kote* Action within forty calendar days of receiving proof of such claim, and unreasonably insisting on information that was not required for resolution of HP's claim, also in violation of that regulation;

h.  Failing to acknowledge HP's claim in a timely fashion, provide assistance to HP to resolve the claim in a timely fashion, and begin investigation of HP's claim in a timely fashion in violation of its obligations under the Master Policy and those

Case 5:07-cv-04676-JW     Document 19-8     Filed 12/17/2007     Page 40 of 53
Case 5:99-cv-20207-JW     Document 472     Filed 08/10/2007     Page 42 of 52

Case 5:02-cv-01847-JW     Document 1     Filed 04/17/2002     Page 14 of 15

1    imposed by California Code of Regulations, Title 10 § 2695.5, which required

2    CIGNA to do so within fifteen days of receiving HP's notice of claim;

3    i.    Making numerous misrepresentations throughout the duration of the Coverage

4         Action solely for the purpose of delaying or wrongfully avoiding its obligation to

5         reimburse HP for defense costs incurred in the *Nu-kote* Action;

6    j.    Refusal to pay the reasonable costs of accessing documents produced in the *Nu-*

7         *kote* Action that it previously insisted were critical to making any coverage

8         determination regarding HP's claim;

9    k.    Forcing HP to retain coverage counsel to obtain the policy benefits due and

10        owing under the CIGNA Master Policy; and,

11   l.    Delaying resolution of the Coverage Action by such tactics as bringing motions

12        to challenge the Special Master's interim rulings even though such motions were

13        expressly prohibited by the trial court.

14   52.    As a direct and proximate result of CIGNA's breach of the implied duty of good faith

15   and fair dealing, HP has suffered substantial damages.  HP was forced to hire attorneys to pursue

16   coverage litigation and has been required to pay all Nu-kote defense costs.  HP is entitled to an award

17   of damages from CIGNA, including, but not limited to, reimbursement of all past, present and future

18   amounts incurred to investigate and defend the Nu-kote Counterclaim, including attorneys' fees and

19   costs incurred to obtain the benefits owed under the policies (*see Brandt v. Superior Court*, 37 Cal. 3d

20   813 (1985)), prejudgment interest and all other consequential costs in an amount to be proven at trial.

21   53.    In addition, HP is entitled to an award of exemplary damages against CIGNA because its

22   wrongful actions described above were done with malice or oppression within the meaning of

23   California Civil Code § 3294, which defines "malice" as "conduct which is intended by the defendant

24   to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful

25   and conscious disregard of the rights or safety of others, and defines "oppression" as "conduct that

26   subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."  CIGNA's

27   conduct warrants an award of exemplary damages in part because it undertook the above-described

28   actions solely for the purpose of delaying its contractual obligation to provide HP with a defense to the

1  Nu-kote counterclaim even though there was and could not be a genuine dispute as to coverage under

2  the CIGNA Master Policy.  Moreover, CIGNA continued to consciously disregard HP's contractual

3  right to a defense against Nu-kote's counterclaim even after HP obtained a judicial determination that it

4  had a such a right.  Rather than honor HP's right to a defense, CIGNA undertook dilatory and

5  groundless legal positions in the Coverage Action in further disregard of HP's rights.  CIGNA's

6  conduct, which included making false representations to the court in the Coverage Action, is yet

7  additional evidence of its oppressive and malicious conduct.

**Jury Trial Demanded**

8

9  54.   Plaintiff HP demands a jury trial in this matter.

**PRAYER FOR RELIEF**

10

11  WHEREFORE, HP prays for judgment against CIGNA as follows:

**On the First Cause of Action for Breach of Contract**

12

13  1.   For general, incidental and consequential damages, according to proof;

14  2.   For pre-judgment interest;

15  3.   For costs of suit herein incurred; and

16  4.   For such other and further relief as the court deems proper.

**On the Second Cause of Action for Breach of the
Implied Covenant of Good Faith and Fair Dealing**

17

18

19  5.   For general, incidental and consequential damages, according to proof;

20  6.   For attorneys' fees and costs of defense of the *Nu-kote* Action;

21  7.   For exemplary damages;

22  8.   For costs of suit herein incurred; and

23  9.   For such other and further relief as the court deems proper.

