1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 214383)
   *jal@gauntlettlaw.com*
3  Andrew M. Sussman (SBN 112418)
   *ams@gauntlettlaw.com*
4  Kory S. Booth (SBN 188960)
   *ksb@gauntlettlaw.com*
5  18400 Von Karman Avenue, Suite 300
   Irvine, California  92612
6  Telephone:  (949) 553-1010
   Facsimile:  (949) 553-2050
7
   Attorneys for Plaintiff
8  HEWLETT-PACKARD COMPANY

9

10                    **UNITED STATES DISTRICT COURT**

11        **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

12

13

14  HEWLETT-PACKARD COMPANY, a          )   Case No.: 07-CV-04676-JW (RSx)
    Delaware corporation,               )
15                                      )   Hon. James Ware
                     Plaintiff,         )
16                                      )   **PLAINTIFF'S OPPOSITION TO**
            vs.                         )   **DEFENDANT'S MOTION TO DISMISS**
17                                      )   **PER FED. R. CIV. P. RULE 12(b)(6) AND**
    ACE PROPERTY AND CASUALTY           )   **MOTION TO STRIKE PER FED. R. CIV. P.**
18  INSURANCE COMPANY, a Pennsylvania   )   **RULE 12(f)**
    corporation,                        )
19                                      )   DATE:      March 10, 2008
                     Defendant.         )   TIME:      9:00 a.m.
20  _____    )   CTRM:      8

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I. SUMMARY OF ARGUMENT .................................................................................. 1

II. HIGH STANDARD TO OBTAIN DISMISSAL UNDER FED. R. CIV. P.
12(b)(6) .................................................................................................................... 3

III. ACE HAS NOT SHOWN THE STATUTE OF LIMITATIONS APPLIES
HERE ........................................................................................................................ 4

    A. Federal, Not State, Rules of Procedure Govern When an Action Is
Terminated for Statute of Limitations Purposes ............................................ 4

    B. *Lambert* Does Not Establish that HP's Suit Was Untimely ........................... 5

        1. *Lambert* Is Inapposite and Not Controlling .................................... 5

        2. Applying the Rationale of *Lambert* Leads to a Different Result
Here .................................................................................................. 6

        3. HP's Bad Faith Claim Is Timely Under the *Lambert* Rule ............. 7

    C. HP's Claim Is Timely Under the "Continuing Wrong" Doctrine .................. 8

    D. HP's Claim Is Timely Even Absent the "Continuing Wrong" Doctrine .......... 10

        1. ACE's Conduct Became Entirely Unreasonable After Court Order ....... 10

        2. Independently Unreasonable Conduct Brings Claim Within the
Statute .............................................................................................. 10

IV. ACE HAS FAILED TO ESTABLISH THAT COMMUNICATIONS THAT
ARE EVIDENCE OF BAD FAITH ARE BARRED BY THE LITIGATION
PRIVILEGE ............................................................................................................ 11

V. THE "GENUINE ISSUE" RULE IS NOT APPLICABLE AS A MATTER OF
LAW AND DID NOT RELIEVE ACE OF ITS DUTY TO DEFEND HP IN ANY
EVENT ..................................................................................................................... 12

    A. The Scope of the "Genuine Issue" Doctrine Is Narrow ................................ 12

    B. The Genuine Issue Rule Is Not a Defense to a Bad Faith Failure to Defend ....... 13

    C. No Genuine Issue Exists Regarding the Policy Territory Provision ................... 16

        1. ACE's Unenforceable Territory Provision Makes ACE's
Argument Unreasonable .................................................................. 16

        2. Even If "Advertising Injury" Coverage Must Fall Within an
"Occurrence," Nu-kote's Claims Fell Squarely Under the Policy's
Territory Provision As This Court Has Repeatedly Found ................... 17

        3.     ACE's Failure to Consider Extrinsic Evidence in Its Coverage Analysis Makes Its Uninformed Coverage Analysis Unreasonable........... 19

D.    No Possible "Genuine Issue" As to Coverage for "Unfair Competition" ............ 20

        1.     Defense Required Where Nu-kote *Expressly* Alleged Unfair Competition............................................................................................. 20

        2.     Facts Alleged Also Established Unfair Competition Elements ................. 22

E.    No Genuine Issue on "Advertising Activities" Where False Advertising Alleged ...................................................................................................... 23

F.    No Genuine Issue Excuses ACE's Delay in Paying Defense Expenses ................. 24

VI.    THE COURT SHOULD DENY ACE'S MOTION TO STRIKE HP'S CLAIM FOR FEES AND PUNITIVE DAMAGES; HP HAS PROPERLY PLED A CLAIM FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING ....................................................................................................... 26

A.    Motions to Strike Are Disfavored ................................................................. 26

B.    HP's Request for *Brandt* Fees Is Appropriate As an Item of Damages ............... 28

C.    Specific Factual Allegations Support an Award of Punitive Damages ................. 28

VII.    CONCLUSION............................................................................................. 29

**TABLE OF AUTHORITIES**

**Page(s)**

**FEDERAL CASES**

*American Cas. Co. v. Krieger,*
    181 F.3d 1113 (9th Cir. 1999) ............................................................. 12

*Bell Atlantic Corp. v. Twombly,*
    ___ U.S. ___, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ..................... 4

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft,*
    49 F. Supp. 2d 750 (D.N.J. 1999) ....................................................... 21

*Curtis-Universal, Inc. v. Sheboygan Emerg. Med. Servs., Inc.,*
    43 F.3d 1119 (7th Cir. (Wis.) 1994) .................................................... 22

*Empresa Cubana Del Tabaco v. Culbro Corp.,*
    478 F. Supp. 2d 513 (S.D.N.Y. 2007) ................................................... 5

*Erickson v. Pardus,*
    ___ U.S. ___, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) ................... 3

*Guebara v. Allstate Ins. Co.,*
    237 F.3d 987 (9th Cir. 2001) ............................................................... 15

*In re Hassanally,*
    208 B.R. 46 (9th Cir. BAP (Cal.) 1997) ........................................... 8, 10

*Lockary v. Kayfetz,*
    587 F. Supp. 631 (N.D. Cal. 1984) .................................................. 8, 10

*Lunsford v. American Guar. & Liab. Ins. Co.,*
    18 F.3d 653 (9th Cir. 1994) ................................................................. 12

*Maynard v. City of San Jose,*
    37 F.3d 1396 (9th Cir. (Cal.) 1994) ...................................................... 9

*Nesovic v. United States,*
    71 F.3d 776 (9th Cir. (Cal.) 1995) ........................................................ 9

*Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of New York,*
    484 F. Supp. 1375 (D. Del. 1980) ......................................................... 8

*PAE Gov't Servs., Inc. v. MPRI, Inc.,*
    ___ F.3d ___, 2007 WL 4394427 (9th Cir. 2007) ............................ 4, 27

*Perkins v. Allstate Ins. Co.,*
    63 F. Supp. 2d 1164 (C.D. Cal. 1999) ................................................. 20

*Simmons v. John F. Kennedy Medical Ctr.,*
    727 F. Supp. 440 (N.D. Ill. 1989) ....................................................... 26

*Spell v. McDaniel,*
   591 F. Supp. 1090 (E.D.N.C. 1984)................................................27

*Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.,*
   832 F.2d 1037 (7th Cir. (Ill.) 1987)................................................22

*United States v. Redwood City,*
   640 F.2d 963 (9th Cir. 1981)................................................3

### STATE CASES

*American Cyanamid Co. v. American Home Assur. Co.,*
   30 Cal. App. 4th 969 (1994)................................................13

*Archdale v. American Int'l Specialty Lines Ins.,*
   154 Cal. App. 4th 449 (2007)................................................4

*Atlantic Mut. Ins. Co. v. J. Lamb, Inc.,*
   100 Cal. App. 4th 1017 (2002)................................................19, 24

*Bank of the West v. Superior Court,*
   2 Cal. 4th 1254 (1992)................................................20, 21, 22

*Beck v. State Farm Mut. Auto. Ins. Co.,*
   54 Cal. App. 3d 347 (1976)................................................11

*Brandt v. Superior Court,*
   37 Cal. 3d 813 (1985)................................................5, 28

*Buss v. Superior Court,*
   16 Cal. 4th 35 (1997)................................................3, 15, 26

*CNA Cas. of Cal. v. Seaboard Sur. Co.,*
   176 Cal. App. 3d 598 (1986)................................................21, 22

*Century Surety Co. v. Polisso,*
   139 Cal. App. 4th 922 (2006)................................................3, 13

*Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.,*
   90 Cal. App. 4th 335 (2001)................................................9, 15

*Cross v. Bonded Adjustment Bureau,*
   48 Cal. App. 4th 266 (1996)................................................8

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.,*
   11 Cal. 4th 376 (1995)................................................21

*Diodes, Inc. v. Franzen,*
   260 Cal. App. 2d 244 (1968)................................................21

*El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.,*
   92 Cal. App. 4th 205 (2001)................................................19

*Essex Ins. Co. v. Five Star Dye House, Inc.,*
   38 Cal. 4th 1252 (2006)................................................28

*Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.,*
    94 Cal. App. 4th 842 (2001).................................................................................17

*Gray v. Zurich Ins. Co.,*
    65 Cal. 2d 263 (1966)...............................................................................3, 13

*Hameid v. National Fire Ins. of Hartford,*
    31 Cal. 4th 16 (2003).................................................................................24

*Henderson v. United States Fid. & Guar. Co.,*
    346 N.C. 741 (1997)..................................................................................21

*Hogan v. Midland Nat'l Ins. Co.,*
    3 Cal. 3d 553 (1970)...................................................................................3

*Hughes v. Blue Cross of Northern California,*
    215 Cal. App. 3d 832 (1989).......................................................................28

*Lambert v. Commonwealth Land Title Ins. Co.,*
    53 Cal. 3d 1072 (1991).........................................................................5, 6, 8

*Montrose Chem. Corp. v. Superior Court (Canadian Universal Ins. Co., Inc.),*
    6 Cal. 4th 287 (1993)............................................................................13, 14

*Neal v. Farmers Ins. Exch.,*
    21 Cal. 3d 910 (1978)..........................................................................11, 29

*Polaris Indus., L.P. v. Continental Ins. Co.,*
    539 N.W.2d 619 (Minn. Ct. App. 1995)........................................................21

*Polygram Records, Inc. v. Superior Court,*
    170 Cal. App. 3d 543 (1985).......................................................................21

*Prichard v. Liberty Mutual Ins. Co.,*
    84 Cal. App. 4th 890 (2000).........................................................................8

*Pugliese v. Superior Court,*
    146 Cal. App. 4th 1444 (2007)...............................................................8, 9, 10

*Richardson v. Allstate Ins. Co.,*
    117 Cal. App. 3d 8 (1981).............................................................................5

*Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.,*
    148 Cal. App. 4th 620 (2007)......................................................................14

*Safeco Ins. Co. v. Robert S.,*
    26 Cal. 4th 758 (2001)...............................................................................17

*Scottsdale Ins. Co. v. MV Transp.,*
    36 Cal. 4th 643 (2005).........................................................................15, 26

*Smyth v. USAA Prop. & Cas. Ins. Co.,*
    5 Cal. App. 4th 1470 (1992).....................................................................5, 7

*Tucson Airport Authority v. Certain Underwriters at Lloyd's, London,*
  186 Ariz. 45 (Ct. App. 1996) ................................................................................ 12

