# EXHIBIT C

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4
    Hewlett-Packard Company,     )   CV-07-4676-JW
5                                 )
                    Plaintiff,    )   San Jose, California
6                                 )
           vs.                    )
7                                 )   March 11, 2008
    ACE Property and Casualty     )
8    Insurance,                   )
                                  )   Pages 1-53
9                   Defendant.    )
    _____  )   COPY

10

11              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES WARE
12            UNITED STATES DISTRICT JUDGE

13
    A P P E A R A N C E S:
14

15  FOR THE PLAINTIFF:   Gauntlett & Associates
    Hewlett-Packard      BY:  David Gauntlett
16                            James Lowe
                         18400 Von Karman, STE 300
17                       Irvine, CA  92612

18

19  FOR THE DEFENDANT:   Hinshaw & Culbertson
    ACE Property &       BY:  Robert Romero
20  Casualty Ins.        One California St, 18th FL
                         San Francisco, CA  94111

21

22

23       (APPEARANCES CONTINUED ON THE NEXT PAGE)

24

25  OFFICIAL COURT REPORTER: SUMMER CLANTON, CSR,
                             CERTIFICATE NUMBER 13185

                                                      1

1   FOR THE DEFENDANT:   O'Melveny & Myers
    ACE Property &       BY:  Steven Bergman
2   Casualty Ins.        400 South Hope Street
                         Los Angeles, CA 91608
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    San Jose, California         March 11, 2008

 2                 P R O C E E D I N G S

 3                (Whereupon, court convened and the

 4    following proceedings were held:)

 5                THE CLERK:  Calling case number

 6    C-07-4676.

 7                Hewlett-Packard v.  ACE Property and

 8    Casualty Insurance.

 9                Counsel, please come forward and state

10    your appearances.

11                MR. LOWE:  Good morning, Your Honor.

12    James Lowe and David Gauntlett appearing on behalf

13    of HP.

14                MR. ROMERO:  Good morning, Your Honor.

15    Robert Romero, Hinshaw & Culbertson, on behalf of

16    defendant ACE Property & Casualty Insurance.

17                MR. BERGMAN:  Good morning, Your Honor.

18    Steven Bergman, O'Melveny & Myers, also on behalf

19    of defendant ACE Property & Casualty Insurance

20    Company.

21                THE COURT:  Very well.  This is ACE's

22    motion?

