REQUEST FOR JUDICIAL NOTICE

EXHIBIT 4

1  **GAUNTLETT & ASSOCIATES**
   David A. Gauntlett (SBN 96399)
2  James A. Lowe (SBN 214383)
   jal@gauntlettlaw.com
3  Andrew M. Sussman (SBN 112418)
   ams@gaunlettlaw.com
4  Kory S. Booth (SBN 188960)
   ksb@gauntlettlaw.com
5  18400 Von Karman, Suite 300
   Irvine, California  92612
6  Telephone:  (949) 553-1010
   Facsimile:  (949) 553-2050
7
   Attorneys for Plaintiff
8  HEWLETT-PACKARD COMPANY

9

10              **UNITED STATES DISTRICT COURT**

11      **NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION**

12

13  HEWLETT-PACKARD COMPANY, a          )   Case No.:  07-CV-04676-JW
    corporation,                        )
14                                      )
              Plaintiff,                )   **FIRST AMENDED COMPLAINT FOR**
15                                      )   **BREACH OF THE IMPLIED COVENANT**
       vs.                              )   **OF GOOD FAITH AND FAIR DEALING**
16                                      )
    ACE PROPERTY & CASUALTY             )   **DEMAND FOR JURY TRIAL**
17  INSURANCE COMPANY, a corporation,   )
                                        )
18            Defendant.                )
                                        )
19

20

21

22

23

24

25

26

27

28

Plaintiff, Hewlett-Packard Company ("HP") alleges:

## THE PARTIES

1. Plaintiff HP is a corporation duly organized and existing under the laws of the State of Delaware with its principal place of business in Palo Alto, California.

2. Defendant ACE Property & Casualty Insurance Company ("ACE"), formerly known as CIGNA Property & Casualty Insurance Company, is a corporation duly organized and existing under the laws of the state of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania. HP is informed and believes and on that basis alleges that at all times relevant to this complaint, ACE was an admitted property-casualty insurer under the laws of the state of California and transacted the business of insurance in California. HP is informed and believes and on that basis alleges that in or about 1999, ACE changed its name from CIGNA Property & Casualty Insurance Company to ACE Property & Casualty Insurance Company.

## JURISDICTION AND VENUE

3. Pursuant to 28 U.S.C. §1332(a)(1) this Court has original jurisdiction over this action, as the parties are citizens of different states and the amount in controversy in this action exceeds $75,000.00 exclusive of interest and costs.

4. ACE has purposefully availed itself of the privilege of doing business in and has continuous and systematic business dealings within this District and is therefore subject to personal jurisdiction in this District.

5. Venue for this lawsuit is proper in this Court pursuant to 28 U.S.C. §§1391(a) because a substantial part of the events or omissions giving rise to the claim herein occurred in this judicial district.

## FACTUAL BACKGROUND

6. This action for breach of the implied covenant of good faith and fair dealing arises from two underlying actions entitled (1) *Hewlett-Packard Company v. Nu-kote International, Inc.*, U.S. District Court Northern District of California, Case No. C-94-20647-JW ("the *Nu-kote* Action") and (2) *Hewlett-Packard Company v. ACE Property and Casualty Insurance Company*, U.S. District Court Northern District of California, Case No. C-99-20207-JW ("the HP-ACE Coverage Action").

FIRST AMENDED COMPLAINT
07-CV-04676-JW

1   The *Nu-kote* Action was an intellectual property, antitrust, unfair competition and disparagement

2   action concerning the marketing and sale of inkjet printer products. The ongoing HP-ACE Coverage

3   Action is an insurance coverage action in which HP sought defense expenses from ACE incurred in

4   the *Nu-kote* Action.

5                              **Summary of *Nu-kote* Action**

6        7.    A principal business of Nu-kote International, Inc. ("Nu-kote") was to refill used HP

7   printer cartridges and resell them in packaging which allegedly infringed HP's trademarks and trade

8   dress. Another business of Nu-kote was to sell ink refill kits for HP inkjet cartridges.

9        8.    On September 19, 1994, the *Nu-kote* Action began when HP filed a complaint against

10  Nu-kote alleging patent, trademark, and trade dress infringement, unfair competition and false

11  advertising related causes of action. HP alleged that Nu-kote's products and manufacturing

12  procedures infringed HP patents on its inkjet printer cartridges and its ink and that the packaging Nu-

13  kote used to sell its inkjet products infringed HP's trademarks. HP also alleged that Nu-kote falsely

14  advertised its own inkjet products as being approved by HP and as being less expensive to use than

15  HP cartridges.

16       9.    In November 1994, Nu-kote answered and filed a counterclaim against HP alleging

17  invalidity and non-infringement of various HP patents and trademarks, restraint of trade, unfair

18  competition and antitrust conduct.

19       10.   The scope of Nu-kote's claims increased significantly when Nu-kote filed Amended

20  Counterclaims in June 1996. The second amendment included new claims of conspiracy and

21  restraint of trade; the third amendment added a new claim of interference with economic advantage

22  and the fourth amendment significantly expanded the factual allegations against HP.

23       11.   Nu-kote described the "nature of [its] action [counterclaim]" against HP as seeking,

24  among other things, relief for, "false advertising, trade libel, and unfair competition."

25       12.   The ACE Policy that is the subject of the HP-ACE Coverage Action and which is

26  discussed herein expressly insured against claims for "unfair competition" as an "advertiser's injury"

27  offense.

28  ///

FIRST AMENDED COMPLAINT
07-CV-04676-JW

13.     Nu-kote's counterclaims alleged, *inter alia*, statutory and common law "unfair competition" by HP "falsely" and "deceptively" "publish[ing] … statements, through advertising and otherwise, that its ink jet printer cartridges are non-refillable and non-reusable."

14.     Nu-kote also alleged that HP's advertising – that HP's cartridges were "non-refillable" and that refilling HP's cartridges would damage printers – was deceptive, false, and had "a tendency to cause consumers to avoid Nu-kote products without any valid reason or justification." Based upon these factual allegations Nu-kote alleged "trade libel, disparagement of goods, and defamation under California law."

15.     On March 18, 1999, Nu-kote filed an amended answer and counterclaim to HP's fourth amended complaint ("Counterclaim"). The eleven-count Counterclaim alleged, *inter alia*, that the sole reason HP commenced the lawsuit was its decision to reduce or eliminate competition in the aftermarket for HP inkjet re-supply cartridges and refill kits.

16.     HP had developed its first inkjet printer in 1984, a revolutionary product that allowed high quality low cost printing. HP had invested millions of dollars in research and development to create and perfect the inkjet printer and its component parts.

17.     Nu-kote's suit threatened both the utility of HP's capital expenditures, the ability to commercially exploit HP's unique printing technology, and the financial viability of HP. HP was therefore required to defend and protect its intellectual property rights in its inkjet printer cartridge technology from this frontal attack of Nu-kote, which sought to invalidate HP's patents in inkjet printer cartridge technology and even to dedicate the technology to the public, threatening HP's future.

18.     Discovery in the *Nu-kote* Action was taken on an enormous scale. Nu-kote served upon HP multiple sets of interrogatories and requests for admissions, spent 137 days deposing 90 witnesses and filed 23 motions to compel. HP spent 146 days deposing 75 witnesses and filed 16 motions to compel. 4.7 million pages of discovery were provided by HP to Nu-kote. Over 6,000 pages of pleadings were generated in the *Nu-kote* Action.

19.     Numerous pre-trial motions were filed in the *Nu-kote* Action, including motions for preliminary injunction, at least twenty-one motions to dismiss and nearly thirty motions for summary

1  judgment were filed.  During the eight-week trial, preceded by twenty-seven motions *in limine*, HP

2  expended over 3,000 hours of attorney and paralegal time including in-house lawyers.  HP identified

3  more than 122 witnesses for the trial. Nu-kote identified 112 witnesses for the trial.  The Joint

4  Exhibit List was 545 pages long, with 7,593 potential exhibits, including documents, videotapes,

5  computer animations and demonstratives.

6       20.    After a sixteen week trial the jury returned verdicts in favor of HP.  Following

7  disposition of motions for directed verdict and judgment notwithstanding the verdict, judgment was

8  entered in favor of HP on February 14, 2000.

9       21.    On February 17, 2000, Nu-kote filed a notice of appeal in the United States Court of

10  Appeals for the Federal Circuit.  The appeal was dismissed on April 26, 2000 after the parties

11  reached a settlement and the *Nu-kote* Action was ended.

12  **Summary of HP-ACE Coverage Action**

13       22.    The ongoing HP-ACE Coverage Action concerned a "Comprehensive General and

14  Automobile Liability Policy: Foreign," policy number CXC024869, issued to HP by ACE, then

15  called CIGNA ("ACE Policy").  A true and correct copy of the ACE Policy is submitted with HP's

16  Appendix of Exhibits to this First Amended Complaint ("Appendix") as **Exhibit "1."**[1]

17       23.    The ACE Policy provides, among other things, coverage for HP's "Advertiser's

18  Liability" and "Personal Injury Liability."  The "Advertiser's Liability" section of the ACE Policy

19  obligates ACE to pay on behalf of HP all sums which HP becomes legally obligated to pay as

20  damages occurring in the course of HP's advertising activities, arising out of libel, slander,

21  defamation, violation of the right of privacy, unfair competition, or infringement of copyright, title

22  or slogan.

23       24.    The "Personal Injury Liability" section of the ACE Policy obligates ACE to pay on

24  behalf of HP all sums which HP becomes legally obligated to pay as damages because of personal

25  injury, defined to include, among other things, libel, slander or defamation.

26  ///

27

28  [1] Each and all of the exhibits submitted in HP's Appendix, filed separately and concurrently herewith, are expressly incorporated into this First Amended Complaint as if fully set forth herein.

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

10191-031-11/20/2007-158659.3

25.   The ACE Policy provides that ACE "shall have the . . . duty . . . to defend any suit against the insured seeking damages on account of personal injury or . . . Advertiser's Liability . . . ." It further provides that the ACE Policy applies to occurrences and personal injury committed from October 1992 to October 1995 within the policy territory, defined to be "worldwide for [a] claim or suit resulting from an occurrence outside the United States . . . ."

26.   On June 13, 1998, HP gave notice and tendered the defense of Nu-kote's third amended counterclaim in the *Nu-kote* Action to ACE.

27.   The ACE notice and tender included Nu-kote's counterclaim (filed January 19, 1996) and copies of package inserts included in HP inkjet cartridge boxes distributed worldwide during the ACE Policy period.

28.   By February 1999, eight months had passed since the tender of the defense to ACE but ACE had neither accepted nor denied the request for a defense. Accordingly, HP filed the HP-ACE Coverage Action on February 18, 1999, seeking a declaration that ACE had a duty to defend HP against Nu-kote's counterclaim and that ACE must pay HP's defense expenses.

29.   On August 24, 1999, **over eight years ago**, U.S. District Judge Spencer Williams, the judge then assigned to the HP-ACE Coverage Action, granted HP's Motion for Partial Summary Judgment for a determination of ACE's duty to defend the *Nu-kote* Action. He found that HP had demonstrated that the Nu-kote counterclaim contained claims potentially covered by the ACE Policy and that ACE's duty to defend was triggered as of HP's June 13, 1998 tender.

30.   ACE moved to reconsider Judge Williams' Order, but the Court denied ACE's motion on June 19, 2000, affirming that ACE had a duty to defend.

31.   On April 1, 2002, retired judge Peter Stone, a Special Master appointed by the District Court to assess HP's damages for ACE's failure to defend, found that **(1)** ACE had no right to allocate defense expenses between potentially covered and uncovered Nu-kote claims in the *Nu-kote* Action; **(2)** ACE's duty to defend HP continued through the termination of the *Nu-kote* Action; and **(3)** California Civil Code Section 2860 was not applicable to the determination of reimbursable defense fees.

///

10191-031-11/20/2007-158659.3

1    32.    On October 11, 2002, U.S. District Judge James Ware, who took over the HP-ACE

2 Coverage Action from Judge Williams (who retired), adopted the Special Master's Order "in its

3 entirety and without any modification as an order of the Court."

4    33.    Hearings were held before Special Master Stone from October 14 through 18 and 28

5 through 30, 2002, to determine whether the **$28,418,671.72** in fees and costs HP incurred in the

6 underlying action in the post-tender period were reasonable and necessary to the defense of the Nu-

7 kote Counterclaim. The Special Master concluded in a March 31, 2003 Report that HP had met its

8 burden of establishing that all of the post-tender fees and costs incurred by HP were related to the

9 defense of Nu-kote Counterclaim, and that HP was entitled to reimbursement from ACE for post-

10 tender outside counsel fees in the amount of **$17,818,167.05**, in-house services in the amount of

11 **$1,117,430.00** and costs in the amount of **$9,483,074.67** for a total principal amount of

12 **$28,418,671.72**.

13    34.    On November 25, 2003, the District Court issued an Order remanding the matter back

14 to the Special Master for further consideration.