24  Dated: April __16__, 2002            **GAUNTLETT & ASSOCIATES**

25

26                          By: _____
                                  David A. Gauntlett
27                                  James A. Lowe
                                  Attorneys for Plaintiff
                                  HEWLETT-PACKARD COMPANY
28

**Exhibit G**



NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |
|---|---|
| HEWLETT-PACKARD COMPANY,<br><br>      Plaintiff,<br><br>  v.<br><br>ACE PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>      Defendant.<br>_____/ | NO. C 99-20207 JW<br><br>**ORDER RE CROSS-MOTIONS TO MODIFY SPECIAL MASTER'S ORDER ON SUBMITTED MATTERS; DENYING ACE'S MOTION FOR RECONSIDERATION; GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS ON SPECIAL MASTER'S MARCH 31, 2003 ORDER ON DAMAGES; SETTING CASE MANAGEMENT CONFERENCE** |

This is an insurance coverage dispute between Hewlett Packard Company ("HP") and ACE Property & Casualty Insurance Company ("ACE"). HP contends that ACE breached its duty to defend HP in an underlying lawsuit entitled HP v. Nu-kote (hereinafter "the Nu-kote litigation"). Judge Williams determined that ACE had breached its duty to defend and thereafter appointed Special Master Peter Stone pursuant to Rule 53, Fed.R.Civ.P., for the "[c]omputation and determination of amounts due to HP from [ACE], in accordance with the relief sought by HP in this lawsuit in connection with the defense of the Nu-kote action." Judge Williams' order provided that the Special Master "shall make a detailed report to the Court, and his report shall specifically make necessary findings of the determination of amounts due to HP including reasonable attorneys' fees and costs."

United States District Court
For the Northern 1 of California

1    The Special Master has submitted several reports and orders in the course of this lawsuit.

2    Presently before the Court are the following: ACE's motion to modify the March 31, 2003 Order on

3    Submitted Matters; HP's motion to reject the Special Master's Order on Submitted Matters; ACE's

4    motion for reconsideration based upon the Hameid decision; HP's motion for an order approving

5    reports of the Special Master regarding damages; and ACE's motion to reject or modify the reports

6    of the Special Master regarding damages.

7    The Court conducted a hearing in the above-captioned matter on October 23, 2003. The

8    Court has reviewed the Special Master's orders and reports in accordance with Rule 53(e)(2),

9    Fed.R.Civ.P. Factual findings were reviewed under the clearly erroneous standard. Fed.R.Civ.P.

10    53(e). Legal rulings were reviewed de novo. Cook v. Niedert, 142 F.3d 1004, 1010 (7th Cir. 1998).

11    Based upon all papers filed to date and the comments of counsel at the hearing, the Court orders as

12    follows.

13    A. HP's Motion to Reject Special Master's Order on Submitted Matters

14    HP's motion to reject the Special Master's Order on Submitted Matters is DENIED. The

15    Court has carefully reviewed the record that was before the Special Master when he imposed

16    $260,000 in sanctions against HP and finds that the sanctions are well supported by the facts and the

17    applicable law.

18    In May of 2001, ACE propounded requests to HP seeking copies of all the billings and

19    invoices of HP's defense counsel in the Nu-kote litigation. Request No. 1 sought "[a]ll WRITINGS

20    which reflect, refer to, relate to, or evidence billings, statements, or invoices from attorneys retained

21    by YOU relating to the UNDERLYING ACTION and which are requested by YOU in YOUR Prayer

22    for Relief." Request No. 6 sought "[a]ll WRITINGS which reflect, relate to, refer to, or evidence all

23    payments made by YOU for legal services, costs, experts, and/or consultants in the UNDERLYING

24    ACTION and which are requested by YOU in YOUR Prayer for Relief." HP asserted the attorney-

25    client privilege as to some entries in the billing records, but agreed to produce "copies of defense

26    billing statements submitted to HP for the Nu-kote case, from which privileged time entry

27    descriptions have been redacted." Thereafter, HP produced documents which appeared to be defense

28

2

1 billing statements with redactions.