*Waller v. Truck Ins. Exch.,*
  11 Cal. 4th 1 (1995) .............................................................................................. 20

*White v. Western Title Ins. Co.,*
  40 Cal. 3d 870 (1985) ........................................................................... 1, 6, 9, 11, 12

*Wilson v. 21st Century Ins. Co.,*
  42 Cal. 4th 713 (2007) ................................................................................ 3, 16, 25

*Wyatt v. Union Mortgage Co.,*
  24 Cal. 3d 773 (1979) ............................................................................................ 10

## DOCKETED CASES

*Concept Enterprises, Inc. v. Hartford Ins. Co. of the Midwest,*
  No. CV 00-7267 NM (JWJx), 2001 WL 34050685 (C.D. Cal. May 21, 2001) .............. 11, 26

*Eli Lilly & Co. v. American Cyanamid Co.,*
  No. IP95-0536-C-B/S, 2001 WL 30191 (S.D. Ind. Jan. 8, 2001) .............................. 21

*Longs Drug Stores California, Inc. v. Federal Ins. Co.,*
  No. C 03-01746 JSW, 2005 WL 2072296 (N.D. Cal. Aug. 26, 2005) ...................... 25

*Tosoh SET v. Hartford Fire Ins. Co.,*
  No. A111641, 2007 WL 1242172 (Cal. Ct. App. (1st Dist.) April 30, 2007) ............... 14, 23

## STATE STATUTES

CAL. CIV. CODE § 47(b) ..................................................................................... 11, 27, 28

CAL. CIV. CODE § 3294 ........................................................................................... 28

## FEDERAL RULES AND STATUTES

15 U.S.C. § 1125(a) (Lanham Act § 43(a)) ...................................................................... 22

FED. R. APP. P. 41 ......................................................................................................... 8

FED. R. APP. P. 41(a) ..................................................................................................... 5

FED. R. CIV. P. 8(a)(2) ................................................................................................... 3

FED. R. CIV. P. 12(b)(6) ............................................................................... 1, 3, 27, 28

FED. R. CIV. P. 12(f) ...................................................................................... 1, 26, 27

FED. R. CIV. P. 58 .......................................................................................................... 8

FED. R. CIV. P. 58(a) ..................................................................................................... 5

FED. R. CIV. P. 58(b)(1) ................................................................................................. 7

FED. R. CIV. P. 58(c)(2) ........................................................................................ 5

**MISCELLANEOUS**

BLACK'S LAW DICTIONARY (6th ed. 1990) .......................................................... 21

COUCH ON INSURANCE § 236:102 (3d ed. updated December 2007) ..................... 8

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION, § 1:10
    (4th ed. 1998) ................................................................................................ 20

J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION, *Lanham Act
    § 43(a) and False Advertising,* § 27:24 (Rel. 43, 9/2007)............................... 22

PROSSER & KEETON ON TORTS § 130 (5th ed. 1984)................................... 20, 21

5 WRIGHT AND MILLER, FEDERAL PRACTICE & PROCEDURE § 1380 (1969)..................... 27

1    Hewlett-Packard Company opposes ACE Property and Casualty Insurance Company's

2   motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and Motion to Strike pursuant to Rule 12(f).

3   **I.    SUMMARY OF ARGUMENT**

4    There is no basis for ACE's motion to dismiss or strike. All the legal issues argued by ACE

5   have been repeatedly rejected by this Court in the underlying coverage case,[1] finding a duty to

6   defend and entering judgment for substantial breach of contract damages. *Res judicata* prevents a

7   relitigation of the same meritless arguments here. ACE's statute of limitations argument fails

8   because HP not only filed its bad faith case within two years of the conclusion of the underlying *Nu-*

9   *kote* Action[2] but also because ACE's bad faith conduct has been continuing even to today, keeping

10   the statute tolled. ACE's litigation privilege argument fails because **HP refers to litigation**

11   **communications, only to the limited extent that they are evidence of bad faith conduct,**

12   including a decade long delay in paying defense expenses.

13    HP's complains that ACE breached its covenant of good faith and fair dealing in two

14   principal ways: unreasonable delay in paying policy benefits (defense expenses) and unreasonable

15   claims handling over the course of many years. The First Amended Complaint ("FAC") lists

16   numerous events from 1998 through 2008 as evidence of ACE's course of conduct over the decade

17   during which the breach has occurred. The individual events are not alleged to *be* the bad faith but

18   are rather evidence of the larger bad faith conduct of delaying payment and improper claims

19   handling. **This use is expressly permitted under California law.**[3] For example, even a partial

20   payment of defense expenses was delayed for five years (and three years after the *Nu-kote* case was

21   over) while ACE forced HP to respond to unnecessary requests for documents and spurious legal

22   and factual arguments. And for example, ACE failed to reasonably evaluate information provided to

23   it and ignored multiple court orders finding ACE had a duty to defend. The long and unprecedented

24   insurer stall tactics included unreasonably forcing HP to spend millions of dollars in procuring its

25   ―――――――――――

26    [1]*Hewlett-Packard Company v. ACE Property & Casualty Insurance Company*, Case No. C-99-20207 JW (N.D. Cal.).

27    [2]*Hewlett-Packard Company v. Nu-kote International, Inc.*, Case No. C-94-20647-JW (N.D. Cal.).

28    [3]*White v. Western Title Ins. Co.*, 40 Cal. 3d 870, 893 (1985).

contract benefits. The litigation privilege does not immunize ACE conduct, its delays and its improper claims handling. The litigation privilege is not a curtain behind which an insurer can commit bad faith with impunity. The facts of ACE's conduct are proper evidence of its strategy of unreasonable delay, denial and claims handling. Instead of defending immediately and then seeking reimbursement rights, ACE litigated year after year, ignored evidence establishing its duty to defend and ignored repeated court orders.

Even if ACE had a genuine dispute about ultimate coverage (indemnity for the Nu-kote counterclaims—and it did not), the law still required ACE to defend meaningfully, immediately and entirely and would have given it reimbursement rights for any payments that were later found to be outside its policy obligations; ACE could surely obtain reimbursement from an insured like HP. But it stalled, delayed and denied benefits. Even if ACE had a colorable reason to delay paying for a defense despite the tender in June 1998, ACE could not reasonably continue delaying defense payments (1) after this Court held August 24, 1999 that it had a duty to defend because of the potential for coverage, (2) or after June 19, 2000 when the Court denied ACE's motion for reconsideration because ACE could not "explain what sort of evidence could conclusively establish that the Cigna policy did not apply," (3) or after May 1, 2001 when the Court denied ACE's request for certification of immediate appeal, (4) or after October 10, 2002 when the Court adopted the Special Master's determination that no summary judgment in the *Nu-kote* case negated ACE's duty to defend, that ACE could "not negate the possibility that false advertising and disparaging advertising allegations could not trigger a defense, and that ACE's duty to defend continued through the *Nu-kote* case, (5) or after March 4, 2003 when the Court denied another ACE MSJ finding again that ACE had a duty to defend, rejecting its policy territory argument (again), and rejecting its advertising argument (again), (6) or after November 25, 2003 or October 14, 2004 when the Court twice affirmed ACE's duty to pay defense expenses including prosecution expenses, (7) or after July 31, 2007 when the Court adopted the Special Master's finding that ACE owed defense expenses exceeding $28 million, (8) or after August 22, 2007 when the Court entered judgment against ACE for the principal amount of $28 million. A jury can decide when ACE's bad faith began and if it ever ended. All factual allegations are relevant to the necessary determinations about the good faith and

1    reasonableness of ACE's delays and claims handling.

2    ACE's various arguments about its alleged "genuine disputes" are irrelevant to the bad faith

3    failure to defend or delay in providing a defense because no case supports a genuine dispute defense

4    in this context.[4]  But even if the doctrine applied to a duty to defend case, the California Supreme

5    Court has recently emphasized that the genuine dispute doctrine requires that any such dispute must

6    be made in good faith and must be reasonable.[5]  For ten years ACE has ignored the facts, this

7    Court's orders and California's requirement that it defend a potentially covered suit meaningfully,

8    immediately, and entirely.[6]  ACE cannot create a genuine dispute and delay payment of benefits by

9    **ignoring this Court's orders for over nine years.**  Even if an insurer could avoid a duty to defend

10   by raising a "genuine issue" (which the law does not permit), any uncertainty about ACE's duty to

11   defend was put to rest by the August 24, 1999 order and the many subsequent orders. Failure to

12   accept the rulings ACE sought from this Court is, by itself, an unprecedented example of bad faith.

13   ## II.    HIGH STANDARD TO OBTAIN DISMISSAL UNDER FED. R. CIV. P. 12(b)(6)

14   A Fed. R. Civ. P. 12(b)(6) dismissal is properly granted only in "extraordinary" cases.[7]  ACE

15   cannot meet the standard for dismissal. Rule 12(b)(6) tests only the legal sufficiency of the claims

16   stated in the complaint.

17   In its review the court must identify any cognizable claims, and dismiss any claims which are

18   frivolous, malicious, fail to state a claim upon which relief may be granted, or seek monetary relief

19   from a defendant who is immune from such relief.  Federal Rule of Civil Procedure 8(a)(2) requires

20   only "a short and plain statement of the claim showing that the pleader is entitled to relief."

21   "Specific facts are not necessary; the statement need only " ' "give the defendant fair notice of what

22   the ... claim is and the grounds upon which it rests." ' "  *Erickson v. Pardus*, ___ U.S. ___, ___, 127

23   S. Ct. 2197, 2200, 167 L. Ed. 2d 1081 (2007).  Although in order to state a claim a complaint "does

---

24   [4]*Century Surety Co. v. Polisso*, 139 Cal. App. 4th 922, 963 (2006).

25   [5]*Wilson v. 21st Century Ins. Co.*, 42 Cal. 4th 713, 723 (2007) ("A *genuine* dispute exists only
26   where the insurer's position is maintained in good faith and on reasonable grounds." (emphasis in
     original)).

27   [6]*Buss v. Superior Court*, 16 Cal. 4th 35, 49 (1997); *Hogan v. Midland Nat'l Ins. Co.*, 3 Cal. 3d
     553, 563-64 (1970); *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966).

28   [7]*United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

1   not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his

2   'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the

3   elements of a cause of action will not do. . . . Factual allegations must be enough to raise a right to

4   relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct.

5   1955, 1964-65, 167 L. Ed. 2d 929 (2007) (citations omitted).  A complaint must proffer "enough

6   facts to state a claim to relief that is plausible on its face." *Id.* at 1975.  Even contradictory

7   allegations do not permit relief under any Rule of Federal Procedure.[8]

8   **III.    ACE HAS NOT SHOWN THE STATUTE OF LIMITATIONS APPLIES HERE**

9          **A.    Federal, Not State, Rules of Procedure Govern When an Action Is Terminated
                   for Statute of Limitations Purposes**

10

11         ACE's statute of limitations arguments are based on convenient but incorrect dates for the

12  termination of the underlying *Nu-kote* Action.[9]  ACE relies on *Archdale v. American Int'l Specialty*

13  *Lines Ins.*, 154 Cal. App. 4th 449, 479 (2007) for the proposition that the tolling period ends for a

14  case in California state courts when the action is "finally determined on appeal . . . ."  (Memo 8:21-

15  25)  Though ACE recognizes the FAC alleges the Nu-kote Action was dismissed on April 26, 2000,

16  it claims the allegation is "incorrect and of no moment" because the Court had "merely performed

17  [a] clerical task."  (Memo 9)  Not so. ACE's argument incorrectly relies on California state

18  procedure concerning finality of a judgment. After an appeal California procedure provides that a

19  judgment becomes final on the date that a state court of appeals issues a remittitur to the lower court.