23                MR. ROMERO:  Yes, Your Honor.

24                Your Honor, I understand there's a

25    20-minute limit.  It's our understanding that
```

3

1    there's a case management conference as well, on

2    this case; will that be included in the 20 minutes?

3             THE COURT:  No, of course not.

4             I might stop the clock and give you a

5    little more time than 20 minutes.  I'm familiar

6    with this case, so I figured that you could go

7    right to the highlight of your argument.

8             MR. ROMERO:  Okay.

9             As the court knows, this is a motion to

10   dismiss.  And the court has had a long history with

11   this case and the underlying case which was tried

12   before the court.  I refer to that as the Nu-Kote

13   case.

14            I have a demonstrative piece of evidence,

15   and I moved it just before Your Honor took the

16   bench to give your clerks access.  I apologize for

17   the smallness of it.  I do have the same handout on

18   the Elmo board, so to the extent that it could be

19   projected.

20            Your Honor, we've raised three arguments

21   on the motion to dismiss.  We believe each of them,

22   independently, is sufficient to rule as a matter of

23   law.  The argument that I would like to start with,

24   however, Your Honor, is the Statute of Limitations

25   argument.

4

1          This is a bad faith case predicated on an

2    insurance company, my client's alleged failure to

3    defend.  California law, in the Ninth Circuit,

4    construing California insurance law is crystal

5    clear that in cases like this, the

6    Statute of Limitations begins to run when the duty

7    to defend is breached.

8          Now, the case is -- and I point the court

9    to the Archdale and Lambert case which we cite --

10   the rule is, essentially, this, Your Honor:  When a

11   policy holder tenders to an insurance company and

12   asks for a defense while the underlying case is

13   ongoing, the statute is, essentially, tolled; it's

14   an equitable tolling doctrine.  However, when the

15   underlying case is completed, the policy holder

16   then knows that the Statute of Limitations, the

17   two-year statute to bring an insurance bad faith

18   case, begins to run.

19         Now, in this case, those dates are

20   undisputed and incontrovertible.  The blowup that I

21   have prepared, references a number of dates.  And I

22   have this enlargement, also, with citations to

23   these various dates.  But this, frankly, Your

24   Honor, in my view, was less busy than the other

25   chart.

1          July 22nd, 1999, was the date the Nu-Kote

2    underlying case ended before Your Honor.  That's

3    when HP won the case.  The second date -- and I'm

4    going to tie this in later because it's important

5    to the opposition -- is October 13th, 1999.  That's

6    when a non-party, Xerox, came before you and moved

7    to intervene in the, then concluded, HP underlying

8    case.

9          The critical date, from our perspective,

10   is December 3rd, 1999.  That's when the

11   HP v. Nu-Kote action settles.  In the briefing

12   before you, you have the bankruptcy court from

13   Tennessee's order approving the settlement.

14         So following the judgment in the

15   underlying case, the jury comes back.  There's

16   negotiations between HP and Nu-Kote which culminate

17   a settlement, and that's December 3rd, 1999.

18         So at that point, Your Honor, the policy

19   holder in this case, HP, knows that the duty to

20   defend was at issue.  They contend it was

21   wrongfully breached, and at this point, the

22   Statute of Limitations, the two-year statutes set

23   forth in Code of Civil Procedures, section 339,

24   begins to run.

25         The date at the end of this chart is the

1    date when HP first sued my client for insurance bad

2    faith.  And that date is April 17th, 2002.  So if

3    we are to use the December 3rd, 1999 date, and we

4    believe that that's the date the court should use,

5    as you can see from the arrows on the side, the

6    claim is barred by five months.

7        When you move down the chart, Your Honor,

8    December 17th, 1999, here we have the mention of

9    the Xerox case again.  This is where Your Honor

10   denied Xerox's motion to intervene.  Subsequent to

11   that, Xerox, not HP and not Nu-Kote, but Xerox,

12   filed notice of appeal to the Ninth Circuit.  That

13   happens on January 14th, 2000.  And again I'll come

14   back to Xerox.

15       The next date that we use is

16   February 14th, 2000.  So at this point, Your Honor,

17   the jury has come back in the HP v. Nu-Kote case.

18   On December 3rd, 1999, the parties settle that case

19   ending that case, effectively.  But then we look at

20   the court docket from that underlying case on

21   February 14th, 2000.  This court, in its docket,

22   enters final judgment in the HP v. Nu-Kote case.

23       In terms of talking about when the case

24   ends in this court, I looked at the docket -- I

25   believe it's over here -- for the HP v. Nu-Kote

1    case.  And it says here, "date terminated:

2    February 14th, 2000."

3           And so when we looked at this case in

4    terms of evaluating whether HP's brand new lawsuit

5    for bad faith was time timely, this was an

6    important date for us.  And remember, before this,

7    we know the case ended before you; the parties

8    settle; and the case final judgment is entered on

9    February 14th, 2000.

10           When you interpose that timeline on the

11    cases that govern this type of inquiry, when a

12    policy holder expects a defense from an insurance

13    company, as long as that underlying case is

14    ongoing, Justice Arabian in the Lambert case said,

15    We are going to equitably toll that.  But once the

16    case has ended, the policy holder knows that it can

17    allege a damage at that point.  It knows it can

18    bring a breach of implied covenant in good faith

19    and fair dealing.

20           So the case is terminated, in this court,

21    as of February 14th 2000, at the very latest.  So

22    even if you don't accept an earlier date, which we

23    think should apply, I wanted to look at every date

24    that might apply.

25           Here's another date that might apply, and

1    they are two months late using that date.

2    March 22nd is another date that I reference.

3    That's where the parties stipulated to dismiss the

4    Xerox appeal with prejudice.  The Xerox, which I

5    mentioned three times now, Your Honor, is something

6    that merged in HP's opposition to our motion.

7         I believe their position is that, Wait a

8    minute, the date we believe should be used is

9    April 26, 2000, because at that point, the District

10   Court did a ministerial act and entered an order

11   that acknowledged the April 5th mandate from the

12   Ninth Circuit where it said, "the parties having so

13   agreed, it is ordered that the proceeding is

14   dismissed under the Federal rule of appellate

15   procedure 42(b)."

16        Xerox is important to this discussion

17   this morning because it is being used by HP to

18   suggest something that isn't true, which is that

19   Xerox had anything to do with its rights under my

20   client's policy, or its understanding of when they

21   had an obligation if they were going sue for bad

22   faith, to do so.

23        These dates --

24        THE COURT:  Remind me what the Xerox

25   intervention of was all about.  Why did Xerox seek

1    to intervene and on what side of the case and what

2    was its argument?

3          MR. ROMERO:  The underlying case was

4    unique because much of it was under seal and it's

5    still under seal.

6          I've asked that question, and the only

7    thing we can ascertain from Xerox is it happened

8    after the case was over.  We can look at the

9    court's docket and see references to pleadings.

10   But, Your Honor, I can't answer that question.  I

11   have not seen the actual pleadings; I believe those

12   are under seal.

13         THE COURT:  So that Xerox wished to

14   intervene and somehow the failure to allow it to

15   intervene was the subject of an appeal?

16         MR. ROMERO:  Yes.  Apparently, a notice

17   of appeal.

18         THE COURT:  And was there ever any tender

19   to ACE by HP of defense of the Xerox action to

20   intervene?

21         MR. ROMERO:  No, Your Honor.

22         THE COURT:  As you would argue the law,

23   wouldn't that be unnecessary in the sense that if

24   there had been a tender of the defense, if Xerox

25   was seeking to intervene against HP, let's presume

                                                      10

1    that that's the case, that would be covered by the

2    earlier tender, would it not?

3            MR. ROMERO:  Not necessarily so, Your

4    Honor.  It would depend on what the nature of the

5    allegations were on the motion to intervene.  That

6    was not before my client at any time, so I

7    respectfully say no, that's not necessarily the

8    case at all.

9            THE COURT:  All right.

10           MR. ROMERO:  In other words, we believe,

11   Your Honor, that the Statute of Limitations

12   controls here.  The dates are crystal clear.

13           Even if -- to use your question --

14   hypothetically, Xerox had some relation to my

15   client, which we say it doesn't.  Well, that's why

16   I add the April 5th date, because as of April 5,

17   2000, the Ninth Circuit says this is over as well.

18   So again, you've got two-years and 12 days.

19           This is a case, Your Honor, when HP

20   initially sued my client in a separate lawsuit on

21   April 17th, 2002.  We immediately responded with a

22   12(b)(6) motion at that time.  Subsequent to that,

23   Your Honor knows there has been a tolling

24   agreement, and the coverage case that continues to

25   be before Your Honor has gone on for years and

11

1    years.

2            The only response, Your Honor, to this

3    aspect, is the notion of a continuing loss that HP

4    will contend.  In our view, this case falls

5    squarely within the jurisprudence that has arisen

6    around an insurer's obligation to defend and the

7    consequences of it, if it does not defend when it's

8    supposed to.  And in all of those cases, the courts

9    have said the statute begins to run when the

10   underlying case ends.  There is no notion of

11   continuing loss.

12           And let me now get into the second

13   component, which I think, Your Honor, is equally

14   compelling here, and that's the notion of

15   litigation privilege.  This case is predicated on

16   the fact that you didn't pay, you didn't defend us.

17   That's part one.  Part two of the case is that you

18   are in bad faith because of all of these years

19   we've had to wait to receive defense dollars.

20           That case, in my mind, falls squarely

21   within the litigation privilege set forth in the

22   Code of Civil Procedure, section 47(b).  You have

23   that second part of this case, "we've had to wait,"