15    35.    During January 9 through 13, 2006, the Special Master heard additional testimony

16 and issued a second Report on December 4, 2006, again recommending that "the principal amount of

17 litigation expenses reported on March 31, 2003, **$28,418,671.72** should be awarded to HP and

18 against ACE because they are all reasonable and necessary as defense expenses that were conducted

19 against liability and are likely to have been incurred by a reasonable insured under the same

20 circumstances."

21    36.    On August 22, 2007, District Judge James Ware adopted the Special Master's

22 December 4, 2006 Report and incorporated it as a Court Order. A true and correct copy of the

23 August 22, 2007 Order is submitted with HP's Appendix of Exhibits as **Exhibit "19."**

24    37.    On August 22, 2007, District Judge James Ware entered judgment for HP against

25 ACE in the principal sum of **$28,418,671.72**, together with interest and costs. A true and correct

26 copy of Judgment entered on August 22, 2007 is submitted with HP's Appendix of Exhibits as

27 **Exhibit "20."**

28 ///

7

38.     On December 10, 2007, Judge Ware will entertain HP's motion to amend the judgment to quantify pre-trial interest and costs owed by ACE, which would bring the final judgment to over $50 million.

## ACE'S UNREASONABLE COURSE OF CONDUCT TENDING TO DESTROY OR INJURE HP'S RIGHT TO RECEIVE THE BENEFITS OF THE ACE POLICY

### HP's Tender to ACE

39.     On June 13, 1998, HP gave notice and tendered defense of the *Nu-kote* Action to ACE ("Tender"). HP's Tender explained to ACE the applicable coverage for the Personal Injury and Advertiser's Liability offenses of libel, slander, defamation and unfair competition under the ACE Policy and why the facts alleged by Nu-kote in its Counterclaim in the *Nu-kote* Action gave rise to the potential for coverage of such claims against HP.

40.     Included in the Tender were detailed explications of Nu-kote's Counterclaims, which comported with the common understanding of the phrase "unfair competition," a covered offense under the ACE Policy insuring agreements.

41.     HP explained to ACE in the Tender that the explicit allegations triggering coverage included: **(a)** "false advertising, trade libel, and unfair competition," **(b)** "design[ing] its printers and ink supply cartridges in such away ... to prevent or make more difficult or expensive aftermarket competition from others who make and sell re-supply cartridges or refills of used cartridges, and for no legitimate business purposes," **(c)** "actively assert[ing] in the marketplace that its cartridges are not refillable," **(d)** "publish[ing] knowingly false statements and engag[ing] in deceptive advertising ... including ... false representation that Nu-kote's products are of inferior quality ... are incompatible with Hewlett-Packard equipment and/or are likely to cause damage to Hewlett-Packard equipment," **(e)** "publish[ing] knowingly false statements in the marketplace accusing Nu-kote of infringing its trademarks and patents," **(f)** "employ[ing] sham litigation ... of patent infringement ... in bad faith .. unjustifiably imposing substantial economic burdens on Nu-kote," **(g)** "Hewlett-Packard asserts these patents against others, without regard to whether they in fact are being infringed, in order to discourage competition." The Counterclaims were presented in the Tender as within the coverage of the ACE Policy. A true and correct copy of the June 13, 1998 Tender is

1  submitted with HP's Appendix of Exhibits as **Exhibit "2."**

2  <u>**ACE Advised of Settlement Negotiations – Further Elaboration of Tender**</u>

3      42.    By letter of June 16, 1998, HP advised ACE of efforts to settle with Nu-kote and

4  requested settlement authority. The letter advised that attorneys' fees to that date "exceed $23

5  million," with another $12 million in defense costs estimated through trial, plus a possible indemnity

6  claim approaching $100 million.

7      43.    HP's June 16, 1998 letter to ACE elaborated upon the Tender, quoting Counts Nine

8  and Ten of Nu-kote's counterclaim for "Trade libel, Disparagement of Goods, and Defamation under

9  California Law" [p. 7], and for "California Unfair Competition" [pp. 7-8], respectively. As phrased,

10  Nu-kote's claims tracked the insuring agreement's covered advertiser's liability for "libel" and

11  "unfair competition" and personal injury offenses for "libel" and "disparagement including

12  disparagement of property ...." [pp. 10-11] as contained in an operative endorsement to the ACE

13  Policy included with the June 16, 1998 letter. A true and correct copy of the June 16, 1998 letter is

14  submitted with HP's Appendix of Exhibits as **Exhibit "3."**

15  <u>**ACE Further Advised of Settlement Negotiations**</u>

16  <u>**–"Prudent Insurer" Standard Explained**</u>

17      44.    By letter of June 19, 1998, HP again advised ACE of settlement efforts with Nu-kote

18  and requested settlement authority of up to $15 million. The letter advised that additional attorneys'

19  fees up to $15 million might be incurred by HP without a settlement, making an offer of $15 million

20  a "cost of defense." The letter warned of a possible Nu-kote damage award up to $300 million, in

21  excess of applicable ACE Policy limits. HP's letter averred that the "prudent insurer" standard

22  required ACE's authorizing the offer, characterized by HP as "manifestly reasonable based upon the

23  potential exposure and the relative strength of Nu-kote's position." HP repeated a request, which it

24  had made previously, that ACE execute a confidentiality order in effect in the *Nu-kote* Action to

25  permit the insurer's inspection of documents relating to that action. A true and correct copy of the

26  June 19, 1998 letter is submitted with HP's Appendix of Exhibits as **Exhibit "21."**

27  *///*

28  *///*

**ACE Acknowledges Receipt of Claim**

45.     On June 24, 1998, W. John Ryan, ACE Liability Specialist, Advertising Injury Unit, acknowledged receipt of HP's Tender and advised of ACE's intent to investigate. A true and correct copy of his June 24, 1998 letter is submitted with HP's Appendix of Exhibits as **Exhibit "4."**

**ACE Retains Coverage Counsel One Month After Tender**

**But Fails to Provide Policies to its Coverage Counsel or Respond to Tender**

46.     By e-mail of July 14, 1998, Romain Oliver Nelson, Esq., reported his retention as coverage counsel for ACE to respond to the Tender on the "international primary policy." Mr. Nelson stated he had not yet been provided "any policies" from ACE to evaluate or discuss coverage issues   A true and correct copy of Mr. Nelson's July 14, 1998 e-mail is submitted with HP's Appendix of Exhibits as **Exhibit "22."**

47.     On August 19, 1998, Mr. Nelson confirmed in a telephone conversation that ACE had not yet supplied him with a copy of the pertinent ACE Policy. HP responded by providing Mr. Nelson with a copy of the ACE Policy and requesting ACE to respond to HP's Tender of two months earlier. A true and correct copy of the August 19, 1998 letter to Mr. Nelson from HP memorializing these communications is submitted with HP's Appendix of Exhibits as **Exhibit "5."**

**ACE Replaces Coverage Counsel, Executes Confidentiality Agreement Three Months**

**After Request, and Requests Further *Nu-kote* Action Documentation**

48.     By letter of October 9, 1998, attorney Thomas M. Correll ("Correll"), then of the law firm of Lewis, D'Amato, Brisbois & Bisgaard, LLP, reported his retention as coverage counsel for ACE.

49.     Mr. Correll enclosed an executed copy of a Confidentiality Agreement (provided by HP two months earlier) and requested access to additional documents in the *Nu-kote* Action, including deposition transcripts, documents, motions, and written discovery "related to the Nu-kote" claims.

50.     Mr. Correll's request ultimately encompassed 146 days of deposition transcripts for 75 witnesses deposed by HP, 137 days of transcripts for 90 witnesses deposed by Nu-kote, 39 discovery motions, and multiple sets of interrogatories. It also included materials subject to a

**FIRST AMENDED COMPLAINT**
**07-CV-04676-JW**

protective order in the *Nu-kote* Action which ACE was not privileged to obtain as explained in HP's response of October 27, 1998, as referenced below.   A true and correct copy of Mr. Correll's October 9, 1998 letter is submitted with HP's Appendix of Exhibits as **Exhibit "7."**

**HP Further Explains Basis for Coverage, Requests Articulation of ACE's Coverage Concerns to Enable Customized Document Production to Avoid Violating Protective Order and to Engage ACE In Meaningful Dialogue Re: Coverage**

51.    By letter of October 27, 1998, HP informed ACE that the information previously provided was sufficient to determine insurance coverage.   These previously provided documents included the Nu-kote Counterclaim, the insurance policy, and implicated HP advertising materials in six foreign languages which formed the basis for Nu-kote's claims of product disparagement and unfair competition.

52.    HP further explained that the "stringent court-ordered protective order in the underlying action" limited HP's ability to provide documents designated by Nu-kote as "confidential." HP could provide confidential materials only to insurance carriers "that ha[d] agreed to provide coverage to their respective insureds [sic]." As ACE had not accepted (or denied) HP's tender, ACE did not qualify and, therefore, could not be provided confidential materials absent violating a court order.

53.    In HP's October 27, 1998 letter, it requested ACE to tailor its request for documents to focus on ACE's theretofore unarticulated coverage concerns to enable HP to "carefully frame its responses to avoid incorporating … information … subject to the protective order." This was also to engage ACE in a meaningful dialogue regarding its failure to respond to HP's June 13, 1998 Tender or to specify any reason to deny coverage.   A true and correct copy of the October 27, 1998 letter is submitted with HP's Appendix of Exhibits as **Exhibit "8."**

**ACE Continues to Make No Coverage Determination Or Articulate Specific Coverage Concerns But Requests More Documentation "Related" to Nu-kote's Claims**

54.    By letter of November 16, 1998, ACE again requested from HP documentation "related" to Nu-kote's allegations, acknowledging that ACE had previously been provided "the cross-complaint and the Policy…and copies of two Hewlett-Packard product information sheets."

**FIRST AMENDED COMPLAINT 07-CV-04676-JW**

1  The letter did not define the term "related" or further particularize the requested documents or

2  specify the relevance of the request to a specified coverage issue.

3      55.    The November 16, 1998 letter asserted, *inter alia*, that, "when reviewing the

4  allegations contained in the affirmative defenses and counterclaims presented by Nu-kote as

5  compared to the information contained in the two product information sheets, there appear to be **no**

6  **relationship** between these materials [the product information sheet] and the allegations against HP

7  in this litigation." (emphasis added)    This statement was knowingly and materially false and

8  specifically intended to destroy or injure HP's benefits in the ACE Policy.

9      56.    The product inserts provided to ACE with the Tender contained the following

10 statements: "Caution! Ink leaks if punctured.  Damage to the printer of print cartridge resulting from

11 modifying or refilling the print cartridge is not the responsibility of Hewlett-Packard."

12     57.    The product inserts provided to ACE with the Tender also contained the following

13 statements: "**CAUTION!** Damages to the printer or print cartridge resulting from modification or

14 refilling the print cartridge are not the responsibility of Hewlett-Packard."

15     58.    The above product inserts were related to the Nu-kote affirmative defenses and

16 counterclaims quoted in the Tender as follows:  (**a**) "Since Hewlett-Packard does not recycle used

17 cartridges and, on information and belief, actively asserts in the marketplace that its cartridges are

18 not refillable," (**b**) "Hewlett Packard has published knowingly false statements and engaged in

19 deceptive advertising and other unfair business practices concerning Nu-kote's printer supply

20 products for use with Hewlett-Packard equipment, including … the false representation … Nu-kote's

21 products … are incompatible with Hewlett-Packard equipment and/or are likely to cause damage to

22 Hewlett-Packard equipment," (**c**) "Hewlett-Packard has published, and continues to publish,

23 statements, through advertising and otherwise, that its ink jet printer cartridges are non-refillable and

24 non-reusable."

25     59.    A true and correct copy of ACE's November 16, 1998 letter is submitted with HP's

26 Appendix of Exhibits as **Exhibit "23."**

27 ///

28 ///

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

## HP Provides Further Documentation Containing Advertising Materials

## Disseminated Worldwide During Policy Period

60.    By letter of December 23, 1998, HP provided ACE additional documents, including **(a)** a copy of a protective order issued by this Court limiting HP's ability to disclose documents from the *Nu-kote* Action; **(b)** another analysis of the reasons why a defense obligation was triggered by the Nu-kote counterclaim, including **(i)** a phrase-by-phrase comparison of HP advertisements potentially alleged to constitute "unfair competition," "trade libel" and "disparagement of goods," on the one hand, with allegations of the Nu-kote Third Amended Counterclaim, on the other hand; **(ii)** copies of HP product inserts which reflected advertisements implicated by Nu-kote's claims for unfair competition, trade libel, false and misleading advertising, and its other unfair competition torts such as antitrust; **(iii)** copies of publications confirming that Nu-kote first sold inkjet refill products in competition with Hewlett-Packard in July 1993, during the Policy period; **(iv)** pleadings in which Nu-kote alleged that some of the specific packaging and products which were the subject of the *Nu-kote* Action had been on the market since July 1993.  A true and correct copy of the December 23, 1998 letter is submitted with HP's Appendix of Exhibits as **Exhibit "24."**

## ACE Claims Unspecified Documentation "Related" to Nu-kote's Claims

## Was Not Provided

61.    By letter of January 13, 1999, ACE acknowledged receipt of HP's letter of December 23, 1998, but still failed to accept or deny coverage.