2  In June of 2001, ACE moved to compel production of documents because of the redactions.

3 The Special Master found that HP had waived its privilege and placed the billings at issue by seeking

4 reimbursement of the fees and costs expended in the Nu-kote action.  In October 2001, the Special

5 Master granted ACE's motion to compel and specifically ordered HP to produce, among other

6 things, attorney billings. In response to the October 2001 order, HP produced copies of what

7 appeared to be actual bills that HP had received from defense counsel in the Nu-kote litigation. HP

8 described its production as "copies of the full billing invoices in the Nu-kote case." HP now

9 describes this production as database records that were prepared based on the invoices from outside

10 counsel and HP's payment records.  HP intended to and actually did rely on the database records at

11 the damages hearing.

12  In May of 2002, however, it was discovered that the so-called "copies of the full billing

13 invoices" were not actual billing invoices.  HP does not appear to deny that it failed to produce

14 actual billing invoices.  The Special Master then ordered HP to produce copies of actual bills.  On

15 May 15, 2002, HP produced copies of all the original invoices for the first time.

16  In short, ACE's request for production of documents clearly called for production of actual

17 bills.  Given what is at stake in this lawsuit, it is inconceivable to this Court that counsel for HP

18 failed to provide the actual bills immediately upon being served with ACE's request for production

19 of documents, and without the necessity of an order.  Thereafter, the Special Master's order of

20 October 2001 required production of actual bills.  Again, given what is at stake in this lawsuit, there

21 is no reasonably justification other than bad faith for HP's failure to provide actual bills after the

22 Special Master's October 2001 order.  The Court also infers bad faith from the evidence cited by the

23 Special Master, including among other things, evidence that the fake bills were created to appear to

24 be real invoices, and that certain billing codes were modified to provide less detail.

25  The Special Master carefully tailored the sanction against HP to only reasonable fees and

26 costs "incurred in reviewing the documents produced on October 8, 2001, and comparing the

27 documents produced in May 2002 with the October 2001 production." Special Master Order at pp.

28

3

United States District Court
For the Northern District of California

18-19. ACE provided the Special Master with declarations establishing the reasonable expenses, including attorneys' fees, consultants' fees, and experts' fees, caused by HP's violation of the October order. HP contends, however, that it was denied due process because it was not given an opportunity to depose ACE's attorneys and experts with respect to their declarations. The Court finds no due process violation. HP was afforded all the due process required under the law. ACE's declarations were sufficiently detailed for the Special Master to assess reasonableness. Further, the Special Master conducted a hearing on the issue of sanctions.

Incredibly, HP also contends it should not be sanctioned because regardless of whether HP had produced the originals earlier, ACE would still have had to undertake a comparison of the October 2001 documents and the May 2002 documents. The argument is patently frivolous.

In summary, this Court has reviewed the pertinent record de novo and finds that it fully supports the reasonableness of the sanctions imposed against HP, except to the extent the Special Master apparently made a mathematical error. The total sanction award is accordingly reduced to $184,597.50.

B. Ace's Motion to Modify The March 31, 2003 Order on Submitted Matters

Ace moves for dismissal or other punitive sanctions based upon HP's failure to produce actual bills and the Special Master's finding that HP engaged in willful misconduct. The motion is DENIED. The Court's de novo review of the Special Master's factual findings and legal conclusions leads to the inescapable conclusion that HP engaged in willful misconduct, however, monetary sanctions are an appropriate less drastic alternative to the sanctions requested by ACE. Furthermore, the Court is concerned that imposing any sanction more drastic than monetary sanctions would unfairly prejudice HP for conduct which appears to be attributable to its counsel, Gauntlett & Associates.

C. Ace's Motion for Reconsideration

Ace moves for reconsideration of this Court's March 4, 2003 insofar as the Court rejected Ace's argument that coverage could be conclusively negated on the theory that HP's package insert was not covered "advertising." Ace's motion for reconsideration is premised on

4

the California Supreme Court's decision in <u>Hameid v. National Fire Ins.</u>, 31 Cal.4th 16 (2003),

which issued after the Court's March 4, 2003 order.[1] The Court DENIES the motion for

reconsideration. In <u>Hameid</u>, the California Supreme Court clarified that for purposes of a

comprehensive general liability policy, "advertising" means "widespread promotional activities

usually directed to the public at large." <u>Id.</u> at 24. The <u>Hameid</u> decision, however, does not

conclusively negate coverage. The <u>Hameid</u> decision did not address the issue before this Court:

whether a package insert in a product that is distributed and sold worldwide is "advertising." Indeed,

the <u>Hameid</u> decision expressly declined to address the question of "whether widespread promotional

activities directed at specific market segments constitute advertising under the CGL policy." <u>Id.</u> at

24, n. 3. Arguably, HP's package insert is widespread promotional activity directed at a specific

market segment. Therefore, the Court denies the motion for reconsideration.