20  **Under federal procedure, however, a judgment after appeal does not become final until the**

21  **court of appeals' mandate is entered on the civil docket in the district court.** So even under

22  ACE's *Lambert* argument, the filing of the bad faith case was within the two-year statute of

23  _____

24         [8]*PAE Gov't Servs., Inc. v. MPRI, Inc.*, ___ F.3d ___, 2007 WL 4394427, at *3 (9th Cir. 2007)
    ("The short of it is that **there is nothing in the Federal Rules of Civil Procedure to prevent a**
25  **party from filing successive pleadings that make inconsistent or even contradictory**
    **allegations.**" (emphasis added)).

26         [9]ACE first asserts that the two-year tolling period began to run on April 5, 2000 when the U.S.
    Court of Appeals for the Federal Circuit dismissed the appeal.  Alternatively it relies on an allegation
27  about a settlement agreement in an earlier bad faith complaint to argue that the tolling period ran on
    December 22, 1999.    ACE admits that HP initially filed its bad faith claim April 17, 2002.
28  (Memorandum Supporting Motion to Dismiss ("Memo") 9:19)

1   limitations.

2     Fed. R. App. P. 41(a) provides the court of appeals' mandate returning the case to the district

3   court "consists of a certified copy of the judgment, a copy of the court's opinion, if any, and any

4   direction about costs." Fed. R. Civ. P. 58(a) requires that "every judgment and amended judgment

5   must be set out in a separate document . . . ." Critically, under Fed. R. Civ. P. 58(c)(2) the

6   "judgment is entered . . . when the judgment is entered in the civil docket."[10] The Federal Circuit

7   Court of Appeals' mandate "order[ing] that the [appeal] be dismissed" under F.R.A.P. 42(b) [see

8   HP's contemporaneously filed Request for Judicial Notice, **Exhibit "102"**] was not a judgment and

9   did not result in final termination of the *Nu-kote* action until the district court clerk entered the

10  judgment in the civil docket on April 26, 2000, **less than two years prior** to the filing of HP's bad

11  faith lawsuit.

12    **B.**  ***Lambert* Does Not Establish that HP's Suit Was Untimely**

13      **1.**  ***Lambert* Is Inapposite and Not Controlling**

14    ACE's reliance on *Lambert v. Commonwealth Land Title Ins. Co.*, 53 Cal. 3d 1072, 1074

15  (1991) is misplaced.[11] In *Lambert* the insured's contract damages (its defense costs) had all occurred

16  as soon as the underlying lawsuit ended. In stark contrast, **HP's principal tort damages from**

17  **ACE's bad faith delay continued into 2008,** well after the bad faith suit was first filed (its attorney

18  fees incurred to compel payment of policy benefits).[12] HP will continue to be damaged until the

19  coverage suit concludes and, arguably, during the period of appeal that ACE promises. In cases

20  involving continuing duties, the limitations period does not commence until the full extent of

---

[10]*Empresa Cubana Del Tabaco v. Culbro Corp.*, 478 F. Supp. 2d 513, 517-19 (S.D.N.Y. 2007) (A Court of Appeals mandate is not deemed entered until it is entered in the civil docket by the District Court. The district court held that the Second Circuit's mandate directing that the case be "remanded for entry of an order dismissing all remaining claims" was deemed entered on the date on which the District Court clerk entered the judgment in the civil docket.).

[11]ACE relies on other inapposite case law. *Smyth v. USAA Prop. & Cas. Ins. Co.*, 5 Cal. App. 4th 1470, 1477 (1992) applied the two-year statute to the date on which the insurer simply denied the existence of a policy. *Richardson v. Allstate Ins. Co.*, 117 Cal. App. 3d 8, 14 (1981) held a suit arising from denial of medical benefits was "timely filed" over three years after the causative event. **Neither case alleged ongoing bad faith conduct in delaying payments, as here.**

[12]*Brandt v. Superior Court*, 37 Cal. 3d 813 (1985).

1   damages are capable of being made certain, not simply upon infliction of *any* appreciable harm.[13]

2   *Lambert* was *not* a bad faith case but instead concerned the statute of limitations for a breach

3   of contract claim alleging a failure to defend at a discrete point in time.  Further, *Lambert's* only

4   concern was "when a cause of action against a title insurer alleging a failure to defend accrues" and

5   whether the limitations period is equitably tolled during the underlying lawsuit.  But the wrongful

6   conduct alleged here is *not* simply ACE's failure to defend but rather ACE's unreasonable (and

7   ongoing) delay in paying defense expenses.

8              **2.    Applying the Rationale of *Lambert* Leads to a Different Result Here**

9   Moreover, applying *Lambert's* reasoning leads to a different result here because of different

10  facts.  *Lambert*, 53 Cal. 3d at 1077, held that a claim for breach of the contractual duty to defend

11  accrues when the insurer refuses to defend but that the limitations period is then immediately tolled

12  through the final resolution of the underlying lawsuit because the contractual duty to defend

13  continues until the underlying suit is resolved.  If not, the time to sue could expire on a duty that was

14  still ongoing – an untenable result.  *Id.*

15  **Here, ACE's tortious conduct did not end** when the contractual obligation to defend was

16  concluded and the damages reduced to judgment.  ACE's duty to deal with HP fairly and in good

17  faith – i.e., not to unreasonably delay the payment of policy defense benefits – continues as long as

18  the duty to pay exists and ACE has not paid.  The Supreme Court clarified decades ago that the duty

19  of good faith and fair dealing continues through a coverage suit and bad faith may be proved by

20  litigation conduct.[14]  As in *Lambert*, the limitations period should not expire before the insurer's

21  

----

22  [13]*Lambert*, 53 Cal. 3d at 1079-80.

    [14]*White*, 40 Cal. 3d at 895-96:

23      Defendant first contends that all evidence relating to events after plaintiffs filed suit
        should have been excluded on the ground that, once suit has been filed, the insurer
24      stands in an adversary position to the insured and no longer owes a duty of good faith
        and fair dealing.  The issue is one of first impression. . . . We believe, however, that
25      the issue can be resolved as a matter of principle.  **It is clear that the contractual
        relationship between insurer and the insured does not terminate with
26      commencement of litigation. . . . It could not reasonably be argued** under such
        circumstances either **that the insurer** no longer owes any contractual duties to the
27      insured, or that it **need not perform those duties fairly and in good faith**. . . . The
        policy of encouraging prompt investigation and payment of insurance claims would
28      be undermined by defendant's proposed rule.

1　　duty expires, nor before the insured's damages have stopped accruing.

2　　　　　**3.　　HP's Bad Faith Claim Is Timely Under the *Lambert* Rule**

3　　　　　Even assuming ACE's argument from *Lambert* were correct (it is not), HP's bad faith claim

4　　is timely.  The *Nu-kote* suit ended on April 26, 2000 when the court entered a final judgment from

5　　the Court of Appeals.[15]  That two-year period[16] did not expire until April 26, 2002 when the district

6　　court entered the final judgment under Fed. R. Civ. P. 58(b)(1).  But HP filed its initial bad faith suit

7　　on April 17, 2002 [FAC ¶ 228], rendering it timely.

8　　　　　HP and ACE entered into a tolling agreement as a condition to HP's agreeing to dismiss its

9　　initial bad faith action [FAC ¶¶ 228-232], tolling any statute of limitation and time-based defense

10　　until the suit is re-filed.  [Complaint ¶¶ 229, 231; **Exhibit "98"** at p. 1] ("[A]ny applicable statute of

11　　limitation or defense based on time which has not run or expired prior to the original filing of the

12　　[bad faith] Action, shall be tolled . . . .").]

13　　　　　While the *Lambert* court at times says tolling ceases upon a "final judgment" in the

14　　underlying case, a closer reading reveals that tolling ceases only upon complete resolution of the

15　　underlying suit, whether that be by a final judgment or by a dismissal of any appeal.  *Lambert*

16　　describes the statute being tolled "until the duty to defend has expired," "until the underlying lawsuit

17　　is concluded," until "time for complete performance has passed," "until resolution of the underlying

18

---

19　　　　　Defendant argues that imposing a duty of good faith after litigation has begun
20　　will make it difficult for the insurer to defend the suit.  It claims that investigation of
　　　　the factual circumstances would be hampered by an obligation to reveal to the insured
21　　any material facts it discovers favorable to his claim, and that the attorney who
　　　　prepares the case for trial could not conduct the trial because he would be a critical
22　　witness to the insurer's good faith during the pretrial period.   Neither of these
　　　　concerns, however, justifies a distinction between the period before suit is filed and
23　　the period after it is filed.  Certainly the insurer should have investigated the factual
　　　　basis of the claim before suit is filed, and may well have utilized counsel to evaluate
24　　that claim.  **The issue of contractual liability can be tried separately, and prior to
　　　　the trial on the good faith claim, as was done in the present case.  In any event,
25　　what constitutes good faith and fair dealing depends on the circumstances of
　　　　each case, including the stage of the proceedings and the posture of the parties.**
26　　We trust that the jurors will be aware that parties to a lawsuit are adversaries, and will
　　　　evaluate the insurer's conduct in relation to that setting.  [Emphasis added.]

27　　　　[15][First Amended Complaint for Breach of the Implied Covenant of Good Faith and Fair Dealing
　　　　("FAC") ¶ 21]

28　　　　[16]*See also Smyth*, 5 Cal. App. 4th at 1477.

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS AND MOTION TO STRIKE
No. 07-CV-04676-JW (RSx)

1  claim," and similar phrases. *Lambert*, 53 Cal. 3d at 1077-78, 1081. The *Lambert* court uses the

2  phrase "final judgment" occasionally because there was no appeal in *Lambert*, so the underlying

3  case (and the duty to defend) was over upon first entry of the judgment.

4      The *Nu-kote* action was not over until the Court of Appeals issued its mandate, pursuant to

5  Fed. R. App. P. 41, following Nu-kote's appeal [FAC ¶¶ 121, 128], returning jurisdiction to the

6  district court, and that order was entered as a judgment on the docket as required by Fed. R. Civ. P.

7  58. *Lambert*, 53 Cal. 3d at 1077, explains the limitations period on a lawsuit to vindicate a duty does

8  not expire before the duty itself expires.[17] ACE's duty to pay defense costs has not yet expired.

9      **C.  HP's Claim Is Timely Under the "Continuing Wrong" Doctrine**

10     HP's bad faith suit alleges a "continuing wrong" – ACE's delay in paying defense expenses

11 and continuing damages from 1998 through 2008, forcing HP to incur significant attorneys' fees to

12 obtain those policy benefits. Ordinarily, a cause of action accrues when, under the substantive law,

13 the wrongful act is completed and the defendant's liability arises, upon the occurrence of the last fact

14 essential to the cause of action.[18] But "where a tort involves a continuing wrong, the statute of

15 limitations does not begin to run until the date of the last injury or when the tortious acts cease."[19]

16     The California Supreme Court has characterized an insurer's ongoing refusal to pay policy

17 benefits in bad faith through litigation as a "continuing wrong." Other jurisdictions have found that

18 the continuing wrong doctrine in a statute of limitations context applies to the tort of bad faith delay.