24   is criticizing an insurer for mounting a defense.

25           The cases, and the only case they cite to

1    support them, is the White v. Western Title case.

2    That case, essentially, says that when you're an

3    insurance company and you make lowball settlement

4    offers pre-litigation, at trial, the judge can let

5    the jury hear those.  But that case is very limited

6    on its facts.

7         The California case,

8    Physicians' Services v. Superior Court, that's a

9    1992 case, subsequent.  That's a Fourth District

10    case.  That's more like our case.  In that case,

11    Blue Cross was the insured defendant.  And

12    Blue Cross filed an answer that the plaintiff took

13    issue to and said, This is an additional grounds

14    for insurance bad faith, that you filed this answer

15    and you asserted affirmative defenses that you

16    could never prevail on.

17         And the court -- and more importantly,

18    they used White v. Western Title to support that

19    argument.  And in that case, the court says, No,

20    you can't do that; there's no such thing as a

21    malicious defense.

22         That's what's going here.  This 12(b)(6)

23    motion is very unique, in my mind.  Not only do you

24    have the complaint pled with specificity, but

25    attached to the complaint is, essentially, each and

13

1    every pleading that was not only submitted to Your

2    Honor, but submitted to Special Master Stone.

3         I'm one of the lawyers that has been with

4    this case probably the longest.  There's also a

5    factual component to this motion that can't be

6    divorced from the overall outcome.  This is a case

7    where in August of 1999, your predecessor on this

8    matter, Judge Williams, said that there is a duty

9    to defend issue here.  HP will argue that that was

10   a dispositive game-ending order, in the fact that

11   you didn't pay defense dollars since that time,

12   evidences your bath faith.

13        Well, as the court knows, there's been an

14   exhaustive procedural component to the coverage

15   case which started with Judge Williams saying,

16   Okay, I'm going accept HP's interpretation of the

17   contract; however, there's other issues here.  And

18   the primary issue is:  Was there late notice?

19   Would that have an impact on the potential for

20   coverage and subsequent duty to defend?

21        And more importantly, he started the

22   process of Special Master.  Twice, we've been

23   before Special Master Peter Stone, in 2000 and

24   later in 2006.  And the purpose of that inquiry was

25   to have Judge Stone calculate what amounts of

14

1    defense dollars, if any, would be owed.

2            Now, HP uses that activity and those

3    cases as a predicate to bad faith.  And in my mind,

4    Your Honor, that falls squarely within the

5    privilege.  This case is predicated solely on

6    communications that are evidenced in all the

7    pleadings before you in this case.

8            The last argument, and then I will

9    reserve the balance of my time as a genuine

10    dispute.  And again, Your Honor, this is a notion

11    that not every bad faith case needs to see a jury.

12    Not every bad faith case can survive this Rule

13    12(b)(6) process by simply saying there are triable

14    issues of fact.  The cases in the Ninth Circuit in

15    California note that if there's a genuine dispute

16    about whether coverage exists under the contract or

17    not, those cases should be dismissed as a matter of

18    law.

19            The response that HP provides to the

20    cases we cite in our brief was that, Wait a minute,

21    this has never been determined in a third-party

22    duty to defend case.  And Your Honor, that's flat

23    wrong.  The Lunsford case, which is a Ninth Circuit

24    case, is a case where the policy holder said, I'm

25    entitled to a defense for an abusive process claim.

1    The carrier says, Wait a minute, our policy only

2    covers malicious prosecution.

3         That case went to the trial courts and

4    there was a finding in both coverage and bad faith.

5    But on appeal, the Court of Appeals says, Well,

6    wait a minute, we are going to affirm the coverage.

7    You, carrier, were in breach of your policy

8    holders; you didn't discharge your policy holders'

9    right to a defense.  But on the bad faith case, we

10   are going to rule, as a matter of law, that there

11   was a genuine dispute.

12        The Genuine Dispute Doctrine has been a

13   significant doctrine for both the bench and the

14   insurance part, frankly.  Because prior to this

15   doctrine, every case would have to proceed beyond

16   this point.  But given the realty that bad faith is

17   not a standard of perfection, it's a standard of

18   reasonableness, if the carrier has a reasonable

19   position for its contract interpretation, that

20   should be sufficient.

21        In this case, we don't argue coverage to

22   convince the court that the other rulings were

23   incorrect; that's an issue for another day.  But,

24   we are saying that the positions that we took on

25   contract interpretation were reasonable as a matter

1    of law.

2    And similarly, and then I will end, the

3    whole six years in front of Judge Stone, Judge

4    Stone himself, when you read his recommendations,

5    compliments both sides for their presentation of a

6    very complex case.  Judge Stone isn't saying, You

7    are in bad faith; you are engaging in the process

8    that you shouldn't be putting your policy holder

9    through.

10    My client did exactly what the court

11    asked of us.  We mounted a vigorous defense in that

12    forum, and for that, this separate and new lawsuit

13    for bad faith shouldn't be allowed to proceed.  We

14    think each one of these arguments, standing alone,

15    is sufficient.  And I'm still curious to see how

16    they respond to these dates which we have

17    rigorously verified.

18    And I will reserve the balance of my

19    time.  Thank you, Your Honor

20    THE COURT:  Okay.  Counsel?

21    MR. LOWE:  Good morning, Your Honor.

22    I'd like to ask the court to consider a

23    couple of questions.  When did ACE's bad faith

24    begin?  And then more importantly, when did ACE

25    stop acting in bad faith?  Was it any time before

1    today?  When did ACE stop delaying and denying

2    payment?  What is the final act?

3         Now, ACE would like to avoid its

4    responsibilities and has spent the last decade

5    doing so.  We are coming up on the 10th anniversary

6    of the tender of the underlying case for the

7    defense, and this court has had the misfortune of

8    having to deal with that all that time, so it's

9    certainly aware of all the facts.  But this has

10   been an ongoing matter.

11        Initially, the declaratory relief suit

12   that was filed by HP, simply sought a determination

13   as to whether ACE owed a duty.  ACE fought that

14   pretty much tooth and nail.  Ultimately, this court

15   found over and over again that there was a duty to

16   defend starting in 1999 and continuing forward.  As

17   I counted, at least seven more orders of summary

18   judgement orders, all of which ACE ignored.

19        Now, ACE would like to argue that all of

20   their exposure to bad faith ended when the Nu-Kote

21   case ended, and we argue that is not the case.

22   First of all, we think they are factually incorrect

23   as to when the Nu-Kote case ended, and we laid that

24   out in our opposition.  But the Nu-Kote case was

25   somewhat complicated, including the appeal by Xerox

1    that forced HP and Nu-Kote into the Federal Circuit

2    Court of Appeals.

3            THE COURT:  Was Xerox intervening to

4    assert a covered -- a claim that would be

5    potentially covered under ACE policy?

6            MR. LOWE:  Your Honor, I'm not sure

7    exactly what Xerox was doing other than to,

8    perhaps, ride on the coattails of HP in the

9    determination that was made in the Nu-Kote case by

10   HP.

11           THE COURT:  So I take your answer to be

12   that you don't know whether Xerox was intervening

13   to assert a claim that was, essentially, covered by

14   the ACE policy?

15           MR. LOWE:  I do not know that.

16           THE COURT:  When did the bad faith begin?

17           MR. LOWE:  Well, Your Honor, we think the

18   bad faith began when ACE became so unreasonable in

19   their determination.  We think they should have

20   realized the duty to defend began when the case was

21   tendered.

22           And as Judge Williams found, the

23   complaint of the counterclaim and the extrinsic

24   evidence of the advertising materials, boxes and so

25   forth, were provided to HP.  And in August of 1999,

1    Judge Williams found there was a potential for

2    coverage and they had a duty to defend --

3              THE COURT:  I'm trying to answer the

4    question you put to me.  What would be your answer

5    as to when the bad faith began?

6              MR. LOWE:  I think the clearest time

7    would be the decision by Judge Williams, August 24,

8    1999, that it began then.

9              Conceivably, they may have begun earlier.

10   We haven't determined what their position or

11   activity was because we haven't had discovery in

12   this case to know what was going on in the claims

13   handling process.

14             And if I might, Your Honor, just clarify

15   that there are two components we are arguing in

16   this case.  One is improper claims handling.  In

17   other words, failure to evaluate and reasonably

18   consider the claims that HP was making for policy

19   benefits.  And the failure to do that, by itself,

20   can be bad faith.

21             And secondly, the delay and denial of

22   payment of policy benefits that has gone on all

23   these years and continues as we stand here today.

24             THE COURT:  Well, let's assume that I

25   find that ACE acted in bad faith after the

                                                    20

1    August 24, 1999 event.  Now, what happened on

2    August 24, '99?  That was when a judgment was

3    entered in favor of HP against ACE, that it had a

4    duty to defend, correct?

5             MR. LOWE:  That is correct.  That was the

6    first summary judgement order that they had a duty

7    to defend.

8             THE COURT:  All right.

9             Now, at that time, what was ACE's duty?

10            MR. LOWE:  It was to immediately,

11   completely and entirely, defend the case.

12            THE COURT:  Now, to defend the

13   HP/ Nu-Kote case.

14            MR. LOWE:  That is correct.

15            THE COURT:  What was going on in the

16   HP/Nu-Kote case as of August 24, 1999?

17            MR. LOWE:  Your Honor, I believe at that

18   point in time, the trial had just recently ended

19   and there were -- of course, the motion for summary

20   judgement had been filed while the trial was going

21   on.  I think it was proceeding in July and possibly

22   into August of 1999.  The case hadn't quite ended

23   at the time that Judge Williams entered the first