62.    ACE did not address the coverage analysis presented in HP's December 23, 1998 correspondence, namely, **(a)** HP's analysis of pertinent allegations in Nu-kote's counterclaim, **(b)** HP's phrase-by-phrase comparison of the Nu-kote allegations to the insuring agreement in the ACE Policy, and **(c)** HP's advertising materials disseminated worldwide during the Policy period which were the subject of Nu-kote's allegations of "unfair competition," "trade libel" and "product disparagement."

63.    Rather, in the letter, ACE asserted that the non-particularized documents which it was seeking to assist in its coverage decision were *not* "trade secret or confidential research, development or commercial information" and, therefore, the confidentiality agreement and

13

1  protective order entered in the *Nu-kote* Action were not relevant.

2       64.    ACE concluded by requesting information previously provided, in part, to ACE in

3  HP's letters of June 13, 16, 19, October 27, and December 23, 1998.  A true and correct copy of

4  ACE's January 13, 1999 letter is submitted with HP's Appendix of Exhibits as **Exhibit "9."**

5              **The HP-ACE Coverage Action Filed February 18, 1999**

6       65.    From June 1998 to February 1999, ACE failed to affirm or deny coverage, to provide

7  a defense for HP to the *Nu-kote* Counterclaim or to pay for any of its defense expenses.  During that

8  entire time, HP defended the Nu-kote Counterclaim by itself without ACE's assistance.

9       66.    On February 18, 1999, HP commenced a civil action against ACE entitled, *Hewlett-*

10 *Packard Company v. CIGNA Property and Casualty Insurance Company*, Superior Court of the

11 State of California, County of Santa Clara, Case No. CV780008 (the "HP-ACE Coverage Action"),

12 which was removed by ACE to the United States District Court, Northern District of California, San

13 Jose Division, and assigned Case No. C-99-20207 SW.  A true and correct copy of the Complaint

14 filed in the HP-ACE Coverage Action is submitted with HP's Appendix of Exhibits as **Exhibit "6."**

15      67.    In the HP-ACE Coverage Action HP requested **(a)** a judicial declaration that ACE

16 had a duty to provide HP with a defense to the then-ongoing *Nu-kote* Counterclaim pursuant to the

17 provisions of the ACE Policy, and **(b)** a judicial declaration that ACE was obligated to reimburse HP

18 for all of its attorneys' fees and costs incurred in defending the *Nu-kote* Counterclaim from the date

19 of commencement of the *Nu-kote* Action at the rate charged by HP's defense counsel.

20            **HP Re-Tenders Defense February 19, 1999**

21      68.    By letter of February 19, 1999, HP provided ACE a courtesy copy of the Complaint

22 in the HP-ACE Coverage Action.  HP explained that it had "taken this step because ACE has had

23 over eight months to evaluate HP's tender, yet has refused to state its coverage position on the

24 merits, despite having been provided with sufficient information and documents to demonstrate the

25 existence of a duty to defend . . . . Accordingly, HP regards ACE's refusal to state its coverage

26 position as a constructive denial of coverage."

27      69.    In the February 19, 1999 letter, HP's coverage counsel "once again re-tender[ed]" the

28 defense of the *Nu-kote* Action and requested that "ACE reconsider its earlier decision to refuse to

1    acknowledge and to discharge its contractual duty to defend HP in the action on the Nu-kote

2    counterclaim."

3         70.    HP again stated, "The operative counterclaim alleges several causes of action falling

4    within ACE's express 'advertiser's liability' offense of 'unfair competition,' " noting the "express

5    count for common law unfair competition, as well as claims for state law false advertising, Lanham

6    Act § 43(a) false and misleading advertising, trade libel, and intentional interference with

7    prospective economic advantage," and noting, "Each of these counts alleges a form of unfair

8    competition."

9         71.    HP explained,

10           The factual allegations also fall … squarely within ACE's unfair
       competition coverage. The information and documents provided to
11           ACE show that Nu-kote seeks damages from HP for statements made
       by HP in advertising materials which, Nu-kote contends, disparaged its
12           inkjet refill products. These advertising materials were disseminated
       by HP worldwide during ACE's policy period. Nu-kote expressly
13           allege[d] that it first entered the market with inkjet refill products
       designed to compete with HP inkjet cartridges during ACE's policy
14           period and was immediately damaged by HP's alleged "fear,
       uncertainty and doubt" campaign. ACE has been provided with
15           independent information verifying that Nu-kote's product launch of
       products intended to compete with HP's cartridges occurred in July
16           1993, during ACE's policy period.

17         72.    HP further noted, "To date, ACE's only response had been to demand unfettered

18    access to all Hewlett-Packard's documents without once specifying any particular coverage issues of

19    concern." A true and correct copy of the February 19, 1999 letter is submitted with HP's Appendix

20    of Exhibits as **Exhibit "10."**

21         **ACE Claims HP Response to Request for Materials "Blatantly Inadequate"**

22         73.    By letter of March 5, 1999, ACE stated, "Since ACE has not been allowed access to

23    all available relevant information, it is not in a position to respond to Hewlett-Packard's request for a

24    defense in this matter." ACE further characterized HP's response to requests for information as

25    "blatantly inadequate."

26         74.    In the letter ACE stated, "Despite the fact that ACE executed the Confidentiality

27    Agreement as requested, and despite numerous requests for information with sufficient descriptions

28    to properly notify any reasonable insured of the type of information being requested, your office has

15

**FIRST AMENDED COMPLAINT**
**07-CV-04676-JW**

1  failed to provide anything other than copies of a couple of product inserts."

2       75.    In the March 5, 1999 letter ACE stated, "The easiest and most reasonable method for

3  resolving this would be to allow ACE to review defense counsel's discovery and motion files, other

4  than those materials which have been designated confidential."

5       76.    A true and correct copy of the March 5, 1999 letter is submitted with HP's Appendix

6  of Exhibits as **Exhibit "25."**

### HP Reiterates Coverage Analysis,

### Offers ACE the Opportunity to View Additional *Nu-kote* Action Documents

9       77.    By letter of March 11, 1999, HP made "clear [HP's] previously stated position that

10  the materials and information already furnished to ACE triggered ACE's duty to defend, regardless

11  of the content of [further documentation] to which HP may provide ACE access."

12      78.    HP further stated in the letter of March 11, 1999, "The product inserts previously

13  provided to ACE constitute advertising, and contain statements of the sort of which Nu-kote

14  complains.  Hewlett Packard has provided ACE with information confirming that these materials

15  were disseminated in the policy territory of ACE's policy during its policy period, and that Nu-kote

16  first began sales of its products in competition with Hewlett-Packard during ACE's policy period."

17      79.    Judge Williams' Order of August 24, 1999 was later to confirm the accuracy of this

18  statement as well.

19      80.    In the letter HP offered ACE the opportunity to view documents generated in the *Nu-*

20  *kote* Action no longer being maintained in the repository on a set of 264 CD-ROM discs representing

21  4.7 million pages of discovery provided by HP to Nu-kote.

22      81.    In the letter HP further offered ACE the opportunity to review *all* pleadings and

23  discovery files of HP's defense counsel which were not shielded by the underlying protective order,

24  a total of approximately 6,000 documents.

25      82.    In the letter HP again called ACE's attention to HP's letter of December 23, 1998,

26  which "detailed the relationship between Nu-kote's allegations against HP and the documents

27  provided to ACE."  HP's coverage counsel stated that "the universe of documents which Nu-kote

28  contends support its claims against HP may be small relative to the universe of documents produced

16

**FIRST AMENDED COMPLAINT**
**07-CV-04676-JW**

1  in the underlying action by HP [which have] … only to do with the merit or lack of merit of Nu-

2  kote's claims." HP's coverage counsel further stated,

3  > It has nothing to do with the question whether Nu-kote's allegations
   > trigger a duty to defend by ACE. Just because a document may have
4  > been produced and/or generated in the underlying action does not
   > mean that it is relevant to the issue of coverage under ACE's policy.
5  > … The fact remains, however, that Nu-kote has sued HP for, among
   > other things, the statements made on HP's advertising materials that
6  > were included with every HP inkjet cartridge sold anywhere in the
   > world.   These product inserts and the Nu-kote counterclaim are
7  > sufficient to trigger ACE's duty to defend by themselves.

8  A true and correct copy of the March 11, 1999 letter is submitted with HP's Appendix of Exhibits as

9  **Exhibit "11."**

10  **ACE Answers Complaint in Coverage Action**

11  83.    On March 16, 1999, ACE filed its Answer to HP's coverage action complaint.    A

12  true and correct copy of the Answer is submitted with HP's Appendix of Exhibits as **Exhibit "26."**

13  **HP Provides ACE with Copy of Nu-kote's Fourth Amended Counterclaim**

14  84.    On or about March 18, 1999, Nu-kote filed its fourth and final amendment to its

15  counterclaims ("Counterclaim").  The Counterclaim was provided to ACE by HP on or about April

16  6, 1999.

17  85.    A true and correct copy of Nu-kote's Counterclaim is submitted with HP's Appendix

18  of Exhibits as **Exhibit "28."** This was the operative counterclaim at the time of trial in the *Nu-kote*

19  Action.  Counterclaim Six was entitled "Lanham Act Violation," and alleged false advertising. [p.

20  28:2-27]. Counterclaim Eight was entitled "False Advertising Under California Law." [p. 29:15-24].

21  Counterclaim Nine was entitled "Trade Libel, Disparagement of Goods, and Defamation Under

22  California Law." [p. 29:25 through p. 30:13].  Paragraphs 71 through 101 (7:3 through 17:14) were

23  incorporated by reference into each labeled cause of action.

24  **ACE Claims Documents Offered "Not Responsive to Request"**

25  86.    By letter of March 23, 1999, ACE informed HP, "Your statement that the duty to

26  defend is triggered based upon the materials already furnished … is a misstatement of the law in

27  California."

28  ///

87.    ACE further stated in the letter that "[w]e have reviewed the court file" and requested HP to "take all necessary steps to extend the Confidentiality Agreement for the benefit of ACE, at least with regard to the counterclaim which was filed on May 4, 1998 so that this document may be provided to ACE for review and analysis."

88.    ACE never made an independent effort to modify the protective order.

89.    ACE also stated in the letter,

> I am … concerned that the documentation you are offering as indicated in your letter of March 11, is not responsive to ACE's request. Please provide me with a copy of the request for production so that I can identify which items may be of interest and relevant to the coverage analysis. My suspicion is that the vast majority if not all of these documents relate to the patent infringement issues which I do not believe are necessary for ACE's review.    As I have previously indicated, I am asking for copies of documents which represent advertising materials by HP which could possibly form the bases for the Nu-Kote counterclaim.

A true and correct copy of the March 23, 1999 letter is submitted with HP's Appendix of Exhibits as **Exhibit "29."**

## HP Again Offers ACE Documents Produced by HP to Nu-kote

## And Reiterates Coverage Analysis

90.    By letter of March 30, 1999, HP reiterated to ACE "that the documents previously provided to ACE are sufficient to give rise to a duty to defend, and any contention by ACE that HP has not provided ACE with access to its documents can relate only to either: **(a)** the extent of ACE's ultimate duty to indemnify; or **(b)** allocation of defense costs."

91.    HP explained, "As we previously indicated to you, it will be impossible for us, both for reasons of attorney work-product privilege and due to the manner in which the voluminous documentation has been stored, to segregate out for you specific documents which may correspond to certain discovery requests.  Due to the millions of pages of documents produced, the information has not been stored in a manner conducive to such a request."

92.    HP again offered to produce "the 'objective' data base which accesses the millions of pages of H-P documents produced to Nu-kote," noting the "objective data base contains a description of the stored document; i.e., date of the document, to whom the document is addressed,

10191-031-11/20/2007-158659.3

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

1    from whom the document was received, a general description of what the document is etc."

2        93.    HP also offered to make available "the non-confidential pleadings and discovery …

3    received from H-P's defense counsel …." A true and correct copy of the March 30, 1999 letter is

4    submitted with HP's Appendix of Exhibits as **Exhibit "30."**

5    **HP Again Offers Documents Related to *Nu-kote* Action**

6    **After No Response to Prior Communication**

7        94.    By letter of April 5, 1999, HP again "reiterate[d] that the documents previously

8    provided to ACE are sufficient to give rise to a duty to defend …."

9        95.    HP again offered to produce an "objective data base contain[ing] a description of the

10   stored document; i.e., date of the document, to whom the document is addressed, from whom the

11   document was received, a general description of what the document is, etc. … [so] ACE could then

12   identify which documents listed on the objective data base it would like to have copied …."