### D.  Cross-Motions Re Special Master's Order on Damages

HP moves for an order approving the report of the Special Master dated March 31, 2003 in

which the Special Master recommended that HP be reimbursed by its insured ACE for (1) HP's

outside counsel fees incurred for its defense of the Nu-kote action in the sum of $17,818,167.05; (2)

HP's in-house legal services incurred for its defense of the same action in the sum of $1,117,430.00;

and (3) HP's costs incurred for its defense of the same action in the sum of $9,483,074.67, all in the

total principal amount of $28,418,671.72. The Special Master further found that HP is entitled to

prejudgment interest. HP moves for an order approving the March 31, 2003 report. ACE moves for

an order rejecting or modifying the Special Master's report. ACE contends that the Special Master

committed legal and factual errors. Most fundamentally, however, ACE contends that the Special

Master committed legal error in imposing a legal presumption against ACE that deemed all expenses

incurred in the prosecution of HP's claims against Nu-kote to constitute defense expenses. ACE

requests that the Court hold a case management conference to determine whether to re-submit the

---

[1] Both parties raise additional arguments in support of and against coverage. The parties, however, did not seek and were not granted leave to raise any issue other than the "advertising" issue raised in <u>Hameid</u>.

5

1  damages issue to the Special Master with further instructions as to the law or to proceed to trial.

2  <u>1. Fees and Costs Associated With HP's Affirmative Claims</u>

3      The Special Master's stated the applicable law as follows: "when the insurer breaches its duty

4  to defend, the insured then must prove by a preponderance of evidence the existence and amount of

5  the expenses, which are then presumed to be reasonable and necessary as defense costs. [citation]

6  Such defense costs may include expenses incurred in prosecuting affirmative claims under

7  appropriate circumstances. Once the insured meets its burden, it is the breaching insurer's burden to

8  prove by a preponderance of evidence that the expenses are unreasonable or unnecessary to the

9  defense." Special Master's Report at p.25. Applying this analytical framework, the Special Master

10  concluded that HP was entitled to all fees and costs associated with its affirmative claims.

11      The Court has reviewed the numerous case citations relied upon by the Special Master and

12  the parties and concurs with the Special Master's statement of the applicable law, including the

13  standard of proof, governing the central issue in this case. In <u>State of California v. Pacific Indemnity</u>

14  <u>Company</u>, 63 Cal.App.4th 1535 (1998), the State of California ("State") brought an action under the

15  Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §9601 et seq.,

16  (CERCLA) against numerous defendants. The defendants filed counterclaims against the State

17  alleging that the State was responsible for the contamination. The State's insurer refused to defend

18  the counterclaims. The State sued for declaratory relief, breach of contract and breach of the

19  covenant of good faith and fair dealing. In ruling on a summary judgment motion, the trial court

20  held that the insurer had a duty to defend against the counterclaims. In a court trial, the State argued,

21  among other things, that the prosecution of the CERCLA complaint and defense of the counterclaims

22  were inextricably intertwined. The State's attorneys' bills did not separate time spent between

23  prosecuting and defending the action and did not describe the specific work performed by the

24  attorneys. The trial court found in favor of the State.

25      On appeal, the insurer argued that it should not be responsible for the expenditures incurred

26  by the State for prosecuting the CERCLA action. The State acknowledged that its attorneys' bills

27  did not distinguish between prosecution and defense expenses, but argued that the tasks involved in

28                          6

prosecuting were inextricably linked to those involved in defending. Because it was not possible to separate expenses, the appellate court found the burden of proof critical. The appellate court, relying upon Aerojet-General Corp. v. Transport Indemnity Co., 17 Cal.4th 38, 64 (1997), announced the rule of law applied by the Special Master in this case: when an insurer has breached its duty to defend, it is the insured that must carry the burden of proof on the existence and amount of the expenses, which are then presumed to be reasonable and necessary as defense costs; and further, that it is the insurer that must carry the burden of proof that they are in fact unreasonable or unnecessary. The appellate court then held that the State had met its burden when it demonstrated that all of its work "related to the defense"; that the insured provided no evidence to rebut the claim; and therefore the insured had failed to demonstrate that any specific expense was either unreasonable or unnecessary to the defense. Id. at 1549.