19     In *Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of New York*, 484 F. Supp. 1375,

20 1379-80, 1388, 1390 (D. Del. 1980), the court rejected the insurer's limitations defense under the

21

22 [17]*See Prichard v. Liberty Mutual Ins. Co.*, 84 Cal. App. 4th 890, 903-904 (2000); COUCH ON
   INSURANCE § 236:102 (3d ed. updated December 2007) ("[T]he duty to defend is necessarily a
   continuing one that commences upon notice of the claim and extends at least until judgment is
23 entered and all appeals from it have been resolved.").

24 [18]*In re Hassanally*, 208 B.R. 46, 50 (9th Cir. BAP (Cal.) 1997) (Under California law, "a civil
   action ordinarily accrues when the wrongful act is done and liability arises, i.e., upon the occurrence
25 of the last fact essential to the cause of action."); *Cross v. Bonded Adjustment Bureau*, 48 Cal.
   App. 4th 266, 280 (1996) (same).

26 [19]*Pugliese v. Superior Court*, 146 Cal. App. 4th 1444, 1452 (2007) (wife's domestic violence
   cause of action did not accrue until husband's last act of domestic violence although he abused her
27 throughout 13-year marriage). *See also Lockary v. Kayfetz*, 587 F. Supp. 631, 635-36 (N.D. Cal.
   1984) (federal law) (" '[W]here a continuous chain of events or course of conduct is involved, the
28 cause of action accrues at the time of the final act in that series of events or course of conduct.' ").

1  continuing wrong doctrine and found the delay, a continuing wrong, tolled the limitations period.

2      [I]t argues that the statute began to run on [bad faith] upon the performance by the
       defendant of the **first actions evidencing bad faith**. . . . Plaintiff, on the other hand,
3      takes the position that the **statute has not yet begun to run on** either the **"bad faith"**
       or the failure to defend **claims, since the injuries complained of have been**
4      **continuing ones and continue even today** in the state court litigation. . . . This Court
       is convinced that **plaintiff's position is the proper one**. . . . In the case of a
5      **continuing tort**, Delaware courts have held that where there is a continuing injury
       whose damages cannot be determined until the cessation of the wrong, the **statute of**
6      **limitations begins to run** no earlier than the **last date of that wrong.**

7  (Emphasis added.)  ACE continued through litigation and to this day in refusing to pay benefits.

8      *White*, 40 Cal. 3d at 891:

9      But **where an insurer has unreasonably and in bad faith withheld payment of**
       **benefits due under a policy** prior to litigation, **and then continues this bad faith**
10     **conduct after a complaint is filed**, there seems to be no compelling reason why the
       right to recover for **that continuing wrong** should terminate either because the
11     insurer decides to file a preemptive action for declaratory relief or because the
       insured, under the compulsion of the insurer's recalcitrance, decides to file suit
12     himself. . . . **[T]he insurer's covenant of good faith and fair dealing does not**
       **perish with the onset of litigation** . . . .  [Emphasis added; Justice Grodin
13     concurring.]

14     ACE's continuing delay tactics alleged here, like the insurer's delay in *Cannon*, is a

15  continuing wrong involving " 'repeated instances or continuing acts of the same nature, as for

16  instance, repeated acts of sexual harassment or repeated discriminatory employment practices.' "[20]

17  HP has alleged a continuing wrong[21] – a continuous series of related acts over a period of nine years

18  that, when viewed as a whole, collectively demonstrates ACE's objective of unreasonable claims

19  handling and delay in paying policy benefits.[22]  This delay tactic continues through the present day.[23]

20  _____

21      [20]*Nesovic v. United States*, 71 F.3d 776, 778 (9th Cir. (Cal.) 1995).  *See also Maynard v. City of*
    *San Jose*, 37 F.3d 1396, 1399-1400, 1406 (9th Cir. (Cal.) 1994) (intentional/negligent infliction of
22  emotional distress claims with one year statute of limitations timely filed where city employee
    alleged *ongoing campaign* of retaliation that ended within limitations period even though first
23  wrongful acts occurred more than one year before complaint filed); *Pugliese*, 146 Cal. App. 4th at
    1453 (finding continuing wrong where complaint alleges conduct that *as a whole* states a cause of
24  action even though each act could be viewed as separate act constituting separate offenses; and
    stating, " '[a] continuing tort . . . involves viewing the defendant's conduct as a continuous whole for
25  prescriptive purposes.' ").

26      [21]Unreasonable delay in the processing of a claim or the payment of benefits is bad faith.
    *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 347
27  (2001) ("Thus, before an insurer can be found to have acted tortiously (i.e., in bad faith), **for its**
    **delay** or denial **in the payment of policy benefits**, it must be shown that the **insurer acted**
28  ***unreasonably*** or without *proper cause*." (bold emphasis added)).

        [22][FAC ¶¶ 245, 247-250, 253, 258-259) *See also* FAC ¶¶ 39-227 for the acts constituting ACE's

1  HP's bad faith cause of action will accrue when and if ACE stops its unlawful, ongoing and

2  unreasonable delay in paying HP's defense expenses. Alternatively, it will accrue upon the "date of

3  the last injury." *Pugliese*, 146 Cal. App. 4th at 1452. HP's bad faith injuries have not stopped. Its

4  *Brandt* damages continue to mount because of ACE's ongoing efforts to compel ACE to pay the

5  contractual benefits owed. To date its wrongful conduct continues. [*See* FAC ¶¶ 228-231; Exhibit

6  "98"] *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d 773, 787 (1979) ("So long as a person continues to

7  commit wrongful acts . . . he can neither claim unfair prejudice at the filing of a claim against him

8  nor disturbance of any justifiable repose built upon the passage of time. . . . It was [appellants'] own

9  conduct that kept the cause of action against them alive." (citations and footnote omitted)).

10  **D.    HP's Claim Is Timely Even Absent the "Continuing Wrong" Doctrine**

11  **1.    ACE's Conduct Became Entirely Unreasonable After Court Order**

12  HP's suit was timely filed even if ACE's delay tactics are not considered a "continuing

13  wrong." ACE's refusal to defend arguably became "so unreasonable" on June 19, 2000 when this

14  Court denied ACE's motion for reconsideration of the order finding ACE had a duty to defend HP.

15  [FAC ¶¶ 26-30, 139; Exhibit "14"] **The occurrence of the last act essential to complete the bad**

16  **faith cause of action commences the limitations period.** *In re Hassanally*, 208 B.R. at 50. The

17  test is whether the delay was "so unreasonable as to give rise to bad faith liability." *Id.*

18  Even if HP's claim accrued the first time ACE engaged in *unquestionably* bad faith delay

19  (rather than at the last of its continuous wrongs), it accrued when ACE's delay in paying defense

20  expenses became "so unreasonable." The two-year bad faith statute of limitations expired at the

21  very earliest, then, on June 19, 2002, two months before the statute expired. [FAC ¶ 228] The

22  Tolling Agreement makes the current bad faith suit timely [FAC ¶ 231] even without the continuing

23  wrong doctrine. HP cannot be faulted for filing suit when ACE's conduct became "so unreasonable."

24  **2.    Independently Unreasonable Conduct Brings Claim Within the Statute**

25  HP does not just complain about ACE's unreasonable delay tactics. ACE has also engaged

26  _____

ongoing campaign of delay.

27  [23]*Lockary*, 587 F. Supp. at 635-36 (finding property owner's claim against city based on a 12-

28  year-old water moratorium was timely under continuing wrong doctrine because the duration of the
moratorium was unlawful).

1    in other distinct acts of bad faith that should be viewed separately for statute of limitations purposes.

2    For example, ACE has refused to pay admittedly owed policy benefits. [FAC ¶¶ 197-224, 254]

3    This is a distinct act of bad faith.[24]  Shortly before the remand hearing before Special Master Stone,

4    on January 5, 2006, ACE finally conceded that it owed HP policy defense benefits, but it refused to

5    pay them. ACE's Pre-Hearing Brief agreed that $14,409,532.72 of HP's post-notice litigation

6    expenses in the *Nu-kote* suit were reasonable and necessary to its defense and should be reimbursed

7    by ACE.[25]

8         ACE later affirmed that it owed HP money. During its January 13, 2006 closing argument at

9    the remand hearing, and then in its June 30, 2006 post-hearing briefing, ACE upped the ante twice

10   and agreed that it owed HP $15,396,673 and $15,397,173.72, respectively.[26]  But ACE has only paid

11   $11,061,717.00 (without any explanation for the difference) and refuses to pay more. [FAC ¶ 222]

12   The two-year limitations period thus expired, at the very earliest, on January 5, 2008. The

13   limitations period, in fact, will not expire on January 5, 2008 because of the August 31, 2002 Tolling

14   Agreement.  In that Agreement ACE waived all time-based defenses for conduct in which the

15   limitations period had not yet expired at the time HP filed its initial bad faith suit, on April 17, 2002.

16   [FAC ¶¶ 228-229; 231; **Exhibit "98"**]  That is the case here.

## IV.   ACE HAS FAILED TO ESTABLISH THAT COMMUNICATIONS THAT ARE EVIDENCE OF BAD FAITH ARE BARRED BY THE LITIGATION PRIVILEGE

### A.   *White v. Western Title Ins. Co.* Is Controlling

20        Litigation communications are not the basis of HP's bad faith case. But they may be evidence

21   of ACE's bad faith conduct. In *White*, 40 Cal. 3d 870, the California Supreme Court framed a now

22   well-recognized exception to the application of the Civil Code § 47(b) litigation privilege holding

---

24   [24]*See Beck v. State Farm Mut. Auto. Ins. Co.*, 54 Cal. App. 3d 347, 355-56 (1976) (failure to pay uncontested portions of claim was bad faith); *Neal v. Farmers Ins. Exch.*, 21 Cal. 3d 910, 921-22 (1978) (same); *Concept Enterprises, Inc. v. Hartford Ins. Co. of the Midwest*, No. CV 00-7267 NM (JWJx), 2001 WL 34050685, at *7 (C.D. Cal. May 21, 2001) (bad faith found as a matter of law where insurer ignored existing precedent and failed to pay the undisputed portion of the insured's claim).

27   [25][FAC ¶¶ 202-204; **Exhibit "84,"** pp. 7-8; **Exhibit "85"**]

28   [26][FAC ¶¶ 208-210, 213-214; **Exhibits "89," "90"** p. 2; **"93"**]

1  that evidence of settlement offers is admissible to prove an underlying course of conduct and the

2  insurer's bad faith.  Litigation communications may be *evidence* of bad faith conduct.

> It is obvious, however, that **even if liability cannot be founded upon a judicial communication, it can be proved by such a communication** – otherwise Evidence Code section 1152 would be unnecessary, and much of modern discovery valueless. Defendant's argument, consequently, forces us to draw **a careful distinction between a cause of action based squarely on a privileged communication, such as an action for defamation, and one based upon an underlying course of conduct evidenced by the communication.**  In the present case plaintiffs do not assert that defendant's communications were defamatory, or done with the intent of causing emotional distress, but instead that **they show that defendant was not evaluating and seeking to resolve their claim fairly and in good faith.**  In our opinion, section 47, subdivision 2, does not bar admission of the offers for that purpose.

9  *Id.* at 888 (emphasis added).