24   order.

25            THE COURT:  All right.

1          So let's assume that it should have, on

2      August 24th, entered to defend the case at that

3      point, and that it acted in bad faith for refusing

4      to do so.  When did Judge Williams make an order

5      bifurcating the issue for damages violation after

6      the declaration that there was a duty to defend?

7          Apparently, something happened in the

8      course of the process to give to a Special Master,

9      the question of how much money was owed.  When did

10     that happen?

11         MR. LOWE:  I believe that was in 2000,

12     Your Honor.

13         I don't have the exact date in front of

14     me, but what had happened prior to that time was

15     that ACE had filed -- there had been several

16     summary judgement motions and several motions for

17     reconsideration.

18         Judge Williams had allowed ACE to try to

19     show why he might be wrong about the duty to

20     defend.  They made various arguments.  He allowed

21     them to do additional discovery.  He said they

22     could take some discovery to determine the evidence

23     that could conclusively show that they had no duty

24     to defend.  They failed to provide anything to him.

25     So eventually, after several rounds of briefing, he

1    denied their motion for reconsideration.

2            THE COURT:  Your argument would be that

3    even that was done in bad faith?

4            MR. LOWE:  That would be part of it, Your

5    Honor.  We think this was a continuing course of

6    conduct that ACE had determined that they were

7    never going to pay this claim, or at least they

8    were never going to decide whether they were going

9    to pay the claim.

10           One of the important factors here is that

11   ACE never actually denied that they had a duty to

12   defend.  What they did was say they had to

13   investigate and they had to do discovery.  They

14   wanted to litigate and find out more facts

15           THE COURT:  I'm talking about

16   post-August 24, 1999.

17           At that point, the court had determined

18   there was a duty.  And I understand your argument

19   to be that after that date, ACE acted in bad faith

20   with respect to taking up that duty, and you were

21   telling me about some events where there was

22   reconsideration.

23           My question is:  Is your argument that

24   the request for reconsideration was done in bad

25   faith?

1          MR. LOWE:  Not per se -- not just that

2     fact.  We believe that the course of conduct is

3     showing a decision by ACE, not to properly evaluate

4     the case and never to actually take up the duty to

5     defend.

6          THE COURT:  Why would that be relevant

7     after there is a judgment that they have a duty to

8     defend?  What role does its evaluation play?

9          At that point, it's now a litigant that

10    has lost on an issue, and what I'm searching for is

11    whether or not that superseded the duty to defend

12    and now converted it into a judgment.  And if it is

13    now obligated under that judgment, to comply with

14    the judgment of the court, is it not?

15         MR. LOWE:  Well, we think it certainly

16    had an obligation to comply by making payments, by

17    continuing to pay, but it failed to do so, and that

18    would be an ongoing act of bad faith, an additional

19    part of the course of conduct.

20         There are two things:  Failure to pay and

21    failure to properly evaluate the claim.  Now, there

22    are a number of things that happened during the

23    coverage case that we think play into this.

24         One is that -- a very important one --

25    that they didn't ever say, We have no duty to

1    defend, and sue us if you like.  Instead, they said

2    Well, we haven't made up our mind yet.  Then we

3    went through all this litigation --

4              THE COURT:  Stay with me now, because

5    you're confusing me.

6              Are you telling me those are

7    determinations that were made after August 24, '99

8    or are you in he pre-August '99?

9              MR. LOWE:  I'm after '99.

10             THE COURT:  So after there's a judgment,

11    tell me what the evidence is with respect to the

12    allegation -- what's the allegation, with respect

13    to what ACE did after that date?

14             MR. LOWE:  Well, they continued, for

15    example, to file what we believe to be,

16    essentially, meritless motions for summary

17    judgement.

18             I think there were half a dozen of them.

19    And this court, either Judge Williams or yourself,

20    ruled repeatedly that there was no basis for their

21    argument that they had no duty to defend.

22             THE COURT:  Were they arguing no duty at

23    that point?

24             MR. LOWE:  Yes.

25             THE COURT:  Now, at some point -- and

1     that continued?

2             MR. LOWE:  It continued for the better

3     part of ten years.

4             THE COURT:  All right.

5             So that there was still before

6     Judge Williams, or to the extent I succeed

7     Judge Williams, still before this court, motions

8     arguing that the summary judgement should be

9     somehow vacated?

10            MR. LOWE:  That's exactly right.  And

11    this court made rulings on that in 2003, and 2004,

12    and 2006, and onward.

13            Now, all of this was going on --

14            THE COURT:  When did the -- let's assume

15    that the HP/Nu-Kote case came to an end.  When did

16    HP submit a bill to ACE of the amount that was

17    owed?

18            MR. LOWE:  The information was provided

19    to -- if I might back up just a moment.

20            Judge Williams, I think, conceded that he

21    had made a final decision and it was just a matter

22    of deciding how much was owed.  Then he referred

23    it -- and this was by stipulation -- referred it to

24    Special Master Stone.  Information was provided in

25    that case and we had a hearing, as counsel

1   indicated, in 2000.

2               THE COURT:  I don't want to know the

3   procedural history.

4               When was it that HP sent a bill to ACE

5   saying, Now that the judge had decided that there

6   has been -- that you have the obligation, here's

7   how much you owe us?

8               MR. LOWE:  I believe that was in 2000.

9               THE COURT:  Why does this take a belief

10  system?  There ought to be, at this point,

11  information with respect -- so maybe in 2000?

12  That's a long period.

13              MR. LOWE:  Well, I appreciate that.  We

14  had a hearing before Judge Stone, and this was part

15  of the discovery process.

16              In other words, Judge Williams had

17  referred the matter to him to decide the amount

18  that was owed.

19              THE COURT:  Did the judge ever enter --

20  did any judge enter an order of the amount that was

21  owed?

22              MR. LOWE:  You did, last year.

23              THE COURT:  All right.  So up to that

24  point, was ACE obligated to pay any amount?

25              MR. LOWE:  We believe that they were.

1          THE COURT:  How much?

2          MR. LOWE:  $28 million.

3          THE COURT:  Prior to that?

4          MR. LOWE:  Prior to that.

5          THE COURT:  What was the basis of the

6     obligation to pay prior to the judgment?

7          MR. LOWE:  Well, we had submitted to ACE

8     and to Special Master, evidence of the bills,

9     $28 million, and the back up for that.

10         Judge Stone had a hearing, and prior to that

11    hearing, Judge Stone made some rulings which I

12    believe that this court affirmed, saying that

13    because HP -- I'm sorry -- because ACE had failed

14    to actually defend, they lost the right to certain

15    allocation provisions of California law, and they

16    also had to suffer the burden of proof as to the

17    reasonableness and necessity of the amounts.

18         In that hearing, ACE stipulated to the

19    amount that HP had actually paid in defense costs,

20    but they argued that it wasn't reasonable, and

21    Judge Stone found it was reasonable and necessary.

22    This court ruled that he, perhaps, had used the

23    wrong standard and sent it back to him.  He did

24    that again a few years later, but found exactly the

25    same amount.

1          In neither case, did ACE ever present any

2     evidence to show that a single dollar, less than HP

3     requested, was due.  And this court, in 2007,

4     finally put all that to rest by entering a final

5     judgment that there was $28 million in principle

6     due, plus pre-judgment interest.

7          Now, the process of deciding precisely

8     how much took a long time, but we think that --

9          THE COURT:  At that point, is it the duty

10    to defend at issue or the duty to pay a judgment?

11         MR. LOWE:  Well, there was no final

12    judgment.  And ACE took the position that they

13    didn't have to pay until there was a final

14    judgment.

15         THE COURT:  Listen to my question.

16         At that point, when the judgment was

17    entered as to $28 million, was that a judgment

18    which liquidated a prior adjudicated duty to

19    defend?  Or was it by way of judgment as to the

20    amount owed?  Or was that a judgment finding that

21    there had been an obligation under the underlying

22    case that had been breached earlier?  What's the

23    character of that judgment?

24         MR. LOWE:  The one in 2007?

25         THE COURT:  Yes.

1          MR. LOWE:  Well, we think that is a final

2     judgment that's enforceable.  It's still pending

3     amendment in this court at the moment.  And then

4     ACE has indicated it intends to appeal.  So this is

5     an ongoing process.

6          THE COURT:  So that judgment is still

7     appealable?

8          MR. LOWE:  Yes, Your Honor.

9          THE COURT:  Would it be bad faith for ACE

10    to appeal it?

11         MR. LOWE:  Not per se.

12         THE COURT:  Well, wait.  What is the

13    difference between appealing it and arguing on

14    appeal about it and the pre-appeal conduct that you

15    are complaining is in bad faith here?

16         MR. LOWE:  Well, Your Honor, we think you

17    don't focus on just one item, that this particular

18    motion was bad faith or this particular appeal was

19    bad faith, but we are talking about a course of

20    conduct.

21         THE COURT:  What is the difference

22    between arguing on appeal and what was going on

23    prior to the appeal?  What is the significance

24    between that?

25         MR. LOWE:  It might depend on whether

30

1   they make reasonable arguments on appeal --

2          THE COURT:  Let's assume they make the

3   same arguments on appeal that they made before me

4   and they lost; namely, this bifurcation of the

5   issue, because HP was the plaintiff in the case and

6   there were counterclaims.

7          Let's say they litigate all the same

8   issues on appeal because there's never been a

9   review of the determinations that have been made by