13       96.    HP again offered that "the non-confidential pleadings and discovery we have received

14   from HP's defense counsel can be reviewed in our office at your earliest convenience." A true and

15   correct copy of the April 5, 1999 letter is submitted with HP's Appendix of Exhibits as **Exhibit**

16   **"31."**

17       97.    On April 6, 1999, ACE's counsel agreed to appear at the offices of HP's coverage

18   counsel on April 9, 1999, to review documents, and pleadings in the *Nu-kote* Action. A true and

19   correct copy of Mr. Correll's April 6, 1999 letter is submitted with HP's Appendix of Exhibits as

20   **Exhibit "32."**

21   **ACE Declines Opportunity to Review Documents Produced by HP to Nu-kote**

22       98.    By letter of April 6, 1999, HP again offered to ACE the CD-ROM and database

23   material, stating, "As we have previously informed you, HP has copies of the approximately

24   4,700,000 pages of documents produced to Nu-kote on a set of 264 CD-ROM discs. HP is willing to

25   provide ACE with copies of these CD-ROM discs, upon payment in advance, at the cost to ACE of

26   approximately $65.00 per disc, for a total of $17,160.00. HP will also provide ACE with a copy of

27   the objective data base which accesses the 264 CD-ROMS, upon payment in advance of the

28   reproduction cost of approximately $1,000.00. … You stated ACE wished to reserve its decision

19

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

1    whether it wants copies of these disks until after reviewing the pleadings and discovery documents

2    on April 13, 1999."

3    99.    HP further informed ACE that "[t]he documents on which HP relies [in the coverage

4    action] have long since been produced to ACE."  A true and correct copy of the April 6, 1999 letter

5    is submitted with HP's Appendix of Exhibits as **Exhibit "33."**

6    ### HP Moves for Partial Summary Judgment on Duty to Defend

7    100.    On April 7, 1999, HP filed a Motion for Partial Summary Judgment for a

8    determination of ACE's duty to defend the *Nu-kote* Action.  A true and correct copy of the Notice

9    and Motion is submitted with HP's Appendix of Exhibits as **Exhibit "34."**

10    101.    HP requested the Court to summarily adjudicate that Nu-kote's express claims for

11    common law unfair competition, false advertising, restraint of trade, and trade libel were all forms of

12    "unfair competition" potentially covered by the ACE Policy "advertiser's liability" coverage

13    triggering a duty to defend.

14    102.    HP also requested the Court to summarily adjudicate that HP's advertising activities

15    in Europe and throughout the world fulfilled the "Policy Territory" provision of the ACE Policy.

16    ### Further Information Made Available to ACE

17    103.    By letter dated April 12, 1999, HP advised ACE of Nu-kote's request for settlement

18    discussions.  HP further advised ACE that approximately 150 deposition transcripts were available

19    to ACE at a copying cost of approximately $500. [p. 1]  HP also confirmed ACE's agreement to

20    review and copy non-confidential documents on April 13, 1999 [p. 3] and to respond to other

21    requests for information that could be specifically identified.

22    104.    HP further noted that ACE "has not stated why the Nu-kote counterclaim and

23    advertising materials previously provided to ACE are not sufficient to give rise to a duty to defend,"

24    noting that ACE had not suggested any facts which exist to defeat coverage.  HP thus reiterated that

25    ACE had not articulated any defense to coverage since the Tender.

26    105.    HP quoted to ACE, ten months after HP's Tender, that "[t]he California Supreme

27    Court has ruled:  The duty to defend 'arises as soon as tender is made .... To defend meaningfully,

28    the insurer must defend immediately,' " citing pertinent case law.

FIRST AMENDED COMPLAINT
07-CV-04676-JW

106.    HP stressed that the California Supreme Court authority "clarified the 'immediate defense' requirement … by explaining an insurer should have no hesitation in accepting a defense subject to a reservation of the right to seek reimbursement from the insured for claims which later prove to be uncovered."

107.    HP noted that it offered to make documents available to ACE on April 6, 1999 but that ACE "opted to wait until Tuesday, April 13, 1999." HP also noted that ACE "deferred any decision on obtaining copies of the documents on CD ROM until after reviewing other documents on Tuesday, April 13, 1999." A true and correct copy of the April 12, 1999 letter is submitted with HP's Appendix of Exhibits as **Exhibit "12."**

### Nu-kote Pleadings Provided to ACE at Early Meeting of Counsel

108.    At the Initial Meeting of Counsel in the Coverage Action on April 13, 1999, HP produced to ACE pleadings in the *Nu-kote* Action which were not subject to the *Nu-kote* Action protective order. ACE's counsel reviewed documents and selected those ACE wished to copy. Approximately 6,000 pages of documents were copied by ACE at that time. A true and correct copy of a 45-page index of approximately 500 pleadings provided to ACE at that time is submitted with HP's Appendix of Exhibits as **Exhibit "35."**

109.    By letter dated April 14, 1999, HP confirmed that on April 13, 1999, ACE's coverage counsel "reviewed all non-confidential motions, pleadings and discovery documents in the HP v. Nu-kote matter through March 31, 1999," and other materials. The letter confirmed that HP had previously provided copies "of all H-P's advertising materials pertinent to ACE's policy period and coverage territory provision," and that ACE had not requested a copy of the millions of pages of discovery materials in the underlying case. A true and correct copy of the letter of April 14, 1999 is submitted with HP's Appendix of Exhibits as **Exhibit "36."**

### ACE Opposes Motion for Partial Summary Judgment Re: Duty to Defend

110.    On April 20, 1999, ACE filed an opposition to HP's Motion for Partial Summary Judgment. A true and correct copy of the Opposition is submitted with HP's Appendix of Exhibits as **Exhibit "37."** This pleading marked the first time ACE ever articulated specific coverage defense positions since HP's tender of June 13, 1998. ACE did not seek any discovery pursuant to

FIRST AMENDED COMPLAINT
07-CV-04676-JW

1    Federal Rule of Civil Procedure 56(f) before it filed its 12 page opposition to HP's Motion for

2    Partial Summary Judgment.

3        111.    ACE unsuccessfully argued Nu-kote's counterclaim was restricted to damages

4    resulting from "occurrences" within the United States and, in so doing, disregarded Nu-kote's

5    express claims of alleged injurious conduct in all of North America (including Mexico, within the

6    ACE Policy territory) and further disregarded Nu-kote's claims that it competed with HP on a

7    worldwide basis.

8        112.    ACE unsuccessfully argued that the ACE Policy's undefined phrase "unfair

9    competition" was to be narrowly construed against the insured to exclude "trade libel," "false

10   advertising" and "restraint of trade," as alleged in the Nu-kote counterclaim.

11       113.    ACE unsuccessfully argued that the tender of the defense was not timely, but was

12   unable to articulate "what prejudice ha[d] occurred" due to the alleged "late notice."

13       114.    On April 28, 1999, HP filed a Reply Brief in Support of HP's Motion for Partial

14   Summary Judgment.    A true and correct copy of the Reply is submitted with HP's Appendix of

15   Exhibits as **Exhibit "38."**

16   **ACE Declines Opportunity to Review 4.7 Million Documents Produced by HP**

17   **to Nu-kote and Previously Offered on CD-ROM**

18       115.    By letter of April 28, 1999, ACE requested that copies of *Nu-kote* Action deposition

19   transcripts be made available on CD-ROM as previously proposed.    ACE confirmed it would not

20   need to review the 4.7 million discovery documents on CD-ROM, reserving the right to review them

21   "at any time in the future."    ACE never thereafter availed itself of the outstanding opportunity to

22   view the 4.7 million documents.    A true and correct copy of the April 28, 1999 letter is submitted

23   with HP's Appendix of Exhibits as **Exhibit "39."**

24   **HP Produces 103 Deposition Transcripts from *Nu-kote* Action**

25       116.    By letter dated April 30, 1999, HP confirmed production of *Nu-kote* Action

26   deposition transcripts on computer diskettes upon payment for copying, and confirmed that ACE did

27   not want the discovery material repeatedly offered on CD-ROM.    A true and correct copy of this

28   April 30, 1999 letter is submitted with HP's Appendix of Exhibits as **Exhibit "40."**

1    117.    On or about May 12, 1999 HP delivered to ACE diskettes containing 103 depositions

2    taken in the Nu-kote Action.

3    **ACE Requests Information Previously Provided and Previously Declined**

4    118.    By letter dated June 2, 1999, HP responded to ACE's letter request for "Points and

5    Authorities and court orders [from the *Nu-kote* Action] with regard to the summary judgment

6    motions beginning with and subsequent to summary judgment motion number 4."

7    119.    HP informed ACE that "[o]rders No. 1, 3, & 4 were personally given to you [Correll]

8    on April 13, 1999 … [and] [o]ur files indicate this office sent you [Correll] a letter enclosing Orders

9    No. 2, 5, 6, 7, 8, 12, 13, 14 and 15 on May 19, 1999."

10    120.    HP informed ACE that the points and authorities in support of the motions were filed

11    under seal and subject to the protective order and reminded ACE that its letter of March 8, 1999

12    stated that its request did "not extend to materials which were designated as confidential in the

13    underlying case." A true and correct copy of this June 2, 1999 letter is submitted with HP's

14    Appendix of Exhibits as **Exhibit "41."**

15    **Court Grants HP Partial Summary Judgment: "HP Has Demonstrated that the**

16    **Nu-kote Counterclaim Contains Claims Potentially Covered by the ACE Policy"**

17    121.    On August 24, 1999, over eight years ago, United States District Judge Spencer

18    Williams granted HP's Motion for Partial Summary Judgment on ACE's duty to defend the *Nu-kote*

19    Action. Judge Williams found that "HP has demonstrated that the Nu-kote counterclaim contains

20    claims potentially covered by the Cigna [ACE] Policy." A true and correct copy of the August 24,

21    1999 Order is submitted with HP's Appendix of Exhibits as **Exhibit "13."**

22    122.    Judge Williams held that the "international package inserts" provided to ACE when it

23    was tendered the defense could be construed as "making false representations about the refillability

24    of Hewlett-Packard's cartridges" as set forth in the Counterclaim.

25    123.    Judge Williams further held that HP's disseminating allegedly false advertisement

26    about refilling inkjet printer cartridges internationally fulfilled the ACE Policy territory provision.

27    124.    Judge Williams further held that "unfair competition" "as commonly understood … is

28    typically thought to include a wide variety of competitive conduct, including false representations

23

10191-031-11/20/2007-158659.3

and false advertising" citing a wide variety of sources for this conclusion. Judge Williams therefore concluded "that 'unfair competition' as presented in the [ACE] Policy encompasses the claim for unfair competition alleged in the Nu-kote Counterclaim."

125.    Despite Judge Williams' Order of August 24, 1999 finding that ACE had a duty to defend, ACE did not defend HP in the *Nu-kote* Action and did not pay for its defense expenses.

### ACE Granted Leave to File Motion for Reconsideration to Specify What Discovery Needed to Examine "Exhaustion of Primary Foreign Policy" and "Analyze Coverage" Issue or Demonstrate Prejudice Due to Late Tender

126.    By Order of October 28, 1999, ACE was granted leave to file a motion for reconsideration of the Court's Order of August 24, 1999, on the limited grounds to **(a)** clarify precisely what, if any, further discovery on the issue of exhaustion of the alleged "primary" foreign policies is necessary, and **(b)** clarify what, if any, further discovery is necessary to analyze coverage or establish that delayed tender caused prejudice. A true and correct copy of the Court's October 28, 1999 Order is submitted with HP's Appendix of Exhibits as **Exhibit "42."**

### Underlying *Nu-kote* Action Settles, Nu-kote Appeal Dismissed

127.    The *Nu-kote* Action was litigated vigorously with final judgment on the Nu-kote counterclaims entered in favor of HP on February 14, 2000 after an eight-week jury trial.

128.    On February 17, 2000 Nu-kote filed a notice of appeal to the United States Court of Appeals for the Federal Circuit.

129.    On April 26, 2000 the Nu-kote appeal to the United States Court of Appeals for the Federal Circuit was dismissed when the case settled in HP's favor.

### ACE Moves to Reconsider Order Finding Duty to Defend HP in *Nu-kote* Action

130.    On February 1, 2000, ACE brought a motion to reconsider Judge Williams' August 24, 1999 summary judgment order. A true and correct copy of ACE's motion for reconsideration is submitted with HP's Appendix of Exhibits as **Exhibit "43."** ACE's motion for reconsideration of the August 24, 1999 Order establishing that ACE had the duty to defend HP in the underlying *Nu-kote* Action included ACE's assertion that HP should have been denied summary judgment because of an alleged withholding of information pertinent to ACE's purported late-notice

Case 5:07-cv-04676-JW    Document 8    Filed 11/20/2007    Page 25 of 48

1    defense. (See p. 7:4-24.)