Another case from this District, Larkin v. ITT Hartford, 1999 WL 459351 (N.D. Cal. 1999), also supports the rule of law announced in the Pacific Indemnity case discussed above. In Larkin, the insured, owners of real property, entered into a contract with a developer for the construction of a commercial complex. Later, the insured discovered contamination on the property and filed suit against former tenants seeking recovery of clean up costs. The former tenants cross-claimed alleging that the insured had caused the contamination. In another action, the developer filed suit against the insured and the former tenants for negligence, trespass, misrepresentation, waste, unjust enrichment, indemnity and equitable relief. The insured asked its insurer to pay for the prosecution of its lawsuit against the former tenants, and to pay for the defense against the developer's lawsuit. The insured did not request a defense against the tenants' cross-claims. In pertinent part, the insurer did not respond to the insured's request for prosecution expenses, but agreed to participate in the defense of the developer's lawsuit against the insured.

The insured filed an insurance bad faith case against the insurer. The case proceeded to a bench trial. The insured argued that the insurer was required to pay for the prosecution because it was "defensive in nature." Larkin at *6. The insured reasoned that the purpose of its lawsuit was to hold the former tenants responsible for the contamination on the property, and therefore the lawsuit

7

United States District Court
For the Northern i
of California

United States District Court

For the Northern   of California

1   "facilitated and aided" defense of the developer's lawsuit. Id.  The insured's defense in the

2   developer's lawsuit was based on proving that the former tenants –and not the insured – were

3   responsible for the contamination.

4   The court held that the insured did not have a duty to fund the prosecution of the insured's

5   case against the former tenants. The court reasoned that the insured had not cited to a single case in

6   which an insurer was held to have a duty to fund the prosecution of a separate action for damages in

7   which the insured is a plaintiff. Id.  The court stated that it "declines to extend California law to

8   create a duty to pay litigation expenses incurred in prosecuting an action for damages on the ground

9   that a finding in favor of the plaintiff in that damages action might be used by the plaintiff to

10  successfully defend a separate lawsuit." Next, the court found that the insured's prosecution of its

11  lawsuit against the former tenants did not meet the Aerojet, supra, test.  In particular, the court found

12  that all prosecution costs were not "reasonable and necessary" to the insured's defense of the

13  developer's lawsuit.  The court nonetheless stated that some of the actions taken in the prosecution

14  of the insured's lawsuit may have been reasonable and necessary to the defense of the developer's

15  lawsuit. The court also stated that the burden of identifying those prosecution actions that were also

16  reasonable and necessary to the defense lied with the insured.  Notably, however, the insurer in

17  Larkin did not breach its duty to defend.

18  In summary, this Court need look no further than the Pacific Indemnity and Larkin cases to

19  find the proper analytical framework to apply in the circumstances of this case:  when the insurer

20  breaches its duty to defend, the insured must prove by a preponderance of evidence the existence and

21  amount of the expenses, which are then presumed to be reasonable and necessary as defense costs.

22  The defense costs may include expenses incurred in prosecuting affirmative claims under appropriate

23  circumstances.  Once the insured meets its burden, it is the breaching insurer's burden to prove by a

24  preponderance of evidence that the expenses are unreasonable or unnecessary to the defense.[2]  The

25

26      [2] In the proceedings before the Special Master, HP apparently argued that after it meets its
burden of proof, ACE must present "undeniable evidence" that HP's prosecution expenses were
27  unreasonable or unnecessary. The Court finds that the preponderance of evidence applies based

28                                                      8

multi-million dollar question remains, of course, whether the evidence supports the Special Master's determination that HP is entitled to reimbursement of all expenses incurred in prosecution of its claims against Nu-kote. The Court reviews this matter de novo.