10  The *White* exception applies here because HP's bad faith claim is not based on the

11  communications, but the course of "wrongful and tortious" conduct evidenced by the insurers'

12  actions and communications during the coverage actions.  In *Tucson Airport Authority v. Certain*

13  *Underwriters at Lloyd's, London*, 186 Ariz. 45, 48 (Ct. App. 1996), the court applied the *White*

14  exception to allow in evidence privileged statements by the insurer's counsel made during a pending

15  coverage action.  The court reasoned:

> **TAA's claim does not assail a pleading but instead alleges that its insurers followed a course of conduct in which they failed to perform their duties fairly and in good faith.**  To be sure, the insurers in this case, unlike those in *White*, do not contend that the filing of the coverage actions erased their duties of good faith and fair dealing.  The duties nonetheless would be rendered meaningless if, as we understand these insurers to argue, the litigation privilege could be employed to excuse a breach of those duties, which occurs as part of the conduct of a coverage action. [Emphasis added.]

21  **V.    THE "GENUINE ISSUE" RULE IS NOT APPLICABLE AS A MATTER OF LAW AND DID NOT RELIEVE ACE OF ITS DUTY TO DEFEND HP IN ANY EVENT**

22  **A.    The Scope of the "Genuine Issue" Doctrine Is Narrow**

24  ACE argues that a court can conclude that an insurer's denial of a claim is not unreasonable,

25  so long as a genuine issue existed as to the insurer's liability.[27]  Because the scope of an insurer's

26  duty to defend is so broad, the genuine doctrine has never been applied in a published decision to an

---

[27] *American Cas. Co. v. Krieger*, 181 F.3d 1113, 1123 (9th Cir. 1999) (quoting *Lunsford v. American Guar. & Liab. Ins. Co.*, 18 F.3d 653, 656 (9th Cir. 1994)).

insurer's refusal to provide a defense to a third party claim, only a first-party insurance bad faith refusal to indemnify its insured. In *Century Surety Co. v. Polisso*,[28] the insurer argued that two factual disputes gave rise to a genuine dispute about the duty to defend under the CGL policy.

> **The dispute** [concerning who was responsible to complete work by applying a sealant] [was] **only relevant on** the questions of [the insurer's] duty to **indemnify** [but] **not pertinent to** the question of [the insurer's] **duty to defend**, which only requires the Polissos to show they had potential liability for property damage under the policy.

*Id.* at 952 (emphasis added).  Refusing to apply the doctrine, the court held that the existence of a duty to defend precluded application of the genuine dispute doctrine.

> Century is mistaken because it confuses its duty to indemnify with its duty to defend. ... **Even if there were genuine coverage issues at the time the claim was tendered, there was no genuine dispute as to Century's duty to defend under the policy.**

*Id.* at 950 (emphasis added).  Implicit in *Polisso* is a recognition of the fact that a **genuine dispute** as to coverage is not the equivalent of there being **no potential** for coverage.  **But** indeed, the very existence of a factual coverage dispute **establishes the potential** for coverage and thus the duty to defend.[29]  The *Polisso* court was skeptical that the genuine dispute doctrine applies to an insurer's bad faith duty to defend.

**B.     The Genuine Issue Rule Is Not a Defense to a Bad Faith Failure to Defend**

The duty of a liability insurer to defend claims asserted against an insured is extremely broad. *Montrose Chem. Corp. v. Superior Court (Canadian Universal Ins. Co., Inc.)*, 6 Cal. 4th 287, 295 (1993). An insurer must defend its insured against a suit "which *potentially* seeks damages within the coverage of the policy."[30] The insurer bears the burden of proof and must affirmatively establish

---

[28]*Polisso*, 139 Cal. App. 4th at 951 ("Century has failed to cite any cases that apply the genuine dispute doctrine to the duty to defend and our research has not disclosed any. The doctrine has been applied primarily in first-party coverage cases, usually involving disputes over policy language or its application.").

[29]*American Cyanamid Co. v. American Home Assur. Co.*, 30 Cal. App. 4th 969, 975 (1994) ("If the parties dispute whether the insured's alleged misconduct is potentially within the policy coverage . . ., then factual issues exist precluding summary judgment in the insurer's favor. Indeed, 'the duty to defend is then *established*, absent additional evidence bearing on the issue.' (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1085, 17 Cal.Rptr.2d 210, 846 P.2d 792; accord, *Montrose, supra*, 6 Cal.4th at p. 301.)").

[30]*Montrose*, 6 Cal. 4th at 295, citing *Gray v. Zurich Ins. Co.*, 65 Cal. 2d 263, 275 (1966); *id.* at

1  the absence of coverage. *Id.* at 305-06. The duty exists even where coverage is in doubt and

2  ultimately does not develop.[31] Any doubt as to whether the facts establish the existence of the duty

3  to defend is resolved in favor of the insured. *Montrose*, 6 Cal. 4th at 295.

4       ACE cannot logically, legally or factually raise a so-called "genuine dispute" about the

5  potential for coverage because it has not shown, as a matter of law, that its refusal to defend

6  immediately and completely was based on its genuine view that the third party complaint "can by no

7  conceivable theory raise a single issue which could bring it within the policy coverage." *Id.* at 300.

8  ACE cannot reasonably and in good faith claim that there is "a genuine dispute" as to coverage

9  based on a factual dispute or difference of opinion as to the scope of meaning of the terms

10  "advertising" or "unfair competition," or the scope of its "Policy Territory," consistent with the

11  application of settled principles of California law. The law in California addressing the issues whose

12  construction ACE disputes was sufficient settled that ACE's embrace of extreme positions did not

13  evidence either a reasonable or genuine dispute.

14       At most such *disputes* actually *create a duty to defend*. For example in *Tosoh SET v.*

15  *Hartford Fire Ins. Co.*, No. A111641, 2007 WL 1242172, at *6 (Cal. Ct. App. (1st Dist.) April 30,

16  2007) where, as in the *Nu-kote* case, unfair competition, false advertising and Lanham Act violations

17  were alleged by a competitor without specifying the nature of the advertising or clarifying that the

18  acts fit within the policy definition of advertising, the court found a duty to defend based on long-

19  standing law because such a dispute "creates a potential for coverage":

20       A factual dispute about the nature of the advertising medium does not negate the
         potential for coverage, however. **When there is a factual dispute on which**
21       **coverage depends, that fact itself creates a potential for coverage and hence a**
         **duty to defend.** (See *Horace Mann Ins. Co. v. Barbara B.*, *supra*, 4 Cal.4th [1076
22       (1993)] at pp. 1083-1084.) Tosoh need only show that the underlying claim may fall
         within the policy coverage; Hartford must prove that it cannot. (See *Montrose*
23       *Chemical Corp. v. Superior Court*, supra, 6 Cal.4th [287, (1993)] at p. 300.)

24  ――――――――――――――――
     299-300 ("Any doubt as to whether the facts establish the existence of the defense duty must be
25  resolved in the insured's favor. . . . In other words, the insured need only show that the underlying
     claim *may* fall within policy coverage; the insurer must prove it *cannot*.").

26       [31]*Safeco Ins. Co. of Am. v. Fireman's Fund Ins. Co.*, 148 Cal. App. 4th 620, 629 (2007) (" '[F]or
     an insurer, the existence of a duty to defend turns not upon the ultimate adjudication of coverage
27  under its policy of insurance, but upon those facts known by the insurer at the inception of a third
     party lawsuit.... Hence, the duty [to defend] "may exist even where coverage is in doubt and
28  ultimately does not develop." ' ").

1    (Emphasis added.)

2        When *any potential* exists, an insurer is required to defend meaningfully, immediately, and

3    entirely. *Buss*, 16 Cal. 4th at 49. Only if and after an insurer "negatives all facts" and establishes as

4    a matter of law that there is no possibility of a covered claim may an insurer end its defense

5    obligation. *Scottsdale Ins. Co. v. MV Transp.*, 36 Cal. 4th 643, 655 (2005):

6        **If any facts stated or fairly inferable in the complaint, or otherwise known** or
         discovered by the insurer, **suggest a claim potentially covered** by the policy, **the
7        insurer's duty to defend arises** and is **not extinguished until the insurer negates
         all facts suggesting potential coverage.** On the other hand, if, as a matter of law,
8        neither the complaint nor the known extrinsic facts indicate any basis for potential
         coverage, the duty to defend does not arise in the first instance. [Emphasis added.]

9

10       ACE mistakenly relies on inapposite first-party coverage cases such as *Guebara v. Allstate*

11   *Ins. Co.*, 237 F.3d 987 (9th Cir. 2001), where the court held that the genuine dispute doctrine could

12   be applied sparingly to factual disputes such as where the insurer replies upon independent experts to

13   determine the amount of a loss.[32] That rule, however, cannot be interposed as a defense to a bad

14   faith breach of the duty to defend. In *Guebara*, after the plaintiff's house burned down, the insurer

15   immediately paid plaintiff an advance for living expenses but referred the claim to its Special

16   Investigations Unit because independent fire inspectors believed, based on plaintiff's statements and

17   the evidence at the fire scene, that plaintiff had overstated the quantity and value of her destroyed

18   belongings. The subsequent opinions of the insurer's independent experts contradicted the plaintiff's

19   explanations about the items that could not be found at the scene. Based on the experts' opinions, the

20   insurer denied the plaintiff's contents claim on the grounds of misrepresentation as to the personal

21   property allegedly destroyed by the fire. *Id.* at 989-91. Our case is no *Guebara*.

22       *Chateau Chamberay Homeowners Ass'n*, 90 Cal. App. 4th at 339, was another first-party

23   summary judgment case (not a motion to dismiss) with a dispute about what "loss was actually

24   covered under the policy [and] the proper amount" of the loss. But no bad faith duty to defend case

25   has ever found an alleged "genuine dispute" to be a defense. "[T]he genuine dispute rule does not

26

27   [32]*Guebara*, 237 F.3d at 994 ("Rather than establish a bright-line rule, we hold that the genuine
     dispute doctrine should be applied on a case-by-case basis. In some cases, the application of the rule
28   to purely factual disputes will be inappropriate. In others, investigations by a defendant's
     independent experts will permit the invocation of the doctrine . . . .").

relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim."[33] Nor can it prevent liability when the insurer delays payment for years after a court finds a duty to defend and rejects the insurer's alleged dispute.

Even if the genuine dispute doctrine applied in a duty to defend case, the Supreme Court has clarified that the doctrine does not support a motion to dismiss.

> "On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim **only where the summary judgment record demonstrates the absence of triable issues** as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith.

*Wilson*, 42 Cal. 4th at 724 (emphasis added; citations omitted)).

Here ACE does not even want to file an Answer, let alone respond to discovery seeking to determine why it delayed year after year to pay defense expenses, despite repeated court orders.

### C.    No Genuine Issue Exists Regarding the Policy Territory Provision

#### 1.    ACE's Unenforceable Territory Provision Makes ACE's Argument Unreasonable

The policy territory provision is unenforceable as to "Advertisers' Liability" because it does not apply to such claims. So ACE cannot make a reasonable argument based thereon that excuses its bad faith. The Policy Territory provision requires that a claim or suit "result from" an "occurrence" "outside the United States of America, its territories or possessions, Canada, Cuba and North Korea," although the policy contains no definition of "occurrence." But there is no requirement of an "occurrence" in the Insuring Agreement for "Coverage C – Advertiser's Liability." The phrase "caused by an occurrence as defined herein" appears only in connection with "Coverage B – Property Damage Liability," and not in the coverage for "Personal Injury Liability" or "Advertiser's Liability."[34] An "occurrence" is simply not part of the coverage for "Advertiser's Liability." Consequently, the "Policy Territory"[35] appears to limit territorial coverage only with respect to

---

[33]*Wilson*, 42 Cal. 4th at 723.