10  the court.  But assuming they take the same

11  position, would the appeal be prosecuted in bad

12  faith.

13         MR. LOWE:  Well, I think the appeal would

14  be part of a bad faith, coercive conduct that --

15         THE COURT:  So they appeal at the peril

16  of being found in bad faith?

17         MR. LOWE:  That is correct.

18         What they should have done, if I might

19  say -- we are not saying they can't litigate, that

20  they can't argue what they are arguing.  But the

21  law is that you have to defend immediately and

22  entirely, and if you do so properly --

23         THE COURT:  But that's over.  There's no

24  longer any litigation to defend, correct?

25         MR. LOWE:  That is correct, Your Honor.

                                                    31

1    They should have paid a long time ago.

2    They should have paid at any time.  They could have

3    paid yesterday, but they haven't.  If they pay,

4    then they can appeal.  They can continue to

5    litigate, but they can't continue to delay the

6    payment that is due to HP.

7    THE COURT:  Could they post an appeal

8    bond and still litigate?

9    MR. LOWE:  I think that would be

10   improper.  I think they have a duty to actually

11   pay.  And then if they turn out to be correct on

12   appeal, then they have a right, potentially, to

13   reimbursement.

14   THE COURT:  So they have given up their

15   right to even post a supersedes bond.

16   MR. LOWE:  They can post a bond, but it

17   is at the risk of continuing bad faith.

18   In other words, they have a duty to

19   defend this matter or to pay the claims.

20   THE COURT:  Let me ask another question.

21   When the declaratory judgment action was

22   filed, and I had that in February of 1999 --

23   MR. LOWE:  That's correct.

24   THE COURT:  -- and neither one of you

25   addressed this, so it's only my curiosity.  What

1    gives HP the right to file a lawsuit against ACE

2    for declaratory judgment, without raising in the

3    conduct of that litigation, that ACE is acting in

4    bad faith?

5        MR. LOWE:  Well, Your Honor, at that

6    point in time, HP simply wanted to determine that

7    they had a right to defense.  This was early in the

8    case, relatively, and they have a right under the

9    Declaratory Judgments Act to have that

10   determination made.  HP did not believe, at that

11   point in time, that ACE was acting unreasonably and

12   in bad faith.

13       THE COURT:  Well, if in the course of

14   that litigation, HP came to believe that ACE was

15   acting in bad faith, why wasn't it incumbent upon

16   HP to include in that litigation, that was already

17   ongoing between the two parties, a claim of bad

18   faith?  Why could it end that litigation with a

19   judgment and later file a lawsuit about conduct

20   that took place during the course of this

21   litigation?

22       MR. LOWE:  Well, they could have filed a

23   bad faith claim at various times, but they don't

24   have to file a bad faith claim until the final act

25   of bad faith that occurs.

33

1    If I might direct the court's attention

2    to a couple of cases we have cited in our brief, in

3    our opposition on page eight.  The <u>Pugliese</u>

4    decision, for example, had to do with when a

5    Statute of Limitations expires.

6    This was not a bad faith case, but it had

7    to do with a domestic violence matter that went on

8    for 13 years.  And the court found that they

9    could -- that the plaintiff could have filed a suit

10    earlier, but the cause of action didn't accrue

11    until the last act in that whole course of conduct.

12    There's another case in the same footnote 19 on

13    that page --

14    THE COURT:  Let me ask it another way.

15    I understand that line of cases.  The

16    HP/Ace case is ongoing.

17    MR. LOWE:  That is correct.

18    THE COURT:  Why isn't the lawsuit that is

19    now being brought for bad faith, a part of that

20    lawsuit?

21    MR. LOWE:  Well, there are two parts to

22    this answer, Your Honor.

23    First of all, we asked to amend the

24    complaint, and this court denied our right to do so

25    and found that we should just file a separate case.

34

1    So that's why this case is here.  But prior to that

2    time, and while the coverage case was pending, he

3    had filed a bad faith claim against HP, and the

4    parties agreed, mostly for their own convenience,

5    that the bad faith issue should be held over until

6    a later time.

7              THE COURT:  Now, I understand that.

8              And I remember saying what I said to you

9    all because we were late in the case and I wanted

10   and end to the case that was on my docket since

11   1999, or the court's docket since '99.  But this

12   case was brought in April 2002.  And at that time,

13   I didn't enter an order of whether or not that case

14   should be separate or a part of this case.

15             MR. LOWE:  That's correct.

16             THE COURT:  But you are acknowledging

17   that on April 17, 2002, when HP filed its bad faith

18   case, it was bad faith that it alleged was taking

19   place in the conduct of the lawsuit filed in 1999.

20             MR. LOWE:  That is correct.

21             THE COURT:  But it felt, legally, it

22   could bring it as a separate lawsuit as opposed to

23   a supplemental complaint in the 1999 litigation.

24             MR. LOWE:  That is correct.

25             We know of no case that says you have to

1    bring it within the same lawsuit.  It is,

2    obviously, common for that to occur, but it isn't

3    necessary that it occur within the same lawsuit.

4        THE COURT:  Well, the reason I'm

5    concerned is that in the '99 lawsuit, you had

6    already gone to judgment.  There was a summary

7    judgement on the issue of liability.

8        MR. LOWE:  Well, it was an interlocutory

9    judgement, yes.  And ACE continued to contest that,

10   and they continued to file motions to overturn that

11   matter.

12       So we were, obviously, hoping this was

13   going to be over soon, but it turned out not to be

14   so.

15       THE COURT:  I know I've used our time

16   unwisely, perhaps, but let's turn to the

17   Statute of Limitations issue.

18       So your argument is the bad faith began

19   on August 24, 1999, and the reason you are giving

20   yourself a more liberal Statute of Limitations is

21   that you get to wait until the final act of bad

22   faith before the two-year statute starts to run?

23       MR. LOWE:  That's correct.  That's the

24   first argument we make.  And, in fact, we cited the

25   Lockary v. Kayfetz case which Judge Williams, in

36

1    this court, found that there's a continuous course

2    of events --

3              THE COURT:  So a final act of bad faith

4    has not occurred yet because your argument is that

5    the appeal would be taken in bad faith, so you

6    could wait some two years hence, and then wait

7    another two years after the decision on the appeal.

8              And if the appeal -- if we are turned

9    around on appeal, which I hope not, but if I made a

10   mistake and the Court of Appeals said, No there

11   shouldn't be a bifurcation between the plaintiff

12   cost incurred by HP and the defense costs on the

13   counterclaim, go back and do it again; what becomes

14   of the bad faith claim?

15             MR. LOWE:  Well, potentially, the bad

16   faith claim still lives, but it depends on what the

17   Court of Appeals finds.  But very likely, in many

18   of these cases, where the duty to defend is

19   reversed, the bad faith is also reversed, if there

20   has been a finding of bad faith.

21             THE COURT:  So that, perhaps, your action

22   is premature.

23             MR. LOWE:  Well, potentially, but as I

24   say, many times as this court knows, people will

25   bring these things at the same time.

37

1    THE COURT:  Doesn't the fact that there

2    is a potential that the Court of Appeals will find

3    that the defense costs can be separated from the

4    prosecution costs, lend itself to a finding that

5    there is no bad faith on the merits?

6    In other words, if ACE is right in its

7    position -- if it's ultimately found to be correct,

8    that in HP bringing a lawsuit, there is no duty to

9    defend, but when someone brings a counterclaim,

10   there is a duty to defend.  That's been ACE's

11   position, and we've taken a contrary position, but

12   that has not been finally decided.

13   Your argument on bad faith is that you

14   have been right all along and that ACE has been

15   wrong, so wrong that it's been malicious and in bad

16   faith.  If that issue is still appealable and that

17   could be turned around, that would mean that the

18   bad faith action would go away; you are agreeing

19   with me?

20   MR. LOWE:  I think that's probably true.

21   Now, Your Honor, we think there are

22   factual questions and jury questions as to when the

23   bad faith began and when it ended.  ACE will argue

24   that we did the correct thing at this point, maybe

25   we did something wrong at another point, and so

38

1    forth.  We haven't completed discovery on this.  We

2    have no idea, really, what the claims handling was

3    that was going on behind the scenes.  But this

4    court, in the coverage action, made a series of

5    findings that there was a duty to defend, and

6    continued to tell ACE that they had a duty to

7    defend and a duty to pay.

8         The court has found the amount that they

9    have a duty to pay, and they haven't done any of

10   those things.  And potentially, at some point in

11   time, the bad faith began.  We think it began early

12   and that it continues.

13        But the claims handling is one of the

14   major issues because we think ACE, internally, had

15   to have been making decisions as this court was

16   issuing orders, that they are going to ignore that

17   order and they are not going to pay this time.

18   Let's file another motion, get another order and

19   ignore that order.  On and on, we think this course

20   of conduct is a major part of the bad faith issue.

21   And separately, the failure to pay is a further --

22   and delay in payment is a separate bad faith claim.

23        I think it's important to understand that

24   although ACE took the position that they didn't

25   have -- they didn't know, initially, whether they

                                                    39

1   owed a defense, they never denied a defense.  They

2   argued against it, of course, but they obviously

3   decided that there was at least a potential for

4   coverage, requiring a duty to defend at some point,

5   because much later in the process, in 2003, they

6   actually paid a part of the defense costs.

7          Long after the so called

8   Statute of Limitations was expired.  So they were

9   making determinations in their claims handling that

10  maybe they did have a duty to defend, but it wasn't

11  28 million it was only 11 million

12         THE COURT:  Well, I considered that after