2        131.    On February 16, 2000, Plaintiff, HP, filed its "Opposition to Defendant's Motion for

3    Reconsideration of August 24, 1999." A true and correct copy of that Opposition is submitted with

4    HP's Appendix of Exhibits as **Exhibit "44."**

5        132.    On February 23, 2000, ACE filed its "Reply to Hewlett-Packard's Opposition to

6    Defendant's Motion for Reconsideration." A true and correct copy of ACE's Reply is submitted

7    with HP's Appendix of Exhibits as **Exhibit "45."**

8                    **ACE Demands Discovery Regarding "Other Insurance"**

9        133.    Prior to the Court's summary denial of ACE's Motion to Reconsider ACE claimed, in

10    March 2000, that discovery was necessary with respect to potentially applicable "other insurance."

11        134.    By letter of March 17, 2000, HP informed ACE that such discovery was inappropriate

12    because **(a)** the Court had found ACE had a duty to defend HP with respect to the action on the Nu-

13    kote counterclaim; therefore, the existence or non-existence of other insurance had no bearing on

14    ACE's responsibility to HP; **(b)** having not paid for any of the defense expenses, ACE had no

15    equitable right of contribution from any other insurer ACE may speculate also had a duty to defend;

16    **(c)** no equitable contribution is permitted because HP was self-insured rendering any discovery

17    regarding HP's fronting policies inappropriate; **(d)** ACE was not entitled to discovery of post-1992-

18    1993 policies as HP was entitled to select any policy period under which the defense obligation was

19    triggered and until ACE reimbursed HP for defense expenses, no right of equitable contribution

20    could arise; **(e)** ACE was a party to all locally-admitted foreign primary policies and is deemed to

21    have knowledge of the contents of its own policies; **(f)** the ACE Policy was the only international

22    liability policy providing "advertiser's liability" coverage; **(g)** the domestic liability policies did not

23    provide defense coverage under the facts of the case as demonstrated by a mere reading of the

24    policies provided to HP in connection with HP's motion for partial summary judgment, and

25    equitable contribution is not available as a matter of law from a self-insured entity, and **(h)** the

26    excess policy could not be reached because there was no defense cost limit of liability in the ACE

27    Policy. A true and correct copy of the letter of March 17, 2000 is submitted with HP's Appendix of

28    Exhibits as **Exhibit "46."**

1

### Court Order of April 6, 2000

2    135.    By Order of April 6, 2000, ruling upon ACE's motion for reconsideration of the

3    Court's Order of August 24, 1999, the Court granted ACE a "further opportunity to explain what sort

4    of evidence could conclusively establish that the [ACE] Policy did not apply to Nu-kote's claims at

5    the time of tender" because it was "conceivable" that "a development in the HP v. Nu-kote litigation

6    during the period September 2, 1997 to June 13, 1998, [pre-tender] conclusively eliminated Nu-

7    kote's prior contention concerning competitive injury resulting from alleged false advertising

8    perpetrated." A further opportunity to brief what sort of evidence might exist to support such

9    "conclusive elimination" was granted requiring a brief to be filed by April 28, 2000 no longer than

10    10 pages in length.

11    136.    By the April 6, 2000 Order the Court also granted ACE the right to undertake

12    discovery regarding whether "other insurance might apply to this matter." A true and correct copy

13    of the Court's April 16, 2000 Order is submitted with HP's Appendix of Exhibits as **Exhibit "47."**

14    ### Underlying *Nu-kote* Action Settled and Terminated

15    137.    On April 26, 2000, the *Nu-kote* Action was terminated when Nu-kote's appeal to the

16    Federal Circuit was dismissed.

17    138.    From HP's June 1998 Tender until the final April 26, 2000 termination of the *Nu-*

18    *kote* Action, ACE never defended HP.

19    ### Motion for Reconsideration Summarily Denied

20    139.    By Order dated June 19, 2000, the Court denied ACE's Motion for Reconsideration

21    of Judge Williams' August 24, 1999 Order finding that ACE had a duty to defend HP in the *Nu-kote*

22    Action. A true and correct copy of the Court's June 19, 2000 Order is submitted with HP's

23    Appendix of Exhibits as **Exhibit "14."** Despite denial of its motion for reconsideration, ACE did

24    not pay for any of HP's litigation expenses for the *Nu-kote* Action but continued to insist that it did

25    not owe HP a defense.

26    ### ACE Defense Duty Was Triggered June 13, 1998

27    140.    On May 1, 2001, the Court found that HP effectively tendered defense of the

28    underlying action to ACE on June 13, 1998 and that HP could recover defense expenses incurred

FIRST AMENDED COMPLAINT
07-CV-04676-JW

1  after that date.  A true and correct copy of the May 1, 2001 Order on Cross-Motions for Summary

2  Judgment issued by the Court is submitted with HP's Appendix of Exhibits as **Exhibit "15."**

3  Despite the Court's Order, ACE continued to delay and deny policy benefits to HP and did not pay

4  for any of HP's litigation expenses for the *Nu-kote* Action but continued to insist that it did not owe

5  HP a defense.

### Damages Calculation Referred to Special Master

7      141.   By Order dated June 19, 2001, the HP-Coverage Action was referred to a Special

8  Master pursuant to Rule 53 of the Federal Rules of Civil Procedure for "the determination and

9  computation of plaintiff's damages against defendant arising from defendant's failure to provide a

10 defense to the counterclaims in the [*Nu-kote* Action]."

11     142.   The Special Master was charged with the task of determining the amounts owing

12 from ACE to HP for its failure to defend the *Nu-Kote* Action, "including reasonable attorneys fees

13 and costs," but ACE still did not pay for any of HP's fees and costs.  A true and correct copy of the

14 June 19, 2001 Order is submitted with HP's Appendix of Exhibits as **Exhibit "49."**

### Special Master Authorized to Determine Motions

16     143.   By Order of January 9, 2002, the Court further defined the scope of the Special

17 Master reference by permitting the Special Master to determine HP's pending Motion for

18 Adjudication.   A true and correct copy of the January 9, 2002 Order is submitted with HP's

19 Appendix of Exhibits as **Exhibit "50."**

### ACE Continues to Request and Receive Documents Related to *Nu-kote* Action

21     144.   In January 2002, ACE inspected documents in the custody of HP's counsel in the *Nu-*

22 *kote* Action, Gibson, Dunn & Crutcher ("GDC").  HP produced to ACE an index of pleadings in the

23 *Nu-kote* Action.  The pleadings occupied approximately 40 banker's boxes.  Exhibits admitted at

24 trial and demonstrative exhibits utilized were retrieved by HP from off-site storage for ACE's

25 inspection.  6,246 potential exhibits identified by the parties before the Nu-kote trial, occupying

26 approximately 60 banker's boxes, were stored off-site and offered for inspection at ACE's request.

27 The discovery material stored on CD-ROM was again offered to ACE for its inspection.   The

28 productions and the inspection by ACE are confirmed in correspondence of January 10, 11, and 14,

1  2002. True and correct copies of these correspondences are submitted with HP's Appendix of

2  Exhibits as **Exhibits "51," "52," and "53,"** respectively.

3  ### *Nu-kote* Action Trial Exhibits Available to and Inspected by ACE

4  145.   A true and correct copy of selected excerpts from the "Parties' Joint Trial Exhibit

5  List" showing that the trial exhibits identified hereinafter were prepared for use at trial of the *Nu-*

6  *kote* Action is submitted with HP's Appendix of Exhibits as **Exhibit "54."**   Each and all of the trial

7  exhibits described hereinbelow were offered to ACE for inspection or actually inspected by ACE or

8  its representatives on or before February, 2002.

9  ### Nu-kote Packaging for International Use

10  146.   A copy of relevant portions of trial Exhibit 1963 from the *Nu-kote* Action, an inkjet

11  refill kit sold by Nu-kote, including the box and instruction sheet is submitted with HP's Appendix

12  of Exhibits as **Exhibit "55."**  The instruction sheet and box contain English, French and Spanish

13  advertising, indicating that Nu-kote marketed this refill kit internationally.

14  147.   A copy of relevant portions of trial Exhibit 1924 from the *Nu-kote* Action, an inkjet

15  refill kit sold by Nu-kote, including the box and instruction sheet is submitted with HP's Appendix

16  of Exhibits as **Exhibit "56."**  The instruction sheet and box contain English, French and Spanish

17  advertising, indicating that Nu-kote marketed this refill kit internationally.

18  148.   A copy of relevant portions of trial Exhibit 2421 from the *Nu-kote* Action is

19  submitted with HP's Appendix of Exhibits as **Exhibit "57."** This exhibit was an inkjet refill kit sold

20  by Nu-kote under the "KO-REC-TYPE" mark, including the instruction sheet and box.   The

21  instruction sheet and box contain English and French advertising, indicating that Nu-kote marketed

22  this refill kit internationally.

23  149.   A copy of relevant portions of trial Exhibit 382 from the *Nu-kote* Action is submitted

24  with HP's Appendix of Exhibits as **Exhibit "58."** This exhibit was an inkjet refill kit sold by Nu-

25  kote under the "Pelikan" mark, including the instruction sheet and box.  The instruction sheet and

26  box contain English, French and Spanish advertising, indicating that Nu-kote marketed this refill kit

27  internationally.

28  ///

**FIRST AMENDED COMPLAINT**
**07-CV-04676-JW**

## HP Packaging and Advertising for International Use

150. A true and correct copy of trial Exhibit 1481-D from the *Nu-kote* Action that depicts the outer packaging of one of HP's print cartridges is submitted with HP's Appendix of Exhibits as **Exhibit "59."** The packaging contains a warning to use HP's cartridges that Nu-kote asserted at trial was part of HP's campaign of "Fear, Uncertainty and Doubt" ("FUD"). This warning appears in five different languages (including German, French, Spanish, and Chinese) in addition to English, reflecting HP's international distribution and sales of the cartridges.

151. A copy of relevant portions of trial Exhibit 23 from the *Nu-kote* Action is submitted with HP's Appendix of Exhibits as **Exhibit "60."** This exhibit was HP inkjet print cartridge 51626A, including the box and promotional insert included therein. The back of the box contains the language: "Your HP Print Cartridge works with your HP printer as a precision printing system. That's why we recommend that you always use HP print cartridges. It's your assurance of clear, sharp images every time you print." The box also contained a warning in English and five languages (including German, French, Spanish, and Chinese): **"Caution!** Ink leaks if punctured. Damage to the printer or print cartridge resulting from modifying or refilling the print cartridge is not the responsibility of Hewlett-Packard."

152. A copy of relevant portions of trial Exhibit 619 from the *Nu-kote* Action is submitted with HP's Appendix of Exhibits as **Exhibit "61."** This exhibit was HP inkjet print cartridge 51629A, including the box and advertising insert included therein. The back of the box contains the following language: "Our HP Print Cartridge works with your HP printer as a precision printing system. That's why we recommend that you always use HP print cartridges. It's your assurance of clear, sharp images every time you print." **"Caution!** Ink leaks if punctured. Damage to the printer or print cartridge resulting from modifying or refilling the print cartridge is not the responsibility of Hewlett-Packard."

153. A copy of relevant portions of trial Exhibit 1155 from the *Nu-kote* Action is submitted with HP's Appendix of Exhibits as **Exhibit "62."** This exhibit was HP inkjet print cartridge 51640A, including the box and advertising insert included therein. The back of the box contains the following warning: "Your HP Print Cartridge works with your HP printer as a precision

**FIRST AMENDED COMPLAINT**
**07-CV-04676-JW**

1   printing system. That's why we recommend that you always use HP print cartridges. It's your

2   assurance of clear, sharp images every time you print."

3        154.    The insert shown on page 1 of trial exhibit 1155, which was included in the inkjet

4   package, contains the following warning in English and six international languages (German,

5   French, Spanish, Italian and Chinese): **"Caution!** Ink leaks if punctured. Damage to the printer or

6   print cartridge resulting from modifying or refilling the print cartridge is not the responsibility of

7   Hewlett-Packard."

8        155.    A copy of relevant portions of trial Exhibit 476 from the *Nu-kote* Action is submitted

9   with HP's Appendix of Exhibits as **Exhibit "63."** This exhibit was HP inkjet print cartridge

10  51626A, including the box and advertising insert included therein. This exhibit is different from

11  **Exhibit "60"** because this exhibit ("60") included a game and the box is in the shape of a trapezoid

12  instead of a parallelogram. The insert included in the inkjet package contains the following warning

13  in English and two international languages: **"Caution!** Ink leaks if punctured. Damage to the

14  printer or print cartridge resulting from modifying or refilling the print cartridge is not the

15  responsibility of Hewlett-Packard."