With respect to HP's initial burden, the Court finds that HP submitted sufficient evidence from which a trier of fact could conclude, by a preponderance of evidence, the existence and amount of the expenses. The parties stipulated that HP "actually paid the costs and outside counsels' fees in the underlying Nu-kote litigation in the amounts alleged by HP at the damages hearing and as shown in summary reports already in evidence." HP presented evidence that the stipulated amounts all related to and were necessary to the defense of the Nu-kote counterclaims. Mr. Blecher, Mr. Cooper, Mr. Marshall, Mr. Pecau, Mr. Sullivan, and others provided ample testimony on the issue. Therefore, a trier of fact could properly apply the presumption against ACE. It is at this point in the analysis, however, that the Court disagrees with the Special Master's analysis.

The Court finds that a trier of fact could reasonably conclude, by a preponderance of the evidence, that a portion of HP's expenses were unnecessary to the defense of the Nu-kote counterclaims. An expense is "necessary" only if the expense "would be conducted against liability by a reasonable insured under the same circumstances." Aerojet at 62 and 63; see also Barratt American, Inc. v. Transcontinental Insurance Company, 102 Cal.App.4th 848 (2002); Larkin at *19 ("The question is whether the action taken, here the prosecution of the Larkin action, 'would be conducted against liability by a reasonable insured under the same circumstances.'"). In other words, an expenses is unnecessary if the expense would not have been conducted against liability by a reasonable insured under the same circumstances.

In this case, a trier of fact could reasonably conclude that ACE presented a preponderance of evidence that some of HP's expenses were unnecessary to the defense of Nu-kote's counterclaims. First, there is evidence from HP itself. During the underlying lawsuit between HP and Nu-kote, HP argued before this Court that "the vast majority of Nu-kote's anti-trust allegations are not

---

upon Aerojet, supra, and Buss v. Superior Court, 16 Cal.4th 35 (1997).

9

United States District Court

For the Northern   of California

1    inextricably related to the patent, trademark and false advertising, unfair competition issues in this

2    case." HP prevailed on this argument and this Court allowed HP's affirmative claims to proceed

3    before the anti-trust claims.  Second, ACE  presented the testimony of Professor Menell, who

4    essentially opined that there was a clear dividing line between prosecution expenses and defense

5    expenses.  Professor Menell testified that the claims in the underlying suit remained legally distinct.

6    Third, Robert Rose also testified that HP's prosecution claims and Nu-kote's counterclaims were

7    separate.  Fourth, Craig Aronson also testified that he could separate out expenses related to HP's

8    prosecution claims.  Implicit in each of these witnesses' testimony is that certain prosecution related

9    expenses are severable from the defense expenses, and thus clearly unnecessary to the defense.  That

10   the three witnesses may not have used the terms necessary, unnecessary, reasonable or unreasonable

11   to label expenses does not mean that their testimony is inadequate to carry ACE's burden of proof.

12   Their testimony provides circumstantial evidence from which a trier of fact could reasonably infer,

13   by a preponderance of evidence, that portions of HP's prosecution expenses were wholly

14   unnecessary to its defense.

15            In light of the Court's determination above, it would be premature to address the remaining

16   issues raised by the parties regarding (1) the reasonableness of HP's billing practices; (2) HP's in-

17   house counsel fees; and (3) pre-judgment interest.  The Court sets a case management conference for

18   January 26, 2004 at 10:00 a.m. to discuss the procedure and schedule for final resolution of all issues

19   remaining in the case.  The parties shall file a joint case management conference no later than

20   January 16, 2004 outlining a proposed procedure and schedule.

21

22   Dated:  November 2?, 2003

                                            JAMES WARE
                                            United States District Judge
23

24

25
     99cv20207smJ3103
26

27

28                                              10

THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN MAILED TO:

Thomas M. Correll
Janelle F. Garchie
Correll, Garchie & Edwards LLP
550 West C Street, Suite 500
San Diego, Ca 92101-3540

Alan E. Greenberg
Lewis, D'Amato, Brisbois & Bisgaard LLP
550 West C Street, Suite 800
San Diego, Ca 92101-3540

David A. Gauntlett
James A. Lowe
Gauntlett & Associates
18400 Von Karman, Suite 300
Irvine, Ca 92612

Peter G. Stone
JAMS
160 West Santa Clara Street, Suite 1050
San Jose, Ca 95113

Dated: November 24, 2003

Richard W. Wieking, Clerk

By: _____
Ronald L. Davis
Courtroom Deputy

United States District Court
For the Northern   of California