[34]FAC **Exhibit "1"**, Insuring Agreement p. 1 (HP0000671).

[35]*Id.* at p. 11 (HP0000679).

1  "Property Damage" claims.  The Policy Territory provision, by its own terms simply does not apply

2  to "Advertiser's Liability" claims.  So ACE could not in good faith and reasonably assert or rely on

3  this policy provision and the theory that there was no potential that Nu-kote's unfair competition

4  counterclaim resulted from happenings that occurred outside the United States/Canada to avoid or

5  delay paying defense costs. The coverage limitation cannot be conveniently rewritten[36] to change the

6  limiting "occurrence" language applicable only to "property damage" to "property damage, bodily

7  injury *or advertiser's liability*" outside the United States.   Indeed, ACE had no proper basis for its

8  territory argument whatsoever. Making that argument is just evidence of continuing bad faith.

9        **2.   Even If "Advertising Injury" Coverage Must Fall Within an "Occurrence," Nu-kote's Claims Fell Squarely Under the Policy's**
10       **Territory Provision As This Court Has Repeatedly Found**

11       The Policy provides worldwide coverage for an occurrence assuming an occurrence includes

12 "Advertiser's Injury" with only four geographical exceptions.[37]  ACE's policy territory argument

13 was based on an unreasonable reading of the Nu-kote Counterclaim.  It selectively ignored

14 allegations of conduct within the policy territory and a refusal, for example, to admit that Mexico is

15 in North America.[38] This Court expressly rejected ACE's territory argument in the August 24, 1999

16 summary adjudication finding a duty to defend (**Exhibit "13,"** 10:6-15),[39] rejected it again in

17

18    [36]*Safeco Ins. Co. v. Robert S.*, 26 Cal. 4th 758, 764 (2001) ("[W]e cannot read into the policy what Safeco has omitted."); *Fireman's Fund Ins. Cos. v. Atlantic Richfield Co.*, 94 Cal. App. 4th
19 842, 852 (2001) ("[A]n insurance company's failure to use available language to exclude certain types of liability gives rise to the inference that the parties intended not to so limit coverage.").

20    [37]Garchie Decl. ¶ 3, Exh. "A," p. 11 ("POLICY TERRITORY shall be worldwide for claim or
21 suit resulting from an *occurrence* **outside the United States of America**, its territories or possessions, **Canada, Cuba** and **North Korea**." (emphasis added)).

22    [38]While ACE selectively refers to references in the long Counterclaim that specifically mention the United States, it fails to note the references by Nu-kote to "relevant aftermarkets" (Counterclaim
23 ¶ 145) that are described in the incorporated paragraphs 71 through 101. These in turn, for example, describe "the **North American market**" (Counterclaim ¶¶ 86 and 87) and "**North American**
24 aggregate sales of ink jet resupply cartridges and refill kits . . . ." (Counterclaim ¶ 87.) **North America includes Mexico**, which is within the defined policy territory, in addition to the United
25 States and Canada that are excluded from the territory.  All counterclaim references to North America include Mexico and therefore reference the Policy Territory.

26    Nu-kote's Counterclaims alleged unfair international competition from HP in the printer cartridge aftermarket, including statements in advertising and to retailers in the North American
27 market (including Mexico) and in harmful actions before the European Patent Office. (See **Exhibit "28"** to HP's FAC, e.g., Counterclaim ¶¶ 87, 89, 90, 92, 93, and 97.)

28    [39]"The territorial limitation of the Cigna Policy emphasizes the location of the occurrence, not

1  denying ACE's motion for reconsideration in 2000 (**Exhibit "14"**), and denied ACE's request for

2  certification of immediate appeal in 2001 (**Exhibit "15"**).

3      ACE never had a "genuine dispute" about the policy territory, even before this Court ruled

4  against ACE on August 24, 1999. The dispute was resolved against ACE long ago but ACE

5  adamantly and unreasonably still refused to pay defense costs through 2008. This argument was a

6  delaying tactic and further evidence of bad faith.

7      As this Court found in its Summary Adjudication Order on August 24, 1999 (**Exhibit "13"**

8  5:3-15), HP delivered to ACE with its initial tender, copies of HP inkjet refill package inserts which

9  were distributed internationally during the relevant time period. The international package inserts

10  warn consumers against refilling their cartridges, and could be construed as "making false

11  representations about the refillability of Hewlett-Packard's cartridges" as alleged. A defense is

12  required even if "allegations of the suit are groundless, false or fraudulent."[40] The broadly worded

13  Policy Territory provision of the ACE policy covers claims "worldwide" "resulting from an

14  occurrence" within the policy territory.

15      Although for some "personal injury" incidents the site of the occurrence is also likely to be

16  the site of the injury, in many cases, including "advertising injury" cases, the occurrence or

17  misrepresentation may be at a site different from the site of the resulting injury. The policy period

18  clause of the ACE policy recognizes this principle. It states that "this policy applies only to such

19  occurrences and **personal injury** which take place during the policy period and within the **policy**

20  **territory**." Garchie Decl. ¶ 13, Exh. "A," p. 11 (emphasis added). The policy only required that the

21  claim "result from an occurrence outside the United States . . . ." **The policy's definition of**

22  **occurrence makes no reference to "advertising injury."** Nothing in the policy restricts

23  "advertising injury" coverage claims to those in which all damages must be suffered within the

24  policy territory.

25

26  the location of the resulting damages. In the present case HP disseminated allegedly false
advertisement about refilling inkjet print cartridges internationally. . . . Because Nu-kote could

27  possibly claim damages based, at least in part, on HP extraterritorial ads, the Court finds that the
Policy Territory requirement is satisfied."

28  [40]FAC **Exhibit "1"**, Insuring Agreement p. 1 (HP0000671).

Nu-kote generally describes related HP actions in Europe against Nu-kote. The Counterclaim alleges actions "against independent suppliers of after market products" in the European Patent Office and alleged European actions with Epson, "a puppet British company" and Canon. (Counterclaim ¶ 97.) This rambling paragraph about the European marketplace is immediately followed by an allegation that HP "has published knowingly false statements in the marketplace accusing Nu-kote of infringing its trademarks and patents. (Counterclaim ¶ 98.) **These allegations about misconduct with apparent reference to false statements against Nu-kote (defamation) in Europe raise further potential for "libel, slander or defamation" coverage based on occurrences and damages in Europe, clearly within the policy territory.**

**The territorial limitation in the ACE policy emphasizes the location of the occurrence, and not the location of** any **injury** or **damages,** as is appropriate for analysis of "offense" based coverage. As Judge Croskey noted in *Atlantic Mut. Ins. Co. v. J. Lamb, Inc.*, 100 Cal. App. 4th 1017, 1032 (2002):

> Like advertising injury, "personal injury" is a term of art that describes coverage for certain enumerated offenses that are spelled out in the policy.... Coverage for personal injury is not determined by the nature of the damages sought in the action against the insured, but by *the nature of the claims* made against the insured in that action. Under the personal injury policy provision, "**[c]overage ... is triggered by the** *offense*, **not the injury or damage** which a plaintiff suffers." ... The triggering event is the insured's *wrongful act*, not the resulting injury to the third party claimant.

(Bold emphasis added; citation omitted.) Nu-kote alleged that HP disseminated allegedly false advertisements about refilling inkjet printer cartridges internationally, causing it to suffer damages. And without specifying where those damages occurred. Nu-kote claimed damages based in part on occurrences in the "territory." **Nu-kote persisted through trial claiming damages to domestic business through international acts.**

### 3. ACE's Failure to Consider Extrinsic Evidence in Its Coverage Analysis Makes Its Uninformed Coverage Analysis Unreasonable

ACE was obligated to consider facts outside the complaint evidencing the potential that coverage exists for any of the damages sought from the insured.[41] Nu-kote's claim of lost sales of

---

[41] *El-Com Hardware, Inc. v. Fireman's Fund Ins. Co.*, 92 Cal. App. 4th 205, 217 (2001) ("The extrinsic facts known to respondent at the time appellants tendered their defense of the Penn

1    refill cartridges, incorporated into Nu-kote's unfair competition claim in its March 18, 1999

2    counterclaim, was based on allegations that HP led potential Nu-kote customers to believe that HP's

3    cartridges were not refillable.  HP provided ACE with international package inserts, which intimated

4    that HP's cartridges were not refillable.  So ACE had no good faith and reasonable factual or legal

5    basis for delaying payment.

6         **D.    No Possible "Genuine Issue" As to Coverage for "Unfair Competition"**

7         **1.    Defense Required Where Nu-kote *Expressly* Alleged Unfair Competition**

8              The ACE Policy Advertiser's Liability coverage part provides coverage for the undefined

9    offense of "unfair competition."[42]  ACE argued unsuccessfully that the undefined unfair competition

10   provision of its policy only refers to "passing off" and "palming off" goods.  Although the *Bank of*

11   *the West v. Superior Court*, 2 Cal. 4th 1254, 1263 (1992) says *in dicta* that "[t]he common law tort

12   of unfair competition is generally thought to be synonymous with the act of 'passing off' one's

13   goods as those of another," the decision did not purport to narrow the tort of unfair competition to

14   those narrow circumstances as a matter of law.  Rather, the discussion (at 1265-66) focused on the

15   distinction between the common law tort, which provides remedies for competitive injury, and an

16   unfair competition statute that provide remedies to the public.  *Id.* at 1263-64 ("The primary purpose

17   of these statutes was to 'extend[] to the entire consuming public the protection once afforded only to

18   business competitors.' ").

19             But "unfair competition" as commonly understood, includes claims for damages beyond

20   passing-off or palming-off of goods.  For purposes of indemnity, it might be necessary to determine

21   the meaning a layperson would ordinarily attach to "unfair competition."  *See Waller v. Truck Ins.*

22   *Exch.*, 11 Cal. 4th 1, 18 (1995).

23             The leading treatise on unfair competition advises that "unfair competition" is typically

24
25   ─────────────────────────────────────────
     Fabrication action, considered in light of the complaint's allegations, reveal a possibility of a
     covered claim."); *Perkins v. Allstate Ins. Co.*, 63 F. Supp. 2d 1164, 1174 (C.D. Cal. 1999) (same).

26   [42] J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION, § 1:10 (4th ed.
     1998).  PROSSER & KEETON ON TORTS § 130 at 1013 (5th ed. 1984) holds that the term "unfair
27   competition" is "now a generic name for a number of related torts involving improper interference
     with business prospects."  It explains that "unfair competition" can be found when the defendant
28   engages in any conduct that amounts to a recognized tort and when that tort deprives the plaintiff of
     customers or other prospects. *Id.* at 1014.

thought to include a wide-variety of competitive conduct including false representations and false advertising.    Unfair competition includes disparagement of a competitor's goods or business methods, threats of groundless suits and false advertising.  PROSSER & KEETON ON TORTS § 130 at 1014-20.[43]

California law also recognizes that unfair competition applies to allegedly tortious conduct outside of passing-off or palming-off, including the unjustified interference with an advantageous business relationship.[44]  Case law clarifies that the key elements for unfair competition coverage are assertion of business misconduct in a competitive relationship and a demand for damages.[45] Because "unfair competition" is commonly understood to encompass claims for false advertising and other tortious conduct resulting in competitive injury, it may and often does arise in connection with antitrust allegations.[46]  Indeed, a number of cases whose primary thrust was an antitrust action have

---

[43]BLACK'S LAW DICTIONARY 1528-29 (6th ed. 1990) ("Unfair competition" generally refers to palming-off, but also refers to "deceitful advertising which injures a competitor.").