13  Judge Williams made his order, that it was

14  unquestioned they had a duty to defend.

15         The real issue here is not whether they

16  had a duty to defend, but whether they acted in bad

17  faith, in your calculation, August 24, 1999, and

18  the conduct of litigation over the amount.

19         MR. LOWE:  That's correct.

20         By delaying the payment, by litigating

21  instead of paying, and by putting their insured

22  through this process -- frankly, this is a unique

23  case because if this course of events had happened

24  to any normal insured, other than a large company

25  like HP, the insured would be bankrupt by now and

40

1    we wouldn't be in front of this court.

2          So dragging on this failure to pay for a

3    decade is, frankly, outrageous behavior, we think.

4          THE COURT:  I think this whole situation

5    is outrageous, not necessarily bad faith, but I do

6    agree with you that this has been long and arduous.

7          It would be simpler for all of us that if

8    on August 24, 1999, a judgment had been entered not

9    only that there was a duty, but liquidating that

10    duty in terms of an amount that was owed.

11          I worry that I have conflicting

12    principles involved.  The principle that a litigant

13    who, in good faith, may wish to contest the amount

14    that is owed, and the principle of a policy holder

15    who is entitled to have those expenses paid.

16          And I agree with you that, perhaps, under

17    other circumstances, where the failure to defend

18    and to pay for the defense risks greater liability,

19    it would be a different case.

20          This is a case which HP ultimately won.

21    It didn't have to pay out any liability.  The

22    defense costs is what we are here litigating about

23    and it's an enormous amount.  $28 million is a

24    tremendous amount, and I have to judge whether or

25    not ACE, legitimately, could contest it's

41

1    obligations to pay under these circumstances.

2            Thank you for your argument.  You did

3    reserve a small amount of time, and let me have you

4    have that small amount of time back to respond.

5            MR. LOWE:  Well, Your Honor, if I might

6    just briefly mention we think the

7    Statute of Limitations has not expired because

8    under Rule 58, the action -- the mandate from the

9    Court of Appeal was not entered into the docket of

10   this court, which under Rule 58 and Rule 52,

11   actually is the final act terminating this case.

12   The cases cited by ACE --

13           THE COURT:  I thought your argument is

14   that the statute is still open.

15           MR. LOWE:  Well, it is.  But even if you

16   followed that --

17           THE COURT:  Once you argue that this

18   statute remains open because the final act of bad

19   faith is not -- I'm not even worried about those

20   matters, that's a legal principle that I've got to

21   look at.

22           MR. LOWE:  Your Honor, a couple of other

23   points --

24           THE COURT:  I'm done with your argument

25   because I'm out of time, at this point.

1          MR. LOWE:  All right.

2          Thank you very much.

3          MR. ROMERO:  Thank you, Your Honor.  I

4     will be as brief as I can.

5          THE COURT:  I will cut you off soon, but

6     I wanted to give you an opportunity.  If you heard

7     anything in the argument by your opponent that you

8     wanted to, specifically, rebut.

9          MR. ROMERO:  Yes, Your Honor.  A couple

10    of points.

11         Judge Williams' August 24th, 1999 order

12    was not a judgment, it was an order.  I have a

13    timeline here that I won't show, but essentially,

14    in August 24, 1999, that's not a judgment.

15         THE COURT:  What was it?

16         MR. ROMERO:  It's an order where

17    Judge Williams said there's a potential for

18    coverage.  He interpreted the policy.

19         THE COURT:  Wasn't it a partial summary

20    judgement?

21         MR. ROMERO:  It was a motion on the duty

22    to defend.  It was a partial summary judgement on

23    the declaratory relief action, but in coverage

24    cases, it was unusual in this respect.

25    Judge Williams said, There's a potential for

43

1    coverage; I'm going to agree with HP's

2    interpretation; however, there's still an issue of

3    late notice.  And if you, ACE, can prove late

4    notice, there might not be coverage at the end of

5    the day.

6           More importantly, what Judge Williams did

7    was on August 24th, 1999, we get the order saying

8    we are going to agree with HP, there's potential

9    for coverage.

10          On May 1st, 2001, Judge Williams ruled

11   the scope of the duty did not include pre-tender.

12   You mention the 28 million.  The case tried before

13   you incurred $54 million in fees.  So again, fast

14   forward, there's nothing to pay because we still

15   don't know the amount.  In May 1st, 2001, there's

16   an order from Judge Williams saying pre-tender is

17   not available to you.  HP will, presumably, go to

18   the Ninth Circuit on that issue.

19          Fast forward to June 19th, 2001, that was

20   the date you asked counsel about when Judge Stone

21   became involved.  Precision matters in these dates.

22   They said 2000.  It's June 19th, 2001.  We get

23   Judge Williams appointing Judge Stone, after our

24   stipulation, as Special Master, to compute and

25   determine the amounts.  You asked when could we

                                                    44

1    pay?  Well, we are in 2001, and we are getting a

2    Special Master to determine that.  Underscoring

3    again, what happened in '99 wasn't a judgment.

4            On March 31st -- October, 2002,

5    Judge Stone conducted a two-week damage hearing,

6    essentially a trial, where we, ACE, put on

7    evidence.  I was trial counsel.  Bob Cooper, who

8    tried the case, did a fabulous job for HP.  I

9    cross-examined him, and I said, Mr. Cooper, you had

10   an affirmative case to prove.  Yes, you incur money

11   when you are a trial lawyer and you put on

12   witnesses; that was done

13           THE COURT:  I'll tell you what.  I will

14   short circuit this by giving this as a proposal.

15           You've done an excellent job in briefing

16   the case, but the one thing that I would be helped

17   from both sides because the complaint, itself, is a

18   recitation of the events, all of the events.  And

19   it's hard for me to tell, from the complaint, what

20   the precise bad faith is and which acts are being

21   done in bad faith.

22           And so it could be that I would deny --

23   or grant the motion with leave to amend, but I

24   haven't decided that yet.  What I think I would be

25   helped by is the kind of thing you are doing now;

1    that is, a precise timeline of all of the events in

2    the three lawsuits.

3            We now have three lawsuits involved here.

4    We've got the HP/Nu-Kote case.  We've got the

5    HP/ACE case, number one.  And now HP/ACE number

6    two, subpart B, because it started and then it was

7    suspended and it came up again.

8            But I would be helped by putting all of

9    those events on a single timeline, with various

10   lawsuits on that timeline, so I could compare

11   what's happening when in those three circumstances.

12   And I think you could do that as a joint project

13   because you are all agreeing that these are all

14   events that have transpired.  And then what you

15   would help yourselves out by doing is telling me

16   the significance of that, from HP standpoints, why

17   that was bad faith to do something.

18           Now, it's bad faith duty to defend, it's

19   not just bad faith.  It's got to be bad faith with

20   respect to a particular duty.  And I want to know

21   what duty HP claims was being breached at that

22   point by that conduct.

23           And then the other significant bit of

24   information would be ACE's position as to why it

25   was acting in a legitimate way, in doing what it

1    was doing, at that point in time.  That's the kind

2    of structure I need, and then you need to figure

3    out if you are going to go forward with this case.

4              Ultimately, if you decide you are going

5    to now litigate this case, and I believe there is a

6    claim that arises within the applicable

7    Statute of Limitations, we still will be aided by

8    this chart.  It will help us to know when the

9    Statute of Limitations runs, as to what conduct HP

10   is claiming, and it will help us to see from ACE's

11   standpoint, of why it claims it was privileged to

12   do what it did.

13             That's what I want, and that's how my

14   order will read.  Now, I'm not sure what I will do,

15   maybe I will keep the motion under submission while

16   you give me that information.  But I appreciate

17   your argument.

18             MR. ROMERO:  We would be happy to that.

19   When would you like that, Your Honor?

20             THE COURT:  I will let you know in my

21   order.

22             MR. ROMERO:  Okay.  Thank you, Your

23   Honor.

24             THE COURT:  I don't need a case

25   management conference here today to do that.

47

1        MR. ROMERO:  One last point.

2        The case that I mentioned earlier,

3   California Physicians' Services v. Superior Court,

4   reads as follows:  The principal purpose of section

5   47(2) is to afford litigants and witnesses the

6   utmost freedom of access to the courts without fear

7   of being harassed subsequently by derivative court

8   actions.  Section 47(2) promotes the effectiveness

9   of judicial proceedings by encouraging attorneys to

10  zealously protect their client's interests.

11       We believe when you see the timeline, you

12  will see how that's implicated in this case.

13       THE COURT:  I'm sure you will point that

14  out to us as well.

15       Thank you very much.

16       MR. ROMERO:  Your Honor, the case

17  management conference --

18       THE COURT:  I don't need that.

19       MR. BERGMAN:  Your Honor -- I

20  appreciate -- one issue though, discovery is

21  ongoing in this case, and your ruling on this

22  motion to dismiss will either eliminate the need

23  for discovery or potentially curtail the amount of

24  discovery that's going on.

25       So the question we have here is whether

1    there should be a stay of discovery pending the

2    ruling on the motion --

3              THE COURT:  What kind of discovery is

4    going on?

5              MR. BERGMAN:  They have served,

6    approximately, a 120 document requests, a number of

7    interrogatories, and a number of request for

8    admissions.  They are seeking information both

9    before the filing of the lawsuit and information

10   after the filing of the lawsuit in February, 1999.

11             THE COURT:  Why don't you suspend

12   discovery until after you get this order telling

13   you what I want, and then we will have another case

14   management conference if the case survives the

15   ruling on the motion.

16             MR. GAUNTLETT:  Just to be clear, Your