16       156.    A copy of relevant portions of trial Exhibit 2333 from the *Nu-kote* Action is

17  submitted with HP's Appendix of Exhibits as **Exhibit "64."** This exhibit was HP inkjet print

18  cartridge 51625A, including the box. The back of the box contains the following warning: "Your

19  HP Print Cartridge works with your HP printer as a precision printing system. That's why we

20  recommend that you always use HP print cartridges. It's your assurance of clear, sharp images every

21  time you print."

22       157.    A copy of relevant portions of trial Exhibit 22D from the *Nu-kote* Action is submitted

23  with HP's Appendix of Exhibits as **Exhibit "65."** This exhibit was HP inkjet print cartridge

24  51625A, but in a different package from **Exhibit "64."** The insert included in the inkjet package

25  contains the following warning in English and two international languages: "Damage to the printer

26  or print cartridge resulting from modification or refilling the print cartridge are not the responsibility

27  of Hewlett-Packard."

28  ///

158.    A copy of relevant portions of trial Exhibit 5481 from the *Nu-kote* Action is submitted with HP's Appendix of Exhibits as **Exhibit "66."** This exhibit was HP inkjet print cartridge 41A, including the box. The back of the box contains the following warning: "Your HP Print Cartridge works with your HP printer as a precision printing system. That's why we recommend that you always use HP print cartridges. It's your assurance of clear, sharp images every time you print."

159.    Each and all of the above-referenced trial exhibits were reasonably available to ACE at various times after the Tender and until the present day.

## Jury Instruction in *Nu-kote* Action

160.    A true and correct copy of the "Supplemental Jury Instruction No. 14" given to the jury in the *Nu-kote* Action "concerning Nu-kote's antitrust counterclaims against Hewlett-Packard in [the *Nu-kote*] case and concerning Hewlett-Packard's defense" is submitted with HP's Appendix of Exhibits as **Exhibit "67."**

161.    Supplemental Jury Instruction No. 14 specifically provided, "In this case, Nu-kote claims that HP has engaged in an unfair campaign against competing ink resupply products involving, among other things, false, deceptive and misleading communications to sellers and potential buyers of refill products. ... [A] practice of using misleading or deceptive marketing information to maintain monopoly power in a market may violate the antitrust laws ... and ... rise to the level of an unreasonable restraint of trade."

## Arguments of Counsel in *Nu-kote* Trial

162.    Submitted with HP's Appendix of Exhibits as **Exhibits "68"** and **"69"** are true and correct copies of portions of the certified trial transcript in the *Nu-kote* Action, including portions of trial testimony, a portion of counsel's statements to the Court and to the jury preceding the presentation of evidence on the Nu-kote counterclaims, and portions of closing arguments on the Nu-kote antitrust counterclaims delivered to the jury on July 19, 1999.

163.    Counsel for Nu-kote argued that HP employees sought to inundate the marketplace for inkjet cartridges with "fear, uncertainty and doubt" about the refillability of its cartridges, the potential damages to printers caused by refilling the cartridges, and the loss of quality of print by the

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

1    use of refilled cartridges.

2        164.    Counsel for Nu-kote argued that HP advertised the "knowingly false statement" that

3    "refill inks cause most of the printer problems ... and what the truth was that they knew that less

4    than 10 percent of the problems were caused by refill . . . ."

5        165.    Counsel for HP counter-argued that HP's advertised risks of refilling were not false

6    but "fair and supported" and "likely to induce reasonable reliance by buyers . . . ."

7                        **Special Verdict Form in *Nu-kote* Trial**

8        166.    Submitted with HP's Appendix of Exhibits as **Exhibit "70"** is a true and correct copy

9    of the jury "Verdict on Antitrust Claims" entered in the *Nu-kote* Action on July 22, 1999.  The jury

10   considered and rejected Nu-kote's claim that HP engaged in antitrust misconduct including false and

11   misleading marketing statements.

12           **ACE Demands Production of Discovery Materials First Offered in 1998**

13       167.    By letter of March 19, 2002, HP declined ACE's demand that HP incur the cost of

14   duplicating CD-ROMS which contained *Nu-kote* Action discovery materials.  A true and correct

15   copy of HP's letter of March 19, 2002 to ACE is submitted with HP's Appendix of Exhibits as

16   **Exhibit "71."**

17          **Special Master Order of April 1, 2002 and the Preceding Events**

18       168.    By Order of April 1, 2002, Special Master Hon. Peter G. Stone, Ret., ruled on HP's

19   "Motion for Adjudication" of issues predicate to quantifying defense expenses.  The Special Master

20   found that **(a)** no allocation was permitted between potentially covered and uncovered claims;

21   **(b)** ACE's duty to defend existed through the end of the *Nu-kote* Action; and **(c)** California Civil

22   Code Section 2860 was not applicable to the determination of reimbursable defense fees.  A true and

23   correct copy of the April 1, 2002 Order is submitted with HP's Appendix of Exhibits as **Exhibit**

24   **"16."**

25       169.    Despite Special Master Stone's Order, ACE did not pay for any of HP's litigation

26   expenses for the *Nu-kote* Action but continued to delay and deny policy benefits to HP and insist that

27   it did not owe HP a defense.

28   ///

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

170.    On March 4, 2002, in opposition to HP's Motion for Adjudication, ACE argued that it was a "non-breaching insurer" notwithstanding Judge Williams' ruling of August 24, 1999 finding a duty to defend HP in the *Nu-kote* Action, notwithstanding Judge Williams' denying ACE's motion to reconsider that ruling on June 19, 2000, notwithstanding Judge Williams' denial of ACE's request for certification for interlocutory appeal on May 1, 2001, and notwithstanding that ACE **(a)** had entirely declined to reimburse HP for its defense expenses, **(b)** failed to defend HP under a reservation of rights, **(c)** failed to participate in settlement negotiations, and **(d)** had abandoned its insured, HP.    A true and correct copy of ACE's Opposition to HP's Motion for Adjudication is submitted with HP's Appendix of Exhibits as **Exhibit "72."**

171.    In its March 4, 2002 Opposition ACE asserted, "at the time the coverage determination needed to be made, HP refused to provide ACE with the very documents that could have refuted coverage as a matter of law," without reference to any such documents.

172.    On August 24, 1999 and again on June 19, 2000, Judge Williams found the coverage decision was capable of determination and, in fact, was determined by the Court **as a matter of law,** based upon the Nu-kote counterclaim, the ACE Policy, and the package inserts provided to ACE **in June 1998.**

173.    In its Opposition, ACE further asserted that "ACE PCIC's inability to perform [the coverage] investigation was caused solely by HP itself ... [by] refus[ing] to provide ACE PCIC with requested documents in a timely fashion ... to manufacture coverage."

174.    As of the date of the above-referenced contention of ACE, HP had already provided ACE with 103 deposition transcripts taken in the *Nu-kote* Action, access to 4.7 million documents produced by HP to Nu-kote as discovery in the *Nu-kote* Action, 6,000 pages of pleadings in the *Nu-kote* Action, in addition to package inserts, copies of the pertinent Nu-kote counterclaims and the ACE Policy, which HP was constrained to provide to ACE's coverage counsel to whom ACE had not given a copy of the Policy.

175.    ACE further falsely asserted, to injure and destroy HP's obtaining the benefit of the ACE Policy, that "[t]he only reasonable explanation appears to be that HP needed to manufacture coverage by forcing both ACE PCIC and the Court to rely exclusively on only those pleadings and

1    documents HP saw fit to provide. HP's clever manipulation of this situation cannot lead to a finding

2    that ACE PCIC was a 'breaching insurer.' "

3         176.    In fact, HP did not "force" ACE to rely exclusively on only those pleadings and

4    documents HP saw fit to provide. ACE was permitted to and did review the files of HP's defense

5    counsel, GD&C, at their offices, was provided copies of 103 deposition transcripts, access to 4.7

6    million documents of discovery provided by HP to Nu-kote in the *Nu-kote* Action, 6,000 pleadings

7    from the *Nu-kote* Action, and all trial exhibits. Upon conclusion of the trial the trial transcript was –

8    and remains – a public record as do all of the trial exhibits, some of which have been described

9    hereinabove. Such materials were made available to and inspected by ACE.

10        <u>**ACE Unsuccessfully Moves to Vacate April 1, 2002 Order of Special Master,**</u>

11        <u>**Which Is Adopted In Its Entirety by District Court**</u>

12        177.    On April 10, 2002, ACE moved to "Vacate the April 1, 2002 Order by the Special

13    Master and Redefine the Jurisdiction of the Special Master." A true and correct copy of ACE's

14    Motion to Vacate is submitted with HP's Appendix of Exhibits as **Exhibit "73."**

15        178.    ACE argued that the rulings of the Special Master "exceeded the computational and

16    accounting function" of a Special Master, notwithstanding that **(a)** the computations required

17    predicate rulings on the issues addressed in the Special Master's Order of April 1, 2002, **(b)** the

18    scope of a Rule 53 reference may include, as a matter of law, any "pretrial and post-trial matters,"

19    and **(c)** the District Court found the predicate issues determined by the Special Master "inextricably

20    intertwined" with the computational function rendering parsing out the functions between the

21    Special Master and the District Court facially impractical.

22        179.    ACE's motion to vacate included the statement that "the fact that an insurer did not

23    defend is irrelevant to the issue of allocation [of defense costs]."

24        180.    ACE's motion to vacate included arguments previously rejected by the Court in

25    granting HP's Motion for Partial Summary Judgment on August 24, 1999. ACE asserted HP did not

26    "cooperate and provide information necessary for the insurer to make an informed coverage

27    decision," notwithstanding Judge Williams' Order finding that the face of the Nu-kote counterclaim

28    and the package inserts provided to ACE alone were sufficient to trigger the duty to defend at the

FIRST AMENDED COMPLAINT
07-CV-04676-JW

1    time of Tender.

2        181.    On June 3, 2002, HP opposed ACE's Motion to Reject the April 1, 2002 Order by the

3    Special Master. A true and correct copy of HP's Opposition is submitted with HP's Appendix of

4    Exhibits as **Exhibit "74."**

5        182.    By Order of October 11, 2002, the District Court "adopt[ed] the Special Master's

6    Order on Plaintiffs Motion for Adjudication dated April 1, 2002 as an order of this Court." A true

7    and correct copy of the October 11, 2002 Order is submitted with HP's Appendix of Exhibits as

8    **Exhibit "17."**

9        183.    Despite Special Master Stone's April 1, 2002 Order and the District Court's October

10   11, 2002 Order adopting it, ACE did not pay for any of HP's litigation expenses for the *Nu-kote*

11   Action but continued to delay and deny paying HP's policy benefits and insist that it did not owe HP

12   a defense.

**ACE Unsuccessfully Moves to Compel Discovery**

14       184.    By Order of June 28, 2002 the Special Master denied ACE's Motion to Compel

15   responses to a subpoena directed to Old Republic Insurance Company. By the same Order the

16   Special Master denied ACE's Motion to Compel Production of documents from HP. A true and

17   correct copy of that Order is submitted with HP's Appendix of Exhibits as **Exhibit "75."**

**ACE Unsuccessfully Moves to Reverse August 24, 1999 Order Finding Duty to Defend**

19       185.    On July 23, 2002, notwithstanding Judge Williams' ruling of August 24, 1999 finding

20   a duty to defend HP in the *Nu-kote* Action, notwithstanding Judge Williams' denying ACE's motion

21   to reconsider that ruling on June 19, 2000, notwithstanding Judge Williams' denial of ACE's request

22   for certification for interlocutory appeal on May 1, 2001, notwithstanding the Special Master's

23   April 1, 2002 ruling granting HP's Motion for Adjudication, and contrary to the law of the case,

24   ACE moved for reconsideration regarding its duty to defend, framing the motion as for summary

25   adjudication "of the absence of the duty to defend." A true and correct copy of ACE's

26   "Memorandum of Points and Authorities in Support of Motion for Summary Adjudication of the

27   Absence of a Duty to Defend Plaintiff MSJ No. 6," is submitted with HP's Appendix of Exhibits as

28   **Exhibit "76."**

186.    On March 4, 2003, the Court denied ACE's motion for summary judgment regarding the duty to defend," finding the motion to be "procedurally improper" and "without merit." A true and correct copy of the Court's Order denying ACE's motion is submitted with HP's Appendix of Exhibits as **Exhibit "77."**

187.    Despite all of the evidence provided by HP as identified herein and despite rulings by the court that ACE had all necessary information to show that it had a duty to defend the *Nu-kote* Action, ACE nonetheless still did not pay any defense expenses but continued to ignore repeated Court orders from three different judges that it owed HP a defense in the *Nu-kote* Action.

188.    ACE continued to delay and deny policy benefits to HP.

**First Evidentiary Hearing to Compute Damages and Special Master's Report of**

**March 31, 2003 Quantifying Defense Expenses at $28,418,671.72**

189.    On March 31, 2003, following a two-week-long evidentiary hearing in October 2002 to quantify the defense expenses owed by ACE to HP, the Special Master issued his Report. In it, he recommended that the Court award in HP's favor and against ACE all of HP's post-tender *Nu-Kote* Action defense expenses in the total sum of **$28,418,671.72.** A true and correct copy of the Master's Report is submitted with HP's Appendix of Exhibits as **Exhibit "78."** Despite the Special Master's recommendations, ACE continued to delay and deny policy benefits to HP and still did not pay any of HP's defense expenses.