[44]*Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 255 (1968). *See Bank of the West*, 2 Cal. 4th at 1263; *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995); *CNA Cas. of Cal. v. Seaboard Sur. Co.*, 176 Cal. App. 3d 598, 607-08 (1986); *Polygram Records, Inc. v. Superior Court*, 170 Cal. App. 3d 543, 548 (1985).

[45]*Polaris Indus., L.P. v. Continental Ins. Co.*, 539 N.W.2d 619, 623 (Minn. Ct. App. 1995) ("A public misrepresentation about a product's invention is within the ordinary and usual meaning of unfair competition."); *Henderson v. United States Fid. & Guar. Co.*, 346 N.C. 741, 747 (1997) (interpreting unfair competition to require "some component of competitive injury" and allegations of harm to a competitor).

[46]*Eli Lilly & Co. v. American Cyanamid Co.*, No. IP95-0536-C-B/S, 2001 WL 30191, at *6 (S.D. Ind. Jan. 8, 2001) ("**In addition to its antitrust claims, Zenith's amended counterclaim includes a claim for unfair competition under New Jersey common law.** In this claim, Zenith alleges that the actions Lilly took to prevent generic competition for cefaclor in the United States – **the same actions that Zenith alleges violated the Sherman Act – constitute unfair competition.** Lilly argues that Zenith's allegations fail to state a claim for the tort of unfair competition because New Jersey law limits that tort 'to various forms of misappropriation of property of commercial value, such as "passing off" and "unprivileged imitation." ' . . . The Court carefully has examined the cases cited by Lilly and determined that New Jersey courts do not so limit the tort of unfair competition." (emphasis added));

*Biovail Corp. Int'l v. Hoechst Aktiengesellschaft*, 49 F. Supp. 2d 750, 777 (D.N.J. 1999) ("Defendants' . . . argument that . . . the facts alleged do not constitute unfair competition because the conduct alleged was not 'injurious and otherwise unfair, improper and wrongful' is also summarily rejected. . . . Indeed, having found that **the conduct alleged** by Biovail **constitutes, at least on the pleadings, possible antitrust violations, it is fair to say that the conduct states a claim under the much broader common law tort of unfair competition**. *See* RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 1 cmt. g (1995) (engaging in 'an unlawful restraint of trade' constitutes unfair competition)." (emphasis added)).

1    triggered a defense because as here fact allegations of defamation or disparagement triggering

2    coverage for unfair competition were asserted therein.[47]

### 2.    Facts Alleged Also Established Unfair Competition Elements

4        Nu-kote's allegations satisfy these elements. Nu-kote expressly alleged unfair competition

5    (See, e.g., FAC **Exhibit "28"** ¶ ¶ 165, 166, 167, 169, 180, 181, and 182). Nu-kote also expressly

6    alleged other claims within the meaning of unfair competition under the Policy including claims for

7    false advertising and for false and misleading advertising (See, e.g., FAC **Exhibit "28"** ¶ 93). These

8    claims fall within the "advertiser's liability" offense of "unfair competition." All that is necessary to

9    constitute "unfair competition" within the meaning of the ACE Policy is that there be an allegation

10   of damages by a business competitor stemming from unfair business practices by HP committed in

11   the course of HP's advertising. *Bank of the West*, 2 Cal. 4th at 1264. The elements of a Lanham Act

12   Section 43(a) false and misleading advertising claim, and the allegations of the *Nu-kote*

13   Counterclaim, amply satisfy this requirement.[48] Like HP here, the competitor in each of the cases

14   referenced above claimed the insured had published information in the marketplace as part of an

15   overall campaign to reach actual and potential customers, and succeeded in interfering with the

16   competitor's client base and destroying its market share.

17       Nu-kote also made claims for false and misleading advertising under the common law and

18   the Lanham Act § 43(a). Nu-kote's claim for false and misleading advertising fits squarely within

19   the definition of unfair competition. In a number of cases, like HP's here, a defense arose because of

20   fact allegations of disparagement at issue in the underlying case. For example, Nu-kote alleges HP

21   "has published knowingly false statements and engaged in *deceptive advertising* . . . includ[ing],

22

---

23   [47]*CNA Cas.*, 176 Cal. App. 3d at 608 (An amended complaint containing a cause of action for
     "antitrust" included factual allegations that the insured misrepresented the business property and
24   rights possessed by plaintiffs to persons with whom plaintiffs did business, which created potential
     liability under the policy's coverage for "libel, slander or other defamatory or disparaging
25   material."); *Curtis-Universal, Inc. v. Sheboygan Emerg. Med. Servs., Inc.*, 43 F.3d 1119, 1124 (7th
     Cir. (Wis.) 1994) (A competitor charged the insured with intentional interference with contractual
26   relations and antitrust injury.); *Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co.*, 832 F.2d 1037, 1043-
     44 (7th Cir. (Ill.) 1987) (antitrust claim potentially covered as claim for defamation or unfair
27   competition).

28   [48]J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition, *Lanham Act
     § 43(a) and False Advertising*, § 27:24 at 45-46 (Rel. 43, 9/2007).

---

1    without limitation, *false representations about the refillability of* Hewlett-Packard's cartridges and

2    the quality, compatibility and/or safety of Nu-kote's products." "[S]uch statements and images have

3    had the effect of making a substantial number of consumers believe that Hewlett-Packard's

4    cartridges are not refillable and reusable."[49]

5          Nu-kote's amended Answer and Counterclaims to the Fourth Amended Complaint alleged,

6    *inter alia*, that HP statements and advertising materials distributed during the effective period of the

7    ACE policy contained misrepresentations that caused Nu-kote competitive injury.  Nu-kote alleged

8    that HP's marketing was designed to "deceive," "confuse" and instill "fear, uncertainty and doubt"

9    ("FUD") about Nu-kote inkjet refill products in the minds of resellers and consumers, thus causing

10    damages to Nu-kote including "lost sales" and "expense" in "competing in" and "entering" "relevant

11    aftermarkets."  (See, e.g., FAC **Exhibit "28"** ¶¶ 165, 167, and 169.)

12          **E.**    **No Genuine Issue on "Advertising Activities" Where False Advertising Alleged**

13          ACE's arguments as to whether Nu-kote could prove damages "occurring in the course of

14    [HP's] advertising activities" does not raise any genuine issue as to coverage. Nu-kote expressly

15    alleged false advertising in connection with unfair competition and disparagement. Also, as

16    discussed above, the tender included examples of HP's inkjet cartridge boxes and package inserts

17    that warned consumers of harm from refilling. Nu-kote principally objected to exactly that conduct.

18    In addition to expressly alleging false and misleading advertising by HP causing it damages, Nu-kote

19    generally alleged that HP engaged in a campaign to instill "fear, uncertainty and doubt" in the minds

20    of retailers and consumers about refill products thereby causing damages. Advertising based

21    damages in the course of unfair competition was alleged, even if ACE refused to see it. ACE argued

22    that Nu-kote could not prove damages occurring in the course of advertising, but it cannot in good

23    faith dispute the *potential* for such an outcome.  In similar circumstances the *Tosoh SET* court,

24    finding a duty to defend noted that a dispute about the nature or medium of alleged advertising has

25    no bearing on the duty to defend. *Tosoh SET,* 2007 WL 1242172, at *6

26            Although the . . . complaint does not specify the media in which the advertisements
        appeared, the **advertisement allegation nonetheless raises a potential for coverage.**

27            The complaint includes the allegation that Tosoh "falsely advertise[d]" by making

28    [49]FAC **Exhibit "28"** ¶¶ 93, 165.

1    certain claims, without specifying the advertising media in which the claims

2    appeared. Our Supreme Court has acknowledged that the "commonly understood

     meaning" of advertising is "widespread promotional activities usually directed at the

3    public at large." (*Hameid v. National Fire Ins. of Hartford* (2003) 31 Cal.4th 16, 24.)

     Therefore, a generic allegation that a competitor "advertised" certain disparaging

4    claims creates the potential for coverage because the term "advertising" encompasses

     the types of activity covered under the Hartford policies. . . . [even if] the alleged

5    advertisements took the form of one-on-one solicitations or other non-covered

     activities. **A factual dispute about the nature of the advertising medium does not**

6    **negate the potential for coverage** []. When there is a factual dispute on which

     coverage depends, that fact itself creates a potential for coverage **and hence a duty to**

7    **defend.** [Emphasis added.]

8        This Court has repeatedly found that the allegations potentially met the policy language so as

9  to trigger the duty to defend. See FAC **Exhibit "13,"** 10:22-27, fn. 5 ("**Cigna briefly asserts,**

10  **without argument**, that the package inserts produced by HP are not 'advertising' as the term is used

11  in the Policy. . . . The Court disagrees. . . . The package inserts are 'advertising' as that term is

12  commonly used." (emphasis added)).

13        Raising this red herring again, repeating the argument rejected by the Court again in 2003

14  (FAC **Exhibit "77,"** 8:15-24) relying on *Hameid v. National Fire Ins. of Hartford*, 31 Cal. 4th 16

15  (2003) to redefine "advertising," cannot excuse ACE's failure to defend or create a good faith and

16  reasonable excuse. Disagreeing with the Court and ignoring its rulings does not create a genuine

17  issue excusing delayed defense reimbursement; it establishes bad faith. It was unreasonable for ACE

18  to rely on arguments about advertising or other issues potentially related to indemnity to avoid its

19  duty to defend.[50] Neither eliminates the duty to defend meaningfully, immediately and entirely so as

20  to inoculate ACE against a jury's bad faith finding.

21    **F.    No Genuine Issue Excuses ACE's Delay in Paying Defense Expenses**

22        ACE amazingly asserts that it cannot be accused of committing bad faith because it managed

23  to delay for eight years a final determination as to the precise amount of defense expenses it should

24  have paid to HP, notwithstanding that ACE was unable in all those years and weeks of hearings

25

26       [50]*J. Lamb, Inc.*, 100 Cal. App. 4th at 1039-40 (Only reliance on evidence available at time of

    tender avoids bad faith exposure where it does show a potential for coverage. Otherwise, as here,

27  where *potential* for coverage cannot be negated short of an actual trial or resolution of the meaning

    of potentially ambiguous policy language, a defense exists. A defense duty under such

28  circumstances cannot be reasonably contested.).

1    before a Special Master to establish that HP was entitled to a single dollar less than HP requested.[51]

2    While it may be common that the exact amount of defense costs is not determined until later, ACE

3    cannot excuse its decade-long delay in paying those defense expenses, especially where it could

4    readily compute the sums due based on the court orders it ignored.[52]  This delay touted by ACE is

5    one of the principal bases of HP's bad faith claim.

6          As previously discussed, ACE's unambiguous duty was to pay defense costs completely and

7    immediately.  Had it done so, it could have obtained reimbursement from HP for any overpayment

8    that could later be established, pursuant to *Buss*.  Despite its repeated and meritless arguments that

9    no potential for coverage existed to trigger a duty to defend (and strikingly inconsistent with its

10   arguments in the present motion to dismiss), **ACE belatedly conceded that a duty to defend did**

11   **exist** when on October 14, 2003 it paid $11,857,288.41 to HP for defense expenses. Even that partial

12   payment was unreasonably delayed more than three years after the Nu-kote case was concluded. But

13   ACE's bad faith was multiplied when it flatly refused to pay the full amount demanded by HP (an

14   amount that ACE had stipulated as HP's post-tender expenditures in the Nu-kote case after the first

15   hearing before the Special Master (FAC **Exhibit "78"** 28:4-17). Thereafter for another four years

16   and even after this Court's judgment in August 2007 that more than $28 million is due to HP, ACE

17   has continued to delay and deny payment, as further striking evidence of its bad faith.