17   Honor, once you give us the order from the date of

18   that order going forward, discovery can reconvene?

19             THE COURT:  I'll address the reconvening

20   of discovery as well.

21             If there is a case going forward, of

22   course, you are going to get all of the discovery

23   you need.  You should preserve any of the

24   information that is pertinent to the case.  I'm

25   sure that's already in place.  But I want to see

49

1    the case before I can help you out on what

2    discovery is pertinent.

3              MR. LOWE:  Your Honor, if I might say,

4    one of the things we are presently arguing on that

5    actually has a hearing scheduled later this month

6    before the magistrate judge is obtaining documents

7    concerning the claims handling process, which is

8    part of our claim.  So that is a fairly important

9    thing for us to know about.

10             THE COURT:  I want to suspend that as

11   well because part of what I'm trying to decide is

12   whether claims handling is really at issue here.

13             What I hear, and perhaps claims handling

14   is at issue, but the defense has raised the

15   litigation privilege.  I need to study that because

16   there's a difference between handling a claim, in

17   the sense that I think of it as traditional

18   insurance conduct, and defending yourself against a

19   claim that is being brought by your policy holder

20   against you.  And where those two things come

21   together is what this case is about, and I want to

22   make sure I understand the landscape.

23             So hold off on that.  It won't take me

24   long, once you give me the timeline I'm asking you

25   for, to give you an order.  So just suspend

1    whatever you are doing.  Tell the magistrate judge,

2    if you've got motions pending, that you may need to

3    delay that if I take too long.  I shouldn't, but

4    bring that to my attention if you believe I'm

5    putting that motion practice in jeopardy.  But I

6    will try to lay out from today's hearing, what it

7    is I want from the two sides to help me understand

8    all of this.  I will take a look at this Xerox

9    case, that's an interesting feature that I hadn't

10   focused on before.

11            So you can feel free to put whatever you

12   know before the court, but if you don't know, I

13   will have to figure it out for myself.

14            MR. BERGMAN:  One final question, Your

15   Honor.

16            In the underlying coverage action, there

17   is a motion on prejudgment interest and costs

18   pending before Your Honor, that's why the time to

19   appeal has not run yet, we are pending the ruling

20   from Your Honor on that.

21            THE COURT:  Well, I asked my staff

22   whether or not there had been a judgment which was

23   appealable, and I was told that they considered

24   that the judgment I had issued was appealable and

25   that there was post-judgment issue with respect to

                                                    51

1  fees and costs.  And it could be that you're

2  regarding it as not a final judgment in the case,

3  and reserved for yourselves, argument and appeal

4  rights.

5          But I don't want to weigh in on that.  I

6  will, as quickly as I can -- the question that I

7  had on my desk had to do with Special Master fees,

8  and I thought I had enough information to decide

9  that issue, and I'll give you a decision on it as

10 quickly as I can.

11          MR. BERGMAN:  Thank you, Your Honor.

12          MR. LOWE:  Thank you, Your Honor.

13          (Whereupon, the proceedings in this

14 matter were concluded.)

15

16

17

18

19

20

21

22

23

24

25

1    STATE OF CALIFORNIA    )

2                                    ) ss:

3    COUNTY OF SANTA CLARA )

4

5            I, THE UNDERSIGNED OFFICIAL COURT

6    REPORTER OF THE UNITED STATES DISTRICT COURT FOR

7    THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH

8    FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

9    CERTIFY:

10           THAT THE FOREGOING TRANSCRIPT,

11   CERTIFICATE INCLUSIVE, CONSTITUTES A TRUE, FULL AND

12   CORRECT TRANSCRIPT OF MY SHORTHAND NOTES TAKEN AS

13   SUCH OFFICIAL COURT REPORTER OF THE PROCEEDINGS

14   HEREINBEFORE ENTITLED AND REDUCED BY COMPUTER-AIDED

15   TRANSCRIPTION TO THE BEST OF MY ABILITY.

16

17   {_____}

18        Summer A. Clanton

19        Official Reporter, CSR No. 13185

20

21

22

23

24

25

                                                            53

# EXHIBIT D

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Hewlett-Packard Co., | NO. C 07-04676 JW |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS WITH LEAVE TO AMEND** |
| v. | |
| ACE Property & Casualty Insurance Co., | |
| Defendant. | |

_____/

## I. INTRODUCTION

Hewlett-Packard Company ("HP" or "Plaintiff") brings this diversity action against ACE Property & Casualty Insurance Company ("ACE" or "Defendant"), alleging breach of the implied covenant of good faith and fair dealing. HP alleges that ACE made a bad faith denial of HP's claim for defense of a third party suit for unfair competition.

Presently before the Court is ACE's Motion to Dismiss or, in the Alternative, Strike HP's First Amended Complaint. (hereafter, "Motion," Docket Item No. 28.) The Court conducted a hearing on March 10, 2008. Based on the papers submitted to date and oral arguments of counsel, the Court GRANTS Defendant's Motion to Dismiss with leave to amend.

## II. BACKGROUND

In a Complaint filed on September 11, 2007, Plaintiff alleges as follows:

In 1994, HP sued non-party Nu-Kote International, Inc. for patent infringement. (First Amended Complaint ¶ 8, hereafter, "Complaint," Docket Item No. 8.) Nu-Kote filed a

counterclaim against HP alleging unfair competition and antitrust violations.[1]  (Id. ¶ 9.)  The scope of Nu-Kote's claims expanded in June 1996 and again in 1999 with the filing of amended counterclaims.  (Id. ¶¶ 10, 15.)  In February 2000, HP obtained a jury verdict against Nu-Kote.  (Id. ¶ 20.)  Nu-Kote appealed the judgment to the Federal Circuit Court of Appeals, but the appeal was dismissed after Nu-Kote and HP reached a settlement.  (Id. ¶ 21.)

During the Underlying Action, HP was covered by an insurance policy issued by ACE.  (Id. ¶ 22)  On June 13, 1998, HP notified ACE of the Nu-Kote action and tendered defense of the counterclaims pursuant to the policy.  (Id. ¶ 26.)  ACE neither accepted nor denied the claim.  (Id. ¶ 28.)  On February 18, 1999, HP filed an action against ACE seeking a declaratory judgment that ACE had a duty to defend HP against Nu-Kote's counterclaims.[2]  (Id. ¶ 28.)

On August 24, 1999, Judge Spencer Williams granted HP's motion for summary judgment, finding that Nu-Kote's counterclaims were potentially covered under the policy.  (Id. ¶ 29.)  Judge Williams also found that ACE's duty to defend was triggered by HP's June 13, 1998 tender.  (Id.)  The matter was referred to a Special Master for a determination of the amount of damages for which ACE is liable.  (Id. ¶ 31.)  For the past eight years, ACE has challenged the amounts determined by the Special Master despite numerous rulings in HP's favor.  (Id. ¶¶ 32-38.)  ACE has also refused to pay the amounts that are not disputed.  (Id. ¶¶ 142-224.)

On April 17, 2002, HP filed an action against ACE for breach of the implied covenant of good faith and fair dealing.[3]  (Id. ¶ 228.)  The parties stipulated to dismiss that

---

[1]  The Court refers to Nu-Kote's counterclaim against HP as the "Underlying Action."

[2]  The Court refers to HP's claim against ACE for coverage as the "Coverage Dispute."

[3]  The Court refers to HP's present claim against ACE for bad faith denial as the "Bad Faith Claim."

action and toll any applicable statute of limitations from that point forward.  (Id. ¶ 229)  The

stipulation preserved all rights and defenses that existed as of April 17, 2002.  (Id., Ex. 98.)

On the basis of the allegations outlined above, HP alleges a single cause of action for breach

of the implied covenant of good faith and fair dealing.  HP seeks general and compensatory damages

in excess of $21 million, punitive damages as determined by the Court, and attorney fees.

Presently before the Court is ACE's motion to dismiss.

### III.  STANDARDS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against

a defendant for failure to state a claim upon which relief can be granted against that defendant.

Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient

facts alleged under a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

(9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-534 (9th Cir. 1984).

For purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the

complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v.

City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  Any existing ambiguities must be resolved

in favor of the pleading.  Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973).

However, mere conclusions couched in factual allegations are not sufficient to state a cause

of action.  Papasan v. Allain, 478 U.S. 265, 286 (1986); see also McGlinchy v. Shell Chem. Co., 845

F.2d 802, 810 (9th Cir. 1988).  The complaint must plead "enough facts to state a claim for relief

that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. __ , 127 S. Ct. 1955, 1974

(2007).  Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect

by amendment.  Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000).

### IV.  DISCUSSION

ACE moves to dismiss on the grounds that the bad faith claim is barred by the statute of

limitations or by the litigation privilege.  (Motion at 6, 10.)

3

**United States District Court**
For the Northern District of California

**A.    Statute of Limitations**

Since this is a diversity action, the Court applies California law to determine the parties

substantive rights. Erie Railroad Company v. Tompkins, 304 U.S. 64 (1938). State statutes of

limitations are deemed substantive for Erie purposes. Guaranty Trust Co. V. York, 326 U.S. 99, 110

(1945). If the expiration of the applicable statute of limitations is apparent from the face of the

complaint, the defendant may raise a statute of limitations defense in a Rule 12(b)(6) motion to

dismiss. Jablon v. Dean Witter & Co., 614 F.2d 677, 682 (9th Cir. 1980). Under California law, a

claim for breach of the implied covenant of good faith and fair dealing proceeding under a tort

theory is governed by a two year statute of limitations.[4] Smyth v. USAA Property & Casualty Ins.

Co., 5 Cal. App. 4th 1470, 1477 (1992); Cal. Civ. P. Code § 339(1).

In an action based on a defendant's failure to defend, a plaintiff's claim accrues when the

insurer refuses the plaintiff's tender. See Lambert v. Commonwealth Land Title Ins. Co., 53 Cal. 3d

1072, 1077 (1991.) "Although the statutory period commences upon the refusal to defend, it is

equitably tolled until the underlying action is terminated by final judgment." Id. Similarly, in

Archdale v. American Int'l Specialty Lines Ins. Co., 154 Cal. App. 4th 449 (2007), a tort claimant

filed suit against a tortfeasor's insurer for breach of the implied covenant of good faith and fair