190.    In his Report, the Special Master concluded "HP tendered the defense of the Nu-kote counterclaim to ACE in June 1998. To date [as of March 31, 2003] ACE has failed to accept or reject HP's tender of the defense. The Court, on numerous occasions has found that ACE had a duty to defend HP in the *Nu-kote* action."

191.    In his Report, the Special Master further concluded "[t]he single most important factor in making this determination is ACE's failure to defend. When an insurer wrongfully refuses to defend an insured, the insured must carry the burden of proof on the existence and amount of the expenses, which then are presumed to be reasonable and necessary as defense costs. The insurer then must carry the burden of proof that the expenses are in fact unreasonable or unnecessary."

///

10191-031-11/20/2007-158659.3

192.    The Special Master further concluded that "HP has presented extensive and compelling evidence with respect to post-tender costs and attorneys' fees paid to outside counsel ...."

193.    The Special Master further concluded "ACE has failed to establish by a preponderance of the evidence that any of the fees and costs were in fact unreasonable or unnecessary."

### ACE Unsuccessfully Moves to Reconsider March 4, 2003 Order

194.    On September 5, 2003, ACE moved to reconsider the District Court's March 4, 2003, Order (denying ACE's motion for summary judgment on the absence of the duty to defend HP). ACE asserted that the Court was wrong when it rejected ACE's argument that coverage could be conclusively negated on the theory that HP's package insert was not covered "advertising." A true and correct copy of ACE's motion for reconsideration is submitted with HP's Appendix of Exhibits as **Exhibit "79."**

195.    On October 2, 2003, HP filed its opposition to ACE's third motion for reconsideration. A true and correct copy of HP's Opposition is submitted with HP's Appendix of Exhibits as **Exhibit "80."**

196.    On October 8, 2003, ACE filed its Reply in support of its third motion for reconsideration. A true and correct copy of Ace's Reply is submitted with HP's Appendix of Exhibits as **Exhibit "81."**

### ACE Makes Heavily Discounted Partial Payment
### But Immediately Demands Money be Returned

197.    While ACE's third motion for reconsideration was pending, 64 months after ACE's duty to defend was triggered by HP's notice of the *Nu-kote* suit and 42 months after the *Nu-kote* Action had ended, on October 14, 2003 ACE finally sent HP a purported "reservation of rights" letter, claiming to reserve rights to enforce the ACE Policy notwithstanding that it had been in breach of the ACE Policy at least since the Court's Order of August 24, 1999 (over 50 months). ACE made its first and only payment to HP for defense expenses in the *Nu-kote* Action, sending a check for $11,061,717.00. But the same letter demanded the money be returned to ACE. A true

37

FIRST AMENDED COMPLAINT
07-CV-04676-JW

1    and correct copy of ACE's letter of October 14, 2003 is submitted with HP's Appendix of Exhibits

2    as **Exhibit "82."**

3        198.    ACE did not pay the amount found by the Special Master, **$28,418,671.72** to be

4    reasonable and necessary defense expenses and ACE did not provide any explanation for its grossly

5    discounted and partial payment.

6        199.    By letter of October 24, 2003, HP acknowledged receipt of the $11,061,717.00

7    stating "[t]he purpose of a reservation of rights letter is to ensure that an insured is provided an

8    immediate and complete defense for potentially covered claims, while protecting the insurer's right

9    to later seek determination that there is no coverage or that the damages for noncovered claims need

10   not be paid by the insurer.  In order to reserve its rights, an insurer must first agree to defend its

11   insured while the underlying case is pending."

12       200.    HP further noted that ACE's reservation of a right to seek reimbursement was

13   "misplaced" as ACE had failed to "mount and fund a defense."  HP concluded that it considered the

14   $11 million a partial payment for its damages resulting from ACE's breach of contract.  A true and

15   correct copy of HP's letter of October 24, 2003 is submitted with HP's Appendix of Exhibits as

16   **Exhibit "83."**

17       201.    On November 25, 2003, the Court denied ACE's Motion for Reconsideration of the

18   March 4, 2003 Order denying ACE's Motion for Summary Judgment on the duty to defend.

19            **Second Evidentiary Hearing Before Special Master Yields Same Result;**

20                  **ACE's Admissions of Policy Benefits Owing**

21       202.    Shortly before a second hearing before Special Master Stone, on January 5, 2006,

22   ACE conceded for the first time that it owed HP policy defense benefits, but it would not pay them.

23       203.    On January 5, 2006, ACE filed and served a "Pre-Hearing Brief" which included a

24   chart in which ACE contended that of HP's $28,418,671.72 in proven post-tender litigation expenses

25   for the *Nu-kote* Action, ACE was not obligated to pay $14,009,139.00, or approximately one half of

26   the total amount.  ACE did not deny that $14,409,532.72 ($28,418,671.72 less $14,009,139.00) of

27   HP's post-tender litigation expenses were reasonable and necessary to HP's defense and should be

28   reimbursed by ACE.  A true and correct copy of ACE's January 5, 2006 "Pre-Hearing Brief" is

1    submitted with HP's Appendix of Exhibits as **Exhibit "84."**

2        204.    By letter of January 6, 2006, HP demanded payment of fees ACE admitted as owing

3    in its Pre-Hearing Brief, in the amount of $2,552,304.31. A true and correct copy of HP's letter of

4    January 6, 2006 is submitted with HP's Appendix of Exhibits as **Exhibit "85."**

5        205.    By letter of January 6, 2006, ACE claimed that its payment of $11,061,717.00

6    constituted a "gesture of good faith" made "under a reservation of rights." A true and correct copy

7    of the letter of January 6, 2006 is submitted with HP's Appendix of Exhibits as **Exhibit "86."**

8        206.    On January 9, 2006, the first day of the evidentiary hearing before the Special Master,

9    ACE's counsel admitted that approximately one half of the approximate $28 million dollars of

10    defense expenses incurred by HP in defense of the Nu-kote counterclaim were reasonable and

11    necessary to that defense when he argued:

12                    In closing, I will say that the testimony and the evidence that you're
                     going to hear this week will demonstrate that more than $13 million
13                    should be characterized as nonreimbursable using Judge Ware's
                     definition.
14

15    A true and correct copy of Mr. Wood's opening statement is submitted with HP's Appendix of

16    Exhibits as **Exhibit "87."**

17        207.    On January 11, 2006, the third day of the evidentiary hearing before the Special

18    Master, ACE's expert, Craig Aronson, testified that $13,201,567 of defense expenses incurred by HP

19    were "allocated to the prosecution of HP's affirmative claims." ACE's expert did not contest that

20    the remainder of the defense expenses incurred by HP in the *Nu-kote* Action were reasonable and

21    necessary in the defense of the Nu-kote counterclaim. [pages 519-520] A true and correct copy of

22    the transcript of excerpts from Aronson's testimony is submitted with HP's Appendix of Exhibits as

23    **Exhibit "88."**

24        208.    On January 13, 2006, the fifth day of the evidentiary hearing before the Special

25    Master, ACE's counsel stated in closing argument: "We have presented testimony and evidence to

26    quantify that portion of the expenses which were not conducted against liability before May 7th [and]

27    after May 7th. And the amount is a little more than $13 million. That amount is the amount that was

28    not conducted against liability by a reasonable insured in the same circumstances." [page 1065] A

10191-031-11/20/2007-158659.3

1    true and correct copy of the transcript excerpts of the hearing before the Special Master is submitted

2    with HP's Appendix of Exhibits as **Exhibit "89."**

3        209.    ACE's counsel relied on a chart during his closing argument and contended that ACE

4    was not obligated to pay $13,021,998 of HP's $28,418,671 in post-tender litigation expenses for the

5    *Nu-kote* Action.    In other words, ACE did not contest that $15,396,673 were reasonable and

6    necessary defense expenses that should be paid.

7                    <u>**ACE Refuses to Pay Millions in *Uncontested* Defense Expenses**</u>

8        210.    By letter of January 18, 2006, HP reminded ACE that at the evidentiary hearing

9    before the Special Master on January 13, 2006, ACE counsel Mr. Mark Wood, in his closing

10    argument, argued that "a little more than $13 million that is the amount that was not conducted

11    against liability by a reasonable insured in the same circumstances" and did not deny that the

12    difference between $28,418,671.72 and "a little more than $13 million" was "conducted against

13    liability."    A true and correct copy of HP's letter of January 18, 2006 is submitted with HP's

14    Appendix of Exhibits as **Exhibit "90."**

15        211.    By letter of January 31, 2006, ACE responded to HP's letter of January 18, 2006

16    denying any admissions by ACE and suggesting the matter would ultimately be resolved by the

17    Ninth Circuit Court of Appeals.    A true and correct copy of ACE's letter of January 31, 2006 is

18    submitted with HP's Appendix of Exhibits as **Exhibit "91."**

19        212.    By letter of February 10, 2006, HP demanded payment of fees ACE did not contest at

20    the evidentiary hearing as reasonable and necessary *Nu-kote* defense expenses.    A true and correct

21    copy of HP's letter of February 10, 2006 is submitted with HP's Appendix of Exhibits as **Exhibit**

22    **"92."**

23        213.    On June 30, 2006, ACE filed its Reply Post-Remand Hearing Brief.    After a week

24    long hearing during which ACE presented its best evidence, ACE asserted in its brief that: "ACE

25    offered a sound approach to applying the standard identified by Judge Ware and determined, based

26    on that approach, that $13,021,498 of HP's post-tender expenses were not 'conducted against

27    liability by a reasonable insured under the same circumstances.'" ACE thereby admitted that the

28    balance of HP's post-tender litigation expenses, $15,397,173.72 ($28,418,671.72 less $13,021,498),

10191-031-11/20/2007-158659.3

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

1    were reasonable and necessary defense expenses for the *Nu-kote* Action that ACE should pay.

2    214.    By letter of July 7, 2006, HP again demanded payment of fees ACE admitted as

3    owing referring this time to ACE's Post-Remand Hearing Brief.  A true and correct copy of HP's

4    letter of July 7, 2006 is submitted with HP's Appendix of Exhibits as **Exhibit "93."**

5    215.    By letter of September 8, 2006, ACE declined to pay the sums uncontested as owing

6    at the evidentiary hearing.  A true and correct copy of ACE's letter of September 8, 2006 is

7    submitted with HP's Appendix of Exhibits as **Exhibit "94."**

8    216.    On December 4, 2006, following the week-long January 2006 remand hearing on

9    damages, the Special Master issued his final Report, again finding that $28,418,671.72 should be

10    awarded to HP and against ACE because those fees and costs were "all reasonable and necessary as

11    defense expenses that were conducted against liability and are likely to have been incurred by a

12    reasonable insured under the same circumstances."  A true and correct copy of the Special Master's

13    final Report is submitted with HP's Appendix of Exhibits as **Exhibit "18."**

14    217.    ACE did not pay HP the amount recommended by the Special Master or any amount

15    beyond the unexplained $11,061,717.00 it had paid under a "reservation of rights" on October 14,

16    2003.

17    218.    By letter of December 20, 2006, HP demanded payment of fees admitted as owing at

18    the evidentiary hearing.  A true and correct copy of HP's letter of December 20, 2006 is submitted

19    with HP's Appendix of Exhibits as **Exhibit "95."**

20    219.    By letter of December 21, 2006, HP complained again about ACE's unreasonable

21    delay in paying policy benefits. The letter reminded ACE of findings by the Special Master that

22    evidenced ACE's improper and unreasonable litigation tactics to improperly avoid and delay the

23    payment of policy benefits.  A true and correct copy of HP's letter of December 21, 2006 is

24    submitted with HP's Appendix of Exhibits as **Exhibit "96."**

25    220.    By letter of January 19, 2007, ACE declined to pay the sums admitted owing at the

26    evidentiary hearing.  A true and correct copy of ACE's letter of January 19, 2007 is submitted with

27    HP's Appendix of Exhibits as **Exhibit "97."**

28    ///

10191-031-11/20/2007-158659.3

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

221.    ACE has thus repeatedly delayed, failed and refused to pay HP's defense expenses including millions of dollars that ACE did not contest as being reasonable and necessary to HP's defense.

222.    ACE has only paid HP $11,061,717.00 (without any explanation) and refuses to pay more despite admitting at various times before, during and after the remand hearing, from January 5, 2006 through June 30, 2006, that it did not contest that HP's reasonable and necessary defense expenses ranged from $14,409,532.72 to $15,397,173.72.