18          The California Supreme Court has long ago clarified that the insurer's right to reimbursement

19   is intended to fully protect the insurer from defending uncovered claims and cases but that the right

20   is premised on an intent that the insurer immediately provide a defense, even in questionable cases:

21               As *Buss* further noted, "[n]ot only is it good law that the insurer may seek
                reimbursement for defense costs as to the claims that are not even potentially covered,
22               but it also makes good sense. **Without a right of reimbursement, an insurer might**

---

[51] *Wilson*, 42 Cal. 4th at 724 ("[A] dispute based on . . . an unreasonable position is not
genuine . . . .").

[52] *Longs Drug Stores California, Inc. v. Federal Ins. Co.*, No. C 03-01746 JSW, 2005 WL
2072296, at *1, 4 (N.D. Cal. Aug. 26, 2005) ("Longs bears the burden of demonstrating the
existence and amount of litigation expenses. *Aerojet-General Corp. v. Transport Indem. Co.*, 17
Cal.4th 38, 64, 70 Cal.Rptr.2d 118, 948 P.2d 909 (1997).  However, once Longs does so, the
litigation expenses incurred are presumed to be reasonable and necessary defense costs, and Federal
bears the burden of demonstrating that such expenses were unreasonable or unnecessary. . . . The
Court concludes that the date on which Federal **could have** computed the amount owed was on the
date Longs was billed for the attorneys fees and costs in the *Palacio* action.").

1    be tempted to refuse to defend an action in any part-especially an action with many
     claims that are not even potentially covered and only a few that are-lest the insurer
2    give, and the insured get, more than they agreed. **With such a right, the insurer
     would not be so tempted**, knowing that, if defense of the claims that are not even
3    potentially covered should necessitate any additional costs, it would be able to seek
     reimbursement." (*Buss, supra*, 16 Cal.4th 35, 52-53, 65 Cal.Rptr.2d 366, 939 P.2d
4    766.)[53]

5        Rather than follow the law, ACE deliberately succumbed to the temptation of refusing to

6    defend, instead choosing the "risky strategy" of refusing to defend that exposed it to bad faith

7    liability.[54]  ACE should not now be heard to complain that it must stand trial for its unlawful and

8    unreasonable decisions.    Moreover, ACE's year after year effort to obtain a pre-payment

9    "allocation" of defense expenses was unlawful in California, and has always been.  The Supreme

10   Court emphasized in *Buss* that ACE cannot obtain pre-payment allocation but only post-payment

11   reimbursement, and then only after fully and completely defending.[55]

12       In *Concept Enterprises, Inc. v. Hartford Ins. Co. of the Midwest*, 2001 WL 34050685, the

13   court found an insurer's failure to defend a mixed claim in its entirety "is patently unreasonable" and

14   subjected the insurer to bad faith liability. ACE cannot manufacture a "genuine dispute" based on an

15   abject refusal to follow established law. ACE's Memorandum offers no authority for its position

16   because there is none.  ACE's continued argument for "allocation" contrary to law is more evidence

17   of bad faith.

18   **VI.    THE COURT SHOULD DENY ACE'S MOTION TO STRIKE HP'S CLAIM FOR
            FEES AND PUNITIVE DAMAGES; HP HAS PROPERLY PLED A CLAIM FOR
19          BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

20       **A.    Motions to Strike Are Disfavored**

21       Fed. R. Civ. P. 12(f) provides only that a court may strike from any pleading "any

22   **redundant, immaterial, impertinent, or scandalous** matter."   But this is rarely done.[56]   ACE

23   ───────────────

24   [53]*Scottsdale Ins. Co.*, 36 Cal. 4th at 660 (emphasis added).

     [54]*Id.*

25   [55]*Buss*, 16 Cal. 4th at 57-58 ("An insurer may obtain **reimbursement *only* for defense costs
     that can be allocated *solely* to the claims that are not even potentially covered**.  To do that, **it
26   must carry the burden of proof** as to these costs by a preponderance of the evidence. And to do
     *that*, as we said in *Hogan*, it must accomplish a task that, 'if ever feasible,' may be 'extremely
27   difficult.' (*Hogan v. Midland National Ins. Co.*, 3 Cal.3d [553 (1970)] at p. 564.)" (bold emphasis
     added)).

28   [56]*Simmons v. John F. Kennedy Medical Ctr.*, 727 F. Supp. 440, 442 (N.D. Ill. 1989) (" '**Motions**

1    meritlessly argues that FAC paragraphs 50 through 97 of the FAC, and HP's request for *Brandt* fees

2    and punitive damages (Paragraphs 108, 109 and portions of the Prayer) should be stricken in the

3    alternative if the suit is not dismissed. ACE's presents no bases for doing so apart from the

4    arguments it raised under Rule 12(b)(6).

5        The Ninth Circuit has recently confirmed that "[t]he district court has no free-standing

6    **authority to strike pleadings** simply because it believes that a party has taken inconsistent positions

7    in the litigation. Rather, the district court's powers are generally limited to those provided by the

8    Federal Rules of Civil Procedure."[57] ACE presents no logic or authority to strike damage allegations

9    at the pleading stage. That is what a trial is for. Rule 12(f) does not authorize striking a damage

10   demand.[58] Rule 12(f) is not the appropriate vehicle to resolve whether a plaintiff's complaint states

11   a right to relief or portions of a complaint.

12       ACE moves to strike FAC paragraphs 50 through 97 because "as discussed above, these

13   paragraphs are either time-barred or barred by the absolute litigation privilege contained in

14   California Civil Code section 47(b)." ACE moves to strike paragraph 108 which seeks *Brandt* fees

15   (attorneys fees) and exemplary damages respectively, on the basis that they are not recoverable

16   "[b]ecause ACE has demonstrated that the bad faith allegations fail to state a claim (as either barred

17   by the two-year statute of limitations, the Civil Code section 47(b) privilege and/or subject to the

18   'genuine issue' doctrine." (Motion, p. 21:7-9) ACE claims that punitive damages are not

19   recoverable and the allegations at paragraph 109 and the prayer should be stricken because they

20   "refer to communications which were part and parcel of ACE's defense in Case No. C-99-20207 JW

21   and are barred by the statute of limitations, the litigation privilege and/or the 'genuine issue'

22

---

23   **to strike** under Federal Rule 12(f) **are not favored**, and **are usually denied** unless the language in
     the pleading has **no possible relation** to the controversy and is **clearly prejudicial**.' *Garza v.*

24   *Chicago Health Clubs, Inc.*, 347 F. Supp. 955, 962 (N.D. Ill. 1972). *See also Hanna v. Lane*, 610 F.
     Supp. 32, 34 (N.D. Ill. 1985). Furthermore, the federal rules require only that the pleadings provide

25   notice of the facts and substance of the claims against the defendant. *Crisostomo v. Stanley*, 857
     F.2d 1146, 1152 (7th Cir. 1988)." (emphasis added)).

26       [57]*PAE Gov't Servs., Inc.*, 2007 WL 4394427, at *2 (emphasis added).

27       [58]*Spell v. McDaniel*, 591 F. Supp. 1090 (E.D.N.C. 1984) held a motion to strike a punitive
     damage claim improper under Rule 12(f) (citing 5 WRIGHT AND MILLER, FEDERAL PRACTICE &

28   PROCEDURE § 1380 (1969)).

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
                                                                                MOTION TO DISMISS AND MOTION TO STRIKE
                                                                                No. 07-CV-04676-JW (RSx)

1  doctrine." (Motion, p. 21:17-19.)

2      ACE shows no "alternative" basis for striking paragraphs 50-97 if the Court fails to grant its

3  Rule 12(b)(6) motion. ACE's only two arguments (that the paragraphs are time barred or barred by

4  the Civil Code section 47(b) litigation privilege) are raised in support of ACE's Rule 12(b)(6)

5  motion. If the Court denies ACE's motion to dismiss, it has no basis to strike the allegations.

6      **B.**   **HP's Request for *Brandt* Fees Is Appropriate As an Item of Damages**

7      Paragraphs 35 through 97 and 104 through 109 of the FAC set forth a detailed timeline and

8  chain of events, facts supporting HP's claim for breach of the implied covenant of good faith and fair

9  dealing. These allegations are incorporated by reference into the HP's second claim for breach of

10  the implied covenant of good faith and fair dealing and summarized therein at paragraph 107. These

11  allegations are directly relevant to HP's bad faith claim and damages therefore. *Brandt*, 37 Cal. 3d

12  at 817 ("When an insurer's tortious conduct reasonably compels the insured to retain an attorney to

13  obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for

14  that expense. The attorney's fees are an economic loss – damages – proximately caused by the

15  tort. . . . Since the attorney's fees are recoverable as damages, **the determination of the recoverable**

16  **fees must be made by the trier of fact . . . .**" (emphasis added)).[59]

17      **C.**   **Specific Factual Allegations Support an Award of Punitive Damages**

18      Nowhere does ACE argue that the FAC fails to adequately allege sufficient facts to support a

19  claim for punitive damages under California Civil Code section 3294. ACE's sole argument is that

20  recovery is foreclosed for all of the reasons argued in its Rule 12(b)(6) motion to dismiss: ACE's

21  motion to strike should be denied for the reasons argued in opposition to ACE's motion to dismiss.

22  FAC paragraphs 35 through 109 allege sufficient specific facts alleged to sustain an award of

23  punitive damages.[60]

24  _____

25  [59] *Essex Ins. Co. v. Five Star Dye House, Inc.*, 38 Cal. 4th 1252, 1258 (2006) (" '*Brandt* merely
entitles the insured to all of the benefits due under the policy, undiminished by the expenses incurred
in retaining an attorney to recover under the policy.' ").

26  [60] *See Hughes v. Blue Cross of Northern California*, 215 Cal. App. 3d 832 (1989) (Award of

27  punitive damages upheld when a health carrier engaged in a conscious pattern of conduct designed
to deny the payment of claims (such as the one alleged by HP at paragraphs 35 through 109 of its

28  FAC). "The award of punitive damages finds a justification where it serves to deter socially
unacceptable corporate policies. . . . Thus, in *Neal v. Farmers Ins. Exchange*, *supra*, 21 Cal.3d 910,

1

## VII.    CONCLUSION

2        Plaintiff moves this Court to deny ACE's motion in its entirety.

3  Dated: February 19, 2008                **GAUNTLETT & ASSOCIATES**

4

5                                          By:____s/ James A. Lowe_____
                                               David A. Gauntlett
6                                              James A. Lowe

7                                          Attorneys for Plaintiff
                                           HEWLETT-PACKARD COMPANY
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  ―――――――――――――――
    923, **a judgment of punitive damages was upheld where evidence indicated that an insurer's**
26  **actions 'were all part of a conscious course of conduct,** firmly grounded in established company
    policy . . . .' " (emphasis added; footnote omitted)); *see also Neal v. Farmers Ins. Exchange*, 21 Cal.
27  3d 910, 922 (1978) (award of **punitive damages upheld based on delay** in payment of claims **and**
    **unreasonably forcing insured to institute arbitration proceedings** as a tactic to coerce
28  settlement).