dealing. 154 Cal. App. 4th at 458. The insurer had refused to accept a reasonable settlement offer in

an underlying personal injury lawsuit. Id. at 458-59. Relying on Lambert, the Court of Appeal held

that the statute of limitations was tolled until final judgment was entered. Id.

The basic rule is that while an appeal is pending, a judgment is not final. Archdale, 154 Cal.

App. 4th at 479 (citing McKee v. National Union Fire Ins. Co., 15 Cal. App. 4th 282, 286 (1993)).

---

[4] HP seeks punitive damages in its prayer of relief, suggesting it is proceeding with its bad faith claim under a tort theory. Morever, in its opposition to ACE's motion, HP does not contest the application of a two year statute of limitations period. (Plaintiff's Opposition to Defendant's Motion to Dismiss Per Fed R. Civ. P. Rule 12(b)(6) and Motion to Strike per Fed R. Civ. P. Rule 12(f) at 5, hereafter, "Opposition," Docket Item No. 23.) A party bringing a claim for breach of the applied covenant of good faith and fair dealing under California law may elect to proceed under either a tort or a breach of contract theory. Frazier v. Metropolitan Life Ins. Co., 169 Cal. App. 3d 90, 100-03 (1985). Under a breach of contract theory, HP's bad faith claim would be subject to a four year statute of limitations. Id.; see Cal. Civ. P. Code § 337(1).

4

United States District Court

For the Northern District of California

1

> [A] judgment does not become final so long as the action in which it was rendered is pending and an action is deemed pending until it is finally determined on appeal or until the time for appeal has passed. The determination of the issue in the case is held in abeyance until the appeal is finally decided by an appellate court and the appeal operates to "keep alive the case . . . as it existed before the judgment was rendered."

2

3

4    McKee, Cal. App. 4th at 288. An appeal is final on the date remittitur or mandate issues. Archdale,

5    154 Cal. App. 4th at 479 (citing Hoover v. Galbraith, 7 Cal. 3d 519, 525-526 (1972); Cory v. Poway

6    Unified School Dist. 147 Cal. App. 3d 1158, 1165 (1983); Macedo v. Bosio, 86 Cal. App. 4th 1044,

7    1051, fn.5 (2001)).

8        In this case, the Court entered judgment in the Underlying Action on February 14, 2000. A

9    timely appeal was taken. Pursuant to the parties' settlement, the appeal was dismissed on April 5,

10   2000, the same date the Clerk of Court of the Ninth Circuit issued its mandate.[5] The mandate shows

11   that the Clerk of Court of the Ninth Circuit copied the Clerk of Court of the District Court and the

12   parties' counsel, Martin R. Lueck, Jonathan A. Marshall, and Ronald S. Katz. Thus, the Court finds

13   that Underlying Action reached a final judgment for purposes of calculating the statute of limitations

14   on April 5, 2000. Plaintiff's original Bad Faith Claim was filed on April 17, 2002, more than ten

15   days passed the statute of limitations.

16       Plaintiff contends that since the mandate was not docketed by the Clerk of Court at the

17   district level until April 26, 2000, the running of the statute of limitations should begin on that date.

18   However, Plaintiff provides no legal support for this proposition. Contrary to Plaintiff's contention,

19   Rule 41 of the Federal Rules of Appellate Procedure, which pertains to the issuance of the mandate,

20   provides in relevant part:

21       (a)  Contents. Unless the court directs that a formal mandate issue, the mandate consists
             of a certified copy of the judgment, a copy of the court's opinion, if any, and any
22           direction about costs.
         ***
23       (c)  Effective Date. The mandate is effective when issued.

24

25

26   [5] (Plaintiff's Request for Judicial Notice in Support of Plaintiff Hewlett-Packard Company's
     Opposition to Defendant ACE Property & Casualty Insurance Company's Motion to Dismiss, or in
27   the Alternative Motion to Strike, Ex. 102, Docket Item No. 24.)

28                                                    5

United States District Court

For the Northern District of California

1    Thus, the mandate was effective on April 5, 2000, the date of issuance.  Under <u>Archdale</u>, April 5,

2    2000 is the date of the "final judgment."  Since Plaintiff primarily focused its arguments on the

3    timeliness of its Bad Faith Claim, Plaintiff has not addressed whether the Court should toll[6] the more

4    than ten day delay or whether Defendant is estopped[7] from asserting a statute of limitations defense.

5    Accordingly, the Court GRANTS ACE's motion to dismiss on the ground that HP's Bad Faith claim

6    is barred by the statute of limitations.

7    **B.    <u>Litigation Privilege</u>**

8          While the Court has already dismissed HP's entire Bad Faith action as untimely, the Court

9    addresses Defendant's arguments regarding the scope of Plaintiff's claim in an effort to direct any

10    potential amendment.  Defendant contends that conduct which occurred after the Coverage Dispute

11    began is protected by the litigation privilege of § 47 of the California Civil Code.  (Motion at 10.)

12          California Civil Code § 47(b)(2) states that any publication made in a judicial proceeding is

13    privileged.  Despite § 47, the "contractual relationship between insurer and the insured does not

14    terminate with commencement of litigation," and an insurer's conduct during the course of the

15    litigation—but outside of the judicial proceedings—may be admissible as evidence of bad faith prior

16

17

18          [6] Equitable tolling permits a plaintiff to avoid the bar of a statute of limitations when,
notwithstanding all due diligence, the plaintiff cannot obtain necessary information to give him the
19    ability to pursue the claim. <u>Holmberg v. Armbrecht</u>, 327 U.S. 392, 397 (1946).  Equitable tolling
requires no action by the opposing party, yet generally applies where an opposing party's wrongful
20    conduct prevents the plaintiff from pursuing a claim or when the plaintiff, by exercise of reasonable
diligence, could not have discovered vital information bearing on the claim. <u>Holmberg</u>, 327 U.S. at
21    397; <u>In re United Ins. Mgmt., Inc.</u>, 14 F.3d 1380, 1386 (9th Cir. 1994). "One who fails to act
diligently cannot invoke equitable principles to excuse that lack of diligence." <u>Baldwin County
22    Welcome Ctr. v. Brown</u>, 466 U.S. 147, 151 (1984).

23          [7] A statute of limitations may also be tolled "if the defendant has affirmatively sought to
mislead the charging party." <u>Villasenor v. Lockheed Aircraft Corp.</u>, 640 F.2d 207, 207-08 (9th Cir.
24    1981).  To determine whether estoppel may toll the statute of limitations, the court must consider "of
critical importance" a "showing of the plaintiff's actual and reasonable reliance on the defendant's
25    conduct or representations," among other factors. <u>Naton v. Bank of California</u>
649 F.2d 691, 696 (9th Cir. 1981.) "Conduct or representations" by the defendant that tend to "lull
26    the plaintiff into a false sense of security, can estop the defendant from raising the statute of
limitations based upon the principle that no man may take advantage of his own wrong." <u>Atkins v.
27    Union Pacific R. Co.</u>, 685 F.2d 1146, 1149 (9th Cir. 1982) (citations and alterations omitted).

28                                                                     6

1    to the litigation.  <u>White v. W. Title Ins. Co.</u>, 40 Cal. 3d 870, 888 (1985).  However, as the Court

2    California Court of Appeal noted in <u>California Physicians' Service v. Superior Court</u>:

3         Defensive pleading, including the assertion of affirmative defenses, is communication
          protected by the absolute litigation privilege.  Such pleading, even though allegedly false,
4         interposed in bad faith, or even asserted for inappropriate purposes, cannot be used as the
          basis for allegations of ongoing bad faith.  No complaint can be grounded upon such
5         pleading.

6    9 Cal. App. 4th 1321, 1330 (1992).  Moreover, the law is clear that after suing an insurer for failure

7    to pay a claim and recovering a judgment, the insured cannot assert a claim of bad faith based on the

8    insurer's post judgment conduct, even if the insurer does not pay the judgment in a timely fashion.

9    <u>Tomaselli v. Transamerica Ins. Co.</u>, 25 Cal. App. 4th 1766, 1771-73 (1994).  Post judgment conduct

10   is also irrelevant for proving bad faith prior to the litigation.  <u>White</u>, 40 Cal. 3d at 889 n.12.

11        In this case, HP's bad faith claim is based in part on ACE's original denials of coverage and

12   in part on ACE's litigation strategy.  HP also alleges that ACE's failure to pay defense costs after

13   judgment was entered in the Underlying Action constitutes bad faith.  The Court finds that HP

14   cannot state a claim for bad faith based on any litigation conduct which was consistent with ACE's

15   defensive pleadings in the Underlying Action or any conduct of ACE after judgment was entered in

16   the Underlying Action, because such a claim for bad faith is limited by privilege.  Rather, HP's

17   claim must be based on ACE's conduct outside of the underlying judicial proceedings, such as

18   ACE's initial determination not to provide a defense upon HP's tender prior to the filing of the

19   Underlying Action.

20   **C.    <u>Leave to Amend</u>**

21        The Court considers whether to grant HP leave to amend.  Generally, leave to amend should

22   be granted with "extreme liberality."  <u>Eminence Capital, LLC v. Aspeon, Inc.</u>, 316 F.3d 1048, 1051

23   (9th Cir. 2003).  In this case, the Court GRANTS HP leave to amend, if it wishes, to file a

24   Complaint for bad faith under a breach of contract theory, seeking only those damages allowable

25   under California law for such a claim, if any.

26

27

28

7

**V.  CONCLUSION**

The Court GRANTS ACE's Motion to Dismiss.  The Court GRANTS Plaintiff leave to amend.  However, Plaintiff may not re-allege the following:

(1)    Any allegations of bad faith based on ACE's conduct in the judicial proceedings of the Underlying Action to contest liability; and

(2)    Any allegations of bad faith based on ACE's conduct subsequent to issuance of the mandate on April 5, 2000, which made the Court's judgment final in the Underlying Action.

(3)    Any claim for bad faith under a breach of contract theory shall seek only those damages allowable under California law.

Any amendment shall be filed on or before **June 30, 2008.**

Dated: June 12, 2008

JAMES WARE
United States District Judge

8

**THIS IS TO CERTIFY THAT COPIES OF THIS ORDER HAVE BEEN DELIVERED TO:**

Bradley Marc Zamczyk bzamczyk@hinshawlaw.com
David A. Gauntlett info@gauntlettlaw.com
James A. Lowe jal@gauntlettlaw.com
Robert John Romero rromero@hinshawlaw.com
Steven H. Bergman sbergman@omm.com

**Dated: June 12, 2008**                                    **Richard W. Wieking, Clerk**


                                                            **By:    /s/ JW Chambers**
                                                                 **Elizabeth Garcia**
                                                                 **Courtroom Deputy**

United States District Court
For the Northern District of California