223.    ACE admitted through its witnesses and through the argument and briefing of its counsel, in the course of hearings in January 2006 before Special Master Stone, that ACE did not contest that it owed HP reasonable and necessary defense expenses in at least the approximate principal amount of $2.5 to $3.5 million more than it had paid to HP in 2003.  Nevertheless, ACE unreasonably failed and refused and continues to refuse to pay HP even this uncontested amount of *Nu-Kote* Action defense expenses.

224.    ACE has refused to pay admittedly owed policy defense benefits in the millions of dollars.

## Entry of Judgment in Coverage Action

225.    On July 31, 2007, the Court in the Coverage Action fully and without exception approved and adopted the Special Master's final Report that ACE owed HP reasonable and necessary defense expenses of $28,418,671.72.

226.    On August 22, 2007, the Court entered judgment in the HP-ACE Coverage Action against ACE in the principal sum of $28,418,671.72 as the amount of defense expenses owed by ACE to HP for the defense of the *Nu-kote* Action. A true and correct copy of the Court's Judgment of August 22, 2007 is submitted with HP's Appendix of Exhibits as **Exhibit "20."**

227.    Despite even the entry of judgment against it, ACE still fails and refuses to pay even the principal amount found by the Court to be owing other than the $11,061,717.00 it paid under a "reservation of rights" in 2003.

## HP'S INITIAL BAD FAITH LAWSUIT AND ITS DISMISSAL
## WITHOUT PREJUDICE PER TOLLING AGREEMENT

228.    On April 17, 2002, HP filed a lawsuit against ACE asserting causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing in connection with ACE's failure to fulfill its policy defense obligations to HP for the *Nu-kote* Action, i.e., *Hewlett-Packard Company v. CIGNA Property & Casualty Insurance Company, et al.*, United States District Court, Northern District of California, San Jose Division, Case No. 002-1847 JW RS ARB (the "initial bad faith lawsuit").

229.    In order that the litigation in the Coverage Action could be concluded first, HP and ACE entered into a Tolling Agreement on August 31, 2002, as a condition to HP agreeing to dismiss its initial bad faith lawsuit without prejudice.  A true and correct copy of the Tolling Agreement is submitted with HP's Appendix of Exhibits as **Exhibit "98."**

230.    HP and ACE stipulated to dismiss HP's initial bad faith lawsuit, without prejudice, given the Tolling Agreement.  The stipulation of dismissal without prejudice was filed on September 17, 2002.

231.    The Tolling Agreement provided that any applicable statute of limitation and time-based defense was tolled from the time the initial bad faith lawsuit was filed until it or a substantially similar new action was re-filed.

232.    HP re-filed its bad faith lawsuit on September 11, 2007, i.e., the present action.

### CLAIM FOR RELIEF

### (Breach of the Implied Covenant of Good Faith and Fair Dealing Against ACE)

233.    Plaintiff incorporates each and all of the foregoing allegations as if fully set forth and restated herein.

234.    A duty of good faith and fair dealing is implied by law in every insurance policy issued in California, including the ACE Policy.

235.    This duty requires ACE to act fairly and in good faith in discharging its contractual obligations to HP, prohibits ACE from doing or failing to do anything which will impair HP's right to receive benefits owed under the policy and requires ACE to consider HP's interests equally with

**FIRST AMENDED COMPLAINT**
07-CV-04676-JW

1    its own.  The good faith performance of ACE's obligations under the ACE Policy requires

2    faithfulness to the purposes under the Policy.

3        236.    Among the duties imposed on an insurer by the covenant of good faith and fair

4    dealing is the duty not to unreasonably delay the payment of policy benefits, to promptly pay

5    uncontested portions of the insured's claim, to defend any suit with potentially covered claims

6    immediately, fully and completely, not to misrepresent any facts or law related to coverage issues,

7    and – when a conflict of interest arises – to agree to retention of and pay reasonable rates to

8    competent independent counsel.

9        237.    California Insurance Code Section 790.03(h)(3) imposed a statutory duty on ACE to

10   promptly and thoroughly investigate HP's claims for potential coverage in order to ascertain whether

11   there is the potential for coverage and, therefore, whether ACE owed HP the duty to defend HP, and

12   not merely to seek facts that might justify declining to defend.

13       238.    California Code Regulations., Title 10, Section 2695.5, imposed a statutory duty on

14   ACE to acknowledge receipt of HP's notice of claim and begin investigation of the claim within

15   fifteen days of receiving notice.

16       239.    California Code Regulations., Title 10, Section 2695.7, imposed a statutory duty on

17   ACE to make a prompt determination of HP's claim and to accept or deny the claim within 40

18   calendar days of receiving notice.

19       240.    California law required ACE to protect HP's interests in receiving a defense as if

20   those interests were ACE's own.

21       241.    At all relevant times ACE has put its own financial interests above HP's rights under

22   the ACE Policy and unreasonably frustrated HP's rights and reasonable expectations to receive

23   benefits under the ACE Policy.

24       242.    ACE's course of conduct toward its insured, HP, since notice was given to it of the

25   *Nu-kote* Action, including its unreasonable delay and denial of policy benefits, has breached ACE's

26   duty of good faith and fair dealing.

27       243.    On information and belief, ACE acted unreasonably in the handling of HP's claim for

28   a defense of the *Nu-kote* Action thereby breaching its duty to HP of good faith and fair dealing.

244.    ACE unreasonably failed to conduct a timely, substantial, thorough, meaningful and objective investigation into HP's tender of the defense of the *Nu-kote* Action thereby breaching its duty to HP of good faith and fair dealing.

245.    Instead of acting toward HP its insured with good faith and fair dealing, ACE has spent nearly a decade delaying the payment of policy benefits that it owed. ACE has unreasonably delayed payment of policy benefits by repeatedly and falsely asserting that it needed more information before it could make a decision, despite the massive quantities of information HP has provided and despite repeated court findings that ACE had received sufficient information to show a duty to defend on June 13, 1998. ACE has also unreasonably delayed payment of policy benefits by ignoring court orders requiring that ACE pay for defense, by unreasonably multiplying discovery requests, by filing meritless and repetitive motions to re-litigate issues the court had ruled upon, by refusing to pay policy benefits that even ACE could not contest as reasonable and necessary defense expenses, and by otherwise delaying, denying and frivolously litigating with its insured all in order to avoid paying policy benefits.

246.    ACE's refusal to provide a defense to HP in the *Nu-kote* Action, its failure to conduct a substantial, thorough, timely and meaningful investigation of plaintiff's Tender and its failure to give a timely response to plaintiff's Tender have all been motivated by ACE's own economic self-interest, its concerns about the potential costs of defending the *Nu-kote* Action, and its undue focus on preserving its litigation position in the HP-ACE Coverage Action by avoiding any appearance of inconsistency with its prior acts of bad faith placed in issue in that action.  ACE has thereby placed its own interests ahead of the interest of it insured, in bad faith and in violation of ACE's duty of good faith and fair dealing under the ACE Policy.

247.    ACE unreasonably delayed payment of policy benefits to HP, including delay in paying defense expenses for the *Nu-kote* Action thereby breaching its duty to HP of good faith and fair dealing.

248.    ACE unreasonably used the judicial process and otherwise engaged in a continuous series of repeated and related acts over the course of nine years that collectively demonstrate ACE's objective to delay payment of HP's defense expenses in the *Nu-kote* Action, in breach of its duties to

10191-031-11/20/2007-158659.3

1  HP. ACE's unreasonable delay tactics are ongoing.

2      249.   ACE unreasonably ignored and, in essence, disobeyed numerous court orders finding

3  it had a duty to defend HP in the *Nu-kote* Action starting on August 24, 1999 and to the present day,

4  breaching its duty to HP of good faith and fair dealing.

5      250.   ACE ignored or, in essence, disobeyed at least eleven court orders to defend or pay

6  defense expenses issued by three different judges over a period of eight years, including the Orders

7  of August 24, 1999, June 19, 2000, May 1, 2001, April 1, 2002, October 11, 2002, March 4, 2003,

8  March 31, 2003, November 25, 2003, December 4, 2006, July 31, 2007 and August 22, 2007,

9  thereby unreasonably delaying the payment of policy benefits and otherwise breaching ACE's duty

10  to HP of good faith and fair dealing. This unreasonable delay, course of conduct and non-payment

11  continues through the present day.

12      251.   There has never been any reasonable justification for ACE's continuing refusal to

13  honor its Policy obligations and to pay HP all sums it owes there under. Rather, ACE's continuing

14  refusal to pay those sums to HP has constituted reckless indifference to HP's rights and engaged for

15  the sole and improper purpose of delaying payment of policy benefits to HP. ACE has retained for

16  itself the use of that money.

17      252.   HP is informed and believes and on that basis alleges, ACE has engaged in an

18  intentional or negligent course of conduct to unreasonably delay payment of policy benefits to HP,

19  apparently following a course of conduct in responding to claims that can be summarized as "delay,

20  deny, and litigate," evidenced by its unreasonable actions and its failures to act reasonably and by its

21  litigation conduct between 1998 and 2007 and continuing thereafter.

22      253.   For more than nine years, ACE has unreasonably delayed in paying insurance policy

23  benefits to HP and continues to unreasonably delay such payment as of the filing of this action for

24  breach of the covenant of good faith and fair dealing, forcing HP to pursue its policy benefits

25  through court action.

26      254.   ACE unreasonably failed to pay benefits under the Policy which ACE admitted and

27  acknowledged were owed as reasonable and necessary defense expenses thereby breaching its duty

28  to HP of good faith and fair dealing.

10191-031-11/20/2007-158659.3

FIRST AMENDED COMPLAINT
07-CV-04676-JW

255.    ACE unreasonably delayed rendering a coverage determination both before and after the initiation of the HP-ACE Coverage Action and to the present day, thereby breaching its duty to HP of good faith and fair dealing.  It still has not formally accepted or denied HP's claim as required by California regulation.

256.    Plaintiff did all, or substantially all of the significant things that the ACE Policy required of plaintiff to do or was excused from doing.

257.    All conditions required for ACE's performance occurred.

258.    Defendant knowingly and intentionally engaged in an unreasonable course of conduct to delay and deny plaintiff's entitlement to benefits under the ACE Policy.

259.    Defendant's pattern of conduct demonstrates a clear attempt by defendant to unreasonably avoid responsibility under the ACE Policy.

260.    As a direct and proximate result of ACE's breach of its duty of good faith and fair dealing, HP has suffered substantial damages.  HP had to pay for all the *Nu-kote* Action defense expenses by itself.  Additionally, HP was forced to hire attorneys to pursue the benefits owed to it by ACE under the ACE Policy, including the payment of HP's *Nu-kote* Action defense expenses.  In addition to pre-litigation efforts, HP's attorneys filed and litigated the HP-ACE Coverage Action at HP's expense.

261.    HP continues to incur substantial attorneys' fees, costs and other damages in pursuit of the ACE Policy benefits because ACE still has not paid HP's defense expenses for the *Nu-kote* Action despite numerous court orders and a judgment holding ACE had a duty to defend and pay.

262.    HP is entitled to an award of damages from ACE to be proven at trial, including all attorneys' fees and costs incurred in connection with the HP-Coverage Action and pre-litigation efforts to obtain the policy benefits owed under the ACE Policy, as well as attorneys' fees and costs which continue to mount since ACE has not yet paid, prejudgment interest and other consequential damages.

263.    ACE's acts and omissions as alleged here were and are oppressive, reprehensible and the result of malice and fraud as those terms are defined by California Civil Code Section 3294, so as to justify and require an award of punitive damages in a sum sufficient to punish ACE and to

47

FIRST AMENDED COMPLAINT
07-CV-04676-JW

1    make an example of it, because ACE acted or failed to act as alleged with such oppression, fraud or

2    malice.

3                                          **PRAYER FOR RELIEF**

4         **WHEREFORE**, HP prays for judgment against ACE as follows:

5         1.    For general damages in a sum certain according to proof and in excess of

6    $10,000,000.00.

7         2.    For compensatory damages in a sum certain according to proof and in excess of

8    $11,000,000.00.

9         3.    For punitive damages in a sum certain according to proof and sufficient to punish and

10    make an example of ACE.

11        4.    For prejudgment interest in a sum certain according to proof.

12        5.    For costs of suit, including reasonably attorneys' fees as may be allowed by law or by

13    agreement of the parties; and

14        6.    For such other and further legal or equitable relief as the Court deems just.

15

16

17                                      **DEMAND FOR JURY TRIAL**

18        Plaintiff Hewlett-Packard Company demands a jury trial.

19

20    Dated:  November 20, 2007                    **GAUNTLETT & ASSOCIATES**

21

22                                                By:___s/ James A. Lowe_____
                                                      David A. Gauntlett
23                                                    James A. Lowe
                                                      Andrew M. Sussman
24                                                    Kory S. Booth

25                                                Attorneys for Plaintiff
                                                  HEWLETT-PACKARD COMPANY
26

27

28

10191-031-11/20/2007-158659.3

FIRST AMENDED COMPLAINT
07-CV-04676-JW

# EXHIBIT 34